SEAN K. KENNEDY (145632)
(E-mail: Sean_Kennedy@fd.org)
Federal Public Defender
SEAN J. BOLSER (No. 250241)
(E-Mail: Sean_Bolser@fd.org)
DAISY BYGRAVE (No. 256487)
(E-mail: Daisy_Bygrave@fd.org)
CALLIE GLANTON STEELE (No. 155442)
(E-Mail: Callie_Steele@fd.org)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California  90012-4202
Telephone    (213) 894-2854
Facsimile    (213) 894-0081

Attorneys for Petitioner
RICHARD RAMIREZ

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| RICHARD RAMIREZ,<br><br>              Petitioner,<br><br>      v.<br><br>ROBERT L. AYERS, JR., Warden of California State Prison at San Quentin, et al.,<br><br>              Respondents. | Case No. CV 07-8310-JVS<br><br>DEATH PENALTY CASE<br><br>**Petition for Writ of Habeas Corpus**<br><br>(Exhibits filed concurrently) |

# TABLE OF CONTENTS

PAGE(S)

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

II.    VENUE AND INTRADISTRICT ASSIGNMENT . . . . . . . . . . . . . . . . . .  1

III.   JURISDICTIONAL ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . .  2

IV.   SUMMARY OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

     A.    Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

     B.    Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

          1.    Municipal Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

          2.    Superior Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

     C.    Retention of Unqualified Counsel and Conflicts of Interest . . . . 32

     D.    Absence of Mental Competency Proceedings . . . . . . . . . . . . . . 36

     E.    The Murder of Juror Singletary . . . . . . . . . . . . . . . . . . . . . . . . . 40

     F.    Waiver of Defense at Penalty Trial . . . . . . . . . . . . . . . . . . . . . . . 40

V.     STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

     A.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

     B.    Guilt Phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

          1.    Prosecution case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

               a.    Vincow Incident (June 27 to 28, 1984)
                     Counts 1 and 2 (§ 459, 187(a)) . . . . . . . . . . . . . . . . . 42

                  i)    The death of Jennie Vincow . . . . . . . . . . . . 42

                  ii)    Fingerprint and other physical evidence at
                      the scene . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

                  iii)    Time of death . . . . . . . . . . . . . . . . . . . . . . . 44

               b.    Hernandez and Okazaki Incident (March 17, 1985)
                     Counts 3 through 5 (§§ 459, 664/187, 187(a)) . . . . . 46

                  i)    The shooting of Maria Hernandez . . . . . . . . . 46

                  ii)    The death of Dale Okazaki . . . . . . . . . . . . . . 46

                  iii)    Eyewitness identification . . . . . . . . . . . . . . . 47

i

# TABLE OF CONTENTS

PAGE(S)

c.    Yu Incident (March 17, 1985)
Count 6 (§ 187(a)) . . . . . . . . . . . . . . . . . . . . . . . 48

     i)      The struggle between Yu and the suspect . . . 48

     ii)      The death of Tsai-Lian Yu . . . . . . . . . . . . . . 49

     iii)      Eyewitness identification . . . . . . . . . . . . . . . 50

d.    Zazzara Incident (March 28, 1985)
Counts 7 through 9 (§§ 459, 187(a)) . . . . . . . . . . . 51

     i)      The deaths of Vincent and Maxine Zazzara . 51

     ii)      Shoe print and fingerprint evidence . . . . . . . . 53

     iii)      The causes of death . . . . . . . . . . . . . . . . . . . 54

e.    Doi Incident (May 14, 1985) Counts 10 and 11
(§§ 459/187(a)) . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

     i)      The attack on William and Lillie Doi . . . . . . 54

     ii)      Shoe print and physical evidence at the scene 55

     iii)      Cause of death . . . . . . . . . . . . . . . . . . . . . . 56

     iv)      Identification of recovered property . . . . . . . 56

     v)      Eyewitness identification . . . . . . . . . . . . . . . 57

f.    Bell and Lang Incident (May 29 to June 1, 1985)
Counts 12 through 14 (§§ 459, 187(a), 664/187) . . . 59

     i)      The discovery of Mabel Bell and
Florence Lang . . . . . . . . . . . . . . . . . . . . . . . 59

     ii)      Physical evidence at the scene . . . . . . . . . . . 61

     iii)      Cause of Bell's death . . . . . . . . . . . . . . . . . 61

     iv)      Injuries to Lang . . . . . . . . . . . . . . . . . . . . . 62

     v)      Identification of recovered property . . . . . . . 62

g.    Kyle Incident (May 30, 1985)
Counts 15 through 18 (§§ 459, 261(2), 288a(c),
286(c)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

     i)      The attack on Kyle . . . . . . . . . . . . . . . . . . . 63

TABLE OF CONTENTS

PAGE(S)

ii)    Physical evidence at the scene . . . . . . . . . . . . 65

iii)   Eyewitness identification . . . . . . . . . . . . . . . . 65

iv)   Identification of recovered property . . . . . . . 66

h.    Cannon Incident (July 2, 1985)
Counts 19 and 20 (§§ 459, 187(a)) . . . . . . . . . . . . . 67

i)    The discovery of Mary Louise Cannon . . . . . 67

ii)    Physical evidence at the scene . . . . . . . . . . . . 67

iii)   Shoe print evidence . . . . . . . . . . . . . . . . . . . . 68

iv)   Cause of death . . . . . . . . . . . . . . . . . . . . . . . 68

v)    Identification of recovered property . . . . . . . 69

i.    Bennett Incident (July 5, 1985)
Counts 21 and 22 (§§ 459, 664/187) . . . . . . . . . . . 69

i)    The attack on Whitney Bennett . . . . . . . . . . . 69

ii)    The crime scene . . . . . . . . . . . . . . . . . . . . . . 71

iii)   Physical evidence at the scene . . . . . . . . . . . . 71

j.    Nelson Incident (July 7, 1985)
Counts 23 and 24 (§§ 459, 187(a)) . . . . . . . . . . . . . 72

i)    The discovery of Joyce Nelson . . . . . . . . . . . 72

ii)    Fingerprint and shoe print evidence . . . . . . . . 73

iii)   Cause of death . . . . . . . . . . . . . . . . . . . . . . . 74

iv)   Eyewitness identification . . . . . . . . . . . . . . . . 74

k.    Dickman Incident (July 7, 1985)
Counts 25 through 27 (§§ 459, 261(2), 286(c)) . . . . 74

i)    The attack on Sophie Dickman . . . . . . . . . . . 74

ii)    Physical evidence at the scene . . . . . . . . . . . . 76

iii)   Eyewitness identification . . . . . . . . . . . . . . . . 77

iv)   Identification of recovered property . . . . . . . 78

PAGE(S)

l.   Kneiding Incident (July 20, 1985)
     Counts 28 through 30 (§§ 459, 187(a))  . . . . . . . . . .  78

     i)    Discovery of Maxon and Lela Kneiding  . . . .  78

     ii)   Physical evidence at the scene  . . . . . . . . . . .  79

     iii)  Causes of death  . . . . . . . . . . . . . . . . . . . . . .  80

     iv)   Identification of recovered property  . . . . . . .  80

m.   Khovananth Incident (July 20, 1985)
     Counts 31 through 35 (§§ 459, 187(a), 261(2),
     288a(c), 286(c))  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  81

     i)    The attack on Somkid Khovananth  . . . . . . . .  81

     ii)   The death of Chainarong Khovananth  . . . . . .  83

     iii)  Physical evidence and shoe print evidence  . .  83

     iv)    Eyewitness identification  . . . . . . . . . . . . . . .  84

     v)    Identification of recovered property  . . . . . . .  85

n.   Petersen Incident (August 6, 1985)
     Counts 36 through 38 (§§ 459, 664/187)  . . . . . . . .  85

     i)    The attack on Virginia and Christopher
           Petersen  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  85

     ii)   Fingerprint evidence and physical evidence at the
           scene . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  86

     iii)  Eyewitness identification . . . . . . . . . . . . . . . .  86

o.   Abowath Incident (August 8, 1985)
     Counts 39 through 43 (§§ 459, 187(a), 261(2),
     288a(c), 286(c))  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  87

     i)    The attack on Sakina Abowath  . . . . . . . . . . .  87

     ii)   The death of Elyas Abowath  . . . . . . . . . . . . .  90

     iii)  Cause of death  . . . . . . . . . . . . . . . . . . . . . . . .  90

     iv)   Shoe print evidence and other physical
           evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  90

     v)    Eyewitness identification . . . . . . . . . . . . . . . .  91

TABLE OF CONTENTS

PAGE(S)

vi)  Identification of recovered property  . . . . . . .  91

p.  The Uncharged Incident  . . . . . . . . . . . . . . . . . . . .  92

q.  The Live Line-up  . . . . . . . . . . . . . . . . . . . . . . . .  92

r.  Physical Evidence Linking Petitioner to the Crimes  92

i.  Fingerprint evidence  . . . . . . . . . . . . . . . . . .  95

ii.  Shoe print evidence  . . . . . . . . . . . . . . . . . . .  95

a)  Zazzara Incident . . . . . . . . . . . . . . . . .  98

b)  Doi Incident . . . . . . . . . . . . . . . . . . . . .  99

c)  Bell and Lang Incident  . . . . . . . . . . . .  99

d)  Cannon Incident . . . . . . . . . . . . . . . . .  99

e)  Bennett Incident . . . . . . . . . . . . . . . . .  99

f)  Nelson Incident  . . . . . . . . . . . . . . . . .  99

g)  Khovananth Incident  . . . . . . . . . . . . .  100

h)  Uncharged Incident  . . . . . . . . . . . . . .  100

i)  Abowath Incident . . . . . . . . . . . . . . . .  100

iii.  Ballistics and firearms evidence  . . . . . . . . .  101

a)  Okazaki, Yu, and Kneiding Incidents  101

b)  Zazzara and Khovananth Incidents  . .  102

c)  Doi Incident  . . . . . . . . . . . . . . . . . . . .  102

d)  Petersen and Abowath Incidents  . . . .  102

iv.  Recovery of .22-caliber Jennings pistol . . . .  103

v.  Recovery of stolen property . . . . . . . . . . . . .  105

a)  Donna Myers  . . . . . . . . . . . . . . . . . . .  105

b)  Felipe Solano  . . . . . . . . . . . . . . . . . . .  107

c)  Petitioner's family in Texas . . . . . . . .  112

d)  Property line-up  . . . . . . . . . . . . . . . . .  112

PAGE(S)

s.   Petitioner's Arrest . . . . . . . . . . . . . . . . . . . . . . . . . . 113

     a)    Discovery of the backpack . . . . . . . . . . . . . 115

     b)    Petitioner's statements to police  . . . . . . . . . 116

     c)    Seizure of Petitioner's Stadia shoes . . . . . . . 117

     d)    Recovery of the bag . . . . . . . . . . . . . . . . . . . 117

     e)    Recovery and search of the green Pontiac . . 118

t.   Petitioner's Postarrest Behavior . . . . . . . . . . . . . . . 119

u.   Examination of Petitioner's Teeth and Subsequent Dental Treatment . . . . . . . . . . . . . . . . . . . . . . . . . . 119

2.   Prosecution Case Reopened . . . . . . . . . . . . . . . . . . . . . . . 120

3.   Defense Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

    a.   Vincow Incident . . . . . . . . . . . . . . . . . . . . . . . . . . 123

    b.   Hernandez and Okazaki Incident . . . . . . . . . . . . . 123

    c.   Yu Incident . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

    d.   Doi Incident . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

    e.   Bell and Lang Incident . . . . . . . . . . . . . . . . . . . . 127

     i.     Petitioner's Alibi . . . . . . . . . . . . . . . . . 127

     ii.    Physical Evidence at the Scene . . . . . . . . . 128

    f.   Kyle Incident . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

    g.   Cannon Incident . . . . . . . . . . . . . . . . . . . . . . . . . 129

    h.   Nelson Incident . . . . . . . . . . . . . . . . . . . . . . . . . . 129

    i.   Dickman Incident . . . . . . . . . . . . . . . . . . . . . . . . 130

    j.   Kneiding Incident . . . . . . . . . . . . . . . . . . . . . . . . 130

    k.   Khovananth Incident . . . . . . . . . . . . . . . . . . . . . . 130

    l.   Petersen Incident . . . . . . . . . . . . . . . . . . . . . . . . 130

    m.   Abowath Incident . . . . . . . . . . . . . . . . . . . . . . . . 131

    n.   Hair and Serological Evidence . . . . . . . . . . . . . . 131

TABLE OF CONTENTS

PAGE(S)

        i.     Hair Evidence . . . . . . . . . . . . . . . . . . . . . . 132

            a)     Bell and Lang Incident . . . . . . . . . . 132

            b)     Cannon Incident . . . . . . . . . . . . . . . 132

            c)     Bennett Incident . . . . . . . . . . . . . . . 133

            d)     Nelson Incident . . . . . . . . . . . . . . . . 133

            e)     Kneiding Incident . . . . . . . . . . . . . . 133

            f)     Abowath Incident . . . . . . . . . . . . . . 133

        ii.    Serological Evidence . . . . . . . . . . . . . . . . . 133

            a)     Cannon Incident . . . . . . . . . . . . . . . 133

            b)     Bennett Incident . . . . . . . . . . . . . . . 134
            c)     Abowath Incident . . . . . . . . . . . . . . 134

        iii.   The Live Line-Up . . . . . . . . . . . . . . . . . . . . 135

        iv.   Expert Testimony Regarding Eyewitness
            Identification . . . . . . . . . . . . . . . . . . . . . . . 136

     o.    Testimony of Sandra Hotchkiss . . . . . . . . . . . . . . 137

     p.    Impeachment of Felipe Solano . . . . . . . . . . . . . . 139

    4.    Rebuttal Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . 140

     a.    Impeachment of Sandra Hotchkiss . . . . . . . . . . . 140

     b.    Yu Incident . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

     c.    Kneiding Incident . . . . . . . . . . . . . . . . . . . . . . . 144

     d.    Petitioner's Dental Work and Alibi . . . . . . . . . . . 144

     e.    Live Line-Up . . . . . . . . . . . . . . . . . . . . . . . . . 145

    5.    Surrebuttal Evidence . . . . . . . . . . . . . . . . . . . . . . . . 146

  C.   Penalty Phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

VI.   INCORPORATION OF EXHIBITS AND
      REQUEST FOR JUDICIAL NOTICE . . . . . . . . . . . . . . . . . . . . 147

# TABLE OF CONTENTS

PAGE(S)

VII.  CONSIDERATION OF THE PETITION UNDER THE
ANTITERRORISM AND EFFECTIVE DEATH
PENALTY ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  148

VIII.  ALLEGATIONS APPLICABLE TO EACH AND
EVERY CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  152

IX.  CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  154

CLAIM 1:
PETITIONER WAS MENTALLY INCOMPETENT THROUGHOUT THE
LEGAL PROCEEDINGS IN STATE COURT AND IS CURRENTLY
MENTALLY INCOMPETENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  154

    A.  Petitioner Was Mentally Incompetent Throughout the Trial
Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  159

    B.  Petitioner Is Presently Mentally Incompetent . . . . . . . . . . . . . .  173

CLAIM 2:
THE TRIAL COURT ERRED IN FAILING TO INITIATE COMPETENCY
PROCEEDINGS THUS IT VIOLATED PETITIONER'S CONSTITUTIONAL
RIGHTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  175

    A.  Doubts Raised in Municipal Court as to Petitioner's Mental Competency
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  177

    B.  Doubts Raised in Superior Court as to Petitioner's
Mental Competency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  179

    C.  The Trial Court Violated Petitioner's Constitutional Rights By
Failing to Initiate Proceedings Sua Sponte to Determine Petitioner's
Competence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  181

    D.  The Trial Court Violated Petitioner's Constitutional Rights by
Granting the Motion for Substitution of Counsel Before Resolving
the Issue of Competency . . . . . . . . . . . . . . . . . . . . . . . . . . .  183

    E.  The Court's Failure to Initiate Competency Proceedings Violated
Petitioner's Constitutional Rights . . . . . . . . . . . . . . . . . . . .  183

    F.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  185

CLAIM 3:
TRIAL COUNSEL WAS SO INCOMPETENT THAT PETITIONER WAS
CONSTRUCTIVELY DENIED THE RIGHT TO COUNSEL . . . . . . . . . .  187

    A.  Petitioner Had The Right To Counsel Who Would Ensure
that The Trial Proceedings Were Fair . . . . . . . . . . . . . . . . . .  188

TABLE OF CONTENTS

PAGE(S)

B.    Petitioner Was Denied Counsel the Assistance of Qualified Counsel Who Had the Time and Experience To Properly Prepare His Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

    1.    Arturo and Daniel Hernandez Were Incompetent to Defend a Capital Case . . . . . . . . . . . . . . . . . . . . . . . . . . 189

    2.    Ray Clark's Mid-Trial Appointment Did Not Provide Him With Sufficient Time To Prepare an Effective Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192

C.    Trial Counsel Was Absent During Critical Portions of Petitioner's Capital Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

D.    Trial Counsel Failed To Submit the Prosecution's Case To Meaningful Adversarial Testing . . . . . . . . . . . . . . . . . . . . . . . . . 196

    1.    Pre-Trial Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . 196

        a.    Failure to Challenge Petitioner's Competence . . . . 196

        b.    Change of Venue Motion . . . . . . . . . . . . . . . . . . . . 197

        c.    Miscellaneous Conduct . . . . . . . . . . . . . . . . . . . . . 198

    2.    Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 200

    3.    Penalty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 200

        a.    Waiver of Mitigation Presentation . . . . . . . . . . . . . 201

        b.    Closing Argument . . . . . . . . . . . . . . . . . . . . . . . . 202

E.    Counsel's Performance Was the Equivalent of Total Denial of Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204

F.    In the Alternative, Counsel's Performance Was Ineffective Under Strickland . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204

CLAIM 4: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 206
TRIAL COUNSEL'S CONFLICTS OF INTEREST VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS . . . . . . . . . . . . . . . . . . . . . 206

A.    Petitioner Had a Constitutional Right to Conflict-Free Representation at the Guilt and Penalty Phases of His Trial . . . 207

B.    The Third Party Fee Agreement . . . . . . . . . . . . . . . . . . . . . . . . 210

    1.    Counsel Obtained Separate Retainer Agreements from Petitioner and His Family and Considered Both of Them "Clients" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 210

2.  Counsel Lied To the Court Regarding Their Intention To Obtain a Book or Movie Deal on Behalf of Petitioner's Family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  212

C.  Trial Counsel's Conflict of Interest Adversely Affected Representation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  216

1.  Petitioner's Interests and That of His Family Were In Conflict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  217

2.  Counsel Failed to Pursue Mental Health Defenses Because Doing So Would Have Diminished the Value of the Media Rights and Brought Shame to the Ramirez Family . . . . .  218

3.  Counsel Refrained from Obtaining and Presenting Penalty Phase Mitigation Information that was Unfavorable to Petitioner's Family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  220

4.  The Fee Arrangement Caused Petitioner's Defense to be Underfunded, Resulting in Unwarranted Delay and Counsel's Absence from Critical Portions of the Trial . .  222

5.  The Mid-Trial Appointment of Ray Clark Did Not Cure the Adverse Affect Caused by the Hernandezes' Third-Party Fee Agreement . . . . . . . . . . . . . . . . . . . . . . .  226

D.  Alternatively, Counsel's Conflict of Interest Rendered Them Ineffective Within the Meaning of Strickland . . . . . . . . . . . . . .  227

CLAIM 5: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  229
THE COURT DENIED PETITIONER HIS RIGHT TO EFFECTIVE
ASSISTANCE OF COUNSEL BY PERMITTING THE SUBSTITUTION
OF COUNSEL WHO WERE UNQUALIFIED AND SUFFERED FROM A
PROFOUND CONFLICT OF INTEREST . . . . . . . . . . . . . . . . . . . . . . .  229

A.  The Trial Court Violated Petitioner's Constitutional Rights By Allowing Him to be Represented By Unqualified Counsel . . . .  229

1.  Trial Courts Have the Right to Refuse Counsel of Choice in Order to Ensure the Fairness of the Proceedings . . . . .  230

2.  Counsel's Lack of Qualification and Experience Posed An Obvious Threat To The Fairness of Proceeding At The Time of Substitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  231

3.  Counsel's Incompetent And Unethical Conduct Throughout The Trial Should Have Prompted Their Removal By The Trial Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  234

B.  The Trial Court Erred in Allowing Petitioner to Be Represented By Counsel Who Suffered an Obvious Conflict of Interest . . . .  238

x

# TABLE OF CONTENTS

PAGE(S)

1.    A Defendant Cannot Insist on Being Represented By An Attorney Who Suffers from a Conflict of Interest . . . . . . 238

2.    Counsel's Conflict of Interest Was Apparent At The Time of Substitution . . . . . . . . . . . . . . . . . . . . . . . . 239

3.    Counsel's Repeated Claims of Financial Hardship Should Have Prompted Removal By The Trial Court . . . 242

CLAIM 6:
THE TRIAL COURT'S REFUSAL TO GRANT RAMIREZ'S MOTION FOR A CHANGE OF VENUE AND TRIAL COUNSEL'S FAILURE TO PRESENT RAMIREZ'S MOTION FOR A CHANGE OF VENUE COMPETENTLY VIOLATED MR. RAMIREZ'S CONSTITUTIONAL RIGHTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 247

A.    The Trial Court Erred in Failing to Grant a Change of Venue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 254

    1.    Extent of Publicity . . . . . . . . . . . . . . . . . . . . . . . 256

    2.    Nature of Publicity . . . . . . . . . . . . . . . . . . . . . . . 259

    3.    Gravity and Nature of Offense . . . . . . . . . . . . . . . 270

    4.    Prominence of the Victims and Status of the Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 274

    5.    Size and Nature of the Community . . . . . . . . . . . 276

B.    To the Extent the Trial Court Did Not Commit Error by Denying Petitioner's Venue Motion, the Denial was the Result of Counsel's Ineffective and Deficient Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 301

CLAIM 7:
THE TRIAL COURT VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS BY REJECTING PETITIONER'S FOR-CAUSE CHALLENGES OF JURORS WHO WERE NOT LIFE-QUALIFIED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 310

CLAIM 8:
THE TRIAL COURT DEPRIVED PETITIONER OF HIS RIGHT TO AN IMPARTIAL JURY BY ERRONEOUSLY EXCLUDING POTENTIAL JURORS WHOSE CONCERNS ABOUT THE DEATH PENALTY WOULD NOT HAVE SUBSTANTIALLY IMPAIRED THE PERFORMANCE OF THEIR DUTIES . . . . . . . . . 317

xi

TABLE OF CONTENTS

PAGE(S)

CLAIM 9:
      VOIR DIRE AT PETITIONER'S TRIAL WAS INADEQUATE TO
      SECURE HIS CONSTITUTIONAL RIGHT TO AN IMPARTIAL
      AND LIFE-QUALIFIED JURY . . . . . . . . . . . . . . . . . . . . . . . . . . . .   324

CLAIM 10:
      INEFFECTIVE ASSISTANCE DURING JURY SELECTION . . . . .   332

    A.    Failing To Challenge or Adequately Question Jurors Whose
         Convictions About the Death Penalty Substantially Impaired
         the Performance of Their Duties . . . . . . . . . . . . . . . . . . . . . . . . .   333

    B.    Failing To Adequately Question or Attempt To Rehabilitate
         Prospective Jurors Who Initially Suggested That They Could
         Not Vote for the Death Penalty . . . . . . . . . . . . . . . . . . . . . . . . . .   336

    C.    "Rehabilitating" for the Prosecution's Benefit, Instead of
         Striking, Jurors Who Were Not Actually Life-Qualified . . . . . .   338

    D.    Failing To Examine Jurors Adequately About Aggravating and
         Mitigating Factors Likely To Be Involved in the Case . . . . . . .   339

CLAIM 11:
      THE TRIAL COURT FAILED TO ENFORCE THE LEGAL
      STANDARD FOR HARDSHIP DISMISSAL, RESULTING IN
      A "JURY OF VOLUNTEERS" . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   342

CLAIM 12:
      THE PROSECUTOR VIOLATED THE EQUAL PROTECTION
      CLAUSE BY EXERCISING PEREMPTORY CHALLENGES TO
      REMOVE FEMALE AFRICAN-AMERICAN JURORS BECAUSE
      OF THEIR RACE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   346

    A.    Gwendolyn Thomas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   350

    B.    Katherine Sanford . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   353

    C.    Johnnie Sue Lang . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   356

    D.    Hortensia Roberts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   359

    E.    Demetrius Joseph . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   360

    F.    Alicia Alex . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   361

    G.    The Prosecution's Other Strikes . . . . . . . . . . . . . . . . . . . . . . .   363

CLAIM 13:
      THE PROSECUTOR VIOLATED THE EQUAL PROTECTION
      CLAUSE BY EXERCISING PEREMPTORY CHALLENGES TO
      REMOVE HISPANIC ALTERNATE JURORS BECAUSE OF THEIR
      RACE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   366

CLAIM 14: .................................................... 371
    PETITIONER'S STATEMENTS WERE UNRELIABLE AND
    INVOLUNTARILY OBTAINED AND COUNSEL FAILED TO
    COMPETENTLY LITIGATE A MOTION TO EXCLUDE THEM .. 371

CLAIM 15: .................................................... 377
    COUNSEL'S INEFFECTIVE ASSISTANCE AT PRETRIAL
    PHASE: FAILURE TO PROPERLY CHALLENGE THE
    LEGALITY OF THE SEIZURE OF EVIDENCE ............... 377

CLAIM 16: .................................................... 381
    COUNSEL'S INEFFECTIVE ASSISTANCE AT THE
    PRETRIAL PHASE: FAILING TO CHALLENGE
    EFFECTIVELY IDENTIFICATION PROCEDURES .......... 381

CLAIM 17: .................................................... 397
    PETITIONER WAS DEPRIVED OF HIS RIGHT TO
    EFFECTIVE ASSISTANCE OF COUNSEL AND TO
    A FAIR AND RELIABLE DETERMINATION OF GUILT
    AND PENALTY BY COUNSEL'S PREJUDICIALLY DEFICIENT
    PERFORMANCE: FAILURE TO CHALLENGE THE
    PROSECUTION'S CASE ................................ 397

    A.    Introduction ....................................... 400

    B.    Trial Counsel Failed to Investigate, Litigate, Object to, Cross-
          examine or Otherwise Adequately Challenge the State's
          Evidence in the Vincow Incident, Counts 1-2 (burglary,
          murder, burglary-murder special circumstance) ............. 401

          1.    The Prosecution's Case ......................... 401

          2.    Defense Evidence .............................. 401

          3.    The Defense Failed to Competently Challenge the
                Charges ....................................... 402

    C.    Trial Counsel Failed to Investigate, Litigate, Object to,
          Cross-Examine or Otherwise Adequately Challenge the
          Prosecution's Evidence in the Okazaki/Hernandez Incident,
          Counts 3-5 (Burglary, Attempted Murder, Murder,
          Burglary-Murder Special Circumstance) .................. 406

          1.    The Prosecution's Case ......................... 406

          2.    Defense Evidence .............................. 407

          3.    The Defense Failed to Competently Challenge the
                Charges ....................................... 408

# TABLE OF CONTENTS

PAGE(S)

D.     Trial Counsel Failed to Investigate, Litigate, Object to, Cross-examine or Otherwise Adequately Challenge the Prosecution's Evidence in the Yu Incident, Count 6 (murder) . . . . . . . . . . . .  410

      1.     The Prosecution's Case . . . . . . . . . . . . . . . . . . . . . . . .  410

      2.     Defense Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  411

      3.     The Defense Failed to Competently Challenge the Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  412

E.     Trial Counsel Failed to Investigate, Litigate, Object to, Cross-examine or Otherwise Adequately Challenge the Prosecution's Evidence in the Zazzara Incident, Counts 7-9 (burglary, murder, burglary-murder special circumstance) . . . . . . . . . . . . . . . . . . . .  415

      1.     The Prosecution's Case     . . . . . . . . . . . . . . . . . . . . . . . .  415

      2.     Defense Evidence     . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  416

      3.     The Defense Failed to Competently Challenge the Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  416

F.     Trial Counsel Failed to Investigate, Litigate, Object to, Cross-examine or Otherwise Adequately Challenge the Prosecution's Evidence in the Doi Incident, Counts 10-11 (burglary, murder, burglary-murder special circumstance) . . . . . . . . . . . . . . . . . . . .  421

      1.     The Prosecution's Case     . . . . . . . . . . . . . . . . . . . . . . . .  421

      2.     Defense Evidence     . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  422

      3.     The Defense Failed to Competently Challenge the Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  422

G.     Trial Counsel Failed to Investigate, Litigate, Object to, Cross-Examine or Otherwise Adequately Challenge the Prosecution's Evidence in the Bell/Lang Incident, Counts 12-14 (Burglary, Attempted Murder, Murder, Burglary-Murder Special Circumstance) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  425

      1.     The Prosecution's Case     . . . . . . . . . . . . . . . . . . . . . . . .  425

      2.     Defense Evidence     . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  426

      3.     The Defense Failed to Competently Challenge the Charges     . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  427

PAGE(S)

H.    Trial Counsel Failed to Investigate, Litigate, Object to, Cross-Examine or Otherwise Adequately Challenge the Prosecution's Evidence in the Kyle Incident, Counts 15-18 (Burglary, Rape, Oral Copulation, Sodomy) . . . . . . . . . . . . . . . . . . . . . . . . .   430

        1.    The Prosecution's Evidence . . . . . . . . . . . . . . . . . . . . . .   430

        2.    Defense Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   431

        3.    The Defense Failed to Competently Challenge the Charges 431

I.    Trial Counsel Failed to Investigate, Litigate, Object to, Cross-Examine or Otherwise Adequately Challenge the Prosecution's Evidence in the Cannon Incident, Counts 19-20 (Burglary, Murder, Burglary-Murder Special Circumstance) . . . . . . . . . . .   433

        1.    The Prosecution's Case . . . . . . . . . . . . . . . . . . . . . . . . . .   433

        2.    Defense Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   433

        3.    The Defense Failed to Competently Challenge the Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   434

J.    Trial Counsel Failed to Investigate, Litigate, Object to, Cross-examine or Otherwise Adequately Challenge the Prosecution's Evidence in the Bennett Incident, Counts 21-22 (Burglary, Attempted Murder) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   437

        1.    The Prosecution's Case . . . . . . . . . . . . . . . . . . . . . . . . . .   437

        2.    Defense Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   438

        3.    The Defense Failed to Competently Challenge the Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   438

K.    Trial Counsel Failed to Investigate, Litigate, Object to, Cross-examine or Otherwise Adequately Challenge the Prosecution's Evidence in the Nelson Incident, Counts 23-24 (burglary, murder, burglary-murder special circumstance) . . . . . . . . . . . . .   441

        1.    The Prosecution's Case . . . . . . . . . . . . . . . . . . . . . . . . . .   441

        2.    Defense Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   442

        3.    The Defense Failed to Competently Challenge the Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   442

L.    Trial Counsel Failed to Investigate, Litigate, Object to, Cross-examine or Otherwise Adequately Challenge the Prosecution's Evidence in the Dickman Incident, Counts 25-27 (Burglary, Rape, Sodomy) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   445

xv

# TABLE OF CONTENTS

1. The Prosecution's Case . . . . . . . . . . . . . . . . . . . . . . . . . . 445

2. Defense Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 445

3. The Defense Failed to Competently Challenge the Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 446

M. Trial Counsel Failed to Investigate, Litigate, Object to, Cross-examine or Otherwise Adequately Challenge the Prosecution's Evidence in the Kneiding Incident, Counts 28-30 (Burglary, Murder, Burglary-murder Special Circumstance) . . . . . . . . . . . 448

1. The Prosecution's Case . . . . . . . . . . . . . . . . . . . . . . . . . . 448

2. Defense Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 449

3. The Defense Failed to Competently Challenge the Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 449

N. Trial Counsel Failed to Investigate, Litigate, Object to, Cross-examine or Otherwise Adequately Challenge the Prosecution's Evidence in the Khovananth Incident, Counts 31-35 (burglary, murder, rape, oral copulation, sodomy, burglary-murder special circumstance) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 452

1. The Prosecution's Case . . . . . . . . . . . . . . . . . . . . . . . . . . 452

2. Defense Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 452

3. The Defense Failed to Competently Challenge the Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 453

O. Trial Counsel Failed to Investigate, Litigate, Object to, Cross-examine or Otherwise Adequately Challenge the Prosecution's Evidence in the Petersen Incident, Counts 36-38 (burglary, attempted murder) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 457

1. The Prosecution's Case . . . . . . . . . . . . . . . . . . . . . . . . . . 457

2. Defense Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 457

3. The Defense Failed to Competently Challenge the Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 458

P. Trial Counsel Failed to Investigate, Litigate, Object to, Cross-examine or Otherwise Adequately Challenge the Prosecution's Evidence in the Abowath Incident, Counts 39-43 (burglary, murder, rape, oral copulation, sodomy, burglary-murder special circumstance) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 460

PAGE(S)

1. The Prosecution's Case . . . . . . . . . . . . . . . . . . . . . . . . 460

2. Defense Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 461

3. The Defense Failed to Competently Challenge the
   Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 461

Q. Trial Counsel Failed to Investigate, Litigate, Object to, Cross-
   examine or Otherwise Adequately Challenge the Prosecution's
   Evidence in the Uncharged Incident (Burglary) . . . . . . . . . . . . 463

R. Failure to Competently Present an Opening Statement . . . . . . . 464

S. Further Evidence of Failure to Defend Against the Charges . . . 468

T. Failure to Challenge the Prosecution's Evidence . . . . . . . . . . . . 469

U. Failure to Object to the Prosecutor's Closing Argument . . . . . . 470

V. Other Guilt Phase Errors Rendered the Guilt Trial
   Verdict Unreliable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 470

CLAIM 18:
   COUNSEL'S INEFFECTIVE ASSISTANCE AT THE GUILT
   AND PENALTY PHASES: SOCIAL HISTORY AND MENTAL
   HEALTH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 473

A. Trial Counsel Failed to Adequately and Competently Investigate,
   Develop, and Present Petitioner's Life History and Evidence of
   Petitioner's Significant Cognitive, Neurological, Psychological,
   and Psychiatric Impairments . . . . . . . . . . . . . . . . . . . . . . . . . . . . 477

1. Family Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . 479

2. Experience with Injury, Trauma, and Violence . . . . . . . . 485

3. Exposure to Neurotoxins and Other Environmental
   Risk Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 489

4. Petitioner's Long-Standing History of Neurological,
   Cognitive, Psychological, and Psychiatric Impairments . 491

5. History of Significant Drug Use from an Early Age . . . . 493

6. Petitioner's Mental State at the Time of the Offenses
   and His Arrest and Throughout the Trial Proceedings . . . 494

PAGE(S)

B.    Petitioner Was Prejudiced at Both Phases of His Capital Trial by Trial Counsel's Failure to Conduct an Adequate Social History Investigation, to Present that Information to Appropriate Mental Health Experts, and to Present to the Jury on Petitioner's Behalf All the Evidence that Bore on Petitioner's Competence to Stand Trial and to Waive Rights and on Guilt and Penalty . . . .  501

C.    Additional Constitutional Violations  . . . . . . . . . . . . . . . . . . .  509

CLAIM 19:
THE TRIAL COURT VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS WITH RESPECT TO PETITIONER'S MENTAL COMPETENCY TO WAIVE PRESENTATION OF MITIGATION EVIDENCE . . . . . . . . . . . . . . .  512

CLAIM 20:
THE TRIAL COURT'S DENIAL OF PETITIONER'S MOTION TO SEVER UNRELATED INCIDENTS VIOLATED HIS CONSTITUTIONAL RIGHTS AT BOTH PHASES OF THE TRIAL . . . . . . . . . . . . . . . . . . . . . . . . .  520

A.    Facts  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  521

B.    Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  523

CLAIM 21:  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  539
THE TRIAL COURT VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS BY DENYING HIS MOTION TO HAVE A JURY DRAWN FROM A REPRESENTATIVE CROSS-SECTION OF THE COMMUNITY . . . . . . . . . . . . . . . . . . .  539

A.    The Los Angeles County Jury Selection Procedures Violated the "Fair Cross Section" Requirements of the Sixth Amendment and the Equal Protection Clause of the Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . .  555

1.    Duren prong one . . . . . . . . . . . . . . . . . . . . . . . . . . .  557

2.    Duren prong two . . . . . . . . . . . . . . . . . . . . . . . . . . .  557

3.    Duren prong three . . . . . . . . . . . . . . . . . . . . . . . . . . .  560

B.    The Constitutional Violations Were Prejudicial Per Se  . . . . . . .  563

CLAIM 22:  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  564
THE TRIAL COURT UNCONSTITUTIONALLY SHACKLED PETITIONER THROUGHOUT THE CAPITAL TRIAL . . . . . . . . . .  564

# TABLE OF CONTENTS

PAGE(S)

CLAIM 23: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 575
    THE TRIAL COURT VIOLATED PETITIONER'S
    CONSTITUTIONAL RIGHTS BY ADMITTING
    INFLAMMATORY PHOTOGRAPHS . . . . . . . . . . . . . . . . . . . . . . . 575

CLAIM 24: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 582
    THE TRIAL COURT VIOLATED PETITIONER'S
    CONSTITUTIONAL RIGHTS BY INSTRUCTING THE
    JURY THAT PETITIONER'S REFUSAL TO REMOVE HIS
    SUNGLASSES WAS EVIDENCE OF CONSCIOUSNESS OF
    GUILT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 582

CLAIM 25:
    THE TRIAL COURT VIOLATED PETITIONER'S
    CONSTITUTIONAL RIGHTS BY REMOVING JUROR ROBERT
    LEE DURING DELIBERATIONS . . . . . . . . . . . . . . . . . . . . . . . . . 586

CLAIM 26:
    THE TRIAL COURT'S REFUSAL TO VOIR DIRE THE JURY
    AND GRANT MR. RAMIREZ'S MOTION FOR A MISTRIAL
    AFTER A JUROR WAS MURDERED DURING TRIAL, AND
    TRIAL COUNSEL'S FAILURE TO COMPETENTLY PRESENT
    MR. RAMIREZ'S MOTIONS VIOLATED MR. RAMIREZ'S
    CONSTITUTIONAL RIGHTS . . . . . . . . . . . . . . . . . . . . . . . . . . . 592

    A.    The Trial Court Violated Petitioner's Constitutional Rights
        by Failing to Grant Counsel's Motion for a Mistrial and
        Immediately Voir Dire the Jury . . . . . . . . . . . . . . . . . . . . . . . . 598

CLAIM 27:
    COUNTS 3 AND 5 – THE EVIDENCE WAS INSUFFICIENT TO
    SUPPORT PETITIONER'S CONVICTIONS OF BURGLARY
    AND FIRST-DEGREE FELONY-MURDER . . . . . . . . . . . . . . . . . . 606

CLAIM 28:
    COUNT 5 – THE EVIDENCE WAS INSUFFICIENT TO
    SUPPORT THE SPECIAL CIRCUMSTANCE FINDING OF
    BURGLARY/MURDER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 610

CLAIM 29: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 612
    COUNT 6 – THE EVIDENCE WAS INSUFFICIENT TO
    SUPPORT PETITIONER'S CONVICTION OF
    SECOND-DEGREE MURDER IN THE YU INCIDENT . . . . . . . . . . 612

CLAIM 30: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 618
    THE PROSECUTION KNOWINGLY AND IN BAD
    FAITH PRESENTED UNRELIABLE AND FALSE EVIDENCE . . . 618

CLAIM 31: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 624
    THE PROSECUTION MISLED THE JURY ABOUT
    PETITIONER'S INVOLVEMENT IN THE OFFENSES . . . . . . . . . . 624

# TABLE OF CONTENTS

PAGE(S)

CLAIM 32:
    PETITIONER'S CONSTITUTIONAL RIGHTS WERE
    VIOLATED BY THE PROSECUTOR'S PREJUDICIAL
    MISCONDUCT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 627

CLAIM 33: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 633
    THE GUILT PHASE CUMULATIVE ERRORS
    VIOLATED PETITIONER'S RIGHTS UNDER
    THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH
    AMENDMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 633

CLAIM 34: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 637
    THE ABSENCE OF ANY MITIGATING EVIDENCE
    RENDERED THE CAPITAL SENTENCING PROCESS
    CONSTITUTIONALLY UNRELIABLE IN VIOLATION OF
    THE FIFTH, EIGHTH, AND FOURTEENTH AMENDMENTS . . . . 637

CLAIM 35:
    THE TRIAL COURT VIOLATED PETITIONER'S
    CONSTITUTIONAL RIGHTS BY REFUSING TO
    INSTRUCT THE JURY THAT PETITIONER'S AGE IS
    A MITIGATING FACTOR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 644

CLAIM 36:
    THE TRIAL COURT VIOLATED PETITIONER'S
    CONSTITUTIONAL RIGHTS BY INSTRUCTING THE JURY IN
    THE LANGUAGE OF CALJIC NO. 8.85, THUS UNDERMINING
    HIS RIGHTS TO A RELIABLE PENALTY DETERMINATION . . . 649

CLAIM 37:
    THE TRIAL COURT VIOLATED PETITIONER'S
    CONSTITUTIONAL RIGHTS BY REFUSING TO INSTRUCT
    THE JURY REGARDING SUFFICIENCY OF MITIGATING
    EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 654

CLAIM 38:
    THE TRIAL COURT VIOLATED PETITIONER'S
    CONSTITUTIONAL RIGHTS BY REFUSING TO INSTRUCT
    THE JURY ON THE MEANING OF LIFE WITHOUT THE
    POSSIBILITY OF PAROLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 657

CLAIM 39:
    PETITIONER'S CONSTITUTIONAL RIGHT TO LIMIT THE
    AGGRAVATING CIRCUMSTANCES TO SPECIFIC
    LEGISLATIVELY-DEFINED FACTORS WAS VIOLATED
    BY CALJIC NO. 8.84.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 666

TABLE OF CONTENTS

PAGE(S)

CLAIM 40:
THE DEATH SENTENCE IS DISPROPORTIONATE AND IS
CRUEL AND UNUSUAL PUNISHMENT BECAUSE OF
PETITIONER'S SERIOUS PSYCHIATRIC, PSYCHOLOGICAL,
NEUROCOGNITIVE, NEUROLOGICAL, AND OTHER
IMPAIRMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 670

CLAIM 41:
CALIFORNIA'S DEATH PENALTY STATUTE, AS
INTERPRETED BY THE CALIFORNIA SUPREME COURT
AND APPLIED TO PETITIONER, IS CONSTITUTIONALLY
DEFECTIVE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 674

A.   The California Death Penalty Statute Fails to Narrow the
     Class of Murders Eligible for the Death Penalty. . . . . . . . . . . . 675

B.   The California Death Penalty Scheme Gives Prosecutors
     Unfettered Discretion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 678

C.   County-by-County Variation in the Application of the
     Death Penalty Violates Petitioner's Right to Equal Protection  . 679

D.   California Fails to Provide Inter-Case Proportionality Review  . 680

E.   California's Scheme Violates Due Process By Allowing the
     Jury to Repeatedly Consider the Same Evidence in Aggravation  681

F.   The Penalty Phase Instructions Deprived Petitioner of His
     Constitutional Right to an Individualized and Reliable
     Sentencing Decision Because They Failed to Designate
     Factors as "Aggravating" or "Mitigating" . . . . . . . . . . . . . . . . . 682

G.   The Jury Instructions Failed to Require a Reasonable Doubt
     Determination of Aggravating Factors . . . . . . . . . . . . . . . . . . . . 684

H.   The Jury Instructions Failed to Require Unanimity on
     Aggravating Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 686

I.   The Trial Court Failed to Instruct on the Presumption of a
     Life Sentence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 687

J.   The Jury Instructions Failed to Require Written Findings of
     Aggravating Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 689

K.   The Trial Court Failed to Delete Inapplicable Mitigating
     Factors from the Language of CALJIC 8.85 . . . . . . . . . . . . . . . 690

L.   CALJIC'S Requirement that Mitigating Evidence Be
     "Extreme" Unconstitutionally Limited the Jury's
     Consideration of Petitioner's Mitigating Evidence . . . . . . . . . . 690

xxi

# TABLE OF CONTENTS

M. The Language of CALJIC No. 8.88 Prevents Proper Weighing of Aggravating and Mitigating Evidence . . . . . . . . . . 692

N. The Penalty Phase Instructions Were Unconstitutionally Vague and Incapable of Being Understood by Jurors . . . . . . . . 693

O. The California Sentencing Scheme Violates Equal Protection Because by Denying Procedural Safeguards to Capital Defendants That Are Afforded to Non-capital Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 694

P. Carrying out Petitioner's Death Sentence after Excessive Pre-execution Delay Would Be Cruel and Unusual Punishment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 697

Q. Imposition of the Death Penalty Violates Petitioner's Rights under the Eighth Amendment and International Law . . . . . . . . . 701

R. Execution by Lethal Injection Is Cruel and Unusual Punishment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 703

　　1. Execution by Lethal Injection is Unconstitutional . . . . . . 703

　　2. Execution by Lethal Gas Is Unconstitutional . . . . . . . . . . 705

S. California's System of Unified Appellate and Postconviction Review is Unconstitutional . . . . . . . . . . . . . . . . 707

T. The Trial Court Violated Petitioner's Constitutional Rights When it Failed to Instruct the Jury on the Meaning of Life Without Parole . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 708

U. The Capital Sentencing Scheme Violated the Fifth, Sixth, Eighth, and Fourteenth Amendments by Permitting Multiple Use of a Single Felony as the Basis for a First Degree Murder Finding, as a Capital-Eligibility Factor, and as a Narrowing Factor in Sentencing . . . . . . . . . . . . . . . . . . . . . . . . 710

V. The Trial Court Erred by Ordering Determinate Sentences to Be Served Subsequent to Imposition of Death in Violation of Petitioner's Rights under the Eighth and Fourteenth Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 711

W. Ineffective Assistance of Counsel on Appeal and in Postconviction Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . 714

X. The Impact of the Constitutional Violations Regarding the Penalty Phase Rendered the Sentencing Determination Constitutionally Unreliable . . . . . . . . . . . . . . . . . . . . . . . . . . . . 715

TABLE OF CONTENTS

PAGE(S)

CLAIM 42:
    PETITIONER'S CONVICTIONS AND SENTENCES MUST BE
    REVERSED BECAUSE OF THE CUMULATIVE EFFECT OF
    ALL THE ERRORS AND CONSTITUTIONAL VIOLATIONS
    ALLEGED IN THIS PETITION; THE CUMULATIVE EFFECT
    OF GUILT PHASE AND PENALTY PHASE ERRORS WAS
    PREJUDICIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  717

X.      PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  722

XI.     VERIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  724

# I.

# INTRODUCTION

1.     Petitioner Richard Ramirez ("Petitioner"), by and through his counsel, submits this Petition for Writ of Habeas Corpus (the "Petition") pursuant to 28 U.S.C. § 2241 *et seq.*, and the Local Rules for the United States District Court for the Central District of California.  The State of California convicted and sentenced Petitioner to death.  Petitioner's conviction and death sentence must be set aside because they are the result of numerous violations of his constitutional rights.  This petition contains both exhausted and unexhausted claims for relief and factual allegations in support of those claims.

2.     Petitioner intends to seek a stay of the federal action, pursuant to *Rhines v. Weber*, 544 U.S. 269, 125 S. Ct. 1528, 161 L. Ed. 2d 440 (2005), so that he may file and litigate an exhaustion petition with the California Supreme Court, in which he will raise the unexhausted claims for relief and present the new factual allegations in support of claims previously presented to that court.

3.     In addition, Petitioner intends to seek a stay of the federal action, pursuant to *Rohan ex rel. Gates v. Woodford*, 334 F.3d 803, 817 (9th Cir. 2003), because Petitioner is not presently competent to assist federal habeas counsel.  He will further seek equitable tolling with respect to any new claims that he is presently unable to assert as a result of Petitioner's incompetence.

# II.

# VENUE AND INTRADISTRICT ASSIGNMENT

4.     Petitioner has properly filed the Petition in this District and Division because Petitioner challenges the lawfulness of a conviction and death sentence imposed in Los Angeles County, California.  L.R. 83-17.3(a), 83-17.5(a).

# III.

## JURISDICTIONAL ALLEGATIONS

5.     Petitioner is a prisoner of the State of California.  He is illegally and unconstitutionally confined and restrained of his liberty at the California State Prison at San Quentin, California, by Warden Robert Ayers, Jr., and Matthew Cate, Secretary of the California Department of Corrections and Rehabilitation, pursuant to convictions and death sentences imposed upon him by the Los Angeles County Superior Court.

6.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 2241 *et seq*.  Petitioner is in state custody in violation of the Constitution, laws or treaties of the United States, pursuant to a judgment of the State of California. Petitioner makes the following additional jurisdictional allegations:

7.     Place of detention:  California State Prison at San Quentin, San Quentin, California.

8.     Name and location of court which entered the judgment of conviction under attack:  Superior Court of Los Angeles County, California.

9.     Case number:  No. A771272.

10.     Length of sentence:  Death.

11.     Convictions:  12 counts of first degree murder (Penal Code § 187(a)), one count of second degree murder (§ 187 (a)), five counts of attempted murder (§§ 187, 664), four counts of rape (§ 261, former subd. (2)), three counts of forcible oral copulation (§ 288a, former subd. (c)), four counts of forcible sodomy (§ 286, former subd. (c), and 14 counts of first degree burglary (§ 459).  The jury found true allegations of multiple-murder, burglary, rape, forcible sodomy, and, forcible-oral-copulation special circumstances (§ 190.2).

12.     Date of conviction:  Read and entered on September 20, 1989.

13.     Date of sentence:  November 7, 1989.

14.     Kind of trial:  Jury.

15. Did Petitioner testify at trial?: No.

12. Petitioner was represented by counsel at trial.

16. Automatic appeal:

    a.    Name of Court: Supreme Court of the State of California.

    b.    Result: Affirmed.

    c.    Date of result: affirmed on August 7, 2006; rehearing denied on September 27, 2006.

    d.    Citation or number of opinion: Case No. S012944; 39 Cal.4th 398, 139 P.3d 64, 46 Cal.Rptr.3d 677 (2006).

    e.    In summary, the grounds raised in Petitioner's mandatory automatic appeal included, but were not limited to:

    (1)    By permitting two unqualified counsel to represent Petitioner whose appointment would likely result in significant prejudice to him, the trial court denied Petitioner his right to assistance of counsel guaranteed by the Sixth Amendment to the United States Constitution and Article I, § 15 of the California Constitution;

    (2)    Petitioner was denied the right to conflict-free representation in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, § 15 of the California Constitution;

    (3)    The trial court erred in failing to initiate competency proceedings pursuant to Penal Code §§ 1368(a) and (b); the court's error also violated Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution;

    (4)    The trial court erred in denying Petitioner's motion for change of venue in violation of California Constitution, Article I, § 15, and the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution;

(5)     The trial, court erred and abused its discretion in denying Petitioner's motion to sever unrelated incidents; the error also violated Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution;

(6)     The trial court erred in denying Petitioner's motion for a jury drawn from a representative cross-section of the community in violation of Code of Civil Procedure §§ 197 and 203, California Constitution, Article I, § 16, and the Sixth and Fourteenth Amendments to the United States Constitution;

(7)     The trial court erred in denying Petitioner's motion for sequestered *voir dire* based on prejudicial pretrial publicity; the trial court's failure to shield potential jurors or instruct *sua sponte* regarding pretrial publicity during *voir dire* violated Petitioner's rights under the Sixth, Eighth, and Fourteenth Amendment to the United States Constitution;

(8)     The trial court erred in violation of the Sixth and Fourteenth Amendments to the United States Constitution in denying Petitioner's challenge of Robert Domney for cause in *Hovey voir dire*;

(9)     The trial court erred in ordering Petitioner restrained in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution;

(10)    The trial court erred and abused its discretion in admitting inflammatory photographs of the victims and crime scenes;

(11)    The trial court erred in instructing the jury that Petitioner's refusal to remove his sunglasses was evidence of consciousness of guilt; the error also violated Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution;

(12)    The trial court erred in removing juror Robert Lee during deliberations in violation of Petitioner's rights under the Fifth, Sixth,

Eighth, and Fourteenth Amendments to the United States Constitution; the error was prejudicial *per se*;

(13)   The trial court erred in violation of Petitioner's rights under the Sixth and Fourteenth Amendments to the United States Constitution in denying his request for further inquiry of the jury and his motion for mistrial after a juror was murdered during deliberations;

(14)   The evidence was insufficient under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Due Process Clause of Article I, § 15 of the California Constitution to support Petitioner's convictions of burglary and first degree felony murder in counts 3 and 5;

(15)   The evidence was insufficient under the Due Process clause of the Fourteenth Amendment to the United States Constitution and the Due Process Clause of Article I, § 15 of the California Constitution to support the special circumstance finding in count 5 of burglary murder pursuant to Penal Code § 190.2(a)(17)(vii);

(16)   The evidence was insufficient under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Due Process Clause of Article I, § 15 of the California Constitution to support Petitioner's count 6 conviction of second-degree murder in the Yu incident;

(17)   The guilt phase cumulative errors violated Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution;

(18)   Petitioner was deprived of the right to conflict-free representation at the penalty trial in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Article I, § 15 of the California Constitution;

(19)    The trial court erred in failing to follow procedures pursuant to Penal Code § 1368(a) with respect to Petitioner's mental competency to waive presentation of any mitigation evidence during penalty phase; the court's error violated Petitioner's rights under the Sixth, Eighth, and Fourteenth Amendments to the United State Constitution;

(20)    The absence of any mitigating evidence rendered the capital sentencing process constitutionally unreliable in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution;

(21)    The trial court's denial of Petitioner'ts severance motion created a prejudicial spillover effect during the penalty trial in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution;

(22)    The trial court's refusal to instruct the jury as to Petitioner's age as a mitigating factor pursuant to Penal Code § 190.3(i) violated Petitioner's rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution;

(23)    By instructing the jury in the language of CALJIC No. 8.85, the trial court erroneously undermined Petitioner's constitutional rights to a reliable penalty determination in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution;

(24)    The trial court's refusal to instruct the jury regarding sufficiency of mitigating evidence violated the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution;

(25)    By refusing to instruct the jury on the meaning of life without the possibility of parole, the trial court erred in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution;

(26)    The directive of CALJIC No. 8.84.1 to the jury to determine the facts from the evidence received during the entire trial violated

Petitioner's statutory and constitutional rights to limit the aggravating circumstances to specific legislatively-defined factors;

(27)   The impact of guilt trial errors on the penalty trial rendered the sentencing determination unreliable in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution;

(28)   The trial court erred in failing to instruct the jury that a verdict of death was the appropriate penalty beyond a reasonable doubt and the absence of a burden of proof at the penalty trial rendered the penalty determination arbitrary and unreliable;

(29)   The trial court erred in failing to instruct the jury not to double count the special circumstances as separate components of factor (a) of § 190.3;

(30)   The lack of explicit written jury findings on aggravating factors deprived Petitioner of a reliable determination of penalty and the right to appellate review in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution;

(31)   The California capital sentencing scheme in effect at the time of Petitioner's trial violated the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by permitting multiple use of a single felony as the basis for a first degree murder finding as a capital-eligibility factor and as a narrowing factor in sentencing;

(32)   The California capital sentencing procedure in effect at the time of Petitioner's trial violated the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution because of the virtually unfettered discretion granted to the prosecutor to decide whether Petitioner would be subject to its provisions;

(33)   By failing to narrow the class of death-eligible murders, the 1978 death penalty statute under which Petitioner was sentenced violates the

Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States

Constitution;

(34)    The cumulative effect of guilt phase and penalty phase

errors was prejudicial;

(35)    The trial court erred in violation of Petitioner's rights

under the Eighth and Fourteenth Amendments to the United States Constitution

in ordering determinate sentences to be served subsequent to imposition of death;

(36)    Methods of execution employed in California violate

the Eighth and Fourteenth Amendments to the United States Constitution; and,

(37)    Violations of Petitioner's state and federal

constitutional rights likewise constitute violations of international law.

      17.    Petition for Writ of Certiorari (following affirmance):

          a.    Name of Court:  United States Supreme Court.

          b.    Result:  Denied.

          c.    Date of denial: May 29, 2007.

          d.    Citation of opinion: No. 06-9529.

          e.    The questions presented were:

(1)    After the United States Supreme Court's decision in

*United States v. Gonzalez-Lopez*, 548 U.S. 140, 126 S.Ct. 2557, 165 L.Ed.2d 409

(2006), is a criminal defendant's Sixth Amendment right to counsel violated by

retained counsel's unqualified representation in a capital case?

(2)    Whether California's death penalty law violates the

Fifth, Sixth, and Fourteenth Amendments by permitting the trier of fact to impose

a sentence of death without finding the existence of aggravating factors beyond a

reasonable doubt?

      18.    Petition for Writ of Habeas Corpus (following affirmance):

          a.    Name of Court:  Supreme Court for the State of California.

          b.    Result:  Denied.

c.   Date of result:  December 19, 2007.

d.   Citation or number of opinion: *In re Ramirez*, No. S125755.

e.   In summary, the grounds raised in Petitioner's petition for writ of habeas corpus included, but were not limited to:

(1)   Petitioner's conviction and sentence are unconstitutional because Petitioner was mentally incompetent throughout the legal proceedings below and is currently mentally incompetent;

(2)   Petitioner's constitutional rights were violated because of counsel's conflicts of interest;

(3)   Petitioner was denied effective assistance of counsel on the motion for change of venue in violation of his state and federal rights;

(4)   Counsel's ineffectiveness in failing to properly challenge pretrial and trial identification procedures denied Petitioner a fundamentally fair and reliable trial;

(5)   Petitioner's statements were unreliable and involuntarily obtained;

(6)   Petitioner was denied his fundamental right to assistance of counsel due to counsel's failure to properly challenge the legality of the seizure of evidence;

(7)   The State knowingly and in bad faith presented unreliable and false evidence linking Petitioner to the capital crimes;

(8)   The prosecution misled the jury about Petitioner's involvement in the offenses;

(9)   Petitioner was deprived of his right to effective assistance of counsel and to a fair and reliable determination of guilt and penalty by trial counsel's prejudicially deficient performance;

(10)   The State violated Petitioner's rights by engaging in prejudicial misconduct at the guilt and penalty trials;

(11)　The trial court unconstitutionally and prejudicially ordered Petitioner to be shackled throughout the trial;

(12)　Petitioner received ineffective assistance of counsel at the guilt and penalty trials of his capital trial due to counsel's failure to conduct an adequate investigation into Petitioner's social history, background, and evidence of his long-standing mental and organic impairments; to consult and prepare appropriate lay and expert witnesses; and to present this evidence in defense of the guilt charges and in mitigation of penalty;

(13)　The death sentence is disproportionate and is cruel and unusual punishment because of Petitioner's serious neurocognitive, neurological, and other impairments;

(14)　The California death eligibility process used in this case violates the state and federal constitutions;

(15)　Petitioner's convictions and sentences must be reversed because of the cumulative effect of all the errors and constitutional violations alleged in this petition;

(16)　Carrying out of the death sentence in this case would violate the state and federal constitutions;

(17)　Petitioner cannot be lawfully executed because the method of execution in California is forbidden by state, federal, and international law;

(18)　Petitioner's execution by lethal gas would constitute cruel and unusual punishment in violation of Petitioner's federal and state constitutional rights; and,

(19)　Ineffective assistance of counsel on appeal and in post-conviction proceedings.

19.　Other state proceedings:  None.

20.　Other federal proceedings:  None.

# IV.

# SUMMARY OF THE CASE

## A.    Overview

21.    Richard Ramirez (hereafter Petitioner) was born on February 28, 1960, in El Paso, Texas, where his parents raised him in a close-knit, bilingual family.  In 1984, at the time of the first charged murder, Petitioner was twenty-four years old.  Before 1984, his criminal history was a minor misdemeanor record.

22.    From the very beginning of trial court proceedings, Petitioner, the so- called "Night Stalker," repeatedly engaged in bizarre behavior in his jail cell and in the courtroom, for instance, drawing a pentagram on the palm of his hand in blood, and repeatedly shouting "Hail Satan" in public.  As set forth *infra*, despite substantial evidence of Petitioner's mental problems, the trial court failed to initiate mental competency proceedings pursuant to Penal Code § 1368.[1]

23.    Despite Petitioner's manifest mental problems and likely mental impairment, the trial court permitted him to retain grossly unqualified counsel and waive significant conflicts of interest.  During trial, for example, the court accepted inadequate waivers from Petitioner as to his constitutional right to present a defense to the forty-three-count amended information and to present any mitigating evidence for him at penalty trial.

24.    On November 7, 1989, following guilt and penalty jury trials, the Superior Court of Los Angeles County imposed a judgment of death upon Petitioner.  A jury convicted petitioner of forty-three counts, including twelve counts of first degree murder (§ 187(a)); one count of second degree murder (§ 187(a)); fourteen counts of first degree burglary (§ 459); five counts of

---

[1]  All further statutory references are to the Penal Code, unless otherwise indicated.

attempted murder (§§ 664/187); four counts of forcible rape (§ 261(2)); three counts of forcible oral copulation (§ 288(a)); and four counts of forcible sodomy (§ 286(c).  Special circumstances were found true pursuant to § 190.2(a)(17)(vii) (twelve counts of burglary); § 190.2(a)(17)(iii) (two counts of rape); § 190.2(a)(17)(iv) (two counts of sodomy); § 190.2(a)(17)(vi) (two counts of oral copulation); and, § 190.2(a)(3) (one count of multiple murder).  (XXXI CT 9073-75.)[2]

25.    The murders and related charges of which Petitioner was convicted arose out of fifteen separate incidents that occurred in Los Angeles County as shown in Table 1.

**Table 1. Counts of Conviction by Date and Victim**

| Date | Count | Charge | Victim |
|------|-------|--------|--------|
| June 27-28, 1984 | 1 | § 459 | Jennie Vincow |
| | 2 | § 187(a) | |
| March 17, 1985 | 3 | § 459 | Okazaki/Hernandez |
| | 4 | § 664/187 | Maria Hernandez |
| | 5 | § 187(a) | Dale Okazaki |
| March 17, 1985 | 6 | § 187(a)[3] | Tsai-Lian Yu |
| March 28, 1985 | 7 | § 459 | Vincent and Maxine Zazzara |
| | 8 | § 187(a) | Vincent Zazzara |
| | 9 | § 187(a) | Maxine Zazzara |
| May 14, 1985 | 10 | § 459 | William & Lillie Doi |
| | 11 | § 187(a) | William Doi |
| May 29 - June 1, 1985 | 12 | § 459 | Mabel Bell & Florence Lang |

_____

[2]  There are thirty-five volumes in the Clerk's Transcript, designated I through XXXV, hereafter referred to as I CT through XXXV CT.

[3]  Petitioner was convicted of second degree murder in count 6.

12

| Date | Count | Charge | Victim |
|------|-------|--------|--------|
| | 13 | § 187(a) | Mabel Bell |
| | 14 | § 664/187 | Florence Lang |
| May 30, 1985 | 15 | § 459 | Carol Kyle |
| | 16 | § 261(2) | |
| | 17 | § 288(a)(c) | |
| | 18 | § 286(c) | |
| July 2, 1985 | 19 | § 459 | Mary Louise Cannon |
| | 20 | § 187(a) | |
| July 5, 1985 | 21 | § 459 | Whitney & Steve Bennett |
| | 22 | § 664/187 | Whitney Bennett |
| July 7, 1985 | 23 | § 459 | Joyce Nelson |
| | 24 | § 187(a) | |
| July 7, 1985 | 25 | § 459 | Sophie Dickman |
| | 26 | § 261(2) | |
| | 27 | § 286(c) | |
| July 20, 1985 | 28 | § 459 | Maxon and Lela Kneiding |
| | 29 | § 187(a) | Maxon Kneiding |
| | 30 | § 187(a) | Lela Kneiding |
| July 20, 1985 | 31 | § 459 | Chainarong and Somkid Khovananth |
| | 32 | § 487(a) | Chainarong Khovananth |
| | 33 | § 261(2) | Somkid Khovananth |
| | 34 | § 288a(c) | Somkid Khovananth |
| | 35 | § 286(c) | Somkid Khovananth |
| August 6, 1985 | 36 | § 459 | Christopher and Virginia Petersen |
| | 37 | § 664/187 | Virginia Petersen |
| | 38 | § 664/187 | Christopher Petersen |
| August 8, 1985 | 39 | § 459 | Elyas and Sakina Abowath |
| | 40 | § 187(a) | Elyas Abowath |

| Date | Count | Charge | Victim |
|------|-------|--------|--------|
| | 41 | § 261(2) | Sakina Abowath |
| | 42 | § 288a(c) | Sakina Abowath |
| | 43 | § 286(c) | Sakina Abowath |

## B.    Procedural Background

### 1.    Municipal Court

26.    By felony complaint filed September 3, 1985, in the Municipal Court, Los Angeles Judicial District, Los Angeles County, the State charged Petitioner as set forth in Table 2.

**Table 2.  Charges and Counts of the Felony Complaint**

| Date | Count | Charge | Victim |
|------|-------|--------|--------|
| May 9, 1985 | 1 | § 459 | Clara Hadsall |
| | 2 | § 211 | |
| May 14, 1985 | 3 | § 459 | William and Lillie Doi |
| | 4 | § 211 | |
| | 5 | § 261(2) | Lillie Doi |
| | 6 | § 286(c) | |
| | 7 | § 288a(c) | |
| | 8 | § 187(a) | William Doi |

According to a Municipal Court docket entry, the court appointed the Los Angeles County Public Defender to represent Petitioner.[4]  (XIX CT 5465.)

_____

[4]  The felony complaint filed September 3, 1985, was not part of the original record on appeal.  Subsequent to record certification, Petitioner moved under Cal. Rule of Court, Rule 12, to augment the record to include the original felony complaint.  On February 13, 2002, the court so ordered.  There is no reporter's transcript for the hearing held on September 3, 1985.  (*See* affidavit of court reporter Dan Leddy regarding destruction of his notes, Reporter's Transcript (hereafter "RT") of a February 7, 1986 hearing, following p. 7; *see also* VII Supp. CT 166-67 (Order to Prepare Settled Statement); VIII Supp. CT 7 (Objections to Record on Appeal); VIII Supp. CT 15-16 (Declaration of Counsel

27. On filing of the felony complaint, the court continued Petitioner's arraignment to September 9, 1985. At the hearing on that date, the court again continued the arraignment, to September 27, 1985. (*See* XVII CT 4967-69; *see also* XIX CT 5465.)

28. On September 17, 1985, the trial court held a hearing with respect to pretrial publicity. The court ordered the parties and all witnesses not to make or

---

Re: Settled Statement).)

The record on appeal was provided to appellate counsel on December 2, 1992. The initial motion to correct the record was filed September 3, 1994. Petitioner filed a revised request for correction of the record on appeal on April 26, 1996. Both motions were omitted from the augmented record on appeal. On May 8, 1998, the trial court ordered the record on appeal augmented to include proceedings not contained in the original record. (RT 3 (May 8, 1998 hearing).) Thereafter, on March 12, 1999, the trial court ordered correction of the record on appeal. On June 21, 1999, the court ordered settled statements to be prepared. (*See* VII Supp. CT 166-69.) Petitioner filed objections to the record on appeal on August 19, 1999. Despite an incomplete record, the trial court certified the record on appeal on August 19, 1999. (*See* VIII Supp. CT 4-9, 30.)

There are eight Supplemental Clerk's Transcripts, designated I through VIII, hereafter referred to as I Supp. CT through VIII Supp. CT.

- I Supp. CT consists of one volume of additional superior court records (pages 1 through 104).
- I Supp. CT consists of eight volumes of sealed records (pages 1 through 2445).
- II Supp. CT consists of three volumes of discovery filed in the court by the prosecution (pages 1 through 660).
- I Supp. CT consists of a master index and fifteen volumes of confidential § 987.9 (pages 1 through 4223).
- VI Supp. CT is a one-page volume (page 4919).
- VI Supp. CT consists of seventeen volumes of juror questionnaires (pages 1 through 4918).
- VII Supp. CT is one volume of corrections to the record on appeal and settled statements of trial counsel (pages 1 through 248).
- VIII Supp. CT consists of one volume, including settled statements of trial counsel (pages 1 through 30).

15

authorize public statements concerning evidence in the case.  (*See* XVII CT 4971-78; *see also* XIX CT 5466-67.)

29.     The state filed an amended felony complaint on September 26, 1985. The charges and counts of the amended complaint are set forth in Table 3.

**Table 3.     Counts and Charges of the Amended Complaint Date**

| Date | Count | Charge | Victim |
|---|---|---|---|
| June 27-28, 1984 | 1 | § 459 | Jennie Vincow |
| | 2 | § 187(a) | |
| March 17, 1985 | 3 | § 459 | Okazaki/Hernandez |
| | 4 | § 664/187 | Maria Hernandez |
| | 5 | § 187(a) | Dale Okazaki |
| | 6 | § 187(a) | Tsai-Lian Yu |
| | 7 | § 459 | Thomas Sandoval |
| | 8 | § 459 | Thomas Sandoval |
| | 9 | § 207(a) | |
| | 10 | § 261(2) | |
| | 11 | § 288(b) | |
| March 28, 1985 | 12 | § 459 | Vincent and Maxine Zazzara |
| | 13 | § 187(a) | Vincent Zazzara |
| | 14 | § 187(a) | Maxine Zazzara |
| May 9, 1985 | 15 | § 459 | Clara Hadsall |
| | 16 | § 211 | |
| May 14, 1985 | 17 | § 459 | William & Lillie Doi |
| | 18 | § 187(a) | William Doi |
| | 19 | § 261(2) | Lillie Doi |
| | 20 | § 288a(c) | Lillie Doi |
| | 21 | § 286(c) | Lillie Doi |
| | 22 | § 211 | William & Lillie  Doi |
| May 29 - June 1, 1985 | 23 | § 459 | Mabel Bell & Florence Lang |

16

| Date | Count | Charge | Victim |
|------|-------|--------|--------|
| | 24 | § 187 (a) | Mabel Bell |
| | 25 | § 664/187 | Florence Lang |
| May 30, 1985 | 26 | § 459 | Carol Kyle |
| | 27 | § 261(2) | |
| | 28 | § 288a(c) | |
| | 29 | § 286(c) | |
| | 30 | § 211 | |
| June 27, 1985 | 31 | § 459 | [Victim not alleged] |
| | 32 | § 207(a) | |
| | 33 | § 261(2) | |
| | 34 | § 288a(c) | |
| | 35 | § 286(c) | |
| | 36 | § 211 | |
| June 28, 1985 | 37 | § 459 | Patti Higgins |
| | 38 | § 187(a) | |
| July 2, 1985 | 39 | § 459 | Mary Louise Cannon |
| | 40 | § 187(a) | |
| July 5, 1985 | 41 | § 459 | Whitney and Steve Bennett |
| | 42 | § 664/187 | Whitney Bennett |
| July 7, 1985 | 43 | § 459 | Joyce Nelson |
| | 44 | § 187(a) | |
| July 7, 1985 | 45 | § 459 | Sophie Dickman |
| | 46 | § 261(2) | |
| | 47 | § 286(c) | |
| | 48 | § 211 | |
| July 20, 1985 | 49 | § 459 | Maxon and Lela Kneiding |
| | 50 | § 187(a) | Maxon Kneiding |
| | 51 | § 187(a) | Lela Kneiding |
| July 20, 1985 | 52 | § 459 | Chainarong and Somkid Khovananth |

| Date | Count | Charge | Victim |
|---|---|---|---|
| | 53 | § 187(a) | Chainarong Khovananth |
| | 54 | § 281(2) | Somkid Khovananth |
| | 55 | § 286(c) | Somkid Khovananth |
| | 56 | § 286(c) | Somkid Khovananth |
| | 57 | § 211 | Chainarong and Somking Khovananth |
| | 58 | § 286(c) | [victim not alleged] |
| | 59 | § 288(b) | [victim not alleged] |
| August 6, 1985 | 60 | § 459 | Christopher and Virginia Petersen |
| | 61 | § 664/187 | Virginia Petersen |
| | 62 | § 664/187 | Christopher Petersen |
| August 8, 1985 | 63 | § 459 | Elyas and Sakina Abowath |
| | 64 | § 187(a) | Elyas Abowath |
| | 65 | § 261(2) | Sakina Abowath |
| | 66 | § 288a(c) | Sakina Abowath |
| | 67 | § 286(c) | Sakina Abowath |

In the amended felony complaint, the State alleged burglary-murder special circumstances, pursuant to § 190.2(a)(17), in counts 2, 5, 13, 14, 18, 24, 38, 40, 44, 50, 51, 53, 64.  Multiple-murder special circumstances pursuant to § 190.2(a)(3) were alleged in counts 2, 5, 6, 13, 14, 18, 24, 38, 40, 44, 50, 51, 53, 64.  Count 18 also alleged felony-murder special circumstances pursuant to § 190.2(a)(17) in the commission of robbery, rape, sodomy, and oral copulation.  Count 53 alleged additional felony-murder special circumstances, pursuant to § 190.2(a)(17), in the commission of robbery, rape, sodomy, lewd and lascivious act upon a child under the age of fourteen, and oral copulation.  Count 64 alleged additional felony-murder special circumstances, pursuant to § 190.2(a)(17), in the

commission of robbery, rape, sodomy, and oral copulation. (XVIII CT 5190-273; XIX CT 5468.)[5]

30. On September 27, 1985, the trial court continued Petitioner's arraignment on the amended felony complaint to October 9, 1985, and then to October 24, 1985. (XIX CT 5468-69.) On October 24, 1985, the court arraigned Petitioner on the amended complaint. He entered pleas of not guilty to all counts, and he denied all other allegations. He also waived the time for the preliminary hearing. (XVII CT 5017-18.)

31. The court commenced the preliminary hearing on March 3, 1986. (XIX CT 5477.) After twenty-nine days of hearing, the prosecution rested its case on May 6, 1986. Petitioner presented no affirmative evidence. (XIX CT 5527.) The court held Petitioner to answer on fifty of the charges in the amended felony complaint as shown in Table 4.

**Table 4.     Counts and Charges on Which Petitioner Was Held to Answer After Preliminary Hearing**

| Date | Count | Charge | Victim |
|------|-------|--------|--------|
| June 27-28, 1984 | 1 | § 459 | Jennie Vincow |
| | 2 | § 187(a) | |
| March 17, 1985 | 3 | § 459 | Okazaki/Hernandez |
| | 4 | § 664/187 | Maria Hernandez |
| | 5 | § 187(a) | Dale Okazaki |
| | 6 | § 187(a) | Tsai-Lian Yu |
| March 28, 1985 | 12 | § 459 | Vincent & Maxine Zazzara |
| | 13 | § 187(a) | Vincent Zazzara |
| | 14 | § 187(a) | Maxine Zazzara |
| May 14, 1985 | 17 | § 459 | William and Lillie Doi |

---

[5] Count 68, as set forth in a docket entry of May 6, 1986, inexplicably was omitted from the amended complaint. (*See* XVIII CT 5273-74.)

| Date | Count | Charge | Victim |
| --- | --- | --- | --- |
| | 18 | § 187(a) | William Doi |
| | 22 | § 211 | William and Lillie Doi |
| May 29 - June 1, 1985 | 23 | § 459 | Mabel Bell and Florence Lang |
| | 24 | § 187 (a) | Mabel Bell |
| | 25 | § 664/187 | Florence Lang |
| May 30, 1985 | 26 | § 459 | Carol Kyle |
| | 27 | § 261(2) | |
| | 28 | § 288a(c) | |
| | 29 | § 286(c) | |
| | 30 | § 211 | |
| June 28, 1985 | 37 | § 459 | Patti Higgins |
| | 38 | § 187(a) | |
| July 2, 1985 | 39 | § 459 | Mary Louise Cannon |
| | 40 | § 187(a) | |
| July 5, 1985 | 41 | § 459 | Whitney and Steve Bennett |
| | 42 | § 664/187 | Whitney Bennett |
| July 7, 1985 | 43 | § 459 | Joyce Nelson |
| | 44 | § 187(a) | |
| July 7, 1985 | 45 | § 459 | Sophie Dickman |
| | 46 | § 261(2) | |
| | 47 | § 286(c) | |
| | 48 | § 211 | |
| July 20, 1985 | 49 | § 459 | Maxon and Lela Kneiding |
| | 50 | § 187(a) | Maxon Kneiding |
| | 51 | § 187(a) | Lela Kneiding |
| July 20, 1985 | 52 | § 459 | Chainarong and Somkid Khovananth |
| | 53 | § 187(a) | Chainarong Khovananth |
| | 54 | § 281(2) | Somkid Khovananth |

20

| Date | Count | Charge | Victim |
|---|---|---|---|
| | 55 | § 286(c) | Somkid Khovananth |
| | 56 | § 286(c) | Somkid Khovananth |
| | 57 | § 211 | Chainarong and Somking Khovananth |
| | 58 | § 286(c) | [victim not alleged] |
| | 59 | § 288(b) | [victim not alleged] |
| August 6, 1985 | 60 | § 459 | Christopher and Virginia Petersen |
| | 61 | § 664/187 | Virginia Petersen |
| | 62 | § 664/187 | Christopher Petersen |
| August 8, 1985 | 63 | § 459 | Elyas and Sakina Abowath |
| | 64 | § 187(a) | Elyas Abowath |
| | 65 | § 261(2) | Sakina Abowath |
| | 66 | § 288a(c) | Sakina Abowath |
| | 67 | § 286(c) | Sakina Abowath |

The court also found sufficient evidence to hold Petitioner to answer on special circumstances alleged pursuant to §§ 190.2(a)(3) (multiple murder), 190.2(a)(14)[6] (murder especially heinous, atrocious, or cruel), and 190.2(a)(17) (burglary murder) in counts 2, 13, 14, 18, 24, 38, 40, 44, 50, 51, 53, 56. The court found the evidence sufficient to hold Petitioner to answer on special circumstances, alleged pursuant to § 190.2(a)(3), in counts 5 and 6. (XVII CT 4963-65; XVIII CT 5190-276.)

32. The court dismissed counts 7 through 11, 15, 16, 19, 20, 21, 31 through 36, 58, and 59 on the Prosecution's motion. The court dismissed felony-murder special-circumstance allegations in count 18, pursuant to § 190.2(a)(17),

---

[6] According to the September 26, 1985 amended complaint, the State did not allege special circumstances pursuant to § 190.2(a)(14). The allegations are not set forth in the information or amended information. *See infra*.

in the commission of rape, sodomy, and oral copulation. (XVII CT 4962-63; XVIII CT 5274.)

## 2. Superior Court

33. On May 21, 1986, the State filed an information in the Superior Court of Los Angeles County charging Petitioner with forty-five counts of murder and other crimes as shown in Table 5.

**Table 5. Counts and Charges of the Information**

| Date | Count | Charge | Victim |
|------|-------|--------|--------|
| June 27-28, 1984 | 1 | § 459 | Jennie Vincow |
| | 2 | § 187(a) | |
| March 17, 1985 | 3 | § 459 | Okazaki/Hernandez |
| | 4 | § 664/187 | Maria Hernandez |
| | 5 | § 187(a) | Dale Okazaki |
| | 6 | § 187(a) | Tsai-Lian Yu |
| March 28, 1985 | 7 | § 459 | Vincent and Maxine Zazzara |
| | 8 | § 187(a) | Vincent Zazzara |
| | 9 | § 187(a) | Maxine Zazzara |
| May 14, 1985 | 10 | § 459 | William and Lillie Doi |
| | 11 | § 187(a) | William Doi |
| May 29 - June 1, 1985 | 12 | § 459 | Mabel Bell & Florence Lang |
| | 13 | § 187 (a) | Mabel Bell |
| | 14 | § 664/187 | Florence Lang |
| May 30, 1985 | 15 | § 459 | Carol Kyle |
| | 16 | § 261(2) | |
| | 17 | § 288a(c) | |
| | 18 | § 286(c) | |
| June 28, 1985 | 19 | § 459 | Patti Higgins |
| | 20 | § 187(a) | |
| July 2, 1985 | 21 | § 459 | Mary Louise Cannon |

| Date | Count | Charge | Victim |
|------|-------|--------|--------|
|  | 22 | § 187(a) |  |
| July 5, 1985 | 23 | § 459 | Whitney and Steve Bennett |
|  | 24 | § 664/187 | Whitney Bennett |
| July 7, 1985 | 25 | § 459 | Joyce Nelson |
|  | 26 | § 187(a) |  |
| July 7, 1985 | 27 | § 459 | Sophie Dickman |
|  | 28 | § 261(2) |  |
|  | 29 | § 286(c) |  |
| July 20, 1985 | 30 | § 459 | Maxon and Lela Kneiding |
|  | 31 | § 187(a) | Maxon Kneiding |
|  | 32 | § 187(a) | Lela Kneiding |
| July 20, 1985 | 33 | § 459 | Chainarong and Somkid Khovananth |
|  | 34 | § 187(a) | Chainarong Khovananth |
|  | 35 | § 261(2) | Somkid Khovananth |
|  | 36 | § 288a(c) | Somkid Khovananth |
|  | 37 | § 286(c) | Somkid Khovananth |
| August 6, 1985 | 38 | § 459 | Christopher and Virginia Petersen |
|  | 39 | § 664/187 | Virginia Petersen |
|  | 40 | § 664/187 | Christopher Petersen |
| August 8, 1985 | 41 | § 459 | Elyas and Sakina Abowath |
|  | 42 | § 187(a) | Elyas Abowath |
|  | 43 | § 261(2) | Sakina Abowath |
|  | 44 | § 288a(c) | Sakina Abowath |
|  | 45 | § 286(c) | Sakina Abowath |

The State alleged burglary-murder special circumstances, pursuant to § 190.2(a)(17), in counts 2, 5, 8, 9, 11, 13, 20, 22, 26, 31, 32, 34, and 42. Multiple-murder special circumstances, pursuant to § 190.2(a)(3), were alleged in

23

counts 2, 5, 6, 8, 9, 11, 13, 20, 22, 26, 31, 32, 34, and 42.  Counts 34 and 42 also alleged felony-murder special circumstances, pursuant to § 190.2(a)(17), in the commission of rape, sodomy, and oral copulation.  (XVIII CT 5277-324.)  On May 21, 1985, Petitioner entered pleas of not guilty to all charges, and he denied all other allegations.  (XI CT 6235; A-1 RT–A-3 RT.)[7]

34.    At the next hearing, held on June 17, 1986, the court set a trial date for September 2, 1986.  Petitioner waived time to that date.  (1 RT 17-19.)  The court ordered pretrial motions to be heard on August 1, 1986.  (*Id*. at 21-22.)

35.    The court conducted hearings with respect to pretrial motions for change of venue,[8] suppression of identification evidence,[9] suppression of evidence pursuant to § 1538.5,[10] exclusion of Petitioner's statements,[11] and

---

[7]    The Reporter's Transcripts are hereafter designated A-1 RT through 219 RT.  As a result of record correction proceedings, there are unmarked transcripts for trial court hearings held on October 22, 1985 (pages 1 through 64), and February 7, 1986 (pages 1 through 7).

[8]    *See* XXII CT 6439, 6485, 6486, 6491, 6494, 6530, 6538, 6547, 6578, 6580; XXIII CT 6581-609.  The court denied the motion on January 9, 1987.  (*Id*. at 6610.)

[9]    *See* XXIII CT 6625-52, 6656-67, 6694, 6696.  The court denied the motion on April 7, 1987.  (*Id.* at 6724.)

[10]    *See* XXIII CT 6694, 6699, 6703-10, 6712.  The court denied the motion on March 24, 1987.  (*Id.* at 6722.)

[11]    *See* XXIII CT 6713-18.  The court granted the motion in part on April 7, 1987, and denied it in part on October 21, 1987.  (*See* 29 RT 2063-65; XXIV CT 7104.)

challenge to the jury composition.[12]  Petitioner also moved to set aside the information,[13] and to sever counts.[14]

36.    On December 9, 1987, the State filed an amended information charging Petitioner with forty-three counts of murder and other crimes as shown in Table 6:

**Table 6.  Counts and Charge of the Amended Information**

| Date | Count | Charge | Victim |
| --- | --- | --- | --- |
| June 27-28, 1984 | 1 | § 459 | Jennie Vincow |
| | 2 | § 187(a) | |
| March 17, 1985 | 3 | § 459 | Okazaki/Hernandez |
| | 4 | § 664/187 | Maria Hernandez |
| | 5 | § 187(a) | Dale Okazaki |
| March 17, 1985 | 6 | § 187(a) | Tsai-Lian Yu |
| March 28, 1985 | 7 | § 459 | Vincent and Maxine Zazzara |
| | 8 | § 187(a) | Vincent Zazzara |
| | 9 | § 187(a) | Maxine Zazzara |
| May 14, 1985 | 10 | § 459 | William & Lillie Doi |
| | 11 | § 187(a) | William Doi |
| May 29 - June 1, 1985 | 12 | § 459 | Mabel Bell & Florence Lang |
| | 13 | § 187 (a) | Mabel Bell |
| | 14 | § 664/187 | Florence Lang |

---

[12]  *See* XXIV CT 7018-23, 7078; XXV CT 7193, 7459; XXVI CT 7650-53, 7659, 7661-62, 7680-82, 7684.  The court denied the motion on May 31, 1988. (XXVI CT 7685.)

[13]  *See* XXI CT 6249-62; XXII CT 6319-24; XXIII CT 6614-20.  The court denied the motion on January 21, 1987.  (XXIII CT 6621.)

[14]  *See* XXIV CT 7003-17, 7079-98.  The court denied the motion on November 23, 1987.  (XXV CT 7217.)

| Date | Count | Charge | Victim |
|------|-------|--------|--------|
| May 30, 1985 | 15 | § 459 | Carol Kyle |
| | 16 | § 261(2) | |
| | 17 | § 288a(c) | |
| | 18 | § 286(c) | |
| July 2, 1985 | 19 | § 459 | Mary Louise Cannon |
| | 20 | § 187(a) | |
| July 5, 1985 | 21 | § 459 | Whitney and Steve Bennett |
| | 22 | § 664/187 | Whitney Bennett |
| July 7, 1985 | 23 | § 459 | Joyce Nelson |
| | 24 | § 187(a) | |
| July 7, 1985 | 25 | § 459 | Sophie Dickman |
| | 26 | § 261(2) | |
| | 27 | § 286(c) | |
| July 20, 1985 | 28 | § 459 | Maxon and Lela Kneiding |
| | 29 | § 187(a) | Maxon Kneiding |
| | 30 | § 187(a) | Lela Kneiding |
| July 20, 1985 | 31 | § 459 | Chainarong and Somkid Khovananth |
| | 32 | § 187(a) | Chainarong Khovananth |
| | 33 | § 261(2) | Somkid Khovananth |
| | 34 | § 288a(c) | Somkid Khovananth |
| | 35 | § 286(c) | Somkid Khovananth |
| August 6, 1985 | 36 | § 459 | Christopher and Virginia Petersen |
| | 37 | § 664/187 | Virginia Petersen |
| | 38 | § 664/187 | Christopher Petersen |
| August 8, 1985 | 39 | § 459 | Elyas and Sakina Abowath |
| | 40 | § 187(a) | Elyas Abowath |
| | 41 | § 261(2) | Sakina Abowath |
| | 42 | § 288a(c) | Sakina Abowath |

| Date | Count | Charge | Victim |
|------|-------|--------|--------|
| | 43 | § 286(c) | Sakina Abowath |

The State alleged burglary-murder special circumstances, pursuant to
§ 190.2(a)(17), in counts 2, 5, 8, 9, 11, 13, 20, 24, 29, 30, 32, and 40.  The state
alleged additional felony-murder special circumstances, pursuant to
§ 190.2(a)(17), in the commission of rape, sodomy, and oral copulation in counts
32 and 40.  It alleged multiple-murder special circumstances, pursuant to
§ 190.2(a)(3), in counts 2, 5, 6, 8, 9, 11, 13, 20, 24, 29, 30, 32, and 40.  (XIX
CT 5372-17.)  On December 9, 1987, the court arraigned Petitioner, who pled not
guilty and denied all allegations.  (XXV CT 7222.)

     37.     On July 21, 1988, Petitioner filed a motion to close the *voir dire*
proceedings to the press and public.  (XXVII CT 7880-95.)  On the same date,
counsel for The Los Angeles Times filed an opposition to the motion for
sequestered *voir dire*.  (*Id.* at 7833-79.)  Thereafter, the trial court heard and
denied Petitioner's motion.  The court swore an initial group of prospective
jurors, and *voir dire* commenced.  (*Id.* at 7900.)  On July 25, 1988, the court ruled
that questionnaires were to be given to all prospective jurors who were ordered to
return for *Hovey voir dire*.[15]  (*Id.* at 7907.)  Preliminary juror screening continued
from July 26 through November 30, 1988.  (*See Id.* at 7908-10, 7912-15, 7919,
7921-23, 8058-62, 8065-69; XXVIII CT 8083, 8087-88, 8094, 8098, 8101-02,
8106-19, 8121, 8123-26, 8181-87.)

     38.     On August 17, 1988, Petitioner filed points and authorities in
support of an objection to the time limit imposed by the court for trial counsel's
questioning of prospective jurors.  (XXVII CT 7924-8052.)  On August 18, 1988,
the trial court overruled Petitioner's objection.  (*See* 81 RT 7731.)  On September
28, 1988, Petitioner filed points and authorities in respect to the admonishment of

---

    [15]  *Hovey v. Superior Court*, 28 Cal.3d 1, 80, 168 Cal.Rptr. 128 (1980).

prospective jurors regarding trial counsel's duty to present mitigating evidence. (XXVIII CT 8089-93.)  On the same date, the court modified the statement to inform prospective jurors that the parties would have the opportunity to present evidence at the penalty trial.  (94 RT 9821.)  On September 28, 1988, Petitioner moved for a mistrial as a result of inconsistent jury instructions read to the various panels of prospective jurors.  On the same date, the trial court denied the motion. (XXVIII CT 8094.)

39.     On December 12, 1988, Petitioner filed points and authorities in support of his request to *voir dire* prospective jurors regarding racial bias. (XXVIII CT 8196-97.)  On the same date, the court allowed questioning of prospective jurors regarding racial bias.  (126 RT 13881-85.)  On December 20, 1988, the court denied a request to transfer the case to another courtroom with better facilities and for mistrial based on the crowded condition of the courtroom. (XXVIII CT 8204; 128 RT 14154-59.)

40.     General *voir dire* of prospective jurors was conducted on December 12, 19 through 22, 1988, and January 4, 1989.  (XXVIII CT 8198, 8203-04, 8206-08.)  On January 9, 1989 the court impaneled the jury.  (*Id.* at 8259.)  On January 10, 1989, the court excused two jurors and permitted further *voir dire* before impaneling the jury again.  The court denied Petitioner's request for additional peremptory challenges.  (*Id.* at 8260.)

41.     On January 11, 12, and 19, 1989, the court conducted selection of alternate jurors.  (XXVIII CT 8261-62, 8286.)  On January 23, 1989, the court seated thirteen alternate jurors.  (*Id.* at 8295.)

42.     On January 12, 13, 17, 18, and 19, 1989, the court questioned jurors individually concerning their ability to remain impartial following allegations of juror misconduct.  (XXVIII CT 8262, 8263, 8273, 8284, 8286.)  The court excused one juror and a prospective juror.  (*Id.* at 8273, 8284.)  On January 17, 1989, Petitioner filed motions for sequestered hearing and for mistrial.  (*Id.* at

28

8267-72.)  On January 18, 1989, Petitioner filed a request to examine jurors regarding racial bias.  (*Id.* at 8276-79.)  The court denied the motions and request on January 18, 1989.  (*Id.* at 8284; 138 RT 15590-96.)

43.     On January 20, 1989, the prosecution filed motions to dismiss jurors based on defense exclusion of Caucasian and Asian jurors.  (XXVIII CT 8287-93.) On the same date, the court denied the motions.  (*Id.* at 8294.)

44.     On January 30, 1989, the prosecution made an opening statement. The defense reserved the right to make an opening statement.  (XXVIII CT 8299.)

45.     After thirty-eight days of trial, the prosecution rested on May 8, 1989.  (*See* XXVIII CT 8299, 8315, 8321, 8324, 8327-28, 8331-33, 8336-39, 8351, 8353-54, 8360, 8369-71, 8373, 8379-81, 8383; XXIX CT 8384-85, 8390-91, 8393-99, 8412, 8419.)  The court twice granted the prosecution permission to reopen its case on May 2, and May 8, 1989.  (*Id.* at 8412, 8419.)  The State then rested.  On May 8, 1989, Petitioner moved for acquittal on counts 26 and 27 pursuant to § 1118.1  (XXVIII CT 8280-82.)  The trial court denied Petitioner's motion as to both counts.  (XXIX CT 8419; 178 RT 20785.)

46.     On May 9, 1989, the defense made an opening statement.  (XXIX CT 8423.)  The defense presented its case on May 10, 1989, and rested on June 19, 1989.  (*Id.* at 8426, 8429-30, 8433-39, 8442-47.)

47.     The prosecution called fourteen witnesses in rebuttal on June 20, 21, 22, and 26, 1989.  (XXIX CT 8449-51, 8462.)  On July 10, 1989, the defense called two witnesses in surrebuttal and rested.  (*Id.* at 8478.)

48.     The prosecution commenced closing argument on July 12, 1989, and argued the case on July 13, 17 through 20, 1989.  (XXIX CT 8479, 8484, 8490, 8492, 8493.)  The defense argued the case on July 24 and 25, 1989.  On July 25, 1989, the prosecution presented final argument.  (*Id.* at 8494, 8497.)

49.     On July 26, 1989, the court instructed the jury.  (XXIX CT 8499-500; 212 RT 24409-79.)  The jury commenced deliberations on July 26, 1989, and deliberated thirty-five days.  (*Id.* at 8499, 8610-16, 8618-21, 8632, 8636, 8638, 8656, 8660, 8679, 8685; XXX CT 8686-87, 8690-91, 8696, 8703, 8706-12, 8714, 8721-22, 8789.)  On August 7, 1989, the jury requested read-back of testimony.  (XXIX CT 8617.)  On August 8, 1989, testimony was read back.  (*Id.* at 8619.)  On August 11, 1989, the jury foreman reported that a juror had fallen asleep.  The juror was excused and an alternate juror was seated.  (*See Id.* at 8622-23, 8625.)

50.     On September 20, 1989, the jury returned verdicts, finding Petitioner guilty on all counts, including twelve counts of first degree murder and one count second degree murder as shown in Table 1, *supra*.  (XXX CT 8789.)  The jury found true special circumstances, pursuant to § 190.2(a)(17)(vii) (burglary), on counts 2, 5, 8, 9, 11, 13, 20, 24, 29, 30, 32, and 40; true pursuant to § 190.2(a)(17)(iii) (rape) on counts 32 and 40; true pursuant to § 190.2(a)(17)(iv) (sodomy) on counts 32 and 40; true pursuant to § 190.2(a)(17)(vi) (oral copulation) on counts 32 and 40; and, true pursuant to § 190.2(a)(3) (multiple murder).  (*Id.* at 8727-88.)

51.     On September 21, 1989, the prosecution filed a second amended information alleging that, with respect to the multiple-murder special circumstance under § 190.2(a)(3), Petitioner had been convicted of twelve counts of first degree murder and one count of second degree murder.  (XIX CT 5419-64.)

52.     At penalty trial, the prosecution and defense presented no evidence.  Both sides argued the case on September 27, 1989.  The court instructed the jury.  (XXX CT 8878-87, 8898.)  The jury deliberated four days.  (*Id.* at 8901, 8903-05.)  On October 4, 1989, the jury returned death verdicts with respect to felony-murder special-circumstance findings, pursuant to § 190.2(a)(17)(iii), (iv), (vi),

and (vii), in counts 2, 5, 8, 9, 11, 13, 20, 24, 29, 30, 32, and 40, and multiple-murder special-circumstance findings pursuant to § 190.2(a)(3).  (*Id.* at 8944-54.)

53.　On October 31, 1989, the prosecution filed a sentencing memorandum.  (XXX CT 8960-74.)  The prosecution filed proposed corrections and deletions to the probation report on November 1, 1989.  (*Id.* at 8979-83.)  On November 3, 1989, the State filed an application for modification of death verdicts under § 190.4.  (XXXI CT 8988-08.)  On November 3, 1989, Petitioner moved for continuance of the sentencing hearing, then withdrew the request.  (*Id.* at 8985-87, 9010; 219 RT 24911.)

54.　At the hearing on November 7, 1989, the trial court deemed that Petitioner moved for modification of the verdicts.[16]  (219 RT 24917.)  The trial court made specific findings and denied the motion.  (XXXI CT 9073; 219 RT 24917-926.)  The trial court imposed a judgment of death on counts 2, 5, 8,9, 11, 13, 20, 24, 29, 30, 32, and 40.  (XXXI CT 9073, 9093-101.)

55.　Petitioner was sentenced on count 4 (§§ 664/187) to an aggravated term of nine years.  A sentence of two years and four months each (or one-third of the middle term of seven years) was imposed on counts 14, 22, 37, and 38. The sentences imposed on counts 14, 15, 16, 17, 18, 21, 22, 25, 26, 27, 36, and 37 were ordered served consecutively to the sentence imposed on count 4.[17] (XXXI CT 9074.)  Petitioner was sentenced to one year and four months each (or one-third of the middle term of four years) on counts 15, 21, 25, and 26. Petitioner was sentenced to aggravated terms of eight years each on counts 16, 17, 18, 26, 27, 33, 34, 35, 41, 42, and 43.  Petitioner was further sentenced to

---

[16]  There is no indication in the appellate record that Petitioner filed a motion for new trial or motion for modification of the death verdicts.

[17]  The trial court ordered the sentence of two years and four months imposed in count 37 stayed, except for four months, pursuant to § 1170.1(a). (XXXI CT 9074.)

aggravated terms of six years each on counts 1, 3, 7, 10, 12, 19, 23, 28, 31, and
39. Petitioner was sentenced to fifteen-years-to-life imprisonment on count 6.
The sentences imposed on counts 1, 3, 6, 7, 10, 12, 19, 23, 28, 31, 33, 34, 35, 38,
39, 41, 42, and 43 were ordered permanently stayed. All sentences were ordered
to be served subsequent to and on completion of the death sentence. (*Id*. at 9074-
75.) On January 2, 1990, Petitioner filed a notice of appeal. (I Supp. CT 102.)
An appeal from a judgment of death following a trial by jury is automatic.
§§ 1237 and 1239(a).

## C.     Retention of Unqualified Counsel and Conflicts of Interest

56.     On October 9, 1985, the trial court relieved the Public Defender of
Los Angeles County and Joseph Gallegos, retained counsel, appeared on
Petitioner's behalf.[18] (XIX CT 5469.) Petitioner then sought to substitute
retained counsel in place of Gallegos. On October 22, 1985, the trial court
conducted a hearing regarding substitution of newly retained counsel, Daniel
Hernandez and Arturo Hernandez. The trial court specifically found that neither
Daniel Hernandez nor Arturo Hernandez had the necessary required legal
experience to be appointed as counsel for Petitioner. It found that they did not

---

[18] There is no reporter's transcript for the hearing held on October 9, 1985.
Despite repeated efforts to obtain a complete reporter's transcript on appeal, the
record is incomplete. (*See* affidavit of court reporter Elaine Flack dated
September 25, 1996; *see also* objections to the record on appeal filed by
Petitioner in the trial court on August 19, 1999, VIII Supp. CT 4-9, 13-14.) On
June 21, 1999, the trial court ordered a settled statement to be prepared with
respect to hearings in which the reporter's transcript had not been prepared or
where the court reporter stated that the notes had been destroyed. (VII Supp.
CT 166-69.) The trial court denied Petitioner's request for trial judges to prepare
a settled statement. (*See Id*. at 2; RT 1 (August 6, 1999 hearing).) Trial counsel
prepared a settled statement, and indicated that, on October 9, 1985, the
arraignment was postponed to October 22, 1985. (*See* declarations of Deputy
District Attorney Philip Halpin and Deputy Public Defender Alan Adashek, VIII
Supp. CT 15-16, 19-21.)

meet the necessary qualifications set forth by the Los Angeles County Bar for the indigent criminal defense appointment panel in serious felony cases. (XVII CT 4980-85.)

57. Moreover, the court was aware that both Daniel Hernandez and Arturo Hernandez had been held in contempt of court in Santa Clara County, and a contempt matter involving Daniel Hernandez was currently pending in Santa Clara County. (XVII CT 4986.) The trial court ordered Daniel Hernandez and Arturo Hernandez to disclose to Petitioner all instances of complaints by former clients, any State Bar investigation, citations for contempt of court, and prior allegations of ineffective representation.[19] The court took the matter of substitution of retained counsel under submission. (*Id*. at 4988-89.) The court continued Petitioner's arraignment to October 24, 1985. (*Id*. at 4980-90; XIX CT 5469.) The court appointed independent counsel, Victor Chavez, to provide legal advice to Petitioner related to retention of new counsel, but Petitioner refused to meet that attorney. (XVII CT 4988.)

58. On October 24, 1985, Daniel Hernandez and Arturo Hernandez represented to the court that they had two retainer agreements: one with Petitioner's family, and another with Petitioner. Counsel further indicated that "other parties that have retained us, his family, who are also liable, have acquired some financial responsibility to us due to that contract." (XVII CT 5004-05.) The court conducted a limited inquiry of Petitioner as to whether he read the contract and understood the terms of the contract. The court informed Petitioner

---

[19] Daniel Hernandez disclosed to the court that he was counsel of record in the trial court in *People v. Ortiz*. *In People v. Ortiz*, 51 Cal.3d 975, 800 P.2d 547, 275 Cal.Rptr. 191 (1990), which involved the same attorneys, the California Supreme Court held that the trial court should have discharged Daniel Hernandez and Arturo Hernandez on the defendant's motion based on their incompetence in that pending murder case. Their acts of ineffectiveness in *Ortiz* occurred at the same time they represented Petitioner. *Id*., 51 Cal.3d at 980.

that there were possible conflicts of interest. The court, however, did not explain to Petitioner the nature or implications of the conflicts. Petitioner indicated that there would not be a conflict. (*Id*. at 5005-07.)

59. The court addressed Daniel Hernandez and Arturo Hernandez with respect to conflicts of interest, and specifically noted that trial counsel referred to Petitioner's family as the "client." The court informed counsel to report to the court "any time there is the slightest possibility that a potential conflict might exist . . . ." (XVII CT 5007.) Counsel indicated that there was no conflict, and they had no knowledge of any potential conflicts. (*Id*. at 5008.) The trial court permitted Daniel Hernandez and Arturo Hernandez to substitute for Joseph Gallegos and represent Petitioner in all trial proceedings. (*Id*. at 5004-10, 5014-15.)

60. On December 9, 1987, and July 18, 1988, the prosecutor urged the court to conduct an *in camera* hearing regarding Petitioner's relationship with counsel, his right to enter additional pleas, and the "literary rights" retainer agreement. (*See* 41 RT 2934-35; 64 RT 4764-65.) On each occasion, the court took no further action.

61. Daniel Hernandez and Arturo Hernandez had numerous difficulties with respect to their representation of Petitioner at trial. Arturo Hernandez failed to appear in court at various times during the proceedings. On October 3, 1988, the trial court sent a letter to Arturo Hernandez regarding his absence from trial. (XXVIII CT 8100.) On October 18, 1988, the court issued a body attachment for Arturo Hernandez, and ordered it held to October 24, 1988. (*Id*. at 8111.) On October 25, 1988, Arturo Hernandez appeared in court to explain his absence from trial. Arturo Hernandez moved to be relieved as Petitioner's counsel due to communication problems with Petitioner. The trial court did not relieve Arturo Hernandez, instead the court did not require Arturo Hernandez to be present at all trial proceedings. (*Id*. at 8114; *see* sealed hearing, II Supp. CT VIII 2133-40,

34

2149-50.)  The trial court accepted a waiver from Petitioner with respect to the presence of two attorneys at trial.  (*Id*. at 2154-56, 2159.)  Thereafter, Arturo Hernandez did not attend trial proceedings, including *voir dire* and jury instruction conference.[20]

62.    Having no prior capital trial experience, from September 26, 1988 through January 23, 1989, Daniel Hernandez conducted *Hovey voir dire* without the assistance of co-counsel Arturo Hernandez.  (*See* generally XXVIII CT 8087-95.)

63.    Daniel Hernandez did not appear at trial, due to illness, during the prosecution's case-in-chief, on February 21, 1989.  The trial court ordered Daniel Hernandez to inform the court of his medical condition on February 24, 1989.  On February 24, 1989, Daniel Hernandez failed to notify the court of his medical condition.  On February 21 and February 27, 1989, neither counsel appeared in court; instead, law student Richard Salinas appeared on Petitioner's behalf.  On February 27, 1989, the court continued trial to March 6, 1989.  (XXVIII CT 8338-39, 8341.)  On March 1, 1989, a hearing was held concerning trial counsel Daniel Hernandez's health.  The court determined that there was no legal cause to delay the trial.  (*Id*. at 8345.)  On March 6, 1989, the court appointed attorney Ray Clark pursuant to § 987.2 as co-counsel for Petitioner.  (*See Id*. at 8351.)

64.    During the prosecutor's closing argument at the guilt phase, on July 13, 1989, both Daniel Hernandez and Arturo Hernandez were absent.  The trial court issued a body attachment for Daniel Hernandez and ordered it held to July

---

[20] *See* XXVIII CT 8087-88, 8094, 8098, 8101-02, 8106-19, 8121-26, 8181-87, 8198-99, 8203-04, 8206-08, 8259-63, 8273, 8284, 8286, 8294-95, 8299, 8315, 8321, 8324, 8327-28, 8331-33, 8336-38, 8345, 8353, 8360, 8369-70, 8379-81, 8383; XXIX CT 8384-85, 8391, 8393-97, 8399, 8408, 8412, 8419, 8426, 8429, 8434-39, 8442-47, 8449-51, 8476-79.

14, 1989. (XXIX CT 8484.) On July 14, 1989, the court quashed the attachment, and ordered Daniel Hernandez to be present at all hearings. On that same date, the court ordered Arturo Hernandez to be present in court on July 17, 1989. (*Id.* at 8487.) On July 17, 1989, Arturo Hernandez was not present in court. The court issued a body attachment, and held it to August 18, 1989. (*Id.* at 8490, 8628, 8629, 8632.) On August 18, 1989, the court found Arturo Hernandez in contempt for not calling the court on a daily basis, imposed a fine of $100.00, and ordered him to call the court on a daily basis. (*Id.* at 8638.)

65. On September 14, 1989, the trial court again held Arturo Hernandez in contempt for his failure to contact the court and to pay a fine. The court issued a body attachment, and set bail at $5,000.00. (XXX CT 8712, 8715-17.) On September 15, 1989, Arturo Hernandez contacted the court. (*Id.* at 8714.) Thereafter, on September 18, 1989, Arturo Hernandez submitted a check for $100.00 to the court and filed a declaration of a legal assistant. (*Id.* at 8719-20.) That same date, the court recalled the body attachment and sentenced Arturo Hernandez to 24 days in jail or a fine of $2,400.00. Arturo Hernandez was remanded to custody to serve one day in jail for not timely paying a contempt fine of $100.00. (*Id.* at 8721.) On September 29, 1989, Arturo Hernandez paid a fine for contempt of court in the amount of $2,400.00. (*Id.* at 8903.)

**D.    Absence of Mental Competency Proceedings**

66. At various stages of the proceedings, the court and counsel raised questions concerning Petitioner's mental competency to stand trial. On October 24, 1985, counsel Joseph Gallegos moved for a psychiatric evaluation of Petitioner to determine his present mental state and his ability to choose his own counsel. Gallegos informed the court that he was gravely concerned about Petitioner's mental condition and his ability to retain new counsel. (XVII CT 4995.)

36

67.     Although the Public Defender was not then representing Petitioner, the trial court asked the deputy public defender who had represented Petitioner before the substitution of Gallegos about a confidential psychiatric examination of Petitioner which had been approved by the court.  Former counsel disclosed to the court that a psychiatrist had recently seen Petitioner for ten to fifteen minutes, but Petitioner refused to talk further with him.  Former counsel told the court that the psychiatrist was unable to determine whether Petitioner was mentally competent to assist in his own defense; however, based on his brief meeting with Petitioner, the psychiatrist was of the opinion that Petitioner at most was "borderline" competent.  (XVII CT 4996-97.)

68.     Attorney Gallegos renewed his request to suspend criminal proceedings pursuant to § 1368 to determine Petitioner's "ability to make intelligent decisions."  (XVII CT 5002-03.)

69.     Instead of addressing the trial court's concern about their qualifications and the issue of Petitioner's mental competence, counsel Arturo Hernandez moved to disqualify the court pursuant to Code of Civil Procedure § 170.6.  The court denied the motion as untimely.  (XVII CT 4999-01.)

70.     Attorney Gallegos renewed his request to suspend criminal proceedings pursuant to § 1368.  (XVII CT 5002-03.)  The court inquired briefly of Petitioner regarding his education and potential conflicts of interest with respect to the retainer agreements with Daniel Hernandez and Arturo Hernandez.  (*Id*. at 5005-09.)  The court denied attorney Gallegos's request to suspend criminal proceedings under § 1368.  (*Id*. at 5003.)  The court then permitted substitution of trial counsel Daniel Hernandez and Arturo Hernandez.  (*Id*. at 5009-10, 5014-15.)

71.     At the preliminary hearing on April 14, 1986, trial counsel requested an *in camera* hearing to address Petitioner's mental status and his continued presence at the preliminary hearing.  Without conducting an *in camera* hearing,

the trial court simply indicated there was no evidence to conclude Petitioner was unable to understand and participate in the proceedings. (XI CT 3463-65.)[21]

72. On February 26, 1987, the trial court expressed concern about Petitioner's mental competency and inquired of trial counsel whether they intended to file a motion pursuant to § 1368. Daniel Hernandez replied:

> We've been considering that from the beginning of course and we haven't made a decision on that and we are very aware and concerned about that.

(22 RT 1333-34.)

73. On March 24, 1987, the trial court again raised the issue of Petitioner's mental competency and his ability to proceed to trial.

> The 1368 and related issues I would also like you to consider. I realize that is going to be a very difficult one for you, but I would like you to get working on that as well.

(28 RT 2001.)

74. Trial counsel indicated to the court that they were working on those issues. (28 RT 2001.)

75. On April 7, 1987, the court and parties discussed in chambers – in Petitioner's absence – trial counsel's concern that "there was some problems with our client." (*See* sealed transcript II Supp. CT 16.) Counsel requested to address the court *in camera* regarding Petitioner's mental status pursuant to §§ 1368, 1017, and 1026. However, the court did not conduct the requested hearing. (*Id.* at 16-17.)

---

[21] Subsequently, the court held an *in camera* hearing on April 14, 1986. However, the April 14, 1986 sealed reporter's transcript is not part of the record on appeal. (*See* order to prepare settled statement and declarations of Daniel Hernandez and Arturo Hernandez, VII Supp. CT 166-69; VIII Supp. CT 22-23.)

76. On July 14, 1988, the court held a hearing regarding Petitioner's waiver of a plea of not guilty by reason of insanity. The court agreed to hold an *in camera* hearing on July 18, 1988, to consider the propriety of Petitioner entering a plea of not guilty by reason of insanity. Following the July 18, 1988 closed hearing, Petitioner did not enter an additional plea. (*See* XXVII CT 7830,7832; 63 RT 4723-32.)

77. On numerous occasions during the proceedings, Petitioner's actions and behavior were extremely bizarre, both in the courtroom and in his jail cell. On one occasion, Petitioner was observed by a jail deputy in his cell sitting on the toilet with blood on his hands drawing a pentagram on the floor. (176 RT 20599-600.) On numerous occasions in the courtroom, Petitioner invoked the words "Hail, Satan," and displayed a pentagram on the palm of his hand in the courtroom. (*See Id.* at 20603-04, 20607.) On January 30, 1989, Petitioner appeared at trial in leg shackles. The court accepted a waiver from Petitioner to wear shackles instead of a less obtrusive leg brace. (*See* II Supp. CT VIII 2282-86.)

78. On May 8, 1989, trial counsel was not prepared to present its case because Petitioner indicated that he did not want any defense. (178 RT 20756-58, 20774.) Later that day, trial counsel Clark indicated that Petitioner "flip-flopped," and he wanted a limited defense. However, Daniel Hernandez stated that he did not intend to present a complete defense because without Petitioner's cooperation, it would not be in the client's best interests. (*Id.* at 20789-95.)

79. At the conclusion of the May 8, 1989 hearing concerning Petitioner's waiver of defense at guilt trial, Petitioner had an outburst in the courtroom. He stated, "Media, sensation-seeking parasites." (*See* 178 RT 20787.) On August 23, 1989, the court informed counsel that Petitioner allegedly made a death threat against the trial court. Petitioner also allegedly stated he would physically resist being brought into the courtroom on August 31,

1989.[22]  (*See* II Supp. CT VIII 2433-34.)  Petitioner was absent from the courtroom for the guilt verdicts on September 20, 1989.  He was housed in a holding cell near the courtroom.  (*See* 216 RT 24711-12.)

80.    On November 7, 1989 prior to being sentenced, Petitioner made a bizarre and incoherent statement to the court.  (219 RT 24929.)

**E.    The Murder of Juror Singletary**

81.    On August 14, 1989, after the jury had commenced deliberations, the court recessed because one of the jurors failed to appear.  (XXIX CT 8628.)  On August 15, 1989, the court informed the jury of the death of Juror Singletary.  An alternate juror was seated; the case was again recessed.  (*Id*. at 8629.)  On August 16, 1989, Petitioner requested a recess in the deliberations; the court denied the request.  The court admonished the jury pursuant to CALJIC 17.51 (substitution of juror after deliberations begun) and deliberations resumed.  (*Id*. at 8624, 8632.)

82.    On August 21, 1989, Petitioner filed a request to *voir dire* jurors regarding their impartiality in view of the murder of Juror Singletary.  (XXIX CT 8639-44, 8647-55.)  On August 22, 1989, the State moved to deny the motion.  (*Id*. at 8657-59.)  Petitioner filed supplemental points and authorities in support of motion on August 23, 1989.  (*Id*. at 8661-64.)  That same date, Petitioner also filed moved to disqualify jurors.  (*Id*. at 8667-77.)  On August 23, 1989, the court continued hearing on the motion to disqualify jurors to August 31, 1989.  (*Id*. at 8679.)  The prosecution filed its oppositions to the motion for further *voir dire* on August 24, 1989, and to disqualify jurors and for mistrial on August 31, 1989.  (*Id*. at 8681-83; XXX CT 8692-94.)  On August 31, 1989, the court heard argument of counsel and denied Petitioner's motion to *voir dire* the jurors.  (*Id*. at 8696.)  On September 5, 1989, the trial court denied Petitioner's motions to disqualify jurors and for mistrial.  (*Id*. at 8703.)

---

[22]  August 31, 1989, was the anniversary of Petitioner's arrest.

**F.      Waiver of Defense at Penalty Trial**

83.      On September 27, 1989, the date set for penalty trial, the prosecution rested without presenting any evidence.  (XXX CT 8898.)  On that same date, the trial court accepted a waiver from Petitioner with respect to presentation of defense evidence in mitigation.  (217 RT 24774-76.)  Thereafter, the defense rested without presenting any evidence on Petitioner's behalf.  (XXX CT 8898.) The court informed the jury that both sides rested without presenting evidence. (217 RT 24780-81.)  No evidence was thus presented on Petitioner's behalf during penalty trial.  There was no evidence about Petitioner's mental health, mental competency, background, childhood and formative years, physical and mental condition at the time of the crimes charged in this case, or any information or evidence in mitigation to permit the jury to consider a punishment other than death.

## V.

## STATEMENT OF FACTS

**A.      Introduction**

84.      At the guilt trial, the prosecution's theory of the case was that Petitioner was the perpetrator in fifteen charged incidents and one uncharged incident.  Physical evidence, specifically fingerprint, shoe print, and ballistics, placed Petitioner at many of the crime scenes.  In some of the incidents, eyewitness identification and property belonging to the victims that was later recovered from a "fence" linked Petitioner to the crimes.

85.      During the prosecution's case-in-chief, in an effort to abate ongoing conflicts between retained counsel and Petitioner, the court appointed a lawyer wholly unfamiliar with Petitioner's case to assist the defense.  Thereafter, Petitioner presented a limited defense.  The defense theory of the case was that physical evidence at the crime scenes tended to exclude Petitioner and that testimony regarding eyewitness identification and recovered property was not

credible. In two of the incidents, the defense asserted that Petitioner was not the perpetrator and presented an alibi defense.

86. In rebuttal, the prosecution refuted defense expert testimony regarding physical evidence and eyewitness identification. The prosecution also introduced impeachment evidence with respect to a police informer and Petitioner's alibi witnesses.

87. In surrebuttal, Petitioner introduced further evidence of alibi.

88. At the penalty trial, neither side presented any evidence. In closing argument, the prosecution urged a death verdict because of the brutal nature of the murders. The defense argued that mercy, kindness, and sympathy warranted sparing Petitioner's life.

**B. Guilt Phase**

**1. Prosecution case**

89. The prosecution's theory was that between June 27, 1984, and August 8, 1985, Petitioner committed numerous felonies and murders in Los Angeles County. In fourteen of the incidents, Petitioner forcibly entered victims' homes and committed crimes. In one incident, a victim was confronted and shot to death while seated in a parked car. In eleven incidents, victims were killed; in four incidents, victims were attacked but not killed.

**a. Vincow Incident (June 27 to 28, 1984)**

**Counts 1 and 2 (§ 459, 187(a))**

**i) The death of Jennie Vincow**

90. Jack Vincow lived at 3300 Chapman Street in Los Angeles in the same apartment building as his mother, Jennie Vincow. Her apartment was downstairs; his apartment was upstairs. (142 RT 16198-99.) Jack Vincow ordinarily visited his mother on a daily basis; he also brought her groceries. (*Id.* at 16217, 16245.) Jack Vincow had last visited his mother for one hour between 1:00 and 2:00 p.m. on June 27, 1984. She was alive when he left her apartment.

(*Id*. at 16198-99.) Between 1:00 and 2:00 p.m. on June 28, Jack Vincow went to visit his mother. (*Id*. at 16200.) He found the door to her apartment unlocked. The window screen next to the front door was missing, and the window was open. Inside his mother's apartment, Jack Vincow found the window screen on the floor. Things were tossed around in the living room. (*Id*. at 16200-02.) His mother was lying on her bed. When Jack Vincow lifted a blanket to check on her, he saw a gash on her neck; she was dead. Jack Vincow did not notice anything missing. He stayed in the apartment approximately five minutes before calling the police. (*Id*. at 16204-08, 16227.)

91.    During the brief period of time he was in the apartment, Jack Vincow opened the curtains in the living room and kitchen. He did not wash his hands in the bathroom. (142 RT 16228, 16230.) When he left the apartment, he was in a state of shock. He did not see anyone near the apartment. He did not notice the bedroom window. (*Id*. at 16231.) The previous night, he had been at home, in his own apartment, but did not hear anything. (143 RT 16269.)

92.    At approximately 1:40 p.m. on June 28, 1984, Los Angeles Police Lieutenant Buster Altizer was dispatched to Jennie Vincow's apartment. He arrived shortly before 2:00 p.m. Lieutenant Altizer met Jack Vincow at the scene. Jack reported that he had found his mother dead inside her apartment. (143 RT 16293-96.) Lieutenant Altizer saw a window screen next to the door. He observed blood and water in the bathroom sink. The victim's body was partially covered by blankets. Jennie Vincow had many stab wounds to the upper chest and neck. Officer Wynn and Detective Castillo arrived shortly thereafter; the scene was cordoned off. (*Id*. at 16297-300,16306-07, 16320.)

93.    Following police investigation at the scene, on several occasions, officers contacted Jack Vincow, but he was difficult to interview. On July 16, 1984, Jack Vincow terminated a police interview. Afterward, Detective Castillo followed Jack Vincow to the bank and to his apartment. (143 RT 16337-38.)

43

94.     Jennie Vincow's other son, Manny Vincow, was verbally abusive to her.  It was rumored that Manny beat his mother when she lived in New York.  (142 RT 16211-12.)  From 1981 to 1985, Jack did not have any personal contact with Manny.  (*Id*. at 16244.)

### ii)     Fingerprint and other physical evidence at the scene

95.     Detective Castillo noticed that the window screen by the front door had been removed and was on the floor.  Lights were on in Jennie Vincow's apartment and the curtains open.  (143 RT 16314-15, 16325.)  There were blood spots in the living room, bath and bedroom, in the hallway near the bedroom door, and on a portable car top in the bedroom closet.  (*Id*. at 16325-28.)  Samples were taken from different rooms, including the bathroom sink.  There were blood smudges in the bathroom sink and on a lamp table.  The apartment had been ransacked.  Drawers were left open; things were thrown on the floor.  There was food rotting in the refrigerator.  No weapon was found at the scene.  (*Id*. at 16327-30, 16333-37.)

96.     Los Angeles Police latent print technician Reynaldo Clara arrived at the scene at approximately 5:00 p.m. on June 28, 1984.  Clara lifted five latent fingerprints; four from the aluminum frame of the living room window screen and one from the interior of the living room window.  (143 RT 16354-55, 16357-61.)  Two of the lifts taken from the screen had identifiable prints.  The lifts were taken from different edges but from the same side of the screen.  (*Id*. at 16361-65, 16375-76.)  Because the screen was found on the floor, Clara could not determine which side of the screen was the exterior side.  (*Id*. at 16375.)  The age of the prints on the window frame could not be determined.  (*Id*. at 16392.)

### iii)     Time of death

97.     Los Angeles County Coroner investigator Videl Herrera arrived at Jennie Vincow's apartment at approximately 4:30 p.m. on June 28, 1984.  (143 RT 16402-04.)  Air temperature in the apartment at 4:47 p.m. was 81°F.  The

victim's liver temperature at 4:52 p.m. was 94°F.  (*Id*. at 16406-07.)  Rigor was present in the elbows and wrist but not the jaw.  Lividity in the back, arms, and neck was consistent with the position of the body.  Herrera indicated in his report that Jennie Vincow's body was warm to the touch.  (*Id*. at 16407-09, 16413-17.)  At trial, he was of the opinion that Jennie Vincow may have been sexually assaulted.  (*Id*. at 16405.)

98.  Los Angeles County Coroner deputy medical examiner Dr. Joseph Cogan performed an autopsy on Jennie Vincow on June 30, 1984.  (144 RT 16577-80.)  Dr. Cogan found six to seven stab wounds, four of which individually he considered lethal.  The jugular vein was severed, the victim had aspirated blood.  (*Id*. at 16581-84.)  In Dr. Cogan's opinion, the assailant faced the victim, and the wounds could have been inflicted while she was on the bed. There were "hilt" marks or contusions on her body from the knife handle as a result of the thrust of the blade.  (*Id*. at 16585-86.)

99.  Dr. Cogan estimated the time of death as within two to three hours of 2:00 p.m. on June 28, 1984.  (144 RT 16588.)  Body temperature alone was not a reliable indicator of the time of Jennie Vincow's death because other factors had to be taken into account, such as air temperature, covering on the body, and body fat.  Dr. Cogan's original estimated time of death of 2:00 p.m. did not consider Vincow's weight and the blanket covering her body.  (145 RT 16673-76, 16693-99.)  In Dr. Cogan's opinion, body temperature would be useful within the first 24 hours after death before a body cools down.  Jennie Vincow's recorded liver temperature suggested that she was dead only a few hours before her body was found.  However, rigor in the body indicated she may have been dead anywhere from six to eight hours up to 72 hours.  (144 RT 16587-92; 145 RT 16602-03.)  Rigor is less reliable than body temperature and occurs more quickly in warm conditions.  Lividity becomes fixed within a few hours after death, and blanching occurs only for a few hours after death.  (145 RT at 16602-

45

04, 16640-44, 16680-83.)  Vincow's body blanched easily, but this condition provided only a rough estimate of the time of her death.  (*Id*. at 16683-84.)

**b.** **Hernandez and Okazaki Incident (March 17, 1985) Counts 3 through 5 (§§ 459, 664/187, 187(a))**

**i)** **The shooting of Maria Hernandez**

100. Maria Hernandez lived in a condominium on Village Lane in Rosemead, Los Angeles County, with her roommate, Dale Okazaki. On March 17, 1985, Hernandez came home at about 11:30 p.m. (144 RT 16436-37.) She entered the garage from an alley. An automatic light went on as the garage door opened. Once inside the garage, Hernandez pushed a button to close the garage door, then unlocked a door leading to her residence. She heard a noise and saw a man about twenty-feet away, in the garage. He pointed a gun at her face and approached. Hernandez focused on the gun. She raised her hand as a shield; the garage light went out. She felt a shot to her right hand and fell to the ground. (*Id*. at 16446-49, 16503.) The gunman opened the door to her residence, pushing her body aside with the door. (*Id*. at 16449-50.)

101. Hernandez got up, ran out of the garage to the alley, then around the complex into the street. She saw the gunman who had shot her leave her home by the front door. (144 RT 16451-55.) The gunman walked toward Hernandez; he raised a gun and pointed it at her. She ran to a car and hid. The gunman pointed the gun at her. Hernandez asked him not to shoot her again. The man lowered the gun and then ran off. (*Id*. at 16456-57.)

**ii)** **The death of Dale Okazaki**

102. Maria Hernandez entered her residence and found Dale Okazaki lying face down. She called 911 and stayed on the phone until a Los Angeles County Deputy Sheriff arrived. (144 RT 16458-61.)

103. Deputy Sheriff John Powell arrived at approximately 10:54 p.m. He met Hernandez and checked Okazaki for vital signs. (144 RT 16570-72.) He cordoned off the scene and took witness statements. An unidentified person told him that the suspect was a white male. (*Id*. at 16573-76.)

104. At 12:20 a.m. on March 18, 1985, Detective Gilbert Carrillo responded to the scene. (145 RT 16710-712.) He observed a blue baseball cap with the letters AC/DC on the floor of the garage. (*Id*. at 16716-17.) He tested the garage door opener at the condominium; eight seconds elapsed from the time the door closed until the light went out. A second garage light above the appliances was not on while he was present. (*Id*. at 16741-44.)

105. Coroner investigator Walter Rainey arrived at the scene early on March 18, 1985. Before Rainey removed the body, he examined Okazaki and observed a bullet wound to the head. The air temperature at 2:10 a.m. was 62°F; Okazaki's liver temperature at 2:20 a.m. was 91°F. (144 RT 16563-68.)

106. Joseph Cogan, M.D., testified about the autopsy performed on Dale Okazaki by James Wegner, M.D., on March 19, 1985. According to Dr. Wegner's report, the cause of death was a gunshot wound to the head. (145 RT 16606-07, 16613-19, 16624.) A small caliber projectile was recovered during autopsy. (*Id*. at 16630-35.) The report noted stippling to the skin as a result of a close-range shot less than eighteen inches from the barrel of a firearm to the skin. There also was a separate, blunt-force injury to the back of Okazaki's head. (*Id*. at 16626-29.)

### iii) Eyewitness identification

107. Detective Carrillo knew Hernandez's mother and was a family friend. He first saw Maria Hernandez at the hospital on March 18, 1985. (145 RT 16722-23.) Hernandez described the suspect as a light-skinned Caucasian or Mexican male, 5'9" to 6'1" tall, nineteen to twenty-five years old, thin build, wearing a black jacket. She could not recall whether the suspect wore a hat; if he wore a hat it was dark in color. (146 RT 16748-49.)

108. Hernandez attended two live line-ups prior to Petitioner's arrest; one was held in April 1985, and another in July 1985. Hernandez did not identify anyone at either line-up. (145 RT 16736-37.)

109.   Carillo showed Hernandez two photo spreads consisting of six photos before a third live line-up on September 5, 1985, in which Petitioner participated.  The spreads did not include Petitioner's photo.  (145 RT 16735-36.) Hernandez did not positively identify anyone.  In each spread, Hernandez focused on a person who most resembled the suspect.  Photographs of the individuals whom Hernandez viewed more closely were not released to the media.  (146 RT 16783-84, 16786, 16789.)

110.   Initially, Maria Hernandez saw Petitioner's picture on television and discussed the case with family and friends.  (144 RT 16516-18.)  Her mother told her immediately after the shooting that she knew Detective Carillo.  (*Id*. at 16542.)  At trial, Maria Hernandez did not recall stating at the preliminary examination that Petitioner did not look like the composite drawing she helped to prepare.  (*Id*. at 16543.)  The picture of Petitioner that she first saw on television did not look familiar.  (*Id*. at 16545; 146 RT 16761.)

111.   Detective Carrillo did not brief Maria Hernandez before Petitioner's September 5, 1985 line-up.  He did not tell her that Petitioner would be in the line-up; he already knew she had seen Petitioner on television.  (146 RT 16764-67.)

112.   At trial, Maria Hernandez identified Petitioner as the perpetrator and relied on the fact that he was present in court; however, she could not identify him as the suspect from memory.  (144 RT 16520-24, 16526-27, 16546.) Previously, Hernandez had identified Petitioner at the preliminary hearing and at a pretrial hearing on April 7, 1987.  (*Id*. at 16505-10, 16514-15.)

49

### c. *Yu Incident (March 17, 1985)*

### *Count 6 (§ 187(a))*

#### i) The struggle between Yu and the suspect

113. On March 17, 1985, Jean Wang spent the entire day with Tsai-Lian Yu. Yu came to Wang's house in Monterey Park, Los Angeles County, in the morning. She left Wang's house about 11:00 p.m. (146 RT 16822-25.)

114. At approximately 11:00 p.m., Jorge Gallegos was sitting in his truck with his girlfriend on North Alhambra Avenue in Monterey Park. He heard two cars brake twenty-feet behind his truck. He saw both cars in his side and interior mirrors. (146 RT 16840-42.) Gallegos saw a lone female in a yellow car and a man in a blue car. (*Id*. at 16842-43, 16845, 16884.)

115. Gallegos saw the man from the blue car lean into the window of the yellow car and try to pull the woman from her car. Gallegos thought they were having a lovers' quarrel. He heard someone ask for help. He did not hear any shots. Gallegos noted the license plate number of the blue car as it drove away. Gallegos then saw an Asian female crawling on the ground. Gallegos went to her aid. He remained with the woman until police arrived. (146 RT 16846-48, 16867.)

116. Joseph Duenas, a cousin of Gallegos's girlfriend, lived at 524 North Alhambra Avenue. Around 11:15 to 11:30 p.m. on March 17, 1985, he heard a woman scream for help. Duenas went to the balcony. He saw a man and a woman on the curb across the street. (147 RT 16981-84.)

117. A yellow car was parked on the street. A dark blue or black Escort-type car was also parked in the middle of the street in front of the yellow car. The woman screamed for help five to seven times and held on to the man's arm or jacket. The man got into the blue car and left. (147 RT 16984-88.) The woman crawled toward Duenas. He did not hear any gunshots. He brought the

phone to the balcony and called the police. He then went outside and saw the victim lying motionless, face down. (*Id*. at 16989-92.)

### ii)     The death of Tsai-Lian Yu

118.    Monterey Park Police Officer Ron Endo was called to the scene on March 17, 1985, at about 11:45 p.m. He saw Tsai-Lian Yu lying unconscious in the street five to ten feet from a yellow Chevrolet. He attempted to resuscitate her. Yu had an injury to her left shin where her stocking was torn. A torn 20 dollar bill and a silver medallion were next to her body. (147 RT 17017-19, 17024.)

119.    Officer Endo observed that the car hood of the yellow car was hot. The headlights and radio were on; the car was in reverse. Its engine was running, and the brake was off. The driver's door was open. A woman's shoe was found inside the car; a second shoe was in the street. (147 RT 17021-24, 17027.) He looked for a driver's license inside a purse in the car. Officer Endo sealed off the area. Emergency personnel removed Yu's body from the scene at about 12:05 a.m. (*Id*. at 17026, 17029, 17037-38.)

120.    On March 18, 1985, Garfield Hospital emergency room physician Richard Tenn pronounced Tsai-Lian Yu dead from two gunshot wounds to her chest. (148 RT 17061-62.)

121.    On March 19, 1985, Susan Selser, M.D., from the coroner's office, performed an autopsy on the body of Tsai-Lian Yu. (148 RT 17070.) Detective Romero was present during the autopsy. The cause of death was two gunshot wounds. There was evidence of stippling and soot around one of the wounds. The first wound was inflicted by a gunshot fired at close range, perhaps as close as one inch. A projectile was recovered from the first wound. (*Id*. at 17070-74.) A second gunshot wound to the back was not fired at close range. A projectile was recovered from the second wound. (*Id*. at 17075-76.) In Dr. Selser's opinion, the first wound was fatal; the second less so. There were also bruises on

51

Yu's right thigh, left shin, and left heel.  Dr. Selser observed evidence of previous wounds to the lower limbs that showed signs of healing as well as recent contusions.  (*Id*. at 17076-78.)

### iii)    Eyewitness identification

122.    Gallegos testified with the assistance of a Spanish translator.  During his testimony, there was some confusion regarding translation of Gallegos's testimony with respect to the struggle, identification of the suspect, and position of the two cars.  (*See* 146 RT 16838; 147 RT 16897-905.)

123.    At trial, Gallegos identified Petitioner as the man he saw at the scene.  Petitioner looked different than he appeared at the preliminary hearing; his hair was longer, and he wore dark glasses.  (146 RT 16848; 147 RT 16937.)  On the night of the incident, Gallegos described the suspect as a 5'6" to 5'8" male and as "Oriental" with wavy hair.  (146 RT 16848, 16853-54, 16859-62.)  He only saw the man's profile and back of his head.  The man was wearing light blue pants and  and a light blue shirt.  Gallegos saw a composite drawing and pictures of Petitioner in the newspaper, but he did not attend a line-up.  He also identified a police photograph of the suspect's automobile.  (*Id*. at 16850, 16873-75, 16877, 16879-80, 16886; 147 RT 16936.)

124.    Joseph Duenas testified that he was unable positively to identify the suspect.  He recalled that the male suspect wore jeans, a T-shirt, and jacket.  He described the suspect as "Oriental" or Mexican, 5'7" to 5'8" tall, 145 pounds, with light, shaggy long hair.  He thought possibly the suspect's eyes were slanted.  (147 RT 16994-95.)

***d.***     ***Zazzara Incident (March 28, 1985)***

***Counts 7 through 9 (§§ 459, 187(a))***

### i)     The deaths of Vincent and Maxine Zazzara

125.    Bruno Polo worked for Vincent Zazzara as manager of his pizza restaurant in Whittier. He last saw Zazzara on March 27, 1985, at approximately 10:00 p.m. (148 RT 17134-35, 17137-17138.) At approximately 8:30 p.m. on March 28, 1985, Polo went to Zazzara's house to drop off the day's receipts from the restaurant. He saw the Zazzaras' two cars at the house. (*Id*. at 17139-41.) Polo rang the bell; the door was open and the lights were on, but he did not enter. (*Id*. at 17143-45.) Polo dropped the receipts through the mail slot at the front door. He was at the Zazzara home for about three to four minutes. (*Id*. at 17145-47.)

126.    The next morning, Polo returned to the Zazzara home around 10:00 a.m. A fellow employee, Al Persisco, followed him to the house. (148 RT 17148-49, 17152.) Polo entered the house and saw Zazzara in the television room. Calling out to Zazzara, Polo saw blood on Zazzara. Polo was scared and quickly left the house. (*Id*. at 17153-55.) Persisco also entered the house but quickly left as well. Polo went across the street to call Zazzara's son. The police soon arrived. (*Id*. at 17156-59.)

127.    Los Angeles Fire Captain Carl Allen and his crew arrived at the Zazzara residence on Strong Avenue in Whittier, Los Angeles County, on March 29, 1985. Seeing a man lying on a couch, Allen and his crew left and called the sheriff. (149 RT 17208-11, 17240.) When sheriff's deputies arrived, the fire crew re-entered the house. They found Maxine Zazzara's body in the bedroom. Both Maxine and Vincent Zazzara were dead. (*Id*. at 17212.)

128.    Deputy Sheriff Paul Archambault arrived at the scene at approximately 10:35 a.m. He entered the house with Captain Allen. Mr. Zazzara had a head wound; Ms. Zazzara had been badly cut. (149 RT 17219-22.)

Archambault interviewed the victims' son and neighbors. The house was sealed off. Sheriff Detective Russell Uloth arrived and took charge of the investigation. (*Id*. at 17222-24.) Deputy Archambault found a pool of blood on the porch of a house across the street. No other blood was found outside the Zazzaras' home. (*Id*. at 17226-28.)

129. Vincent Zazzara had been shot in the head by a small caliber gun. Maxine Zazzara had a gunshot wound to the neck and chest. Her eyes had been gouged out. (149 RT 17249-52, 17316.) A clasp from a watch or a bracelet was on the floor near her body. There were bruises to her left wrist that might have been from a ligature. Detective Uloth admitted that bruises could have occurred on removal of a watch or bracelet. A bullet fragment was found on the floor of the bedroom. (*Id*. at 17259-61.)

130. Drawers were opened in the bedroom; personal items were strewn about the bathroom. In another bedroom, file drawers were pulled out. (149 RT 17256, 17275-77.) A coin collection was intact, and bags of money left by Polo on March 28 were still present. (*Id*. at 17257, 17284.) Jewelry was found in a bedroom drawer. Uloth prepared a list of possible items taken from the residence, but it was uncertain what was taken. (*Id*. at 17298, 17312-14.) A burglary had occurred at the Zazzara residence six weeks before. According to the crime report prepared at that time, entry was gained by prying open the front window. (*Id*. at 17282-83.)

### ii) Shoe print and fingerprint evidence

131. Detective Uloth noted that a window at the rear of the house had been pried open and a screen removed. A latent print was lifted from the screen. No instrument matching pry marks on the screen or window was found at the residence. A shoe print was found on a bucket under the rear window of the point of entry. (149 RT 17243-47, 17280-81.)

132.    Other shoe prints found outside the house near the bedroom window were similar to the shoe print on the bucket. (149 RT 17245-46.) Two different shoe print patterns were found in the same vicinity at the scene. The shoe print pattern found on the bucket, the stairs, and dirt area of the garden matched a pair of Vans shoes recovered from the kitchen. (*Id*. at 17247-48, 17287-90.) Uloth checked with civilians and firemen who were at the scene and determined that their shoes did not match either of the shoe prints found at the scene. (*Id*. at 17306-07.)

133.    Sheriff's evidence technician Steve Renteria took photographs and made casts of the shoe prints of each pattern at the southeast corner of the house. (149 RT 17320-25, 17331-32.)

### iii)    The causes of death

134.    Coroner Joseph Cogan, M.D., testified about the autopsies performed on the bodies of Vincent and Maxine Zazzara on March 30, 1985, by Terence Allen, M.D. Vincent Zazzara died from a gunshot wound to the left side of his head. (154 RT 17642-44.) Stippling around the wound indicated that a firearm was fired at close range. Blood stains found on the couch showed Zazzara did not sit upright after being shot; he was shot in the position depicted in the photographs admitted into evidence (Prosecution's Trial Exs. 8 and 8-A). The position of Zazzara's body was consistent with him having been asleep on the couch when shot. (154 RT 17645-49.) A bullet fragment was removed from Vincent Zazzara's head. (149 RT 17263.)

135.    Maxine Zazzara died from multiple gunshot wounds to the head and neck. (154 RT 17651.) Stippling occurred as a result of a close-range gunshot wound to the head. (*Id*. at 17654.) Two bullet fragments were removed from Maxine Zazzara's head and neck. (149 RT 17263-65.) She also had been stabbed. There was a ligature contusion on her left wrist. Maxine's eyes had

been removed; the eyes were not recovered.  (154 RT 17652-54.)  Stab wounds to the abdomen and eyes appeared to be post-mortem injuries.  (*Id*. At 17660-62.)

### e. *Doi Incident (May 14, 1985)*

### *Counts 10 and 11 (§§ 459/187(a))*

### i) **The attack on William and Lillie Doi**

136.    Monterey Park police dispatcher Darlene Boese received a 911 call at approximately 5:00 a.m. on May 14, 1985.  The enhanced 911 system showed a reporting address of 1586 Trumbower Street.  A male voice repeatedly said, "Help me."  An ambulance was sent, and the call was terminated.  (150 RT 17410-12.)  A second 911 call from the same address was made a few minutes later.  A male voice again asked for help.  By that time, a fire company arrived on the scene.  (*Id*. at 17413-15.)

137.    Monterey Park firefighter Norman Case arrived at the Doi residence at 5:04 a.m.  The front door was open, and house lights were on.  An elderly female dressed in a nightgown was standing near the hallway.  She was incoherent.  There was blood on her left thumb.  (150 RT 17418-22.)  An unconscious male was sitting in a chair in the den.  Mr. Doi – the unconscious male – was taken by ambulance to Garfield Hospital.  (*Id*. at 17422-24, 17427.)  Monterey Park Police Officer Michael Gorajewski was the first police officer to arrive.  He observed that rooms in the house were ransacked, drawers open, and clothes thrown about.  Ms. Doi – the elderly female – appeared to be in shock.  (151 RT 17476-81.)  Officer William Reynolds arrived shortly after 5:00 a.m.  He spoke to Ms. Doi who answered slowly.  Her face was swollen and a thumb cuff dangled from her left thumb.  She was taken to Monterey Park Hospital.  (*Id*. at 17495-97.)

138.    Linda Doi-Fick, the victims' daughter, last visited her parents on May 13, 1985.  They appeared well, and the house was in order.  Her mother suffered a stroke in 1982 and had impaired speech patterns.  On May 14, 1985,

Doi-Fick received a call from police at 5:00 a.m. (154 RT 17698-701.) Later, she met with police officers and tried to communicate with her mother. With her assistance, officers were able to prepare a composite drawing of a suspect. (*Id*. at 17720-22.)

### ii) Shoe print and physical evidence at the scene

139. Monterey Park Police Sergeant Paul Torres arrived at the Doi home about 6:30 a.m. He observed shoe prints in the dirt underneath the front bedroom window. One print appeared to be from a tennis or jogging shoe; the other was from a heavy combat boot with cleats. (151 RT 17515, 17517-19.) Officer Anthony Jiron, who was in charge of security outside the residence, wore boots. (*Id*. at 17519-20.)

140. Sergeant Torres noted that a screen had been removed from a bathroom window. The window was completely open and the bathroom undisturbed. The master bathroom, located between the victims' two bedrooms, was ransacked. Blood had been smeared on the tub and walls. A blood-stained pillowcase was in the bathtub. (151 RT 17522-24.) Mr. Doi's bedroom was ransacked. Boxes were found on the floor. There was a blood-stained pillow at the head of the bed. Bloodstains were found in the hallway. (*Id*. at 17524-26.) A small caliber cartridge casing was found on the hallway carpet. (*Id*. at 17528.)

141. Forensic serologist Joseph Snyder collected evidence and drew a sketch of the scene. (151 RT 17440-41.) He found a shell casing on the carpeted floor near the hall door. He made casts of two shoe prints by the front bedroom and bathroom. (*Id*. at 17441-43, 17446-47.) He did not make casts of the muddy shoe impressions observed in front of the house. (*Id*. at 17451-52, 17456.) On speaking with officers at the scene, Snyder determined that an investigating officer – probably Officer Jiron – had made the muddy impressions with his boots. Snyder did not check other shoes worn by the various personnel at the scene. (*Id*. at 17458-59, 17461-63.)

### iii) Cause of death

142.   Garfield Medical Center emergency room physician Anthony Reid testified that Mr. Doi arrived by an ambulance early in the morning on May 14, 1985.  Efforts to revive him were unsuccessful.  Mr. Doi had abrasions to his face and a gunshot wound to his head.  (151 RT 17490-92.)

143.   Coroner Dr. Cogan testified about the findings of George Bolduc, M.D., who performed an autopsy on Mr. Doi on May 15, 1985.  The cause of Doi's death was a gunshot wound to the head.  The entrance wound at the chin had stippling, which indicated that the gunshot had been fired at close range. (154 RT 17678-80.)  A bullet was recovered during autopsy.  (151 RT 17530-33.)

### iv) Identification of recovered property

144.   Linda Doi-Fick made a list of missing items from her parents' home. She attended a police property line-up on September 5, 1985, and identified items belonging to her parents, including a watch that her father never removed.  Other items taken from the Doi residence were never recovered.  (154 RT 17709-14.)

### v) Eyewitness identification

145.   At trial, Launie Dempster identified Petitioner as the man she saw on three occasions in the Monterey Park area in 1985.  (162 RT 18775-77.)  From August 1984 until November 1985, Dempster had a newspaper route in Monterey Park.  During that time, she also worked as a security guard.  (*Id*. at 18754-56.) She drove her daily newspaper route from 2:00 a.m. to 5:00 a.m.  (*Id*. at 18756-59.)

146.   At approximately 3:30 a.m., while on her route in early May 1985, Dempster saw a man sitting in a car on Trumbower Street, opposite the house at 1594 Trumbower Street.  On returning an hour later, Dempster saw an ambulance in the driveway at 1586 Trumbower Street.  (162 RT 18759-63.)  The car that she had seen was gone.  Dempster later learned that the residence had been broken into and that someone had died.  (*Id*. at 18764-65.)

147.    Two weeks later, at about 3:15 a.m., Dempster saw the same man in the neighborhood in the same car.  She described the car as a brownish-green, older American model, like a Chevrolet, with black hubcaps and dark interior. (162 RT 18765-68.)

148.    When the Night Stalker police task force first contacted Dempster, she explained that she had seen a young Mexican male in a car around the neighborhood.  (162 RT 18768-69.)  Between the second and third sightings, Dempster was stopped while on her route by the task force; she explained that she was delivering newspapers.  However, Dempster did not mention that twice she had seen the same man in the neighborhood.  (*Id*. at 18773.)

149.    On one occasion while on duty as a security guard, Dempster saw a composite drawing of a suspect.  He did not resemble the man she had seen in Monterey Park.  She explained to a deputy sheriff that the composite was inaccurate, but he told her that she was mistaken because witnesses had described the man as he appeared in the drawing.  (162 RT 18774-75.)

150.    Dempster saw Petitioner's face on television after his arrest.  She told her boss that the man on television was the same person she had seen on her route.  (162 RT 18777-78.)  She recalled that the man was 6' to 6'1" tall, thin, and lanky.  (*Id*. at 18787.)  In 1986, she had further contact with a police officer and told him about her observations.  At this police officer's insistence, Dempster contacted Sheriff Detective John Yarbrough.  Dempster gave Yarbrough a route list that was current for April 1986.  The route had changed only slightly from Dempster's route in 1985.  (*Id*. at 18779-81.)

151.    At the preliminary hearing, Dempster identified photographs of a car that looked like the suspect's car (Prosecution's Trial Exs. 48 and 48-A); the hubcaps were black.  (162 RT 18782-84.)  The car depicted in the photographs appeared to be black, not brownish-green as she indicated previously.  Dempster

did not know whether the car depicted in the photographs was the same car she had seen on her route. (*Id*. at 18794-95.)

152.    On cross-examination, Dempster stated that when she first saw the man seated in the parked car in Monterey Park, he had dark hair, dark skin, and appeared to be Mexican. The man she had seen did not resemble the composite drawing; his face was different, his hair was dark, longer, and not as curly. (162 RT 18802-03.) The second time she saw the man, he was seated in a parked car and shouted a few words at her. (*Id*. at 18815-21.) The third time, he was outside the car, and she recognized him from prior occasions. Dempster did not notice anything about him except that he wore a short-sleeve dark shirt. (*Id*. at 18825-28, 18832.) His car had black tires, but she did not notice if it had hubcaps. (*Id*. at 18838.) She described the man as Mexican or Mexican-American solely based on his facial features. (*Id*. at 18839.)

153.    Linda Prewitt, a branch sales manager for the Los Angeles Herald Examiner, worked with Launie Dempster. (163 RT 18853-54.) In 1985, Dempster told Prewitt that she had seen a man in a parked car on her route. Dempster indicated that she knew that a murder had occurred on the route, specifically on Trumbower Street. (*Id*. at 18856, 18858.) Dempster told Prewitt that the man she had seen on television and in the newspaper looked like the person she had seen on her route. (*Id*. at 18860, 18865-69, 18885.)

154.    Monterey Park Police Officer William Reynolds met Launie Dempster on Olive Street following a traffic stop in May 1985, between 4:30 a.m. and 5:00 a.m. He was assigned to the Night Stalker task force and drove an unmarked car. (163 RT 18914-16.) Dempster indicated to Officer Reynolds that she thought she had seen the Night Stalker while delivering newspapers on her route. Officer Reynolds did not recall that Dempster provided a physical description of the suspect; he made no notes of the conversation with Dempster. (*Id*. at 18917-18.)

60

155. Deputy Sheriff Paul Archambault spoke with Launie Dempster in early August 1985 about a composite drawing. She told him that she had seen a person whom she described as a male Mexican, but who did not resemble the composite. (163 RT 18954-55, 18958.) Archambault advised Dempster to contact the Monterey Park police. (*Id*. at 18965-66.)

### f. Bell and Lang Incident (May 29 to June 1, 1985)
### Counts 12 through 14 (§§ 459, 187(a), 664/187)

#### i) The discovery of Mabel Bell and Florence Lang

156. Charles Valenzuela worked sixteen years for two elderly women, Mabel Bell and Florence Lang, who lived in a house on Alta Vista Street in Monrovia. Sometime in 1985, Valenzuela went to their house and saw two newspapers in the driveway. He knocked on the door, but there was no answer. (155 RT 17752-53.) Valenzuela returned the next day, opened the door, and saw a can on the kitchen table. He found Lang on a bed in a bedroom and found Bell on the floor in another bedroom. A table was on top of Bell's chest. Valenzuela removed the table and then contacted neighbors to call the police. (*Id*. at 17753-59.)

157. Monrovia firefighter Kenneth Struckus responded to the scene at 11:40 a.m. on June 1, 1985. He found Bell on the floor in a bedroom. She was not breathing very well. Struckus turned Bell on her side and removed her clothing to check for injuries. (155 RT 17765-71.) He observed blood all over her head, and contusions to her ribs, four to five inches long on each side. A reddish star-circle mark had been drawn on her body. Both Bell and Lang were taken to a hospital. (*Id*. at 17772.)

158. Firefighter Steve Ford found Lang on a bed in the bedroom. Ford observed a pentagram on the bedroom wall. Lang's hands had been tied behind her back with an electrical cord; her ankles had been taped. Ford cut the

electrical cord and performed emergency treatment. He attempted to communicate with Lang, but she was unresponsive. (158 RT 18139-44.)

159. Monrovia Police Officer James Olds arrived at the scene at about 11:30 a.m. He took a series of photographs of the scene and victims both in their home and at the hospital. (155 RT 17785-86.) Bell had a star-circle on her left thigh. Officer Olds photographed Lang's injuries as well as the cord and electrician's tape on her arms and legs. Olds instructed others at the house not to touch a hammer found on a table. He collected evidence and sexual assault kits from hospital staff. (*Id*. at 17787-92, 17795, 17802.) He observed a star-circle on the wall above a bed in a bedroom. (*Id*. at 17793.)

160. Sheriff homicide investigator Michael Bumcrot arrived at the scene at 3:15 p.m. on June 1, 1985. He observed that the kitchen door had two locks; a deadbolt lock was in place. (155 RT 17830-32, 17837.) On the dining room table, there was a partially-eaten banana. Bumcrot observed a TV Guide on a tray in the living room; it was turned to the schedule from 10:00 p.m. on May 29, 1985, to noon on May 30, 1985. (*Id*. at 17833.) Bathroom cabinet drawers were open. Two electric clocks were unplugged; another clock was plugged in and still running. (*Id*. at 17834-36.)

161. A table was lying on the bed in Bell's bedroom. The room had been ransacked. (155 RT 17838.) There was a hammer on top of a dresser in Lang's bedroom that appeared to have blood and hair on it. Strips of tape were on the bedstead. A star-circle had been drawn on the wall over Lang's bed. On the south wall, other red marks had been made with lipstick. (*Id*. at 17838-42.)

### ii) Physical evidence at the scene

162. Criminalist Michelle LePisto was in charge of the scene. Some of the items collected at the scene included part of the bedroom wall with stains, pieces of electrical tape and cord, a portion of wall with a star-circle, sheets, clothing, fibers, and carpet samples. A key was found at the foot of one of the

beds. (156 RT 17896, 17903-04, 17907, 17910-11, 17913.) LePisto collected a hammer with blood stains. No other tools were found at the scene. (*Id*. at 17909, 17924-25.)

163. Deputy Sheriff Charles VanderWende attempted to lift fingerprints in the house but was unsuccessful. Deputy Sheriff Robert Meinke lifted a print from a soda can found on the kitchen table. (155 RT 17857.) A telephone and electric clock had fabric marks, indicating that they were handled by someone holding a cloth or wearing gloves. (*Id*. at 17858, 17870.) A shoe print found on one of the clocks looked like the ball of a shoe. It was similar in design to shoe prints found at other crime scenes in this case. (*Id*. at 17859-60, 17866, 17873.)

### iii)   Cause of Bell's death

164. Bell and Lang were transported to Arcadia Methodist Hospital. (155 RT 17773-74.) Michael Agron, M.D., was on duty in the emergency room when Bell and Lang arrived. Bell had severe head injuries with brain tissue protruding from a skull fracture. She was comatose and subsequently died. There was a burn mark below her right breast; the skin was blistered. There were burn-like marks on her back. (*Id*. at 17816-19.) A red star-circle drawn in lipstick was observed on her left leg. Bell's wounds were approximately two days old. (*Id*. at 17821-23.)

165. Coroner Sara Reddy, M.D., performed an autopsy on Mabel Bell's body on July 17, 1985. The cause of death was head trauma. At the time of the autopsy, her wounds were more than two weeks old. Dr. Reddy had seen similar round-shaped wounds in the past and was on the opinion that they were caused by a hammer. (156 RT 17886-93.)

### iv)   Injuries to Lang

166. Dr. Agron also examined Lang at Arcadia Methodist Hospital when she and Bell arrived. Lang, who was comatose, had suffered head injuries, two black eyes, a cut over the left eyebrow, ligature marks on both wrists, swollen

hands, and bruising on the face. There were scrapes around the vaginal area. In Dr. Agron's opinion, Lang's head wounds had been caused by force from a hard object. (155 RT 17823-27.)

167.    Claire Neiby, another emergency room physician on duty with Dr. Agron, also examined Lang after her arrival. Dr. Neiby observed that Lang had suffered tissue injury near the vagina, likely caused by sudden, forced stretching. Smears were taken during the course of Dr. Neiby's examination. (155 RT 17807-11.) Although Lang subsequently regained consciousness, she could not be interviewed because she was unable to communicate. (*Id*. at 17846-47, 17851.)

### v)    Identification of recovered property

168.    David Nipp, grandson of Bell and great-nephew of Lang, identified a photograph of a cassette tape player as the one he had given Bell in April 1985. (158 RT 18112-13.) He also identified a photograph of the instruction booklet that accompanied the tape player. (*Id*. at 18116.)

169.    He recalled reviewing the booklet and the serial numbers of the cassette player with Bell. (158 RT 18114.) The last time Nipp visited Bell in April 1985, the tape player was at her house. (*Id*. at 18115, 18124.) He usually talked to Bell every one to two weeks and knew that she enjoyed the tape player. Nipp also identified the cassette player in an evidence room at the sheriff's department. (*Id*. at 18116, 18125-26.)

170.    Mark Krainbrink, who was David Nipp's brother, last saw Bell and Lang two months before the incident. He went to the hospital on June 1, 1985. At the time of his visit, both Lang and Bell were comatose. (158 RT 18130-33.) On June 3, 1985, Krainbrink found the instruction booklet for the cassette player in Bell's home and gave it to the Monrovia Police Department. He identified the last entry in Bell's diary, dated May 29, 1985, although he had not previously seen the diary. (*Id*. at 18132-34.) Krainbrink last saw Lang the day before he

testified at trial.  She was then unable to speak and was being fed through a tube.  Before the incident, Lang was in good health.  (*Id*. at 18131.)

### g. *Kyle Incident (May 30, 1985)*

#### *Counts 15 through 18 (§§ 459, 261(2), 288a(c), 286(c))*

##### i) **The attack on Kyle**

171.   On May 29, 1985, Carol Kyle lived with her seventeen-year-old daughter and twelve-year-old son on North Avon Street in Burbank.  Only she and her son were home on the night of May 29, 1985.  Kyle went to bed at about 1:00 a.m.  The house was locked, but the back door had a small dog door that was not secured.  (156 RT 17936-37.)  Kyle awakened at 4:00 a.m. to look at the clock.  The lights were off.  A man flashed a light in her eyes and said, "Get up and don't make any noise."  He was holding a small dark handgun.  (*Id*. at 17938-40, 17942.)  The man told Kyle to move to the living room.  She indicated that her son was in the house.  They went to her son's bedroom; the man turned on the light, jumped on her son, and handcuffed him.  He told both of them not to look at him.  (*Id*. at 17941-43.)

172.   Kyle was then handcuffed with her son and shoved into a hall closet.  The man demanded money, jewelry, and a VCR.  When he appeared again, he was holding a different gun that was shiny.  The man found Kyle's wallet which contained 30 dollars.  (156 RT 17944-47, 17949.)  Kyle and her son were escorted to her son's room and told to lie on the floor.  They were covered with a sheet.  The man removed the handcuffs from Kyle and put her son into the closet.  The man took Kyle to her bedroom and demanded jewelry.  She gave him a diamond and gold chain.  When he asked for more jewelry, Kyle showed him a jewelry box.  (*Id*. at 17949-53.)  The man tied Kyle's hands behind her back with pantyhose.  He pushed her onto the bed, covered her head with a pillow, and screamed at her.  He pounded on her back with his fist.  Twice, he left the room and came back.  (*Id*. at 17953-55.)

173.   When the man returned for the second time, he removed the pillow and told Kyle to lie down on her back on the bed.  Her hands were still tied behind her back.  The man ripped open the front of Kyle's nightgown and removed her underpants.  Kyle told the man she was having her period and had an infection.  The man threatened to kill her.  He took off his jacket, unzipped his pants, and started kissing her.  (156 RT 17955-56.)  The man got on top of her.  He put his penis in her vagina.  After a few minutes, he turned her over and put his penis in her anus; he ejaculated in her anus.  (*Id*. at 17957-58.)

174.   Kyle then spoke with the man for fifteen to twenty minutes as he ransacked her closet.  The man brought Kyle a robe because she was cold.  (156 RT 17959-60.)  He untied the pantyhose on her left wrist and later removed it altogether.  He tried to tie her ankles with a telephone cord.  The man said to her, "I don't know why I'm letting you live.  I've killed people before."  He told Kyle to tell police he wore a mask.  (*Id*. at 17961-63.)  He then brought Kyle's son to her bedroom and handcuffed them to the bed.  The man left handcuff keys on the mantle and told Kyle to make sure her daughter found them.  In Kyle's opinion, the man seemed confused, asking the name of the town and directions to the freeway.  When the man left, Kyle thought his car sounded like a big, older car.  Kyle's son called 911; the police arrived within a few minutes after the call.  (*Id*. at 17964-65.)

### ii)      Physical evidence at the scene

175.   Burbank Police Officer Ronald Cervenka was called to Kyle's home about 6:25 a.m. on May 30, 1985.  He found the front door locked, but the back door by the kitchen was ajar.  There was no sign of forced entry.  It appeared that entry was gained through the kitchen door.  (156 RT 18014-15 .)  The house was ransacked.  Kyle and her son were still handcuffed.  Officer Cervenka removed the cuffs with the key on the mantle.  The handcuffs were larger than those used by police.  He later took Kyle to St. Joseph Medical Center.  (*Id*. at 18008-14.)

66

176.   Evidence technician Robert Cestaro collected handcuffs, keys, and women's clothing from the bedroom in Kyle's home.  Cestaro also dusted for latent fingerprints.  (156 RT 18019-21.)

### iii)   Eyewitness identification

177.   Kyle identified Petitioner at trial as her assailant on May 30, 1985. His dress and hair were different than on May 30, 1985. (156 RT 17967.)  Kyle initially described the assailant as approximately 6' tall, wearing a black leather jacket, black slacks, and black gloves.  (*Id*. at 17948, 17957.)  She told police that the assailant wore bangs, but had no facial hair.  She said his hair was parted on the left across his face and appeared to be shiny and wavy.  She said at first she did not see the man's face except from the side.  Later in her bedroom, she noticed his teeth were straight and white.  He was very thin with prominent cheekbones.  Kyle noticed his smile because he laughed several times when he spoke to her.  (*Id*. at 17982-84, 18003-04.)

178.   Kyle assisted in the preparation of two composite drawings.  (156 RT 17999-01.)  She saw a photo spread of possible suspects in July 1985 but did not identify anyone.  (*Id*. at 17987.)  On September 5, 1985, Kyle attended a live line-up.  Petitioner was in the line-up and Kyle recognized the inflection of his voice.  (*Id*. at 17971-74.)  She identified Petitioner at the preliminary hearing. (*Id*. at 17979.)

179.   Deputy Sheriff Mahlon Coleman met with Carol Kyle on August 30, 1985, at her residence.  Based on her descriptions, he made sketches of jewelry stolen from her residence and of the suspect.  He turned over his sketch of the suspect to Sergeant Frank Salerno (Prosecution's Trial Ex. 16-B).  When he made the sketch, Coleman had not seen a photograph of Petitioner.  (176 RT 20582-85.)  Kyle described the suspect to Coleman as wearing a black jacket with a stain on the left shoulder, brown and black checked shirt, dark pants, and black belt with silver holes.  She described the suspect as a Latin male, twenty years old, six

feet tall, and very thin. She described him as having a tan complexion, brown eyes, black hair that was dry ,but shiny, and parted on the left side and curly on the ends, but long in the back. She described him as having no facial hair and a clean face, she said that he spoke with good diction, and that he had straight teeth and excessive gums. (*Id*. at 20587-88.) The suspect's skin color according to Kyle was close to the color of a pencil used to prepare the sketch. (*Id*. at 20589-91.)

### iv) Identification of recovered property

180. Kyle identified jewelry taken from her home at the police property line-up on September 5, 1985. She identified a bracelet, silver chain, earrings, necklaces, and a ring. (156 RT 17974-78.)

### h. *Cannon Incident (July 2, 1985)*
### *Counts 19 and 20 (§§ 459, 187(a))*
#### i) The discovery of Mary Louise Cannon

181. Frank Starich lived next door to Mary Louise Cannon on East Haven Avenue, Arcadia, Los Angeles County. Cannon was in her eighties and lived alone. Starich was home on July 2, 1985. About 8:30 a.m., he noticed the screen from Cannon's window lying on her porch. (157 RT 18030-32.) He picked up the screen; about a half-hour later he put the screen back on the open window. Starich retrieved Cannon's newspaper which was wet from automatic lawn sprinklers. (*Id*. at 18032-34.) Starich became concerned about Cannon. He and his wife used a key to enter Cannon's house. Things were thrown around in the hallway. A light was on in the hall. They left and called the police. (*Id*. at 18034-36, 18052.)

182. Starich stayed up until 11:00 p.m. the night before but did not hear anything unusual. He watched television in a room thirty to thirty-five feet away from Cannon's house. His bedroom was on the opposite side of Cannon's house. (157 RT 18042-43.)

183. Tina Starich knew Cannon well. Cannon had visited the Stariches' house on July 1, 1985, at about 6:00 p.m. Cannon had not been feeling well for a long time. The day before, she had been in a traffic accident but was uninjured. (157 RT 18046, 18049.) There were two locks on her front door, but Cannon did not use the dead bolt. Ordinarily, she kept the screen door locked. Tina Starich telephoned Cannon on July 2, 1985, but Cannon did not answer. Cannon's screen door was unlocked, but the front door was locked. Tina Starich re-entered Cannon's house with Officer Winter and found Cannon lying on her bed. (*Id*. at 18047-54.)

#### ii) Physical evidence at the scene

184. Arcadia Police Officer Edward Winter responded to the scene at about 9:26 a.m. on July 2, 1985. He met Tina Starich and went with her into Cannon's house. In the living room, he noticed a drawer pulled out of the coffee table; other items were on the hallway floor. Mary Cannon's body was lying face down on the bed in the bedroom. (157 RT 18059-61.) There was a lot of blood on the bed. The room was ransacked. A paper tissue on the floor had a waffle shoe print pattern. Glass from a broken lamp was found near the victim's shoulder. A walking cane and knife were on the bed. A file cabinet had been ransacked; a jewelry box was on the floor. (*Id*. at 18067-68, 18074-76, 18078.)

185. Coroner criminalist Lloyd Mahanay collected two sets of shoe prints, a heel print, glass shards, and a sexual assault kit from Cannon's body. (158 RT 18150-51.)

186. Sergeant Salerno observed a window screen missing from the victim's bedroom window. (160 RT 18431-32.) One of the window panes had been broken. Shoe impressions on the carpet and a bloody shoe print on a piece of tissue were collected as evidence. (*Id*. at 18433-35, 18437.) Pieces of a broken lamp were found in Cannon's hair. A bloody, 10" knife was found on the bed. A knife sharpener matching the knife was found in the kitchen. (*Id*. at 18439-41.)

### iii) Shoe print evidence

187. Waffle-soled shoe prints were found in several rooms of Cannon's house. The shoe prints did not match the shoes worn by any of the officers who participated in the investigation or the Stariches. (157 RT 18065.) Three pieces of carpet containing shoe prints were preserved as evidence. At trial, shoe print impressions on the carpet pieces were no longer visible. (158 RT 18151-55.)

### iv) Cause of death

188. Coroner Joan Shipley, M.D., performed an autopsy on the body of Mary Cannon on July 3, 1985. In Dr. Shipley's opinion, the cause of death was

multiple neck wounds and strangulation. Dr. Shipley also found blunt trauma wounds to the face and head, a broken nose, black eyes, and puncture wounds to the mouth area. In Dr. Shipley's opinion, the injuries to the head could have been inflicted by use of hands. (157 RT 18084-87, 18089.) Dr. Shipley observed four stab wounds; one cut the carotid artery. Smaller stab wounds were observed on the back of the neck. (*Id*. at 18089-95.)

189.   Cannon's body showed trauma to the neck caused by strangulation but without finger imprints on the skin, indicating the use of a soft, wide ligature such as hands, or pressure from an elbow joint as the means of strangulation. Petechial hemorrhages of the eyes were caused by loss of oxygen. In Dr. Shipley's opinion, Cannon died within a few minutes after infliction of the wounds or strangulation. (157 RT 18095-98.)

### v)   Identification of recovered property

190.   Lynda Klempel last saw Mary Cannon on June 14, 1985, in Paso Robles. At trial and at the September 5, 1985 property line-up, Klempel identified a necklace (Prosecution's Trial Ex. 19-F) and a locket (Prosecution's Trial Ex. 19-G) belonging to Cannon. The exotic, handmade necklace contained beads and brass trim, it cost 15 dollars. (162 RT 18731-35, 18743.)

### i.   *Bennett Incident (July 5, 1985)*
### *Counts 21 and 22 (§§ 459, 664/187)*
### i)   The attack on Whitney Bennett

191.   Sixteen-year-old Whitney Bennett lived with her parents on Arno Drive, Sierra Madre, Los Angeles County. Around 5:00 p.m. on July 4, 1985, Bennett went to a friend's house and returned home at 12:45 a.m. (159 RT 18223-25.) She parked her car in the back of her house and entered by the back door. Bennett locked the back door and left a note for her father on his closed bedroom door. No one was awake when she returned home. The hall and

outside lights were on. She turned on the light in her bedroom. Her bedroom curtains were open. (*Id*. at 18226-29.)

192. Bennett changed her clothes, removed her jewelry, which she placed in a jewelry box on the dresser, and went to sleep. She awakened between 2:45 a.m. and 3:45 a.m. (159 RT 18230-32.) She was lying, face down, on the bed. Blood was all over her sheets; her head and hands hurt. The lights were not on in the room. The curtains were closed. Bennett ran screaming to the hallway where she was found by her father. After the paramedics transported her to the hospital, she was hospitalized for eight days. She has had surgery on her hand, head, and face. (*Id*. at 18233-36.)

193. Bennett testified that blood stains found in her bedroom were new; they were not there when she went to bed. When Bennett awakened, her telephone was on the window sill and her jewelry box had been moved. Her underpants had been removed. Two gold rings were missing and never recovered. A tire iron, found in her bedroom, was unknown to her. (159 RT 18239-45.)

194. Steve Bennett testified that his daughter left their home on the afternoon on July 4, 1985. He had guests for dinner who left about 11:00 p.m. through the back door; he did not recall if the front door was locked. Mr. Bennett stayed up until midnight to watch fireworks. (159 RT 18266-69.) Mr. Bennett did not hear his daughter return home. Mr. Bennett was awakened early in the morning by a moaning sound; he found his daughter at her bedroom door. She was bloody and complained about her head. Her bedroom was in disarray. Blood was everywhere, and a tire iron was on the floor. (*Id*. at 18270-75.)

195. Robert Costarella, M.D., a plastic surgeon, was on duty at Arcadia Methodist Hospital on July 5, 1985. He treated Whitney Bennett for massive head lacerations, skull fractures, fracture of the eye socket, and fracture to a finger on her left hand. (161 RT 18665-73.) He operated on her several times to

remove scars. Bennett suffered eye damage and partial retinal detachment. (*Id.* at 18673-75.) Marks that he observed around her neck were likely caused by a rope or cord. In Dr. Costarella's opinion, Bennett's head injuries were consistent with blunt force trauma caused by a tire iron. (*Id.* at 18677-78.)

196. On July 5, 1985, Sergeant Salerno interviewed Whitney Bennett at Arcadia Methodist Hospital. He observed cuts to her cheekbone and ligature marks on the right side of her neck. Bennett's eyes and hands were swollen. (159 RT 18313.)

### ii)     The crime scene

197. Sierra Madre Police Sergeant Gerald Skinner arrived at the Bennett home at 5:10 a.m. on July 5, 1985. (158 RT 18171.) He spoke with Mr. Bennett and checked the house for suspects. He found a window screen outside, leaning against the front of the house. (*Id.* at 18172-74.)

198. Whitney Bennett was on the hallway floor. Her head was bleeding and wrapped in towels. Blood stains were observed on the bedroom carpet and walls. The curtain in her bedroom was slightly open. (158 RT 18175-76.) A tire iron was lying on the carpet in a pool of blood. Skinner observed a hand print on the window sill in Bennett's bedroom, which appeared to have been made by some sort of fabric or a gloved hand. After an emergency rescue unit arrived, Whitney Bennett was transported to the hospital. (*Id.* at 18178-79, 18181, 18186.)

### iii)     Physical evidence at the scene

199. Criminalist Giselle LaVigne collected evidence from Bennett's bedroom on July 5, 1985, including a tire iron, curtain sash, bed comforter which appeared to have a shoe print, and blood stains on the carpet. (158 RT 18191-98.)

200. Deputy sheriff Ronald George participated in the investigation at the Bennett home on July 5, 1985. He photographed the house and processed

fingerprints on the bedroom window sill. There was a fabric mark and blood on the window sill. Deputy George was unable to obtain any fingerprint lifts. He also photographed a shoe transfer on a comforter found in the bedroom. (159 RT 18278-81.)

201. Sergeant Frank Salerno arrived at the Bennett home about 7:05 a.m. on July 5, 1985. He observed blood and a print mark on the bedroom window sill. The window screen had been removed from the bedroom window. A telephone cord in Whitney Bennett's bedroom had been cut with a sharp instrument. (159 RT 18307-08, 18315, 18319.) A pair of underpants and a sash were found near the window. A bed comforter was partially stained with blood. In Salerno's opinion, the shoe impression on the comforter in Whitney Bennett's bedroom appeared similar to shoe prints found at the Cannon and Zazzara crime scenes. (*Id*. at 18310-12, 18315-16.)

> **j.** **Nelson Incident (July 7, 1985)**
> **Counts 23 and 24 (§§ 459, 187(a))**
> **i)** **The discovery of Joyce Nelson**

202. At about 6:00 a.m. on July 7, 1985, Robert Blanco, a neighbor of Joyce Nelson on East Arlight Street in Monterey Park, Los Angeles County, noticed that Nelson's back gate was open. (159 RT 18329-30.) Blanco went into her yard and heard the sound of Nelson's television set. Blanco called to Nelson, but there was no response. Nor was there any response when Blanco checked on Nelson again at 9:00 a.m. (*Id*. at 18331-32.) At that time, Blanco noticed a window screen from the front window lying in the flowerbed. Blanco did not step in the flowerbed or touch the windowsill when he called out to Nelson. Nelson's front window was open. (*Id*. at 18334-36, 18344.)

203. Blanco went to Nelson's porch; the front door was open. Pushing open the front door, Blanco saw open drawers, and the television was on. He

called out, but there was no response.  Blanco told another neighbor what he had seen and the neighbor's wife called the  police.  (159 RT 18336-39.)

204.  Monterey Park Police Officer Robert Daltorio was called to Nelson's home shortly after 9:00 a.m. on July 7, 1985.  Officer Daltorio observed a window without a screen; he found the screen leaning against the house.  (159 RT 18357-58.)  The front window was open and the shade pulled down.  He observed shoe prints in the dirt under the window.  The back door had a small, freshly-made cut in the screen.  He observed shoe prints on the porch.  (*Id*. at 18359-61, 18367-69.)

205.  Dead bolts had not been set either on the front or back doors.  The key to the front door was in the lock on the inside.  The bathroom and a bedroom had been ransacked.  (159 RT 18362.)  Officer Daltorio observed items on the bed and a pillow without a case.  Officer Daltorio tried to open the second bedroom, but the door was blocked.  He pushed his way inside and found Joyce Nelson's body on the bed, face down, with her hands locked behind her back. (*Id*. at 18363-66.)

### ii)      Fingerprint and shoe print evidence

206.  Deputy Sheriff Vander Wende photographed shoe impressions in the planter under the window in front of Nelson's house and four similar imprints on a concrete porch.  He obtained tape lifts of shoe prints.  (159 RT 18381-82, 18384-86.)  He observed a shoe print on the left side of Nelson's face and her robe.  In Deputy Vander Wende's opinion, shoe prints found on the porch of Nelson's home were similar to the sole pattern of a shoe print found at the scene of the Bell and Lang incident.  (*Id*. at 18387-88.)  Deputy Vander Wende lifted palm prints from the front bedroom door and from the bedroom windowsill above the planter.  Glove marks on a file box in another bedroom were similar to marks on the night stand in Nelson's bedroom.  (*Id*. at 18388-90.)

207. Sergeant Salerno also participated in the investigation at Nelson's home. In his opinion, shoe prints found outside the Nelson residence were similar in appearance to shoe prints found at the scenes of the Zazzara, Cannon, and Bennett incidents. (160 RT 18443-44, 18465-66.) Criminalist Gerald Burke analyzed the shoe prints found at the Nelson home. Burke determined that the sole pattern of the shoe prints was identical to the sole pattern of a shoe made by the Avia Company. (*Id*. at 18466-70.) A pair of Avia high-top basketball shoes brought to the Nelson residence was found to have a sole pattern similar to the shoe prints found in and around the Nelson home. (*Id*. at 18472-73.)

### iii)     Cause of death

208. Coroner investigator David Campbell participated in the investigation of Nelson's death. When Campbell entered Nelson's home at 2:35 p.m. on July 7, 1985, he observed Nelson's body on the floor; she had multiple cuts to her face. The air temperature at 5:00 p.m. was 84°F; the liver temperature of Nelson's body at 9:08 p.m. was 87°F. Rigor mortis and lividity were present in the body. There were no other signs of trauma or ligature marks on the body. (160 RT 18487-92.)

209. Coroner Irwin Golden, M.D., performed an autopsy on Nelson's body on July 8, 1985. In Dr. Golden's opinion, death resulted from head injury and manual strangulation. Nelson sustained a hinge-type skull fracture prior to death through the use of severe force. (160 RT 18494-500, 18502.) She sustained injuries to her eyes, a scratch from a blunt instrument to the jaw, and bruises on her knuckles, fingers, foot, and ankle. Dr. Golden observed deep tissue abrasions to the larynx and evidence of manual strangulation. (*Id*. at 18501-03, 18505-09.)

### iv)     Eyewitness identification

210. Launie Dempster placed Petitioner in the neighborhood around the time of Nelson's murder. At the beginning of July, she saw the same man she

recognized from two previous occasions in a parked car on Arlight Street between 3:00 a.m. and 4:30 a.m. At the end of her route, Dempster saw the man walk from the back of his car to the driver's side. He was wearing a black, short sleeve T-shirt, a dark jacket, and dark pants. (162 RT 18769-72.)

### k. *Dickman Incident (July 7, 1985)*
### *Counts 25 through 27 (§§ 459, 261(2), 286(c))*
#### i) The attack on Sophie Dickman

211. At 3:30 a.m. on July 7, 1985, Sophie Dickman, a retired nurse who lived alone on Hollyoak Drive in Monterey Park, Los Angeles County, was awakened by a light in her bedroom. A man was standing in her bedroom doorway. (160 RT 18520-21.) The man was holding a gun in his hand; he ordered Dickman to be quiet and threatened to kill her. The gun appeared to be metallic silver with a three-inch barrel. (*Id*. at 18522.)

212. Dickman was unclothed except for her underpants. The man closed the shutters in the bedroom and then handcuffed Dickman's hands behind her back. The man pulled her into an adjacent dressing room. Dickman had difficulty walking because of a recent foot injury. (160 RT 18526-28.) She tried to remove and hide surreptitiously a sapphire and diamond ring but the man retrieved the ring. (*Id*. at 18526-28.) Dickman was then taken to the bathroom where the man covered her head with a towel. (*Id*. at 18530-34.) He found several rings, including a gold wedding ring, gold engagement ring, and two diamond rings. Dickman told the man that she had money in two purses. When the man left her alone in the bathroom, the towel slipped off her head. The man returned and demanded more money. Dickman estimated that 150 to 160 dollars in cash was kept in her purses. She found 78 dollars the next day in a zippered compartment of one of her purses that had not been opened. (*Id*. at 18536-37.)

213. The man returned Dickman to her bedroom and put her, still handcuffed, on the bed. The man took off Dickman's underpants and ordered her

to spread her legs. The man removed one of his gloves, put it in her mouth, and told her to bite down on it. Dickman testified that the glove was leather with a ridge pattern. (160 RT 18538-40.) The man put a pillow over Dickman's head, got on top of her, first attempted vaginal intercourse, and then tried to penetrate her rectum. A few minutes later, he resumed his attempt at intercourse but did not penetrate her vagina. (*Id*. at 18541-43.) Shortly afterward, the man stood up and began taking the telephone out of the wall. Dickman later found the telephone in the hall closet; another telephone had been removed from the kitchen. (*Id*. at 18544-46.)

214.    After handcuffing Dickman to the bed, the man left. Dickman heard a car engine start up near her bedroom window. She stood up, put on a robe, dragged the bed to her window, and called for help. Dickman's neighbor, a deputy sheriff, came to her window and told her not to touch anything. Soon, the police arrived. (160 RT 18547-51.)

215.    Dickman was taken to Monterey Park Hospital. She was examined by Gerald Bross, M.D. (160 RT 18512.) Dr. Bross observed no evidence of trauma outside the pelvic region. He found dried blood on Dickman's inner thigh, small tears to the vaginal lining, and fresh bleeding inside the vagina. In Dr. Bross's opinion, the tears and bleeding were likely caused by blunt force or a sharp object. (*Id*. at 18513-14.)

### ii)    Physical evidence at the scene

216.    Monterey Park Police Officer William Costleigh responded to Dickman's house at 3:45 a.m. on July 7, 1985. He found Dickman standing at her bedroom window handcuffed to the bedpost. Officer Costleigh tried to remove the handcuffs from Dickman. (161 RT 18691-94.) The handcuffs were unique; he had never seen a similar pair of handcuffs.

217.    Another officer removed the handcuffs. Walking through Dickman's house, Officer Costleigh saw that the sliding glass door was open but

locked by something on the track of the sliding door.  (161 RT 18695-99.)  A cat door appeared to be bent.  The panel to the cat door was missing.  Dickman later noticed the panel had been moved.  (*Id*. at 18566-68.)  Outside, the screen on the backdoor was torn.  (*Id*. at 18701.)  A plastic pail normally kept near the garbage cans had been used to prop open the screen to the service porch door.  (*Id*. at 18571-74.)

218.    Monterey Park Police Officer David Corrigan arrived at Dickman's house at about 4:30 a.m.  He photographed the house, the torn screen, telephone cords, and handcuffs.  (161 RT 18711-14.)  The handcuffs removed from Dickman appeared to be an inexpensive novelty item; they were not used by law enforcement.  (*Id*. at 18716.)

219.    Dickman later found items on her dining room floor, including a purse and telephone cord.  Other items were out of place and on the floor in the guest bathroom, den, and bedrooms.  (161 RT 18571-75.)  Dickman identified a pistol (Prosecution's Trial Ex. 46) as similar to the weapon used by the intruder during the incident.  (*Id*. at 18588-89.)  She also found unopened soda cans on the floor of the service porch.  (*Id*. at 18623-24.)

### iii)    Eyewitness identification

220.    According to Officer Costleigh, Dickman initially described her assailant as possibly white, about twenty-seven years old, 5'8" to 5'9", thin, with dark brown curly hair.  (161 RT 18702-03.)  He indicated in his report that the suspect was described as wearing cloth mesh, black gloves and black high-top sneakers.  (*Id*. at 18707-08.)

221.    Dickman testified that she described the suspect as 6' to 6'1".  (161 RT 18627-28.)  The man was dressed in black clothing, wore black gloves, and black high-top tennis shoes with a white line around the sole.  (160 RT 18522; 161 RT 18607-12.)  On several occasions when shown groups of photographs, Dickman was unable to identify anyone.  (160 RT 18555-58.)

222. Officer Conigan worked with Dickman to prepare a composite drawing of the suspect. She provided the same general physical description of the suspect as previously given to Officer Costleigh. Officer Conigan prepared a bulletin which listed the suspect's physical description as: 5'7" to 5'8", thin build, twenty-seven years old, dark brown hair. (161 RT 18718-19, 18724.)

223. Prior to the September 5, 1985 line-up, Dickman attended a live line-up conducted by Monterey Park Police Department. She did not identify anyone in that first line-up. On September 5, 1985, Dickman attended a live line-up and identified Petitioner. (160 RT 18555-58.)

224. At trial, Dickman identified Petitioner as her assailant. (160 RT 18532-33.) He appeared different in court; his bangs were separated, and his hair was longer. (161 RT 18582.) She first saw Petitioner's picture on August 30, 1985, on television and was aware that Petitioner had been arrested. She regularly watched television and read the newspapers. She saw Petitioner's face on television on every broadcast, five times a day. (*Id*. at 18630-31, 18651.) Dickman testified that in identifying Petitioner, she was not influenced by his appearances on television. (*Id*. at 18641-42.)

### iv)     Identification of recovered property

225. A pillowcase from Dickman's bed and items of jewelry were taken from her home. Dickman attended a property line-up on September 5, 1985; at the lineup, she identified jewelry that belonged to her, including earrings, two pins, and rings. (160 RT 18548, 18554-55; 161 RT 18583-86.)

### l.     *Kneiding Incident (July 20, 1985)*
### *Counts 28 through 30 (§§ 459, 187(a))*

### i)     Discovery of Maxon and Lela Kneiding

226. Maxon and Lela Kneiding lived on Stanley Avenue in Glendale, Los Angeles County. Roy Murley last saw Maxon Kneiding at church on Friday, July 19, 1985. (163 RT 18971-72.) The Kneidings' daughter, Judith Arnold, saw her

parents on the morning of July 19, 1985. At that time, they made plans to meet the next morning for breakfast at a restaurant in Glendale. On July 20, 1985, after her parents did not show up at the restaurant, Judith drove to church and then to her parents' home. (*Id*. at 18974-76.) She arrived at 8:15 a.m., entered through the back door and found them lying in bed. Judith's husband called the police. (*Id*. at 18976-77.)

227. Glendale Police Officer Tom Kuh arrived at the Kneiding residence at approximately 9:25 a.m. He met Judith Arnold at the house; they found Maxon and Lela Kneiding dead in the bedroom. (164 RT 19000-01.)

228. A screen on the rear door had been cut and stretched near the door knob. (164 RT 19006, 19042-44.) Open dresser drawers, clothing, a brown wallet, and a purse were on the floor of the bedroom. The bedroom window was slightly open. (*Id*. at 19019-21.)

229. Maxon Kneiding was found on his right side, face down across the bed against his wife, who was on her right side, face down with her legs over the edge of the bed. Both were dressed in night clothes. (164 RT 19022.) Lela Kneiding was not wearing any jewelry, but there was a white band of skin on her left ring finger. (*Id*. at 19030-31.)

230. Coroner's investigator Frederick Corral examined the bodies of Maxon and Lela Kneiding on July 20, 1985. At 8:00 p.m., the air temperature was 76°F; the liver temperature of the victims' bodies was 85°F. Both bodies were in full rigor. (164 RT 19060-62.)

## ii) Physical evidence at the scene

231. The Kneidings lived in a neighborhood with many trees and bushes. Across the street from their home was a supermarket; nearby, there was a large construction site. An elevated freeway ran behind the house. (164 RT 19023-24.)

232. Two bullet fragments were found in the carpeting in the bedroom; one near Lela Kneiding's body and one on the floor by a sewing cabinet. (164 RT 19032-33, 19051-54.) Blood stains and spatter were observed at the head of the bed, on the window curtains, and on the overhead light. The spatter trail had multi-directional patterns and ran upward, slightly to the right. Stains on the wall above the bed appeared to run upward at a forty-five-degree angle. A large clump of hair with blood that appeared to be from Lela Kneiding was found on the curtain. A clump of bloody hair was found in Lela Kneiding's clenched right hand. Hair also was found on the curtains, approximately seven feet above the floor. The bedroom was the only room that had been ransacked. (*Id*. at 19036-41, 19045-47.)

### iii)    Causes of death

233. Coroner Irwin Golden, M.D., performed autopsies on the bodies of Maxon and Lela Kneiding on July 22, 1985. Lela Kneiding's death resulted from two gunshot wounds to the head – one in the cheek area and another to the back of the head. The wound to the cheek area was caused by a weapon fired at close range. The shot to the back of the head was a contact-type wound, indicating that the gun barrel was close to the head when the weapon was fired. (169 RT 19630-34.) A small-caliber bullet was recovered from the wound to the back of the head. Dr. Golden observed trauma to Lela Kneiding's neck caused by a cut behind the right ear. There were cuts on her right hand and arm and bruises on her right shoulder and upper arm that appeared to be defensive wounds. In Dr. Golden's opinion, the incised wounds occurred before death. (*Id*. at 19634-38, 19643.)

234. Maxon Kneiding's death resulted from a gunshot wound to the neck. No bullet was recovered. Dr. Golden was unable to estimate the distance from which the weapon was fired. (169 RT 19639-40.) Four incised wounds to the neck did not sever major blood vessels but would have been fatal if not treated

due to lack of blood.  The wounds varied in size and depth, from three-quarters of an inch to three inches deep, and in Dr. Golden's opinion, they were inflicted before the gunshot wound to the neck.  (*Id*. at 19641-43.)

### iv)    Identification of recovered property

235.   On September 5, 1985, Judith Arnold and her sister, Ellen Francis, attended a property line-up.  Judith Arnold identified personal property belonging to her parents, including her mother's wedding rings, a ring box, and a watch. (163 RT 18980-82.)  Ellen Francis identified a belt, rings, a necklace, combs, and a pin as belonging to her mother.  (*Id*. at 18985-88.)

*m.* ***Khovananth Incident (July 20, 1985)***

***Counts 31 through 35 (§§ 459, 187(a), 261(2), 288a(c), 286(c))***

### i) The attack on Somkid Khovananth

236.    Somkid Khovananth and her husband Chainarong Khovananth lived on Schoenborn Street in Sun Valley, Los Angeles County, with their two children.  (164 RT 19070-71.)  In the early morning of July 20, 1985, Ms. Khovananth was asleep on the living room couch; she got up at 12:30 a.m. to open the door for her husband who was returning from work.  Ms. Khovananth locked the front door.  Mr. Khovnanth went to the bedroom; Ms. Khovananth stayed in the living room.  A sliding glass door from the living room to the backyard was kept open.  The screen was shut, as were the curtains on the sliding door.  (*Id*. at 19072-74.)

237.    Ms. Khovananth was awakened by the sound of the sliding glass door.  She looked up and saw a tall, skinny man walk in the living room holding a gun.  He told her to be quiet and threatened to kill her.  The gunman walked to the hallway leading to the bedroom.  (164 RT 19075.)  Ms. Khovananth heard a gunshot.  The gunman came back to the living room and said that he killed her husband.  The gunman told Ms. Khovananth to do what he told her and threatened to kill her children.  Every time the man spoke, he called her "bitch." (*Id*. at 19076.)

238.    The gunman pointed the gun at Ms. Khovananth's head.  She told the man that she would give him everything and asked him not to hurt the children.  The gunman ripped off her nightgown, led her into the bedroom, and pushed her on the floor.  Mr. Khovananth was on the bed, covered with bedding. (164 RT 19077-78.)  The gunman forced Ms. Khovananth to have sexual intercourse.  Afterward, she was taken into a bathroom where the gunman tied her hands with the cord from a portable hair dryer.  (*Id*. at 19078-81.)  The

gunman beat and slapped Ms. Khovananth, took her to the bedroom again and forced her to perform oral copulation. He forced Ms. Khovananth to have anal intercourse. (*Id*. at 19081-83.)

239. An alarm in the son's bedroom sounded at 6:00 a.m. By that time, it was daylight. The gunman left Ms. Khovananth with her legs tied and went into the son's room. Ms. Khovananth heard her son crying. About fifteen minutes later, the gunman came out of the bedroom and went to the kitchen. (164 RT 19083-85.) He went back to her son's room carrying fruit juice. Soon, the gunman returned to Ms. Khovananth's bedroom; he asked for her jewelry. Ms. Khovananth told him that jewelry was hidden under a kitchen drawer. (*Id*. at 19086-87.) He demanded money; Ms. Khovananth gave him 80 dollars from her purse. She also gave him jewelry and a silver coin collection kept in her son's room. (*Id*. at 19087-90.)

240. While in her son's room, Ms. Khovananth saw her son lying on the floor. He was tied up. His pajama pants were torn off and a sock was in his mouth. The gunman beat Ms. Khovananth's son in her presence. (164 RT 19090-92.) The gunman escorted Ms. Khovananth to the daughter's room. Ms. Khovananth told the gunman not to wake her daughter because she would cry. Ms. Khovananth told the gunman there was more jewelry outside in her husband's car. (*Id*. at 19092-93.) The gunman put a coat over Ms. Khovananth's head, and they went to the garage. Mr. Khovananth's wallet containing 15 dollars was under the front seat of his car. They went back into the house; the gunman pulled out the telephone near the kitchen. (*Id*. at 19094-96.)

241. The gunman asked Ms. Khovananth for a suitcase and put her VCR inside the suitcase. He placed jewelry in a pillowcase and put the pillowcase into the suitcase. The gunman again bound Ms. Khovananth on the bedroom floor. He slapped her before leaving the house. (164 RT 19096-98.)

242. Ms. Khovananth untied her legs with a knife, pulled one hand loose, and ran to her son's room. She untied her son, got her daughter, and called a neighbor for help. The neighbor took her children while she returned home. She found her husband dead on the bed in their bedroom. (164 RT 19099-100.)

## ii)    The death of Chainarong Khovananth

243. Los Angeles Police Officer Diane Fichtner arrived at the scene at 7:00 a.m. on July 20,1985. She found the body of Mr. Khovananth on the bed in the master bedroom with a pool of blood around his head. (164 RT 19140.)

244. Coroner Dr. Joseph Cogan performed an autopsy on the body of Chainarong Khovananth on July 21, 1985. Death was caused by a gunshot wound to the head. (167 RT 19406-07.) The entrance wound was near the left ear. In Dr. Cogan's opinion, the weapon was fired at very close range. A small caliber bullet was recovered from the right side of Mr. Khovananth's scalp during the autopsy. (*Id*. at 19407-10.)

## iii)    Physical evidence and shoe print evidence

245. Los Angeles Police Detective Carlos Brizzolara arrived at the scene at 9:30 a.m. He observed a telephone cord in the living room that had been pulled from the wall. Mr. Khovananth's body had been left on the bed in the master bedroom; the bedroom had been ransacked. (165 RT 19149-54.) The kitchen had also been ransacked; cabinet drawers were pulled out and food items had been spilled on the floor. In the son's bedroom, items were on the bed and floor. A butcher knife and a jar of apple juice were on the dresser. (*Id*. at 19156-58.) A partially open suitcase with items inside was on the floor of the son's bedroom. (*Id*. at 19158.) Detective Brizzolara observed shoe prints on the front and side porches and on the hallway floor. (*Id*. at 19158-59.)

246. Deputy Vander Wende and criminalist Burke examined shoe prints on the front porch of the Khovananth home on July 21, 1985. (167 RT 19391-92.) Deputy Vander Wende previously observed similar shoe prints at the home

of Joyce Nelson on Arlight Street in Monterey Park and the Bell and Lang residence in Monrovia.  (*Id*. at 19393-94.)  Deputy Vander Wende observed shoe prints outside the sliding glass door at the rear of the living room and a partial shoe print at the back porch.  (*Id*. at 19394-95.)  Three lifts were made of the shoe print on the front porch.  (*Id*. at 19397-98.)  Deputy VanderWende was unsuccessful in obtaining clear lifts from the hallway and back step.  (*Id*. at 19398-99.)  Shoe print lifts were also taken from the hall next to the master bedroom door and from the front and back porches.  (171 RT 19960-62.)

### iv)    Eyewitness identification

247.    Somkid Khovananth initially described the gunman as a male Hispanic, 6' tall, thin build, thirty to thirty-five years old, wavy brown hair with soft curls, wearing brown pants and a multi-colored shirt.  (164 RT 19141.)  Ms. Khovananth first identified Petitioner at a live line-up on September 5, 1985.  At trial, she again identified Petitioner as the gunman who entered her home on July 20, 1985, attacked her, and shot her husband.  (*Id*. at 19108, 19110, 19116.)

248.    On cross-examination, Ms. Khovananth acknowledged that she had previously described her assailant as having a brown face, like a Mexican, and loose, curly hair.  (164 RT 19118-20.)  At trial, Petitioner's hair appeared to be longer than in 1985.  Ms. Khovananth had seen Petitioner's face on television and in the newspaper a few weeks after the incident.  She assisted in preparing a composite drawing and remembered that her attacker's teeth were bad.  (*Id*. at 19120-26.)  He spoke with an accent, but Ms. Khovananth could not identify his country of origin.  He spoke as though he was uneducated.  After the incident and before the live line-up, Ms. Khovananth met with police three to four times.  She gave a description of the man to police and tried to provide all the details, but she was upset.  (*Id*. at 19128-29.)  She recalled that the man wore gloves, taking them off only when he hit her.  The gloves were not leather; they were gray or light brown cloth.  (*Id*. at 19130-31.)

**v)     Identification of recovered property**

249.    On September 5, 1985, Ms. Khovananth attended a property line-up. She recognized a jade pendant, a chain, a suitcase, a ruby pendant, a jewelry bag, a tie pin, a diamond pendant and chain, a ring, loose diamonds, a watch, and a necklace.  All of the items had been taken from her house by the gunman on July 20, 1985.  Ms. Khovananth identified a photograph of a suitcase that she and her husband owned.  One suitcase of the set had been taken from her home.  (164 RT 19107, 19110-14.)

*n.     Petersen Incident (August 6, 1985)*

*Counts 36 through 38 (§§ 459, 664/187)*

**i)     The attack on Virginia and Christopher Petersen**

250.    At about 9:00 p.m. on August 5, 1985, Virginia Petersen went to bed in her home at 18241 Acre Street in Northridge, Los Angeles County, while her husband, Christopher Petersen, watched television in the living room.  Their four-year old daughter was asleep in her bedroom.  (165 RT 19177-78.)  When Ms. Petersen retired for the night, the sliding glass door and screen in the den were closed but not locked.  (*Id*. at 19194.)  Early in the morning, Ms. Petersen heard footsteps in the living room and from her bed saw a man in the hallway.  He was over six feet tall, had a muscular build, wore dark clothing, and had shaggy hair. The man stood at the bedroom doorway holding a silver object in his hands.  (*Id*. at 19178-80.)

251.    Ms. Petersen asked the man who he was and told him to get out.  He lowered the object, then shot her.  Ms. Petersen's face went numb and she fell back, but she did not feel any pain.  (165 RT 19181-83.)  Mr. Petersen sat up in bed as a second shot was fired; wounded, he fell back in bed.  The man stood at the foot of the bed laughing.  Mr. Petersen jumped out of bed and gave chase. Ms. Petersen heard two more gunshots.  Mr. Petersen fell to the floor.  (*Id*. at 19183-85.)  The gunman left the house by the sliding glass door.  (*Id*. at 19197-

19198.)  Their daughter started to scream.  Ms. Petersen got out of bed, grabbed her daughter, and ran next door.  (*Id*. at 19186.)  Finding no one home, Ms. Petersen went back home and dialed 911.  She grabbed a towel and wrapped it around her face to stop the bleeding.  She ran outside as her husband and daughter were getting into their truck.  They drove to Northridge Hospital.  (*Id*. at 19186-88.)

252.  Ms. Petersen had been shot on the left side of her nose; the bullet exited the back of her neck.  Mr. Petersen had been shot on the right side of the head; the bullet was still lodged in his neck.  (165 RT 19188-89.)

### ii)      Fingerprint evidence and physical evidence at the scene

253.  Los Angeles Police Department forensic print examiner Charles Caudell was dispatched to the Petersen home at 1:35 p.m. on August 6, 1985.  He took fingerprint lifts from the sliding glass door and screen door.  The lifts appeared to be fabric impressions from gardening gloves.  (168 RT 19554-56, 19559-60.)

254.  Los Angeles Police Detective Lewis Bobbitt arrived at the Petersen home at 4:00 a.m. on August 6, 1985.  He recovered items at the scene, including spent cartridges found in the bedroom.  (165 RT 19227-34.)  Detective Bobbitt examined a window screen that appeared to have a bullet hole.  (*Id*. at 19235.)

255.  Mr. Petersen later found a hole in the bedroom wall below the windowsill and above the ordinary position of his wife's head while in bed.  (165 RT 19205.)  On August 29, 1985, Los Angeles Police Detective David Weller recovered a projectile from the hole in the bedroom wall observed by Mr. Petersen.  (*Id*. at 19245-147.)

### iii)      Eyewitness identification

256.  In a statement to police, Ms. Petersen said that the gunman had well-manicured hands.  They were cleaner and lighter than the rest of his appearance.

In Ms. Petersen's opinion, the gunman's hands seemed more like those of an artist than a construction worker. (165 RT 19213-15, 19221.) She initially described the suspect as six feet tall, possibly taller, wearing dark tennis shoes, new Levi's or dark pants, a close-fitting T-shirt or turtleneck sweater. She said he had a very lean face, hollow cheekbones, wild hair, and a diabolical grin. (*Id*. at 19218-19.)

257. At trial, Virginia Petersen identified Petitioner as the intruder on August 6, 1985. Previously, she had identified Petitioner at a live line-up held on September 5, 1985. (165 RT 19189-91, 19201.) She also previously identified Petitioner at the preliminary hearing. Ms. Petersen clearly saw Petitioner's face during the incident and recalled that his hands were very long and light-colored; he could have been wearing gloves during the incident. (*Id*. at 19207, 19213.)

258. On cross-examination, Ms. Petersen said that she saw photographs of Petitioner on television and in the newspaper. She first saw his photograph on television on the night before his arrest. (165 RT 19215-16, 19221-22.)

> ### *o.    Abowath Incident (August 8, 1985)*
> ### *Counts 39 through 43 (§§ 459, 187(a), 261(2), 288a(c), 286(c))*
> ### i)    The attack on Sakina Abowath

259. Sakina Abowath and Elyas Abowath lived with their two children, a three-year old boy and a 10-week old boy at 21309 Pinehill Lane in Diamond Bar, Los Angeles County. (168 RT 19424-26.)

260. At 2:20 a.m. on August 8, 1985, Ms. Abowath awakened and went to feed her baby in another bedroom. She left a light on in the living room and a night light in the bedroom. (168 RT 19425-27, 19436.) After feeding her baby, Ms. Abowath went back to sleep in the master bedroom with her husband. Shortly, she was awakened by a noise that sounded like a "pop." Suddenly, she was hit very hard on the head and forcibly turned over on her stomach. She was

handcuffed and hit on the ears, and her hair was pulled.  An intruder stood on the bed; he kicked Ms. Abowath in the head very hard with his shoes.  (*Id*. at 19429-30.)  He tied her feet with a piece of clothing and stuffed her mouth with clothing.  The man slapped her, threatened to kill her children, and ordered her to "swear upon Satan" that she would not scream.  (*Id*. at 19431-32.)  The man put a blindfold over her eyes while she was on the floor.  Later, the man untied the blindfold, took the gag out of her mouth, and demanded money and jewelry.  Ms. Abowath pointed to the closet where several briefcases were kept.  (*Id*. at 19433-37.)

261.   Ms. Abowath indicated that there was jewelry in a briefcase.  The intruder opened the pocket of the briefcase and took out a bag of gold jewelry.  (168 RT 19438-39.)  He hit Ms. Abowath again, telling her not to look at him.  After looking at jewelry in the bathroom under the light, the man came back to her bedroom and demanded money.  He retrieved Ms. Abowath's purse and took her money; he looked for her husband's wallet in the kitchen.  (*Id*. at 19442-43.)  Returning again to the bedroom, the intruder took a ring off her finger and a small chain from her neck.  He hit her when she stated that she did not have a diamond wedding ring.  He told her to "swear upon Satan" that she did not have a wedding ring.  (*Id*. at 19444-45.)

262.   The intruder left the room but soon returned and tore off Ms. Abowath's pajamas.  He dragged Ms. Abowath by her hair to the guest bedroom.  He pushed her on the bed, beat her again, and told her not to scream.  Ms. Abowath sat on the bed as the intruder pulled her mouth to his penis and forced her to perform oral copulation.  (168 RT 19445-48.)  He forced her to engage in sexual intercourse.  Afterwards, he put a bedspread over her face.  When Ms. Abowath's son began crying, the intruder took Ms. Abowath into her son's room where she laid down with her son who went back to sleep.  (*Id*. at 19448-49.)  She was then taken into the guest bedroom, pushed down on the bed, and forced

to have sexual intercourse again after the man tried unsuccessfully to put his penis in her rectum. (*Id*. at 19450, 19452-54.) He left the room but returned when her son started screaming. Ms. Abowath told her son to get into bed with her. (*Id*. at 19451.)

263. The intruder tied her three-year old son by his hands and feet, pushed him on her bed, and placed pillows on top of him. The boy complained that he could not breathe. (168 RT 19452.) The man left the room but returned saying that he had hit Ms. Abowath's husband on the head. He was laughing. (*Id*. at 19455.) He asked for scotch tape to put over Ms. Abowath's son's mouth. Ms. Abowath told him she did not have any tape. He handcuffed her to the doorknob and moved the bed and pillows from the living room against the door. He threatened to return and kill her and the children if she called the police or went outside. She heard a car drive off. (*Id*. at 19455-59.)

264. Ms. Abowath untied her son's hands and feet and tried to open the door. She saw melon seeds on the hallway floor and panicked because she thought the melon was used to gag her husband. She told her son to go take out whatever was in his father's mouth, but he returned, saying he had found nothing in his father's mouth. His father did not wake up. (168 RT 19459-61.) Ms. Abwoath started screaming and told her son to go to the neighbor for help. He left the house and returned with a neighbor who quickly left. Another neighbor, Charles (Bob) Wilson, came in and checked on Mr. Abowath, who did not respond. (*Id*. at 19462-64.) A police officer arrived and freed Ms. Abowath from the door by kicking off the doorknob. Eventually, the handcuff was cut off with scissors. (*Id*. at 19465.)

265. Pomona Valley Hospital physician Kenneth Moore, M.D., treated Sakina Abowath on August 8, 1985. He noted abrasive injuries to her wrist consistent with being handcuffed, tender areas near her nose, and a small cut to her upper lip. Ms. Abowath suffered bruising and swelling to the vagina and a

small cut outside the vagina consistent, in Dr. Moore's opinion, with sexual assault. There was a superficial tear around Ms. Abowath's anus consistent with forced insertion of a penis into the rectum. (174 RT 20328-31.)

### ii) The death of Elyas Abowath

266. At 3:43 a.m. on August 8, 1985, the Abowaths' neighbor Charles (Bob) Wilson, was awakened by the ringing of his front doorbell. The neighbors' son was at the door dressed in pajamas. He appeared frightened and asked Wilson for ice cream. The son had a belt tightly wrapped around his arm. (168 RT 19496-98.) Wilson and his wife went next door and found Sakina Abowath handcuffed to a doorway, screaming. She asked for a robe. Wilson's wife returned home and called police. (*Id*. at 19498-502.) Charles Wilson checked on Elyas Abowath. He tried to resuscitate Mr. Abowath but concluded that he was dead. (*Id*. at 19503-04.)

267. Deputy Sheriff John Knight responded to the scene at 4:08 a.m. and entered the residence with his partner, Deputy Kirk Smith. He found Ms. Abowath handcuffed to a bedroom door. She was hysterical and asked him to help her husband. Mr. Abowath appeared to be dead; he was not breathing and had no pulse. There was a small amount of blood on the left side of his head. (168 RT 19510-12.)

### iii) Cause of death

268. Dr. Joseph Cogan performed an autopsy on the body of Elyas Abowath on August 9, 1985. In Dr. Cogan's opinion, the cause of death was a gunshot wound to the head. There was stippling around the entrance wound above the left ear indicating that the weapon was fired at close range, approximately one inch from Mr. Abowath's head. (167 RT 19411-12.) A copper-jacketed, small-caliber bullet was recovered during the autopsy. (*Id*. at 19413-14.)

### iv) Shoe print evidence and other physical evidence

269.    Sergeant Sheriff Patrick Robinson arrived at the Abowath home at 5:40 a.m.  He observed that the bottom portion of a window screen next to the sliding glass door had been bent and pulled away from the frame.  The window and the sliding door were open.  The lock on the slider had pry marks and the screen also was bent.  (168 RT 19527-29.)  There were shoe prints on the linoleum floor in the kitchen.  There was a melon on the kitchen counter; seeds from the melon were scattered on the hallway carpet.  Telephone wires in the master bedroom had been cut.  (*Id*. at 19529-32.)  Elyas Abowath's body was found on the bed.  Two briefcases and other boxes were on the floor of the master bedroom; the room had been ransacked.  A small-caliber expended bullet shell was found on the right side of the mattress.  (*Id*. at 19532-34.)

270.    Deputy Sheriff Ralph Salazar photographed the Abowath residence and collected evidence.  He examined a shoe print on the linoleum floor and took two lifts of the print.  (168 RT 19538-42.)

### v)      Eyewitness identification

271.    Sakina Abowath attended a live line-up on September 5, 1985, at which she identified Petitioner.  At the preliminary hearing, she identified Petitioner as the intruder and assailant.  (168 RT 19465-68.)  At trial, she identified Petitioner as her assailant.  (*Id*. at 19439.)

272.    Ms. Abowath initially described her assailant as a light-skinned Caucasian, 6'2" to 6'4", with light to medium brown hair.  (168 RT 19512-14.)  She reported that his teeth were stained and crooked.  (*Id*. at 19518.)  She recalled that the intruder wore gloves while inside her house.  (*Id*. at 19478.)  She assisted in preparing a composite drawing and told the police artist that, based on lighting in her bathroom, she thought that the man's hair was light brown.  (*Id*. at 19481-83.)  She reported that the intruder wore jeans and hard shoes, not tennis shoes.  (*Id*. at 19487, 19490.)

### vi)      Identification of recovered property

273. On September 5, 1985, Sakina Abowath attended a property line-up. She identified jewelry, including two gold chains, earrings, an engagement ring, a necklace pendant, a television, and a VCR as property taken from her home by the intruder on August 8, 1985. (168 RT 19468-70.)

### p. The Uncharged Incident

274. On May 9, 1985, Monrovia Police Officer Thomas Wright responded to a call at 424 West Olive Street in Monrovia, Los Angeles County. Officer Wright found that louvers were removed from the kitchen window; a patio chair pushed against the wall. Officer Wright dusted for fingerprints and lifted several prints and a shoe print from the kitchen sink and a fingerprint from the kitchen awning. A shoe print on the patio that could not be lifted matched the tread pattern of the shoe print found on the sink. (150 RT 17396-403.)

### q. The Live Line-up

275. A live line-up was conducted and videotaped at the Los Angeles County Jail on September 5, 1985. Petitioner stood in position number two. He was identified by Maria Hernandez, Carol Kyle, Sophie Dickman, Virginia Petersen, Somkid Khovananth, and Sakina Abowath.

276. The videotape was admitted into evidence at trial and viewed by the jury. (169 RT 19571-73, 19575-76.)

### r. Physical Evidence Linking Petitioner to the Crimes

277. Prosecution experts who testified at trial linked Petitioner to many of the alleged crimes. Fingerprints found at the Vincow scene and at the uncharged scene were identified as Petitioner's fingerprints. Shoe prints found at eight scenes were made by Avia shoes; in seven of those incidents, the shoe was determined to be an Avia aerobics model, size 11 to 12. Petitioner was positively identified by a victim in one of the incidents in which Avia shoe prints were found. In one incident, shoe impressions found at the scene matched Stadia

shoes, size 12, worn by Petitioner at the time of his arrest.  Ballistics analysis confirmed that many of the incidents were linked by use of a common weapon.

278.   The following chart briefly summarizes the physical evidence the prosecution introduced in an attempt to link Petitioner to the charged and uncharged crimes.

| Incident | Evidence | Findings |
| --- | --- | --- |
| 1.  Vincow | Fingerprint | Matched Petitioner's rolled prints |
| 2.  Hernandez/Okazaki | .22-caliber revolver | Bullet fired from same weapon in Yu and Kneiding |
| 3.  Yu | .22-caliber revolver | Bullet fired from same weapon in Okazaki and Kneiding |
| 4.  Zazzara | Shoe print | Avia, size 11-½ to 12 |
|  | .22-caliber revolver | Bullet fired from same weapon in Khovananth |
| 5.  Doi | Shoe print | Avia, size 11 to 12 |
|  | .22-caliber semi-automatic | Jennings .22-caliber semi-automatic pistol[23] |
| 6.  Bell/Lang | Shoe print | Avia |
|  | Gloves |  |

---

[23]  Jennings Firearms were manufactured in Nevada and Southern California.

| Incident | Evidence | Findings |
|---|---|---|
| 7. Kyle | Gloves | |
| 8. Cannon | Shoe print | Avia, size 11 to 11-½ |
| 9. Bennett | Shoe print | Avia, size 11 to 12 |
| | Gloves | |
| 10. Nelson | Shoe print | Avia, size 11-½ to 12 |
| | Gloves | |
| 11. Dickman | Gloves | |
| 12. Kneiding | .22-caliber revolver | Bullet fired from same weapon in Okazaki and Yu |
| 13. Khovananth | Shoe print | Avia, size 11-½ to 12 |
| | Gloves | |
| | .22-caliber revolver | Bullet fired from same weapon in Zazzara |
| 14. Petersen | .25-caliber automatic | Bullet fired from same weapon in Abowath |
| 15. Abowath | Shoe print | Stadia, size 12 |
| | .25-caliber automatic | Bullet fired from same weapon in Petersen |
| 16. Uncharged | Fingerprint | Matched Petitioner's rolled prints |

| Incident | Evidence | Findings |
|----------|----------|----------|
|          | Shoe print | Avia |

### i. Fingerprint evidence

279. the prosecution asserted that Petitioner's rolled fingerprints matched lifts taken from the Vincow home and in the uncharged case. The prosecution also asserted that Petitioner's fingerprints also matched fingerprints found inside a 1976 Pontiac Grand Prix automobile, on the contents of a bag seized from the Greyhound bus station, and on items found inside a backpack belonging to Petitioner seized at the time of his arrest.

280. Deputy Sheriff Hannah Woods, an expert in fingerprint identification, compared Petitioner's rolled fingerprints with latent prints found on the window screen at the Vincow residence. In Woods's opinion, the latent prints lifted at the Vincow residence matched Petitioner's rolled fingerprints. (175 RT 20489-90, 20493-97.) Woods also positively identified Petitioner's fingerprints on lifts from the scene of the uncharged case at 424 West Olive Street, Monrovia. (*Id*. at 20499-501.) Woods further identified Petitioner's fingerprints on lifts taken from a coffee cup retrieved from the Pontiac Grand Prix and from the vehicle's rearview mirror. (*Id*. at 20502-03.) Woods identified Petitioner's fingerprints on items found inside the Greyhound bag and backpack. (*Id*. at 20504-06.)

### ii. Shoe print evidence

281. Criminalist Gerald Burke examined the shoe print evidence from eight crime scenes: Zazzara, Doi, Bell and Lang, Cannon, Bennett, Nelson, Khovananth, and the uncharged incident. Burke concluded that some of the impressions found at the scenes were made by Avia's aerobic or basketball shoes, ranging in sizes 11 to 12. In Burke's opinion, a size 12 Stadia shoe seized from

Petitioner following his arrest matched a shoe print pattern found at the Abowath scene. (*See infra*.)

282. Avia Footwear data processing manager Jeff Brewer testified about sales of the Avia Model 445B. The men's Avia aerobics model 445B was no longer being produced. The average life of a particular shoe model was typically eighteen months. Of the total production run of Model 445B, 5.1% were made in size 11-½. (174 RT 20279-80.) In Southern California, from January through July 1985, twenty-four pairs of Avia model 445B, black in color, were sold. Only one pair of size 11-½ was sold. (*Id*. at 20280-81.) In the San Francisco Bay Area, forty-one pairs of model 445B shoes were sold from January through July 1985. Only two of the pairs sold were size 11-½. (*Id*. at 20281-82.) In all, three pairs of size 11-½ men's model 445B were sold in the San Francisco Bay Area and Southern California. (*Id*. at 20283.) In Northern California and Nevada, a total of ninety-four pairs of size 11-½ shoes were sold. Nationally, there were 1,225 pairs of model 445B, size 11-½ shoes sold during that period of time. All the shoes had the same width. (*Id*. at 20283-85.)

283. The total number of Avia aerobics shoes sold from January through the end of July 1985 was 33,447. A large percentage, 72.7%, went to undesignated areas of the country. The sizes that were shipped in the largest volume were sizes 9-½ and 10. No records were kept on shoes that could be "pirated." Avia did not sell new soles for its own shoes. (174 RT 20286-89.) Avia shoes were manufactured overseas. Avia did not license the sole pattern to other companies. Sales records were adjusted for returns; the men's model 455B was adjusted for returns. (*Id*. at 20289-95.)

284. The total number of men's white aerobics shoes, model 445 sold from January through July 1985 was 31,110; 580 pairs were sold in Southern California, 38 pairs in the Bay Area, 6,192 pairs in Northern California and Nevada. There were approximately 24,300 pairs sold to national distributors.

The shoe, in both black and white, first came on the market in mid-February 1985. (174 RT 20296-99.)

285. Jerry Stubblefield, formerly vice president of research and development for Avia Footwear, testified that he designed the Avia sole which had two patented features: a cantilever outsole based on a concave shape, to deflect and absorb shock, and pivotal flex joints to allow the foot to bend and pivot at the same time. (174 RT 20301-03.) The coach and basketball models in both white and black used the same sole. The coach model came in black; the basketball model in white. Avia did not make black basketball shoes or high-top shoes. In 1985, Avia made a white high-top basketball model. (*Id*. at 20303-04.) The white aerobics shoe, model 445 came on the market in November 1984. There was no structural difference between the sole of the white and black models. There were twenty-four molds manufactured in Taiwan for the run; only one mold was used for size 11-½. (*Id*. at 20308-09.)

286. Although the same patents applied to the aerobics and coach models shoes, there were a few differences between them. The pattern in the heel of the coach model did not go to the back of the heel, and the length of the groove also was wider down the center of the sole. There was a slight difference between the pivotal flex joints, and the chevrons did not meet the flex joint. (174 RT 20304-05, 20319.) Avia won a patent infringement lawsuit against LA Gear sometime after mid-1985. The infringement was based on the back part of the Avia shoe sole combined with another company's sole and a different tread pattern. There was no infringement on the pivotal portion of the sole. (*Id*. at 20306-07.)

287. The Stadia shoes were manufactured by Kinney Corporation. Many shoe companies skipped half-sizes above size 11 because there was little difference, only about one-sixth of an inch in the actual length, and one-twelfth of an inch in width. Stadia shoes did not come in size 11-½. (174 RT 20310-13.)

The Stadia shoes were less expensive than the Avia aerobics shoe, which cost about 45 dollars.  (*Id*. at 20322.)

288.  Stubblefield testified that, of the shoe  prints provided by the Sheriff Department that  he examined, at least one or two prints were made by the Avia aerobics shoe, based on the distinctive heel pattern.  He further testified that all of the partial shoe prints that he examined were made by Avia Shoes, either the aerobics or basketball model.  (174 RT 20317-18.)  Avia provided outsole replacement jogging shoes.  (*Id*. at 20316.)  Avia manufactured sole replacements for jogging shoes that were different from the aerobics shoe.  Stubblefield was uncertain whether Avia also produced outsoles for the aerobics model.  (*Id*. at 20321, 20324.)

289.  Criminalist Burke had no previous experience in the comparison of shoe print evidence.  In June 1985, Burke identified an Avia shoe sole after examining ninety-seven different brands of shoes.  (174 RT 20373-76.)  Around July 1, 1985, Sergeant Salerno brought a pair of Avia shoes to Burke's lab.  Shortly thereafter, Burke went to Avia Footwear in Oregon where he met with Stubblefield to compare the Avia aerobics model shoe to basketball and coach models.  (*Id*. at 20377-79.)  He observed noticeable differences between the structure of the two types of soles; the aerobics outsole was different than the Avia basketball or coach model.  Burke made inked impressions of the outsoles and prepared overlays to compare shoe print patterns found at various scenes.  (*Id*. at 20382-84.)  He spent two and one-half months evaluating the shoe print evidence in this case. (175 RT 20430.)

### a)  Zazzara Incident

290.  Burke examined plaster casts from shoe print impressions found in the flowerbed and on a bucket lid at the Zazzara home.  He compared the sole patterns of the impressions to the Avia aerobics shoe using overlays.  The pattern of the casts fit the Avia aerobics model, size 11-½ to 12.  A partial pattern of one

of the impressions was consistent with the Avia chevron pattern. (174 RT 20386-89.) The size 11-½ aerobics model had a unique sole pattern of ten chevrons and a narrow ridge in the heel. The line around the chevrons had a more gentle slope than other Avia models. The ridge pattern on the coach or basketball model which had the same sole and only nine chevrons was wider than the aerobics model. (Id. at 20392-95.)

### b) Doi Incident

291. Burke compared plaster casts from shoe prints at the Doi scene with Avia overlays and found the impressions were made by an Avia aerobics or basketball shoe, size 11 to 12. He was unable to determine the exact model. (174 RT 20389-91.) A right shoe print found outside the bathroom window was an Avia shoe. Based on Burke's research, in his opinion no other model or brand of shoe had the same sole pattern as the Avia shoe. (*Id*. at 20396, 20398-99.)

### c) Bell and Lang Incident

292. The concentric circle pattern on an electric clock was consistent with the unique circle pattern found on the sole of an Avia shoe. Burke was unable to determine the model or size. (174 RT 20400-01.) In his early analysis, Burke found dissimilarities in the sole patterns of shoe impressions found at the Zazzara and Bell and Lang scenes but later changed his mind after obtaining flat outsoles from Avia. (175 RT 20467-71, 20476-79.)

### d) *Cannon Incident*

293. Burke examined a partial shoe print found on a piece of tissue paper found in the northeast bedroom and an outline of a shoe print found on carpeting in the southeast bedroom. The partial print on the tissue was consistent with an Avia aerobics left shoe; but the size could not be determined. The shoe print on the carpet was similar to an Avia aerobics shoe, size 11 or 11-½. Both prints shared similar characteristics, including the chevron pattern. (175 RT 20405-09.)

### e) Bennett Incident

294.   Burke examined a pink comforter and photographs of two partial shoe prints on the comforter.  In Burke's opinion, the more complete shoe print was an Avia aerobics shoe, size 11 to 12.  (175 RT 20410-12, 20448.)

### f)   *Nelson Incident*

295.   Burke examined lifts of shoe prints from the back porch and compared them to the Avia overlays.  In Burke's opinion, one of the shoe prints was made by an Avia aerobics shoe size 11-½ to 12.  The remaining shoe print lifts did not show enough detail to determine the shoe's model, but, in Burke's opinion, they were made by an Avia shoe.  (175 RT 20412-14.)

### g)   **Khovananth Incident**

296.   Burke examined shoe print lifts from the front porch, back step near the sliding glass door, and hallway.  In his opinion, the impression found on the front porch was made by an Avia aerobics shoe, size 11-½ to 12.  The back step and hallway patterns were consistent with an Avia shoe.  (175 RT 20415-20.)

### h)   *Uncharged Incident*

297.   Burke examined a shoe print lift that appeared to have been made by an Avia shoe.  He was unable to determine the model or size.  (174 RT 20397-98.)  Burke testified that in measuring shoe print impressions, slippage of the foot and the type of surface must be considered.  As a result of these variables, it was not possible to make precise measurements of all prints.  (175 RT 20421-23, 20435.)

### i)   **Abowath Incident**

298.   In Burke's opinion, a shoe  print lifted from the dining room floor was made by a Stadia shoe, but Burke could not determine whether it was made by a left or right shoe.  Burke examined Petitioner's Stadia shoes, size 12, and found they matched the dot matrix pattern of the lifted impression.  (175 RT 20423-27.)

299.   On cross-examination, Burke conceded that the size of shoe prints involved ranged from size 11 to 12.  (175 RT 20435-36.)  Burke's measurements of a shoe outsole were made by placing the sole against a wall and estimating the distance from one end to the other.  (*Id*. at 20438-42, 20450-53.)  In some instances, his measurements were affected by the nature of the surface on which the measurement was made, for example, plaster casts in the Zazzara and Doi incidents.  (*Id*. at 20454-60.)  In the Bell and Lang and Cannon incidents, there were insufficient impressions to obtain accurate measurements.  (*Id*. at 20460-61.)  In the Bennett incident, the shoe size was estimated by counting the number of chevrons in the sole pattern.  (*Id*. at 20462-63.)  In the Nelson and Khovananth incidents, Burke made measurements of lifts taken from the scenes, then compared the sole patterns of the lifts to overlays.  (*Id*. at 20464-65.)  The concentric sole pattern was not found on any other shoes that he examined.  (*Id*. at 20436-37.)

### iii.   Ballistics and firearms evidence

300.   In the eight incidents in which a firearm was used, four different firearms were identified:  (1) one .22-caliber firearm fired all the bullets recovered in the Okazaki, Yu, and Kneiding incidents; (2) another .22-caliber firearm fired bullets recovered in both the Zazzara and Khovananth incidents; (3) a Jennings .22-caliber, long-rifle, semi-automatic pistol was used in the Doi incident; and (4) a single .25-caliber firearm fired bullets in both the Abowath and Petersen incidents.

301.   Deputy Sheriff Edward Robinson worked in the firearm identification section; he first became involved in the case in April 1986.  (172 RT 20008-12.) Deputy Robinson testified that firearm identification required the use of a comparison microscope to manipulate bullets from different angles.  All of the bullets and bullet fragments in this case were photographed through the comparison microscope by a camera attached above the eyepiece in order to

demonstrate identifiable marks. Each photograph was numbered; notes were made of the findings. (*Id*. at 20016-18.) In Robinson's opinion, a positive identification meant that a bullet was fired from a firearm "to the exclusion of all other firearms." Microscopes in his laboratory were calibrated twice yearly. (*Id*. at 20082, 20085.)

### a) Okazaki, Yu, and Kneiding Incidents

302. Based on his examination of projectiles recovered at the three scenes, in Robinson's opinion the bullets were all fired from the same .22-caliber firearm. Projectiles in the Okazaki incident (Prosecution's Trial Ex. 5-A), the Kneiding incident (Prosecution's Trial Ex. 30-E), and the Yu incident (Prosecution's Trial Ex. 6-1) had identical characteristics: six lands and grooves with a right-hand twist, the most common characteristics of .22-caliber firearms. Robinson was unable to determine the manufacturer and exact type of firearm that fired the recovered bullets. (172 RT 20034-46.)

### b) Zazzara and Khovananth Incidents

303. In Robinson's opinion, projectiles fired in both incidents (Prosecution's Trial Exs. 9-G and 32-F, respectively) were fired from the same .22-caliber firearm. (172 RT 20047-49.) The firearm was different from the .22-caliber firearm used in the Okazaki, Yu and Kneiding incidents. (*Id*. at 20051-52.)

### c) Doi Incident

304. A Jennings semi-automatic pistol (Prosecution's Trial Ex. 46) fires .22-caliber, long-rifle ammunition. Long-rifle ammunition refers to the size of projectile and can be fired from a handgun. (172 RT 20057-58.) Robinson compared test fires from the Jennings pistol (Prosecution's Trial Ex. 46) to a bullet fragment recovered from William Doi (Prosecution's Trial Ex. 11-B). Robinson concluded that the bullet was fired from the Jennings pistol. In Robinson's opinion, a cartridge casing found on the hallway floor of the Doi

residence (Prosecution's Trial Ex. 11-B) was fired from the same pistol as well. (*Id*. at 20060-65.)

305. Robinson determined that the Jennings firearm used in the Doi incident was not used in either the Okazaki, Yu and Kneiding incidents or in the Zazzara and Khovananth incidents. (172 RT 20065-66, 20078.)

### d) Petersen and Abowath Incidents

306. Robinson compared the bullet recovered from Elyas Abowath and a cartridge casing found at the scene (Prosecution's Trial Ex. 40-G) with expended .25-caliber cartridge casings and a slug or deformed bullet in the Petersen incident (Prosecution's Trial Exs. 38-B and 38-C). In Robinson's opinion, the cartridge casings and bullets in both cases were fired from the same .25-caliber firearm. A .25-caliber weapon was not recovered. (172 RT 20066-70.)

307. Robinson compared .25-caliber ammunition recovered from the Greyhound bag (Prosecution's Trial Ex. 52-L) with .25-caliber long-rifle cartridge casings in the Abowath and Petersen incidents. In his opinion, the tool marks on the expended .25-caliber cartridge casings in those incidents were the same as the tool marks on the .25-caliber live ammunition from the Greyhound bag. (172 RT 20071-76.)

### iv. Recovery of .22-caliber Jennings pistol

308. Jesse Perez testified that he met Petitioner through Petitioner's brother, Julio Ramirez, who lived near Florence Avenue and Central Avenue in Los Angeles. (170 RT 19653-54.) Perez often saw Petitioner at the Greyhound bus station in downtown Los Angeles where Perez frequently worked as an unlicensed taxi driver. He once drove Petitioner to Tijuana. (*Id*. at 19654-55.) He also drove Petitioner around Los Angeles. On one occasion, Perez drove Petitioner to a barbershop at Alvarado and Third Streets where Perez saw Felipe Solano. (*Id*. at 19655-56; *see infra*.) At times, Petitioner called himself Richard Moreno. He also had a nickname "Greñas" which referred to his long, uncombed

hair. (*Id*. at 19711-12.) Petitioner told Perez that he liked to go to yellow houses because "orientals live in yellow houses," and that he liked to burglarize their houses for jewelry since the victims would not retaliate. (*Id*. at 19712-14.)

309. Perez denied that he had committed any crimes with Petitioner. He testified that his daughter was a Deputy Marshal. (170 RT 19657.) In August 1985, he met with Los Angeles sheriff deputies at his daughter's insistence. The meeting occurred after Perez saw a description of the Night Stalker in the newspaper; he told his daughter that Petitioner fit the description of the suspect. (*Id*. at 19657-61.)

310. Perez testified that he obtained the .22-caliber, long-rifle semi-automatic pistol and ammunition clip (Prosecution's Trial Ex. 46) from Petitioner. He gave the weapon to his girlfriend, Esperanza Contreras, in Tijuana. (170 RT 19661-63.) Perez was granted immunity from prosecution for being an ex-felon in possession of a firearm. He was sixty-five years old and had lived in Los Angeles since 1969. (*Id*. at 19651, 19670-71, 19709.) He previously had been convicted of manslaughter following a barroom fight and had served a prison sentence. Forty years earlier he had been sentenced to prison on a burglary conviction. (*Id*. at 19652, 19709.)

311. Perez accompanied Sheriff Detective Aguilar to Tijuana to retrieve the Jennings pistol from Contreras on August 31, 1985, the day Petitioner was arrested. Contreras turned the weapon over to Detective Aguilar. (170 RT 19666-69, 19676.)

312. On cross-examination, Perez did not recall that he had previously testified at the preliminary hearing about asking Petitioner to sell him a handgun six to nine months before Petitioner's arrest. (170 RT 19679-81.) Perez once saw a black .25- or .32-caliber automatic firearm in a car that Petitioner drove. (*Id*. at 19664-65.) Perez worked odd jobs, doing residential construction work for individuals in west Los Angeles. He never discussed with Petitioner the

locations of his jobs or what was inside the homes where he worked. He also drove people to Tijuana off and on during 1985 in several cars, including a white Dodge station wagon. (*Id*. at 19685-92.) Petitioner bought Perez lunch in exchange for driving him a few times, once to a pool hall to get money and, on another occasion, to Felipe Solano's home. (*Id*. at 19698-700.) Perez denied that he ever drove Felipe Solano to Tijuana. (*Id*. at 19693.)

313. Esperanza Contreras testified that she had been living in Tijuana, Mexico for fifteen years and that she knew Jesse Perez. She first saw the handgun (Prosecution's Trial Ex. 46) three years prior to trial. Perez brought it to her because she needed a gun for protection. (170 RT 19723-24.) She kept it in a cabinet; it did not have any bullets. She had the gun for about a month and then gave it to a police officer. She was granted immunity from prosecution at the preliminary hearing. (*Id*. at 19725-26.) She did not know Petitioner. (*Id*. at 19727.)

314. Sheriff investigator Wayne Griggs met Jesse Perez on August 30, 1985 at the sheriff homicide bureau in downtown Los Angeles. He made arrangements to accompany Perez and Sergeant Aguilar by helicopter to San Diego the next morning. They then traveled to Tijuana. Perez left Griggs and Aguilar at a restaurant. He returned an hour later with Esperanza Contreras who surrendered a .22-caliber Jennings semi-automatic pistol. At the Customs office at the border, Griggs found that the weapon was loaded with a clip containing five .22-caliber rounds. (170 RT 19666-69, 176 RT 20576-79.)

### v. Recovery of stolen property

315. After Petitioner's arrest, property was recovered that had been taken from the following victims: Doi, Bell, Lang, Kyle, Cannon, Diclanan, Kneiding, Khovananth, and Abowath. Donna Myers, who lived in the San Francisco Bay area and was acquainted with Petitioner, testified that Petitioner gave her some jewelry in 1985. Felipe Solano, a known Los Angeles "fence," also testified that

he bought many items from Petitioner, including jewelry.  Property belonging to the victims was also recovered from Petitioner's family in El Paso.

### a)    Donna Myers

316.    Donna Myers lived in San Pablo in the East Bay area.  In 1979, she met Armando Rodriguez.  (169 RT 19579-80.)  That same year, she went to visit Rodriguez's relatives in El Paso, Texas; there she met Petitioner.  Between 1979 and 1981, Petitioner stayed a few times at her home in Richmond, California, which she shared with Rodriguez.  Later, after she had moved to live alone in San Pablo, Petitioner and Rodriguez frequently came to visit her.  (Id. at 19581-82.)

317.    On August 16, 1985, Petitioner came alone to her house.  He brought a jewelry box containing jewelry and asked Myers to hold it for him.  A few days later, Petitioner returned to Myers's home to pick up his things.  Petitioner gave her the jewelry box, a bracelet, and three rings.  She described the box as glass, 6- 8" wide, with a lid.  Petitioner took the rest of the jewelry with him when he left.  Myers described the jewelry as "14 carat gold, good jewelry." (169 RT 19583-86.)  Myers kept the jewelry box and gave the bracelet to her daughter, Deleen Gregg, and a ring to her granddaughter.  She gave a man's ring to her son, Floyd Joseph Dvorak, Jr., and kept one ring for herself.  (*Id*. at 19586-88.)

318.    On August 30, 1985, Myers was contacted by San Francisco Police Officers Frank Falzon and Carl Klotz.  They asked her about the bracelet that she had given to her daughter.  She explained how she got the jewelry and turned over the jewelry box and ring to police.  Myers indicated that she knew Petitioner as "Rick."  In an effort to obtain his last name, she gave police a telephone number for Armando Rodriguez.  (169 RT 19589-91.)

319.    In 1985, Myers saw Petitioner dressed in dark pants, shirt, and shoes.  Petitioner told her he wore dark clothing so that he would not be seen at night.  He also told her that he was "ripping people off."  She saw Petitioner

wearing brown cloth garden gloves on several occasions. (169 RT 19592-93.)
Several times, Petitioner brought costume jewelry to her home. Myers watched
Petitioner box up jewelry; he told her he was going to send it to his sister, Rosie.
In mid-1985, Petitioner gave her 500 dollars to hold for him. He told her that if
anything happened to him, she should mail the money to Rosie. He wrote her
telephone number on an envelope. Shortly thereafter, Petitioner picked up the
money. Myers gave the envelope to police on August 30, 1985. (*Id*. at 19593-
95.) On one occasion, Petitioner gave Myers 75 dollars, and he later told her to
wire the money to Los Angeles in the name of Rick Mena. (*Id*. at 19599-600.)
Myers testified that Petitioner had an ink drawing of a pentagram on his left arm,
but it was not a tattoo. Petitioner told Myers that Satan was his "supreme being."
(*Id*. at 19596.) Once, she saw Petitioner examine a large police revolver that he
was going to buy from Rodriguez, but eventually he did not buy the gun. She
never saw Petitioner carry a gun. Petitioner told her he was fencing jewelry in
Los Angeles. In 1985, Petitioner claimed to have a master key for Datsun and
Toyota vehicles. (*Id*. at 19596-98.)

320. In 1985, Myers also saw Petitioner in possession of foreign coins
and coin purses. (169 RT 19601.) On one occasion, Petitioner asked if she was
afraid of him; he told Myers he could kill her and that no one would know. In
late August 1985, they watched television and saw a composite drawing of "the
Night Stalker." Myers told Petitioner that he fit the description, but "he didn't
have enough guts to kill anybody." (*Id*. at 19602.) She testified that Petitioner's
teeth were discolored, chipped, and decayed. (*Id*. at 19598.) Petitioner used a
weight gain supplement to put on weight. In August 1985, Petitioner told Myers
that he left Los Angeles to get away for a while. (*Id*. at 19603.) Petitioner was
peaceful around Myers and her family. (*Id*. at 19605-07.)

321. Earl Gregg, Myers's son-in-law, also lived in San Pablo. He
testified that he had known Petitioner for ten years; he met him through Armando

Rodriguez. (169 RT 19618-20.) Around Easter 1985, Gregg saw Petitioner at Myers's house. Petitioner asked Gregg if he wanted to buy a gun. Petitioner showed him two guns: a .25-caliber automatic and a small-caliber, black revolver that resembled the Jennings handgun (Prosecution's Trial Ex. 46). Petitioner said he had some rifles, but Gregg never saw them. (160 RT 19620-23.) Petitioner pulled the handguns out of a brown, zippered gym bag. (*Id.* at 19623, 19625-26.) Gregg never saw Petitioner with a backpack. (*Id.* at 19628.)

### b) Felipe Solano

322. Felipe Solano first testified at the preliminary hearing and, at trial, was granted immunity from prosecution for receiving stolen property. (172 RT 20112-14.) In 1984 and 1985, Solano lived at 842 Laveta Terrace, Echo Park in Los Angeles County. (*Id.* at 20115.) He first met Petitioner in late November or early December 1984 at the Greyhound bus station on Sixth Street in Los Angeles. After meeting Solano, Petitioner offered to sell Solano a small car. About five days later, Petitioner called about the car and then drove to Solano's house in a maroon or dark brown Toyota station wagon. Petitioner offered to sell the vehicle to Solano but did not have the pink slip. (*Id.* at 20116-19.)

323. A week later, Petitioner returned to Solano's home with a television that he sold to Solano for approximately 200 dollars. Petitioner told Solano that his name was Ricardo Moreno; he also told Solano that his name was David. (172 RT 20119-20.) Several weeks later, Petitioner brought Solano some jewelry, including three rings. Solano did not buy anything. Petitioner gave him some colored chains and bracelets and indicated they were costume jewelry. (*Id.* at 20120-22.) Petitioner again offered to sell jewelry to Solano in 1985. Solano bought a piece of gold jewelry, marked "14 K" or "18 K." Altogether, Solano bought jewelry from Petitioner eight to ten times; he also bought a television, VCR, and radio. (*Id.* at 20123-25.) Petitioner gave Solano some pieces of costume jewelry that Solano gave to his wife; he saved the gold jewelry. Solano

denied that he sold any of the jewelry obtained from Petitioner to others. He did sell the television and radio to Jorge Castro who lived in a hotel near Alvarado Street between Fifth and Sixth Streets. (*Id.* at 20126-27.) After police contacted him, Solano reclaimed the television and radio from Castro and gave Castro back his money. (*Id.* at 20127-28.)

324. Solano knew about the price of gold jewelry by window shopping at jewelry stores. The prices he paid to Petitioner for jewelry were "ridiculous" and "cheap." (172 RT 20128-29.) Solano also bought clothes from four to five people who hung around a pool hall on Alvarado Street. He believed the clothing and jewelry were stolen because of the inexpensive prices that he paid for them. (*Id.* at 20130-31.) Solano last bought jewelry from Petitioner in August 1985. On occasion, Solano gave Petitioner money even though he did not buy anything from him. Twice, he wired money to Petitioner in San Francisco in the name of Ricardo Moreno. (*Id.* at 20132-33.)

325. Solano testified that Petitioner usually wore dark clothes. Many times, Petitioner wore a baseball cap with lettering similar to the cap with AC/DC written on it. (Prosecution's Trial Ex. 3-E.) Solano saw a star and circle drawing on Petitioner's left forearm and his palm. (172 RT 20133-35.)

326. Solano first saw Petitioner's photograph on television on August 30, 1985, the night before his arrest. Solano had last seen Petitioner two days earlier when Petitioner asked him for money. Petitioner was wearing a light, short-sleeved shirt and was driving a motorcycle. Petitioner had an object shaped like a gun tucked under his shirt. Petitioner indicated he needed money "because he was very hot and he had to leave the city." (172 RT 20135-36; 173 RT 20236.) Afterward, Solano moved his wife and children out of their house. He was afraid because he had seen a picture on television of a station wagon similar to the one driven by Petitioner. He gave some of the jewelry obtained from Petitioner to his son; he took other pieces to a factory where he worked. (172 RT 20137-39.) The

night before Petitioner was arrested, he called Solano at approximately 11:00 p.m. and asked him for 1,000 dollars. Solano told Petitioner he did not have any money. Petitioner said to him, "In the morning I'm going for it." (*Id*. at 20136-37.)

327. Police came to Solano's home on the day after Petitioner's arrest and asked him if he knew Petitioner. He admitted that he did. Solano's house was searched by police and property was impounded. (172 RT 20140-41.)

328. Solano identified photographs of a Pontiac Grand Prix as a vehicle that Petitioner drove on two to three occasions. (Prosecution's Trial Exs. 48 and 48-A; 172 RT 20145-46.) Solano once saw a woman in the car with Petitioner, but he did not see her face. On some occasions, Petitioner arrived at Solano's house on foot. (173 RT 20196-97.)

329. On cross-examination, Solano admitted that in his first police interview he did not tell officers about property that he had moved from his house to other locations. (173 RT 20152.) He also did not disclose to police that he kept jewelry in his van. After a police search of his van failed to yield any jewelry, Solano turned over more jewelry to police, including a wedding ring set. (*Id*. at 20205-07.) The day after Petitioner's arrest, Solano spoke to a woman at a pool hall about buying gold and silver chains. (*Id*. at 20188-91.) He saw the woman again the next night at his home. He was angry that the woman came to his home; he did not buy anything from her. (*Id*. at 20191-93.)

330. Solano admitted that Eva Castillo[24] worked at his home before he met Petitioner. On at least one occasion, Solano saw Castillo with Petitioner at the House of Billiards on Alvarado Street. Solano denied that Castillo ever sold him jewelry. (173 RT 20200-05.)

---

[24] Eva Castillo is an alias for Rosa Solis. *See infra*.

331.   Solano also testified that during a police interview he said he received a revolver from Petitioner, but he did not know the caliber.  Solano kept the gun in his car for safety reasons.  He did not remember whether or not the gun had ammunition.  (173 RT 20213-15.)  On one occasion, Solano saw Petitioner clean his hands with a red-stained pillowcase.  (*Id*. at 20231.)

332.   Petitioner frequently asked Solano for money, usually 15 to 20 dollars.  When Solano loaned him money, Petitioner did not pay him back.  In total, Solano paid Petitioner approximately 2,000 to 2,500 dollars for the property he bought.  (173 RT 20215-17.)  After Petitioner's arrest, Solano gave him some money in jail.  (*Id*. at 20220-21.)

333.   On August 30 and 31, 1985, Sheriff Detective Frank Durazo attempted to develop probable cause to search Solano's home after learning that Solano had bought stolen property from Petitioner.  Sandra Hotchkiss, a police informer and drug user, participated in the scheme.  She was unsuccessful in selling property to Solano, both at the pool hall on Alvarado Street and at Solano's home.  (173 RT 20238-46.)

334.   On the night of August 31, 1985, after Hotchkiss's failed efforts to sell jewelry to Solano, Detective Durazo and Deputy Layton went to Solano's house and spoke with him about Petitioner.  Solano said that he had bought property from "Richard."  Solano mentioned having seen a composite drawing on television.  On September 1, 1985, Solano consented to a search of his residence.  (173 RT 20246-47.)  Sergeant John Yarbrough acted as custodian for property recovered from the house and identified by Solano as having been sold to him by Petitioner.  (*Id*. at 20249-51.)  Yarbrough observed a .38-caliber blue steel revolver inside a Chevrolet parked in the driveway of the house.  (176 RT 20557-58.)  Solano told police the weapon belonged to Petitioner.  (*Id*. at 20531-32.)

335.   On September 1, 1985, the day of the search, Sergeant Carlos Avila also interviewed Solano in Spanish at the homicide bureau.  The conversation

was tape-recorded.  (176 RT 20523-24.)  Solano admitted buying property from Petitioner.  On September 2, 1985, Sergeant Avila and Detective Durazo met Solano to recover more property.  Solano's nephew, Alejandro Solano, took them to a table factory on East 23rd Street in Los Angeles where he retrieved numerous items.  (*Id*. at 20524-26.)  Later that day, Felipe Solano took the officers to his son's home at 3000 Greenleaf Avenue in West Covina.  There, Felipe Solano, Jr., turned over three cloth rolls containing jewelry.  (*Id*. at 20526-27.)

336.   On September 3, 1985, Sergeant Avila received a call from Solano about still more property at another table factory.  Solano turned over two cameras, a ring set, and some other items; he explained that he had forgotten about this additional property.  (176 RT 20527-28.)  Later in September 1985, Solano turned over a television set, radio, and six to seven empty jewelry boxes.  (*Id*. at 20529-30.)  Solano told police that all the property that he had turned over to the police originally came from Petitioner.  (*Id*. at 20534.)

### c)   Petitioner's family in Texas

337.   On August 30, 1985, Sheriff Sergeant Robert Perry made arrangements to travel to El Paso, Texas, to investigate Petitioner's background and to retrieve stolen property from his family.  (176 RT 20537-38.)  On that same date, Sergeant Yarbrough interviewed Donna Myers from whom he obtained a telephone number in Texas for Petitioner's sister, Rosa Ramirez.  Sergeant Yarbrough gave the number to Sergeant Perry.  (*Id*. at 20561.)  Shortly before Perry left for El Paso, Petitioner was arrested.  On September 2, 1985, Perry contacted the El Paso Police from whom he obtained a street address for Rosa Ramirez.  (*Id*. at 20540-41.)

338.   Sergeant Perry testified that, on September 3, 1985, he obtained two warrants through the El Paso courts to search the houses of Petitioner's sister and parents.  Before the warrants were executed, Petitioner's parents, his sister Rosa, and brother Julian, Jr., voluntarily met with Sergeant Perry at El Paso Police

Department. They consented to having their homes searched. (176 RT 20547-49.) While at the police station, Rosa turned over earrings and a bracelet. During a search of her home, she turned over a wooden box containing costume jewelry that had been given to her by Petitioner. The parents' home was not searched. (*Id*. at 20549-51, 20554.)

### d) Property line-up

339. A property line-up was held at the Los Angeles County Jail on September 5, 1985. (176 RT 20601-02.) Property seized and obtained from Solano and from Petitioner's relatives was viewed by witnesses, relatives, and victims. Identified property was photographed. A chart listing the identified property was admitted into evidence at trial (Prosecution's Trial Ex. 56). (176 RT 20565-67.) Fewer than one-quarter of the approximately 1,500 items displayed at the line-up were identified by witnesses and victims. (*Id*. at 20570-71.)

### s. Petitioner's Arrest

340. Between 8:00 a.m. and 9:00 a.m. on August 31, 1985, Manuela Villanueva and Carmelo Robles drove to a store on South Indiana Street in Los Angeles. While Robles got out to buy food, Villanueva sat in the car. A man ran up to her car and asked for the car key. (170 RT 19746-50.) He tried to open the car door. At trial, Villanueva identified Petitioner as the man who approached her car. (*Id*. at 19748-49.) When she first saw Petitioner, he took sunglasses out of his pocket and then put them back. Villanueva thought he had a gun. (*Id*. at 19756.) Petitioner spoke to her in Spanish. He said he wanted her car because his mother had died. (*Id*. at 19759-60.) Villaneuva was scared and wanted to get out of the car. She began to scream for help in Spanish. (*Id*. at 19749-51.) Several men came out of a nearby barbershop, including Frank Moreno. Robles came out of the store. He and Moreno chased the man into an alley. (*Id*. at 19752-54.)

341.   Frank Moreno was in a barbershop at South Indiana and Whittier Streets when he heard a woman scream for help in Spanish.  He went outside and tried to move a man away from her.  (170 RT 19762-64.)  At trial, Moreno identified Petitioner as the man whom he saw near Villaneuva on August 31, 1985.  (*Id*. at 19765.)  When Moreno approached, Petitioner ran away.  Moreno and Robles chased Petitioner into the alley on Alma Street.  Petitioner jumped over a fence and went through a yard.  Moreno ran a few blocks to East Hubbard Street where he found Petitioner on the ground in a daze, bleeding from the back of his head.  Shortly thereafter, the police arrived and arrested Petitioner.  (*Id*. at 19765-67, 19771.)

342.   Between 7:00 a.m. and 8:00 a.m. on August 31, 1985, Fastino Pinon was at home on East Hubbard Street.  He was warming up a car in his backyard when a man jumped over the fence and got into the car.  Pinon told the man to get out.  The car moved back five feet and hit a chimney.  (170 RT 19775-77.)  The man spoke in Spanish and told Pinon that he had a gun.  The car went forward and stopped; then the car door flew open.  ( *Id*. at 19778-79.)

343.   Pinon grabbed the car keys.  The man jumped a gate and went into the street toward another car parked across the street from Pinon's house.  Pinon saw his neighbor hold the man; someone else hit the man over the head with a steel bar.  (170 RT 19778-80, 19789.)  At trial, Pinon identified Petitioner as the man whom he saw in his yard on August 31, 1985.  (*Id*. at 19776-77.)

344.   Between 7:00 a.m. and 8:00 a.m. on August 31, 1985, Angelina Delatorre was seated in her car at 3754 East Hubbard Street.  A man ran up and told her in Spanish to give him the car keys.  She held onto the steering wheel as he pulled her and tried to get the keys.  The man pulled Delatorre out of the car; she threw him the keys.  She screamed and a neighbor, Jose Burjoin, told the man to leave her alone.  Delatorre's husband came over, hit the man with a steel bar, and then chased him.  Delatorre's sister called police.  (170 RT 19793-98.)  At

trial, Delatorre identified Petitioner as the man who tried to take her car on August 31, 1985. (*Id*. at 19794.)

345. Manuel Delatorre was in his backyard at 3754 East Hubbard Street when he was informed that someone was hitting his wife. He went to the front of his house and saw a man trying to start their car. His wife was upset. Another man, whom Delatorre did not know, attempted to get the man out of the car. (170 RT 19801-02.) Delatorre got a 3' metal bar, and hit the man on the head. The man then ran toward Indiana Street. Delatorre gave chase. When the man fell down, Delatorre told him not to move. A crowd of twenty to thirty people began to gather. The man, who had suffered a head wound on being hit by Delatorre, was taken away by police. (*Id*. at 19803-06; 19816-17.) At trial, Delatorre identified Petitioner as the man whom he hit on August 31, 1985. (*Id*. at 19802.)

346. Deputy Sheriff Andres Ramirez received a call at 9:00 a.m. on August 31, 1985, to respond to an incident on East Hubbard Street. When he arrived, Deputy Ramirez saw a group of seven to eight men on the street surrounding a man, later identified as Petitioner, sitting on the ground with a bloody head. Manuel Delatorre told Deputy Ramirez that Petitioner had attempted to take his wife's car and had assaulted his wife. (170 RT 19811-14.) Deputy Ramirez placed Petitioner under arrest for attempted grand theft and assault. Petitioner said his name was Ricardo Ramirez. He was not armed; neither contraband nor a weapon was found. He was cooperative. (*Id*. at 19819-21.) Petitioner was handcuffed and treated by paramedics. Petitioner was turned over to Los Angeles Police Officers Strandgren and Vidal who arrived shortly thereafter. (*Id*. at 19814-16, 19819-21.)

347. Officer Strandgren took Petitioner into custody. He recognized Petitioner as the same person who had been pictured in a mugshot handed out at roll call earlier that morning. Officer Vidal searched Petitioner for weapons. He

removed a wallet from Petitioner's rear pocket. After inspecting the wallet, Officer Vidal put it back into Petitioner's pocket. (171 RT 19858-61, 19865-66.)

### a) Discovery of the backpack

348. Los Angeles Police Officer Robert Rysdon received a radio call on August 31, 1985, about 8:30 a.m. concerning a possible homicide suspect who was described as a Hispanic male, six feet tall, dark curly hair, stained teeth, wearing a black backpack. (171 RT 19840-41.) He drove to Eighth Street with his partner, Officer Young. When they arrived, two men gestured to the officers to follow them. The officers followed the men to a backyard at 3455 Bestwick Street. There, Officer Rysdon retrieved a black backpack. (*Id*. at 19841-44.)

349. Officer Rysdon unzipped the backpack to look for dangerous objects. He observed a black leather jacket. Officer Rysdon then secured the pack by locking it in the trunk of his police car. Officer Rysdon was later informed that Petitioner had been arrested. On his return to the Hollenbeck police station, Officer Rysdon and Deputy Woods went through the pack. (171 RT 19844-46.) Inside the pack the officers found binoculars, a small flashlight, a nylon gym bag, a black leather jacket, and a pair of brown fabric garden gloves. (*Id*. at 19847-49, 19990.) There were no weapons or ammunition inside the pack. (*Id*. at 19852.) The backpack and contents were taken to the sheriff's crime lab. (*Id*. at 19992.)

### b) Petitioner's statements to police

350. After his arrest on Hubbard Street, Petitioner was driven to Hollenbeck police station by Los Angeles Police Officers James Kaiser and Danny Rodriguez. (171 RT 19879-81.) During the ten minute drive to the station, Petitioner made several statements to Officers Kaiser and Rodriguez about being chased from Olympic Boulevard. He said he would be blamed for all the killings, that he would be sent to the electric chair, and that he wanted to die. Petitioner also stated that the mugshot on the visor of the police car was a picture

of him. (*Id*. at 19882-83, 19885-86.) Petitioner indicated that he was afraid of being attacked. The officers assured him that they would protect him. (*Id*. at 19892-93.)

351. Officer Kaiser testified that he spent one-half of an hour alone with Petitioner at the police station. He testified that he did not question Petitioner, and he did not advise him of his constitutional rights. Petitioner was handcuffed at the time. (171 RT 19886-87.) Officer Kaiser testified that Petitioner told him that there was a .32-caliber automatic gun in a Greyhound bus locker; he said the ticket to the locker was in his wallet. Officer Rodriguez retrieved the claim ticket from Petitioner's wallet, then returned the ticket to the wallet until a detective took over. (*Id*. at 19887-89.)

### c) Seizure of Petitioner's Stadia shoes

352. At the time of his arrest, Petitioner was wearing a black T-shirt, dark pants, and black, low-top Stadia aerobics shoes. (171 RT 19908-09.) Petitioner was held in an interview room. Los Angeles Police Sergeant George Thomas removed Petitioner's shoes to look at the pattern of the soles. He then placed the shoes in a corner of the interview room in which Petitioner was being held. Petitioner was not advised of his constitutional rights. (*Id*. at 19906-07, 19909-10.)

353. Petitioner asked Sergeant Thomas the day of the week, made a statement about wanting to die, then began to laugh. Petitioner hummed a song by a rock group, AC/DC. He said he was "a killer" and deserved to die. He spoke of Satan several times and laughed. (171 RT 19916-19, 19944.) Petitioner stopped talking when he realized Sergeant Thomas was taking notes. Sergeant Thomas was not prepared to interview Petitioner; he only had a piece of paper and pen, but he started writing as soon as Petitioner began to talk. He had no idea if there was a tape recorder in the interview room. (*Id*. at 19919, 19933-34.)

Sergeant Thomas observed an inverted star in a circle on Petitioner's left shoulder. While in the interview room, Petitioner banged his head on the table ten times. (*Id*. at 19919-21.)

#### d) Recovery of the bag

354. At 7:00 a.m. on August 31, 1985, Los Angeles Police Officer Dennis Lee was instructed to go to the Greyhound bus station to watch for a possible suspect. He received a photograph of the suspect and was told that his name was Richard Ramirez. (171 RT 19948-50.) Several hours later, he was told to look for luggage at the bus station; he was given a baggage claim number. Officer Lee found a leather-like zippered travel bag. (*Id*. at 19950-54.)

355. The travel bag (Prosecution's Trial Ex. 52-A) was searched pursuant to a warrant. The name of Greg Rodriguez, 1242 Brannick Street, Los Angeles, was written on a tag attached to the bag. Petitioner's brother, Julio Ramirez, lived at 1259 South Brannick Street, Los Angeles. (171 RT 19981-85.) The bag yielded a can of weight gain supplement, AC adapter and batteries, sunglasses, channel lock pliers, nail clipper, black vinyl jacket, two sets of keys, and a handcuff key. One set of keys fit the door and trunk of a Pontiac recovered by police on September 1, 1985. (*Id*. at 19986-88, 19990; *see infra*.) A small, blue bag was found inside the Greyhound bag. It contained a jar of Vaseline, a .32-20 caliber revolver, vitamin supplements, a box of Remington .32-20 caliber cartridges, four .25-caliber semi-automatic pistol cartridges, and five .22-caliber cartridges. (*Id*. at 19987-88.) Three of the four .25-caliber cartridges contained a red-colored surface surrounding the primer. The .22-caliber cartridges did not have primer. (*Id*. at 19989-90.)

356. On September 5, 1985, fingerprints were lifted from a can of weight powder, a Sanyo battery, and knife portion of nail clippers contained in the bag. A latent fingerprint was later lifted from the flashlight found in the backpack. (171 RT 19995-96, 19999-20000.)

122

**e) Recovery and search of the green Pontiac**

357. On September 1, 1985, Sheriff homicide investigators Russell Uloth and Jerald Olsen went to Julian Ramirez's residence at 1259 South Brannick Street. Ramirez led officers to a green, two-door Pontiac parked across the street from 126 Avenue 23. (171 RT 19962-64.) The vehicle was photographed and then towed to East Los Angeles sheriff station. (172 RT 20003-05.) There the car was searched and dusted for fingerprints. (171 RT 19964-65.) Latent fingerprints were lifted from a white cup in the glove compartment and from the rearview mirror. Partial lifts were obtained from handcuffs found underneath the carpet and a seatbelt fastener on the front seat. A pentagram drawn in pencil was observed on the vinyl dashboard. (*Id*. at 19966-69.)

**t. Petitioner's Postarrest Behavior**

358. Deputy sheriff Gerald Newbold was assigned to a suicide watch for Petitioner at Los Angeles County Jail on September 2, 1985. Petitioner was then being housed on the hospital side of the jail and watched twenty-four hours a day. (176 RT 20597-98.) During a security check, Deputy Newbold saw Petitioner write on the cell floor with blood from his right palm the number "666" and draw a star in a circle. The drawings were photographed. (*Id*. at 20599-600.)

359. On October 24, 1985, Sergeant Salemo was present in Los Angeles Municipal Court as Petitioner raised his hands and said aloud "Hail Satan." Salemo saw an inverted star with a circle around it and "666" written on the palm of Petitioner's hand. (176 RT 20603-04, 20607.)

360. On October 30, 1986, Deputy sheriff David Laws was summoned by Petitioner to his cell. Petitioner showed him two photographs of a deceased person. One photograph showed a female naked from the waist down; the other showed the same woman lying on a bed with her head turned away from the camera. (176 RT 20612-13.) Petitioner told Deputy Laws: "People come up

here and call me a punk and I show them the photographs and tell them there is blood behind the Night Stalker and then they go away all pale." At the time, Laws did not report Petitioner's behavior or statement to his supervisor. (*Id*. at 20614.)

### u. Examination of Petitioner's Teeth and Subsequent Dental Treatment

361. On September 3, 1985, a dentist with the Sheriff Department, Alfred Otero, D.D.S., examined Petitioner's teeth. He described Petitioner's front teeth as stained, with nine decayed teeth. Petitioner indicated that he had no complaints. (174 RT 20352-53.) In January 1986, Dr. Otero treated Petitioner for tooth decay, performed a root canal, and restored Petitioner's teeth with fillings. (*Id*. at 20354-58.)

362. On September 13, 1985, Gerald Vale, a forensic dentist, also examined Petitioner at the Los Angeles County Jail. He found Petitioner's teeth in very poor condition with advanced decay. A jagged gap was observed between Petitioner's two front teeth, other teeth were missing. (174 RT 20335-37.) Photographs were taken of Petitioner's teeth, showing stains and missing teeth. Dr. Vale also made casts of Petitioner's teeth. (*Id*. at 20338-41.)

363. In Dr. Vale's opinion, Petitioner may have had recent dental work, including the replacement of a crown. The missing teeth may have been removed by a dentist. Petitioner's gums had healed from the extractions. (174 RT 20346.)

### 2. Prosecution Case Reopened

364. The prosecution rested its case-in-chief on April 13, 1989. On May 1, 1989, the date set for the defense case to commence, the prosecution moved to reopen its case. The case was put over to May 2, 1989. (176 RT 20632; 177 RT 20637-40.) On May 2, 1989, Petitioner objected to Felipe Solano's further testimony. (*Id*. at 20656-64.)

365. The prosecution contended that trial counsel Daniel Hernandez was incompetent because he failed to properly review prosecution discovery and conduct defense investigation. The trial court overruled Petitioner's objections and request for a hearing pursuant to Evidence Code § 402 and granted the prosecution's motion to reopen its case. (177 RT 20665-66, 20670-76.)

366. Felipe Solano testified that he first met Petitioner toward the end of August 1984 at the Greyhound bus station. He admitted that he first met Eva Castillo, whom he knew as Rosa Solis, in Tijuana in August or September 1984. Solano admitted receiving stolen property from Solis on three occasions. (177 RT 20683-85.) The week before his first appearance at trial, Solano identified property he received from Solis. He previously had denied receiving property from her because he wanted to protect her. Solano last saw Solis at his home in September 1985 when she stayed overnight. (*Id*. at 20686-89.)

367. Solano also received stolen property twice from a man whom he knew as "Monje." Monje was 29 to 30 years old, small, with a thin build. Solano first met Monje in April 1984. Solano also bought a television and mirror from a man named "Cuba," who was heavy-set, had a Cuban accent, and was about twenty-three years old. Solano met Cuba through Solis or Petitioner. Solano did not believe the property he bought from Cuba had been stolen. (177 RT 20687-90, 20695.)

368. Solano identified photographs of a comb, purse, and microwave that he received as gifts from Solis (Prosecution's Trial Exs. 59, 59-A, and 59-B). He bought a ring for 50 dollars from Solis to give to his wife. He bought necklaces for 100 dollars from Monje. He also bought earrings and a chain with a pendant from Monje but could not recall the price. (177 RT 20691-94.) Solano recalled receiving earrings and a black necklace that looked like dark pearls from Solis, but he did not see them in the photographs shown to him at the Sheriff Department's homicide bureau. (*Id*. at 20697.)

369.   On one occasion, Cuba came to Solano's house accompanied by Petitioner.  They attempted to sell Solano some typewriters that Solano thought were stolen.  On another occasion, Petitioner came to Solano's house with Solis.  Petitioner stayed in the car while Solis spoke with Solano.  Solis borrowed 20 dollars from him.  (177 RT 20695-97.)

370.   Solano admitted on cross-examination that he had committed perjury by denying he bought stolen property from Solis.  He admitted that he lied to the defense about Solis and to the police about when he first met Petitioner.  (177 RT 20741-45.)  Solano admitted that he lied about when he saw Solis and Petitioner together.  (*Id*. at 20702-04.)  Solano previously denied buying property from Monje and Cuba because he thought they were friends.  (*Id*. at 20717-18.)  Solano kept property he purchased from Petitioner in a closet, dresser, and other places in his home.  Property that Solano bought from Solis was mixed in with property from Petitioner.  Property that Solano bought from Monje was kept separately in a closet.  (177 RT 20733-35.)

371.   After Solano testified on May 2, 1989, the prosecution rested.  (177 RT 20747.)  The court permitted the prosecution to again reopen its case with respect to the introduction of certified documents, including arrest, probation, and parole records pertaining to Rosa Solis.  (178 RT 20798-804; 179 RT 20814-15.)

**3.     Defense Case**

372.   Petitioner's defense was limited, in part because he was unable to rationally communicate with counsel, to participate in his case or defend against the charges.  Petitioner's defense was also limited because of his trial counsel's incompetence.  During trial, trial counsel Ray Clark represented to the court that Petitioner sought to waive his right to present any defense during the guilt trial.  (178 RT 20789-91.)  The court held that counsel could override his client's decision to waive a defense.  (*Id*. at 20793-94.)  Trial counsel Daniel Hernandez thereafter indicated there would only be a limited defense because "I don't feel

that putting on a defense without his cooperation is going to make my defense very viable." (*Id*. at 20794.)

373.    On May 9, 1989, the defense gave an opening statement. (179 RT 20819-45, 20848, 20852-53, 20858-80, 20890-911.)  The defense that was offered sought to raise a reasonable doubt of Petitioner's guilt as to all the charged crimes through lack of physical evidence, including hair and serological evidence and an alibi defense in two of the incidents.  In their attempt to create a reasonable doubt in the jurors' minds as to Petitioner's guilt, Petitioner's trial counsel rendered ineffective assistance of counsel.  They incompetently executed the "limited" defense they had elected to put on; importantly, they also failed to investigate and present evidence that was critical to Petitioner's defense.

### a.    Vincow Incident

374.    Wanda Doss, the property manager of Vincow's apartment building, inspected Vincow's apartment after her death.  No repairs had been requested or made to Vincow's apartment in June and July 1984.  The slider windows in her apartment were in working order.  No repairs were made to the windows after Vincow's death.  (184 RT 21651-54.)

375.    Werner Spitz, M.D., a forensic pathologist, was of the opinion, based on body and room temperature and covering on the victim, that Vincow had been dead for four to five hours by the time the coroner's investigator examined her body at the scene on June 28, 1985 at 4:47 p.m.  (191 RT 22463-65, 22515-24.)  On cross-examination, Dr. Spitz indicated that there was blanching to Vincow's body which normally would occur up to seven or eight hours after death.  (*Id*. at 22529-31.)  In Dr. Spitz's opinion, Vincow's body was in the early stages of rigidity when she was discovered, and the coroner's investigator's findings with respect to the time of death were inaccurate.  (*Id*. at 22533-35, 22537-38.)

### b.    Hernandez and Okazaki Incident

127

376. Detective Carrillo investigated the crime scene and observed a baseball cap in the garage. The cap was just inside the threshold of the garage. (181 RT 21013, 21019-21.)

377. Maria Hernandez viewed two photographic line-ups. (181 RT 21155, 21157.) Petitioner's photograph was not included in the photographic line-ups. (*Id*. at 21055.) Hernandez later attended a live line-up prior to the line-up in which Petitioner stood, but she did not identify anyone. (*Id*. at 21157-58.)

378. Hernandez told Carrillo after the September 5, 1985 live line-up that when she first saw Petitioner on the news he did not look like the suspect. (181 RT 21164.)

### c. Yu Incident

379. According to a supplemental report prepared by Monterey Park Police Officer Dan Romero, Jorge Gallegos denied hearing or seeing a fight involving Yu. He denied that he heard shots. He also stated he would be unable to identify the suspect. (180 RT 20975-76.) Gallegos gave the police a license plate number of the suspect's vehicle – 521 NCD.[25] (*Id*. at 20979-80.)

380. On March 17, 1985, Monterey Park Police Officer David Corrigan interviewed Jorge Gallegos in Spanish. (184 RT 21536-38.) Gallegos provided a vague description of the suspect as male Latino or Oriental with dark hair. (*Id*. at 21539-40.) Gallegos indicated he only glanced at the suspect who drove without headlights by his parked truck. Gallegos indicated that he heard a child cry or scream when he was seated in his parked car. A few seconds later, he heard the same sound from behind his truck. At that point, a car drove by without its headlights on. Gallegos obtained the vehicle's license number. (*Id*. at 21540-41.)

381. During the interview, Gallegos did not appear confused. (184 RT 21542.) Gallegos had difficulty speaking English and appeared to be a recent immigrant. (*Id*. at 21543-44.) At the time of the interview, Officer Corrigan made handwritten notes that were later typed into the report. (*Id*. at 21546.) Officer Corrigan mistakenly wrote "suspect" in his typed report instead of "witness," and then crossed out the word. (*Id*. at 21547.) Gallegos told Corrigan that he initially thought that a child was being abducted. (*Id*. at 21548.) At the time, Gallegos's girlfriend was also in the truck. (*Id*. at 21551-52.)

382. Dennis Lew, a photographer and film editor, photographed North Alhambra Avenue in daylight and at night. He also photographed himself at

---

[25] The vehicle's owner, Teresa Cerna, testified in rebuttal that her Toyota license number was 521 MNI. (*See infra*.)

night on the street.  Because of poor lighting on the street, it was difficult to discern his features in the photograph.  Lew also simulated a car driving by a parked car.  Because of lighting and the effect of lights on car mirrors at night, any view of a passing car at night from inside a parked car would be confusing to the observer.  (184 RT 21565-68.)

383.    Coroner Susan Selser, M.D., testified that Yu suffered two gunshot wounds.  The trajectory of the first bullet was along the right side of her chest through the skin, causing a fracture to the sixth rib, then through the right lung, grazing the heart before resting near the left side of the chest.  (189 RT 22238-39.)  The bullet traveled 10 to 20 degrees downward from back to front.  The angle appeared to be 30 to 45 degrees, probably closer to 30 degrees from the midline toward the front.  It was a slightly downward, short path.  (*Id*. at 22239-41, 22251-53.)

384.    The second bullet traveled left to right, slightly upward through the spinal cord.  The path of the bullet was short and low on the back.  The bullet was recovered from the vertebrae, near the entrance wound.  (189 RT 22256-57.)  Neither of the two projectiles exited the body.  (*Id*. at 22241.)  Trajectory was estimated by a visual examination of the wounds.  Dr. Selser was unable to determine whether Yu was sitting or standing when she was shot.  (*Id*. at 22242, 22245, 22254-56.)  The wounds were nine inches apart.  (*Id*. at 22261, 22264-65.)

385.    Werner Spitz, M.D., the forensic pathologist, reviewed a number of autopsy photographs and reports.  (191 RT 22450-53.)  The wound to the right side of Yu's chest close to the armpit was inflicted at close range and probably was a contact wound.  The path of the bullet was horizontal.  The wound was not immediately incapacitating; the victim would have been able to talk, scream, even run.  (*Id*. at 22453-55.)  The wound, however, was fatal unless quickly treated.  (*Id*. at 22462.)

386. The second wound to Yu's lower back may have caused paralysis to the legs. It was not inflicted at close range. (191 RT 22455-58.) There also was bruising to the shins and right thigh. Injury to the thigh was consistent with the victim hitting the steering wheel. There was no physical evidence that the victim crawled or was pulled by her hands. (*Id*. at 22459-62.) Both injuries were consistent with the victim being shot inside the vehicle. (*Id*. at 22463.)

387. On cross-examination, Dr. Spitz explained that his opinion as to the victim's location at the time the wounds were inflicted was based on the close-range nature of the wounds and near horizontal trajectory of the bullets. (191 RT 22466, 22472.) In a photograph of the first wound where a bullet was recovered, based on the presence of specks of gunpowder, Dr. Spitz was of the opinion that the muzzle of the gun was held in a forward direction. (*Id*. at 22471-75.)

388. The shape of the bruise to Yu's right thigh was consistent with having been dragged across the steering wheel; there was no abrasion, and the bruise was sizeable. (191 RT 22484-87.) Dr. Spitz agreed it was possible that Yu had been pulled from the car, although her clothing was not torn. Abrasions to her lower legs were consistent with striking objects while quickly exiting the car. (*Id*. at 22488-91.)

389. There was no physical evidence of a shooting, such as powder residue or blood in Yu's car. (191 RT 22494.) Yu could have been dragged or carried. (*Id*. at 22497-98.) Dr. Spitz was of the opinion that Yu's chest wound had been inflicted first, consistent with her sitting or leaning over. (*Id*. at 22499.) Hypothetically, the path of a bullet would be significantly more downward if a 5'3" tall victim were shot by a person who was 6'1". (*Id*. at 22500-01.)

390. A demonstration was conducted with the prosecutor assuming a driver's position and Dr. Spitz as the passenger. The demonstration showed that the first wound could not have been inflicted if Yu had been sitting straight and

forward in the driver's seat. (191 RT 22501-04.) The second wound could have occurred as the victim turned away, hit the steering wheel, and tried to open the door. (*Id*. at 22504-05.)

391. The prosecutor also demonstrated the suspect's position outside the driver's door with Dr. Spitz sitting in the driver's seat. An assailant could have reached inside, grabbed the victim, and shot her as she pulled away. In Dr. Spitz's opinion, a significant amount of force would be required to pull a person from a vehicle. There was no evidence of force, such as torn clothing. Based on all known factors, Dr. Spitz was of the opinion that Yu was shot inside the car. (191 RT 22506-07.)

### d. Doi Incident

392. Dennis Lew photographed the location where Launie Dempster had seen a possible suspect. He photographed the street and a parked car. He also photographed a simulated drive-by. At night, lighting and shadows made it difficult to see the features of a person sitting in a car. (184 RT 21570-74.) Lew printed his photographs and made single exposures using normal photographic techniques. (*Id*. at 21579.)

### e. Bell and Lang Incident

#### i. Petitioner's Alibi

393. Petitioner's father, Julian Ramirez, testified that Petitioner visited El Paso, Texas beginning about May 23, 1985, and stayed with his family for ten days. Ramirez's granddaughter received her First Communion on Saturday, May 25, 1985, an event that Petitioner did not attend. Ramirez saw Petitioner every day that week after work. Petitioner left El Paso by bus on the following Friday evening. (181 RT 21122-25.)

394. After Ramirez testified, the court ordered a continuance of trial to permit the prosecution to investigate his testimony. (181 RT 21127-36.) When Ramirez resumed his testimony, he testified that his granddaughter's communion

was held Saturday, May 24, 1985. Petitioner did not attend the communion service at church; he only attended the party. (182 RT 21180-83.) Petitioner arrived on May 22 or 23, 1985, and left on Friday, May 31, 1985. (*Id*. at 21187.) Petitioner first stayed in a motel, then with his parents. Ramirez did not meet Petitioner at the bus station when he arrived, nor did he drop Petitioner off at the bus station when he left El Paso. Ramirez could not recall how many times Petitioner may have visited El Paso in 1985. (*Id*. at 21188-90.) He did not remember speaking with Sergeant Perry about Petitioner's whereabouts when Perry came to El Paso and searched his daughter's residence. He did not recall when Sergeant Perry was in El Paso. (*Id*. at 21191-93.)

## ii.    Physical Evidence at the Scene

395.    Criminalist Michelle LePisto collected a red-stained pillow, sheets, a cord with hairs, and stockings from the northeast bedroom of the residence. She also collected red-stained sheets, clothing, and tape from the northwest bedroom. Hospital personnel removed tape from one of the victim's ankles. (189 RT 22289-91.)

396.    Monrovia Police Detective Steven Cordell was dispatched to the Bell and Lang home on June 1, 1985. He found two newspapers from May 29 and 30, 1985, in front of the residence. The papers were collected and placed in evidence at the police department. (189 RT 22299-300.) He also observed a *TV Guide* in the living room that was open to May 30 and May 31, 1985. He later saw a diary in the home with entries up to and including May 29, 1985. (*Id*. at 22306-13.) Monrovia Fire Inspector Steven Mikity handled brush clearance in 1985. On the morning of May 29, 1985, he went to the victims' residence to notify them to clear brush from their property; no one was home. The garage and kitchen doors were closed at that time. (195 RT 22869-70, 22890-92.) Mikity returned to the home later in the day at about 5:00 p.m. and noticed that the garage and kitchen doors were open. He saw a large object in the trunk of a car

inside the garage. The car was an older model with faded paint. The object in the trunk appeared to be a television set. (*Id*. at 22871-73.) Mikity did not stop or attempt to contact the residents. (*Id*. at 22875.) Mikity drove by the same house every day; it was unusual to see the garage door open. (*Id*. at 22890.)

397. Two days later, Mikity returned to the Bell and Lang residence. Paramedics had just arrived. (195 RT 22875-77.) He did not recall whether on that day the garage door was still open. (*Id*. at 22882-87.) He returned the following day with police officers who showed him a car in the garage that appeared to be identical to the one he previously saw. This time, the trunk was closed. (*Id*. at 22873-74, 22888-89.)

### f. Kyle Incident

398. Petitioner's alibi, presented through his father's testimony, also related to the crimes charged in the Kyle incident, which occurred early on the morning of May 30, 1985. (*See* Kyle Incident, *supra*.)

### g. Cannon Incident

399. Criminalist Giselle LaVigne collected evidence at the scene, including a knife and other items from the bedroom and kitchen counter. (185 RT 21662-67.) Physical evidence collected by LaVigne had been released to the defense but not returned to the crime lab. (*Id*. at 21669-70.)

400. In LaVigne's opinion, there appeared to be blood on broken glass found near the victim's head. The blood had not solidified. On the day of LaVigne's investigation at the scene it was very hot; the temperature was in the nineties. (185 RT 21669.)

### h. Nelson Incident

401. As in the Doi incident, Dennis Lew photographed the scene. His photographs taken under different lighting conditions – showing the streetlights, the victim's residence, and a night view of the scene – were admitted into

evidence.  (184 RT 21580-84.)  Lew took black and white photographs because they more accurately reflected actual conditions.  (*Id*. at 21586-87.)

### i. Dickman Incident

402.   Detective Carrillo testified that Dickman viewed a photographic line-up that did not include Petitioner's photograph and identified a person.  (181 RT 21045, 21054.)  The person later was arrested for murder and submitted to homicide processing for blood, saliva, and hair samples.  (*Id*. at 21045-46.)  Hair samples were submitted to the lab.  (*Id*. at 21052.)

### j. Kneiding Incident

403.   Glendale Police evidence technician Marvin Marshall recovered a shirt from a storage bin at a construction site east of the Kneiding residence.  The shirt appeared to have been dropped or thrown.  (188 RT 22199-202.)

404.   Evidence technician Sally Jiminez-Herring collected hair samples from the carpet of the southeast bedroom.  (188 RT 22214, 22218.)  She also unsuccessfully examined the scene for fingerprints.  She collected a pillowcase and mattress containing red stains, as well as several bullet fragments.  (*Id*. at 22217-21.)

### k. Khovananth Incident

405.   Chainarong Khovananth's sister, Debbie Piyaratanaphipat, spoke with Somkid Khovananth on the day after her brother's death.  Somkid then described the suspect as a man with curly hair and dark skin.  (186 RT 21904-07.)

### l. Petersen Incident

406.   Private investigator David Frank visited the Petersen residence on April 17, 1989.  He photographed the home, specifically the back bedroom and the view from the bedroom toward the living room.  (180 RT 20915-21, 20944.)  He also photographed the living room toward the back bedroom.  (*Id*. at 20935.)  Only a narrow area of the living room was visible from the back bedroom.  (*Id*. at 20938.)

407. Frank positioned himself at the approximate location in the room where a person would sit up in bed if the bed was situated under the window. As he moved to the right, the view into the living room diminished. (180 RT 20957-58.)

### m. Abowath Incident

408. Sheriff's Department criminalist Burke collected 35 items from the residence. He later analyzed a tape lift from the dining room floor. (185 RT 21673-79.)

409. Detective Carrillo was not the investigating officer in the Abowath incident and was not aware whether Sakina Abowath indicated she did not wish to attend the line-up for religious reasons. Abowath was requested to attend the live line-up. (181 RT 21059.)

410. Sergeant Yarbrough interviewed Sakina Abowath at the hospital on August 8, 1985, and the next day at a friend's home. Sakina described the suspect as a light-complexioned male, approximately 25 to 30 years old, with yellowish skin. She described the suspect as possibly Caucasian with Latin features, tall, thin, with a recessed chest and light brown or medium blond hair with curls. The suspect did not speak with an accent. He had wide front teeth, although Sakina did not recall gaps in his teeth. The suspect had an odor of stale sweat. He wore a long-sleeved shirt, pants similar to dark Levi's, and possibly boots. (189 RT 22293-95.)

### n. Hair and Serological Evidence

411. The defense presented expert testimony regarding hair and serological evidence found at the scene of six incidents, which tended to exclude Petitioner as the perpetrator of the crimes in those incidents. The following table summarizes the evidence and test results:

### Analyses of Certain Hair and Serological Evidence

| Incident | Evidence | Findings as to Petitioner |
|----------|----------|---------------------------|
| Bell and Lang | Hair | Negative |
| Cannon | Hair | Negative |
| | Blood stains | Inconclusive |
| Nelson | Hair | Negative |
| Bennett | Hair | Inconclusive |
| | Blood stains | Negative |
| Kneiding | Hair | Negative |
| Abowath | Hair | Negative |
| | Vaginal swab, semen | Consistent with blood type |

### i.      Hair Evidence

412.   Former Sheriff Department criminalist Melvin Kong compared hairs recovered from numerous crime scenes with Petitioner's medium brown hair. (186 RT 21909-14.)

### a)      Bell and Lang Incident

413.   Some of the hair samples collected from the bedroom were buckled or pubic hairs.  Kong concluded they were dissimilar to Petitioner's hair based on microscopic characteristics.  (193 RT 22605-07.)  Kong noted that it was not possible to determine a person's age based on hair analysis.  (*Id*. at 22607-08.) Comparison of head hair found on a stocking, sheets and mattress pad, and on electrician's tape proved to be dissimilar to Petitioner's hair.  (*Id*. at 22609-10.)

### b)      Cannon Incident

414.   Animal and human hairs were found at the scene.  Recovered light brown hair was compared to Petitioner's known hair.  The recovered hair was not similar to Petitioner's hair, owing to differences in length, color, and curl.  (186 RT 21918-22.)

### c) Bennett Incident

415.   Head hairs found in the victim's left hand were determined to be consistent with the victim's hair.  A "buckled" hair found on the carpet was similar to Petitioner's pubic hair and dissimilar to the victim's; however, it was a commonly found hair without any unique characteristics.  (193 RT 22611-15, 22621-22.)

### d) Nelson Incident

416.   Medium brown head hairs recovered from the scene were dissimilar to Petitioner's hair.  (186 RT 21937-39, 21943-45.)

### e) Kneiding Incident

417.   Hair found in Lela Kneiding's hand was similar to her own hair and dissimilar to Petitioner's hair.  (193 RT 22615-21.)  Pubic hairs collected from a bedspread were found to be dissimilar to the victims and Petitioner.  (*Id*. at 22627-29.)  One hair found on a shirt was not similar to Petitioner's hair.  The same shirt had dark brown stains, possibly blood.  (193 RT 22626-27.)

### f) Abowath Incident

418.   Two buckled hairs recovered from the scene appeared to be pubic hair but could have been transitional hairs from the lower stomach.  On comparison with Petitioner's hair, they were found to be dissimilar.  (186 RT 21922-23, 21935-36.)

### ii. Serological Evidence

419.   Sheriff criminalists Gisele LaVigne and Steve Renteria testified as to their findings with respect to the Cannon, Bennett, and Abowath incidents.

### a) Cannon Incident   420.   A blood sample from a piece of broken glass was subjected to electrophoretic testing to determine PGM

markers.[26] (190 RT 22344-47.) The PGM subtype found on the glass was different from the PGM markers of both the victim and Petitioner. (*Id*. at 22349-50.) Criminalist LaVigne was of the opinion that her findings were not accurate because the sample was degraded. In LaVigne's opinion, neither the victim nor Petitioner could be excluded as possible donors. (*Id*. at 22367-70, 22394.)

421. The PGM subtype found on a gray mitten recovered from the bedroom was consistent with both the victim's and Petitioner's blood. (190 RT 22352, 22354-55.) However, additional electrophoretic testing conclusively demonstrated that blood on the mitten did not originate from Petitioner. (*Id*. at 22383-84.)

### b) Bennett Incident

422. Criminalist LaVigne collected numerous items from the scene including a pillowcase, comforter, clothing, blanket, sheets, carpet, tire iron, two belts, one tie, sash, and curtains. (190 RT 22329-32.)

423. Serological testing conducted on the sash disclosed blood stains consistent with Type ABO-Type A blood. The victim and Petitioner were both Type O. (190 RT 22338-42.) Antigens found on the sash did not originate from either the victim or Petitioner. (*Id*. at 22344.)

### c) Abowath Incident

424. Criminalist Renteria tested a vaginal swab obtained from Sakina Abowath to determine PGM subtype. Elyas Abowath and Petitioner shared the same PGM subtype. (190 RT 22396-98, 22422.) Semen and vaginal secretions were present on the swab obtained from Sakina. (*Id*. at 22401.) Test results indicated that the fluid on the swab could not have originated from either Elyas Abowath or Petitioner. (*Id*. at 22412-18.) In Renteria's opinion, however, testing

---

[26] Similar to the ABO Type of identification, identifying PGM markers in a blood sample is a method of identifying the source.

techniques used for PGM subtypes were unreliable. (*Id*. at 22419-23, 22434-36.) Some semen samples found on a bedspread were consistent with Petitioner's blood type. Other stains found on the bed sheets were consistent with Elyas Abowath's blood type and inconsistent with Petitioner's. (*Id*. at 22424-25.)

### iii.    The Live Line-Up

425.    A line-up was held at the Los Angeles County Jail on September 5, 1985. Members of the defense team were present during the line-up. (182 RT 21199, 21201-02.) A preview of the line-up was initially held during which the line-up participants appeared on stage and were given instructions. Following the preview and because of the number of witnesses, the line-up was held in two separate sessions. (*Id*. at 21206-07.) Line-up witnesses were seated in the audience. During the first line-up, there were approximately forty witnesses seated in six to seven front rows. (*Id*. at 21208-10.)

426.    Petitioner participated in the line-up. He had an injury to the back of his head. (182 RT 21212-13, 21220.) Petitioner was assigned the Number 2 position in both line-ups. (*Id*. at 21217-19; 183 RT 21449.)

427.    Witnesses were instructed not to talk to each other about the line-up. (182 RT 21248.) The prosecutor and an investigating officer sat near the witnesses. (*Id*. at 21211-12.) During the first line-up, a police officer raised his right hand and gestured with two fingers. The witnesses were able to see the gesture. (183 RT 21431-33.) The officer made this gesture before the witnesses were asked to fill out their line-up cards. (*Id*. at 21434.) After the second line-up, another officer appeared in front of the stage and asked if any of the witnesses had questions. (*Id*. at 21438-40.) He, too, gestured with two fingers, moving his hand back and forth as he walked across the room a few feet in front of the witnesses. (*Id*. at 21436-38, 21447-48.)

428.    Elizabeth Loftus, Ph.D., a psychologist, testified that memory of an event is based on acquisition of information, its retention and retrieval or recall. (194 RT 22700-06.)  Stress and fright adversely affect memory.  Weapon focus may occur when a witness's attention is captured by a weapon, adversely affecting the ability to remember other details.  The period of time in which an event occurs may also affect memory.  Individuals often overestimate the duration of an event that occurs under stressful conditions.  Memory fades over time.  (*Id*. at 22707-12.)  Post-event information may contaminate or alter memory.  (*Id*. at 22712, 22718-19.)  Witnesses who are exposed to media coverage or asked leading questions during interviews may have distorted memory.  Retrieval of memory occurs when a witness answers questions or makes an identification.  (*Id*. at 22712-15.)

429.    Mistakes frequently occur in the eyewitness identification of strangers if the witness and stranger are of different races.  In Dr. Loftus's opinion, cross-racial identification is difficult for reasons that researchers do not fully understand.  (194 RT 22715-16.)  On cross-examination, Loftus admitted that she did not interview eyewitnesses in this case with respect to reliability of cross-racial identification.  (*Id*. at 22727-29.)

430.    Loftus also testified that stress and the amount of time a witness views an event affect the reliability of identification.  (194 RT 22811-12, 22820.)  According to Loftus's research, it is hard for a witness to retain an accurate memory of an event.  (*Id*. at 22826-27.)  Subjects frequently recall post-event information instead of the memory of the actual event itself.  Subjects often give inaccurate accounts based on other information received, such as media coverage. (*Id*. at 22828-34, 22837.)  Eye contact between a witness and a suspect increases

the witness's ability to remember the suspect's appearance.  (195 RT 22849-50, 22853-54.)

431.   Dr. Loftus also studied the reaction of victims to traumatic events. Retrograde amnesia frequently occurs as a result of mental or physical shock, thereby reducing the victim's ability to remember events.  Dr. Loftus's research showed that victims who suffered mental trauma experienced difficulty in remembering events.  (194 RT 22771-74.)

### o.   Testimony of Sandra Hotchkiss

432.   Sandra Hotchkiss, a convicted felon and police informer in state prison at the time of trial, testified that Felipe Solano was involved in numerous stolen property transactions in addition to his dealings with Petitioner.  (185 RT 21689-91.)  Sandra Hotchkiss had been enlisted, unsuccessfully, by law enforcement officers to sell stolen property to Solano both at a pool hall on Sixth and Alvarado Streets, and at his home just prior to Petitioner's arrest.  (*Id*. at 21714-15, 21718-26, 21730-31.)  Hotchkiss was unaware that her work with law enforcement officers to sell jewelry to Solano in August and September 1985 was actually related to a homicide investigation.  She believed Solano had been arrested and that she would be called as a witness in his case.  (187 RT 21968-69.)

433.   Hotchkiss first met Petitioner in early 1985 at Brunswick Billiards on Third and Main Streets in Los Angeles.  Solano and Petitioner were both in the pool hall at the time, talking with a group of people.  Hotchkiss saw Petitioner sell Solano jewelry on two occasions in March 1985.  (186 RT 21869-71, 21874.) On the first occasion, Hotchkiss bought several rings and chains from Petitioner. (*Id*. at 21874-79.)  Hotchkiss later bought jewelry from Petitioner at good prices because he was unaware of the weight of the gold or the value of stones.  (185 RT 21707-08.)

434.    Two to three weeks after their first meeting in March 1985,

Hotchkiss and Petitioner started committing residential burglaries together,

during the day and early evening.  They used a car Hotchkiss had borrowed.  (185

RT 21708-09.)  Hotchkiss never saw Petitioner with a gun.  (*Id.* at 21713-14.)  He

did not act violently or aggressively in her presence.  She considered Petitioner to

be an amateur burglar.  (*Id.* at 21695-96, 21698, 21701.)  Petitioner usually

waited in the car and acted as the driver, while Hotchkiss committed the

burglaries.  She picked the homes to be burglarized.  According to Hotchkiss,

Petitioner did not know how to identify valuable jewelry.  (*Id.* at 21702-04.)  She

last saw Petitioner in July 1985 in the downtown area near Third and Broadway

Streets.  (*Id.* at 21709-10.)

435.    At trial, Hotchkiss refused to answer specific questions about

burglaries that she had committed with Petitioner.  (186 RT 21888, 21892.)

Hotchkiss agreed to testify only about crimes as to which the statute of

limitations had expired.  The prosecutor told the court that there was no evidence

that Hotchkiss had been involved in any of the murder cases.  (*Id.* at 21929-32.)

436.    Hotchkiss admitted committing 20 to 25 burglaries with Petitioner

between January and July 1985 in west Los Angeles, Glendale, Atwater, Silver

Lake, Santa Monica, and Montrose.  (187 RT 21996-22000.)  She stopped

working with Petitioner because their burglaries did not go smoothly.

Sometimes, Petitioner became scared and abandoned her at the scene.  (*Id.* at

22009.)  They had disagreements about where to park their car and what to take.

She denied that Petitioner ever wrote on mirrors with lipstick during their

burglaries.  (*Id.* at 22018-21.)

437.    Hotchkiss and Petitioner used various cars to commit burglaries.

Petitioner frequently changed cars, driving at times a two-door maroon Chevrolet,

a four-door white Dodge, and a small station wagon.  (187 RT 22029-30.)  On

occasion, they used her Dodge Colt. (*Id*. at 22104.) Hotchkiss saw Petitioner with a screwdriver and pocketknife, but never with a gun. (*Id*. at 22032-33.)

438. Neither Hotchkiss nor Petitioner wore gloves during burglaries they committed together. She believed that gloves hindered her actions during a burglary. Occasionally, she used clear nail polish on her fingertips to avoid leaving fingerprints. Petitioner used clear polish on his fingertips almost every time they worked together. (188 RT 22142, 22184-86.)

439. In exchange for her work with police as an informant and her efforts with police to buy and sell stolen property from and to Felipe Solano, Hotchkiss received respectively six-year and eight-year suspended prison terms and grants of probation in two separate cases. In August 1986, Hotchkiss was arrested, charged with being under the influence, and released from custody. (185 RT 21748, 21754.) On October 26, 1986, she was arrested and charged with burglary. As a result of that arrest, her probation was violated, and she was sentenced to prison for fourteen years. (*Id*. at 21753-54.)

440. Since 1960, Hotchkiss had regularly used cocaine, heroin, and methadone. She also was suffering from an epilepsy disorder; she was required to take medication for seizures. Hotchkiss testified that her memory was not affected by her medication. Following her arrest on October 26, 1986, Hotchkiss became comatose as a result of a drug overdose. (185 RT 21748; 188 RT 22190-92.)

441. At the time of trial, Hotchkiss was in protective custody in state prison, owing to her involvement as a witness in a Long Beach homicide case. While in Los Angeles County Jail, she was housed in protective custody. (188 RT 22157-59.)

144

### p.    Impeachment of Felipe Solano

442.    In 1985, Ruben Cardenas lived near Felipe Solano at 846 Laveta Terrace in Los Angeles.  He was related to Solano through marriage.  Shortly before Petitioner's arrest, Solano asked Cardenas to hide a box for him.  Cardenas refused.  (191 RT 22443-44.)  Two years after Petitioner's arrest, Cardenas told a defense investigator that in 1985 he had seen Solano and his wife sort jewelry on the kitchen table of their residence.  (192 RT 22590.)

443.    Felipe Solano, Jr., testified that he worked at the same factory as his father in August and September 1985.  In August 1985, his father brought a handkerchief containing jewelry to his home and told him to keep the jewelry for him.  Solano, Jr. did not know the property had been stolen.  (184 RT 21525-27, 21533.)  A few days later, his father retrieved the jewelry in the company of police officers.  (*Id*. at 21528.)

444.    Felipe Solano's friend, Rosa Solis, was in custody during the time Solano was involved with Petitioner.  On October 6, 1985, Solis was paroled to the Solano residence at 842 Laveta Terrace, but she later absconded.  (181 RT 21079-80.)  A warrant was issued for her arrest on December 3, 1985.  As of October 7, 1985, she was a parolee-at-large.  (*Id*. at 21094-95.)

445.    According to Los Angeles County Probation Department documents, Rosa Solis's true name was Eva Castillo.  (181 RT 21097.)  She was sentenced to prison on November 14, 1984 for a crime committed on July 12, 1984, and paroled on October 6, 1985.  (*Id*. at 21100, 21107.)

### 4.    Rebuttal Evidence

446.    Evidence was introduced to impeach Sandra Hotchkiss and to refute defense evidence as to the Yu and Kneiding incidents.  Testimony of a news reporter who interviewed Petitioner's father and evidence of dental records were offered to undermine Petitioner's alibi.  The prosecution also presented evidence

to explain hand gestures made by a law enforcement officer during Petitioner's line-up.

### a. Impeachment of Sandra Hotchkiss

447. Burbank Police Sergeant Kight testified that he first met Sandra Hotchkiss in 1976 or 1977, following her arrest for burglary. He knew she was a burglar, a fence, and a prostitute. Over a ten-year period, Hotchkiss stayed in touch with Kight. He last saw her in jail in 1986. (196 RT 22904-05, 22920.)

448. In August 1985, Kight was asked to provide an informant who knew downtown Los Angeles to assist in a Sheriff Department investigation. He introduced Hotchkiss to Detective Ghan and Sergeant Yarbrough. (196 RT 22905-07.) Hotchkiss was in contact with Ghan and Yarbrough at least ten days prior to Petitioner's arrest. (*Id*. at 22910-11.)

449. Shortly after Petitioner's arrest, in early September, Hotchkiss called Kight and indicated she had completed her work for the sheriff's department.

450. Kight may have told Hotchkiss that the investigation concerned Petitioner's case. (196 RT 22914-15.) However, Kight was unaware that Hotchkiss knew Petitioner or Felipe Solano. (*Id*. at 22915-16.)

451. In August 1985, Kight knew that Hotchkiss was charged with two burglaries and was out of custody on bail. He agreed to provide a letter on her behalf for a pending criminal prosecution. The chief of police signed a letter that Kight prepared. As a result, Hotchkiss was granted probation. Following her subsequent arrest for violation of probation, Hotchkiss contacted Kight for assistance, but Kight did not assist her. Hotchkiss was later returned to state prison. (196 RT 22917-20.)

452. Former Sheriff's Detective Robert Ghan met Hotchkiss on August 29, 1985. Ghan interviewed Hotchkiss; she provided names and places of activity related to stolen property. Hotchkiss did not provide either Felipe Solano's or Petitioner's name. At that time, Ghan was unaware of both Solano

146

and Petitioner.  (196 RT 22934-36.)  Ghan put Hotchkiss in touch with Sergeant Laurie.  Ghan had no further contact with Hotchkiss and was unaware that she was being prosecuted for burglary.  He was unaware that his name had been mentioned in a letter on her behalf that explicitly referred to the Night Stalker Task Force.  (*Id*. at 22937-39.)

453.   Los Angeles Police Detective Felix Estrada testified that he first met Hotchkiss in late 1984.  She acted as an informant in some of his cases by buying stolen property.  A letter was prepared on her behalf by Los Angeles Police Department.  (196 RT 22954-55.)

454.   Shortly after Petitioner's arrest, Estrada spoke with Hotchkiss who offered to sell stolen property to the owner of a pool hall on Alvarado Street near 6th Street.  Hotchkiss stated that she did not know Petitioner but she had learned he sold stolen property at a pool hall.  (196 RT 22956-59, 22961.)  Estrada was not on the Night Stalker Task Force and did not bring up Petitioner's name in his conversations with Hotchkiss.  She did not at that time disclose to Estrada that she knew Felipe Solano.  (*Id*. at 22967-69.)

455.   Estrada did not enlist Hotchkiss to sell stolen property at a pool hall.  Hotchkiss frequently called Estrada; on one occasion, she asked him for money.  Estrada refused.  (196 RT 22960-62.)  Hotchkiss indicated to Estrada that since neither he nor the prosecution would help her, she would contact the defense to "see if they would pay her for information."  (*Id*. at 22962.)  Estrada considered Hotchkiss generally a reliable informer but not always truthful.  (*Id*. at 22963-64.)

456.   Sergeant Yarbrough first met Hotchkiss on August 29, 1985, at the sheriff station.  He had no further contact with her until October 31, 1986 when he spoke with her at the Sybil Brand Institute for Women.  Hotchkiss told him that she first met Petitioner on 6th Street in Los Angeles while he was buying drugs.  Petitioner's nickname was "Flaco," which meant "skinny" in Spanish.  (196 RT 22975-81.)  Hotchkiss bought drugs for Petitioner at the Brunswick Pool

Hall on Fourth and Main Streets.  She also bought items from Petitioner, including a camera and camera equipment, two gold necklaces with emeralds, a choker, and a man's yellow gold ring with a diamond.  Based on her conversations with Petitioner, Hotchkiss believed that he obtained property from burglaries.  (*Id*. at 22981-83.)  She also claimed that Solano lied about meeting Petitioner at the bus station.  Solano did not pay Petitioner a fair price for the property he had purchased from Petitioner.  (*Id*. at 22984.)

457.   On March 3, 1987, Yarbrough again met with Hotchkiss who was still in custody.  Hotchkiss related that she and Petitioner together committed four or five burglaries in the Pasadena or Burbank area.  She said she was present with Petitioner in an orange Toyota station wagon when he was involved in a fatal hit and run incident in 1985.  Yarbrough later confirmed that an unsolved fatal hit and run involved a white Buick.  (196 RT 23004-05.)

458.   In a later interview on March 26, 1987, Hotchkiss indicated that she knew Petitioner but did not associate him with the Night Stalker.  They used cocaine together.  (196 RT 23005, 23008.)  She admitted observing Petitioner place jewelry in a pay locker at the bus station and, on several occasions, saw him remove jewelry from the locker.  She believed that Petitioner burglarized a house in her neighborhood between November 1984 and February 1985.  (*Id*. at 23009-11.)  She did not like working with Petitioner because he was careless, stole worthless property, and used amateur tools.  On one occasion, while committing a burglary with Hotchkiss, Petitioner wrote on a mirror with lipstick.  (*Id*. at 23012.)  Sergeant Yarbrough investigated information provided by Hotchkiss.  In Yarbrough's opinion, Hotchkiss gave inconsistent, inaccurate information.  (*Id*. at 23026.)

### b.     Yu Incident

459.    Monterey Park Police Agent Ron Endo observed the victim's right shoe on the driver's side floorboard.  Her left shoe was found on the ground in front of the car.  (197 RT 23087-89.)  The victim's clothing was not disheveled.  (*Id*. at 23090-92.)  When paramedics arrived, they cut away her clothing.  (*Id*. at 23099-101.)

460.    James Njavro, a coroner's photographer, identified a photograph of Yu's clothed body taken before the autopsy.  In the photograph, Yu's clothing appeared disheveled.  (197 RT 23057-59, 23065-70.)

461.    On March 17, 1985, Teresa De Jesus Cerna worked at 9th and Olive Streets in downtown Los Angeles.  When she left work, she found that her car, a 1974 Toyota Corolla station wagon, license number 521MNI, was missing.  She immediately reported that her car had been stolen.  On March 20, 1985, she obtained her car from the California Highway Patrol.  (198 RT 23126-31.)  Only the ignition had been damaged; nothing was missing.  The door lock was intact.  The car had been locked when she parked it on March 17.  (*Id*. at 23133.)

462.    Monterey Park Police Officer Kimberly Torres impounded a 1974 dark blue Toyota vehicle, license plate number 521MNI, on March 20, 1985.  The car had been parked at the emergency entrance to the Monterey Park Hospital which was located four blocks from the Yu incident.  The car had first been cited on March 18, 1985.  The vehicle had minor damage to the front end and a paint scratch to the right side.  (197 RT 23048-54.)

### c.     Kneiding Incident

463.    On June 3, 1988, criminalist Steve Renteria examined a T-shirt found during the investigation of the crime scene.  He tested reddish-brown stains on the T-shirt and concluded that the stains were not blood.  (197 RT 23105-07.)

### d. Petitioner's Dental Work and Alibi

464.    Gerald Vale, D.D.S., compared Petitioner's dental records and x-rays taken after his arrest to the dental records of a patient named Richard Mena who had been treated by Dr. Peter Leung.  (198 RT 23139-41, 23145.)  In Dr. Vale's opinion, all the records pertained to the same person.  Both sets of records showed twelve teeth missing and distinctive dental work.  A molar with two fillings appeared in each set of records.  (*Id*. at 23151-54.)  X-rays of the eyeteeth lateral incisors, and central incisors depicted the same teeth.  Both sets of records demonstrated identical wearing of the teeth and that a root canal had been performed on the same tooth.  There were more than 73 matching points in the two sets of dental records.  (198 RT 23156-58, 23166.)

465.    Dr. Leung practiced dentistry in Chinatown at 732 North Broadway, Los Angeles.  (198 RT 23172.)  From March 5, 1985, through May 30, 1985, he treated a patient named Richard Mena.  His records disclosed that x-rays of Mena's teeth were first taken on March 5, 1985.  On May 17, 1985, a root canal was performed.  On May 21, 1985, Mena had a tooth extracted.  (*Id*. at 23174-79, 23182.)

466.    On May 23, 1985, Mena underwent further dental work.  On May 30, 1985, a crown was cemented in place.  Mena paid for the dental work in cash.  (198 RT 23184-91.)  At trial, Dr. Leung identified Petitioner as his patient Richard Mena.  (*Id*. at 23192.)

467.    News reporter David Hancock worked for the El Paso Times on August 31, 1985.  He interviewed Petitioner's father, Julian Ramirez, in Spanish on that date at the father's residence.  Ramirez appeared shaken by news of Petitioner's arrest.  (199 RT 23241-44.)  They discussed when Petitioner's father last saw Petitioner.  Ramirez indicated he had not seen Petitioner for two to three years.  (*Id*. at 23227-29.)  The interview lasted ten minutes.  (*Id*. at 23231.)

### e.    Live Line-Up

468.    Deputy sheriff John Jones attended the live line-up on September 5, 1985.  He met a witness, Minnie Kelsey, before the line-up.  She was elderly, confined to a wheelchair, and hard of hearing.  (198 RT 23204-05.)  Deputy Jones wheeled Kelsey to the front of the line-up room.  (*Id*. at 23206-09.)  Jones used his hands when talking to Kelsey, but he did not gesture to anyone.  (*Id*. at 23210.)

### 5.    Surrebuttal Evidence

469.    Raymundo Pantoya lived in El Paso and worked with Petitioner's father for the Santa Fe Railroad.  He knew Petitioner.  Pantoya last saw Petitioner on a Saturday when Julian Ramirez's granddaughter, Jennie, was to receive communion.  (202 RT 23405-07.)  Jennie lived with Petitioner's parents.  (*Id*. at 23423-24.)  Petitioner was at his father's house when Pantoya came over to help unclog a sink.  He brought a tool with him and left it at the house.  (*Id*. at 23409-10, 23412-15.)  Petitioner's mother also was at home at that time.  Pantoya did not attend the communion service or stay for the party.  (*Id*. at 23416-17.)

470.    Maria Torres lived in El Paso.  Her sister was married to Petitioner's brother, Ignacio.  On May 25, 1985, she was at the Ramirez family home on Corozal Street on the day Jennie received her First Communion.  (202 RT 23441-43.)  Photographs were taken in the afternoon.  Torres saw Petitioner, his father, mother, and Jennie pose together for a photograph.  She later saw the resulting Polaroid photograph that was admitted into evidence at trial (Defense Trial Ex. Az).  (202 RT 23444-47, 23473.)

471.    Torres saw Petitioner again the following Wednesday, May 29, 1985, at her sister's house.  (202 RT 23448-49.)  Petitioner walked into the living room and spoke with Torres for a few minutes.  Petitioner went to his brother's bedroom and left the house a few minutes later.  She remembered the date because she had separated from her husband exactly one month earlier, on April

29.  (*Id.* at 23450-53, 23463-64.)  When she last saw Petitioner, he was wearing a dark T-shirt and jeans.  (*Id.* at 23469.)

**C.    Penalty Phase**

472.    At the penalty trial, neither the prosecution nor the defense presented any evidence.  (*See* 217 RT 24780-81.)

## INCORPORATION OF EXHIBITS AND REQUEST
## FOR JUDICIAL NOTICE

473.   Petitioner incorporates the accompanying exhibits into this petition by reference as if set forth in full herein.  Petitioner's claims are based on the petition, the declarations and documents appended thereto, and all records, documents and pleadings filed in the California Supreme Court in his direct appeal and habeas actions.  Los Angeles County Superior Court No. S012944; California Supreme Court Case Nos. S125755.  Petitioner hereby requests this Court to take judicial notice of the entire record from his direct appeal, and his related state habeas action.

474.   Petitioner requests that the Court consider all the exhibits filed with this petition.  As to those exhibits that have not been authenticated, which contain hearsay information or which might otherwise be inadmissible at an evidentiary hearing on this petition, Petitioner presents them as an offer of proof about what evidence Petitioner could introduce after full investigation, discovery and access to this Court's subpoena power.  In citing in this petition to specific exhibits or to specific pages or paragraphs thereof, Petitioner does not contend or concede that these specific references are the only evidence which could be presented at an evidentiary hearing in support of his claims.

475.   All articles, records, photographs, and other documents submitted as exhibits are what they purport to be.  Petitioner originally copied or printed some documents on paper larger and smaller than 8-½ x 11 inches; except where noted, Petitioner has reduced or enlarged those copies in size for convenience in filing.

476.   Original copies of Petitioner's exhibits are available at the Office of the Federal Public Defender, 321 East 2nd Street, Los Angeles, California, 90012, and will be furnished to the Court or shown to opposing counsel upon request.  Other original copies of exhibits are on file with the California Supreme

Court, pursuant to the rules directing habeas petitioners to do so, or will be filed with the California Supreme Court when an exhaustion petition is filed in March, 2009.

## VII.

## CONSIDERATION OF THE PETITION UNDER THE ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT

477.   Ramirez filed his initial federal habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), and therefore the AEDPA governs his petition. *Woodford v. Garceau*, 538 U.S. 202, 123 S. Ct. 1398, 155 L. Ed. 2d 363 (2003).

> Under AEDPA, a habeas petition challenging a state court judgment
> shall not be granted with respect to any claim that was adjudicated
> on the merits in State court proceedings unless the adjudication of
> the claim – (1) resulted in a decision that was contrary to, or
> involved an unreasonable application of clearly established Federal
> law, as determined by the Supreme Court of the United States; or (2)
> resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

28 U.S.C. § 2254(d).  28 U.S.C. § 2254(e)(1) states that "a determination of a factual issue made by a State court shall be presumed to be correct" and that the habeas petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

478.   Ninth Circuit cases consistently hold that less deference to state court decisions are warranted where, with regard to the majority of Petitioner's claims, the state court summarily denied the claim without an opinion or an evidentiary hearing.  First, because "there is no reasoned state court decision to assess," the federal court "must conduct an independent review of the record" to

154

determine if the state court decision was objectively unreasonable.  *Reynoso v. Giurbino*, 462 F.3d 1099, 1119 (9th Cir. 2006); *Brown v. Palmateer*, 379 F.3d 1089, 1092 (9th Cir. 2004) ("Because the Oregon courts have provided no *ratio decidendi* to review, or to which we can give deference, we employ the 'objectively reasonable' test.  In this situation, federal habeas courts accord the state court decisions less deference than in standard habeas cases"); *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003) (similar).  A leading treatise describes this Ninth Circuit rule as "an intermediate approach" in which the court "review[s] the record 'independently' in a manner that is somewhat more deferential to the state courts than the pre-AEDPA standard of *de novo* review."  Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure*, Vol. 2 § 32.2 at 1576 & n.10 (5th ed. 2005).

479.    Second, because the state courts made no findings of fact or held a hearing on the claims, there are no factual determinations for this Court to defer to, or for § 2254(e)(1)'s presumption of correctness to apply to.  *Taylor v. Maddox*, 366 F.3d 992, 1014 (9th Cir. 2004) ("It is well-established that when the state courts do not make findings at all, no presumption of correctness attaches, and we must make our own findings.") (*citing Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527, 2540, 156 L. Ed. 2d 471 (2003)); *Nunes v. Mueller*, 350 F.3d 1045, 1055 (9th Cir. 2003) ("with the state court having refused Nunes an evidentiary hearing, we need not of course defer to the state court's factual findings – if that is indeed how those stated findings should be characterized – when they were made without such a hearing"); *Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002) (similar).

480.    Further, in *Holland v. Jackson*, 524 U.S. 649, 653, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam), the Supreme Court recognized that "[w]here new evidence is admitted [in the federal habeas court], some Courts of Appeals have conducted *de novo* review [rather than apply the § 2254(d)(1) and

155

(2) standards] on the theory that there is no relevant state-court determination to which one could defer." *See, e.g.*, *Monroe v. Angelone*, 323 F.3d 286, 297-99 & n.19 (4th Cir. 2003); *Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003); *Williams v. Coyle*, 260 F.3d 684, 706 (6th Cir. 2001); *but see Matheny v. Anderson*, 377 F.3d 740, 747 (7th Cir. 2004); *Valdez v. Cockrell*, 274 F.3d 941, 946-47, 951-52 (5th Cir. 2001); *see also LeCroy v. Secretary, Florida Dep't of Corrections*, 421 F.3d 1237, 1262-63 & n.30 (11th Cir. 2005) (collecting cases). This rule makes sense: "the new, relevant evidence was never before the state court so it never considered the impact of the evidence when denying relief, and there is arguably nothing to defer to." *LeCroy*, 421 F.3d at 1263 n.30.

481. Petitioner is unaware of published Ninth Circuit opinions discussing this line of cases on the issue of *de novo* review, but in *Killian v. Poole*, 282 F.3d at 1207, the court concluded that "[f]or claims for which no adjudication on the merits in state court was possible . . . AEDPA's standard of review does not apply." The court explained:

> AEPDA deference does not apply to Killian's perjury claim in this case because the state courts could not have made a proper determination on the merits. Evidence of the perjury, after all, was adduced only at the hearing before the magistrate judge.

482. The terms "contrary to" and "unreasonable application" have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002); *Sarausad v. Porter*, 479 F.3d 671 (9th Cir. 2007). A state court decision is "contrary to" clearly established federal law if it arrives at a conclusion opposite to that of the Supreme Court on a question of law, or decides the case differently than the Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000); *accord Carey v. Musladin*, 549 U.S. 70, 127 S. Ct. 649, 653, 166 L. Ed. 2d 482 (2006). To be an "unreasonable application of"

clearly established federal law, the state court decision must have identified the correct legal rule but unreasonably applied it to the facts at hand. *Id.* at 406.

483. "Supreme Court holdings at the time of the state court's last reasoned decision are the source of clearly established Federal law for the purposes of AEDPA," *citing Williams*, 529 U.S. at 412; *Abdul-Kabir v. Quarterman*, 127 S. Ct. 1654, 167 L. Ed. 2d 585 (2007) (granting habeas relief under AEDPA because state court decision ignored "fundamental principles established by [the Supreme Court's] most relevant precedents"); *Barker v. Fleming*, 423 F.3d 1085, 1093 (9th Cir. 2005); *accord Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). Ninth Circuit precedent remains persuasive authority in determining what is clearly established federal law. *See Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999); *Arnold v. Runnels*, 421 F.3d 859, 865 n.6 (9th Cir. 2005). As the Supreme Court has stated, "in the context of federal habeas" "[d]eference does not imply abandonment or abdication of judicial review." *Miller-El v. Cockrell* (*Miller-El I*), 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003). To that end, while the standard as articulated in section 2254 is demanding, it is "not insatiable; as we said the last time this case was here, "'[d]eference does not by definition preclude relief.'" *Miller-El v. Dretke*, 545 U.S. 231, 240, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005) (*Miller-El II*) (granting habeas relief under AEDPA), *citing Miller-El I*, 537 U.S. at 340; *see Panetti v. Quarterman*, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007) ("AEDPA does not "'require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied.'"), *citing Carey*, 127 S. Ct. at 656 (Kennedy, J., concurring in judgment).

484. When state courts fail to render a reasoned decision on the merits of a claim, the AEDPA rules are fundamentally altered. Ninth Circuit cases consistently hold that less deference to state court decisions is warranted when the state court summarily denies a claim without an opinion or an evidentiary

157

hearing. First, because "there is no reasoned state court decision to assess," the federal habeas court "must conduct an independent review of the record" to determine if the state court decision was objectively unreasonable. *Reynoso v. Giurbino*, 462 F.3d 1099, 1119 (9th Cir. 2006); *Brown v. Palmateer*, 379 F.3d 1089, 1092-93 (9th Cir. 2004) ("Because the Oregon courts have provided no ratio decidendi to review, or to which we can give deference, we employ the 'objectively reasonable' test. In this situation, federal habeas courts accord the state court decisions less deference than in standard habeas cases."); *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003) (similar). A leading treatise describes this Ninth Circuit rule as "an intermediate approach" in which the court "review[s] the record 'independently' in a manner that is somewhat more deferential to the state courts than the pre-AEDPA standard of de novo review." Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure* (5th ed. 2005), Vol. 2, § 32.2 at 1576 & n.10.

## VIII.

## ALLEGATIONS APPLICABLE TO EACH AND EVERY CLAIM

485. Petitioner makes the following allegations that apply to each and every claim and allegation in this Petition.

486. The facts in support of each claim are based on the allegations in the Petition, the declarations and other documents contained in the exhibits; the entire record of all the proceedings involving petitioner in the trial courts of Los Angeles County; the documents, exhibits, and pleadings in *People v. Richard Munoz Ramirez*, Case No. S012944, *In Re Ramirez*, Case No. S125755, any judicially noticed facts, and all other documents and facts that Petitioner may develop.

487. Legal authorities in support of each claim are identified within that claim. Each and every claim is based both on the state and the federal constitutions.

488.   Petitioner does not waive any applicable rights or privileges by the filing of this Petition and the exhibits, and in particular, does not waive either the attorney-client privilege or the work-product privilege. *See Bittaker v. Woodford*, 331 F.3d 715 (9th Cir. 2003).  Petitioner hereby requests that any waiver of a privilege occur only after a hearing with sufficient notice and the right to be heard on whether a waiver has occurred and the scope of any such waiver. Petitioner also requests "use immunity" for each and every disclosure he has made and may make in support of this Petition.

489.   It should be noted that, despite counsel's best efforts and exercise of due diligence, the claims presented herein are unavoidably incomplete, for all the reasons alleged herein, but also due to two external factors beyond Petitioner's and counsel's control that inherently preclude the full investigation and development of potentially meritorious habeas corpus claims that entitle Petitioner to habeas corpus relief: 1) Petitioner's serious mental illness and inability to rationally understand and assist in these proceedings (viz., the investigation and presentation of the petition for writ of habeas corpus); and 2) the impossibility of being able to thoroughly investigate and develop the underlying facts in support of potentially meritorious issues because Petitioner was allowed to represent himself at trial, the crucial and constitutionally-relevant facts underlying his claims are exclusively within his knowledge, and he is currently too mentally ill to recall, relate, articulate, understand, assess, explain or otherwise impart to counsel (or to the Court on his own behalf) the critical and indispensable facts that lie at the heart of those claims.

490.   Until Petitioner can be restored to competence, generally, and specifically with respect to the events that led to the capital charges and the subsequent legal proceedings that are the subject of this Petition for relief, these proceedings should be suspended.  Failing to do so would violate his state and federal constitutional rights to pursue and prosecute his habeas corpus rights.

491. Nevertheless, counsel for Petitioner presents the claims for relief to the extent possible notwithstanding the limitations that inhere in the peculiar facts of Petitioner's case. There are undoubtedly additional relevant, highly probative facts in support of each claim presented here, as well as other potentially meritorious claims which are currently unknowable due to Petitioner's mental illness. Until Petitioner is restored to a level of competence where he can rationally aid and assist in the investigation, development and presentation of the claims presented here, and any other potentially meritorious claims which are now indeterminable, this Court cannot justly or fairly deny or otherwise adjudicate Petitioner's claims without violating his federal constitutional rights.

## IX.

## CLAIMS FOR RELIEF

## CLAIM 1:

### PETITIONER WAS MENTALLY INCOMPETENT THROUGHOUT THE LEGAL PROCEEDINGS IN STATE COURT AND IS CURRENTLY MENTALLY INCOMPETENT

492. Exhaustion of the claim: This claim was fairly presented to the California Supreme Court in the direct appeal and in Section VII of the June 2004 petition for writ of habeas corpus, although it includes additional factual allegations. Petitioner will present the claim with the additional factual allegations to the California Supreme Court in an exhaustion petition he will file no later than March 17, 2009.

493. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

494. Those facts and allegations set forth in the petition, declarations, claims of constitutional violations, and the accompanying exhibits are

incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

495.   Petitioner's conviction and sentence are illegal, unconstitutional, and void under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments because he was mentally incompetent to stand trial or to waive rights, to understand the proceeding in state court or to aid and assist in his defense.  He is currently mentally incompetent to assist federal habeas counsel.

496.   Petitioner's conviction and sentence of death were rendered in violation of his rights to due process and equal protection, a fair trial, present a defense, compulsory process, confrontation, disclosure of all material, exculpatory and/or impeaching evidence, a reliable, rational, and accurate determination of guilt, death-eligibility and death-worthiness, free of any unconstitutionally unacceptable risk that such determinations were the product of bias, prejudice, arbitrariness or caprice; effective assistance of counsel and access to competent mental health experts who are qualified to assist in the investigation, preparation and presentation of evidence relevant to significant mental state issues under the above-referenced provisions of the Constitution.

497.   The violations of these rights, individually and cumulatively, prejudicially affected and distorted the investigation, discovery, presentation, and consideration of evidence as well as each and every factual and legal determination made by trial counsel, the state courts and the jurors at all stages of the proceedings from the time of Petitioner's arrest through and including the rendering of the judgment of death.

498.   A person cannot be tried and sentenced to death while mentally incompetent.  *Pate v. Robinson*, 383 U.S. 375, 375 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966).  The test for incompetency to stand trial is whether as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the

conduct of a defense in a rational manner.  The defendant must have "sufficient present ability to consult with is lawyer with a reasonable degree of understanding" and must have a "rational as well as a factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960); *accord Drope v. Missouri*, 420 U.S. 162, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975) ("[A] person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him to consult with counsel, and to assist in preparing his defense may not be subjected to trial.").  The trial of an accused who is unable to assist counsel rationally or understand the nature of the proceedings against him also violates his substantive due process rights to be tried while physically and mentally present. *James v. Singletary*, 957 F.2d 1562 (11th Cir. 1992).

499.   There is a basic presumption against the waiver of constitutional rights. *Brookhart v. Janis*, 384 U.S. 1, 86 S. Ct. 1245, 16 L. Ed. 2d 314 (1966).  To properly waive a constitutional right a defendant must do so voluntarily, knowingly and intelligently, with a sufficient understanding of the relevant circumstances and the likely consequences. *See Brady v. United States*, 397 U.S. 742, 90 S. Ct. 1463, 25 L. Ed. 2d 747 (1970): *Johnson v. Zerbst,* 304 U.S. 458, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938).  To meet this standard when waiving the right of presenting mitigating evidence to a penalty phase jury, an individual must understand what constitutes mitigating evidence and whether any such evidence exists in his case.  Against this backdrop, Petitioner's decision to waive presentation of mitigating evidence at the penalty phase of his trial did not constitute a valid waiver.

500.   Counsel's performance was constitutionally deficient.  Trial counsel failed to adequately and thoroughly investigate mitigating evidence.  Evidence of childhood abuse, neglect, injury and trauma, institutional failure, polysubstance use, and long-standing mental illness and impairments was available to trial

counsel. Counsel decided to go forward at trial without fully investigating and understanding the impact of the mitigation evidence and Petitioner's impaired mental state, which was material and relevant at both phase of Petitioner's trial. Thus, almost the only evidence the jury heard was extremely violent and bizarre criminal acts.

501. An effective investigation by trial counsel developing the evidence even in their possession would have uncovered significant mitigating evidence regarding childhood abuse, neglect, injury and trauma, institutional failure, polysubstance use, multiple mental impairments, including organic brain damage and psychosis.

502. Petitioner's purported waiver of a penalty-phase defense was based on a lack of competent, conflict-free advice from counsel, of rational understanding of the proceedings and consequences, and of the ability to communicate rationally with counsel and to assist in his own defense. Any purported waiver was therefore not a knowing and intelligent waiver under *Brady* and *Zerbst*. Petitioner cannot be held to have waived his fundamental right to present penalty phase evidence as he was mentally incompetent.

503. For the same reasons, Petitioner was incompetent to waive any defenses or any of his constitutional or statutory rights, including his right to make knowing, intelligent, and voluntary waivers of constitutional rights; to a speedy trial, conflict-free and legally competent counsel; his right not to incriminate himself; his right to be free from unlawful searches and seizures; his right to rationally assist counsel in the preparation of his defense; his right to be present at trial proceedings; his right to cross-examine witnesses brought against him; his right to present a defense at the guilt and penalty phases of his trial; his right to compel witnesses to testify on his behalf; his right to effective assistance of counsel; and his right to present mitigation evidence. No waiver of constitutional or statutory rights that may appear on the record was in fact

knowing, voluntary, or competent, and the trial court inadequately investigated the existence of any alleged knowledge, voluntariness, or competence. Any one or combination of these rights that he may have been deemed to have abandoned prejudicially affected both the guilt and penalty determinations in this case, including the investigation, discovery, presentation and consideration of evidence as well as every factual and legal determination made by trial counsel, the municipal and superior courts, and the jurors.

504. To the extent that the trial court was not aware that Petitioner was incompetent to stand trial,[27] trial counsel were constitutionally ineffective for failing to fully and adequately investigate Petitioner's social history and background; failing to have Petitioner adequately evaluated by competent mental health professionals; and failing to properly present the results of such investigation and evaluation to the court in a timely manner in order to demonstrate that he was incompetent throughout the proceedings below and was incompetent to stand trial and to waive his rights.

505. Petitioner argues below, *see* Claim 2, *post*, that, given the information available to it at the time, the trial court erred in failing to initiate competency proceedings to determine Petioner's competence to stand trial and to waive rights. In the alternative, however, to the extent that the evidence before the trial court was insufficient to raise a good faith doubt with respect to Petitioner's competency, Petitioner is still entitled to relief if he can now show he was in fact incompetent. *Steinsvik v. Vanzant*, 640 F.2d 949, 954 (9th Cir. 1981).

506. Moreover, trial counsel's conflicts of interest and constitutionally deficient performance precluded a thorough and effective mental health

_____

[27] The trial court raised concerns about Petitioner's mental competency. (*See* 22 RT 1333, 1334; 28 RT 2001.) Petitioner asserts in this Petition that the trial court erred in failing to suspend criminal proceedings and in failing to hold a hearing to determine Petitioner's competence to stand trial and to waive rights.

164

evaluation of Petitioner, motions, and presentation of evidence on his behalf regarding mental state evidence. *See infra.*

507. To the extent that the facts set forth below could not have been uncovered by trial counsel, those facts constitute newly discovered evidence establishing that Petitioner was incompetent at the time of the proceedings below, and cast doubt on the reliability and non-arbitrariness of the proceedings, judgment of conviction and sentence. As such, Petitioner's rights to due process and a fair trial have been violated and collateral relief is appropriate.

## A. Petitioner Was Mentally Incompetent Throughout the Trial Proceedings

508. Petitioner was rendered incompetent by his long-term mental impairments, including but not limited to history of temporal lobe epilepsy, a organic thought disorder of psychotic proportion, a psychotic disorder, a severe mood disorder, organic brain damage, severe cognitive and behavioral impairments, a long history of deprivation, injury, abuse, and neglect, posttraumatic stress disorder, neuro-, neurocognitive-, and neuropsychiatric-dysfunction, long history of significant drug use and addiction, and learning and developmental deficits. These multiple mental impairments, alone or in combination, severely impaired Petitioner's ability to, among other things, reason, process and solve problems, accurately comprehend verbal and written information, exercise rational judgment, consider and weigh consequences, effectively communicate, work with new information or situations, and generate possible solutions to problems. Petitioner's mental functioning detrimentally affected his ability to defend himself, rationally understand the proceedings against him or rationally aid and assist counsel from the time of arrest through the trial proceedings, in that they effectively rendered him incapable of: (a) making knowing and intelligent waivers of his constitutional and statutory rights; (b) understanding the true nature of the charges brought against him; (c) assisting

counsel in the preparation of his defense; (d) understanding the nature and object of the legal proceedings; (e) understanding the nature and impact of the testimony and evidence brought against him; (f) exercising his constitutional and statutory rights, including his right to effective and conflict-free assistance of counsel, his right to cross-examine witnesses, and right to an affirmative defense and reliable penalty determination; and (g) understanding his waiver of the right to a reliable determination of penalty.

509. Petitioner exhibited symptoms consistent with multiple impairments, including, but not limited to, cognitive, psychiatric, psychological, neurological, neuropsychological, and neuropsychiatric deficits and impairments; posttraumatic stress disorder, bipolar and/or other mood disorders, and polysubstance addiction.

510. Petitioner incorporates by reference as though fully set forth in Exhibits 31, 32, 38, 41, 42, 43, 72, 100, 99, 98, 96 which are the Declarations of Dietrich Blumer, M.D., dated 05/10/2004; Marilyn Cornell, dated 06/16/2004; Robert Schneider, M.D., dated 02/23/2004; William Vicary, M.D., dated 03/15/2004; Dale Watson, Ph.D., dated 04/24/2004; Jane Wells, J.D., Ph.D., dated 05/19/2004; and Anne Evans, Ph.D., dated 04/18/1995, as well as the reports of George W. Woods, M.D., dated 04/19/1995; Elise Taylor, M.F.C.C., dated 03/06/1995; Myla H. Young, Ph.D, dated 03/13/1995; and the letter from Victor Henderson, M.D., to Daniel Hernandez, dated 05/29/1987.

511. Beginning at age ten, close in time after he sustained a concussion playing football, Petitioner began to suffer epileptic seizures. He suffered at least three convulsive epileptic seizures at school, which prompted school officials to call an ambulance to have Petitioner taken to the hospital, and numerous other epileptic seizures outside of school. Petitioner was twice hospitalized at Hospital Hotel Dieu following seizures: once in 1970, at age 10, and once in 1972, at age 12. In 1972, doctors diagnosed him with epilepsy and prescribed Phenobarbital to control the seizures. EEGs administered at the time revealed abnormal results,

which confirmed a diagnosis of epilepsy or seizure disorder. Petitioner took the medication, which can have significant adverse effects, for approximately a year and a half. Petitioner suffered at least twelve serious convulsive epileptic seizures and continued to experience such seizures until he was seventeen years old, and, from the age of ten on, he experienced partial or absence epileptic seizures – characterized by brief periods of staring into space, unaware of his surroundings – multiple times per day. (Ex. 32, M. Cornell Dec., ¶ 51; Ex. 103, M. Ramirez Dec., ¶ 19; Ex. 104, Robert Ramirez Dec., ¶ 10; Ex. 105, Rosario Ramirez Dec., ¶ 10-11; Ex. 102, I. Ramirez Dec., ¶ 21; Ex. 125, E. Milam Dec., ¶¶ 3-4, 9; Ex. 123, Declaration of Patricia Kassfy, dated 10/28/2008, ¶¶ 3-4; Ex.121, Declaration of Elizabeth Duenas, dated 10/27/2008, ¶ 3; Ex. 50, Schneider M.D.; Ex. 57, Hospital Hotel Dieu Records re Richard Ramirez; Ex. 50, Articles on Epilepsy and Related Psychiatric Disorders; Ex. 31, D. Blumer Dec., ¶ 8.)

512. An organic brain disorder such as Petitioner's seizure disorder can have, and in Petitioner's case did have, profound neuropsychiatric effects. As a result of the epilepsy/seizure disorder he experienced in adolescence, he developed a severe thought disorder of psychotic proportions. (Ex. 31, D. Blumer Dec., ¶¶ 9-10, 14-15.)

513. After the seizures, Petitioner's behavior and personality changed significantly. He became an insomniac and experienced anger. He became socially withdrawn. He began leaving the house late at night, sometimes staying out all night without telling anyone where he was or what he was doing. His performance at school declined, and he became truant and eventually he dropped out. He began drinking Coke and eating cookies and candy obsessively. He suffered headaches and paranoid fears. He began to get in trouble with the law and was known in the neighborhood for stealing. And he began to show psychiatric and psychotic symptoms consistent with an organic brain disorder and

167

temporal lobe epilepsy.  (Ex. 31, D. Blumer Dec., ¶ 8; Ex. 32, M. Cornell Dec., ¶ 51; Ex. 103, M. Ramirez Dec., ¶¶ 20, 25-26; Ex. 105, Rosario Ramirez Dec., ¶ 12; Ex. 121, E. Duenas Dec., ¶ 4.)

514.   Within a year, Petitioner discontinued his prescribed phenobarbital and began using street drugs which further compromised his developing brain. By age 16, Petitioner's thinking was psychotic.  He was unable to separate fantasy from reality.  (*See* Ex. 43, J. Wells, J.D., Ph.D., Dec., ¶ 31.)

515.   At age 17, Petitioner was committed to the Texas Youth Council. He was evaluated by a psychologist there, who concluded Petitioner was unable to separate reality from fantasy, exhibited disorganized thinking, weakness in ideation, depression, and withdrawal.  Psychiatric treatment was recommended, but Petitioner never received such treatment.  (Ex. 32, M. Cornell Dec., ¶ 75-79; Ex. 60, Texas Youth Counsel Records re: Richard Ramirez.)

516.   Around the age of 19, Petitioner moved to California.  After living briefly with his brother, Julian Ramirez, Jr., Petitioner essentially became homeless, living on the streets and failing to care for himself.  His family became worried, and his parents and his sister traveled to California to attempt to find him and bring him home.  On one such trip, his sister found him living on the street, but his physical appearance had worsened so significantly that she failed to recognize him initially.  (Ex. 103, M. Ramirez Dec., ¶ 28; Ex. 105, Rosario Ramirez Dec., ¶ 22; Ex. 102, I. Ramirez Dec., ¶¶ 34-35; Ex. 124, Declaration of Cynthia Melendez, dated 11/24/2008, ¶ 9; Ex. 123, P. Kassfy Dec., ¶ 9.)

517.   Also around the age of 19, Petitioner became obsessed with Satan and Satanism.  He had developed an interest in Satanism and the occult as early as the ninth grade.  But in late adolescence and in his early twenties, he experienced severe delusions, hallucinations, paranoia and disorganized, psychotic thoughts concerning Satan as an actual presence in his life, with whom he believed he had a significant personal relationship.  After he moved to

168

California, he called his mother and told her that he had met people involved with Satanism who frightened him and that he had seen some scary things – including a lamp moving by itself. At first his experiences frightened him, but over time his psychosis and thought disorder developed and deepened. (Ex. 125, E. Milam Dec., ¶ 12; Ex. 103, M. Ramirez Dec., ¶ 29; Ex. 124, C. Melendez Dec., ¶ 7; Ex. 122, Declaration of Gilbert Flores, dated 11/24/2008, ¶¶ 4-5.)

518. Shortly after Petitioner's arrest, in September 1985, William Vicary, M.D., a psychiatrist, briefly examined Petitioner at the request of his counsel at the time the Los Angeles Public Defender.[28] Dr. Vicary found that

> Petitioner was psychotic, *i.e.*, he suffered mental impairment that interfered with his ordinary functioning. He appeared to be irrational and self-destructive. [He] met the criteria for mental incompetence, . . . in that he did not have the ability to rationally assist counsel in his defense.

(Ex. 41, W. Vicary, M.D., Dec., ¶ 5.)

519. Only a few months later, on January 19 and 20, 1986, Dietrich Blumer, M.D., neuropsychiatrist, examined Petitioner at trial counsel's request and found he suffered from temporal lobe disorder. "[T]here is evidence of a disorder of psychotic proportion . . . ." (Ex. 31, D. Blumer, M.D., Dec., ¶ 10.) Dr. Blumer opined that Petitioner was mentally incompetent and could not assist counsel in his own defense. (*Id.*, ¶ 8.)

520. Petitioner's psychosis prevented him from thinking logically or behaving in a rational manner. His judgment was impaired; he could not function rationally. As Dr. Blumer stated:

---

[28] Trial counsel provided ineffective assistance of counsel for failing to obtain, review, follow up on, and fairly present Dr. Vicary's findings. *See infra.*

Petitioner suffers from a persistent thought disorder of psychotic degree. His chief delusion consists of the conviction of having an intimate relationship with Satan.

. . . .

The neurological and psychiatric symptoms of epilepsy are complicated; they require careful treatment and periodic monitoring over a long period of time. Even when the patient no longer experiences complex partial seizures, there is concern that additional symptoms may appear, especially where, as here, the patient has used illicit drugs and no longer takes prescribed medication. It is not uncommon to see patients with temporal lobe epilepsy develop psychotic disorders. Treatment for interictal (the phase free of seizures) psychosis requires effective use of drugs.

(Ex. 31, D. Blumer, M.D., Dec., ¶¶ 9, 14; *see* Blumer, et al., *Treatment of Interictal Psychoses*, J. Clin. Psychiatry 61:2 (Feb. 2000), attached to Exhibit 31.)

521. In May 1987, at the request of trial counsel, victor Henderson, M.D., a neurologist examined Petitioner and concluded that he had suffered brain damage. He informed Daniel Hernandez, Petitioner's trial counsel, of his findings. (Ex. 96, Henderson letter.)

522. The opinions of Drs. Vicary, Blumer, and Henderson were known to trial counsel (the Hernandezes).

523. In addition, counsel were aware of the bizarre nature of the crimes that Petitioner was accused of committing; his bizarre behavior both in the courtroom and in his jail cell. On September 2, 1985, for example, a jail deputy observed Petitioner in his cell writing the number "666" and drawing a star in a circle on the cell floor with blood from his right palm. (176 RT 20599-600.)

524. On numerous occasions, Petitioner engaged in bizarre behavior in court. For instance, Petitioner loudly invoked the words "Hail, Satan" in the

courtroom and displayed a bizarre pentagram on the palm of his hand at the October 24, 1985 hearing held with respect to retention of counsel. A sheriff's investigator testified at trial that, at that hearing, he observed Petitioner raise his hands and say aloud "Hail Satan." The investigator saw an inverted star with a circle around it and "666" written on the palm of Petitioner's hand. (176 RT 20603-04, 20607.)

525. Trial counsel were fully aware that Petitioner repeatedly refused to cooperate with them in his defense and repeatedly behaved in a strange and bizarre manner that, by any measure, further raised doubts about his mental competence. Petitioner continued to behave irrationally during trial: on January 30, 1989, he allegedly waived his right to wear an unobtrusive leg brace and agreed to wear shackles before the jury (*see* Claim 22, *infra*); on February 6, 1989, he refused to remove his sunglasses at the court's direction (*see* Claim 24, *infra*); on May 8, 1989, he was unwilling to cooperate with counsel in order to present a proper defense at the guilt trial (178 RT 20794-75); on September 20, 1989, he waived his presence at the guilt verdicts (216 RT 24710-11); on September 27, 1989, he waived his right to present any mitigation evidence at the penalty trial (217 RT 24774-76); and on November 7, 1989, he made an irrational statement at the sentencing hearing.

526. And counsel were aware that prior counsel Joseph Gallegos had declared his doubt as to Petitioner's competence.

527. All of this information put counsel on notice that Petitioner was not competent to stand trial or to waive rights. They provided constitutionally deficient performance in failing to present the opinions of those expert to the trial court in support of a motion to determine Petitioner's competence to stand trial and to waive rights.

528. Trial counsel also provided constitutionally deficient performance in failing to investigate, develop, and present evidence of Petitioner's incompetence

171

to stand trial and waive rights that was developed and presented by counsel representing Petitioner in subsequent legal proceedings – criminal trial proceedings in the San Francisco County Superior Court and post-conviction proceedings arising from the Los Angeles case. Evidence such as that obtained by lawyers representing Petitioner in those proceedings could and should have been presented in Petitioner's proceeding in the Los Angeles County Superior Court.

529. After Petitioner was convicted and sentenced to death in Los Angeles, he was transferred to San Francisco for trial on additional criminal charges arising from an incident that occurred there. San Francisco County Superior Court, Case No. 140188. He was represented by the Office of the Public Defender for the City and County of San Francisco ("SFPD"). His counsel in the San Francisco case conducted the social history and mental health investigation that his counsel in the Los Angeles case failed to undertake. The social history and mental health investigation confirmed and expanded on the various opinions of Drs. Vicary, Blumer, and Henderson that Petitioner was psychotic, suffered an organic-based thought disorder of psychotic proportion, had suffered brain damage, and was not competent to stand trial or to waive his rights:

530. Dr. George W. Woods, M.D., retained by the SFPD, evaluated Petitioner. He diagnosed Petitioner with a severe mental disorder: a Psychotic Disorder due to Temporal Lobe Syndrome, which includes delusions that are both paranoid and erotomanic. Dr. Woods also found that Petitioner exhibited significant compulsive and obsessive behavior. And Dr. Woods concluded that Petitioner suffers significant cognitive deficits of a kind typically associated with prefrontal, frontal, and temporal areas of the brain. (Ex. 100, Woods Report, at 1.) He identified a number of symptoms resulting from Petitioner's disorder that impaired his ability to rationally assist counsel in his defense, including paranoia,

impaired concentration, poor attention span, delusional thinking, forced thinking, severe mood swings, inability to analyze and process relevant data, altered sexual interest, limited insight and judgment, and profound depression. As a result of this constellation of impairments, Dr. Woods opined that Petitioner was incompetent to stand trial and to waive rights and that Petitioner's incompetence dated back at least to the time of his first contact with the criminal justice system in 1985. (*Id.* at 4, 8.)

531. Dr. Wood's conclusions are supported by the report of Myla H. Young, Ph.D., who was retained by the SFPD and who administered a series of neuropsychological and personality tests to Petitioner. Her diagnostic impressions included: Axis I: Personality Change Due to Epilepsy, Combined Type (Disinhibited, Aggressive, Paranoid Features) and Mood Disorder Due to Epilepsy, with Depressive Features; Axis III: Epilepsy, partial, with Impairment of Consciousness (Temporal Lobe). (Ex. 98, M. Young Report, at 7.) The neuropsychological testing that she administered revealed particular impairments in tasks of memory and higher cognitive functioning – a pattern similar to that of individuals who have a known history of cognitive impairment secondary to seizure disorder. (*Id.* at 3-4.) Petitioner's impairments in those areas suggest that he experiences brain impairment that affects his abilities for judgment, planning ahead, anticipating consequences of his behavior, and modulating his impulses. The personality testing that she administered revealed that Petitioner suffers severe, painful depression, pervasive anger, and unmodulated, impulsive emotionality and indicated that he tends to become lost in an internal world that is perceptually inaccurate; at times that is grossly distorted; and at times reaches delusional proportions. (*Id.* at 7.) Dr. Woods, in his report, reviews in some detail examples of how Petitioner's impairments undermined his ability to rationally understand the proceeding against him and to rationally assist counsel in his defense. (*Id.* at pp. 4-7.)

173

532. The SFPD also retained Anne Evans, Ph.D., who evaluated Petitioner and administered neuropsychological and personality tests. Dr. Evans concluded, consistent with the findings of Drs. Vicary, Blumer, Henderson, Woods, and Young, that Petitioner suffers from a serious mental disorder of long standing. (Ex.72, A. Evans Dec., at pp. 4-5.) She believed it likely that his impairments related to his temporal lobe system, noting that the constellation of symptoms and behaviors are consistent with an organically based syndrome such as seizure disorder. (*Id.* at pp. 32-33.) Dr. Evans opined that he suffers paranoid delusions, that his thinking is severely psychotic, disturbed, disorganized, and fragmented; his perceptions are markedly inaccurate; he is seriously out of touch with reality, distorting the meaning of what is going on around him; and he is unable to modulate his behavior or control his responses (*Id.* at pp. 7, 10, 31.) Dr. Evans further opined that Petitioner suffers intense mood swings and long-standing depression. (*Id.* at pp. 8.) She concluded that he was not competent to assist counsel in a rational manner and not competent to stand trial or waive rights and that his incompetence dated back at least to his first contact with the criminal justice system in 1985. (*Id.* at pp. 11, 12, 14, 31, 34.) Dr. Evans, in her declaration, reviews in detail examples of how Petitioner's impairments undermined his ability to rationally understand the proceedings against him and to rationally assist counsel in his defense. (*Id.* at pp. 11-18, 19-31.)

533. Because Petitioner was incompetent to stand trial, based upon this social history and mental health evidence developed by lawyers at the SFPD, his criminal trial proceedings in the San Francisco County Superior Court were stayed indefinitely in 1995 and were never brought to trial. For the same reasons, he was incompetent to stand trial and waive rights in the Los Angeles proceedings.

534. State post-conviction counsel in the instant proceedings retained two additional mental health experts who evaluated Petitioner and opine that he was

not competent to stand trial or to waive rights in the Los Angeles trial proceedings: Dale Watson, Ph.D., and Jane Wells, J.D., Ph.D. Their opinions, again, are consistent with, and corroborate and expand upon, the previous opinions of Drs. Vicary, Blumer, Henderson, Woods, Young, and Evans, and provide additional support that Petitioner was incompetent to stand trial and waive rights in the Los Angeles proceedings. In addition, Petitioner's trial counsel performed deficiently in failing to investigate, develop, and present this mental health evidence to the trial court.

535. Dale Watson, Ph.D., is a neuropsychologist who examined Petitioner and administered neuropsychological testing at the request of state post-conviction counsel and determined that Petitioner is severely impaired. Dr. Watson's testing shows that Petitioner has impaired executive functions – abilities associated with supervisory or control functions including the monitoring, initiation, inhibition, and shifting of behaviors and cognitive sets; memory impairment; and impairment in the auditory processing centers of the brain. Such impairments are typically associated with impairment in frontal and temporal lobes. As a result of these impairments, Petitioner is unable to shift his thinking or behaviors to, solve new situation, or make decisions and exercise judgment. Petitioner's long-standing neurocognitive impairments adversely affects his behavior, personality, and functioning. (Ex. 42, D. Watson, Ph.D., Dec., ¶¶ 11-21.) Dr. Watson concluded that Petitioner has temporal lobe disorder that was likely etiologically related to the psychotic disorder that other mental health experts had diagnosed. (*Id.*, at ¶¶ 19-20.) According to Dr. Watson's findings, Petitioner suffers from a neurocognitive brain-related disorder and is psychotic – the same findings made by Dr. Blumer *twenty-two* years ago. Petitioner remains severely impaired. Dr. Watson also concluded that Petitioner appears to suffer from frontal lobe dysfunction with neurocognitive deficits and that he suffers from depression, a mood disorder, and memory impairment. (*Id.*

at ¶ 21-22.)  Dr. Watson opines that Petitioner was not competent to stand trial or waive rights in his state-court proceedings.  (*Id.* at 24, 26.)

536.    Jane Wells, J.D., Ph.D., evaluated Petitioner at the request of state post-conviction counsel.  She concluded that he suffers a myriad of mental problems, including a psychotic disorder somewhere on the schizophrenic or psychotic end of the spectrum.  (Ex. 43, J. Wells, Dec., ¶ 49.)  She observed him to be significant paranoid, delusional, and thought-disordered.  (*Id.*)  She also opined that he suffers a mood disorder with transient manic and depressive states as well as agitation and hypersexuality.  (*Id.*)  And she concluded that he suffered organic brain damage.  (*Id.*, at ¶ 52.)  Based on her findings, Dr. Wells concluded that Petitioner was incompetent to stand trial and to waive rights in his state-court proceedings.  (*Id.* at ¶ 51.)

537.    The expert opinions described above establish that Petitioner was incompetent to stand trial and to waive rights throughout the proceedings in the Los Angeles County Superior Court.  In addition, attorneys Manuel J. Barraza, who represented Petitioner briefly following his arrest, Michael N. Burt and Dorothy Bischoff, who represented Petitioner in his criminal trial proceedings in the San Francisco County Superior Court, Geraldine Russell, who represented Petitioner in his state post-conviction proceedings, and Sean J. Bolser, one of the attorneys assigned to represent Petitioner in the instant proceedings, have, during the course of their various representations, come to believe that Petitioner is mentally incompetent, that he lacks a rational understanding of the proceedings, and that he lacks the ability to communicate rationally with counsel and assist in his own defense.  Petitioner's trial counsel provided constitutionally deficient performance in failing to develop and present such evidence to the trial court.

538.    Petitioner was incapable of understanding what he was entitled to before, during, and after his trial.  Petitioner did not understand how the court functioned or how his attorneys should be functioning.  He could not understand

176

that he had a right to a strong and vigorous defense in a trial where his life was at stake. Petitioner's counsel failed to protect his interests throughout their representation of him, a four-year period. In so failing, counsel prejudiced Petitioner's rights, including his purported waivers of his right to wear an unobtrusive leg brace; his refusal to remove his sunglasses at the court's direction; his inability to present a proper defense at trial; his waiver of his presence at the guilt verdicts; and his purported waiver of his right to present any mitigation evidence at the penalty trial. Petitioner lacked the mental competency and knowledge to remedy the repeated and glaring abuses in his case.

539. Petitioner was also unable to aid and assist counsel and mental health professionals in their evaluations of his own mental functioning, including his mental functioning at the time of the charged offenses, because he had severe behavioral and cognitive impairments and was not able to provide his complete sociomedical history. Petitioner could not provide all pertinent data regarding his family history; neurological and medical history; academic history; childhood physical, psychological, emotional trauma and abuse; history of head injuries; history of emotional and physical neglect; history of institutional failure, and other information critical to a competent mental health assessment. The neglect and abuse that surrounded Petitioner – in his home, neighborhoods, schools, and juvenile custody – was so ingrained that he was unable to understand, assess or report on its severity and impact on him. For all these reasons, Petitioner was unable to discuss with counsel, or the mental health professionals retained by counsel, these very important factors and events that shaped his life. Moreover, he could not aid in the discovery of mitigation evidence as a result of his incompetence.

540. Petitioner's intellectual and mental deficits resulted in his being unaware of any rights he might have otherwise been deemed to have abandoned. He was, and is, incompetent to waive defenses or exercise and/or waive any

constitutional or statutory rights, including his right to counsel, or not incriminate himself, to be present at trial, to cross-examine and confront witnesses against him, and to present a defense.

541.   Petitioner was incompetent at the penalty phase of his trial.  As such, Petitioner did not have a rational understanding of the proceedings regarding presentation of evidence on his behalf, and he was likewise incompetent to make any waiver of defense or his constitutional rights regarding those proceedings. *See infra.*

542.   Furthermore, Petitioner's family history of mental disorders, substance abuse, depression, mood disorders and other mental illness should have alerted the court and counsel to Petitioner's incompetence to stand trial.  *Drope v. Missouri*, 420 U.S. at 171; *Pate v. Robinson*, 383 U.S. at 385.  Petitioner's deficits rendered him unable to knowingly, intelligently, and voluntarily waive any constitutional rights to which he was entitled, or to disclose accurately the events surrounding the incidents for which he was charged with capital murders, other counts and other special allegations.

543.   Petitioner's constitutional rights were violated because he was incompetent throughout the legal proceedings below, and he was therefore deprived of a trial that was fundamentally fair and that comported with due process and a fair, reliable and non-arbitrary penalty determination.  Accordingly, his conviction and sentence must be set aside.

544.   In addition, the denial of his right to effective assistance of counsel substantially prejudiced Petitioner, rendered the trial proceeding fundamentally unfair, eroded the reliability of the verdict and had a substantial and injurious effect on the verdict.  But for the denial of this right, it is reasonably probable that a more favorable result would have been attained.  Under these circumstances, the adversarial system completely broke down, and Petitioner was left without meaningful representation.  Although many of trial counsel's errors were, by

themselves, so egregious as to require reversal, the extraordinary accumulation of errors and omissions over the course of the trial created a total breakdown in the adversarial process, so that prejudice is conclusively presumed. *United States v. Cronic*, 466 U.S. 648, 656-662, 104 S. Ct. 2039, 2045-48, 80 L. Ed. 2d 657 (1984). Even assuming a showing of prejudice is required, Petitioner has made that showing here. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

**B.    Petitioner Is Presently Mentally Incompetent**

545.    Petitioner re-alleges the facts set out above.

546.    Petitioner is presently incompetent to assist undersigned counsel in litigating his federal habeas corpus challenges to his state convictions and sentences.

547.    A capital habeas corpus petitioner has a right to competence during federal proceedings on his petition. *Rohan ex rel. Gates v. Woodford*, 334 F.3d 803, 817 (9th Cir. 2003) ("*Gates*"). The right derives from the statutory right to counsel, which

> contemplates effective communication between lawyer and client. A
> putative habeas petitioner's mental incompetency – a condition that
> is, obviously, an extraordinary circumstance beyond the prisoner's
> control – renders the petitioner unable to assist his attorney in the
> preparation of a habeas petition. Such a condition would eviscerate
> the statutory right to counsel.

*Id.* at 814 (quoting *Calderon v. United States District Court (Kelly)*, 163 F.3d 530 (9th Cir. 1998) (en banc), *overruled in unrelated part*, *Woodford v. Garceau*, 538 U.S. 202, 123 S. Ct. 1398, 155 L. Ed. 2d 363 (2003)).

548.    Although the *Gates* court expressly left open the precise showing that a petitioner must make to require a competency hearing (*id.* at 819 n.11), the Ninth Circuit, in an analogous context, has described the threshold showing as

one leading the court to "reasonably question[]" petitioner's competence. *See*
*Mason v. Vasquez*, 5 F.3d 1220, 1225 (9th Cir. 1993), *vacatur of stay aff'd*, 1
F.3d 964 (9th Cir.) (en banc), *en banc mandated recalled and case remanded to*
*panel*, 5 F.3d 1226 (9th Cir. 1993); *cf.* 18 U.S.C. § 4241(a) (court shall order
competence hearing "if there is reasonable cause to believe that the defendant
may presently be suffering from a mental disease or defect rendering him
mentally incompetent to the extent that he is unable to understand the nature and
consequences of the proceedings against him or to assist properly in his defense")
(emphasis added).

549.    Whatever the precise standard required to obtain a hearing or relief
on his claim of incompetence to assist federal habeas counsel, Petitioner has more
than met it in this case.  The facts and expert opinions alleged above establish that
Petitioner is presently mentally incompetent to assist habeas counsel in his own
defense in the instant proceedings.  In addition, attorneys Manuel J. Barraza, who
represented Petitioner briefly following his arrest, Michael N. Burt and Dorothy
Bischoff, who represented Petitioner in his criminal trial proceedings in the San
Francisco County Superior Court, Geraldine Russell, who represented Petitioner
in his state post-conviction proceedings, and Sean J. Bolser, one of the attorneys
assigned to represent Petitioner in the instant proceedings, have, during the
course of their various representations, come to believe that Petitioner is mentally
incompetent, that he lacks a rational understanding of the proceedings, and that
he lacks the ability to communicate rationally with counsel and assist in his own
defense.  *Gates*, 334 F.3d at 819; *see also Dusky v. United States*, 362 U.S. 402,
402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960).

550.    Present counsel for Petitioner have identified and presented in this
petition a number of potentially meritorious claims for habeas corpus relief from
his convictions and death sentences.  Although undersigned counsel were able to
identify many facts in support of these claims, Petitioner's competent

communication is necessary to the complete development and successful presentation of most of these claims – including claims concerning constructive deprivation of counsel; counsel's conflicts and constitutionally deficient performance; prosecutorial misconduct; and mental state issues from the trial. And Petitioner's present incompetence may well have prevented him from assisting undersigned counsel in identifying and developing facts and evidence in support of additional claims, presently unknown. *See Gates*, 334 F.3d at 817 (counsel cannot be required to identify with particularity what petitioner would tell them were he competent).

551. Accordingly, the instant proceedings must be stayed, pending Petitioner's restoration to competency. *Id*. at 819.

552. In addition, Petitioner's present mental illness and other mental impairments preclude his execution. Executing Petitioner would be unconstitutionally cruel and unusual because he is incompetent to be executed under *Ford v. Wainwright*, 477 U.S. 399, 106 S. Ct. 2595, 91 L. Ed. 2d 335 (1986), and *Panetti v. Quarterman*, ___ U.S. ___, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007). Although this claim is not yet ripe because no date has been set for Petitioner's execution, Petitioner raises it now in this Petition in order to preserve his right to review. *Cf. Stewart v. Martinez-Villareal*, 523 U.S. 637, 118 S. Ct. 1618, 140 L. Ed. 2d 8 (1998).

**CLAIM 2:**

## **THE TRIAL COURT ERRED IN FAILING TO INITIATE COMPETENCY PROCEEDINGS THUS IT VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS**

553. Exhaustion of the claim: This claim was fairly presented to the California Supreme Court in the direct appeal. It was presented in Section III of the Opening Brief.

554.   In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

555.   Those facts and allegations set forth in the petition, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

556.   Petitioner was charged with a series of bizarre and highly publicized brutal murders and other crimes that raised serious questions about his mental status.  Abnormal acts accompanying the murders included the removal of the eyes of murder victim Maxine Zazzara; mutilation-type wounds on victims Vincow, Cannon, Maxon and Lela Kneiding; and a strange pentagram drawn on the thigh of victim Bell.  One victim also reported that the perpetrator laughed diabolically during a sex crime; the suspect ordered another victim to swear upon Satan.

557.   The United States Supreme Court has "repeatedly and consistently recognized that 'the criminal trial of an incompetent defendant violates due process.'"  *Cooper v. Oklahoma*, 517 U.S. 348, 116 S. Ct. 1373, 134 L. Ed. 2d 498 (1996) (citing *Medina v. California*, 505 U.S. 437, 453, 112 S. Ct. 2572, 120 L. Ed. 2d 353 (1992)).

558.   To be found competent for due process purposes, a defendant must meet two criteria:  (1) "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding," and (2) "a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 295 F.2d 743, 746 (8th Cir. 1961).  These criteria do not include a necessary finding of "mental disease or defect" (specifically required under § 1367).  Moreover, in two of the seminal United States Supreme Court cases, failure to

182

hold a hearing on competence was found reversible despite psychiatric reports falling short of such findings.[29]

## A. Doubts Raised in Municipal Court as to Petitioner's Mental Competency

559.    After his arrest, on many occasions, Petitioner behaved in a bizarre manner both in the courtroom and in his jail cell.  On September 2, 1985, for example, a jail deputy observed Petitioner in his cell writing the number "666" and drawing a star in a circle on the cell floor with blood from his right palm.  (176 RT 20599-600.)

560.    On numerous occasions, Petitioner engaged in bizarre behavior in court.  For instance, Petitioner loudly invoked the words "Hail, Satan" in the courtroom and displayed a bizarre pentagram on the palm of his hand at the October 24, 1985 hearing held with respect to retention of counsel.  A sheriff's investigator testified at trial that, at that hearing, he observed Petitioner raise his hands and say aloud "Hail Satan."  The investigator saw an inverted star with a

---

[29] Although the defendant had a difficult time "relating" and appeared agitated in an examination, and the psychiatrist recommended additional psychiatric treatment, nonetheless, "[t]here was no sign as to the presence of any delusions, illusions, hallucinations, obsessions, ideas of reference, compulsions or phobias at this time." *Drope v. Missouri*, 420 U.S. 162, 164 n.1, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975).  In discussing *Pate v. Robinson*, 383 U.S. 375, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966), the Court indicated:

> . . . that a history of irrational behavior is a relevant factor which, on the record before it, was sufficient to require further inquiry notwithstanding Robinson's demeanor at trial and the stipulated opinion of a psychiatrist that Robinson knew the nature of the charges against him and could cooperate with counsel when the psychiatrist examined him two or three months before.

*Drope*, 420 U.S. at 172 n.9.

circle around it and "666" written on the palm of Petitioner's hand. (176 RT 20603-04, 20607.)

561. At the same hearing on October 24, 1985, then-counsel Joseph Gallegos informed the court that he had grave concerns about Petitioner's mental condition and moved to suspend criminal proceedings pursuant to Penal Code § 1368 "as to [Petitioner's] present mental state . . . ." (XVII CT 4995.)

562. Before ruling on counsel's motion, the court asked Petitioner's former counsel, deputy public defender Henry Hall, regarding a confidential psychiatric examination of Petitioner authorized several weeks before the October 24, 1985 hearing and unrelated to a competency hearing pursuant to Penal Code § 1368. Hall informed the court that a psychiatrist had spoken with Petitioner for ten to fifteen minutes. Although Petitioner refused to talk very long, the doctor concluded, based on his observations of Petitioner then, that Petitioner appeared, at most, to be "borderline competent." Hall also reported that he had no knowledge about Petitioner's mental condition at the time of the October 24 hearing and the psychiatrist could not speculate about it. (XVII CT 4996-98.)

563. Joseph Gallegos renewed his request that Petitioner undergo a psychiatric examination pursuant to Penal Code § 1368. (*Id.* at 5002-03.) The court, however, found that Petitioner was not mentally incompetent under § 1368 because he "remembered things" and, based on Petitioner's answers to the court's question on prior occasions, "I don't have any problem with that." (*Id.* at 5003.) The court made no inquiry about Petitioner's mental health background, his ability to communicate and cooperate with Joseph Gallegos, or his comprehension of the charges, the nature of the proceedings against him, or the possible punishments involved. Petitioner indicated that he was sane and did not want to go to a hospital. (*Id.* at 5003, 5005.)

564.   Six months later, at the April 14, 1986 preliminary hearing, trial counsel – now the Hernandezes – requested an *in camera* hearing to address Petitioner's mental status and Petitioner's continued presence at the preliminary hearing.  Without conducting an *in camera* hearing, the trial court indicated there was no evidence to conclude Petitioner was unable to understand and participate in the proceedings.  (XII CT 3463-65.[30]  There was no determination of Petitioner's mental competency in Municipal Court.

**B.     Doubts Raised in Superior Court as to Petitioner's Mental Competency**

565.   On February 26, 1987, the trial court expressed concern about Petitioner's mental competency.  The court asked trial counsel whether they intended to file a motion pursuant to Penal Code § 1368.  Daniel Hernandez replied:

> We've been considering that from the beginning of course and we haven't made a decision on that and we are very aware and concerned about that.

(22 RT 1333-34.)

566.   On March 24, 1987, the trial court again raised the issue of Petitioner's mental competency and his ability to proceed to trial:

> The [section] 1368 and related issues I would also like you to consider. I realize that that is going to be a very difficult one for you, but I would like you to get working on that as well.

---

[30]  Subsequently, an *in camera* hearing was held on April 14, 1986. However, despite repeated, diligent efforts of state appellate counsel to obtain a complete record on appeal, the sealed reporter's transcript of the hearing held that date was not made part of the record on appeal and no settled-statement summarizing that hearing could be obtained.  (*See* VII Supp. CT 166-69; VIII Supp. CT 22-23 (order to prepare settled statement and declarations of Daniel Hernandez and Arturo Hernandez).)

185

(28 RT 2001.)

567. On April 7, 1987, a discussion was held in chambers in the presence of all parties except Petitioner regarding trial counsel's concern "that there was some problems with our client." (4-7-1987 Sealed RT 6.) Counsel asked to address the court *in camera* regarding Petitioner's mental status pursuant to Penal Code §§ 1368, 1017, and 1026. However, according to the record on appeal the court did not later conduct the requested hearing. (4-7-1987 Sealed RT 6-7.)

568. The trial court was fully aware that Petitioner repeatedly refused to cooperate with counsel in his defense and repeatedly behaved in a strange and bizarre manner that, by any measure, further raised doubts about his mental competence. Petitioner continued to behave irrationally during trial: on January 30, 1989, he allegedly waived his right to wear an unobtrusive leg brace and agreed to wear shackles before the jury (*see* Claim 22, *infra*); on February 6, 1989, he refused to remove his sunglasses at the court's direction (*see* Claim 24, *infra*); on May 8, 1989, he was unwilling to cooperate with counsel in order to present a proper defense at the guilt trial (178 RT 20794-75); on September 20, 1989, he waived his presence at the guilt verdicts (216 RT 24710-11); on September 27, 1989, he waived his right to present any mitigation evidence at the penalty trial (217 RT 24774-76); and on November 7, 1989, he made an irrational statement at the sentencing hearing.[31]

_____

[31] Petitioner stated to the court:

It is nothing you would understand, but I do have something to say. In fact, I have a lot to say, but now is not time or the place. I don't even know why I'm wasting my breath, but what the hell.

As for what is said of my life, there have been lies in the past and there will be lies in the future. I don't believe in the hypocritical moralistic dogma of this so-called civilized society and need not

186

**C.** **The Trial Court Violated Petitioner's Constitutional Rights By Failing to Initiate Proceedings *Sua Sponte* to Determine Petitioner's Competence**

569.    In *Pate v. Robinson*, 383 U.S. 375, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966) the Supreme Court found that where sufficient evidence is presented that a defendant may be mentally incompetent, due process requires that a hearing be held on that issue.  The defense in *Pate* presented testimony of four lay witnesses who related defendant's history of disturbed behavior and gave opinions of present insanity, as well as evidence of a brief prior commitment.  *Pate v. Robinson*, 383 U.S. at 383-84.  The Court found this showing sufficient to grant

---

look beyond this room to see all of the liars, the haters, the killers, the crooks, the paranoid cowards, truly the trematodes of the earth, each one in his own legal profession.

You maggots make me sick.  Hypocrites one and all.  We are all expendable for a cause, and no one knows that better than those who kill for policy, clandestinely or openly, as do the governments of the world which kill in the name of God and country and for whatever else they deem appropriate.

I don't need to hear all of society's rationalizations.  I've heard them all before and the fact remains that is what it is.

You don't understand me.  You are not expected to.  You are not capable of it.  I am beyond your experience.  I am beyond good and evil.

Legions of the night, night breed, repeat not the errors of night prowler and show no mercy.  I will be avenged.  Lucifer dwells within us all.

(219 RT 24929.)

habeas corpus relief due to failure to inquire as to the defendant's competence to stand trial. *Id*. at 385.

570. In *Drope*, the High Court reaffirmed *Pate*, holding that due process requires that a hearing be held on the issue of a defendant's mental competency upon a proper showing. The Court considered, *inter alia*, evidence of defendant's absence from the courtroom resulting from injuries sustained in a suicide attempt as supporting the need to inquire into the defendant's competence. First, the accused's forced absence implied a demeanor making him unable to cooperate with counsel in his defense; second, it deprived court and counsel of a further opportunity to observe his capacity rationally to understand the proceedings and contribute to his defense. 420 U.S. at 180-81. The Court noted that "[e]ven when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." *Id*. at 181. The Court described the requirements of the inquiry:

> The import of our decision in *Pate v. Robinson*, is that evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient. There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated. That they are difficult to evaluate is suggested by the varying opinions trained psychiatrists can entertain on the same facts.

*Id*. at 180.

571. Here, trial counsel declared a doubt as to Petitioner's competence. In light of that declaration of doubt and on the other facts and information to the trial court, the court's failure to initiate competency proceedings violated Petitioner's federal due process rights.

**D.     The Trial Court Violated Petitioner's Constitutional Rights by Granting the Motion for Substitution of Counsel Before Resolving the Issue of Competency**

572. For obvious reasons, once a reasonable doubt as to a defendant's competency has been raised, "the correct course [is] to suspend the trial until such an evaluation [can] be made." *Drope*, 420 U.S. at 181. Here, proceedings were not suspended. The result was to permit an incompetent defendant to terminate an attorney who wanted to raise competency and mental defenses, with counsel who did not.

573. By effectively turning over the key strategic decision in the case to the court and prospective counsel who had conflicts of interest, the court violated Petitioner's right to Fourteenth Amendment due process, and the Sixth Amendment right to counsel. An incompetent defendant cannot assist counsel; the Court should have deferred the motion for substitution of counsel until and unless there was a proper determination of Petitioner's mental competency to proceed to trial.

**E.     The Court's Failure to Initiate Competency Proceedings Violated Petitioner's Constitutional Rights**

574. On a proper showing, a trial court must inquire as to a defendant's mental competency as a matter of due process of law. *Pate v. Robinson,* 383 U.S. 375. A defendant who is incompetent may not be criminally prosecuted. *Odle v. Woodford*, 238 F.3d 1084, 1087 (9th Cir. 2001); *see also Medina v. California*, 505 U.S. 437, 449, 112 S. Ct. 2572, 120 L. Ed. 2d 353 (1992).

575.   In *Odle*, the Ninth Circuit found that where a reasonable trial judge would have a doubt as to the defendant's competence, the defendant is entitled to a competency hearing.  The court also held that a defendant who may be incompetent cannot knowingly and intelligently waive his right to a competency hearing and cannot be presumed to be sufficiently intelligent to understand evidence of his incompetence.  *Id*. at 1089 n.5.  "[A]n inquiry into whether [an accused] possesses the mental acuity to participate in the proceedings is the reasonable and appropriate course of action."  *Id*. at 1089.  The trial court's failure to conduct a competency hearing in light of substantial evidence of mental impairment, as in *Odle*, violates the defendant's right to due process of law under the Fourteenth Amendment, thus implicating Petitioner's Fifth, Sixth, and Eighth Amendment rights.  *Id*. at 1087, 1089.

576.   The Supreme Court has held that fundamental Fifth and Sixth Amendment rights guaranteed at trial (*e.g.*, effective assistance of counsel, the right to confront witnesses, and the right to testify or remain silent) also depend on an accused's ability to function rationally and cooperate with counsel.  *Riggins v. Nevada*, 504 U.S. 127, 139-40, 112 S. Ct. 1810, 118 L. Ed. 2d 479 (1992); *see also Pate v. Robinson*, 383 U.S. 375.

577.   The trial court erred in failing to hold a hearing on the issue of Petitioner's competence to stand trial and to waive rights and in failing to hold the proceedings in abeyance unless and until Petitioner was restored to competence.  As the result of the trial court's error, Petitioner was denied due process of law by the acceptance of his purported waiver of a complete defense at the guilt trial, of his waiver of the right not to wear visible restraints before the jury, and of his waiver of the right to be present at the guilt verdicts.  The trial court's failure to act in accordance with the mandatory provisions of Penal Code § 1368 violated Petitioner's fundamental rights to due process of law and fair trial guaranteed by the Fifth, Sixth, and Fourteenth Amendments.  *Washington v.*

*Texas*, 388 U.S. 14, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967). Further, as a result of the trial court's error, Petitioner's waiver of mitigation evidence at the penalty trial, were he incompetent, led to an unreliable determination of punishment in violation of the Eighth and Fourteenth Amendments. *Caldwell v. Mississippi*, 472 U.S. 320, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985); *Johnson v. Mississippi*, 486 U.S. 578 108 S. Ct. 1981, 100 L. Ed. 2d 575 (1988).

**F.    Conclusion**

578.    On numerous occasions, both the court and counsel expressed doubts about Petitioner's mental competency. However, on each occasion, the trial court failed in its duty to ensure that a proper inquiry was conducted and that Petitioner was mentally competent to proceed.

579.    The trial court failed properly to inquire about and conduct a full hearing as to Petitioner's mental competency to actively participate in the proceedings. Petitioner was entitled to a full and fair determination of his mental competency in this multiple murder capital case.

> After all, competence to stand trial does not consist merely of passively observing the proceedings. Rather, it requires the mental acuity to see, hear and digest the evidence, and the ability to communicate with counsel in helping prepare an effective defense.

*Odle v. Woodford*, at 1089; *see Dusky v. United States*. Petitioner's rights to due process and fair trial guarantees under the Sixth and Fourteenth Amendments were violated. Moreover, as discussed in Claim 19, *infra*, the error also implicated Petitioner's Eighth Amendment right to a reliable determination of penalty.

580.    Prejudice inheres in the very fact that Petitioner was tried where the evidence shows he was incompetent to understand and cooperate in his own defense. A finding of incompetence automatically results in reversal of the judgment – even absent a contemporaneous objection. Thus, prejudice is

intrinsic. *See Pate v. Robinson*, 383 U.S. at 384 (failure to raise incompetence in trial court does not waive issue on collateral review). This is because trial of an incompetent defendant is a violation of due process under the Fourteenth Amendment. *Godinez v. Moran*, 509 U.S. 389, 396, 113 S. Ct. 2680, 125 L. Ed. 2d 321 (1993).

> Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so.

*Cooper v. Oklahoma*, 517 U.S. at 354 (citing *Drope v. Missouri*, 420 U.S. at 171-72, and *Riggins v. Nevada*, 504 U.S. at 139-140 (Kennedy, J., concurring)). The loss of the ability to participate in all these fundamental trial protections is particularly egregious in capital cases, for the defendant is precluded from contributing to both the determination of guilt and the imposition of punishment to an extent greater than non-capital prosecutions. Here, counsel's failings resulted in Petitioner being tried by a court lacking fundamental jurisdiction and deprived him of due process and full participation in the trial process. The error thus violated Petitioner's most fundamental trial rights and was reversible *per se*. *Pate v. Robinson,* 383 U.S. 374; *Drope v. Missouri*, 420 U.S. at 172.

581. The foregoing violations of Petitioner's constitutional rights, taken singly or in combination with the other errors alleged in the Petition, constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Petition, so infected the

192

integrity of the proceedings that the error cannot be deemed harmless. The foregoing violations of Petitioner's rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622, 637-38.

582.   In addition, the denial of his right to effective assistance of counsel substantially prejudiced Petitioner, rendered the trial proceeding fundamentally unfair, eroded the reliability of the verdict and had a substantial and injurious effect on the verdict. But for the denial of this right, it is reasonably probable that a more favorable result would have been attained. Under these circumstances, the adversarial system completely broke down, and Petitioner was left without meaningful representation. Although many of trial counsel's errors were, by themselves, so egregious as to require reversal, the extraordinary accumulation of errors and omissions over the course of the trial created a total breakdown in the adversarial process, so that prejudice is conclusively presumed. *United States v. Cronic*, 466 U.S. 648, 656-662, 104 S. Ct. 2039, 2045-48, 80 L. Ed. 2d 657 (1984). Even assuming a showing of prejudice is required, Petitioner has made that showing here. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

**CLAIM 3:**

## **TRIAL COUNSEL WAS SO INCOMPETENT THAT PETITIONER WAS CONSTRUCTIVELY DENIED THE RIGHT TO COUNSEL**

583.   Exhaustion of the claim: A Portion of this claim was presented in the 2004 state habeas petition. It was presented in Claim XVIII of the petition. Petitioner will present the claim with additional factual allegations to the California Supreme Court in an exhaustion petition he will file no later than March 17, 2009.

584.   In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

585.   Those facts and allegations set forth in the petition, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

## A.   Petitioner Had The Right To Counsel Who Would Ensure that The Trial Proceedings Were Fair

586.   The assistance of counsel "is one of the safeguards of the Sixth Amendment deemed necessary to insure fundamental human rights of life and liberty." *Johnson v. Zerbst*, 304 U.S. 458, 462, 58 S. Ct. 1019, 82 L. Ed 1461 (1938).   That a person who happens to be a lawyer is present at trial alongside the accused, however, is not enough to satisfy the constitutional command. *Strickland*, 466 U.S. at 685.   A criminal defendant is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair.   *Id.*

587.   In order to receive a fair trial, a defendant is entitled to "a reasonably competent attorney," *McMann v. Richardson*, 397 U.S. 759, 770, 90 S. Ct. 1441, 1449, 25 L. Ed. 2d 763 (1970), whose advice is "within the range of competence demanded of attorneys in criminal cases." *Id.*, at 771, 90 S. Ct., at 1449.   *See also Cuyler v. Sullivan*, 446 U.S. 335, 344, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980) (stating that the Constitution guarantees "adequate legal assistance."); *Engle v. Isaac*, 456 U.S. 107, 134, 102 S. Ct. 1558, 71 L. Ed. 2d 783 (1982) (Sixth Amendment right refers to "a fair trial and a competent attorney.")  *Id.*

588.   Counsel's incompetence can be so serious that it rises to the level of a constructive denial of counsel that can constitute constitutional error without any showing of prejudice. *See Cronic*, 466 U.S. at 659-660.  *Cronic* applies when

"counsel [is] either totally absent, or prevented from assisting the accused during a critical stage of the proceeding" or when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Id.* A presumption of prejudice is required where the circumstances of the case indicate that "although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a competent one," could not provide effective assistance. *Id.* at 660, *citing Powell v. Alabama*, 287 U.S. 45, 53 S. Ct. 55, 77 L. Ed. 158 (1932) (defendants were charged with an atrocious crime and counsel was appointed so close to trial that the chances that counsel could be effective was remote.)

589.   Alternatively, if the *Cronic* test does not apply to a defendant's ineffective assistance of counsel claim, relief may nevertheless be obtained under the usual *Strickland* standard.  Under *Strickland*, a defendant must prove that his counsel's performance was deficient and that he was prejudiced as a result. *Strickland v. Washington*, 466 U.S. 668, 694.

**B.    Petitioner Was Denied Counsel the Assistance of Qualified Counsel Who Had the Time and Experience To Properly Prepare His Defense**

**1.    Arturo and Daniel Hernandez Were Incompetent to Defend a Capital Case**

590.   On September 3, 1985, the Municipal Court appointed the Public Defender of Los Angeles County to represent Petitioner.  (XIX CT 5465.)  After that, the court relieved the public defender and privately retained counsel Joseph Gallegos appeared on Petitioner's behalf on October 9, 1985.  (XIX CT 5469.)

591.   On October 22, 1985, Petitioner sought to substitute newly retained counsel Daniel Hernandez and Arturo Hernandez in place of Joseph Gallegos. (XVII CT 4981.) The Municipal Court noted that Petitioner's case was unusual and that he faced numerous serious charges and special circumstances that could lead to the "gravest of possible consequences."  (XVII CT 4983-84.)

195

592.    Prior to allowing the substitution, the court held an *in camera* hearing to question the Hernandezes on their qualifications which, as the colloquy revealed, were seriously deficient for a case of this magnitude.[32]  Daniel Hernandez had been admitted to practice for only three years and had handled approximately 15-17 jury trials, only four of which involved charges of murder.[33]  He had never handled a death penalty case.  He admitted that he had been held in contempt for not appearing on time and had, on one or two occasions, been fined $100.  He stated that "the most notorious time [he] had been held in contempt," he had been put in jail with his client in the middle of a murder trial for failing to appear in another court in which his presence was required.  (Sealed RT of October 22, 1985, 3-14).

593.    Arturo Hernandez was similarly lacking in experience.  He had been admitted to the bar only two years prior and had never tried a death penalty case.  He too admitted that he had been held in contempt twice and fined $100, referring to his citations as a "ritual that we go through as young attorneys."  (Sealed October 22, 1985 RT 15-17).  The court then warned the Herndandezes that if they did not have the financial resources to litigate the case, they would have to proceed *pro bono* because they were not qualified to be appointed.  (*Id.* at 32).  Daniel Hernandez assured the court that the case was fully financed and that

---

[32]  Under *Cronic*, the character of a particular lawyer's experience does not, by itself, establish a presumption of prejudice but it does inform the evaluation of his performance.  466 U.S. at 664.  Here, Daniel and Arturo's lack of experience militates in favor of a finding that their failures and omissions were the result of incompetence, not reasonably informed trial strategy.

[33]  One of the murder cases handled by Daniel Hernandez was *People v. Ortiz.*  (Sealed RT of October 22, 1985 hearing, 8.)  In *People v. Ortiz*, 51 Cal. 3d at 980, the state court held that both Daniel Hernandez and Arturo Hernandez should properly have been discharged by the trial court as retained counsel on the defendant's motion based on their incompetence in a pending murder case.

they would not seek appointment in the future, a promise he would not keep. (*Id.*)

594.    When the parties resumed in open court on October 22, 1985, the court explicitly informed Petitioner that,

> neither Daniel Hernandez nor Arturo Hernandez have the legal
> experience which would qualify them to be appointed by this court
> to represent him in this case, nor do either attorney meet the
> qualifications set forth by the Los Angeles County Bar for the
> indigent criminal defense appointment panel.

(XVII CT 4984-85.)  The court specifically held that under the Bar plan, an attorney must have practiced law for a minimum of ten years, have been counsel of record in at least forty jury trials, thirty of which must have been felonies, and have been counsel of record in at least three cases in which murder charges were alleged and they must have tried at least one murder case to a jury.  (XVII CT 4985.)  The court also referenced the past and pending contempt charges against Daniel and Arturo Hernandez in Santa Clara county. (XVII CT 4986.)

595.    The court ordered Daniel Hernandez and Arturo Hernandez to disclose to Petitioner any complaints by clients, citations for contempt of court, or allegations of ineffective assistance of counsel.  Petitioner was offered the assistance of independent counsel to help him review any information provided by counsel.  The matter was put over for two days.  (XVII CT 4986-88.)

596.    At the next hearing on October 24, 1985, before the court ruled on the substitution motion, attorney Gallegos explicitly informed the court that he was "gravely concerned" about Petitioner's "present mental state, his ability to choose his own attorney and other related matters concerning this trial," and moved for a psychiatric examination of Petitioner as to his mental state pursuant to Penal Code § 1368.  (XVII CT 4995.)  After cursory colloquies with former counsel Henry Hall, the Hernandezes and Petitioner, the court denied the motion

for an examine Petitioner's competency, including his ability to select counsel and waive their apparent conflicts of interests.[34]  (XVII CT 4996-97.)

597.   Despite having previously acknowledged that "it is the duty of the trial court to protect the defendant's right to a counsel who is effective" (XVII CT 4983, the court permitted substitution of unqualified trial counsel, Daniel Hernandez and Arturo Hernandez.[35]  (XVII CT 5009-10, 5014-15.)

## 2.   Ray Clark's Mid-Trial Appointment Did Not Provide Him With Sufficient Time To Prepare an Effective Defense

**598.**   A defendant is constructively denied the assistance of counsel when "although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial."  *Cronic*, 466 U.S. at 659-660.  *Cronic* cites *Powell v. Alabama* as an example of these circumstances.  *Id.*  In *Powell*, the defendants were being tried for a highly publicized capital case and counsel was appointed on the first day of trial, with no time to prepare.  *Powell*, 287 U.S. 45, 57-58, 53 S. Ct. 55, 77 L. Ed. 158 (1932).  The *Powell* Court held that "such designation of counsel as was attempted was either so indefinite or so close upon the trial as to amount to a denial of effective and substantial aid in that regard."  *Id.*  Ray Clark's appointment in the middle of trial constitutes constructive denial of counsel within the meaning of *Cronic* and *Powell*.

599.   In March 1989, the court appointed Ray Clark to assist Daniel Hernandez because Hernandez felt he could not defend Petitioner alone, as he

---

[34]  A claim of trial court error for failing to hold a competency hearing is separately alleged in Claim 2.

[35]  A claim of trial court error for allowing the substitution of unqualified counsel is separately alleged in Claim 5.

198

had been doing for months. (Ex. 16, R. Clark Dec., ¶ 5). Clark, however, was not appointed until March 1989, when trial was underway, and he had "no time to prepare for trial" or review discovery prior to his involvement in the case. (*Id.* at ¶¶ 1, 6.) Thus his role at the guilt phase was limited to cross examining prosecution experts without advance preparation. (*Id.* at ¶ 6). His comments during penalty phase closing reflect his total lack of knowledge of Petitioner's life history. *See infra*, Section (D)(3)(b). Under these circumstances, Petitioner was constructively denied the assistance of counsel.

## C.     Trial Counsel Was Absent During Critical Portions of Petitioner's Capital Trial

600.    At various times, Arturo Hernandez abandoned Petitioner by failing to appear in court for trial proceedings.[36]  For example, on October 3, 1988, the trial court sent a letter to Arturo Hernandez regarding his absence from trial. (XXVIII CT 8100.)  On October 18, 1988, the court issued a body attachment for Arturo Hernandez. (XXVIII CT 8111.)  However, after conducting a hearing on October 25, 1988, the court decided not to require Arturo Hernandez to attend all of the trial proceedings. (*See* I Supp. CT VIII 2133-2215; XXVIII CT 8114.) Arturo Hernandez was absent from many trial proceedings critical to Petitioner's defense, including jury selection, the prosecution's presentation of its entire case-in-chief, and jury instruction conferences.[37]  The trial court subsequently ordered Arturo Hernandez to maintain telephone contact with the court during trial. (*See*

_____

[36]  In *People v. Ortiz*, 51 Cal. 3d at 981, the California Supreme Court noted that both Daniel Hernandez and Arturo Hernandez failed to appear at trial.

[37]  *See* XXVIII CT 8087-88, 8094, 8098, 8101-02, 8106-19, 8121-26, 8181-87, 8198-99, 8203-04, 8206-08, 8259-63, 8273, 8284, 8286, 8294-95, 8299, 8315, 8321, 8324, 8327-28, 8331-33, 8336-38, 8345, 8353, 8360, 8369-70, 8379-81, 8383; *and* XXIX CT 8384-85, 8391, 8393-97, 8399, 8408, 8412, 8419, 8426, 8429, 8434-39, 8442-47, 8449-51, 8462, 8476-79.

173 RT 20186.)  Arturo Hernandez was absent for four months, September 26, 1988, through January 23, 1989, during *voir dire*, including *Hovey*[38] examination. (*See* XXVIII CT 8087-88, 8094, 8098, 8101-02, 8106-12, 8115-19, 8121, 8123-26, 8181-87, 8198, 8203-04, 8206-08, 8259-63, 8273, 8284, 8286, 8294-95.)

601.  On February 21, 1989, during the prosecution's case in chief, Daniel Hernandez informed the court by telephone that he was ill and would be absent from trial for one week.  Hernandez sent his law clerk, Richard Salinas, to appear at trial on Petitioner's behalf.  Court had to recess until Hernandez could return. (152 RT 17574.)

602.  On March 1, 1989, the court held a hearing concerning trial counsel Daniel Hernandez's health.  Daniel Hernandez submitted a letter from his physician stating that he suffered from nervous exhaustion and would require an absence from trial of four to six weeks to recuperate.  (153 RT 17604-05.)  Daniel Hernandez explained that he was unable adequately to represent Petitioner – he could not "carry the load" – and needed yet another counsel to assist "in this enormous trial."  (153 RT 17610-11.)  The court found no legal cause to delay the trial.  (153 RT 17606, 17614-16.)

603.  On July 13, 1989, during the prosecutor's guilt phase closing argument Arturo Hernandez was absent and Daniel Hernandez failed to return from the lunch break.  (204 RT 23673.)  The trial court issued a body attachment for Daniel Hernandez and excused the jury, telling them "as you can see Hernandez is not with us this afternoon. . . Frankly, we don't know where he is." *Id;* (XXIX CT 8484.)  On July 14, 1989, the court quashed the attachment and ordered Daniel Hernandez to be present at all hearings.  (*Id.* at 8487.)

604.  Arturo Hernandez was again absent from closing argument in the guilt trial on July 17, 1989.  The court issued a body attachment for Arturo

---

[38]  *Hovey v. Superior Court*, 28 Cal. 3d at 80.

Hernandez and ordered it held to August 18, 1989.  (XXIX CT 8490, 8628-29, 8632.)

605.   On August 18, 1989, the trial court conducted a contempt hearing and found that Arturo Hernandez had failed to maintain telephonic contact with the court as previously ordered.  Arturo Hernandez admitted that he had traveled to Europe on a honeymoon during trial after telling the court he was in Mexico for his brother's funeral.  (214 RT 24609-11.)  The court found Arturo Hernandez in contempt and that he had abandoned Petitioner.  (*Id*. at 24611-12.)

606.   Arturo Hernandez offered a no contest plea and apologized to the court.  (214 RT 24613-14.)  After considering Arturo Hernandez's statement, the trial court found Arturo Hernandez in contempt for failing "to notify the court by phone each morning," but withdrew its finding that counsel had abandoned Petitioner.[39]  (*Id*. at 24614.)

607.   On September 14, 1989, the trial court again found Arturo Hernandez in contempt for failing to maintain contact with the court.  (215 RT 24690-91.)  The court sentenced Arturo Hernandez to serve twenty-four days in jail or pay a $2,400 fine to be paid on or before September 29, 1989.  The court ordered Arturo Hernandez to serve one day in jail.[40]  (*Id*. at 24698-700.)

608.   Counsel's numerous absences from critical portions of Petitioner's trial constituted deprivation of counsel within the meaning of *Cronic*.

---

[39]  The court ordered Arturo Hernandez to pay a fine of $100.  (214 RT 24615.)

[40]  Arturo Hernandez paid the fine of $2,400 on September 29, 1989. (XXX CT 8903.)

**D.    Trial Counsel Failed To Submit the Prosecution's Case To Meaningful Adversarial Testing**

609.    The adversarial process protected by the Sixth Amendment requires that the accused have "counsel acting in the role of an advocate." *Anders v. California*, 386 U.S. 738, 743, 87 S. Ct. 1396, 1399, 18 L. Ed. 2d 493 (1967). The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. *Cronic*, 466 U.S. at 656-57.  When a true adversarial criminal trial has been conducted, even if defense counsel may have made demonstrable errors, the kind of testing envisioned by the Sixth Amendment has occurred.  But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated.  *Id.* (footnotes omitted).

610.    Because trial counsel failed to submit several portions of Petitioner's case to meaningful adversarial testing, the fundamental fairness of entire proceeding was jeopardized and prejudice may be presumed.  *Id.*

**1.    Pre-Trial Proceedings**

611.    Prior to trial, counsel completely failed to perform several basic functions necessary to ensure Petitioner's rights.  Counsel failed to seek hearing on Petitioner's competence, mishandled of the change of venue motion, and engaged in various ethical violations that constructively deprived Petitioner of the right to counsel.

**a.    Failure to Challenge Petitioner's Competence**

**612.**    First, counsel failed to raise a challenge to Petitioner's competence to stand trial, despite the fact that significant evidence suggested he suffered from a major mental disorder.  *See* XVII CT 5020 (Petitioner shouted "Hail, Satan!" in court); (Ex. 18, H. Hall Dec., ¶ 4) (describing Petitioner as "irrational and agitated"); Ex. **128,** 1994 M. Barraza Dec., ¶ 7) (stating that Petitioner exhibited

extreme mood swings; his dialogue was remarkable for it incoherence and irrationality; Petitioner was unable to listen to counsel's advice).

613. Evaluation by experts revealed Petitioner suffered disorder of psychotic proportion. His psychotic disorder is the result of a temporal lobe disorder that persisted after the remission of the seizures he suffered as an adolescent. As a result of his disorder, Petitioner suffered impairments including, disorganized and psychotic thinking, a frequent tendency to misperceive and misinterpret reality and to become lost in a grossly distorted internal world with a limited relationship to reality, obsessive behavior, and delusions, both paranoid and erotomanic. His chief delusion consists of his conviction of having a personal relationship with Satan, and he has experienced related hallucinations. (Ex. 31, D. Blumer, M.D. Dec., ¶¶ 8-10; Ex. 41, W. Vicary, M.D. Dec., ¶¶ 5; Ex. 98, M. Young, Ph.D. Report, at 6, 7; Ex.72, A. Evans, Ph.D. Dec.; Ex.100, G. Woods, M.D., Report at 2, 4; Ex. 42, D. Watson Dec., ¶¶ 19, 21, 24.)

614. Petitioner also suffered from a severe mood disorder, likely due to his epilepsy, with depressive features. (Ex. 98, M. Young Report, at 7; Ex. 72, A. Evans Dec., at 8; Ex. 42, D. Watson Dec., ¶ 19, 22.), and brain damage. (Ex. 96, Letter from Victor Henderson, M.D., to Daniel Hernandez, dated 05/29/1987.)

615. Despite this information, counsel failed to challenge Petitioner's competence to stand trial, in violation of Mr. Ramirez's Sixth Amendment right to the effective assistance of counsel.

### b. Change of Venue Motion

616. Second, counsel failed to litigate the change of venue motion in a competent manner. Counsel's lack of familiarity with the rules of evidence resulted in 28 exhibits not being admitted because counsel did not know how to properly authenticate them. (*See* 16 RT 702-293).

617. On January 6, 1987, the court gave the following soliloquy in a closed session:

Now, I am calling this hearing, *Mr. Ramirez, to tell you that I reluctantly have to tell you that in my opinion your lawyers are incompetent*. Now, I have had this case for six months and I must say that I am convinced that your lawyers are nice guys, good company, maybe good fellows to spend an evening with. I am also convinced that they are dedicated to your defense emotionally. But I must tell you that in my opinion they are not competent to handle your case. I don't think that they have sufficient experience in the law. I don't think that they have the staffing, if you will, or whatever, to do the job....

I am telling you now...I don't think they know the law well enough, I don't think they know the rules of evidence well enough, they are not ready to present the evidence and push it through....I am just telling you this because I have no personal axe to grind at all, I simply want to see that whatever happens in this case is done right and you get your rights protected, that whatever conclusion is reached is right. *And I am telling you now that your rights are not being protected.*

(Sealed RT of January 6, 1987, 16-A RT 733-737) (emphasis added.) The court's statements confirm that the change of venue motion was litigated so poorly that Petitioner was effectively denied the assistance of counsel on that matter.

### c.    Miscellaneous Conduct

618.    At various times, counsel's incompetence deprived Petitioner of the benefits he would have ordinarily enjoyed in a relationship with his counsel, including the right to confidentiality and the right to possess and review discovery.

619. Early in the case, counsel inexplicably violated the attorney-client privilege by proving the press with an unflattering cartoon Petitioner had drawn of the prosecutor. (Ex., 81, Paul Feldman, *Ramirez Hearing: Daily Ritual of Testimony and Stares*, L.A. Times, April 14, 1986; Ex. 81, *Bloody Testimony at Stalker Suspects Hearing,* April 2, 1986, L.A. Herald Examiner at A11.) The cartoon was widely reproduced in the media, further contributing to the negative publicity and contaminating the jury pool. Over two years later, at lest one juror remembered the cartoon, said it made her angry at Ramirez, and rendered her incapable of impartiality. (*See* 120 RT 13215 (excusing prospective juror Doris Jaffe on November 21, 1988.)

On May 12, 1988, counsel gave Petitioner a tape of heavy metal music that had been offered to him by a spectator in the audience. This was in direct violation of the court's previous orders that Petitioner was not allowed to possess anything considered contraband. During an *in camera* session, the court told counsel:

> This is outrageous conduct for counsel, and you your stonewalling here in court, in chambers, leaves me with no other choice, I think, but to order my bailiff henceforth, before you go into the lockup area, that you be submitted -- you will subjected to a patdown search for weapons or contraband. There will be no briefcases permitted in the lockup area.
>
> You have abused this court for the last time. You have, I guess desecrated is as good a word as any, the honor of the legal profession in my opinion and *I think your conduct has been despicable*.

(Sealed RT of May 12, 1988, Vol. 58-A, 4187) (emphasis added.) The court then ordered the sheriff to confiscate the recording device and tapes that Petitioner was allowed to retain as part of his legal materials. (*Id.*) Due to counsel's unethical

conduct, Petitioner was deprived of the opportunity to possess and review the discovery in his case, a right that would have endured had his counsel been competent.

**2. Trial**

620. At trial, counsel completely failed to investigate and present a mental health defense to the charges. Despite the existence of substantial evidence that Petitioner suffered serious mental impairments, especially his psychosis, severe mood disorder, neurological and cognitive deficits, PTSD, counsel did not present a defense of not guilty by reason of insanity. The multiple deficits and impairments described by Drs. Blumer, Vicary, Henderson, Woods, Young, Evans, Wells, and Watson indicate that numerous mental state and other defenses could have been presented at Petitioner's guilt phase, but was not due to counsel's incompetence.

**3. Penalty**

621. Trial counsel failed to submit the entire penalty phase of Petitioner's case to meaningful adversarial testing, rendering the entire proceeding presumptively unreliable. *See Cronic*, 466 U.S. at 659. Not only did counsel waive the presentation of mitigating evidence, he effectively conceded that no mitigating circumstances were present in Petitioner's case. Furthermore, counsel's repeated acknowledgments that Ramirez did not deserve the jury's kindness rendered his request for mercy ineffective. *Compare United States v. Swanson*, 943 F.2d 1070 (9th Cir. 1991) (counsel's concession of the only factual issue in closing argument was ineffective under *Cronic*) *with Bell v. Cone*, 535 U.S. 685, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002) (counsel was not ineffective under *Cronic* or *Strickland* for waiving evidence at penalty where he had presented significant medical, psychological and social mitigation during the guilt phase insanity defense; counsel referred to evidence already presented as a basis for mercy in his penalty phase argument.)

### a. Waiver of Mitigation Presentation

622. On September 27, 1989, Daniel Hernandez's waived presentation of a mitigation presentation, stating that "we have made a decision as a defense team and decided [not to put on any evidence]." (217 RT 24775.) He did so despite the fact that ample medical, psychological and social evidence could have been presented in mitigation.

623. As described by Dr. Jane Wells, J.D., Ph.D., who evaluated Petitioner at the request of state post-conviction counsel, Petitioner suffered from:

(1) a childhood characterized by extreme poverty, physical and emotional neglect, physical and emotional abuse, and overall deprivation; (2) a gross and persistent absence of parental attention, guidance, affection, and protection due in part to his parents' lack of education and their impoverished lifestyle that resulted in a pervasive pattern of neglect and left Petitioner on his own much of the time; (3) a serious brain impairment of early origin known at the time of trial; (4) a psychotic disorder that was evident and diagnosed and/or diagnosable at the time of trial; (5) serious mood disorders that often accompany psychosis with components of both mania and depression that was treatable at an early age but that went untreated; (6) early use with side effects of phenobarbital, exposure to illegal depressants, stimulants and hallucinogens during Petitioner's critical formative years; (7) early childhood exposure to criminal activity by Petitioner's brothers and other adults; (8) childhood exposure to violence and trauma, including extremely traumatic events outside the range of normal human experience, including witnessing the aftermath of the shooting death of his cousin's wife; and finally (9) commitment as a teenager to the Texas Youth Council and long-term confinement while awaiting trial on capital charges in the Los

Angeles County Jail, where the inadequate staffing, programming, and other adverse conditions of confinement resulted in institutional failure to address and provide appropriate intervention and treatment.

(Ex. 43, Declaration of Dr. Jane Wells, J.D., Ph.D., dated 05/19/2004, ¶ 46.)

624.    However, counsel presented none of this evidence in the penalty phase.  This omission constitutes a complete failure to submit the prosecution's penalty phase case to adversarial testing.

### b.    Closing Argument

625.    After the waiving introduction of aggravating evidence, the prosecution gave closing argument in the penalty phase.  Noting the number and gravity of the crimes, and the lack of any mitigation evidence, the prosecution concluded that Ramirez  "the personification of evil and if anyone has ever earned the death penalty, Richard Ramirez has." (217 RT 24833).  Instead of presenting a strong counter-argument, Ray Clark opened his remarks by saying "I think Mr. Halpin (the prosecutor) was right on most things."  (*Id.* at 24834).  For the remainder of his argument, he inexplicably told the jury that none of the mitigating factors in Cal. Penal Code §190.3 applied Petitioner's case.[41]

626.    As to Ramirez's mental state at the time of the crimes, counsel told the jury "what possessed Mr. Ramirez to do this we will not know soon.  Psychiatry is in whatever state it is in.  What possessed [Petitioner] to permit Ms.

_____

[41]  When not discounting the existence of mitigating facts, counsel confused the jury with tangential references to Patrick Henry, the conflict in Northern Ireland, and slavery, as well as bizarre hypotheticals, such as whether it would make sense to call 911 if Ramirez had a heart attack after being sentenced to death.  (*See* 217 RT 24837-24856.)  At one point, he admitted, "I'm not doing as well as I thought I would do.  It would seems like there were so many things I had to tell you or I had to discuss with you within the confines of what I wanted to say."  (*Id.* at 24846.)

Kyle to live, I will never know." (217 RT at 24840). Later, counsel suggested that even if there were such evidence, it would not impact the jury. He said "I think it is inescapable that something was wrong [with Richard Ramirez] and that we don't know what it was. Even if we knew what it was, I'm not sure that that (*sic*)would change your task any." (*Id.* at 24853). Later he added "there is a lot we do not know about [Ramirez], about his behavior, which we will not know probably in our lifetimes, which man will never know about man." (*Id.* at 24857).

627. When discussing the possibility of abuse in Petitioner's upbringing, counsel told the jury "there is inferential evidence here that that (*sic*) is not the kind of home from which Mr. Ramirez came." (*Id.* at 24841.) He even suggested that there was no evidence of the reverse—of Petitioner's redeeming qualities-- noting "there is not a lot to be said here as to—as to he was a good boy, he did this, he went to this school or that school. Obviously don't even consider that. That wasn't presented and I don't know what school he went to." (*Id.* t 24853).

628. Even when discussing the only factor that was apparent without the presentation of evidence, Mr. Ramirez's age, counsel said it did not apply: "he is a young man. . . . but there is nothing, absolutely nothing, not even close to anything that would justify in any fashion whatsoever a single one of these 43 counts." *Id.* at 24854.

629. At one point, counsel told the jury that even he would have killed Petitioner: "Now I recognize that if anyone in this courtroom had come upon Mr. Ramirez during the commission of one of these crimes, and we had the ability to kill him, he would be dead right now, and I think that includes everybody in this courtroom other than him." *Id.* at 24848.

630. Ultimately, counsel's argued that the jury should exercise "mercy," which he defined as "forbearance and compassion shown by one person to another who is in his power and has no claim to receive kindness." 217 RT

24839.  He made it clear to the jury that "Richard Ramirez. . . .has no claim to your kindness." *Id.*  Because counsel had effectively negated the existence of any mitigating circumstance, he told the jury "mercy doesn't have to be based on anything quantitative." *Id.* at 24840.  In making such comments, counsel failed to focus on the key elements of a death penalty determination: "the character and record of the individualized offender and the circumstances of the particular offense." *Penry*, 492 U.S. at 316.

631.   Counsel's closing argument—a request for mercy not based on any evidence—was so ineffective as to be a complete failure to act as Petitioner's advocate.

**E.     Counsel's Performance Was the Equivalent of Total Denial of Counsel**

632.    In such a unique situation as this case, the harm to Petitioner caused by the court's error was equivalent to the total denial of the constitutional right to representation.  *United States v. Cronic*, 466 U.S. at 658-59.  Counsel's complete failures, at numerous points throughout the trial, undermined the entire adversarial process and the reliability of the resulting verdict.  *See Gerlaugh v. Stewart,* 129 F.3d 1027, 1036 (9th Cir. 1997) (reviewing courts must consider the totality of counsel's errors, not just parts of them in isolation.)  Under *Cronic*, Petitioner is entitled to a presumption of prejudice.  *Cronic*, 466 U.S. at 659.

**F.     In the Alternative, Counsel's Performance Was Ineffective Under**
**        *Strickland***

633.    Counsel's failures in the pre-trial, trial and penalty phases were numerous, and any one of them could have changed the outcome of the proceeding.  During pre-trial proceedings, a proper hearing on Petitioner's competence could have resulted in a finding that he was unfit to stand trial; a competent presentation of the change of venue motion could have resulted in Mr. Ramirez being tried more neutral jurisdiction; an aggressive mental health defense could have resulted in an acquittal on some or all of the charges.

634.   Had the jurors known of Petitioners severe and long-standing mental illness and impairments, they would have given full consideration to all the relevant evidence bearing on the question of guilt and sentence.  Several of the trial jurors indicate they would have considered all evidence bearing on Petitioner's guilt.  The jurors report that had the defense presented more evidence, the outcome of the guilt trial could have been different.  (Exs. 28-30, 115, 117.)

635.   A truly adversarial penalty phase mitigation presentation and argument could have resulted in a life sentence.  Several of the jurors indicate they expected to hear evidence presented by the defense to save their client's life.  Mitigation evidence could have had a difference in the outcome.  Evidence presented on Petitioner's behalf would have been carefully considered during four days of deliberations, particularly evidence of Petitioner's background and mental condition.  (Exs. 28-30, 115, 117.)  Counsel's failings made Petitioner even less sympathetic in the eyes of the jury and inclined it toward death.

636.   The foregoing violations of Petitioner's constitutional rights, taken singly or in combination with the other errors alleged in the Petition, constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993).  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Petition, so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violations of Petitioner's  rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice.  *See id.* at 622, 637-38.

**CLAIM 4:**

## TRIAL COUNSEL'S CONFLICTS OF INTEREST VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS

637.  Exhaustion of the claim: Portions of this claim was fairly presented to the California Supreme Court in section VIII of the June 2004 petition for writ of habeas corpus.  Petitioner will present the claim with additional factual allegations to the California Supreme Court in an exhaustion petition he will file no later than March 17, 2009.

638.  In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

639.  Those facts and allegations set forth in the petition, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

640.  Petitioner's conviction and sentence are illegal, and unconstitutional and void under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments because his trial counsel's financial conflict of interests adversely affected the representation he received.

641.  The violations of these rights, individually and cumulatively, prejudicially affected and distorted the investigation, discovery, presentation, and consideration of evidence as well as each and every factual and legal determination made by trial counsel, the state courts and the jurors at all stages of the proceedings from the time of Petitioner's arrest through and including the rendering of the judgment of death.

642.  In considering counsel's deficient performance individually and cumulatively in conjunction with other claims alleged herein, the verdicts in both the guilt phase and penalty phases of Petitioner's trial must be set aside.

213

Petitioner adopts and incorporates by reference as though fully set forth all facts and claims set forth elsewhere in this petition.

## A. Petitioner Had a Constitutional Right to Conflict-Free Representation at the Guilt and Penalty Phases of His Trial

643.   The Sixth Amendment of the Constitution, as applied to the states through the Fourteenth Amendment, guarantees criminal defendants the right to the assistance of counsel.  U.S. Const. amend VI, XIV; *Gideon v. Wainwright*, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963).  The Supreme Court has long recognized that the Constitution's guarantee is the right to the *effective* assistance of counsel.  *McMann v. Richardson*, 397 U.S. 759, 771, n.14, 90 S. Ct. 1441, 25 L. Ed. 2d. 763 (1970).

644.   Where a defendant has a right to counsel, the Sixth Amendment also provides a "correlative right to representation that is free from conflicts of interest."  *Wood v. Georgia*, 450 U.S. 261, 271, 101 S. Ct. 1097, 67 L. Ed. 2d 220 (1981).  An attorney whose representation is adversely affected by a conflict of interest is ineffective within the meaning of the Constitution.  *Cuyler v. Sullivan*, 446 U.S. 335, 344, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980).  The Sixth Amendment's guarantee to effective assistance applies equally to attorneys who are appointed and those who are retained by the defendant.  *Id.*

645.   In most circumstances, a defendant alleging an ineffective assistance of counsel claim must demonstrate that counsel's performance was deficient and that he suffered prejudice: "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  However, the Supreme Court has held that there are certain circumstances where the likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary. *See United States v. Cronic*, 466 U.S. 648, 658-59, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984).  Ineffective assistance resulting

214

from counsel's conflict of interest does not require a showing of prejudice. *See Holloway v. Arkansas*, 435 U.S. 475, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978); *Cuyler v. Sullivan*, 446 U.S. 335, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980).

646. Under *Sullivan*, to establish a Sixth Amendment violation based on a conflict of interest, petitioner must show (1) that counsel actively represented conflicting interests, and (2) that an actual conflict of interest adversely affected his lawyer's performance. *Sullivan*, 446 U.S. at 350-51. An "actual conflict of interest" is a conflict that actually affects the representation, as opposed to a "mere theoretical division of loyalties." *Mickens v. Taylor*, 535 U.S. 162, 171, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002).

647. In *Wood v. Georgia*, 450 U.S. at 268-69, the Supreme Court acknowledged that a conflict of interest can arise when a lawyer accepts payment for a criminal defendant's representation from a third-party. In *Wood*, the defendants were low-level employees in an adult theater who were convicted, sentenced to probation, and fined for distributing obscene material. *Id.* at 263. After the defendants did not pay their fines, the county probation office moved to revoke their probationary status and send them to jail. *Id.* The defendants petitioned the Supreme Court, alleging that it was a violation of the Equal Protection Clause to imprison a probationer simply because of his inability to make payments on a fine. *Id.* at 264. When the case came before the Court, however, it was revealed that all the defendants were represented by a single lawyer who was paid by their employer. *Id.* at 267. The record suggested that the lawyer did not seek leniency or a reduced fine for the defendants, but rather allowed probation to be revoked in order to bring a "test case" on the constitutional claim, an issue of interest to the employer. *Id.* at 268.

648. Declining to address the Equal Protection question, the Court instead turned to the potential conflict, noting "courts and commentators have recognized the inherent dangers that arise when a criminal defendant is represented by a

215

lawyer hired and paid by a third party." *Wood*, 450 U.S. 268-69. One risk is that the lawyer will prevent the defendant from offering testimony that is unfavorable to the party paying for the representation. *Id.* Another risk is that the lawyer will defer to the third-party's goals while sacrificing the defendant's best interest. *Id.* at 270, Given the "clear possibility of a conflict of interest," the Court remanded the case for hearing to determine whether an actual conflict existed within the meaning of *Sullivan*.[42] *Id.* at 267, 274.

649.    Because trial counsel had a third-party fee agreement with Mr. Ramirez's family, they suffered from a conflict of interest that adversely affected the representation Petitioner received at trial. Under *Sullivan* and *Wood*, Petitioner is entitled to relief.[43] Alternatively, he is entitled to relief under *Strickland* because trial counsel's conflict of interest caused their performance at trial to be deficient, and Petitioner was prejudiced as a result.

---

[42] *Wood* was technically decided under the due process clause rather than the Sixth Amendment, as only the former provision sets constitutional bounds on parole revocation hearings. The Court analogized defendants' rights in *Wood* to those in *Sullivan* because where a defendant has the right to counsel, "our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest." *Wood*, 450 U.S. at 271.

[43] Petitioner notes that the Supreme Court criticized the application of the *Sullivan* standard to conflicts of interests not involving multiple concurrent representation. *Mickens*, 535 U.S. at 174. *Wood's* application of *Sullivan* to third-party conflict claims is consistent with *Mickens*, however, because "some third-party fee arrangements can develop into the functional equivalent of multiple representation." *Beets v. Collins*, 65 F.3d 1258, 1267 (5th Cir. 1995).

216

**B.    The Third Party Fee Agreement**

**1.    Counsel Obtained Separate Retainer Agreements from Petitioner and His Family and Considered Both of Them "Clients"**

650.    After Petitioner was arrested for murder in Los Angeles, police searched the home of Petitioner's older sister, Rosario, in El Paso, Texas.  A neighbor, Joe Mena, suggested to the Ramirez family that they talk to a local lawyer Manual Barraza, a cousin of Mr. Mena's wife.  After meeting with the family, Mr. Barraza traveled to California with the intention of defending Petitioner. (Ex. 105, Rosario Ramirez Dec, ¶ 25.)  Mr. Barraza's representation also included "protect[ing] the family's interest related to Petitioner's case."  (Ex. 13, M. Barraza Dec., ¶ 2 (June 7, 2004.))

651.    On October 3, 1985, while still officially represented by the public defenders Henry Hall and Alan Adashek, Petitioner executed a seven-page, signed and notarized Assignment of Rights to his sister Rosario Ramirez.  (Ex. 110, "Assignment of Rights"; *see* also Ex. 18, H. Hall Dec, ¶ 4 (noting that the public defender's office was not relieved as counsel until October 9, 1985.)  The document covered rights "in any and all present or future literary, publishing, motion picture, television, interviews, serials, dramatizations, advertisements, manuscripts, all whether written or unwritten, published or unpublished, copyrighted or non-copyrighted, direct or subsidiary." (Ex. 110, "Assignment of Rights.")  In it, Petitioner "irrevocably consent[ed] to and forever authorize[d] the use by the Assignee (Rosario) or anyone authorized by the Assignee, *her legal representatives,* the absolute and unqualified right to use the Assignor's life material in any manner the Assignee may desire." (*Id.*)  The assignment also

named Rosario Ramirez as Petitioner's attorney-in-fact to execute any documents necessary to secure copyrights to his life story.[44] (*Id.*):

652.   Mr. Barraza told Rosario that people immediately began calling his office about book or movie deals. (Ex. 105, Rosario Ramirez Dec., ¶ 26.) Mr. Barraza intended to assist the family in obtaining movie and/or book rights to Petitioner's case. (Ex. 13, M. Barraza Dec., ¶ 2.) In the event of a movie and/or book deal, Mr. Barraza was to receive a percentage of the monies paid to the family. (*Id.*) Rosario recalls signing documents for Barraza, including a promissory note in excess of $100,000. (Ex. 105, Rosario Ramirez Dec., ¶ 26.)[45]

653.   Ultimately, Mr. Barraza could not take the Petitioner's criminal case because he was not licensed in California. (Ex. 105, Rosario Ramirez Dec., ¶ 25.) Mr. Barraza referred the family to Arturo Hernandez, the only lawyer he knew who practiced in California. (Ex. 13, M. Barraza Dec., ¶ 4.) At the same time, Petitioner was meeting with Joseph Gallegos, a private attorney, who was introduced to Petitioner through public defender Alan Adashek. According to news reports, the Petitioner and Mr. Gallegos reached an agreement on retention

---

[44]   Both Mr. Barraza and Mr. Hall admitted that Petitioner was acting unusually at and around the time the assignment of rights was executed. Mr. Hall admitted that Petitioner was "agitated and irrational" during his contacts with him. (Ex. 18, H. Hall Dec., ¶ 4.) Mr. Barraza admitted that during the times he met with Petitioner in September and October 1985, Petitioner "exhibited extreme mood swings and his dialogue was remarkable for its incoherence and irrationality.... He was unable to focus or listen to [Barraza's] attempted explanation about what appeared to be in his best interests." (Ex. 128, M. Barraza Dec., ¶ 7) (Dec. 21, 1994).

[45]   During a hearing much later in the case, Arturo Hernandez told the court the agreement with the family required an immediate $50,000 payment for preliminary hearing and an additional $150,000 for trial. (Sealed RT of September 29, 1987, Vol. 33C, 2355). He also admitted that he had not even seen the Criminal Complaint at the time the retainer agreement had been signed. (*See Id.*)

on Monday, October 7, 1985, but Mr. Gallegos declined to state how he would be paid. (Ex. 82, Paul Feldman, *Ramirez Allowed to Switch Lawyers*, L.A. Times, Oct. 10, 1985.)

654. On October 9, 1985, Petitioner informed the court in an *in camera* hearing that he had retained private attorney Joseph Gallegos. The court relieved the public defender's office as counsel, subject to Mr. Gallegos providing the court with a written retainer agreement. That agreement was never provided to the court. (Ex. 18, H. Hall Dec., ¶ 4; see XVII CT 4981) (October 22, 1985 hearing referencing events that occurred on October 9, 1985.) According to news reports, Mr. Barraza, Arturo and Daniel Hernandez, also attended court on October 9, 1985. They attempted to address Judge Soper in open court but she would not recognize them. (Ex. 82, Paul Feldman, *Ramirez Allowed to Switch Lawyers*, L.A. Times, Oct. 10, 1985.)

655. Rosario met Daniel and Arturo Hernandez in court, on the day the Hernandezes appeared to represent Petitioner. (Ex. 105, Rosario Ramirez Dec., ¶ 27.) It was subsequently agreed that Daniel and Arturo Hernandez would represent Petitioner in his capital murder case. They signed a retainer agreement with Petitioner as well as a separate retainer agreement with Petitioner's family.

## 2. Counsel Lied To The Court Regarding Their Intention To Obtain a Book or Movie Deal on Behalf of Petitioner's Family

656. The family retainer agreement specified that the Hernandezes would receive money from the family for their legal services when they received payment for the book or movie rights to Petitioner's story. They expected to be paid early on in the case by the family's attorney, Manuel Barraza, or by the family. Petitioner's agreement did not require him to pay any funds for his defense. The client retainer agreement bound the attorneys to represent Petitioner through trial court proceedings.

219

657.   On October 22, 1985, Petitioner appeared in a closed, *in camera* hearing with Mr. Gallegos, and Daniel and Arturo Hernandez.  Petitioner indicated that he wished to substitute the Hernandezes  as counsel.  Daniel Hernandez informed the court that he had been retained by Petitioner and his family, and that an official contract had been prepared and signed by the parties.  When asked if he had been paid for the representation, Daniel Hernandez said he was not comfortable discussing that information with the court.  (Sealed RT of October 22, 1985 hearing, 2-4.)

658.   When the court asked trial counsel for assurances that they had the financial resources to litigate the case, Arturo Hernandez stated

> the financial...area in this case has no bearing on my duties and my
> abilities to appear in this case.  I think that once we undertake the
> case, we have the ethical duty to the court and to our client primarily
> to assist him and give him effective assistance of counsel, as is his
> constitutional right.  I feel awkward in being asked that type of
> question.  Of course I'm going to be available for this court.

(Sealed RT October 22, 1985 hearing, 20.) He further stated "we have made arrangements for associate counsel. . . [for] people to assist and all the resources are there.  I don't see any problems with that at all, no matter how long it takes, if it takes, we are anticipating at least two years." (*Id.*)

659.   Once the prosecution was excused from the room, Daniel Hernandez informed the court that they had agreements with both Mr. Ramirez and his family and that the family was responsible for payment of Petitioner's defense.  When asked what the family's source was, Daniel Hernandez replied, "I really can't comment on that.  I am really not necessarily aware of that, and I am not necessarily anxious to discuss their finances at all." (Sealed RT October 22, 1985 hearing, 30.)  The court noted that Mr. Barraza has been on television soliciting attorneys to take the case based upon fee arrangements from television, movie

and books rights.  The trial court stated, "if there is any thought of that being involved, it is necessary for [the court] to know because there are potential conflicts...which Mr. Ramirez can waive, but the court must be aware of them and Mr. Ramirez must be aware of them."  (*Id.* at 31.)  Daniel Hernandez replied,

It is not really our business to know anything of where the family gets its money....We have no interest.  We have no contracts that include those type of arrangements.  We have had no conversations or discussions with anyone concerning those type of arrangements. . . It would be our ethical responsibility in our perspective, in our eyes, to inform the court of all the developments in those directions.

(*Id.*)

660.   At a hearing later that day, the court stated that it was "concerned about any agreement regarding any rights, book rights, life story rights. . .even though that agreement may be between Mr. Ramirez' family and Mr. Barazza."  Arturo Hernandez clarified that he never said such a thing regarding Mr. Barraza, repeating again that "we have no knowledge, whatsoever, of any [book or movie deal] negotiations."  (*Id.* at 37).

661.   After the court noted that television reports indicate that the family has very limited financial resources available to them, the court asked counsel, "knowing that you may not be receiving funds or insufficient funds (*sic*) to cover this type of case in the future, are you still willing to undertake this case, knowing that you will not be appointed by the court?"  (*Id.* at 38).  In a statement that would follow him for the rest of the case, Arturo Hernandez replied

[W]e undertake this case knowingly and fully conscious of the possibilities that this case might extend beyond the means of the family at this point.  However, we are willing to undertake the case under those circumstances anyway, and we are fully aware of the tremendous amount of work that we are undertaking, but we have no

problems with that. . . . Although we are retained in this case, if that case comes about, we are willing to do the rest of it *pro bono* anyway.

(*Id.*)

662.   He also added that, "[the Ramirez family's] means are modest, they have a substantial amount of family members contributing to the case"—a highly misleading statement, given that the Ramirez family had not paid the Hernandezes at all.  (*Id.* at 39)

663.   Upon further questioning, it was revealed that Petitioner had not signed a retainer agreement with the Hernandezes; rather, he had signed substitution of counsel forms and it was Petitioner's family who had signed a written agreement.  (Sealed RT October 22, 1985 hearing, 40.)  The court ultimately ordered the Hernandezes to reduce Petitioner's retainer agreement to writing so that an independent attorney could review it.  The motion to substitute counsel was put over for two days.  (XVII CT 4984-4988).

664.   On October 24, 1985, after denying attorney Gallegos's motion for a psychiatric evaluation of Petitioner, the trial court advised Mr. Ramirez that "your attorneys have a contract with you and with your family, those two contracts may at some point be in conflict. . . Do you understand that possibility does exists?"  Petitioner replied "it does exist but I feel there will be no conflict." (XVII CT 5006.)

665.   The court noted that the Hernandezes had previously called the family their "client" and advised counsel that Petitioner was to have "prime consideration." Counsel were further instructed to inform the court "if at any time there is  the slightest possibility that a potential conflict might exist."  Arturo Hernandez assured the court that he understood the court's directive and asserted that they did not anticipate a conflict of interest, noting that they used their

222

standard retainer agreement which had been used in many cases.  (XVII CT 5007-08).

666.    Despite what Daniel Hernandez told the court, he encouraged Rosario, from the first day they met, to persuade Petitioner to sign a contract[46] for a book or movie deal.  Daniel was very persistent, talking to her six or seven times throughout the investigation and trial.  Daniel told Rosario that in order for he and Arutro Hernandez to provide Petitioner with a strong defense at trial, it was important for Petitioner to sign a book or movie contract.  Daniel told her that they needed money to help build a defense and that a book deal would help accomplish this.  (Ex. 105, Rosario Ramirez Dec., ¶ 27).

667.    Daniel took Rosario to a meeting with a Hollywood producer interested in Petitioner's story.  The deal fell through when Petitioner refused to sign the contract.  After that, Daniel told Rosario that he would continue to work on obtaining a deal.  (*Id.*)

## C.    Trial Counsel's Conflict of Interest Adversely Affected Representation

668.    In order to obtain relief under *Sullivan*, a defendant must show that his counsel's performance was adversely affected by an actual conflict of interest. *Sullivan*, 446 U.S. at 348.  Actual conflict need not be a direct conflict, and it need not be established separately from adverse effect.  *Hovey v. Ayers*, 458 F.3d 892, 908 (9th Cir. 2006) (*citing Mickens v. Taylor*, 535 U.S. at 172 n. 5). "Adverse affect" means that "that some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests."  *Id.*; *see also United States v. Wells*, 394 F.3d 725, 733 (9th Cir.

_____

[46]  Even though Rosario was the legal holder of the rights to Petitioner's story, Mr. Ramirez's cooperation was required to secure a media agreement because he was presumably the only person who would know certain facts pertaining to his alleged criminal activity.

2005) (internal quotation marks omitted); *see also United States v. Shwayder*, 312 F.3d 1109, 1118 (9th Cir. 2002) (alternatively describing the standard as requiring "that counsel was influenced in his basic strategic decisions" by the conflict).

### 1. Petitioner's Interests and That of His Family Were In Conflict

669. Petitioner's best interests before and during trial and that of his family were divergent and irreconcilable. The fee agreement placed counsel in an untenable position between client's best legal strategy – which included the adoption of a mental health defense at the guilt phase and/or and the presentation of his impoverished and abusive upbringing at penalty – and the financial and privacy interests of his family.

670. In this case, the prospect of a book or movie deal further divided counsel's loyalties. For example, more than once, Petitioner's family voiced their concerns about protecting their monetary interest in Petitioner's case: the Ramirezes expected to receive in excess of $300,000 for Petitioner's story. (Ex. 18, H. Hall Dec., ¶ 3). Since trial counsel was dependent on the Ramirez family for the entire balance of the retainer agreement, counsel could not offend or embarrass them during the investigation or presentation of Petitioner's case. The fact that no book or movie deal developed during the case, only furthered the Hernandezes' indebtedness to the Ramirez family, and gave counsel an ongoing incentive to defer to the interests of the family over Petitioner's.

671. Counsel's third-party fee arrangement was a violation of the California State Bar rules in effect in 1985, which stated that counsel shall not accept employment adverse to a client (Rule 4-101); knowingly acquire an interest adverse to a client (Rule 5-101); or represent conflicting interest (Rule 5-102). Under the 1989 State Bar rules, an attorney shall not accept compensation from one other that the client unless "there is no interference with the member's

independence of professional judgment or the client-lawyer relationship." (Rule 3-310(E)(1).)

### 2. Counsel Failed to Pursue Mental Health Defenses Because Doing So Would Have Diminished the Value of the Media Rights and Brought Shame to the Ramirez Family

672. From the outset of Petitioner's case, it was clear that a competency hearing and/or a mental health defense should have been investigated and raised. The bizarre nature of the crimes, Petitioner's irrational outbursts in court, and his unusual behavior in attorney-client meetings all indicated that he suffered from a major mental disorder. (*See* XVII CT 5020 (Petitioner's shouted "Hail, Satan!" in court); Ex. 18, H. Hall Dec., ¶ 4 (describing Petitioner as "irrational and agitated"); Ex. 128, M. Barraza Dec., ¶ 7 (stating that Petitioner exhibited extreme mood swings; his dialogue was remarkable for it incoherence and irrationality; Petitioner was unable to listen to counsel's advice).)

673. However, when attorney Joseph Gallegos moved for a competency evaluation just prior to the Hernandezes' substitution, Arturo Hernandez objected, stating that Petitioner had no trouble understanding the proceedings. (XVII CT 5003.) The Hernandezes never again moved for a competency evaluation, nor did they present any kind of mental health defense at trial. There is no legitimate reason why competent counsel would have refrained from pursuing a finding that Petitioner was incompetent or not guilty by reason of insanity, given that it was true and it would have spared Petitioner the death penalty.[47]

---

[47] Daniel and Arturo Hernandez claimed they did not pursue a mental state defense at trial because Petitioner did not want to be considered mentally ill. However, Ray Clark admits there was very little discussion about Petitioner's mental condition or his background. He believes that Petitioner was "nuts" and unable to assist counsel in a rational manner. (Ex. 16, R. Clark Dec., ¶¶ 7-8).

674.   However, a finding that Petitioner was not criminally liable due to his mental state would have diminished the value of the media rights held by the family.  A competency hearing, including a thorough examination of Petitioner by a psychiatrist, might have answered some of the lingering questions the public andpress held about Petitioner's mental health, given the bizarre behavior involved in some of the crimes.  If such information were to come out as a public hearing, it would lose its appeal to a literary agent seeking exclusive material.  Furthermore, if Petitioner had been found legally incompetent, the veracity of any subsequent interview he gave would have been seriously undermined.  Keeping this information secret benefitted the Ramirez family as the holder of the rights to Petitioner's life story.

675.   With regard to an insanity defense at trial, a finding that Petitioner was not guilty by reason of insanity (NGRI) would have brought shame to the Ramirez family.  Although Petitioner would not be considered legally responsible for his conduct, an NGRI verdict would have nonetheless been an acknowledgment that he did have a role in committing the crimes.  Such a finding could have also given credence to law enforcement accusations that the Ramirez family knew about the murders, or played a role in hiding clear evidence of homicide.  (*See e.g.* Ex. 83, *Stalker May Have Mailed Eyes to Kin*, undated, (referencing the search of Rosario's house for the eyes of one of the victims.  Because of the intense media scrutiny they received, the Ramirezes had a strong desire to clear the family name, a goal that would not be accomplished if Petitioner were found incompetent or not guilty by reason of insanity. *See also infra* subsection D(2); Claim 8.

--------

Because counsel has an obligation to investigate and present mental health defenses where doing so is in the client's best interest, counsel's deference to Petitioner's alleged wishes is not a valid strategic reason for their performance.

676. Counsel had no strategic reason to forgo pursuing a finding of incompetence or not guilty by reason of insanity, particularly because a finding of either incompetence or NGRI would have spared Petitioner the death penalty. But because counsel could not pursue either of those alternatives without diminishing the value of the media rights, or shaming the Ramirez family, counsel's representation was adversely affected by the conflict of interest created by the third-party fee arrangement.

### 3. Counsel Refrained from Obtaining and Presenting Penalty Phase Mitigation Information that was Unfavorable to Petitioner's Family

677. The family's adverse interests also interfered with Petitioner's constitutional right to an adequate penalty phase investigation and mitigation presentation. One of the defense paraprofessionals declares that counsel limited her investigation of the case to brief interviews of family members. (Ex. 14, K. Baur Dec., ¶ 3-4.). Thus, she could not develop medical, psychosocial, institutional, familial, or other sources of mitigation, because counsel and the family essentially erected a wall around any information regarding Petitioner, preventing her from conducting the critical investigation. (*Id.*, ¶ 4 ("It seemed purposeless to limit our work . . . when we were aware of many areas of investigation, including . . . psychiatric, . . . and family dynamics that would have yielded significant mitigation evidence on Petitioner's behalf.")

678. Had counsel conducted a thorough mitigation investigation, including effective interviews with family members, neighbors and others, it would have revealed information that was valuable to Petitioner's defense but embarrassing to the Ramirez family. For example, Petitioner's mother may have contributed to his brain impairments through her employment at the Tony Lama Boot factory, where she worked while pregnant with Petitioner. She was told the fumes might harm her unborn child, but continued working there because she

needed the money. (Ex. 32, M. Cornell Dec., ¶ 21; Ex. 103, M. Ramirez Dec., ¶¶ 5-6.) Meanwhile, Petitioner's father, Julian Ramirez, Sr., had a violent temper and beat his sons (except for the disabled Ignacio); he hit them with a water hose, electrical cords, and belts. He beat Petitioner many times, hard enough to leave bruises on Petitioner's legs. He once brandished a gun at his son Robert. (Ex. 32, M. Cornell Dec., ¶¶ 64, 69; Ex. 104, Robert Ramirez Dec., ¶¶ 2-4; Ex. 105, Rosario Ramirez Dec., ¶ 13; Ex. 102, I. Ramirez Dec., ¶ 13.)

679. In addition to outright abuse, Petitioner suffered neglect because his parents were focused on the numerous problems of his older brothers: Julian Ramirez, Jr., was born with a birth defect, was mentally retarded, sexually abused by a special education teacher and became a life-long heroin addict, who has been in and out of jail, mostly on drug-related offenses. (Ex. 32, M. Cornell Dec., ¶¶ 22-23; Ex. 67, J. Ramirez Dec., ¶¶ 4-6; Ex. 103, M. Ramirez Dec., ¶¶ 9-10; Ex. 105, Rosario Ramirez Dec., ¶ 3; Ex. 106, School Records of Julian Ramirez, Jr.).

680. Petitioner's brother, Ignacio Ramirez, suffered painful bone deformities in his legs and ankles that required frequent doctor visits and numerous surgeries and was also mentally retarded. (Ex. 32, M. Cornell Dec., ¶ 26; Ex. 103, M. Ramirez Dec., ¶ 12; Ex. 102, I. Ramirez Dec., ¶¶ 7-8, 15; Ex. 105, Rosario Ramirez Dec., ¶ 4; Ex. 109, School Records of Ignacio Ramirez.)

681. Petitioner's brother, Robert Ramirez, had difficulty learning to speak and was classified as the educable mentally retarded. Robert was sexually abused by the same special education teacher who sexually abused his older brother Julian, Jr. Robert began getting into trouble with the law when he was a teenager. Robert dropped out of school in the tenth grade. He was convicted of theft and other crimes, and. at the age of eighteen was incarcerated for approximately two years. Thereafter, his life continued to be unstable. Robert has been diagnosed with bipolar disorder and schizophrenia. (Ex. 32, M. Cornell Dec., ¶ 26; Ex. 103,

228

M. Ramirez Dec., ¶ 13; Ex. 104, Robert Ramirez Dec., ¶¶ 15, 17; Ex. 105, Rosario Ramirez Dec., ¶ 5; Ex. 107, School Records of Robert Ramirez.)

682.    Petitioner was also exposed to extreme levels of violence through his cousin Miguel Valle, a Viet Nam veteran.  He showed, or described, to Petitioner photographs that he claimed to have brought back from Viet Nam – photographs that depicted Valles and others participating in rape, violence, torture, murder, and other atrocities against Vietnamese prisoners.  Valles sexualized the atrocities he described to Petitioner.  Petitioner was extremely upset after he spent time with Valles, however, Valles remained a strong influence on Petitioner.  When Petitioner was thirteen years old, Valles shot and killed his wife – in front of Petitioner.  Valles was arrested and charged in the killing.  Petitioner witnessed the shooting, and, later, after Valles had been arrested, returned to and observed the blood-soaked crime scene.  (Ex. 32, M. Cornell Dec., ¶ 54; Ex. 69, M. Ramirez Dec., ¶ 7; Ex. 103, M. Ramirez Dec., ¶ 22; Ex. 105, Rosario Ramirez Dec., ¶ 17, 18; Ex. 102, I. Ramirez Dec., ¶ 26.)

683.    All of the above information could have been presented as part of a compelling penalty phase mitigation presentation.  But because counsel was dependent upon the Ramirez family to recover the enormous costs of Petitioner's defense, they were not in a position to confront the family about the role they played in Petitioner's abusive, neglectful and traumatic upbringing.

**4.      The Fee Arrangement Caused Petitioner's Defense to be Underfunded, Resulting in Unwarranted Delay and Counsel's Absence from Critical Portions of the Trial**

684.    The third-party fee arrangement the Hernandezes secured with Petitioner's family severely affected their ability to litigate the case in a competent and timely manner.  When the Hernandezes initially requested to be substituted as counsel, Arturo Hernandez assured the court that "all the resources are there . . . no matter how long it takes" to fully defend Petitioner's case (Sealed

229

RT of October 22, 1985 hearing, 20). He did not inform the court that neither he nor Daniel Hernandez had actually been paid by the family, or that they expected to be paid early on in the case from the proceeds of a book or movie deal. When a deal did not materialize, Arturo Hernandez was forced to take additional retained work over the next four years, from 1985 through 1989.

685. Even before trial began, it became apparent that counsel's lack of funding was causing unwarranted delay. Early on, Arturo Hernandez explained that one of the reasons he had not filed a suppression motion was because "Mr. Ramirez is an indigent defendant. . . . he doesn't have the means or the resources, as the People do, to maintain a pace that is required by the People." (19 RT 906-07). Failure to file timely motions became routine, causing the court to chastize trial counsel for their tardiness (*see*, *e.g.*, 26 RT 1855) and for raising financial matters as grounds for delaying the case. (*See*, *e.g.*, 41 RT 2933-40; 43 RT 3006-08.) The Hernandezes were informed that "financial concerns are not reason really (*sic*) to continue this case. You owe [Mr. Ramirez] a duty of at least warm zeal on this case, and of course, as officers of the court—this court, owe prompt attention to this case." (*Id.* at 3007.)

686. By May 1987, the Hernandezes had to close down their local offices, telling the court "we're broke. We had to move home [to San Jose]." (Sealed May 4, 1987, 30A RT 2199.) Even the court's appointment of another attorney, Michael Carney, to assist in writing motions, did not improve the situation because Daniel and Arturo Hernandez were always in San Jose working on other cases and were unable to confer on Petitioner's case. (Sealed September 23, 1987, 33A RT 2331-32).

687. During an unsuccessful attempt to get appointed by the court, Arturo Hernandez explained the shortage of funding by saying that "the case originally seemed something that was totally indefensible....[now] we find the case has turned out to be very defensible. . . .the monies we've agreed to with the family

230

are totally inadequate" to defend the case. (Sealed September 29, 1987, 33B RT 2346.) With trial just one month way, Arturo Hernandez claimed that the Ramirez family's inability to pay would cause them "to give less than adequate representation and render ineffective assistance of counsel to our client, because we have to work and try to survive and maintain some sort of practice." (Sealed September 29, 1987, 33C RT 2358).

688.    After trial began, Arturo Hernandez simply stopped appearing in court. During Arturo Hernandez's four-month absence between September 26, 1988, through January 23, 1989, Daniel Hernandez, who had no previous capital litigation experience, conducted *voir dire*, including *Hovey*[48] examination. (*See* XXVIII CT 8087-88, 8094, 8098, 8101-02, 8106-12, 8115-19, 8121, 8123-26, 8181-87, 8198, 8203-04, 8206-08, 8259-63, 8273, 8284, 8286, 8294-95.) Arturo Hernandez was also absent during other proceedings critical to Petitioner's defense, including the prosecution's entire case-in-chief, and jury instruction conferences.[49]

689.    Eventually, Arturo was only maintaining contact with the court by telephone, and even then, he often failed to do so. (173 RT 20186). At one point, Daniel Hernandez could not locate Arturo through relatives, and did not know whether he was even in the country. (Sealed October 3, 1988 96A RT 10144). "It is crippling to me to have someone on board as co-counsel who can't

_____

[48]    *Hovey v. Superior Court*, 28 Cal. 3d 80, 616 P.2d 1301, 168 Cal. Rptr. 128 (1980).

[49]    *See* XXVIII CT 8087-88, 8094, 8098, 8101-02, 8106-13, 8115-19, 8121-26, 8181-87, 8198-99, 8203-04, 8206-08, 8259-63, 8273, 8284, 8286, 8294-95, 8299, 8315, 8321, 8324, 8327-28, 8331-33, 8336-39, 8341, 8353, 8360, 8369-70, 8379-81, 8383; XXIX CT 8384-85, 8391, 8393-97, 8399, 8408, 8412, 8419, 8426, 8429, 8434-39, 8442-47, 8449-51, 8462, 8476-79.

function. . . it is almost better not to have one," Daniel Hernandez told the court in his request to relieve Arturo from the case. (*Id.* at 10153.)

690.   In January 1989, Daniel Hernandez attempted to force the court into giving him county funding, claiming that his representation of Petitioner would suffer without additional money for the defense. During an *in camera* hearing, the court accused him of extortion:

> Mr. Hernandez, when you tell the court that if you don't get
> appointed you are going to withdraw, or if you don't get appointed
> you are going to do less than diligent work on this case, as you
> appear to state in these motions, that is frightening to me because
> that is extortion. And I will be honest with you, this court is not
> going to be extorted.

(Sealed January 20, 1989, 140A RT 16005.)

691.   The court also correctly discerned that counsel had previously lied at the time of their substitution, noting, "you said, in effect, that you misrepresented to Judge Soper your [financial] position for matters of expediency." (*Id.* at 16006.) The court denied Daniel Hernandez's request for appointment and stated "this kind of representation from a member of the bar is something I simply never even contemplated." (*Id.* at 16006-07.)

692.   When that tactic did not work, Daniel Hernandez claimed that the stress of defending the case alone caused his health to suffer such that he could not attend trial. On February 21, 1989, Daniel Hernandez failed to appear. He telephoned the court to report that he was ill and would be absent for one week. In a letter to the court, his physician stated: "I do not feel he is presently capable of functioning effectively as a trial attorney. My estimate of additional time required to recuperate would be four to six weeks." (Ex. 11, Letter from John Pace, M.D., regarding patient Daniel Hernandez, Esq., dated 02/24/1989 (State Habeas Exhibit 8A).) In a hearing on March 1, 1989, Daniel Hernandez

232

explained that he was unable to adequately represent Petitioner – could not "carry the load" – and needed yet another counsel to assist "in this enormous trial." (153 RT 17609-11.) The court found no legal cause to delay the trial. (*Id.* at 17606, 17614-16.)

693. The lack of funding also adversely affected counsel's ability to present defense witnesses. In June 1989, Daniel Hernandez claimed that he could not comply with the court's schedule regarding defense witnesses because he had spent all of his money. Later, the court questioned how delaying the testimony would change the situation, telling Daniel Herndandez "you are going to be in the same boat, aren't you? You are dead broke now. You are not eating." (Sealed June 26, 1989 hearing, 199A RT 23267). Hernandez replied "well I'm eating but I'm not paying rent." (*Id.*) When counsel could not get a continuance of the testimony, Daniel Hernandez flatly told the court "I can't do it." (*Id.* at 23269.) The then court accused Hernandez of attempting to create reversible error, to which counsel replied, "I've been going without anything for myself for four years and now I have to eat my pride again and say I'm broke, and even then you stuff it down my throat." (*Id.* at 23270.)

694. The lack of funding, a direct cause of counsel's unethical third-party fee arrangement, adversely affected Petitioner's defense. Furthermore, counsel's repeated statements that they could not be effective under such circumstances indicate that a presumption of prejudice is warranted.

## 5. The Mid-Trial Appointment of Ray Clark Did Not Cure the Adverse Affect Caused by the Hernandezes' Third-Party Fee Agreement

695. At various times, Daniel Hernandez sought appointment to Petitioner's case pursuant to § 987, citing his financial problems because the family was unable to pay his fees. (XXVIII CT 8242-46.) The court refused to appoint counsel under Penal Code § 987.2, which provides for appointment of

counsel to represent an indigent defendant, because he was not qualified to be appointed as counsel in a capital case. Eventually, the court appointed Ray Clark to assist Daniel Hernandez because Hernandez felt he could not defend Petitioner alone, as he had been doing for months. (Ex. 16, R. Clark Dec., ¶ 5). Clark, however, was not appointed until March 1989, when trial was underway, and he had no time to review discovery prior to his involvement in the case. (*Id.* at ¶¶ 2, 6.) Clark's role was thus extremely limited, and he merely considered himself Daniel Hernandez's assistant. (*See Id.* at ¶ 6.)

696. This likely due to the fact that Ray Clark suffered from his own third-party payment conflict of interest. Though he was appointed and paid by the court, Clark had agreed to pay Daniel Hernandez 30% of all of his fees in exchange for "referring" him the Ramirez case (Ex. 16, R. Clark Dec., ¶¶ 3), which was not revealed to the court at the time of Clark's appointment. (Sealed March 7, 1989, 153A RT 17618-24.) Because Clark was dependent on Daniel Hernandez's continued consent to his appointment, Clark was in no position to challenge Daniel's strategy or judgment.

697. Clark's presence did not cure the delays and errors that were made prior to his appointment to the case. Furthermore, Clark did not exercise sufficient authority over Daniel Hernandez to prevent the adverse affects that occurred during the defective guilt and penalty phase presentation, due to the Hernandezes' third-party fee arrangement with Petitioner's family.

**D.    Alternatively, Counsel's Conflict of Interest Rendered Them Ineffective Within the Meaning of *Strickland***

698. If the *Sullivan* test does not apply to a defendant's conflict of interest claim, relief may nevertheless be obtained under the usual *Strickland* standard for ineffective assistance of counsel. Under *Strickland*, a defendant must prove that his counsel's performance was deficient and that he was prejudiced as a result. *Strickland*, 466 U.S. at 694.

699. "Deficient performance" under *Strickland* is comparable to "adverse affect" under *Sullivan*. *See Mickens*, 535 U.S. 174. Petitioner has demonstrated that his counsel's representation was adversely affected by the third-party fee arrangement between the Hernandezes and the Ramirez family. Counsel's deference to the interests of the family caused Hernandezes to forgo a mental health defense, a proper penalty phase investigation and presentation and prevented Petitioner's case from being litigated in a timely manner. There was no valid strategical reason for any of these actions. As a result, counsel's performance was deficient.

700. Petitioner suffered prejudice from counsel's failure to litigate his competency, raise a mental health defense or present mitigation evidence at penalty. Had the jurors known of Petitioner's severe and long-standing mental illness and impairments, they would have given full consideration to all the relevant evidence bearing on the question of guilt and sentence. Several of the trial jurors indicate they would have considered all evidence bearing on Petitioner's guilt. The jurors report, that had the defense presented more evidence, the outcome of the guilt trial could have been different. (Exs. 28-30.)

701. Several of the jurors indicate they expected to hear evidence presented by the defense to save their client's life. Mitigation evidence could have had a difference in the outcome. Evidence presented on Petitioner's behalf would have been carefully considered during four days of deliberations, particularly evidence of Petitioner's background and mental condition. (Exs. 28-30.) Counsel's failings made Petitioner even less sympathetic in the eyes of the jury and inclined it toward death.

702. Counsel's conflicts of interest deprived Petitioner of any reasonable opportunity of receiving a fair trial and fair and reliable determination of guilt and penalty under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments.

703.    The foregoing violations of Petitioner's constitutional rights, taken singly or in combination with the other errors alleged in the Petition, constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993).  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Petition, so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violations of Petitioner's  rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice.  *See id.* at 622, 637-38.

**CLAIM 5:**

**THE COURT DENIED PETITIONER HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BY PERMITTING THE SUBSTITUTION OF COUNSEL WHO WERE UNQUALIFIED AND SUFFERED FROM A PROFOUND CONFLICT OF INTEREST**

704.    Exhaustion of the claim: Portions of this claim was fairly presented to the California Supreme Court in the direct appeal.  It was presented in Section I of the Opening Brief.  This claim will also be presented in the state exhaustion petition Mr. Ramirez will file in March 17, 2009.

705.    In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

706.    Those facts and allegations set forth in the petition, declarations, claims of constitutional violations, and the accompanying exhibits are

incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

**A.     The Trial Court Violated Petitioner's Constitutional Rights By Allowing Him to be Represented By Unqualified Counsel**

707.    The trial court's substitution of unqualified counsel who suffered from an obvious conflict of interest violated Petitioner's right to the effective assistance of counsel.  In denying this claim on direct appeal, the California Supreme Court held that "the trial court correctly recognized that the defendant has the right to counsel of his choice."  *Ramirez*, 39 Cal. 4th at 424.  This holding misapprehends Supreme Court jurisprudence on the qualified nature of the defendant's right to choose counsel as well as the court's power to intervene when the defendant's choice would impair the fair and orderly administration of justice.

**1.     Trial Courts Have the Right to Refuse Counsel of Choice in Order to Ensure the Fairness of the Proceedings**

708.    The Sixth Amendment's guarantee to the right to the assistance of counsel is accorded to "ensure that criminal defendants receive a fair trial." *Strickland v. Washington*, 466 U.S. at 689.  Thus, while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to ensure that each criminal defendant receives an effective advocate who can ensure the fairness of the adversarial process, rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.  *Wheat v. United States*, 486 U.S. 153, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988).

709.    In most circumstances, a defendant has "the right to be represented by an otherwise *qualified* attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144, 126 S. Ct. 2557, 165 L. Ed.

2d 409 (2006).  This right, however, is circumscribed in several important respects.  A defendant cannot insist on being represented by someone who is not a member of the bar, or who suffers from a conflict of interest.  *Id.* at 152; *see infra,* Section (B)(1).

710.  Likewise, the Supreme Court's Sixth Amendment jurisprudence "recognize[s] the authority of trial courts to establish criteria for admitting the lawyers to argue before them."  *Gonzalez-Lopez*, 548 U.S. at 151.  In exercising this authority, courts have "wide latitude in balancing the right to counsel of choice against the needs of fairness" and against the court's schedule.  *Id.*

711.  Trial courts also have an "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Id.* at 152, (citing Wheat, 486 U.S. at 160); *see also United States v. Stiles*, 56 F.3d 1020 (9th Cir. 1995) (court properly refused the substitution of retained counsel who had committed unethical conduct earlier in the proceeding, even though attorney's actions did not rise to the level of contempt); *United States v. Walters*, 309 F.3d 589, 592 (9th Cir. 2002) (defendants choice of counsel does not have to be respected if "would unreasonably delay proceedings or burden the court with counsel who was incompetent or unwilling to abide by court rules and ethical guidelines."); *United States v. Ensign*, 491 F.3d 1109, 1115 (9th Cir. 2007) (court properly refused counsel of choice where counsel had past and pending ethical violations, filed motions of dubious merit and would delay proceedings).

**2.  Counsel's Lack of Qualification and Experience Posed An Obvious Threat To The Fairness of Proceeding At The Time of Substitution**

712.  On September 3, 1985, the Municipal Court appointed the Public Defender of Los Angeles County to represent Petitioner.  (XIX CT 5465.)  After

that, the court relieved the public defender and privately retained counsel Joseph Gallegos appeared on Petitioner's behalf on October 9, 1985. (*Id.* at 5469.)

713. On October 22, 1985, Petitioner sought to substitute newly retained counsel Daniel Hernandez and Arturo Hernandez in place of Joseph Gallegos. (XVII CT 4981.) Prior to allowing the substitution, the court held an *in camera* hearing to question the Hernandezes on their qualifications which, as the colloquy revealed, were seriously deficient for a case of this magnitude. Daniel Hernandez had only been admitted to practice for three years and reported he had handled approximately 15-17 jury trials, only four of which involved charges of murder. He had never handled a death penalty case. He admitted that he had been held in contempt for not appearing on time and had, on one or two occasions, been fined $100. He stated that "the most notorious time [he] had been held in contempt," he had been put in jail with his client in the middle of a murder trial for failing to appear in another court in which his presence was required. (Sealed October 22, 1985, RT 3-14).

714. Arturo Hernandez was similarly lacking in experience. He had only been admitted to the Bar two years prior and had never tried a death penalty case. He too admitted that he had been held in contempt twice and fined $100, referring to his citations as a "ritual that we go through as young attorneys." (Sealed October 22, 1985, RT 15-17).

715. When open court resumed on October 22, 1985, the court noted that Petitioner's case was unusual and that he faced numerous serious charges and special circumstances that could lead to the "gravest of possible consequences." (XVII CT 4983-84.) Significantly, the court explicitly informed Petitioner that,

> neither Daniel Hernandez nor Arturo Hernandez have the legal
> experience which would qualify them to be appointed by this court
> to represent him in this case, nor do either attorney meet the

239

qualifications set forth by the Los Angeles County Bar for the

indigent criminal defense appointment panel.

(XVII CT 4984-85.)  The court specifically held that under the Bar plan, an

attorney must have practiced law for a minimum of ten years, have been counsel

of record in at least forty jury trials, thirty of which must have been felonies, and

have been counsel of record in at least three cases in which murder charges were

alleged and they must have tried at least one murder case to a jury.  (*Id.* at 4985.)

716.   The court further noted that both Daniel Hernandez and Arturo

Hernandez had been found in contempt of court on at least two occasions in Santa

Clara County where they ordinarily practiced and that contempt proceedings in

another case were pending against Daniel Hernandez.[50]  (*Id.* at 4986.)  Due to the

fact that Petitioner had been in custody and unable to interview various attorneys,

the court ordered counsel Daniel Hernandez and Arturo Hernandez to disclose to

Petitioner any complaints by clients, citations for contempt of court, or

allegations of ineffective assistance of counsel.  The court also offered the

assistance of independent counsel to help Petitioner review any information

provided by counsel.  (*Id.* at 4986-88.)  The court put the matter over for two

days.  (*Id.* at 4989.)

717.   At the next hearing on October 24, 1985, before the court ruled on

the substitution motion, attorney Gallegos explicitly informed the court that he

was "gravely concerned" about Petitioner's "present mental state, his ability to

choose his own attorney and other related matters concerning this trial," and

---

[50] Counsel Daniel Hernandez informed the court that he was counsel of
record in the trial court in *People v. Ortiz.*  (*See* Misc. Sealed (October 22, 1985
hearing) RT 8.)  In *People v. Ortiz*, 51 Cal. 3d at 980, the state court held that
both Daniel Hernandez and Arturo Hernandez should properly have been
discharged by the trial court as retained counsel on the defendant's motion based
on their incompetence in a pending murder case.

240

moved for a psychiatric examination of Petitioner as to his mental state pursuant to Penal Code § 1368. (XVII CT 4995). The court asked briefly of Petitioner regarding his education and potential conflicts of interest with respect to the retainer agreements with Daniel Hernandez and Arturo Hernandez. (XVII CT 5005-09.) The court denied Mr. Gallegos's request to suspend criminal proceedings under Penal Code § 1368. (*Id.* at 5003.)[51]

718. Turning to the motion for substitution, the court inquired whether counsel had disclosed "any facts, both positive and negative, which would bear...on your ability to represent" Mr. Ramirez. (XVII CT 5009). Counsel claimed this had been done. However, the court nothing to verify that either Daniel Hernandez or Arturo Hernandez disclosed anything to Petitioner as the court had previously ordered. (*See Id.*)

719. Despite having previously acknowledge that "it is the duty of the trial court to protect the defendant's right to a counsel who is effective" (XVII CT 4983), the court permitted substitution of unqualified Daniel Hernandez and Arturo Hernandez. (XVII CT 5009-10, 5014-15.) This was a violation of the court's duty to ensure that the uninformed choice of a defendant's counsel does not endanger the fairness of the proceeding. *Gonzalez-Lopez*, 548 U.S. at 151.

### 3. Counsel's Incompetent And Unethical Conduct Throughout The Trial Should Have Prompted Their Removal By The Trial Court

720. Later in the case, the judge hearing the motion for a change of venue called a special *in camera* session to comment on the incompetence of Petitioner's attorneys:

> Now, I am calling this hearing, Mr. Ramirez, to tell you that I
> reluctantly have to tell you that in my opinion your lawyers are

---

[51] *See infra* Section (B)(2) for a more detailed recitation of the facts surrounding the court's erroneous ruling on counsel's conflict of interest.

incompetent. Now, I have had this case for six months and I must
say that I am convinced that your lawyers are nice guys, good
company, maybe good fellows to spend an evening with. I am also
convinced that they are dedicated to your defense emotionally. But I
must tell you that in my opinion they are not competent to handle
your case. I don't think that they have sufficient experience in the
law. I don't think that they have the staffing, if you will, or
whatever, to do the job....

I am telling you now... I don't think they know the law well enough, I
don't think they know the rules of evidence well enough, they are not
ready to present the evidence and push it through.... I am just telling you
this because I have no personal axe to grind at all, I simply want to see that
whatever happens in this case is done right and you get your rights
protected, that whatever conclusion is reached is right. And I am telling
you now that your rights are not being protected.

(Sealed January 6, 1987, 16-A RT 733-37.) Despite the court's clear
acknowledgment that Petitioner's rights were not being protected, the court
declined to remove counsel from the case.

721. Once trial resumed, the court repeatedly failed to protect Petitioner's
Sixth Amendment right to counsel despite being made aware of counsel's lack of
qualifications, experience, knowledge, and professionalism with respect to
representation of Petitioner in a capital murder trial.

722. At various times, Arturo Hernandez abandoned Petitioner by failing
to appear in court for trial proceedings.[52] For example, on October 3, 1988, the

_____

[52] In *People v. Ortiz*, 51 Cal. 3d at 981, the California Supreme Court
noted that both Daniel Hernandez and Arturo Hernandez failed to appear at Ortiz

trial court sent a letter to Arturo Hernandez regarding his absence from trial. (XXVIII CT 8100.) On October 18, 1988, the court issued a body attachment for Arturo Hernandez. (*Id.* at 8111.) However, after conducting a hearing on October 25, 1988, the court decided not to require Arturo Hernandez to attend all of the trial proceedings. (*See* I Supp. CT VIII 2133-2215; XXVIII CT 8114.) Arturo Hernandez was absent from many trial proceedings critical to Petitioner's defense, including jury selection, the prosecution's presentation of its entire case-in-chief, and jury instruction conferences.[53] The trial court subsequently ordered Arturo Hernandez to maintain telephone contact with the court during trial. (*See* 173 RT 20186.)

723. Owing to the four-month absence of Arturo Hernandez between September 26, 1988, through January 23, 1989, the court permitted Daniel Hernandez, who had no previous capital litigation experience, to conduct *voir dire*, including *Hovey*[54] examination. (*See* XXVIII CT 8087-88, 8094, 8098, 8101-02, 8106-12, 8115-19, 8121, 8123-26, 8181-87, 8198, 8203-04, 8206-08, 8259-63, 8273, 8284, 8286, 8294-95.)

724. Other instances of counsel's ineffective assistance of counsel are pervasive in the record. Daniel Hernandez and Arturo Hernandez failed on numerous occasions to abide by court orders and failed to appear at trial. For example, during the prosecutor's guilt phase closing argument on July 13, 1989, both Daniel Hernandez and Arturo Hernandez were absent from trial and the

———————————

trial.

[53] *See* XXVIII CT 8087-88, 8094, 8098, 8101-02, 8106-19, 8121-26, 8181-87, 8198-99, 8203-04, 8206-08, 8259-63, 8273, 8284, 8286, 8294-95, 8299, 8315, 8321, 8324, 8327-28, 8331-33, 8336-38, 8345, 8353, 8360, 8369-70, 8379-81, 8383; *and* XXIX CT 8384-85, 8391, 8393-97, 8399, 8408, 8412, 8419, 8426, 8429, 8434-39, 8442-47, 8449-51, 8462, 8476-79.

[54] *Hovey v. Superior Court*, 28 Cal. 3d at 80.

court was forced to recess in their absence.  The trial court issued a body attachment for Daniel Hernandez.  (XXIX CT 8484.)  On July 14, 1989, the court quashed the attachment and ordered Daniel Hernandez to be present at all hearings.  (*Id*. at 8487.)

725.   Arturo Hernandez was again absent from closing argument in the guilt trial on July 17, 1989.  The court issued a body attachment for Arturo Hernandez and ordered it held to August 18, 1989.  (XXIX CT 8490, 8628-29, 8632.)

726.   On August 18, 1989, the trial court conducted a contempt hearing on Arturo Hernandez and specifically found that Arturo Hernandez had failed to maintain telephonic contact with the court as previously ordered.  Arturo Hernandez admitted that he had traveled to Europe on a honeymoon during trial after informing the court he was in Mexico for his brother's funeral.  (214 RT 24609-11.)  The court explicitly found Arturo Hernandez's conduct contemptuous and that he had abandoned Petitioner.  (*Id*. at 24611-12.)

727.   Arturo Hernandez offered a no contest plea and apologized to the court.  (214 RT 24613-14.)  After considering Arturo Hernandez's statement, the trial court found Arturo Hernandez in contempt for failing "to notify the court by phone each morning," but withdrew its finding that counsel had abandoned Petitioner.[55]  (*Id*. at 24614.)

728.   On September 14, 1989, the trial court again found Arturo Hernandez in contempt for failing to maintain contact with the court.  (215 RT 24690-91.)  The court sentenced Arturo Hernandez to serve twenty-four days

_____

[55]  The court ordered Arturo Hernandez to pay a fine of $100.  (214 RT 24615.)

244

in jail or pay a $2,400 fine to be paid on or before September 29, 1989.  The court

ordered Arturo Hernandez to serve one day in jail.[56]  (*Id*. at 24698-700.)

729.   On February 21, 1989, during the prosecution's case in chief, Daniel

Hernandez informed the court by telephone that he was ill and would be absent

from trial for one week.  Hernandez sent his law clerk, Richard Salinas, to appear

at trial on Petitioner's behalf.  (152 RT 17574.)

730.   On March 1, 1989, the court held a hearing concerning Daniel

Hernandez's health.  Daniel Hernandez submitted a letter from his physician

stating that he suffered from nervous exhaustion and would require an absence

from trial of four to six weeks to recuperate.  (153 RT 17604-05.)  Daniel

Hernandez explained that he was unable adequately to represent Petitioner –

could not "carry the load" – and needed yet another counsel to assist "in this

enormous trial."  (153 RT 17610-11.)  The court found no legal cause to delay the

trial.  (*Id.* at RT 17606, 17614-16.)

731.   On September 27, 1989, the trial court permitted Petitioner to waive

presentation of any mitigation evidence at the penalty trial based on Daniel

Hernandez's representation that "we have made a decision as a defense team and

decided [not to put on any evidence]."  (217 RT 24775.)

732.   Counsel's lack of qualifications, failures to appear, and

incompetence were obvious to the trial judge throughout the proceedings.

Furthermore, it is clear that counsel's deficits endangered the fairness of the

proceedings, and diminished the integrity of the legal profession.  The trial court

erred in allowing Petitioner to stand trial on capital charges with such ineffective

representation.

---

[56]  Arturo Hernandez paid the fine of $2,400 on September 29, 1989.
(XXX CT 8903.)

245

**B.    The Trial Court Erred in Allowing Petitioner to Be Represented By Counsel Who Suffered an Obvious Conflict of Interest**

### 1.    A Defendant Cannot Insist on Being Represented By An Attorney Who Suffers from a Conflict of Interest

733.    When counsel suffers from a conflict of interest, especially one arising out of the joint representation, the fairness of the trial process is undermined. *Holloway v. Arkansas*, 435 U.S. 475, 482, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978).  For that reason, trial courts "confronted with and altered to possible conflicts of interest must take adequate steps to ascertain whether the conflict warrants separate counsel." *Id.* at 160.  Where an actual conflict of interest exists, "there can be no doubt that it may decline a proffer of a waiver" and insist on separate representation." *Id.* at 162.  This wide latitude to insist on conflict-free counsel is allowed "not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." *Wheat*, 486 U.S. at 163; *see also United States v. Gonzalez-Lopez*, 548 U.S. at 152 (defendant has no right to be represented by an attorney with a conflict of interest.)

734.    Likewise, the Supreme Court has held "whatever the full extent of the Sixth Amendment's protection of one's right to retain counsel of his choosing, that protection does not go beyond the individual's right to spend his own money to obtain the advice and assistance of ... counsel." *Walters v. National Assn. of Radiation Survivors*, 473 U.S. 305, 370, 105 S. Ct. 3180, 3215, 87 L. Ed. 2d 220 (1985) (Stevens, J., dissenting).  That is, "a defendant has no Sixth Amendment right to spend another person's money for services rendered by an attorney, even if those funds are the only way that that defendant will be able to retain the attorney of his choice." *Caplin & Drysdale, Charted v. United States*, 491 U.S. 617, 626, 109 S. Ct. 2646, 105 L. Ed. 2d 528 (1989).

246

735. The California Supreme Court's holding that Petitioner had a right to insist on lawyers who suffered from a conflict of interest, and who were not being paid by him, is contrary to clearly established Supreme Court law.

## 2. Counsel's Conflict of Interest Was Apparent At The Time of Substitution

736. On October 22, 1985, Petitioner appeared in a closed *in camera* hearing with Mr. Gallegos, Daniel and Arturo Hernandez. Petitioner indicated that he wished to substitute the Hernandezes as counsel. Daniel Hernandez informed the court that he had been retained by Petitioner and his family, and that an official contract had been prepared and signed by the parties. When asked if he had been paid for the representation, Daniel Hernandez said he was not comfortable discussing that information with the court. (Sealed October 22, 1985 RT 2.)

737. When the court asked trial counsel for assurances that they had the financial resources to litigate the case, Arturo Hernandez stated

> the financial... area in this case has no bearing on my duties and my abilities to appear in this case. I think that once we undertake the case, we have the ethical duty to the court and to our client primarily to assist him and give him effective assistance of counsel, as is his constitutional right. I feel awkward in being asked that type of question. Of course I'm going to be available for this court.

(Sealed October 22, 1985 RT 20.) He further stated "we have made arrangements for associate counsel... [for] people to assist and all the resources are there. I don't see any problems with that at all, no matter how long it takes, if it takes, we are anticipating at least two years." (*Id.*)

738. Once the prosecution was excused from the room, Daniel Hernandez informed the court that they had agreements with both Mr. Ramirez and his family and that the family was responsible for payment of Petitioner's defense.

247

When asked what the family's source was, Daniel Hernandez replied "I really can't comment on that.  I am really not necessarily aware of that and I am not necessarily anxious to discuss their finances at all."  (Sealed October 22, 1985 hearing, RT 30.)  The court noted that Barraza has been on television soliciting attorneys to take the case based upon fee arrangements from television, movie and books rights.  The trial court stated "if there is any thought of that being involved, it is necessary for [the court] to know because there are potential conflicts...  which Mr. Ramirez can waive, but the court must be aware of them and Mr. Ramirez must be aware of them."  (*Id.* at 31.)  Daniel Hernandez replied

> It is not really any of our business to know anything of where the
> family gets its money....We have no interest.  We have no contracts
> that include those type of arrangements, we have had no
> conversations or discussions with anyone concerning those type of
> arrangements...  It would be our ethical responsibility in our
> perspective, in our eyes, to inform the court of all the developments
> in those directions.

(*Id.*)

739.   At a hearing later that day, the court stated that it was "concerned about any agreement regarding any rights, book rights, life story rights...even though that agreement may be between Mr. Ramirez' family and Barazza."  Arturo Hernandez clarified that he never said such a thing regarding Barraza, repeating again that "we have no knowledge, whatsoever, of any [book or movie deal] negotiations."  (*Id.* at 37.)

740.   After the court noted that television reports indicate that the family has very limited financial resources available to them, the court sought asked counsel "knowing that you may not be receiving funds or insufficient funds (*sic*) to voer this type of case in the future, are you still willing to undertake this case,

knowing that you will not be appointed by the court?" (*Id.* at 38). In a statement that would follow him for the rest of the case, Arturo Hernandez replied

> [W]e undertake this case knowingly and fully conscious of the possibility that this case might extend beyond the means of the family at this point. However, we are willing to undertake the case under those circumstances anyway, and we are fully aware of the tremendous amount of work that we are undertaking, but we have no problems with that.... Although we are retained in this case, if that case comes about, we are willing to do the rest of it *pro bono* anyway.

(*Id.*)

741. Upon further questioning, it was revealed that Petitioner had not signed a retainer agreement with the Hernandezes; rather, he had signed substitution of counsel forms and it was Petitioner's family who had signed a written agreement. (Sealed October 22, 1985 RT 40). The court ultimately ordered the Hernandezes to reduce Petitioner's retainer agreement to writing so that an independent attorney could review it. The motion to substitute counsel was put over for two days. (XVII CT 4984-88).

742. On October 24, 1985, after denying attorney Gallegos's motion for a psychiatric evaluation of Petitioner, the trial court advised Mr. Ramirez that "your attorneys have a contract with you and with your family, those two contracts may at some point be in conflict... Do you understand that possibility does exists?" Petitioner replied "it does exist but I feel there will be no conflict." (XVII CT 5006).

743. The court noted that the Hernandezes had previously called the family their "client" and advised counsel that Petitioner was to have "prime consideration." Counsel were further instructed to inform the court "if at any time there is the slightest possibility that a potential conflict might exist." Arturo

Hernandez assured the court that he understood the court's directive and asserted that they did not anticipate a conflict of interest, noting that they used their standard retainer agreement which had been used in many cases. (XVII CT 5007-5008).

744.   Thus it was clear at the time of substitution that Mr. Ramirez had "chosen" counsel to which he had no right, *i.e.* counsel he could not pay for himself. *Caplin & Drysdale, Charted v. United States*, 491 U.S. at 626. Furthermore, it was clear that Arturo and Daniel Hernandez had joint loyalty to both of their clients: Petitioner and the Ramirez family. Because of this, Petitioner had no right to insist on being represented by the Hernandezes. The court could have, and should have, required that Petitioner and his family be represented by separate counsel. *Wheat*, 486 U.S. at 162. The California Supreme Court's holding that the trial court was bound to honor Petitioner's counsel of choice is contrary to clearly established federal law.

### 3.   Counsel's Repeated Claims of Financial Hardship Should Have Prompted Removal By The Trial Court

745.   Even if the trial court was not adequately put on notice of counsel's conflict of interest at the time of substitution, the adverse affect on Petitioner's representation became clear later in the proceeding. Counsel repeatedly claimed that they could not litigate the case properly or in a timely manner because their third-party fee arrangement had resulted in the case being underfunded. On several occasions, the court itself noted counsel's ineffectiveness.

746.   Even before trial began, it became apparent that counsel's lack of funding was causing unwarranted delay. Early on, Arturo Hernandez explained that one of the reasons he had not filed a §1538.5 motion (suppression) was because "Mr. Ramirez is an indigent defendant.... he doesn't have the means or the resources, as the People do, to maintain a pace that is required by the People." (19 RT 907). Failure to file timely motions became routine, causing the court to

250

chastize trial counsel for their tardiness, (*See*, *e.g.*, 26 RT 1855) and for raising financial matters as grounds for delaying the case. (*See*, *e.g.*, 41 RT 2933-40; 43 RT 3006-08.) The Hernandezes were informed that "financial reasons are not reason really (*sic*) to continue this case. You owe [Mr. Ramirez] a duty of at least warm zeal on this case, and of course, as officers of the court—this court, owe prompt attention to this case." (*Id.* at 3007.)

747. By May 1987, the Hernandezes had to close down their local offices, telling the court "we're broke. We had to move home [to San Jose]." (Sealed RT May 4, 1987, 30A RT 2199.) Even the court's appointment of another attorney, Michael Carney, to assist in writing motions, did not improve the situation because Daniel and Arturo Hernandez were always in San Jose working on other cases and were unable to confer on Petitioner's case. (Sealed September 23, 1987, 33A RT 2331).

748. During an unsuccessful attempt to get appointed by the court, Arturo Hernandez explained the shortage of funding by saying that "the case originally seemed something that was totally indefensible.... [now] we find the case has turned out to be very defensible..... the monies we've agreed to with the family are totally inadequate" to defend the case. (Sealed September 29, 1987 33B RT 2346.) With trial just one month way, Arturo Hernandez claimed that the Ramirez family's inability to pay would cause them "to give less than adequate representation and render ineffective assistance of counsel to our client, because we have to work and try to survive and maintain some sort of practice." (*Id.* at 2358.)

749. After trial began, Arturo Hernandez simply stopped appearing in court. During Arturo Hernandez's four-month absence between September 26, 1988, through January 23, 1989, Daniel Hernandez, who had no previous capital litigation experience, conducted *voir dire*, including *Hovey* examination. (*See* XXVIII CT 8087-88, 8094, 8098, 8101-02, 8106-12, 8115-19, 8121, 8123-26,

251

8181-87, 8198, 8203-04, 8206-08, 8259-63, 8273, 8284, 8286, 8294-95.)  Arturo Hernandez was also absent during other proceedings critical to Petitioner's defense, including the prosecution's entire case-in-chief, and jury instruction conferences.[57]

750.   Eventually, he was only maintaining contact with the court by telephone, and even then, he often failed to do so.  (*See* 173 RT 20186).  At one point, Daniel Hernandez could not locate Arturo through relatives, and did not know whether he was even in the country.  (Sealed October 3, 1988 Vol. 96A RT 10144).  "It's crippling to me to have someone on board as co-counsel who can't function . . . it is almost better not to have one," Daniel Hernandez told the court in his request to relieve Arturo from the case.  (*Id.* at 10153.)

751.   In January 1989, Daniel Hernandez attempted to force the court into giving him county funding, claiming that his representation of Petitioner would suffer without additional money for the defense.  During an *in camera* hearing, the court accused him of extortion:

> Mr. Hernandez, when you tell the court that if you don't get
> appointed you are going to withdraw, or if you don't get appointed
> you are going to do less than diligent work on this case, as you
> appear to state in these motions, that is frightening to me because
> that is extortion.  And I will be honest with you, this court is not
> going to be extorted.

(Sealed January 20, 1989,  140A RT 16005.)

---

[57] *See* XXVIII CT 8087-88, 8094, 8098, 8101-02, 8106-13, 8115-19, 8121-26, 8181-87, 8198-99, 8203-04, 8206-08, 8259-63, 8273, 8284, 8286, 8294-95, 8299, 8315, 8321, 8324, 8327-28, 8331-33, 8336-39, 8341, 8353, 8360, 8369-70, 8379-81, 8383; XXIX CT 8384-85, 8391, 8393-97, 8399, 8408, 8412, 8419, 8426, 8429, 8434-39, 8442-47, 8449-51, 8462, 8476-79.

752.   The court also correctly discerned that counsel had previously lied at the time of their substitution, noting, "you said, in effect, that you misrepresented to Judge Soper your [financial] position for matters of expediency." (*Id.* at 16006.)  The court denied Daniel Hernandez's request for appointment and stated "this kind of representation from a member of the bar is something I simply never even contemplated." (*Id.* at 16007.)

753.   When that tactic did not work, Daniel Hernandez claimed that the stress of defending the case alone caused his health to suffer such that he could not attend trial.  On February 21, 1989, Daniel Hernandez failed to appear.  He telephoned the court to report that he was ill and would be absent for one week.  In a letter to the court, his physician stated:  "I do not feel he is presently capable of functioning effectively as a trial attorney.  My estimate of additional time required to recuperate would be four to six weeks." (Ex. 11, Letter from John Pace, M.D., regarding patient Daniel Hernandez, Esq.,  In a hearing on March 1, 1989, Daniel Hernandez explained that he was unable adequately to represent Petitioner – could not "carry the load" – and needed yet another counsel to assist "in this enormous trial." (153 RT 17610-11.)  The court found no legal cause to delay the trial. (*Id.* RT 17606, 17614-16.)

754.   The lack of funding also adversely affected counsel's ability to present defense witnesses.  In June 1989, Daniel Hernandez claimed that he could not comply with the court's schedule regarding defense witnesses because he had spent all of his money.  Later, the court questioned how delaying the testimony would change the situation, telling Daniel Herndandez "you are going to be in the same boat, aren't you?  You are dead broke now.  You are not eating." (Sealed RT June 26, 1989 199A RT 23267).  Hernandez replied, "well I'm eating but I'm not paying rent." (*Id.*)  When counsel could not get a continuance of the testimony, Daniel Hernandez flatly told the court "I can't do it." (*Id.* at 23269.)  The then court accused Hernandez of attempting to create reversible error, to

which counsel replied "I've been going without anything for myself for four years and now I have to eat my pride again and say I'm broke, and even then you shove it down my throat." (*Id.* at 23270.)

755. The trial court's failure to remove counsel once the effect of their conflict of interest became clear violated Petitioner's constitutional rights, as well as the obligation of judges to ensure the fairness of criminal proceedings. United States Supreme Court law allows trial courts to address conflicts of interest whenever they become apparent, even in the late stages of a case. *See Wood v. Georgia*, 450 U.S. 261, 271, 101 S. Ct. 1097, 67 L. Ed. 2d 220 (1981) (remanding for a hearing on counsel's conflict of interest, even after the case had reached the Supreme Court on a constitutional issue.) The California Supreme Court's holding that the trial court was bound to honor Petitioner's choice of counsel throughout the proceeding was contrary to clearly established Supreme Court law.

756. The foregoing violations of Petitioner's constitutional rights, taken singly or in combination with the other errors alleged in the Petition, constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Petition, so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violations of Petitioner's rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622, 637-38.

**CLAIM 6:**

## THE TRIAL COURT'S REFUSAL TO GRANT RAMIREZ'S MOTION FOR A CHANGE OF VENUE AND TRIAL COUNSEL'S FAILURE TO PRESENT RAMIREZ'S MOTION FOR A CHANGE OF VENUE COMPETENTLY VIOLATED MR. RAMIREZ'S CONSTITUTIONAL RIGHTS

757. Exhaustion of the claim: This claim was fairly presented to the California Supreme Court in Section IV of the Opening Brief and in Section IX of the June 2004 petition for writ of habeas corpus, although it includes additional factual allegations. Petitioner will present the claim with the additional factual allegations to the California Supreme Court in an exhaustion petition he will file no later than March 17, 2009.

758. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

759. Those facts and allegations set forth in the petition, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

760. Petitioner's alleged crimes, arrest, and trial constituted one of the most notorious criminal cases in Los Angeles history. By the time Petitioner was arrested as the alleged "Night Stalker," the Los Angeles public was in a state of hysteria. The mass-panic in Los Angeles, the official view of Petitioner as guilty of the murders unless proven innocent, and the public sentiment declaring victory over the Night Stalker, were reported in hundreds of articles and television broadcasts throughout Petitioner's pre-trial and trial proceedings. The unprecedented publicity surrounding Petitioner and the Night Stalker phenomenon served to heighten the existing anxiety, fear, and terror collectively felt by Los Angeles County.

761. Petitioner's counsel filed a motion for change of venue on July 21, 1986. (XXI CT 6263-82.) On November 3, 1986, the court began the change of venue hearing. The prosecution filed its opposition on July 24, 1986. (*Id.*, 6313-17.) The motion was heard on November 17 and 26, 1986, December 1, 2, 8, 9, 10, 12, and 16, 1986, and January 6 and 9, 1987. (*See* XXII CT 6439, 6463, 6485-6, 6490-91, 6494, 6530, 6538, 6547.) The trial court denied the motion on January 9, 1987, adding, "If I err, I am sure somebody will tell me." (17 RT 856.)

762. Counsel spent five days presenting testimony from various expert and lay witnesses who would demonstrate personal knowledge of the panic created in the Los Angeles community because of the "Night Stalker" phenomenon. The presentation included the following witnesses:

    a.    Defense expert Dr. Paul Strand, who testified on December 8 and 10, 1986. Dr. Strand testified regarding a telephone survey he conducted of a random sample of the jury-eligible population of Los Angeles County who resided within a twenty-mile radius of the courthouse. (*See* 11 RT 317-23.) Of those who responded, 94.3% had heard of Petitioner's case, and 52.7% had specific recollections. (13 RT 440-45.) 51.7% believed Petitioner was responsible for the Night Stalker murders. (*Id.* at 455.) Of those surveyed, only one said Petitioner was not responsible for the killings. Only 34.7% of the respondents said they would need more information to know if Petitioner was responsible for the murders. (*Id.*)

    b.    Patrick Kelly testified that sales of handguns and ammunition in the gun shop where he worked in Alhambra, Los Angeles County tripled starting about August 15, 1985. (14 RT

256

634-38.)  Many of the customers coming into the store were women and couples saying they were buying guns because of fear of the Night Stalker.  (*Id*. at 639-42.)  Gun sales dropped off immediately following Petitioner's arrest.  (*Id*. at 640.)

c.  Captain Joseph Santoro, of the Monterey Park Police Department, testified about the fears of residents.  (*Id*. at 622.)  During the summer of 1985, the volunteer Neighborhood Watch program about doubled.  (*Id*. at 613-14.)  The police department set up a night watch program involving "block captains, and there was about a hundred and fifty-seven of them" who set up all-night citizen vigils.  (*Id*. at 623.)  The program included giving out free dead bolts, and there was even "a training program on how to dial 911 in the dark, so that they would not have to make their position known."  (*Id*. at 619, 626.)

d.  Los Angeles Police Officer, George Willoth, testified that in the San Fernando Valley, an area quite far from where the Night Stalker crimes allegedly occured, calls on the night shift during August 1985 went up from twenty to thirty per night, "probably to 80 to a hundred calls a night, easy."  (15 RT 658, 661.)  "Most citizens were concerned about their safety in their residence and what their rights were and how to protect themselves . . . .  They were in fear."  (*Id*. at 665.)

e.  Defense expert psychiatrist Dr. Paul Blair testified regarding the general sense of panic in the metropolitan Los Angeles area.  (14 RT 568, 574.)  Although Dr. Blair's direct observations were in Orange County, he opined that fear and tension would be greater geographically closer to the

257

incidents, so would likely be greater in Los Angeles than in Orange County. (*Id*. at 583.) In Dr. Blair's opinion, "[P]eople were very afraid . . . . [S]ome people were semi-panicky. Other newspaper articles were reporting that people were buying weapons in large numbers for the purpose of self-protection." (*Id*. at 574.)

     f.     Dr. Blair testified about the special role that the randomness of the murders and assaults play in increasing that fear: "The concept of randomness does cause an increased amount of fear . . . like a fear of the unknown, a fear of the dark[.] (*Id*.) "The fact that someone was getting into these homes on a regular basis without a whole lot of knowledge about who was doing this or where this person was going to come to next, did play a role [in the fear generated by the Night Stalker.]" (*Id*. at 576.)

     763.   On November 26 and December 1, 1986, defense counsel played five video-tapes: four from "Channel 11" local news and one from the "NBC" local affiliate in open court. (9 RT 249-275.) Throughout the presentation of the tapes, however, the court repeated its sentiment that it did not "feel that it would be productive to sit through all of these tapes." (*Id*. at 256.) After continuing to admonish trial counsel to hurry through the showing of the video-tapes, the court finally halted the video-tape viewing, citing "a responsibility to control the amount of evidence to come in on any subject. This is cumulative." (*Id*. at 270.) Along with the Channel 11 video, trial counsel submitted scripts of the introductory anchor-person's comments during the broadcasts. Eventually, all of the video-cassettes and Channel 11 scripts were admitted into evidence. (16 RT 767, 771, 778-80.)

764. In addition to broadcast news-tapes, the Court admitted into evidence various articles from the *La Opinion, L.A. Times, Orange County Register, Daily News, Pacific Citizen,* and *Dong-A*; Dr. Strand's survey; orders issued by the Los Angeles Board of Supervisors concerning rewards offered in the Night Stalker case; and a Los Angeles Herald Examiner circulation report. (*See Id*. at 767, 770, 773, 776, 778-81, 784, 786-89.)

765. Petitioner's Counsel was unsuccessful in admitting numerous articles from the *L.A. Times*, *San Gabriel Valley Tribune*, *Herald Examiner*, *Press Telegram*, *Noticias Del Mundo, Daily Journal, Pomona Progress Bulletin, Palisidian Post,* the *UPI News Wire*, *Pasadena Star News*, *Arcadia Tribune*, *Rafu Shimpu*, *Torrance Daily Breeze*, *Monrovia news Post, Whittier Daily News, Duartean Dispatch*, *Glendale News Press*, and the *Eagle Rock Sentinel*. (*See Id*. at 728, 744, 750, 754, 756-61, 764-65.)

   a. Because of counsel's failure to authenticate or lay a foundation for the articles, Petitioner requested that the trial court take judicial notice of L.A. Times articles regarding "the general feeling in the community of fear and of apprehension of the so-called Night Stalker suspect." (*Id*. at 710-11.) Arguing that the defense was in effect asking the court to rely upon hearsay under the guise of "judicial notice," the prosecutor objected on those grounds and the court sustained the objection. (*Id*.) The court stated that "to the extent that you have made a request that I infer from these articles and news media things that the public agreed or responded to these articles or items, that request is denied." (*Id*. at 714.) The court ruled that because Petitioner's counsel failed to properly lay foundation for, and authenticate the records, it excluded the news reports. (*See Id*. at 742-54 (discussion and ruling.))

b.     The trial court dismissed the remaining papers similarly for
lack of authentication and foundation.  The court repeatedly
asserted, however, that it was aware of the evidence in the
articles and of their publication:

(1)     "I do notice . . . that I have seen some of these articles
in the *Times* . . . and I will conclude that they have
basically been published because I have seen some of
them and I have read most of them."  (*Id*. at 754.)

(2)     "Again, I have deny their admission.  However, I am
aware of the fact there were numerous articles in the
*Herald Examiner* and that there was full coverage of
this case by that newspaper.  I don't read the *Herald*
with the regularity that I do the *Times*, but I do read it
on occasion, and so I am aware that it did give full
coverage as a newspaper in this community."  (*Id*. at
756.)

(3)     I am going to deny admission of [*Noticia Del Mundo*].
However, I will note that it does appear to be Spanish
language reporting of the case and there is an English
translation here."  (*Id*. at 758.)

(4)     "But again I note that there is evidence that [the
*Pomona Progress Bulletin*] have covered the incidents."
(*Id*. at 759.)

(5)     It will be sustained, but the court will again note the
coverage by the *Palisidian Post*."  (*Id*. at 760.)

(6)      "But again, gentlemen, I do have knowledge and I will
accept the principle that all of the -- virtually all of the
local news media, including the small outlet media,

local newspapers, ethnic-oriented publications, various language publications, have covered this case, if that is the point you are trying to make." (*Id*. at 765.)

766. Following argument by counsel, the trial court denied the motion for change of venue on January 9, 1987. The court was "not convinced by the survey that the survey shows that the pretrial publicity in this case has created an atmosphere where [Petitioner] cannot receive a fair trial." (17 RT 853.) The court found there was not a showing of a reasonable likelihood that Petitioner could not have a fair trial in view of the size and diversity of the jury pool. (*Id*. at 854-55.)

767. The court conceded, however, that "I would characterize the news coverage of this case as saturation, as much as they possibly can give. And I would imagine that the reporters' editors have told them 'Go get everything you can and cover the case every day.'" (*Id*. at 806.) The trial court stressed: "I don't think it is possible that much more publicity could have been given to this case. I can't imagine how." (*Id*. at 846.)

768. In denying Petitioner's motion for change of venue, the court relied heavily on the size of potential jury pool in Los Angeles County: "You are talking about what I think is the largest jury pool of any jurisdiction in the country." (*Id*. at 854.) "[T]his county is so large and the people here are so sophisticated and so diverse that I just don't think you can say that you can't have a fair trial in this county." (*Id*. at 855.) "You could call in 2,000 jurors to talk to them on voir dire in this case, and there is no place else that you can do that.'" (*Id*. at 856.)

**A.     The Trial Court Erred in Failing to Grant a Change of Venue**

769.    The presumption of innocence and an impartial tribunal are essential aspects of a fair trial. *Irwin v. Dowd*, 366 U.S. 717, 722, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961) ("In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process.") (citing *In re Oliver*, 333 U.S. 257, 68 S. Ct. 499, 92 L. Ed. 682 (1948)). Pretrial publicity poses a grave threat to a fair trial by flipping the presumption of innocence and imbedding bias into the jury pool. A recent study concluded that "subjects exposed to negative [pretrial publicity] were significantly more likely to judge the defendant guilty compared to subjects exposed to less or no [pretrial publicity]." (Ex. 75, E. Bronson Dec., at ¶ 20.) Pretrial publicity is so dangerous because it creates a story or narrative that becomes the prism through which all the facts, including evidence at trial, is viewed. (*Id.*, ¶¶ 21-23.) This is an even greater problem where, as in Petitioner's case, there is a significant delay until trial (in this case, a nearly three-year delay.) With delay, peoples' memories tend to become distorted, and they tend to be unable to recall events or facts that are inconsistent with the storyline they have been presented; molding facts they do have to be consistent with that storyline. (*Id.*, ¶¶ 24-25.) This is especially troubling where, as in Petitioner's case, errors during voir dire uncovering this hidden bias.

770.    Federal law recognizes that a change of venue is required when the defendant shows either "presumed prejudice" or "actual prejudice" resulting from pretrial publicity. *Murphy v. Florida*, 421 U.S. 794, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975). "Presumed prejudice" appears in rare cases where the community was saturated with media publicity about the case. *Ainsworth v. Calderon*, 138 F.3d 787, 795 (9th Cir. 1998). A Petitioner has shown presumed prejudice where (1) there is a "barrage of inflammatory publicity immediately prior to trial,

amounting to a huge . . . wave of public passion;" (2) "news accounts were primarily factual because such accounts tend to be less inflammatory than editorials or cartoons;" and (3) "media accounts contained inflammatory or prejudicial material not admissible at trial." *Daniels v. Woodford*, 428 F.3d 1181, 1211 (9th Cir. 2005) (internal citations omitted).

771. "Actual prejudice" is established when the record of voir dire shows the jurors exhibited actual partiality or hostility that could not be laid aside. *Ainsworth*, 138 F.3d at 795. This type of prejudice may be shown by the seating of a juror who had preconceived opinions about guilt that could not be set aside (*id*. at 796), or by the fact that an inordinate number of panelists admitted to disqualifying prejudicial opinions during voir dire. *Id.*

772. In California, a "denial of a motion for change of venue will be upheld on appeal unless the record shows both that it was reasonably likely that a fair trial could not be had at the time the motion was made" and that it was "reasonably likely a fair trial was in fact had." *People v. Massie*, 19 Cal. 4th 550, 578, 967 P.2d 29, 79 Cal. Rptr. 2d 816 (1998). The California Supreme Court has not reversed a single appeal based on venue since 1989, a string of 53 consecutive cases. (Ex. 75, E. Bronson Dec., ¶ 28.) The factors California courts use to assess the necessity of a change of venue are the (1) nature and extent of the publicity, (2) nature and gravity of the crime, (3) status of the victim(s) in the community, (4) status of the defendant in the community, and (5) the size and nature of the community. *See People v. Massie*, 19 Cal. 4th at 578; *Williams v. Superior Court*, 34 Cal. 3d 584, 588, 668 P.2d 799, 194 Cal. Rptr. 492 (1983).

773. California's five-factor inquiry combined with prejudice requirement places a higher burden on a petitioner to prove the necessity of a change of venue than the federal constitutional standard. The five California requirements for a necessary change of venue inform and subsume the three federal factors for finding presumed prejudice in the federal standard. Petitioner is entitled to de

novo review as the California Supreme Court and trial court unreasonably applied clearly established federal law. Petitioner is also entitled to de novo review for the ineffective assitance of counsel claims and to the extent the California Supreme Court did not address the merits of Petitioner's federal claim.

774. When assessing these factors, California courts rely on three types of evidence: (1) "qualified public opinion surveys[,]" (2) "opinion testimony offered by individuals," or (3) the court's "own evaluation of the nature, frequency, and timing of the material involved [i.e. a content analysis of the media]." *Main v. Superior Court of Mendocino County*, 68 Cal. 2d 375, 383, 438 P.2d 372, 66 Cal. Rptr. 724 (1968) (citing the American Bar Association Project on Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press (1966)).

775. With all three types of evidence before it, Petitioner's trial court erred in violation of Petitioner's Fifth, Sixth, Eighth, and Fourteenth Amendment rights by denying a change of venue. As shown below, the trial court's ruling ran afoul of both the federal and state factors considered when requiring a change of venue.

### 1. Extent of Publicity

776. The extent of publicity is the first part of the "Nature and Extent" category of California's venue analysis. It is also relevant in considering the federal standard to find a "barrage" of publicity "amounting . . . to a huge wave of public passion." *Ainsworth*, 138 F.3d at 795.

777. The extent of coverage in Petitioner's case was extraordinary and unprecedented. As the trial court conceded, media coverage reached "saturation" levels. (17 RT 806.) The trial court repeatedly made a record that it was considering the vast number of articles, despite the fact counsel failed to admit the actual articles themselves. (*See Infra* at ¶ 6.b.)

778.    Indeed, Petitioner's current counsel were able to collect 903 articles written about the case from the beginning of the Night Stalker murders through September 1, 1989.  (Ex. 75, E. Bronson Dec., ¶ 38.)  This included 211 articles from the *L.A. Times*, 197 articles from the *Los Angeles Herald Examiner*, 120 articles from the *Los Angeles Daily News*, 113 articles from the *La Opinion*, 108 articles from the *Los Angeles Daily Breeze*, and 154 articles from other smaller local newspapers.  (*Id*.)  This number does not include additional articles submitted to the trial court from newspapers with less circulation.  (*See* 16 RT 779.)  Further, among just three major Los Angeles newspapers, 167 articles were written about Petitioner *during* his trial.  (Ex. 78, Articles during trial.)

779.    The enormity of these numbers become clear when comparing it to other cases.  Dr. Edward Bronson, a social scientist and venue expert, has testified in one-hundred twenty trial cases over the course of twenty-five years.  Additionally, he has recommended against a need for a change of venue in over one hundred other cases.  In the one-hundred and twenty cases Dr. Bronson has testified in, the median number of articles was 91.5.  (Ex. 75, E. Bronson Dec., ¶ 40.)  Among Dr. Bronson's cases with fewer than ninety-two articles where the court reached the venue issue (fifty-five cases), the court granted a change of venue 49.1% of the time.  (*Id*.)

780.    Dr. Bronson has worked on such high-profile cases as the Oklahoma City Bombing cases (both the separate federal and state proceedings), the Enron case (defendants Skilling and Lay), and the cases against the Allstate Insurance Company arising from Hurricane Katrina.  Of all of the 120 cases Dr. Bronson has been involved with, Petitioner's case "is approximately 10 times as great as the median number and one of the very highest I have ever dealt with." (*Id*.)

781.    Dr. Bronson noted that out of the ninety-two California venue cases, forty-one mentioned the number of articles, with some including radio and/or televison coverage as well.  (Ex. 75, E. Bronson Dec., ¶ 41.)  The extent of

publicity in Petitioner's case, based solely on quantifying newspaper articles, substantially exceeds every one of those forty-one California cases. (*Id*.)

782. The extent of coverage in the *L.A. Times* alone[58] weighed heavily in favor of a change of venue:

    a.    In the *Times* alone, there were 211 articles published on the "Night Stalker" or Petitioner between August 13, 1985 and August 11, 1988.

    b.    Of the 211 articles in the *Times*, 97 were either on the front page of the entire paper or on the front page of an interior section -- increasing the likelihood the article would have been read by prospective jurors. (Ex. 75, E. Bronson Dec., ¶ 48.)

    c.    There were 97 pictures accompanying the articles, both increasing the article readership and in some instances the level of potential prejudice. (*Id*., ¶ 49.)

783. Further evidencing the vast extent of the media saturation, the circulation data for five of the largest Los Angeles County newspapers in 1985 show news-media reaching millions. 1985 audit reports from the Audit Bureau of Circulations ("ABC") showed copies of five Sunday newspapers having a combined circulation of 1,957,236[59]. (Ex. 77, ABC Circulation Reports.) These

---

[58] The trial court stated it had seen "most" of the articles published in the *L.A. Times* and would consider that in its venue determination. (*See, e.g.,* 16 RT 754, 756.) Additionally, it was and is the newspaper with the widest circulation in the Los Angeles area.

[59] The *Los Angeles Times* had a circulation of 1,314,542; the *Los Angeles Herald Examiner* had a circulation of 214,705; the *Los Angeles Daily News* had a circulation of 162,360; the *Daily Breeze* had a circulation of 124,576; and the *Los Angeles Press-Telegram* had a circulation of 141,053. (Ex. 77, ABC Circulation Reports; Ex. 75, E. Bronson Dec., Table 3.)

circulation numbers are more pronounced when considering there are an average of 2.4 or more readers for each newspaper.  (Ex. 75, E. Bronson Dec., ¶ 51.)

784.   The trial court erred in dismissing the massive saturation of publicity surrounding Petitioner's case.  To the extent the court was unaware of just how immense the coverage was, Petitioner's counsel was grossly and prejudicially ineffective for failing to authenticate hundreds of articles that would have shed light on the extent of publicity.

### 2.     Nature of Publicity

785.   Examining the nature of the publicity is perhaps the trial court's most important duty in assessing the prejudice of pretrial publicity.  It is during this analysis that a trial court can assess to what degree the media was inflammatory or whether there has been prejudicial material publicized in the media that was not admissible at trial.  *See Daniels*, 428 F.3d at 1211.  (*See also* Bronson Dec. ¶¶ 55-58 (discussing hierarchy of prejudice used in content-analysis).)

786.   The trial court had ample evidence of prejudicial publicity before it, including copies of *L.A. Times* articles from August 9, 1985 through May 27, 1986 admitted as an exhibit during the venue motion, (*See* Def. Ex. FF in support of motion for change of venue.), its own knowledge of "most" of the additional *L.A. Times* articles not admitted, a sampling of other local newspapers, hours of video footage of local broadcast footage, and anchor-scripts from a broadcast channel.

787.   The trial court failed to acknowledge the inflammatory and prejudicial nature of the prejudicial publicity.  The trial court admitted to reading "most" of the *L.A. Times* articles and admitted multiple *L.A. Times* articles during the motion.  (Def. Ex. FF in support of motion for change of venue.)  Therefore,

Dr. Bronson conducted a content-analysis of only a statistical-sampling[60] of the *L.A. Times* newspapers published through August of 1988. (Ex. 75, E. Bronson Dec., ¶ 59.) Even with the limited articles reviewed, Dr. Bronson's analysis shows the nature of the publicity weighed overwhelmingly in favor of granting a change of venue. Further, his analysis, when combined with the extent of the publicity, demonstrates a "barrage of inflammatory publicity" containing prejudicial material, much of which was inadmissible at trial. *See Daniels*, 428 F.3d at 1211.

788. <u>Inflammatory Material from the *Times*</u>: A review of the *L.A. Times* showed extremely prejudicial and inflammatory language used to describe and characterize Petitioner and the "Night Stalker" crimes:

        a.     "Night Stalker" or "Stalker" was referred to 158 times, 16 times in the headline. Additional monikers such as "Valley Invader," Valley Intruder," "L.A. Intruder," "Fearsome Intruder," and "Walk-in Killer" were used repeatedly. (Ex. 75, E. Bronson Dec., ¶ 65.)

        b.     "Jack the Ripper" was mentioned as scrawled on a wall, (Ex. 76, *L.A. Times* Articles Reviewed by Dr. Bronson, A-12), and "Jack the Knife" was mentioned as scrawled on lipstick. (*Id.*, A-20; Ex. 75, E. Bronson Dec., ¶ 65.)

        c.     Repeated and detailed allusions to Satan and Satan worship were included in articles about Petitioner. Direct quotations in the *L.A. Times* alone included but were not limited to the following:

---

[60] Every fourth article, or one-quarter of the actual amount of *L.A. Times* articles.

(1) "Devil Worshiper" (Ex. 76, *L.A. Times* Articles Reviewed by Dr. Bronson, A-20);

(2) "Diabolical" (*Id.*, A-4);

(3) "Satan Worship" (*Id.*, A-36);

(4) "Satanic Cult" (*Id.*, A-20);

(5) "Satanism;" (*Id.*, A-36);

(6) "Satanic Overtones;" (*Id.*, A-40)

(7) "Satanic" (*Id.*, A-184)

(8) "Satanic rituals" (*Id.*, A-40);

(9) "Satanic activities" (*Id.*, A-40)

(10) "Shouted 'hail Satan!' as he was being led from the courtroom' (*Id.*, A-80)

(11) self-proclaimed devil-worshiper" (*Id.*, A-168)

(12) "Ramirez flashed a pentagram inscribed on his palm to the courtroom audience;" (*Id.*, A-124)

(13) "pentagrams drawn on in Ramirez's courtroom holding cell" (*Id.*, A-124)

(14) "pentagrams discovered" (*Id.*, A-20, 36, 124)

(15) "stalker drew pentagrams on the walls" (*Id.*, A-40)

(16) "spray-painted pentagrams on walls of victims' homes" (*Id.*, A-20)

(17) "pentagrams drawn in lipstick" (*Id.*, A-124)

(18) "He sent a postcard with a picture of a scorpion, a drawing of a pentagram and a threatening poem" (*Id.*, A-148)

(19) "At House hearing regarding alleged pornography in rock music, panel was told by an expert about AC/DC, 'one of their fans, I'm sure you know, is the accused

269

Night Stalker,' referring to serial murder suspect Ricahrd Ramirez" (*Id.*, A-56.)

      (20)   "The music has been called satanic that reportedly obsessed Richard Ramirez, the man suspected of the 'Night Stalker' killings." (*Id.*, A-184; Ex. 75, E. Bronson Dec., ¶ 66.)

d.    Petitioner was characterized as a "vicious serial killer," (Ex. 76, *L.A. Times* Articles Reviewed by Dr. Bronson, A-12), a "serial killer loose" (*id.*, A-24, 40), and a feared serial killer." (*Id.*, 148.)

e.    Even more inflammatory than language used when describing Petitioner, was the inflammatory characterization of the crimes:

      (1)   "A trail of death and destruction" (*Id.*, A-64);

      (2)   "atrocities" (*Id.*, A-20);

      (3)   "terrible trauma" (*Id.*, A-76);

      (4)   "Spread terror," "terrorized," "terrified California residents," "night of terror," "really terrible." (*Id.*, A-20, 28, 80, 96, 140);

      (5)   "Bloody rampage" and "savage assault." (*Id.*,. A-40);

      (6)   "seven month crime spree. (*Id.*, A-28, 196, 204);

      (7)   "string of slayings, rapes and attacks" (*Id.*, A-96);

      (8)   "string of sadistic nighttime mudrers" (*Id.*, A-208);

      (9)   "More horrendous than (the Hillside Strangler)" (*Id.*, A-4, 40);

      (10)   "gruesome" (*Id.*, A-100, 124, 128);

      (11)   "grisly details," "grisly attacks, "grisly series," "grisly series of attacks" (*Id.*, A-128, 148, 180, 188);

(12) "gory" (*Id.*, A-128);

(13) "Heinous" (*Id.*, A-20);

(14) "A trail of violence" (*Id.*, A-40);

(15) "Brutal," "brutalized," "brutality" (*Id.*, A-20, 40, 48, 124.)

789. <u>Inflammatory Material in Television Broadcasts.</u> In addition to the *Times* articles reviewed by Dr. Bronson, the Channel 11 broadcast scripts admitted during the venue motion show Petitioner's jury pool was exposed to even more inflammatory and prejudicial publicity through television. The exposure of the public to television news was overwhelming. According to Dr. Stand's survey[61], admitted during the venue motion, "33.3 percent said they watch a local television news program from one to six times a week day," and "64 percent say they watch a local television news program every day. The mean number of days that people watch a local television news program is 5.42." (13 RT 460.) In other words, 97% watched televised news at least once per week, and the average exposure was more than five days per week. Just a small sampling of the inflammatory content in the Channel 11 scripts reveal shockingly inflammatory statements about Petitioner and his alleged crimes:

a. "since the Night Stalker has been on his rampage . . ." (Ex. 79, Channel 11 scripts, p. 2340);

b. "leading to the capture of the Night Stalker . . . the man who has terrorized and brutalized residents . . ." (*Id.*, p. 2345);

c. "They call him the Night Stalker . . . and he's hit again!" (*Id.*, p. 2414);

---

[61] The methodology Dr. Strand's survey and Dr. Strand's qualifications are discussed in Dr. Bronson's declaration. (Ex. 75, E. Bronson Dec., ¶¶ 138-150.)

d. "Not since the Hillside Strangler has a killer created such widespread fear and terror in the southland" (*Id.*);

e. "Now people wait and wonder . . . where the Night Stalker will hit next!" (*Id.*, p. 2419);

f. "either you close and lock your doors . . . or you leave yourself vulnerable to the dreaded Night Stalker." (*Id.*, p. 2421);

g. "police say the trail of death left by the man call[ed] the nite stalker [sic] . . ." (*Id.*, p. 2499.)

h. These were only small portion of the countless examples of inflammatory and emotionally-charged language read on the air used to describe Petitioner and the Night Stalker crimes, and were taken from only one of the many local television stations. (*See Id.*)

790. <u>Inadmissible Material in the *Times*</u>: The *Times* articles randomly sampled by Dr. Bronson also contain multiple reports of crimes for which Petitioner ultimately was not charged during the Los Angeles trial. Media reports of evidence or activities not admissible at trial are especially prejudicial to a prospective jury. Not only will prospective jurors be told that certain acts or facts are linked to a defendant, they will also be inclined to think the defendant is deliberately hiding those facts when they never come out during the trial. A jury may therefore weigh uncharged and even untrue crimes when assessing the guilt or punishment for a defendant. For these reasons, the federal courts regard publicity of inadmissible material as a factor weighing in favor of presuming prejudice. *See Daniels*, 428 F.3d at 1211; *Ainsworth*, 138 F.3d at 795. The publicity in Petitioner's case contained multiple stories and accounts of facts that Petitioner's jury was never entitled to hear in the courtroom:

a.   After a judge ruled an "8-year-old Eagle Rock rape victim must testify in open court, the prosecutor . . . said the girl will not take the witness stand and that no evidence on the incident is likely to be presented." (Ex. 76, *L.A. Times* Articles Reviewed by Dr. Bronson, at p. A-120);

b.   ". . . the decision will not have a negative impact on the overall case against Ramirez even if the charges concerning the March, 1985, incident are dropped." -- which they eventually were. (*Id.*, p. A-120.)

c.   Many other articles reported on Petitioner's alleged involvement in murders committed in San Francisco. At least one article examined by Dr. Bronson quoted the Sheriff saying the San Francisco murder is linked to the "Valley Intruder." (*Id.*, p. A-8.) Still others referred to ballistic tests and statements by officials, including the mayor of San Francisco, tying the "Night Stalker" to the San Francisco crimes. (*See Id.*, pp. A-20, 80, 12.)

d.   One *Times* article reported Petitioner's "many previous arrests" with a "history" of drug offenses and driving stolen vehicles, as well as having Petitioner having "several aliases." (*Id.*, p. A-20.)

791.   <u>Inadmissible  Material in Television Media:</u>  In addition to the references of inadmissible material in the *Times* articles reviewed by Dr. Bronson, the trial court was shown repeated television broadcasts that portrayed Petitioner as a child molester and rapist. The scripts from the anchor-persons narrating these broadcasts were admitted at trial and tell of officials implicating Petitioner in multiple child-sex crimes using dramatic and inflammatory language. As stated above, this television publicity posed an even greater danger

to prejudicing Petitioner's jury pool as the vast majority of prospective jurors watched broadcast news. A small sampling of quotations of the Channel 11 script, admitted as evidence during the motion, include the following reports:

a.   "The tale of two cities continues . . . as an alleged sex offender comes back to Santa Monica" (Ex. 79, Channel 11 scripts, at p. 2313);

b.   "In addition to the string of Night Stalker attacks against adults . . . it now appears this violent man may also be a child molester." (*Id.*, p. 2436);

c.   "the investigating task force is now attempting to link recent descriptions with that of a man suspected of four child abductions earlier this year." "In those cases, the children were molested by the suspect, then released near freeways. Asked if the description of the kidnap suspect matches that of the serial killer, police say 'close enough.'" (*Id.*, pp. 2438-39);

d.   "the so-called Night Stalker's reign of terror might have begun as early as last February. As they probe possible ties to the February abduction of a Montebello schoolgirl, authorities have issued a new composite drawing of the suspected killer." (*Id.*, p. 2443);

e.   "More than a third of his murder victims have been Asian . . . as well as at least one of the child molestation victims." (*Id.*, p. 2451);

f.   "the suspect . . .shown in a composite sketch drawn from survivor's descriptions . . . may be responsible for half a dozen murders and dozens of rapes and assaults in the San Gabriel and San Fernando valleys" (*Id.*, p. 2324);

274

g. "The stalker task force is now exploring a possible link between the latest adult attacks and a series of earlier child molestations" (*Id.*, p. 2444);

h. "The number of molestation and kidnaping cases attributed to the 'Night Stalker' may be growing." (*Id.*, p. 2612);

i. "some of the charges against accused Night Stalker Richard Ramirez will be dropped. Those charges deal with a case of child molestation. And as Channel 11's Tony Valdez Reports . . . they depend on the testimony of one eight-year-old girl." (*Id.*, p. 2724.)

792. The United States Supreme Court found presumed prejudice and reversible error for failure to grant a venue change for publicity of inadmissible material far less inflammatory than Petitioner's case: "Much of the material printed or broadcast during the trial was never heard from the witness stand such as the charges that Sheppard had purposely impeded the murder investigation . . . that he had sexual relations with numerous women" and many other character-damning allegations. *Sheppard v. Maxwell*, 384 U.S. 333, 356-57, 86 S. Ct. 1507, 16 L. Ed.2d 600 (1966). The Eleventh Circuit found presumed prejudice where just *one* article "noted the possibility that Coleman and his co-indictees might have been responsible for the murder of a Pennsylvania youth . . . . The article quoted . . . the director of the Georgia Department of Investigation, as saying that the circumstantial evidence" was overpowering. *Coleman v. Kemp*, 778 F.2d 1487, 1491 (11th Cir. 1985). In Petitioner's case, countless articles and television broadcasts warned the Los Angeles Community that Petitioner was a sexual predator, and child molester. Petitioner was never charged with child molestation. Rather, the allegations resulted from overjealous police investigation and journalism, not reliable facts. Nevertheless, the publicity led to the pool of Petitioner's prospective jurors getting a barrage of false and

inadmissible information that imprinted a narrative of Petitioner as a threat not just to adults but innocent children as well.

793.    The publicity in Petitioner's case went from inflammatory reports of the fear, panic, and terror of the Los Angeles community to the collective sigh of relief the Los Angeles community felt when Petitioner was taken into custody. This led to local officials and the media covering the case presuming Petitioner's guilt at the outset.  This presumption of guilt prejudiced Petitioner's jury pool to an extent that required a change of venue for a chance at a fair trial.  In examining only the *L.A. Times*, Dr. Bronson noted:

> The entire tenor of the coverage reflects the view that Mr. Ramirez was guilty and deserving of death, even if the stories often included de regueur terms such as 'alleged' or 'charged.'  One reading through these articles is left with an abiding belief that the writers are convinced of Ramirez's guilt.  This is not to say that the reporters have written their stories unprofessionally -- it is to say that their personal exposure to what happened and how so many people over so long a period were so badly affected caused them to react as most people would.  And the way local jurors would if the trial is not moved.

(Ex. 75, E. Bronson Dec., ¶ 74.)  This presumption was exacerbated by media accounts of Petitioner's own statements, local officials giving statements regarding Petitioner's capture, and other statements and evidence against Petitioner inferring his guilt:

> a.    Dr. Bronson found multiple instances in his analysis of the *L.A. Times* where articles quote Petitioner's statements.  The *Times* reported that Petitioner boasted that he was a "super-criminal" (Ex. 76, *L.A. Times* Articles Reviewed by Dr. Bronson, A-20) who killed people because he enjoyed

watching them die (*Id.*, p. A-2.)  Petitioner was quoted as saying he "enjoyed killing people" and "I love to kill people.  I love watching people die.  I would shoot them in the head and then they would wiggle and squirm all over the place, and then just stop or cut them with a knife and watch the face turn real white . . .  I love all that blood." (*Id.*, p. A-148.)

b.  Dr. Bronson also noted numerous statements implying Petitioner's guilty by expressing relief at his capture.  Some of the statements were made by local officials.  Statements by officials are especially prejudicial as they are assigned societal roles of heightened responsibility and power in the community.  The media accounts of Petitioner's capture identified by Dr. Bronson in the *Times* included:

(1)  The mayor of Los Angeles stating that "California can breathe a sigh of relief tonight" after Petitioner was arrested.  (*Id.*, p. A-20);

(2)  A sheriff stating "we have now definitely tied 14 murders (including one in San Francisco) to this individual and possibly as many as 33 cases." (*Id.*, p. A-12.)

(3)  Local authorities publicly identifying Petitioner as the Stalker.  (*Id.*, p. A-20);

(4)  "Thank god the caught him." (*Id.*, p. A-44);

(5)  An article describing how residents of Los Angeles felt relief upon Petitioner's arrest;

(6)  In one opinion piece in the *Times*, the author notes that "California breathed a sigh of relief and celebrated their release from fear." (*Id.*, p. A-64);

c.     Publicity regarding specific evidence pointing to Petitioner
       was also widely reported in the *Times* articles reviewed by Dr.
       Bronson.  Articles were written about the exhaustive
       fingerprint identification of Petitioner, the State's effective
       fingerprinting system that "zeroed" in on Petitioner as the
       Night Stalker suspect, and even quoted the San Francisco
       mayor discussing how ballistics tests ties Petitioner to San
       Francisco crimes.  (*Id.*, pp. A-12, 20, 24 32, 40, 68, 172); (Ex.
       75, E. Bronson Dec., ¶ 77.)

794.     The *Times* articles affecting Petitioner's presumption of guilt
reviewed by Dr. Bronson led him to conclude that the media was "extremely
prejudicial."  (*Id.*, ¶ 74.)  This conclusion is supported by the Channel 11
television scripts considered by the trial court:

a.     "The Mayor was calling for early action on the offered reward
       without waiting for a conviction."  (Ex. 79, Channel 11
       Scripts, at p. 230);

b.     "Mayor Bradley says he would like to see the people of
       Hubbard Street get the reward for catching the suspected
       Night Stalker as soon as possible . . . even if Richard Ramirez
       is not convicted."  (*Id.*, p. 2557);

c.     "Ramirez took what might be his last steps in the outside
       world" (*Id.*, p. 2497);

d.     "Six people have been honored by the Los Angeles County
       board of supervisors . . . one man was so happy that he cried .
       . . it was a proud moment for the people of an East Los
       Angeles neighborhood . . ."  (*Id.*, p. 2515);

e.     "a sheriff's deputy received plaques of heroism from the L.A.
       county board of supervisors" (*Id.*, p. 2524);

f.    "They are being called 'the heroes of Hubbard Street' . . . the citizens credited with the capture of suspected Night Stalker Richard Ramirez." (*Id.*, p. 2538);

g.    "The youngest of the heroes [who helped capture Petitioner] was receiving an early reward." (*Id.*, p. 2576.)

## 3.    Gravity and Nature of Offense

795.    Another factor relevant in determining whether a change venue is required is the nature and gravity of the offense.  The trial court found that "this is as grave and serious a case as has been filed in this or any other state."  It therefore admitted that "the gravity and nature of the crime would indicate that venue ought to be changed."  (17 RT 846.)  The trial court erred, however, in limiting its analysis to simply the seriousness of Petitioner's crimes.

796.    The fact that Petitioner was charged with capital crimes carrying a penalty of death requires an even greater assurance that a jury pool is not tainted by prejudicial publicity.  By virtue of having a possible penalty phase of trial, jurors in a capital case are required to perform tasks that are unique and that make having an impartial jury even more important.  The California Supreme Court described a capital jury as being "charged with a responsibility different in kind from . . . guilt phase decisions:  it's role is not merely to find facts, but also -- and most important -- to render an individualized, normative determination about the penalty appropriate for a particular defendant -- *i.e.*, whether he should live or die."  *People v. Brown*, 46 Cal. 3d 432, 448, 758 P.2d 1135, 250 Cal. Rptr. 604 (1988); *see also People v. Williams*, 48 Cal. 3d at 1131 ("where the jury in its discretion is responsible for determining whether a defendant *lives* or *dies*, the need for juror impartiality is obviously most acute.") (emphasis in original.)

797.    Pretrial publicity combined with the expanded role of a capital juror increases the danger that factors such as fear and anger will, in practice, be "part of the calculus of penalty phase decision-making[.]"  (Ex. 75, E. Bronson Dec., ¶

83.)  Extensive media exposure increases the risk a jury will rely on factors not included in aggravation.  "It can change the prism through which those unfairly exposed to the media assess the aggravating and mitigating evidence presented by the parties." (*Id.*, at ¶ 84.)  In the penalty phase, where the defense wishes to humanize a defendant and the prosecutor is seeking to do the opposite while emphasizing the victim's perspective, the media can interfere and prevent a fair trial.  In Petitioner's case, the media did just that:  performing the prosecutor's role with respect to both the defendant and the victims.  (*Id.,* at ¶ 85.)

      a.    Dr. Bronson's analysis of *L.A. Times* articles revealed prejudicial publicity focusing on the fear generated among individuals and in the broader Los Angeles community.  One article, an opinion piece, said Petitioner's alleged crimes were "even more horrendous because of the fact that this person goes into people's homes.  He's going into your sanctuary, your private place." (Ex. 76, *L.A. Times* Articles Reviewed by Dr. Bronson, at p. A-4.)  Multiple articles discussed the paralyzing fear citizens across Los Angeles felt because of the "Night Stalker" phenomenon -- causing them to lock their doors and windows at night, be afraid to walk alone even to a car, buy extra guns, barricade doors, and even move to upstairs apartments.  (*See, e.g., id*., p. A-4.)  One article describes  a "climate of near hysteria." (*Id.*, p. A-124.)  The *Times* reported an increase in calls to police, (*id*., pp. A-4, 24), homeowners organizing neighborhood patrolling, (*id*., pp. A-40, 72), and fear hanging over the city "like a smog," (*id*., p. A-48).

      b.    A jury pool drawn from an angry community, similar to a fearful community, is far less likely to give Petitioner a fair

trial and more interested in retribution.  (Ex. 75, E. Bronson Dec., ¶ 90.)  The publicity in Petitioner's case not only reported on, but exacerbated the sense of anger at Petitioner in the community.  Articles described the community as "livid" about the Night Stalker.  (Ex. 76, *L.A. Times* Articles Reviewed by Dr. Bronson, at p. A-4.)  "I hope they give him the electric chair, that's what vicious killers deserve."  (*Id.*,. p. A-20)  Still another article described his capture: he was beaten with a steel rod by angry citizens.  (*Id*.)  "Police arrest Ramirez, taking him into custody after he is captured and beaten by angry citizens who grab him on an East Los Angeles street[.]"  (*Id.*, p. A-24.)  These captors were hailed as "heroes" by the City Council, the County Board of Supervisors, and even the state legislature.  (*Id.*, p. A-48.)

c.   Further stoking the anger of a Los Angeles jury pool were the *L.A. Times* descriptions of the crimes.  They quoted victims as saying Petitioner "pointed the gun on my head, said, 'Bitch, shut up'."  (*Id.*, p. A-136.)  A desperate call for police sounded as if a victim was "choking or gurgling and gasping."  (*Id.*, p. A-116.)  Dr. Bronson details *Times* various description of Petitioner's charges as including murder, burglarly, robbery, rape, sodomy and forced oral copulation, twelve murder counts, 61 new felony charges, at least 18 separate incidents, attacking 28 people and murdering 15, and 54 related crimes.  (*See id*., pp. A-52, 60, 76, 96, 100;  ex. 75, E. Bronson Dec., ¶ 91.)

d.   The randomness of the Night Stalker attacks created the potential for even greater fear to be generated in the

281

community.  (*Id.*, ¶ 93.)  Hence, the coverage emphasizing the randomness of the attacks poses a threat of prejudicing the jury pool.  As shown in the *Times* articles reviewed by Dr. Bronson, this coverage was immense:

(1) He was not killing "them" in a faraway, dingy place, but people like "us" in comfortable, ordinary homes. (Ex 76, *L.A. Times* Articles Reviewed by Dr. Bronson, at p. A-48);

(2) The serial killer is more fearsome because he attacks in the home and without a discernable pattern. (*Id.*, p. A-4);

(3) The attacks are random.  (*Id.*, pp. A-4, 180);

(4) Murders include businessman, retired couples, students, parking lot attendants and grandmothers.  (*Id.*, p. A-124);

(5) The police state "when it starts happening in your town it makes you stop and think about it."  (*Id.*, p. A-4.)

798. While the trial court did briefly mention that the nature and gravity of the offense weigh in favor of a change of venue, it failed to account for the increased prejudice of publicity on a possible penalty-phase juror.  To the extent trial counsel failed to clarify the impact of this category for the court, it was prejudicially ineffective.

### 4. Prominence of the Victims and Status of the Defendant

799. The trial court agreed with Petitioner's counsel that the victim's "prominence" or status were such "that one would tend to identify with [them], especially the type of people who tend to sit on juries."  (17 RT 849.)  The trial court erred, however, by failing to realize the full import of the victims' blamelessness and randomness, and how publicity can exacerbate a prospective

juror's feelings of empathy for a victim that conflicted with Petitioner's fair trial rights.

800.   By virtue of their number, the nature of the harm that befell them, and their "ordinariness and random qualities," the victims "acquired the special kind of sympathy and empathy that likely generated the bias against the defendant with which this factor is concerned." (Ex. 75, E. Bronson Dec., ¶ 99.) This empathy is pronounced because the victims "were entirely blameless." (*Id.*, ¶ 100.)  Therefore, unlike victims who make bad or unwise choices, the victims in Petitioner's case made it easy for a prospective juror to feel empathy.

801.   The publicity in this case only exacerbated this effect.  While some stories did focus specifically on the *group of victims*, Dr. Bronson's content-analysis of the *L.A. Times* showed that the media focused on the *entire community* as victims "during a reign of terror perpetrated by the Night Stalker." (*Id.*, ¶ 103.)  This sense of collective victimization by citizens living in the jury-pool community, when combined with the documentation of fear, anger, and inflammatory accounts of the crime, provided strong evidence of the need for a change of venue.  (*Id.*)

802.   The trial court also did not properly assess the impact Petitioner's status in the community had on the need for a change of venue.  The court seemingly dismissed this factor because "Mr. Ramirez is a totally anonymous individual . . . this is not a situation in which a person who already had an image was involved in a case."  (17 RT 850.)  It is precisely Petitioner's status as an "outsider" and "drifter," however, that prejudiced Petitioner and weighed in favor of the need for a change of venue.  (Ex. 75, E. Bronson Dec., ¶ 104)  In just the sampling of *L.A. Times* articles reviewed by Dr. Bronson, Petitioner was repeatedly referred to as a "drifter" and "native of El Paso."  (Ex. 76, *L.A. Times* Articles Reviewed by Dr. Bronson, at pp. A-20, 40, 52, 60, 80, 96, 100, 116, 124, 136, 144, 168, 188.)

803. Petitioner was portrayed by the media coverage "as a one-dimensional, comic book-type of an archetypal evil figure: who was "repeatedly linked to various forms and symbols of Satanism, pentagrams, and the like." (Ex. 75, E. Bronson Dec., ¶ 106.) Petitioner was shown winking and grinning during court and looking "cunning" and "dangerous." (Ex. 76, *L.A. Times* Articles Reviewed by Dr. Bronson, at pp. A-80, 148.) Readers of the *Times* were even warned that "most serial murder[ers] don't stop. They might relocate. They will kill again." (*Id.*, p. A-8.)

804. Publicity of Petitioner was entirely devoid of sympathetic or humanizing accounts of Petitioner's life. Dr. Bronson does "not recall ever encountering such an absence in the over 200 potential change-of-venue cases I have previously dealt with." (Ex. 75, E. Bronson Dec., ¶ 108.) Yet, the trial court failed to acknowledge any of this evidence, or lack thereof, when ruling the publicity in Petitioner's case did not warrant a change of venue.

### 5. Size and Nature of the Community

805. The California Supreme Court approved of the trial court's reliance on the size of Los Angeles county as the main factor weighing in favor of a change of venue: "You are talking about what I think is the largest jury pool of any jurisdiction in the country." (17 RT 854.) "[T]his county is so large and the people here are so sophisticated and so diverse that I just don't think you can say that you can't have a fair trial in this county." (*Id.*, 855.) "You could call in 2,000 jurors to talk to them on voir dire in this case, and there is no place else that you can do that.'" (*Id.*, 856.) The trial court erred in relying so heavily on the sheer size of Los Angeles County while failing to account for the nature of the community *as it responds to Petitioner's case.* Had it correctly addressed this crucial factor, the court would have found a change of venue appropriate. To the extent trial counsel failed to alert the court to its error, counsel was prejudicially ineffective.

806.   At the time of trial, Los Angeles County had the highest population of any county in California, at over eight million.  While the courthouse where Petitioner was tried only selected juries within a 20-mile radius, and not county-wide, the jury-pool for Petitioner's trial was still in the millions.  Focusing on the number of jurors without taking into account the specifics of Petitioner's case, however, does not accurately reflect the likelihood that Petitioner could have received a fair trial.  A large jury pool reduces the need for a change of venue because of:  (a) the greater numbers make it easier to pick a jury, (b) the community communications network is less of a problem, (c) the attention on and memory of the case may be less, and (d) the number of those with a case connection will be a smaller percentage of the population.  (Ex. 75, E. Bronson Dec., ¶ 112.)  Looking at these factors in the context of the coverage and circumstances of Petitioner's trial reveals the size of the community is not availing.

    a.    Theoretically it is easier to obtain a venire that is untainted by pretrial publicity or other prejudice with a larger jury pool.  This fails to consider, however, the fact that resolution of a venue motion requires examining the prejudice of prospective jurors who may be qualified to be on the trial panel but still express prejudice from pretrial publicity necessitating a change of venue.  (Ex. 75, E. Bronson Dec., ¶ 114.)  With a case as widely recognized as Petitioner's, even if a particular juror could state their lack of bias, the nature of the media coverage demonstrated above can create pressure on local jurors that would inhibit their impartiality.  (*Id.*, ¶ 115.)

    b.    A second reason for the theory that a large jury pool weighs against a venue change is the notion that as a venue gets larger, the jury pool becomes less homogeneous.  There is less

informal gossip, rumors, and "coffee shop" interchanges. (*Id.*, ¶ 118.) Smaller communities tend to have a higher degree of "cultural integration and shared values"that can make it more difficult to find a fair jury. (*Id.*, ¶ 119.) As shown by the testimony of Patrick Kelly, Joseph Santoro, George Willoth, and others during the venue motion, as well as media coverage considered by the court, however, the Night Stalker phenomenon essentially brought Los Angeles County together as a small group. Neighborhood watch groups formed, and neighborhoods united around a common fear of the Night Stalker. Hence, any benefit to a large jury pool was lost when all of Los Angeles experienced "such widespread fear and terror[.]" (Ex. 79, Channel 11 Scripts, at p. 2414.)

c.   Related to the supposed heterogeneous effects of a larger jury pool, the percentage of the total population that has a connection with the case is thought to be smaller in larger venues. Therefore, the risk of a prejudiced jury pool is less. Yet, Petitioner's case is an exception. Despite the large population, most residents were directly affected by the Night Stalker phenomenon: whether they lived in fear, participated in block patrols, added locks to their doors and windows, or bought guns, they were personally effected. Therefore the percentages of those involved in Petitioner's case would be comparable to what is found in smaller communities. (Ex. 75, E. Bronson Dec., ¶ 126.)

d.   Similarly unavailing is the reasoning that the attention and collective memory of a particular case is less with a larger venue. While in most cases that is true, Petitioner's case "is

286

now part of the collective memory of the community, and still is imbedded there." (*Id.*, ¶ 120.)  Indeed, coverage of Petitioner's case faced little competition and dominated the news cycle up through Petitioner's trial.

e.   The size of Los Angeles County is offset by what Dr. Bronson describes as "salience."  This is when a case is especially relevant to one's own life, or as Dr. Bronson describes it, "Salience may arise because of propinquity -- it could happen to me, it happened near me or in a palace I know or have been, it affects me, people like me are involved, and other similar factors." (*Id.*, ¶ 121.)  For example, Dr. Bronson recommended a change of venue for the Oklahoma City bombing case because it had salience with the people in Oklahoma.  Yet, he recommended against a change of venue in the Unabomber case because there was no special salience in Sacramento as compared to other areas.  (*Id.*)

f.   In this case, Dr. Bronson found an extremely high rate of local salience.  While those in other parts of the state may have known of the Night Stalker, those in Los Angeles county had a unique fear of Petitioner and relationship with his alleged criminal activity.  (*Id.*, ¶ 122.)  Some examples of this salience in the *Times* articles reviewed by Dr. Bronson include:

(1)   An article discussing the case as more fearsome because he attacks the home and without a pattern (Ex. 76, *L.A. Times* Articles Reviewed by Dr. Bronson, at p. A-4);

(2)   What made the crimes especially fearsome was that they occurred in quiet suburbs, not "Skid Row" (*Id.*, p. A-48);

287

(3)    "Seems even more horrendous because this person goes into people's homes, he's going into your sanctuary, your private place.  That's very frightening to me, and he's doing it in such a diabolical way."  (*Id.*, p. A-4);

(4)    "you're not even safe in your own home.  It seems like a violation of privacy even though you haven't been accosted."  (*Id.*, p. A-4.)

g.    The trial court acted unreasonably by failing to take into account the salience of Petitioner's case, or any of the other mitigating factors offsetting the benefit of Los Angels county's high population on obtaining a fair trial.

807.    The witness testimony during the venue motion helped illustrate the unique unrest, concern, collective action, and fear the Night Stalker phenomenon generated in Los Angeles county.  From the testimony, the trial court recognized that law enforcement "certainly did solicit an enhanced level of community based awareness activity and support, and got it."  (17 RT 849.)  It also acknowledged that "there was a feeling of fear across at least part of the community" but found "it was not necessarily [a] county-wide feeling."  (*Id.*)  The court's glib characterization of the evidence, however, failed to grasp the extent to which the publicity of Petitioner's case had already made a fair trial highly unlikely.

a.    Members of the "Guardian Angels," an organization that sends members to people's homes for protection and a sense of security, testified that the organization was involved in setting traps for the Night Stalker.  (12 RT 418-428.)

b.    Dr. Paul Blair, a psychiatrist who had dealt with hostage negotiations, testified regarding the public's fear of the Night Stalker.  Dr. Blair discussed the role random murders and assaults play in increasing the fear of a community.  "The

288

concept of randomness does cause an increased amount of fear . . . like a fear of the unknown, a fear of the dark." (14 RT 574.) He then discussed how the media in the Night Stalker case only helped to increase the public's fear: "The more information that comes out in the press . . . the more people will read it, the more people talk about it . . . . Things begin to get distorted and the tension level goes up dramatically." (*Id.*, 578.) Dr. Blair's testimony also informed the trial court about the issue of salience that increases the likelihood of a prejudiced jury pool. (*See* Ex. 75, E. Bronson Dec., ¶¶ 179-185 (discussing Dr. Blair's testimony).)

c. Witnesses Patrick Bates and Joseph Santoro testified that Los Angeles had essentially joined together out of fear; taking drastic steps to secure their safety. Santoro testified that 20% of Monterrey Park had joined neighborhood watch groups to protect themselves from the Night Stalker. The police department had set up programs for elderly people to receive free dead bolt locks, and calls to the police doubled or even tripled. (14 RT 606-33.) Mr. Bates testified that gun sales at his gun store had doubled, and even tripled among women, but then returned to normal once Petitioner was arrested. (*Id.*, 634-652.)

d. The testimony presented during the venue motion demonstrated that the likelihood for obtaining a fair trial in Los Angeles county was small. The Night Stalker crimes affected so many personally and so dramatically, it would be especially difficult for jurors to set aside their prejudice and

289

for Petitioner to obtain a fair trial.  (Ex. 75, E. Bronson Dec., ¶ 189.)

808.    The testimony at the venue motion was corroborated by the sensational and inflammatory reports about how the Night Stalker thrust Los Angeles into a state panic.  As shown by just a small sampling of the Channel 11 scripts admitted in the venue motion, the panic was intense:

a.    "Authorities throughout the southland are urging everyone to lock all doors and windows tonight . . . as the search goes on" for the Night Stalker  (Ex 77, Channel 11 Scripts, at p. 2315);

b.    "There is a degree of alarm among those who live in the outlying valleys . . . people are fearful of where this random killer will strike next."  (*Id.*, p. 2329);

c.    "Residents are locking their doors and windows . . . and arming themselves tonight . . . as neighbors are braced to protect themselves . . . police are converging a special task force"  (*Id.*, p. 2332);

d.    "many women . . . especially those who live alone . . . are taking measures they never even considered before"  (*Id.*, p. 2368);

e.    "vicious series of Night Stalker attacks is making some people take matters into their own hands"  (*Id.*, p. 2385);

f.    "Many Southern Californians are resorting to drastic measures to protect themselves . . . as a result of the Night-Stalker series of killings"  (*Id.*, p. 2446);

g.    "As each day goes by without the Night Stalker being brought into custody . . .the anxiety of local residents continue to rise"  (*Id.*, p. 2460.)

809. While the trial court admitted personal knowledge of the contents and extent of the *L.A. Times* coverage, the trial court's ruling denying articles submitted by trial counsel violated Petitioner's federal due process rights because of its flagrant violation of established state law relating to change of venue motions under California Penal Code section 1033. Section 1033 provides that the court shall order a change of venue when it appears that there is a reasonable likelihood that a fair and impartial trial cannot be had. In support of change of venue, a defendant is required to establish that pretrial publicity is prejudicial and that there is a reasonable likelihood that a fair trial cannot be had. *Smith v. Superior Court*, 276 Cal. App. 2d 145, 80 Cal. Rptr. 693 (1969).

810. In *Powell v. Superior Court*, 232 Cal. App. 3d 785, 283 Cal. Rptr. 777 (1991), the Court of Appeal held that change of venue was compelled for Los Angeles police officers charged in the Rodney King incident. The reviewing court considered pretrial publicity and other factors in support of change of venue. *Powell* further observed that judicial notice of news media coverage not presented in the trial court was appropriate on de novo review. *Id*. at 790 n.2. The court ruled that "Los Angeles County is so saturated with knowledge of the incident, . . . and so permeated with preconceived opinions that potential jurors cannot try the case solely upon the evidence presented in the courtroom." *Id.* at 802. Thus, in Petitioner's case, the court was required to consider *all relevant matters* related to change of venue. The court, likewise, was entitled to take judicial notice of the vast array of prejudicial media coverage of this case.

811. Originally, a motion for change of venue was based principally on the parties' affidavits. *See Maine v. Superior Court*, 68 Cal. 2d at 378; *People v. Carter*, 56 Cal. 2d 549, 364 P.2d 477, 15 Cal. Rptr. 645 (1961); *People v. McCracken*, 39 Cal. 2d 336, 246 P.2d 913 (1952); *People v. McKay*, 37 Cal. 2d 792 236 P.2d 145 (1951). *People v. Yeager*, 194 Cal. 452, 229 P. 40 (1924), was one of the first reported cases where newspaper clippings were appended as

exhibits to the affidavit supporting the motion for change of venue. Since then, parties have appended more extensive supporting exhibits so that, as a practical matter, the exhibits overshadow the affidavits. This change in practice occurred without explicit requirements by the courts or legislature. It follows that where an affidavit alone is legally sufficient to support a motion for change of venue, the court cannot deny the motion on the mere formality that exhibits were not authenticated. Exhibits are not legally required for a sufficient motion for change of venue, therefore, the failure to provide authentication of exhibits cannot be a legitimate reason for denial of the motion. The trial court was required to rule on the sufficiency of the assertions of the affidavits, for which the exhibits and testimony merely demonstrated a reasonable likelihood of prejudice.

812. To prevail on a motion for change of venue, the moving party must show a "reasonable likelihood" of prejudicial effect, a standard of proof less than preponderance of the evidence. *People v. Jenkins*, 22 Cal. 4th 900, 943, 997 P.2d 1044, 95 Cal. Rptr. 2d 377 (2000). The "reasonable likelihood" standard fits the original use of affidavits as the principal mode of proof. The trial court must decide if the assertions of prejudice, as documented by credible supporting exhibits, show a reasonable likelihood of prejudice. Requiring authentication of hundreds of individual media reports is inconsistent with this standard. Trial counsel provided reasonable authentication that the news reports in the exhibits pertained to Petitioner's case and were from the media sources. Hence, the trial court erred in refusing to take judicial notice of the defense- proffered exhibits that demonstrated the prejudicial nature of the media coverage in Petitioner's case. *Powell v. Superior Court*, 232 Cal. App. 3d at 790 n.2.

813. The trial court also erred by ruling the community survey was unpersuasive to the venue question. Properly, the court was "convinced" that the methodology was "scientifically based and properly done." (17 RT 853-54; *see also* Ex. 75, E. Bronson Dec., ¶¶ 139-150.) It dismissed the survey, however,

solely because it asked respondents whether they felt Petitioner was "responsible," and not whether they would base their decision on media instead of evidence in the courtroom. (17 RT 852-53.) Just as it did with the publicity analysis and opinion testimony, the court again failed to recognize the staggering degree of prejudice that the community survey demonstrated existed in the Los Angeles jury pool.

      a.    The question in the survey the court took issue with focused on prejudgment. Respondents were asked whether they felt Petitioner was responsible from the Night Stalker murders based on what they had seen or heard. (Def. Ex. R in support of motion for change of venue.) Only respondents who had previously stated that they recognized the case were asked this question. Yet, of all 300 respondents, 51.7% said they felt Petitioner was responsible. While not shocking on its face, this rate ranked third highest among California Supreme Court cases that discussed a survey asking this question. (Ex. 75, E. Bronson Dec., ¶ 158.) The prejudgment rate was also the highest Dr. Strand had personally ever seen. (12 RT 463-64.) Even so, the *actual* prejudgment in Petitioner's case was likely higher than the 51.7% rate indicated by the survey for three reasons:

      (1)    First, Dr. Strand only gave the prejudgment percentage rate among the entire group of respondents (300.) The entire group was not asked the question, however. The percentage of those who found Petitioner responsible increases to 55.4% when including only those who were actually asked the question. (Ex. 75, E. Bronson Dec., ¶¶ 160-62.)

293

(2)     Another problem with the prejudgment percentage
        reported by Dr. Strand is that the question gave
        respondents an opt-out answer that was more socially
        desirable than admitting they had prejudged Petitioner.
        When asked if they felt Petitioner was responsible, they
        were given the choices "yes," "no," and "or do you
        need more information to make up your mind?" (Def.
        Ex. R in support of motion for change of venue.)[62]
        Even where respondents were certain of Petitioner's
        guilt, this option allowed respondents to act on their
        desire to appear open-minded and give a more
        acceptable response. (*Id.*, ¶¶ 164-69.)

(3)     Finally, the prejudgment question asked by Dr. Strand
        did not scale the responses.  In other words, it did not
        give respondents the options of saying Petitioner is
        "definitely responsible" or "probably" responsible."
        Giving respondents an all-or-nothing choice likely
        diminished the number of those indicating they felt
        Petitioner was responsible.  (*Id.*, ¶ 168.)

b.      The survey's first question was designed to measure case
        recognition, and asked respondents whether they had read or

---

[62]    While not in place at the time Dr. Strand conducted his survey,  The
national standard for surveys promulgated by the American Society of Trial
Consultants ("ASTC") now states "efforts should be made to avoid context,
wording or other influences that raise the likelihood of responses due to social
desirability or other response bias."  *See* ASTC (American Society of Trial
Consultants) website: ASTC Professional Code, Practice Area A. Venue Surveys,
Professional Standards, II. Basic Questionnaire Design (last visited Dec. 10,
2008) <http://www.astcweb.org/public/article.cfm/ASTC-Professional-Code>.

heard anything about the Night Stalker case.  A staggering
94.3% recognized the case, with only 17 respondents saying
they did not.  (Def. Ex. R in support of motion to change of
venue.)  Dr. Bronson, an expert of statistical surveys and one
of the authors of the guidelines for venue surveys adopted and
published by the ASTC, found this to be one of the highest
recognition rate of any case he has seen.  Only eleven of the
121 cases Dr. Bronson has worked on had a higher
recognition rate, including the Oklahoma bombing and dog
mauling case in San Francisco.  (Ex. 75, E. Bronson Dec., ¶
155.)  Further, only three of the forty-two venue cases in the
California Supreme Court discussing a community survey had
a higher recognition rate -- one being the Rodney King case
where venue was transferred from Los Angeles County.  (*Id.*,
¶ 154); *see also Daniels*, 428 F.3d at 1211 (venue denial
reversed where community survey showing that "eighty-seven
percent of the jury pool recognized the case" helped show
media saturation.)  Such a high rate of recognition illustrates
the degree to which a respondent is exposed to the types of
prejudicial coverage discussed above.

c.     Additionally, the trial court failed to account for the extremely
high rate of prejudgment of penalty among the respondents
who were asked.  While Dr. Strand testified that only 43.3%
of the 300 respondents indicated Petitioner should receive the
death penalty, only 155 people were asked the question.
When looking at the more meaningful percentage of those that
chose death who were actually asked about penalty, the
percentage jumps to 83.8% (or 130 of the 155people asked.).

295

(Def. Ex. R in support of motion to change of venue.)  In the thirty-two cases in which Dr. Bronson has asked a death penalty question in a survey, Petitioner's case had the highest level of support for the death penalty by almost ten percentage points.  (Ex. 75, E. Bronson Dec., ¶ 173.)  Therefore, while the possibility of receiving a fair trial with a prejudiced Los Angeles jury pool was suspect, the "chances of a fair trial at a penalty phase were de minimus."  (*Id.*)

    d.    Had the trial court grasped the true import of the community survey and accurately assessed Dr. Strand's reports, it would have been forced to acknowledge the prejudice infecting Los Angeles County.  The data provided to the court indicated there was a high awareness of Petitioner's case, a large percentage of the jury pool that had prejudged Petitioner's guilt, and an even larger percentage that prejudged his penalty.  All of this data was supported by the nature and extent of publicity and the opinion testimony presented by Petitioner's counsel.  (*Id.*, ¶¶ 139-90.)

    814.    The inflammatory nature and broad extent of publicity, the nature and gravity of the Petitioner's alleged offenses, and the community status of Petitioner and the victim all weighed heavily in favor of a change of venue.  The size of Los Angeles County, while in most cases allowing for a high likelihood of an impartial jury, was insufficient to protect Petitioner's fair trial rights with such extensive prejudicial publicity and wide-spread panic and fear throughout the Southland.  Yet, the trial court failed to grasp the obstacles Petitioner faced in getting a fair trial.  Further, despite the California Supreme Court's duty to "independently examine the record and determine de novo whether a fair trial is or was obtainable" and its "de novo standard of review" of "our consideration of

the five relevant factors," *Williams v. Superior Court*, 39 Cal. 4th at 434, the California Supreme Court only spent three paragraphs on all five factors. *See People v. Ramirez*, 39 Cal. 4th 398, 433-37, 139 P.3d 64, 46 Cal. Rptr. 3d 677 (2006). It unreasonably found that "the defendant did not show that the media coverage was unfair or slanted or revealed incriminating facts that were not introduced at trial" despite the fact the trial court admitted knowledge of "most" of the *L.A. Times* articles reviewed by Dr. Bronson and had before it television footage of local broadcasts and Channel 11 scripts. Even a sampling of these materials demonstrated the prejudicial nature of the publicity.

815. Moreover, the California Supreme Court and the trial court acted unreasonably in light of the clearly established federal standard repeated by the Ninth Circuit in *Daniels* and *Ainsworth*. Under this standard, the prejudice of the jury pool, irrespective of what the actual voir dire indicates, is presumed where there was a

> barrage of inflammatory publicity immediately prior to trial, amounting to a huge . . . wave of public passion; (2) whether the news accounts were primarily factual because such accounts tend to be less inflammatory than editorials or cartoons; and (3) whether the media accounts contained inflammatory or prejudicial material not admissible at trial.

*Daniels*, 428 F.3d at 1211 (citations omitted). With well over 903 articles published up to the time of the first admonishment of the jury to avoid media in September of 1989, 167 articles published throughout the trial, and even more television and broadcast media present throughout the pre-trial and trial proceedings, describing the media coverage as a "barrage" is more than accurate. (Ex. 78, Articles published during trial.) As shown by both Dr. Bronson's analysis of a sampling of the *L.A. Times* articles, and the scripts of Channel 11 news, the media publicity was extremely prejudicial and inflammatory. (Ex. 75,

E. Bronson Dec., ¶¶ 44-104.)  While the articles were mostly factual, those facts were inflammatory described with inflated emotional language.  (*Id.*, ¶ 136.) Lastly, the media accounts of Petitioner and the Night Stalker phenomenon contained numerous instances of inadmissible and highly inflammatory material - - including references to Petitioner as a child molester, and sexual predator.

816.   While the federal standard does take into account how close the publicity occurred to trial, in Petitioner's case, where the Night Stalker phenomenon was etched into the collective memory of Los Angeles County, such an inquiry is not dispositive.  This is evidenced by the fact that prospective jurors recognized the Night Stalker case at a higher rate (94.7%) in 1988 than respondents did in Dr. Strand's community survey in 1986 (94.3%.)  (*Id.*, ¶ 204.)

817.   Even so, the publicity surrounding Petitioner's case did not abate during his trial.  Among just three major newspapers[63], counsel has identified 167 articles related to Petitioner that were published during Petitioner's trial, (Ex. 78, Articles published during trial), including inflammatory reports of a juror that was murdered during deliberations.  (*See* Claim IX; ex. 80.)

818.   Therefore,  prejudice in Petitioner's case should be presumed under the federal standard , and hence an examination of the voir dire is unnecessary. *See Marshall v. United States*, 360 U.S. 310, 312, 79 S. Ct. 1171, 3 L. Ed. 2d 1250 (1959) (finding a change of venue necessary despite jurors at voir dire stating they could be impartial); *Irwin v. Dowd*, 366 U.S. 717, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961) (same); ABA Criminal Justice Standard 3.2(c) (explicitly not requiring a showing of actual prejudice at trial for a venue motion.)

819.   Even considering voir dire, both the trial court's unreasonable and improper restrictions on the publicity voir dire, and trial counsel's ineffective and prejudicial performance rendered the voir dire in Petitioner's case inadequate to

---

[63]   The *L.A. Times*, *Outlook*, and *The Daily Breeze*.

uncover bias and protect Petitioner's fair trial rights. Voir dire was divided into four distinct phases: (1) hardship questioning, (2) publicity questioning, (3) questioning on attitudes regarding the death penalty, and (4) general voir dire. After prospective jurors expressing hardships were dismissed, individual jurors were sequestered and questioned individually about publicity. Those who "passed" this stage were then given questionnaires. (*See* VI Supp. CT, Vols. 1-17.) Finally, jurors were questioned generally and about their attitudes on the death penalty.

820. While the trial court took precautionary steps during the publicity questioning by sequestering the jury and allowing counsel to directly ask questions, its errors during this phase of questioning prevented voir dire discovering the extent to which the jury pool was prejudiced by publicity; thereby failing to protect Petitioner's fair trial rights.

821. Publicity voir dire began on July 21, 1988 and ended on September 1, 1988. (*See* 65 RT 4856 - 89 RT 9483.) On August 1, 1988, the trial court decided "to limit counsel on both sides to ten minutes per prospective juror with regards to this so-called publicity aspect of the case." Counsel objected, and even filed a memorandum of points and authorities, but the court kept the limitation in place throughout the publicity voir dire. (*See* 81 RT 7727-28.)

a. The trial court's arbitrary time limit stifled counsel's ability to fully question jurors regarding their attitudes based on the massive publicity surrounding the Night Stalker phenomenon. The trial court's apparent irritation with trial counsel that led to the enactment of the time limit created a chilling effect on counsel's questioning of prospective jurors.

b. Dr. Bronson, who reviewed a reasonably representative sampling[64] of the publicity voir dire, found that of the near sixty panelists he reviewed, the trial court warned trial counsel five times that he was approaching the ten-minute mark. He never once asked the court for additional time with a prospective juror, "even when he seemed to be on to a potential problem." (Ex. 75, E. Bronson Dec., ¶ 236.) To the extent counsel's failure to follow up on crucial issues and continuously object to the time limitation counsel's error, trial counsel was acting deficiently and prejudicially.

822. The trial court further stripped the publicity voir dire of its effectiveness by giving repeated instructions to the panelists about their duty to remain impartial and unbiased. This left panelists with a clear impression as to what the appropriate answer should be. The panelists knew exactly what the trial court wanted to hear and they were under a certain amount of pressure to deliver.

a. Examples of the trial court's admonishments to panelists included the following:

(1) "Because of the publicity surrounding this case, the jurors must be examined to see if they have formed any firm opinions about the guilt or innocence of Mr. Ramirez and whether or not those opinions can be set aside." (65 RT 4830-31); and

---

[64] Dr. Bronson reviewed the first ten panel members on three dates: the first day of publicity voir dire, the last day of publicity voir dire, and the date falling in the middle of the process. He also examined each of the seated and alternate jurors' publicity voir dire. (Ex. 75, E. Bronson Dec., ¶¶ 191, 193.)

(2)     "It is important that jurors be unbiased and free from
any preconceived notions about whether this defendant
in a criminal case is guilty or innocent."  (65 RT 4856.)

b.     The trial court repeatedly reminded individual panelists of its
admonishments during the questioning.  For example, the
court asked,  "Do you remember my -- the last thing I gave to
the jury this morning about presuming the defendant
innocent?"  (77 RT 7078.)  "Could you follow the court's
instruction that you heard this morning with regard to the
presumption of innocence?"  (89 RT 9380.)

823.   While a trial court certainly has an obligation to admonish a jury
regarding their requirements necessary for a fair trial, doing so before they have
been questioned by counsel or have even filled out questionnaires obstructs
counsel's ability to accurately assess potential bias.  (Ex. 75], E. Bronson Dec., ¶¶
197-99.)  The prospective jurors quickly realized from the trial court's
instructions that they should say they can be fair and impartial.  An example of
this dynamic between a court and prospective juror can be seen in the following
interplay during publicity voir dire:

The Court:   That's right.  The idea is whether or not he did them.
That is what this trial is all about.

Panelist:    Yeah, Yeah.

The Court:   Whatever opinion you have for him, Ma'am, do you
believe you could set that opinion aside and be a neutral
and objective juror in this case?

Panelist:    Yes, considering what you said this morning.

The Court: Okay.

Panelist:    I think he's entitled to a fair trial.

The Court:   Okay.  Could you then follow the court's instruction
             about the presumption of innocence?

Panelist:    Yes.

(77 RT 7095.)

824.   Instead of the trial court's ill-timed admonishment to prospective jurors about the need for a presumption of innocence and an unbiased jury, the court should have given, as many courts do, an instruction tailored specifically to voir dire.  This admonishment would have instructed jurors to be honest and forthright, that there are no right or wrong answers, and that their only obligation is to answer truthfully.  (Ex. 75, E. Bronson Dec., ¶ 201.)  Instead, the trial court's implicitly suggestive instructions to the prospective jurors prevented the voir dire process from performing its required function, and is another reason why prejudice should be presumed when assessing the necessity of a change of venue in Petitioner's case.

825.   Compounding the trial court's errors, trial counsel's performance during the voir dire of prospective jurors amounted to incompetence and rendered the voir dire inadequate to identify the extent of prejudicial publicity.  Trial counsel unconstitutionally deficient performance during its questioning of prospective jurors, and by its failure to renew its motion for change of venue following the publicity voir dire.  But for the trial counsel's deficient performance, the voir dire would have revealed overwhelming prejudice due the venire due to pretrial publicity and a change of venue would have been granted. (*See Id*., ¶¶ 225-39.)

826.   Trial counsel was prejudicially deficient in preparing and presenting the questionnaire given to prospective jurors.  Curiously, trial counsel allowed the questionnaire, which contained five questions regarding publicity, to be given to prospective jurors *after* they had already passed the publicity voir dire.  Therefore, counsel did not have the benefit of the written responses when

questioning the jurors.  When voir dire was already limited to just ten-minutes, failure to have questionnaires given to the panelists *before* publicity questioning wasted unnecessary and valuable time to get at juror bias.  Competent counsel would have strenuously objected to the trial court's desire to give the questionnaires in this order.  (*See* 140 RT 15967.)  There was no reasonable strategic decision that could justify such a strategy, especially where the questionnaire contained largely unhelpful and vague inquiries.  (Ex. 75, E. Bronson Dec., ¶ 227.)  Indeed, in Dr. Bronson's extensive career, he has never once encountered such a procedure.  (*Id.*, ¶ 226.)

827.  During the publicity voir dire, trial counsel prejudicially failed to sufficiently question prospective jurors about their potential biases.  In the fifty-seven juror voir dires examined by Dr. Bronson, trial counsel never once exceeded the ten minute time limit improperly imposed by the court, and only came close to approaching the ten minute mark five times.  (*Id.*, ¶ 236.)

a.  In some instances, trial counsel failed to question prospective jurors at all.  There could be no reasonable strategic decision not to do so.  For example, two consecutive jurors were asked no questions by counsel even though one admitted to reading newspaper articles and another admitted watching television and reading newspapers.  (*See* 65 RT 4885-88.)  As counsel varied the degree and nature of his inquiry from panelist to panelist randomly, identifying prejudice essentially depended on the luck of the draw.  (Ex. 75, E. Bronson Dec., ¶ 233.)

b.  One prospective juror remembered hearing about the crimes when they occurred and that there were signs of devil worship and pentagrams in the victims' residences.  This panelist knew "certain barbaric activity" occurred during the crimes and that there was no doubt Petitioner was the Night Stalker since the

police did their homework. Yet, superficially saying she could put all that aside, trial counsel passed on challenging her for cause. (66 RT 5063-76.)

c.   Yet another prospective juror admitted to feeling relief when Petitioner was arrested and to thinking Petitioner was guilty. Trial counsel again passed on challenging for cause. (68 RT 5386-5407.)

d.   A prospective juror doubted that he could completely forget about the crime. When the trial court gets him to say he thinks it will not influence him, however, the defense passes for cause. (87 RT 8827-38.)

e.   Still another prospective juror admitted to thinking the authorities arrested the right suspect, Petitioner, and that he is aware Petitioner is the only suspect apprehended. When, in response to the trial court's questioning, he says he can form an opinion based on what he heard in court, trial counsel passed for cause. (87 RT 8892-9004.)

f.   In another example, one panelist admitted she knew Petitioner as the "Night Stalker," remembered his picture, said that he committed murder of families, was familiar with the case before he was arrested, expected Petitioner to show evidence that he was not guilty and disprove what was heard in the media, admitted it would be difficult to forget things she heard in the media, and heard he was a devil worshiper. (75 RT 6729-39.) Yet trial counsel acted as an essential prosecutor, asking the juror rehabilitating questions such as "Can you tell me what you've heard -- specifics that you've heard that -- well, what you've heard about the case that would tend to tell

you that he's guilty." (*Id.* at 6735.)  Ultimately, evidencing the prejudice from counsel's deficient performance, trial counsel passed on a challenge for cause. (*Id.* at 6739.)  This juror was eventually seated and served as juror #12.

g.    Still again, a prospective juror admitted to remembering seeing Petitioner on television "holding up his hand with a pentagra[m] on it, and Petitioner saying the words 'hail satan.'" (65 RT 4867.)  Nevertheless, trial counsel inexplicably passed on a challenge for cause.

h.    Each of these examples demonstrate counsel's deficient performance in identifying and challenging potential jurors who indicated prejudice due to pretrial publicity.  Had counsel effectively questioned the jurors, more evidence of actual prejudice necessitating a change of venue would have become apparent.

828.    Even with the trial court's improper handling of voir dire and trial counsel's deficient performance, a review of the publicity voir dire demonstrates sufficient prejudice to warrant a change of venue.  There was a 100% recognition rate of Petitioner's case among the thirty panel members not seated on Petitioner's jury and reviewed by Dr. Bronson.  Fourteen of those thirty, or 46.7%, said that they thought Petitioner was guilty even after the trial court's attempts to rehabilitate them.  Eleven of the thirty were excused for cause.  (Ex. 75, E. Bronson Dec., ¶ 206.)  Among the seated and alternate jurors, twenty-six of twenty-seven jurors  recognized Petitioner's case prior to voir dire.  (*Id.*, ¶¶ 209, 223.)  The lone juror who did not recognize the case stated that he never read the newspaper.  (89 RT 9401-11.)

829.    These numbers are buttressed by the fact that the questionnaires filled out by jurors who passed publicity voir dire indicated a 94.7% recognition

305

rate -- higher than the 94.3% rate obtained in Dr. Strand's community survey conducted in 1986. (Ex. 75, E. Bronson Dec., ¶ 204.) This becomes significant when recognizing the length of time between the commencement of news coverage (May of 1985) and the voir dire questioning (1988.) While traditional logic indicates case-recognition lessens over time, Petitioner's case was essentially burned into the collective memory of the county, as the recognition rate actually went up with the passage of time. This caused Los Angeles to become the functional equivalent of a much smaller community in which Petitioner faced a higher likelihood that he could not receive a fair trial. (*Id.*)

830.    The raw numbers do not fully portray the extent of prejudice shown by the voir dire. Rather, the publicity voir dire had many problems that understated the true extent of prejudice due to pretrial publicity.

831.    A phenomenon known as "response bias" causes prospective jurors (as well as respondents interviewed in surveys) to pick up on even subtle clues as to what the interviewer, or trial court, wants to hear. (*Id.*, ¶¶ 213-14.) A prospective juror's preconceived notions of due process along with a trial court's admonishments give him/her a clear message that a "good" juror is not supposed to have prejudicial biases against a defendant, and if he/she does, he needs to be able to set them aside. Prospective jurors may therefore give the impression of being a "good juror" even if they harbor such biases. (*Id.*) This is not an intentional act of deceit by prospective jurors, but rather a masking of certain information due to hidden response bias. (*Id.*)

832.    The publicity voir dire in Petitioner's case was ripe with examples of response bias, where the prospective jurors were essentially taught to give acceptable answers. For example, the trial court asked one panelist if she had an opinion on guilt. She responded, "I have heard what you said this morning about being innocent until you are proven guilty. I would go by that." (77 RT 7094.) Her assertion that she could follow the proper guilt presumption was bellied by

her other statements that "I can't understand how anybody could do such things and be innocent," (*Id*. at 7094), and "[Petitioner] claimed to have done it, you know." (*Id*. at 7097.) Her mere recitation of the court's admonishment thus appeared "to be more a product of training rather than her true feelings[.]" (Ex. 75, E. Bronson Dec., ¶ 207.)

833. In yet another example of the difficulty of ascertaining jurors' prejudice because of their desire to give acceptable responses, one prospective juror initially admitted that he had believed Petitioner was guilty. (89 RT 9389.) The trial court then rehabilitated the panelist, asking him "do you feel that [Petitioner is guilty] very strongly?" to which the juror replied "Well, I can't say strongly, but from the media attention and what they said and stuff, that's what I think inside my head." (*Id*. at 9389-90.) It then asked the panelist if it would be difficult to set aside his opinion and "be a neutral and objective juror" to which the panelist said, "no." (*Id*. at 9390.) When counsel began to question the juror, however, it came out that he remembered everybody he knew was afraid or worried about their safety and was relieved when Petitioner was arrested. The panelist even conceded that once he saw that after Petitioner's arrest no one was "crawling through people's windows and stuff" he knew thought Petitioner was guilty. (*Id*. at 9393.) Illustrating response bias, the panelist said that he knew "they say that you are not supposed to [prejudge a defendant]." (*Id*.) Only when the panelist admitted, in contradiction to his initial statement to the court, that it would be difficult for him to be impartial did the trial court excuse him. This, however, was a rare occurrence of extensive questioning by counsel. Assuredly much more information and prejudice went undiscovered through the court's approach at preinstructing the jury pool.

834. Where publicity voir dire did expose prejudice among prospective jurors, often times the trial court would improperly ignore it, and "pass" the prospective juror regardless of his/her indication of prejudice. Despite the trial

court's error, these panelists' voir dire provides powerful evidence that pretrial publicity raised a reasonable likelihood Petitioner could not have received a fair trial in Los Angeles County:

a. For example, one panelist said "he [Petitioner] is the Night Stalker." (77 RT 7046.) She added that her friends gave her opinions about the case based upon their following of the news stories. Trial counsel would get her to say, "Everyone assumed right away he was guilty, why do they want to have a trial," (*Id*. at 7050), that "I have a couple girlfriends that were afraid to see his face on T.V. They say he was evil, 'Oh, he looks evil.'" (*Id*. at 7053.) She talked about her friends who "were sleeping with their guns under the bed," one of whom "couldn't sleep at all until he was captured." (*Id*.) Despite trial counsel's initial challenge for cause, the trial court ended up passing this panelist.

b. Another panelist noted the killings stopped after Petitioner was arrested and that the media seems to think he is guilty. The panelist even admitted to thinking Petitioner is guilty based on what she has read, but understands the need to be proven guilty in court. Curiously, she admits she does not believe he is innocent but at the same time claims she could be objective. The trial court denied trial counsel's challenge for cause. (67 RT 5255-5274.)

c. In another example, a prospective juror talked extensively about the fear everyone felt around the Night Stalker, including the precautions she took and her relief when he was arrested. The trial court denied trial counsel's challenge for cause. (69 RT 5554-80.)

d.     A prospective juror admitted to thinking Petitioner was probably guilty, that it was the publicity that made her feel this way, and that she would have trouble setting that aside. The trial court improperly rehabilitated the juror and denied trial counsel's challenge for cause.  (79 RT 7357-73.)

e.     These examples, along with those instances where trial counsel simply failed to challenge a juror for cause, demonstrate the extent of prejudice the pretrial publicity in Petitioner's case had on the jury pool.

835.    A weak voir dire process, brought about by deficient counsel and trial court error, made it difficult to identify the scope of prejudice affecting Petitioner's jury pool.  Even so, with such a high rate of recognition and prejudgment, and an "unusual" number of panelists who admitted bias, the voir dire revealed the need for a venue change.  (Ex. 75, E. Bronson Dec., ¶ 224.)  Because of the trial court's improper handling of the voir dire, trial counsel's deficient performance, and instances of response bias, the voir dire examination prospective jurors provides little confidence that Petitioner could receive a fair trial in a community so saturated with prejudicial and inflammatory media publicity.  (*Id.*)  Therefore, if the Court decides not to presume prejudice based on the pre-trial publicity in Petitioner's case, the constitutional error by the trial court in failing to grant a change of venue, and the unreasonable affirmation by the California Supreme Court  are demonstrated by the actual voir dire of prospective jurors.

**B.    To the Extent the Trial Court Did Not Commit Error by Denying Petitioner's Venue Motion, the Denial was the Result of Counsel's Ineffective and Deficient Performance**

836.    While Petitioner maintains the trial court violated his constitutional rights by failing to grant a change of venue, to the extent the Court finds the trial

309

court's or the California Supreme Court's determination was reasonable, trial counsel was ineffective in presenting evidence that would have conclusively shown a change of venue was required. Trial counsel's failure to competently voir dire prospective jurors, renew the venue motion after voir dire, or even file a writ of mandamus from the trial court's denial of the venue motion constituted prejudicially deficient performance. Hence, trial counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. *See Strickland*, 466 U.S. 668.

837. As a result of trial counsel's incompetence, there was a complete breakdown in the adversarial process. Counsel's performance impaired the proper functioning of the criminal justice system such that the proceedings cannot be relied on as having produced a just result. *Id*. at 686. There is a reasonable probability that but for counsel's failings, the result of the venue motion would have been more favorable. *Id*. at 687-96. Moreover, the failure to obtain a change of venue prejudiced Petitioner at the guilt phase and particularly at the penalty phase.

838. Trial counsel's incompetence was most apparent in their attempts to admit evidence of the extent and nature of prejudicial publicity in Petitioner's case. Trial counsel lacked basic knowledge of the law, including the most fundamental rules governing authentication of documents under the evidence code. Further, trial counsel's haphazard and sloppy attempts at introducing evidence, riddled by mistakes and clerical errors, only exacerbated the prejudicial effects of its ignorance of the law.

839. Trial counsel offered into evidence hundreds of newspaper articles and computerized printouts of local television stories[65]. This included the

---

[65] Trial counsel admitted it did not attempt to retrieve *all* articles from various sources because it did not have time and because it felt the court would

310

following exhibits presented during the defense trial motion for a change of venue, which can be found in Exhibit 9 to Petitioner's State Petition for Writ of Habeas Corpus:

a.  Exhibit A -- computerized printouts of sixty-seven articles from the Los Angeles Daily News.

b.  Exhibit B -- computerized printouts of at least 225 television stories from Channel 7 News.

c.  Exhibit C -- fifty articles from the San Gabriel Valley Tribune.

d.  Exhibit D -- thirty-three newspaper articles from the Los Angeles Times.

e.  Exhibit F -- eighteen articles from the Los Angeles Herald.

f.  Exhibit F -- two articles from the Press Telegram.

g.  Exhibit G -- five articles from the Pomona Press Bulletin.

h.  Exhibit H -- one article.

i.  Exhibit I -- three articles from the Pasadena Star News.

j.  Exhibit J -- four articles from the Arcadia Tribune.

k.  Exhibit K -- three articles from Rafu Shimpu.

l.  Exhibit L -- four articles from the Torrence Daily Breeze.

m.  Exhibit M -- two articles from the Monrovia News.

n.  Exhibit N -- three articles from La Opinion (in Spanish language.)

o.  Exhibit O -- one article from the Whittier Daily News.

p.  Exhibit P -- three articles from the Glendale News Press.

---

find multiple articles repetitive. (16 RT 757-58.) This proffered reason fails to recognize the importance of showing the "extent" of media coverage as required by the five California venue factors.

q.   Exhibit Q -- one article from the Eagle Rock Sentinel.

r.   Exhibit R -- set of television ratings.  No documentary evidence was offered with respect to the significance of the ratings.  The court indicated that many cases held an expert should be called to interpret ratings, but counsel did not present an expert.  (16 RT 769-70.)

s.   Exhibit S -- computerized printouts of 265 wire service stories.

t.   Exhibit U -- letter from KABC forwarding printouts.

u.   Exhibit V -- letters from San Gabriel Tribune.

v.   Exhibit W -- declaration of editor of La Opinion.

w.   Exhibit X -- six videotapes from Channel 4.

x.   Exhibit Y -- videotape from Channel 52.

840.   Within these documents were hundreds of media accounts that recounted the gruesome details of the crimes, the pervasive sense of terror that had gripped Los Angeles County, and inflammatory and prejudicial accounts of the "Night Stalker" and Petitioner.  Yet trial counsel failed to have these materials admitted because of its failure to lay a foundation or authenticate the articles:  a basic requirement and rule of evidence.

a.   For example, the trial court rejected Defense Exhibit A because counsel failed to introduce any evidence that the documents were actually published.  (16 RT 722-26.)  To compound matters, trial counsel had mistakenly labeled the articles as being from television broadcast channels when they were actually printouts of articles from the Los Angeles Daily News.  (*Id*. at 718-721.)

b.   Another example of trial counsel's almost brazen incompetence occurs when, responding to an objection that

the defense failed to authenticate the articles by showing they were actually published, trial counsel attempts to prove authentication by pointing to a letter sent to counsel from the news company attesting that the articles were published. The problem: trial counsel did not introduce that letter into evidence so the court did not have it to consider. (*Id*. at 726.)

    c.    To authenticate articles from the San Gabriel Valley Tribune, counsel offered a declaration from a librarian dated July 31st. The articles included stories up through September 3rd, however. Therefore, the court dismissed the declaration as unreliable and misleading, as it did not, as proffered by trial counsel, account for the authenticity of over a month's worth of articles. (*Id*. at 747-750.)

841. Trial counsel's argument for having the articles admitted had no support in the law. For example, in a December 23, 1986 motion, trial counsel requested that the court "should take judicial notice" of certain articles from the Los Angeles Times, San Gabriel Valley Tribune and United Press International. (XXII CT 6548.) Counsel also requested that the trial court "should acknowledge that the comments reported in the following articles correctly reflect the opinions and concerns of the officials being quoted" and the "type of community awareness and preoccupation with the 'NIGHT STALKER' crimes." (*Id*. at 6548.) Counsel repeated this argument during the argument as well. (*See* 16 RT 717, 741.)

    a.    Trial counsel's attempt to introduce records by judicial notice was fatally flawed. Judicial notice was legally unavailable for admission of documentation for the purpose of proving community attitudes. Under the clear wording of California Evidence Code § 451 (matters which must be judicially

noticed) and § 452 (matters which may be judicially noticed.), the law does not contemplate its use to prove community attitudes in a change of venue hearing. (*Id*. at 712-13.) On more than one occasion, counsel insisted that authentication was not necessary. (*Id*. at 704, 717.) The trial court refused to admit the material. (*Id*. at 705-17; *see* Evidence Code § 1400; *People v. Mayfield*, 14 Cal. 4th 668, 928 P.2d 485, 60 Cal. Rptr. 2d 1 (1997).

b. More importantly, trial counsel's argument focused solely on the subject of the articles, *e.g.* the community feelings regarding the Night Stalker, rather than the fact that the articles were published. This misplaced focus improperly ignored the relevance of the nature and extent of publicity, and the effect of publicity on a jury pool. The fact that an article was published, and repeated inflammatory or prejudicial statements, is just as important as whether the article was accurate or truthful in its account of the community's feeling. In fact, an article *misrepresenting* facts may be even more powerful evidence supporting a change of venue than articles that were purely factual. Counsel's failure to grasp this point was unreasonable.

842. Perhaps realizing its deficient performance, counsel admitted, "I am under some medication, I am not making a lot of sense sometimes and I advise the court I have been under medication for the last two weeks. Let the record be clear that if you are having some problems, it is perhaps because of my medication." (16 RT 741.) A reasonable justification for abridging Petitioner's right to counsel does not include being medicated.

314

843.  Trial counsel's confusing, mistake-riddled, and legally baseless attempts to introduce evidence at the venue hearing led the trial court to the extraordinary step of finding trial counsel incompetent on the record.  On January 6, 1987, in the presence of only Petitioner and his counsel, the trial court personally addressed Petitioner:

> [In] my opinion your lawyers are incompetent.  Now I have had this case for six months . . . in my opinion they are not competent to handle your case.  I don't think that they have sufficient experience in the law.  . . . I don't think they know the law well enough, I don't think they know the rules of evidence well enough, they are not ready to present the evidence. . . .  And I am telling you now that your rights are not being protected.

(16-A RT 733-734 (sealed).)  While the trial court erred in not protecting Petitioner's rights once it realized they were being infringed by trial counsel, this was powerful evidence of deficient performance.

844.  Trial counsel's deficient performance was not limited to its attempts to introduce evidence, but permeated the entire venue motion, including the presentation of television media and witness testimony.  For example, trial counsel insisted the court view video-cassettes consisting of television broadcasts related to the Night Stalker crimes and Petitioner's arrest.  (9 RT 248-67.)  Yet counsel appeared to have no idea what information the tapes contained; merely pressing the "play" button on the VCR and encumbering the trial court with hours of unfocused television viewing.  Despite the apparent annoyance by the trial court at viewing endless video without any explanation as to its relevance, trial counsel presented no explanation or analysis of what was being viewed or why it was prejudicial or inflammatory.

845.   Trial counsel's incompetent presentation of the video-tape evidence allowed the trial court to commit error by finding the only relevance from the tapes were their demonstration of the "frequency and saturation" of coverage. (*Id*. at 268-70.)  Perhaps even more important than showing extent of coverage, the video tapes should have been considered for the "nature" of the coverage about Petitioner -- including inflammatory, inaccurate, and inadmissible materials being broadcasts throughout Los Angeles County.  (*See e.g.* Ex. 79, Channel 11 Scripts.)  Trial counsel failed to explain to the court how the content, and even the repetitiveness, of the broadcasts provided evidence of the *prejudicial* publicity inundating Los Angeles County's jury pool.

846.   In examining witnesses during the venue hearing, counsel at times seemed unable to frame questions to witnesses.  For example, when questioning defense expert Dr. Paul Blair, trial counsel could not pose a basic hypothetical, even with clear direction from the court.  (14 RT 595-97.)  Finally, the court had to take over questioning and ask the hypothetical itself.  In another example, trial counsel could not perform the basic task of laying the foundation for a question about a witness's ability to perceive, forcing the court to ask the proper question instead.  (15 RT 669-70.)

847.   At the conclusion of voir dire, trial counsel unreasonably and prejudicially failed to renew the change of venue motion or file a writ of mandamus to the appellate court challenging the trial court's adverse ruling.  This procedure was standard practice after the 1968 California Supreme Court decision of *Maine v. Superior Court*, 68 Cal. 2d at 381 (discussing procedures to file a writ of mandamus challenging the denial of a change of venue and for renewing a motion.)  Trial counsel's failure to renew the motion following voir dire unreasonably suggested counsel was satisfied with the jury.  More importantly, counsel's failure to file a writ of mandamus prejudiced Petitioner because the "reasonable likelihood" standard does not include an actual prejudice

assessment during a writ, and because courts are more willing to grant a change of venue on appeal *before* the trial takes place. *See id.* ("it is proper, and often preferable, to determine the place of trial prior to the actual trial of the case rather than afterwards.")

848. Had counsel operated at even a minimal standard of competency, the trial court would have accorded appropriate weight to the evidence of pretrial publicity and granted Petitioner's motion for a venue change. While the court did consider and acknowledge news articles not formally accepted into evidence, competent counsel could have ensured the court appropriately considered the evidence before it.

849. Trial counsel did not offer a content-analysis similar to what Dr. Bronson performed. Left with unfiltered and unexplained video of television broadcasts, a sampling of various newspaper articles, and its own knowledge of the *L.A. Times* and other media publicity, the trial court failed to notice or consider the *nature* of the publicity that saturated Los Angeles county. Instead, the trial court unduly focused on the "extent" of coverage when it assessed the publicity. (*See, e.g.,* 9 RT 269-70; 16 RT 712-15, 764-65.)

850. Further evidence of the prejudice resulting from trial counsel's deficient performance can be seen in the California Supreme Court's discussion of the venue motion. When discussing the "nature" of the publicity, the California Supreme Court noted the "defendant did not show that the media coverage was unfair or slanted against him or revealed incriminating facts that were not introduced at trial." *Ramirez*, 39 Cal. 4th at 433. While this finding by the California Supreme Court is an unreasonable determination of the facts based on what was actually presented and considered during the motion, (*see e.g.* ex. 79, Channel 11 Scripts), it does indicate that had counsel been more explicit in explaining the nature of the publicity, the venue motion would have been granted.

851.    The foregoing violations of Petitioner's constitutional rights, taken singly or in combination with the other errors alleged in the Petition, constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)  Even assuming, however, the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Petition, so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violations of Petitioner's  rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice.  *See id.* at 622, 637-38.

852.    In addition, the denial of his right to effective assistance of counsel substantially prejudiced Petitioner, rendered the trial proceeding fundamentally unfair, eroded the reliability of the verdict and had a substantial and injurious effect on the verdict.  But for the denial of this right, it is reasonably probable that a more favorable result would have been attained.  Under these circumstances, the adversarial system completely broke down, and Petitioner was left without meaningful representation.  Although many of trial counsel's errors were, by themselves, so egregious as to require reversal, the extraordinary accumulation of errors and omissions over the course of the trial created a total breakdown in the adversarial process, so that prejudice is conclusively presumed.  *United States v. Cronic*, 466 U.S. 648, 656-662, 104 S. Ct. 2039, 2045-48,  80 L. Ed. 2d 657 (1984).  Even assuming a showing of prejudice is required, Petitioner has made that showing here.  *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

**CLAIM 7:**

## THE TRIAL COURT VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS BY REJECTING PETITIONER'S FOR-CAUSE CHALLENGES OF JURORS WHO WERE NOT LIFE-QUALIFIED

853. Exhaustion of the claim: The portion of this claim regarding Robert Domney was fairly presented to the California Supreme Court in the direct appeal in Section VIII of the Opening Brief. The remaining portion will be presented to the California Supreme Court in an exhaustion petition that Petitioner will file no later than March 17, 2009.

854. Ramirez's convictions, sentences, and death judgment violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the trial court erroneously denied his for-cause challenges against jurors who were not life-qualified, forcing him to use peremptory challenges, which he exhausted. *Morgan v. Illinois*, 504 U.S. 719, 728, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992).

855. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

856. Those facts and allegations set forth in the petition, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

857. <u>Robert Domney</u>: On his questionnaire, prospective juror Robert Domney stated that he believed the State should impose the death penalty upon everyone who for any reason intentionally kills another human being, during the course of a robbery or otherwise. (IV Supp. CT 9, at 2715.) During *Hovey voir*

*dire*, Domney stated that he considered himself a strong supporter of the death penalty in California; that on a scale of one to ten, he would call himself an eight; and that he considered the death penalty a just punishment for some crimes, including murder, unless it was in self-defense. (*See* 120 RT 13261-76.) Domney indicated that he would automatically vote for the death penalty if no mitigation evidence were presented at a penalty trial. However, on examination by the prosecutor, Domney said that he would not vote for the death penalty automatically in a case of first degree murder, and that he could consider all of the facts and consider life imprisonment without the possibility of parole equally along with the death penalty. (120 RT 13261-76.)

858. Based on Domney's responses, Petitioner challenged him for cause. The prosecutor asserted that Domney should not be disqualified on the ground that he would "automatically" vote for the death penalty. The trial court, in substance, agreed with the prosecutor, saying that the juror was "about 80 percent in favor of the death penalty," which was not sufficient for disqualification. Petitioner's challenge for cause of Robert Domney was denied. (120 RT 13276; XXVIII CT 8182.)

859. Petitioner subsequently exercised a peremptory challenge to remove Domney from the jury. (141 RT 16054.) Petitioner exercised all twenty peremptory challenges and moved to increase the number of peremptory challenges. On January 10, 1989, the trial court denied this request. (*See* 133 RT 14937; XXVIII CT 8260.)

860. The California Supreme Court has repeatedly held that "neither the prosecution nor the defense has the burden of proof" during the penalty phase. *People v. Daniels*, 52 Cal. 3d 815, 890, 802 P.2d 906, 277 Cal. Rptr. 122 (1991). Robert Domney made it clear that he favored the death penalty as the appropriate

punishment and would place a burden on a defendant to prove that death was not the appropriate punishment.

861. In *Wainwright v. Witt*, 469 U.S. 412, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985), the Supreme Cou held that the proper standard for a determination of when a court may excuse a prospective juror for cause because of his views on the death penalty is whether the juror's views would "prevent or *substantially impair* the performance of his duties as a juror in accordance with his instructions and his oath." *Id.* at 424 (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S. Ct. 2521, 65 L. Ed. 2d 581 (1980)) (emphasis added).

862. Domney clearly stated his views: he was a strong supporter of the death penalty and favored the death penalty in nearly all situations – unless the defendant proved self-defense or demonstrated at a penalty trial why his life should be spared. There was no doubt in his mind that the defense had a burden of persuasion with respect to the death penalty. Even though the juror stated that he would consider the evidence, he could not "faithfully and impartially apply the law." *Witt*, 469 U.S. at 426.

863. The record here shows that Domney held views that would substantially impair his ability, conscientiously and impartially, to perform his duty to judge the evidence and determine the penalty. The record reflects that there was nothing equivocal or conflicting in his answers. *People v. Breaux*, 1 Cal. 4th 281, 309-10 821 P.2d 585, 3 Cal. Rptr. 2d 81 (1991); *see also People v. Mattson*, 50 Cal. 3d 826, 844, 789 P.2d 983, 268 Cal. Rptr. 802 (1990); *People v. Wash*, 6 Cal. 4th 215, 254-55, 861 P.2d 1107, 24 Cal. Rptr. 2d 421 (1993). Thus, the trial court erred in denying the challenge for cause as to Domney.

864. In *Morgan v. Illinois*, 504 U.S. 719, 728, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992), the Supreme Court held that a defendant is entitled to challenge for cause any prospective juror who has already formed an opinion on the merits

and would automatically vote for death.  Such a juror who would act otherwise would not give the defendant an impartial trial as required by the Sixth Amendment or a reliable penalty determination under the Eighth Amendment as required by *Woodson v. North Carolina*; *Lockett v. Ohio*, 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978); and *Caldwell v. Mississippi*, 472 U.S. 320, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985).  To ensure his right to jury impartiality under the Sixth and Fourteenth Amendments, Petitioner was entitled to have prospective juror Domney removed for cause.

865.   Because of the court's erroneous ruling, Petitioner exercised a peremptory challenge to excuse Domney.  Petitioner ultimately exercised all his peremptory challenges.  (*See* 133 RT 14873, 14923-26, 14937, 14939, 14952, 14970.)  The court denied Petitioner's request for additional peremptory challenges.  (*See id*. at 14887; XXIV CT 6976-86; XXVIII CT 8260.)  The trial court's denial of the challenge for cause thus prejudiced Petitioner.

866.   The trial court's error in denying Petitioner's challenge of Domney for cause, combined with the limited number of peremptory challenges, interfered with Petitioner's constitutional rights to an impartial jury, due process, and to equal protection of the laws.

867.   <u>Johnnie Sansberry</u>:  At *Hovey voir dire*, prospective juror Johnnie Sansberry stated that he "strongly" supported the death penalty in a case of multiple murders.  (105 RT 11520.)  "[I]f it is premeditated murder, it would be the death penalty," Sansberry testified, although he later stated that "normally I probably would" vote for the death penalty in such a case.  (*Id.* at 11521.) Sansberry testified that he would not vote for the death penalty if a killing were accidental, but that he would always vote for the death penalty if the defendant had committed an intentional murder during a burglary.  (*Id.* at 11522-24.)

868.   The defense challenged Sansberry for cause, but the challenge was

denied. (*Id.* at 11528.) The court held that it would grant defense challenges of prospective jurors who had given disqualifying answers only if defense counsel had asked whether the jurors would automatically vote for death even after considering mitigation evidence. (*Id.* at 11528-29.)

869. The trial court erred in denying the motion for cause. Sansberry was not qualified to sit as a penalty phase juror in a case involving multiple murders or murder in the course of a burglary. His views on the death penalty in such cases "substantially impaired" his ability to serve impartially. As with Robert Domney, Petitioner was forced to use a peremptory strike to remove Sansberry from the jury. (129 RT 14494.) Furthermore, the trial court erred in placing upon Petitioner the responsibility to "rehabilitate" jurors by asking them about mitigation evidence.

870. <u>Josie Carter</u>: Josie Carter wrote on her juror questionnaire that, "[r]egarding the death penalty, any person involved or has been proved guilty of committing a series of murders and proven guilty beyond a reasonable doubt should serve the death penalty." (108 RT 11855.) She affirmed this questionnaire response at *Hovey voir dire*. (*Id.* at 11856-59.) Carter also said the death penalty was used too seldom in California, and that she would always vote for the death penalty in a case of intentional murder during the course of a burglary. (*Id.* at 11863-65; VI Supp. CT 8, at 2363.) Although she said that she wanted to hear "everything" before voting on a penalty (108 RT 11868.), when her *voir dire* testimony is read as a whole, it becomes clear that by "everything," Carter meant all evidence regarding the defendant's *guilt*. (*See id.* at 11871.)

871. The trial court denied defense counsel's motion for cause (*id.* at 11874.), and defense counsel later used a peremptory challenge to remove Carter (130 RT 14527.). The trial court's decision was error. The court noted that Carter's answers favoring imposition of the death penalty were not phrased in absolute terms (108 RT 11873.), but the relevant question is whether Carter's

views "substantially impaired" her ability to serve impartially.  Clearly Carter was substantially impaired in a case involving multiple murders or murder during the course of burglary.  Because Petitioner's case involved both circumstances, Carter was not qualified to serve in his case.

872.    <u>William Christopher Conklin</u>: Prospective juror Conklin believed that

the death penalty was given too seldom.  (IV Supp. CT 9, at 2522.)  On his questionnaire, he stated that he believed that the state should impose the death penalty upon everyone who for any reason intentionally kills another, and anyone who intentionally kills another during the course of a burglary.  (*Id.*)  At *Hovey voir dire*, Conklin testified that there were some cases in which he would vote for the death penalty regardless of any information about the defendant or his background.  (108 RT 11935.)  A case involving multiple brutal murders would be one such case.  (*Id.* at 11937.)  Conklin even went so far as to say that, based on what he knew of Petitioner's case at the time, he would automatically vote for the death penalty in Petitioner's case.  (*Id.* at 11939.)

873.    At this point, the court stepped in and "rehabilitated" Conklin by leading him to state that he would consider mitigation evidence before voting on the appropriate penalty.  (*Id.* at 11939-40.)  Defense counsel objected to the court's suggestive "rehabilitation," but the court denied defense counsel's challenge nonetheless.  (*Id.* at 11943.)  The trial court's decision was constitutional error, as Conklin was "substantially impaired" in his abilities to serve on a capital jury in a case, like Petitioner's, involving multiple brutal murders.

874.    The trial court's decision to retain the aforementioned jurors because they stated that they could "consider" mitigation evidence was particularly unreasonable in light of the introduction the court gave to each group of new prospective jurors.  In this introduction, the court instructed the jurors that they

324

were *required* to consider such mitigating evidence. It stated that even after convicting a defendant of first degree murder and finding the special circumstances to be true, the jury "must listen to, consider and weigh all of the [mitigation] evidence before they come back with a verdict." (*See, e.g.*, 119 RT 13086.) In other words, the trial court informed the prospective jurors of the answer that was acceptable to the question they were about to be asked. Only a blatantly rebellious juror would, after this introduction from the court, state that he would not consider mitigation evidence.

875. The jurors' assurances that they would do so cannot negate the other responses establishing that their views on the death penalty "substantially impaired" their ability to serve. If a juror expresses a disqualifying dogmatic preference in favor of imposing the death penalty, a concomitant pledge to "follow the law" will not save him. "It may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so." *See Morgan*, 504 U.S. at 735.

876. The foregoing violations of Petitioner's constitutional rights, taken singly or in combination with the other errors alleged in the Petition, constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Petition, so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violations of Petitioner's rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them

325

1  fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622,
2  637-38.

3      877.   To the extent that this Court finds that this claim should have been
4  presented earlier, all prior counsel who failed to present the claim after the facts
5  on which it is based became known or should have been known rendered
6  ineffective assistance in not asserting it sooner, and the Court should consider the
7  claim on the merits. *Coleman v. Thompson*, 501 U.S. 722, 753-54, 111 S. Ct.
8  2546, 115 L. Ed. 2d 640 (1991); *Strickland v. Washington*, 466 U.S. 668, 104 S.
9  Ct. 2052, 80 L. Ed. 2d 674 (1984).

10 **CLAIM 8:**

11      **THE TRIAL COURT DEPRIVED PETITIONER OF HIS RIGHT TO**
12      **AN IMPARTIAL JURY BY ERRONEOUSLY EXCLUDING**
13      **POTENTIAL JURORS WHOSE CONCERNS ABOUT THE DEATH**
14      **PENALTY WOULD NOT HAVE SUBSTANTIALLY IMPAIRED**
15      **THE PERFORMANCE OF THEIR DUTIES**

16      878.   Exhaustion of Claim:  Ramirez will present this claim to the
17  California Supreme Court in an exhaustion petition that he will file no later than
18  March 17, 2009.

19      879.   Ramirez's convictions, sentences, and death judgment violate the
20  Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States
21  Constitution because the trial court erroneously excluded for cause two
22  prospective jurors who were actually qualified to serve, thus depriving Ramirez
23  of his right to an impartial jury.  *Witherspoon v. Illinois*, 391 U.S. 510, 88 S. Ct.
24  1770, 20 L. Ed. 2d 776 (1968); *see Gray v. Mississippi*, 481 U.S. 648, 668, 107 S.
25  Ct. 2045, 95 L. Ed. 2d 622 (1987).

26      880.   The exhibits filed with this Petition and the allegations set forth
27  elsewhere in this Petition are hereby incorporated by reference into this claim as
28  though set forth in full.

881.    The facts in support of this claim, among others to be presented after full investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing, include the following:

882.    The trial court committed prejudicial error by granting the prosecution's motions to exclude prospective jurors Ross Arakaki and Jose Garrido for cause.  Neither of these jurors expressed views regarding the death penalty that justified their exclusion under *Witherspoon*, 391 U.S. 510, or *Wainwright v. Witt*, 469 U.S. 412, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985).

883.    In *Witherspoon*, the Supreme Court held that the prosecution in a capital case may challenge a juror for cause, on the basis of opposition to the death penalty, only when the juror makes it unmistakably clear that he "would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before [him]."  391 U.S. at 523 n.21.  The Court explained that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction."  *Id.* at 522.

884.    The Court has never retreated from the central constitutional point it made in *Witherspoon*, that "[a] man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State and can thus obey the oath he takes as a juror."  391 U.S. at 519.  Indeed, "those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law."  *Lockhart v. McCree*, 476 U.S. 162, 176, 106 S. Ct. 1758, 90 L. Ed. 2d 137 (1986).  A challenge for cause is warranted only when a juror's views on capital punishment would "prevent or substantially impair the performance of his duties as a juror in

accordance with his instructions and his oath." *Witt*, 469 U.S. at 424 (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S. Ct. 2521, 65 L. Ed. 2d 581 (1980)) (internal quotation marks omitted).

885. Accordingly, prospective jurors are not excludable under *Witherspoon* and *Witt* merely because they (1) "voice[] general objections to the death penalty or express[] conscientious or religious scruples against its infliction," *Witherspoon*, 391 U.S. at 522; (2) express nervousness or emotion stemming from the "potentially lethal consequences of their decision," *Adams*, 448 U.S. at 49-50; or (3) are otherwise "hesitant in their ability to sentence a defendant to death," *see Morgan v. Illinois*, 504 U.S. 719, 732, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992). This is because "[i]t is entirely possible, of course, that even a juror who believes that capital punishment should never be inflicted and who is irrevocably committed to its abolition could nonetheless subordinate his personal views to what he perceived to be his duty to abide by his oath as a juror and to obey the law of the State." *Witherspoon*, 391 U.S. at 515 n.7.

886. "[I]t is the adversary seeking exclusion who must demonstrate, through questioning, that the potential juror lacks impartiality." *Witt*, 469 U.S. at 423. The Supreme Court has recognized that prospective jurors who express concerns about the death penalty may "clarif[y] their positions upon further questioning and reveal[] that their concerns about the death penalty [are] weaker than they originally stated." *Gray*, 481 U.S. at 662-63. Improper exclusion of jurors in violation of *Witt* is harmful per se and no prejudice need be shown. *Id.* at 659-60.

887. <u>Ross Arakaki</u>: On his juror questionnaire, Arakaki wrote that he was "undecided" about the death penalty. (VI Supp. CT 7, at 1796.) In response to the court's questioning at *Hovey voir dire*, Arakaki stated that he believed he could vote for the death penalty knowing that it would confirm a man to death. (101 RT 10903.) He said that he would consider the degree of premeditation,

violence, and remorse in determining whether the death penalty were appropriate. (*Id.* at 10906.) Arakaki told the prosecutor that he had some "repugnance" for the death penalty, but that he was still "undecided" about its propriety in specific cases. (*Id.* at 10910-11.) He said that he'd prefer not to have to confront the issue, but if he were required to do so, he would "have to weigh all the evidence and weigh my conscience at the same time." (*Id.* at 10911.)

888. At this point, the court, apparently believing that Arakaki was "backing off" from his earlier affirmation that he could vote for the death penalty, began to question him again. The court asked whether, "if you thought it were appropriate that the death penalty should be imposed, do you think that you could impose that penalty, you personally say to defendant 'X,' 'You are going to die. I'm going to tell you you're going to die'? Could you do that?" (*Id.* at 10914-15.)

889. The court and Arakaki then had the following exchange:

[Arakaki]: Perhaps. I don't know.

The Court: Perhaps not. So right now you don't know if you could do it?

[Arakaki]: I guess the bottom line, yes, I don't know.

The Court: So your answer before that, yes, you could do it, wasn't really an accurate reflection of how you feel about that?

[Arakaki]: That's correct.

The Court: Is it more likely that you would not be able to vote for the death penalty because of some conscientious objections that you have?

[Arakaki]: I really don't have a decision of swaying either way at this time.

(*Id.* at 10915.)

890. The prosecutor challenged Arakaki for cause because he was, allegedly, "obviously unable to make a decision with respect to the issue of death penalty." (*Id.* at 10916.) The court stated that "we're in that very, very gray area." (*Id.*) Defense counsel argued that Arakaki was simply being conscientious, and pointed out that he had testified that he could in fact vote for the death penalty. (*Id.* at 10917.) The court called the challenge a "very, very close case." (*Id.*) It said that "[f]ive years ago . . ., this would not disqualify." (*Id.* at 10918.) The prosecutor argued that the law had changed "immensely" in five years, and assured the court that "I certainly don't think that we should even concern ourselves with *Witherspoon* at this juncture." (*Id.* at 10918-19.) The trial court granted the challenge, finding that Arakaki "does not at this point have the capacity to -- to really make a decision on life or death for a defendant in a capital case," and thus, that his views would "substantially impair" the performance of his duties. (*Id.* at 10919.)

891. The trial court gravely erred in its questioning and dismissal of Arakaki. It was entirely improper for the court to ask Arakaki whether he could "personally say to defendant 'X,' 'You are going to die. I'm going to tell you you're going to die'?" Of course, no juror would ever be required to do this, and Arakaki's responses to the court's misleading and inflammatory question cannot possibly be used to disqualify him.

892. The decision between life and death should be a difficult one. The Constitution does not tolerate exclusion of prospective jurors who state that "the potentially lethal consequences of their decision would invest their deliberations with greater seriousness and gravity or would involve them emotionally." *Adams*, 448 U.S. at 49. Nor does "repugnance" toward the death penalty in general disqualify a juror from serving.

893. Similarly, the trial court's reliance on Arakaki's indecision is misplaced, as equivocation or uncertainty often reflects the "seriousness" that

*Adams* condones.  *See Gray*, 481 U.S. at 653, 659 (holding that the exclusion of a juror whose testimony was "somewhat confused," but who "ultimately stated that she could consider the death penalty in an appropriate case," violated the Constitution); *see also Gall v. Wilson*, 231 F.3d 265, 331-32 (6th Cir. 2000) (holding that trial court committed reversible error by excusing prospective juror who was "undecided" on capital punishment and who stated that "it is just one of those things you would have to cross when you got to it"), *superseded by statute on other grounds*, *Bowling v. Wilson*, 344 F.3d 487 (6th Cir. 2003).

894.    "As *Witt* makes clear, . . . our inquiry does not end with a mechanical recitation of a single question and answer." *Darden v. Wainwright*, 477 U.S. 168, 176, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986).  It is necessary to "examine the context surrounding [the juror's] exclusion." *Id.*  Although Arakaki described himself as "undecided," his testimony overall makes clear that he believed himself able to make the decision if necessary.

895.    "[I]f prospective jurors are barred from jury service because of their views about capital punishment on 'any broader basis' than inability to follow the law or abide by their oaths, the death sentence cannot be carried out." *Adams*, 448 U.S. at 47-48 (quoting *Witherspoon*, 391 U.S. at 522 n.21).  Taking into account the entire context of Arakaki's exclusion, it is clear that his exclusion was improper.

896.    <u>Jose Garrido</u>: Prospective juror Jose Garrido was a Catholic who had religious scruples against the death penalty.  While at first Garrido indicated that he would always vote against the death penalty, he also made clear that he was confused about the hypothetical nature of the questions at *Hovey voir dire*.  (115 RT 12501-02.)  Garrido said that he was reluctant to make a decision about the death penalty, but that his view might change after hearing the case.  In particular, it would depend on "weighing the case, . . . how serious the defendant." (*Id.* at 12508.)  Garrido understood that he would have certain duties

331

as a juror, and said that he might vote for the death penalty if he became a seated juror.  (*Id.* at 12512.)

897.   The prosecutor asked Garrido whether he understood that if he were seated on the jury, "it is possible that you will be asked to take that man's life." (*Id.* at 12515.)  "[A]re you willing to put aside your religion and take a man's life for the State of California?"  (*Id.* at 12516.)  Garrido responded that "I might put away my religious belief and apply the state belief, you know, however you want to call it."  (*Id.*)  The prosecutor then had Garrido concede that if he voted for the death penalty, he would be committing "a mortal sin."  (*Id.* at 12517.)  The prosecutor asked: "Are you saying that you are willing to commit a mortal sin, to condemn yourself to everlasting hell in voting for the death penalty for an individual?"  (*Id.*)  The court sustained defense counsel's objection, but the prosecutor followed by asking, "Are you saying that you are willing to commit a mortal sin and condemn someone to death?"  Garrido replied that he was not. (*Id.*)  The court granted the prosecutor's challenge for cause.  (*Id.* at 12521.)

898.   Garrido's statements on his questionnaire amounted to an expression of opposition to capital punishment based on "religious scruples."  It is absolutely clear under Supreme Court precedent that such a position is not sufficient to render a prospective juror excludable.  Garrido was clear that he understood the obligations of a juror and that he was open to applying the "state's belief" instead of his "religious belief."  This is precisely what the *Witherspoon* inquiry endeavors to determine:  whether a juror, though opposed to capital punishment, is able and willing to "temporarily set aside [her] own beliefs in deference to the rule of law."  *McCree*, 476 U.S. at 176; *see also Witherspoon*, 391 U.S. at 515 n.7 ("It is entirely possible, of course, that even a juror who believes that capital punishment should never be inflicted and who is irrevocably committed to its abolition could nonetheless subordinate his personal views to what he perceived to be his duty to abide by his oath as a juror and to obey the law of the State.").

332

899. Moreover, the prosecution's questions about whether Garrido was willing to "take a man's life for the State of California" and "condemn [himself] to everlasting hell" were improper and misleading. No juror would be asked to "take" a man's life in any active sense of the word. These inflammatory questions served only to back Garrido into a position in which he would disqualify himself. Garrido's exclusion violated the Constitution.

900. The foregoing violations of Petitioner's constitutional rights, taken singly or in combination with the other errors alleged in the Petition, constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L.Ed.2d 353 (1993). However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Petition, so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violations of Petitioner's rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622, 637-38.

901. To the extent that this Court finds that this claim should have been presented earlier, all prior counsel who failed to present the claim after the facts on which it is based became known or should have been known rendered ineffective assistance in not asserting it sooner, and the Court should consider the claim on the merits. *Coleman v. Thompson*, 501 U.S. 722, 753-54, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991); *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

**CLAIM 9:**

333

# ***VOIR DIRE*** **AT PETITIONER'S TRIAL WAS INADEQUATE TO SECURE HIS CONSTITUTIONAL RIGHT TO AN IMPARTIAL AND LIFE-QUALIFIED JURY**

902.   <u>Exhaustion of Claim</u>:  This claim will be presented to the California Supreme Court in an exhaustion petition that he will file no later than March 17, 2009.

903.   Ramirez's convictions, sentences, and death judgment violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the *voir dire* proceeding conducted at his trial was inadequate to secure his right to an impartial and life-qualified jury.  *Morgan v. Illinois*, 504 U.S. 719, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992).

904.   The exhibits filed with this Petition and the allegations set forth elsewhere in this Petition are hereby incorporated by reference into this claim as though set forth in full.

905.   The facts in support of this claim, among others to be presented after full investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing, include the following:

906.   The *voir dire* proceeding conducted at Ramirez's trial was constitutionally inadequate to secure his right to an impartial, life-qualified jury.  Three major factors contributed to the infirmity of the proceeding:  (1) the trial court's conduct at hardship and publicity *voir dire* taught the jurors that they were to follow the court's lead in answering *voir dire* questions; (2) at *Hovey voir dire*, the court instructed the jurors that they would be required to consider mitigation evidence before asking them whether they would do so; and (3) defense counsel was forbidden from asking prospective jurors questions specific enough to determine whether they could fairly and impartially serve, not on an abstract capital case, but on Ramirez's case in particular.  As a result, Ramirez was unable to probe prospective jurors in a meaningful fashion to determine whether they

could be impartial.  Ramirez was similarly prevented from exercising his peremptory strikes in an informed and intelligent fashion.

907.   The Sixth Amendment guarantees criminal defendants trial by an impartial jury.  A juror who is not "life-qualified" -- that is, one who would automatically vote for the death penalty after conviction in every capital case -- is not considered impartial.  *Morgan*, 504 U.S. at 729.  "[P]art of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors."  *Id.*  "*Voir dire* plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored.  Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled."  *Rosales-Lopez v. United States*, 451 U.S. 182, 188, 101 S. Ct. 1629, 68 L. Ed. 2d 22 (1981) (plurality opinion).

908.   "Were *voir dire* not available to lay bare the foundation of petitioner's challenge for cause against those prospective jurors who would *always* impose death following conviction, his right not to be tried by such jurors would be rendered as nugatory and meaningless as the State's right, in the absence of questioning, to strike those who would *never* do so."  *Morgan*, 504 U.S. at 733-34.  "Inadequacy of *voir dire*" itself -- completely apart from whether any of the seated jurors was actually biased -- requires the reversal of a death sentence.  Indeed, this  was the result in *Morgan* itself.  *Id.* at 739.

909.   As for the substance of *voir dire*, general questions about prospective jurors' fairness and impartiality are not sufficient to satisfy the Constitution.  *Morgan*, 504 U.S. at 735.  The defendant must be permitted to inquire about the jurors' ability to discharge their sentencing obligations in the case at hand.  *Uttecht v. Brown*, 127 S. Ct. 2218, 2226, 167 L. Ed. 1014 (2007) (upholding a trial court finding that a prospective juror was disqualified under

335

*Witherspoon v. Illinois*, 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968), because his *voir dire* questioning revealed that "he had both serious misunderstandings about his responsibility as a juror and an attitude toward capital punishment that could have prevented him from returning a death sentence *under the facts of this case*" (emphasis added)).

910.   It is both permissible and necessary to explore juror bias with respect to particular aggravating and mitigating factors likely to be presented to the jurors in the case before them.  *See generally United States v. Johnson*, 366 F. Supp. 2d 822 (N.D. Iowa 2005).  For example, a prospective juror who states, in response to abstract questions, that he could vote for life without parole, while in actuality, he  could never so vote in a case of murder-for-hire, would not be qualified to serve in a murder-for-hire case.  Such a juror would certainly vote for death following conviction in that case, rendering the penalty phase a meaningless exercise.  If the defendant were forbidden from inquiring about the prospective juror's views on the death penalty in cases of murder for hire, the juror's bias could never be uncovered.  *See State v. Williams*, 550 A.2d 1172, 1184, 113 N.J. 393 (1988) (reversing conviction and death sentence largely because defendant was prevented from inquiring about prospective jurors' ability to vote for life in the case at hand, which involved murder and rape); *see also State v. Maxie*, 653 So. 2d 526, 538, 93-2158 (La. 4/10/95) ("A potential juror who indicates that she will not consider a life sentence and will automatically vote for the death penalty under the factual circumstances of the case before her is subject to a challenge for cause."); *People v. Kirkpatrick*, 7 Cal. 4th 988, 1005, 30 Cal. Rptr. 2d 818 (1994) (as modified) ("A prospective juror who would invariably vote . . . for . . . the death penalty because of one or more circumstances likely to be present in the case being tried, without regard to the strength of aggravating or mitigating circumstances, is therefore subject to challenge for cause . . . .").

911.    The same principle applies to types of mitigating evidence.  A juror who would never consider evidence of an abusive childhood to be mitigating, for example, is not qualified to sit on a case in which the defendant relies wholly or primarily on such evidence, even if the juror could, in theory, find some other type of evidence to have a mitigating effect.  Such a juror could not, in the case at hand, follow the constitutional imperative to "consider[] any constitutionally relevant mitigating evidence." *Buchanan v. Angelone*, 522 U.S. 269, 276, 118 S. Ct. 757, 139 L. Ed. 2d 702 (1998); *Eddings v. Oklahoma*, 455 U.S. 104, 114-15, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982) ("Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence. . . . [Sentencers] determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration.").

912.    Petitioner's *voir dire* did not live up to the demands of the Constitution -- it was not a serious, meaningful inquiry into the qualifications and biases of the prospective jurors.  The judge's offhanded comments taught the jurors to regard *voir dire* as a boring necessity to be endured.  "I know it is boring," the judge remarked at one point, "but try doing it for a living sometimes, it is tough."  (66 RT 4970.)

913.    *Voir dire* was treated as a rote and vacuous exercise.  At one point during publicity *voir dire*, after defense counsel questioned a prospective juror about the conversations she had had with her coworker about Ramirez and the Night Stalker killings, the trial judge referred to defense counsel's questioning as a "waste [of] time."  (70 RT 5846.)  Defense counsel rightly responded, "Your honor, this is *voir dire*.  I expect the court not to constantly refer to it as a waste of time."  (*Id.*)

914. Even more important, the trial court's conduct at hardship and publicity *voir dire* taught the jurors that they were to follow the court's lead in answering *voir dire* questions. Countless times, the court, in front of large panels of prospective jurors, led or attempted to lead panelists to give answers that qualified them for hardship dismissal. The court emphasized that there were certain "lines" that could get a prospective juror dismissed. (*See, e.g.*, 68 RT 5358 ("That is known as a leading and suggestive question, sir. If you don't pick up on the first one, I'm not going to do it again."); *id.* at 5368 (after prospective juror answered "yes," court instructed, "[w]ell, now wait a minute. Just give me a no . . . ."); 70 RT 5772 ("That is the line I'm waiting for. Give me that one."); *id.* at 5773 ("Will you do me a favor, Mr. Nemecek, and have your boss tell you that you won't be paid . . . ."); 72 RT 6188 (Court: "Just tell me you think you got a health hardship and I will let you go." Juror: "I think I have a hardship, health hardship."); 74 RT 6499 ("I give you these lines, Mr. Dill, and you don't pick them up."); 76 RT 6851 ("I can only feed you straight lines for so long.").)

915. Just as there were "lines" that could get a prospective juror dismissed, there were lines that could insulate a juror from dismissal, as the court made fairly clear. Defense counsel objected at length to the court's pattern:

> I think this is educating the individuals on this panel that is left to at
> least leaning them in the direction where they can know what they
> have to say if they want to be on the jury, whatever the motive is for
> wanting to be on the jury.
> I think it is detrimental and I think on those grounds I want to
> challenge the panel that is left because I feel th court has, in essence,
> educated those who want to remain on this jury, just like sometimes
> we give them leads as to how to get a hardship. The court gives
> them leads as to how to get hardship.

The court gave them the ultimate lead as to how to stay on this jury,
if they want to, by saying they haven't formed an opinion. I don't
think that that is up to the court to do that.

I think the court should just be very objective, very brief in letting
them know just the topic, the areas that we're going into, and not
making any statements or conclusions or leading statements that will
open the door to the jury room or the key to the jury room door.

. . . .

Basically what . . . I'm objecting to is basically that once the court
starts giving them concrete positions that they could take in order to
be on the jury or to get off the jury, either way, that it is no longer up
to the questioning or the inquiring by the attorneys.

(86 RT 8583-85.) Instead of admonishing prospective jurors about the gravity of
their oath, and the constitutional significance of the *voir dire* process, the trial
judge encouraged the jurors to choose the outcome they desired -- excusal or
retention -- and answer the questions accordingly. The trial court's actions
devalued the jurors' oath and rendered their responses untrustworthy.

916. The second major flaw in Ramirez's *voir dire* intensified the harmful
effects of the first. In explaining the trial process, the trial court informed the
prospective jurors what answers were acceptable to the questions they were about
to be asked at *Hovey voir dire*. In particular, the court instructed the jurors that
they were *required* to consider and weigh mitigation evidence before voting on
the penalty. It stated that even after convicting a defendant of first degree murder
and finding the special circumstances to be true, the jury "must listen to, consider
and weigh all of the [mitigation] evidence before they come back with a verdict."
(*See, e.g.*, 119 RT 13086.) Only a blatantly rebellious juror would, after this
introduction from the court, state that he would not consider mitigation evidence.

917. A number of times, however, jurors who appeared to be disqualified because they would automatically vote for death after finding guilt and special circumstances in a case such as Ramirez's were saved by asserting that they would "consider" mitigation. Chris Conklin, for example, testified that in a case like the Charles Manson case, or Ramirez's case as far as he knew, he would automatically vote for the death penalty after finding guilt and special circumstances. (108 RT 11938-39.) The court followed up: "Hang on a minute. When you say automatically, Mr. Conklin, do you mean no matter what you heard during the penalty phase, whether you heard any mitigation or not, you would vote in the Manson case, let's say, for death, without regard to what you heard in mitigation during the penalty phase?" (*Id.* at 11939.) Conklin replied that he would consider mitigation, the defense's challenge for cause was denied. (*Id.* at 11939-40, 11944-45.)

918. Petitioner's life should not hang on the assurances of prospective jurors regurgitating answers that were fed to them by the court. The jurors' answers were meaningless because the judge had devalued their oath and fed them the answers they had to give to obtain his approval and to appear to be fair.

919. The third major flaw in Ramirez's *voir dire* was that defense counsel was forbidden from asking prospective jurors questions specific enough to determine whether they could fairly and impartially serve on Ramirez's case. For months, defense counsel asked prospective jurors at *Hovey voir dire* whether they could consider imposing a life sentence for a murder committed during the course of a burglary or residential robbery. One of the questions on the juror questionnaire probed precisely this issue. One day, however, the court suddenly decided to limit counsel's questioning. "[I]f you will couch your questions in terms of felony/murder perhaps and leave out burglary or residential robbery, I guess that will be required of you," the court ordered. (121 RT 13412-13; *see*

340

*also id.* at 13414 ("Do not ask jurors if they would -- could give a life without parole punishment on a residential burglary/murder, okay?").)

920.    The heightened restrictions made it impossible for defense counsel to examine prospective jurors in a meaningful fashion.  The fact of the matter is that the offenses charged *did* involve murders during the course of residential burglaries or robberies.  Even a defendant charged with such crimes, however, has a constitutional right to put on a guilt and penalty phase defense before jurors who are not too biased to consider it impartially.  Without such jurors, the penalty phase is a useless exercise the outcome of which is already known.  A juror who would automatically vote for death after conviction on such charges was not qualified under the Constitution to serve in this case.  The trial court's restriction made it impossible for Ramirez to identify such jurors and, thus, deprived him of his constitutional rights.

921.    The foregoing violations of Petitioner's constitutional rights, taken singly or in combination with the other errors alleged in the Petition, constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict.  *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Petition, so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violations of Petitioner's  rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice.  *See id.* at 622, 637-38.

922.    To the extent that this Court finds that this claim should have been presented earlier, all prior counsel rendered ineffective assistance in not asserting

341

it sooner, and the Court should consider the claim on the merits. *Coleman v. Thompson*, 501 U.S. 722, 753-54, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991); *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

## CLAIM 10:

### INEFFECTIVE ASSISTANCE DURING JURY SELECTION

923. <u>Exhaustion</u>: This claim will be presented to the California Supreme Court in an exhaustion petition that he will file no later than March 17, 2009.

924. Ramirez's convictions, sentences, and death judgment violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because he was deprived of the effective assistance of counsel in connection with the jury selection phase of his trial. *See Strickland v. Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

925. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

926. Those facts and allegations set forth in the petition, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

927. Defense counsel rendered ineffective assistance in the following ways, considered both individually and cumulatively:

**A.    Failing To Challenge or Adequately Question Jurors Whose Convictions About the Death Penalty Substantially Impaired the Performance of Their Duties**

928. Defense counsel failed adequately to *voir dire* and challenge seated juror Donald McGee, who expressed opinions in favor of the death penalty that would "prevent or substantially impair the performance of [his] duties" as a juror

342

with respect to the choice of penalty.  *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S. Ct. 2521, 65 L. Ed. 2d 581 (1980)).  Trial counsel rendered ineffective assistance in failing to challenge McGee or question him carefully and reasonably in order to expose or confirm views concerning capital punishment that would have supported a challenge for cause or the intelligent exercise of a peremptory strike.  Trial counsel challenged seated juror Chakalit Harris for cause, but failed to *voir dire* her adequately to establish a basis for her removal, and failed to exercise a peremptory strike against her.  This, too, constituted prejudicial ineffective assistance of counsel.

929.  A prospective juror who would automatically impose a sentence of death upon conviction of a capital offense is disqualified from sitting on a capital jury. *Morgan v. Illinois*, 504 U.S. 719, 729, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992).  "[T]he belief that death should be imposed *ipso facto* upon conviction of a capital offense reflects directly on that individual's inability to follow the law. . . . Any juror who would impose death regardless of the facts and circumstances of conviction cannot follow the dictates of law."  504 U.S. at 735.  Such individuals deem mitigating evidence to be irrelevant to the penalty determination, despite the constitutional imperative that it be considered. *See, e.g.*, *Eddings v. Oklahoma*, 455 U.S. 104, 114-15, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982).

930.  A juror who would never consider evidence of an abusive childhood to be mitigating, for example, is not qualified to sit on a case in which the defendant relies wholly or primarily on such evidence, even if the juror could, in theory, find some other type of evidence to have a mitigating effect.  Such a juror could not, in the case at hand, follow the constitutional imperative to "consider[] any constitutionally relevant mitigating evidence." *Buchanan v. Angelone*, 522 U.S. 269, 276, 118 S. Ct. 757, 139 L. Ed. 2d 702 (1998); *Eddings*, 455 U.S. at

343

114-15 ("Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence. . . . [Sentencers] determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration.").

931.   If a juror expresses a disqualifying dogmatic preference in favor of imposing the death penalty, a concomitant pledge to "follow the law" will not save him. "It may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so." *See Morgan*, 504 U.S. at 735.

932. <u>Donald McGee</u>:  Seated juror Donald McGee stated on his juror questionnaire that the death penalty should be imposed on everyone who for any reason intentionally kills another, during the course of a burglary or otherwise. (VI Supp. CT 15, at 4270.)  He wrote that "[a]n accidental killing may not warrant the death penalty. Premeditated murder may warrant death penalty." (*Id.*)

933.   At *Hovey* voir dire, McGee rated himself a seven of ten in favor of the death penalty. (97 RT 10303.) He explained that the propriety of the death penalty depended, in his opinion, upon the nature of the crime: "I'm not a person who says that whoever commits a crime must have the death penalty. . . . I don't think that everybody that is convicted of a crime . . . should be lumped into one group of people . . . .  Everybody who is convicted of a crime should -- maybe they don't deserve the death penalty, maybe their particular crime doesn't warrant the death penalty, and I think that is where my seven comes in." (*Id.* at 10309.)

934.   Crucially, defense counsel never asked McGee whether a case involving multiple murders, brutal murders, or intentional murders during the course of a residential burglary or rape would be the type of case in which the death penalty was always appropriate. Counsel's failure to do so is inexplicable

344

in light of the fact that he asked other prospective jurors some of these questions.

935.   In light of McGee's statements -- in his questionnaire and at *voir dire* -- that he believed that the death penalty should be imposed in any case of intentional murder, and that the propriety of the death penalty depended upon the nature of the crime, defense counsel should have either challenged McGee for cause or *voir dired* him further to explore and confirm his predisposition for a death verdict.  If the trial court had denied a for-cause challenge, counsel should have exercised a peremptory strike to remove McGee from the jury.  Counsel rendered ineffective assistance of counsel in permitting McGee to serve.

936.   <u>Chakalit Harris</u>:  Seated juror Chakalit Harris wrote on her questionnaire that "[s]ome people need to be put to death; some don't."  (105 RT 11485.)  At *Hovey voir dire*, she clarified that "those that willfully did what they were doing for their own purpose" deserve to be put to death.  (*Id.* at 11486.)  "[I]f they're willfully doing it because they're getting a kick out of it or whatever it is doing for them, they don't need to be alive.  If they're getting off . . . killing other people, then maybe they have ought to be dead, too."  (*Id.*)

937.   In response to the court's questioning, Harris said that she would be "willing to listen to other circumstances in mitigation" in such a case, although she had earlier said that she did not "know what any other circumstances could be added to that to make it any different."  (*Id.* at 11487, 11489-90.)  The court denied the defense's challenge for cause.  (*Id.* at 11498.)

938.   Despite Harris's harsh answers, and despite the fact that the defense bore the burden of proving that Harris was disqualified, defense counsel failed entirely to question Harris about her ability to consider the types of mitigation evidence that may have been at issue in Ramirez's case.  For example, defense counsel never questioned Harris about whether, in a case involving multiple intentional murders, she could meaningfully consider and give effect to evidence

345

regarding addiction, seizure disorder, mental illness, child abuse, or any of a host of other factors. Had Harris answered no to any of these questions, the defense's challenge for cause would have succeeded. Failing this, defense counsel should have used a peremptory strike to remove Harris from the jury.[66]

**B.** **Failing To Adequately Question or Attempt To Rehabilitate Prospective Jurors Who Initially Suggested That They Could Not Vote for the Death Penalty**

939. The 1989 American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases stated that "[c]ounsel should be familiar with techniques for rehabilitating potential jurors whose initial indications of opposition to the death penalty make them possibly excludable." Guideline 11.7.2.B.[67] Yet Ramirez's trial counsel failed entirely, or almost entirely, to attempt to rehabilitate a substantial number of prospective jurors in his case. Counsel either failed to test the prospective jurors' stated opposition to the death penalty -- for example, by asking whether they would fail to consider the death penalty even for a defendant who committed multiple, brutal, intentional murders during the course of residential burglaries or robberies -- or failed to re-examine the jurors after the prosecutor had led them to give disqualifying answers. 940. The Supreme Court has recognized that prospective jurors who express concerns about the death penalty may "clarif[y]

---

[66] The trial court's erroneous denial of several of the defense's for-cause challenges, coupled with its refusal to expand the number of peremptory strikes available, may have contributed to the defense's failure to use a peremptory strike against Harris. (*See* Claim 7.)

[67] *See Wiggins v. Smith*, 539 U.S. 510, 524, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) (explaining that ABA Guidelines provide guidance in assessing defense counsel's performance under *Strickland* and citing other cases that support the same principle).

their positions upon further questioning and reveal[] that their concerns about the death penalty [are] weaker than they originally stated." *Gray v. Mississippi*, 481 U.S. 648, 662-63, 107 S. Ct. 2045, 95 L. Ed. 2d 622 (1987).

941.    Counsel's failure to rehabilitate prospective jurors permeated the entire *Hovey voir dire* and resulted in a record substantially different from the one that would have been produced through competent questioning.  It is impossible to identify with confidence all of the stricken jurors who might have been rehabilitated by competent counsel, potentially changing the makeup of Petitioner's jury.  As an example, counsel did not meaningfully attempt to rehabilitate the following prospective jurors "whose initial indications of opposition to the death penalty ma[d]e them possibly excludable":  Weasner (92 RT 9653); Kirkpatrick (98 RT 10515); Martinez (107 RT 11728); Cortez (107 RT 11734); Jackson (108 RT 11907); Shuldiner (112 RT 12347); Takai (117 RT 12804); Beckstrom (119 RT 13146); and Foland (120 RT 13313).

942.    There is a reasonable probability that competent counsel could have rehabilitated at least one prospective juror and prevented his or her excusal.  If any juror were still excused after being rehabilitated on the record, the dismissal would then have constituted reversible error under *Gray v. Mississippi*, 481 U.S. 648, 107 S. Ct. 2045, 95 L. Ed. 2d 622 (1987).  Trial counsel's failing constituted ineffective assistance of counsel under *Strickland* and deprived Ramirez of his right to "a jury empaneled in compliance with the Fourteenth Amendment." *Morgan v. Illinois*, 504 U.S. 719, 739, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992).

## C.    "Rehabilitating" for the Prosecution's Benefit, Instead of Striking, Jurors Who Were Not Actually Life-Qualified

943.    On many occasions throughout *Hovey voir dire*, defense counsel failed to challenge for cause prospective jurors whose responses in favor of imposing the death penalty rendered them excludable.  These were jurors who wrote or testified that they would always or automatically vote for the death

penalty after finding guilt and special circumstances in a case involving intentional murder, multiple murder, or some other circumstance present in Petitioner's case. Instead of challenging these jurors, defense counsel essentially stepped into the prosecutor's shoes and "rehabilitated" them by leading them to affirm that they would "consider" mitigation testimony before choosing between life and death.[68] Defense counsel's actions constituted ineffective assistance of counsel that prejudiced Petitioner.

944. For example, defense counsel "rehabilitated" the following jurors whom he should have moved to strike: Ortiz (97 RT 10269); Willis (97 RT 10346); Langford (102 RT 11057); Hernandez (104 RT 11293); Douglas (104 RT 11308); and Barr (116 RT 12655). Defense counsel later used peremptory challenges to remove three of these jurors, highlighting the illogic of his approach. (129 RT 14468 (Willis); 132 RT 14736 (Barr); 132 RT 14696 (Hernandez).)

## D. Failing To Examine Jurors Adequately About Aggravating and Mitigating Factors Likely To Be Involved in the Case

945. The 1989 American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases stated that "[c]ounsel should be familiar with the precedents relating to questioning and challenging potential jurors, including the procedures surrounding 'death qualification' concerning any potential juror's beliefs about the death penalty." Guideline 11.7.2.B. "Death qualifying" a jury requires examining prospective jurors about both aggravating

---

[68] Entirely apart from the fact that *defense counsel* should not have been the one to "rehabilitate" these prospective jurors, the jurors' assurances that they would "consider" mitigation evidence cannot lend much comfort because the trial judge had just instructed them that they were *required* to consider such evidence. (*See* Claim 7.)

and mitigating factors that are likely to be involved in the case.  Trial counsel did so only sporadically at best.

946.    For jurors who appear to be opposed to imposing the death penalty, trial counsel must question them about whether they would refuse to impose the death penalty even in a case involving the aggravating factors present in the case at hand.  In this case, for example, trial counsel should have questioned such jurors about whether they would refuse to impose the death penalty even in a case involving multiple murders, murders in the course of rape, and murders in the course of residential burglary or robbery.  Many prospective jurors who were inclined against the death penalty in the abstract may have considered it an option in a case involving such aggravation.  These jurors were fit to serve.

947.    Similarly, for prospective jurors who appeared inclined to impose the death penalty after convicting and finding special circumstances to be true, trial counsel should have examined them about whether they could meaningfully consider life without parole even in a case involving the aforementioned aggravation.

948.    Trial counsel must also examine prospective jurors about whether they could meaningfully consider and give effect to various types of mitigating evidence -- in this case, addiction, mental illness, seizure disorder, and child abuse, among other factors.  Jurors who could not give effect to such mitigation -- in a case involving the aggravation at issue here -- would have been removable for cause.

949.    In general, counsel's questioning at *Hovey voir dire* often seemed to follow little pattern.  He asked confusing questions that the jurors had trouble understanding, as the court noted on the record.  (104 RT 11325 ("If you could ask a direct question . . . and stay to the point, you probably wouldn't have this problem. . . . I think if you clean up your questions and if you would stop digressing in the middle and stop putting all the exceptions and -- because it is --

I know where you are going and it is very difficult for me to follow and I'm sure
it is almost impossible for these people to follow and they're kind of flipping the
coin and saying yes or no and not knowing really what they come up with.")).
And while he neglected to ask some of the jurors certain crucial questions, he
asked other questions repeatedly within the same examination.  (109 RT 11989
(Judge: "You are not going to beat this dead horse again.  You are reverting to
form . . . .  [Y]ou were repetitive to a terrible degree."))  In one instance, defense
counsel passed for cause on the last prospective juror of the day without asking a
single question.  (105 RT 11535.)

950.   Counsel's failure to examine prospective jurors about aggravation
and mitigation permeated the entire *Hovey voir dire* and resulted in a record
substantially different from the one that would have been produced through
competent questioning.  It is impossible to identify with confidence all of the
stricken jurors who might have been rehabilitated by competent counsel, or all of
the retained jurors who might have been stricken.  The makeup of Petitioner's
jury would have been substantially different, and more favorable to Petitioner,
had his counsel engaged in competent *voir dire*.

951.   The foregoing violations of Petitioner's constitutional rights, taken
singly or in combination with the other errors alleged in the Petition, constitute
structural error and warrant the granting of this Petition without any
determination of whether the violations substantially affected or influenced the
jury's verdict.  *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S.Ct.
1710, 123 L.Ed.2d 353 (1993).  However, even assuming the harmless error
doctrine applies to this claim, the foregoing constitutional violations, singly and
in combination with the other errors alleged in this Petition, so infected the
integrity of the proceedings that the error cannot be deemed harmless.  The
foregoing violations of Petitioner's  rights had a substantial and injurious effect
or influence on Petitioner's convictions and sentences, rendering them

350

fundamentally unfair and resulting in a miscarriage of justice.  *See id.* at 622, 637-38.

952.   In addition, the denial of his right to effective assistance of counsel substantially prejudiced Petitioner, rendered the trial proceeding fundamentally unfair, eroded the reliability of the verdict and had a substantial and injurious effect on the verdict.  But for the denial of this right, it is reasonably probable that a more favorable result would have been attained.  Under these circumstances, the adversarial system completely broke down, and Petitioner was left without meaningful representation.  Although many of trial counsel's errors were, by themselves, so egregious as to require reversal, the extraordinary accumulation of errors and omissions over the course of the trial created a total breakdown in the adversarial process, so that prejudice is conclusively presumed.  *United States v. Cronic*, 466 U.S. 648, 656-662, 104 S. Ct. 2039, 2045-48,  80 L. Ed. 2d 657 (1984).  Even assuming a showing of prejudice is required, Petitioner has made that showing here.  *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

953.   To the extent that this Court finds that this claim should have been presented earlier, all prior counsel who failed to present the claim after the facts on which it is based became known or should have been known rendered ineffective assistance in not asserting it sooner, and the Court should consider the claim on the merits.  *Coleman v. Thompson*, 501 U.S. 722, 753-54, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991); *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

**CLAIM 11:**

**THE TRIAL COURT FAILED TO ENFORCE THE LEGAL STANDARD FOR HARDSHIP DISMISSAL, RESULTING IN A "JURY OF VOLUNTEERS"**

954.  Exhaustion:  This claim will be presented to the California Supreme Court in an exhaustion petition that he will file no later than March 17, 2009.

955.  Ramirez's convictions, sentences, and death judgment violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the trial court failed to enforce the legal standard for hardship dismissal and, as a result, Ramirez was tried by a "jury of volunteers."

956.  In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

957.  Those facts and allegations set forth in the petition, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

958.  Throughout hardship and publicity *voir dire*, the trial judge made it clear that he would excuse virtually anyone who asked to be excused.  "I'm up front with you," the court explained at one point.  "I'm going to be real liberal at this point.  You tell me you are sick or you got a sick kid, I'm going to believe you.  There is not going to be any cross-examination with you."  (80 RT 7432; *see also* 79 RT 7338-39 ("Some of you may have some interesting ways to excuse yourself.  We had a lady yesterday who was fine in the morning . . . .  So I put her back in the jury room waiting to come out for the other part.  And when she came out, she . . . had picked up laryngitis in an hour or so from the air conditioning.  So I thought this was very interesting and nice and novel and, of course, I honored that."); 77 RT 7031 ("If you have a problem that -- let's just say it is a medical problem that you think is important enough to keep you off, just say that.  You don't have to come here up [sic].").)

959.  The court's conduct at this phase of *voir dire* taught the jurors that they were to follow the court's lead in answering the *voir dire* questions.

Countless times, the court, in front of large panels of prospective jurors, led or attempted to lead panelists to give answers that qualified them for hardship dismissal. The court emphasized that there were certain "lines" that could get a prospective juror dismissed. (*See, e.g.*, 68 RT 5358 ("That is known as a leading and suggestive question, sir. If you don't pick up on the first one, I'm not going to do it again."); *id.* at 5368 (after prospective juror answered "yes," court instructed, "[w]ell, now wait a minute. Just give me a no . . . ."); 70 RT 5772 ("That is the line I'm waiting for. Give me that one."); *id.* at 5773 ("Will you do me a favor, Mr. Nemecek, and have your boss tell you that you won't be paid . . . ."); 72 RT 6188 (Court: "Just tell me you think you got a health hardship and I will let you go." Juror: "I think I have a hardship, health hardship."); 74 RT 6499 ("I give you these lines, Mr. Dill, and you don't pick them up."); 76 RT 6851 ("I can only feed you straight lines for so long."); 77 RT 7147.) The court's behavior devalued the jurors' oath and taught them to answer the questions instrumentally rather than honestly.[69]

960. A sizable slew of jurors was dismissed for "health problems" without any further explanation. (*See, e.g.*, 80 RT 7442, 7446, 7451, 7454, 7455; 81 RT 7608; 82 RT 7766.) Other jurors were dismissed despite uncertainty about their employers' pay policies. (*See, e.g.*, 68 RT 5409; 69 RT 5667; 71 RT 5948 (juror uncertain how long her Catholic school-employer will pay; judge dismisses her, saying, "I don't think they got money to throw around, . . . so I will excuse you."); 76 RT 6849.) Yet others were excused for reasons that never became clear. (*See, e.g.*, 66 RT 4975 ("too much . . . to deal with"); 79 RT 7345 ("I'm past seventy years old and I don't feel like I could put in two years of my life.").)

---

[69] The jurors, of course, carried this lesson with them into the life- and death-qualification process at *Hovey voir dire*, drastically reducing the reliability of that process. (*See* Claim 7.)

353

Additionally, the court almost never asked whether jurors who would not be paid by their employer had access to another source of financial support, and thus never truly established that they would suffer an actual financial hardship worthy of a hardship dismissal.

961.   On several occasions, the trial judge became distracted and failed to obtain even the bare minimum of information from the prospective jurors he then dismissed (*see, e.g.*, 71 RT 6945); this included a particularly inappropriate interchange in which he joked about a juror's name:

> [Hou]: My name is Robert Hou.  I'm employed --
>
> [Prosecutor]: I didn't get that.
>
> The Court: Yes?
>
> [Hou]: Robert Hou.
>
> The Court: Who's on first?  I didn't get the last name.
>
> [Hou]: Hou, H-O-U.
>
> The Court: Thank you, sir.  I apologize, Mr. Hou.  I don't get a
>
> chance like that very often.  You are excused, sir.

(75 RT 6691-92.)

962.   The result of all this is that Petitioner was tried by a jury culled from a throng of "volunteers" -- persons who for whatever reason *wanted* to serve on his jury.  Particularly in a high-profile multiple-murder trial like Petitioner's, this group was highly unlikely to constitute an impartial tribunal consistent with the guarantees of due process and the Sixth and Eighth Amendments.  This is why prospective jurors are supposed to be dismissed only for legitimate financial hardship, and not based on a thinly veiled personal preference against serving:

> Jury service is a duty as well as a privilege of citizenship; it is a duty
> that cannot be shirked on a plea of inconvenience or decreased
> earning power.  Only when the financial embarrassment is such as to
> impose a real burden and hardship does a valid excuse of this nature

354

appear. . . . "The motives influencing such tendencies may be of the best must not blind us to the dangers of allowing any encroachment whatsoever on this essential right.  Steps innocently taken may one by one, lead to the irretrievable impairment of substantial liberties." *Thiel v. S. Pacific Co.*, 328 U.S. 217, 224-25, 66 S. Ct. 984, 90 L. Ed. 1181 (1946) (quoting *Glasser v. United States*, 315 U.S. 60, 86, 62 S. Ct. 472, 86 L. Ed. 680 (1942)).

963.   The foregoing violations of Petitioner's constitutional rights, taken singly or in combination with the other errors alleged in the Petition, constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict.  *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993).  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Petition, so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violations of Petitioner's  rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice.  *See id.* at 622, 637-38.

964.   To the extent that this Court finds that this claim should have been presented earlier, all prior counsel who failed to present the claim after the facts on which it is based became known or should have been known rendered ineffective assistance in not asserting it sooner, and the Court should consider the claim on the merits.  *Coleman v. Thompson*, 501 U.S. 722, 753-54, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991); *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

**CLAIM 12:**

**THE PROSECUTOR VIOLATED THE EQUAL PROTECTION**
**CLAUSE BY EXERCISING PEREMPTORY CHALLENGES TO**
**REMOVE FEMALE AFRICAN-AMERICAN JURORS BECAUSE**
**OF THEIR RACE**

965. <u>Exhaustion of Claim</u>:  Ramirez will present this claim to the California Supreme Court in an exhaustion petition that  he will file no later than March 17, 2009.

966. Ramirez's convictions, sentences, and death judgment violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the prosecution exercised peremptory challenges against black female prospective jurors on the basis of race. *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

967. The exhibits filed with this Petition and the allegations set forth elsewhere in this Petition are hereby incorporated by reference into this claim as though set forth in full.

968. The facts in support of this claim, among others to be presented after full investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing, include the following:

969. Petitioner is a Hispanic man who stood trial for multiple murders, nearly all of which were interracial.  The prosecution exercised peremptory challenges to remove 14 of the 27 black women examined during general *voir dire*.  (139 RT 15926.)  The prosecution dismissed nine black female prospective jurors and five black female prospective alternate jurors.  Defense counsel objected to the prosecution's challenge of the 14 black women, citing *People v. Wheeler*, 22 Cal. 3d 258, 148 Cal. Rptr. 890 (1978), the California counterpart to

*Batson v. Kentucky*, 476 U.S. 79.[70]  The trial court held a hearing to consider the defense's motion, finding that Ramirez had made out a prima facie case that the black female jurors had been excluded because of their race.  (140 RT 15950.) The prosecution presented race-neutral justifications for exercising the peremptory challenges against each of the 14 black women.  (*Id.* at 15972-87.) The court provided defense counsel an opportunity to present argument in response to the prosecution's justifications.  (*Id.* at 15991).  However, the defense submitted without providing any response.  (*Id.*)  The trial court denied the defense's *Wheeler* motion, finding the prosecution's justifications to be satisfactory and rejecting any implication that the prosecuting attorneys were bigoted.  (*Id.* at 15994-95)

970.   In addition to striking the 14 black female prospective jurors, the prosecutor also used peremptory strikes to remove five of six Hispanic prospective alternate jurors.  *See* Claim 13.

971.   The law in support of this claim includes:

972.   The Equal Protection Clause forbids the prosecution from exercising peremptory challenges on the basis of race.  *Batson*, 476 U.S. at 89.  When a defendant claims that a prosecutor's peremptory strikes were racially motivated, the court must apply a three-step process for evaluating the challenge.

973.   First, at step one, the defendant must make a prima facie showing that race motivated the prosecutor's strikes.  *Batson*, 476 U.S. at 89.  To meet this burden, the defendant need only raise an "inference" of discrimination.  *Id.* at 96. "In making this showing, the defendant is entitled to rely on the fact that peremptory challenges provide a useful vehicle for those intent on discriminating."  *United States v. Esparza-Gonzalez*, 422 F.3d 897, 904 (9th Cir.

_____

[70]  A *Wheeler* challenge is sufficient to preserve a *Batson* claim.  *Paulino v. Castro*, 371 F.3d 1083, 1088 n.4 (9th Cir. 2004).

2005). When a proceeding is bound up with racial issues -- such as in a case of interracial murder -- this, too, may be considered in evaluating the existence of a prima facie case. *Id.* at 905-06.

974.    The prima facie showing may, but need not, be satisfied based upon statistical disparities alone. *Paulino v. Castro*, 371 F.3d 1083, 1091 (9th Cir. 2004). The prosecutor's questions -- or lack thereof -- are relevant considerations as well. *Miller-El v. Dretke* (*Miller-El II*), 545 U.S. 231, 255-63, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005); *Batson*, 476 U.S. at 97; *see Fernandez v. Roe,* 286 F.3d 1073, 1079 (9th Cir. 2002) (relying partly on the fact that the "prosecutor failed to engage in meaningful questioning" of minority jurors in finding a prima facie showing). The opponent of a strike need not demonstrate a pattern of discriminatory strikes because "the Constitution forbids striking even a single prospective juror for a discriminatory purpose." *United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994), *quoted in Snyder v. Louisiana*, 128 S. Ct. 1203, 1208, 170 L. Ed. 2d 175 (2008).

975.    At *Batson*'s first step, courts "must consider 'the totality of the relevant facts' and 'all relevant circumstances' surrounding the peremptory strike." *Boyd v. Newland*, 467 F.3d 1139, 1146 (9th Cir. 2006) (as amended) (quoting *Batson*, 476 U.S. at 94, 96). A defendant can make out a prima facie case "by offering a wide variety of evidence, so long as the sum of the proffered facts gives 'rise to an inference of discriminatory purpose.'" *California v. Johnson*, 545 U.S. 162, 169, 125 S. Ct. 2410, 162 L. Ed. 2d 129 (2005) (quoting *Batson*, 476 U.S. at 94) (footnote omitted). "[T]he threshold for making a prima facie *Batson* claim is quite low." *Boyd*, 467 F.3d at 1145; *see also id.* at 1151 ("[T]he burden for making a prima facie case is not an onerous one.").

976.    If a prima facie case is established, the burden then shifts to the State to articulate a race-neutral explanation for the challenge. *Batson*, 476 U.S. at 97. The prosecutor "must give a 'clear and reasonably specific' explanation of his

358

'legitimate reasons' for exercising the challenges." *Id*. at 98 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)). Vague assertions or even good faith denials of discriminatory intent do not suffice. *Batson*, 476 U.S. at 98; *Bui v. Haley*, 321 F.3d 1304, 1316 (11th Cir. 2003) ("[V]ague explanations will be insufficient to refute a prima facie case of racial discrimination."). In addition, the purported justification must be "related to the particular case to be tried." *Batson*, 476 U.S. at 98 & n.20.

977. If the second step is satisfied, the court must then reach "the ultimate question of intentional discrimination." *Hernandez v. New York,* 500 U.S. 352, 359, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991) (plurality opinion). At this third and final stage of the *Batson* analysis, the court must undertake "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Batson*, 476 U.S. at 93 (quoting *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977)) (internal quotation marks omitted); *see also Snyder*, 128 S. Ct. at 1208 ("In *Miller-El v. Dretke*, the Court made it clear that in considering a *Batson* objection, or in reviewing a ruling claimed to be *Batson* error, *all* of the circumstances that bear upon the issue of racial animosity must be consulted." (emphasis added)). Such evidence includes, at the least, all of the evidence presented at step one. *Miller-El v. Cockrell* (*Miller-El I*), 537 U.S. 322, 341, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003). A reviewing court should engage in comparative juror analysis, considering whether the prosecutor's "proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve." *Miller-El II*, 545 U.S. at 241. If so, "that is evidence tending to prove purposeful discrimination." *Id.* Similarly, discrimination is more likely when the prosecutor's justifications are unsupported or directly refuted by the record. *Lewis v. Lewis*, 321 F.3d 824, 834 (9th Cir. 2003); *Johnson v. Vasquez*, 3 F.3d 1327, 1331 (9th Cir. 1993). A reviewing court

should consider "how reasonable, or how improbable, the explanations are; and . . . whether the proffered rationale has some basis in accepted trial strategy." *Miller-El I*, 537 U.S. at 339.

978.    In some cases, the prosecutor may offer more than one reason for a strike.  "[I]f a review of the record undermines the prosecutor's stated reasons, or many of the proffered reasons, the reasons may be deemed a pretext for racial discrimination."  *Lewis*, 321 F.3d at 830; *United States v. Chinchilla*, 874 F.2d 695, 699 (9th Cir. 1989) (explaining that the pretextual nature of two of the prosecutor's four proffered reasons militated against the sufficiency of the remaining two facially acceptable reasons); *see also Kesser v. Cambra*, 465 F.3d 351, 369 (9th Cir. 2006) (en banc).

## A.    Gwendolyn Thomas

979.    Gwendolyn Thomas was a thirty-two-year-old black prospective juror.  (VI Supp. CT 4, at 934.)  The prosecutor peremptorily challenged Thomas.  (128 RT 14392.)  In her juror questionnaire, Thomas expressed that she did not have a firm opinion about the death penalty and that her position would depend on the crime. (VI Supp. CT 4, at 941.)  She also opined in her questionnaire that the State should impose the death penalty upon everyone who for any reason intentionally kills another.  (VI Supp. CT 4, at 941.)  During *Hovey voir dire*, Thomas told the prosecutor that she would vote to keep the death penalty if it were up for reconsideration during a general election.  (98 RT 10456.)  She did express some concern about implementing a death penalty sentence, stating that such a decision should not be taken lightly.  (*Id.* at 10446-49.)  However, Thomas also said that she could vote for the death penalty if the evidence showed that such a sentence was warranted.  (*Id.* at 10456-57.)  During general *voir dire*, Thomas revealed that she participated in a twelve-step program for compulsive gamblers.  (*Id.* at 14099.)

980.    The prosecutor offered three justifications for striking Thomas, all of which are patently pretextual.  In support of his challenge, the prosecutor pointed to Thomas's questionnaire answer reflecting that she did not have a strong opinion about the death penalty, her *Hovey* statement that it would be a difficult penalty to implement, and her admission about being part of a twelve-step program.  (140 RT 15972.)  The prosecutor emphasized his last justification by stating:

> Bottom line is when she came in for general *voir dire* and finally
> asked to approach the bench, it turns out she was a compulsive
> gambler and belonged to an organization that is designed to help
> people with those problems. . .  I didn't want to take a chance on
> someone who could be overcome by such a compulsion.

(*Id.*)

981.    The prosecutor's justifications pertaining to Thomas's written and verbalized sentiments about the death penalty were taken out of context.  While she indicated that her stance on the death penalty would depend on a person's crime, her questionnaire also said that she would favor the death penalty for any person who intentionally kills another.  (VI Supp. CT 4, at 941.)  Additionally, while she expressed some reservations about having to give someone the death penalty, she also said that she could do it.  (98 RT 10456-57.)  With respect to Thomas's questionnaire answer, the prosecutor's justification is undermined by the fact that many seated and alternate jurors also wrote that the implementation of the death penalty should depend on the crime.  (*See* the juror questionnaires of Lilian Aragon (VI Supp. CT 6, at 1764); Chakalit Harris (VI Supp. CT 12, at 3470); Alfred Carrillo (VI Supp. CT 8, at 2331); Donald McGee (VI Supp. CT 15, at 4270); Verbe Sutton (VI Supp. CT 3, at 861); Arlena Wallace (VI Supp. CT 5, at 1238); Martha Salcido (VI Supp. CT 1, at 162); Phyllis Singletary (VI Supp. CT 2, at 587); Sandra Perkins (VI Supp. CT 17, at 4876); and Bonita Smith

(VI Supp. CT 3, at 652).)  Like Thomas, two alternate jurors, Janice McDowell and Max DeRuiter, wrote on their questionnaires that they did not have firm opinions about the death penalty.  (McDowell (VI Supp. CT 15, at 4254); DeRuiter (VI Supp. CT 10, at 2683).)  Shirley Zelaya, a seated juror, did not respond to the question at all.  (VI Supp. CT 6, at 1573.)

982.   Similarly, Thomas's *Hovey* statement that implementing the death penalty would be challenging not only reflected a realistic and thoughtful consideration of capital jury service, but also echoed the ambivalence raised by other seated and alternate jurors.  Lilian Aragon, for example, stated during *Hovey voir dire* that she did not consider herself a supporter of the death penalty and that she did not have a well-defined opinion about the death penalty.  (97 RT 10324.)  Arthur Johnson likewise stated that he never had strong feelings for or against the death penalty, and said that life in prison and a death sentence are equally serious.  (*Id.* at 10331-33.)  "If a proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step."  *Miller-El II*, 545 U.S. at 241.

983.   The prosecutor's final justification for challenging Thomas, based on her treated gambling problem and twelve-step-program membership, was likewise undermined by his failure to challenge Donald McGee, a seated juror who was a self-professed "recovering alcoholic" and who attended Alcoholics Anonymous meetings every day.  (VI Supp. CT 15, at 4278.)

**B.   Katherine Sanford**

984.   Katherine Sanford was a forty-four-year-old black female potential juror.  (VI Supp. CT 2, at 370.)  The prosecutor peremptorily challenged Sanford.  (132 RT 14802.)  She had worked for the city of Los Angeles for twenty-two years.  (VI Supp. CT 2, at 370.)  During her twenty-two years of civil service for the city, she rotated between the Los Angeles Police Department and the

Department of Water and Power, and was employed two times by each agency. (VI Supp. CT 2, at 370.)  On her juror questionnaire, Sanford reflected, "I personally would not want to sentence anyone to death but if it was a decision I had to make I'd make it."  (VI Supp. CT 2, at 377.)  She also stated that she was in support of the death penalty, and would be inclined to sentence any person who intentionally killed another while committing a burglary to death.  (*Id.*)  During her *Hovey voir dire*, Sanford told the prosecutor that she could give the death penalty to a defendant if it were the appropriate sentence.  (93 RT 9746).  During general *voir dire*, Sanford provided details about her work as a secretary for the Los Angeles Police Department's Homicide Division.  (132 RT 14793-95.)  She explained that "Whenever I see or hear about a victim I have sympathy for the person or for anybody that has been wronged."  (*Id.* at 14796.).  On her juror questionnaire, Sanford used the explanation sheet to elaborate that while she would find it personal difficult to implement the death penalty, she could do it.  (VI Supp. CT 2, at 385.)  Sanford stated that she would follow the orders of the court and would "abide by the judge, court or state whether I believe or agree with it."  (*Id.*)

985.   The prosecutor offered several justifications for striking Sanford. He stated that he found her alternation between jobs signaled that either "people are passing her around or she can't find a place where she is happy, and I didn't expect her to be any happier on the jury."  (140 RT 15981.)  The prosecutor also said that he was troubled by her explanation sheet.  He called it a "rambling history really of her life and defeats that she had been dealt and her beliefs and almost a purging of something within her."  (*Id.*)  Finally, the prosecutor justified his strike based on Sanford's questionnaire statement that she would not like to personally be the one to sentence someone to die.  (*Id.* at 15982.)  All of these justifications are pretextual.

986. The prosecutor's justification regarding Sanford's job changes was undermined by the fact that several seated and alternate jurors had employment records with numerous job changes. Alfred Carrillo, a seated juror, had six jobs in ten years. (VI Supp. CT 8, at 2324-25.) His term of employment at each position ranged from eight months to two years. (*Id.*) Cynthia Hayden, a seated juror, had four job changes over the last ten years. (VI Supp. CT 12, at 3399-3400.) Felipe Rodriguez, the jury foreperson, had four jobs over the last ten years and stayed at each job for only two to four years. (VI Supp. CT 1, at 146-47.) Bonita Smith, an alternate juror, had four jobs in the last ten years, ranging from nine months to three years. (VI Supp. CT 3, at 644-45.) Neither attorney specifically examined Sanford about why she had changed jobs between the police and water departments, nor did they ask her if she was unhappy with her current or past positions. At the very least, the prosecutor should have followed up with Sanford "before getting to the point of exercising a strike." *Miller-El II*, 545 U.S. at 244; *id.* at 250 n.8 ("[T]he failure to ask undermines the persuasiveness of the claimed concern."). Clearly, frequent job change did not disqualify, in the prosecutor's mind, the four seated and alternate jurors listed above. Sanford's occupational record was not a significant factor in her ability to be a good juror, and the prosecutor's reliance on this justification is pretextual.

987. The prosecutor's justification relating to Sanford's explanation sheet inaccurately characterized what Sanford actually wrote. Sanford's explanation sheet did not include a rambling history of her life's defeats or anything of the sort. Instead, she elaborated on her personal thoughts about capital jury service. (VI Supp. CT 2, at 385.) Her explanation reflected a thoughtful consideration of the importance of jury service and her ability to follow the law. (*Id.*) By relying on a contorted and inaccurate description what Sanford wrote, the prosecutor revealed that his justification was pretextual.

364

988.    Finally, the prosecutor's justification for striking Sanford based on her questionnaire response that she would "personally would not want to sentence anyone to death" is likewise incomplete.  She also said, in the same sentence, that she could in fact do so.  (VI Supp. CT 2, at 377.)  These sentiments were further elaborated in the explanation sheet that the prosecutor derogated as "rambling."  (VI Supp. CT 2, at 385.)  Furthermore, she also expressed that she would be inclined to give the death penalty in a case similar to Ramirez's, where a person was found guilty of intentionally killing another during a burglary.  (*Id.*)

989.    The prosecutor's justification is also undermined by the fact that other jurors also stated some ambivalence about implementing the death penalty.  Lilian Aragon, for example, stated during *Hovey voir dire* that she did not consider herself a supporter of the death penalty and that she did not have a well-defined opinion about the death penalty.  (97 RT 10324.)  Arthur Johnson likewise stated that he never had strong feelings for or against the death penalty, and said that life in prison and a death sentence are equally serious.  (*Id.* at 10331-33.)  Additionally, Sanford was likely more strongly inclined toward the death penalty than some of the selected jurors were.  Lilian Aragon and Cynthia Hayden both stated that they could not think of a type of case that would always require the death penalty.  (Aragon, *id.* at 10323; Hayden, 93 RT 9775.)  Max DeRuiter, an alternate juror, stated in his questionnaire that it was "very hard to explore [his] feelings regarding something like the death penalty." (VI Supp. CT 10, at 2683.)

990.    Totality of Sanford's questionnaire and *voir dire* responses, especially those reflecting her experience working and sympathizing with crime victims as part of her police department duties, reveal that she would have likely been a strong juror for the prosecution. For all of these reasons, the prosecutor's justifications for striking her were pretextual.

## C. Johnnie Sue Lang

991.   Johnnie Sue Lang was a forty-four-year-old black female prospective juror. (VI Supp. CT 14, at 4008.) Lang was peremptorily challenged by the prosecution. (130 RT 14545.) Lang had two relatives who worked in law enforcement. Her husband was a peace officer for the California Youth Authority, and her niece's husband was an LA County Sheriff. (VI Supp. CT 14, at 4009; RT 14515.) On her juror questionnaire, Lang opined that the death penalty is pursued too seldom. (VI Supp. CT 14, at 4015.) Lang also stated that she had not formed an opinion about the validity of psychiatric opinions and understood that she was not bound to accept any psychiatrist or psychologist opinions as conclusive. (VI Supp. CT 14, at 40017). Like many of the seated and alternate jurors, Lang wrote on her questionnaire that the implementation of the death penalty should depend on the crime. (VI Supp. CT 14, at 40015.) Lang wrote that such a decision should also be based on the evidence, including any psychiatric evaluation brought forth. (*Id.*) In response to defense counsel's questioning during *Hovey voir dire*, Lang reiterated that she would consider psychological evidence when determining the appropriateness of the death penalty. (94 RT 9890-91.) Also during *Hovey voir dire*, Lang told the prosecutor that her two sons were currently incarcerated for drug-related charges and had been prosecuted by the Los Angeles County District Attorney's office. (*Id.* at 9897-98.) When asked if her sons' cases would bias her against the prosecution or otherwise affect her ability to remain impartial, she responded, "No it would not. They broke the law." (*Id.* at 9899.).

992.   The prosecution offered several justifications for striking Lang, all of which were pretextual. The prosecutor stated that Lang was too "concerned with the psychology of [the] case," as indicated by her questionnaire and *Hovey* answers and that she might be biased against the prosecution because of her sons' criminal cases. The prosecutor also expressed his vague impression that Lang's

*voir dire* "demeanor indicated to me that shoe [sic] did not want to be here," and "that she was trying to get out of here."  The prosecutor elaborated on this notion, explaining:

> I just don't want to have to deal with that issue after we've been in trial for a number of months, somebody who didn't want to be here in the first place becomes belligerent, and for those reasons we excused her.

(140 RT 15977.)

993.   The prosecutor's justifications clearly overstated Lang's statements regarding psychological evidence.  Her questionnaire answers only indicated that she would consider psychiatric evidence, if presented, along with all other evidence, before determining the appropriateness of a death sentence.  (VI Supp. CT 14, at 4015.)  This is exactly what a juror sitting on a capital murder case is supposed to do -- weigh and consider all of the mitigating and aggravating evidence presented.  When considered in the context of Lang's other psychology-related questionnaire answers, it is clear that she was not in fact very "concerned with the psychology of the case."  To the contrary, her questionnaire answers revealed that she had not formed an opinion about the validity of psychiatric opinions and understood that she was not bound to accept such evidence as conclusive.  (VI Supp. CT 14, at 40016-17.)  Furthermore, her *Hovey* statement that she would consider such evidence when determining the appropriateness of the death penalty came in response to the defense attorney's questions, which indicated that such evidence *should* be considered during the penalty phase.  (94 RT 9890-91.)

994.   The prosecutor's justification pertaining to Lang's statements regarding her consideration of psychological evidence is undermined by the fact that several seated jurors stated that they would consider psychological evidence before implementing a death sentence.  Cynthia Hayden expressed in her juror

questionnaire that she had valued her personal experience in psychological therapy and had read a lot about the psychology of human development. (VI Supp. CT 12, at 3408, 3414.) Donald McGee had been employed as a psychological technician, and stated a psychiatric evaluation is a very important way to determine a person's state of mind. (VI Supp. CT 15, at 4271.) Felipe Rodriquez, the jury foreperson, also stated that he had previously studied psychology and thought that it has merit. (VI Supp. CT 1, at 154.) Martha Salcido answered that psychological evidence is relevant, including information about developmental psychology, such as evidence about upbringing and childhood. (VI Supp. CT 1, at 170.)

995. The prosecution's justification for challenging Lang based on her sons' prosecutions is undermined by the fact that two seated jurors had family members also prosecuted for drug-related crimes. Lilian Aragon's husband was prosecuted for drug possession. (VI Supp. CT 6, at 1759.) Alfred Carrillo's two brothers were prosecuted by the Los Angeles County District Attorney's office and incarcerated for drug-related crimes, just like Lang's sons. (106 RT 11570-72.) Carrilo's *Hovey* statement about why his brothers' prosecutions would not affect his ability to serve as an impartial juror was very similar to the explanation provided by Lang. Carrilo stated, "They did what they did and. . . had to go to prison for it." (*Id.* at 11571.).

996. Finally, the prosecution's justifications based on a vague notion of Lang's courtroom demeanor also ring hollow. Nothing in the record corroborates the prosecutor's characterization of Lang's demeanor. Neither the court nor the defense commented on the prosecution's characterization. Because the court did not discuss the prosecutor's characterization of Lang's court demeanor, it "cannot be presume[d] that the trial judge credited the prosecutor's assertion." *Snyder*, 128 S.Ct. at 1209. Nothing in the record demonstrates that the prosecutor

"credibly relied on demeanor in exercising a strike." *Id.* As such, the prosecutor's justification cannot sustain his challenge.

**D.     Hortensia Roberts**

997.    Hortensia Roberts was a black female potential juror. The prosecutor peremptorily challenged Roberts. (131 RT 14626.) During her *Hovey voir dire* Roberts said that a person who kills and then mutilates the deceased's body should always get the death penalty, regardless of their state of mind or other types of mitigating evidence. (RT 10828-29.) Like Lang, in response to the defense attorney's *Hovey* questions, Roberts stated that she would consider evidence of the defendant's background and psychology when considering the appropriateness of the death penalty. (101 RT 10830.) Similarly, Roberts's juror questionnaire reflected that during the penalty phase, she would consider all of the circumstances of the crime, including the defendant's psychological state, before implementing the death penalty. (*Id.* at 10832.)

998.    The prosecutor justified his challenge of Roberts by citing her reliance on psychological evidence. (140 RT 15977.) Roberts's statement that she would consider the circumstances of the crime, including evidence pertaining to the defendant's psychological state, was not extraordinary. As stated above, several seated and alternate jurors likewise stated that such information was valuable and would be part of the evidence they would consider during the penalty phase. The prosecutor's justification for challenging Roberts, based solely on her consideration of psychological evidence, was patently pretextual for all of the same reasons that his similar justification of Lang's strike was pretextual.

999.    The prosecution also justified dismissing the two following women due to their purported "immaturity." The challenges of these women were also pretextual and therefore improper.

### E.    Demetrius Joseph

1000.  Demetrius Joseph was a twenty-five-year-old black female prospective juror.  (VI Supp. CT 14, at 3912.)  She was dismissed by the prosecution with a peremptory challenge.  (131 RT 14645.)  Joseph was a mail handler and had worked for the United States Postal Service for four years.  (VI Supp. CT 14, at 3912.)  She was the mother of three children aged six years, four years, and nineteen months.  (*Id.*)  During general *voir dire*, the defense attorney asked her if she had ever experienced racial discrimination.  (131 RT 14631.)  She described a situation in which a store clerk did not give her proper change, and when she asked for it, the clerk called her and her friend "niggers."  She explained that her friend ran at the man.  (*Id.* at 14632.)  When counsel asked her the store clerk's race, she responded that she thought he was Chinese.  (*Id.* at 14633.)  She stated that the incident did not make her feel prejudiced against people of Chinese decent because "I figure that's just the way he was.  You know, I don't have anything against the whole race; it's just the person themselves."  (*Id.*)  The prosecutor passed for cause for Joseph without any further inquiry.  (*Id.* at 14634.)

1001.  The prosecutor justified his strike of Joseph by saying she appeared to be "immature."  The prosecutor made specific reference to her incident with the store clerk, stating:

> I just concluded that she was so immature that she seemed to have a problem in that regard.  Certainly concerning this Chinese store owner.  We have Chinese victims in this case.  We're going to have Chinese witnesses in this case.  If there was some carry over, I didn't want to be the recipient of it, and basically her immaturity was why I exercised a challenge with respect to Miss Joseph.

(140 RT 15978.)

1002. Nothing in the record supports the prosecution's assertion that Joseph was an immature person. To the contrary, her employment and parenthood spoke to her maturity. Just like seven of the seated and alternate jurors, Joseph had a stable job as a U.S. Postal Service employee. (VI Supp. CT 14, at 3912; *see* juror questionnaires of the following postal employees: Mary Herrera (VI Supp. CT 13, at 3543); Arthur Johnson (VI Supp. CT 14, at 3832); Martha Salcido (VI Supp. CT 1, at 162); Shirley Zelaya (VI Supp. CT 6, at 1566); James Muldrow (VI Supp. CT 16, at 4680); and Sandra Perkins (VI Supp. CT 17, at 4870). She was also a mother to three young children. (VI Supp. CT 14, at 3912.) The fact that a seated juror, Alfred Carrillo, was only one year older than she was, undermined any implicit assertion that Joseph's age made her too immature to be on the jury. (VI Supp. CT 8, at 2324.) Nothing about Joseph's story regarding her incident with the store clerk suggested that *she* was immature. She was the victim of racial discrimination, yet she refused to respond in kind. She reasoned that it was not the clerk's race, but his personal ignorance, that caused him to treat her the way he did. Her reasoning demonstrated her maturity, and the prosecutor's justification was plainly pretextual.

1003. To the extent that the prosecutor believed that Joseph was immature based on her demeanor, he failed to make a record of this fact; the trial court, too, made no comment on Joseph's demeanor. Her demeanor, therefore, cannot help to support the prosecution's strike. *Snyder*, 128 S.Ct. at 1209.

## F.    Alicia Alex

1004. Alicia Alex was a nineteen-year-old black female potential alternate juror. (VI Supp. CT 6, at 1676.) The prosecutor peremptorily challenged Alex (135 RT 15213). Alex did not work, but did attend cosmetology classes in the evening. (134 RT 15145.) On her juror questionnaire, Alex answered that she had not really thought much about the death penalty. (VI Supp. CT 6, at 1683.) During *Hovey voir dire*, Alex said that she would lean toward the death penalty in

a case in which a person purposefully killed another person and felt no remorse. (100 RT 10647).  She also told the prosecutor that she would probably vote to keep the death penalty if it were up for reconsideration in a general election.  (*Id.*)

1005.  The prosecutor justified striking Alex because he said that she seemed immature, as exemplified by her age and lack of a job.  (140 RT 15983).  The prosecutor also justified his strike by saying that she had not thought much about the death penalty.  (*Id.*)  He also asserted that she paused too much during her *voir dire* answers.  (*Id.*)  However, the prosecutor did note that such pausing was not reflected in the record, because such things "don't always show in the transcript . . . but there was reluctance here.  She was slow to answer." (*Id.* at 15984.)  The prosecutor's justifications were pretextual.

1006.  The prosecutor's justification regarding Alex's ambivalent death penalty sentiments, as expressed on her juror questionnaire, is undermined by similar ambivalence expressed by seated and alternate jurors.  During *Hovey voir dire*, two seated jurors stated that they had not formed a strong opinion about the death penalty, and did not firmly know if they even supported it.  Lilian Aragon said she was not necessarily a supporter of the death penalty.  (97 RT 10324.)  Arthur Johnson said that he did not have strong feelings either for or against the death penalty.  (*Id.* at 10333.)  Since Alex stated during *Hovey* that she favored the death penalty in some situations, and would likely vote for it during a general election, her stance in favor of the death penalty was apparently stronger than both Aragon's and Johnson's.  The prosecutor's justification was also undermined by the presence of seated juror Shirley Zelaya, who took no position about the death penalty on her juror questionnaire, and alternate juror Max DeRuiter, who wrote that it was hard for him to "explore his feelings" about the death penalty.  (Zelaya, VI Supp. CT 6, at 1573; DeRuiter, VI Supp. CT 10, at 2683.)

372

1007. The justification regarding Alex's immaturity, based on her age, is similarly undermined by the presence of Alfred Carrillo as a seated juror, who himself was only twenty-six years old. (VI Supp. CT 8, at 2324.) Additionally, although Alex was unemployed, she was attending school in the evenings.

1008. The prosecutor's final statement that Alex's pausing during *voir dire* served as a basis for his challenge also seems thinly veiled, especially in light of all of the other demonstrated pretexts. Even the prosecutor noted that the record did not reflect Alex's apparent speaking style and the trial court made no finding on this issue. As such, it "cannot be presume[d] that the trial judge credited the prosecutor's assertion" of Alex's demeanor or even that the prosecutor "credibly relied on demeanor in exercising a strike" against Alex. *Snyder*, 128 S.Ct. at 1209. But even assuming Alex was "slow to answer," the prosecutor provided no explanation as to why that would make her a bad juror. (140 RT 15984.)

## G. The Prosecution's Other Strikes

1009. In addition to the six black women described above, the prosecutor peremptorily challenged eight additional black female prospective jurors. While each and every one of the above peremptory challenges by itself constituted a violation of the Equal Protection Clause under *Batson*, the prosecutor's entire record of peremptory challenges against black women was especially egregious and constitutes additional evidence of discrimination at step three of the *Batson* inquiry. The prosecution also struck five out of six Hispanic prospective alternate jurors.

1010. Defense counsel, for his part, failed to challenge the pretextual justifications provided by the prosecutor. The court gave defense counsel two opportunities to respond to the prosecutor's justifications for striking the 14 black women. (140 RT 15991-92.) The following exchange ensued:

Mr. Hernandez: I think the court should look at the transcripts that they referred to and the questionnaires they referred to, and look

373

beyond their explanation before making a determination whether
their explanation is sufficient.

. . .

Mr. Halpin: Let me ask that Mr. Hernandez at this point, if he has
any specifics, refer them to the court.

Mr. Hernandez knew the subject of this inquiry and he had the
opportunity, the same as we did, to sit down and review his material.

(*Id.* at 15992.)

1011. Defense counsel failed entirely to respond to the prosecutor's
patently pretextual justifications for the unconstitutional strikes of the 14 black
female prospective jurors. Defense counsel rendered constitutionally deficient
and prejudicial assistance of counsel insofar as he failed to respond. Counsel's
incompetence deprived the court of valuable evidence of discrimination -- to wit,
the comparative analysis performed above. *Strickland v. Washington*, 466 U.S.
668 (1984).

1012. The court denied Ramirez's *Batson* motion. In doing so, it
relied primarily upon its longstanding personal relationship with the prosecuting
attorneys, and its opinion that neither of the attorneys was a "bigot":

I, too, find these accusations -- these kind of accusations
troublesome and I have known Mr. Yochelson for some years and I
don't think there is a man in this court building that does not have a
high respect for him.

Mr. Halpin and I have been acquainted for probably close to
18 or 19 years, I as a public defender and Mr. Halpin as a District
Attorney . . . nobody in this building, and certainly not this court,
has ever accused him of being dishonest or deceitful or a bigot.

And I see nothing in this record to indicate any of that.

(140 RT 15994.)

374

1013. The trial court's decision was entirely inappropriate. To deny Ramirez's *Batson* motion, the court relied upon evidence outside the record -- that is, his personal opinion of the prosecuting attorneys, formed from years of interactions that occurred before Ramirez's trial. Because this extrajudicial evidence was not in the record, there was no possible way for defense counsel to respond to it or attempt to rebut it. The trial judge essentially became a witness in the case -- testifying to the good character of the prosecuting attorneys -- yet defense counsel had no opportunity to cross-examine him or to present contrary evidence. Furthermore, the trial court's willingness to allow his personal opinions to color his legal decisions suggests that he was anything but an impartial adjudicator. In addition to the fact that the trial court's decision denying Ramirez's *Batson* motion was substantively incorrect, the manner in which the court reached that decision did not comport with due process.[71]

1014. The foregoing violations of Petitioner's constitutional rights, taken singly or in combination with the other errors alleged in the Petition, constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Petition, so infected the integrity of the proceedings that the error cannot be deemed harmless. The

---

[71] In addition, the trial court had earlier stated on the record that it did not believe that racial bias was a genuine problem in Southern California in 1988, suggesting that it was not an impartial adjudicator with respect to the *Batson* motion, but instead approached the motion already disinclined to grant it. (126 RT 13884 ("I suspect that the issue of racial bias might be a little bit more pertinent in South Carolina than it is in Southern California.").)

foregoing violations of Petitioner's rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622, 637-38.

1015. To the extent that this Court finds that this claim should have been presented earlier, all prior counsel who failed to present the claim after the facts on which it is based became known or should have been known rendered ineffective assistance in not asserting it sooner, and the Court should consider the claim on the merits. *Coleman v. Thompson*, 501 U.S. 722, 753-54, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991); *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *see Davis v. Sec'y for the Dep't of Corr.*, 341 F.3d 1310, 1314-17 (11th Cir. 2003) (addressing failure to preserve a *Batson* claim).

**CLAIM 13:**

> **THE PROSECUTOR VIOLATED THE EQUAL PROTECTION CLAUSE BY EXERCISING PEREMPTORY CHALLENGES TO REMOVE HISPANIC ALTERNATE JURORS BECAUSE OF THEIR RACE**

1016. Exhaustion of Claim:  This claim will be presented to the California Supreme Court in an exhaustion petition that  he will file no later than March 17, 2009.

1017. Ramirez's convictions, sentences, and death judgment violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the prosecution exercised peremptory challenges against Hispanic prospective alternate jurors on the basis of race. *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

1018. The exhibits filed with this Petition and the allegations set forth elsewhere in this Petition are hereby incorporated by reference into this claim as though set forth in full.

1019. The facts in support of this claim, among others to be presented after full investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing, include the following:

1020. Petitioner is a Hispanic man who stood trial for multiple interracial murders. The prosecution exercised peremptory challenges to remove both of the first two Hispanic prospective alternate jurors who were called to the jury box and were not dismissed for hardship -- Eugene Mendez and John Lucero. Defense counsel brought a motion under *People v. Wheeler*, 22 Cal. 3d 258, 148 Cal. Rptr. 890 (1978), the California counterpart to *Batson v. Kentucky*, after the second strike.[72] The trial court denied the motion at *Batson*'s step one, finding no "systematic exclusion" of Hispanic alternates. (135 RT 15234-36.) The court specifically stated, however, that "I would think that if we have another Latin excluded, . . . that a hearing would be in order. (*Id.* at 15234.)

1021. Defense counsel renewed the *Batson* motion after the prosecution struck Deloris Reserva. (139 RT 15881.) The court originally listed Reserva as a "Latin," but the prosecution asserted that she was not Hispanic. (*Id.* at 15882.) The trial court again found no prima facie case -- no "pattern" -- even assuming that Reserva was Hispanic. (*Id.* at 15883, 15890.) At this point, counting Reserva as Hispanic, and not counting jurors removed for hardship dismissals, the prosecution had struck three out of the four Hispanic prospective alternate jurors who were called to the box. (*Id.* at 15883-87.)

---

[72] A *Wheeler* challenge is sufficient to preserve a *Batson* claim. *Paulino v. Castro*, 371 F.3d 1083, 1088 n.4 (9th Cir. 2004).

1022. *Voir dire* continued, and eventually the prosecution struck two more Hispanic alternates, Ramon Lopez and Celia Lucero. Defense counsel renewed the *Batson* motion. By now the prosecution had struck five out of the six Hispanic prospective alternates (four out of five if Reserva is not counted). The prosecutor had also used peremptory strikes to remove 14 of the 27 black female prospective jurors. *See* Claim 12. The trial court again found that no prima facie case had been established and denied the motion without explanation. (141 RT 16076.)

1023. Petitioner incorporates by reference the statement of law regarding *Batson v. Kentucky* and its progeny presented in Claim 12.

1024. The trial court's determination that Ramirez failed to make out a prima facie *Batson* claim was objectively unreasonable. The prosecutor struck five of six, or 83 percent, of the available Hispanic alternate jurors who were called to the jury box.[73] This statistical figure is easily sufficient, by itself, to raise an inference of discriminatory purpose. *See Fernandez v. Roe*, 286 F.3d 1073, 1078 (9th Cir. 2002) (four of seven (57%) Hispanic jurors satisfied prima facie showing); *Turner v. Marshall*, 63 F.3d 807, 813 (9th Cir. 1995) (five of nine (55%) African Americans stricken), *overruled on other grounds by Tolbert v. Page*, 182 F.3d 677, 684 (9th Cir. 1999) (en banc); *United States v. Lorenzo*, 995 F.2d 1448, 1453-54 (9th Cir. 1993) (assuming prima facie case where three of nine (33%) Hawaiian jurors stricken); *United States v. Bishop*, 959 F.2d 820, 822 (9th Cir. 1992) (assuming prima facie case where two of four (50%) African American jurors stricken), *overruled on other grounds*, *Boyde v. Brown*, 404 F.3d 1159, 1171 n.10 (9th Cir. 2005).

---

[73] Because the trial court found no prima facie case even assuming that Reserva was Hispanic, Petitioner counts her as Hispanic here. In any event, the data is clearly sufficient to make out a prima facie case even if Reserva is not counted.

1025. "[C]ourts should engage in a rigorous review of a prosecution's use of peremptory strikes. If a trial court's conclusion that a defendant failed to make a prima facie case could insulate from review a prosecution's use of peremptory strikes, the holdings of [*Johnson* and *Miller-El II*] would be undermined." *Boyd v. Newland*, 467 F.3d 1139, 1149-50 (9th Cir. 2006) (as amended).

1026. The trial court did not state what prima facie standard it applied in rejecting Ramirez's claim, but statements during voir dire strongly suggest that the court applied the onerous *Wheeler* standard of which the U.S. Supreme Court disapproved in *Johnson v. California*, 545 U.S. 162, 125 S. Ct. 2410, 162 L. Ed. 2d 129 (2005). The court first denied Ramirez's *Batson* challenge because it found no "systematic exclusion" of Hispanic alternates. (135 RT 15234-36.) It later stated that it had found no "pattern." (139 RT 15883.) This understanding of the *Batson* threshold is incorrect: no invidious *pattern* must be shown, as even a single race-based strike violates the constitution. *United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994); *see also Batson*, 476 U.S. at 95 ("'A single invidiously discriminatory governmental act' is not 'immunized by the absence of such discrimination in the making of other comparable decisions.'") (quoting *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 n.14, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977)); *accord Snyder v. Louisiana*, 128 S. Ct. 1203, 1208 (2008). The *Wheeler* standard is contrary to Supreme Court precedent. *Johnson*, 545 U.S. at 173.

1027. The only remaining question is whether "other relevant circumstances" surrounding the strikes refute the inference of discrimination raised by the statistical disparity. *See Williams v. Runnels*, 432 F.3d 1102, 1107 (9th Cir. 2006). Because the issue that ultimately matters is the prosecutor's real reasons for the strikes, "to rebut an inference of discriminatory purpose based on statistical disparity, the 'other relevant circumstances' must do more than indicate that the record would support race-neutral reasons for the questioned challenges."

1    *Id.* at 1108, 1109.  In other words, it is not appropriate for a reviewing court to

2    survey the record for race-neutral reasons that might have supported the

3    prosecutor's five peremptory strikes of the Hispanic jurors.

4         1028. Far from rebutting the inference of discriminatory purpose, the

5    totality of the circumstances helps confirm it.  As noted, Ramirez is a Hispanic

6    man.  The prosecutor may have feared that Hispanic jurors would be sympathetic

7    to Petitioner and his family.  The prosecutor's strikes against 14 of the 27 black

8    female jurors are also relevant circumstances militating in favor of an inference

9    of discrimination.  *See Snyder*, 128 S. Ct. at 1208 (explaining that the strike of

10   one juror must be considered as it bears on the strike of another juror claimed to

11   have been removed based on discriminatory intent); *Fernandez*, 286 F.3d at 1079

12   (relying in part on prosecutor's strikes against Hispanic jurors in determining that

13   prima facie case existed with respect to African American jurors).

14        1029. To the extent that the trial court relied on the presence of one

15   Hispanic alternate juror, Mary Herrera, to refute any finding of a prima facie

16   case, this was error.  It is hornbook law that the presence of such jurors does not

17   immunize the prosecution's race-based strikes.  *See, e.g.*, *Miller-El II*, 545 U.S. at

18   240, 266 (granting relief where black juror served); *Turner*, 63 F.3d at 811 (four

19   black jurors served); *Id.* at 814 ("In denying a *Batson* motion, . . . a trial court

20   may not rely solely on the fact that some African-Americans remain on the

21   jury.").  The threshold for making a prima facie *Batson* claim is quite low."  *Boyd*

22   *v. Newland*, 467 F.3d 1139, 1145 (9th Cir. 2006) (as amended).  Ramirez has

23   passed that threshold here.

24        1030. The foregoing violations of Petitioner's constitutional rights, taken

25   singly or in combination with the other errors alleged in the Petition, constitute

26   structural error and warrant the granting of this Petition without any

27   determination of whether the violations substantially affected or influenced the

28   jury's verdict.  *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S.

Ct. 1710, 123 L.Ed.2d 353 (1993). However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Petition, so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violations of Petitioner's rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622, 637-38.

1031. To the extent that this Court finds that this claim should have been presented earlier, all prior counsel who failed to present the claim after the facts on which it is based became known or should have been known rendered ineffective assistance in not asserting it sooner, and the Court should consider the claim on the merits. *Coleman v. Thompson*, 501 U.S. 722, 753-54, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991); *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *see Davis v. Sec'y for the Dep't of Corr.*, 341 F.3d 1310, 1314-17 (11th Cir. 2003) (addressing failure to preserve a *Batson* claim).

**CLAIM 14:**

**PETITIONER'S STATEMENTS WERE UNRELIABLE AND INVOLUNTARILY OBTAINED AND COUNSEL FAILED TO COMPETENTLY LITIGATE A MOTION TO EXCLUDE THEM**

1032. Exhaustion of the claim: This claim was fairly presented to the California Supreme Court in Section XI of the June 2004 petition for writ of habeas corpus, although it includes additional factual allegations. Petitioner will present the claim with the additional factual allegations to the California Supreme Court in an exhaustion petition he will file no later than March 17, 2009.

381

1033. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

1034. Those facts and allegations set forth in the petition, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

1035. Petitioner's conviction and sentence are illegal, unconstitutional and void under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because counsel failed to effectively prosecute the motion to exclude Petitioner's admission and protect Petitioner's rights to due process, a fair trial, and reliable determination of guilt and penalty.

1036. Petitioner's conviction and sentence of death were rendered in violation of his rights to due process; a fair trial; present a defense; compulsory process; disclosure of all material, exculpatory and/or impeaching evidence; a reliable, rational and accurate determination of guilt, death eligibility and death worthiness, free of any unconstitutionally unacceptable risk that such determinations were the product of bias, prejudice, arbitrariness or caprice; and effective assistance of counsel under the Constitution.

1037. On March 17, 1987, the defense filed "Points and Authorities for Motion to Exclude Statement of Defendant." (XXIII CT 6713-18.) Counsel asserted that Petitioner's statements were involuntary without specifying any grounds, other than invoking his Fifth Amendment rights.[74] With respect to statements allegedly made by Petitioner following his arrest and before his

---

[74] After an evidentiary hearing, the court suppressed Petitioner's statements that were made after he invoked his Fifth Amendment rights.

advisory, counsel failed to litigate any reasonable factual or legal grounds to exclude the statements. (*See* 37 RT 2701-15.)

1038. The court found the statements were made voluntarily and were spontaneous. (37 RT 2717.) The motion to suppress Petitioner's statements was denied. (*Id*. at 2716.)

1039. Had counsel conducted a competent investigation, they would have learned of Petitioner's background, his history of mental illness, psychosis, and other significant neurological, cognitive, psychological and psychiatric impairments. Competent counsel would have presented such evidence to the court in support of their motion to suppress and the evidence would have established the statements' lack of voluntariness and spontaneity.[75] Counsel knew that Petitioner acted out while he was in police custody. He sustained a head injury upon arrest and was observed by police banging his head on a table at least ten times. (*See* 26 RT 1884, 1888.) There was ample evidence, known or available to counsel, that Petitioner suffered from serious mental impairments.

1040. At the motion hearing, counsel failed to introduce evidence of Petitioner's long-standing temporal lobe epilepsy; mental incompetency in September 1985; thought disorder of psychotic proportion, resulting from organic brain disorder; psychotic disorder; disorganized speech, thought, and behavior; hallucinations, delusions, paranoia; severe mood disorder; brain damage; severe impairments in memory tasks and higher cognitive functioning, of a kind typically associated with impairment of the frontal and temporal lobes; impairments in his ability to inhibit behavior and responses and obsessive and compulsive behaviors; and the impact on his behavior and personality of multiple

---

[75] At a minimum, counsel was well aware of Petitioner's history of temporal lobe epilepsy, psychosis and mental illness having had Dietrich Blumer, M.D., a neuropsychiatrist, examine Petitioner on January 19 and 20, 1986. (Ex. 31, Blumer Dec.)

disorders – all of which established that Petitioner was seriously mentally ill and which rendered Petitioner's statements involuntary and not spontaneous. Petitioner incorporates by reference as though fully set forth in Exhibits 31, 32, 38, 41, 42, 43, 72, 100, 99, 98, 96 which are the Declarations of Dietrich Blumer, M.D., dated 05/10/2004; Marilyn Cornell, dated 06/16/2004; Robert Schneider, M.D., dated 02/23/2004; William Vicary, M.D., dated 03/15/2004; Dale Watson, Ph.D., dated 04/24/2004; Jane Wells, J.D., Ph.D., dated 05/19/2004; and Anne Evans, Ph.D., dated 04/18/1995, as well as the reports of George W. Woods, M.D., dated 04/19/1995; Elise Taylor, MFCC, dated 03/06/1995; Myla H. Young, Ph.D, dated 03/13/1995; and the letter from Victor Henderson, M.D., to Daniel Hernandez, dated 05/29/1987.

1041. Competent counsel would also have introduced evidence that psychological impairments render statements coercive. (Ex. 20, Trauma-Related Coerced Confessions.) Thus, competent counsel would have established that Petitioner was so impaired he was unable to function in a rational manner, and his statements were involuntary.

1042. Petitioner was prejudiced by counsel's failure to object or refute the evidence at trial. Evidence of Petitioner's guilt was established by his statements. Petitioner's statement that he would be blamed for the killings and would be sent to the electric chair was crucial to the prosecution's case. Trial counsel's failure to properly object to introduction of the statements and refute the prosecution's evidence was damaging to Petitioner. Petitioner was prejudiced by the prosecutor's closing argument that Petitioner's admissions established his guilt. (209 RT 24069.) There was no mental state evidence introduced on Petitioner's behalf. The jury was not informed as to the involuntary nature of the statements.

1043. Had counsel properly developed Petitioner's case, evidence would have been presented of Petitioner's mental illness and of the circumstances of Petitioner's arrest; continuing objections would have been made on the grounds

that the statements lacked the indicia of reliability; and counsel's closing argument to the jury would have explained that Petitioner's statements were unreliable and not reflective of his guilt.

1044. Trial counsel's failure to investigate, develop and present evidence of Petitioner's state of mind, basis for the admissions, the fearful setting, and the stress at the time that the statements were allegedly uttered deprived Petitioner of effective assistance of counsel and the full panoply of his constitutional rights.

1045. The Due Process Clause bars the use of involuntary confessions in criminal trials, independently of whether a violation of the *Miranda* prophylaxis is established. *See, e.g., Fikes v. Alabama*, 352 U.S. 191, 193, 197, 77 S. Ct. 281, 1 L. Ed. 2d 246 (1957). Use of an involuntary confession is a separate violation of due process of law regardless of whether the specific parameters of *Miranda* were observed in obtaining the statement. For this reason, the Supreme Court has stated that "*any* criminal trial use against a defendant of his *involuntary* confession is a denial of due process . . . ." *Mincey v. Arizona*, 437 U.S. 385, 398, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978) (emphasis in original); *see also Doody v. Shriro*, No.06-17161, 2008 WL 4937964 (9th Cir. 2008) .

1046. One reason why use of an involuntary statement at trial violates due process is because of the high risk of its lack of reliability and accuracy. Leading pre-*Miranda* case law on involuntary confessions repeatedly stressed the reliability/accuracy rationale that bars the admission of involuntary confessions. *See, e.g., Stein v. New York*, 346 U.S. 156, 182, 73 S. Ct. 1077, 97 L. Ed. 1522 (1953) (due process entails concerns for the accuracy of the evidence adduced in the trial process); *see also Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) (exculpatory evidence); *Drope v. Missouri*, 420 U.S. at 172-173 (defendant's participation); *Ake v. Oklahoma*, 470 U.S. at 77 (defense access to expert evidence).

1047. The indicia of reliability of an involuntary confession was a valid issue regardless of whether the statements were made pursuant to an official police interrogation in violation of *Miranda*.[76] Petitioner raises precisely such concerns about the accuracy and reliability of the evidence against him. Counsel failed to investigate, substantiate or argue Petitioner's mental impairments to establish the unreliable nature of his statements and violation of his due process rights. Because of counsel's failure to investigate or present any evidence of the circumstances of Petitioner's statement, available evidence of involuntariness was never presented. Counsel's failure was unreasonable in light of case authority and statutory authority prohibiting use of involuntary statements.

1048. The foregoing violations of Petitioner's constitutional rights, taken singly or in combination with the other errors alleged in the Petition, constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S.Ct. 1710, 123 L. Ed. 2d 353 (1993). However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Petition, so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violations of Petitioner's rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622, 637-38.

---

[76] Involuntary statements are excludable if there is some element of coercion present. *See Colorado v. Connelly*, 479 U.S. 157, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986). Remediable claims of involuntary statements do not require the usual trappings of a police interrogation. *See Arizona v. Fulminante* (involuntary statement made to jailhouse informant).

1049. In addition, the denial of his right to effective assistance of counsel substantially prejudiced Petitioner, rendered the trial proceeding fundamentally unfair, eroded the reliability of the verdict and had a substantial and injurious effect on the verdict. But for the denial of this right, it is reasonably probable that a more favorable result would have been attained. Under these circumstances, the adversarial system completely broke down, and Petitioner was left without meaningful representation. Although many of trial counsel's errors were, by themselves, so egregious as to require reversal, the extraordinary accumulation of errors and omissions over the course of the trial created a total breakdown in the adversarial process, so that prejudice is conclusively presumed. *United States v. Cronic*, 466 U.S. 648, 656-662, 104 S. Ct. 2039, 2045-48, 80 L. Ed. 2d 657 (1984). Even assuming a showing of prejudice is required, Petitioner has made that showing here. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

## CLAIM 15:

### COUNSEL'S INEFFECTIVE ASSISTANCE AT PRETRIAL PHASE: FAILURE TO PROPERLY CHALLENGE THE LEGALITY OF THE SEIZURE OF EVIDENCE

1050. Exhaustion of the claim: This claim was fairly presented to the California Supreme Court in Section XII of the June 2004 petition for writ of habeas corpus.

1051. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

1052. Those facts and allegations set forth in the petition, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

1053. Petitioner's conviction and sentence are illegal, and unconstitutional and void under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments because counsel failed to effectively represent Petitioner and protect his rights to due process and a fair trial and reliable determination of guilt and penalty.

1054. Petitioner's conviction and sentence of death were rendered in violation of his rights to due process; to a fair trial; to present a defense; to compulsory process; to disclosure of all material, to exculpatory and/or impeaching evidence; to a reliable, rational, and accurate determination of guilt, death eligibility and death worthiness, free of any unconstitutionally unacceptable risk that such determinations were the product of bias, prejudice, arbitrariness or caprice; and to effective assistance of counsel under the above-referenced provisions of the Constitution.

1055. The violations of these rights, individually and cumulatively, prejudicially affected and distorted the investigation, discovery, presentation, and consideration of evidence as well as each and every factual and legal determination made by trial counsel, the state courts and the jurors at all stages of the proceedings from the time of Petitioner's arrest through and including the rendering of the judgment of death.

1056. Counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 693-94. As a result of trial counsel's deficiencies, there was a complete breakdown in the adversarial process. Counsel's performance impaired the proper functioning of the criminal justice system such that the proceedings cannot be relied on as having produced a just result. *Id.* at 686. There is a reasonable probability that but for counsel's failings, the result in the guilt and penalty phases would have been more favorable. *Id.* at 687-96.

1057. On March 2, 1987, defense counsel moved to suppress evidence. The motion was exceedingly short and without a statement of adequate grounds. (XXIII CT 6703-06.) Counsel failed to move to quash and traverse the search warrant. The court noted that counsel had failed to file a motion to quash and traverse the search warrant but permitted counsel to examine the witnesses concerning grounds for issuance of the warrant. (26 RT 1855.) Counsel also failed to follow the evidentiary procedures required for a § 1538.5 hearing, including calling witnesses to testify and raising a legal claim that evidence had been illegally seized. (*See*, *e.g.*, 27 RT 1976.)

1058. Trial counsel failed to properly investigate the circumstances surrounding Petitioner's arrest, the actions of various police agents, and the seizure of incriminating physical evidence, including the contents of a bag retrieved from a storage locker at a Greyhound bus station, and a green Pontiac vehicle. Petitioner's statements led police to search his person, the Greyhound bag, and the car. Trial counsel's failure to investigate and present evidence of the circumstances surrounding the seizure of evidence amounted to ineffective assistance of counsel.

1059. Allegations of probable cause contained in the search warrant affidavit were based on statements Petitioner made while in custody without being advised of his *Miranda* rights. He allegedly told a police officer that he had in his possession a ticket to a bus locker in which a handgun was stored. Another officer seized the ticket from Petitioner. Police relied on this information as support for obtaining a search warrant for Petitioner's person and property, the Greyhound bag, and the vehicle. (Ex. 21, Search Warrant, Search Warrant Affidavit and Return of Search Warrant (State Habeas Exhibit 11), p. 14.) Trial counsel were also ineffective because they failed to investigate and present evidence that Petitioner's statements were involuntary. *See supra*. The seizure of evidence based on information obtained from Petitioner's involuntary

statements was unlawful and violated Petitioner's fundamental constitutional rights.

1060. On March 24, 1987, the court denied the motion to suppress evidence. (XXIII CT 6722.) The court specifically found the search warrant had been properly issued based on ample probable cause and that the police acted properly with respect to the warrantless seizure of evidence from Petitioner. (Ex. 21, Search Warrant, Search Warrant Affidavit and Return of Search Warrant.)

1061. Had counsel properly investigated the circumstances that led to the issuance of the search warrant and seizure of evidence, it is reasonably probable that counsel would have been able to demonstrate Petitioner's statements were involuntary, that the evidence was unlawfully seized, and that there were insufficient grounds to justify seizure of property from Petitioner's person and lack of legally sufficient probable cause to issue the search warrant.

1062. Competent counsel would have investigated, developed and presented evidence to challenge the validity of information set forth in the search warrant affidavit. Competent counsel would have established that Petitioner's statements lacked voluntariness due to Petitioner's long-standing mental impairments, including neurological and neurocognitive deficits, impaired and psychotic thought processes, his severely compromised ability to shift mental sets and make decisions, and the coercive setting in which Petitioner was held at the time of the statements. Counsel would have properly moved to suppress evidence seized from Petitioner's person, the Greyhound bag, and the green Pontiac because the statements were involuntary and the police lacked probable cause. The seizure of evidence violated Petitioner's Fourth and Fifth Amendment rights.

1063. Evidence seized from Petitioner's person, the Greyhound bag, and the green Pontiac vehicle, was admitted at trial. As a result of counsel's failures,

the jury considered evidence that implicated Petitioner in the crimes of which he was convicted.  In failing to properly challenge and object to the seized evidence, trial counsel deprived Petitioner of his fundamental constitutional rights.

1064. The foregoing violations of Petitioner's constitutional rights, taken singly or in combination with the other errors alleged in the Petition, constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993).  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Petition, so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violations of Petitioner's  rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice.  *See id.* at 622, 637-38.

1065. In addition, the denial of his right to effective assistance of counsel substantially prejudiced Petitioner, rendered the trial proceeding fundamentally unfair, eroded the reliability of the verdict and had a substantial and injurious effect on the verdict.  But for the denial of this right, it is reasonably probable that a more favorable result would have been attained.  Under these circumstances, the adversarial system completely broke down, and Petitioner was left without meaningful representation.  Although many of trial counsel's errors were, by themselves, so egregious as to require reversal, the extraordinary accumulation of errors and omissions over the course of the trial created a total breakdown in the adversarial process, so that prejudice is conclusively presumed.  *United States v. Cronic*, 466 U.S. 648, 656-662, 104 S. Ct. 2039, 2045-48,  80 L. Ed. 2d 657 (1984).  Even assuming a showing of prejudice is required, Petitioner has made

391

that showing here. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

**CLAIM 16:**

**COUNSEL'S INEFFECTIVE ASSISTANCE AT THE PRETRIAL PHASE:  FAILING TO CHALLENGE EFFECTIVELY IDENTIFICATION PROCEDURES**

1066. Exhaustion of the claim:  This claim was fairly presented to the California Supreme Court in Section X of the June 2004 petition for writ of habeas corpus, although it includes additional factual allegations.  Petitioner will present the claim with the additional factual allegations to the California Supreme Court in an exhaustion petition he will file no later than March 17, 2009.

1067. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

1068. Those facts and allegations set forth elsewhere in the petition, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

1069. Petitioner's conviction and sentence are illegal, and unconstitutional and void under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because counsel failed to meaningfully test eyewitness identification evidence and protect Petitioner's rights to due process, a fair trial and a reliable determination of guilt and penalty.

1070. In considering counsel's deficient performance individually and cumulatively in conjunction with other claims alleged herein, the verdicts in both the guilt phase and penalty phases of Petitioner's trial must be set aside. Petitioner adopts and incorporates by reference, as though fully set forth, all facts and claims set forth elsewhere in this petition.

1071. Petitioner's conviction and sentence of death were rendered in violation of his rights to due process; a fair trial; to present a defense; compulsory process; disclosure of all material, exculpatory and/or impeaching evidence; a reliable, rational, and accurate determination of guilt, death eligibility and death worthiness, free of any unconstitutionally unacceptable risk that such determinations were the product of bias, prejudice, arbitrariness or caprice; and effective assistance of counsel under the above-referenced provisions of the Constitution.

1072. Counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 693-94. There is a reasonable probability that but for counsel's failings, the result in the guilt and penalty phases would have been more favorable. *Id.* at 687-96.

1073. The prosecutor's eyewitness identification evidence purportedly linked Petitioner to nine of the sixteen incidents. It consisted of testimony of eyewitnesses who viewed photographic spreads, assisted in the preparation of composite drawings, and made identifications at a live lineup, and in court.

1074. Trial counsel failed to properly and adequately investigate, develop, and present evidence through the meaningful adversarial testing of the evidence to demonstrate in each incident the witness's opportunity to view the suspect; the stress the witness was under at the time; the witness's ability to provide a description; cross-racial and cross-gender aspects of the identification; multiple viewings of Petitioner; and, most importantly, whether the identification was based on independent grounds and not contaminated by the lineup procedures, extensive media coverage, or other factors in the highly publicized case.

1075. Trial counsel failed to present all the relevant grounds to challenge the evidence, including, as described in more detail below, irregularities at the live lineup that contaminated the in-court identification; and unreliability due to inconsistencies in the physical descriptions of the suspect. Counsel consistently

failed to adequately cross-examine the witnesses, test the evidence, and object to the lack of independent grounds for in-court identifications.

1076. Trial counsel failed to challenge the reliability of the prosecution's evidence effectively or to test the evidence. At pretrial hearings to suppress identification based on the live lineup, counsel presented only limited information about the circumstances surrounding the live lineup. Counsel failed to develop and present evidence of the prejudicial impact of recent pervasive and prejudicial media coverage of the crimes for which Petitioner was charged; multiple opportunities the witnesses had to see Petitioner's face on television and in the print media following his arrest; crowded conditions at the lineup room; the property lineup conducted at the same time in an adjoining room; conducting a group live lineup and property lineup with a person who knew Petitioner well and who was found to be in possession of some of the stolen property from the crimes (*see* Ex. 86, witness card of Felipe Solano, Sr.; 172 RT 20115-16, 22-32, 42-44); pressure and bias of witnesses to make an identification in the case; the lack of independent grounds for the in-court identification; and the impact of stress, fear, memory retrieval, and cross-racial factors on the reliability of eyewitness identification. Counsel failed to elicit evidence of the tainted identification procedures from defense expert witness Elizabeth Loftus, Ph.D. (*See* Ex. 37, Declaration of Dr. Elizabeth Loftus).

1077. In addition, although trial counsel presented testimony of an eyewitness identification expert, Dr. Elizabeth Loftus, trial counsel failed to provide Dr. Loftus with an adequate background regarding the incidents in the case to allow her to identify the factors that would likely have been relevant to the witnesses' identifications of Petitioner. As a result, Dr. Loftus was unable to present testimony that related to the facts of the case. This had an adverse impact on Petitioner's case because Dr. Loftus' testimony was general and not specific to his case; the jury was less likely to be able to link the substance of the

testimony to the facts; and Dr. Loftus' testimony was less likely to actually enhance the jurors' sensitivity to the credibility of the eyewitness evidence presented. (*See* Ex. 71, Declaration of Dr. Kathy Pezdek, ¶ 134).

1078. Also, during trial, counsel failed to adequately link the facts of Petitioner's case and the eyewitness identification factors that Dr. Loftus described in her testimony. Thus, her testimony did not seem to be relevant to the case, and was particularly dry and academic. (*See id.*) One example is that many witnesses had seen Petitioner on television or in the newspaper before they identified him at the lineup or in court. Because the witnesses had previously seen Petitioner in the media, there was a high probability that the witnesses' memories were suggestively influenced before they identified Petitioner at the lineup or in court, at the preliminary hearing or the trial. (*See id.*, pp. 134-35). Although Dr. Loftus testified regarding the effect of "post event information" on the memory of the witnesses, trial counsel never explained to the jury what the term meant with respect to Petitioner's case, and why it would call into question the reliability of the identifications in this case. (*See* Dr. Loftus' testimony, 194 RT 22699-838, Ex. 71, Declaration of Dr. Kathy Pezdek, pp. 134-35).

1079. Trial counsel failed to establish, through cross examination, through the presentation of evidence, and through the presentation of expert testimony, that the witnesses' identifications of Petitioner were faulty. For example, many of the witnesses initially described a suspect who was arguably different than Petitioner. For example, Petitioner was a 25 year old, Mexican male, 6'1", and 150 pounds. (*See* Ex. 94, 8/31/85 Supp. Report, p. 2830). Maria Hernandez described the suspect as a light-skinned male, either Mexican or Caucasian. (*See* Ex. 88, 4/15/85 LASO Supp. Report , p. 2809). Sophie Dickman initially told the police that the suspect was a White male, approximately, 5'8" to 5'9". (*See* Ex. 90, 7/7/85 Police Report, p. 2819.) She also helped to prepare a sketch of the suspect, and indicated that the suspect was 5'8 or 5'9". She later testified that

she had described his height to the police as 6' or 6'1" (CR 3202, 3218, 160 RT 18628, 18644). Somkid Khovananth described the suspect as White male, with a tan complexion, who was 30-35 years old. (*See* Ex. 91, LAPD Press Release, 8/5/85, p. 2820). Virginia Petersen described the suspect as a male with a light complexion. (*See* Ex. 92, 8/8/85 Police Interview, p. 2822). Sakina Abowath initially described the suspect as a White male with light brown or blond curly hair. (*See* Ex. 93, 8/8/85 Supp. Report, p. 2823). Jorge Gallegos only saw the suspect from behind, and he could not be sure if the person was Asian or Latino. (*See* Ex. 87, 3/18/85 Supp. Report, p. 2804).

1080. Trial counsel failed to provide the jury with examples of how "post event information", as described by defense expert Dr. Loftus, could possibly have affected the identifications in Petitioner's case. Trial counsel should have provided the following examples to the jury to establish how "post event information" may have had an effect on the memories of the eyewitnesses in Petitioner's case:

> Maria Hernandez first identified Ramirez as the man who shot her at the live lineup (3 CT 791), and then subsequently at the Preliminary Hearing (3 CT 738). However, she admitted at the Preliminary Hearing that prior to attending the lineup, she had seen his picture in the newspaper and saw him on television about 5 times (3 CT 775-6), and that she specifically saw his picture on television the day before he was arrested (8 CT 777).

> Carol Kyle first identified Ramirez at the live lineup and then subsequently at the Preliminary Hearing (8 CT 2286). However, she testified at the Preliminary Hearing that prior to attending the lineup, she had seen his picture in the newspaper and after the police identified him as the Night Stalker (8 CT 2343, 2345-46). She testified that in the days leading up to the lineup, she saw news reports "probably every day" (8 CT 2345-46).

396

Officers had indicated to her that the Night Stalker would be in the lineup (8 CT 2346).

Sophie Dickman first identified Ramirez at the live lineup (11 CT 3164-66) and then subsequently at the Preliminary Hearing (11 CT 3135). However, she testified at the Preliminary Hearing that she had seen Ramirez's photograph in the news "lots of times" before she picked him out of the lineup, and she read the newspaper daily (11 CT 3221, 3224). She learned from the news that the Night Stalker was responsible for her attack about 5 days after his arrest (11 CT 3224), which was prior to the live lineup.

Launie Dempster testified that while she was delivering newspapers very early in the morning in the Monterey Park area, she saw the same man on three different occasions. (16 CT 4624-26, 29-33, 37-38, 162 RT 18755, 60-61, 65-66, 69). She was shown a composite drawing by the police, but it did not depict the same person that she saw. (162 RT 18802-04, 18845). She testified that she saw Mr. Ramirez's picture on the television news the day before he was arrested (16 CT 4649-50, 162 RT 18777). After he was arrested, she saw his picture in the newspaper paper and kept up with the news for about a month (16 CT 4662). At the trial and at the Preliminary Hearing, she identified Mr. Ramirez in court (16 CT 4624-25, 162 RT 18775). She did not attend the live lineup.

Somkid Khovananth first identified Ramirez at the live lineup (12 CT 3528, 164 RT 19110) and then subsequently in court at the Preliminary Hearing (12 CT 3513). She testified that prior to the live lineup, she had seen his picture on television a few weeks after she was attacked and knew it was him although she did not call the police (12 CT 3551, 3563, 3570,

397

3580).  She also saw Ramirez's picture in the news before he was arrested (12 CT 3572).

Virginia Petersen first identified Ramirez at the live lineup (12 CT 3673) and then subsequently in court at the Preliminary Hearing (12 CT 3672). At the trial, she again identified Ramirez (165 RT 19189) and testified that she had seen his picture on television and in newspaper at least 6-7 times before attending the lineup.  However, although she recognized him as the man who attacked her, she never called the police to tell them (165 RT 19215, 19222).

(*See* Ex. 71, Declaration of Dr. Kathy Pezdek, at 135-37).

1081.  In the Okazaki/Hernandez incident, counsel failed to effectively cross-examine eyewitness Maria Hernandez about the lineup procedures or her multiple opportunities to see Petitioner's face on television or in the print media.[77]  Counsel failed to establish the nature and extent of the witness's exposure to the coverage.  Ms. Hernandez was not examined about the effect of "weapon focus" during her quick viewing of the suspect, her inability to recall the suspect's features, or her stress and fear during the brief encounter.  Counsel failed to establish that poor viewing conditions rendered her identification inherently unreliable.  There was no defense challenge to the various lineups and photographic spreads seen by the witnesses prior to Petitioner's arrest and how that affected the reliability of the evidence.

1082.  In the Yu incident, prosecution witness Joseph Duenas testified that, while he was on his balcony, he saw two cars parked on the street.  The defense

---

[77]  The massive publicity surrounding Petitioner's arrest gave witnesses many opportunities to see Petitioner's face on television and in newspapers before the live lineup was held.

failed to question the witness about his contacts with another witness, Jorge Gallegos, related to identification of the suspect.  Similarly, Mr. Gallegos was not examined by the defense about multiple opportunities to view Petitioner's face on television; his contact with witness Mr. Duenas who was related to his girlfriend, or others who knew Mr. Duenas, and their conversations about the case and Petitioner's arrest; the prejudicial impact of the media coverage to which he was exposed; and failure of memory based on the length of time from the incident (March 17, 1985), the preliminary examination approximately one year later, and at trial four years later.[78]

1083.  Trial counsel failed to competently challenge the testimony of Launie Dempster related to the Doi and Nelson incidents.  There were unusual circumstances surrounding her identification due to the fact that Ms. Dempster delivered newspapers early in the morning when it was still dark.  She failed to timely report her sightings of a possible suspect but later identified Petitioner after seeing his face on television.  There was no adequate defense examination of her sightings, multiple opportunities to view Petitioner's face, or the basis for identification, including length of time viewing the person's face or particular features of the face.  There was no defense examination with respect to individuals depicted in the composite drawing and lack of independent grounds for the in-court identification.  Moreover, Ms. Dempster's credibility for failing to report her sightings during the rash of killings was suspect, but trial counsel failed to establish her motivation for failing to do so.

1084.  In the Kyle incident, trial counsel failed to establish that stress, fear, weapon focus, lighting, memory retrieval, and related factors rendered the eyewitness identification unreliable even though the suspect description given to

---

[78]  The prosecution attacked the inadequate defense photographic evidence in the Yu, Doi, Nelson, and Petersen incidents.

police was unreliable and inaccurate. The witness recalled the suspect's teeth were straight and white, unlike Petitioner's. Ms. Kyle participated in several pre-lineup identification procedures but the defense failed to adequately question her about the features of the suspects depicted in the photo spread and composite drawings. Counsel also failed to establish likely contamination due to the witness's multiple contacts with law enforcement and numerous opportunities to modify and change the description from the original description given to police.

1085. Similarly in the Dickman incident, there were numerous factors trial counsel overlooked. Ms. Dickman's initial suspect description varied in key respects with her trial testimony; she first described the suspect as possibly white, 5'8" to 5'9" tall. At the trial nearly four years later, she identified Petitioner as the suspect. Counsel failed to establish cross-racial factors, stress and fear, unreliability, lack of independent grounds for in-court identification, memory retrieval, and contamination due to preparation of a composite drawing, viewing a lineup prior to Petitioner's lineup, and multiple opportunities to see Petitioner's face on television and the print media.

1086. In the Khovananth incident, trial counsel failed to establish unreliability of the identification by the eyewitness based on cross-racial factors, the composite drawing, multiple opportunities to see Petitioner's face, to meet with police and discuss the suspect's descriptions, stress, fear, and bias that influenced the in-court identification. Counsel failed to explore in any detail the impact of these factors on the witness's testimony.

1087. In the Petersen incident, trial counsel failed to prove the viewing conditions at night prevented the witness from making a reliable identification. Moreover, counsel failed to examine the witness about the multiple opportunities to see Petitioner's face on television and in newspapers, and to discuss, modify, or change her memory of the suspect based on contacts with police and her

husband who had also been shot. There was no attempt by counsel to establish lack of independent grounds for the in-court identification.

1088. In the Abowath case, the witness described the suspect as a light-skinned caucasian male. Trial counsel did not examine the witness about the composite drawing, viewing conditions, stress, fear, bias, and cross-racial factors that rendered the in-court identification unreliable.

1089. In each incident, competent counsel would have demonstrated the unreliability of the identification and the live lineup, the nature of media exposure encountered by the eyewitnesses and their respective police contacts, including viewing of composite drawings, conversations about Petitioner's case and arrest, transportation to and from the live lineup, intense feelings of bias and pressure to make an identification, and lack of independent grounds to establish reliability of the in-court identification.

1090. Competent counsel would have presented evidence of the actual extent of media coverage exposure by each eyewitness, including media exposure, thorough examination of police personnel involved in preparing careful composite drawings, and unreliability of eyewitness identification. The evidence would have established that the witnesses were not able to accurately and independently identify Petitioner as the suspect.

1091. Trial counsel's performance fell below the objective standard of reasonableness because trial counsel failed to present several relevant eyewitness factors to the jury, factors which were known by eyewitness identification experts at the time of the trial in 1989. Trial counsel failed to present evidence on the following relevant factors:

> Voice Identification Accuracy - Several of the eyewitnesses in this case identified Mr. Ramirez at the live lineup based on his voice. The research on voice identification suggests that voice identification is even less reliable, and fades over time even faster than face identification (cf.

Clifford, 1983). For example, when Carol Kyle identified Ramirez at the live lineup (156 RT 17972) she noted down on her witness card "I'm absolutely positive. Even the infliction [sic] in his voice is the same, . . ."

Tainted Identification Procedure - In a live lineup, all individuals should match the description given by the eyewitnesses (Luus & Wells, 1991) and be presented such that extra attention is not drawn to the suspect (Buckhout, 1974). To the extent that this does not occur in a lineup, the lineup is tainted and biased. It appears that the 6 individuals in the live lineup did not all match the eyewitness descriptions. Also, to the extent that the witnesses noticed the bald spot on the back of Ramirez's head at the lineup and knew the circumstances of his arrest, this would have drawn attention to the defendant and thus enhanced the bias of the live lineup. Another factor that could have tainted the live lineup was the fact that during the lineup, apparently with the witnesses present, a deputy sheriff stood in front of the room and held up 2 fingers (*see* Ex. 85, Photograph of Lineup). Mr. Ramirez was in position #2.

Bias of an In-Court Identification - An in-court identification is not a fair and unbiased identification procedure because the eyewitnesses are not given a set of similar looking individuals from which to select the perpetrator. There is also the suggestion in court that the defendant must be guilty because he is there. All in-court identifications at the Preliminary Hearing and the Trial would have suffered from this bias. In addition, two witnesses identified Mr. Ramirez for the first time in Court. Launie Dempster first identified the defendant at the Preliminary Hearing (16 CT 4624-25) having not attended the live lineup. Jorge Gallegos first identified Ramirez at the Preliminary Hearing. He did not attend the live lineup (4 CT

402

1080, 1107).  He had reported to police that he only saw the suspect as the suspect drove away (3/18/85 Monterey Park Police interview of Gallegos).  Nonetheless, he did identify Ramirez at the Preliminary Hearing.  (4 CT 1103).

Experimenter Expectancy Effect - The Experimenter Expectancy Effect is a specific type of suggestive identification procedure.  If the officer administering a lineup knows which person is the suspect, the officer may find it difficult to avoid giving subtle cues to the witness regarding which individual is the suspect.  This effect has been known in the literature for several decades.

(Ex. 71, Declaration of Dr. Kathy Pezdek, pp. 137-39).

1092.  In addition, trial counsel failed to argue to the jury in closing argument the full extent of the evidence that would have demonstrated eyewitness identification lacked sufficient credibility to warrant conviction in the Okazaki/Hernandez, Yu, Doi, Nelson, Kyle, Dickman, Khovananth, Petersen, and Abowath incidents.  Counsel's failure to effectively challenge the eyewitness identifications in this case is further evinced by observations of several jurors who sat through Petitioner's trial.  (*See e.g.*, Ex. 120, B. Smith Dec., ¶ ¶ 3, 5 and 6; Ex. 119, F. Sendejas Dec., ¶ 3; Ex. 117, D. McGee Dec., ¶ 3; Ex. 118, J. Muldrow Dec., ¶ 4.)

1093.  The defense expert witness, Elizabeth Loftus, Ph.D., testified in general terms about the factors involved in eyewitness identification.  Trial counsel failed to elicit critical expert testimony about the specific factors involved in the identification process, and reliability and accuracy of the witnesses' identification in the nine incidents discussed above.

1094.  Competent counsel would have presented expert testimony in each of the incidents, Okazaki/Hernandez, Yu, Doi, Nelson, Kyle, Dickman,

Khovananth, Petersen, and Abowath, regarding the length of time of the witness's observation, fear and stress at that time, the witness's focus during the time of the observation, such as weapon focus, and the impact of fear and stress on memory and retrieval of information. An expert such as Dr. Loftus would also have explained the factors that influenced identification at the live lineup, including the impact of media coverage, bias and pressure to identify a potential suspect. (Ex. 37, Declaration of Dr. Elizabeth Loftus). The expert would have explained other factors as well, such as the impact of the crowded lineup and the property lineup held at the same time.

> An adequate explanation of the facts and circumstances surrounding identification is critical to the jury's understanding of the identification process.

> . . . I was not asked to render an opinion about the facts and circumstances of eyewitness identification. If I had been asked, I would have rendered an opinion based on the following:

> (a)    Procedures employed during preparation of composite drawings prepared by law enforcement with the assistance of eyewitnesses;

> (b)    inconsistencies in physical descriptions of the suspect given by eyewitnesses;

> (c)    massive publicity following Petitioner's arrest on August 31, 1985, including extensive television coverage of Petitioner's face; and

> (d)    the impact of post-event information on eyewitness identification, including 5, 1985, pretrial live lineup and simultaneous property lineup, and multiple viewing of Petitioner in court, which had the potential to alter, supplement, or contaminate the witnesses' recollection.

> In my opinion, expert testimony pertaining to the above facts and
> circumstances was important for the jury to consider in assessing the
> credibility of eyewitness identification evidence.

(Ex. 37, Declaration of Dr. Elizabeth Loftus, pp. 1267-68).  Expert testimony about the unique factors in Petitioner's case was crucial evidence for the jury to consider in assessing credibility of eyewitness testimony.

1095. A competent examination of an expert witness that adequately explores the individual factors that influence identification evidence, such as length of opportunity to view the suspect, race of the witness and suspect, weapon focus, fear and stress, and memory retrieval, is set forth in the deposition given by Dr. Loftus in a criminal prosecution in the State of South Carolina. (Ex. 40, Deposition of Elizabeth Loftus, Ph.D., in *South Carolina v. John Boyd Frazier*, 02/11/2000).

1096. In failing to properly and adequately test the prosecution's eyewitness identification evidence, trial counsel prejudiced Petitioner's rights. The jury was misinformed as to the relevant criteria to consider with respect to the factors affecting reliability and accuracy of identification evidence in nine incidents, and thus had no basis for a verdict more favorable to Petitioner.

1097. Trial counsel failed to explain to the jury the critical flaws in eyewitness testimony, and thus failed to rebut the prosecution's misstatements and misrepresentations of the evidence in closing argument.  Trial counsel failed to request appropriate pinpoint instructions related to credibility of identification testimony, including identification made at the live lineup and the impact of extensive media coverage of Petitioner and his case.  Counsel's failures deprived Petitioner of his fundamental rights to a fair trial and reliable determination of guilt and penalty.

1098. After reviewing the eyewitness identification evidence presented in this case, Dr. Kathy Pezdek, an expert on eyewitness memory, found as follows:

"[g]iven the strong reliance on eyewitness evidence in this case - the fact that the prosecutor's eyewitnesses linked Petitioner to nine of the sixteen incidents - it is my opinion that it was ineffective for defense counsel not to have presented a more competent eyewitness defense." (Exhibit 71, Declaration of Dr. Kathy Pezdek, p. 140).

1099. The foregoing violations of Petitioner's constitutional rights, taken singly or in combination with the other errors alleged in the Petition, constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Petition, so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violations of Petitioner's  rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622, 637-38.

1100. In addition, the denial of his right to effective assistance of counsel substantially prejudiced Petitioner, rendered the trial proceeding fundamentally unfair, eroded the reliability of the verdict and had a substantial and injurious effect on the verdict. But for the denial of this right, it is reasonably probable that a more favorable result would have been attained. Under these circumstances, the adversarial system completely broke down, and Petitioner was left without meaningful representation. Although many of trial counsel's errors were, by themselves, so egregious as to require reversal, the extraordinary accumulation of errors and omissions over the course of the trial created a total breakdown in the adversarial process, so that prejudice is conclusively presumed. *United States v.*

406

*Cronic*, 466 U.S. 648, 656-662, 104 S. Ct. 2039, 2045-48, 80 L. Ed. 2d 657 (1984). Even assuming a showing of prejudice is required, Petitioner has made that showing here. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

## CLAIM 17:

### PETITIONER WAS DEPRIVED OF HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AND TO A FAIR AND RELIABLE DETERMINATION OF GUILT AND PENALTY BY COUNSEL'S PREJUDICIALLY DEFICIENT PERFORMANCE: FAILURE TO CHALLENGE THE PROSECUTION'S CASE

1101. Exhaustion of the claim: This claim was fairly presented to the California Supreme Court in Section XII of the June 2004 petition for writ of habeas corpus, although it includes additional factual allegations. Petitioner will present the claim with the additional factual allegations to the California Supreme Court in an exhaustion petition he will file no later than March 17, 2009.

1102. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

1103. Those facts and allegations set forth elsewhere in this petition, and the claims of constitutional violations and accompanying exhibits, are incorporated by reference as if fully set forth herein to avoid unnecessary duplication.

1104. Petitioner's convictions and sentence of death were rendered in violation of Petitioner's rights to a fair and impartial jury, to a reliable, fair, non-arbitrary, and non-capricious determination of guilt and penalty, to the effective assistance of counsel, to present a defense, to confrontation and compulsory process, to the enforcement of mandatory state laws, to a trial free of materially false and misleading evidence, and to due process of law as guaranteed by the

407

Fifth, Sixth, Eighth and Fourteenth Amendments of the federal constitution because Petitioner's trial counsel rendered constitutionally deficient representation at all critical stages of the criminal proceedings.

1105. Trial counsel unreasonably failed to conduct a timely or adequate investigation of the potential guilt and penalty phase issues, did not develop or present a coherent trial strategy, and were unable to make informed and rational decisions regarding potentially meritorious defenses and tactics. Trial counsel's errors and omissions were such that a reasonably competent attorney acting as a diligent and conscientious advocate would not have performed in such a fashion. Reasonably competent counsel handling a capital case at the time of Petitioner's trial would have known that a thorough investigation of the prosecution's theories of guilt, independent analyses of the physical evidence supporting those theories, and a thorough investigation of potential defenses was essential to the development and presentation of a defense at trial. Reasonably competent counsel also would have recognized that a thorough investigation of Petitioner's background and family history, including, but not limited to, Petitioner's medical, mental health, academic, and social history, was essential to the adequate preparation of both the guilt and penalty phases.

1106. Counsel's failures to investigate adequately and present defenses and protect Petitioner's statutory and constitutional rights prejudiced the defense. It is reasonably likely that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

1107. Trial counsel unreasonably and prejudicially failed to investigate, develop, and present a coherent trial strategy to challenge the multiple charges of murder, attempted murder, burglary, rape, oral copulation, sodomy, and multiple special circumstances. Instead of undertaking a reasonable investigation of potential defenses to these charges, trial counsel abdicated their duty to investigate and present a defense at trial, conceded the truth of much of the

408

prosecution's evidence, and failed to challenge the prosecution's case with respect to many of the charges. Reasonably competent counsel would have investigated and developed possible defenses to the charges, including the defense that Petitioner (1) was not present at the crime scenes; (2) did not shoot or kill the victims; (3) did not act with intent to kill; or (4) suffered from impaired mental functioning that precluded him from forming the requisite mental state to commit capital murder. (Ex. 1, Guideline 11.41.1.) *See*, *e.g.*, *(Terry) Williams v. Taylor,* 529 U.S. 362, 396 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000) (defense counsel in a capital case has an "obligation to conduct a thorough investigation of the defendant's background"); *Mayfield v. Woodford*, 270 F.3d 915, 927 (9th Cir. 2000) ("To perform effectively in the penalty phase of a capital case, counsel must conduct sufficient investigation and engage in sufficient preparation to be able to 'present[] and explain[] the significance of all the available [mitigating] evidence.'"); *Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999) ("[i]t is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase"); *Stouffer v. Reynolds*, 168 F.3d 1115, 1167 (10th Cir. 1999) ("[i]n a capital case the attorney's duty to investigate *all* possible lines of defense is strictly observed") (emphasis added); *Bell v. Ohio*, 438 U.S. 637, 98 S. Ct. 2977, 57 L. Ed. 2d 1010 (1978). As a result, counsel provided ineffective assistance.

1108. Trial counsel unreasonably and prejudicially failed to conduct a complete and thorough investigation of possible defenses to the charged crimes and special circumstances. Trial counsel failed to properly challenge admission of Petitioner's inherently unreliable statements and police seizure of evidence.

1109. Trial counsel unreasonably and prejudicially failed to investigate and challenge the prosecution's theory that Petitioner was present at the crime scenes and participated in the crimes. Reasonably competent counsel would have investigated, developed, and presented evidence and argument to the jury

supporting the conclusion that Petitioner was not culpable of the crimes for which he was convicted.

## A.    Introduction

1110.    At trial, counsel were unable to agree among themselves about decisions in Petitioner's case.  (*See* 178 RT 20789-90.)  Counsel failed to raise reasonable and adequate defenses to the 43 charged offenses, or to the uncharged Monrovia burglary.  Through their incompetent representation, the defense failed to challenge critical evidence in support of the prosecution's case:  the uncharged Monrovia burglary,[79] and the shoe print impressions and ballistics evidence.[80]  In nine incidents (Zazzara, Doi, Bell/Lang, Cannon, Bennett, Nelson, Khovananth, Abowath, and the uncharged case), trial counsel failed to challenge or refute the testimony of the prosecution's unqualified, inexperienced shoe print witness.  In eight incidents, ballistics evidence went unchallenged.  The testimony of the prosecution's firearms expert attempted to link the Okazaki homicide to those of Yu and Kneiding; attempted to link the Zazzara homicide to the Khovananth incident; attempted to link a Jennings semi-automatic pistol that fires .22-caliber long-rifle ammunition[81] to the Doi case; and attempted to link the Petersen and Abowath incidents.  Defense counsel failed to competently challenge this evidence.

---

[79]  *See* 210 RT 24225 (closing argument).

[80]  *See* 210 RT 24197, 24201, 24224-24225, 24228-29 (closing argument).

[81]  In this context, "long-rifle ammunition" refers to ammunition of a designated length and weight that is longer and heavier than "short-rifle" ammunition.

**B.    Trial Counsel Failed to Investigate, Litigate, Object to, Cross-examine or Otherwise Adequately Challenge the State's Evidence in the Vincow Incident, Counts 1-2 (burglary, murder, burglary-murder special circumstance)**

**1.    The Prosecution's Case**

1111. On June 28, 1984, the apartment of Jennie Vincow was broken into and ransacked, and Vincow was killed.  Entry was gained through a window near the front door.  The victim's throat was slashed; a coroner's investigator opined at trial that Vincow may have been sexually assaulted; however, no physical evidence supported this assertion, except for the investigator's observation that Vincow's girdle was pulled down and her dress partially lifted.  (143 RT 16402-04.)  Deputy medical examiner Joseph Cogan estimated Vincow's time of death as within two or three hours of 2:00 p.m.  (144 RT 16588.)

1112. According to Los Angeles County Deputy Sheriff Hannah Woods, a partial fingerprint found on the window screen matched Petitioner's.[82]

1113. In closing argument, the prosecutor emphasized that Petitioner was guilty of burglary murder by virtue of his entry to commit theft, even if nothing in the apartment had been taken.  (204 RT 23663.)  The prosecutor urged conviction based upon fingerprint identification.  (204 RT 23664-65.)

**2.    Defense Evidence**

1114. Daniel Hernandez argued outside the presence of the jury that one of the victim's sons, Manny Vincow, had a motive to kill his mother.[83]  The court rejected the theory after the prosecution represented to the court that Manny

_____

[82]  Palm print and shoe print evidence allegedly linked Petitioner to the May 9, 1985 uncharged Monrovia burglary.

[83]  The defense failed to litigate and obtain a ruling as to the viability of a third-party culpability defense before trial.

411

Vincow was in New York at the time of the killing, and the defense had been provided with discovery of that fact. (142 RT 16213-15.) The defense also failed to make an adequate offer of proof that Jack Vincow had killed his mother. (142 RT 16235-37.)

1115. Trial counsel did not introduce any evidence challenging the fingerprint evidence. Hernandez briefly questioned prosecution witness Reynaldo Clara regarding the age and duration of the latent prints found at the scene. (143 RT 16392.)

1116. The defense offered only the testimony of forensic pathologist Dr. Werner Spitz regarding time of death. (191 RT 22450-543)

### 3. The Defense Failed to Competently Challenge the Charges

1117. Testifying for the defense, Dr. Spitz attempted to establish the time of death was consistent with a defense theory that the victim's son, Jack Vincow, may have killed her. On cross-examination, Dr. Spitz admitted having never seen photographs of the victim that were relevant as to the time of death. (191 RT 22540.) As a result of counsel's failure to adequately prepare their expert witness, the prosecution succeeded in challenging and impeaching Dr. Spitz's testimony as to the time of death. (206 RT 23700-24.)

1118. As a result of trial counsel's failures, no affirmative evidence was introduced on Petitioner's behalf with respect to fingerprint evidence, third-party suspect(s), or mental state.

1119. Trial counsel failed to present a competent and adequate defense to the incident which occurred nearly nine months before the March 17, 1985 incident. The defense failed to challenge or refute the only physical evidence linking Petitioner to the crime: the fingerprint on the window screen. They did not present exculpatory evidence based upon the presence of other, unidentifiable prints on the same window screen. (210 RT 24186.)

1120. Standing alone, it was unlikely that the Vincow case would have resulted in conviction. The dissimilarities between this case and the other incidents would have led a reasonable juror to conclude the state overreached in its efforts to link Petitioner to all of the cases. There was a lengthy period of time between the 1984 Vincow incident and the 1985 crimes. The Vincow case did not fit the prosecution's assertion of a "pattern." This was the only incident involving the daytime death of a lone woman by means of stab wounds and the only charged incident in which a partial fingerprint was identified as Petitioner's. No property from Vincow's apartment was recovered. (Ex. 40, Declaration of Steve Strong, dated 06/11/2004.)

1121. Trial counsel failed to investigate, develop, and present expert testimony regarding fingerprint evidence or the significance of other prints found at the scene.[84] The defense failed to object, challenge, or request sanctions for the prosecution's failure to preserve the prints. At a pretrial hearing, trial counsel sought sanctions for the prosecution's failure to preserve evidence, *i.e.*, the unidentifiable prints on the window screen at the Vincow apartment. (47 RT 3225-27.) At trial, the defense failed to challenge the unidentifiable prints through cross-examination of the prosecution's latent print technician, Reynaldo Clara, the print examiner, Deputy Woods, or the victim's son, Jack Vincow. Trial counsel failed to challenge the reliability of partial fingerprint comparison

---

[84] Fingerprint examiner, Ron Smith, has been retained by federal habeas counsel to review the fingerprint evidence introduced against Petitioner at trial; however, he requires the release of the fingerprint exhibits to his care in order to do so. (*See* Ex. 74, Declaration of Ron Smith.) Petitioner has filed a request with the Superior Court to release the exhibits to Mr. Smith's care; the government has opposed Petitioner's request.

and identification during cross-examination of the prosecution's expert.[85] (*See* 175 RT 20507-11.)

1122. The defense failed to argue against the prosecution's case and raise a reasonable doubt about Petitioner's guilt. The jury questioned the unidentifiable fingerprints during deliberations. At the outset of their protracted deliberations, the jury asked the court for a definition of unidentifiable fingerprints.

> What is the legal definition of an unidentifiable fingerprint? Is it because there is not enough of a print to make an I.D. or because the print is not a part of the records the police have with which to make a comparison.

(XXIX CT 8609.) Thus, the defense should have explained to the jury the significance of unidentifiable prints and argued that the prints were not Petitioner's.

1123. Trial counsel failed to object to the prosecutor's misconduct with respect to the fingerprint evidence during closing argument. The prosecution effectively shifted the burden of proof to the defense to prove when Petitioner's fingerprints were left at the scene.

> And there is no evidence that the defendant was ever at that location at any time other than this time when the screen upon which his fingerprints were located was found inside.

(204 RT 23665.)

---

[85] *See* Ex. 23 (Article entitled "Letter from the National Institute of Justice Regarding the Solicitation of Forensic Friction Ridge (Fingerprint) Examination Validation Studies" July 2000, Vol. 2, Number 3 (State Habeas Exhibit 11).)

1124. The defense failed to investigate, develop, and present competent evidence regarding time of death.[86] Dr. Spitz testified only about the Vincow and Yu homicides. The prosecution impeached Dr. Spitz because of his inadequate preparation. Counsel lacked even the most basic skills to competently prepare their witnesses, develop defense strategy, properly ask questions, and lay the necessary foundation for the expert's opinion.[87] Because counsel had failed to provide Dr. Spitz with the Vincow autopsy photographs, Spitz was unable to render an opinion about the lack of distinctive features of the wounds. (191 RT 22539-40.)

1125. The defense failed to investigate, develop, and present a third-party defense. In order to assert a third-party culpability defense, counsel was required, at a minimum, to properly investigate potential suspects and make an adequate offer of proof in a timely manner. Counsel did neither, with the result that no third-party evidence was admitted. Counsel failed to lay a proper foundation to impeach Jack Vincow regarding his prior mental hospitalization (142 RT 16233-40); his less than enthusiastic cooperation with the police investigation (142 RT 16247-50); and his unwillingness to take a polygraph examination (142 RT 16256, 16259-62).

1126. Ultimately, counsel failed to present a defense to the charges. In closing argument, after conceding the fingerprint evidence, counsel offered a wholly inadequate basis for acquittal: that Petitioner's fingerprints found on the window screen were an insufficient basis for conviction because his fingerprints were not found inside the apartment. (210 RT 24185-86.)

---

[86] The only conceivable relevance of the time of death was to show that Jack Vincow had an opportunity to commit the crime. However, the defense failed to offer any third-party culpability evidence.

[87] Dr. Spitz mistakenly testified that he evaluated photographs and autopsy reports pertaining to all of the murder charges. (191 RT 22452.)

1127. Trial counsel failed to investigate, develop, or present any evidence with respect to alternative defenses based on lack of requisite mental state due to Petitioner's history of serious mental illness, neurocognitive and neurological deficits, psychosis, mood disorders, mind-altering substance abuse, and brain impairment. (*See* Exs. 31, 38, 41, 42, 43, Declarations of D. Blumer, M.D.; R. Schneider, M.D.; W. Vicary, M.D.; D. Watson, Ph.D.; and, J. Wells, J.D., Ph.D.) In addition, counsel failed to conduct a reasonable investigation that would have permitted them to make a reasonable tactical decision to forego such defenses in favor of a defense based on innocence.

C. **Trial Counsel Failed to Investigate, Litigate, Object to, Cross-Examine or Otherwise Adequately Challenge the Prosecution's Evidence in the Okazaki/Hernandez Incident, Counts 3-5 (Burglary, Attempted Murder, Murder, Burglary-Murder Special Circumstance)**

1. **The Prosecution's Case**

1128. On March 17, 1985, Maria Hernandez entered the garage of her condominium in Rosemead, where an assailant pointed a gun at her and shot her in the right hand. As she fell to the ground, the assailant pushed past her and opened the door to her residence. Hernandez ran out of the garage and saw the assailant by her front door. The assailant pointed a gun at her but did not fire the weapon. Hernandez went inside her residence and found her roommate, Dale Okazaki, lying on the floor; Okazaki had been shot in the head.

1129. Maria Hernandez identified Petitioner as her assailant at a live lineup conducted September 5, 1985, at Los Angeles County Jail. She subsequently identified Petitioner at pretrial hearings and at trial. (203 RT 23601)

1130. A baseball cap with the letters AC/DC was found on the garage floor. Following his arrest, Petitioner allegedly hummed a song by the rock group AC/DC. He allegedly said he was a killer and deserved to die. (171 RT 19916-19; 19944.)

416

1131. A firearms examiner testified that the .22-caliber firearm with which Okazaki was shot was also used in the Yu and Kneiding homicides. Deputy Sheriff Edward Robinson opined that projectiles recovered from all three scenes were fired from the same weapon.

1132. The prosecutor argued in closing argument that a burglary was committed even though no evidence was presented that property was taken.

> [O]nce he's through the door, the burglary is committed, and the fact that it did not go as he planned . . . the burglary has still been committed.

(206 RT 23719-20.)

1133. The prosecutor also argued that the defense undermined its own case by failing to prove representations made in opening statement that the garage door closed in one to two seconds, thus depriving Hernandez of the opportunity to identify the suspect (203 RT 23599) and that sweat on the cap found in the garage did not originate from Petitioner (203 RT 23601-02).

## 2. Defense Evidence

1134. Trial counsel sought to impeach Maria Hernandez's identification based on a prior inconsistent statement and lack of independent basis for the in-court identification.[88] (210 RT 24195.) In closing argument, counsel argued that

---

[88] Elizabeth Loftus testified generally about the effects of stress on eyewitness identification. However, once again the prosecution undermined the expert's testimony because of trial counsel's failure to investigate and prepare their expert about relevant issues in the case. Trial counsel failed to present evidence about improprieties inherent in eyewitness identification and lineup procedures. (*See* Ex. 37, E. Loftus Dec.)

Dr. Kathy Pezdek, an eyewitness expert retained by federal habeas counsel, has further examined the trial record in Petitioner's case as it relates to eyewitness identification issues. Dr. Pezdek details the ineffectiveness of Petitioner's trial counsel in challenging identification evidence as well as the ineffective use of the eyewitness identification expert at trial. (*See* Ex. 71, K.

Hernandez was under great stress at the time she observed the suspect. (210 RT 24196-97.)

1135. With respect to ballistics evidence, trial counsel offered no evidence, instead stating: "[Y]ou have to assume that the [prosecution's] ballistics evidence is correct . . . ." (210 RT 24197.) Counsel unreasonably conceded evidence that the prosecution used to link Petitioner to other incidents.

### 3. The Defense Failed to Competently Challenge the Charges

1136. The defense presented no affirmative evidence on Petitioner's behalf with respect to ballistics evidence, mental state, or the circumstances of the eyewitness identification and the September 5, 1985, live lineup.

1137. Trial counsel failed to investigate, develop, or present evidence to refute the prosecution's ballistics findings connecting three unrelated murders. Trial counsel failed to present any evidence with respect to ballistics testing, accuracy of scientific findings, chain of custody, or qualifications and reliability of the examiners who tested the projectiles and weapons. Expert testimony would have challenged the conclusions reached by Deputy Sheriff Edward Robinson because law enforcement analysis conducted by three different examiners was inaccurate and unreliable.

1138. Firearms expert Paul Dougherty explains that the law enforcement work up was inaccurate and inadequate. In reviewing the work up performed in this case, he found that "there are internal conflicts in the written reports with regard to the testing conducted, such as condition of the bullets." (Ex. 35, Declaration of Paul Dougherty, dated 06/12/2004, ¶ 4.) In Dougherty's opinion, all of the ballistics evidence should be retested. (*Id.*, ¶ 5.) The State, in its zeal to convict Petitioner, presented evidence that was unreliable. "It is impossible to say with certainty whether the findings . . . are accurate. [T]here are internal

_____

Pezdek Dec.)

418

conflicts in the written reports with regard to the testing . . . such as the condition of the bullets." (*Id.*, ¶ 4.)

1139. Trial counsel failed to adequately cross-examine Hernandez regarding lack of an independent basis for her in-court identification. Trial counsel failed properly to lay the foundation with respect to factors that influence and contaminate eyewitness identification, *i.e.*, massive media exposure of Petitioner's face, pressure to make an identification, and lack of reliability due to stress, fear, and limited viewing of the suspect. (Ex. 37, E. Loftus Dec.) (*See also* Ex. 71, K. Pezdek Dec.)

1140. Competent counsel would have argued to the jury specific factors set forth in CALJIC No. 2.92 related to bias, stress, poor lighting, limited viewing, and other factors that influence the accuracy of eyewitness identification. (XXIX CT 8538-39.) However, the defense failed to competently establish that Hernandez's eyewitness testimony was unreliable. In closing argument trial counsel weakly observed: "Hernandez's identification of Petitioner was of insufficient certainty to tie him to the crime." (210 RT 24197.)

1141. In his opening statement, trial counsel claimed to have proof that the cap found at the scene was not Petitioner's. However, incompetent counsel had not provided the cap for testing before trial, and there was no evidence available regarding test results. (Ex. 44, Declaration of Brian Wraxall, dated 05/25/2004.)

1142. Trial counsel failed to investigate, develop, or present any evidence with respect to alternative defenses based on lack of requisite mental state due to Petitioner's history of serious mental illness, neurocognitive and neurological deficits, psychosis, mood disorders, mind-altering substance abuse, and brain impairment. (*See* Exs. 31, 38, 41, 42, 43, Declarations of D. Blumer, M.D.; R. Schneider, M.D.; W. Vicary, M.D.; D. Watson, Ph.D.; and, J. Wells, J.D., Ph.D.) In addition, trial counsel failed to conduct a reasonable investigation that would

419

have permitted them to make a reasonable tactical decision to forego such defenses in favor of a defense based on innocence.

**D.     Trial Counsel Failed to Investigate, Litigate, Object to, Cross-examine or Otherwise Adequately Challenge the Prosecution's Evidence in the Yu Incident, Count 6 (murder)**

**1.     The Prosecution's Case**

1143. On March 17, 1985, shortly after the Hernandez/Okazaki incident and several miles away, Tsai-Lian Yu was found unconscious in the street in Monterey Park. She had been shot twice; there was evidence of stippling around one of the wounds. She was pronounced dead at a nearby hospital.

1144. Eyewitness Jorge Gallegos testified that he saw two cars stopped on a street where he was parked. Gallegos saw a man trying to pull a woman from one of the two cars. He thought they were having a "lover's quarrel." He heard someone call for help. He did not hear any shots. He saw an Asian woman crawling on the ground. Gallegos went to her aid. At trial, Gallegos identified Petitioner as the man he saw at the scene.

1145. Joseph Duenas was in his residence when he heard a woman scream for help. He saw a man and a woman across the street. The woman screamed again and held onto the man's jacket. The man got in a car and left. Duenas called police. At trial, he was unable to positively identify Petitioner as the man he saw at the scene.

1146. The prosecution introduced ballistics evidence in an attempt to link the Yu incident to the Hernandez/Okazaki and Kneiding incidents.[89] Deputy Sheriff Robinson testified that projectiles recovered from all three scenes were

---

[89] The defense theory that Petitioner was not the perpetrator necessarily entailed refuting ballistics evidence linked him to other incidents; yet, the defense presented no ballistics evidence to refute the prosecution's case.

420

fired from the same .22-caliber firearm.  Robinson could not determine the manufacturer and exact type of firearm used in the incidents.

1147.  In closing, the prosecutor pointed out that the defense had failed to prove matters raised in opening statement:  specifically, that a silver medallion found at the scene would be shown to belong to an assailant (not Petitioner); that Yu was involved in a "lover's quarrel"; that Gallegos had identified a car from Pomona that had nothing to do with the shooting; and that Yu was shot while seated in her car.  (203 RT 23603-07.)

1148.  Earlier in the trial, the court asked Petitioner to remove his sunglasses. Petitioner refused.  The prosecutor argued in his closing argument that Petitioner's refusal to remove his sunglasses when the prosecutor asked Gallegos if he could identify Petitioner in court as the man he saw amounted to consciousness of guilt.

> You might conclude from that that he didn't want to give Mr.
> Gallegos any more opportunity to identify him than was necessary.
(206 RT 23743.)

1149.  The prosecution attacked defense witness Dennis Lew and photographs Lew had taken of the crime scene.  The photographs failed to simulate the approximate lighting at the time of the incident.  (203 RT 23605.) The prosecution attacked the defense theory that the crime was manslaughter because it was inconsistent with defense counsel's contention that Petitioner was not present at the scene and did not kill the victim; thus there was no plausible support for a verdict less than murder.  (211 RT 24346-47.)

### 2.    Defense Evidence

1150.  The defense theory was that Petitioner was not present at the scene and did not shoot Ms. Yu.

1151.  Dr. Werner Spitz testified regarding the circumstances of the Yu shooting and rendered an opinion as to the nature of the injuries.  On cross-

examination, Dr. Spitz participated in a demonstration with the prosecution that, in effect, undermined his own testimony that Yu could have been shot while in the driver's seat. On cross-examination, the prosecutor also impeached Dr. Spitz's testimony regarding Yu's injuries by establishing that Dr. Spitz was unfamiliar with crime scene and autopsy photographs. (191 RT 22471-512.) The defense had failed to prepare Dr. Sptiz by providing him with the relevant photographs. (191 RT 22470.) In closing, the prosecution denigrated Dr. Spitz's testimony as "worthless." (211 RT 24346.)

1152. Dennis Lew photographed the scene in an effort to show that the lighting conditions impaired the eyewitnesses' ability to identify a passerby from inside a parked vehicle. The prosecution assailed Mr. Lew's testimony, calling the photographs inaccurate and unreliable. (*See* 206 RT 23756-63 (closing argument).)

1153. In closing, defense counsel inexplicably and unreasonably highlighted the defense's failure to challenge the prosecution's ballistics evidence: "I didn't have any evidence to prove that it was a different gun, therefore you didn't hear any. [¶] I certainly would have brought it in if I had, you could rest assured of that."[90] (210 RT 24201.)

### 3. The Defense Failed to Competently Challenge the Charges

1154. The defense failed to defend against the prosecution's case by failing to present competent evidence that: (1) the identification by eyewitness Gallegos was inherently suspect; (2) ballistics evidence was inaccurate and less than conclusive proof of Petitioner's guilt; (3) Petitioner's refusal to remove his sunglasses in order for witness Gallegos to view him at trial did not evince a

_____

[90] The defense argued alternatively that Petitioner was guilty of manslaughter: "Lover's quarrel came out a couple of times from both witnesses. Maybe something to it. There may be something to the way they characterize it." (210 RT 24200-01.)

consciousness of guilt; and (4) circumstances of the shooting supported a manslaughter verdict.

1155. In closing argument, the prosecution emphasized the defense's failings. (*See* 206 RT 23735-40, 23745-86, 23788-826 (closing argument).) The prosecutor argued: "[B]ut you do know that it was with the same gun that murdered Ms. Okazaki, and the same gun that later murdered the Kneidings." (206 RT 23735-36.) The prosecutor recalled that in response to defense questioning of Gallegos: "The court asked [Petitioner to stand up and take off his sunglasses] and the defendant, 'no,' he said. [¶] You might conclude from that that he didn't want to give Mr. Gallegos any more opportunity to identify him than was necessary. [¶] I think that is a reasonable conclusion." (206 RT 23743.)

1156. The defense failed to competently investigate, develop, and present evidence that Gallegos's identification of Petitioner as the assailant was unreliable. Gallegos's identification was unreliable based on his limited viewing of the assailant, the poor lighting conditions, and the stress of the events. The defense failed to properly present evidence regarding these factors that adversely affected his eyewitness identification.

1157. The defense failed to investigate, develop, and present competent photographic evidence of the scene in order to establish that Gallegos's identification was less than reliable. Competent evidence would have demonstrated that night-time lighting impaired the witness's ability to make an accurate and reliable eyewitness identification while seated inside a vehicle. The defense photographs did not accurately depict the conditions or visibility.

1158. The defense failed to investigate, develop, and present evidence to refute the prosecution's ballistics evidence. No evidence was introduced on Petitioner's behalf to contest the prosecution's findings with respect to accuracy of the comparison of projectiles in the Okazaki and Kneiding cases. The defense failed to competently examine the prosecution witness about the testing and

findings made in each instance.  Defense counsel limited his cross-examination of Deputy Sheriff Edward Robinson to generic information about ballistics testing and findings.  (172 RT 20081-104.)  Mr. Clark was unprepared to challenge the prosecution's case.  (Ex. 16, R. Clark Dec., ¶ 6.)

1159. Counsel incompetently prepared defense expert Dr. Spitz to testify by failing to provide him with vital crime scene and autopsy  records.  The defense elicited an uninformed opinion about the cause of death.

1160. Additionally, the prosecutor impeached defense photographer Dennis Lew regarding his less than accurate depiction of the scene.  Competent counsel would have presented evidence of the lighting at or near the time of the incident to accurately depict the viewing conditions.

1161. During his preliminary evaluation, firearms expert Paul Dougherty found that faulty testing protocol rendered the evidence unreliable.  (*See* Ex. 35, P. Dougherty dec., ¶¶ 4-5.)  His opinion regarding validity of the testing results provides support for relief.  Had trial counsel investigated and presented evidence challenging the accuracy and reliability of firearms evidence – instead of conceding the evidence – the result would have been more favorable as there would have been a reasonable doubt regarding the prosecution's evidence.

1162. Counsel's failure to challenge the firearms evidence allowed the prosecution to link Petitioner to both the Okazaki and Kneiding incidents.  An alternative defense based on mental state was supported by the observations of bystanders who reported witnessing a quarrel between two parties -- circumstances of the offense which would have supported a finding of manslaughter.  However, trial counsel failed to investigate and develop this crucial mental state evidence.  Failure to investigate alternate defenses does not excuse as tactical a decision not to present a readily available line of defense. *Phillips v. Woodford*, 267 F.3d 966, 976-79 (9th Cir. 2001).  "A defense attorney's failure to consider alternate defenses constitutes deficient performance

when the attorney 'neither conduct[s] a reasonable investigation nor ma[kes] a showing of strategic reasons for failing to do so.'" *Rios v. Rocha*, 299 F.3d 796, 805 (9th Cir. 2002). The allegations in the petition and supporting documentation show counsel made no reasoned investigation of reasonable alternate defenses to the charges. Absent a proper and adequate investigation, the decision not to present a reasonable alternate defense was unsound and resulted in constitutionally deficient representation.

1163. Trial counsel failed to investigate, develop, or present any evidence with respect to alternative defenses based on lack of requisite mental state due to Petitioner's history of serious mental illness, neurocognitive and neurological deficits, psychosis, mood disorders, mind-altering substance abuse, and brain impairment. (*See* Exs. 31, 38, 41, 42, 43, Declarations of D. Blumer, M.D.; R. Schneider, M.D.; W. Vicary, M.D.; D. Watson, Ph.D.; and, J. Wells, J.D., Ph.D.) In addition, trial counsel failed to conduct a reasonable investigation that would have permitted them to make a reasonable tactical decision to forego such defenses in favor of a defense based on innocence.

**E. Trial Counsel Failed to Investigate, Litigate, Object to, Cross-examine or Otherwise Adequately Challenge the Prosecution's Evidence in the Zazzara Incident, Counts 7-9 (burglary, murder, burglary-murder special circumstance)**

**1. The Prosecution's Case**

1164. On March 28, 1985, Vincent and Maxine Zazzara were found dead inside their home. Vincent Zazzara had been shot in the head with a small-caliber gun. Maxine Zazzara had a gunshot wound to her neck and check. Her eyes had been gouged out. Stab wounds to the eyes and abdomen appeared to be postmortem injuries.

1165. Shoe prints found at the scene matched an Avia shoe size 11-½ to 12. Ballistics evidence determined that projectiles were fired from the same .22-caliber firearm as in the Khovananth case.

1166. In closing, the prosecutor urged that Petitioner was the assailant based on throat wounds; ligature marks; Avia shoes, size 11-½ to 12; and testimony that the weapon used in the Zazzara crimes was the same .22-caliber gun used in the Khovananth case. (207 RT 23839-41.) The prosecution also argued that the defense failed to prove matters raised in opening statement: specifically, that shoe print impressions of Avia and Van shoes were found in the front of the house; evidence the *modus operandi* was not unique, and evidence that unidentified fingerprints were not Petitioner's. (203 RT 23611-14.)

### 2.     Defense Evidence

1167. Trial counsel presented no evidence on Petitioner's behalf.

1168. In closing argument, counsel argued that "Zazzara was the first place that the Avia showed up . . . ." (210 RT 24224.) The defense argued that the prosecution linked Petitioner to Zazzara based upon palm prints and an Avia shoe print found at the May 9, 1985, uncharged Monrovia burglary. (210 RT 24224.) Trial counsel stated that Petitioner "is not a choir boy." (*Id.*) Trial counsel urged that "when you find this man [at a crime scene], you should find no people. That is the way [Sandra Hotchkiss and Petitioner] operated." (210 RT 24224.) The defense unreasonably, and inexplicably, conceded that Petitioner committed the Monrovia burglary: "No question he was there. [¶] It was a typical Ramirez burglary." (210 RT 24225.)

### 3.     The Defense Failed to Competently Challenge the Charges

1169. Trial counsel failed to investigate, develop, and present evidence to refute the prosecution's evidence. The defense presented no evidence or expert testimony to challenge the prosecution's physical and forensic evidence; defense counsel presented no evidence about third-party suspects; and they presented no

426

evidence about Petitioner's mental state. Nor did defense counsel present evidence to refute the ballistics evidence introduced by the prosecution in an attempt to link the Zazzara crimes to the Khovananth crimes.

1170. A competent defense expert could have testified that the conclusions made by the prosecution's criminalist, Burke, regarding Avia shoe prints were inaccurate, unreliable, and misleading.

1171. No police investigation was conducted of Petitioner's appearance, clothing, or shoe size. There was no law enforcement follow-up investigation of witnesses or potential suspects with respect to footwear.[91] According to Lisa DiMeo:

> In the first case involving shoe print evidence, there were Avia shoe prints – one right, one left, and several partial impressions – observed in dry soil outside the residence. Photographs and casts (approximately 12-12-½) were collected. The impressions were consistent with many Avia shoes: Aerobics, All Sport/Court and Basketball models, men's and women's styles, which exhibit a convex dam inset that meets the flex joint. Models 252, 255 255W, 552R, 560, 565, 565W, 652, and 655 were eliminated based on heel design. (See Avia chart attached to the declaration.)
>
> In addition, a partial herringbone pattern was observed on a bucket outside a window. However, contrary to accepted professional standards and practice, there was no scale in the photographs. A Van's right shoe print also was recovered from soil outside the scene.

---

[91] By failing to challenge the shoe print identification, the defense allowed the prosecution to make the argument that there was only one pair of size 11-½–to–12 Avia shoes involved in the case.

427

(Ex. 33, L. DiMeo Dec. dated 05/21/2004, ¶¶ 22-23.)[92]

1172. No defense evidence was presented with respect to nondistinctive features of throat wounds. Counsel's cross-examination was limited to the time period in which the wounds were inflicted. (154 RT 17690-95.) A competent defense expert would have testified that the prosecution's case lacked distinctive features of pattern evidence. (*See* Ex. 40, S. Strong dec.)

1173. Ms. DiMeo has found that two shoe impressions were Avia Aerobics; however, she specifically found the prosecution's evidence "incorrect" with respect to size of shoe. (Ex. 33, L. DiMeo dec., ¶ 35.) DiMeo's supplemental declaration addresses discrepancies with respect to Gerald Burke's measurement of shoe impression evidence. DiMeo also found that "[a]ny shoe exhibiting a similar herringbone pattern could have been the source of th[e] partial print." (Ex. 34, Supplemental Declaration of Lisa DiMeo, dated 11/10/2005, ¶ 17.) The defense unreasonably failed to present, through the testimony of an expert such as DiMeo, available evidence about the large pool of possible shoes and testimony regarding shoe measurement to challenge the prosecution's case. Competent counsel would have done so.

1174. Trial counsel failed to elicit evidence from the prosecution's witnesses or their own witnesses to show that the Zazzara incident lacked a connection to the other charged crimes. Steve Strong's opinion the crimes were not related is based on his training and his analysis of *modus operandi* evidence, as well as his consideration of physical evidence that went unchallenged by the

_____

[92] Lisa DiMeo, who has been retained by federal habeas counsel, requires additional access to the shoe print evidence introduced against Petitioner at trial in order to give even greater depth and detail to her findings and conclusions. Petitioner has filed a request with the Superior Court to release the shoe print evidence to Ms. DiMeo's care; the government has opposed Petitioner's request. (*See* Ex. 75, Lisa DiMeo Dec. dated 12/12/2008).

defense. (Ex. 40, S. Strong dec., ¶¶ 9-22.) Strong identified specific factors signifying the lack of a distinctive pattern: the nature of the wounds, the location of the crime scene, and the lack of fingerprint evidence. (*Id.*, ¶ 20 (chart).) Counsel failed to challenge the prosecution's false and unreliable physical evidence. Reasonable investigation of the case necessarily included an investigation into third-party culpability. Petitioner has established that there was evidence available to trial counsel with respect to several potential suspects, including Manuel Hechevarria (also known as "Cuba"), Julio, and Sandra Hotchkiss. These individuals admitted having committed crimes during the same period as the charged crimes.[93] (*See* Ex. 22, Los Angeles County Sheriff's Department - Supplementary Report, dated 09/11/1985 by Sgt. William S. Stoner and Investigator Michael W. Griggs, p. 3.)

1175. Counsel failed to challenge the prosecution's firearms evidence, even though there was evidence of bullet distortion and lack of unique rifling characteristics. (Ex. 35, P. Dougherty dec., ¶ 3.) Although three firearms examiners generally were involved in firearms testing, only one examiner testified at trial. Firearms expert Paul Dougherty has declared that the prosecution's test results are unreliable because of faulty testing results in certain incidents. (*Id.*) At a minimum, Mr. Dougherty's preliminary evaluation raises serious questions about the validity of the prosecution's evidence. Based on his preliminary findings, a comprehensive examination of the evidence would likely raise further questions about the reliability of the evidence. Trial counsel's

[93] Cuba claimed to have ended his involvement in residential burglaries by November 1984; however, he was in possession of stolen property when contacted by sheriff deputies on September 3, 1985. (Ex. 22, Los Angeles County Sheriff's Department - Supplementary Report, dated 09/11/1985 by Sgt. William S. Stoner and Investigator Michael W. Griggs (State Habeas Exhibit 11I), p. 6.)

failure to investigate, develop, and present evidence related to reliability of testing procedures and accuracy of the evidence constituted ineffective representation.

1176. Counsel's failure to challenge shoe print and firearms evidence prejudiced Petitioner. Trial counsel also unreasonably failed to investigate available evidence that supported an alternative defense based on mental state. Given Petitioner's lengthy history of serious mental illness, impoverished living conditions, illicit drug usage, and psychotic behavior at or near the time of the offense, counsel were required, at a minimum, to investigate and develop mental state evidence before reaching a decision regarding the theory of the case.

1177. As discussed above, counsel's failure to investigate any alternate defenses does not excuse as tactical a decision not to present a readily available line of defense. *See Phillips*, 267 F.3d at 976-79. "A defense attorney's failure to consider alternate defenses constitutes deficient performance when the attorney 'neither conduct[s] a reasonable investigation nor ma[kes] a showing of strategic reasons for failing to do so.'" *Rios*, 299 F.3d at 805. The allegations in the petition and the supporting documentation show counsel made no reasoned investigation of alternate defenses to the charges. Absent a thorough and adequate investigation, the decision not to present a reasonable alternate defense was unsound and resulted in constitutionally deficient representation.

1178. Furthermore, trial counsel failed to investigate, develop, or present any evidence with respect to alternative defenses based on lack of requisite mental state due to Petitioner's history of serious mental illness, neurocognitive and neurological deficits, psychosis, mood disorders, mind-altering substance abuse, and brain impairment. (*See* Exs. 31, 38, 41, 42, 43, the Declarations of D. Blumer, M.D.; R. Schneider, M.D.; W. Vicary, M.D.; D. Watson, Ph.D.; and, J. Wells, J.D., Ph.D.) In addition, trial counsel failed to conduct a reasonable

investigation that would have permitted them to make a reasonable tactical decision to forego such defenses in favor of a defense based on innocence.

**F.      Trial Counsel Failed to Investigate, Litigate, Object to, Cross-examine or Otherwise Adequately Challenge the Prosecution's Evidence in the Doi Incident, Counts 10-11 (burglary, murder, burglary-murder special circumstance)**

**1.      The Prosecution's Case**

1179. On May 14, 1985, William Doi suffered a gunshot wound to the head at his home in Monterey Park. His wife, Lillian Doi, sustained injuries to her face and hand. Their home was ransacked. A shoe print was discovered under the Doi's front bedroom window. A bathroom window screen had been removed. A blood-stained pillowcase was found in the bathtub.

1180. The prosecution introduced evidence in an attempt to show that a bullet fragment recovered from William Doi had been fired from a Jennings pistol, later recovered from ex-convict Jesse Perez on August 30, 1985.

1181. In closing, the prosecutor urged conviction based on Avia shoe prints and ballistics evidence, including recovery of the .22-caliber Jennings semi-automatic pistol. (211 RT 24375.)

1182. Ms. Launie Dempster testified that she delivered newspapers on May 14, 1985, in Monterey Park. During her route, she saw a man sitting in a car opposite the Doi residence. She later identified photographs of a car and stated that Petitioner was the man she had seen sitting in the car, based on seeing his face on television.

1183. Property purportedly stolen from the Doi residence on May 14, 1985 was identified by the Doi's daughter, Linda Doi-Fick, at the September 5, 1985,

property lineup.[94]  Felipe Solano, a "fence", testified that he bought property from Petitioner.  In closing, the prosecutor told the jury that although Solano was involved in receiving stolen property, the State would have to release Petitioner if they wanted to prosecute Solano.[95]  (209 RT 24085.)  The prosecution credited Dempster for her supposed familiarity with the Monterey Park neighborhood, despite the fact that her deliveries took place in the dark.  (211 RT 24391.)  The prosecutor also argued that defense photographs of the neighborhood were inaccurate.  (208 RT 23959-61.)

## 2. Defense Evidence

1184.  Dennis Lew testified about lighting conditions at night on the street in front of the Doi residence and photographs of the area.

1185.  No other evidence was presented on Petitioner's behalf.

1186.  In closing argument trial counsel argued that Jesse Perez could not be believed (210 RT 24173-79); that Felipe Solano lied about the stolen property (210 RT 24181); and that recovery of property did not mean Petitioner was the killer, absent his prints on the property.  (210 RT 24243.)

## 3. The Defense Failed to Competently Challenge the Charges

1187.  Trial counsel did not mount a reasonable or adequate defense to the charges.  The defense did not present any evidence related to the origin of the stolen property.  The defense failed to challenge the physical evidence or impeach Dempster about her sightings and eyewitness identification.  (Ex. 37, E. Loftus Dec.) (*See also* Ex. 71, K. Pezdek Dec.)

1188.  The defense failed to investigate, develop, or present evidence to challenge the accuracy and reliability of the prosecution's ballistics findings.

---

[94]  The Doi home had reportedly been burglarized a few weeks prior to the incident.

[95]  The defense failed to object to the inflammatory remarks.

(Ex. 35, P. Dougherty dec.)  Moreover, the defense failed to investigate, develop, and present evidence to challenge recovery and chain of custody of a Jennings .22-caliber semi-automatic pistol.  Mr. Perez claimed to have retrieved the firearm from a friend in Tijuana, Mexico, more than three months after the Doi shooting.  (170 RT 19663-65.)

1189.  The defense failed to present expert testimony challenging the prosecution's case with respect to the shoe  print impressions.

1190.  Photographs and casts were taken of two partial shoe impressions at the scene.  Concentric circles were noted on the impressions.  However, the questioned impressions were too poor to make any meaningful comparison.  It was not possible to exclude any Avia Aerobics, Basketball, Referee/Coach or All Court Sport model, which exhibited a similar design to the partial questioned impressions.  (Ex. 33, L. DiMeo dec., ¶ 24.)

1191.  The defense also failed to introduce reasonably competent evidence to demonstrate the poor lighting conditions at the time that Dempster claimed to have seen the suspect as well as other factors affecting reliability of her identification.  The defense photographs failed to depict accurately the viewing conditions.

1192.  Trial counsel unreasonably failed to introduce evidence to challenge the prosecution's assertion that the crimes were necessarily a series committed by one person.  (Ex. 40, S. Strong dec., ¶ 22.)

1193.  Trial counsel failed to challenge the eyewitness testimony of Launie Dempster.  By failing properly to cross-examine this eyewitness regarding lighting conditions, stress, fear, memory, multiple viewings, and her lack of independent basis for identification, and by failing to properly prepare the defense eyewitness identification expert, trial counsel deprived Petitioner of a meaningful defense.  As discussed, *supra*, the defense was obligated to prepare

their expert to testify as to relevant factors that influence reliability of eyewitness identification. This they consistently failed to do.

1194. Trial counsel improperly conceded firearms and shoe print evidence. Counsel were obligated adequately to defend their client by challenging the prosecution's false and unreliable evidence. Petitioner has shown preliminary review of firearms evidence in certain incidents to be unreliable. Mr. Dougherty stated that the testing was faulty and inaccurate; the reliability of the test results is in question. (Ex. 35, P. Dougherty dec., ¶ 4.) Based on the preliminary findings, there are serious questions as to the validity of the prosecution's evidence. Competent counsel would have investigated, developed, and presented testimony to challenge the reliability and accuracy of the firearms evidence.

1195. Lisa DiMeo found that "there were many possible models and sizes of shoes that could have been identified from the shoe print impressions. Mr. Burke's testimony . . . was incorrect." (Ex. 33, L. DiMeo dec., ¶ 35.) DiMeo's findings undermine the validity of the prosecution's evidence as to size and model of shoe:

> [the two casts] represent a large possible pool of shoes as the source
> of the impressions.

(Ex. 34, L. DiMeo suppl. dec., ¶ 8.) Shoe print evidence did not conclusively link Petitioner to the incident. Petitioner has provided specific showing of prejudice with respect to the individual incidents charged against him, including false and unreliable physical evidence, unreliable eyewitness identification, and lack of a reasonable defense theory of the case.

1196. Steve Strong's declaration that the crimes were not related is based on his training and analysis of lack of distinctiveness of *modus operandi* evidence and consideration of physical evidence. (Ex. 40, S. Strong dec., ¶¶ 8-9.) Mr. Strong has identified specific factors pointing to lack of distinctive pattern: specifically, the nature of the wounds, the lack of fingerprints, and the location of

the crime scene, all of which the defense failed to challenge. (*Id.*, ¶ 17.) The unreliability of the shoe print and firearms evidence introduced against Petitioner further support s Mr. Strong's findings.

1197. As previously discussed, counsel's decision to forego investigation of a mental health defense was neither reasonable nor informed. Having conceded physical evidence of shoe print and firearms evidence, trial counsel failed to investigate evidence to support an alternate mental state defense. Given Petitioner's lengthy history of serious mental illness, impoverished living conditions, illicit drug usage, and psychotic behavior at or near the time of the offense, counsel were required, at a minimum, to investigate and develop mental state evidence before reaching a decision regarding the theory of the case.

1198. Trial counsel failed to investigate, develop, or present any evidence with respect to alternative defenses based on lack of requisite mental state due to Petitioner's history of serious mental illness, neurocognitive and neurological deficits, psychosis, mood disorders, mind-altering substance abuse, and brain impairment. (*See* Exs. 31, 38, 41, 42, 43, the Declarations of D. Blumer, M.D.; R. Schneider, M.D.; W. Vicary, M.D.; D. Watson, Ph.D.; and, J. Wells, J.D., Ph.D.) In addition, trial counsel failed to conduct a reasonable investigation that would have permitted them to make a reasonable tactical decision to forego such defenses in favor of a defense based on innocence.

**G.    Trial Counsel Failed to Investigate, Litigate, Object to, Cross-Examine or Otherwise Adequately Challenge the Prosecution's Evidence in the Bell/Lang Incident, Counts 12-14 (Burglary, Attempted Murder, Murder, Burglary-Murder  Special Circumstance)**

**1.    The Prosecution's Case**

1199. Between May 29 and June 1, 1985, two elderly women were attacked in their home in Monrovia. Mabel Bell subsequently died; the cause of death was head trauma. Florence Lang suffered head injuries, ligature marks on

both wrists, and bruising on the face.  A treating physician also observed an injury to the vaginal tissue.

1200. Physical evidence found at the scene included a shoe print impression on a clock, found to be consistent with the concentric circle pattern of an Avia shoe.  Fabric marks were found on a telephone and clock, which indicated they were handled by someone possibly wearing gloves.  A star-circle had been drawn on the wall over Lang's bed.  A relative identified a cassette tape player stolen from the residence and later recovered from Felipe Solano.

1201. In closing, the prosecutor urged conviction based on an Avia shoe print (207 RT 23868), identification of property stolen from the residence and recovered from Felipe Solano (207 RT 23869), a pentagram found at the scene (207 RT 23873), the use of restraints (207 RT 23888), fabric glove impressions (207 RT 25868), and failure of the defense to present a credible alibi (207 23897-900).

## 2.     Defense Evidence

1202. Despite dental records that conclusively showed Petitioner was in Los Angeles on May 30, 1985, the defense attempted to show that Petitioner was in El Paso, Texas at the same time.  Petitioner's father, another relative, and a co-worker testified that he was in El Paso around May 23, 1985, and left on May 31, 1985.  While in El Paso, Petitioner attended a family party for his niece who received her First Communion.  In closing argument, trial counsel's own remarks defeated the alibi defense by asserting there was no basis to doubt the dental records: "I believe the doctor's testimony from Chinatown regarding the 30th was

accurate.  I have no reason to believe that it is not accurate . . . ."[96]  (211 RT 24308.)

### 3.    The Defense Failed to Competently Challenge the Charges

1203.  The defense offered no affirmative evidence to refute the prosecution's physical evidence, including shoe print, fabric gloves, restraints, or identification of stolen property.[97]

1204.  The defense failed to investigate, develop, and present competent evidence pertaining to shoe print impression evidence.  As indicated *supra*, expert testimony would have established that the prosecution's evidence was inexact.

> A partial concentric circle pattern was developed with fingerprint power on a plastic clock case.  Based on the lack of sufficient detail, it was not possible to eliminate any Avia athletic shoe model, size, or style, or any manufactured shoe that exhibited a similar concentric circle pattern as the source of the impression.

(Ex. 33, L. DiMeo dec., ¶ 25.)

1205.  The defense failed to investigate, develop, and present evidence to challenge the prosecution's evidence about fabric glove impressions.  Competent defense counsel would have presented evidence that fabric impressions were incapable of yielding identifiable prints.  (Ex. 24, Articles on Latent Prints (State Habeas Exhibit 11E).)

1206.  In failing to present a reasonably competent alibi defense, trial counsel lost any credibility they had with the jury.  In addition to failing to account for the alibi witnesses' lack of specificity, the defense failed to account

---

[96]  Trial counsel argued the crime occurred on May 29.  However, no substantial proof was presented to support the theory.  (211 RT 24309, 24314.)  Counsel's argument contradicted Petitioner's alibi.

[97]  The appearance of a pentagram-like drawing at the scene by itself did not connect Petitioner to the crime.

for dental records that the prosecution introduced to demonstrate that Petitioner was in Los Angeles.

1207. The prosecution also presented evidence to impeach Petitioner's father. A local newspaper reporter testified that, in an interview, Petitioner's father stated that he had not seen his son for more than two years before his arrest. The defense failed to rehabilitate their witness or to clarify that Petitioner's father had been mistaken in his recollection.

1208. The defense failed to investigate, develop, and present evidence that restraints allegedly used during the incident were unremarkable and easily obtainable.

1209. The defense failed to adequately investigate, develop, and present evidence that Felipe Solano's testimony was not credible. Competent counsel would have established that Solano's self-serving testimony was false and that law enforcement agencies had knowledge about other individuals who sold property to Solano.

1210. The prosecution's shoe print evidence was neither accurate nor reliable. (Ex. 33, L. DiMeo dec., ¶ 35.) DiMeo's findings demonstrate that many shoes could have made the impressions. (Ex. 34, Lisa DiMeo suppl. dec., ¶ 28.) With respect to the fabric glove impressions, cross-examination of the prosecution's witness, Mr. Vander Wende, would have established that the fabric impressions could not yield identifiable prints and were unreliable. Competent counsel would have challenged the evidence. (*See also* Ex. 24, Articles on Latent Prints; Ex. 46, R. Epstein, Fingerprints Meet *Daubert*: The Myth of Fingerprint "Science" Is Revealed, 75 So. Cal. L.R. 605 (2002).)

1211. Evidence was available to trial counsel of potential third-party suspects who committed burglaries and likely sold stolen property to Solano. (Ex. 22, LACSD - Suppl. Rpt., 09/11/1985.) Law enforcement identified potential third-party suspects but the defense failed to investigate, develop, or

present any evidence on Petitioner's behalf. Hechavarria, also known as "Cuba," admitted having committed burglaries allegedly with Petitioner. He denied committing burglaries after November 1984; yet, he was in possession of stolen property on September 3, 1985. (*Id.*, pp. 2-6.) Eva Castillo admitted having committed burglaries with Cuba. (*Id.*, p. 6.) Sandra Hotchkiss admitted burglarizing residences with Petitioner. Third-party evidence would have benefitted Petitioner by establishing a reasonable likelihood that Solano, who was well-acquainted with Castillo, obtained stolen property from Castillo and from other persons Castillo knew. Counsel failed to cross-examine Felipe Solano regarding Castillo's background and criminal activity, as well as her knowledge of and involvement with Cuba, Julio, and Charlie. (*Id.*, p. 7.)

1212. Having failed to present an adequate alibi defense, counsel failed to investigate, develop, and present an alternate defense. Having conceded the Prosecution's shoe print evidence and at the same time arguing a less-than-credible alibi defense, trial counsel deprived Petitioner of any reasonable defense. Given Petitioner's lengthy history of serious mental illness, impoverished living conditions, illicit drug usage, and psychotic behavior at or near the time of the offense, counsel were required, at a minimum, to investigate and develop mental state evidence before reaching a decision regarding the theory of the case.

1213. Failure to investigate alternate defenses does not excuse as tactical a decision not to present a readily available line of defense. *Phillips*, 267 F.3d at 976-79. "A defense attorney's failure to consider alternate defenses constitutes deficient performance when the attorney 'neither conduct[s] a reasonable investigation nor ma[kes] a showing of strategic reasons for failing to do so.'" *Rios*, 299 F.3d at 805. The allegations in the petition and the supporting documentation show counsel made no reasoned investigation of alternate defenses to the charges. Absent a proper and adequate investigation, the decision

439

not to present a reasonable alternate defense was unsound and resulted in constitutionally deficient representation.

1214. Trial counsel failed to investigate, develop, or present any evidence with respect to alternative defenses based on lack of requisite mental state due to Petitioner's history of serious mental illness, neurocognitive and neurological deficits, psychosis, mood disorders, mind-altering substance abuse, and brain impairment. (*See* Exs. 31, 38, 41, 42, 43, the Declarations of D. Blumer, M.D.; R. Schneider, M.D.; W. Vicary, M.D.; D. Watson, Ph.D.; and, J. Wells, J.D., Ph.D.) In addition, trial counsel failed to conduct a reasonable investigation that would have permitted them to make a reasonable tactical decision to forego such defenses in favor of a defense based on innocence.

**H. Trial Counsel Failed to Investigate, Litigate, Object to, Cross-Examine or Otherwise Adequately Challenge the Prosecution's Evidence in the Kyle Incident, Counts 15-18 (Burglary, Rape, Oral Copulation, Sodomy)**

**1. The Prosecution's Evidence**

1215. Early in the morning on May 30, 1985, Carol Kyle was attacked in her Burbank home. She later identified Petitioner as the man who sexually assaulted her, stole property from her home, and handcuffed her and her son to the bed. The house was ransacked. Handcuffs found at the scene were unlike those used by police. Kyle assisted in preparing composite drawings; a sketch was made of the suspect on August 30, 1985, shortly before Petitioner's arrest.

1216. In closing argument the prosecutor urged conviction based on Kyle's identification (207 RT 23888); discovery of a handcuff key that matched handcuffs in other incidents (207 RT 23893); recovery of the Kyles' property at the home of Petitioner's sister Rosa in El Paso (207 RT 23898); and Petitioner's inherently implausible alibi (2067 RT 23898-001).

440

1217. In an effort to challenge identification of jewelry found at Petitioner's sister's home, defense counsel argued, but failed to present evidence in support of the contention, that the recovered jewelry was not unique and lacked distinctive characteristics. (211 RT 24310-13.)

## 2. Defense Evidence

1218. The defense presented no evidence on Petitioner's behalf except for the failed alibi defense discussed in the Bell/Lang incident, *supra*. Trial counsel argued unconvincingly in closing argument that the identification by Ms. Kyle was inconsistent with her statements that her suspect had straight teeth. "If the person who committed these crimes . . . had straight white teeth, the person was not Petitioner." (210 RT 24255.)

## 3. The Defense Failed to Competently Challenge the Charges

1219. The defense failed to investigate, develop, and present competent evidence to support a credible alibi defense, as in the Bell/Lang incident, *supra*.

1220. Trial counsel failed to investigate, develop, or present any evidence with respect to alternative defenses based on lack of requisite mental state due to Petitioner's history of serious mental illness, neurocognitive and neurological deficits, psychosis, mood disorders, mind-altering substance abuse, and brain impairment. (*See* Exs. 31, 38, 41, 42, 43, the Declarations of D. Blumer, M.D.; R. Schneider, M.D.; W. Vicary, M.D.; D. Watson, Ph.D.; and, J. Wells, J.D., Ph.D.) In addition, trial counsel failed to conduct a reasonable investigation that would have permitted them to make a reasonable tactical decision to forego such defenses in favor of a defense based on innocence.

1221. As in the Bell/Lang incident, trial counsel presented a wholly discredited alibi. Counsel failed to present any credible evidence that Petitioner was somewhere other than in the Los Angeles area on May 30, 1985. In fact, uncontroverted evidence from a Los Angeles dental office established that Petitioner was in Los Angeles on May 30, 1985.

1222. Viewing conditions at the time of the incident were crucial to a determination of the reliability of the victim's identification. There was evidence in the record regarding lighting, stress, and fear, as well as memory and post-event information, which competent defense counsel would have used to show that the identification was inaccurate and unreliable. Dr. Loftus was not asked to testify about many factors that influence a witness's ability to accurately recall physical features of a suspect. Competent counsel would have elicited testimony from the eyewitness and expert as set forth in Dr. Loftus's declaration with respect to stress, fear, lighting, and memory contamination by post-event information such as multiple viewings of the same suspect. (Ex. 37, E. Loftus Dec., ¶ 6.) (*See also* Ex. 71, K. Pezdek Dec.) Competent counsel would have urged the jury to consider relevant factors in evaluating eyewitness testimony.

1223. Defense counsel unreasonably failed to investigate mental state evidence. Given Petitioner's lengthy history of serious mental illness, impoverished living conditions, illicit drug usage, and psychotic behavior at or near the time of the offense, counsel were required, at a minimum, to investigate and develop mental state evidence before reaching a decision regarding the theory of the case.

1224. Counsel presented a defense that was inherently flawed and incompetent. As noted above, failure to investigate alternate defenses does not excuse as tactical a decision not to present a readily available line of defense. *See Phillips*, 267 F.3d at 976-79. "A defense attorney's failure to consider alternate defenses constitutes deficient performance when the attorney 'neither conduct[s] a reasonable investigation nor ma[kes] a showing of strategic reasons for failing to do so.'" *Rios*, 299 F.3d at 805. The allegations in the petition and the supporting documentation show counsel made no reasoned investigation of alternate defenses to the charges. Absent a proper and adequate investigation, the

decision not to present a reasonable alternate defense was unsound and
uninformed, resulting in constitutionally deficient representation.

**I.      Trial Counsel Failed to Investigate, Litigate, Object to, Cross-Examine
or Otherwise Adequately Challenge the Prosecution's Evidence in the
Cannon Incident, Counts 19-20 (Burglary, Murder, Burglary-Murder
Special Circumstance)**

**1.      The Prosecution's Case**

1225.  On July 2, 1985, Mary Louise Cannon was found dead in her
Arcadia home.  She had suffered blunt trauma head and face wounds, stab
wounds to the neck and carotid artery, and manual strangulation.  A partial shoe
print on a piece of tissue paper was consistent with an Avia shoe; a shoe print
found on carpeting was similar to an Avia shoe, size 11 or 11-½.  Jewelry stolen
from her residence was recovered from Felipe Solano and later identified at the
property lineup held September 5, 1985.

1226.  The state urged conviction based on Avia shoe prints and jewelry
stolen from the residence.  The prosecutor compared the wounds to the Zazzara
case: "the slash/stab wound to the neck" (207 RT 23915); "same types of stab
wounds" (207 RT 23916); and a similar type of weapon: "[the sharp object
might] not have facilitated the sawing slashing act as much as these others" (207
RT 23916).

**2.      Defense Evidence**

1227.  The defense offered testimony regarding hairs found at the scene and
blood stains found near the victim's head and on a mitten.  A sheriff's criminalist
testified that the findings of the PGM subtype on the glass were inaccurate

because the sample was degraded.[98] Blood found on the mitten was not Petitioner's. Hair examined from the scene was dissimilar to Petitioner's.

1228. Trial counsel offered no evidence concerning shoe print impressions or stolen property recovered from Felipe Solano. In closing, trial counsel argued that the Cannon homicide was not part of a unique pattern: "[S]tabbings and beating people with things is the most common method of killing someone" (211 RT 24272); "you [cannot] take them all together and try to put some sort of pattern to it" (211 RT 24273); "once again, you cannot give these shoes to Petitioner." (*Id.*)

### 3. The Defense Failed to Competently Challenge the Charges

1229. The defense failed to investigate, develop, and present a competent defense, including a third-party culpability defense. Defense counsel failed to challenge the shoe print evidence or the recovery of property.

1230. As discussed above, competent defense counsel would have refuted the prosecution's evidence, particularly the shoe print comparison. Expert testimony would have cast doubt on the conclusions of the prosecution's experts'.

1231. At trial, the prosecution introduced a photographic display of a shoe impression in carpet. (Prosecution's Trial Ex. 20A-1.) The impression was consistent in general shape and gross pattern with any model and style of Avia athletic shoe.

1232. A photograph taken of a facial tissue on the floor with a partial print revealed a series of straight lines and a block-shaped element, consistent with any model, size, and style Avia athletic left shoe. No measurement scale was used in the photographs. (Ex. 33, L. DiMeo Dec., ¶¶ 26, 27.)

_____

[98] The defense failed to move for sanctions for the prosecution's failure to preserve the evidence.

1233. The defense failed to investigate, develop, or present evidence to challenge Felipe Solano's testimony. Competent counsel would have established that other persons engaged in selling stolen property to Solano could have been involved in committing the crimes. (Ex. 40, S. Strong Dec., ¶ 22.)

1234. Trial counsel failed to investigate, develop, or present any evidence with respect to alternative defenses based on lack of requisite mental state due to Petitioner's history of serious mental illness, neurocognitive and neurological deficits, psychosis, mood disorders, mind-altering substance abuse, and brain impairment. (*See* Exs. 31, 38, 41, 42, 43, the Declarations of D. Blumer, M.D.; R. Schneider, M.D.; W. Vicary, M.D.; D. Watson, Ph.D.; and, J. Wells, J.D., Ph.D.) In addition, trial counsel failed to conduct a reasonable investigation that would have permitted them to make a reasonable tactical decision to forego such defenses in favor of a defense based on innocence.

1235. Counsel unreasonably failed to investigate potential third-party suspects, challenge the prosecution's shoe print evidence, and develop a reasonable theory of the case.

1236. Counsel unreasonably failed to investigate potential third-party suspects: Sandra Hotchkiss, Eva Castillo, Monje, Cuba, Julio, and Charlie. (Ex. 22, LACSD - Suppl. Rpt., 09/11/1985.) Third-party culpability evidence was not investigated, developed, or presented at trial. Some of these individuals were interviewed by law enforcement and admitted involvement in criminal activity. (*Id.*) Cuba admitted he had committed burglaries with Petitioner and Julio in 1984. (*Id.*, pp. 1-6.) On September 3, 1985, he was found in possession of stolen property. (*Id.*, p. 6.) Castillo admitted to committing burglaries in 1984 with Cuba and Julio. (*Id.*, pp. 7-8.) She also reported that Charlie and Cuba burglarized her apartment. (*Id.*, p. 7.) Moreover, Sandra Hotchkiss testified that she committed burglaries with Petitioner in 1985. (185 RT 21698.) Counsel's failure to investigate and develop third-party culpability evidence precluded the

jury from making a connection between Felipe Solano and third-party suspects. The jury had little to consider because counsel failed to adequately impeach Solano regarding his involvement with Cuba, Monje, and Castillo. (Ex. 22, LACSD - Suppl. Rpt., 09/11/1985, p. 6.) The prosecutor observed that trial counsel had failed properly to investigate Solano. (*See* 177 RT 20663-66.)

1237. Counsel failed to challenge the prosecution's shoe print evidence. Petitioner's habeas expert, Lisa DiMeo, has reviewed the evidence and determined that the impression evidence compares to different models and sizes of Avias. DiMeo established a valid basis for examination and comparison of the impressions. The lack of distinctive marks makes it impossible to exclude many models and sizes. (Ex. 33, L. DiMeo Dec., ¶ 35.) DiMeo explains that prosecution expert Burke's identification was unsubstantiated and conflicted with his examination of the evidence. (Ex. 34, L. DiMeo Suppl. Dec., ¶¶ 19-25.) Trial counsel unreasonably failed to cross-examine the prosecution's expert as to comparison methods and lack of distinctive marks.

1238. Trial counsel failed to develop a reasonable defense theory of the case. By conceding shoe print evidence, while at the same time challenging the prosecution's bloodstain evidence, the defense presented an inconsistent and illogical defense. Competent counsel would have properly challenged the Prosecution's physical evidence and investigated and presented third-party culpability evidence. Trial counsel failed to investigate and develop a reasonable theory of the case and a reasonable alternate defense. Given Petitioner's lengthy history of serious mental illness, impoverished living conditions, illicit drug use, and psychotic behavior, competent counsel would have, at a minimum, investigated and developed mental state evidence before reaching a decision regarding the theory of the case.

1239. Trial counsel presented an inconsistent defense. Moreover, counsel's failure to investigate alternate defenses does not excuse as tactical a

decision not to present a readily available line of defense. *See Phillips*, 267 F.3d at 976-79. "A defense attorney's failure to consider alternate defenses constitutes deficient performance when the attorney 'neither conduct[s] a reasonable investigation nor ma[kes] a showing of strategic reasons for failing to do so.'" *Rios*, 299 F.3d at 805. The allegations in the petition and the supporting documentation show counsel made no reasoned investigation of alternate defenses to the charges. Absent a proper and adequate investigation, the decision not to present a reasonable alternate defense was unsound and resulted in constitutionally deficient representation.

## J. Trial Counsel Failed to Investigate, Litigate, Object to, Cross-examine or Otherwise Adequately Challenge the Prosecution's Evidence in the Bennett Incident, Counts 21-22 (Burglary, Attempted Murder)

### 1. The Prosecution's Case

1240. On July 5, 1985, 16-year-old Whitney Bennett was attacked in her sleep in her Sierra Madre home. When she woke up early that morning, her head and hands hurt. She suffered head lacerations, skull fractures, fracture of the eye socket, and fracture to a finger on her left hand. Marks around her neck were likely caused by a rope or cord. Her head injuries were consistent with blunt force trauma caused by a tire iron. She had no recollection of the assault.

1241. Evidence found at the scene included a tire iron, curtain sash, and a bed comforter. The tire iron had not been there before she went to sleep. A shoe impression on the comforter appeared similar to shoe prints found at the Cannon and Zazzara scenes. A photograph of a shoe impression on the comforter was identified as an Avia aerobics shoe, size 11 to 12. Fabric glove impressions were found on the bedroom window sill.

1242. In closing argument the prosecution urged conviction based on shoe prints, ligature marks, blunt force trauma, fabric glove marks, and evidence of ransacking. (207 RT 23924-27.) The prosecutor argued that the Bennett

447

residence was near Cannon's home as well as Bell and Lang's.  (207 RT 23919-20.)

**2.  Defense Evidence**

1243. The defense presented evidence only with respect to hair and blood. A buckled hair found on the carpet was similar to Petitioner's pubic hair and dissimilar to the victim's; however, it lacked unique characteristics.  Antigens found on the sash did not originate from the victim or Petitioner.

1244. Trial counsel conceded the shoe print impression evidence.  (211 RT 24279.)  Trial counsel argued to the jury that "Petitioner is not wearing Avias, never been seen with Avias on . . . ."  (*Id.*)

**3.  The Defense Failed to Competently Challenge the Charges**

1245. Trial counsel failed to investigate, develop, and present evidence to refute the prosecution's physical evidence, including shoe print and fabric glove marks and failed to challenge the prosecution's assertion that the case fit a pattern of crimes linked to Petitioner.

1246. Trial counsel failed to challenge the prosecution's findings related to shoe print impressions.[99]  Competent counsel would have presented evidence of the following:

> Found at the scene was a partial shoe print – ball area – in
> apparent blood on a fabric comforter.  This was consistent with an
> Avia athletic right shoe that exhibited similar class characteristics to
> the Aerobics model.  Only the Avia Referee/Coach model 552R can
> be eliminated as the source of the print based upon the break
> between the dam element and flex joint.  A second partial print on

---

[99]  Trial counsel argued in closing that Petitioner was never seen wearing Avia shoes, but failed to present evidence in support of this assertion.

the comforter in apparent blood exhibited herringbone elements, but
no further description could be determined.

(Ex. 33, L. DiMeo dec., ¶¶ 28, 29.)

1247. The defense failed to investigate, develop and present evidence with respect to fabric glove marks. Expert testimony would have established that no identifiable prints could be obtained.

1248. The defense failed to investigate, develop and present evidence to establish that the case did not fit the prosecution's theory of a pattern of crimes; specifically, trial counsel failed to assert differences between this case and other incidents.[100] By failing to competently argue that the Bennett case and the vast geographical range did not fit the overall pattern, counsel undermined Petitioner's defense. (*See* Ex. 40, S. Strong dec., ¶ 22.) Moreover, the defense failed to offer a logical scenario with respect to hair and blood findings that may have involved other suspects. (*Id*.) Thus, Petitioner was deprived of an adequate defense.

1249. Trial counsel failed to investigate, develop or present any evidence on alternative defenses based on lack of requisite mental state due to Petitioner's history of serious mental illness, neurocognitive and neurological deficits, psychosis, mood disorders, mind-altering substance abuse, and brain impairment. (*See* Exs. 31, 38, 41, 42, 43, the Declarations of D. Blumer, M.D.; R. Schneider, M.D.; W. Vicary, M.D.; D. Watson, Ph.D.; and, J. Wells, J.D., Ph.D.) In addition, trial counsel failed to conduct a reasonable investigation that would have permitted them to make a reasonable tactical decision to forego such defenses in favor of a defense based on innocence.

---

[100] By contrast, the prosecutor summed up the relative differences in closing argument and offered an explanation as to how the crime fit an overall pattern with other incidents. (207 RT 23919-29.)

1250. Without conducting a proper investigation, trial counsel conceded that shoe print evidence linked Petitioner to the crime. There was no reasonable basis for trial counsel's failure to challenge this evidence. DiMeo's testimony would have cast a reasonable doubt on Mr. Burke's conclusions with respect to the size and model of shoes involved, as well as the prosecution's theory that there was only one pair of shoes that could have been involved. (Ex. 33, L. DiMeo Dec., ¶ 17.)

1251. The defense did not challenge the glove-print evidence. As discussed previously, there was no reasonable basis for counsel not to challenge this unreliable evidence. Petitioner has demonstrated grounds for challenging the fingerprint evidence. (*See*, *e.g.*, Ex. 24, Articles on Latent Prints; Ex. 46, "Fingerprints Meet *Daubert*".)

1252. Petitioner has demonstrated evidence of potential third-party suspects that was not investigated or presented at trial. (Ex. 22, LACSD - Suppl. Rpt., 09/11/1985.) As discussed earlier, competent counsel would have investigated potential suspects based on interviews of individuals who had admitted involvement in burglaries.

1253. Steve Strong's declaration shows "there was significant evidence to demonstrate lack of pattern . . . crimes were not related, including inexactness of the shoe print evidence; distance between crime scenes; different weapons . . ., and lack of physical evidence found at the scenes indicating there could have been additional suspects." (Ex. 40, S. Strong Dec., ¶ 22.) Thus, there was crucial evidence the defense failed to present to distinguish Bennett from other incidents, and to demonstrate potential third-party suspects.

1254. As a result, trial counsel presented an inconsistent defense. Trial counsel failed to investigate an alternate defense, despite evidence of Petitioner's lengthy history of serious mental illness, impoverished living conditions, illicit drug usage, and psychotic behavior at or near the time of the offense. Counsel

were required, at a minimum, to investigate and develop mental state evidence, before reaching a decision regarding the theory of the case.

1255. As noted above, failure to investigate alternate defenses does not excuse as tactical a decision not to present a readily available line of defense. *See Phillips*, 267 F.3d at 976-79. "A defense attorney's failure to consider alternate defenses constitutes deficient performance when the attorney 'neither conduct[s] a reasonable investigation nor ma[kes] a showing of strategic reasons for failing to do so.'" *Rios*, 299 F.3d at 805. The allegations in the petition and the supporting documentation show counsel made no reasoned investigation of alternate defenses to the charges. Absent a proper and adequate investigation, the decision not to present a reasonable alternate defense was unsound and resulted in constitutionally deficient representation.

**K.    Trial Counsel Failed to Investigate, Litigate, Object to, Cross-examine or Otherwise Adequately Challenge the Prosecution's Evidence in the Nelson Incident, Counts 23-24 (burglary, murder, burglary-murder special circumstance)**

**1.    The Prosecution's Case**

1256. On July 7, 1985, Joyce Nelson was found dead in her Monterey Park home. Death resulted from a head injury and manual strangulation. Shoe print impressions found at the scene were similar to a sole pattern found at the Bell/Lang incident. Shoe prints at the scene also were similar in appearance to shoe prints found at the Zazzara, Cannon, and Bennett scenes.

1257. Ms. Dempster identified Petitioner as the person she saw in the neighborhood around July 5, 1985.

1258. The prosecutor argued to the jury that Nelson resembled the Cannon case in terms of injuries (208 RT 23938); that shoe print impressions were identified as Avia shoes (208 RT 23943-45); that Dempster saw a person she identified as Petitioner in the neighborhood (208 RT 23950); that the residence

451

had been ransacked; and that a jewelry box was found on Nelson's bed (208 RT 23946-47).

**2. Defense Evidence**

1259. The defense evidence was limited to Dennis Lew's inaccurate photographs, and testimony regarding hairs recovered from the scene.

1260. In closing, defense counsel argued that the shoe print evidence failed to tie Petitioner to the crimes (210 RT 24228); that the prosecution did not prove Petitioner wore Avia shoes (210 RT 24238); and that Dempster's eyewitness identification was not credible (211 RT 24303).

**3. The Defense Failed to Competently Challenge the Charges**

1261. Trial counsel failed to investigate, develop, and present evidence to challenge the physical evidence and to discredit Dempster's identification. The defense also failed to explain to the jury the differences between the Nelson incident and the other charged crimes, to refute the prosecution's argument that the crimes fit a pattern.

1262. The defense failed to challenge the shoe print evidence. Competent counsel would have presented expert testimony to explain that there were thousands of pairs of shoes that compared to the impressions.

Two partial overlapping shoe prints exhibiting herringbone elements and a flex joint were found in dry soil outside the scene. They were consistent with any model and style of Avia athletic shoes.

Of four shoe prints on the concrete floor, the following findings were made:

a) Left Avia. Cannot exclude any Aerobics, Basketball, or All Court Sport model, which exhibited similar class characteristics as the questioned print. Heel area was not captured in the photograph.

452

(b)  Right Avia.  Cannot exclude any Aerobics, Basketball, Referee/Coach or All Court Sport model, which exhibited similar class characteristics as the questioned print.  Heel area was not captured in the photograph.

(c)  Right Avia.  Cannot exclude Aerobics, Basketball, or All Court Sport model, which exhibited similar class characteristics as the questioned print.  Heel – three graduating length parallel bars – observed in the photograph are consistent with models 252, 255, 255W, 552R, 560, 565W, and 565.

(d)  Left Avia.  Cannot exclude any Aerobics, Basketball, Referee/Coach All Court Sport model, which exhibited similar class characteristics as the questioned print.  Heel area was not captured in the photograph.

(Ex. 33, L. DiMeo Dec., ¶¶ 30, 31.)

1263. Trial counsel failed to investigate, develop, or present any evidence with respect to alternative defenses based on lack of requisite mental state due to Petitioner's history of serious mental illness, neurocognitive and neurological deficits, psychosis, mood disorders, mind-altering substance abuse, and brain impairment.  (*See* Exs. 31, 38, 41, 42, 43, Declarations of D. Blumer, M.D.; R. Schneider, M.D.; W. Vicary, M.D.; D. Watson, Ph.D.; and, J. Wells, J.D., Ph.D.) In addition, trial counsel failed to conduct a reasonable investigation that would have permitted them to make a reasonably informed decision to forego such defenses in favor of a defense based on innocence.

1264. Shoe print evidence purportedly linked Petitioner to the scene.  But the prosecution presented unreliable and inaccurate shoe print evidence about the make, model, and size of shoe, and the defense presented no evidence to refute the prosecution's case.  Trial counsel failed to challenge the shoe print evidence, and effectively conceded the truth of the prosecution's evidence in closing

argument. Counsel thus deprived Petitioner of a reasonable defense. Forensic specialist Lisa DiMeo disputes Burke's findings and would have testified that his conclusions are not supported by the evidence; specifically, she would have testified that the model and size of the shoes cannot be determined. Many other shoes could have been responsible for the impressions. (Ex. 24, Articles on Latent Prints; Ex. 34, L. DiMeo Suppl. Dec., ¶ 26.)

1265. Counsel were ineffective in failing to challenge Dempster's identification. They failed to introduce substantial evidence pointing to unreliability of eyewitness identification. Expert testimony would have established fear, stress, memory, poor lighting, and multiple viewings impacted eyewitness identification. (Ex. 37, E. Loftus Dec., ¶ 4.) (*See also* Ex. 71, K. Pezdek Dec.) Trial counsel did not properly cross-examine Dempster about the reliability of her identification. The record establishes that the viewing conditions were poor, but counsel failed to cross-examine the witness effectively about her observations.

1266. Steve Strong opines there were significant differences between various incidents demonstrating lack of pattern, which trial counsel failed to develop and present. (Ex. 40, S. Strong dec., ¶ 21.) Moreover, available evidence pointed to potential third-party culpability. (*Id*., ¶ 22.) Trial counsel failed to present evidence that someone other than Petitioner could have committed the crime. Trial counsel's failure to challenge shoe print and pattern evidence and eyewitness identification states a prima facie case for relief.

1267. Competent counsel would have investigated alternate defenses, including mental state. Given Petitioner's lengthy history of serious mental illness, impoverished living conditions, illicit drug usage, and psychotic behavior at or near the time of the offense, counsel were required, at a minimum, to investigate and develop mental state evidence, before reaching a decision regarding the theory of the case.

1268. As noted above, failure to investigate alternate defenses does not excuse as tactical a decision not to present a readily available line of defense. *See Phillips,* 267 F.3d at 976-79. "A defense attorney's failure to consider alternate defenses constitutes deficient performance when the attorney 'neither conduct[s] a reasonable investigation nor ma[kes] a showing of strategic reasons for failing to do so.'" *Rios,* 299 F.3d at 805. The allegations in the petition and the supporting documentation show that counsel unreasonably failed to adequately investigate alternate defenses to the charges. Absent a proper and adequate investigation, the decision not to present a reasonable alternate defense was unsound and resulted in constitutionally deficient representation.

**L.    Trial Counsel Failed to Investigate, Litigate, Object to, Cross-examine or Otherwise Adequately Challenge the Prosecution's Evidence in the Dickman Incident, Counts 25-27 (Burglary, Rape, Sodomy)**

**1.    The Prosecution's Case**

1269. On July 7, 1985, Sophie Dickman was awakened in the bedroom of her Monterey Park home. A man was standing there, holding a metallic silver handgun. He handcuffed her, stole her jewelry and money, then sexually attacked her. The man left after handcuffing Dickman to the bed. According to police, the handcuffs appeared to be an inexpensive novelty item. The house had been ransacked. At trial Dickman identified a .22-caliber Jennings firearm as similar to the weapon used by the intruder. She identified Petitioner as the assailant. She also identified jewelry at the September 5, 1985 lineup.

1270. The prosecution urged the jury to convict Petitioner based on alleged similarities to the Kyle case (208 RT 23987); evidence that a similar handgun was used in Doi (208 RT 23988); evidence that handcuffs were used to restrain the victim (208 RT 23985); evidence that jewelry was placed in a pillowcase taken from her home (208 RT 23991); and the proximity of Dickman's home the to the Nelson incident (208 RT 23997-98).

## 2. Defense Evidence

1271. The defense presented testimony with respect to a photographic lineup held before Petitioner's arrest. Dickman identified one of the photographs as the suspect; Petitioner's photograph was not included in the lineup. No other evidence was presented on Petitioner's behalf.

1272. In closing argument, trial counsel argued that the circumstances of the Dickman crime did not fit the alleged *modus operandi* of other charged crimes, such as Zazzara, Doi, Bell/Lang, Okazaki, and Khovananth. (211 RT 24281-82). Counsel also argued that Dickman's description of her assailant did not match Petitioner's physical appearance. (211 RT 24281.)

## 3. The Defense Failed to Competently Challenge the Charges

1273. Trial counsel failed to present a reasonable and competent defense to the incident. Counsel failed to investigate, develop, and present evidence to challenge the prosecution's case, including eyewitness identification and recovery of stolen property.

1274. Trial counsel failed to properly challenge the eyewitness identification. The only direct evidence linking Petitioner to the incident was Dickman's identification.

1275. As discussed *supra*, trial counsel failed to investigate, develop, and present evidence that the in-court identification was tainted due to the victim's repeated exposure to Petitioner's photographs, extensive media coverage of the case, inconsistencies in the initial physical description, and factors related to limiting viewing, lighting, and stress of the events at the time of the incident. (Ex. 37, E. Loftus Dec.) (*See also* Ex. 71, K. Pezdek Dec.)

1276. Trial counsel failed to impeach Felipe Solano with respect to his fencing activities with other parties who may have been involved in the crimes for which Petitioner was on trial. As discussed *supra*, there were individuals engaged in selling stolen property to Solano; they were not called as witnesses at

456

Petitioner's trial.  (Ex. 40, S. Strong dec., ¶ 22.)  Thus, Petitioner was deprived of competent and effective representation.

1277.  Trial counsel failed to investigate, develop, or present any evidence with respect to alternative defenses based on lack of requisite mental state due to Petitioner's history of serious mental illness, neurocognitive and neurological deficits, psychosis, mood disorders, mind-altering substance abuse, and brain impairment.  (*See* Exs. 31, 38, 41, 42, 43, the Declarations of D. Blumer, M.D.; R. Schneider, M.D.; W. Vicary, M.D.; D. Watson, Ph.D.; and, J. Wells, J.D., Ph.D.)  In addition, trial counsel failed to conduct a reasonable investigation that would have permitted them to make a reasonable tactical decision to forego such defenses in favor of a defense based on innocence.

1278.  The prosecution introduced eyewitness identification testimony in an attempt to link Petitioner to the Dickman case.  Trial counsel unreasonably failed to competently cross-examine the eyewitness in order to establish the unreliability of her identification.  Counsel failed adequately to cross-examine the witness as to memory, recall, and independent grounds for identification.  Counsel also failed to elicit testimony from the defense expert regarding factors that influence eyewitness identification, such as lack of independent grounds for the identification, unreliability of memory and retrieval due to multiple viewings, and the impact of stress, fear, and physical conditions at the time of the incident.

1279.  Pursuant to discovery provided by the prosecution, trial counsel knew of third-party suspects. (Ex. 22, LACSD - Suppl. Rpt., 09/11/1985.)  Eva Castillo and several other individuals (Cuba, Charlie, and Julio) had been involved in burglaries and may have committed crimes with which Petitioner was charged.  Counsel's failure to investigate, develop, and present available evidence of third-party culpability was inexcusable.  Third-party evidence established that other suspects allegedly committed crimes and sold stolen property to Felipe Solano.  Eva Castillo did not testify; however, she had been involved in

drug-related activities, and had a relationship with Felipe Solano. Trial counsel failed to establish the link between Castillo, Julio, Charlie, and Cuba that involved stolen property and would have further discredited Solano.

1280. Counsel failed adequately to refute the prosecution's case, including eyewitness identification and Petitioner's link to Solano. As a result of counsel's deficient performance, Petitioner was deprived of his fundamental rights. Competent counsel would have investigated reasonable alternate defenses. Given Petitioner's lengthy history of serious mental illness, impoverished living conditions, illicit drug usage, and psychotic behavior at or near the time of the offense, counsel was required, at a minimum, to investigate and develop mental state evidence before reaching a decision regarding the theory of the case.

1281. As discussed above, failure to investigate alternate defenses does not excuse as tactical a decision not to present a readily available line of defense. *See Phillips*, 267 F.3d at 976-79. "A defense attorney's failure to consider alternate defenses constitutes deficient performance when the attorney 'neither conduct[s] a reasonable investigation nor ma[kes] a showing of strategic reasons for failing to do so.'" *Rios*, 299 F.3d at 805. The allegations in the petition and the supporting documentation show counsel made no reasoned investigation of alternate defenses to the charges. Absent a proper and adequate investigation, the decision not to present a reasonable alternate defense was unsound and resulted in constitutionally deficient representation.

**M. Trial Counsel Failed to Investigate, Litigate, Object to, Cross-examine or Otherwise Adequately Challenge the Prosecution's Evidence in the Kneiding Incident, Counts 28-30 (Burglary, Murder, Burglary-murder Special Circumstance)**

### 1. The Prosecution's Case

1282. On July 20, 1985, Maxon and Lela Kneiding were found dead in their Glendale home. Maxon died from a gunshot wound to the neck. No bullet was recovered. Four incised wounds to the neck occurred before the gunshot wound. Lela suffered two gunshot wounds to the head; both were fired at close range. There were cuts to her neck, hand, and arms that appeared to have been inflicted before death. The house had been ransacked. The Kneidings' daughters identified their mother's jewelry at the property lineup. A projectile recovered from Lela Kneiding was fired from the same .22-caliber firearm in the Okazaki and Yu cases.

1283. In closing argument the prosecution argued that the incident was very similar to Zazzara (209 RT, 24014); property was recovered from Solano[101] (209 RT 24016); and ballistics evidence established that the same weapon fired the rounds in Okazaki, Yu, and Kneiding (209 RT 24018). The state also argued that "within minutes virtually of the murder of Maxon and Lela Kneiding, the defendant arrived in Sun Valley [Khovananth] . . . again the same morning . . . ." (209 RT 24020.)

### 2. Defense Evidence

1284. Trial counsel presented a limited defense to the Kneiding charges. A shirt discovered near the scene appeared to have been dropped or thrown there; hairs found on the shirt were dissimilar to Petitioner's hair. The defense

---

[101] The prosecutor falsely characterized Felipe Solano as less than a "major receiver of stolen property . . . ." (209 RT 24017.)

presented no evidence with respect to the prosecution's ballistics findings or as to Felipe Solano's testimony regarding stolen property.

### 3. The Defense Failed to Competently Challenge the Charges

1285. The defense failed to investigate, develop, and present evidence to defend against the charges. The defense's failure to challenge the prosecution's ballistics evidence in Okazaki and Yu, prejudiced Petitioner's defense in the Kneiding case. Competent defense counsel would have presented evidence regarding conflicts and inaccuracies of the prosecution's ballistics evidence in all three cases. (*See* Ex. 35, P. Dougherty dec.)

1286. Trial counsel failed to adequately and properly impeach Felipe Solano. Competent counsel would have offered evidence to show that other parties sold stolen property to Solano and that oher suspects may have been involved in the crimes for which Petitioner was on trial. (*See* Ex. 22, LACSD - Suppl. Rpt., 09/11/1985.)

1287. Trial counsel failed to investigate, develop, or present any evidence with respect to alternative defenses based on lack of requisite mental state due to Petitioner's history of serious mental illness, neurocognitive and neurological deficits, psychosis, mood disorders, mind-altering substance abuse, and brain impairment. (*See* Exs. 31, 38, 41, 42, 43, the Declarations of D. Blumer, M.D.; R. Schneider, M.D.; W. Vicary, M.D.; D. Watson, Ph.D.; and, J. Wells, J.D., Ph.D.) In addition, trial counsel failed to conduct a reasonable investigation that would have permitted them to make a reasonable tactical decision to forego such defenses in favor of a defense based on innocence.

1288. Trial counsel unreasonably conceded the inaccurate and unreliable firearms evidence the prosecutor introduced in an attempt to link Petitioner to the Okazaki and Yu incidents. As previously explained, competent counsel would have challenged this evidence based on the distortion of the bullets and the fact that the ballistics evidence lackedreliability. At a minimum, competent counsel

460

would have challenged the testing results of the firearms evidence. Paul Dougherty reviewed the Okazaki, Yu, and Kneiding incidents and concluded that "there are internal conflicts in the written reports with regard to the testing conducted, such as condition of the bullets." (Ex. 35, P. Dougherty dec., ¶ 4; *see also* attachment to Ex. 35.)

1289. Trial counsel failed to investigate third-party culpability evidence. Individuals with ties to Eva Castillo included Cuba, Charlie, and Julio, all of whom had been involved in burglaries. (Ex. 22, LACSD - Suppl. Rpt., 09/11/1985, pp. 3, 6-7.) Cuba turned over stolen property to police agents on September 3, 1985. (*Id.*, p. 6.) According to the supplemental Los Angeles Sheriff report (Ex. 22), Cuba was not prosecuted for his criminal activity. (*Id.*) Steve Strong's analysis of the case adds further support for relief: other individuals had motive and opportunity to commit crimes and sell stolen property to Solano. (*See* Ex. 40, S. Strong dec.) Trial counsel failed to investigate, develop, and present evidence that pointed to Castillo and others with whom she associated as the perpetrators. (Ex. 22, LACSD - Suppl. Rpt., 09/11/1985, pp. 3, 6-7.)

1290. Competent counsel would have investigated reasonable alternate defenses, including a mental state defense. Given Petitioner's lengthy history of serious mental illness, impoverished living conditions, illicit drug usage, and psychotic behavior at or near the time of the offense, counsel was required, at a minimum, to investigate and develop mental state evidence before reaching a decision regarding the theory of the case. There was substantial evidence of Petitioner's long-standing impairments that would have been admissible at trial.

1291. Trial counsel's failure to investigate alternate defenses does not excuse as tactical their decision not to present a readily available line of defense. *See Phillips*, 267 F.3d at 976-79. "A defense attorney's failure to consider alternate defenses constitutes deficient performance when the attorney 'neither

461

conduct[s] a reasonable investigation nor ma[kes] a showing of strategic reasons for failing to do so.'" *Rios*, 299 F.3d at 805. The allegations in the petition and the supporting documentation show counsel made no reasoned investigation of alternate defenses to the charges. Absent a proper and adequate investigation, the decision not to present a reasonable alternate defense was unsound and resulted in constitutionally deficient representation.

**N.** **Trial Counsel Failed to Investigate, Litigate, Object to, Cross-examine or Otherwise Adequately Challenge the Prosecution's Evidence in the Khovananth Incident, Counts 31-35 (burglary, murder, rape, oral copulation, sodomy, burglary-murder special circumstance)**

**1.** **The Prosecution's Case**

1292. On July 20, 1985, Somkid Khovananth was attacked in her home. She was sexually assaulted and forced to turn over jewelry and money to her assailant. Her husband, Chainarong Khovananth, was shot in the head at very close range. The prosecution introduced evidence that a small-caliber bullet recovered from Mr. Khovananth's scalp had been fired from the same .22-caliber firearm that was used in the Zazzara case.

1293. Shoe prints found at the scene were similar to impressions at the Nelson and Bell/Lang residences. Khovananth identified Petitioner as her assailant. She also identified jewelry at the property lineup.

1294. The prosecution urged conviction based on similarities to the Abowath case (see *infra*); argued that the same .22-caliber gun was used in Zazzara; that ligature marks on her arm were similar to marks on Zazzara's arm; and that eyewitness and property identification linked Petitioner to the Khovananth crimes. (209 RT 24024-32.)

**2.** **Defense Evidence**

1295. Trial counsel conceded the truth of the prosecution's ballistics evidence that purportedly linked Petitioner to the Zazzara case. (210 RT 24201.)

1296. Trial counsel presented the testimony of Chainarong Khovananth's sister regarding the initial description given by Somkid Khovananth of her assailant as dark-skinned.

1297. Trial counsel argued that Somkid Khovananth's initial suspect description should be believed and the case did not fit a distinctive pattern. (211 RT 24284-89.)

**3.     The Defense Failed to Competently Challenge the Charges**

1298. The defense failed to investigate, develop, and present evidence with respect to the Prosecution's ballistics evidence, shoe print impression evidence, and the property recovered from Felipe Solano.  Trial counsel's failures deprived Petitioner of adequate assistance of counsel.

1299. Competent defense counsel would have challenged the ballistics evidence and the lack of accuracy and unreliability of the prosecution's findings. The findings were inaccurate.  Firearms expert Paul Dougherty has stated that there are internal conflicts in the reports of various law enforcement examiners and the evidence should be retested.  (Ex. 35, P. Dougherty dec., ¶ 4.)

1300. Competent counsel would have presented expert testimony regarding shoe print impressions.

A partial print on the floor developed with black fingerprint powder consisted of eight straight parallel bar elements; a second partial print consisted of four half-circles.

A photograph of an Avia left shoe print on the floor was made by a possible wet soil transfer that was subsequently treated with black fingerprint powder and lifted with tape.  It was consistent with Avia Aerobics model, or any other Avia model, which exhibited similar class characteristics: convex dam area, which meets the last straight bar element of the flex joint.  The heel area is indistinguishable.  Exemplars of all other shoe models would be needed for elimination.

(Ex. 33, L. DiMeo Dec., ¶¶ 32, 33.)

1301. Trial counsel failed to impeach the testimony of Felipe Solano regarding his fencing activities with other individuals.  Competent counsel would have introduced evidence to show that individuals other than Petitioner sold

464

stolen property to Solano during the same time period.  (Ex. 22, LACSD - Suppl. Rpt., 09/11/1985.)

1302. Trial counsel failed to investigate, develop, and present evidence to challenge eyewitness identification.  Trial counsel failed to introduce evidence to show that the eyewitness's initial description of her assailant was more reliable than her later description.  Expert testimony would have established the factors that influenced the identification and rendered the in-court identification unreliable.  (*See* Ex. 37, E. Loftus Dec.) (*See also* Ex. 71, K. Pezdek Dec.)

1303. Trial counsel failed to investigate, develop, or present any evidence with respect to alternative defenses based on lack of requisite mental state due to Petitioner's history of serious mental illness, neurocognitive and neurological deficits, psychosis, mood disorders, mind-altering substance abuse, and brain impairment.  (*See* Exs. 31, 38, 41, 42, 43, the Declarations of D. Blumer, M.D.; R. Schneider, M.D.; W. Vicary, M.D.; D. Watson, Ph.D.; and, J. Wells, J.D., Ph.D.)  In addition, trial counsel failed to conduct a reasonable investigation and thus could not have made a reasonable, tactical decision to forego such defenses in favor of a defense based on innocence.

1304. The prosecution sought to link Petitioner to the Zazzara and Khovananth incidents using firearms evidence.  Trial counsel's failure to challenge the firearms evidence -- effectively, a concession -- allowed the prosecution to link Petitioner to both incidents.  As a result of trial counsel's deficient performance, the jury never heard evidence related to the inaccuracy of the testing results and internal discrepancies in the firearms examiners' reports.  (Ex. 35, P. Dougherty dec., ¶ 2.)  Counsel unreasonably failed to investigate and challenge the bullet distortion and firearms identification evidence.  (*See id.*; Ex. 47, U.S. Department of Justice Press Release, "FBI Laboratory Announces Discontinuation of Bullet Lead Examinations, 09/01/2005; Los Angeles County Sheriff's Department – General Rifling Characteristics Report, by Sgt. J.D.

Smith, 04/01/1985, pp. 28-29.) Petitioner has demonstrated, based on preliminary evaluation, that the prosecution's firearms testing was faulty, unreliable, and inaccurate. Competent counsel would have challenged the prosecution's evidence. Petitioner has provided specific showing of prejudice with respect to individual incidents and incidents linked together by unreliable evidence.

1305. Trial counsel also conceded the truth of the prosecution's shoe print evidence. However, forensic specialist DiMeo found that the prosecution's evidence was insufficient to determine the exact model of the shoe. A partial print on the floor and indistinguishable heel area of another print preclude further identification. (Ex. 33, L. DiMeo Dec., ¶ 17.) Many models and sizes could have made the shoe print impression in question. (Ex. 34, L. DiMeo Suppl. Dec., ¶ 19.) Trial counsel were required to investigate the prosecution's evidence, which was inaccurate, misleading, and unreliable. Competent counsel would not have conceded the evidence and would have elicited testimony from a forensic specialist such as Dimeo, which would have raised a reasonable doubt in the jurors' minds as to reliability and accuracy of the prosecution's evidence.

1306. Trial counsel knew or should have known of third-party culpability evidence, based upon the Los Angeles Sheriff Supplemental Report dated September 11, 1985. (Ex. 22, LACSD - Suppl. Rpt., 09/11/1985.) Individuals known to Eva Castillo, including Cuba, Charlie, and Julio, had been involved in burglaries and thefts. Available evidence would have established that these persons committed crimes and were likely to have sold stolen property to Felipe Solano. Trial counsel also failed to investigate Eva Castillo's background, her criminal activities, her illicit drug use, and her relationship with Felipe Solano, all of which would have further impeached Solano.

1307. Eyewitness identification evidence went unchallenged by the defense. Evidence related to factors that affect memory, recall, and retrieval was

not elicited on cross-examination of eyewitnesses by trial counsel or from the defense expert. Petitioner has demonstrated grounds to impeach eyewitness identification, *i.e.*, factors related to confidence of memory, retention, retrieval, and unreliability of eyewitness identification described in Dr. Loftus's deposition which are critical to a determination of reliability of eyewitness identification. (Ex. 37, E. Loftus Dec., pp. 1-113.) (*See also* Ex. 71, K. Pezdek Dec.)

1308. Competent counsel would have investigated alternate defenses, including a mental state defense. Given Petitioner's lengthy history of serious mental illness, impoverished living conditions, illicit drug usage, and psychotic behavior at or near the time of the offense, counsel was required, at a minimum, to investigate and develop mental state evidence before reaching a decision regarding the theory of the case.

1309. Counsel undermined Petitioner's defense by conceding the truth of physical evidence introduced by the prosecution in an attempt to link Petitioner to the crime. There was no sound reason for failing to investigate alternate defenses. Moreover, as discussed above, failure to investigate alternate defenses does not excuse as tactical a decision not to present a readily available line of defense. *See Phillips*, 267 F.3d at 976-79. "A defense attorney's failure to consider alternate defenses constitutes deficient performance when the attorney 'neither conduct[s] a reasonable investigation nor ma[kes] a showing of strategic reasons for failing to do so.'" *Rios*, 299 F.3d at 805. The allegations in the petition and the supporting documentation show counsel made no reasoned investigation of alternate defenses to the charges. Absent a proper and adequate investigation, the decision not to present a reasonable alternate defense was unsupported and resulted in constitutionally deficient representation.

**O.    Trial Counsel Failed to Investigate, Litigate, Object to, Cross-examine or Otherwise Adequately Challenge the Prosecution's Evidence in the Petersen Incident, Counts 36-38 (burglary, attempted murder)**

**1.    The Prosecution's Case**

1310. On August 5, 1985, Virginia and Christopher Petersen were shot while asleep in their Northridge home. No weapon was recovered. The prosecution introduced evidence that expended .25-caliber cartridge casings and a slug were fired from the same firearm as the bullet recovered in the Abowath incident. The prosecution also introduced evidence that .25-caliber ammunition found in the bag in the locker at the Greyhound Bus Station after Petitioner's arrest had the same tool marks as the expended casings in both cases. Fingerprint lifts from the doors in the house appeared to have been made by garden gloves. Virginia Petersen identified Petitioner as her assailant.

1311. The prosecution urged conviction based on ballistics evidence, eyewitness identification, and similarities to other cases. (209 RT 24034, 24038-43.) The prosecutor argued that photographs taken by the defense showed that Virginia Petersen could readily monitor her daughter's movement at the end of the hallway and thus had an adequate opportunity to view the suspect.

> And I don't know exactly what the point was, but the point couldn't have been made better by anyone else, . . . Mrs. Petersen could look down there and she (sic) her, and that is a reasonable thing to do.

(209 RT 24035.)

**2.    Defense Evidence**

1312. Trial counsel conceded the truth of ballistics evidence that the prosecutor introduced in an attempt to link Petitioner to the Abowath case. Counsel offered only testimony regarding photographs taken of the house in an effort to show the limited view of a person in the hallway from the bed in the

468

back bedroom.  Counsel argued that the photographs proved the lighting was insufficient to identify a person standing the hallway.  Defense counsel also argued that Virginia Petersen did not call the police to identify Petitioner once his photograph was shown on television and in the newspaper and that her identification was suspect.  Counsel observed that this case did not involve any Avia shoe prints.  (211 RT 24296.)

### 3. The Defense Failed to Competently Challenge the Charges

1313.  Trial counsel failed to challenge the prosecution's case.  By conceding the truth of the prosecution's ballistics evidence in the Petersen and Abowath crimes, counsel deprived Petitioner of a competent defense.

1314.  Trial counsel failed to investigate, develop, and present evidence to refute ballistics evidence.  Competent defense counsel would have challenged the ballistics evidence and the lack of accuracy and unreliability of the prosecution's findings.  Firearms expert Paul Dougherty states that there are internal conflicts in the reports of various law enforcement examiners and the evidence should be retested.  (Ex. 35, P. Dougherty dec., ¶ 4.)

1315.  Trial counsel failed to investigate, develop, and present evidence to refute eyewitness identification.  Expert testimony would have challenged the basis for eyewitness identification; there were sources of contamination that led to unreliable identification.  (Ex. 37, E. Loftus Dec.) (*See also* Ex. 71, K. Pezdek Dec.)

1316.  Trial counsel failed to investigate, develop, or present any evidence with respect to alternative defenses based on lack of requisite mental state due to Petitioner's history of serious mental illness, neurocognitive and neurological deficits, psychosis, mood disorders, mind-altering substance abuse, and brain impairment.  (*See* Exs. 31, 38, 41, 42, 43, the Declarations of D. Blumer, M.D.; R. Schneider, M.D.; W. Vicary, M.D.; D. Watson, Ph.D.; and, J. Wells, J.D., Ph.D.)  In addition, trial counsel failed to conduct a reasonable investigation that

469

would have permitted them to make a reasonable tactical decision to forego such defenses in favor of a defense based on innocence.

1317. Mr. Dougherty found evidence of inaccuracies and internal inconsistencies in the firearm examiners' reports related to other incidents. (Ex. 35, P. Dougherty dec., ¶ 4.) Trial counsel were required to investigate the firearms evidence and properly determine accuracy of testing results, bullet distortion, and firearm identification. Counsel improperly conceded firearms evidence. Eyewitness identification evidence was presented with respect to each of these crimes. Counsel were ineffective in failing to investigate, develop, and present evidence through cross-examination of the eyewitness and the defense expert with respect to memory and retrieval of information, including the effect of fear, stress, and multiple viewings of a suspect. The eyewitness was not questioned about the extent to which publicity surrounding the case resulted in contamination of her identification. Petitioner has demonstrated that Dr. Loftus would have testified about the impact of various factors, including contamination and thus would have established the identification lacked reliability. (Ex. 37, E. Loftus Dec., ¶ 4.) (*See also* Ex. 71, K. Pezdek Dec.)

1318. Trial counsel failed to challenge the firearms evidence and conceded the truth of the prosecution's evidence linking Petitioner to the Abowath incident. Thus, counsel were required to properly investigate, develop, and present evidence of an alternate defense. Competent counsel would have investigated and considered reasonable alternate defenses. Counsel failed to investigate evidence of a mental state defense. Given Petitioner's lengthy history of serious mental illness, impoverished living conditions, illicit drug usage, and psychotic behavior at or near the time of the offense, counsel was required, at a minimum, to investigate and develop mental state evidence before they could reach a decision regarding the theory of the case.

470

1319. Failure to investigate alternate defenses does not excuse as tactical a decision not to present a readily available line of defense. *See Phillips*, 267 F.3d at 976-79. "A defense attorney's failure to consider alternate defenses constitutes deficient performance when the attorney 'neither conduct[s] a reasonable investigation nor ma[kes] a showing of strategic reasons for failing to do so.'" *Rios*, 299 F.3d at 805. The allegations in the petition and the supporting documentation show counsel made no reasoned investigation of alternate defenses to the charges. Absent a proper and adequate investigation, the decision not to present a reasonable alternate defense was unsound and resulted in constitutionally deficient representation.

**P.    Trial Counsel Failed to Investigate, Litigate, Object to, Cross-examine or Otherwise Adequately Challenge the Prosecution's Evidence in the Abowath Incident, Counts 39-43 (burglary, murder, rape, oral copulation, sodomy, burglary-murder special circumstance)**

**1.    The Prosecution's Case**

1320. On August 8, 1985, Sakina Abowath was attacked and sexually assaulted in her Diamond Bar home. Her husband, Elyas Abowath, was shot in the head; the weapon had been fired at close range. The bullet recovered during autopsy was fired from the same .25-caliber firearm as the bullets fired in the Petersen incident. The prosecution introduced evidence that Stadia shoes taken from Petitioner upon his arrest matched the shoe print impressions on the dining room floor.

1321. Ms. Abowath identified Petitioner as the assailant. She also identified property recovered from Felipe Solano.

1322. In closing, the prosecution urged the jury to convict Petitioner because of similarities to the Khovananth case (209 RT 24044); shoe print evidence (209 RT 24045); ballistics evidence (209 RT 24048); use of restraints (209 RT 24050); eyewitness identification (209 RT 24033); and discovery of .25-

471

caliber ammunition that purportedly matched tool marks on the bullet recovered from Mr. Abowath.  (209 RT 24067.)

### 2.    Defense Evidence

1323. The defense case was limited to impeachment of the eyewitness; and to the introduction of hair and semen findings that were negative as to Petitioner.

1324. Trial counsel conceded the truth of the prosecution's ballistics and shoe print evidence.

### 3.    The Defense Failed to Competently Challenge the Charges

1325. As indicated *supra*, the defense failed to investigate, develop, and present a competent defense with respect to ballistics evidence.  Expert testimony would have established that the prosecution's ballistics findings were not accurate or reliable.  (Ex. 35, P. Dougherty dec., ¶ 4.)

1326. Competent counsel would have presented evidence that the incident was not part of a pattern that linked Petitioner to numerous crimes.

1327. Trial counsel failed to impeach Ms. Abowath with respect to eyewitness identification.  Expert testimony would have established important factors that influenced her identification, including pressure and bias to make an identification, fear, stress, and memory retrieval.  (Ex. 37, E. Loftus Dec.) (*See also* Ex. 71, K. Pezdek Dec.)

1328. Trial counsel failed to investigate, develop, or present any evidence with respect to alternative defenses based on lack of requisite mental state due to Petitioner's history of serious mental illness, neurocognitive and neurological deficits, psychosis, mood disorders, mind-altering substance abuse, and brain impairment.  (*See* Exs. 31, 38, 41, 42, 43, the Declarations of D. Blumer, M.D.; R. Schneider, M.D.; W. Vicary, M.D.; D. Watson, Ph.D.; and, J. Wells, J.D., Ph.D.)  In addition, trial counsel failed to conduct a reasonable investigation that would have permitted them to make a reasonable tactical decision to forego such defenses in favor of a defense based on innocence.

1329. Trial counsel conceded the truth of the prosecution's firearms evidence and failed to challenge this evidence. Counsel failed to challenge the accuracy and reliability of the firearms examiner's findings. Preliminary review raises serious concerns about the firearms testing results. Further examination of the firearms evidence would likely show additional problems with bullet distortion and identification. Trial counsel failed to challenge reliability and accuracy of the testing results that linked numerous incidents. Thus, counsel failed to defend against the charges effectively.

1330. Defense counsel unreasonably failed to introduce available evidence to show that the Abowath crimes were not related to other cases. (*See* Ex. 40, S. Strong dec., pp. 7-9.) Defense counsel unreasonably failed to challenge the prosecution's evidence or investigate and present evidence of dissimilarities between the Abowath crimes and other incidents. Counsel unreasonably failed to refute the prosecution's shoe print and firearms evidence, pattern evidence, and eyewitness identification testimony.

1331. Trial counsel unreasonably failed to challenge eyewitness identification evidence. Counsel failed to elicit crucial evidence of memory and retrieval related to the witness's identification. Counsel failed to properly investigate eyewitness identification, then failed to prepare the defense expert to address specific factors related to eyewitness identification, including the effects of fear, stress, and focus on memory and retrieval, all of which impact reliability of identification.

1332. Competent counsel would have investigated reasonable alternate defenses, including a mental state defense. Given Petitioner's lengthy history of serious mental illness, impoverished living conditions, illicit drug usage, and psychotic behavior at or near the time of the offense, counsel was required, at a minimum, to investigate and develop mental state evidence before reaching a decision regarding the theory of the case.

473

1333. Failure to investigate alternate defenses does not excuse as tactical a decision not to present a readily available line of defense. *See Phillips*, 267 F.3d at 976-79. "A defense attorney's failure to consider alternate defenses constitutes deficient performance when the attorney 'neither conduct[s] a reasonable investigation nor ma[kes] a showing of strategic reasons for failing to do so.'" *Rios*, 299 F.3d at 805. The allegations in the petition and the supporting documentation show that counsel made no reasoned investigation of alternate defenses to the charges. Absent a proper and adequate investigation, the decision not to present a reasonable alternate defense was unsound and resulted in constitutionally deficient representation.

## Q. Trial Counsel Failed to Investigate, Litigate, Object to, Cross-examine or Otherwise Adequately Challenge the Prosecution's Evidence in the Uncharged Incident (Burglary)

1334. The prosecution presented evidence of a palm print identified as Petitioner's and an Avia shoe that left an impression at the scene.

1335. Trial counsel failed to challenge the prosecution's evidence. Competent counsel would have demonstrated that the shoe print impression evidence was less conclusive; "[the partial shoe print] was consistent with any model and style of an Avia athletic right shoe exhibiting similar class characteristics . . . ." (Ex. 33, L. DiMeo dec., ¶ 34.) Moreover, counsel failed to challenge the reliability of the fingerprint evidence.

1336. Petitioner has described available evidence, including Lisa DiMeo's declaration regarding inaccurate and unreliable shoe print evidence. (Ex. 33, L. DiMeo Dec., ¶ 35; Ex. 34, L. DiMeo Suppl. Dec., ¶ 27.) Grounds also existed to challenge fingerprint evidence. (Ex. 24, Articles on Latent Prints; Ex. 46, "Fingerprints Meet *Daubert*".)

1337. Petitioner has shown a partial shoe print found at the scene "was consistent with any model and style of an Avia athletic right shoe exhibiting

similar class characteristics . . . ." (Ex. 33, L. DiMeo dec., ¶ 34.) However, trial counsel failed to challenge the evidence or show lack of distinctive shoe print characteristics. Avia shoes were not a rare commodity in the Los Angeles area. As DiMeo has stated:

> . . . there were many possible models and sizes of shoes that could have been identified from the shoeprint impressions. ¶ There were actually many models . . ., totaling tens of thousands of shoes . . . that could have been the source of the impression evidence.

(Ex. 33, L. DiMeo Dec., ¶¶ 35-36.) Here, no evidence linked Petitioner to the crime other than shoe print evidence. By failing to present any evidence in Petitioner's defense, and failing to challenge -- effectively, conceding -- the truth of the prosecution's unreliable shoe print evidence, trial counsel failed to reasonably defend Petitioner against the uncharged offense.

## R.     Failure to Competently Present an Opening Statement

1338. Trial counsel failed to present an opening statement that reasonably reflected a rational defense to be presented at trial. During closing argument, the prosecution made repeated reference to counsel's opening statement, and exploited the lack of a cohesive and competent defense strategy.[102]

> [O]n May 9, Tuesday May 9, 1989, in volume 179 if (sic) our daily transcript here beginning at page 20819, Mr. Hernandez made his opening statement in this case.         And I want to talk about that, because there were a lot of errors in that opening statement. . . . [M]aybe he just misunderstood it or maybe they are going to try to show that we were wrong . . . .   But we came to the end of the

---

[102]  Trial counsel consistently failed to object to the prosecution's argument.

defense case and most of that stuff is not addressed . . . . Mr.
Hernandez . . . failed to deliver . . . .

(203 RT 23576.)

Page 20839, . . . Mr. Hernandez, . . . indicated that the defendant will show that Felipe Solano bought items that he said he bought from the defendant but were actually bought from other people.  Now, this is important.  There is no such evidence in this case.  ¶ [T]hat is not true.  That was never proved.

(203 RT 23594-95.)

1339.  The prosecution argued numerous other instances of defense incompetency during opening statement.

[T]here were a lot of errors in [Daniel Hernandez's] opening statement.

(203 RT 23576.)

[I]t turns out to be something Mr. Hernandez told you he was going to present and failed to deliver . . . .

(*Id.*)

[A] diagram . . . purported to be the Kneiding, household.  . . .  It is not in evidence . . . [o]n that diagram there were some locations . . . Avia shoeprints were recovered.  [¶]  Well, that is not so.  . . .  This is something that was made up.

(203 RT 23579.)

[T]here must be something here then in his opening statement.  What does Mr. Hernandez tell you? . . .  [Y]ou never heard from Mr. Hernandez again on the subject. . . .  [¶]  Why?  Because it was all bunk.

(203 RT 23585-86.)

And again, again in his opening statement Mr. Hernandez promised
you he was going to prove that Eva and Julio were committing these
burglaries. . . . ¶ Never happened, bunk, never happened.

(203 RT 23587.)

So again, Mr. Hernandez harps upon Eva and Julio and yet nothing
came forward; nothing.

(203 RT 23588.)

The same volume at page 20834, Mr. Hernandez told you that the
defendant was working with a fellow . . . . Well, you really don't
have any evidence of that.

(203 RT 23592.)

Oh, again now, again . . . page 20837, talking about Felipe Solano
. . . dealing in all sorts of things . . . there is absolutely no evidence
of that at all, . . . so that again is off the wall.

(203 RT 23593.)

Page 20839 . . . Mr. Hernandez . . . indicated that the defendant will
show that Felipe Solano bought items that he said he bought from
the defendant but were actually bought from other people.

Now, this is important. There is no such evidence in this case.

(203 RT 23594.)

You see, Hernandez stands up and gives the clear indication that . . .
Solano is a big dealer . . . .

Absolutely not one shred of evidence of that . . . .

(203 RT 23597.)

Mr. Hernandez told you that he was going to prove that an
examination of the sweatband of that cap showed that the blood type
. . . was different from that of the defendant's.

477

Absolutely bogus.  You never heard any more about it.  That never

existed, never happened.[103]

(203 RT 23601-02.)

[Blood evidence] does not exist and it was not presented, because it

does not exist. . . . [Y]ou should not speculate about those things that

are discussed by counsel and were never forthcoming.

You should not speculate about any of it, whether it is bogus

or whether it just was some – some inadvertence and didn't make it

this far.

(203 RT 23602.)

And when you start talking about reasonable doubt at some point in

these arguments, that is not reasonable doubt.  That is not the

creation of reasonable doubt.

You do that by the presentation of evidence or the lack of

presentation of evidence, but not by suggesting something to a jury

and then not showing up.

(203 RT 23604.)

And that part begins at page 20870.  Mr. Hernandez was telling you

what he was going to present in the Bennett incident.

. . .

That [fingerprint evidence] is non-existent, . . . .  [Y]ou just can't

throw this stuff out if you are a lawyer.  This is serious business here

and it is not just because you are on the defense side you can throw

this stuff out and let it flow.

---

[103]  The defense failed to present any evidence about the cap.  The cap was
never tested by the defense expert.  (Ex. 44, B. Wraxall dec., ¶ 4.)

478

There was not evidence of that at all. If there was such

evidence, then the defense, and they considered it relevant, the

defense had the obligation to bring it forward.

(203 RT 23615-17.)

[T]hese things were referred to by counsel, and yet there was no

evidence on it . . . .

In Mr. Hernandez' opening statement, again volume 179, this

time at page 20879, he referred to the Nelson incident . . . he did

make the remark that . . . [hair recovered] . . . was compared to . . .

family members, that type of thing. That is not true.

(204 RT 23627-28.)

Mr. Hernandez told you that they were going to prove to you

that there was a private security guard in the area of the Abowath

murder . . . .

. . .

No nothing, no evidence of that at all.

I mean that is – you know, you are not allowed to make up

evidence, and that is one of the rules.

(204 RT 23648.)

**S.    Further Evidence of Failure to Defend Against the Charges**

1340. Trial counsel failed to properly and Competently Challenge the

charges, due in part to its failure to properly and competently examine the

prosecution's witnesses. The prosecution capitalized on the failings during

closing argument by arguing that the burden of proof was on the defense to prove

Petitioner's innocence.

[The fingerprint witness] was here and could have been examined

. . . and was not.

So if there was some evidence there that was going to be helpful to the defense, they didn't bother to ask anybody any questions about it. (203 RT 23613.)

> First of all, Mr. Clark indicated that he saw nothing wrong with our firearms identification. If he did, if he had some contra evidence, he would present it, and of course that is true, and you know the testimony was not presented. . . . And nothing came from the defense about firearms. So I presume we'll take Mr. Clark at his word, that the firearms in this case was done, was done right.

(211 RT 24335.)

1341. Petitioner has demonstrated that (1) counsel failed to adequately defend against the charges and competently examine the prosecution's witnesses, and (2) the prosection, without any objection from trial counsel, improperly argued that the burden of proof was on the defense to prove Petitioner's innocence. It is not merely the prosecutor's opinion that is at issue, but the prosecution's improper argument shifting the burden of proof to the defense.

1342. Counsel failed to develop a coherent theory of defense. Counsel failed competently to challenge fingerprint, shoe print, and ballistics evidence. Competent counsel would have evaluated the prosecution's testing protocol, uncovered inaccuracies and discrepancies in the testing, and cross-examined the prosecution's witnesses. Competent counsel would not have conceded the prosecution's case. Petitioner has shown a more favorable result would have occurred had counsel properly defended against the charges and objected to the prosecutor's improper argument.

**T.    Failure to Challenge the Prosecution's Evidence**

1343. Trial counsel's failure to competently defend Petitioner is further illustrated by the prosecution's final comments in closing argument regarding promises made by the defense to produce evidence.

And I talked to you before about promises that were made by the
defense that were unfulfilled.

The real problem with Mr. Clark's argument is the same as
with Mr. Hernandez' opening statement, and that is this:

Mr. Clark told you to forget what I said about Mr. Hernandez'
opening statement because the defense was a team and the members
of the team can get together and change their mind (sic) about their
approach to a case at any given time.

They had the entire people's case plus there were two weeks
between the people's case and the defense. That was the time when
the team should have gotten together and decided what they were
going to do.

And if they weren't going to present evidence, nobody should
have talked about it, you see?

Well, that is dishonest. That is not true. If there was
evidence, it would be here. It should be here.

(211 RT 24319-20.)

**U.    Failure to Object to the Prosecutor's Closing Argument**

1344. Trial counsel failed to object to the prosecutor's closing argument on
the grounds that the State committed misconduct, improperly commented on
matters not in evidence, shifted the burden of proof, and misled the jury. In
failing to object, trial counsel was incompetent.

1345. The prosecutor argued the case to the jury over a seven-day period.
The defense failed to object to the prejudicial and inflammatory argument and
numerous instances of prosecutorial misconduct discussed infra.

**V.    Other Guilt Phase Errors Rendered the Guilt Trial Verdict Unreliable**

1346. Counsel failed in numerous other respects, including but not limited
to the following:

481

1          (a)  Trial counsel failed to investigate all available defenses, and as a

2   result failed to properly voir dire prospective jurors and exercise peremptory

3   challenges, and failed to give a reasonable and coherent presentation of the

4   defense case during voir dire, in opening statement and closing argument.

5          (b)  Trial counsel were on notice that there was evidence that pointed

6   to third-party suspects, including in the Vincow and uncharged incidents.

7   Counsel failed to properly investigate, present evidence of third-party culpability;

8   counsel failed to challenge the Prosecution's case and failed to object to

9   misconduct by law enforcement officers, the district attorney, and other state

10  actors who acted independently and in concert to present unreliable and

11  misleading testimony regarding Petitioner's alleged statements, Felipe Solano,

12  Cuba, and other potential third party suspects.  The district attorney and law

13  enforcement officers consistently presented evidence in a misleading and

14  factually inaccurate way to establish that Petitioner acted alone in order to obtain

15  a conviction of capital murder and a sentence of death against Petitioner.  This

16  misconduct infected the adversarial process so as to deny Petitioner his right to a

17  fair trial and reliable determination of guilt and penalty.

18         (c)  Trial counsel failed to object to, cross-examine the prosecution's

19  experts, and present competent evidence with respect to ballistics testing, shoe

20  print impressions findings, chain of custody, and preservation of physical

21  evidence.  Counsel failed to properly challenge the prosecution's evidence.  Had

22  counsel done so, the jury would have known that the evidence was inaccurate and

23  unreliable.

24         (d)  Counsel failed to seek a ruling on all grounds of admissibility of

25  the physical evidence, including failure to preserve evidence, Hitch sanctions,

26  and failure to request and obtain jury instructions.  Counsel failed to present

27  evidence to establish that the State had not proven Petitioner's guilt beyond a

28  reasonable doubt, nor proven all the elements required to convict Petitioner of the

capital charges.  Had counsel adequately investigated and presented these defenses, issues and instructions, it is reasonably probable that the jury would have found Petitioner not guilty of capital murder and rendered a sentence less than death.

(e)  Counsel failed to object to, cross-examine the prosecution's experts, and present competent evidence to challenge the prosecution's theories regarding evidence of pattern and how the physical evidence and Solano's testimony bore on Petitioner's culpability; and counsel failed to assert proper grounds for severance of counts.

(f)  Counsel failed to investigate and present guilt phase defenses including Petitioner's inability to form the requisite mental state.  Competent counsel would have investigated and properly determined the evidence of Petitioner's intoxication, drug usage,  as well as his cognitive and mental impairments, his resulting inability to plan, organize, orchestrate, and execute complex motor and intellectual functions, and his impoverished and limited background.  Competent counsel would have investigated all available defenses and made a reasoned tactical decision regarding the defense.  Had counsel done so, it is reasonably probable that the jury would have determined that Petitioner was not culpable for capital murder and rendered a verdict other than capital murder and a sentence less than death.

(g)  Counsel failed to properly request and obtain necessary jury instructions on all matters raised above, and other material including but not limited to Petitioner's appearance at trial in shackles, improper inference of consciousness of guilt by Petitioner not removing his sunglasses, and failure of the evidence.

(h)  The cumulative errors that occurred at the guilt trial were due to counsel's ineffectiveness.

1347. The resulting failure of counsel to subject the case against Petitioner to a constitutionally acceptable adversarial process denied him effective assistance of counsel and the full panoply of federal and state constitutional rights to which he is entitled under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and their California analogues.

1348. In addition, the denial of his right to effective assistance of counsel substantially prejudiced Petitioner, rendered the trial proceeding fundamentally unfair, eroded the reliability of the verdict and had a substantial and injurious effect on the verdict. But for the denial of this right, it is reasonably probable that a more favorable result would have been attained. Under these circumstances, the adversarial system completely broke down, and Petitioner was left without meaningful representation. Although many of trial counsel's errors were, by themselves, so egregious as to require reversal, the extraordinary accumulation of errors and omissions over the course of the trial created a total breakdown in the adversarial process, so that prejudice is conclusively presumed. *United States v. Cronic*, 466 U.S. 648, 656-662, 104 S. Ct. 2039, 2045-48, 80 L. Ed. 2d 657 (1984). Even assuming a showing of prejudice is required, Petitioner has made that showing here. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

## CLAIM 18:

### COUNSEL'S INEFFECTIVE ASSISTANCE AT THE GUILT AND PENALTY PHASES: SOCIAL HISTORY AND MENTAL HEALTH

1349. Petitioner's confinement, convictions, and death sentences are illegal and unconstitutional under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution, because he was denied the effective assistance of counsel at the guilt and penalty phases of his trial. The performance of Petitioner's counsel fell below reasonable standards of representation, to

Petitioner's prejudice, in that counsel failed to exercise the skill, judgment and diligence expected of a reasonably competent criminal defense lawyer in investigating the case, preparing for trial, retaining, preparing, and presenting defense experts, challenging the prosecution's evidence, and presenting evidence and a defense at both phases of his trial. *Rompilla v. Beard*, 545 U.S. 374, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005); *Wiggins v. Smith*, 539 U.S. 510, 534, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003); *Strickland v. Washington*, 466 U.S. 668, 694; 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

1350. Exhaustion of the claim: This claim was fairly presented to the California Supreme Court in Section XVIII of the June 2004 petition for writ of habeas corpus, although it includes additional factual allegations. Petitioner will present the claim with the additional factual allegations to the California Supreme Court in an exhaustion petition he will file no later than March 17, 2009.

1351. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

1352. Those facts and allegations set forth in the petition, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

1353. Trial counsel provided constitutionally deficient performance throughout Petitioner's trial proceedings. Trial counsel improperly failed to conduct a comprehensive inquiry into the events and circumstances of Petitioner's childhood, life, and family history, as well as Petitioner's long-standing history of neurological, cognitive, psychological, and psychiatric impairments. A thorough and competent investigation would have developed crucial evidence and information, and counsel's failure to conduct such an investigation infected their representation of Petitioner throughout the

proceedings and prevented counsel from (a) obtaining and presenting a complete mental state evaluation; (b) developing and presenting mental state and other defenses to the guilt-phase charges, including Petitioner's incompetence to stand trial and to waive his rights; (c) developing and presenting significant mitigating evidence at the penalty phase; and (d) discharging their constitutional and ethical obligations to provide Petitioner with informed, competent advice.

1354. Trial counsel improperly failed to research and otherwise educate themselves about the medical, neurological, psychological, psychiatric, and legal issues necessary to competently advise Petitioner and to investigate, develop, and present evidence and information concerning Petitioner's background, social and family history, and his significant cognitive, neurological, psychological, and psychiatric impairments.

1355. Trial counsel improperly failed to retain and consult with appropriate medical, mental health, and other experts. Trial counsel failed to provide retained experts with information and evidence necessary to obtain crucial expert opinions, including a thorough and competent mental health evaluation of Petitioner. The assistance of a psychiatrist is crucial to a capital defendant's ability to marshal a defense to the charges and in mitigation of sentence. *Ake v. Oklahoma*, 470 U.S. 68, 77, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985). Unlike lay witnesses, psychiatrists can identify the "elusive and often deceptive" symptoms of mental illness. "[P]sychiatrists gather facts, through professional examination, interviews, and elsewhere, that they will share with the judge or jury; they analyze the information gathered and from it draw plausible conclusions about the defendant's mental condition, and about the effects of any disorder on behavior; and they offer opinions about how the defendant's mental condition might have affected his behavior at the time in question." *Id.* at 80.

1356. Trial counsel improperly failed to recognize, competently investigate, develop, and present to the trial court and to the jury evidence

pertaining to Petitioner's family and social history and his significant medical, neurological, cognitive, psychological, and psychiatric impairments. Counsel improperly failed adequately to prepare and consult with lay witnesses and qualified experts with regard to these topics. Counsel improperly failed to present expert or lay testimony with regard to these topics: among other failures, counsel failed to challenge Petitioner's competence to stand trial and to waive his rights; failed to present mental health and other available defenses to the charges at the guilt-phase of his trial; failed to present to the sentencing jury significant mitigating evidence; failed to provide Petitioner constitutionally and ethically required competent advice.

1357. Trial counsel's failings constituted an abandonment of Mr. Ramirez and ineffective assistance of counsel. And, but for this ineffective assistance, it is reasonably probable that the jury would have returned more favorable verdicts at the guilt- and penalty-phases of his trial.

1358. Trial counsel's performance prior to and during the trial fell below the standard of care that reasonably competent attorneys would have provided and that the Sixth Amendment commands. Trial counsel's deficient performance prejudiced Petitioner because, had trial counsel performed competently, Petitioner would have been found incompetent to stand trial and have been provided with a powerful and compelling defense at both the guilt and penalty phases. The result of the trial would have been more favorable to Petitioner but for counsel's deficient performance. The evidence that counsel failed to investigate, develop, and present demonstrated that Petitioner was incompetent to stand trial and to waive his rights and explained Petitioner's behavior, provided a basis for Petitioner's acquittal or reduced culpability and established that he should not be sentenced to death.

1359. Counsel's failures impaired the representation they gave to Petitioner, and the fundamental fairness of the trial he received, on numerous

occasions and with respect to numerous issues throughout the guilt and penalty phases of his trial. These issues include but are not limited to the following: Petitioner's mental state at the times of the charged offenses; Petitioner's lack of competency to waive rights, his inability to assist counsel and to stand trial; the waiver of powerful mitigation case at penalty phase; effective challenges to the prosecution's case at guilt and penalty phases; and effective *voir dire* of jurors.

1360. Trial counsel's errors and omissions denied Petitioner the right to present a defense and to present all relevant evidence; the right to cross-examine and confront witnesses; the privilege against self-incrimination; the right to a jury determination of every material fact; the right to compulsory process; the right to a reliable, rational, and accurate determination of guilt, death-eligibility and death-worthiness, free from any constitutionally unacceptable risk that those determinations were the product of bias, prejudice, arbitrariness or caprice; the right to be subjected to the death penalty only if reliable evidence was properly introduced proving that Petitioner was death-eligible and death-worthy; the right to a trial free of intentionally, demonstrably or inferentially false inculpatory evidence; the right to the effective assistance of counsel; the right to due process and the equal protection of law; and the right to a fair trial and to a reliable and appropriate penalty as guaranteed by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments.

**A.   Trial Counsel Failed to Adequately and Competently Investigate, Develop, and Present Petitioner's Life History and Evidence of Petitioner's Significant Cognitive, Neurological, Psychological, and Psychiatric Impairments**

1361. According to Marilyn Cornell, a licensed Marriage and Family Therapist who prepared a social history in Petitioner's post-conviction case:

488

[Petitioner's] development as an infant, child, and adolescent was severely and adversely affected by poverty, neglect, physical and emotional deprivation and abuse, exposure to violence, family dysfunction and instability, lack of parental supervision, guidance and protection, trauma, and a host of cognitive, emotional, environmental, psychological, neuropsychological, and psychiatric impairments. (Ex. 32, Declaration of Marilyn Cornell, M.F.T., dated 06/16/2004, ¶ 88.)

1362. As described by Dr. Jane Wells, J.D., Ph.D., who evaluated Petitioner at the request of state post-conviction counsel: Petitioner's background severely impaired his overall functioning. According to Dr. Wells, Petitioner suffered from:

> (1) a childhood characterized by extreme poverty, physical and emotional neglect, physical and emotional abuse, and overall deprivation; (2) a gross and persistent absence of parental attention, guidance, affection, and protection due in part to his parents' lack of education and their impoverished lifestyle that resulted in a pervasive pattern of neglect and left Petitioner on his own much of the time; (3) a serious brain impairment of early origin known at the time of trial; (4) a psychotic disorder that was evident and diagnosed and/or diagnosable at the time of trial; (5) serious mood disorders that often accompany psychosis with components of both mania and depression that was treatable at an early age but that went untreated; (6) early use with side effects of phenobarbital, exposure to illegal depressants, stimulants and hallucinogens during Petitioner's critical formative years; (7) early childhood exposure to criminal activity by Petitioner's brothers and other adults; (8) childhood exposure to violence and trauma, including extremely traumatic events outside the range of normal human experience, including witnessing the aftermath of the shooting death of his cousin's wife; and finally (9)

commitment as a teenager to the Texas Youth Council and long-term

confinement while awaiting trial on capital charges in the Los

Angeles County Jail, where the inadequate staffing, programming,

and other adverse conditions of confinement resulted in institutional

failure to address and provide appropriate intervention and

treatment.

(Ex. 43, Declaration of Dr. Jane Wells, J.D., Ph.D., dated 05/19/2004, ¶ 46.)

1363. Petitioner's trial counsel, however, failed to adequately and competently investigate, develop, and present such evidence concerning Petitioner's life history and his significant cognitive, neurological, psychological and psychiatric impairments. Competent investigation was necessary to formulate a competent theory of the case at guilt and penalty, to adequately prepare mental health professionals in order to obtain competent and reliable diagnoses, to meaningfully and adequately voir dire jurors, to competently challenge jurors for cause and exercise peremptory challenges, and to present a constitutionally adequate defense in all phases of the trial, including challenging Petitioner's competence to stand trial. Competent counsel would have recognized, investigated, developed, and presented to the court and to the jury, at the guilt and penalty phases of Petitioner's trial, evidence including, but not limited to, the following:

1364. Petitioner incorporates herein, as though fully set forth, the declarations of Robert Schneider, M.D.; William Vicary, M.D.; Dietrich Blumer, M.D.; Marilyn Cornell, M.F.T.; Mercedes Ramirez, Julian Ramirez, Jr., Ignacio Ramirez, Robert Ramirez, Rosario Ramirez, Katharine Baur, A.C.S.W., Dale Watson, Ph.D., Jane Wells, J.D., Ph.D., Steve Strong, Howard Kessler, Ph. D; Anne Evans, Ph.D., Cynthia Melendez, Edward Milam, David Palacios, Patricia Kassfy, Elizabeth Duenas, and Gilbert Flores; the reports of Myla H. Young,

Ph.D., and George Woods, M.D.; and the letter from Victor Henderson to Daniel Hernandez, dated May 29, 1987.

### 1. Family Background

1365. Petitioner was born into an impoverished family on February 28, 1960, in El Paso, Texas. (Ex. 55, Birth Certificate of Richard Ramirez; Ex. 69, Declaration of Mercedes Munoz Ramirez, dated 06/2004, ¶ 6; Ex. 67, Declaration of Julian Ramirez, Jr., dated 04/30/2004, ¶ 2; Ex. 102, Declaration of Ignacio Ramirez, dated 12/13/2008, ¶ 2; Ex. 32, M. Cornell Dec., ¶ 49.)

1366. Petitioner's father, Julian Ramirez, Sr., was born in 1927, in Carmargo, Mexico. Petitioner's mother, Mercedes Ramirez, was born in 1927, in Rocky Ford, Colorado. When she was ten years old, her family moved to Carmargo, Mexico, where she later met Julian Ramirez, Sr. Petitioner's parents traveled from Camargo, Mexico, to Cuidad Juarez, Mexico, in the 1940's, where they married. In 1951, they moved across the border to El Paso. (Ex. 32, M. Cornell Dec., ¶¶ 10, 14, 15; Ex. 69, M. Ramirez Dec., ¶ 1.)

1367. Petitioner's father had a first-grade education and no significant job skills when he entered the United States. After his arrival in the United States, he struggled to find regular, full-time employment; for some periods he was unable to find work, and, at other times, could only find part-time work. He worked various jobs, including construction, and at the Tony Lama boot factory and the ASARCO oil refinery. He eventually found employment with the Santa Fe Railroad, where he worked installing ties and tracks. He worked for the Santa Fe Railroad at the time of Petitioner's birth. Mr. Ramirez's job with the railroad frequently kept him away from home for long periods of time; it was not unusual for him to be gone for days at a time or longer. Julian Ramirez ultimately worked for the Santa Fe Railroad for nearly 40 years, retiring in 1990. He died from cancer in 1991. (Ex. 32, M. Cornell Dec., ¶¶ 14-19; Ex. 69, M. Ramirez Dec., ¶ 1; Ex. 103, M. Ramirez Dec., ¶ 3; Ex. 103, I. Ramirez Dec., ¶ 2; Ex. 105,

Declaration of Rosario Ramirez, dated 11/25/2008, ¶ 6; Ex. 104, Declaration of Robert Ramirez, dated 11/19/2008, ¶ 2.)

1368. Petitioner's mother had a fifth-grade education and no significant job skills when his parents moved to El Paso. She worked for a while as a domestic, cleaning homes. Later she found full-time employment at the Tony Lama boot factory. Ms. Ramirez worked at Tony Lama while she was pregnant with Petitioner. (Ex. 32, M. Cornell Dec., ¶¶ 15, 20-21; Ex. 69, M. Ramirez Dec., ¶¶ 4-5; Ex. 102, I. Ramirez Dec., ¶ 3 .)

1369. Generally, Ms. Ramirez worked eight hours a day, five days a week. The working conditions were very difficult. Other than lunch breaks, she spent all day on her feet. She typically did not use the restroom all day, because the restrooms at the plant did not provide privacy from the male workers. Her job involved polishing, shining, and treating the leather boots with various chemicals, dyes, paints, paint thinners, rubber cement, and glue. Her fingers were nearly always stained black, and the dyes and paints were nearly impossible to wash off her skin. She was not provided gloves, masks, or eye protection, and the factory was poorly ventilated. The fumes from the chemicals in the factory often made her dizzy and nauseated, and she suffered headaches. (Ex. 32, M. Cornell Dec., ¶¶ 20-21; Ex. 69, M. Ramirez Dec., ¶ 4; Ex. 103, M. Ramirez Dec., ¶¶ 5-6.)

1370. While she was pregnant with Petitioner, Ms. Ramirez suffered nausea, headaches, and dizziness from the fumes at the factory, and, as a result, she consulted a medical specialist. The doctor advised her to take some time off from work; he told her that continuing to work might harm her and her unborn child. She was able to take two months off from work just before Petitioner's birth. She also took forty days off from work after he was born. Despite the terrible working conditions, she had no choice but to continue to work at the factory because her family needed the money. (Ex. 32, M. Cornell Dec., ¶ 21; Ex. 103, M. Ramirez Dec., ¶¶ 5-6.)

1371. Richard was the youngest of five children born to Julian and Mercedes Ramirez.

1372. Petitioner's brother, Julian Ramirez, Jr., was born on June 10, 1950. He was born with a large bump behind his left ear, and doctors were not sure he would live. He remained hospitalized for nearly one month after his birth. Even after he was released, his mother frequently had to take him to a clinic for treatment of the growth. Growing up, Julian, Jr., had problems with his studies at school and had to attend special education classes in high school. Intelligence testing administered at school indicated that Julian, Jr.'s I.Q. met the diagnostic criterion for mental retardation, and he was classified as the educable mentally retarded. He was sexually abused by a special education teacher. Julian, Jr., began getting in trouble with the law when he was a teenager. Julian, Jr., became addicted to heroin and dropped out of high school after sustaining a knife wound that disabled the use of one arm. He is a life-long heroin addict, who has been in and out of jail, mostly on drug-related offenses. (Ex. 32, M. Cornell Dec.,¶¶ 22-23-24; Ex. 67, J. Ramirez Dec., ¶¶ 4-6; Ex. 103, M. Ramirez Dec., ¶¶ 9-10; Ex. 105, Rosario Ramirez Dec., ¶ 3; Ex. 105, School Records of Julian Ramirez, Jr.)

1373. Petitioner's brother, Ignacio Ramirez, was born May 31, 1951. Although he appeared healthy at birth, when he began to learn to walk his parents realized Ignacio had health problems. He suffered painful bone deformities in his legs and ankles that required frequent doctor visits and numerous surgeries, throughout his childhood and adolescence and even into adulthood. Ignacio underwent surgery every summer from the age of five to the age of eighteen. The surgeries often involved painful, lengthy recovery periods. Ignacio was forced to wear special shoes and braces for much of his childhood, and walking was always difficult for him. His leg was amputated a few years ago. Intelligence testing administered at school indicated that Ignacio's I.Q. met the diagnostic criterion for mental retardation. The same special education teacher who sexually abused

his brothers Julian, Jr., and Robert, visited Ignacio at home while his parents were at work and once visited him in the hospital following one of his surgeries. The teacher did not sexually abuse Ignacio. (Ex. 32, M. Cornell Dec., ¶ 26; Ex. 103, M. Ramirez Dec., ¶ 12; Ex. 102, I. Ramirez Dec., ¶¶ 7-8, 15; Ex. 105, Rosario Ramirez Dec., ¶ 4; Ex. 109, School Records of Ignacio Ramirez.)

1374. Petitioner's brother, Robert Ramirez was born December 1, 1953. When Mercedes Ramirez was pregnant with Robert, Julian Ramirez, Sr., had been laid off from work, and the family worried about making ends meet. Robert had difficulty learning to speak, and he was unable to form words clearly. He also had problems understanding things. Robert attended special education classes at school. Intelligence testing administered at school indicated that Robert's I.Q. met the diagnostic criterion for mental retardation, and he was classified as the educable mentally retarded. Robert was sexually abused by the same special education teacher who sexually abused his older brother Julian, Jr. Robert began getting into trouble with the law when he was a teenager. Robert dropped out of school in the tenth grade. He was convicted of theft and other crimes, and, at the age of eighteen was incarcerated for approximately two years. Thereafter, his life continued to be unstable. Robert has been diagnosed with bipolar disorder and schizophrenia. (Ex. 32, M. Cornell Dec.,¶ 26; Ex. 103, M. Ramirez Dec., ¶ 13; Ex. 104, Robert Ramirez Dec., ¶¶ 15, 17, 19; Ex. 105, Rosario Ramirez Dec., ¶ 5; Ex. 107, School Records of Robert Ramirez.)

1375. Petitioner's sister, Rosario ("Rosa") Ramirez was born February 6, 1955. Rosa and Petitioner were always very close, from the time that Petitioner was a young boy. Petitioner followed Rosa everywhere she went. Rosa was like a second mother to Petitioner and often cared for him while his parents were away at work. When Rosa got married, Petitioner, who was then around 13, was very depressed and afraid because she was leaving. He was so upset that he would not allow anyone to photograph him at the wedding. Petitioner eventually

moved in with Rosa and her husband, before he moved to California. (Ex. 32, M. Cornell Dec.,¶ 30; Ex. 103, M. Ramirez Dec., ¶ 14.)

1376. Petitioner, as a young boy, was a happy and seemingly healthy child, who was sweet natured and loved music and animals. He was something of a loner, more likely to play alone than with other children. He was quiet as a young boy and never a trouble maker. (Ex. 103, M. Ramirez Dec., ¶¶ 15, 18; Ex. 102, I. Ramirez Dec., ¶ 16.)

1377. Petitioner's upbringing, however, was characterized by parental neglect and a lack of adult supervision. To make ends meet, both of his parents worked and were frequently absent from the home. For a few years, until Petitioner was three years old, his parents employed a young girl to watch him, while his mother was at work. From the time that Petitioner was three or four years old, when his parents were at work, the children were left unsupervised. Lacking adult supervision, he and his siblings engaged in wild horseplay in and around the home and had to fend for themselves. And, even when his parents were not at work, Petitioner's siblings required most of their attention and care. His brother Ignacio, in particular, given his severe medical needs, received most of their parents' love and concern. Even Ignacio, however, at the age of eleven, had to take himself to the hospital for one of his surgeries, because his mother could not afford to take time off from work. His brothers Julian, Jr., and Robert, too, with their difficulties in school and, later, their problems with the law, worried their parents and absorbed the little time they had outside of work. (Ex. 32, M. Cornell Dec., ¶¶ 59-63, 67; Ex. 103, M. Ramirez Dec., ¶ 12; Ex. 104, Robert Ramirez Dec., ¶ 2; Ex. 105, Rosario Ramirez Dec., ¶¶ 6-7; Ex. 102, I. Ramirez Dec., ¶¶ 2-6, 12, 13; Ex. 68, I. Ramirez Dec., ¶ 3.)

1378. Petitioner and his siblings were also subjected to physical abuse by Julian Ramirez, Sr., who was a very strict father and who had a violent temper. Julian Ramirez, Sr., once became so enraged while trying to fix the kitchen sink

that he hit himself repeatedly in the head with a hammer; on another occasion, when attempting to repair the brakes on a car, he became so frustrated that he kicked the jack, knocking the car to the ground. Julian Ramirez, Sr., beat his sons (except for the disabled Ignacio); he hit them with a water hose, electrical cords, and belts. He beat Petitioner many times, hard enough to leave bruises on Petitioner's legs. He once brandished a gun at his son Robert. (Ex. 32, M. Cornell Dec., ¶¶ 64, 69; Ex. 104, Robert Ramirez Dec., ¶¶ 2-4; Ex. 105, Rosario Ramirez Dec., ¶ 13; Ex. 102, I. Ramirez Dec., ¶ 13.)

1379. Petitioner was also subjected to the abusive and neglectful treatment of his older brothers. Petitioner's brother Julian, Jr., abused Petitioner when he was a young child, and Petitioner's sister Rosa tried to protect him from the brothers' abuse. Petitioner's sister sought to care for him and protect from his older brothers. After Rosa left home, she allowed Petitioner to stay at her home. Rosa knew that Petitioner was having difficulties at home as well as at school. (Ex. 32, M. Cornell Dec., ¶ 59; Ex. 67, J. Ramirez, Jr. Dec., ¶ 7; Ex. 70, Rosario Ramirez Dec., ¶ 2.)

1380. Petitioner attended school in El Paso, where records show that he had a history of learning problems. Petitioner attended Lincoln Elementary School from 1966 to 1970. (Ex. 56, Cumulative School Records of Richard Ramirez.) In 1970, Petitioner attended Cooley Elementary School and his grades began to decline. When he attended Henderson Junior High School in 1972, Petitioner experienced serious learning problems. He was unable to read or solve mathematical problems at the eighth grade level. His grades suffered and he began to stay away from his classes. He first experienced difficulties with law enforcement in 1974, when he was 14 years old. Petitioner attended Jefferson High School in 1975, but was unable to finish the ninth grade. He was found truant and eventually left school followed by his commitment to Texas Youth

Council on March 17, 1977.  (Ex. 56, Cumulative School Records of Richard Ramirez; Ex. 60, Texas Youth Council Records re: Richard Ramirez.)

**2.      Experience with Injury, Trauma, and Violence**

1381.  Petitioner was exposed to multiple traumas and "suffered a significant history of physical and psychological trauma, beginning as a young child.  (Ex. 32, M. Cornell Dec., ¶ 54.)  "He received no treatment or help of any kind for the lengthy pattern of traumatic experiences he had endured.  Institutions responsible for Petitioner's care . . . ignored his disturbed background and consistently failed to provide necessary treatment."  (*Id.*)

1382.  In addition to the physical abuse that he suffered at the hands of his father and older brothers, described above, examples of injuries, trauma, and violence that Petitioner experienced include the following:

1383.  At age three, Petitioner climbed up on a dresser to turn on a radio that was too high for him to reach.  The dresser and other objects fell on him, hitting him on the back of the head and cutting his face.  He bled profusely.  His mother rushed him to the hospital, where he was treated for a bump on the back of his head and a large gash.  (Ex. 32, M. Cornell Dec., ¶ 54; Ex. 103, M. Ramirez Dec., ¶ 16; Ex. 102, I. Ramirez Dec., ¶ 18.)

1384.  At age six, Petitioner was knocked unconscious when he was hit in the head by a swing.  He was unconscious for a long period of time and had a large cut on his forehead that bled profusely.  His mother rushed him to the emergency room, where doctors treated a large gash on his head that required six or seven stitches to close.  (Ex. 32, M. Cornell Dec., ¶ 54; Ex. 103, M. Ramirez Dec., ¶ 17; Ex. 105, Rosario Ramirez Dec., ¶ 8; Ex. 102, I. Ramirez Dec., ¶ 19.)

1385.  When Petitioner was seven or eight years old, his older brother, Julian Ramirez, Jr., was stabbed in an altercation.  Friends rushed him to the hospital and then came to Petitioner's home to inform his family.  Petitioner's parents went to the hospital, leaving Robert, Ignacio, Rosario, and Petitioner at

home. Petitioner ran out to look at the car in which Julian Jr. had been transported to the hospital. The inside of the car was soaked with blood, including pools of blood on the floor of the car. Petitioner was very frightened and disturbed by what he saw and deeply affected by his brother's injuries when Julian, Jr., returned from the hospital. Julian, Jr., lost full use of his arm as a result of his injuries. (Ex. 32, M. Cornell Dec., ¶ 54; Ex. 103, M. Ramirez Dec., ¶ 17; Ex. 104, Robert Ramirez Dec., ¶ 8; Ex. 105, Rosario Ramirez Dec., ¶ 3; Ex. 102, I. Ramirez Dec., ¶ 23.)

1386. Each summer, Petitioner witnessed his brother Ignacio go to the hospital for leg surgery and return home for lengthy recuperation following the painful operations. Petitioner worried about his brother and was frightened and devastated by these events. (Ex. 103, M. Ramirez Dec., ¶ 12; Ex. 15, I. Ramirez Dec., ¶¶ 2, 4; Ex. 105, Rosario Ramirez Dec., ¶ 4; Ex. 102, I. Ramirez Dec., ¶¶ 9-11.)

1387. When Petitioner was young, his brother Robert was incarcerated for about a year and a half. Petitioner was extremely upset, crying and asking his mother to bring Robert home. (Ex. 103, M. Ramirez Dec., ¶ 13.)

1388. In the fifth grade, Petitioner was hit by a car while riding his bicycle. He was knocked hard to the pavement and was unconscious for a minute or two. Bystanders called an ambulance, and Petitioner suffered a large bump on his head and a concussion. Also in the fifth grade, Petitioner suffered a blow to the head while playing football, sustaining a concussion. (Ex. 32, M. Cornell Dec., ¶ 54; Ex. 125, Declaration of Edward Milam, dated 11/2008, ¶¶ 7, 9.)

1389. At age 13 or 14, Petitioner was injured jumping from a moving train. He climbed on the train while it was stationary, and when it began to move, not sure when or when it would stop, he jumped, injuring his back and legs. Petitioner refused to go to the doctor. (Ex. 32, M. Cornell Dec., ¶ 54; Ex. 103, M. Ramirez Dec., ¶ 21.)

498

1390. Petitioner was exposed to extreme levels of violence through his cousin Miguel Valles. Petitioner spent a lot of time with Valles, after Valles returned home from military service in Viet Nam. Petitioner was then twelve or thirteen years old. Valles filled Petitioner's head with stories of rape, violence, torture, murder, and other atrocities that he claimed to have witnessed or participated in while in Viet Nam. Valles claimed to have brought back a bag of shrunken heads that he said were the remains of persons he killed. He showed, or described, to Petitioner photographs that he claimed to have brought back from Viet Nam – photographs that depicted Valles and others participating in rape, violence, torture, murder, and other atrocities against Vietnamese prisoners. Valles sexualized the atrocities he described to Petitioner. Petitioner was extremely upset after he spent time with Valles, however, Valles remained a strong influence on Petitioner. Petitioner's parents tried to prevent Petitioner from spending time with Valles, but were unsuccessful. (Ex. 32, M. Cornell Dec., ¶ 54; Ex. 69, M. Ramirez Dec., ¶ 7; Ex. 103, M. Ramirez Dec., ¶ 22; Ex. 105, Rosario Ramirez Dec., ¶ 17; Ex. 102, I. Ramirez Dec., ¶ 26.)

1391. When Petitioner was thirteen years old, Valles shot and killed his wife – in front of Petitioner. Valles was arrested and charged in the killing. Petitioner witnessed the shooting, and, later, after Valles had been arrested, returned to and observed the blood-soaked crime scene. Petitioner was traumatized by the event, upset and frightened. Following his arrest, Valles was found incompetent to stand trial and was hospitalized at a mental health facility. He was later found criminally liable for the death of his wife, but served little time in prison, having spent significant time awaiting trial, committed to a mental facility. Vallles was diagnosed with schizophrenia. (Ex. 32, M. Cornell Dec., ¶ 54; Ex. 103, M. Ramirez Dec., ¶ 23; Ex. 105, Rosario Ramirez Dec., ¶ 18; Ex. 125, E. Milam Dec., ¶ 11.)

1392. When Petitioner was approximately fourteen or fifteen years old, his sister's husband frequently stole through the neighborhood late at night, spying in people's windows and trying to catch women undressing. Her husband derived sexual gratification from the spying, and he sometimes took Petitioner with him. (Ex. 105, Rosario Ramirez Dec., ¶ 19.)

1393. When Petitioner was approximately sixteen years old, he was a passenger in a car driven by one of his good friends. The car was in an accident, and the driver was impaled and killed. Petitioner witnessed his friend's death and was deeply saddened and upset by the event. For four or five months after the accident, Petitioner suffered nightmares and seemed very nervous and scared. (Ex. 32, M. Cornell Dec., ¶ 54; Ex. 103, M. Ramirez Dec., ¶ 24; Ex. 105, Rosario Ramirez Dec., ¶ 16.)

1394. At age sixteen, Petitioner was thrown from a horse. He was experimenting with acid (LSD), and he tried to ride the horse while high. The horse threw him, and Petitioner injured his ribs, arm, and head in the fall. He suffered a concussion. (Ex. 32, M. Cornell Dec., ¶ 54; Ex. 102, I. Ramirez Dec., ¶ 20.)

1395. Having been repeatedly traumatized in his childhood and adolescence, Petitioner was re-traumatized in jail following his arrest in 1985. Men who have been traumatized in the past and experience any significant degree of psychiatric morbidity are vulnerable to new traumas and with trauma their conditions tend to worsen. (Kupers, M.D. "Trauma and its Sequelae in Male Prisoners: Effects of Confinement, Overcrowding, and Diminished Services," 66 (2) Am. J. Orthopsychiatry, 194 (1996); Ex. 48, County of Los Angeles, County Counsel 06/15/1988 Opinion re: Los Angeles County Jail Overcrowding .)

1396. Petitioner's long history of injuries, trauma, and experience of violence went entirely untreated. This history profoundly affected Petitioner's development.

**3.    Exposure to Neurotoxins and Other Environmental Risk Factors**

1397. Petitioner's parents scraped by raising five children in the Segundo Barrio of El Paso, next to the Juarez border and close to the ASARCO smelting plant.  An Environmental Protection Agency (EPA) Superfund Cleanup is underway in El Paso for lead poisoning caused by the long-term presence of the ASARCO smelting plant.[104]  This was one of the poorest areas in the United States.

1398. As stated above, Petitioner's mother, Mercedes Ramirez, worked at the boot factory where she was exposed daily to high levels of toxins and other substances used in curing, dying, manufacture, and finishing of leather. Petitioner's father worked for a time at the ASARCO plant, and then for the Santa Fe Railroad where he was similarly exposed to high levels of chemicals and other toxic substances in connection with his work.  And the family lived near the ASARCO plant.

1399. Petitioner, his siblings, and his parents were thus exposed to various neurotoxins, including lead, arsenic, leather tanning chemicals, paint thinner, glue, and other chemicals that his parents unwittingly transported into the family home through their work clothing, shoes, tools, and other implements that they wore and utilized at their respective places of employment.  This exposure to neurotoxins was in addition to the neurotoxins that emanated from the ASARCO smelting plant, which was in close proximity to the family home.  Petitioner's family members suffered from symptoms and impairments consistent with exposure to high levels of these chemicals and other neurotoxins, including headaches, neurocognitive deficits and learning disorders, depression and other

---

[104]  Ex. 49 (Environmental Protection Agency (EPA) Literature on El Paso Neurotoxins.)

psychological and psychiatric impairments, bone disease and cancer.  (Exs. 61-70, declarations of Ramirez family members, and birth and death certificates.)

1400.  It is well-documented that neurotoxins cause impairment to developing brains.  "Exposure to . . . lead as a child – even at low levels – can result in neurodevelopmental disorders and lowered IQ's."  (Ex. 36, Declaration of Howard Kessler, Ph.D., dated 06/16/2004, ¶ 3.)  These and other factors likely contributed to Petitioner's multiple impairments, including but not necessarily limited to genetic markers for Marfan Syndrome (*see* attachment to Ex. 42, Dr. Dale Watson Declaration, dated 04/24/2004), a genetic predisposition to depression and mood disorders (Ex. 43, J. Wells Dec.), and his lifelong learning disabilities and cognitive, neurological, psychological, and psychiatric impairments.

**4.  Petitioner's Long-Standing History of Neurological, Cognitive, Psychological, and Psychiatric Impairments**

1401.  Beginning at age ten, close in time after he sustained a concussion playing football, Petitioner began to suffer epileptic seizures.  He suffered at least three convulsive epileptic seizures at school, which prompted school officials to call an ambulance to have Petitioner taken to the hospital, and numerous others outside of school.  Petitioner was twice hospitalized at Hospital Hotel Dieu following seizures: once in 1970, at age 10, and once in 1972, at age 12.  In 1972, doctors diagnosed him with epilepsy and prescribed Phenobarbital to control the seizures.  EEGs administered at the time revealed abnormal results, which confirmed a diagnosis of epilepsy or seizure disorder.  Petitioner took the prescribed phenobarbital, which can have significant adverse effects, for approximately a year and a half, before stopping on his own.  Petitioner suffered at least twelve serious convulsive epileptic seizure and continued to experience such seizures at least until he was seventeen years old, and, from the age of ten on, he experienced partial or absence epileptic seizures – characterized by brief

502

periods of staring into space, unaware of his surroundings – multiple times per day.  (Ex. 32, M. Cornell Dec., ¶ 51; Ex. 103, M. Ramirez Dec., ¶ 19; Ex. 104, Robert Ramirez Dec., ¶ 10; Ex. 105, Rosario Ramirez Dec., ¶ 10-11; Ex. 102, I. Ramirez Dec., ¶ 21; Ex. 125, E. Milam Dec., ¶¶ 3-4, 9; Ex. 123, Declaration of Patricia Kassfy, dated 10/28/2008, ¶¶ 3-4; Ex. 121, Declaration of Elizabeth Duenas, dated 10/27/2008, ¶ 3; Ex. 50, Declaration of Robert Schneider, M.D.; Ex. 57, Hospital Hotel Dieu Records re Richard Ramirez.)

1402.  After the seizures, Petitioner's behavior changed significantly.  He became an insomniac.  He became socially withdrawn.  He began leaving the house late at night, sometimes staying out all night without telling anyone where he was or what he was doing.  His performance at school declined, and eventually he dropped out.  He began drinking Coke and eating cookies and candy obsessively.  He suffered headaches and paranoid fears.  He began to get in trouble with the law and was known in the neighborhood for stealing.  And he began to show psychiatric and psychotic symptoms consistent with an organic brain disorder and temporal lobe epilepsy.  (Ex. 32, M. Cornell Dec., ¶ 51; Ex. 102, M. Ramirez Dec., ¶¶ 20, 25-26; Ex. 105, Rosario Ramirez Dec., ¶ 12; Ex. 121, E. Duenas Dec., ¶ 4.)

1403.  At age 17, Petitioner was committed to the Texas Youth Council. He was evaluated by a psychologist, who concluded Petitioner was unable to separate reality from fantasy, exhibited disorganized thinking, weakness in ideation, depression, and withdrawal.  Psychiatric treatment was recommended, but Petitioner never received such treatment.  (Ex. 32, M. Cornell Dec., ¶ 75-79; Ex. 60, Texas Youth Council Records re: Richard Ramirez.)

1404.  Around the age of 19, Petitioner moved to California.  After living briefly with his brother, Julian Ramirez, Jr., Petitioner essentially became homeless, living on the streets and failing to care for himself.  His family became worried, and his parents and his sister traveled to California to attempt to find

him and bring him home.  On one such trip, his sister found him living on the street, but his physical appearance had worsened so significantly that she failed to recognize him initially,   (Ex. 103, M. Ramirez Dec., ¶ 28; Ex. 105, Rosario Ramirez Dec., ¶ 22; I. Ramirez Dec., ¶¶ 34-35; Ex. 124, Declaration of Cynthia Melendez, dated 11/24/2008, ¶ 9; Ex. 123, P. Kassfy Dec., ¶ 9.)

1405.  Also around the age of 19, Petitioner became obsessed with Satan and Satanism.  He had developed an interest in Satanism and the occult as early as the ninth grade.  But in late adolescence and in his early twenties, he experienced severe delusions, hallucinations, and disorganized, psychotic thoughts concerning Satan as an actual presence in his life, with whom he believed he had a significant personal relationship.  After he moved to California, he called his mother and told her that he had met people involved with Satanism who frightened him and that he had seen some scary things – including a lamp moving by itself.  At first his experiences frightened him, but over time his psychosis and thought disorder developed and deepened.  (Ex. 125, E. Milam Dec., ¶ 12; Ex. 102, M. Ramirez Dec., ¶ 29; Ex. 124, C. Melendez Dec., ¶ 7; Ex. 122, Declaration of Gilbert Flores, dated 11/24/2008, ¶¶ 4-5.)

**5.    History of Significant Drug Use from an Early Age**

1406.  Beginning around the age of thirteen, at approximately the same time he stopped taking the Phenobarbital that doctors had prescribed to control his epileptic seizures, Petitioner began using illegal and potentially unadulterate drugs.  From age thirteen on, he smoked marijuana heavily – almost every day, frequently all day.  He also began snorting cocaine two or three times a week.  At the age of approximately seventeen, he began taking LSD.  After he moved to California at age nineteen, Petitioner developed a serious cocaine addiction, using as much as $500 worth of cocaine daily, and he injected the cocaine intravenously.  Petitioner's heavy drug use from such a young age, impaired his development and exacerbated his cognitive, neurological, psychological, and

504

psychiatric impairments.  (Ex. 32, M. Cornell Dec., ¶¶ 54, 68-73; Ex. 67, J. Ramirez Dec., ¶ 8; Ex. 103, M. Ramirez Dec., ¶ 23; Ex. 105, Rosario Ramirez Dec., ¶ 21; Ex. 102, I. Ramirez Dec., ¶¶ 31-32; Ex. 126, Declaration of David Palacios, dated 10/27/2008, ¶¶ 5-6; Ex. 125, E. Milam Dec., ¶ 10; Ex. 124, C. Melendez Dec., ¶ 4; Ex. 122, G. Flores Dec., ¶¶ 2-3, 9.)

### 6. Petitioner's Mental State at the Time of the Offenses and His Arrest and Throughout the Trial Proceedings

1407.  At the time of the crimes of which Petitioner was convicted and of his arrest and throughout the trial proceedings, Petitioner suffered severe psychiatric impairments and disorders that rendered him incompetent to stand trial and to waive his rights and that reduced his culpability for the crimes and constituted significant mitigating evidence in favor of a sentence less than death. Competent counsel would have presented to the trial court and to the jury at both phases of Petitioner's trial mental health evidence including, but not limited to:

1408.  Shortly after Petitioner's arrest, in September 1985, William Vicary, M.D., a psychiatrist, briefly examined Petitioner at the request of his counsel at the time the Los Angeles County Public Defender.[105]  Dr. Vicary found that

> Petitioner was psychotic, *i.e.*, he suffered mental impairment that interfered with his ordinary functioning.  He appeared to be irrational and self-destructive.  [He] met the criteria for mental incompetence, . . . in that he did not have the ability to rationally assist counsel in his defense.

(Ex. 41, W. Vicary, M.D., Dec., ¶ 5.)

1409.  Only a few months later, on January 19 and 20, 1986, Dietrich Blumer, M.D., neuropsychiatrist, examined Petitioner at trial counsel's request

---

[105]  Trial counsel provided ineffective assistance of counsel for failing to obtain, review, follow up on, and fairly present Dr. Vicary's findings.  *See infra.*

and found he suffered from temporal lobe disorder. "[T]here is evidence of a disorder of psychotic proportion . . . ." (Ex. 31, D. Blumer, M.D., Dec., ¶ 10.)

1410. Petitioner's psychosis prevented him from thinking logically or behaving in a rational manner. His judgment was impaired; he could not function rationally. As Dr. Blumer stated:

> Petitioner suffers from a persistent thought disorder of psychotic degree. His chief delusion consists of the conviction of having an intimate relationship with Satan.
>
> . . . .
>
> The neurological and psychiatric symptoms of epilepsy are complicated; they require careful treatment and periodic monitoring over a long period of time. Even when the patient no longer experiences complex partial seizures, there is concern that additional symptoms may appear, especially where, as here, the patient has used illicit drugs and no longer takes prescribed medication. It is not uncommon to see patients with temporal lobe epilepsy develop psychotic disorders. Treatment for interictal (the phase free of seizures) psychosis requires effective use of drugs.

(Ex. 31, D. Blumer, M.D., Dec., ¶¶ 9, 14; *see* Blumer, et al., *Treatment of Interictal Psychoses*, J. Clin. Psychiatry 61:2 (Feb. 2000), attached to Exhibit 31.)

1411. Dr. Blumer opined that Petitioner was mentally incompetent and could not assist counsel in his own defense. (Ex. 31, at ¶ 8.) He further opined that Petitioner's psychotic disorder bore directly on the criminal charges that Petitioner faced, and it would have been vital for the jury to consider such evidence with respect to Petitioner's state of mind at the time of the crimes, at the time of his arrest, and with respect to sentencing. (*Id.* at ¶¶ 10, 16.)

1412. In May 1987, at the request of trial counsel, Dr. Victor Henderson, a neurologist, examined Petitioner and concluded that he had suffered brain

506

damage. He informed Daniel Hernandez, Petitioner's trial counsel, of his findings. (Ex. 96, Henderson letter.)

1413. The opinions of Drs. Vicary, Blumer, and Henderson were known to trial counsel. They provided constitutionally deficient performance in failing to present the opinions of those expert to the trial court in support of a motion to determine Petitioner's competence to stand trial and to waive rights. The opinions of these experts, and the factual bases for those opinions, moreover, would have constituted mental health and other defenses to the charged crimes at the guilt phase and powerful mitigation at the sentencing phase of Petitioner's trial, and counsel performed deficiently in failing to present such defenses to the jury.

1414. Trial counsel also provided constitutionally deficient performance in failing to investigate, develop, and present evidence of Petitioner's mental illness and impairments that was developed and presented by counsel representing Petitioner in subsequent legal proceedings – criminal trial proceedings in the San Francisco County Superior Court and post-conviction proceedings arising from the Los Angeles case. Evidence such as that obtained by lawyers representing Petitioner in those proceedings could and should have been presented in Petitioner's proceeding in the Los Angeles County Superior Court.

1415. After Petitioner was convicted and sentenced to death in Los Angeles, he was transferred to San Francisco for trial on additional criminal charges arising from an incident that occurred there. San Francisco County Superior Court, Case No. 140188. He was represented by the Office of the Public Defender for the City and County of San Francisco ("SFPD"). His counsel in the San Francisco case conducted the social history and mental health investigation that his counsel in the Los Angeles case failed to undertake. The social history and mental health investigation confirmed and expanded on the opinions of Drs. Vicary, Blumer, and Henderson that Petitioner was psychotic,

507

suffered an organic-based thought disorder of psychotic proportion, had suffered brain damage, and was not competent to stand trial or to waive his rights. Such evidence, which would have been discovered and developed by competent counsel, would have reduced or eliminated Petitioner's culpability for the charged crimes and would have mitigated sentence in the Los Angeles proceedings.:

1416. George W. Woods, M.D., retained by the SFPD, evaluated Petitioner. He diagnosed Petitioner with a severe mental disorder: a Psychotic Disorder due to Temporal Lobe Syndrome, which includes delusions that are both paranoid and erotomanic. Dr. Woods also found that Petitioner exhibited significant compulsive and obsessive behavior. And Dr. Woods concluded that Petitioner suffers significant cognitive deficits, of a kind typically associated with prefrontal, frontal, and temporal areas of the brain. (Ex. 100, Woods Report, at p. 1.) He identified a number of symptoms resulting from Petitioner's disorder that impaired his ability to rationally assist counsel in his defense, including paranoia, impaired concentration, poor attention span, delusional thinking, forced thinking, severe mood swings, inability to analyze and process relevant data, altered sexual interest, limited insight and judgment, and profound depression. As a result of this constellation of impairments, Dr. Woods opined that Petitioner was incompetent to stand trial and to waive rights and that Petitioner's incompetence dated back to the time of his first contact with the criminal justice system and had impaired his cognitive, intellectual, and emotional functioning since childhood. (*Id.* at pp. 2, 4, 8.)

1417. Dr. Wood's conclusions are supported by the report of Myla H. Young, Ph.D., who was retained by the SFPD and administered a series of neuropsychological and personality tests to Petitioner. Her diagnostic impressions included: Axis I: Personality Change Due to Epilepsy, Combined Type (Disinhibited, Aggressive, Paranoid Features) and Mood Disorder Due to

Epilepsy, with Depressive Features; Axis III: Epilepsy, partial, with Impairment of Consciousness (Temporal Lobe). (Ex. 98, Young Report, at p. 7.) The neuropsychological testing that she administered revealed particular impairments in tasks of memory and higher cognitive functioning – a pattern similar to that of individuals who have a known history of cognitive impairment secondary to seizure disorder. (*Id.* at 3-4.) Petitioner's impairments in those areas suggest that he experiences brain impairment that affects his abilities for judgment, planning ahead, anticipating consequences of his behavior, and modulating his impulses. The personality testing that she administered revealed that Petitioner suffers severe, painful depression, pervasive anger, and unmodulated, impulsive emotionality and indicated that he tends to become lost in an internal world that is perceptually inaccurate; at times that is grossly distorted; and at times reaches delusional proportions. (*Id.* at 7.)

1418. The SFPD also retained Anne Evans, Ph.D., who evaluated Petitioner and who administered neuropsychological and personality tests. Dr. Evans concluded, consistent with the findings of Drs. Vicary, Blumer, Henderson, Woods, and Young, that Petitioner suffers from a serious mental disorder of long standing. (Ex. 72, A. Evans Dec., at pp. 4-5.) She believed it likely that his impairments related to his temporal lobe system, noting that the constellation of symptoms and behaviors are consistent with an organically based syndrome such as seizure disorder. (*Id.* at pp. 32-33.) Dr. Evans opined that he suffers paranoid delusions, that his thinking is severely psychotic, disturbed, disorganized, and fragmented; his perceptions are markedly inaccurate; he is seriously out of touch with reality, distorting the meaning of what is going on around him; and he is unable to modulate his behavior or control his responses (*Id.* at pp. 7, 10, 31.) Dr. Evans further opined that Petitioner suffers intense mood swings and long-standing depression. (*Id.* at pp. 8.) She concluded that he was not competent to assist counsel in a rational manner and not competent to

stand trial or waive rights and that his incompetence dated back at least to his first contact with the criminal justice system in 1985 and that his mental problems have been of a long-standing and severe nature. (*Id.* at pp. 11, 12, 14, 31, 34.)

1419. Petitioner's mental illness and other mental impairments, evidence of which lawyers at the SFPD discovered and developed, rendered him incompetent to stand trial in the San Francisco County Superior Court case. For that reason, proceedings there were stayed indefinitely in 1995, and he was never brought to trial. Petitioner's counsel in the Los Angeles proceeding could and should have developed and presented the same evidence, to challenge Petitioner's competence and to raise guilt- and penalty-phase defenses, and their failure to do deprived him of the effective assistance of counsel.

1420. State post-conviction counsel in the instant proceedings retained two additional mental health experts, Dale Watson, Ph.D., and Jane Wells, J.D., Ph.D., who evaluated Petitioner and opined that he suffers significant mental illness and other impairments. Their opinions, again, are consistent with, and corroborate and expand upon, the previous opinions of Drs. Vicary, Blumer, Henderson, Woods, Young, and Evans. Again, Petitioner's Los Angeles County trial counsel performed deficiently in failing to investigate, develop, and present this mental health evidence to the trial court and the jury.

1421. Dale Watson, Ph.D., is a neuropsychologist who examined Petitioner and administered neuropsychological testing at the request of state post-conviction counsel and determined that Petitioner is severely impaired. Dr. Watson's testing shows that Petitioner has impaired executive functions – abilities associated with supervisory or control functions including the monitoring, initiation, inhibition, and shifting of behaviors and cognitive sets; memory impairment; and impairment in the auditory processing centers of the brain. Such impairments are typically associated with impairment in frontal and temporal lobes. As a result of these impairments, Petitioner is unable to shift his

thinking or behaviors to, solve new situation, or make decisions and exercise judgment. Petitioner's long-standing neurocognitive impairments adversely affects his behavior, personality, and functioning. (Ex. 42, D. Watson, Ph.D., Dec., ¶¶ 11-21.)

1422. Dr. Watson concluded that Petitioner has temporal lobe disorder that was likely etiologically related to the psychotic disorder that other mental health experts had diagnosed. (*Id.*, at ¶¶ 19-20.) According to Dr. Watson's findings, Petitioner suffers from a neurocognitive brain-related disorder and is psychotic – the same findings made by Dr. Blumer *twenty-two* years ago. Petitioner remains severely impaired. Dr. Watson also concluded that Petitioner appears to suffer from frontal lobe dysfunction with neurocognitive deficits and that he suffers from depression, a mood disorder, and memory impairment. (*Id.* at ¶ 21-22.)

1423. Dr. Watson opined that Petitioner was not competent to stand trial or waive rights in his state-court proceedings. (*Id.* at ¶¶ 24, 26.) He further opined that his mental health findings were linked directly to Petitioner's culpability for the crimes charged, his competence to stand trial, his waiver of fundamental rights, including penalty trial and a reliable determination of penalty and would have been crucial to provide to the jury. (*Id.* at ¶¶ 26.)

1424. Dr. Jane Well, J.D., Ph.D., evaluated Petitioner at the request of state post-conviction counsel. She concluded that he suffers a myriad of mental problems, including a psychotic disorder somewhere on the schizophrenic or psychotic end of the spectrum. (Ex. 43, Wells, Dec., ¶ 49.) She observed him to be significant paranoid, delusional, and thought-disordered. (*Id.*) She also opined that he suffers a mood disorder with transient manic and depressive states as well as agitation and hypersexuality. (*Id.*) And she concluded that he suffered organic brain damage. (*Id.*, at ¶ 52.) Based on her findings, Dr. Wells concluded that Petitioner was incompetent to stand trial and to waive rights in his state-court proceedings. (*Id.* at ¶ 51.)

1425. In light of the above, competent counsel could and should have investigated, developed, and presented evidence that Petitioner, from his childhood and continuing to the present day, suffered from long-standing and severe psychiatric, psychological, neurological, and cognitive impairments, including, but not limited to, long-standing temporal lobe epilepsy; mental incompetency in September 1985; thought disorder of psychotic proportion, resulting from his seizure disorder; psychotic disorder; disorganized speech, thought, and behavior; hallucinations, delusions, paranoia; severe mood disorder; brain damage; severe impairments in memory tasks and higher cognitive functioning, of a kind typically associated with impairment of the frontal and temporal lobes; impairments in his ability to inhibit behavior and responses and obsessive and compulsive behaviors; and the impact on his behavior and personality of multiple disorders – all of which established that Petitioner was seriously mentally ill and incompetent to stand trial and waive his rights and which would have constituted effective defenses, at guilt and penalty, to the crimes charged against him. Indeed, Petitioner's conduct throughout his life was consistent with these types of mental disorders.

**B.     Petitioner Was Prejudiced at Both Phases of His Capital Trial by Trial Counsel's Failure to Conduct an Adequate Social History Investigation, to Present that Information to Appropriate Mental Health Experts, and to Present to the Jury on Petitioner's Behalf All the Evidence that Bore on Petitioner's Competence to Stand Trial and to Waive Rights and on Guilt and Penalty**

1426. While the prosecution portrayed Petitioner as a cold-blooded, remorseless killer, in fact, Petitioner's myriad impairments indicate that he was incompetent at the time of the offenses charged and throughout his trial proceedings. Had the jury known about Petitioner's serious mental impairments, especially his psychosis, severe mood disorder, neurological and cognitive

deficits, PTSD, and other mental impairments, it would have better understood Petitioner and his background. The multiple deficits and impairments described by Drs. Blumer, Vicary, Henderson, Woods, Young, Evans, Wells, and Watson indicate that numerous mental state and other defenses could have been presented at Petitioner's guilt and penalty phases. Had the jury been presented an accurate profile of Petitioner's history and life, this evidence would have mitigated the prosecution's case because the jurors would have had a proper context in which to judge Petitioner's behavior and assess his culpability. Similarly, had the jurors known that Petitioner was suffering from serious and bona fide mental illness, they would have viewed the guilt evidence in a manner that comported with all the relevant facts and reached a verdict more favorable to Petitioner. (Exs. 28, M. Herrera Dec., dated 06/12/2004; 29, D. McGee Dec., dated 06/09/2004; 117, D. McGee Dec., ¶ 10; 30, M. Salcido Dec., dated 06/09/2004; Ex. 115, M. De Ruiter Dec., ¶ 3.)

1427. At the guilt trial, the defense counsel ineffectively relied on or presented the testimony of several witnesses, including an expert who testified regarding time of death in the Vincow case and the circumstances of Yu's death; two witnesses who testified regarding visibility and viewing conditions at night in Yu, Doi, Nelson, and Petersen incidents; alibi witnesses regarding Petitioner's whereabouts at the end of May 1985; testimony about hair and serology in six of the cases; testimony from an expert regarding eyewitness identification generally; and finally, testimony of convicted felon Sandra Hotchkiss who testified about her contact with Petitioner in the course of committing burglaries. While this evidence had some potential to undermine the prosecution's case, it was not even remotely as powerful or relevant to the issues before the jury as the compelling mental health evidence that was readily available, bore directly on Petitioner's legal and moral culpability, and unequivocally negated the mental states required to convict Petitioner and sentence him to death.

513

1428. Had the jurors known of Petitioners severe and long-standing mental illness and impairments, they would have given full consideration to all the relevant evidence bearing on the question of guilt and sentence. Several of the trial jurors indicate they would have considered all evidence bearing on Petitioner's guilt. The jurors report that had the defense presented more evidence, the outcome of the guilt trial could have been different. (Exs. 28-30, 115, 117.)

1429. Several of the jurors indicate they expected to hear evidence presented by the defense to save their client's life. Mitigation evidence could have had a difference in the outcome. Evidence presented on Petitioner's behalf would have been carefully considered during four days of deliberations, particularly evidence of Petitioner's background and mental condition. (Exs. 28-30, 115, 117.) Counsel's failings made Petitioner even less sympathetic in the eyes of the jury and inclined it even more toward death.

1430. The account of Petitioner's life presented in this petition, although incomplete, as a result of Petitioner's present incompetence to assist habeas counsel, nevertheless evokes sympathy for Petitioner by providing an explanation, grounded in documents and facts about his history, of the conduct that led to his current circumstances. This critical evidence, which was never presented on Petitioner's behalf, clearly establishes Petitioner's reduced culpability and the utter inappropriateness of the death sentence imposed by the jury. Indeed, it presents a prima facie case of ineffective assistance of counsel – counsel's performance fell below the stand of competent performance articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) and its progeny, and but for counsel's errors, Petitioner would have received a more favorable outcome at both phases of his capital trial. Had counsel performed competently, and conducted a minimally adequate

investigation, they would have been able to present a wealth of evidence on Petitioner's behalf, including but not necessarily limited to the following proof:

(a) A childhood characterized by extreme poverty, physical and emotional neglect, physical and emotional abuse, and overall deprivation;

(b) A gross and persistent absence of parental attention, guidance, affection, and protection that resulted in a pervasive and premature independence from authority;

(c) Cognitive, neurological, psychological and psychiatric impairments of early origin as disclosed in pre-existing medical reports, pretrial neuropsychiatric reports, and post-conviction neuropsychological testing and psychiatric evaluation;

(d) Early childhood exposure to alcohol and illegal depressants, stimulants and hallucinogens during Petitioner's critical formative years;

(e) Early and repeated childhood exposure to extreme levels of violence, trauma, and abuse;

(f) Early childhood exposure to criminal activity by older brothers and others in the community;

(g) Extreme traumatic events outside the range of normal human experience, including witnessing the aftermath of the shooting death of his cousin's wife;

(h) Petitioner's commitment as a teenager to Texas Youth Council and his incarceration in the Los Angeles County Jail while awaiting trial on the capital charges as a young adult.

1431. Trial counsel's failure to investigate and discover detailed and documented information about Petitioner's personal and family history, and to present evidence of Petitioner's background and impairments to appropriate mental health experts, denied Petitioner the right to a reliable mental health evaluation and precluded Petitioner from presenting the jury powerful statutory

515

and nonstatutory mitigation evidence as a basis for a sentence less than death. Had counsel performed competently and presented the wealth of evidence that existed regarding Petitioner's life, upbringing, and multiple cognitive, organic, and mental health impairments, a result more favorable to Petitioner would have been obtained. Counsel's substandard performance prejudiced the defense by failing to present the jury with readily available evidence that demonstrated Petitioner's lessened moral and legal culpability.

1432. Counsel's many failings rendered both the trial court and the jury completely ignorant and unaware of the existence of significant and compelling evidence of Petitioner's multiple cognitive, neuropsychological, neurological, emotional and psychiatric impairments and deficits. This evidence was critical to Petitioner's constitutional rights to, inter alia, effective assistance of counsel, due process and a fair trial. The failure to present this evidence assured that Petitioner's trial was anything but fair; under these circumstances, Petitioner's trial could not comport with the constitutional requirements of the due process mandated by capital jurisprudence. Counsel had a duty to present all evidence that demonstrated that Petitioner was not competent to stand trial or waive rights, that potentially negated Petitioner's culpability and that provided a basis for a sentence less than death. There was significant available mitigating evidence of Petitioner's serious mental illness, his youthfulness, lack of prior felony record, close family ties, and even in the circumstances of charged offenses, particularly the instances in which victims were not killed. Counsel's failings are inexcusable.

1433. The lack of mitigation evidence clearly was not lost on the court. In preparation for instructing the jury at penalty trial, the court observed that defense requested special instruction setting forth mitigating factors (*see* XXX CT 8893) was not warranted by the evidence.

The Court:   Well, since none of this has been done, it is really not a

relevant instruction.

(217 RT 24789.)  Similarly, the court denied the defense requested instruction

concerning Petitioner's age.  (*See* XXX CT 8894.)

The Court:   I do not believe, Mr. Clark, that the instruction is

pertinent to any evidence that I've heard in this case.

(217 RT 24790.)

1434.  Counsel's failure to present any extenuating evidence was repeatedly

called to the jury's attention by the prosecution in argument.  First, the prosecutor

structured his argument based on the list of aggravating and mitigating factors

that the statute directed the jury to take into account in fixing the penalty.  *See*

former Cal. Penal Code § 190.3.  Reviewing each of those factors, (d) through

(k), the prosecutor found none favorable to Petitioner.  (*See* 217 RT 24807-18.)

The prosecutor told the jury:

There has been no evidence presented to you in terms of mitigation

here, and I submit because there is none.  There is no mitigating this

person. . . .

This man is the personification of evil and if anyone ever has earned the

death penalty, Petitioner has.

(217 RT 24832-33.)

1435.  In response to the prosecution's argument, trial counsel's

substandard performance left them no choice but to concede what the prosecution

had already argued.  No mitigating evidence regarding Petitioner's character,

background or history was presented.  And, as if counsel's own failings were not

enough, as the prosecutor had done, *trial counsel* reminded the jury of the

absence of mitigation evidence.  "I don't think anybody knows and I don't think

anybody will ever know [Petitioner's motivation]."  (217 RT 24840.)  Counsel

had the temerity to comment on the lack of mental state evidence:  "What

517

possessed Petitioner to do this we will not know soon." (*Id*. at 24841.) Indeed, counsel told the jury "it is your job to search for [mitigating evidence] if you decide to extend mercy for Petitioner, that is, permit him to live." (*Id*. at 24852.) Given the very serious charges against Petitioner, it is difficult to imagine a more impotent closing argument or more troubling example of ineffective assistance of counsel.

1436. Trial counsel totally failed to present any positive evidence of Petitioner's attributes, actions, his youth, or family relationships in mitigation. Although trial counsel claimed to have spoken with witnesses in Texas, it is not clear what, if anything, was actually done to prepare for the penalty trial. Indeed, given the nature of this case with numerous brutal killings, any hope or chance that the jury would return anything less than a death verdict rested exclusively on the efforts of counsel to present mitigating evidence at penalty trial and to explain and make understandable for the jury Petitioner's background, upbringing, and motivations – in essence, to humanize Petitioner in the eyes of the jury. Trial counsel's tactics cannot be construed as reasonable. Trial tactics or strategy did not militate in favor of abandoning mitigating evidence; to the contrary, appropriate tactics and strategy in this case above all demanded a vigorous presentation of all possible evidence on Petitioner's behalf. *Strickland v. Washington.*

1437. Had all the information described herein been adequately investigated, developed and presented to mental health experts at Petitioner's trial, they would likely have concluded, that Petitioner's history was rife with serious mental illness, brain impairment, psychosis; he in fact exhibited symptoms of mental illness and disturbance, including but not necessarily limited to schizophrenia, mood disorders, depression and trauma, and that these disorders would likely have supported a mental state defense at trial and would have mitigated the evidence against him.

1438. Trial counsel's submission of the case without offering any tangible mitigating evidence during the penalty trial was tantamount to a concession that the death penalty was proper in this case. The refusal to present any mitigating evidence of which counsel was aware constitutes a miscarriage of justice. While nothing in the pertinent statutory provisions or jury instructions suggested that a death penalty was required in the event Petitioner failed to offer any mitigating evidence (*See* § 190.3), the absence of any mitigating evidence in light of the prosecution's overwhelming case against Petitioner offered the jury no alternative but to vote for the death penalty.

1439. Petitioner's conviction and death sentence must be reversed and vacated due to the failure of Petitioner's counsel to render effective assistance of counsel in the preparation, investigation and presentation of the defense case at the guilt and penalty phases. *Kimmelman v. Morrison*, 477 U.S. 365, 377, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986); *Strickland v. Washington*, 466 U.S. at 685.

1440. The declarations of Drs. Blumer, Vicary, Woods, Evans, Young, Henderson, Watson, and Wells, and of Marilyn Cornell make clear that Petitioner was prejudiced by the ineffective assistance of his trial lawyers in failing to present available mitigating evidence on Petitioner's behalf at the penalty trial. Trial counsel's substandard performance resulted in their failure to discover and develop this evidence, even though they had information in their possession that should have put them on notice that such investigation was necessary. Petitioner's habeas experts have discovered and developed the evidence that was readily available to counsel at the time of trial, had they performed even minimally adequate investigation into Petitioner's life. Had trial counsel presented the trial experts with the evidence which current counsel has developed, and had the trial experts performed competently, they would have reached the same conclusions as Petitioner's habeas experts.

1441. Petitioner was severely prejudiced by counsel's failure to investigate and present all mitigating evidence at trial. This evidence would have provided a powerful counterpoint to the prosecutor's damning argument that Petitioner deserved to die. In fact, the combination of Petitioner's deprived history of mental illness and impairment, neglect, abuse, exposure to neurotoxins, excessive exposure to trauma and violence, PTSD, and depression, would have provided the jurors with powerful evidence of his impairments and garnered the jury's sympathy. Petitioner's impairments cast serious doubt on the prosecution's case and on the outcome at the guilt and penalty phases of trial.

1442. Given this evidence, which was not presented on Petitioner's behalf due to the ineffective assistance of counsel and experts, Petitioner's conviction and sentence must be set aside. This evidence should have been presented on Petitioner's behalf at both the guilt and penalty phases of his capital trial. But for counsel's errors, it's more probable than not, that the jury would have returned verdicts more favorable to Petitioner and that they would have rendered a sentence of life, not death.

## C.  Additional Constitutional Violations

1443. Counsel failed in numerous other respects, including but not limited to the following;

(a) Trial counsel were on notice of Petitioner's serious mental impairments and his mental incompetency. Their performance in not investigating and presenting mental state evidence fell below the standard of care at the time of Petitioner's trial. Because of the history of mental impairments, Petitioner's purported waivers taken by the court were not knowing, voluntary, or intelligent, including but not limited to use of restraints at trial, waiver of a guilt and penalty defense, absence from trial proceedings, self-incrimination, and impermissible consciousness of guilt inference due to Petitioner's refusal to remove his sunglasses.

(b)  Trial counsel incompetently conducted the *Hovey* voir dire and failed to explain a reasonable defense strategy and mental state and mitigation evidence to prospective jurors.

(c)  Counsel failed to explain Petitioner's mental state at the time of the murders, including brain impairment, psychosis, mental illness, drug use, and addiction that would have persuaded the jury at the guilt trial that Petitioner was not culpable for first degree murder and at the penalty trial, that Petitioner was not death-worthy.

(d)  Counsel failed to explain Petitioner's mental state with respect to his post-arrest conduct.  On one occasion, Petitioner was observed by a jail deputy in his cell sitting on the toilet with blood on his hands drawing a pentagram on the floor.  (176 RT 20599-600.)  On numerous occasions in the courtroom, Petitioner invoked the words "Hail, Satan" and displayed a pentagram on the palm of his hand in the courtroom.  (*See Id*. at 20603-04, 20607.)  On January 30, 1989, Petitioner appeared at trial in leg shackles.  The court accepted a waiver from Petitioner to wear shackles instead of a less obtrusive leg-brace. Petitioner was absent from the courtroom for the guilt verdicts on September 20, 1989.  He was housed in a holding cell near the courtroom.  (XXX CT 8789). On November 7, 1989 prior to being sentenced, Petitioner made a bizarre and incoherent statement to the court.

(e)  Counsel failed to properly defend Petitioner.  On May 8, 1989, trial counsel was not prepared to present its case because Petitioner said that he did not want any defense.  (178A RT 20759-60).  Later that day, Mr. Clark indicated that Petitioner "flip-flopped" again, and he wanted a limited defense. However, Daniel Hernandez stated that he did not intend to present a complete defense because without Petitioner's cooperation it would not be in the client's best interests.  (*Id*. at 20789, 20794).

(f) Petitioner has been prejudiced by the ineffective assistance of trial counsel due to failures discussed above and for their failure to request legally correct and accurate jury instructions at guilt and penalty phases and by their failure to formulate appropriate jury instructions.

(g) Petitioner certainly was not asked to waive his right to have the jury fully instructed. Without such a waiver, Petitioner's counsel are simply not authorized to deprive him of these important constitutional rights. A fundamental decision to waive constitutional rights to have a jury fully instructed on the law is not something that can be waived without an express waiver given by Petitioner in open court.

(h) Petitioner was denied his constitutional rights to due process and a reliable penalty determination because his trial counsel failed to present mitigating evidence of Petitioner's age and the trial judge refused to instruct the jury as to Petitioner's age.

(i) Because Petitioner's trial counsel failed to present mitigation evidence, the prosecution relied on the language of CALJIC No. 8.85, which undermined Petitioner's right to a reliable determination of penalty.

(j) Petitioner was denied his constitutional rights to due process and a reliable penalty determination because his trial counsel failed to propose an appropriate admonition pursuant to CALJIC No. 8.84.1. (RB 310-12.) The deficiencies in this instruction prejudiced his substantial rights because the instruction was fundamentally flawed. Petitioner has been prejudiced from the ineffective assistance of trial counsel for their failure to propose an appropriate instruction.

(k) Trial counsel requested and then withdrew a jury instruction on the meaning of life without the possibility of parole. It was ineffective assistance of counsel not to submit a properly worded instruction regarding life without the possibility of parole.

(l) The cumulative errors that occurred at the guilt and penalty trials were due to counsel's ineffectiveness.

(m) Counsel failed to adequately prepare, litigate, and represent Petitioner at the motion for modification of the verdict under § 190.4(e) based on the omissions discussed above. Under the statute, before a trial judge may impose the death penalty after a jury's recommendation thereof, the judge must undertake an independent reweighing of the evidence, make an independent determination as to whether imposition of the death penalty is appropriate, give a specific statement on the record of the reasons for its decision on those matters, and provide for the entry of such reasons on the clerk's minutes.

**CLAIM 19:**

### THE TRIAL COURT VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS WITH RESPECT TO PETITIONER'S MENTAL COMPETENCY TO WAIVE PRESENTATION OF MITIGATION EVIDENCE

1444. Exhaustion of the claim: This claim was fairly presented to the California Supreme Court in the direct appeal. It was presented in Section XIX of the Opening Brief.

1445. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

1446. Those facts and allegations set forth in the petition, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

1447. Petitioner exhibited irrational and bizarre behavior before and during the guilt trial, as described, *supra*.

1448. On August 23, 1989, counsel informed the trial court that Petitioner would "do whatever he can physically and otherwise to resist coming into the courtroom" on August 31, 1989, the date for hearing on his mistrial motion. (I Supp. CT VIII 2433.) The trial court expressed concern about "any unnecessary physical altercations, that means everybody, and there is a chance of injury all the way around." (*Id*. at 2433.) The court did not want to have televised coverage of a fight in the courtroom. (*Id*. at 2434.) The court informed counsel that Petitioner allegedly made a threat against the court. (*Id*. at 2433-34.) The prosecutor was upset about Petitioner's behavior; Petitioner previously disrupted court proceedings and called the trial court "a bunch of names." (*Id*. at 2435.)

1449. Trial counsel told the court that Petitioner would be disruptive if he were required to appear in court on August 31, 1989. Counsel requested that Petitioner be allowed to listen to court proceedings in a holding cell. (214 RT 24624-25.) Counsel Daniel Hernandez also stated:

> I am representing to the court that it is a serious situation. ¶ At this point I'm concerned that I may not be able to maintain that type of situation [courtroom decorum].

(*Id*. at 24625.)

1450. The trial court commended counsel for a "stellar job that you have done in keeping this guy under control," and credited the law clerk, "who spends a great deal of his time at counsel table talking with him or amusing one another." (*Id*. at 24625.)

1451. Shortly thereafter, Petitioner appeared in court and stated: "This trial is a joke." (*Id*. at 24629.) He also directed crude remarks to the court: "Piece of shit" and "Fuckin' asshole," before being escorted from the courtroom. (*Id*. at 24629.)

1452. Petitioner subsequently absented himself from two crucial court proceedings: the hearing on the motion for mistrial and the guilt trial verdicts.

At the hearing on the mistrial motion, held on August 17, 1989, Petitioner was placed in a holding cell with a "piped-in sound system." (215 RT 24653.) The next occasion when Petitioner appeared in court on September 20, 1989, the jury returned its verdicts. Petitioner wore jail clothes and chains, and sought to waive his appearance before the jury. (216 RT 24705-08.) On accepting Petitioner's waiver, the trial court observed that "if [Petitioner] decides to raise a physical fight by being in court and we have to chain him, rather than do that, I will take a waiver from him and let him sit this one out. ¶ He can listen to it in the lockup." (*Id*. at 24709.) The court advised Petitioner that, "we have no way of knowing what sort of an impact [your absence] will have on the jury," and that "if there is a penalty phase . . . that unknown impact may very well go against your best interests." (*Id*. at 24710.)

1453. Before the verdicts were read, the court informed the jury that Petitioner was absent from trial.

> We took a waiver from him. He did so. He waived his right to be
> here. I found that was freely and voluntarily and intelligently made,
> and I went along with his desires and he is listening to these
> proceedings in a cell below us. We have piped in sound, and so he
> is aware of what is going on and to that extent is present in court, but
> physically he is not.
>
> So please do not consider this for any purpose. It is just a request
> that he has made and I think the law requires to me to along with that
> request.

(216 RT 24714-15.)

1454. Following Petitioner's conviction of thirteen murders, thirty lesser crimes, and true findings of nineteen special circumstances, one week later, on September 27, 1989, the court accepted Petitioner's waiver of presenting any mitigating evidence on his behalf. At the time of the waiver, and despite manifest

and substantial evidence of Petitioner's continued bizarre behavior, including his lack of cooperation with counsel, his refusal to appear in court, his outbursts in court, and his irrational comments to the court, the court made no inquiry of counsel, or Petitioner, as to Petitioner's present mental condition or competency. The court was aware that Petitioner repeatedly had refused to cooperate with counsel in his defense and repeatedly had made strange and bizarre expressions, all of which, by any measure, cast doubt on his mental competence.[106]

---

[106] Illustrative of Petitioner's delusional and psychotic thinking and mental incompetence was his statement at his sentencing:

> It is nothing you would understand, but I do have something to say. In fact, I have a lot to say, but now is not time or the place. I don't even know why I'm wasting my breath, but what the hell.
>
> As for what is said of my life, there have been lies in the past and there will be lies in the future. I don't believe in the hypocritical moralistic dogma of this so-called civilized society and need not look beyond this room to see all of the liars, the haters, the killers, the crooks, the paranoid cowards, truly the trematodes of the earth, each one in his own legal profession.
>
> You maggots make me sick. Hypocrites one and all. We are all expendable for a cause, and no one knows that better than those who kill for policy, clandestinely or openly, as do the governments of the world which kill in the name of God and country and for whatever else they deem appropriate.
>
> I don't need to hear all of society's rationalizations. I've heard them all before and the fact remains that is what it is.
>
> You don't understand me. You are not expected to. You are not capable of it. I am beyond your experience. I am beyond good and evil.
>
> Legions of the night, night breed, repeat not the errors of night prowler and show no mercy. I will be avenged. Lucifer dwells within us all. (219 RT 24929-30.)

This was but a sample of Petitioner's statements and conduct throughout trial, which put the trial court on notice that Petitioner was not competent to waive presentation of mitigation evidence, including evidence of his mental incompetency.

1455. In the *Pate v. Robinson*, 383 U.S. 375, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966), the Supreme Court found that where sufficient evidence is presented that a defendant may be mentally incompetent, due process requires that a hearing be held on that issue. The defense in *Pate* presented testimony of four lay witnesses who related defendant's history of disturbed behavior and gave opinions of present insanity, as well as evidence of a brief prior commitment. *Id.* at 383-84. The court found this showing sufficient to grant habeas corpus relief due to failure properly to inquire as to defendant's competence to stand trial. *Id.* at 385.

1456. In *Drope v. Missouri*, 420 U.S. 162, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975), the Court reconfirmed *Pate*, that due process requires a hearing on the issue of a defendant's mental competency upon a proper showing. The Court considered evidence of defendant's absence from the courtroom resulting from injuries sustained in a suicide attempt as supporting the need to inquire into the defendant's competence. First, the accused's forced absence implied a demeanor making him unable to cooperate with counsel in his defense; second, it deprived court and counsel of a further opportunity to observe his capacity rationally to understand the proceedings and contribute to his defense. *Id.* at 180-81. The Court noted that, "[e]ven when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." *Id.* at 181. The Court described the requirements of the inquiry:

> The import of our decision in *Pate v. Robinson* is that evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient. There are, of course, no fixed or immutable signs which

527

invariably indicate the need for further inquiry to determine fitness
to proceed; the question is often a difficult one in which a wide
range of manifestations and subtle nuances are implicated.  That they
are difficult to evaluate is suggested by the varying opinions trained
psychiatrists can entertain on the same facts.

*Id.* at 180.

1457.  There is a basic presumption against the waiver of  constitutional
rights.  *Brookhart v. Janis*, 384 U.S. 1, 4, 86 S. Ct. 1245, 16 L. Ed. 2d 314
(1966).  To properly waive a constitutional right a defendant must do so
voluntarily, knowingly and intelligently, with a sufficient understanding of the
relevant circumstances and the likely consequences.  *See Brady v. United States*,
397 U.S. 742, 749, 90 S. Ct. 1463, 25 L. Ed. 2d 747 (1970); *Johnson v. Zerbst,*
304 U.S. 458, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938).  To meet this standard when
waiving the right of presenting mitigating evidence to a penalty phase jury, an
individual must understand what constitutes mitigating evidence and whether any
such evidence exists in his case.  Against this backdrop, Petitioner's decision did
not constitute a valid waiver.

1458.  Counsel's performance was deficient.  Trial counsel failed properly
to investigate mitigating evidence their cursory investigation had revealed.
Evidence of childhood abuse, institutional failure, poly drug use, and long-
standing mental illness and organic brain disorder was available to trial counsel.
Counsel decided not to go forward at trial without fully investigating and
understanding the impact of the mitigation evidence and Petitioner's impaired
mental state.  Thus, the primary evidence the jury heard was extremely violent
criminal acts.

1459.  A proper investigation by trial counsel using the evidence in their
possession would have uncovered significant, readily available mitigating
evidence regarding childhood abuse and neglect, institutional failure, polydrug

use, multiple mental impairments, including organic brain damage, and psychosis. Petitioner's purported waiver was based on lack of advisal and understanding of the consequences and was therefore not a knowing and intelligent waiver under *Brady*. Petitioner cannot be held to have waived his fundamental right to present penalty phase evidence as he was mentally incompetent.

1460. The Court has repeatedly held that the criminal trial of an incompetent defendant violates due process. *Medina v. California*, 505 U.S. 437, 112 S. Ct. 2572, 120 L . Ed. 2d 353 (1992); *Pate*, 383 U.S. at 378.Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so. *Riggins v. Nevada*, 504 U.S. 127, 139-40, 112 S. Ct. 1810, 118 L. Ed. 2d 479 (Kennedy, J., concurring) (citation omitted).

1461. As demonstrated above, following the guilt trial, there was further, substantial evidence of Petitioner's unsound mental condition that placed the court on notice that Petitioner was mentally incompetent to stand trial and to waive his rights, thus, triggering the trial court's duty of inquiry regarding Petitioner's mental state. Despite ample evidence that Petitioner was mentally unsound and incompetent, the court failed to order a competency hearing *sua sponte*. Under the circumstances of this case, federal due process obligated the court to initiate proceedings to determine Petitioner's competency to waive presentation of mitigation evidence. Before accepting Petitioner's purported waiver of mitigation evidence at the penalty trial, the court was required by law to determine his competency. Failing to do so, the court erred and abused its discretion.

1462. An error in failing to declare a doubt as to competence is reversible *per se*. *Pate*, 383 U.S. at 389. Such an error may not be cured by a retrospective determination of Petitioner's mental competence.

1463. Were a lesser standard of error other than prejudice *per se* to apply, the trial court's failure to inquire as to Petitioner's mental competence to waive penalty trial ultimately prejudiced Petitioner. First, a retrospective determination of Petitioner's competence would demonstrate that Petitioner was, in fact, incompetent to stand trial and incompetent to waive his rights. Second, in the alternative, the jury considered the mass of evidence at guilt trial. Following the guilt verdicts, the jury deliberated for a lengthy period of time at the penalty trial. However, the jury was prevented from considering any mitigation evidence in the penalty phase because the court turned a blind eye to Petitioner's mental incompetence and permitted him to waive presentation of significant mitigating evidence to the jury. The Supreme Court in *Godinez v. Moran*, 509 U.S. 389, 396, 113 S. Ct. 2680, 125 L. Ed. 2d 321 (1993), reaffirmed that a defendant cannot stand trial if he cannot "consult with his lawyer with a reasonable degree of rational understanding," or lacks "a rational as well as factual understanding of the proceedings against him." The Court has long held that an incompetent person cannot be permitted to proceed to trial: "We have repeatedly and consistently recognized that 'the criminal trial of an incompetent defendant violates due process.'" *Cooper v. Oklahoma*, 517 U.S. 348, 354, 116 S. Ct. 1373, 134 L. Ed. 2d 498 (1996).

1464. The error constituted a federal due process violation under the Fourteenth Amendment and penalty reliability under the Eighth and Fourteenth Amendments with respect to the heightened need for the determination that death is the appropriate punishment. *Woodson v. North Carolina*, 428 U.S. 280, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976); *California v. Ramos*, 463 U.S. 992, 103 S. Ct. 3446, 77 L. Ed. 2d 1171 (1983). Petitioner's right to a fair penalty determination

was prejudiced as a result of the court's failure to conduct a proper competence and waiver inquiry.

1465. The foregoing violations of Petitioner's constitutional rights, taken singly or in combination with the other errors alleged in the Petition, constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Petition, so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violations of Petitioner's rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622, 637-38.

1466. In addition, the denial of his right to effective assistance of counsel substantially prejudiced Petitioner, rendered the trial proceeding fundamentally unfair, eroded the reliability of the verdict and had a substantial and injurious effect on the verdict. But for the denial of this right, it is reasonably probable that a more favorable result would have been attained. Under these circumstances, the adversarial system completely broke down, and Petitioner was left without meaningful representation. Although many of trial counsel's errors were, by themselves, so egregious as to require reversal, the extraordinary accumulation of errors and omissions over the course of the trial created a total breakdown in the adversarial process, so that prejudice is conclusively presumed. *United States v. Cronic*, 466 U.S. 648, 656-662, 104 S. Ct. 2039, 2045-48, 80 L. Ed. 2d 657 (1984). Even assuming a showing of prejudice is required, Petitioner has made

that showing here.  *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

**CLAIM 20:**

> **THE TRIAL COURT'S DENIAL OF  PETITIONER'S**
> **MOTION TO SEVER UNRELATED INCIDENTS VIOLATED**
> **HIS CONSTITUTIONAL RIGHTS AT BOTH PHASES OF**
> **THE TRIAL**

1467.  Exhaustion of the claim:  The argument in this claim regarding the guilt phase was fairly presented to the California Supreme Court in the direct appeal, in Section V of the Opening Brief.  The argument as to the effect of the violation at the penalty phase was fairly presented to the California Supreme Court, in Section XXI of the Opening Brief.

1468.  In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

1469.  Those facts and allegations set forth in the petition, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

**A.     Facts**

1470.  On September 30, 1987, Petitioner moved to sever counts comprising fifteen incidents:  forty-three charges, and nineteen special circumstances.  (XXIV CT 7003-17.)  Petitioner offered two principal grounds in support of his motion: (1) the crimes charged were not connected in their commission and (2) the offenses were not cross-admissible.  He sought to sever the charged crimes into eight different trials based on cross-admissibility of physical evidence as follows:

(a) Petersen and Abowath (common ballistics evidence)[107];

(b) Hernandez/Okazaki, Yu and Kneiding (common ballistics evidence);

(c) Khovananth and Zazzara (common ballistics evidence);

(d) Higgins[108] (absence of any cross-admissible evidence);

(e) Vincow (absence of cross-admissible evidence);

(f) Kneiding, Bennett, Bell/Lang, Cannon, Nelson, and Doi (similar shoe print evidence);[109]

(g) Dickman (absence of cross-admissible evidence); and,

(h) Kyle (absence of cross-admissible evidence).

(XXIV CT 7119.)

1471. Petitioner conceded the existence of eyewitness identification evidence in nine incidents: Hernandez/Okazaki, Yu, Doi, Kyle, Nelson, Dickman, Khovananth, Petersen, and Abowath. (XXIV CT 7120-22.)

---

[107] According to the prosecution's case, there were four different firearms used in three separate sets of incidents and one unrelated incident. At trial, the prosecution established that the same .22-caliber firearm was used in Hernandez/Okazaki, Yu and Kneiding, but a different .22-caliber firearm was used in Zazzara and Khovananth. A third weapon was used in Doi, a .22-caliber, Jennings semi-automatic pistol. Bullets and cartridge casings recovered in Petersen and Abowath were identified as fired from the same .25-caliber firearm which was not recovered.

[108] At the hearing on the severance motion, the prosecution conceded that the Higgins incident was dissimilar and moved to dismiss counts 19 and 20 of the information pursuant to § 1385. The court so ordered. (40 RT 2865-67.) The dismissal is reflected in the amended information filed December 9, 1987. (XIX CT 5372-5417.) Petitioner was neither tried for nor convicted of any crimes involving Higgins. That incident is thus not included in this claim for relief.

[109] Shoe prints were identified as having been made by Avia aerobic shoes, size 11 to 12, except in Abowath, where the shoe print matched Stadia brand shoes worn by Petitioner at the time of his arrest.

1472. The prosecution argued that all counts had been properly joined and that all evidence would be cross-admissible. It argued, for example, that stab wounds inflicted on the victim in the Vincow incident were shared common marks with evidence in other incidents in which a sharp instrument was used. (*See* 40 RT 2865.)

1473. The trial court ruled that all crimes were of the same class. In all incidents in which a homicide had occurred, it reasoned that burglary charges formed the basis for alleged felony-murder special circumstances, and that all evidence in every incident was cross-admissible because of the existence of a common scheme and design. (40 RT 2868.) The court also ruled that the need for judicial economy outweighed any potential prejudice to Petitioner. (*Id*. at 2869-70; XXV CT 7217.)

## B.    Argument

1474. Joinder of separate offenses in a single trial is permitted under § 954 if the alleged crimes are all related by stemming from the same incident, being alternate statements of the same offense, or belonging to the "same class of crimes or offenses." Section 954 grants discretion to a trial court to sever counts that are otherwise joinable under the statute. However, a trial court must sever separate offenses if the defendant makes a clear showing of potential prejudice from the joinder. *People v. Kraft*, 23 Cal. 4th 978, 1030, 5 P.3d 68, 99 Cal. Rptr. 2d 1 (2000); *People v. Bradford*, 15 Cal. 4th 1229, 1314-15, 939 P.2d 259, 65 Cal. Rptr. 2d 145 (1997).

1475. The party seeking severance has the burden to show there is a "substantial danger of prejudice requiring that the charges be separately tried." *People v. Bradford*, 15 Cal. 4th at 1315. A trial court's ruling denying severance is reviewed under an abuse of discretion standard. *Id*. Appellate review of the denial of a motion to sever is judged by the information "available to the court at

the time the motion is heard." *People v. Cummings*, 4 Cal. 4th 1233, 1284, 850 P. 2d 1, 18 Cal. Rptr. 2d 796 (1993).

1476. The factors to be considered in granting or denying severance are well-established.  Denial of a motion to sever may constitute an abuse of discretion when:  (1) evidence of the crimes to be tried jointly would not be cross-admissible in separate trials; (2) certain charges are unusually likely to inflame the jury against the defendant; (3) a relatively "weak" case has been joined to a relatively "strong" one; and (4) a capital offense is joined to noncapital ones or the joinder itself causes the case to be a capital one.[110]  *People v. Bradford*, 15 Cal. 4th at 1315; *People v. Kraft*, 23 Cal. 4th at 1030.

1477. The process of determining the first of these factors (cross-admissibility) essentially involves an application of Evidence Code § 1101 to the evidence of each incident.[111]  *Kraft*, 23 Cal. 4th at 1030-31.  As noted in *People v. Thompson*, 27 Cal. 3d 303, 316-17, 611 P.2d 883, 165 Cal. Rptr. 289 (1980):

> Evidence Code § 1101 subdivision (a) expressly prohibits the use of
> an uncharged offense if the only theory of relevance is that the

---

[110]  The Yu incident was a non-capital homicide charge that was elevated to a capital case by reason of joinder.

[111]  In relevant part, § 1101 provides as follows:

> (a) . . . [E]vidence of a person's character or a trait of
> his character (whether in the form of an opinion,
> evidence of reputation, or evidence of specific instances
> of his conduct) is inadmissible when offered to prove
> his conduct on a specified occasion.
> (b)  Nothing in this section prohibits the admission of
> evidence that a person committed a crime, civil wrong,
> or other act when relevant to prove some fact (such as
> motive, opportunity, intent, preparation, plan
> knowledge, identity, or absence of mistake or accident)
> other than his disposition to commit such acts.

accused has a propensity (or disposition) to commit the crime
charged and that this propensity is circumstantial proof that the
accused behaved accordingly on the occasion of the charged offense
. . . . Subdivision (a) does not permit a court to balance the
probative value of the evidence against its prejudicial effect. The
inference of a criminal disposition may not be used to establish any
link in the chain of logic connecting the uncharged offense with a
material fact. If no theory of relevancy can be established without
this pitfall, the evidence of the uncharged offense is simply
inadmissible.

1478. Evidence Code § 1101(b), however, permits evidence of other
crimes if offered to prove identity or intent, for example, not simply propensity:

[E]vidence of 'other crimes' or prior acts of misconduct may be
admissible provided that it has relevance to the issues of the intent or
identity of the accused . . . . Thus, for example, evidence of a
common design or plan, which might be highly probative of the
identity of the perpetrator or of his intent to commit the offense, may
very well meet relevancy standards.

*Williams v. Superior Court*, 36 Cal. 3d 441, 449, 683 P.2d 699, 204 Cal. Rptr.
700 (1984).

1479. If the evidence supporting the joined counts does not meet the test
under Evidence Code § 1101, it would not be cross-admissible in separate trials
and, therefore, joinder is potentially prejudicial although not dispositive. *People
v. Bradford*, 15 Cal. 4th at 1315-16.

1480. The proffered evidence must first be analyzed to determine what
facts are in dispute. *See People v. Alcala*, 36 Cal. 3d 604, 634, 685 P.2d 1126,
205 Cal. Rptr. 775 (1984); *People v. Thompson*, 27 Cal. 3d at 316 ((the trial court
"must examine the precise elements of similarity between the offenses with

536

respect to the issue for which the evidence is proffered and satisfy itself that each link of the chain of inference between the [offenses] is reasonably strong.") (quoting *People v. Schader*, 71 Cal. 2d 761, 775, 457 P.2d 841, 80 Cal. Rptr. 1 (1969)).

1481. Before admitting evidence of one crime to prove commission of another crime, this Court requires a strong chain of inference to show that the facts surrounding the commission of one crime are probative of the identity or intent of the perpetrator in another crime. The court should resolve any doubts regarding admissibility in favor of exclusion. *See, e.g.*, *People v. Bean*, 46 Cal. 3d 919, 937-38, 760 P.2d 996, 251 Cal. Rptr. 467 (1988) (burglary-homicides twelve blocks apart in which victims were struck on the head were not sufficiently similar to allow cross admission); *People v. Alcala*, 36 Cal. 3d at 631-36 (evidence of attacks on young girls not admissible in prosecution for murder of a young girl); *People v. Thompson*, 27 Cal. 3d at 316-21 and note 22 (evidence of prior robbery not sufficiently similar to charged robberies); *People v. Guerrero*, 16 Cal. 3d 719, 548 P. 2d 366, 129 Cal. Rptr. 166 (1976) (rape of a 17-year-old girl six weeks earlier not admissible to prove rape of a murder victim).

1482. In admitting other crimes evidence, the California Supreme Court has also found the requirement of common marks a touchstone of cross-admissibility:

> [O]nly common marks having some degree of distinctiveness tend to raise an inference of identity and thereby invest other-crimes evidence with probative value. The strength of the inference in any case depends upon two factors: (1) the *degree of distinctiveness* of individual shared marks, and (2) the *number* of minimally distinctive shared marks.

*People v. Thornton*, 11 Cal. 3d 738, 756, 523 P.2d 267, 114 Cal. Rptr. 467 (1974) (*overruled on other grounds* in *People v. Flannel*, 25 Cal. 3d 668, 684 n.12, 603

P.2d 1, 160 Cal. Rptr. 84 (1979) (emphasis in original).  The evidence required to lead to the different inferences is significant.  To show common scheme or plan, "the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual."  *People v. Ewoldt*, 7 Cal. 4th 380, 403, 867 P.2d 757, 27 Cal. Rptr. 2d 646 (1994).  To show identity via *modus operandi*, the evidence must disclose common marks or identifiers that, considered singly or in combination, support a "strong inference" that the defendant committed all the crimes so joined.  *People v. Bean*, 46 Cal. 3d at 937; *People v. Ewoldt*, 7 Cal. 4th at 403; *Bradford*, 15 Cal. 4th at 1316.

1483.  In Petitioner's case, many incidents were dissimilar.  For example, the Yu incident occurred on a public street and involved the shooting of a woman following a struggle near a parked car.  That case was completely dissimilar to the stabbing death that occurred in the Vincow incident or the shooting deaths in the Zazzara incident.  They, in turn, were dissimilar to the sexual assaults in the Kyle and Dickman incidents.  Under *People v. Bean*, 46 Cal. 3d at 937, there were insufficient distinctive marks among the various incidents to support a strong inference that Petitioner committed all the crimes.  The court should not have permitted joinder under Evidence Code §§ 1101(a) or (b).

1484.  Petitioner's case was so unusual and unique that once some evidence linked Petitioner to one incident, the jury would presume his guilt of every charged crime.  At the time of the trial court's ruling, each of the joined offenses was highly inflammatory.  The media had identified Petitioner as the perpetrator of four non-homicide incidents.  Some physical evidence linked Petitioner to the brutal killings of other elderly or vulnerable victims in eleven other incidents.  However, the disparity in the strength of evidence between non-homicide and homicide incidents was likely to result in impermissible bootstrapping and

spillover effects, leading inevitably to Petitioner's conviction on all counts despite the state or strength of the evidence.

1485. The joinder of forty-three counts involving fifteen separate incidents also allowed the prosecution unfairly to exploit relatively strong fingerprint evidence that existed solely in the Vincow incident to bolster evidence in other incidents, such as Yu, Cannon, and Kneiding, where there was only a weak, inferential link to Petitioner. Moreover, joinder of non-homicide offenses in the Kyle, Bennett, Dickman, and Petersen incidents with the more inflammatory murders committed in the Zazzara, Khovananth and Abowath incidents was highly likely to preclude the jury from dispassionately evaluating any of the evidence and from returning any verdict based solely on the evidence of each particular crime.

1486. The prosecution needed joinder of all fifteen incidents to make its case on all forty-three counts, since evidence of Petitioner's identity as the perpetrator was derived from inferential links from those incidents with seemingly solid identification evidence to those with none whatsoever. In closing argument, the prosecutor used the circumstantial links between the attempted murders in the Petersen incident and the Zazzara murders, and those between the sexual assault incidents in Dickman and Kyle, and the murders in Doi, Nelson, and Bell\Lang to urge the jury to convict Petitioner on all counts.

1487. The prosecutor also argued that generic marks in some incidents proved Petitioner's guilt in all of the incidents. With respect to the Kneiding and Zazzara incidents, for example, the prosecutor argued Petitioner's guilt was demonstrated by evidence that, although different weapons had been used, the victims commonly suffered gunshot wounds to the head and three of the four victims in unrelated incidents suffered cuts to the throat. (209 RT 24007.)

539

1488. Manifesting the extent to which purported common marks were used, the prosecutor stressed that the Kneiding residence was underneath a freeway that was near another freeway that led to Vincow's apartment:

> [T]his was an incident that took place in Glendale, . . . just almost virtually underneath the freeways there, a couple of freeways that join, and just up the way there from our very first murder, that is the murder of Jennie Vincow, just over the border from Los Angeles into Glendale.

(209 RT 24007.)

1489. Similarly, the prosecutor urged that in the Khovananth incident marks found on Mrs. Khovananth's arm had some similarity to marks on Mrs. Zazzara. (209 RT 24025.) The prosecution argued similarities in the Petersen and Zazzara incidents. (209 RT 24039.) In the Dickman incident, the prosecutor argued Petitioner's guilt based on similar evidence in the Nelson and Doi incidents:

> Just like the Nelson situation, somebody has torn that screen opened and tried to get in there and then opted for the cat door . . . .
>
> . . .
>
> And so we showed her the gun that we had here that was associated with the Doi murder, and she said 'yeah,' it appeared similar to that gun . . . .

(208 RT 23984-85; 208 RT 23988.)

1490. In the Kyle incident, the prosecutor argued there was evidence that was identical to the Bell and Lang incident:

> [W]e actually have the handcuffs here and the key. The key is still hooked there, and you will see that that key is identical to the one that was found at the Bell and Lang residence.

(207 RT 23893.)

1491. The prosecutor premised the theory of guilt in all incidents on tenuous common links or marks among all crimes. The prosecutor's closing argument insured that the jury would focus on inferential links and would use weak, but inflammatory evidence from one incident unfairly to bolster the evidence in other incidents.

1492. In evaluating inflammatory evidence in the fifteen unrelated incidents, the Court should consider that nighttime attacks on vulnerable victims in their homes, often in their own beds, are shocking and disturbing to average jurors. Besides this reality, other evidence heightened the potential prejudice from joinder of unrelated crimes. For example, the nature of some wounds was particularly gruesome (postmortem removal of victim Maxine Zazzara's eyes). A pentagram was discovered drawn on a victim in another case. Satanist elements were found in the Abowath incident.

1493. Empathy for a particularly vulnerable victim, revulsion at gruesome acts committed on the bodies of some victims, and random attacks on average citizens were likely to provoke strong emotional reactions by the jury and prevent unbiased evaluation of the evidence concerning each separate incident. The joinder of less sensational incidents – the attempted murders of Hernandez, Bennett and the Petersens; murders in the Okazaki, Yu, Doi, Nelson, and Cannon incidents; and sexual assaults in the Kyle and Dickman incidents with the more sensational and inflammatory incidents – Zazzara, Bell/Lang, Kneiding, Khovananth, and Abowath was thus highly prejudicial.

1494. In evaluating the trial court's ruling on Petitioner's severance motion, this Court should also examine the relative levels of inflammatory evidence. *People v. Balderas*, 41 Cal. 3d at 174-76. Inflammatory evidence generally induces an irrational or emotional reaction in the jury. *See, e.g., People v. Karis*, 46 Cal. 3d 612, 638, 758 P.2d 1189, 250 Cal. Rptr. 659 (1988) (evidence that evokes emotional bias against a defendant but has little effect on

541

the issues is prejudicial).  One such category of evidence in this case was evidence of sexual misconduct or deviant behavior.  Sexual acts have an exponentially greater potential for inducing emotional responses from jurors, inflaming their passions, than other types of evidence. Although the state court has not found that a sexual offense is inherently inflammatory (*see People v. Balderas*, 41 Cal. 3d at 174 (in joinder of sex offense and robbery to homicide count, "there was no charge or evidence particularly calculated to inflame or prejudice a jury" since the behavior was not "particularly brutal, repulsive, or sensational")), there is little doubt that this sort of evidence stirs profound emotions. *See Coleman v. Superior Court*, 116 Cal. App. 3d 129, 172 Cal. Rptr. 86 (1981) (joinder of child molestation count to adult rape and murder counts was inflammatory).

1495. In *Coleman*, the court specifically found prejudice from the joinder of unrelated incidents to be great because evidence of charged sex crimes would inflame the jury in its consideration of a charged murder.  *Coleman v. Superior Court*, 116 Cal. App. 3d at 138.

> This difficulty would be exacerbated by the fact that the  murder
> case consists primarily of circumstantial evidence; [palm and thumb
> prints] . . . .  If a juror has a reasonable and appropriate doubt about
> the identity of the murderer, the jury may find it difficult to maintain
> that doubt in the face of direct evidence concerning [the] repulsive
> crimes . . . .

*Id*. Petitioner's case is more analogous to *Coleman* than *Balderas* in that the jury here, as in *Coleman*, had many opportunities to become inflamed by relatively weak evidence that was simply brutal, repulsive, and sensational.  In *Balderas*, multiple sexual assaults all involved the same victims during a single, continuing episode.  The victims in *Balderas* were not physically harmed beyond the sexual assaults.  *People v. Balderas*, 41 Cal. 3d at 170.  Here, in contrast, Petitioner's

jury was presented with multiple sexual assaults in four unrelated incidents (Kyle, Dickman, Khovananth, and Abowath). In two of the four incidents, the victims' husbands were murdered. In eleven other incidents, sex offenses were not alleged. Thus, both the number and nature of sexual assaults in some, but not all, incidents constituted highly inflammatory evidence likely to infect evaluation of the evidence in all remaining incidents unlike *Balderas*. In view of the number of incidents and victims, and the extensive media attention given to events surrounding Petitioner's apprehension and trial, this case is both quantitatively and qualitatively different from such cases as *Balderas* where joinder was upheld.

1496. Joinder has also been upheld where a defendant failed to demonstrate prejudice. For example, in *People v. Mendoza*, 24 Cal. 4th 130, 162, 6 P.3d 150, 99 Cal. Rptr. 2d 485 (2000), the court held that evidence as to each of the consolidated counts was of the same relative strength and, further, that "counts likely to inflame a jury . . . were sufficiently distinct from the consolidated counts as to render the likelihood of prejudice minimal." In *People v. Bradford*, 15 Cal. 4th at 1317, the court found that two unrelated murders were "similar in nature and equally gruesome." The court held the defendant failed to show prejudice by the joinder of both counts where the prosecution's case as to each murder was "nearly equal in strength." *Id*. In *People v. Davis*, 10 Cal. 4th 463, 896 P.2d 119, 41 Cal. Rptr. 2d 826 (1995), the defendant conceded that evidence of sexual assault against one victim and sexual assault and murder against another victim was cross-admissible. *Id*. at 508-09. The court ruled the defendant failed to show the evidence was inflammatory. In *Cummings*, 4 Cal. 4th at 1284-85, the court held that robbery and murder charges were properly joined where eyewitnesses identified the defendant as a participant in the murder, thus ruling out any possibility that evidence of the robbery unfairly influenced the jury.

1497. Here, however, the prosecutor linked Petitioner to weak incidents simply because the cases were joined. The tremendous difference in the inflammatory nature of some murders, such as the Zazzara incident as compared to the Yu incident or the Petersen attempted murder incident, rendered the joinder of all incidents highly prejudicial. This case thus contrasts dramatically with *People v. Bradford*, 15 Cal. 4th at 1315, where evidence as to some counts was not sufficiently inflammatory to infect or taint other counts. *See also People v. Kraft*, 23 Cal. 4th at 1030 (murder, mayhem, and sodomy charges alleged against same victims).

1498. A prejudicial spillover effect also occurred in this case by joining counts involving relatively weak evidence with those involving relatively strong evidence. In *People v. Smallwood*, 42 Cal. 3d 415, 722 P.2d 197, 228 Cal. Rptr. 913 (1986), the court held that such erroneous joinder of counts likely contributed to the defendant's convictions. The court found that the verdicts on some counts could have been the result of a compromise due to the spillover effect arising from the jury's consideration of unrelated charges. Citing *Williams v. Superior Court*, 36 Cal. 3d 441, the court further observed that evidence on one joined count was weak, thus making it more likely that joinder affected the outcome. *People v. Smallwood*, 42 Cal. 3d at 429.

1499. In *People v. Musselwhite*, 17 Cal. 4th 1216, 954 P.2d 475, 74 Cal. Rptr. 2d 212 (1998), the court again considered the potential spillover effect of joining two unrelated offenses in a consolidated trial. The court stressed that the evidence was not inflammatory and that the spillover effect was minimal largely owing to the mental state defense and brain disorder evidence offered by the defendant as to both murders. *Id*. at 1245-46.

1500. In Petitioner's case, in contrast, strong evidence supported some counts; other counts were only weakly supported. The weak counts, however, were extremely inflammatory. The prosecution's eyewitness identification

evidence established that Petitioner was the assailant in Hernandez and Okazaki, Kyle, Dickman, Khovananth, Petersen, and Abowath. Eyewitness testimony of bystanders in Yu, Doi and Nelson pointed to Petitioner as the perpetrator. As to the other counts, Bell and Lang, Cannon, and Nelson, there was either no identification evidence or at best weak physical evidence that only tenuously linked Petitioner to the crimes.

1501. Moreover, the evidence in each incident was not of equal strength. *People v. Balderas*, 41 Cal. 3d at 173 (joinder of weak and strong cases may alter the outcome). The spillover effect thus made it impossible for the jury to compartmentalize evidence of fifteen unrelated incidents, including cases in which there were eyewitnesses as compared with cases in which there were no eyewitnesses and very little physical evidence to connect Petitioner to the crimes. There was no safeguard against a significant spillover effect of the evidence in some incidents in this case that would otherwise have been prevented had Petitioner's severance motion been granted. The trial court's instructions did not deal with the possibility of the spillover effect. (*See* 212 RT 24418.)

1502. Judicial economy was not an overriding concern. It should not have outweighed inflammatory evidentiary concerns or the spillover effect. The court could have easily severed Petitioner's case, for example, into four separate groups: the distinct Vincow incident; those incidents involving inflammatory evidence, such as mutilation and Satanism;[112] incidents with minimal inflammatory evidence;[113] and incidents in which no murders occurred.[114]

---

[112] The Zazzara, Bell/Lang, Cannon, Nelson, and Khovananth incidents.

[113] The Hernandez/Okazaki, Yu, Kneiding, and Abowath incidents.

[114] The Bennett, Kyle, Dickman, and Petersen incidents.

545

Petitioner's trials overall would have been substantially shortened.  As the *Williams* court observed:

> Although there is inevitably some duplication in cases where the
> same defendant is involved, it would be error to permit this concern
> to override more important and fundamental issues of justice.  Quite
> simply, the pursuit of judicial economy and efficiency may never be
> used to deny a defendant his right to a fair trial.

*Williams v. Superior Court*, 36 Cal. 3d at 451-52.

1503.  The state court has condemned joinder that bolsters a weak case.  In *Bradford*, for example, the court found that where evidence of guilt was stronger in one case, joinder may bolster an otherwise weak case due to the cumulative effect of the evidence.  That is precisely what occurred here.  Because of similarities of some incidents, coupled with inflammatory evidence in others, the cumulative effect of the evidence as a whole could not be compartmentalized by the jury.  Where "it would be difficult for jurors to maintain doubts about the weaker case when presented with stronger evidence as to the other," prejudice has been demonstrated.  *Williams v. Superior Court*, 36 Cal. 3d at 453; *see also Coleman v. Superior Court*, at 138; *People v. Davis*, 10 Cal. 4th at 508; *Bradford*, at 1318.

1504.  Improper joinder of fifteen unrelated incidents was highly prejudicial.  Judicial economy did not justify it.  There was a strong likelihood that the spillover effect would ineluctably lead to Petitioner's conviction on all counts despite the evidentiary gaps in some cases.

1505.  Overall, the joint trial of forty-three counts and nineteen special circumstance allegations was unfair and amounted to a denial of due process.  *People v. Ochoa*, 19 Cal. 4th 353, 409, 966 P.2d 442, 79 Cal. Rptr. 2d 408 (1998); *People v. Arias*, 13 Cal. 4th 92, 127, 913 P.2d 980, 51 Cal. Rptr. 2d 770 (1996); *see also People v. Johnson*, 47 Cal. 3d 576, 590, 764 P.2d 1087, 253 Cal.

Rptr. 710 (1988).  Denial of due process of law in a capital trial violates the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. *See Estelle v. McGuire* (erroneous trial court evidentiary rulings implicate federal due process guarantees); *Walters v. Maass* (infringement on federal constitutional protections deprives a defendant of due process); *Caldwell v. Mississippi* (reliable determination of penalty required under the Eighth Amendment).

1506.  Federal authority fully protects state defendants against improper joinder of inflammatory charges.  *See Park v. California*, 202 F.3d 1146 (9th Cir. 2000); *Procter v. Butler*, 831 F.2d 1251 (5th Cir. 1987); *Breeland v. Blackburn*, 786 F.2d 1239 (5th Cir. 1986).  In *Bean v. Calderon*, 163 F.3d 1073 (9th Cir. 1998), the Court ruled that the defendant was deprived of his fundamental right to a fair trial because of the improper joinder of weak and strong cases.  The Court noted that a high risk of prejudice occurs when other-crimes evidence is introduced, making it difficult for jurors to compartmentalize the damaging information.  The Court concluded after review of the record that joinder of the two cases was fundamentally unfair because weak counts consolidated with more compelling charges led the jury "to infer criminal propensity."  *Id.* at 1083; *see also United States v. Lewis*, 787 F.2d 1318 (9th Cir. 1986).

1507.  In *Featherstone v. Estelle*, 948 F.2d 1497, 1503 (9th Cir. 1991), the Court held that consolidation of separate incidents taints proceedings and renders a trial fundamentally unfair where the jury is unable properly to compartmentalize the evidence.  In *Featherstone*, however, the jury failed to convict the defendant on one count, thus demonstrating by its verdicts that it had properly compartmentalized the evidence.  In Petitioner's case, nothing in the record shows that the jury compartmentalized the highly inflammatory evidence.

1508.  In addition, Petitioner was further prejudiced by the continued impact and spillover effect of the court's ruling during the penalty trial in

547

violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

1509. A prejudicial spillover effect first occurred during the guilt trial as a result of the joinder of weak and strong counts. At the penalty trial, the joinder also created a spillover effect. In closing argument, the prosecutor urged Petitioner's convictions of noncapital crimes as a basis for a death verdict:

> May 30, 1985, we get to the first instance where the defendant committed one of these crimes, that is Carol Kyle, . . . and someone survived that he did not intend to kill.
>
> . . .
>
> And I submit to you, if somebody tells you, well, that was an act in mitigation, maybe so if the killing had ended there, see? Maybe so.

(217 RT 24827.)

1510. The prosecutor compared less sensational murders, such as the Yu incident to more sensational murders which involved mutilation:

> . . . so you didn't have the mutilation [in Okazaki] that you had in a number of these other cases, but certainly very cold-blooded, deliberate act and inexcusable.
>
> . . .
>
> March 17 also, the murder of Ms. Yu out on the street . . . .
> Another terrible act again with no time to mutilate . . . .

(217 RT 24824.)

1511. In addition, any lingering doubt about Petitioner's guilt on some counts sought to be severed was removed by the prosecutor's prejudicial argument that Petitioner deserved death because of his convictions in all of the fifteen unrelated incidents. (*See* 217 RT 24823-31; *People v. Marshall*, 13 Cal.

4th 799 (1996); *People v. Osband*, 13 Cal. 4th 622, 919 P.2d 640, 55 Cal. Rptr. 2d 26 (1996)).

1512. Based on the length of the jury's deliberations, it is reasonably likely that in the absence of the prejudicial joinder, at least one juror would have voted for a sentence less than death. Thus, Petitioner's right to a reliable determination of penalty was violated. *Caldwell v. Mississippi*, 472 U.S. at 341. The error implicated Petitioner's Eighth and Fourteenth Amendment rights.

1513. For the same reasons set forth *supra*, the inflammatory evidence pertaining to fifteen consolidated incidents produced a spillover effect and precluded a fair and reliable determination of penalty. Given the nature of the defense at the guilt trial coupled with the total absence of mitigation evidence at the penalty trial, the penalty of death determination was unreliable in this case in violation of the Eighth Amendment. *Caldwell v. Mississippi*, 472 U.S. at 341.

1514. The erroneous denial of a severance motion or improper joinder of charges is of federal constitutional dimension. For the same reasons discussed in *Bean v. Calderon*, 163 F.3d 1073, and *Park v. California*, 202 F.3d 1146, joinder of fifteen unrelated incidents in the present case violated Petitioner's rights to due process of law and fair trial in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. In light of Petitioner's convictions – twelve counts of first degree murder, one count of second degree murder, thirty additional felony counts, and nineteen true special-circumstance findings – it cannot be said that the jury was effectively able to compartmentalize the damaging, spillover information. Considering as well the absence of any mitigating evidence at the penalty trial, the conclusions are inescapable that joinder could not have been harmless beyond a reasonable doubt and that Petitioner was denied a reliable and meaningful determination of penalty in violation of the Eighth Amendment. *Caldwell v. Mississippi*, 472 U.S. at 329.

549

1515. Violation of federal due process and fair trial rights occurs where the improper joinder of charges renders a trial unfair. *Park v. California*, 202 F.3d 1146 (9th Cir. 2000). Petitioner's Fifth, Sixth, Eighth, and Fourteenth Amendment rights were violated by the improper consolidation of charges at trial. Petitioner's rights to due process, a fair trial, and a reliable penalty determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments were also violated because the improper joinder unfairly tipped the scales toward death. *Washington v. Texas*, 338 U.S. 14, 87 S. Ct. 1920, 18 L. Ed. 2d 119 (1967); *Estelle v. McGuire*, 502 U.S. 62, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991).

1516. The foregoing violations of Petitioner's constitutional rights, taken singly or in combination with the other errors alleged in the Petition, constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Petition, so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violations of Petitioner's rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622, 637-38.

CLAIM 21:

## THE TRIAL COURT VIOLATED PETITIONER'S
## CONSTITUTIONAL RIGHTS BY DENYING HIS MOTION
## TO HAVE A JURY DRAWN FROM A REPRESENTATIVE
## CROSS-SECTION OF THE COMMUNITY

1517. Exhaustion of the claim: This claim was fairly presented to the California Supreme Court in the direct appeal. It was presented in Section VI of the Opening Brief.

1518. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

1519. Those facts and allegations set forth elsewhere in this petition, and the claims of constitutional violations and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication.

1520. Petitioner's trial was held in the Superior Court of Los Angeles County in the downtown region of the City of Los Angeles. Both the superior and municipal courts housed in the downtown courthouse were part of a segment of Los Angeles County courts known as the "Central Judicial District." All superior and municipal courts of every district in Los Angeles County shared the same jury pool managed by the Los Angeles County Office of the Jury Commissioner.

1521. On January 20, 1988, prior to jury selection, Petitioner challenged the composition of Los Angeles County jury pools and moved to quash all existing panels.[115] Petitioner alleged that Los Angeles County jury selection

_____

[115] The motion was not part of the record on appeal. Subsequent to record certification, Petitioner filed with the California Supreme Court, pursuant to

551

procedures failed to comply with California Code of Civil Procedure § 190 et seq., that cognizable groups were unconstitutionally excluded from the jury pool for Los Angeles County and its downtown superior court, and that Petitioner was denied his right to a representative cross-section of the community guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. In response, the prosecution asserted that Petitioner failed to make a *prima facie* showing of systematic exclusion of a cognizable group. (26 CT 7578-88.)

1522. The trial court heard Petitioner's motion during various hearings in April and May 1988. (*See* 26 CT 7650-53, 7659, 7661-62, 7680-82, 7684.)

1523. On April 1, 1988, defense counsel moved to continue both the jury composition hearing and the trial because the new 1988-1989 master list containing most of Petitioner's jurors would not be completed or available to study until sometime in May or June 1988. (51 RT 3392, 3397, 3413.) The prosecution argued that the claim could be proven using statistics from any fiscal year's master list. "(I)f the jury selection system is systematically invalid at this time, . . . it will be systematically invalid in the future . . . . The statistics are not going to change." (51 RT 3383, 3506.) The court agreed with the prosecution that no statistically significant difference existed from one fiscal year to the next and denied defense counsel's motion to continue. (51 RT 3511.) Defense counsel objected. (51 RT 3513.)

1524. Beginning in 1984, the California legislature required jury commissioners to merge the Registrar of Voters (ROV) list with the California Department of Motor Vehicle (DMV) list of drivers when creating their master list of qualified and eligible jurors. (51 RT 3462; 52 RT 3629.) The DMV list in

_____

California Rules of Court, Rule 12, a motion to augment the record on appeal to include Petitioner's motion challenging the composition of the jury pool summoned to the Los Angeles County Superior Court in downtown Los Angeles. On February 13, 2002, the court so ordered.

552

Los Angeles County at the time of Petitioner's trial contained 5 million names compared to the Registrar of Voters (ROV) list which contained 3 million names. (52 RT 3582.) According to testimony of Raymond Arce, Director of Jury Management, Los Angeles County Office of the Jury Commissioner, a merger of the larger DMV list with the smaller ROV list was expected to result in a more inclusive jury pool and remedy under-representation of minority groups. Yet Mr. Arce found no statistically significant increase in minorities on the master jury lists from 1984 to 1987 as a result of his office's annual merging of ROV and DMV lists for Los Angeles County. (51 RT 3431; 58 RT 4212.)

1525. Mr. Arce was unaware that his data processing staff was erroneously deleting multiple names from the master jury list. (58 RT 4230.) During his first appearance at the jury composition hearings, Mr. Arce explained why he had instructed Los Angeles County data processors to include a field for driver and voter addresses in the county's matching software program. He said, "(T)he more information you have, the more likely you are to make a good decision . . . (when) eliminating a name as being (a) duplicate." (58 RT 4197, 4213, 4215.) Mr. Arce's staff's error became evident when expert witnesses from both sides met with his staff at the Department of Data Processing to discuss their matching software and merger procedures. (52 RT 3618, 3628; 57 RT 4146-48.) Mr. Arce's computer staff explained that their matching software was capable of including fields for driver and voter addresses, birth dates, age, and sex. They just had not complied with Mr. Arce's instruction to include the address field and to check whether addresses matched before deleting duplicate names. (57 RT 4103, 4105, 4146-47, 4150.) Mr. Arce testified that addresses should have been included, that no name should have been deleted without first checking its address, and that he had never questioned his staff to check whether or not his instructions had been followed. (58 RT 4232.)

1526. Mr. Arce testified that his staff was comparing only last names and the first four letters of first names. They were "tak(ing) a common name such as Jose Jiminez" from the ROV list and deleting it wherever it appeared again in the DMV list when in fact those names on the DMV list represented "a unique person and should (have been) added" to the master list. (52 RT 3673; 58 RT 4207.)

1527. Petitioner introduced Dr. John Weeks, a demographics expert and professor of sociology at San Diego State University, who testified that the problem of common first and last names is even more prevalent for Spanish-origin names. The mismanagement of the matching software had caused a disproportionate exclusion of Hispanics from the master jury list. (57 RT 4146-47; 53 RT 3749; 57 RT 4101.)

1528. Both Mr. Arce and Dr. Nancy Minter, the prosecution's expert in demographics employed by the County of Los Angeles, agreed with Dr. Weeks that adding an address field would increase the number of Hispanics in the jury pool for the downtown Los Angeles County courthouse, although they disagreed on the extent of the increase. (60 RT 4488; 62 RT 4660-65.)

1529. Experts also agreed it would take minimal cost and about two months for changes to the matching program to increase the number of Hispanics in the jury pool. (51 RT 3408; 58 RT 4225; 60 RT 4409-12, 4488-89.) Mr. Arce informed the trial court that the new master jury list for the 1988-89 fiscal year would be compiled in May and go into effect in early June; however, any changes to the matching program could not be implemented until the end of August 1988 at the very earliest. (52 RT 3526; 58 RT 4225.) Voir dire of jurors for Petitioner's trial began in July 1988.

1530. Taking note of "a certain lightness . . . in the number of Hispanics . . . in the jury lounge," the trial court suggested to Mr. Arce that he take steps to include addresses in the matching software. The trial court declined to order Mr. Arce to make that change because it did "not want to take over the jury selection

process in this county or the Jury Commissioner's Office." (61 RT 4653.) Mr. Arce reported to the trial court on June 7, 1988, that he had not been able to add addresses to the matching software as the trial court requested. (62 RT 4660-65.) Mr. Arce explained that the Department of Data Processing had experimented on a sample list using new software and adding a field for birth dates but not addresses. Jurors from the resulting list were mailed questionnaires and would enter the jury lounge with jurors from older lists by approximately mid-July. Full first names were still not included, and addresses would not be included until September or October, well after Petitioner's jurors were summoned to court. (*Id.*)

1531. Petitioner renewed his request to continue the trial until Mr. Arce could institute agreed upon changes to the 1988-1989 master jury list. Defense counsel wanted to prevent re-litigation of the issue. (69 RT 4244.) The trial court denied a continuance and said, "We're not going to re-litigate this issue that we have litigated once." (68 RT 4253.)

1532. Mr. Arce also testified that potential jurors were deleted from the master jury list whenever their preliminary questionnaires were incomplete, lost, or otherwise unreturned. (52 RT 3553.) He added that California Code of Civil Procedure § 204.3(B) made it optional for courts to send follow-up letters to track lost, unreturned, or incomplete jury questionnaires, so Los Angeles County courts had opted not to follow up. (51 RT 3448; 52 RT 3559.) Mr. Arce estimated that 11 percent more Hispanics would qualify for jury service if Los Angeles County changed the policy and required courts to follow up on lost, unreturned, and incomplete questionnaires. (51 RT 3443.)

1533. Dr. Weeks testified that the lack of follow up by Los Angeles County courts disproportionately excluded Hispanics from the jury pool since more than half of all lost, unreturned, and incomplete jury questionnaires were originally sent to people with Hispanic last names. Dr. Weeks estimated that 47

percent of Hispanics excluded for not properly responding to questionnaires would have otherwise qualified as eligible jurors. (51 RT 3401, 3404, 3487-88; 52 RT 3636, 3639-40; 53 3685.)

1534. While Dr. Minter agreed that Hispanics are disproportionately represented among people who do not respond to the jury questionnaire, she theorized that Hispanics disqualify themselves and purposefully fail to return the questionnaires because they are non-citizens or do not speak English. (55 RT 4005-4008.) Dr. Weeks suggested that Dr. Minter was overestimating self-disqualification among Hispanics compared to any other ethnic group. He cited supporting studies in Riverside and San Diego Counties. (52 RT 3620-24; 53 RT 3671, 3690.) Dr. Weeks asked for the Court's permission and time to take a sample of recently sent and returned questionnaires to determine the population of self-disqualifying Hispanic jurors in Los Angeles County and to determine whether follow-ups would increase all races proportionately, or whether it would disproportionately increase the number of jury-eligible Hispanics. (53 RT 3686.) The court disallowed the study and suggested that Dr. Weeks had enough information from other counties to give his opinion. The court called the issue "nebulous" and "a filigree" with no statistical significance. (53 RT 3826-27.)

1535. In Dr. Weeks' opinion the timing of the DMV/ROV merger systematically excluded eligible 18 and 19-year-old jurors and by extension, eligible Hispanic jurors. Mr. Arce testified that the first step in the merger of the two lists was to remove anybody on the DMV list who was under 18 years old. (52 RT 3582.) Dr. Weeks noted that because DMV lists were created in November, DMV data was outdated before the ROV/DMV merger in July. On the date of the master jury list's production, half of 18 year olds on the DMV list had turned 19 and half of the 19-year-olds had turned 20. By the end of the fiscal year, the list had no 18-year-old potential jurors. (60 RT 4422.) Dr. Weeks estimated that 84 percent of Los Angeles County's 18 to 20-year-olds were

under-represented on the jury master list. Two-thirds of that under-representation related to Los Angeles County's merger timing problem. (*Id.*) Dr. Weeks offered the solution of leaving all drivers on the DMV list, adding birth dates to the matching software, and phasing eligible jurors in as they became 18-years-old. (60 RT 4422.) Although Mr. Arce and his staff eventually added a birth date field to the matching software, the Office of the Jury Commissioner did not rectify the timing issue. (62 RT 4660.) According to Dr. Weeks, young people in Los Angeles County are disproportionately Hispanic, so their exclusion from the master jury list further reduced the percentage of Hispanics in the jury room. (53 RT 3685.)

1536. Dr. Weeks testified that the jury commissioner's system for merging ROV and DMV lists relied too heavily upon the ROV list as the primary source for jurors. The result was a jury lounge more closely aligned to the list of voters than to the population in Los Angeles County. (57 RT 4095-4101.) Even Hispanics who were eligible to vote were three-fourths less likely to register to vote than non-Hispanics. (60 RT 4418.) Consequently, the ROV list was missing a significant portion of eligible Hispanic jurors. (52 RT 3621, 3627.) The DMV list more closely represented the population of Los Angeles County. (52 RT 3628.)

1537. The trial court ordered Mr. Arce and Dr. Weeks to perform a test to determine whether it mattered which list the jury commissioner used as the primary list when merging and matching names. (53 RT 3812-14.) Dr. Weeks and Mr. Arce took a 1 percent sample from both the ROV and DMV lists to create a test sample master lists. The list was 26 percent Hispanic when the DMV list was the primary source and only 19 percent Hispanic when the ROV list was the first source. (57 RT 4144; 58 RT 4201.) Dr. Weeks concluded that the DMV list was more representative and the ROV list was inadequate; that an inadequate primary source list creates an inadequate master jury list; and that Los

Angeles County should either use the DMV list as the primary source or merge both lists to avoid the primary source list problem.  (52 RT 3625, 3629.)

1538.  Dr. Weeks supposed that a preference in procedure that gave the ROV list greater weight, the invasive deletion of eligible jurors' names from the list, the six-month delay in merging the DMV list, and the lack of follow up for lost, incomplete, or unreturned questionnaires could account for the fact that Mr. Arce had found no statistically significant increase in eligible Hispanic jurors even after DMV lists began to be merged in 1984.  (52 RT 3628.)

1539.  Population of Hispanics in the jury lounge:  Dr. Weeks and Mr. Arce did a study of jurors who appeared in the downtown Los Angeles County Superior Court from August 5 to December 14, 1987.  Of the 10,125 jurors sampled from the court's jury lounge, 14 percent identified themselves as Hispanic.  (52 RT 3596.)  Experts on both sides used 14 percent as their base for comparison.

1540.  Community:  The trial court heard testimony from all of the expert witnesses defining the community from which jurors were summoned to the downtown Los Angeles Superior Court.  Three possibilities were discussed:  the Central Judicial District, a 20-mile radius, and Los Angeles County.

a.    The "Central Judicial District" community was defined as a relatively small geographic area around the courthouse in downtown Los Angeles.  Experts agreed that the "Central Judicial District" community contained the largest percentage of Hispanics among all of the definitions of community, though they could not agree upon exact population figures.  (60 RT 4500.)  In Dr. Minter's opinion, the "Central Judicial District" community was too small of an area to represent the population from which jurors were drawn to the courthouse in downtown Los Angeles.  Dr. Minter thought this definition of community was statistically unworkable and unrealistic

558

because "20 percent of the population (of Los Angeles County) is not supplying 40 percent of the jurors." (60 RT 4454.) Asked by the prosecution how he could make population comparisons for the "Central Judicial District" community when jurors presently sitting in the jury lounge were drawn from an area larger than the "Central Judicial District" community, Dr. Weeks conceded that it required certain mathematical assumptions, but fewer than the assumptions required to make the same comparisons using the community defined as the 20-mile radius. (53 RT 3740.)

b. The idea of a community of jurors within a 20-mile radius of the courthouse originated from language in California Code of Civil Procedure § 203: "No juror shall be required to serve at a distance greater than 20 miles from his or her residence." (52 RT 3529.) Mr. Arce of the Jury Commissioner's Office testified that in Los Angeles County, a juror's name would be pulled randomly from the master list. If a court within 20 miles of the juror's residence needed jurors that day, the juror would be summoned to that court. If no court within 20 miles of the juror's residence needed a juror, then that juror was rejected and a new juror's name was pulled from the master list.

   i. Many courts in Los Angeles County were closer then 20 miles from each other and shared portions of jurors from both of their 20-mile radii. (52 RT 3544.) Dr. Weeks testified that the overlapping nature of these 20-mile radius communities created a "non-probability sample" since it was not possible to establish in advance the probability that any eligible juror within the 20-mile radius of a given courthouse could be

drawn to that court.  (57 RT 4107.)  The population of
the 20-mile radius was unpredictable and unquantifiable
on any given day.  At the Los Angeles County level, a
juror was drawn randomly and placed on the master list.
The juror's name then could be drawn randomly from
the master list.  But if that juror resided within the 20-
mile radii of two or more courthouses that required
jurors on the same day, the jury commissioner's staff
had to decide which courthouse to place the juror.  The
decision was based upon the juror's residence, but it
was no longer random.

ii.     Mr. Arce testified that the Los Angeles County master
jury list provided jurors for both the superior and the
municipal courts.  (52 RT 3527.)  The downtown Los
Angeles court where Petitioner's case was heard shared
an overlapping 20-mile radius with the municipal court
in the same building and with other courts in Los
Angeles County as well.  Dr. Weeks said the 20-mile
radius around the downtown court in Los Angeles was
not a community from which jurors could be adequately
counted or compared because its population could not
be statistically defined.  Too many variables remained
consistently unknowable.  (53 RT 3752-69, 3771,
3784.)  Dr. Minter added that the smaller size of the 20-
mile radii made those communities more fluid in
population and increased the possibility of statistical
error.  (55 RT 4055; 60 RT 449.)

iii.  In *Williams v. Superior Court*, 49 Cal. 3d 736, 781 P.2d 537, 263 Cal. Rptr. 503 (1989), a case litigated in Los Angeles County at the same time as Petitioner's case, the prosecution maintained that the community was the predominantly Caucasian "Central Judicial District." The prosecution argued in *Williams* that the "20-mile radius" community created overlaps such that jurors could reside in multiple "communities" at once and be counted multiple times, and would require the jury commissioner to violate numerous provisions of state and federal statutory and constitutional law in the course of jury selection, thus a "community" so defined would not be a "community" in any meaningful sense. *Id.* In Petitioner's case, the prosecution preferred to define community as the "20-mile radius" to include predominantly Caucasian neighborhoods outside the predominantly Hispanic "Central Judicial District." It is evident that the prosecution manipulated definitions of "community" differently to suit their cases.

iv.  The trial court had a more intuitive understanding of the 20-mile radius and could not comprehend why the "20-mile radius" community would not work for comparisons, as so many Hispanics lived near the downtown courthouse in Los Angeles. Dr. Weeks explained to the trial court that its bull's eye approach was a statistically inaccurate way to measure the issue. (53 RT 3771-72.) Dr. Minter gave a similar explanation to the trial court about why prudence is

561

1                    required in making statistical assumptions about the

2                    race of residents within the different 20-mile radii.  (60

3                    RT 4502.)

4      c.      All of the experts agreed that Los Angeles County was well defined

5                    and its population statistics were easily determined.  (57 RT 4110;

6                    60 RT 4500.)   According to Dr. Weeks, "The only disparity

7                    (figures) that we can really rely upon in this case is the disparity that

8                    we have found in the master list, because we know what the entire

9                    community of Los Angeles (County) should look like in terms of

10                   (the) percent(age) of Hispanic(s)."  (57 RT 4110.)  In Dr. Minter's

11                   opinion, county-wide calculations were more specific and required

12                   less assumption than the other community models.  (60 RT 4504.)

13     1541.  <u>Standard Deviation</u>:  Dr. Weeks calculated that 37.6 percent of the

14 population of Los Angeles County were Hispanic as of the 1980 census.  (52 RT

15 3597; 3615.)  Dr. Weeks and Mr. Arce studied a sample of 10,125 jurors in the

16 downtown Los Angeles Superior Court over a period of four months.  (57 RT

17 4144; 58 RT 4201.)  Given the population of 37.6 percent Hispanic in Los

18 Angeles County, Dr. Weeks would have expected the number of Hispanics

19 among the 10,125 people summoned to serve at the downtown courthouse over 4

20 months to be 3,807.  The observed number of Hispanics in the courthouse was 14

21 percent, or 1,418 Hispanics.  (*Id.*)  Dr. Weeks testified that the difference between

22 the expected value (3,807) and the observed number (1,418) with 49 standard

23 deviations is so large that "there is less than one chance in a ... million that we

24 would get this kind of difference only by chance alone."  (57 RT 4129-31; *see*

*also* 53 RT 3763-64, 4130; 57 RT 4110.)  Generally, a standard deviation of 2 or 3 is considered large enough to be suspect.[116]

1542. Even after subtracting for lack of English proficiency and citizenship, Dr. Weeks said that he would expect to find a 24.3 percent[117] Hispanic population in jury pools at the "bare minimum."  (52 RT 3601.)  He cautioned, though, that calculating in the language and citizenship disqualifiers for Hispanics only and not for other non-English-speaking and non-citizen groups skewed the statistics.  (53 RT 3741-48, 3774, 3804; 57 RT 4113.)  Dr. Minter did not have an estimate for 1987 but did give an estimate of the population of Hispanics in Los Angeles County in 1985.  Subtracting a percentage of Hispanics which she believed would be disqualified for language and citizenship, Dr. Minter gave her opinion that the population in Los Angeles County in 1985 included 15.7 percent jury-eligible Hispanics.[118]  (60 RT 4453.)

---

[116]  The data reflect a difference between the expected and observed number of Hispanics of approximately 49 standard deviations since the square root of 10,125 multiplied by .376 multiplied by .624 is 49.  "As a general rule ... if the difference between the expected value and observed number is greater than 2 or 3 standard deviations, then the hypothesis that the jury drawing was random would be suspect to a social scientist." *Casteneda v. Partida*, 430 U.S. 482, 496 n.17, 97 S. Ct. 1272, 51 L. Ed. 2d 498 (1977) (explaining how to calculate standard deviations); *see also United States v. Rodriguez-Lara*, 421 F.3d 932, 943 n.10 (9th Cir. 2005); *Hirst v. Gertzen*, 676 F.2d 1252, 1258 n.14 (9th Cir. 1982) (suggesting courts are incorrect to rely upon "absolute disparity" analysis which can be less accurate than standard deviation in some cases).

[117]  The data reflect a difference between the expected and observed number of Hispanics of approximately 43 standard deviations.  (The square root of 10,125 multiplied by .243 multiplied by .757 is 43.)

[118]  The data reflect a difference between the expected and observed number of Hispanics of approximately 36 standard deviations.  (The square root of 10,125 multiplied by .157 multiplied by .843 is 36.)

1543. <u>Absolute and Comparative Disparities</u>:  Mr. Arce provided Drs. Weeks and Minter with 1980 United States Census data for two geographic areas within the boundaries of the "Central Judicial District" and the "20-mile radius" communities.  Dr. Weeks requested data for the entire Los Angeles County but never received that information from Mr. Arce.  (53 RT 3702.)

a.  Dr. Weeks estimated 37.6 percent of the "Central Judicial District" community to be Hispanic.  Compared to the 14 percent population in the downtown Los Angeles jury lounge survey, Dr. Weeks calculated an absolute disparity[119] of 23.6 percentage points.  (51 RT 3476.)  This meant a relative or comparative disparity of 63 percent under-representation of Hispanics in the jury pool.[120]  Dr. Minter did not contest Dr. Weeks' figures as to the "Central Judicial District" community.  (60 RT 4479-81.)

b.  Dr. Weeks estimated 27 percent of the population within the "20-mile radius" community to be Hispanic.  (52 RT 3615.)  Compared to the 14 percent population in the downtown Los Angeles jury lounge survey, Dr. Weeks calculated an absolute disparity of 13 percentage points.  This meant a 48 percent under-representation of Hispanics in the jury pool.

1544. One dispute with the census numbers was whether upward adjustments were needed to reflect a disproportionate Hispanic population growth from 1980 to 1987.  All of the expert witnesses agreed that the 1980 census data was outdated and that the Hispanic population had increased in Los Angeles

---

[119] "Absolute disparity" is the difference between the percentage of a group within a community and its percentage in the jury pool.

[120] "Comparative" or "relative" disparity is a ratio of the absolute disparity and the expected number in the population (census data).

County from 1980 to 1987, though Dr. Minter was not certain that the Hispanic population had grown more rapidly than the remainder of the population. (51 RT 3486; 55 RT 3998-99; 4019, 4023.)

1545. Dr. Weeks adjusted upward for an estimated 8 percent growth in the jury-eligible Hispanic population from 1980 to 1987. He used data of similar growth in the population between 1970 and 1979 of jury-eligible Hispanics over the age of eighteen. (52 RT 3611-14; 53 RT 3713.) Dr. Minter estimated a 7.5 percent population growth from 1980 to 1985. (60 RT 4481.)

    a.    Accounting for a disproportionate increase in the population of Hispanics in Los Angeles County, Dr. Weeks gave what he considered a conservative estimate that 26.3 percent of the "Central Judicial District" community was Hispanic. (52 RT 3611.) Compared to the 14 percent in the downtown Los Angeles jury lounge survey, Dr. Weeks calculated an absolute disparity of 12.3 percent. This meant a relative disparity of 47 percent under-representation of Hispanics in the jury pool.

    b.    Accounting for a disproportionate increase in the population of Hispanics in Los Angeles County, Dr. Weeks estimated 17.5 percent of the "20-mile radius" community to be Hispanic. (52 RT 3615.) Compared to the 14 percent in the downtown Los Angeles jury lounge survey, Dr. Weeks calculated an absolute disparity of 3.5 percent. This meant a relative disparity 20 percent under-representation of Hispanics in the jury pool.

    c.    Dr. Minter disagreed with Dr. Weeks that population growth statistics could be applied uniformly below the Los Angeles County level to smaller communities such as the "20-mile radius" community. (60 RT 4453; 4498.)

565

1546. Another dispute regarding the 1980 census figures was whether downward adjustments were needed to reflect jury disqualifications of language and citizenship particular to the Hispanic population. The trial court believed that a downward adjustment of the Hispanic population in the 1980 census was required. (53 RT 3778-80.) Experts on both sides disagreed with the trial court. Dr. Weeks explained that a downward adjustment for one race would skew disparity and deviation calculations. (53 RT 3748.) Dr. Minter said there was no statistical difference in excusals between non-Hispanics with a 62.8 percent excusal rate, and Hispanics, with a 63.5 percent excusal rate for all reasons, including citizenship, language difficulties, and hardship. (53 RT 3748; 55 RT 4034.) Dr. Weeks explained, "When you meet an Hispanic on the street, he or she is just as likely to be qualified for jury service as the non-Hispanic that you meet on the street." (52 RT 3638, 3652.) Dr. Weeks' advice was to take out all eligibility factors, or include them all, but not to take out some factors piecemeal. (57 RT 4113.) The trial court acknowledged a "standstill" on the issue and requested that Dr. Weeks "try to convince me I'm wrong on this or . . . confine yourself to numbers involving people of Hispanic descent who would be eligible to serve on a jury." (53 RT 3778-80; 3804; 57 RT 4112.)

    a.    To accommodate the trial court, Dr. Weeks made estimates taking into account English language deficiency and non-citizenship. He estimated 24.3 percent of the "Central Judicial District" community to be Hispanic. (52 RT 3600.) Compared to the 14 percent in the downtown Los Angeles jury lounge survey, Dr. Weeks calculated an absolute disparity of 10.3 percentage points. (53 RT 3751.) This meant a 42 percent under-representation of jury-eligible Hispanics in the jury pool.

    b.    Accounting for English language deficiency and non-citizenship, Dr. Weeks estimated 16.1 percent of the "20-mile radius" community to

be Hispanic.  (52 RT 3615.)  Compared to the 14 percent in the downtown Los Angeles jury lounge survey, Dr. Weeks calculated an absolute disparity of 2.1 percentage points.  This meant a 13 percent under-representation of jury-eligible Hispanics in the jury pool.

c.   Dr.  Minter testified that the percentage of Hispanics with citizenship and proficiency in the English language was 16.3 percent of the population in the "20-mile radius" community.  (55 RT 3988.)  Compared to the 14 percent in the downtown Los Angeles jury lounge survey, Dr. Minter found an absolute disparity of 2.3 percent.  This meant a 14 percent under-representation of Hispanics in the jury pool.  (55 RT 4913.)

1547. On May 31, 1988, the court denied Petitioner's motion and declined to order any changes in the jury pool selection or the ROV/DMV merger procedures.  The trial court suggested, but did not order, that Mr. Arce should make changes to the merger software to include an address match, but changes were not implemented before voir dire of the jury for Petitioner's trial.  (62 RT 4653, 4660-65.)

1548. The trial court found that the jury selection process and procedures in Los Angeles County complied with Code of Civil Procedure § 190 et. seq.  (61 RT 4653.)

1549. As a matter of law, the court found that the appropriate community for comparison was the "20-mile radius" and not the "Central Judicial District" or Los Angeles County.  (61 RT 4652.)

1550. Although finding Hispanics a cognizable group and stating that it was "frankly troubled by the number" (61 RT 4652), the trial court did not find a constitutional violation in the deviations and disparities between the percentage of Hispanics in the "20-mile radius" community and Hispanics summoned to the downtown Los Angeles County Superior Court.  (*See id*. at 4650-53.)  The trial

567

court said the disparity "does not appear to this court to be of constitutional significance, but it does appear to this court that there is a certain lightness, if you will, in the number of Hispanics that actually appear in the jury lounge." (*Id*. at 4652.)

### A. The Los Angeles County Jury Selection Procedures Violated the "Fair Cross Section" Requirements of the Sixth Amendment and the Equal Protection Clause of the Fourteenth Amendment

1551. The Sixth Amendment provides:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law.

1552. The rights to jury trial guaranteed by the Sixth Amendment and the California Constituion are "coextensive protections and the analysis identical." *People v. Bell*, 49 Cal. 3d 502, 525 n.10, 778 P.2d 129, 262 Cal. Rptr. 1 (1989). The federal guarantee of a trial by a jury of one's peers is a fundamental constitutional right. *People v. Collins*, 26 Cal. 4th 297, 304, 27 P. 3d 726, 109 Cal. Rptr. 2d 836 (2001). Indeed, there is no more fundamental provision of the Bill of Rights than the right of a criminal defendant to a trial by an impartial jury selected from a representative cross-section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 538, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975).

1553. In *Duren v. Missouri*, 439 U.S. 357, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979), the Supreme Court held that the fair cross-section requirement of the Sixth Amendment was violated by the disproportionate exclusion of women from jury venires. *Duren* found that jury venires must represent the community and systematic exclusion of women from juries by virtue of automatic exemption violated the Sixth Amendment. *Id*. at 363-64. To establish a *prima facie* violation of the fair cross-section requirement, *Duren* held, a defendant must

568

show: (1) that a group alleged to be excluded is "distinctive" in the community (*Duren* prong one); (2) the representation of this group in jury venires is not fair and reasonable in relation to the number of such persons in the community (*Duren* prong two); and (3) the under-representation is the result of systematic exclusion of the group in the selection process (*Duren* prong three). *Duren v. Missouri*, 439 U.S. at 364; *see also Thomas v. Borg*, 159 F.3d 1147, 1149-50 (9th Cir. 1998). In *People v. Sanders*, 51 Cal. 3d at 491-93, the court held that a jury must be drawn from a representative cross-section of the community and reaffirmed the *Duren* three-pronged analysis. *See People v. Ochoa*, 26 Cal. 4th 398.

### 1.    *Duren* prong one

1554. All parties below, and the trial court, agreed that Hispanics are a distinctive group. The Supreme Court has so held. *Castaneda v. Partida*, 430 U.S. 482, 97 S. Ct. 1272, 51 L. Ed.2d 498 (1977); *Lockhart v. McCree*, 476 U.S. 162, 175, 106 S. Ct. 1758, 90 L. Ed. 2d 137 (1986). *Duren* prong one was satisfied in this case as to the Hispanic population in the downtown Los Angeles courthouse.

### 2.    *Duren* prong two

1555. As to the second *Duren* prong, the Supreme Court ruled that a defendant may rely on census data for adults to establish "the percentage of the community made up of the group alleged to be under represented, for this is the conceptual benchmark for the Sixth Amendment fair cross-section requirement." *Duren*, 439 U.S. at 364. The use of census data on the actual population of the community, rather than more detailed data on the "jury eligible" population of the community, was reaffirmed in *Castaneda v. Partida*, 430 U.S. 482; *see also People v. Harris*, 36 Cal. 3d at 53-54.

1556. In *Harris*, the court rejected the prosecution's argument that evidence of studies comparing the entire population base rather than just a jury-

eligible population were inadequate to meet the second *Duren* prong. In *People v. Morales*, 48 Cal. 3d 527, 548, 770 P.2d 244, 257 Cal. Rptr. 64 (1989), the court confirmed that *Harris* had allowed "challenges based upon gross population statistics, rather than 'voter eligible' statistics," where voter eligibility was tantamount to juror eligibility.

1557. In *People v. Bell*, 49 Cal. 3d 502, the court held that for cases tried before its decision (September 5, 1989), total population figures rather than jury-eligible population figures could be used to establish a *prima facie* case under the second *Duren* prong. Once a significant disparity is shown the prosecution may introduce evidence to more accurately define the presumptively jury-eligible population in order to rebut the *prima facie* case. *Bell*, 49 Cal. 3d at 526 n.12; *accord Sanders*, 51 Cal. 3d at 490 n.4, 496 n.8.

1558. In Petitioner's hearing, the trial court required the expert witnesses to base population comparisons upon jury-eligible Hispanics who could speak English proficiently and who were citizens. When Dr. Weeks explained the error of discounting juror disqualifications for Hispanics without also discounting juror disqualifications for non-Hispanics, the trial court could not understand his reasoning and stood by its own intuition. The court said:

> I'm honestly not sure I can accept that. And again because maybe
> my training hasn't been adequate in this arcane science, but if these
> folks aren't going to be eligible legally . . . then it seems to this court
> that they need not be accounted for . . . whereas folks that are just
> excused for . . . hardship or whatever, are legally eligible, and
> therefore, . . . appropriate to include . . . in the analysis.

(53 RT 3802.)

1559. The prosecution's expert witness, Dr. Minter, made comparisons that began with an estimate of Hispanics who were jury-eligible. Her statistical comparisons were not helpful in the determination of whether Petitioner made a

570

*prima facie* showing of an unreasonable relationship between population and jury pool under the second *Duren* prong. Rather, her numbers were more relevant as a rebuttal to an established prima facie case. The trial court told Dr. Weeks, "Try to convince me I'm wrong on this or . . . confine yourself to numbers involving people of Hispanic descent who would be eligible to serve on a jury." (57 RT 4112.) On the same subject, the court told Dr. Weeks, "I guess we're at a standstill on this one." (53 RT 3804.) It is evident in the court's finding of no constitutional disparity between the population of Hispanics in the county and the number of Hispanics serving as jurors in its courthouse that the trial court was unconvinced by mathematical calculations to sway from his own intuitions about race in the community. (61 RT 4652.)

1560. Petitioner presented expert testimony proving that Hispanics were substantially under-represented in the relevant community. Dr. Weeks found an absolute disparity of 23.6 percent in the Central Judicial District and of 13 percent in the 20-mile radius. With a correction of 8 percent for growth of the Hispanic population, Dr. Weeks found an absolute disparity for the 20-mile radius of 3.5 percent and comparative disparity of 20 percent; the absolute disparity for the Central Judicial District was 12.3 percent and the comparative disparity was 47 percent.

1561. Petitioner also demonstrated that the absolute disparity, as defined for purposes of a *prima facie* showing (the percentage of Hispanics in the adult population minus the percentage in the jury pool), was 23.6 percent for the "Central Judicial District" community and 13 percent for the "20-mile radius" community. Petitioner proved that the "Central Judicial District" community could not be compared to the courthouse jury lounge because of its small and inherently unrepresentative size. Petitioner proved that the "20-mile radius" was not a random sample and contained too many unknown variables to be statistically relevant in an analysis by comparison. Petitioner proved disparity

and a large standard deviation by comparing Los Angeles County's population of Hispanics in 1980 to the sample in the juror lounge of the downtown Los Angeles Superior Court. Petitioner's expert witness provided multiple methods to repair the disparity, but did not, nor was he required to, guarantee those methods would repair the disparity. His recommendations were largely ignored.

1562. Petitioner met the second *Duren* prong. Petitioner showed that the Los Angeles County jury commissioner's office, fully aware of the problem, had failed to remedy the disparities in the downtown Los Angeles County courthouse, although means were readily available to do so. The prosecution expert largely conceded Petitioner's evidence that overwhelmingly showed that the jury pool in Los Angeles County was unrepresentative of the community. Petitioner showed by clear, convincing and largely uncontroverted evidence that representation of Hispanics was not fair and reasonable under the Constitution.

### 3. *Duren* prong three

1563. As to the third *Duren* prong, Petitioner also demonstrated, by largely uncontroverted evidence, that the under-representation of Hispanics resulted from a systematic exclusion inherent in the procedures used in the Los Angeles County jury selection process.

> [I]n Sixth Amendment fair-cross-section cases, systematic
> disproportion itself demonstrates an infringement of the defendant's
> interest in a jury chosen from a fair community cross section. The
> only remaining question is whether there is adequate justification for
> this infringement . . . . [O]nce the defendant has made a prima facie
> showing of an infringement of his constitutional right to a jury
> drawn from a fair cross section of the community, it is the State that
> bears the burden of justifying this infringement by showing
> attainment of a fair cross section to be incompatible with a
> significant state interest.

*Duren*, 439 U.S. at 368 n.26.

1564. Under the most stringent test, Petitioner showed an absolute disparity for Hispanics of more than 10 percent in the "Central Judicial District" community. An absolute disparity of more than 10 percent is generally deemed substantial. *People v. Bell*, 49 Cal. 3d at 528. Certainly, the higher absolute disparity demonstrated here must also be considered substantial. *Sanders*, 51 Cal. 3d at 492 n.5 (absolute disparity measures representativeness between under-represented group in the general population and under-represented group in the jury pool).

1565. By demonstrating that the disparity resulted in systematic disproportion, Petitioner also met the test outlined by the court in *Bell*. The failure to merge DMV and ROV lists correctly, match names before deletion of "duplicates," follow-up on lost, incomplete, or unreturned questionnaires, or use a recent and updated DMV list resulted in systematic exclusion of Hispanics. Mr. Arce mismanaged his staff and failed to supervise or inquire whether his instruction to add addresses to the DMV/ROV matching software had been implemented until he was made aware of the problem by Petitioner's expert witness. Even after the trial court suggested the inclusion of an address field in the software and a comparison of addresses before deletion, Mr. Arce did not make those changes although he expressed a desire to make the changes and his opinion that adding addresses would increase the number of Hispanics in the Los Angeles County jury pool at a minimal cost of time or money. The statistical evidence offered by Petitioner showed a direct, causal relationship between the absolute and comparative disparities and the merger process.

1566. A jury selection process that results in significant under-representation of a cognizable group, such as Hispanics here, violates the fundamental and explicit purpose of the Sixth Amendment: maintenance of the appearance and reality of "impartial" juries.

1567. In his motion before the trial court, Petitioner asserted his intent to incorporate equal protection claims to the extent supported by the facts. The third *Duren* prong need not be established when a *prima facie* claim of discrimination is established. *Cf.*, *Castaneda v. Partida*, 430 U.S. 482. Petitioner showed a presumption of discrimination by at least three facts, individually and cumulatively:

    (a)    the prosecution's insistence on the "Central Judicial District" community in the context of Caucasians surrounded by minorities in *Williams v. Superior Court*, 49 Cal. 3d 736, while insisting in Petitioner's case that the "20-mile radius" community was the community of jurors for comparison in the context of minorities surrounded by Caucasians;

    (b)    the jury commissioner's failure to institute follow-up procedures for unreturned, lost, or incomplete questionnaires with the knowledge that this practice reduced Hispanic representation (*see* VI Supp. CT XII 3487-88, 3559); and

    (c)    the objections of the prosecution, the trial court, and the jury commissioner (i) to modification of the jury selection software to do what the jury commissioner had originally intended and instructed his staff to do, i.e., add addresses and check matches before deleting names; (ii) to merging of the ROV and DMV lists with matching weights or with the DMV list as the primary and; (iii) to adjusting the timing of the merger to avoid using outdated DMV lists, knowing that this would likely help correct the under-representation of Hispanics in the jury pool.

Accordingly, Petitioner established a *prima facie* showing of intentional discrimination which the State was obliged to but failed to rebut.

1568. In any event, in *People v. Anderson*, 25 Cal. 4th 543, 22 P.3d 347, 106 Cal. Rptr. 2d 575 (2001), the court found no dispute in the record that Hispanics were a cognizable group and were under-represented in the jury pool (prongs one and two of *Duren*). However, the court held that evidence of systematic exclusion was speculative and thus failed to satisfy the third prong of *Duren*. *Id*. at 564-68. By contrast, Petitioner has shown clear, convincing, and largely uncontroverted evidence statistically establishing the disparity, resulting from systematic exclusion inherent in the Los Angeles County jury selection procedures, thus satisfying the third prong of *Duren* as well. The evidence here established that the disparity among Hispanics arose from improper DMV/ROV merger procedures (conceded by the county) and the erroneous use of a 20-mile radius for cross-sectional analysis improperly approved by the trial court. The causes of the under-representation among Hispanics were well documented.

1569. In conclusion, Petitioner met all three prongs of *Duren.* Petitioner established that Hispanics are a cognizable group under *Duren* prong one. Jury-eligible Hispanics were under-represented in the venire under *Duren* prong two. Under-representation resulted from systematic exclusion under *Duren* prong three. *Duren*, 439 U.S. at 366-67. The prosecution failed to show any state interest in justifying the disproportionate exclusion of Hispanics from the Los Angeles County Superior Court in downtown Los Angeles County as required under *Duren*. *Id*. at 367-68.

**B.      The Constitutional Violations Were Prejudicial *Per Se***

1570. The denial of Petitioner's fundamental federal constitutional right to trial by jury drawn from a representative cross-section of the community was prejudicial *per se*. *Duren v. Missouri*, 439 U.S. at 369-70; *Rose v. Clark*, 478 U.S. 570, 578, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986).

1571. The foregoing violations of Petitioner's constitutional rights, taken singly or in combination with the other errors alleged in the Petition, constitute

structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Petition, so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violations of Petitioner's rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622, 637-38.

**CLAIM 22:**

## THE TRIAL COURT UNCONSTITUTIONALLY SHACKLED PETITIONER THROUGHOUT THE CAPITAL TRIAL

1572. Exhaustion of the claim: This claim was fairly presented to the California Supreme Court in Section XVII of the June 2004 petition for writ of habeas corpus, and in Section IX of the Opening Brief, although it includes additional factual allegations. Petitioner will present the claim with the additional factual allegations to the California Supreme Court in an exhaustion petition he will file no later than March 17, 2009.

1573. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

1574. Those facts and allegations set forth in the petition, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

576

1575. Petitioner's conviction, death sentence and confinement were unlawfully obtained in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights to due process, a fair and open trial, the presumption of innocence, equal protection, the right to be present and the opportunity to be heard, the effective assistance of counsel, and a fair, reliable and accurate determination of guilt and penalty by the trial court's decision to shackle Petitioner at trial.

1576. Prior to trial, on February 24, 1986, at a hearing in the court's chambers, outside of the presence of Petitioner, the court stated that even though it had already indicated that Petitioner would be required to wear handcuffs and no leg shackles to court, the court had decided that Petitioner would be required to wear leg shackles, and no handcuffs. The court made the decision based on the advice of the marshal. The court stated that the marshal had indicated to the court that Petitioner had made some statements indicating that he was going to try to escape, if he could, and he would do so by taking the officer's weapon if he could. ( I CT 8.).[121] The court stated as follows:

> Based upon that, we have elected to proceed in this fashion. I am not
> welded (sic) to it. If things go well, we may change. It is also better for
> your client's benefit to have a rather peaceful Marshal's Corp.

(I CT 8.).

After a recess, in another hearing held in the court's chambers which was held outside of the presence of Petitioner, the court and the parties discussed

---

[121] The statements allegedly made by Petitioner were provided to the court *ex parte* by the marshal. They were also relayed to the court out of the presence of petitioner, trial counsel, and the district attorney. There was never an evidentiary hearing held, so that the marshal who allegedly heard the statements could be cross-examined, or to determine the reliability of the alleged statements. *See* (CR 8-11).

courtroom security.  Trial counsel was concerned that there had been no
screening of the members of the public which were coming to watch the trial.
Trial counsel was concerned because the defense attorneys had received death
threats.  The court allowed a law enforcement officer, who was referred to as "the
sergeant," to discuss the issue.  (I CT 9-11.).  The sergeant indicated that since
the metal detector had failed, courtroom security had to opt for either hand
searching, or no searching.  They decided not to search individuals based upon
what they had learned from other deputies that had provided security for
Petitioner's case, and based on intelligence that they had received.  (I CT 9-10.).
The sergeant indicated that if the metal detector was repaired or replaced, then
they would consider whether it was necessary to use it on a day-to-day basis,
taking into account what the court wanted.  (I CT 10.)

Next, the court discussed that Petitioner did not pose a danger in the
courtroom.  The exchange took place as follows:

| | |
|---|---|
| The Court: | Now what is it that gives you your sense of satisfaction with the security status of the courtroom now? |
| The Bailiff: | The fact that the defendant has not proven to be violent.  He has had contact with a lot of our deputies. |
| The Court: | I am not worried about him, I am worried about the people in the audience.  Why do they not present a threat to him or you or to counsel? |
| The Bailiff: | We do monitor the audience in these security cases as the trials progress... |

(I CT 11.)

1577.  Even though Petitioner had contact with many deputies and had not
proven to be violent, at trial, Petitioner was visibly restrained.  During jury

578

selection, on December 19, 1988, he was restrained with shackles, which could be observed by the jurors, and a discussion was held regarding whether Petitioner was to be restrained in shackles or a leg brace. (127 RT 13961-68.) Deputy District Attorney Halpin addressed the court and indicated as follows:

> I was just going to bring up another issue that we talked about briefly at the bench, but the defendant was not party to the conversation, and that is the fact that the defendant is wearing chains in the courtroom.

> I was going back over some old material and did come across those cases where we're admonished not to -- not to do that. We are back now in a smaller situation, smaller courtroom again, and I'm told the jury is going to have to walk by the counsel table here to get up to the jury box, apparently, because the other gate is blocked by some chairs.

> I think we probably better address the issue of chains again.

(127 RT 13961.)

When the court inquired as to what trial counsel, Daniel Hernandez, would suggest regarding restraints, trial counsel suggested that all restraints should be removed from Petitioner. (127 RT 13963.) Deputy District Attorney Halpin suggested that a leg brace be utilized, since it would not be visible. (127 RT 13964.) The court noted that the leg brace was physically painful for Petitioner, and indicated that the court was not going require Petitioner to be "uncomfortable and physically in pain" during the trial. (*id.*) The court stated that because of some statements Petitioner had made, and the history of the case, restraints were required. (*id.*) Trial counsel noted that any statement allegedly made by Petitioner had never been established at a hearing, and questioned whether such baseless allegations were sufficient grounds for the shackles. (*id.*) The court acknowledged that the restraints had been visible to the jurors, and stated as follows:

I mean, quite frankly, gentleman, Mr. Ramirez has been in restraints the
entire period of jury selection and his legs, I would assume, have been in
view of the prospective jurors as they came in individually and sat in the
jury box and looked down the table and saw him.

I don't think it is any surprise.

(*See* 127 RT 13964-65.)

Trial counsel suggested building a barrier or putting up a curtain so that the
jurors would not see the leg shackles worn by petitioner. The court denied that
request. (*See* 127 RT 13966.) Thus, it is apparent from the record, that
beginning at jury selection, Petitioner was visibly restrained in front of the jury.

1578. The record reflects that at a closed hearing held at the beginning of
trial on January 30, 1989, the trial court ordered Petitioner to be restrained in
chains, which were visible to the jury. Trial counsel had previously objected to
Petitioner being restrained in chains. The court gave Petitioner a choice of either
wearing a leg brace, that Petitioner had indicated was uncomfortable, or wearing
shackles, that were visible to the jury. Petitioner indicated that he did not want to
wear anything. (I Supp. CT VIII 2284-85.) The court responded, stating "I
understand that you would prefer not to have any kind of restraint at all, but that
appears to be a security measure that the sheriff feels is necessary." (I Supp.
CT VIII 2285.) The court then took a "waiver" from Petitioner and trial counsel
which purported to assert Petitioner's "willingness" to wear leg shackles at trial
instead of a leg brace in light of his complaints that a leg brace was painful and
uncomfortable. (I Supp. CT VIII 2284-86.)

1579. The waiver was not valid, however. The court did not advise
Petitioner that he had a constitutional right not to wear visible restraints without
manifest need and, further, that there was a recognized danger the jury would
likely consider him guilty or dangerous, thus affecting both the guilt and penalty
determinations. *See infra.* In addition, the court essentially gave Petitioner a

choice between wearing an uncomfortable leg brace during a trial that was going to be extremely long, or wearing shackles, which were visible to the jury. Such a choice was unreasonable, and thus, the waiver was invalid.

1580. At the conclusion of the guilt trial, the prosecutor requested the trial court to instruct the jury regarding Petitioner's restraints. (208 RT 23931-32; 209 RT 24004.) The trial court instructed the jury as follows:

> You may have observed that the defendant has worn restraints while in the courtroom. This fact shall have no bearing upon your determination of the defendant's guilt or innocence. That determination must be based solely upon the evidence presented to you.

(212 RT 24413.)

1581. The juror and alternate jurors were aware that Petitioner was shackled during the trial. (Ex. 120, Declaration of Bonita Smith, ¶ 10; Ex, 129, Declaration of Martha Salcido, p. Ex. 129,¶ 6). Alternate juror Janice McDowell recalled as follows:

> I remember seeing leg chains on Mr. Ramirez. Sometimes I could hear the chains rattle when he entered the courtroom or shifted in his seat.

(Ex. 116, Declaration of Janice McDowell, ¶ 5) Another alternate juror, Max De Ruiter, believed that Petitioner was shackled at trial, and he believed that the shackling was necessary because he had heard that Petitioner had tried to attack someone in the court room. (Ex. 115, Declaration of Max De Ruiter, ¶ 5). The unconstitutional and visible shackling of Petitioner during his trial deprived him of a fair trial because jurors believed that Petitioner was dangerous and that it was necessary to shackle him during the trial for security purposes.

1582. The Ninth Circuit has stated:

> It is axiomatic that our criminal justice system affords every accused individual a presumption of innocence. *Coffin v. United States*, 156

581

U.S. 432, 453, 15 S. Ct. 394, 402, 39 L. Ed. 481 (1895), *cited in*
[*Kennedy v. Cardwell,* 487 F.2d 101, 104 (6th Cir. 1973)].  When an
accused is forced to appear before his peers in chains, this
presumption is seriously jeopardized.  *See Holbrook v. Flynn*, 475
U.S. 560, 569, 106 S. Ct. 1340, 1346, 89 L. Ed. 2d 525 (1986) . . . .
*Spain v. Rushen*, 883 F.2d 712, 722 (9th Cir. 1989) (other citations omitted); *see also People v. Duran*, 16 Cal. 3d 282, 290, 545 P.2d 1322, 127 Cal. Rptr. 618 (1976) (United States Supreme Court decisions collected); *Williams v. Woodford*, 306 F.3d 665, 689 (9th Cir. 2003) "A criminal defendant has a constitutional right to be free of shackles and handcuffs in the presence of the jury absent an essential state interest that justifies the physical restraints.").

1583.  *Jones v. Meyer*, 899 F.2d 883, 885 (9th Cir. 1990) described the analysis a reviewing court must undertake:

> First, the [trial] court must be persuaded by compelling
> circumstances 'that some measure was needed to maintain the
> security of the courtroom.'  *Spain*, 883 F.2d at 720.  Second, the
> court must 'pursue less restrictive alternatives before imposing
> physical restraints.'  *Id.* at 721; *see also Illinois v. Allen*, 397 U.S. [at
> 344] (stating that shackling and gagging should only be used as a
> 'last resort').

1584.  There was insufficient justification in Petitioner's case for physical restraints.  Petitioner had no history of escape or violence in the courtroom.  There was no showing of manifest need to restrain Petitioner.  *See Duran*, 16 Cal. 3d at 291.  The only apparent reasons the court ordered Petitioner restrained were the nature of the charges, the high media profile of Petitioner's case, and statements allegedly made by Petitioner.

1585.  In relation to these apparent bases for the shackling, Petitioner's case compares with *Spain v. Rushen*, 883 F.2d 712 (9th Cir. 1989).  There, the

582

petitioner was a high-profile prisoner serving a life sentence for crimes committed in connection with his membership in the Black Panther Party. He was tried for murder allegedly committed during a prison escape attempt. The trial was held in the same courthouse where, not long before, another escape attempt had resulted in the killing of a trial judge. Thus, the atmosphere created concern for security and safety; Spain and his five co-defendants were ordered heavily shackled throughout the proceedings. Despite this background, and despite evidence that Spain posed a serious escape and security risk while in court, the Ninth Circuit affirmed the district court's finding that Spain had been denied his constitutional rights by being shackled at trial. The trial court was deemed to have erred and abused its discretion in not considering and applying less extreme measures of courtroom control. *Spain*, 883 F.2d at 728-29.

1586. While Petitioner's case also involved a very high degree of media attention and public awareness, there was no evidence that Petitioner posed an immediate threat to security or safety while in the courtroom during trial. In *Spain*, the petitioner was charged with conspiring to violently escape from custody with the assistance of outside conspirators and was associated with previous actual deadly attempts. Here, Petitioner committed no such acts and was never shown to pose any sort of security or escape risk. In fact, prior to trial, the bailiff stated that many deputies had been in contact with Petitioner, and that he was not violent.

(I CT 11.) The court also indicated that it was not worried about Petitioner as a security risk. ( *id.*)

1587. The improper restraints violated Petitioner's Fifth, Sixth, Eighth, and Fourteenth Amendment rights. *See Rhoden v. Rowland*, 172 F.3d 633 (9th Cir. 1999) (unjustified shackling of defendant in trial violated due process). The trial court's ruling in ordering Petitioner restrained interfered with his fundamental rights, including his right to counsel, and his right to a reliable determination of

583

guilt and penalty under the Sixth, Eighth and Fourteenth Amendments. Petitioner's right to a fair trial was violated in that the improper restraints created a negative impression of him that undermined the presumption of innocence. *Estelle v. Williams*, 425 U.S. 501, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976). As a result, Petitioner was prejudiced in the eyes of the jury. The visible restraints detracted from the dignity of the proceedings and impeded Petitioner's ability to communicate with counsel. *Duckett v. Godinez*, 67 F.3d 734, 747 (9th Cir. 1995).

1588. Moreover, the trial court's cautionary instruction in Petitioner's case was legally and factually deficient. The instruction admonished the jury not to use the fact of restraints in the determination of guilt or innocence. However, the language of CALJIC No. 1.04 is much broader and prohibits consideration of restraints for any purpose:[122]

> The fact that physical restraints have been placed on defendant [    ] must not be considered by you for any purpose. They are not evidence of guilt, and must not be considered by you as any evidence that [he] [she] is more likely to be guilty than not guilty. You must not speculate as to why restraints have been used. In determining the issues in this case, disregard this matter entirely.

CALJIC No. 1.04 (6th ed. 1996). CALJIC No. 1.04, adopted in 1992, must be given *sua sponte* if restraints are visible.[123] *People v. Jackson*, 14 Cal. App. 4th 1818, 1825, 18 Cal. Rptr. 2d 586 (1993). CALJIC No. 1.04 clarifies the general rule that restraints have no role in the weighing of any evidence. The instruction

---

[122] The Use Note to CALJIC No. 1.04 cites *People v. Duran*, 16 Cal. 3d 282.

[123] There is no *sua sponte* duty to give CALJIC No. 1.04 if the restraints are not visible. *People v. Medina*, 11 Cal. 4th 694, 732, 906 P.2d 2, 47 Cal. Rptr. 2d 165 (1995).

given here, however, failed adequately to clarify that the jury was not to consider Petitioner's restraints for any purpose. The approved instruction contains a specific admonition against speculation as to the purpose or reason for restraints; the instruction given in Petitioner's case did not. Finally, CALJIC No. 1.04 reiterates that restraints serve no function whatsoever in the jury's consideration of the evidence; the instruction given here was limited only as to the issue of guilt or innocence.

1589. As the Supreme Court has reiterated, due process under the federal Constitution forbids visible shackling of a criminal defendant in the presence of the jury absent a showing of an "essential state interest." *Deck*, 544 U.S. 622, 125 S. Ct. 2007, 161 L. Ed. 2d 953 (2005). In *Deck*, Justice Breyer, writing for the majority, held that the ban on shackling of a defendant in front of the jury was so long-standing and universal that it applied equally to guilt and penalty phases of a capital trial. *Deck*, 544 U.S. at 632-33. Noting that American courts have long followed this "principle deeply embedded in the law" (*id.* at 629), the Court held fundamental due process bans such practice even in the penalty phase of a capital trial absent "indisputably good reasons." *Id.* at 634-35. This is so because, even though there is no longer a concern the jury will attribute guilt to the defendant on account of the shackles, the decision as to life or death is akin to a guilt determination, so that adverse inferences arising from visible shackling are as grave a matter as at the guilt phase:

> Although the jury is no longer deciding between guilt and innocence, it is deciding between life and death. That decision, given the " 'severity' " and " 'finality' " of the sanction, is no less important than the decision about guilt. [¶] Neither is accuracy in making that decision any less critical. The Court has stressed the "acute need" for reliable decision making when the death penalty is at issue. . . . It also almost inevitably affects adversely the jury's

585

perception of the character of the defendant.  And it thereby

inevitably undermines the jury's ability to weigh accurately all

relevant considerations – considerations that are often unquantifiable

and elusive – when it determines whether a defendant deserves

death. In these ways, the use of shackles can be a "thumb [on]

death's side of the scale."

*Id.* at 632-33 (citations omitted).  Noting the Court had previously held that shackling is "inherently prejudicial" (*Id.* at 635 (quoting *Holbrook v. Flynn* 475 U.S. 560, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986)), and that the prejudice accruing "cannot be shown from a trial transcript," *Deck* ruled improper restraint orders require no showing of prejudice by the defendant under the Due Process clause, and the burden lay on the prosecution to show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Deck*, 544 U.S. at 635. (quoting *Chapman v. California*, 386 U.S. at 24).

1590. The court violated Petitioner's right to appear before the court with the appearance, dignity and self-respect of a free and innocent man, that is, without restraints.  Petitioner was charged with numerous crimes of violence and lesser felonies.  Petitioner did not testify on his own behalf at the guilt trial.  The jury found Petitioner guilty on all counts.  The use of chains and shackles to restrain Petitioner adversely affected the jury's impression of him and likely contributed to the jury's view that he had violent propensities and must be guilty as charged.  Finally, at the penalty trial, Petitioner's jury was allowed improperly to draw the inference of Petitioner's future dangerousness and greater culpability by virtue of the instruction permitting the jury to consider all guilt evidence. *See* Claim 36, *infra*.

1591. In addition, during the trial, there were times when Petitioner appeared before the jury in prison clothes.  During the penalty phase, the court found that Petitioner waived his right to appear in civilian clothes.  (217 RT

24775-76.)  The court instructed the jury to disregard the fact that Petitioner appeared in jail clothes.  (*Id.* at 24798-99.)  Jurors also observed Petitioner in prison clothes at times during the trial.  (Ex. 118, J. Muldrow Dec., ¶ 7)  The United States Supreme Court has held that it is a violation of the Fourteenth Amendment to force a defendant to appear before a jury in prison clothes.  *See Estelle v. Williams*, 425 U.S. 501, 512 (1976).  Petitioner was unconstitutionally restrained in shackles, and he unconstitutionally appeared in prison clothes before the jury at his trial

1592.  The foregoing violations of Petitioner's constitutional rights, taken singly or in combination with the other errors alleged in the Petition, constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict.  *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993).  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Petition, so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violations of Petitioner's  rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice.  *See id.* at 622, 637-38.

**CLAIM 23:**

### THE TRIAL COURT VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS BY ADMITTING INFLAMMATORY PHOTOGRAPHS

1593.  Exhaustion of the claim:  This claim was fairly presented to the California Supreme Court in the direct appeal.  It was presented in Section X of the Opening Brief.

1594. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

1595. Those facts and allegations set forth in the petition, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

1596. The prosecution sought to introduce autopsy and crime scene photographs of victims in fifteen unrelated incidents. (*See*, *e.g.*, 143 RT 16427; *see also* XXVIII CT 8355-59.) Petitioner objected to the introduction of photographs of the victims and crime scenes under Evidence Code § 352. (*Id*. at 8310-14.)

1597. With respect to the Vincow incident, Petitioner objected to photographs of the victim taken at the scene and autopsy (People's Exs. 1-F, 1-G, 1-H, 2, 2-A, and 2-B), because the photographs were not relevant; rather, they were gruesome and highly inflammatory. (143 RT 16428; 145 RT 16595-96; 158 RT 18215-18.) The trial court admitted the photographs, finding they were relevant to the time and manner of death and were not "unduly gruesome." (143 RT 16429; 158 RT 18219.)

1598. With respect to the Hernandez/Okazaki incident, Petitioner objected to photographs of the victim taken at the scene and autopsy (People's Exs. 4-D, 4-E and 5) on relevance and prejudice grounds. (*See* 146 RT 16803-06.) The trial court admitted the photographs, finding they were probative as to cause of death. (*Id*. at 16804, 16806, 16811.)

1599. With respect to the Yu incident, Petitioner objected to introduction of coroner photographs of the victim (particularly People's Ex. 5-F showing the victim while intubated) because the photographs were irrelevant and prejudicial. (*See* 147 RT 16971-73; 148 RT 17119.) The court admitted the photographs,

ruling that People's Exhibit No. 6-F was unpleasant but was relevant. (147 RT 16974-75.)

1600. With respect to the Zazzara incident, Petitioner objected to photographs of Maxine Zazzara at the scene (People's Exs. 9-A and 9-B) as "extremely grotesque and prejudicial." (151 RT 17554-55.) The court ruled that the photographs, although unpleasant, were relevant to the cause of death. (*Id*. at 17555.) Petitioner also objected to coroner photographs of Mrs. Zazzara (People's Exs. 9-C, 9-D, 9-E, and 9-F). (151 RT 17557.) The court ruled the photographs were relevant to establish the nature of the wounds. (*Id*. at 17557-58.)

1601. With respect to the Doi incident, Petitioner objected to a coroner's photograph of William Doi with a breathing apparatus in his mouth and a photograph of Lillian Doi in a hospital bed with a bruise on her face (People's Exs. 11-A and 10-X, respectively). (151 RT 17545-48.) The court ruled that the photographs were probative and not inflammatory. (*Id*. at 17547-48.)

1602. With respect to the Cannon incident, Petitioner objected to photographs of the victim which depicted neck wounds (People's Exs. 20-G, 20-H and 20-1) as gory and inflammatory. (157 RT 18070-71.) The court admitted two photographs of the victim (People's Exs. 20-H and 20-1) pursuant to Evidence Code § 352. (157 RT 18072-73; 162 RT 18850.)

1603. With respect to the Kneiding incident, Petitioner objected to coroner photographs of victim Lela Kneiding (People's Exs. 30, 30-B and 30-C) as irrelevant and inflammatory. (164 RT 18992-95; 165 RT 19249.) The court admitted two photographs (People's Exs. 30 and 30-C). (164 RT 18993, 18997-98; 165 RT 19249.)

1604. It has long been held to be an abuse of discretion for a trial court to admit explicit autopsy photographs or photographs of postmortem examinations where the victim's body is badly decomposed or disfigured. *See People v. Cox*,

53 Cal. 3d 618, 665-66, 809 P.2d 351, 280 Cal. Rptr. 692 (1991). In *Cox*, the court held that the introduction of autopsy photographs did not constitute an abuse of discretion where they were small and not particularly gruesome. Significantly, in *Cox*, the prosecution also declined to introduce even more graphic depictions of the victim's wound. *People v. Cox*, 53 Cal. 3d at 666.

1605. As to the Vincow incident, photographs of the victim were not probative because the cause of the victim's death was not at issue, only the time of death. The admitted photographs did not assist the jury in determining the time of death. Matters relevant to time of death, such as body temperature and lividity, were not discernible from the photographs.

1606. As to the Okazaki incident, the coroner photograph of the victim (People's Ex. 5) was not probative of any material issue at trial. Any slight probative value was far outweighed by the prejudicial effect of the autopsy photograph. Other photographs of the scene and the victim (People's Exs. 4-D and 4-E) admitted by the court were cumulative. The photographs did not aid the jury in its determination of any contested fact. *Contrast People v. Scheid*, 16 Cal. 4th 1, 15, 939 P.2d 748, 65 Cal. Rptr. 2d 348 (1997) (crime scene photographs bolstered witnesses' credibility); *People v. Frank*, 51 Cal. 3d 718, 734, 798 P.2d 1215, 274 Cal. Rptr. 372 (1990) (gruesome photographs ruled admissible as highly relevant evidence).

1607. In the Yu incident, the coroner photograph of the victim with a mechanical device in her mouth was gruesome and highly inflammatory. The photograph did not assist the jury in determining the manner of death. Extensive testimony of two pathologists described the victim's wounds and conditions of the shooting. The photograph was superfluous and designed only to inflame the passions of the jury. *Contrast People v. Taylor*, 26 Cal. 4th 1155, 1168, 34 P.3d 937, 113 Cal. Rptr. 2d 827 (2001) (crime scene photographs of victim lying face down but no close-up views held admissible).

1608. Unlike photographs admitted in *People v. Cox*, the admitted photographs of Maxine Zazzara were highly inflammatory and prejudicial. Detailed photographs of her wounds, particularly the gouged eye sockets, were not probative of the determination of guilt. People's Exhibit No. 9-B depicted gruesome scarring caused by removal of the victim's eyes. This exhibit was extremely gruesome, highly inflammatory, and had no evidentiary value with respect to any material or contested issue before the jury. The trial court erred in failing properly to determine the relevance of the photographs. *People v. Thompson*, 50 Cal. 3d 134, 182-83, 785 P.2d 857, 266 Cal. Rptr. 309 (1990).

1609. In Doi, photographs of the two victims were not probative of the determination of guilt. Petitioner was charged only with the death of William Doi. The prejudicial effect of having the jury view both the decedent and his injured wife outweighed any probative value under Evidence Code § 352. The photographs did not assist the jury in deciding any contested fact in the case. *People v. Frank*, 51 Cal. 3d at 735.

1610. Similarly, in Cannon, photographs of the victim's wounds were inflammatory and not probative of any issue related to the determination of guilt. The photographs did not assist the jury in deciding any contested facts. *Id.*

1611. As to the Kneiding incident, photographs of the victim Lela Kneiding taken at the scene were inflammatory and not probative of any contested issues in the case. The nature and extent of the victim's injuries, although brutal, were not at issue. *Id.*

1612. Petitioner was prejudiced by the gruesome and inflammatory photographs in the joint trial of fifteen unrelated incidents. The photographs did not aid the jury in its determination of the evidence; they were highly prejudicial. The photographs had little, if any, relevance to the determination of guilt.

1613. In closing argument, the prosecutor urged the jury to consider photographs of the gaping throat wound in the Vincow incident as evidence of a

591

signature mark.  (*See* 206 RT 23701.)  However, the prosecution's speculation about the possible significance of the wounds failed adequately to demonstrate relevance; the photographs should have been excluded under Evidence Code § 352.  In the Yu incident, the prosecutor relied on photographs of the victim's injuries to support his theory of her death.  (*See* 206 RT 23781-84, 23789-825.)  The gruesome photograph objected to by Petitioner was not instructive as to the cause of death; it was inflammatory, cumulative and prejudicial.  In the Okazaki incident, the prosecution relied on photographs of the victim in order to speculate about a motive for the killing consistent with a possible motive in other incidents.  (*See Id*. at 23718-20.)

1614.  In the Zazzara incident, the prosecution argued that ligature marks and throat wounds on Maxine Zazzara were similar to marks observed on victims in other incidents.  (207 RT 23839-40.)  The prosecutor also argued that the photographs of Maxine Zazzara's injuries showed her eyes had been cut out.  (*Id*. at 23839.)  However, there was no relevance as to the injuries to her eyes; the photographs were highly inflammatory, prejudicial and cumulative.  In the Doi incident, the prosecution engendered sympathy for the victim by emphasizing photographs of both William Doi and Lillian Doi that were not probative of the determination of guilt.  (*Id*. at 25854.)

1615.  In many instances, the prosecutor's argument created an impermissible spillover effect.  By comparing inflammatory photographs of victims and crime scenes in incidents with stronger evidence to photographs of victims and crimes scenes in incidents with weaker evidence, the prosecution created a prejudicial spillover effect which the jury was unable to compartmentalize.  The prejudicial photographs were also used to link Petitioner to many of the numerous crimes in violation of his rights to a fair trial, to a fair and reliable determination of guilt, to have every element of the charge proven beyond a reasonable doubt, and to due process and fundamental fairness under

the Fifth, Sixth, Eighth, and Fourteenth Amendments. *In re Winship*, 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). The erroneous ruling also violated Petitioner's right to a reliable determination of penalty. *Caldwell v. Mississippi*. For the reasons discussed above, the trial court erred in admitting cumulative and prejudicial evidence. A number of death judgments have been reversed due, at least in part, to the failure to exclude gruesome photographs. *Cf. Spears v. Mullin*, 343 F.3d 1215, 1226 (10th Cir. 2003) (photographs "so infected the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process"); *People v. Love*, 53 Cal. 2d 843, 856, 350 P.2d 705, 3 Cal. Rptr. 665 (1960) (photographs "served primarily to inflame the passions of the jurors;" probative value "was more than adequately" conveyed "by the doctor"); *accord Clark v. Commonwealth*, 833 S.W.2d 793, 794-95 (Ky. 1991); *Tobler v. State*, 688 P.2d 350, 355-56 (Okla. Crim. App.1984); *see also United States v. Sampson*, 335 F. Supp. 2d 166, 181-83 (D. Mass. 2004) (photographs excluded to protect the defendant's "due process right … to a fundamentally fair [penalty] trial").).

1616. As the jurors were improperly inflamed and impassioned by the erroneous admission of the photograph, Petitioner's right to a reliable adjudication at all stages of a capital case was denied. *Ford v. Wainwright*, 477 U.S. 399, 411, 106 S. Ct. 2595, 91 L. Ed. 2d 335 (1986); *see also Beck v. Alabama*, 447 U.S. at 638. The trial court abuse of discretion in admitting this photograph also violated Petitioner's right to due process and made his trial fundamentally unfair. *Estelle v. McGuire*, 502 U.S. at 67-69; *Kealohapauole v. Shimoda*, 800 F.2d at 1465 (citing *Lisenba v. California*, 314 U.S. 219, 236, 62 S. Ct. 280, 86 L. Ed. 166 (1941)).

1617. The court's rulings admitting the photographs into evidence violated Petitioner's constitutional right to due process, a fundamentally fair trial, and a reliable adjudication at all stages of a capital case. U.S. Const. amends V, VIII,

XIV; *Ford v. Wainwright*, 477 U.S. 399; *Gardner v. Florida*, 430 U.S. 349; *Hicks v. Oklahoma*, 447 U.S. 343.[124]  For these reasons, Petitioner's death sentence must be reversed.

1618.  The foregoing violations of Petitioner's constitutional rights, taken singly or in combination with the other errors alleged in the Petition, constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993).  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Petition, so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violations of Petitioner's  rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice.  *See id.* at 622, 637-38.

**CLAIM 24:**

> **THE TRIAL COURT VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS BY INSTRUCTING THE JURY THAT PETITIONER'S REFUSAL TO REMOVE HIS SUNGLASSES WAS EVIDENCE OF CONSCIOUSNESS OF GUILT**

1619.  Exhaustion of the claim:  This claim was fairly presented to the California Supreme Court in the direct appeal.  It was presented in Section XI of the Opening Brief.

---

[124]  See note, *supra*.

1620. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

1621. Those facts and allegations set forth in the petition, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

1622. During Jorge Gallegos' testimony regarding the Yu incident, the court advised Petitioner to take off his sunglasses to permit the witness to view Petitioner's profile. Petitioner refused to remove his glasses. (146 RT 16889.)

1623. The prosecution requested an instruction on consciousness of guilt relating to Petitioner's refusal to remove his glasses at trial. The prosecution contended that Petitioner's refusal to remove his glasses demonstrated consciousness of guilt. (200 RT 23339; 201 RT 23348-49.) Trial counsel objected to such an instruction, contending that Petitioner's conduct did not give rise to an inference or consciousness of guilt. (*Id*. at 23347-48, 23352-53.) The trial court recalled that Petitioner had been warned at the time the request was made that as a consequence of his refusal, the prosecution would be permitted to argue that Petitioner's conduct was evidence of consciousness of guilt.[125] (201 RT 23350-53.) Overruling Petitioner's objections, the trial court thus instructed the jury as follows:

> If you find that the defendant was offered and refused the
> opportunity in court to stand and remove his sunglasses for the
> purpose of viewing by a witness, such refusal is not sufficient

---

[125] The record does not support the trial court's recollection that Petitioner had been so advised or admonished at the time of his refusal. (*See* 146 RT 16889.)

standing alone and by itself to establish the guilt of the defendant, but it is a fact which, if proved, may be considered by you in the light of other facts in deciding whether the defendant is guilty or not guilty. ¶ The weight to which such a circumstance is entitled and whether or not such conduct shows a consciousness of guilt are matters for your determination.

(212 RT 24430.)

1624. Generally, a defendant's efforts to suppress evidence indicate consciousness of guilt.

1625. The trial court erred by failing to determine whether Petitioner's refusal supported an inference of consciousness of guilt. The court did not conduct a hearing to determine whether Petitioner's conduct amounted to an inference of consciousness of guilt. In addition, the court failed properly to advise Petitioner of the prejudicial inferences to be drawn from his refusal.

1626. Prior to Petitioner's refusal to remove his glasses, the prosecution established through Gallegos' testimony the following:

- Gallegos identified Petitioner as the perpetrator and stated that at trial Petitioner looked "a little different" as to his hair and clothing (146 RT 16848-50);

- Gallegos saw the suspect's profile at the scene (*Id*. at 16875); and

- Gallegos previously identified Petitioner based on a photograph in a newspaper (*Id*. at 16879).

1627. The trial court also failed appropriately to guide the jury's deliberations and proper evaluation of key evidence.

1628. The prosecutor, in closing argument, urged the jury to find Petitioner guilty of the Yu murder because of his refusal to remove his glasses. The prosecutor quoted the trial testimony of witness Gallegos:

596

'But are you sure this is the man?  Does he look different today than he did on this occasion?'

'Yeah, hair might be a little longer and he's wearing sunglasses.'

'Could he stand up and take his sunglasses off, please?'

The court asked him to do that and the defendant, 'no,' he said.

You might conclude from that that he didn't want to give Mr. Gallegos any more opportunity to identify him than was necessary.

I think that is a reasonable conclusion.

(206 RT 23743.)  By the prosecutor's argument, the jury was urged to convict Petitioner on all counts by virtue of his refusal to remove his sunglasses at trial.

1629.  Petitioner's refusal to remove his glasses did not impinge upon or adversely impact in any meaningful way the witnesses's identification of Petitioner.  Thus, the evidence failed to "supply the necessary nexus between defendant and the alleged suppression of evidence."  *People v. Hannon*, 19 Cal. 3d 588, 599, 564 P.2d 1203, 138 Cal. Rptr. 885 (1977).

1630.  Reducing the prosecution's burden to prove every element of the crime beyond a reasonable doubt is a violation of federal due process guarantees.  *Sandstrom v. Montana*, 442 U.S. 510, 520, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979).  Instructional error may constitute a federal due process violation where the issue of intent is removed from the jury's consideration.  *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979).  Without sufficient evidence to warrant the consciousness of guilt instruction, the jury was effectively compelled to draw an improper inference of guilt in violation of Petitioner's right to due process of law.  *Sandstrom*, 442 U.S. 510; *In re Winship*, 397 U.S. 358, 361-64, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970).

1631. In the absence of the trial court's erroneous instruction, it is reasonably probable that the jury would have properly considered the evidence. For example, in respect to the Yu incident, and incidents involving weaker counts, and eyewitness identifications such as in the Kyle, Dickman and Petersen incidents, and found that Petitioner's refusal did not in itself signify his guilt. Thus, the error was prejudicial.

1632. The foregoing violations of Petitioner's constitutional rights, taken singly or in combination with the other errors alleged in the Petition, constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Petition, so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violations of Petitioner's rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622, 637-38.

**CLAIM 25:**

## THE TRIAL COURT VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS BY REMOVING JUROR ROBERT LEE DURING DELIBERATIONS

1633. Exhaustion of the claim: This claim was fairly presented to the California Supreme Court in the direct appeal. It was presented in Section XII of the opening appeal brief.

1634. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

1635. Those facts and allegations set forth in the petition, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

1636. Jury selection in this case began on July 21, 1988. (65 RT 4803.) Robert Lee became one of the regular, impaneled jurors. (*See* XXVIII CT 8295.) The trial commenced on January 30, 1989. (*Id.* at 8299) During closing argument on July 25, 1989, the court received a note from a member of the jury regarding Juror Lee and his tendency "to catnap during the day." (XXIX CT 8498.) In response to the juror's note, the court instructed the jury to report to the court if "you've missed any of the evidence that has come before the court . . . ." (211 RT 24268-69.) Following the court's admonition, the jury reported no such incidents to the court. Thereafter, at the conclusion of trial and following the court's instructions, jury deliberations began on July 26, 1989. (212 RT 24483.)

1637. On August 11, 1989, after Juror Lee had served for six months of trial and after 13 days of deliberations, the trial court was presented with a note from the jury foreman. The note read as follows:

> Your honor, fellow jurors have brought it to my attention that juror No. 3, Mr. Robert Lee, has fallen asleep on two occasions during our deliberations. I have also seen him not quite as attentive as a result of this – of his dozing off. ¶ As foreman I find it my responsibility to bring this to your attention.

(213 RT 24522-23; XXIX CT 8622.) Trial counsel told the court: "I just don't think the jury should be able to select the jury, and it appears as though this is

599

what is happening." (213 RT 24524.)  The prosecutor remarked for the first time that this juror had previously been sleeping in court, a characterization the court questioned:  "I can't say he has slept, but he certainly has jerked his head up abruptly from time to time as if he were nodding off or had nodded off and was awakening, but I cannot say that I have ever found him to be asleep."  (*Id*. at 24524.)

1638.  The court held a hearing at which the foreman was questioned, not under oath, as to what had occurred.  He said that from his vantage point he could see all the jurors well.  He saw Juror Lee nod off for four to five minutes on Tuesday, August 8, just before the lunch break, and again briefly in the afternoon on Wednesday, August 9, the eleventh day of deliberations.  Significantly, the foreman stated he had not noticed Juror Lee sleeping before Tuesday, nor did any of the other jurors mention it before then.  (213 RT 24525-30.)  The foreman also represented that Juror Lee appeared on both occasions during deliberations to be asleep; the foreman called his name, and he awakened and said he had been reading.  (*Id*. at 24528-29.)  In a contradictory representation, the foreman said the second incident was not after lunch but "during lunch actually."  (*Id*. at 24531.)  Proceeding to discuss Juror Lee's participation during deliberations – which was not at issue – the foreman characterized Juror Lee's comments on matters under discussion as "a little off the wall sometimes."  (*Id*. at 24527.)

1639.  In the prosecutor's view, the jury, having been out two weeks, was "at a point where they should start making decisions," but "what they're trying to tell you is that there is some interference here."  (213 RT 24534.)

1640.  Only two other jurors had allegedly noticed that Juror Lee may have briefly fallen asleep, but they were not questioned by the court.  (*See Id.* at RT 24531.)  On August 11, 1989, on the basis of the information provided by the jury foreman, without exploring alternatives and without questioning Juror Lee himself, the court decided to remove Juror Lee from the jury.  Trial counsel

objected.  (*Id.* at 24533, 24535-36.)  The court found that "[g]ood cause exists to excuse him because of his sleeping . . . .  I think I really have no choice and I find good cause to excuse Mr. Lee.  ¶ I don't think there is any other finding I need make."  (*Id.* at 24537.)

1641.  On August 28, 1989, Petitioner filed a mandamus petition in the Court of Appeal, Case No. B044368, to compel the trial court to discharge the jury and dismiss the case against Petitioner, and issue a writ of prohibition to bar refiling of the charges in Petitioner's case.  Relief was sought on the basis of the trial court's failure to conduct a sufficient inquiry and determine whether good cause existed to discharge Juror Lee under § 1089.  Petitioner argued that he had been placed in jeopardy by virtue of the trial court's order to renew jury deliberations.  The appellate court summarily denied the petition on August 29, 1989.  (*See* I Supp. CT 9-58.)

1642.  Over 180 years ago in *United States v. Perez*, 22 U.S. 579, 6 L. Ed. 165 (1824), the Supreme Court stated:

> [T]he law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking *all* the circumstances into consideration, there is a *manifest necessity* for the act, *or the ends of public justice would otherwise be defeated*.  They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere.  *To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and, in capital cases especially*, Courts should be extremely careful how they interfere with any of the chances of life in favour of the prisoner.

*Id.*, at 580 (emphasis added).

1643. Ever since *Perez*, courts have recognized that once a jury is sworn, the defendant has a constitutional right to have his case decided by that particular jury. *See United States v. Shafer*, 987 F.2d 1054, 1057 (4th Cir. 1993). The Supreme Court has held that this right is rooted in the double jeopardy clause of the Fifth Amendment. *United States v. Jorn* 400 U.S. 470, 484, 91 S. Ct. 547, 27 L. Ed. 2d 543 (1971). As elsewhere noted by the United States Court of Appeals for the Eleventh Circuit, the necessity referred to in Perez is intended to accommodate an accused's right to have his trial completed by the tribunal sworn to hear the case. *United States v. Chica*, 14 F.3d 1527, 1531 (11th Cir. 1994).

1644. In addition to the defendant's right under the Fifth Amendment to have his case decided by the particular jury selected, the requirements imposed by the Sixth Amendment right to a jury trial, the Eighth Amendment requirement of a reliable fact-finding process in a capital case, the federal rights to a unanimous determination of guilt and penalty beyond a reasonable doubt, and the rights to an impartial jury and to equal protection of the laws, also preclude interference by the jury itself in its composition.

1645. In *Tanner v. United States*, 483 U.S. 107, 115-16, 107 S. Ct. 2739, 97 L. Ed. 2d 90 (1987), the Court held that evidence of juror incompetence was too "meager" even to allow for an evidentiary hearing, let alone the discharge of a juror as in this case. In *Tanner*, allegations arose during trial that the foreperson was an alcoholic and that other jurors daily imbibed large quantities of alcohol, marijuana and cocaine, and slept their way through Tanner's trial. At least one offending juror "felt like . . . the jury was on one big party." *Id*. Even under those circumstances, the Supreme Court concluded that the evidence of juror incompetence was too "meager" to warrant a hearing. *Tanner v. United States*, 483 U.S. at 126.

1646. When one or more members of a jury complain to a trial court about relatively innocuous behavior, such as occasional instances of napping or

sleeping during trial or even during deliberations, extreme care is thus required to avoid unnecessary inquiry. In this case, Juror Lee did not sleep throughout deliberations; he was observed sleeping a few minutes on two brief occasions. The foreman's report itself was contradictory as to what had actually occurred as one incident of sleeping actually may have occurred during lunch and not deliberations. Evidence of Juror Lee's sleeping was thus insufficient to establish that he was either incompetent, had committed misconduct warranting discharge, or was unable to perform his duties during deliberations. By taking the statements of the foreman at face value, without further inquiry of Juror Lee, and by discharging Juror Lee for two brief unsubstantiated incidents, the court erred and abused its discretion. The court also impermissibly allowed the jurors to exercise control over the composition of the jury.

1647. The court failed to conduct an appropriate hearing sufficient to establish good cause to remove Juror Lee. The court limited its inquiry by speaking briefly only with the jury foreman. The court did not question Juror Lee. Thus, the court's investigation court was inadequate. Absent sufficient inquiry, the court did not marshal or obtain the facts needed to decide whether Juror Lee's ability to continue his deliberations was impaired. The trial court thus erred in removing Juror Lee.

1648. The discharge of Juror Lee violated Petitioner's rights to due process and a fair trial. Petitioner had a constitutional right to have his trial completed by the tribunal selected and sworn to hear the case. "[W]here the judge, acting without the defendant's consent, aborts the proceeding, the defendant has been deprived of his 'valued right to have his trial completed by a particular tribunal.'" *United States v. Jorn*, 400 U.S. at 484; *United States v. Shafer*, 987 F.2d 1054.

1649. Moreover, the Supreme Court has explicitly recognized that "in capital cases especially, Courts should be extremely careful" in exercising their limited discretion to remove jurors after they have been sworn, especially after

603

they have commenced deliberations.  *United States v. Perez*, 22 U.S. at 579.  The long-ago ruling in *Perez* was a premonition of current Eighth Amendment jurisprudence that particular care is required to protect a defendant's right to a reliable determination of penalty under such circumstances.

1650.  The removal of Juror Lee violated Petitioner's fundamental rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.  The court's failure to conduct a sufficient inquiry to determine whether the juror's conduct warranted removal flawed the deliberative process.  Petitioner was denied his constitutional right to a fair trial by a particular jury.  *United States v. Jorn*, 400 U.S. at 484. Affecting the framework within which Petitioner's trial proceeds and rendering the trial fundamentally unfair, the error constituted a structural error that was reversible *per se*.  *Arizona v. Fulminante*, 499 U.S. at 310.

1651.  Petitioner was entitled to have his case decided by the particular jury sworn to hear the case, which included Juror Lee.  The trial court's unwarranted removal of Juror Lee violated Petitioner's constitutionally protected right to a particular jury.  *United States v. Jorn*, 400 U.S. at 484.  Following removal of Juror Lee, the newly-constituted jury ultimately returned guilty verdicts on all counts, made true findings on 19 special-circumstance allegations, and rendered a death verdict.  Thus, the trial court's error was prejudicial.  Under the federal standard, it cannot be said that the error was harmless beyond a reasonable doubt.

1652.  The foregoing violations of Petitioner's constitutional rights, taken singly or in combination with the other errors alleged in the Petition, constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993).  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Petition, so infected the

integrity of the proceedings that the error cannot be deemed harmless. The foregoing violations of Petitioner's rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622, 637-38.

**CLAIM 26:**

## THE TRIAL COURT'S REFUSAL TO VOIR DIRE THE JURY AND GRANT MR. RAMIREZ'S MOTION FOR A MISTRIAL AFTER A JUROR WAS MURDERED DURING TRIAL, AND TRIAL COUNSEL'S FAILURE TO COMPETENTLY PRESENT MR. RAMIREZ'S MOTIONS VIOLATED MR. RAMIREZ'S CONSTITUTIONAL RIGHTS

1653. Mr. Ramirez's convictions, confinement, and sentence are illegal and unconstitutional under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because (1) the trial court erroneously refused to voir dire the jury and grant Mr. Ramirez's motion for a mistrial after a juror was murdered just after guilt-phase deliberations had begun, and (2) trial counsel performed deficiently in failing to competently present motions to voir dire the jury and for a mistrial. These errors deprived Mr. Ramirez of his rights to be free from cruel and unusual punishment; to a fair and impartial jury; to a reliable, fair, non-arbitrary, and non-capricious determination of guilt, death eligibility, and penalty; to the effective assistance of counsel; to present a defense; to confrontation and compulsory process; to the enforcement of mandatory state laws; to a trial free of materially false and misleading evidence; to equal protection of law; and to due process of law as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the Untied States Constitution; and international human rights law as established by treaties, customary law, and under the doctrine of *jus cogens*.

1654. Exhaustion of the claim:  This claim was fairly presented to the California Supreme Court in the direct appeal.  It was presented in Section XIII of the Opening Brief, although it includes additional factual allegations.  Petitioner will present the claim with the additional factual allegations to the California Supreme Court in an exhaustion petition he will file no later than March 17, 2009.

1655. The facts in support of this claim, among others to be presented after full investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing, include the following:

1656. Mr. Ramirez's jury began guilt phase deliberations on July 26, 1989.  (212 RT 24483.)  In the middle of guilt-phase deliberations, Phyllis Singletary, Juror No. 8, was murdered.  The circumstances of Juror Singletary's murder were eerily similar to the murders of which the jury was deciding Mr. Ramirez's responsibility for.  Ms. Singletary was found in her home dead: beaten very badly and then shot.

1657. On the Monday afternoon of August 14, 1989, the trial court was told over lunch that Juror Singletary "was dead in her home of a gunshot wound." (213-A RT 23549.)  During the afternoon session, the court informed counsel, outside the presence of the jury, that it believed Juror Singletary was killed.  The court recognized that "this is going to make a splash whether [the jury] conscientiously avoid news media material or not.  I think it's going to be very, very difficult for them to avoid this[.]"  (*Id.* at 24550.)

1658. The court then brought the jury out and informed them that it is "attempting to find out exactly what is going on with Juror Singletary.  We haven't anything definitive yet to tell you."  (*Id.* at 24553.)  After a brief admonishment, the court excused the jury and ordered them to return the next day.

1659. That evening, as the trial court had predicted, Los Angeles county was inundated with media accounts of Juror Singletary's murder -- much of which was prejudicial to Mr. Ramirez and falsely implied the murder was related to his case. On Tuesday, August 15, 1989, a Herald Examiner newsstand located directly in front of the Criminal Courts building displayed the headline from the daily paper reading "NIGHT STALKER JUROR SHOT DEAD" with the subheading "No mistrial seen in case beset with problems." (29 CT 8670); (Ex. 80.)

1660. On the morning of Tuesday, August 15, 1989, the court again addressed counsel outside of the jury's presence, suggesting a stern admonishment to the jury and then "get on with the business of selecting an alternate jury -- juror and then proceed with their deliberations." (213-B RT 24555.) Defense counsel indicated that its only concern was when the jury was to resume deliberations, but otherwise had no objection to the trial court's initial plan. (*Id.* at 24556.) The trial court then told counsel, "What I was going to do, and I think this also might be required, would be to poll them as a group, if there is anybody who, because of this tragedy, could no longer be a fair and impartial juror." (*Id.* at 24557.)

1661. At this time, trial counsel informed the court it anticipated making a motion for a mistrial but the court told counsel he needed to make the motion immediately to which counsel responded, "I can't do it this morning." (*Id.* at 24558.) Clearly perturbed, the court dismissed the idea of a mistrial: "I know you can't and I don't think there are any grounds for it, Mr. Hernandez." (*Id.*) The trial court then told Mr. Hernandez "If you could find that there are grounds . . . I think you might be able to bring them up at a later date, in a day or two, if we decide to go forward with this thing." (*Id.* at 24559.)

1662. The court admitted the jurors were shaken by the incident: "[T]here are some very distraught people walking into this courtroom that went into the

607

jury room.  I mean, there were some very, very --" (*Id.*)  It then told counsel its intention to inform the jury as to what happened, question the jury as to whether they could be impartial, and select an alternate.  (*Id.* at 24561-62.)  This procedure, however, never occurred.

1663.  Instead, before the jury was brought out, the prosecution objected to the court's intended plan; in part because "polling at this time might in fact elicit emotional responses and could well cause a mistrial."  (213 RT 24564.)  The court agreed:  "I think Mr. Halpin has an excellent point, and I think people are shocked by a situation of sudden death and that perhaps requesting an immediate response is not appropriate."  (*Id.* at 24565.)

1664.  The court then brought out the jury to inform them of the murder.  Rather than put the jurors' minds at ease, however, its tepid explanation only exacerbated whatever feelings of fear for their personal safety they may have already had.  First, the court explained to the jury why it had not informed them the previous day about he murder of Juror Singletary, stressing that it "didn't want to alarm you, I didn't want to panic you and I didn't want to give you false information that I would have to retract later on, so I made a decision simply to not give you any information at all."  (*Id.* at 24568.)

1665.  The court then, for the first time, acknowledged to the jury that "your friend, and our juror here in court, Phyllis Singletary, has been shot."  (*Id*.)

1666.  Then, in giving a half-hearted admonition, the court added to speculation that the juror's murder was related to the trial:  "I want to emphasize it has, *as far as we are able to determine*, and I'm sure, has nothing to do with this case."  (*Id.* (emphasis added.))

1667.  After this less-then-reassuring statement, the court stoked the jurors' fears, warning them "I talked to the undersheriff of this county and an arrest [has] not been made, but that is the latest we have."  (*Id.* at 24569.)

1668. The court then selected the distraught and overwhelmed alternate juror Herrerra to replace Ms. Singletary -- certainly traumatizing her as she replaced a juror who was murdered just days ago.

1669. Before dismissing the jury for the evening, the trial court morbidly told the jury, "I feel sorry for all of you," and ordered them to resume deliberations the next morning at 9:30 a.m. Finally, the court ended with a cautionary warning to "take care of yourselves." (213 RT 24571.) Even the prosecutor recognized the court's speech created a "misimpression" that the murder could have been related to petitioner's case. (*Id.* at 24583.)

1670. The next morning, on Wednesday, August 16, 1989, out of the presence of the jury, the court and counsel again discussed juror Singletary's death and the impact of her murder on the jury. Trial counsel moved for suspension of jury deliberations to enable the defense to discuss the matter with its jury consultant, Jo-Ellen Dimitrius, Ph.D., who had assisted the defense throughout the jury selection process, and with Dr. Carlo Webber, a clinical psychologist specializing in trauma and crisis intervention. (*Id.* at 24574-76.) The trial court dismissed counsel's proposal to suspend deliberations, "perhaps as long as a week, so that the jury can go through the three-or four-step process that they must to get back on some kind of equilibrium that they will need to possibly deliberate on this case." (*Id.* at 24582.)

1671. Instead, the court opted merely to "inquire of the jury foreman as to his belief" about the other eleven jurors' state of mind. (*Id.* at 24590.) The court deemed a mere three-question inquiry sufficient to gauge the ability of the jurors to fairly and impartially continue deliberations. The three questions posed to the foreperson were improperly leading and required answers well beyond his ability to perceive:

The Court:  Do you have an opinion as to whether or not the events of the last few days have sort of settled down now and that the jury is able to continue on with their deliberations?

Juror Seven (Mr. Rodriguez):  Yea, I feel that it is somewhat tranquil, but it is -- I feel that we can probably continue today.

The Court:  Nobody has indicated in the jury room that they are unable to proceed?

Juror Seven (Mr. Rodriguez):  No.

The Court:  They all seem to be able to carry out their duties then as jurors?

Juror Seven (Mr. Rodriguez):  Right.  Everyone appears to have put it behind them.

(*Id.* at 24591.)

1672. If there were any doubt as to the answer the court hoped to elicit from his leading questions, it was made obvious by its response to the foreperson at the conclusion of his two-question interview:  "I am delighted to hear that." (*Id.* at 24591.)

1673. Immediately after the foreperson left the stand, the court ruled: "Unless someone has some authority to give me, the court is reasonably satisfied that the jurors are able to proceed with their deliberations and that upon further admonishment I propose that is exactly what we do."  (*Id.* at 24592.)  The court then denied trial counsel's objections and motion for further inquiry.

1674. By 10:45 A.M. on Wednesday, August 16th, a mere two days after the jury learned one of their colleagues was brutally murdered in a similar manner as the charged murders of which they were deliberating, the jury had resumed their deliberations.

610

**A.     The Trial Court Violated Petitioner's Constitutional Rights by Failing to Grant Counsel's Motion for a Mistrial and Immediately Voir Dire the Jury**

1675. The trial court committed egregious error and violated Petitioner's federal and constitutional rights in failing to declare a mistrial after Juror Singletary was murdered.

1676. On Tuesday, August 15, 1989, defense counsel informed the court that they would file a motion for a mistrial. (213-B RT 24557.) The trial court curtly and improperly told counsel "I don't think there are any grounds for it." (*Id.* at 24558.) After counsel's insistence that it was his "obligation" to bring a motion, the court instructed counsel "bring them up at a later date, in a day or two, if we decide to go forward with this thing." (*Id.* at 24559.)

1677. On August 23, 1989, Petitioner moved to disqualify the jurors and for a mistrial. Petitioner alleged that under the California Constitution and the Sixth Amendment, the jury was unable to deliberate in an unbiased manner because of the death of Juror Singletary and should be disqualified. Trial counsel further argued that the jury committed misconduct through their volitional, as well as unavoidable, exposure to media coverage of the juror's death. (XXIX CT 8667-77.) The prosecution opposed the motion on August 31, 1989. (XXX CT 8692-94.)

1678. The trial court denied Petitioner's motion on September 5, 1989 without conducting any inquiry. The court found no good cause to grant relief as the jury had resumed deliberations without any reported difficulty. (215 RT 24674-75.) At the hearing, however, the court indicated it had made clear its ruling long before it formally denied the motion: "the motion for mistrial is also denied for reasons stated last week." (*Id.* at 24675.)

1679. Trial counsel's motion and accompanying declaration provided alarming details regarding the extent of shock and dismay felt by the jurors. In

his declaration counsel stated he noticed the alternate juror replacing Juror Singletary as "conspicuously distraught and unable to proceed to take juror chair number 8." (XXIX CT 8670.) Counsel also informed the court that it learned "Ms. Herrera was emotionally overcome with grief in the corridor just prior to the hearing. One person informed defense counsel that Ms. Herrera was 'hysterical.' The entire panel of regular jurors as well as all the alternate jurors were teary eyes and appeared subdued by emotion." (*Id.* at 8671.)

1680. Trial counsel's declaration also stated "A Herald Examiner newsstand located directly in front of the Criminal Courts Building displayed" a headline referring the Juror Singletary's murder. Indeed, the August 15, 1989 edition of the Herald Examiner carried as its headline: "Night Stalker juror shot dead" in large bold letters. (Ex. 80.)

1681. Moreover, the murder of a female juror by a male perpetrator was similar in execution to many of the charges in Petitioner's case, leaving jurors with a psychological attachment between the two perpetrators and victims that would endanger their ability to remain impartial during deliberations.

1682. Further, the jury was not unaccustomed to acts of violence, which they could have reasonably associated as purposefully targeted against them. For example, Juror Singletary's car windows were previously broken out during trial (133 RT 14822-26), and Juror Salcido had her car stolen and recovered. (Ex. 129, J. Salcido Dec., ¶ 10.)

1683. The events surrounding the murder of Juror Singletary led to juror bias and constituted a legal ground to discharge the jury. The murder of Juror Singletary substantially interfered with the discharge of the jury's duties. As the trial court noticed, the jurors were "very distraught." (213-A RT 24559.) Having spent months enveloped in a trial beset with violent and disturbing facts, having the jurors' bond broken by a brutal murder required the court to declare a mistrial.

1684. The trial court also committed error by refusing even to question jurors regarding their ability to remain impartial. As early as Tuesday, August 15, 1989, counsel objected to the court's decision to solely question the juror foreperson, and instead made a "request that the other jurors be questioned[.]" (213 RT 24595.) However, the court immediately dismissed counsel's objection, stating, "Mr. Hernandez, it is never my intention to permit counsel to do any polling whatsoever, so I mean the most I was inclined to read and consider any questions you had to offer." (*Id.*)

1685. On August 21, 1989, Petitioner submitted a written motion to voir dire the jurors regarding their impartiality in light of Juror Singletary's death. (XXIX CT 8639-44, 8647-55.) On August 23, 1989, Petitioner filed supplemental points and authorities in support of his motion to voir dire jurors. (*Id.* at 8661-64.) The prosecution filed its opposition on August 24, 1989. (*Id.* at 8681-83.)

1686. In a remarkable display of 'putting the cart before the horse,' the court denied trial counsel's motion to question the jurors about their thoughts and feelings regarding the murder *because* the court had not yet gotten any indication of the juror's thoughts and feelings about the murder. "This court has had nothing that would put it on notice, either by the jury or by its own observations, that would indicate that this jury is not able to continue on with its deliberations . . . I so find . . . that they are able to deliberate, that we have had no words from the jury indicating otherwise . . . so your motion to have the jury polled, either by court or counsel, is denied." (215 RT 24665.)

1687. Had the court conducted a voir dire, it would have realized the jury could not have fairly deliberated on petitioner's guilt. For example, one juror recalls already having sleepless nights "because of the gruesome nature of the crimes and the evidence presented in the courtroom." (Ex. 120, B. Smith Dec., ¶ 11.) After Juror Singletary's murder, the juror "became even more uneasy." (*Id.*)

1688. Another juror remembered Petitioner always staring at the jurors as they were brought in. (Ex. 114, J. Dabney Dec., ¶ 5.) While this did not necessarily trouble the juror before, Juror Singletary's murder suddenly made Petitioner's courtroom conduct bothersome. (*Id.*)

1689. A Los Angeles Times newspaper article reported at least three jurors expressing concerns over the murder of Juror Singletary:

> Several jurors also told of fears for their personal safety when they learned of Singletary's murder on the night of Aug. 14 -- mostly from television news bulletins. At the time, it had not been determined who killed the woman. [Juror Cynthia] Haden was in her Glendale home -- only two blocks from the scene of a Night Stalker double homicide -- when a news flash interrupted a late-night TV movie. *'My first thought was that we were all going to be picked off, one by one. Who's next?' she recalled. Her roommate got his gun out and kept it handy.* Moments later, Haden got a *frantic call from Chakalit Harris, another juror, expressing the same concern.* But Harris was less fearful for her own safety. During the course of the trial, she had installed window bars on her home -- and had bought a third dog, a Great Dane. *When [juror] Rodriguez heard the news, while watching an Angels baseball game, he quickly gathered up his two children and locked up the house.* His wife was still at work.

(Ex. 78, at p. 2208-09.)

1690. The trial court similarly erred in refusing to question jurors regarding the impact of prejudicial publicity on their ability to be impartial. The morning the court learned Jury Singletary was murdered, it admitted "this is going to make a splash whether they conscientiously avoid news media material

614

1     or not.  I think it is going to be very, very difficult for them to avoid this[.]

2     (213A-RT 24550.)

3        1691.  The jury was not told by the trial court what happened to Juror

4     Singletary on Monday, August 15, 1989.  Instead, they were sent home.  As the

5     trial court predicted, news of the juror's murder inundated the county.  Rather

6     than from the court, the media's inflammatory and sensational reporting about the

7     jurors' murder were the first the jury heard about their fellow juror's murder.

8        a.     Plastered in a front page headline across a major Los Angeles

9                newspaper, the Herald Examiner, read the headline:  "Night

10             Stalker juror shot dead."  (Ex. 80.)

11        b.     One juror recalls finding out about the murder of Juror

12             Singletary "while I was watching a movie on the television."

13             (Ex. 113, L. Casselli Dec., ¶ 3.)  Even with the most diligent

14             attempt to follow the court's admonishment to avoid media

15             surrounding the case, it was impossible to avoid hearing of her

16             death as a "news flash came up that said one of the Ramirez

17             jurors had been murdered."  (*Id.*)  She explained that upon

18             hearing the news, her "first thought was that the murder as

19             related to the Ramirez case and for a few days we jurors

20             believed that to be true."  (*Id.*)

21        c.     Despite trying to follow the court's admonishment, another

22             juror admitted to catching "a glimpse of the murdered juror

23             being wheeled out on a gurney but I immediately looked

24             away.  I was nervous on the way to court.  I wondered what

25             was going on."  (Ex. 129, J. Salcido Dec., ¶ 2.)

26        d.     Still another juror still remembers that he "was at home one

27             night and passed by a television set and caught a fleeting

28             glimpse of a fellow juror named Phyllis Singletary.  When

that happened, I remember saying, 'My God, I know that lady.'"  (Ex. 117, J. McGee Dec., ¶ 4.)

1692.  The Supreme Court has long held that a defendant has a constitutional right to an impartial tribunal.  An impartial jury is at the core of our criminal justice system.  *Jordan v. Massachusetts*, 225 U.S. 167, 176, 32 S. Ct. 654, 56 L. Ed. 1038 (1912).  Jurors must render a verdict based on evidence presented at trial.  *Irwin v. Dowd*, 366 U.S. 717, 721-22, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961).  Testimony of jurors in situations where an extraneous influence may have affected the jury is required in *Mattox v. United States*, 146 U.S. 140, 149, 13 S. Ct. 50, 36 L. Ed. 917 (1892) (jurors heard and read prejudicial information not admitted at trial); *Parker v. Gladden*, 385 U.S. 363, 365, 87 S. Ct. 468, 17 L. Ed. 420 (1966) (comments about defendant made by bailiff); and *Remmer v. United States*, 347 U.S. 227, 228-30, 74 S. Ct. 450, 98 L. Ed. 654 (1954) (juror offered a bribe.)

1693.  An inquiry into the jury's exposure to the news coverage of Juror Singletary's death was required, yet the trial court did nothing to determine the nature and extent of the jurors' exposure to publicity.  Comments by the court, the prosecution and trial counsel clearly indicated that jurors had been exposed to media coverage of the juror's death and that one, several, or all of the jurors were likely to have been influenced to Petitioner's potential detriment.

1694.  Petitioner's right to an inquiry by the trial court to determine possible juror bias (exposure to material outside the record) or other bias leading to the necessity of a mistrial has been fully recognized and protected in federal law.  *See Remmer*, 347 U.S. at 230.  Where a defendant alleges facts raising the possibility of juror misconduct, for example, the trial court should order an evidentiary hearing to ascertain what occurred and whether a defendant has been prejudiced.  As one prominent federal commentator has summarized:  "A party who makes a proper preliminary showing is entitled to an evidentiary hearing,

616

and in criminal cases the entitlement is of constitutional dimension." Mueller, *Jurors' Impeachment of Verdicts and Indictments in Federal Court Under Rule 606(b),* 57 Neb. L. Rev. 920, 962-63 (1978) (footnotes omitted.)

1695. In *Remmer*, someone approached one of the jurors during trial and suggested "he could profit by bringing in a verdict favorable to the [defendant]." *Id.* at 228. The matter was brought to the attention of the trial court and prosecutors who investigated the matter. They apparently concluded the statement had been made in jest. Defense counsel was not informed about the matter until after the verdict. Counsel moved for a new trial. The trial court denied the motion without an evidentiary hearing. In reversing the conviction, the Supreme Court explained:

> The trial court should not decide and take final action ex parte on information such as was received in this case, but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate.

*Id.* at 229-30.

1696. The United States Courts of Appeals have regularly used evidentiary hearings to explore claims of jury misconduct and bias. *E.g., United States v. Madrid*, 842 F.2d 1090 (9th Cir. 1988); *United States v. Bagnariol*, 665 F.2d 877, 884 (9th Cir. 1981); *United States v. Mirkin*, 649 F.2d 78, 80 (1st Cir. 1981); *Port Terminal & Warehousing Co. v. John S. James Co.*, 695 F.2d 1328 (11th Cir. 1983); *Morgan v. United States*, 380 F.2d 915 (5th Cir. 1967). As one Court of Appeals has noted, a party claiming an improperly influenced jury returned a verdict against him is entitled to the opportunity to prove the claim. In response to such an allegation, the trial judge "must conduct a full investigation to ascertain whether the alleged jury misconduct actually occurred; if it occurred, he must determine whether or not it was prejudicial." *United States v. Brantley*, 733

F.2d 1429, 1439 (11th Cir. 1984) (quoting *United States v. McKinney*, 429 F.2d 1019, 1026 (5th Cir. 1970)); *accord*, *Bagnariol*, 665 F.2d at 885 (trial court, upon learning of a possible incident of juror misconduct, must hold an evidentiary hearing to determine the precise nature of the extraneous information); *Haley v. Blue Ridge Transfer Co., Inc.*, 802 F.2d 1532, 1535 n.1 (4th Cir. 1986) (allegations of juror prejudice arising from extraneous communications during trial raise serious questions about the fairness of the result and, in most cases, require a probing factual inquiry into the substance of the allegations – an inquiry that is reviewable on appeal); *see also United States v. Corbin*, 590 F.2d 398, 400 (1st Cir. 1979).

1697. While district courts have discretion to decide whether and how to conduct evidentiary hearings dealing with allegations of jury misconduct and tampering (*e.g.*, *United States v. Bradshaw*, 787 F.2d 1385, 1390 (10th Cir. 1986); *United States v. Hendrix*, 549 F.2d 1225, 1227 (9th Cir. 1977)), abuse of discretion has been invariably found where evidentiary hearings, necessary to fairly and adequately determine the extent to which the allegations of misconduct were true, were not conducted, as in the present case. *See, e.g., Remmer*, 347 U.S. 227; *United States v. Brantley*; *Richardson v. United States*, 360 F.2d 366, 369 (5th Cir. 1966); *Wheaton v. United States*, 133 F.2d 522, 527 (8th Cir. 1943).

1698. The California Supreme Court unreasonably attributed the trial court's error in failing to grant a mistrial and voir dire the jurors to the court being "asked to rule on this request more than two weeks after the jury had resumed deliberations." *People v. Ramirez,* 39 Cal. 4th 398, 460, 139 P.3d 64, 46 Cal. Rptr. 3d 677 (2006). As described above, as early as August 16, 1989 - one day after learning of the murdered juror, trial counsel indicated to the court its objection to questioning only one juror and asked that all jurors be questioned. (213 RT 24595.) While the written motions for voir dire and a mistrial were submitted on August 21st and 23rd, the rules regarding notice did not allow for a

hearing until September 5, 1989. Indeed, it was the trial court itself that endorsed the idea of counsel proceeding by notice motion, which under California rules stalled the ability of the trial to hear the matter. (*See* 213-B RT 24557-59.) In any event, to the extent counsel was to blame for the court's failure to grant a mistrial and voir dire the jurors, counsel acted deficiently and prejudicially. *See Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)

**CLAIM 27:**

## COUNTS 3 AND 5 – THE EVIDENCE WAS INSUFFICIENT TO SUPPORT PETITIONER'S CONVICTIONS OF BURGLARY AND FIRST-DEGREE FELONY-MURDER

1699. Exhaustion of the claim: This claim was fairly presented to the California Supreme Court in the direct appeal. It was presented in Section XIV of the Opening Brief.

1700. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

1701. Those facts and allegations set forth in the petition, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

1702. The prosecution alleged commission of burglary with the intent to commit larceny in fourteen of the fifteen charged incidents (counts 1, 3, 7, 10, 12, 15, 19, 21, 23, 25, 28, 31, 36, and 39). (*See* XIX CT 5419-57.) The prosecution relied on burglary charges as to those counts to support felony-murder allegations in ten of the incidents involving Vincow, Okazaki, Zazzara, Doi, Bell, Cannon,

Nelson, Kneidimg, Khovananth, and Abowath (counts 2, 5, 8, 9, 11, 13, 20, 24, 29, 30, 32, and 40).[126]  (*See Id*. at 5420-58.)

1703.  The case was submitted to the jury on alternative theories of first degree felony murder and willful, deliberate and premeditated murder.  Jury instructions on deliberate and premeditated murder (CALJIC No. 8.20) as well as first degree felony murder (CALJIC No. 8.21) were given by the trial court.  (*See* 212 RT 24445-48; XXIX CT 8548-50.)  The trial court instructed the jury on burglary (CALJIC No. 14.50) (212 RT 24471-73), and theft by larceny (CALJIC Nos. 14.00 and 14.02) (*Id*. at 24470-71).  During closing argument, the prosecutor focused exclusively on the felony-murder theory of liability on count 5.  (*See* 206 RT 23719-20.)  The jury convicted Petitioner of all burglaries and felony murders as charged.  Death sentences were imposed on counts 2, 5, 8, 9, 11, 13, 20, 24, 29, 30, 32, and 40.  (*See* XXX CT 8727-88; XXXI CT 9076.)

1704.  In respect to the Okazaki incident (counts 3 and 5), the evidence was insufficient to support his conviction of burglary and felony murder based on the commission of burglary.  The evidence failed to establish that a theft occurred – before, during, or after the homicide.  There was insufficient evidence that a burglary had occurred.  There was insufficient evidence of specific intent to commit burglary.  And there was insufficient evidence to prove beyond a reasonable doubt that Petitioner was the perpetrator of the charged crimes.

1705.  A conviction or other finding which is not supported by sufficient evidence constitutes not just an error of state law, but also a denial of due process and a violation of an accused's federal constitutional rights.  *Jackson v. Virginia*, 443 U.S. at 309.  The federal constitutional standard for determining the sufficiency of evidence is identical to the standard under California law.  *People v. Staten*, 24 Cal. 4th 434, 460, 11 P.3d 968, 101 Cal. Rptr. 2d 213 (2000).  Under

---

[126]  The Yu homicide (count 6) took place on a public street.

both, reversal is required if one of the essential elements of the crime is not supported by substantial evidence. *People v. Hernandez*, 47 Cal. 3d 315, 345-46, 763 P.2d 1289, 253 Cal. Rptr. 199 (1988).

1706. The elements of burglary to commit larceny are defined in CALJIC No. 14.50. The commission of burglary consists of (1) entry into a structure, (2) a specific intent to take away someone else's property at the time of the entry, and (3) the intent to permanently deprive the owner of such property. Theft by larceny is defined in CALJIC No. 14.02.

1707. The commission of theft by larceny consists of (1) taking the personal property of another, (2) with the specific intent to permanently deprive the person of such property, and (3) obtaining physical possession and control of the property for some period of time.

1708. An attempt to commit burglary requires a specific intent to commit burglary and a direct but ineffectual act done towards its commission. (CALJIC No. 6.00.)

1709. Burglary requires proof of entry into a structure with the intent to commit theft or a felony. If there is evidence of the requisite intent to commit theft or a felony, the offense is deemed completed whether or not the underlying act actually is committed. *People v. Montoya*, 7 Cal. 4th 1027, 1041-42, 874 P.2d 903, 31 Cal. Rptr. 2d 128 (1994). However, where there is a lack of intent to commit the underlying felony or theft, the evidence fails to establish a burglary. *People v. Teamer*, 20 Cal. App. 4th 1454, 1457-58, 25 Cal. Rptr. 2d 296 (1993).

1710. The evidence at trial was insufficient to support the underlying burglary conviction in count 3. There was no evidence of theft, ransacking, or attempted taking of property. The discovery of Okazaki's body in the condominium without any sign of theft did not support the commission of a burglary with the specific intent to commit theft.

1711. A charge of first-degree murder based on the theory of felony murder requires proof of an independent felonious intent separate from the intent to commit homicide. *People v. Ireland*, 70 Cal. 2d 522, 539, 450 P.2d 580, 75 Cal. Rptr. 188 (1969). In other words, if the theory of homicide is felony murder based on a killing in the course of a burglary, the intent to commit an assault or to commit murder cannot be the felonious intent which underlies the burglary. *People v. Teamer*, 20 Cal. App. 4th at 1459-60; *People v. Wilson*, 1 Cal. 3d 431, 436-42, 462 P.2d 22, 82 Cal. Rptr. 494 (1969); *People v. Garrison*, 47 Cal. 3d 746, 778, 765 P.2d 419, 254 Cal. Rptr. 257 (1989). There must be an independent intent to commit another felony (*e.g.*, theft) underlying the burglary for it to serve as the basis for a felony- murder conviction. *See People v. Sears*, 2 Cal. 3d 180, 188, 465 P.2d 847, 84 Cal. Rptr. 711 (1970) (first degree murder conviction reversed on basis of *Ireland* and *Wilson*); *People Sanders*, 51 Cal. 3d 471, 509 (1990) (burglary based on intent to assault cannot support felony-murder instruction, following *Ireland* and *Wilson*); *People v. Baker*, 74 Cal. App. 4th 243, 250, 87 Cal. Rptr. 2d 803 (1999) (trial court erred in applying felony-murder rule to conspiracy to commit assault with deadly weapon, following *Wilson*).

1712. Here, the evidence at best showed that a killing occurred but not in the course of a burglary. The evidence offered at trial in respect to count 5 demonstrated that the perpetrator's intent fell within the *Ireland* merger doctrine, that is, an intent to commit murder or assault, rather than a separate, primary intent to commit theft. The manner of the victim's death and the absence of any attempt to take property from the victim failed to support a finding of first degree felony murder. The evidence at trial more reasonably supported the view that the entry was merely incidental to the killing.

1713. Although reasonable inferences must be drawn in support of the judgment, an appellate court may not "go beyond inference and into the realm of

speculation in order to find support for a judgment.  A finding of first degree murder which is merely the product of conjecture and surmise may not be affirmed.  *People v. Memro*, 38 Cal. 3d 658, 695-96, 700 P.2d 446, 214 Cal. Rptr. 832 (1985).  Considered as a whole, the evidence is neither strong nor substantial.  No rational trier of fact could have found that Petitioner was the perpetrator of a burglary with the intent to commit theft.

1714. Consequently, Petitioner's burglary conviction in count 3 cannot be sustained.  Moreover, the jury's determination of guilt failed to support the burglary-murder conviction in count 5.  Because the jury considered legally insufficient evidence in rendering its verdicts, Petitioner's right to due process and fundamental fairness under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated.  *Estelle v. McGuire*, 502 U.S. 62, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991); *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979).  Absent sufficient evidence, his convictions on counts 3 and 5 also violated the Eighth Amendment requirement of a reliable determination of penalty.  *Caldwell v. Mississippi*, 472 U.S. 320, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985).

1715. The foregoing violations of Petitioner's constitutional rights, taken singly or in combination with the other errors alleged in the Petition, constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993).  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Petition, so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violations of Petitioner's  rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them

fundamentally unfair and resulting in a miscarriage of justice.  *See id.* at 622, 637-38.

## CLAIM 28:

### COUNT 5 – THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE SPECIAL CIRCUMSTANCE FINDING OF BURGLARY/MURDER

1716. Exhaustion of the claim:  This claim was fairly presented to the California Supreme Court in the direct appeal.  It was presented in Section XV of the Opening Brief.

1717. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

1718. Those facts and allegations set forth in the petition, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

1719. The burglary-murder special circumstance is defined as the commission of "murder . . . while the defendant was engaged in . . . the commission of, attempted commission of, or the immediate flight after committing or attempting to commit," the felony of burglary.  Cal. Pen. Code § 190.2(a)(l7)(vii).  The jury found this alleged special circumstance to be true in count 5.  (*See* XXX CT 8733.)

1720. In reviewing the sufficiency of the evidence for a special circumstance, the question to be addressed on appeal is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the allegation beyond a reasonable doubt.  *People v. Rowland*, 4 Cal. 4th at 271.

1721. For the same reasons as set forth in Argument 22, *supra*, the evidence in this case was also insufficient to support the charged burglary-murder special circumstance within the meaning of § 190.2(a)(17)(vii).  It follows that if evidence is insufficient as to the underlying burglary and first degree felony murder, the finding of the felony-murder special circumstance must automatically be set aside.  *People v. Green*, 27 Cal. 3d at 52.

1722. The foregoing violations of Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, taken singly or in combination with the other errors alleged in the Petition, constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993).  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Petition, so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violations of Petitioner's  rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice.  *See id.* at 622, 637-38.

**CLAIM 29:**

**COUNT 6 – THE EVIDENCE WAS INSUFFICIENT TO SUPPORT PETITIONER'S CONVICTION OF SECOND-DEGREE MURDER IN THE YU INCIDENT**

1723. Exhaustion of the claim:  This claim was fairly presented to the California Supreme Court in the direct appeal.  It was presented in Section XVI of the Opening Brief.

1724. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

1725. Those facts and allegations set forth in the petition, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

1726. At the initial jury instruction conference, the court held in abeyance Petitioner's request for instructions on manslaughter as to the Yu incident pending further research of the case law. (200 RT 23320-21.) Subsequently, Petitioner argued that there was sufficient evidence in the record for a manslaughter instruction predicated on heat of passion on the basis of witness Gallegos's characterization of the encounter between the suspect and the victim as a "lover's quarrel," and witness Duenas's description of the incident as an argument between two parties. (201 RT 23363-68.)

1727. The trial court ruled that evidence of a fight supported an instruction on voluntary manslaughter. (201 RT 23368-69, 23373.) The jury was instructed pursuant to CALJIC Nos. 8.37 (definition of manslaughter), 8.40 (voluntary manslaughter), 8.42 (quarrel and heat of passion defined), 8.43 (cooling period), 8.44 (heat of passion non-specific) and 8.50 (murder vs. manslaughter). (212 RT 24450-54; XXIX CT 8552-58.)

1728. In closing argument, the prosecution urged the jury to find Petitioner guilty of first degree murder in the Yu incident based on a theory of deliberate and premeditated killing with malice aforethought. (206 RT 23749.) In rebuttal argument, the prosecution stated that Petitioner's denial of involvement in the Yu shooting abrogated the jury's need to consider any of the manslaughter instructions. (211 RT 24347-48.) The jury returned a verdict of second-degree murder. (XXX CT 8734.)

1729. The jury was instructed on three homicide theories in regard to the Yu incident: first-degree murder, second-degree murder, and voluntary manslaughter. For the jury to have found Petitioner guilty of any degree of murder, there had to be evidence at trial of malice aforethought, as the element of malice distinguished murder from manslaughter. *People v. Blakeley*, 23 Cal. 4th 82, 87, 999 P.2d 675, 96 Cal. Rptr. 2d 451 (2000). That is, Petitioner must have had an intent to kill or killed without considerable provocation and under circumstances showing an abandoned and malignant heart. Penal Code § 188.

1730. The evidence of malice aforethought was insufficient to support Petitioner's conviction of second degree murder on count 6. The evidence at trial was not sufficient to show either an intent to kill or reckless disregard for human life, the bases for express and implied malice respectively. As for express malice, there was no showing of an express or verbalized intent to kill. However, intent to kill can sometimes be inferred from the method or manner of death. Malice may be implied when "the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his [or her] conduct endangers the life of another and who acts with conscious disregard for life." *People v. Blakeley*, 23 Cal.4th at 87. Here, the evidence was insufficient to prove beyond a reasonable doubt that Petitioner acted with the intent to fire the weapon and kill the victim.

1731. Nor did the manner of Yu's death manifest an intent to kill. While the firing of a weapon at close range may be sufficient to demonstrate express malice (*see*, *e.g.*, *People v. Jackson*, 49 Cal. 3d 1170, 1201, 783 P.2d 211, 264 Cal. Rptr. 852 (1989) ("[T]he very act of firing a shotgun toward the officer . . . would permit an inference of intent to kill from the manner of killing"); *People v. Lashley*, 1 Cal. App. 4th 938, 946, 2 Cal. Rptr. 2d 629 (1991) (substantial evidence of intent to kill malice present where defendant aimed and fired a .22-caliber rifle in victim's direction at a range and in a manner that would have

inflicted a mortal wound had the bullet been on target)), Petitioner's case differs significantly from those cases where such a finding was made.

1732. In *Jackson*, the defendant argued that the evidence showed he had aimed a shotgun at a patrol car's light bar, not at the officer who was hit. Witnesses, however, had seen the defendant aim at the victim, and a shotgun blast at a short distance was certain to hit the officer even if not aimed precisely at him. There was also evidence that the defendant had removed a police shotgun from the patrol car and attempted to cock the weapon before pointing it at the officer. *People v. Jackson*, 49 Cal. 3d at 1201. Similarly, in *Lashley*, there was evidence of the defendant's threat to do bodily harm. Testimony at trial established that he took aim before firing. This fact, coupled with the proximity in time of the shooting and the nature of the wound, was held sufficient evidence of intent to kill. *People v. Lashley*, 1 Cal. App. 4th at 945.

1733. In contrast, the evidence in Petitioner's case did not establish any prior threat or intent to harm the victim. Witnesses did not see a weapon aimed at the victim in a manner suggesting an intent to kill. The expert testimony of two pathologists established that the shots were not fired at a vital organ. The wounds, the direction of each bullet, and the number of shots fired demonstrated at most a chaotic encounter, not a determined effort to inflict lethal harm.

1734. Even in cases where there may be sufficient evidence of express or implied malice, where the evidence also shows the presence of a condition which negates or mitigates the finding of malice, the crime committed is voluntary manslaughter, not murder. *People v. Rios*, 23 Cal. 4th 450, 463 n.10, 2 P.3d 1066, 97 Cal. Rptr. 2d 512 (2000). Thus, if evidence shows that a killing was committed in the heat of passion, upon a sudden quarrel, or pursuant to an unreasonable belief in the need to defend oneself, notwithstanding any other evidence suggesting the presence of malice aforethought, an accused can be convicted of no greater crime than voluntary manslaughter. These conditions

628

legally negate the finding of malice. *People v. Lasko*, 23 Cal. 4th 101, 110-11, 999 P.2d 666, 96 Cal. Rptr. 2d 441 (2000).

1735. The logical corollary to the *Blakeley-Lasko* rule is that if there is evidence of a negating factor which creates a burden of proof on the prosecution as to the absence of that negating factor, it follows that the defense need only raise a reasonable doubt that the factor is present to avoid a conviction of murder as a matter of law. Where the evidence warrants the imposition of the burden on the prosecution, that burden must be discharged by proof beyond a reasonable doubt. Thus, an accused need only raise a reasonable doubt in support of that defense. *See*, *e.g.*, *People v. Flannel*, 25 Cal. 3d at 680-83.

1736. Similarly, in the context of the presumption of malice under Penal Code § 189.5, the state court has held in a line of cases deriving from *People v. Cornett*, 33 Cal. 2d 33, 42, 198 P.2d 877 (1948), that "the defendant is not required to prove mitigating circumstances by a preponderance of the evidence, but need only introduce evidence of such circumstances to raise a reasonable doubt." This long established rule is firmly ensconced in criminal jurisprudence:

> The prosecution bears the burden of proving all elements of the
> offense charged and must persuade the factfinder 'beyond a
> reasonable doubt' of the facts necessary to establish each of these
> elements . . . .

*Sullivan v. Louisiana*, 508 U.S. 275, 277-78, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993) (citations omitted).

1737. In Petitioner's case, there was ample evidence to support a reasonable doubt as to the charge of second degree murder. First, percipient witnesses observed what appeared to be a "lovers' quarrel." The prosecution conceded more than once in closing argument that witnesses Gallegos and Duenas so characterized the confrontation as a two-way altercation. (206 RT 23730, 23732, 23734.) Second, the eyewitness observations were objectively

supported by evidence of a struggle, including, most significantly, attempts by the assailant to get away, and his overheard statement "Get away from me." (146 RT 16846, 16872; 147 RT 16988-89.) While physical evidence showed that the assailant attempted to pull the victim from the car, the evidence also showed that the victim may have been dragged in an effort by the assailant to leave the scene. Finally, another eyewitness placed the victim and the assailant outside the victim's car standing by the curb, indicating that they were likely to have been engaged in a mutual confrontation or struggle. (*Id.* at 16981-84.)

1738. The evidence at trial thus did not strongly support a finding of express or implied malice in light of the countervailing evidence that the shooting involved a struggle between the victim and assailant. The fatal encounter by all accounts and evidence occurred during the heat of passion or a sudden quarrel between the victim and assailant. With weak evidence of intent to kill and the presence of malice-negating factors, the evidence on the whole thus failed to support Petitioner's conviction of second degree murder on count 6. *People v. Blakeley*, 23 Cal. 4th at 87.

1739. Because the jury considered legally insufficient evidence in rendering its verdicts, Petitioner's right to due process and fundamental fairness under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated. *Estelle v. McGuire*, 502 U.S. 62, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991); *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). Absent sufficient evidence, his convictions on counts 3 and 5 also violated the Eighth Amendment requirement of a reliable determination of penalty. *Caldwell v. Mississippi*, 472 U.S. 320, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985).

1740. The foregoing violations of Petitioner's constitutional rights, taken singly or in combination with the other errors alleged in the Petition, constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the

jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Petition, so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violations of Petitioner's rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *Id.* at 622, 637-38.

**CLAIM 30:**

## THE PROSECUTION KNOWINGLY AND IN BAD FAITH
## PRESENTED UNRELIABLE AND FALSE EVIDENCE

1741. Exhaustion of the claim: This claim was fairly presented to the California Supreme Court in Section XIII of the June 2004 petition for writ of habeas corpus.

1742. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

1743. Those facts and allegations set forth elsewhere in this petition, and the claims of constitutional violations and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication.

1744. Petitioner's convictions and sentences were obtained by reason of prosecution misconduct in knowingly presenting inaccurate, misleading and unreliable evidence in violation of his rights to a fair trial, impartial jury, jury trial, effective assistance of counsel, to confront and cross-examine witnesses, to present a defense, a reliable determination of guilt and sentence, and to due process and fundamental fairness, and in violation of Petitioner's right to be free from cruel and unusual punishment, under the Sixth, Eighth, and Fourteenth Amendments.

1745. The constitutional violations had a substantial and injurious effect upon the verdict and were it not for the errors, it is reasonably probable that the results at guilt and penalty would have favored Petitioner.

1746. The prosecution's case was based primarily on physical evidence, including shoe print impression evidence and ballistics, and the testimony of a "fence." The state relied heavily on an inexperienced law enforcement witness

and presented false, misleading and unreliable testimony in an effort to connect Petitioner to the crimes.

1747. The shoe print evidence was misleading and based on inaccurate findings by an unqualified witness with no prior experience in the field of shoe print impressions. According to the prosecution expert Gerald Burke, the overall findings in eight incidents pointed to a size 11-½ to 12 Avia aerobics shoe. The prosecution presented evidence that only one such pair of shoes was sold in Southern California from January to July 1985. Burke did not properly examine the impression evidence and was not qualified to render an opinion. Thus, the prosecution knowingly presented materially unreliable and false evidence.

1748. Forensic specialist Lisa DiMeo disputes Mr. Burke's findings.

Based on my review of the trial testimony and exhibits described above and my findings, it is my opinion that the trial testimony of Gerald Burke was misleading in several critical respects: his findings and conclusions regarding size and models were inaccurate and based on improper information; he lacked the necessary experience and training to properly compare impression evidence; distortion in casting sizes led to inaccurate findings; the lack of individual shoeprint characteristics, including wear patterns rendered his findings scientifically unreliable. In this case, there were many possible models and sizes of shoes that could have been identified from the shoeprint impressions. Mr. Burke's testimony that the impression evidence originated from an Avia 445B model, size 11 to 12 (*See*, *e.g.*, 174 RT 20382-384, 20386-92, 20396, 20399, 20405-14) was incorrect.

In conjunction with Mr. Brewer's testimony that only one Avia model 445B size 11-½ was sold in Southern California in the first half of 1985 (see 174 RT 20280-81), the jury was led to believe

that only one pair of shoes could be identified from the shoeprint

impression evidence.  There were actually many models of Avia

athletic shoes, and numerous sizes of shoes totaling tens of

thousands of shoes, which were distributed throughout the United

States through sales and promotions that could have been the source

of the impression evidence.  (See generally 174 RT 20286-89.)

(Ex. 33, L. DiMeo dec., ¶¶ 35-36.)  In the absence of Mr. Burke's conclusions as

to Zazzara, Doi, Bell and Lang, Cannon, Bennett, Nelson, Khovananth, and the

uncharged incident, the evidence failed to link shoe print impression evidence to

Petitioner.  The jury was misled by the unreliable evidence.

1749.  The prosecution relied on ballistics evidence to try to link the crimes

in Okazaki and Yu to Kneiding, Zazzara to Khovananth, and Petersen to

Abowath.  Prosecution witness Edward Robinson testified that ballistics evidence

conclusively linked the incidents above (172 RT 20034-52.)  He also testified that

a recovered Jennings .22-caliber semi-automatic pistol was positively compared

to the Doi case (172 RT 20061.)  Robinson was the last of three law enforcement

firearms examiners to evaluate the general rifling characteristics of the ballistics

evidence.  Yet the two other examiners, who did not reach entirely the same

conclusions, were not called to testify at trial.  For example, in the report

prepared by Robert Christiansen on March 28, 1985, he concluded that due to

distortions of the .22-caliber bullet in the Okazaki case, no positive comparison

can be made to the Yu case.  In the Kneiding case, firearms examiner Hawkins

found there was 60% mutilation of an expended bullet but identified the bullet as

having been fired from the same firearm as the bullets fired in the Yu case.  This

finding raises questions about the reliability of the testing.  (*See* Ex. 35, P.

Dougherty dec., and attached GRC reports.)

1750.  Firearms expert Paul Dougherty explains that the law enforcement

work up was inaccurate and inadequate.  In reviewing the work up performed in

this case, he found that "there are internal conflicts in the written reports with regard to the testing conducted, such as condition of the bullets." (Ex. 35, P. Dougherty dec., ¶ 4.)  In his opinion, all of the ballistics evidence should be retested.  (*Id.*, ¶ 5.)

1751. The prosecution improperly relied on evidence that was inaccurate and unreliable.

1752. The prosecution also relied on the uncorroborated testimony of Felipe Solano, who was granted immunity from prosecution, to establish that property belonging to some of the victims allegedly was sold to him by Petitioner.  Property recovered from Solano was identified by witnesses in the Doi, Bell and Lang, Cannon, Kneiding, and Abowath incidents.  The prosecution improperly based its case on Solano's unreliable and self-serving testimony.  The testimony of Mr. Solano was suspect because there was evidence that other individuals also sold him stolen property and may have been involved in the crimes with which Petitioner was charged.  *See infra*.

1753. In closing argument, the prosecution emphasized to the jury that physical evidence, specifically shoe print impression and ballistics, linked Petitioner to the commission of a series of crimes.  (*See*, *e.g.*, 206 RT 23724; 209 RT 24044, 24060; 211 RT 24329-41, 24377.)

1754. The prosecution argued improperly that the crimes constituted a pattern of offenses.  There was significant evidence to show that the offenses were not all linked to one another.  Private investigator Steve Strong describes the prosecution's evidence as demonstrating a lack of pattern with respect to many of the incidents.

> In the Vincow incident, Petitioner's fingerprints were found on a window screen but not inside the residence.  Time of death was estimated to be in the afternoon, unlike the nighttime intrusions in the other incidents.  Based on the conditions of the crime scenes in

many of the cases (Vincow, Zazzara, Doi, Bell and Lang, Cannon, Bennett, Nelson, Kneiding, and the uncharged incident), it is not possible to determine how many persons were involved in each incident. It is not so obvious that Petitioner was the only suspect due, in part, to the lack of evidence at the scenes. For example, it is just as likely that one person could have opened a window to allow another person to enter the residence.

The reason it was hard to apprehend a suspect was because there was no discernable pattern among the crimes. The locations of the scenes had no particular pattern, except for four incidents in Monterey Park. The killings had no distinctive pattern; different weapons were used in many incidents. The state's theory that Petitioner must have put gloves on upon entry does not make sense because the crimes lacked organization according to the victims' testimony.

Ballistics evidence was involved in only eight of the incidents. The firearms comparison evidence did not determine who fired the weapons. Shoeprint impressions were discovered in only eight incidents.

(Ex. 40, S. Strong dec., ¶¶ 18-20.) Mr. Strong concludes:

There was substantial evidence to show that the crimes were not related, including inexactness of the shoeprint evidence; distance between crime scenes; different weapons that were not recovered, nondistinctive wounds, and lack of evidence found at the scenes indicating there could have been additional suspects.

(Ex. 40, S. Strong dec., ¶ 22.)

1755. Throughout the guilt trial, the prosecution knowingly and repeatedly emphasized unreliable and inaccurate evidence, urging its significance upon the jury in a manner calculated to win a conviction and sentence of death.

1756. The prosecution's reliance on the evidence led to the jury's incorrect and prejudicial assumptions about the evidence presented against Petitioner and, in turn, to his conviction and sentence. Reliance upon incorrect assumptions from the evidence when passing upon guilt and sentence violates due process and constitutes plain error. *United States v. Tobias*, 662 F.2d 381, 388 (5th Cir. 1981); *United States v. Tucker*, 404 U.S. 443, 92 S. Ct. 589, 30 L. Ed. 2d 592 (1972); *Townsend v. Burke*, 334 U.S. 736, 68 S. Ct. 1252, 92 L. Ed. 1960 (1948). Petitioner's conviction and sentence rest upon materially false evidence and misinformation. *Napue v. Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959). The prosecution's abuse of its power and discretion denied Petitioner's rights to fair trial and a judicial process that comports with minimal constitutional standards under federal decisional and statutory law.

1757. Because the death penalty is qualitatively different from any other criminal punishment, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case. In capital cases the finality of the sentence imposed warrants protections that may not be required in other cases. The Supreme Court has repeatedly condemned sentencing procedures that inject unreliability into jury deliberations in capital cases. Petitioner's death sentence is based on evidence introduced at the guilt trial and relied on by the jury at the penalty trial, that does not meet the constitutional requirement of heightened reliability for capital cases and which was materially false and inaccurate.

1758. The foregoing violations of Petitioner's constitutional rights, taken singly or in combination with the other errors alleged in the Petition, constitute structural error and warrant the granting of this Petition without any

determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Petition, so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violations of Petitioner's rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622, 637-38.

**CLAIM 31:**

> **THE PROSECUTION MISLED THE JURY ABOUT**
> **PETITIONER'S INVOLVEMENT IN THE OFFENSES**

1759. Exhaustion of the claim: This claim was fairly presented to the California Supreme Court in Section XIV of the June 2004 petition for writ of habeas corpus.

1760. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

1761. Those facts and allegations set forth in the petition, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

1762. Petitioner's convictions and sentences were obtained by reason of prosecution misconduct in knowingly presenting inaccurate, misleading and unreliable evidence in violation of his rights to a fair trial, impartial jury, jury trial, effective assistance of counsel, to confront and cross-examine witnesses, to present a defense, a reliable determination of guilt and sentence, and to due

process and fundamental fairness, and in violation of Petitioner's right to be free from cruel and unusual punishment, under Sixth, Eighth and Fourteenth Amendments.

1763. The prosecution asserted that Petitioner alone committed the crimes with which he was charged. In closing argument, the prosecutor argued to the jury that no other suspects were involved in the crimes charged against Petitioner. (*See*, *e.g.*, 203 RT 23613.) However, the prosecutor was aware of the police interview with Manuel "Cuba" Hechevarria in which the witness professed his involvement with Petitioner in committing thefts and burglaries, along with another accomplice. Hechevarria reportedly committed burglaries with Petitioner on many occasions in 1984, including four to five residential burglaries. He claimed to have terminated his involvement with Petitioner when he became employed as a security guard in November 1984. (Ex. 22, L.A. Sheriff Dept. Supp. Report dated 9/11/85.) The state did not call Mr. Hechevarria to testify at Petitioner's trial.

1764. In the September 11, 1985 interview, Hechevarria admitted having been involved in committing burglaries with Petitioner and another person, "Julio," whom he described as a male Mexican, approximately 21 years old, 6 feet, 160 pounds and, blond hair parted in the middle. (*Id*.) The description of Julio fit the description of the suspect given by eyewitnesses in the Okazaki/Hernandez and Abowath incidents.

1765. Hechevarria mentioned in the police interview that Julio introduced him to Eva Rosa (Rosa Solis) – Solano's friend. (*Id*.) Solis and Hechevarria also sold stolen property to Solano. Hechevarria's statements provided strong evidence that he participated in residential burglaries near the time of Vincow's death; stolen property allegedly received by Solano from Petitioner came from other sources, including Hechevarria and Julio; and Julio was involved in committing burglaries at the time the crimes alleged against Petitioner were

committed. Moreover, the witnesses' statement and description of Julio comport with Steve Strong's conclusions that other parties could have been involved in the crimes charged against Petitioner. (Ex. 40, S. Strong dec., ¶ 22.)

1766. Despite evidence to the contrary, the prosecution did not present any evidence of the involvement of Manuel Hechevarria or Julio in the crimes with which Petitioner was charged. It did not present evidence of any involvement by other parties in the crimes charged against Petitioner, and thus misled the jury to Petitioner's culpability.

1767. Based on the Sheriff Department's investigation, the prosecution misrepresented Petitioner's involvement in the offenses and misled the jury. This misconduct led to the jury's incorrect and prejudicial assumptions about the evidence presented against Petitioner and, in turn, to his conviction and sentence. Reliance upon incorrect assumptions from the evidence when passing upon guilt and sentence violates due process and constitutes plain error. *Napue v. Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959); *United States v. Tobias*, 662 F.2d 381, 388 (5th Cir. 1981); *United States v. Tucker*, 404 U.S. 443, 92 S. Ct. 589, 30 L. Ed. 2d 592 (1972); *Townsend v. Burke*, 334 U.S. 736, 68 S. Ct. 1252, 92 L. Ed. 1960 (1948). The prosecution's abuse of its power and discretion denied Petitioner's rights to a fair trial and a judicial process that comports with minimal constitutional standards under federal decisional and statutory law.

1768. The foregoing violations of Petitioner's constitutional rights, taken singly or in combination with the other errors alleged in the Petition, constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Petition, so infected the

integrity of the proceedings that the error cannot be deemed harmless. The foregoing violations of Petitioner's rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622, 637-38.

**CLAIM 32:**

## PETITIONER'S CONSTITUTIONAL RIGHTS WERE VIOLATED BY THE PROSECUTOR'S PREJUDICIAL MISCONDUCT

1769. Exhaustion of the claim: This claim was fairly presented to the California Supreme Court in Section XVI of the June 2004 petition for writ of habeas corpus.

1770. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

1771. Those facts and allegations set forth in the petition, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

1772. The prosecution violated Petitioner's constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution during closing argument by making improper comment on the evidence, improper argument regarding matters not in evidence, stating his personal beliefs, misleading the jury as to reasonable doubt, improper shifting of the burden of proof, misrepresentation of the prosecution's power and authority, and misstating legal concepts.

1773. The violations of these rights, individually and cumulatively, prejudicially affected and distorted the investigation, discovery, presentation, and

consideration of evidence, as well as each and every factual and legal

determination made by trial counsel, the state courts and the jurors at all stages of

the proceedings from the time of Petitioner's arrest through and including the

rendering of the judgment of death.

1774. The prosecution misstated the legal standard of proof beyond a

reasonable doubt and improperly argued that failure of the evidence did not

amount to reasonable doubt.

> Reasonable doubt does not have anything to do with the prospective.
> It does not have anything to do with something to come in the future,
> . . . . [¶] And it has nothing to do with your belief that it may come
> true or may not. [¶] Reasonable doubt is only retrospective. . . . [¶]
> So reasonable doubt can only be applied to something in the past.

(211 RT 24317.)

> And the argument was, well, there with (sic) no prints found inside,
> just on this screen. [¶] Well, the screen was inside, . . . [the
> defendant] was a burglar so he might have burglarized that house
> sometime in the past and his prints were still on the screen. [¶] He
> might have. Might have is not reasonable doubt.

(*Id.* at 24341.)

1775. The prosecutor improperly shifted the burden of proof, and argued

the State had no interest in convicting the wrong person.

> The real problem with Mr. Clark's argument is the same as
> with Mr. Hernandez' opening statement . . . .
>
> . . .
>
> Well, let me submit to you that they had plenty of time to
> [decide their approach to the case] before Mr. Hernandez made his
> opening statement.
>
> . . .

642

1  And if they weren't going to present evidence, nobody should

2  have talked about it, you see?

3  . . .

4  That there is evidence, but the team has just decided late in the game

5  that they didn't have to present it, see?

6  Well, that is dishonest. That is not true. If there was

7  evidence, it would be here. It should be here.

8  . . .

9  If a man says that to you, you are going to have to disbelieve

10  him.

11  They have had every opportunity to fulfill those grandiose

12  statements made by Mr. Hernandez at the opening of their case.

13  (*Id*. at 24319-20.)

14  [A]nd I always wonder at that point why would a prosecutor want

15  the wrong guy? Why would he want to prosecute the wrong guy?

16  (*Id*. at 24324.)

17  Mr. Clark doesn't have to worry about how many Avias were

18  sold and who was wearing them because his position is the

19  defendant never owned them.

20  (*Id*. at 24374.)

21  [If the defense] could have done better than Kong, then of course

22  they would have brought in their own experts.

23  (*Id*. at 24377-78.)

24  1776. The prosecution improperly argued that its authority guaranteed that

25  prosecution witness Solano was telling the truth.

26  [S]o there was no reason for [Solano] . . . to testify falsely, because

27  the immunity applied no matter what he said. I mean, once the court

28

643

signs the order, that is it.

(*Id*. at 24333.)

1777. Additionally, in closing argument at the guilt phase, the prosecutor improperly shifted the burden of proof by arguing that defense counsel raised matters in his opening statement but failed to prove them at trial. (*See*, *e.g.*, 203 RT 23576 ("[T]here were a lot of errors in [Daniel Hernandez's] opening statement.") *and* ("[I]t turns out to be something Mr. Hernandez told you he was going to present and failed to deliver . . . ."); *see also id*. at 23579; 23585-86; 23587; 23588; 23592; 23593; 23594; 23597; 23601-02; 23604; 23615-17; 23627-28; 23648 (all similar)

1778. The prosecutor improperly and in bad faith argued that the State would be forced to release Petitioner from custody if its witness Felipe Solano were arrested and charged with receiving stolen property. (*Id.* 24085.)

1779. The prosecutor, an employee of county government himself, argued that government funding influenced an expert's findings. (209 RT 24122.)

1780. The prosecution improperly and prejudicially asserted references to the devil in an effort to link Petitioner to the crimes. (211 RT 24336.)

1781. The prosecutor misled the jury with respect to the prosecution's eyewitness identification evidence. (*Id*. at 24373-74.)

1782. After Petitioner waived the penalty trial, in his closing argument, the prosecutor referenced religious views and the morality of the death penalty repeatedly.

> . . . it seems to me to be as difficult as that admonition in the Bible which says 'Thou shalt not kill.'
>
> And I submit that that is a difficult philosophical issue, . . . you have to arrive at the conclusion that the death penalty is not the moral equivalent of murder.

644

The death penalty is not the moral equivalent of murder by the
state; it is a banding together of people in the society to attempt to
survive.

(217 RT 24804-05.)

A friend of mine is a biblical scholar, and . . . suggests to me
that perhaps the King James version that employs the language
'Thou shalt not kill' was a departure from the original language.
. . . Suppose then that the language was instead of 'Thou shalt not
kill' was simply 'Thou shalt not commit murder' and suppose that
the language specified that that base antisocial activity of taking a
life under those circumstances that amount to murder, that that tends
to make more sense in the scheme of a death penalty in a society. [¶]
I submit to you that – that that may well be a morally acceptable
translation . . . of the Old Testament that call[s] for the death penalty
in certain cases.

(*Id*. at 24806.)

1783. The prosecutor improperly urged the jury to consider everything
considered at the guilt trial. (*Id*. at 24813.)

1784. The prosecutor improperly argued there was no evidence of extreme
mental or emotional disturbance under factor (d) or (h). (*Id*. at 24813-16.) The
prosecutor urged the jury not to consider Petitioner's age as evidence in
mitigation. (*Id*. at 24816 ("No evidence of anything like that here.").)

1785. The prosecution improperly argued that, under aggravating factor (j),
there was "[n]o evidence of anyone else being involved in this case, the defendant
apparently being a lone actor throughout this case." (*Id*. at 24817.) The
prosecutor argued under factor (k) there was no mitigating evidence. (*Id*. at
24819.)

1786. The prosecutor contended the defense waiver of the penalty trial signified that there was no mitigation. The prosecution argued that the defense presented no evidence "because there is none. There is no mitigating this person. ¶ . . . It is difficult for us as human beings to face this type of evil . . . . [¶] This man is the personification of evil . . . ." (*Id.* at 24832-33.)

1787. The prosecutor's argument at the guilt and penalty trials was improper and constituted misconduct by urging the jury to misapply the law to the evidence, and shifting the burden of proof. This misconduct led to the jury's incorrect and prejudicial assumptions about the evidence presented against Petitioner and, in turn, to his conviction and sentence. Reliance upon incorrect assumptions from the evidence when passing upon guilt and sentence violates due process and constitutes plain error. *Napue v. Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959); *United States v. Tobias*, 662 F.2d 381, 388 (5th Cir. 1981); *United States v. Tucker*, 404 U.S. 443, 92 S. Ct. 589, 30 L. Ed. 1690 (1948); *Townsend v. Burke,* 334 U.S. 736, 68 S. Ct. 1252, 92 L. Ed. 1690 (1948); *Sechrest v. Ignacio*, No. 04-99004, 2008 WL 510988, at *16 (9th Cir. 2008) . Petitioner's conviction and sentence rest upon materially false evidence and misinformation. The prosecution's abuse of its power and discretion denied Petitioner's rights to a fair trial and a judicial process that comports with minimal constitutional standards under federal decisional and statutory law.

1788. The foregoing violations of Petitioner's constitutional rights, taken singly or in combination with the other errors alleged in the Petition, constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Petition, so infected the

integrity of the proceedings that the error cannot be deemed harmless. The foregoing violations of Petitioner's rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622, 637-38.

**CLAIM 33:**

## THE GUILT PHASE CUMULATIVE ERRORS VIOLATED PETITIONER'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS

1789. Exhaustion of the claim: This claim was fairly presented to the California Supreme Court in the direct appeal. It was presented in Section XVII of the Opening Brief.

1790. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

1791. Those facts and allegations set forth in the petition, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

1792. At the outset of the trial proceedings, Petitioner was substantially prejudiced due to denial of qualified counsel, denial of conflict-free counsel, and denial of a proper determination of his mental competency. *See* related claims, *supra*.

1793. At trial, the trial court erred in denying Petitioner's change of venue motion and challenge to the jury composition. The court also erred in denying Petitioner's severance motion. *See* related claims, *supra*. Other trial court rulings violated Petitioner's constitutional right to a fair trial.

1794. The Court should address not only the individual errors that may have occurred during the guilt phase but also their cumulative impact. *People v. Hill*, 17 Cal. 4th 800, 844-48, 952 P.2d 673, 72 Cal. Rptr. 2d 656 (1998), considered the combined effect of prosecutorial misconduct, improper shackling of the defendant, error regarding testimony by the bailiff, and *Carlos*[127] error. While acknowledging that an accused is not entitled to a perfect trial, only a fair one, the court nonetheless observed: "Lengthy criminal trials are rarely perfect, and this court will not reverse a judgment absent a clear showing of a miscarriage of justice. Nevertheless, a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." *People v. Hill*, 17 Cal. 4th at 844-45. This is particularly true if some of the errors permeate the entire process of the adjudication or are so numerous as to amount to a heightened level of prejudice. *Id*. at 845.

1795. Moreover, the state court has found that the weight of numerous, individually harmless errors can also combine to create an even greater effect on the jury, which is exposed to them over the course of a trial, than accrues to each one considered on its own or altogether. Multiple error may create a negative synergistic effect, rendering a degree of overall unfairness to the defendant more than that flowing from the sum of individual errors. *Id*. at 847.

1796. In the present case, the errors at the outset of the proceedings and at trial, and demonstrated elsewhere in this petition, combined together so that the prejudicial whole was greater than the sum of its parts. The combined weight and effect of the errors on the jury prejudiced Petitioner. Significantly, all of the errors were of federal constitutional magnitude.

---

[127] *Carlos v. Superior Court*, 35 Cal. 3d 131, 672 P.2d 862, 197 Cal. Rptr. 79 (1983).

1797. Under federal constitutional standards, the cumulative effect of multiple errors in violation of Petitioner's Fifth, Sixth, Eighth, and Fourteenth Amendment rights must be considered to determine the overall prejudice to the defendant. In *Mak v. Blodgett*, 970 F.2d at 622, the Ninth Circuit observed: "We do not need to decide whether these deficiencies alone meet the prejudice standard because other significant errors occurred that, considered cumulatively, [warrant relief]."

1798. The Court in *Mak* cited improper preclusion of third-party evidence and erroneous jury instructions as combining with the ineffective assistance of counsel to produce overall prejudice justifying reversal. *Id*. at 622-25; *accord Harris v. Wood*, 64 F.3d 1432, 1438-39 (9th Cir. 1995).

1799. As a result of judicial, prosecutorial, and trial counsel error in this case, Petitioner's federal constitutional rights were violated:

1.     Petitioner was denied his right to qualified counsel;

2.     Petitioner was denied his right to conflict-free counsel;

3.     Petitioner was denied his right to a proper determination of his mental competency;

4.     Petitioner was improperly restrained in trial;

5.     The trial court erred by permitting the jury to view inflammatory and irrelevant autopsy and crime scene photographs;

6.     The trial court erred by permitting the jury to base Petitioner's guilt on an impermissible consciousness of guilt inference;

7.     The evidence was insufficient to support burglary and burglary-murder convictions in the Okazaki incident;

8.     The evidence was insufficient to support the burglary-murder special circumstance in the Okazaki incident;

9.     The evidence was insufficient to support findings that Petitioner committed second degree murder in the Yu incident;

10.    The trial court erred by improperly excusing a juror during deliberations; and,

11.    The trial court erred by failing to conduct an inquiry of juror misconduct during deliberations.

1800. The errors specified above violated the federal Constitution. The errors cumulatively and in the aggregate deprived Petitioner of his right to a fair trial (*Estelle v. McGuire*, 502 U.S. 62, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991)); violated due process guarantees (*Hicks v. Oklahoma*, 447 U.S. 343, 100 S. Ct. 2227, 65 L. Ed. 2d 175 (1980)); rendered the proceedings unreliable in violation of the prohibition against cruel and unusual punishment (*Woodson v. North Carolina*, 428 U.S. 280, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976)); and impermissibly lightened the prosecution's burden of proof (*Yates v. Evatt*, 500 U.S. 391, 111 S. Ct. 1884, 114 L. Ed. 2d 432 (1991)). In short, the errors violated Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. In light of the seriousness and constitutional ramifications of the errors involved, under either *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), *or People v. Watson*, 46 Cal. 2d 818, 836 (1956), Petitioner was prejudiced. The combination and cumulative impact of the errors adversely influenced the jury; but for the errors, a more favorable result would have occurred in this case. *Estelle v. McGuire*, 502 U.S. 62, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991).

1801. The foregoing violations of Petitioner's constitutional rights, taken singly or in combination with the other errors alleged in the Petition, constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and

650

in combination with the other errors alleged in this Petition, so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violations of Petitioner's rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622, 637-38.

**CLAIM 34:**

## THE ABSENCE OF ANY MITIGATING EVIDENCE RENDERED THE CAPITAL SENTENCING PROCESS CONSTITUTIONALLY UNRELIABLE IN VIOLATION OF THE FIFTH, EIGHTH, AND FOURTEENTH AMENDMENTS

1802. Exhaustion of the claim: This claim was fairly presented to the California Supreme Court in the direct appeal. It was presented in Section XX of the Opening Brief,, although it includes additional factual allegations. Petitioner will present the claim with the additional factual allegations to the California Supreme Court in an exhaustion petition he will file no later than March 17, 2009.

1803. Those facts and allegations set forth in the petition, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

1804. The trial court accepted Petitioner's waiver of mitigating evidence at the penalty. (*See* 217 RT 24774-76.) Petitioner did not offer or present any mitigating evidence on his behalf in support of a sentence less than death. In closing argument, the State vigorously argued under factors (a) and (b), Penal Code § 190.3, that Petitioner must be sentenced to death. (*See Id*. at 24823-31.)

1805. In his closing argument, the prosecutor urged the jury to return a death verdict in part because of the absence of mitigating evidence. (*See* 217

RT 24813-19.)  The prosecutor argued there was "no evidence [under factor (d)]
of that at all, . . . ."  (*Id*. at 24814.)  The prosecutor argued that under (e), "Of
course there is no evidence of that at all . . . ."  (*Id*. at 24815.)  Under factor (g),
the prosecutor argued:  "It doesn't exist.  No evidence of that here."  (*Id*.)  The
prosecutor further argued that there was no evidence under factors (h), (I), and
(j).  (*Id*. at 24816-17.)  The prosecutor argued against application of factor (k):
 "Now, I submit to you that there has been virtually no mitigating evidence in the
case, but you might find some."  (*Id*. at 24819.)

  1806.  Evolving due process standards and requirements of reliability of the
death sentencing procedure have undermined any argument that a one-sided
presentation of penalty evidence is sufficient to constitute a reliable determination
of penalty.  Absent mitigation evidence, a penalty trial becomes a mere
formalistic proceeding and fails to provide any rational foundation for the jury to
weigh the evidence or make a normative decision on punishment.  *See*, *e.g.*,
*(Terry) Williams v. Taylor*, 529 U.S. 362, 396, 120 S. Ct. 1495, 146 L. Ed. 2d 389
(2000)  (defense counsel in a capital case has an "obligation to conduct a
thorough investigation of the defendant's background"); *Mayfield v. Woodford*,
270 F.3d 915, 927 (9th Cir. 2001) ("To perform effectively in the penalty phase
of a capital case, counsel must conduct sufficient investigation and engage in
sufficient preparation to be able to 'present[] and explain[] the significance of all
the available [mitigating] evidence.'"); *Caro v. Calderon*, 165 F.3d 1223, 1227
(9th Cir. 1999) ("[i]t is imperative that all relevant mitigating information be
unearthed for consideration at the capital sentencing phase"); *Stouffer v.
Reynolds*, 168 F.3d 1155, 1167 (10th Cir. 1999) ("[i]n a capital case the
attorney's duty to investigate *all* possible lines of defense is strictly observed")
(emphasis added).  As a result, counsel failed to prepare and present readily
available mitigation evidence at trial.

1807. There was no penalty verdict reliability in Petitioner's case. No mitigation was presented at the penalty trial. Thus, his penalty trial violated the requirement of reliability in two ways. First, the penalty jury had no facts pertaining to Petitioner on which to base its decision. Absent appropriate mitigating evidence, the penalty verdict became a mere procedural hurdle devoid of evidentiary substance. In *People v. Weaver*, 26 Cal. 4th 876, 976-77, 29 P.3d 103, 111 Cal. Rptr. 2d 2 (2001), the court found no constitutional infirmity at the penalty trial by virtue of counsel's performance where the defendant (in contrast to the present case) presented *some* mitigation evidence of mental disturbance under factor (d), and testified about the circumstances surrounding an assault. As *Weaver* demonstrated, there always is some evidence in mitigation that may be offered and considered by the jury. Here, there was none. No one spoke for Petitioner. Nothing was offered. There was only dead silence in response to the evidence in aggravation.

1808. Second, the lack of penalty trial or any mitigating evidence on Petitioner's behalf deprived the jury of a rational basis for conducting its constitutionally required balancing process. The scales of justice were lopsided and ineluctably skewed toward death from the start absent mitigation evidence; a death verdict was inevitable. The process of normative weighing of the evidence at the heart of the penalty determination, as described in *People v. (Albert) Brown*, 40 Cal. 3d 512, 538-40, 726 P.2d 516, 230 Cal. Rptr. 834 (1985), *accord, People v. Bacigalupo*, 6 Cal. 4th 457, 468, 862 P.2d 808, 24 Cal. Rptr. 2d 808 (1993), was not logically possible; there was nothing for the jury to weigh.

> [W]ith respect to the process of selecting from among that class those defendants who will actually be sentenced to death, '[w]hat is important . . . is an individualized determination on the basis of the character of the individual and the circumstances of the crime.' It is not simply a finding of facts which resolves the penalty decision,

'but . . . the jury's moral assessment of those facts as they reflect on whether defendant should be put to death . . . .' The jury must be free to reject death if it decides on the basis of any constitutionally relevant evidence or observation that it is not the appropriate penalty.

*People v. (Albert) Brown*, 40 Cal. 3d. at 540 (citations *omitted*).

1809. *Brown* signifies that a capital jury cannot carry out its sentencing duties on a rational basis if it lacks requisite balancing evidence on which to make that assessment. Here, the jury considered circumstances of the offenses under factor (a), and other acts of force or violence under factor (a), as argued by the prosecution, factors contributing only one side of the normative equation. (*See* 217 RT 24823-31.) An individualized moral assessment of the appropriateness of the penalty was impossible given the evidentiary vacuum. When considered additionally through the lens of trial counsel's vacuous argument against his own client which stressed the absence of any mitigating evidence concerning Petitioner's background (*id*. at 24853 ("I don't know what school he went to")); lack of mitigating evidence of Petitioner's mental state (*id*. at 24841 ("What possessed Petitioner to do this we will not know soon")); and, trial counsel's feelings of retribution (*id*. at 24848 ("if anyone in this courtroom had come upon Petitioner during the commission of one of these crimes, and we had the ability to kill him, he would be dead now, and I think that includes everybody in this courtroom other than him")), the jury was precluded from performing its constitutionally mandated weighing process to reach a reliable penalty verdict in this case. Absent any evidence in mitigation, the penalty could not have involved an individualized determination or rational moral assessment as required.

1810. The Supreme Court has stressed that capital-sentencing bodies must be allowed to examine and consider all available mitigation that a defendant

wishes to present. *Lockett v. Ohio*, 458 U.S. 586, 98 S. Ct. 2954 57 L. Ed. 2d 973 (1978); *Eddings v. Oklahoma*, 455 U.S. 104, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982); *Skipper v. South Carolina*, 476 U.S. 1, 106 S. Ct. 1669, 90 L. Ed. 2d 1 (1986); *Mills v. Maryland*, 486 U.S. 367, 108 S. Ct. 1860, 100 L. Ed. 2d 384 (1988). This requirement is rooted in the notion that society and the state need to ensure that the death penalty is imposed only in appropriate situations when fully and constitutionally warranted. By allowing the jury to hear and consider all evidence relevant to its decision, society can be satisfied that the process has been fair and just.

1811. For this reason, "[t]he fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special 'need for reliability in the determination that death is the appropriate punishment' in any capital case." *Johnson v. Mississippi*, 486 U.S. 578, 584, 108 S. Ct. 1981, 100 L. Ed. 2d 575 (1988). The Court has stressed that reliability of the penalty determination underpins scrutiny of error in capital sentencing proceedings. Petitioner's jury neither considered mitigating evidence nor properly performed the requisite weighing process. Thus, society cannot be satisfied that the capital sentencing jury reliably determined death was the appropriate punishment. *See Caldwell v. Mississippi*, 472 U.S. 320, 341, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985).

1812. The California Supreme Court has rejected contentions that the weighing process described in *People v. (Albert) Brown*, 40 Cal. 3d 512, requires presentation of mitigating evidence. *People v. Stansbury*, 4 Cal. 4th 1017, 1066, 846 P.2d 756, 17 Cal. Rptr. 2d 174 (1993). However, the court has not considered a situation as extreme as Petitioner's case in which no mitigation evidence at all was offered and the reasons offered to justify that decision were absolutely devoid of merit. Unlike virtually every other capital case, the jury here lacked any type of essential mitigating evidence with which to perform the

655

requisite weighing process to determine penalty. Absent mitigating evidence, the jury's putative or normative evaluation of appropriate penalty amounted to a mere pretense, a virtual sham of penalty reliability.

1813. Despite the absence of mitigation evidence, the jury deliberated four days before returning its verdict of death. The jury thus worked long and hard but in a vacuum, considering or balancing nothing. The penalty jury's function was reduced to a one-sided effort full of formalism without substance. Had the defense presented mitigating evidence of Petitioner's background, his childhood, family life, good deeds, and, most significantly, of his mental condition, only then could it be said that a meaningful, constitutionally sufficient weighing process had been performed. Indeed, there was a reasonable possibility that at least one juror would have considered mitigating evidence and weighed such evidence in favor of a verdict of life imprisonment without the possibility of parole rather than death. *People v. (John) Brown*, 46 Cal. 3d 432, 448-49, 758 P.2d 1135, 250 Cal. Rptr. 604 (1988).

1814. The jurors and alternate jurors have indicated that trial counsel was unprepared and not qualified to handle Petitioner's case. (*See* Ex. 117, Donald G. McGee dec., ¶ 2; Ex. 120, Bonita Smith dec., ¶ 2; Ex. 115, Max De Ruiter dec., ¶ 2.) Alternate Juror Hernease Dabney stated that it was obvious that trial counsel "didn't have a clue as to how to defend a capital case". (*See* Ex. 114, Hernease Dabney dec., ¶ 3.) Hernease Dabney also indicated that it appeared as if trial counsel was trying to cause a mistrial. (*Id.*) Another juror indicated that Daniel Hernandez and Arturo Hernandez were "both idiots". (*See* Ex. 119, Fernando Sendejas dec., ¶ 2.) Jurors indicated that had the defense presented some evidence at the penalty phase, they would certainly have considered it in determining the appropriate penalty verdict. For example, Donald G. McGee, a juror in Petitioner's case, stated as follows: "[i]f the defense had presented evidence about the defendant's background and his mental condition, I would

have carefully considered that evidence before reaching my decision on the penalty." (*See* Ex. 117, Donald G. McGee dec., ¶ 10.)   In addition, alternate Juror Max De Ruiter stated as follows:

> [i]n the penalty phase of the trial, I do not remember the defense presenting anything to the jury about Mr. Ramirez's mental state, his mental history, or his life history.  The defense lawyers did nothing to help us understand why Mr. Ramirez did the things he was found guilty of doing.  I believe that it would have been important for Mr. Ramirez's lawyers to help us understand why Mr. Ramirez did what he did.  If I had deliberated as a juror in this case, I would have considered any and all mitigating evidence presented by the defense before making a decision as to the proper penalty for Mr. Ramirez."

(*See* Ex. 115, Max De Ruiter dec., ¶ 3.)

1815. Based on the state of the evidence and the nature of the jury's deliberations absent mitigating evidence, it cannot be said that the error had "no effect" on the verdict.  *Caldwell v. Mississippi*, 472 U.S. at 341.  Accordingly, the death judgment must be reversed.

1816. The foregoing violations of Petitioner's constitutional rights, taken singly or in combination with the other errors alleged in the Petition, constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993).  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Petition, so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violations of Petitioner's  rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them

657

fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622, 637-38.

**CLAIM 35:**

## THE TRIAL COURT VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS BY REFUSING TO INSTRUCT THE JURY THAT PETITIONER'S AGE IS A MITIGATING FACTOR

1817. Exhaustion of the claim: This claim was fairly presented to the California Supreme Court in the direct appeal. It was presented in Section XXI of the Opening Brief.

1818. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

1819. Those facts and allegations set forth in the petition, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

1820. Petitioner requested the following jury instruction:

> One of the factors for you to consider in determining the penalty is the age of the defendant at the time of the offense(s).
>
> Chronological age, by itself, is a matter over which the defendant has no control, and which is not relevant to the choice of penalty.
>
> However, the factor relating to 'defendant's age,' as set forth in these instructions, refers to any matter concerning defendant's age, maturity, and judgment which common experience or morality might indicate to be relevant to the issue of penalty.
>
> You shall therefore give any age-related factors and argument consideration in arriving at a judgment as to penalty.

659

(XXX CT 8894.)  The trial court refused the proffered instruction, indicating that there was no evidence in the record to support the instruction.  (217 RT 24789-90.)  The court instructed the jury in the standard language of CALJIC No. 8.85 (penalty trial – factors in consideration) which permitted the jury under factor (i), to consider "[t]he age of the defendant at the time of the crime."  (*Id*. at 24870-73.)

1821.  Petitioner was present at trial and observed by the jury.  His youthful appearance was a matter to be considered under Penal Code § 190.3(i).  Petitioner was twenty-four to twenty-five years old at the time of the offenses.  (*See* XXXV CT 10429.)  Thus, there was evidence in the record of Petitioner's age that was relevant to the jury's determination of penalty.

1822.  The California Supreme Court has long recognized that the statutory factor of age of the defendant can be legitimately argued by either side at penalty phase.  *People v. Rodriguez*, 42 Cal. 3d 730, 789, 726 P.2d 113, 230 Cal. Rptr. 667 (1986).  Thus, the court has recognized the prosecution may constitutionally argue to the jury the absence of any mitigation under this factor without committing *Davenport* error.  *See People v. Davenport*, 41 Cal. 3d 247, 288, 710 P.2d 861, 221 Cal. Rptr. 794 (1985).

1823.  CALJIC No. 8.85, as given by the trial court, clearly required the jury to consider all applicable factors, including the age of Petitioner at the time of the crimes.  However, the instruction given by the trial court did nothing more than state that age was a factor for consideration; it provided no guidance to the jury about how it should apply Petitioner's age to the penalty determination.  A bare instruction, as given by the trial court, caused confusion with factor (i) in that the prosecution was thereby justified in arguing lack of age-related mitigation as weighing in favor of death.  To avoid that danger, the court was obligated to give a more explicit statement of the meaning of factor (i) to indicate what and how the jury could weigh under this factor.  In the absence of a

clarifying instruction, as submitted by Petitioner, the jury could have overlooked

relevant mitigation or have treated the apparent absence of this factor as

aggravation.

1824. The California Supreme Court has held that pinpoint instructions at

penalty phase are inappropriate if they are argumentative or duplicative of

standard instructions. *People v. Catlin*, 26 Cal. 4th 81, 174, 26 P.3d 357, 109

Cal. Rptr. 2d 31 (2001).

> [T]he proffered special instruction for the most part in effect argued
>
> the evidence by 'highlight[ing] certain aspects . . . without further
>
> illuminating the legal standards at issue [citations].' [Citation.]
>
> Other instructions given by the trial court and summarized above
>
> adequately covered the defense theory in the penalty phase. Those
>
> elements of defendant's special instruction that were not
>
> argumentative were thus duplicative, and the trial court did not err in
>
> declining to give them. [Citation.] There was no error.

*People v. Musselwhite*, 17 Cal. 4th 1216, 1269-70, 954 P.2d 475, 74 Cal. Rptr. 2d

212 (1998) (quoting *People v. Noguera*, 4 Cal. 4th 599, 648, 842 P.2d 1160, 15

Cal. Rptr. 2d 400 (1992) (italics omitted)).

1825. The instruction proffered by Petitioner here differed from those

disapproved in *Musselwhite* and *Noguera*. Petitioner's instruction was not

argumentative and did not identify age as solely mitigating in nature. *People v.*

*Sandoval*, 4 Cal. 4th 155, 189, 841 P.2d 862, 14 Cal. Rptr. 2d 342 (1992). In

fact, the proffered instruction relied on language in *Lucky*, indicating that age

alone is neither aggravating nor mitigating. *People v. Lucky*, 45 Cal. 3d, 259,

301-02, 753 P.2d 1052, 247 Cal. Rptr. 1 (1988). Nor was the instruction merely

duplicative of the standard instruction or language in CALJIC No. 8.85. CALJIC

No. 8.85 provided no guidance at all to the jury about how to apply factor (i); no

other instruction guided the jury that age could be considered either way in its

penalty determination or age-related considerations that evidence the jurors' common experience, or morality reasonably bore on the penalty decision. In fact, the prosecutor even argued that under factor (i) actual age was not relevant. (*See* 217 RT 24816.) Finally, the statement of law set forth in the proffered instruction was neither biased toward one side nor duplicated in other instructions; it was appropriate, and in view of the statement made in CALJIC No. 8.85 as to age generally, the instruction was necessary to provide the jury with proper guidance on this factor.

1826. The trial court rejected the special instruction, not on the ground that it was an inappropriate pinpoint instruction, but that there was no evidence to support it. In this regard, the court's ruling was also erroneous as there was evidence of Petitioner's age before the jury. The jury was certainly required to make a proper penalty verdict based on the statutory factors. Trial counsel's failure otherwise to present a case in mitigation on Petitioner's behalf did not relieve the jury of the duty to consider each of the factors in reaching its decision. Moreover, under *Lucky*, the jury was to consider not only "evidence" on age-related factors, but "common experience or morality that might reasonably inform the choice of penalty." *People v. Lucky*, 45 Cal. 3d at 302. That is, the jury was to apply its experience and conscience on this factor regardless of whether it was suggested by specific evidence in the record. For that reason, the special instruction was both proper and necessary.

1827. Petitioner's age was vital evidence that the jury was entitled to consider. *Eddings v. Oklahoma*, 455 U.S. 104, 115 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982); *Skipper v. South Carolina*, 476 U.S. 1, 106 S. Ct. 1669, 90 L. Ed. 2d 1 (1986). In the absence of the presentation of mitigating evidence at the penalty trial, evidence of Petitioner's age was the one discernible mitigating factor that the jury properly could have weighed in Petitioner's favor. Thus, the

prosecutor's argument based on CALJIC No. 8.85, that there was no mitigating evidence with respect to Petitioner's age, was especially harmful.

1828. Petitioner was entitled to have the jury consider mitigation evidence of age. The trial court's refusal to instruct on mitigating evidence under factor (i) rendered the jury's penalty determination unreliable under the Eighth Amendment. *Caldwell v. Mississippi*, 472 U.S. 320, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985). Given the four days of penalty deliberations, it cannot be said that the error had no effect on the jury. Thus, it is both reasonably possible and probable that had the jury properly been instructed regarding age, a more favorable result would have occurred. The court's error denied Petitioner due process of law. *Hicks v. Oklahoma*, 447 U.S. 343, 100 S. Ct. 2227, 65 L. Ed. 2d 175 (1980).

1829. The foregoing violations of Petitioner's constitutional rights, taken singly or in combination with the other errors alleged in the Petition, constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Petition, so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violations of Petitioner's rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622, 637-38.

## CLAIM 36:

### THE TRIAL COURT VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS BY INSTRUCTING THE JURY IN THE LANGUAGE OF CALJIC NO. 8.85, THUS UNDERMINING HIS RIGHTS TO A RELIABLE PENALTY DETERMINATION

1830. Exhaustion of the claim: This claim was fairly presented to the California Supreme Court in the direct appeal. It was presented in Section XXIII of the opening appeal brief.

1831. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

1832. Those facts and allegations set forth in the petition, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

1833. In his closing argument, the prosecutor urged the jury to return a death verdict in part because of the absence of mitigating evidence. (*See* 217 RT 24813-19.) The prosecutor argued there was "no evidence [under factor (d)] of that at all, . . . ." (*Id*. at 24814.) The prosecutor argued that under (e), "[o]f course there is no evidence of that at all . . . ." (*Id*. at 24815.) Under factor (f), the prosecutor argued: "It doesn't exist. No evidence of that here." (*Id*.) With respect to factor (g), the prosecutor argued, 'No evidence of that here. Not to be considered by you." (*Id*. at 24815.) The prosecutor further argued that there was no evidence under factors (h), (i), and (j). (*Id*. at 24816-17.) The prosecutor argued against application of factor (k): "Now, I submit to you that there has been virtually no mitigating evidence in the case, but you might find some." (*Id*. at 24819.)

1834. The trial court instructed the jury in the standard language of CALJIC No. 8.85. (217 RT 24870-71; *see also* XXX CT 8881-83.)

1835. The court's use of CALJIC No. 8.85 as given was constitutionally deficient. The instruction failed properly to inform the jury of its duty and interfered with the jury's proper determination of the appropriate penalty. Specifically, the instruction was given without deleting inapplicable language. The wording of most enumerated factors suggested that, even in their absence, they could be weighed by the jurors either as factors in mitigation or aggravation.

1836. CALJIC No. 8.85 as given provided jurors with largely irrelevant considerations. The instruction expressed aggravating and mitigating factors in a manner that invited improper attention by jurors. Notwithstanding the court's admonition, the instruction failed to eliminate the probability that jurors would treat the absence of mitigation as aggravation.

1837. CALJIC No. 8.85 as given was severely defective. It invited arbitrary and capricious responses to capital sentencing according to how each juror individually may have perceived the instruction's meaning. *See Proffitt v. Florida*, 428 U.S. 242, 260, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976).

1838. Empirical evidence and the jurors' actual trial experience support the conclusion that it was both reasonably possible and probable (*People v. Brown*, 46 Cal. 3d at 448-49; *Chapman v. California*, 386 U.S. at 24) that the jury misunderstood and therefore misapplied the various sentencing factors on which they were instructed. Misapplication of sentencing factors violated Petitioner's rights under the Eighth Amendment by making the death determination constitutionally unreliable. *Johnson v. Mississippi*, 486 U.S. at 584. Considering as well the absence of mitigating evidence and the prosecutor's argument emphasizing absence of mitigation, the instructional error was particularly harmful. As a result, Petitioner's rights to due process and a fair jury trial under the Fifth, Sixth, and Fourteenth Amendments were also violated. *Estelle v.*

1 *McGuire,* 502 U.S. 62, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991); *Gardner v.*
2 *Florida*, 430 U.S. 349, 97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977).

3     1839. The Court must examine the propriety of CALJIC No. 8.85 in light
4 of the need for consistency of federal due process guarantees. *See People v.*
5 *Davenport,* 11 Cal. 4th 1171, 1228, 906 P.2d 1068, 47 Cal. Rptr. 2d 800 (1995);
6 *Mills v. Maryland*, 486 U.S. 367, 108 S. Ct. 1860, 100 L. Ed. 2d 384 (1988).

7     1840. As with many pattern jury instructions, CALJIC No. 8.85 contains
8 factors and conditions which may not be applicable to the facts of a particular
9 case. The usual procedure followed by trial courts is to delete inapplicable
10 portions of the instruction. In rejecting prior challenges to CALJIC No. 8.85,
11 however, the state court has held that it is not necessary to edit the instruction or
12 delete factors that are inapplicable to the case involved. Unlike other instructions
13 that must be modified or edited to delete potentially misleading or confusing
14 language (*People v. Jennings*, 53 Cal. 3d 334, 807 P.2d 1009, 279 Cal. Rptr. 780
15 (1991) (penalty phase jury instruction should have been tailored)), CALJIC No.
16 8.85 alone is treated differently. In a situation where the law requires heightened,
17 not lessened scrutiny, the state court incongruously sanctioned irrelevant or
18 inapposite instructional language.

19     1841. CALJIC No. 8.85 apprises jurors of factors irrelevant to the case.
20 Prosecutors, as here, commonly engage in the pernicious tactic of reviewing the
21 entire list of statutory factors, both applicable and not applicable, to highlight the
22 lack of mitigation evidence. The prosecutor did so in his closing argument when
23 he urged the jury to find there was no mitigation under factors (d), (e), (f), (g),
24 (h), (i), (j), and (k). He argued the absence of those factors did not warrant a
25 sentence less than death. Some factors mentioned by the prosecutor and used in
26 support of his argument for the death penalty were not germane to this case.
27 Other factors were rare and are hardly ever present. Nevertheless, by
28 highlighting the absence of exceptional factors, the prosecutor created an

inaccurate impression of the weighing criteria used by the jury to determine penalty that improperly and unfairly tipped the scales toward death.

1842. It is unrealistic to believe that the jurors in this case avoided considering the entire list of factors or failed to conclude that were those factors present, Petitioner would be more worthy of receiving a sentence less than death. The failure to delete irrelevant factors placed undue emphasis on the consideration of absent factors and effectively characterized Petitioner as unworthy to live by their very absence.

1843. There are almost always more inapplicable mitigating factors under factors (d) through (j) than aggravating ones under factors (a) through (c). The instruction as given inevitably created the improper illusion that a case for mitigation was far less substantial than a case in aggravation.

1844. The wording of the instruction in regard to factors (d), (e), (f), (g), (h), (i), and (j) instructed the jury to consider "whether or not" each applied to the case at hand. This wording created the inescapable inference that the factors could either be mitigating (if they applied) or aggravating. This interpretation was virtually inevitable because similar alternative wording was used in factors (b) and (c), which were indeed "bivalent" factors: aggravating if present, mitigating if absent. The language of the instruction thus greatly increased the likelihood that the jurors would mistakenly think that mitigating factors could be used as factors in aggravation. Such use by the jury violated federal decisional law on capital sentencing requirements. *Mills v. Maryland*, 486 U.S. at 367, 108 S. Ct. 1860, 100 L. Ed. 2d 384 (1988).

1845. The misleading language of the instruction was compounded by the fact that factors (d) through (h) and (j) which could *only* be mitigating in effect[128] were not so identified in the instruction.

1846. The deliberate withholding of legally correct information relevant to the jury's proper duties was illogical and invited improper application of the instruction by individual jurors, particularly considering the absence of mitigating evidence under Penal Code § 190.3.

1847. Empirical research shows how juries understand these factors as aggravating. A 1994 study of impaneled jurors on California capital trials found that they had actually believed, despite ostensible instruction to the contrary, that the absence of mitigation evidence supported a sentence of death. *See* Haney, Sontag, and Costanzo, Deciding to Take a Life: Capital Juries, Sentencing Instructions, and the Jurisprudence of Death, 50 J. Soc. Issues, 149, 169 (1994). In the face of such empirical evidence, it is apparent that jurors in fact understand what is commonly – but erroneously – considered to be the "plain meaning" of the instruction's language.

1848. Counsel presented no mitigation evidence at the penalty trial. Nevertheless, the jury deliberated over a four-day period. (XXX CT 8901, 8903-05.) It is both reasonably possible and reasonably likely that the jury misunderstood and misapplied the sentencing factors. The prosecutor urged the jury to return a death verdict not only because of the nature of the offenses, but because of the lack of mitigation under factors (d) through (k). The prosecutor encouraged the jury to misapply the sentencing factors. It is likely that the jury

---

[128] *Zant v. Stephens*, 462 U.S. 862, 885, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983) (some matters can only be mitigating); *see also People v. Davenport*, 41 Cal. 3d at 288; *People v. Hamilton*, 48 Cal. 3d 1142, 1184, 774 P.2d 730, 259 Cal. Rptr. 701 (1989); *People v. Whitt*, 51 Cal. 3d 620, 654, 798 P.2d 849, 274 Cal. Rptr. 252 (1990).

both considered the prosecutor's argument as to the lack of mitigating factors and weighed their absence adversely to Petitioner.

1849. Under the circumstances of this case, therefore, it cannot be said that the inherently confusing wording regarding factors to be considered, the failure to excise inapplicable factors, and lack of guidance provided by the trial court had "no effect" on the verdict. *See Caldwell v. Mississippi*, 472 U.S. at 341. To the contrary, given the close attention paid to the evidence by the jury, it is likely that in the absence of error a more favorable result would have occurred.

1850. The foregoing violations of Petitioner's constitutional rights, taken singly or in combination with the other errors alleged in the Petition, constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Petition, so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violations of Petitioner's rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622, 637-38.

**CLAIM 37:**

**THE TRIAL COURT VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS BY REFUSING TO INSTRUCT THE JURY REGARDING SUFFICIENCY OF MITIGATING EVIDENCE**

1851. Exhaustion of the claim: This claim was fairly presented to the California Supreme Court in the direct appeal. It was presented in Section XXIV of the Opening Brief.

1852. AEDPA: The California Supreme Court denied this claim. *People v. Ramirez*, 39 Cal. 4th at 469-73. Because the state court's adjudication of this claim was dependent on an antecedent unreasonable application of federal law, this Court "must then resolve the claim without the deference that AEDPA otherwise requires." *Panetti*, 127 S. Ct. at 2858.

1853. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

1854. Those facts and allegations set forth in the petition, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

1855. Trial counsel requested that the court instruct the jury regarding sympathy, sufficiency of one mitigating factor, and that the list of aggravating factors is exclusive. The court refused to so instruct the jury, indicating the instruction was argumentative. (*See* 217 RT 24788; XXX CT 8889-92.) The defense closing argument focused on sympathy for Petitioner, mercy, and forgiveness. (*See Id*. at 24835, 24839-41, 24843, 24846-47, 24849-50, 24852-53, 24857-60 (closing argument).) The jury was not specifically instructed as to the application of sympathy or mercy. (*See Id*. at 24869-76 (jury instructions).

1856. The trial court's failure to instruct the jury on sympathy and its refusal to specify the exclusivity of aggravation evidence invited misunderstanding by jurors. This was the heart of Petitioner's case. The trial court did not explain to the jury the role of sympathy or the weight to be assigned to sympathy in determining penalty. Thus, without guidance from the court, the

jury was unfairly persuaded by the prosecutor's argument and weighed aggravating evidence against Petitioner. *See* Mills v. Maryland, 486 U.S. 367, 108 S. Ct. 1860 100 L. Ed. 2d 384 (1988); *People v. Davenport*, 11 Cal. 4th 1171, 906 P.2d 1068, 47 Cal. Rptr. 2d 800 (1995).

1857. As discussed in Claim 28, *supra*, Petitioner presented no mitigation evidence at the penalty trial. Petitioner's hopes for a sentence less than death hinged on sympathy – practically the only factor that could be construed in Petitioner's favor. Under the circumstances of this case, it is both reasonably possible and probable that the jury misapplied the sentencing factors. Given the fact that the jury deliberated at length in a conscientious manner, it is likely that in the absence of the error a more favorable result would have occurred. At least one juror would have been inclined to vote for life imprisonment without the possibility of parole if the jury had been properly instructed that sympathy was a sufficient basis for imposing a punishment less than death.

1858. The foregoing violations of Petitioner's constitutional rights, taken singly or in combination with the other errors alleged in the Petition, constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Petition, so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violations of Petitioner's rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622, 637-38.

**CLAIM 38:**

**THE TRIAL COURT VIOLATED PETITIONER'S**

**CONSTITUTIONAL RIGHTS BY REFUSING TO INSTRUCT**

**THE JURY ON THE MEANING OF LIFE WITHOUT THE**

**POSSIBILITY OF PAROLE**

1859. Exhaustion of the claim: This claim was fairly presented to the California Supreme Court in the direct appeal. It was presented in Section XXV of the opening appeal brief.

1860. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

1861. Those facts and allegations set forth in the petition, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

1862. Trial counsel requested that the court instruct the jury as follows:

> Statements by some jurors during jury selection showed an awareness of news reports concerning other cases where sentences of death were not carried out for legal reasons or where person sentenced to life imprisonment have been considered for parole.
>
> Under the 1978 death penalty law, which governs this case, the only possible penalties are death or life imprisonment without the possibility of parole.
>
> In the past, other cases were decided under other laws which are no longer in effect.
>
> You must not consider other cases or news reports, or speculate about actions by other authorities

1    in arriving at a penalty verdict in this case. Those are

2         matters that must not affect your verdict.

3  (XXX CT 8895.)

4      1863. The trial court indicated that it would clarify the meaning of life

5  imprisonment without the possibility of parole only if requested to do so by the

6  jury.  The court ruled that it was not necessary to raise the question and was

7  "bound not to bring forth [the issue] unless the jury itself raises the question

8  during their deliberations."  (217 RT 24790.)  The court further ruled it would be

9  error to so instruct the jury on the meaning of life imprisonment without the

10  possibility of parole and requested defense counsel to withdraw his proffered

11  instruction.  (*Id*.)  As a direct result of the court's request, and only in response to

12  the court's request asking counsel to withdraw the instruction, trial counsel

13  obeyed the court and withdrew the instruction.  (*Id*.)  The trial court did not

14  instruct the jury on the meaning of life imprisonment without the possibility of

15  parole.  The court only instructed the jury in the language of CALJIC No. 8.88

16  (1989 Revision) which stated in relevant part:

17         It is now your duty to determine which of the two

18         penalties, death or confinement in the state prison for

19         life without the possibility of parole shall be imposed

20         on the defendant.

21  (*Id*. at 24874.)

22      1864. Petitioner's proffered special instruction was appropriate under the

23  circumstances of this case.  In the face of vehement and repeated insistence by the

24  prosecutor that Petitioner deserved to die; that he was evil; and that he posed a

25  danger to society (217 RT 24802, 24805, 24819-21, 24832-33), the trial court

26  should have, consonant with due process principles, instructed the jury as

27  Petitioner requested that life imprisonment without parole meant exactly that.

28

673

1865. Under the Fifth, Sixth, Eighth, and Fourteenth Amendments, Petitioner was entitled to the proffered instruction. At the time of Petitioner's trial, decisional law provided that Petitioner was entitled at the very least to explain parole ineligibility. *Barclay v. Florida*, 463 U.S. 939, 950, 103 S. Ct. 3418, 77 L. Ed. 2d 1134 (1983); *Gardner v. Florida*, 430 U.S. at 362, 97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977).

1866. The California Supreme Court's prior rulings that a further instruction on the meaning of life imprisonment without the possibility of parole is not required were predicated on a footnote in the plurality opinion in *Simmons v. South Carolina*, 512 U.S. 154, 167 n.7, 114 S. Ct. 2187, 129 L. Ed. 2d 133 (1994). Footnote 7 lists California as one of seventeen states in which the capital sentencing jury is expressly told about a defendant's ineligibility of parole. Relying on that footnote, the state court repeatedly has turned aside challenges to CALJIC No. 8.88. However, the *Simmons* Court based its decision on two foundations. First, the Court concluded that the defendant was denied due process by being precluded from responding to the prosecution's claims of future dangerousness by informing the jury that he was in actuality ineligible for parole. Second, and most importantly, the plurality in *Simmons* held that instructions which simply inform a capital jury of the sentencing options in literal terms but without explanation are constitutionally inadequate under the Eighth and Fourteenth Amendments.

1867. In *Simmons*, South Carolina argued the instruction given informed the jury that "life imprisonment was to be understood in its 'plain and ordinary' meaning.'" *Simmons v. South Carolina*, 512 U.S. at 169. The Court nevertheless found the instruction insufficient under the Fifth and Fourteenth Amendments:

> An instruction directing juries that life imprisonment
> should be understood in its 'plain and ordinary'
> meaning does nothing to dispel the misunderstanding

674

reasonable jurors may have about the way in which the particular State defines 'life imprisonment.'  *See Boyde v. California*, 494 U.S. 370, 380, 110 S. Ct. 1190, 108 L.Ed.2d 316 (1990) (where there is a 'reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence,' the defendant is denied due process).

*Simmons v. South Carolina*, 512 U.S. at 170 (footnote omitted).

1868. Justice Blackmun, writing in *Simmons* for three concurring justices, stated: "It can hardly be questioned that most juries lack accurate information about the precise meaning of 'life imprisonment' as defined by the States." *Id.*, 512 U.S. at 169.  Jurors and the general public alike regularly misunderstand that defendants sentenced to life imprisonment without the possibility of parole may be and are later released from prison. *Id.* at 169-70 n.9.

1869. The Court in *Simmons* also cited *Barclay v. Florida*, 463 U.S. at 950, which held:  "Any sentencing decision calls for the exercise of judgment.  It is neither possible nor desirable for a person to whom the State entrusts an important judgment to decide in a vacuum, as if he had no experiences." *Simmons v. South Carolina*, 512 U.S. at 171.  Justice Blackmun, in his concurring opinion, further noted that an instruction that simply tells the jury not to consider parole possibilities is not the same as informing it positively what the sentences they impose mean in actuality. *Id.*

1870. Justice Souter's concurring opinion (joined by Justice Stevens) went further in stressing that in addition to the Fifth Amendment, the Eighth Amendment also demands the jury be fully informed of the meaning of the sentencing options they must mete out. *Id.* at 172-74.  Noting that the Eighth Amendment "requires provision of 'accurate sentencing information [as] an

675

indispensable prerequisite to a reasoned determination of whether a defendant should live or die,'" Justice Souter indicated that this necessitates instructions on the meaning of legal terms, so that "whenever there is a reasonable likelihood that a juror will misunderstand a sentencing term, a defendant may demand instruction on its meaning, and a death sentence following the refusal of such a request should be vacated as having been 'arbitrarily or discriminatorily' and 'wantonly and . . . freakishly imposed.'" *Id*. And in fact, *Simmons* made a substantive showing of juror confusion in the trial court through a survey that showed over 90% of jury-eligible adults did not believe that a life sentence meant the prisoner would actually stay in prison the rest of his life. *Id*. at 159.

1871. There was reasonable likelihood of a similar misunderstanding of the nature of life imprisonment without the possibility of parole among jury-eligible California adults generally and at the time of Petitioner's trial. *See* Craig Haney and Mona Lynch, "Clarifying Life and Death Matters: An Analysis of Instructional Comprehension and Penalty Phase Closing Argument," 21 Law & Hum. Behav. 575 (1997). Accordingly, by virtue of the Court plurality opinions in *Simmons*, Petitioner was entitled to an instruction such as that which he requested clarifying the meaning of a life sentence without the possibility of parole.

1872. The state court has approved instructions telling the jury to assume that the sentence imposed will not be overturned and that the penalty chosen will indeed be imposed. *See, e.g., People v. Smithey*, 20 Cal. 4th 936, 1007-08, 978 P.2d 1171, 86 Cal. Rptr. 2d 243 (1999).[129] To instruct a jury to assume that its

---

[129] Of an instruction that "you should vote on the assumption that your decision will not be overturned" and that the jury should choose the penalty on the basis that its decision will stand, the *Smithey* court remarked, "We conclude that the court's instructions regarding the jury's sentencing alternatives were sufficient and correct . . . ." *People v. Smithey*, at 1009-10.

decision on penalty will be carried out is virtually identical to an instruction that the jury must assume for sentencing purposes that the defendant will either be executed or remain in prison the rest of his life with no chance of parole. It is logically impossible for the *Smithey* formulation to be correct and the one offered by Petitioner to be incorrect.

1873. Also, *Shafer v. South Carolina*, 532 U.S. 36, 121 S. Ct. 1263, 149 L. Ed. 2d 178 (2001), makes clear that:

> It is only when the jury endeavors the moral judgment
> whether to impose the death penalty that parole
> eligibility may become critical. Correspondingly, it is
> only at that stage that *Simmons* comes into play . . . .
> [W]henever future dangerousness is at issue in a capital
> sentencing proceeding under South Carolina's new
> scheme, due process requires that the jury be informed
> that a life sentence carries no possibility of parole.

*Id.*, 532 U.S. at 37-38 (citation omitted).

1874. The Court in *Shafer* reaffirmed the need of a *Simmons* instruction. The Court rejected suggestions that the trial court's instructions or defense counsel's argument made up for the lack of a *Simmons* instruction. In particular, the Court found inadequate the instruction that "life imprisonment means until the death of the offender. Parole eligibility is not for your consideration." *Id.* at 45. That instruction, concluded the Court, failed to inform the jury of the true nature of the sentences it might impose. "That instruction did nothing to ensure the jury was not misled and may well have been taken to mean 'that parole was available but that the jury, for some unstated reason, should be blind to this fact.'" *Id.* at 53 (quoting *Simmons v. South Carolina*, 512 U.S. at 170.) The *Shafer* Court also quoted with approval the dissenting opinion in *State v. Kelly*, 343 S.C. 350, 375, 540 S.E.2d 851 (2001): "Without the knowledge that, if

677

aggravators are found, a life sentence is not subject to being reduced by parole, or any other method of early release, the jury is likely to speculate unnecessarily on the possibility of early release, and impose a sentence of death based upon 'fear rather than reason.'" *Shafer v. South Carolina*, 532 U.S. at 53-54.

1875. In Petitioner's case, his proffered special instruction informed the jury that he would remain in prison for the rest of his life and never be paroled. The instruction further obligated the jury to ignore other cases in the past under other laws in which the death penalty, particularly in other notorious cases, was not carried out. Petitioner's instruction fell squarely within the reasoning of *Simmons* and now *Shafer*. Petitioner's jury was not informed of the true nature of its sentencing options.

1876. *Simmons* and *Shafer* are applicable to the California capital sentencing scheme. Together, these cases hold that whenever a statutory capital sentencing scheme presents the sentencer with a choice, but fails to provide adequate information on the nature of those choices, due process has been violated. This is particularly so where the prosecution, as here, relies on continuing dangerousness and the sentencer is ignorant as to the meaning of an alternate sentence of life without the possibility of parole. In such cases, the sentencer is susceptible to inflicting death out of misplaced fear the defendant may be released from prison on parole or by another method of early release. The jury here should have been advised that Petitioner's sentence would never be reduced by parole or other method of early release or that a sentence of life without possibility of parole meant that Petitioner would remain in prison for the rest of his life.

1877. As in *Simmons*, there is empirical evidence that California jurors fundamentally misunderstand even the most basic concepts of the capital sentencing process. *See* Haney & Lynch, "Clarifying Life and Death Matters: An Analysis of Instructional Comprehension and Penalty Phase Closing

Argument," 21 Law & Hum. Behav. 575; *see also Simmons v. South Carolina*, 512 U.S. at 170 n.9 (studies on misconstruing the meaning of life without the possibility of parole). The language of the instructions condemned in *Simmons* and *Shafer* and those given by the trial court in this case without Petitioner's proffered instruction differ but superficially.[130] The danger that the jury would misunderstand the operation of the capital sentencing process lurked beneath the trial court's instructions just as in *Simmons* and *Shafer*. The *Simmons*-Shafer rationale thus applies, for to "simply identify the jury's sentencing alternatives" (*Simmons v. South Carolina*, at 167 n.7) as was also done here, failed to address the likelihood of substantive confusion among jurors that underpinned the identical process violation *in Simmons*.

1878. The objectionable instructions are equally susceptible to a *Simmons-Shafer* analysis. Absent Petitioner's proffered instruction, those given by the court presented the sentencing jury with the same two-way decision. Petitioner's proffered instruction was a bare minimum explication needed under both *Simmons* and *Shafer* to dispel any possibility of jury misunderstanding about the meaning of life without the possibility of parole.

1879. Moreover, *Kelly v. South Carolina*, 534 U.S. 246, 122 S. Ct. 726, 151 L. Ed. 2d 670 (2002), confirms Petitioner's right to an appropriate instruction with respect to parole ineligibility, especially where there was evidence that

---

[130] The California Supreme Court's statement that life without the possibility of parole is to be understood "in the common and nontechnical sense that the plain meaning of its words conveys" (*People v. Bonin*, 46 Cal. 3d 659, 698, 758 P.2d 1217, 250 Cal. Rptr. 687 (1988) precisely echoes the South Carolina argument that the words "life imprisonment" were to be understood in their "plain and ordinary meaning" that the United States Supreme Court rejected in *Simmons v. South Carolina*, at 169-70. Both states adopted the same unconstitutionally sanguine but erroneous attitude toward jurors' abilities to divine the actual meaning of sentencing options from unclear or vague instructions.

supported an inference of future dangerousness. Thus, the Eighth Amendment requirement of penalty reliability was not met. *Woodson v. North Carolina*, 428 U.S. 280, 196 S. Ct. 2978, 49 L. Ed. 2944 (1976).

1880. The trial court's failure properly to instruct the jury on the meaning of life without the possibility of parole and its rejection of Petitioner's explanatory instruction were highly prejudicial. Moreover, in view of the particular facts of this case, the issue of future dangerousness was of greater concern to the jury than in other cases. The prosecutor vigorously argued in closing argument that Petitioner should be sentenced to death. The defense, on the other hand, struggled to convince the jury that Petitioner should be spared because of mercy and sympathy. (*See* 217 RT 24839.) The defense emphasized that life imprisonment without the possibility of parole constituted harsh punishment. (*See* 217 RT 24836-37.) The actual meaning of the punishment was a cornerstone of the defense case. Even without mitigation evidence, the jury conscientiously considered the issue of punishment during four days of deliberations. Given the length of deliberations, a proper instruction defining life imprisonment without the possibility of parole could well have affected the penalty decision rendered.

1881. Petitioner was unfairly denied a clear instruction that informed the jury adequately and fully of the precise and accurate meaning of life without the possibility of parole. The lack of clarifying instruction, as proposed by Petitioner, made it reasonably possible and reasonably likely that at least one juror misunderstood the actual consequences of the potential punishments set forth in CALJIC No. 8.88 (1989 Revision), and voted accordingly. *People v. Brown*, 46 Cal. 3d 432, 471, 757 P.2d 1135, 250 Cal. Rptr. 604; *Chapman v. California,* 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). In light of the length of the jury's penalty deliberations, it cannot be said that the lack of clarification on the meaning of life imprisonment without the possibility of parole

had "no effect" on this jury's penalty verdict. *Caldwell v. Mississippi*, 472 U.S. at 341.

1882. The foregoing violations of Petitioner's constitutional rights, taken singly or in combination with the other errors alleged in the Petition, constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Petition, so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violations of Petitioner's rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622, 637-38.

**CLAIM 39:**

**PETITIONER'S CONSTITUTIONAL RIGHT TO LIMIT THE AGGRAVATING CIRCUMSTANCES TO SPECIFIC LEGISLATIVELY-DEFINED FACTORS WAS VIOLATED BY CALJIC NO. 8.84.1**

1883. Exhaustion of the claim: This claim was fairly presented to the California Supreme Court in the direct appeal. It was presented in Section XXVI of the opening appeal brief.

1884. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

1885. Those facts and allegations set forth in the petition, declarations, claims of constitutional violations, and the accompanying exhibits are

incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

1886. The trial court instructed the jury in the language of CALJIC No. 8.84.1 that "you must determine what the facts are from the evidence received during the entire trial unless you are instructed otherwise." (217 RT 24869.)

1887. The court refused the defense instruction informing the jury not to consider any other facts except the list of aggravating circumstances. (217 RT 24789; XXX CT 8892.)

1888. There is no statutory basis for the mandate given the jury to determine the facts under CALJIC No. 8.84.1. What the jury may consider at the penalty phase is dictated by Penal Code § 190.3, as construed to meet constitutional requirements. Section 190.3 sets forth specific aggravating and mitigating factors which must be considered by the jury. CALJIC No. 8.84.1 contravenes the requirements of § 190.3.

1889. *People v. Boyd*, 38 Cal. 3d 762, 700 P.2d 782, 215 Cal. Rptr. 1 (1985), held that, pursuant to Penal Code § 190.3. the "prosecution's case for aggravation is limited to evidence relevant to the listed factors exclusive of factor (k)." *People v. Boyd*, 38 Cal. 3d at 775. The directive to the jury in CALJIC No. 8.84.1 violated § 190.3 by permitting the jury to interpret a new guilt phase evidence as factors in aggravation although the evidence failed to fit into any of the specific statutory factors. For instance, under the sweeping mandate of CALJIC No. 8.84.1 that the jury "must determine what the facts are from the evidence received during the entire trial unless you are instructed otherwise," the jury was required to consider evidence that:

- Petitioner was Hispanic, a transient, and the subject of a massive manhunt, and that his prosecution attracted extensive media coverage;

682

- Petitioner associated with drug users and other known criminals;
- Petitioner may have used illicit drugs;
- Petitioner may have bought or sold stolen property;
- Petitioner was in chains throughout trial and refused to remove his sunglasses at trial; and,
- Petitioner harbored Satanist beliefs, made pentagram drawings, and engaged in other unusual cult-like behavior at crime scenes, in jail, and in the courtroom

– all of which was constitutionally impermissible (*Zant v. Stephens*, 462 U.S. 862); unconstitutionally vague (*People v. Sanders*, 51 Cal. 3d 471, 797 P.2d 561, 273 Cal. Rptr. 537 (1990)); and, irrelevant with respect to the jury's determination of penalty.

1890. *People v. Boyd*, 38 Cal. 3d 762, held that nonstatutory factors in aggravation cannot be considered by the jury. *Boyd* necessarily implies that the wholesale incorporation of the guilt phase evidence into the record for the jury's consideration at the penalty phase is improper. Even without *Boyd*, however, constitutional safeguards would preclude consideration of such evidence.

1891. *Zant v. Stephens*, 462 U.S. at 873-80, upheld Georgia penalty phase jury instructions which allow the jury to consider nonstatutory aggravating circumstances provided at least one statutory aggravating circumstance is found to be true. In so ruling, however, the Court specifically held that a "constitutionally necessary function" of statutory aggravating circumstances is to "circumscribe the class of persons eligible for the death penalty." *Id*. at 878. Under *Zant*, a statute which fails "to create any 'inherent restraint on the arbitrary and capricious infliction of the death sentence,'" remains unconstitutional. *Id*. Such a defect exists in CALJIC No. 8.84.1 by allowing the jury to consider, as in this case, nonstatutory aggravating factors and to consider in its total discretion,

683

as conferred by CALJIC No. 8.84.1 any or all guilt phase evidence as circumstances warranting the death penalty.[131]

1892. At the very least, the trial court was obligated to reassess the balance of prejudice and probative value of evidence adduced at the guilt phase before placing it wholesale before the jury for its mandatory consideration at the penalty phase by virtue of CALJIC No. 8.84.1. The California instruction was erroneous precisely because it permitted the jury to sentence Petitioner to death even if it considered the statutory aggravating circumstances to be of minimal or no significance, based on other nonstatutory circumstances or evidence introduced during the guilt trial. *See Simmons v. South Carolina*, 512 U.S. 154, 114 S. Ct. 2187, 129 L. Ed. 2d 133 (1994); *Stringer v. Black*, 503 U.S. 222, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993).

1893. For these reasons, instruction of the jury in the vague, unmodified language of CALJIC No. 8.84.1 in this case was erroneous as a matter of statutory construction and as a matter of federal constitutional law. Petitioner was denied his right to due process under the Fourteenth Amendment and his right to a reliable determination of penalty under the Eighth Amendment. *Woodson v. North Carolina*, 428 U.S. 280, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976).

1894. The foregoing violations of Petitioner's constitutional rights, taken singly or in combination with the other errors alleged in the Petition, constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the

---

[131] A similar conclusion was drawn by the Supreme Court of Washington in *People v. Bartholomew*, 101 Wash. 2d 631, 683 P.2d 1079 (1984), which held, as a matter of both state and federal constitutional law, that nonstatutory aggravating circumstances cannot be given the same weight as specifically listed statutory factors. *Id*. at 1089.

jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Petition, so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violations of Petitioner's rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622, 637-38.

**CLAIM 40:**

> **THE DEATH SENTENCE IS DISPROPORTIONATE AND IS CRUEL AND UNUSUAL PUNISHMENT BECAUSE OF PETITIONER'S SERIOUS PSYCHIATRIC, PSYCHOLOGICAL, NEUROCOGNITIVE, NEUROLOGICAL, AND OTHER IMPAIRMENTS**

1895. Exhaustion of the claim: This claim was fairly presented to the California Supreme Court in Section XIX of the June 2004 petition for writ of habeas corpus.

1896. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

1897. Those facts and allegations set forth in the petition, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

1898. Petitioner is mentally incompetent, and was at the time of his arrest and throughout his trial proceedings. His execution would therefore be in contravention of rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth

Amendments guaranteeing fair trial, rights to present a defense, to counsel, to due process, to a reliable determination of sentence, and to prohibiting cruel and unusual punishment. Sections 3701 to 3704 also prohibit the execution of the insane.

1899. Petitioner challenges his sentence on the grounds that the death penalty is inappropriate for an individual of his mental capabilities, who suffers from severe psychiatric impairments, including psychosis, disorganized thought and behavior, and impaired reality testing; and, other severe psychological, neurological, and cognitive deficits.

1900. Petitioner's multiple impairments and incompetency render a death sentence disproportionate and in violation of his constitutional rights.

1901. Severe mental illness, rendering an individual insane, bars execution under §§ 3701 through 3704. Thus, independent state grounds prohibit a disproportionate sentence.

1902. Petitioner's impairments manifested when he was a young child. In 1970, at the age of 10, he suffered serious neurological problems, was hospitalized, and found to have neurological deficits and a seizure disorder. (Ex. 57, Hotel Dieu Medical Records.) His functioning was and is impaired; he is mentally ill, suffers a thought disorder of psychotic proportion, a severe mood disorder, is cognitively impaired, and incompetent – all of which contribute to his severe mental impairments and limited functioning. The psychiatric impairments likely manifested by age 12.

1903. *Atkins v. Virginia*, bars execution of the mentally retarded. Petitioner has asserted that his condition is long-standing, profoundly affects his functioning and, therefore, is akin to an *Atkins* claim. The reasoning in *Atkins* to exempt the mentally retarded from execution is based on the permanent and debilitating effect of mental impairments.

686

Cognitive and behavioral impairments . . . diminished ability to understand and process information, to learn from experience, to engage in logical reasoning, or to control impulses – all of which is applicable to a seriously mentally ill defendant.

*Atkins v. Virginia*, 536 U.S. at 320. Moreover, the Supreme Court acknowledged the deterrence effect of capital punishment is predicated on deliberate and premeditated murders. *Id.* at 319 (quoting *Enmund v. Florida*, 458 U.S. 782, 102 S. Ct. 3368, 73 L. Ed.2d 1140 (1982)).

1904. The American Psychiatric Association's position statement on diminished responsibility in capital sentencing holds:

Defendants shall not be sentenced to death or executed if, at the time of the offense, they had a severe mental disorder or disability that significantly impaired their capacity (a) to appreciate the nature, consequences or wrongfulness of their conduct, (b) to exercise rational judgment in relation to their conduct, or (c) to conform their conduct to the requirements of the law.

American Psychiatric Association, Diminished Responsibility in Capital Sentencing (Position Statement 2004). Moreover, mental illness and retardation are similar in many respects. Mentally ill individuals may have permanent impairments which interfere with the normal range of functioning. They are similarly situated as mentally retarded persons with respect to limited functioning. Mental illness equates to mental retardation in reduced functioning and lack of normalcy, unlike the situation of juvenile and adult offenders, which are separate groups lacking common ground.

1905. Dr. Blumer has stated that Petitioner's multiple impairments require "proper care and treatment for serious, lifelong neuropsychiatric deficits because [of] … debilitating effects of organic brain dysfunction." (Ex. 31, D. Blumer, M.D., dec., ¶ 15.) Dr. Blumer's findings establish that Petitioner is permanently

687

afflicted; he will not recover or regain normal functioning.  Treatable in this instance certainly does not mean curable.  Petitioner has been ill for at least thirty-five years, and probably all of his life.  Dr. Watson conservatively estimated that Petitioner suffers from "temporal lobe disorder and frontal lobe dysfunction" and, "[he has] neurocognitive deficits related to a psychotic and/or schizophrenic spectrum disorder.  His functioning is impaired.  He suffers … from mood disorders.  These conditions combine to render Petitioner severely impaired."  (Ex. 42, D. Watson, Ph.D., dec., ¶¶ 19-20 (fn. omitted).)

1906.  Petitioner was seriously impaired and insane or had reduced mental state at the time of the offenses, and he was incompetent throughout the trial proceedings.  Given the nature of Petitioner's debilitating and long-standing mental illness, the death sentence violates his fundamental rights under the Constitution.  Petitioner is entitled to a hearing in which he will demonstrate the nature and extent of his psychiatric and psychological, neurological, and cognitive deficits, their profound effects upon his ability to function as a child and adult; that the impairments are of long duration and negatively impact his behavior, and that there is presently a national and regional consensus against the execution of the mentally retarded.  *See Atkins v. Virginia*, 536 U.S. 304.  Persons exhibiting the same kinds of cognitive impairments and disabilities as described by the High Court in *Atkins* should, as a matter of equal protection, fall within the ambit of this ruling.  Petitioner exhibits symptoms and impairments similar or identical to those described in *Atkins* and under equal protection principles; his execution is also prohibited under the Eighth and Fourteenth Amendments.  Reversal of his death sentence is required.

1907.  The foregoing violations of Petitioner's constitutional rights, taken singly or in combination with the other errors alleged in the Petition, constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the

jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Petition, so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violations of Petitioner's rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622, 637-38.

**CLAIM 41:**

## **CALIFORNIA'S DEATH PENALTY STATUTE, AS INTERPRETED BY THE CALIFORNIA SUPREME COURT AND APPLIED TO PETITIONER, IS CONSTITUTIONALLY DEFECTIVE**

1908. Exhaustion of the claim: Petitioner presented subsections of this claim to the California Supreme Court.

1909. Many features of California's capital sentencing scheme violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. The California Supreme Court has rejected challenges to many of these features, but the challenges retain their federal constitutional validity since they have not been rejected by the United States Supreme Court. Petitioner presents these arguments in an abbreviated fashion sufficient to alert the Court to the nature of each claim and its federal constitutional basis. Individually and collectively, these various constitutional defects require that Petitioner's sentence of death be set aside.

1910. In support of these subclaims, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

1911. Those facts and allegations set forth in the petition, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

1912. The following violations of Petitioner's constitutional rights, taken singly or in combination with the other errors alleged in the Petition, constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Petition, so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violations of Petitioner's rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622, 637-38.

## A.       The California Death Penalty Statute Fails to Narrow the Class of Murders Eligible for the Death Penalty.

1913. Exhaustion of the claim: This claim was fairly presented to the California Supreme Court in the direct appeal. It was presented as Claim XXXIII of the Opening Brief. It was also fairly presented to the California Supreme Court as Claim XX in the June 2004 petition for a writ of habeas corpus.

1914. Petitioner's convictions and sentence are unconstitutional because the California death penalty scheme does not sufficiently narrow the class of persons eligible for the death penalty. The California capital statutory scheme is overly broad and inclusive because it contains so many special circumstances that it fails to perform the constitutionally required narrowing function. The statutory

690

scheme, therefore, violates the Eighth Amendment prohibition against cruel and unusual punishments and the Fifth and Fourteenth Amendment requirement of due process of law.

1915. Under the United States Supreme Court decisions, *inter alia*, in effect at the time of Petitioner's trial, a state statutory scheme must provide rational, meaningful and objective criteria for narrowing the class of person's eligible for the death penalty from the larger group of murder defendants who are not. *Zant v. Stephens*, 462 U.S. 862, 877, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983) ("To pass constitutional muster, a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty'"); *Furman v. Georgia*, 408 U.S. 238, 313, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972) (a death penalty law violates the Eighth Amendment unless it provides a meaningful basis for distinguishing the few cases where the death penalty is imposed from the many in which it is not); *California v. Ramos*, 463 U.S. 992, 103 S. Ct. 3446, 77 L. Ed. 2d 1171 (1983) (a capital murder statute must take into account the concepts that death is different be in accord with Eighth Amendment).

1916. The narrowing must occur at the definitional stage and is required to ensure that those chosen for the death penalty will be among the worst offenders, those whose murders are "particularly serious or for which the death penalty is peculiarly appropriate . . . ." *Gregg v. Georgia*, 428 U.S. 153, 222, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976) (White, J., conc. op.); *Zant v. Stephens*, 462 U.S. at 878; *Blystone v. Pennsylvania*, 494 U.S. 299, 110 S. Ct. 1078, 108 L. Ed. 2d 255 (1990); *Lowenfeld v. Phelps*, 484 U.S. 231, 244-45, 108 S. Ct. 546, 98 L. Ed. 2d 568 (1988); *see also Adamson v. Ricketts*, 865 F.2d 1011 (9th Cir. 1988) (blanket eligibility for death sentence may violate the Fifth and Fourteenth Amendment due process guarantees as well as the Eighth Amendment).

1917. The *Furman* principle has resulted in a statutory narrowing requirement with two components: (1) the death-eligible class of convicted

murderers must be small enough that a substantial percentage are in fact sentenced to death; and (2) the states, through their legislatures, must decide the composition of the death-eligible class. (Ex. 39, Steven Shatz dec., ¶ 5.). In other words, *Furman* is satisfied if, and only if, the legislature, by defining categories of murderers eligible for the most severe penalty, genuinely narrows the death-eligible class. (*Id.*)

1918. California's death penalty statute, however, enacted by initiative, has ignored the Eighth Amendment by multiplying the "few" into the many. Because of the breadth of California's definition of first-degree murder, nearly all murders committed in California can be capitally charged. At the time of the homicide in Petitioner's case, there were 26 "special" circumstances in existence under California Penal Code § 190.2, effectively embracing every likely type of murder. There were only eight fact situations possible where a defendant could have been guilty of first degree murder and actually not be death-eligible. (Ex. 39, Steven Shatz dec., ¶ 5.)

1919. It appears the proponents of Proposition 7, the initiative enacted into law as § 190.2, contemplated an unconstitutional over-broad purpose in drafting and advocating such expansive special circumstances. In their "Argument in Favor of Proposition 7" in the 1978 Voter's Pamphlet, they described certain murders not covered by the then-existing death penalty statute, and then stated:

> And, if you were to be killed on your way home tonight simply because the murderer was high on dope and wanted the thrill, the criminal would not receive the death penalty. Why, Because the Legislature's weak death penalty law does not apply to every murderer. Proposition 7 would.

(1978 Voter's Pamphlet, p. 34 (emphasis added).)

1920. In California, death eligibility is the rule, not the exception. Professor Steven Shatz determined that from 1988-1992, a four-year period encompassing this case, at least 84 percent of first-degree murderers convicted in California were death-eligible. (Ex. 39, Steven Shatz dec., ¶¶ 17 & 28.)  Through his careful statistical studies, Shatz has concluded that California's statutorily defined death-eligible class is so large, and the imposition of the death penalty on members of the class so infrequent, that the statute performs no narrowing of the death-eligible class as mandated by *Furman*.  In fact, it creates a greater risk of arbitrary death sentences than the pre-Furman death penalty schemes.  (*Id.*, ¶ 33.)

1921. With the exception of the "heinous, atrocious or cruel" special circumstance already held unconstitutional, *People v. Superior Court (Engert)*, 31 Cal. 3d 797, 800-02, 647 P.2d 76, 183 Cal. Rptr. 800 (1982), any of the 26 individual special circumstances, when viewed in isolation, may have been sufficiently objective and narrow to satisfy *Furman*.  However, given the number and breadth of the special circumstances, the scheme as a whole does not genuinely narrow the death-eligible class.

## B.     The California Death Penalty Scheme Gives Prosecutors Unfettered Discretion

1922. Exhaustion of the claim: This claim was fairly presented to the California Supreme Court in the direct appeal.  It was presented as Claim XXXII of the Opening Brief.

1923. Under *Furman*, sentencing procedures may not create a substantial risk that the death penalty will be inflicted in an arbitrary or capricious manner. *Furman* does not require that all sentencing discretion be eliminated, only that it be directed and limited so that the death penalty will be imposed in a more consistent and rational manner, and so that there will a meaningful basis for distinguishing the cases in which it is imposed from those in which it is not. *See Lockett v. Ohio*, 438 U.S. 576, 600-01, 98 S. Ct. 2957, 57 L. Ed. 2d 973 (1978).

1924. In California, however, each individual prosecutor has sole authority and complete discretion to determine whether a penalty hearing will be held to determine if the death penalty will be imposed. No sentencing hearing is required after conviction for murder with special circumstances, nor is the prosecutor directed as to when he may seek the death penalty. *People v. Williams*, 30 Cal. 3d 470, 477, 637 P.2d 1029, 179 Cal. Rptr. 443 (1981); *Ramos v. Superior Court*, 32 Cal. 3d 26, 29, 648 P.2d 589, 184 Cal. Rptr. 622 (1982). Under California's scheme, it is the prosecutor who narrows the class of similarly charged defendants through his decision to waive death or to demand a sentencing hearing following conviction. The prosecutor has unlimited discretion, unaided by legislatively created directives, in the performance of this indispensable part of the sentencing function.[132]

1925. Just like the "arbitrary and wanton" jury discretion condemned in *Woodson*, 428 U.S. at 303, such unprincipled, broad discretion is contrary to the principled decision-making mandated by *Furman*, 408 U.S. at 239-40. Under these principles, the complete discretion given to the prosecutor by California's death penalty statute to seek, or not to seek, a sentence of death violates the Eighth Amendment's ban against cruel and unusual punishment.

---

[132]  Petitioner acknowledges that in *Gregg v. Georgia*, the opinions joined in by Justices Stewart, Powell, Stevens, White, Rehnquist, and Chief Justice Burger, suggested that the requirements imposed upon a sentencing body are not applicable to decisions by prosecutors. *Gregg v. Georgia*, 428 U.S. at 199, 224-26;
However, any such expression in *Gregg* does not apply to the California death penalty law because the statutes in Georgia, Florida and Texas, approved by the Supreme Court in Gregg and its companion cases, properly serve the function of narrowing the class of death-eligible defendants. The California statutory scheme fails in that essential function, leaving the task of narrowing to prosecutorial discretion.

694

## C. County-by-County Variation in the Application of the Death Penalty Violates Petitioner's Right to Equal Protection

1926. The California Attorney General is the chief law officer of the state, with supervisory power over every District Attorney. Cal. Const. art. V, § 13; Cal. Govt. Code § 12550. The California Attorney General has the power, as well as the duty, to assure uniformity in implementing a fundamental right (the fundamental right to life, as well as the rights to due process and freedom from cruel and unusual punishment). However, the Attorney General has instead allowed charging decisions to be made in a standardless and inconsistent fashion from county to county, without any assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied.

1927. Implementation of the death penalty in California violates the Equal Protection Clause because the decision whether to seek the death penalty against a potentially death eligible defendant (*i.e.* one where special circumstances have been charged) is left solely to the discretion of the prosecutor in the county where the crime was committed. In California, the fifty-eight counties, through the respective prosecutors's offices, make their own rules, within the broad parameters of §§ 190.2 and 190.25, as to who is charged with capital murder and who is not. There are no effective restraints or controls on prosecutorial discretion in California. Each county may and does impose its own standards (or none at all), for deciding who will face death.

1928. Of the California counties that have five or more death verdicts in a twenty-year period, the rate of death verdicts has ranged from sixty-two death verdicts per thousand homicides down to only four. The lack of general consistency constitutes a violation of equal protection of the laws and deprives Petitioner of his legitimate expectation that he will be deprived of his life or liberty only to the extent and in the manner provided for by law. *See Bush v.*

*Gore*, 531 U.S. 98, 121 S. Ct. 525, 148 L. Ed. 2d 388 (2000); *Hicks v. Oklahoma*, 447 U.S. 343, 100 S. Ct. 2227, 65 L. Ed. 2d 175 (1980).

**D.      California Fails to Provide Inter-Case Proportionality Review**

1929. California's death penalty scheme does not require a trial or appellate court to undertake a comparison between Petitioner's case and other similar cases regarding the relative proportionality of the death sentence imposed. *See People v. Fierro*, 1 Cal. 4th 173, 253, 821 P.2d 1302, 3 Cal. Rptr. 2d 426 (1991). This omission violates the Eighth Amendment's requirement that the death penalty not be imposed arbitrarily or capriciously. *Gregg v. Georgia*, 428 U.S. at 189.

1930. The Supreme Court has recognized that such a provision "guards against a situation comparable to that present in *Furman* [*v. Georgia*, 408 U.S. 238]" in which Georgia's capital scheme was struck down because it gave juries unfettered discretion to impose the death penalty without proportionality review. *Gregg v. Georgia*, 428 U.S. at 198. As a result, states such as Georgia and Florida have adopted procedures to allow for intercase proportionality review. *See e.g.* Ga. Stat. Ann., § 27-2537(c); *Proffitt v. Florida*, 428 U.S. 242, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976). California's lack of such a review mechanism violates his rights under the Eighth and Fourteenth Amendments of the Constitution.

**E.      California's Scheme Violates Due Process By Allowing the Jury to Repeatedly Consider the Same Evidence in Aggravation**

1931. Exhaustion of the claim: This claim was fairly presented to the California Supreme Court in the direct appeal. It was presented in Section XXIX of the Opening Brief.

1932. The California death penalty scheme improperly allows the jury to repeatedly consider the same facts throughout the guilt and penalty phases.

1933. First, the scheme allows for the "triple use" of the same facts underlying the felony conduct; (1) to support the conviction of first degree murder on a felony murder theory, (2) to support the finding of the felony as a special circumstance and (3) the use of the felony as an aggravating factor which warrants the imposition of the death penalty. *See People v. Marshall*, 50 Cal. 3d 907, 790 P.2d 676, 269 Cal. Rptr. 269 (1990). The Supreme Court in *Lowenfield v. Phelps*, 484 U.S. 231, 246 108 S. Ct. 546, 98 L. Ed. 2d 568 (1988), rejected a similar challenged to Louisiana's death penalty scheme, reasoning that the "legislature may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase." *Id.* at 246. However, California's scheme has a far greater number of felonies that make a defendant both eligible for first degree murder and death eligible than did Louisiana. As such, the scheme under which Petitioner was convicted does not provide for the narrowing of death-eligible murders by the jury that the Court found in *Lowenfield* and, thus, violates Petitioner's rights under the Eighth and Fourteenth Amendments.

1934. Second, under § 190.3(a), the jury may consider "the circumstances of the crime of which the defendant was convicted in the present proceedings and the existence of any special circumstances found to be true." No limitations are placed on the jury's use of these "circumstances." The California Supreme Court has acknowledged the potential for double-counting the same felony conduct as both a special circumstance and an aggravating factor under § 190.3(a). *People v. Melton,* 44 Cal. 3d at 768-69. The use of felony-based special circumstances as independent factors for imposing a death sentence violated Petitioner's right to a reliable determination of penalty in violation of the Eighth and Fourteenth Amendments. *Caldwell v. Mississippi*, 472 U.S. at 341.

1935. Third, § 190.3(b) (presence of any criminal activity involving attempted use of force or violence) and § 190.3(c) (presence of any prior felony

conviction) allow the jury to double count the same violent conduct as separate aggravating factors. Thus, double-counting the aggravating circumstances prevented the jury from a fair and proper consideration of the evidence and a reliable determination of penalty. *Caldwell v. Mississippi*, 472 U.S. at 341.

**F.     The Penalty Phase Instructions Deprived Petitioner of His Constitutional Right to an Individualized and Reliable Sentencing Decision Because They Failed to Designate Factors as "Aggravating" or "Mitigating"**

1936. CALJIC 8.85, which was given to Petitioner's jury, presents a list of factors to be considered in the penalty phase determination, but it does not indicate which factors are aggravating and which are mitigating. Under California law, certain factors[133] may be given only mitigating weight and may not be used in aggravation. *People v. Hardy*, 2 Cal. 4th 86, 207, 825 P.2d 781, 5 Cal. Rptr. 2d 796 (1992); *People v. Hamilton*, 48 Cal. 3d 1142, 1184, 7744 P.2d 730, 259 Cal. Rptr. 701 (1989); *People v. Davenport*, 41 Cal. 3d 247, 288-90, 710 P.2d 861, 221 Cal. Rptr. 794 (1985).

1937. The failure of the trial court to define these terms permitted the prosecutor to improperly convert mitigating evidence into aggravating evidence. Here, the prosecutor argued that because there were people Petitioner could have

_____

[133]  (d) (whether offense was committed under influence of extreme mental or emotional disturbance), (e) (whether victim participated in or consented to the defendant's homicidal conduct), (f) (whether offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct), (g) (whether the defendant acted under extreme duress or under the substantial domination of another person), (h) (whether the defendant lacked the capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law was impaired as a result of a mental disease or defect or the effects of intoxication) and (k) (any other circumstance which extenuates the gravity of the crime...or any other aspect of the defendant's character or record) .

killed but did not was not mitigating, it was aggravating.  The prosecutor argued that,

> The defendant might say, well, that was mitigation in that he spared
> their life, but I submit to you that perhaps – perhaps not; perhaps he
> enjoyed more doing what he did and not killing them at that
> particular time.  ¶ Perhaps that was more than gratifying in some of
> those cases.

(217 RT 24820.)  Turning Petitioner's factor (k) mitigating evidence into a non-statutory dangerousness factor violated Petitioner's Eighth and Fourteenth Amendment rights to a reliable and individualized sentencing decision.  *Zant v. Stephens*, 462 U.S. at 878-79 n.17; *People v. Boyd,* 38 Cal. 3d 762, 772-76, 700 P.2d 782, 215 Cal. Rptr. 1 (1985).

## G.    The Jury Instructions Failed to Require a Reasonable Doubt Determination of Aggravating Factors

1938. Exhaustion of the claim:  This claim was fairly presented to the California Supreme Court in the direct appeal.  It was presented in Section XXVIII of the Opening Brief.

1939. Although § 190.3 requires the trier of fact in a capital case to find that at least one aggravating factor exists and that such aggravating factor (or factors) outweigh any and all mitigating factors, as a prerequisite to the imposition of the death penalty, California does not require that a reasonable doubt standard be used during any part of the penalty phase of a defendant's trial except as to proof of prior criminality relied upon as an aggravating circumstance – and even in that context, the required finding need not be unanimous.  The jurors in Petitioner's case were not instructed that there was any burden of proof at the penalty phase with respect to the aggravating factors or the penalty determination itself.

1940. In *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), the United States Supreme Court held that a state may not impose a sentence greater than that authorized by the jury's simple verdict of guilt unless the facts supporting an increased sentence (other than a prior conviction) were also submitted to the jury and proved beyond a reasonable doubt. *Id*. at 478.  In *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), the Supreme Court held that Arizona's death penalty scheme, under which a judge sitting without a jury makes factual findings necessary to impose the death penalty, violated the defendant's constitutional right to have the jury determine, unanimously and beyond a reasonable doubt, any fact that might increase the maximum punishment.  While the primary problem presented by Arizona's capital sentencing scheme was that a judge, sitting without a jury, made the critical findings, the court reiterated its holding in *Apprendi*, that when the state bases an increased statutory punishment upon additional findings, such findings must be made by a unanimous jury beyond a reasonable doubt.

1941. The death penalty scheme under which Petitioner was sentenced violates the federal constitution because Petitioner's jury was not asked to determine, unanimously and beyond a reasonable doubt, the existence of at least one aggravating factor, and whether the aggravating factors outweighed the mitigating factors.  These two sets of determinations are critical and a death sentence is not authorized by California law without them, despite the fact that a jury has previously determined a special circumstance to be true.

1942. In addition, *Ring* dictates habeas relief with respect to Petitioner's death sentence because his jury was not asked to determine, unanimously and beyond a reasonable doubt, whether each of the unadjudicated acts introduced in aggravation was proven.  In light of the crucial importance of such findings, the trial court erred in failing to instruct the jury regarding the elements of the alleged other criminal acts.  Absent such instructions, the jury could not be expected to

decide, unanimously and beyond a reasonable doubt, whether the elements of the alleged other crimes were proven.

1943. Besides the Fifth and Sixth Amendment violations under *Apprendi* and *Ring*, the lack of a reasonable doubt standard at penalty also deprived Petitioner of his Eighth Amendment right to a reliable penalty determination. *Woodson v. North Carolina*, 428 U.S. at 305; *see also California v. Ramos*, 463 U.S. at 998-99; *Caldwell v. Mississippi*, 472 U.S. at 341. There can be no explanation why the most important and sensitive fact-finding process in all of the law – a penalty phase jury's choice between life and death – could or should be the only fact-finding process in all of the law completely exempted from a burden of proof.

1944. The absence of the appropriate burden of proof prevented the jury from rendering a reliable determination of penalty. The error was structural and interfered with the jury's function, thus "affecting the framework within which the trial proceeds" and rendered the trial fundamentally unfair. *Arizona v. Fulminante*, 499 U.S. at 310.

## H. The Jury Instructions Failed to Require Unanimity on Aggravating Factors

1945. Exhaustion of the claim: This claim was fairly presented to the California Supreme Court in the direct appeal. It was presented in Section XXX of the Opening Brief.

1946. As a prerequisite to the imposition of the death penalty in California, § 190.3 requires the trier of fact to find that at least one aggravating factor exists and that such aggravating factor (or factors) outweigh any and all mitigating factors. According to California's former principal sentencing instruction, "an aggravating factor is any fact, condition or event attending the commission of a crime which increases its guilt or enormity, or adds to its injurious consequences

which is above and beyond the elements of the crime itself." CALJIC No. 8.88 (emphasis added); *see* CALCRIM 763.

1947. Thus, before the process of weighing aggravating factors against mitigating factors can begin, the presence of one or more aggravating factors must be found by the jury. And before the decision whether or not to impose death can be made, the jury must find that aggravating factors outweigh mitigating factors. These factual determinations are essential prerequisites to death-eligibility, but do not mean that death is the inevitable verdict; the jury can still reject death as the appropriate punishment notwithstanding these factual findings.

1948. As previously stated, the Supreme Court made clear in *Ring* that the mere availability of either life or death as sentencing options does not relieve states of the responsibility for ensuring that jurors unanimously find, beyond a reasonable doubt, any facts increasing the authorized punishment. "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact – no matter how the State labels it – must be found by a jury beyond a reasonable doubt." *Ring*, 536 U.S. at 600-01. The issue of *Ring's* applicability hinges on whether, as a practical matter, the sentencer must make additional fact-findings during the penalty phase before determining whether or not the death penalty can be imposed.

1949. A California jury must first decide whether any aggravating circumstances, as defined by § 190.3 and the standard penalty phase instructions, exist in the case before it. Only after this initial factual determination has been made can the jury move on to weigh those factors against the proffered mitigation. The presence of at least one aggravating factor is the functional equivalent of an element of capital murder in California and requires the same Sixth Amendment protection. See *Ring*, 536 U.S. at 600-01.

702

1950. Thus, in summary, two critical sets of factual determinations must be made by California jurors before a death sentence may be imposed: the existence of at least one factor in aggravation, and whether the aggravation outweighs the mitigation. The earlier determination of the existence of a special circumstance merely permits the penalty phase to occur and does not dispense with these additional, crucial determinations that capital jurors are required to make. Because no death sentence is permitted under California law without these two critical determinations, *Ring* makes clear that the jury must make its findings unanimously and beyond a reasonable doubt.

1951. No greater interest is ever at stake than in the penalty phase of a capital case. *Monge v. California*, 524 U.S. 721, 732, 118 S. Ct. 2246, 141 L. Ed. 2d 615 (1998) ("the death penalty is unique in its severity and its finality"). As the Supreme Court stated in *Ring*,:

> Capital defendants, no less than non-capital defendants, we conclude, are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment .
>
> . . . The right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the fact-finding necessary to increase a defendant's sentence by two years, but not the fact-finding necessary to put him to death.

536 U.S. at 588, 606.

1952. Petitioner was deprived of his rights to due process and trial by jury because of the constitutionally inadequate sentencing procedure employed at his trial.

## I.    The Trial Court Failed to Instruct on the Presumption of a Life Sentence

1953. In non-capital cases, the presumption of innocence acts as a core constitutional and adjudicative value to protect the accused, and is a basic

703

component of a fair trial. *Estelle v. Williams*, 425 U.S. 501, 503, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976). Paradoxically, at the penalty phase of a capital trial, where the stakes are life or death, the jury is not instructed as to the presumption of life, the penalty phase correlates of the presumption of innocence. Note, *The Presumption of Life: A Starting Point For A Due Process Analysis Of Capital Sentencing*, 94 Yale L.J. 351 (1984); *cf. Delo v. Lashley*, 507 U.S. 272, 113 S. Ct. 1222, 122 L. Ed. 2d 620 (1993).

1954. Here, the failure to instruct the jury that the law establishes a presumption of life, correlative to the presumption of innocence at the guilt phase, violated Petitioner's federal constitutional rights.

**J.     The Jury Instructions Failed to Require Written Findings of Aggravating Factors**

1955. Exhaustion of the claim: This claim was fairly presented to the California Supreme Court in the direct appeal. It was presented as Claim XXX in the Opening Brief.

1956. The California capital sentencing scheme under which Petitioner was tried was constitutionally flawed by failing to require explicit findings by the jury on which aggravating factors it relied in reaching its death verdict. Each juror could have relied on one of many factors in the twelve capital murders which potentially constituted proper aggravation yet still have differed on the factors on which other jurors may have relied. As a result, there was no actual agreement by the jury why Petitioner should be condemned to death. The jury should have been required to state the findings on which it relied in its sentencing determination. *See Hamelin v. Michigan*, 501 U.S. 957, 994, 111 S. Ct. 2680, 115 L. Ed. 2d 836 (1991).

704

1957. The failure to require written or other specific findings by the jury on the aggravating factors selected by it deprived Petitioner of his federal due process and Eighth Amendment rights to meaningful appellate review. *California v. Brown*, 479 U.S. 538, 543, 107 S. Ct. 837, 93 L. Ed. 2d 934 (1987); *Gregg*, 428 U.S. at 195. In *Mills v. Maryland* , 486 U.S. 367, 108 S. Ct. 1860, 100 L. Ed. 2d 384 (1988), for example, the written-finding requirement in Maryland death cases enabled the Supreme Court not only to identify the error that had been committed under the prior state procedure, but to gauge the beneficial effect of the newly implemented state procedure. *Id.* at 383 n.15. Further, most state statutory schemes, moreover, require such findings.[134]

1958. The failure to require explicit findings here precludes meaningful appellate review and violates the Fifth, Sixth, Eighth, and Fourteenth Amendments.

## K. The Trial Court Failed to Delete Inapplicable Mitigating Factors from the Language of CALJIC 8.85

1959. The jury was instructed in the standard language of CALJIC 8.85 which lists the entire list of statutory aggravating and mitigating factors. (XXX CT 8881-83.) However, several of the mitigating factors were not

---

[134] *See, e.g.*, Ala. Code, §13A-5-47(d); Ariz. Rev. Stat., § 13-703(D) (1995); Conn. Gen. Stat., § 53a-46a(e); 11 Del. Code, § 4209(d)(3); Fla. Stat., § 921.141(3); Idaho Code, § 19-2515(e); Ind. Code Ann., § 35-38-1-3(3); Md. Code Ann., Art. 27, §§ 413(i), (j); Miss. Code Ann., § 99-19-101(3); Rev. Stat. Mo., § 565.030(4); Mont. Code Ann., § 46-18-306; Neb. Rev. Stat., § 29-2522; N.J. Stat., § 2C:11-3(c)(3); N.C. Gen. Stat., § 15A-2000(c); 21 Okla. Stat., § 701.11; 42 Pa. Stat., § 9711(F)(1); Tenn. Code Ann., § 39-13- 204(g)(2)(A)(1); Wyo. Stat., § 6-2-102(d)(ii); *see also* 21 U.S.C., § 848(k).

applicable to Petitioner's case.[135]  The mitigating factors not present in Petitioner's case were not deleted from the instruction.

1960. The trial court's failure to delete inapplicable mitigating factors rendered this instruction constitutionally deficient.  The presence of irrelevant mitigating factors suggested that their absence could be considered aggravation. The wording of the instruction furthers this misperception because factors (e), (f), (g), and (j) are prefaced with the term "whether or not."  This wording created the inescapable inference that the factors could either be mitigating (if they applied) or aggravating. This interpretation was virtually inevitable because similar alternative wording was used in factors (b) and (c), which were indeed "bivalent" factors: aggravating if present, mitigating if absent.  The language of the instruction thus greatly increased the likelihood that the jurors would mistakenly think that mitigating factors could be used as factors in aggravation. Such use by the jury violated federal decisional law on capital sentencing requirements. *Mills v. Maryland*, 486 U.S. at 373-75.

1961. The presence of irrelevant mitigating factors in the jury instructions also diminished the weight of Petitioner's mitigating evidence by inviting the jurors to compare it to the entire realm of possible mitigating factors, even though some factors are rarely ever present (*e.g.* victim participation in the homicidal act) and virtually no case will have every factor.  Thus it likely that the jurors sentenced Petitioner to death because there was "only" two or three mitigating factors present, rather than weighing the factors that were present against the aggravating factors as the law requires.  The standard language of CALJIC 8.85 therefore deprived Petitioner of his right to an individualized and non-arbitrary

---

[135] Factors (e) (victim participation or consent offense); (f) (moral justification); (g) (defendant's extreme duress or substantial domination of another person); and, (j) (defendant was an accomplice and participation was relatively minor), did not specifically apply to Petitioner's case.

sentencing determination.  *See Proffitt v. Florida*, 428 U.S. 242, 260, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976); *Woodson v. North Carolina*, 428 U.S. at 304.

**L.     CALJIC'S Requirement that Mitigating Evidence Be "Extreme" Unconstitutionally Limited the Jury's Consideration of Petitioner's Mitigating Evidence**

1962. CALJIC 8.85(d) states that the jury may consider "whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance."   The requirement that the mitigating evidence as "not relevant" if it fell below a certain weight or degree of severity.

1963. The "extreme" qualifier included in the instructions deprived Petitioner of his right to have the capital sentencing jury consider and give effect to all relevant mitigating evidence.  *Boyde*, 494 U.S. at 377-78; *Penry*, 492 U.S. at 328 ("*full* consideration of evidence that mitigates against the death penalty is essential" [emphasis in original]).  By providing that the jurors could consider only whether the homicide occurred under the influence of mental or emotional disturbance only if the disturbance was "extreme," the jurors were implicitly instructed that they were required to disregard a mental or emotional disturbance of a lesser severity.

1964. Where instructed that they could consider a mental or emotional disturbance only if it was "extreme," after finding the mental or emotional disturbance not to be "extreme," reasonable jurors would understand the invitation to consider "any other circumstance" in mitigation as constituting factors other than mental or emotional disturbance that had already been deemed insufficient under law as given by the court.  *Smith v. McCormick*, 914 F.2d 1153, 1165-66 (9th Cir. 1990) (Montana scheme unconstitutional because it permitted sentencer "to refuse to consider . . . mitigating evidence simply because it fell below a certain weight."); *Kenley v. Armontrout*, 937 F.2d 1298, 1309 (8th

707

Cir. 1991) (defendant need not be insane for mental problems to "be . . . considered mitigating evidence").

## M. The Language of CALJIC No. 8.88 Prevents Proper Weighing of Aggravating and Mitigating Evidence

1965. Petitioner's jury was instructed in the 1989 revised language of CALJIC No. 8.88 which, in pertinent part, allows the jury to impose a death if each person is "persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." (*See* XXX CT 8885.)

1966. The language of this instruction was constitutionally defective because it failed to accurately describe the proper process for weighing aggravating and mitigating circumstances. It contradicted the language of 190.3 by indicating that a death judgment could be returned if the aggravating circumstances were merely "substantial" in comparison to mitigating circumstances, thus permitting the jury to impose death even if the mitigating circumstances ultimately outweighed the "substantial" aggravating circumstances. It also failed to inform the jury that a single mitigating circumstance, by itself, could be sufficient to outweigh any aggravating circumstances. These defects deprived Petitioner of the individualized sentencing decision to which he was entitled under the Eighth and Fourteenth Amendments.

## N. The Penalty Phase Instructions Were Unconstitutionally Vague and Incapable of Being Understood by Jurors

1967. Prior to penalty phase deliberations in this case, the trial court issued pattern instructions to the jury that tracked the language of § 190.3, factors (a) through (k), concerning the factors that the jury was to take into consideration in determining Petitioner's sentence. Taken as a whole, these instructions were not readily understandable to the lay jurors and failed to adequately guide the jury in rendering a reliable, individualized and non-arbitrary penalty determination.

708

1968. California capital sentencing jurors, virtually without exception, fail to understand many of the concepts at the core of the Eighth Amendment restrictions on the death penalty and, as a result, skew the process in favor of a death verdict.

1969. The jury instructions based on § 190.3 (a) were particularly confusing. Factor (a), which directs the jury to consider the "circumstances of the crime," is unconstitutionally vague, not in an abstract sense (*see Tuilaepa v. California*, 512 U.S. 967, 114 S. Ct. 2630, 129 L. Ed. 2d 750 (1994)), but because it fails to identify any circumstances or types of circumstances that the jury may consider in order to distinguish the offense from other offenses not subject to the death penalty or to make clear that there may be mitigating aspects to the circumstances of the crime. Furthermore, factor (a) allows the sentencer to consider the presence of *any* special circumstance findings. The sentencer's discretion is therefore not properly channeled because all capital cases have at least one special circumstance and a jury cannot know how to distinguish a death-worthy case from one that is not death-worthy. For these reasons, the broad expanse of factor (a) did not constitutionally guide Petitioner's jury in determining whether death was the appropriate punishment.

1970. Further, the instructions given to Petitioner's jury did not properly explain that they could take their emotions, including pity and sympathy, into account when considering Petitioner's mitigating evidence, as was his right under section 190.3(k). As a result, the jury did not give full consideration to the mitigation. The common mistake of interpreting factor (k) as a non-statutory dangerousness factor violated Petitioner's federal constitutional rights.

1971. To the extent that any of the errors alleged in the present claim deprived Petitioner of the benefits of state law in which he had a liberty interest, he was deprived of equal protection and due process of law under the federal Constitutions. *Hicks v. Oklahoma*, 447 U.S. at 346.

709

**O. The California Sentencing Scheme Violates Equal Protection Because by Denying Procedural Safeguards to Capital Defendants That Are Afforded to Non-capital Defendants**

1972. The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution guarantees all persons that they will not be denied their fundamental rights and bans arbitrary and disparate treatment of citizens when fundamental interests are at stake. *Bush v. Gore*, 531 U.S. 98, 104-105 (2000)).  In addition to protecting the exercise of federal constitutional rights, the Equal Protection Clause also prevents violations of rights guaranteed to the people by state governments. *Charfauros v. Board of Elections*, 249 F.3d 941, 951 (9th Cir. 2001).

1973. The United States Supreme Court has repeatedly said that a greater degree of reliability is required when death is to be imposed and that courts must be vigilant to ensure procedural fairness and accuracy in fact-finding. *See, e.g., Monge v. California*, 524 U.S. 728, 731-732 (1998). Despite this directive, California's death penalty scheme provides significantly fewer procedural protections for persons facing a death sentence than are afforded persons charged with non-capital crimes. This differential treatment violates the constitutional guarantee of equal protection of the laws.

1974. Under the Equal Protection Clause, a state may not create a classification scheme which affects a fundamental interest without showing that it has a compelling interest which justifies the classification and that the distinctions drawn are necessary to further that purpose *Skinner v. Oklahoma*, 316 U.S. 535, 541, 62 S. Ct. 1110, 86 L. Ed. 1655 (1942); *People v. Olivas* 17 Cal. 3d 236, 251 (1976).

1975. The interest at stake is Ramirez's right to life.  The "right to life" is not merely a fundamental right.  It occupies the most "prominent place in the due process clause . . . .  [T]he right to life is the basis of all other rights . . . .  It

encompasses, in a sense, 'the right to have rights,' *Trop v. Dulles*, 356 U.S. 86, 102 (1958)." Given the paramount nature of the interest at stake here, the scrutiny of the disparities under challenge must be as strict as possible, and any purported justification by the state for the differential treatment must be extraordinarily compelling.

1976. In *Ring v. Arizona*, 536 U.S. at 589, the Supreme Court stated that "capital defendants, no less than non-capital defendants, … are entitled to" the procedural protections necessary to assure the reliability of and accurate fact-finding in sentencing proceedings. "The right[s] … guaranteed by the [Fifth,] Sixth[, and Eighth] Amendment[s]" – as well as the "right to life" – "would be senselessly diminished if [they] encompassed the factfinding necessary to increase a defendant's sentence by two years, but not the factfinding necessary to put him to death."

1977. Yet that is not the case. An enhancing allegation in a California non-capital case is a finding that must, by law, be unanimous. (*See, e.g.*, §§ 1158, 1158a.) No such unanimity is required before a juror can find that a particular fact is aggravating and militates in favor of death. *See, e.g., People v. Prieto*, 30 Cal. 4th 226, 265 (2003).

1978. When a California judge in a non-capital case is considering which sentence is appropriate: "The reasons for selecting the upper or lower term shall be stated orally on the record, and shall include a concise statement of the ultimate facts which the court deemed to constitute circumstances in aggravation or mitigation justifying the term selected." California Rules of Court, Rule 4.42(e). No such requirement exists in a capital case. *See, e.g., People v. Fauber*, 2 Cal. 4th 792, 859, 831 P.2d 249, 9 Cal. Rptr. 2d 24 (1992).

1979. In a non-capital case, furthermore: "Circumstances in aggravation and mitigation shall be established by a preponderance of the evidence." Rule 4.42(b). There is no standard of proof in the penalty phase of a capital case. *See,*

*e.g., People v. Hawthorne*, 4 Cal. 4th 43, 79, 841 P.2d 118, 14 Cal. Rptr. 2d 133 (1992)

1980. In non-capital cases, defendants are entitled to disparate-sentence review. Cal. Pen. Code § 1170(d). Those sentenced to death are not. *See, e.g., People v. Crittenden*, 9 Cal. 4th 83, 157, 885 P.2d 887, 36 Cal. Rptr. 2d 474 (1994).

1981. The disparity in treatment described above violates the Equal Protection Clauses of the Fifth and Fourteenth Amendments. The foregoing violations of Petitioner's constitutional rights, taken singly or in combination with the other errors alleged in the Petition, constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993).

1982. However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Petition, so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violations of Petitioner's rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622, 637-38.

**P.      Carrying out Petitioner's Death Sentence after Excessive Pre-execution Delay Would Be Cruel and Unusual Punishment**

1983. Exhaustion of the claim: This claim was fairly presented to the California Supreme Court in Section XXII of the June 2004 petition for writ of habeas corpus.

1984. Petitioner's death sentence, confinement on death row, and any eventual carrying out of the death sentence violates the Fifth, Sixth, Eighth, and Fourteenth Amendments in that Petitioner was sentenced to death over fourteen

years ago, and is waiting for resolution of his appellate process due to circumstances substantially beyond his control.

1985. International standards have established that subjecting a person to the agony and degradation of extended years on death row is inhumane. *Pratt and Morgan v. Attorney General of Jamaica*, 3 SLR 995, 2AC 1, 4 All ER. 769 (1993) (*en banc*); *Catholic Comm'n for Justice and Peace in Zimbabwe v. Attorney General*, No. S.C. 73 (Zimb. 1993) (Supreme Court of Zimbabwe commuted the death sentences of four men due to the prolonged delay in conjunction with the harsh and degrading conditions under which the prisoners were confined); *and see Soering v. United Kingdom*, 11 Eur. Hum. Rgts. Rep. 439 (1989) (European Court of Human Rights refused to extradite a man detained in England and wanted in Virginia on capital murder charges, partly because of the extremely long duration of stay on death row, coupled with severe conditions and "mounting anguish").

1986. In *Lackey v. Texas*, 514 U.S. 1045, 115 S. Ct. 1421, 131 L. Ed .2d 304 (1995) the defendant argued that his seventeen years on death row violated the Eighth Amendment. Although the Supreme Court denied *certiorari*, Justice Stevens wrote a memorandum to stress the importance of the claim due to the far-reaching consequences. Justice Stevens noted that under *Gregg v. Georgia*, the death penalty was upheld against Eighth Amendment attacks because it "might serve 'two principal social purposes: retribution and deterrence.'" However, Justice Stevens pointed out that those goals are not served when prisoners have spent many years on death row. *Lackey v. Texas*, 514 U.S. 1045; *see also In re Medley*, 134 U.S. 160, 172, 10 S. Ct. 384, 33 L. Ed. 835 (1890); *Ceja v. Stewart*, 134 F.3d 1368 (9th Cir. 1998) (Fletcher, J., dis. op.).

1987. Some reviewing courts which have considered the issue of excessive confinement on death row have rejected the claim because the delays were caused by the condemned inmate's pursuit of collateral avenues of relief. *See*, *e.g.*,

713

*McKenzie v. Day*, 57 F.3d 1461 (9th Cir. 1995), *aff'd en banc, McKenzie v. Day,*
57 F.3d 1493.  In Petitioner's case, however, the excessive confinement on death
row has been through no fault of his own.  In fact, the loss of and failure to
prepare critical court records resulted in numerous delays in record correction.
Full and fair review of the trial court proceedings necessitates a complete record
(*Chessman v. Teets*, 354 U.S. 156, 77 S. Ct. 1127, 1 L. Ed. 2d 1253 (1957); Cal.
Pen. Code § 190.7; *see* Cal. R. Ct., Rule 39.5) and effective appellate
representation.  *People v. Barton*, 21 Cal. 3d 513, 518, 579 P.2d 1043, 146 Cal.
Rptr. 727 (1978); *People v. Gaston*, 20 Cal. 3d 476, 573 P.2d 423, 143 Cal. Rptr.
205 (1978); *People v. Silva*, 20 Cal. 3d 489, 573 P.2d 430, 143 Cal. Rptr. 212
(1978); *In re Smith*, 3 Cal. 3d 192, 474 P.2d 969, 90 Cal. Rptr. 1 (1970).
California's procedure for review of death judgments does not permit a
condemned person to choose whether he or she wishes to appeal his or her
sentence in the first place, as the appeal is automatic.  Cal. Pen. Code § 1239(b);
*People v. Sheldon*, 7 Cal. 4th 1136, 1139, 875 P.2d 83, 31 Cal. Rptr. 368 (1994)
("no authority to allow [the] defendant to waive the [automatic] appeal"); *People
v. Stanworth*, 71 Cal. 2d 820, 833-34, 457 P.2d 889, 80 Cal. Rptr. 49 (1969).

1988.  The delays in Petitioner's automatic appeal are attributable to the
State and the criminal justice system that failed in its obligation to preserve and
prepare the records of trial proceedings in Petitioner's case.  The delays have
nothing to do with the exercise of any discretion on Petitioner's part.  The delays
have been caused by the negligence and action by the State.  *Lackey v. Texas*, 514
U.S. 1045.

1989.  Many long years of life on death row must be considered with
respect to an Eighth Amendment analysis.  *See People v. Anderson*, 6 Cal. 3d
628, 649, 493 P.2d 880, 100 Cal. Rptr. 152 (1972) ("The cruelty of capital
punishment lies not only in the execution itself and the pain incident thereto, but
also in the dehumanizing effects of the lengthy imprisonment prior to execution

714

during which the judicial and administrative procedures essential to due process of law are carried out. Penologists and medical experts agree that the process of carrying out a verdict of death is often so degrading and brutalizing to the human spirit as to constitute psychological torture."); *see also Furman v. Georgia*, 408 U.S. at 288-89 ("Mental pain is an inseparable part of our practice of punishing criminals by death, for the prospect of pending execution exacts a frightful toll during the inevitable long wait between the imposition of sentence and the actual infliction of death"); *Suffolk County District Attorney v. Watson*, 411 N.E.2d 1274, 1287 381 Mass. 648 (Mass. 1980) ("The mental agony is, simply beyond question, a horror.").

1990. A death sentence "must serve some legitimate penological end that could not be otherwise accomplished." *Ceja v. Stewart*, 134 F.3d 1368, 1373. In the absence of such a legitimate end, death violates the Eighth and Fourteenth Amendments.

1991. The delay caused by the appellate process itself is also beyond Petitioner's control. California's procedure for review of death judgments does not permit a condemned person to choose whether he or she wishes to appeal his or her sentence in the first place, as the appeal is automatic. Cal. Pen. Code § 1239(b); *People v. Sheldon*, 7 Cal. 4th 1136, 1139, 875 P.2d 83, 31 Cal. Rptr. 368 (1994) ("no authority to allow [the] defendant to waive the [automatic] appeal"); *People v. Stanworth*, 71 Cal. 2d 820, 833-34, 457 P.2d 889, 80 Cal. Rptr. 49 (1969).

1992. Confinement under a sentence of death subjects a condemned inmate to extraordinary psychological duress, as well as the extreme physical and social restrictions that inhere in life on death row. In *People v. Anderson*, the California Supreme Court recognized as much:

> The cruelty of capital punishment lies not only in the execution itself
> and the pain incident thereto, but also in the dehumanizing effects of

715

the lengthy imprisonment prior to execution during which the
judicial and administrative procedures essential to due process of
law are carried out. Penologists and medical experts agree that the
process of carrying out a verdict of death is often so degrading and
brutalizing to the human spirit as to constitute psychological torture.

6 Cal. 3d 628, 649 (1972)

1993. The penological justification for carrying out an execution
disappears when an extraordinary period of time has elapsed between the
conviction and the proposed execution date. When the death penalty "ceases
realistically to further [legitimate penological] purposes, . . . its imposition would
then be the pointless and needless extinction of life with only marginal
contributions to any discernable social or public purposes. A penalty with such
negligible returns to the State would be patently excessive and cruel and unusual
punishment violative of the Eighth Amendment." *Furman v. Georgia*, 408 U.S. at
312 (White, J., concurring).); *see also Gregg v. Georgia*, 428 U.S. at 183 ("The
sanction imposed cannot be so totally without penological justification that it
results in the gratuitous infliction of suffering.").

**Q.    Imposition of the Death Penalty Violates Petitioner's Rights under the
        Eighth Amendment and International Law**

1994. Exhaustion of the claim: This claim was fairly presented to the
California Supreme Court in the direct appeal. It was presented in Section
XXXVII of the Opening Brief.

1995. In support of these subclaims, Petitioner alleges the following facts,
among others to be presented after full discovery, investigation, adequate
funding, access to this Court's subpoena power, and an evidentiary hearing.
Those facts and allegations set forth in the petition, declarations, claims of
constitutional violations, and the accompanying exhibits are incorporated by

reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

1996. The following violations of Petitioner's constitutional rights, taken singly or in combination with the other errors alleged in the Petition, constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Petition, so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violations of Petitioner's rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622, 637-38.

1997. The United States's use of the death penalty violates widely-accepted international norms of humanity and decency. The United States stands as one of a small number of nations that regularly uses the death penalty as a form of punishment. . . . The United States stands with China, Iran, Nigeria, Saudi Arabia, and South Africa as one of the few nations which has executed a large number of persons. . . . Of 180 nations, only ten, including the United States, account for an overwhelming percentage of state ordered executions. *Soering v. United Kingdom*: Whether the Continued Use of the Death Penalty in the United States Contradicts International Thinking, 16 Crim. and Civ. Confinement 339, 366 (1990). According to Amnesty International, 137 countries are either abolitionist by law or in practice, *i.e.* they have not executed anyone in 10 years and are believed to have policies o an established practice of not carrying out death sentences. "The Death Penalty: List of Abolitionist and

Retentionist Countries" (July 21, 2008), on Amnesty International website www.amnesty.org.

1998. Due process is not a static concept, and neither is the Eighth Amendment. *Roper v. Simmons*, 543 U.S. 551, 560-61, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005); *Atkins v. Virginia*, 536 U.S. 304, 321, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002). The Eighth Amendment in particular draws its meaning from the evolving standards of decency that mark the progress of a maturing society. *Id.* Further, inasmuch as the law of nations now recognizes the impropriety of capital punishment as regular punishment, it is unconstitutional in this country inasmuch as international law is a part of our law. *Roper*, 543 U.S. at 575 (Supreme Court historically "has referred to the laws of other countries and to international authorities as instructive for its interpretation of the Eighth Amendment's prohibition of 'cruel and unusual punishments'").

1999. International law has clearly established a norm against the infliction of the death penalty as a regular form of punishment. This norm is codified in such international agreements as the Universal Declaration of Human Rights, the International Covenant on Civil and Political Rights (ICCPR), Article 14, and the American Declaration of the Rights and Duties of Man (American Declaration), Article 26. Infliction of the death penalty on Petitioner in light of the errors identified in this Petition would constitute arbitrary deprivation of life in violation of customary international law and Article 6, § 1, of the ICCPR, and Article 1 of the American Declaration.

2000. In addition, Petitioner's status as a mentally disordered individual provides a separate basis for the prohibition of the death penalty under international law. *See* The Question of the Death Penalty, Hum. Rts. Comm., 61 Sess., Resolution 2002/104 (2002) E/CN.4/2002/L.104; United Nations, Extrajudicial, Summary or Arbitrary Executions: Report by the Special Rapporteur, E/CN.4/2000/3, Para. 97, Jan. 25, 2000.)

2001. The United States is bound by customary international law, as informed by such instruments as the ICCPR and the American Declaration. The purpose of these treaties is to bind nations to an international commitment to further protections of human rights. The United States must honor its role in the international community by recognizing the human rights standards in our own country to which we hold other countries accountable.

2002. Should all appeals within the United States justice system fail, Petitioner intends to bring his claim to the Inter-American Commission on the basis that the violations appellant has suffered are violations of the American Declaration of the Rights and Duties of Man.

**R.  Execution by Lethal Injection Is Cruel and Unusual Punishment**

2003. Exhaustion of the Claim:  this Claim Was Fairly Presented to the California Supreme Court in the direct appeal.  It was presented in Section XXXVI of the Opening Brief, and in Sections XXIII and XXIV of the June 2004 petition for writ of habeas corpus.

**1.  Execution by Lethal Injection is Unconstitutional**

2004. An execution procedure that involves "the unnecessary and wanton infliction of pain . . . ," violates the Eighth Amendment.  *Gregg*, 428 U.S. at 173. The Eighth Amendment's prohibition is not static, but is responsive to "evolving standards of decency," and "contemporary values concerning the infliction of a challenged sanction."  *Id.*  Furthermore, the Fourteenth Amendment guarantees that no person may be deprived of life, liberty, or property without due process of law. A violation of procedural due process requires a showing of (1) a constitutionally protected interest in life, liberty, or property; (2) governmental deprivation of that right; and (3) constitutional inadequacy of tChalleghe procedures effecting the deprivation. *Bank of Jackson County v. Cherry*, 980 F.2d 1362, 1366 (11th Cir. 1993). A prisoner sentenced to death has a constitutionally protected interest in life not extinguished by the conviction and death sentence.

1  *Ohio Adult Parole Authority v. Woodward*, 523 U.S. 272, 281, 118 S. Ct. 1244,

2  140 L. Ed. 2d 387 (1998).

3      2005.  In *Morales v. Tilton,* the Honorable Jeremy Fogel, District Judge of

4  the Northern District of California held that California's current protocol raised

5  substantial questions as to whether Petitioner will suffer excessive pain when he

6  is executed. *Morales v. Tilton*, Nos. C 06 219 JF RS & C 06 926 JF RS, 415 F.

7  Supp. 2d 1037 (N.D. Cal. 2007); see *Taylor v. Crawford*, 457 F.3d 902 (8th Cir.

8  2006) (remanding cruel and unusual lethal injection claim, brought pursuant to §

9  1983, to the district court with regard to newly revised protocol); *Anderson v.*

10  *Evans*, 2006 WL 83093 (W.D.Okla. Jan. 11, 2006) (denying motion to dismiss

11  and holding that death row inmate properly stated claim that lethal injection

12  procedure, nearly identical to California's, violated the Eighth Amendment); *see*

13  *also Hill v. McDonough*, 547 U.S. 573, 126 S. Ct. 2096, 165 L. Ed. 2d 44 (2006)

14  (discussing the viability of lethal injection claims).

15      2006.  In addition, a state court judge has found that the California

16  Department of Corrections and Rehabilitations ("CDCR") violated the

17  Administration Procedures Act when it adopted the lethal injection protocol,

18  officially known as San Quentin Operational Procedure No. 0-770 ("OP 0-770).

19  *Morales v.CDCR*, CV061436, Marin County Superior Court, Order After

20  Hearing (October 31, 2007).  Thus, California is currently enjoined from carrying

21  out any execution by lethal injection according to 0-770.  *Id.*  As a result of the

22  *Morales* litigation in state and federal court, California does not currently have in

23  place a lethal injection procedure.

24      2007.  If and when California enacts a revised protocol for the

25  administration of lethal injection, the method must adhere to "standards

26  established under the direction of the Department of Corrections."  Cal. Gov't

27  Code § 3604(a).  Unless and until such standards have been properly formulated

28  and implemented, imposition of the lethal injection method would deprive

appellant of his right to due process of law, threaten him with the infliction of cruel and unusual punishment, and cannot be imposed as in violation of explicit state law and the Eighth and Fourteenth Amendment.

2008. Because California has not yet enacted a protocol for executing the condemned,[136] this claim is not ripe. Petitioner raises it to preserve his rights to federal habeas review.

## 2. Execution by Lethal Gas Is Unconstitutional

2009. Petitioner's rights under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments will be violated because punishment of death may be inflicted by administering a lethal gas in violation of Petitioner's constitutional rights as guaranteed by the Eighth and Fourteenth Amendments.

2010. Justice Stevens, in a dissent joined by Justice Blackmun, "concludes that execution by cyanide gas is both cruel and unusual, and that it violates contemporary standards of human decency." *Gomez v. U.S. District Court*, 503 U.S. 653, 658, 112 S. Ct. 1652, 118 L. Ed. 2d 293 (1992).

2011. The Supreme Court has condemned as violative of the Eighth Amendment all punishment that inflicts torture or a lingering death (*In re Kemmler*, 136 U.S. 436, 447, 10 S. Ct. 930, 34 L. Ed. 519 (1890)) and punishment that involve the unnecessary and wanton infliction of pain. *Hudson v. McMillian*, 503 U.S. 1, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992).

2012. The Supreme Court has not confined the prohibition embodied in the Eighth Amendment to "barbarous" methods that were generally outlawed in the 18th century, but instead has interpreted the Amendment in a flexible and

---

[136] Because there is no protocol in place, the Supreme Court's decision in *Baze v. Rees*, 128 S. Ct. 1520, 1531 170 L. Ed. 2d 420 (2008) which held that Kentucky's particular lethal injection protocol did not pose a "substantial risk of serious harm," does not foreclose this claim.

dynamic manner. *Stanford v. Kentucky*, 492 U.S. 361, 371, 73 S. Ct. 1077, 97 L. Ed. 1522 (1953).

2013. Use of lethal gas constitutes a barbaric means of execution that inflicts unnecessarily cruel and wanton pain and suffering on those subjected to it. Petitioner's execution by lethal gas pursuant to his death sentence under the laws of the State of California would constitute cruel and unusual punishment in violation of Petitioner's Eighth Amendment rights.

2014. Administration of a lethal gas was adopted as a means of execution in California in 1937, replacing death by hanging. The lethal gas used is hydrogen cyanide.

2015. As administered in the State of California, execution by lethal gas constitutes torture. Death occurs as a result of asphyxiation. A person subjected to the administration of hydrogen cyanide gas desperately gasps for air and chokes as the gas is inhaled. A person forced to breathe hydrogen cyanide gas does not immediately lose consciousness or die, but suffers a lingering, torturous death.

2016. Witness accounts of lethal gas executions proves that this barbaric method of execution inflicts unnecessary and extreme pain.

2017. Death by lethal gas is brutal, agonizing and cruel. It is also unusual given the infrequency of its use and the virtual unanimous abandonment of it as a method of execution. *Thompson v. Oklahoma*, 487 U.S. 815, 822, 108 S. Ct. 2687, 101 L. Ed. 2d 702 (1988).

2018. The overwhelming majority of states with death penalty statutes have abandoned or rejected the use of lethal gas as a method of execution.

2019. In fact, use of the gas chamber is so aberrational that it must be considered incompatible with the evolving standards of decency that mark the progress of a maturing society.

2020. Petitioner's execution by lethal gas pursuant to his sentence of death would constitute cruel and unusual punishment in violation of Petitioner's Eighth Amendment rights.

**S.    California's System of Unified Appellate and Postconviction Review is Unconstitutional**

2021. Petitioner has a statutory duty and a constitutional right to appeal his convictions and death sentence. *People v. Sheldon,* 7 Cal. 4th at 1139. In a criminal case, the defendant's right to assistance of counsel derives from the Sixth and Fourteenth Amendments to the Constitution of the United States. Where an indigent defendant has a statutory right to appeal, he or she has a constitutional right, under the due process and equal protection of the law provisions of the Fourteenth Amendment, to court-appointed counsel. *In re Smith,* 3 Cal. 3d 192, 474 P.2d 969, 90 Cal. Rptr. 1 (1970); *Evitts v. Lucey*, 469 U.S. 387, 105 S. Ct. 830, 83 L. Ed. 2d 821 (1985), *Smith v. Robbins*, 528 U.S. 259, 120 S. Ct. 746, 145 L. Ed. 2d 756 (2000).

2022. The California Supreme Court requires that ineffective assistance of counsel claims – including claims of ineffective assistance on appeal – be filed in a habeas petition. *People v. Tello*, 15 Cal. 4th 264, 266-67, 933 P.2d 1134, 62 Cal. Rptr. 2d 437 (1997). Generally, in a capital case the habeas petition must be filed simultaneously with the appeal to be presumptively timely. The habeas petition is presumptively timely if filed within 180 days of the due date of the reply brief. The Court appears to maintain that there is no actual due date for the filing of a habeas petition. Yet, at least in practice, the petition is "due" within 180 days of the reply because a timeliness default may apply if the petition is filed after the 180 days. A petitioner who files an untimely petition risks losing his claims to relief, and, to put it starkly, his life.

2023. Ineffective assistance of appellate counsel claims, however, do not arise and are not discoverable until after the Court has decided the appeal. Thus,

there is no appropriate time under the California scheme of capital case review to raise claims of ineffective assistance of appellate counsel. As a result, the California scheme of capital case review violates the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments (due process and the equal protection clauses) of the federal Constitution.

**T.     The Trial Court Violated Petitioner's Constitutional Rights When it Failed to Instruct the Jury on the Meaning of Life Without Parole**

2024. The trial court instructed the jury, in part, that,

> It is the law of this state that the penalty for a defendant found guilty of murder of the first degree shall be death or confinement in the state prison for life without possibility of parole in any case in which the special circumstance[s] alleged in this case [have] been specially found to be true.

(XXX CT 8879 (CALJIC 89.84.)  However, it failed to explain significant language in that instruction:  the meaning of "life without the possibility of parole."  The court should have instructed the jury that Petitioner will remain in prison for the rest of his life and will not be paroled at any time.[137]

2025. *Shafer v. South Carolina*, 532 U.S. 36, 121 S. Ct. 1263, 149 L. Ed. 2d 178 (2001), holds that, where future dangerousness is at issue in a capital sentencing, due process requires that the jury be informed that a life sentence carries no possibility of parole.  *Id*. at 51.

2026. The jury in *Shafer* was told by defense counsel in closing argument that if they elected to impose a life sentence, Shafer would "die in prison" after "spending his natural life there."  *Shafer*, 532 U.S. at 52.  Furthermore, the *Shafer* jury was instructed that "life imprisonment means until the death of the defendant."  *Id.*  Nevertheless, the Supreme Court held that neither of these was a

---

[137] Counsel's failure to request this instruction was ineffective assistance.

724

substitute for an instruction that informed the jury a defendant sentenced to life imprisonment would not be eligible for any type of parole or early release program. *Id.* at 53. Petitioner's jury was never informed about this fact.

2027. The rationale behind *Shafer* is that, without such an instruction, the "jury is likely to speculate unnecessarily on the possibility of early release, and impose a sentence of death based upon fear rather than reason." *Id.* at 53-54 (internal quotations omitted). This rationale is based on the fact that

> displacement of 'the longstanding practice of parole availability'
> remains a relatively recent development, and 'common sense tells us
> that many jurors might not know whether a life sentence carries with
> it the possibility of parole.'

*Shafer*, 532 U.S. at 52 (citing *Simmons v. South Carolina*, 512 U.S. 154, 177-78, 114 S. Ct. 2187, 129 L. Ed. 2d 133 (1994) (O'Connor, J.)).

2028. A substantial number of death qualified jurors (almost 25%) erroneously believe that life without parole will allow the parole or judicial system to release the defendant in less than ten years due to overcrowding and over 75% believe the literal language of life without parole. *See* CACJ Forum Vol. 21, No. 2, pp. 42-45 (1994); *see also* Haney, Sontag and Costanzo, *Deciding to Take a Life: Capital Juries Sentencing Instructions, and the Jurisprudence of Death*, 50 Journal of Social Sciences, No. 2 (Summer 1994).

2029. The trial court's failure to inform the jury of all the relevant information deprived Petitioner of his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**U.** **The Capital Sentencing Scheme Violated the Fifth, Sixth, Eighth, and Fourteenth Amendments by Permitting Multiple Use of a Single Felony as the Basis for a First Degree Murder Finding, as a Capital-Eligibility Factor, and as a Narrowing Factor in Sentencing**

2030. Exhaustion of the claim:  This claim was fairly presented to the California Supreme Court in the direct appeal.  It was presented in Section XXXI of the Opening Brief.

2031. The California death penalty statute in effect at the time of Petitioner's trial was unconstitutional by allowing the jury to make multiple use of a single underlying felony.  Death-selection was virtually automatic and mandatory as well as unfair by permitting a capricious infliction of punishment under the Fifth, Sixth, Eighth, and Fourteenth Amendments.  *Proffitt v. Florida,* 428 U.S. 242; *Eddings v. Oklahoma*, 455 U.S. at 112.

2032. The state court has rejected these claims previously.  In *People v. Sanchez*, 12 Cal. 4th 1, 906 P.2d 1129, 47 Cal. Rptr. 2d 843 (1995), the court held that the statute properly narrows the class of death-eligible murders. However, *Sanchez*'s reliance on *Tuilaepa v. California* was misplaced, thus rendering its opinion unsound and in need of reexamination, because *Tuilaepa* did not rule on the question of the constitutionality of the narrowing factors.  *See People v. Adcox*, 47 Cal. 3d 207, 272, 763 P.2d 906, 253 Cal. Rptr. 55 (1988). Moreover, in *Adcox*, the court relied on *Lowenfeld v. Phelps*, without appropriately considering that the California capital sentencing scheme differs significantly from the Louisiana scheme approved in *Lowenfeld*.[138]

2033. Unlike the procedure approved by the Supreme Court in *Lowenfeld*, in California, a single felony, such as burglary charged in Petitioner's case, was utilized three times by the jury.  Having determined initially the facts underlying

---

[138]  In Louisiana, the legislature has determined by statute which defendants are death-eligible, and the capital jury applies the narrowing factors to determine appropriateness of the death penalty.  *Lowenfeld v. Phelps*, 484 U.S. at 246.  In California, in contrast, the same jury in this case (1) determined guilt, (2) determined the existence of death eligibility factors (special circumstances) and (3) applied the narrowing factors in the penalty trial.

a felony at guilt trial, the jury was then mandated to make a finding as to the alleged special circumstance involving the same felony and then, on finding the truth of the special circumstance, weigh the predicate felony as evidence in aggravation. Based on the prosecution's closing argument and the lack of any clarifying jury instructions, multiple use of a single felony inevitably made death eligibility and narrowing virtually automatic. *See* Claim 37, subpart C, *supra*. The use of this process in Petitioner's case precluded a fair and reliable determination of appropriate punishment in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. *Caldwell v. Mississippi*, 472 U.S. at 341; *Mills v. Maryland*, 486 U.S. at 376-77; *Johnson v. Mississippi*, 486 U.S. at 584-85.

**V.      The Trial Court Erred by Ordering Determinate Sentences to Be Served Subsequent to Imposition of Death in Violation of Petitioner's Rights under the Eighth and Fourteenth Amendments**

2034. Exhaustion of the claim:  This claim was fairly presented to the California Supreme Court in the direct appeal.  It was presented in Section XXXV of the Opening Brief.

2035. On November 7, 1989, Petitioner was sentenced to a total determinate term of fifty-nine years and four months on counts 4, 14, 15, 16, 17, 18, 21, 22, 25, 26, 27, 36, and 37.  He was sentenced to death on counts 2, 5, 8, 9, 11, 13, 20, 24, 29, 30, 32, and 40.  (XXXI CT 9076-78.)  The trial court explicitly ordered the determinate sentence of fifty-nine years and four months to be served after imposition of the death judgment.

> As soon as all appeals have become final, the court orders the warden and the Department of Corrections not to permit the defendant to complete the determinate sentence part of this sentence prior to imposing the death penalty in this case.  ¶ I don't believe that order is necessary.  I think the Department of Corrections and

the Warden of the State of California State Prisons know what their duties are, but if there is any doubt in your mind, I hope that takes care of it.

(219 RT 24951-52.)

2036. The prosecution indicated that the determinate sentence should be stayed pending imposition of the death sentence. (219 RT 24952.) The court rejected the prosecution's request. (*Id*. at 24953.)

2037. The trial court modified the sentence nunc pro tunc on November 15, 1989, and ordered as follows: "The sentences on the noncapital counts are ordered to be consecutive to, and to be served subsequent to, and only upon completion of, the death sentences enumerated above : . . ." (XXXI CT 9074.)

2038. The trial court erred in ordering the determinate sentence to be served subsequent to the death sentence. The trial court imposed a death sentence and ordered that the determinate sentence be served subsequent to the death sentence. The trial court thus violated the principles under Penal Code § 654 prohibiting multiple punishment.

2039. When a greater sentence is imposed upon a defendant, the lesser sentence must be stayed pursuant to the bar against multiple punishment under § 654. In *People v. Price*, 1 Cal. 4th 324, 821 P.2d 610, 3 Cal. Rptr. 2d 106 (1991), the court held that the defendant was required to serve the sentence imposed in a separate, noncapital murder only in the event his death sentence was set aside. *Id*. at 492. In *People v. Thompson*, 7 Cal. App. 4th 1966, 10 Cal. Rptr. 2d 15 (1992), the court held that, where the trial court had the discretion to impose the greater punishment of life imprisonment without the possibility of parole or 25-years-to-life, the trial court was required to impose only one punishment and stay the other punishment under§ 654.

2040. Under Penal Code § 669, Petitioner was entitled to be sentenced to serve the determinate sentence first. Section 669 states, in part, that "[w]henever

728

a person committed to prison on a life sentence which is ordered to run consecutive to any determinate term of imprisonment . . . the determinate term of imprisonment shall be served first . . . ." In *People v. Grimble*, 116 Cal. App. 3d 678, 172 Cal. Rptr. 362 (1981), the court held that the determinate term must be served prior to the life term:

> We construe Penal Code § 669 to mean that whenever a person is sentenced to prison on a life sentence and any other term of imprisonment for a felony conviction, and the sentences are to run consecutively, the sentence must provide that the determinate term of imprisonment shall be served first and the life sentence shall be consecutive to the determinate term, and not vice versa.

*Id*. at 684-85.

2041. Although the death sentence imposed here was not a life term in the ordinary sense, it was analogous to an indeterminate sentence under Penal Code § 1168. *See*, *e.g.*, *People v. Hardy*, 73 Cal. App. 4th 1429, 1433-34, 87 Cal. Rptr. 2d 279 (1999) (a doubled sentence of life imprisonment without the possibility of parole is consistent with § 669).) The sentence thus was the functional equivalent of a life sentence in that Petitioner was sentenced to spend the rest of his life in prison. The trial court thus erred in ruling that the death sentence must be carried out before the determinate sentence of 59 years and 4 months could be served. Both the intent and reasoning of § 669 preclude such a sentence. *People v. Grimble*, 116 Cal. App. 3d at 684-85.

2042. The trial court was required to sentence Petitioner in accordance with the constitutional protections afforded him under the Eighth and Fourteenth Amendments. The trial court's error in ordering the determinate term to be served subsequent to the death sentence violated Petitioner's rights under the Eighth and Fourteenth Amendments. *See Fetterly v. Paskett*, 997 F.2d 1295 (9th Cir. 1993) (misapplication of sentencing statute in imposition of death sentence

implicates Eighth and Fourteenth Amendments).  Thus, the trial court's order in this case should be modified accordingly.

**W.     Ineffective Assistance of Counsel on Appeal and in Postconviction Proceedings**

2043. Exhaustion of the claim:  This claim was fairly presented to the California Supreme Court in Section XXV of the June 2004 Petition for Writ of Habeas Corpus.

2044. Petitioner has been denied effective assistance of counsel on appeal and in state post-conviction proceedings in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.  Petitioner has also been denied his rights to competent representation on appeal and in post-conviction proceedings.

2045. The performance of appellate counsel was below reasonable standards of representation.  To the extent counsel's performance in appellate and postconviction proceedings in any way limits the consideration of the claims in this petition, Petitioner has been substantially prejudiced.

**X.     The Impact of the Constitutional Violations Regarding the Penalty Phase Rendered the Sentencing Determination Constitutionally Unreliable**

2046. Exhaustion of the claim:  This claim was fairly presented to the California Supreme Court in the direct appeal.  It was presented in Section XXVII of the Opening Brief.

2047. The court instructed the jury according to the standard language in CALJIC No. 8.85 to "consider all of the evidence which has been received during any part of the trial of this case, except as you may be hereafter instructed."  (217 RT 24870; XXX CT 8881.)  By this instruction, the jury was required to take into

consideration all of the evidence admitted in the guilt trial. It is presumed that the jury followed the court's instructions. *People v. Bonin*, 46 Cal. 3d at 699; *People v. Mickey*, 54 Cal. 3d 612, 689 n.17, 818 P.2d 84, 286 Cal. Rptr. 801 (1991).

2048. Among the evidence considered by the jury in the penalty trial and previously admitted during the guilt trial, was inflammatory evidence in the joint trial of fifteen unrelated incidents. *See* Claim 10, *supra*. There was a prejudicial spillover effect of this evidence that carried over to the penalty trial. *See* Claim 30, *supra*. The jury was also permitted to consider Petitioner's shackling and his refusal to remove his sunglasses at trial. *See* Claims 17 and 19, *supra*.

2049. In addition, other errors committed at the guilt trial, even if harmless as to the determination of guilt, were considered by the jury in its penalty determination.

2050. The California Supreme Court has expressly recognized that evidence which may otherwise not affect the guilt determination can have a prejudicial impact during penalty trial. As noted by the court:

> Conceivably, an error that we would hold nonprejudicial on the guilt trial, if a similar error were committed on the penalty trial, could be prejudicial. Where, as here, the evidence of guilt is overwhelming, even serious error cannot be said to be such as would, in reasonable probability, have altered the balance between conviction and acquittal. But in determining the issue of penalty, the jury, in deciding between life imprisonment and death, may be swayed one way or another by any piece of evidence. If any substantial piece or part of that evidence was inadmissible, or if any misconduct or other error occurred, particularly where, as here, the inadmissible evidence, the misconduct and other errors directly related to the character of appellant, the appellate court by no reasoning process

can ascertain whether there is a "reasonable probability" that a

different result would have been reached in the absence of error.

*People v. Hamilton*, 60 Cal. 2d 105, 136-37, 383 P.2d 412, 32 Cal. Rptr. 4

(1963); *see also People v. Brown*, 46 Cal. 3d at 466.

2051. Guilt trial errors affected the jury's determination of penalty and detracted from its consideration of any lingering doubt in determining the proper punishment. By definition, guilt phase errors deemed harmless beyond a reasonable doubt do not erode confidence in the verdict's factual foundation. Lingering doubt based on any residual disbelief concerning evidence of Petitioner's involvement which remained after the reasonable doubt standard had been satisfied, however, had continued vitality during the penalty trial particularly as Petitioner presented no mitigation evidence. Therefore, even harmless guilt phase errors may undermine or taint constitutionally-rooted penalty determinations. The previously enumerated guilt phase errors in this case had a significant impact on the jury's penalty determination.

2052. The jury was likely swayed by the prejudicial spillover effect of inflammatory evidence erroneously admitted in the joint trial, Petitioner's shackling at trial, and instructional errors. Given the substantial nature of the trial court errors in the guilt trial, coupled with Petitioner's waiver of mitigation evidence in the penalty trial, there is a "reasonable probability" that a different result would have occurred in the absence of the errors. *Hamilton*, 60 Cal. 2d at 137.

2053. Improper consideration by the jury of guilt phase errors during the penalty trial violated Petitioner's right to due process of law and a fair trial under the Fifth and Sixth Amendments. *Washington v. Texas*. Improper consideration of prejudicial evidence also violated Petitioner's rights to a reliable determination of sentence under the Eighth and Fourteenth Amendments. *Caldwell v.*

*Mississippi*. In light of the serious nature of the guilt phase errors, it cannot be said that the evidence had no effect on the penalty determination by the jury. *Id*.

**CLAIM 42:**

> **PETITIONER'S CONVICTIONS AND SENTENCES MUST BE REVERSED BECAUSE OF THE CUMULATIVE EFFECT OF ALL THE ERRORS AND CONSTITUTIONAL VIOLATIONS ALLEGED IN THIS PETITION; THE CUMULATIVE EFFECT OF GUILT PHASE AND PENALTY PHASE ERRORS WAS PREJUDICIAL**

2054. Exhaustion of the claim: This claim was fairly presented to the California Supreme Court in the direct appeal. It was presented in Section XXXIV of the opening appeal brief, and in Section XXI of the June 2004 petition for writ of habeas corpus.

2055. In support of this claim, Petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

2056. Petitioner's confinement is illegal and unconstitutional under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments because the errors complained of in this petition compound one another, resulting in a trial that was fundamentally unfair and in imposition of cruel and unusual punishment.

2057. All other allegations and supporting exhibits are incorporated into this claim by specific reference.

2058. Each of the specific allegations of constitutional error in each claim and sub-claim of this petition requires the issuance of a writ of habeas corpus. Assuming arguendo that the Court finds that the individual allegations are, in and of themselves, insufficient to justify relief, the cumulative effect of the errors demonstrated by this petition and the briefing submitted in Petitioner's Automatic Appeal (No. S012944) compels reversal of the judgment and issuance of the writ.

733

When all of the errors and constitutional violations are considered together, it is clear that Petitioner has been convicted and sentenced to death in violation of his basic human and constitutional right to a fundamentally fair and accurate trial, and his right to an accurate and reliable penalty determination, in violation of the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments.

2059. Petitioner hereby incorporates by specific reference the record on appeal, and each of the claims and arguments raised in his Opening Brief and Reply Brief in his related automatic appeal (No. S012944) and any appendices and exhibits referred to therein as if fully set forth in this paragraph. Alternatively, Petitioner requests that the Court take judicial notice of the same.

2060. Petitioner's convictions, sentences, and confinement were obtained as the result of serious errors constituting multiple violations of his fundamental constitutional rights at every phase of his trial, from the unfair and discriminatory decision to charge and prosecute him, prosecutorial misconduct, the presentation of inaccurate, incomplete and unreliable evidence in the guilt phase, and culminating in a sentencing phase, in which no evidence of his character, background, and mental illness was presented, and was fatally flawed by gross prosecutorial misconduct. Through it all, Petitioner's trial counsel were so ineffective and incompetent that they consistently provided grossly ineffective representation and failed to protect his fundamental rights.

2061. Each of the specific allegations of error and constitutional violation presented in the instant petition, whether or not it justifies reversal or issuance of the writ standing alone, must be considered in the context of all the other such allegations set forth in the petition. As the Ninth Circuit stated recently,

> [T]rial errors are more likely to be prejudicial to a defendant – i.e., not harmless – when the government's case on a critical element is weak. [citation] Accordingly, in determining whether the combined effect of multiple errors rendered a criminal defense 'far less

734

persuasive' and had a 'substantial and injurious effect or influence' on the jury's verdict, the overall strength of the prosecution's case must be considered because 'a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.'

*Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007) (quoting *Strickland v. Washington*, 466 U.S. at 696). As explained throughout this Petition, the prosecution's case against Petitioner, largely unchallenged by ineffective counsel, was insufficient and circumstantial.

2062. The prejudicial impact of each of the specific allegations of constitutional error presented in this petition and in the direct appeal must be analyzed within the overall context of the evidence introduced against Petitioner at trial. No single allegation of constitutional error is severable from any other allegation set forth in this petition and/or in Petitioner's automatic appeal. "In other words, a column of errors may sometimes have a logarithmic effect, producing a total impact greater than the arithmetic sum of its constituent parts." *United States v. Sepulveda*, 15 F.3d 1161, 1196 (1st Cir. 1993). Where, as here, "the combined effect of multiple trial errors" give rise to a due process violation, even though "each error considered individually would not require reversal." *Parle v. Runnels*, 505 F.3d at 928 (citing *Donnelly*, 416 U.S. at 643; *Chambers*, 410 U.S. at 290 n.3, 298, 302-03); *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) ("Where, as here, there are a number of errors at trial, 'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the defendant."); *Taylor v. Kentucky*, 436 U.S. 478, 487-88, 98 S. Ct. 1930, 56 L. Ed. 2d 468 (1978).

2063. Justice demands that Petitioner's convictions and sentences, and especially his convictions for capital murder and his sentence of death, must be

735

reversed because the cumulative effect of all the errors and violations alleged in the present petition "was so prejudicial as to strike at the fundamental fairness of the trial." *United States v. Parker*, 997 F.2d 219, 222 (6th Cir. 1993) (citation omitted); *see also Kelly v. Stone*, 514 F.2d 18, 19 (9th Cir. 1975) (inflammatory statements during argument, taken together, denied defendant a fair trial); *United States v. Tory*, 52 F.3d 207, 211 (9th Cir. 1995) (cumulative effect of errors deprived defendant of fair trial).

2064. This is also true of state law violations which may not independently rise to the level of a federal constitutional violation. *See*, *e.g.*, *Barclay v. Florida*, 463 U.S. 936, 951, 103 S. Ct. 3418, 77 L. Ed. 2d 1134 (1983). The cumulative effect of state law errors in this case resulted in the denial of fundamental fairness and violate due process and equal protection guarantees under the Fourteenth Amendment. *See Hicks v. Oklahoma*, 447 U.S. at 346; *Walker v. Engle*, 703 F.2d 959, 962 (6th. Cir. 1983).

2065. The cumulative weight of the guilt phase errors and penalty trial errors was prejudicial to Petitioner. As demonstrated elsewhere in this Petition and in the opening brief with respect to various guilt phase errors, Petitioner's rights were violated under the Fifth, Sixth, Eighth, and Fourteenth Amendments. *See Hicks v. Oklahoma*, 447 U.S. at 346. In the penalty trial, Petitioner was deprived of a fair and reliable determination of penalty under the Fifth, Sixth, Eighth, and Fourteenth Amendments. *Eddings v. Oklahoma*, 455 U.S. at 112; *Johnson v. Mississippi*, 486 U.S. at 584. Together, the cumulative effect of the errors was prejudicial.

2066. It is both reasonably probable and likely that the jury's penalty determination was adversely affected by the cumulative errors. In the absence of the errors, the outcome could have been more favorable to Petitioner. It certainly cannot be said that the errors had "no effect" on this jury's penalty verdict. *Caldwell v. Mississippi*, 472 U.S. 320, 105 S. Ct. 263, 86 L. Ed. 231 (1985). In

736

light of the cumulative effect of all the errors and constitutional violations that occurred over the course of the proceedings in Petitioner's case, the writ should issue to prevent a fundamental miscarriage of justice.

2067. The foregoing violations of Petitioner's constitutional rights, taken singly or in combination with the other errors alleged in the Petition, constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993).  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Petition, so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violations of Petitioner's  rights had a substantial and injurious effect or influence on Petitioner's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice.  *See id.* at 622, 637-38.

## X.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner prays that this Court:

2068. Permit Petitioner, who is indigent, to proceed without prepayment of costs or fees;

2069. Grant Petitioner the authority to obtain subpoenas in forma pauperis for witnesses and documents necessary to prove the facts alleged in this Petition;

2070. Grant Petitioner and his counsel the right to conduct discovery, including the right to take depositions, request admissions, and propound interrogatories, as well as the means to preserve the testimony of witnesses;

2071. Require Respondent to bring forth the entire state court records in the following cases so that this Court can review those parts of the record that are

relevant to the issues and defenses raised in this proceeding: *People v. Richard Munoz Ramirez*, Case No. S012944, and *In Re Ramirez*, Case No. S125755.

2072. Order respondent to show cause why Petitioner is not entitled to the relief sought;

2073. Permit Petitioner to amend this Petition to allege any other basis for his unconstitutional confinement as it is discovered or becomes ripe for federal habeas review;

2074. Conduct an evidentiary hearing at which proof may be offered concerning all of the allegations in this Petition;

2075. Issue a writ of habeas corpus to have Petitioner brought before this Court to the end that he might be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional sentences, including the sentence of death, imposed in Los Angeles County Superior Court Case No. A771272; and,

2076. Grant such other relief as this Court may deem appropriate.

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

DATED:  December 17, 2008          By   */s/ Sean J. Bolser*
SEAN J. BOLSER
DAISY BYGRAVE
CALLIE GLANTON STEELE
Deputy Federal Public Defenders

Counsel for Petitioner
Richard Munoz Ramirez

738

I, Sean J. Bolser, declare as follows:

1.      I am a Deputy Federal Public Defender in the Central District of California.  I represent Richard M. Ramirez in his federal habeas corpus proceeding, *Richard Munoz Ramirez v. Ayers, et al.*, CV 07-8310-JVS (C.D. Cal.).

2.      Petitioner is confined and restrained of his liberty at San Quentin State Prison, San Quentin, California.  I make this verification on Petitioner's behalf because these matters are more within my knowledge than his, and because he is incarcerated in a county different from my office.  I have read this Petition and know the contents of the Petition to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 17th day of December 2008, at Los Angeles, California.


   */s/ Sean J. Bolser*
Sean J. Bolser
Deputy Federal Public Defender

**PROOF OF SERVICE**

I, the undersigned, declare that I am a resident or employed in Los Angeles County, California; that my business address is the Office of the Federal Public Defender, 321 East 2nd Street, Los Angeles, California 90012-4202; that I am over the age of eighteen years; that I am not a party to the above-entitled action; that I am employed by the Federal Public Defender for the Central District of California, who is a member of the Bar of the United States District Court for the Central District of California, and at whose direction I served the **Petition for Writ of Habeas Corpus and Exhibits in Support of Petition for Writ of Habeas Corpus (Exhibits 56, 60, 71-129),** by hand-delivery addressed as follows:

Death Penalty Law Clerk
U. S. Courthouse, Room 801
312 N. Spring Street
Los Angeles, CA 90012

This proof of service is executed at Los Angeles, California, on December 17, 2008.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____/s/ Dolores Coultas_____
DOLORES COULTAS