## DECLARATION OF DR. KATHY PEZDEK

### In the Matter

### Richard M. Ramirez v. Robert L. Ayers, Jr.

I, DR. KATHY PEZDEK, under penalty of perjury, declare:

I am Professor of Psychology at Claremont Graduate University, Claremont, California. A true and correct copy of my Curriculum Vita is attached hereto and incorporated herein by reference. Said Vita documents my professional background and accomplishments. Based on my professional background, I have qualified to testify as an Expert Witness on Eyewitness Memory in more than 250 cases, in Federal and Superior Courts throughout the state of California and in Arizona. I make this Declaration in connection with Petitioner, ***Richard Ramirez.***

I received a Masters of Science degree and a Doctoral degree in Experimental Psychology from the University of Massachusetts, Amherst. My specialty is Cognitive Psychology, that is the study of perception, attention and memory. In particular my research has been in the area of memory for real world events. I teach graduate courses and conduct research on this topic at Claremont Graduate University.

My own research has been widely published, as indicated in the attached copy of my Vita. I am a Fellow of the American Psychological Society. I edited four books on cognitive psychology and have published dozens of research articles and book chapters. I also have presented my research at numerous national and international professional conferences. ***It is on the basis of the scientific research that I have conducted and the***

***related research of my peers, that I have qualified as an Expert Witness on Eyewitness Identification and Memory.***

To familiarize myself with the facts regarding the eyewitness identifications of Mr. Ramirez, I reviewed the transcript of Dr. Elizabeth Loftus's testimony at the trial, numerous police reports, exhibits, transcripts of the testimony of the eyewitnesses themselves, and a summary of the eyewitnesses' testimony. Based on my reading of these materials, I have concerns about the adequacy of counsel regarding three specific points related to the eyewitness defense presented in Mr. Ramirez's trial:

(a) It appears that defense counsel did not provide Dr. Loftus with an adequate background of the case so that she could identify the factors that were most likely to have been relevant to the eyewitness identifications of Mr. Ramirez. Consequently, her ability to present testimony that was specific to the facts of this case was quite limited. This is a concern because when the testimony of an Eyewitness Expert is global and nonspecific, (1) the jury is less likely to link the content of this testimony to the facts of the case, and (2) the Eyewitness Expert testimony is less likely to enhance the sensitivity of jurors to the credibility of the eyewitness evidence presented.

(b) During Dr. Loftus's testimony, defense counsel did not adequately make the link between the factors about which she was testifying and the facts of Mr. Ramirez's case. Consequently, Dr. Loftus's testimony seemed dry, academic, and not especially relevant to the case. For example, in this case, many of the eyewitnesses had seen a photograph of Mr. Ramirez on television or in the

newspaper prior to identifying him for the first time at the live lineup or at the Preliminary Hearing . This would have introduced a high probability that their memory was suggestively influenced prior to their identification. Dr. Loftus testified about the effect of "post event information" on eyewitness memory (*see* section beginning at 194 RT 22712) but it was never made clear what this technical sounding term specifically referred to in this case and why it would have raised doubts about the reliability of the eyewitness identifications. There are numerous examples of how "post event information" could have affected the eyewitness identifications in this case. The following are examples of these that would have provided the jury with a better link between Dr. Loftus's testimony and the facts of this case:

(i)    **Maria Hernandez** first identified Ramirez as the man who shot her at the live lineup (CT 791), and then subsequently at the Preliminary Hearing (CT 738). However, she admitted at the Preliminary Hearing that prior to attending the lineup, she had seen his picture in the newspaper and saw him on television about 5 times (CT 775-6), and that she specifically saw his picture on television the day before he was arrested (CT 777).

(ii)   **Carol Kyle** first identified Ramirez at the live lineup and then subsequently at the Preliminary Hearing (CT 2286).  However, she testified at the Preliminary Hearing that prior to attending the lineup, she had seen his picture in the newspaper and after the

police identified him as the Night Stalker (CT 2319, 2343, 2345). She testified that in the days leading up to the lineup, she saw news reports "probably every day" (CT 2356). Officers had indicated to her that the Night Stalker would be in the lineup (CT 2356).

(iii)  **Sophie Dickman** first identified Ramirez at the live lineup (CT 3164-66) and then subsequently at the Preliminary Hearing (CT 3135). However, she testified at the Preliminary Hearing that she had seen Ramirez's photograph in the news "lots of times" before she picked him out of the lineup, and she read the newspaper daily (CT 3221, 3224). She learned from the news that the Night Stalker was responsible for her attack about 5 days after his arrest (CT 3224), which was prior to the live lineup.

(iv)  **Launie Dempster** testified that while she was delivering newspapers very early in the morning in the Monterey Park area, she saw the same man on three different occasions. (CT 4624-26, 29-33, 37-38, 162 RT 18755, 60-61, 65-66, 69). She was shown a composite drawing by the police, but it did not depict the same person that she saw. (162 RT 18802-04, 18845). She testified that she saw Mr. Ramirez's picture on the television news the day before he was arrested (CT 4649-50, 162 RT 18777). After he was arrested, she saw his picture in the newspaper paper and kept up with the news for about a month (CT 4662). At the trial and at the

Preliminary Hearing, she identified Mr. Ramirez in court (CT 4624-25, 162 RT 18775). She did not attend the live lineup.

(v)   **Somkid Khovananth** first identified Ramirez at the live lineup (CT 3528, 164 RT 19110) and then subsequently in court at the Preliminary Hearing (CT 3513).  She testified that prior to the live lineup, she had seen his picture on television a few weeks after she was attacked and knew it was him although she did not call the police (CT 3551, 3563, 3570, 3580).  She also saw Ramirez's picture in the news before he was arrested (CT 3572).

(vi)   **Virginia Petersen** first identified Ramirez at the live lineup (CT 3673) and then subsequently in court at the Preliminary Hearing (CT 3672).  At the trial, she again identified Ramirez (165 RT 19189) and testified that she had seen his picture on television and in newspaper at least 6-7 times before attending the lineup. However, although she recognized him as the man who attacked her, she never called the police to tell them (165 RT 19215, 19222).

(c) Several relevant eyewitness factors were not included in Dr. Loftus's testimony. These are factors about which relevant research was available at the time of the trial in 1989. These factors include the following:

(i)   ***Voice Identification Accuracy*** – Several of the eyewitnesses in this case identified Mr. Ramirez at the live lineup based on his

voice. The research on voice identification suggests that voice identification is even less reliable, and fades over time even faster than face identification (cf. Clifford, 1983). For example, when Carol Kyle identified Ramirez at the live lineup (156 RT 17972) she noted down on her witness card "I'm absolutely positive. Even the infliction in his voice is the same, . . ."

(ii)     ***Tainted Identification Procedure*** – In a live lineup, all individuals should match the description given by the eyewitnesses (Luus & Wells, 1991) and be presented such that extra attention is not drawn to the suspect (Buckhout, 1974).  To the extent that this does not occur in a lineup, the lineup is tainted and biased.  It appears that the 6 individuals in the live lineup did not all match the eyewitness descriptions. Also, to the extent that the witnesses noticed the bald spot on the back of Ramirez's head at the lineup and knew the circumstances of his arrest, this would have drawn attention to the defendant and thus enhanced the bias of the live lineup. Another factor that could have tainted the live lineup was the fact that during the lineup, apparently with the witnesses present, a deputy sheriff stood in front of the room and held up 2 fingers (*see* Photograph of Lineup). Mr. Ramirez was in position #2.

(iii)   ***Bias of an In-Court Identification*** – An in-court identification is not a fair and unbiased identification procedure because the eyewitnesses are not given a set of similar looking individuals from which to select the perpetrator.  There is also the suggestion in court that the defendant must be guilty because he is there. All in-court identifications at the Preliminary Hearing and the Trial would have suffered from this bias.  In addition, two witnesses identified Mr. Ramirez *for the first time* in Court. Launie Dempster first identified the defendant at the Preliminary Hearing (CT 4624-25) having not attended the live lineup. Jorge Gallegos first identified Ramirez at the Preliminary Hearing. He did not attend the live lineup (CT 1080, 1107).  He had reported to police that he only saw the suspect as the suspect drove away (3/18/85 Monterey Park Police interview of Gallegos). Nonetheless, he did identify Ramirez at the Preliminary Hearing.  (CT 1103).

(iv)   ***Experimenter Expectancy Effect*** – The Experimenter Expectancy Effect is a specific type of suggestive identification procedure. If the officer administering a lineup knows which person is the suspect, the officer may find it difficult to avoid giving subtle cues to the witness regarding which individual is the suspect.  This effect has been known in the literature for several decades.

Given the strong reliance on eyewitness evidence in this case – the fact that the prosecutor's eyewitnesses linked Petitioner to nine of the sixteen incidents – it is my opinion that it was ineffective for defense counsel not to have presented a more competent eyewitness defense.

I certify that the above statement and the attachment are true and correct to the best of my knowledge and belief at this time.  Executed under penalty of perjury this 15th day of December, 2008  in Claremont, California.

Kathy Pezdek, Ph.D.

## References

Buckhout, R. (1974). Eyewitness testimony. *Scientific American, 231*, 23 - 31.

Clifford, B.R. (1983). Memory for Voices: The Feasibility and Quality of Earwitness Evidence. In S.M.A. Lloyd-Bostock & B.R. Clifford (Eds.), Evaluating Witness Evidence, Chichester: John Wiley & Sons.

Luus, C. A. E., & Wells, G. L. (1991). Eyewitness identification and the selection of distracters for lineups. *Law and Human Behavior, 15*, 43-57.

*Declaration of Dr. Kathy Pezdek in the Matter of Richard M. Ramirez v. Robert L. Ayers, Jr.*          10

**Attachment to Declaration**

VITA
**KATHY PEZDEK, Ph.D.**

Professor and Associate Dean
Department of Psychology
Claremont Graduate University
Claremont, California 91711
Email: Kathy.Pezdek@CGU.EDU
(909) 621-6900

**EDUCATION**

- Ph.D.,  Psychology, University of Massachusetts, Amherst, 1975
- M.A.,  Psychology, University of Massachusetts, Amherst, 1972
- B.S.,    Psychology, University of Virginia, Fredericksburg, 1971

**PROFESSIONAL ASSOCIATIONS**

- American Psychological Society, Elected APS Fellow, 1999
- American Psychology - Law Society, APA Division 41
- The Psychonomic Society
- Society for Applied Research in Memory and Cognition;
        Currently Chairperson
        Elected Governing Board Member, 1994-2000, 2000-2006
- The Society for Research in Child Development

**EDITORIAL EXPERIENCE**

- North American Editor of <u>Applied Cognitive Psychology</u> (1995-2000)
- Member of the Editorial Board for:
    - *Journal of Applied Psychology* (2002 - present)
    - *Legal and Criminological Psychology* (2005 - present)
    - *Applied Cognitive Psychology* (1993 - present)
    - *Child Development* (1984-1985), (1987-1991)

**GENERAL RESEARCH INTERESTS**          **GENERAL TEACHING INTERESTS**

| | |
|---|---|
| Eyewitness Memory | Statistics |
| Suggestibility of Memory | Memory |
| Visual Memory | Cognitive Development |
| Autobiographical Memory | Applied Cognitive Psychology |
| Memory and Comprehension | Research Design and Methodology |

## PUBLICATIONS
### Journal Articles

Pezdek, K., Lam, S. T., & Sperry, K. (in press). Forced Confabulation More Strongly Influences Event Memory if Suggestions are Other-Generated than Self-Generated. *Legal and Criminological Psychology.*

Blandón-Gitlin, I., Pezdek, K., Lindsay, S.D., & Hagan, L. (in press). Criteria-Based Content Analysis of true and suggested accounts of events. *Applied Cognitive Psychology.*

Pezdek, K., & Blandón-Gitlin, I. (in press). *Planting False Memories for Childhood Sexual Abuse Only Happens to Emotionally Disturbed People … not Me or My Friends*. Applied Cognitive Psychology.

Kleider, H.M., Pezdek, K., Goldinger, S.D., & Kirk, A. (in press). *Schema-driven source misattribution errors: Remembering the expected from a witnessed event.* Applied Cognitive Psychology.

Goodman, G.S., Sayfan, L., Lee, J.S., Sandhei, M., Walle-Olsen, A., Magnussen, S., Pezdek, K., & Arrdeondo, P. (2007). *The development of memory for own- and other-race faces.* Journal of Experimental Child Psychology, 98, 233-242.

Pezdek, K., Sperry, K., & Owens, S., (in press). *Interviewing Witnesses: The Effect of Forced Confabulation on Event Memory.* Law & Human Behavior.

Pezdek, K., Blandon-Gitlin, I., Lam, S., Hart, R.E. & Schooler, J. (in press). *Is knowing believing?: The role of event plausibility and background knowledge in planting false beliefs about the personal past.* Memory & Cognition.

Pezdek, K., Blandon-Gitlin, I. & Gabbay, P. (in press). *Imagination and Memory: Does Imagining Implausible Events Lead to False Autobiographical Memories?* Psychonomic Bulletin & Review.

Pezdek, K. (2007). *It's Just Not Good Science.* Consciousness & Cognition, 16, 29-30.

Pezdek, K. & Lam, S. (2007). *What research paradigms have cognitive psychologists used to study "False memory," and what are the implications of these choices?* Consciousness & Cognition, 16, 2 –17.

Freyd, J.J., Putnam, F.W., Lyon, T.D., Becher-Blease, K.A., Cheit, R.E., Siegel, N.B. & Pezdek, K. (2005). *The science of child sexual abuse.* Science, 308, 501.

Pezdek, K. & Blandon-Gitlin, I. (2005). *When is an intervening lineup most likely to affect eyewitness identification accuracy?* Legal and Criminological Psychology. 10, 247-263.

Blandon-Gitlin, I., Pezdek, K, Rogers, M. & Brodie, L. (2005). *Detecting deception in children: An experimental study of the effect of event familiarity on CBCA ratings.* Law and Human Behavior, 29, 187-197.

Pezdek, K., et al. (2004). *Detecting deception in children: Event familiarity affects Criterion Based Content Analysis ratings.* Journal of Applied Psychology, 89, 119-126.

Pezdek, K. (2003). *Event memory and autobiographical memory for the events of September 11, 2001.* Applied Cognitive Psychology, 17, 1033-1045.

Pezdek, K., Blandon-Gitlin, I., & Moore, C. (2003). *Children's face recognition memory: More evidence for the cross-race effect.* Journal of Applied Psychology, 88, 760-763.

Pezdek, K., Berry, T., & Renno, P.A. (2002). *Children's mathematical achievement: The role of parents' perceptions and their involvement in homework.* Journal of Educational Psychology, 94, 771-777.

Pezdek, K. (2002). *Teaching psychology in the context of a university-community partnership.* Teaching of Psychology, 29, 157-159.

Pezdek, K., & Eddy, R. M. (2001). *Imagination inflation: A statistical artifact of regression toward the mean.* Memory and Cognition, 29, 707-718.

Hinz, T., & Pezdek, K. (2001). *The effect of exposure to multiple lineups on face identification accuracy.* Law and Human Behavior, 25, 185-198.

Pezdek, K. (2001). *A cognitive analysis of the recovered memory/false memory debate.* Journal of Aggression, Maltreatment, and Trauma, 4 (2). [Reprinted in J. J. Freyd & A. P. DePrince (Eds.). Trauma and Cognitive Science. Haworth Press: San Diego, CA.]

Finger, K. & Pezdek, K. (1999). *The effect of the cognitive interview on face identification accuracy: Release from verbal overshadowing.* Journal of Applied Psychology, 84, 340-348.

Pezdek, K., & Hodge, D. (1999). *Planting false childhood memories in children: The role of event plausibility.* Child Development, 70, 887-895.

Underwood, J., & Pezdek, K. (1998).  *Memory suggestibility as an example of the sleeper effect.*  Psychonomic Bulletin & Review, 5, 449-453.

Arrigo, J. M., & Pezdek, K. (1997).  *Lessons from the study of psychogenic amnesia.* Current Directions in Psychological Science, 6, 148-152.  [Reprinted in Oltmanns, T. F. & Emery, R. E. (Eds.).(2004). Current directions in abnormal psychology. Upper Saddle River, NJ: Pearson Education, Inc.

Pezdek, K., Finger, K., & Hodge, D.  (1997).  *Planting false childhood memories: The role of event plausibility.*  Psychological Science, 8, 437-441.

Pezdek, K., & Roe, C. (1997).  *The suggestibility of children's memory for being touched: Planting, erasing, and changing memories*.  Law and Human Behavior, 21, 95-106.

Pezdek, K., & Roe, C. (1995).  *The effect of memory trace strength on suggestibility*. Journal of Experimental Child Psychology, 60, 116-128.

Pezdek, K., & Roe, C. (1994).  *Memory for childhood events: How suggestible is it?* Consciousness and Cognition, 3, 374-387.

Pezdek, K. (1994).  *The illusion of illusory memory*.  Applied Cognitive Psychology, 8, 339-350.

Pezdek, K. (1994).  *Avoiding false claims of child sexual abuse: Empty promises*. Family Relations, 43.  [Reprinted in Baker, R. A. (Ed.). (1998).  Child sexual abuse and false memory syndrome.  Amherst, NY: Prometheus Books.]

Pezdek, K., & Prull, M. (1993).  *Fallacies in memory for conversations: Reflections on Clarence Thomas, Anita Hill, and the Like.*  Applied Cognitive Psychology, 7, 299-310.

Pezdek, K., & Greene, J. (1993).  *Testing eyewitness memory: Developing a measure that is more resistant to suggestibility*.  Law and Human Behavior, 17, 361-369.

Holst, V. F., & Pezdek, K. (1992).  *Scripts for typical crimes and their effects on memory for eyewitness testimony*.  Applied Cognitive Psychology, 6, 573-587.

Reynolds, J. K., & Pezdek, K. (1992).  *Face recognition memory: The effects of exposure duration and encoding instructions*.  Applied Cognitive Psychology, 6, 279-292.

Pezdek, K. et al. (1989). *Memory for real world scenes: The role of consistency with schema expectation*. Journal of Experimental Psychology: Learning, Memory and Cognition, 15, 587-595.

Pezdek, K. et al. (1988). *Picture memory: Recognizing added and deleted details*. Journal of Experimental Psychology: Learning, Memory & Cognition, 14, 468-476.

Pezdek, K., Simon, S., Stoeckert, J., & Kieley, J. (1987). *Individual differences in television comprehension*. Memory & Cognition, 15, 428-435.

Pezdek, K. (1987). *Eyewitness identification: The elusive threads of memory*. Connections, 2, 13-17.

Pezdek, K. (1987). *Memory for pictures: A life-span study of the role of visual detail*. Child Development, 58, 807-815.

Pezdek, K., Roman, Z., & Sobolik, K. G. (1986). *Spatial memory for objects and words*. Journal of Experimental Psychology: Learning, Memory, & Cognition, 12, 530-537.

Pezdek, K. (1985). *Debunking some myths regarding cognitive processing of television*. Television and Children, 8(4), 41-46.

Pezdek, K., Lehrer, A., & Simon, S. (1984). *The relationship between reading and cognitive processing of television and radio*. Child Development, 55, 2072-2082.

Runco, M. A., & Pezdek, K. (1984). *The effect of television and radio on children's creativity*. Human Communication Research, 11, 109-120.

Pezdek, K., & Stevens, E. (1984). *Children's memory for auditory and visual information on television*. Developmental Psychology, 20, 212-218.

Pezdek, K., & Hartman, E. F. (1983). *Children's television viewing: Attention and comprehension of auditory versus visual information*. Child Development, 54, 1015-1023.

Pezdek, K. (1983). *Memory for items and their spatial locations by young and elderly adults*. Developmental Psychology, 19, 895-900.

Evans, G. W., Smith, C., & Pezdek, K. (1982). *Cognitive maps and urban form*. Journal of the American Planning Association, 48, 232-244.

Pezdek, K., & Chen, H-C. (1982). *Developmental differences in the role of detail in picture recognition memory*. Journal of Experimental Child Psychology, 33, 207-215.

Pezdek, K., & Miceli, L. (1982).  *Life-span differences in memory integration as a function of processing time*.  Developmental Psychology, 18, 485-490.

Pezdek, K. (1980).  *Life-span differences in semantic integration of pictures and sentences in memory*.  Child Development, 51, 720-729.

Evans, G. W., & Pezdek, K. (1980).  *Cognitive mapping: Knowledge of real world distance and location information*.  Journal of Experimental Psychology: Human Learning and Memory, 6, 13-24.

Pezdek, K., & Evans, G. W. (1979).  *Visual and verbal memory for objects and their spatial locations*.  Journal of Experimental Psychology: Human Learning and Memory, 5, 360-373.

Pezdek, K. (1978).  *Recognition memory for related pictures*.  Memory & Cognition, 6, 64-69.

Pezdek, K. (1977).  *Cross-modality semantic integration of sentence and picture memory*.  Journal of Experimental Psychology: Human Learning and Memory, 3, 515-524.

Pezdek, K., & Royer, J. M. (l974).  *The role of comprehension in learning concrete and abstract sentences*.  Journal of Verbal Learning and Verbal Behavior, 13, 551-558.

Myers, J. L., Pezdek, K., & Coulson, D. (1973).  *Effects of prose organization upon free recall*.  Journal of Educational Psychology, 65, 313-320.


### Books

Costanzo, M., Krauss, D., & Pezdek, K. (Eds.) (2007). Expert psychological testimony for the courts. Mahwah, NJ: Erlbaum.

Donaldson, S., Berger, D. & Pezdek, K. (Eds.). (2006). Applied psychology: New frontiers and rewarding careers. Mahwah, NJ: Erlbaum.

Pezdek, K., & Banks, W. P. (Eds.). (1996).  The recovered memory/false memory debate.  San Diego: Academic Press.

Berger, D., Pezdek, K., & Banks, W. P. (Eds.) (1987).  Applications of cognitive psychology: Problem solving, education and computing.  Hillsdale, NJ: Erlbaum.

## Chapters & Encyclopedia Entries

Davies, G.  & Pezdek, K. (in press). Children as Witnesses.  In Towl, G. & Crighton, D. (Eds.) *Textbook on Forensic Psychology.*

Pezdek, K. (in press). Content, form and ethical issues concerning expert psychological testimony on eyewitness identification. In Cutler, B.L. (Ed.), *Expert testimony on the psychology of eyewitness identification.*

Blandón-Gitlin, I., & Pezdek, K. (in press). Children's memory in forensic contexts: Suggestibility, false memory, and individual differences. In Bottoms, B.L., Goodman, G.S., & Najdowski, C.J. (Eds.), *Child victims, child offenders: Psychology and law.* New York: Guildford Press.

Pezdek, K. (in press). Forced Confabulation. In B. L. Cutler (Ed.) *Encyclopedia of Psychology and Law*, Thousand Oaks, CA: SAGE Publications.

Pezdek, K. (in press). Post-Event Information. In B. L. Cutler (Ed.) *Encyclopedia of Psychology and Law*, Thousand Oaks, CA: SAGE Publications.

Pezdek, K. & Freyd, J.J. (in press). False Memory. In C.T. Hendrix, A. Moore-Parmley, P. Tolan & B. Perry (Eds.), *Encyclopedia of Interpersonal Violence*, Thousand Oaks, CA: SAGE Publications.

Pezdek, K. (in press). Expert Testimony on Eyewitness Memory and Identification. In M. Costanzo, D. Krauss, & K. Pezdek (Eds.), *Expert Psychological Testimony for the Courts.* Mahwah, NJ: Erlbaum.

Pezdek, K.,  Deffenbacher, K. A., Lam, S., & Hoffman, R. R. (2006). Cognitive Psychology: Applications and Careers.  In S. Donaldson, D. Berger, & K. Pezdek (Eds.), Applied psychology: New frontiers and rewarding careers. Mahwah, NJ: Erlbaum.

Pezdek, K. (in press).  *Memory for the Events of September 11, 2001.*  In Nilsson, L.-G. and Ohta, N. (Eds.), Memory & Society: Psychological Perspectives. New York: Routledge and Psychology Press.

Pezdek, K., & Hinz, T. (2002).  *The construction of false events in memory.*  In H. Westcott, G. Davies & R. Bull (Eds.), Children's testimony: A handbook of psychological research and forensic practice. London: Wiley.

Pezdek, K., & Taylor, J. (2002).  *Memory for traumatic events by children and adults.* In M. L. Eisen, G. S. Goodman, & J. A. Quas (Eds.), Memory  and suggestibility

in the forensic interview (pp. 165-183).  Mahwah, NJ: Lawrence Erlbaum and Associates.

Pezdek, K., & Taylor, J. (1999).  *Discriminating between accounts of true and false events*. In D. F. Bjorklund (Ed.), <u>Research and theory in false-memory creation in children and adults</u>.  Mahwah, NJ: Lawrence Erlbaum and Associates.

Arrigo, J. M., & Pezdek, K. (1998).  *Textbook models of multiple personality--Source, bias, and social consequence*.  In S. J. Lynn, & K. McConkey (Eds.), <u>Truth in memory</u> (pp. 372-393).  New York: Guilford Press.

Pezdek, K., & Gauvain, M. (1990).  *Memory for pictures: Developmental trends*.  In T. Husen & T. N. Postlethwaite (Eds.), <u>International Encyclopedia of Education</u> (pp. 416-419).  Oxford: Pergamon Press.

Pezdek, K. (1987).  *Television comprehension as an example of applied cognitive psychology*. In D. Berger, K. Pezdek, & W. P. Banks (Eds.), <u>Applications of cognitive psychology</u>: <u>Problem solving, education and computing</u>.  Hillsdale, NJ: Erlbaum.

Pezdek, K. (1986).  *Comprehension: It's even more complex than we thought*.  In J. H. Danks, I. Kurcz, & G. W. Shugar (Eds.), <u>Knowledge and language</u>.  Amsterdam: North-Holland.

Pezdek, K. (1980).  *Arguments for a constructive approach to comprehension and memory*.  In F. B. Murray (Ed.), <u>Reading and understanding</u>.  Newark, DE: International Reading Association.

## **<u>Book Reviews</u>**

Pezdek, K. (2002).  [Review of  <u>The fate of early memories:  Developmental science and the retention of childhood experiences</u>, by M. L. Howe.]  <u>Contemporary Psychology</u>.

Pezdek, K. (1999).  [Review of <u>Memory, trauma treatment, and the law</u>, by D. Brown, A. W. Scheflin, & D. C. Hammond.]  <u>Contemporary Psychology</u>.

Pezdek, K. (1998).  [Review of <u>International perspectives on child abuse and children's testimony</u>, by B. L. Bottoms & G. S. Goodman.]  <u>Contemporary Psychology</u>.

Pezdek, K. (1998).  [Review of <u>Memory and testimony in the child witness</u>, by M. S. Zaragoza et al.]  <u>Contemporary Psychology</u>.

Pezdek, K. (1997).  [Review of <u>Adult eyewitness testimony: Current trends and developments</u>, by D. F. Ross et al. and <u>Mistaken identification: The eyewitness, psychology and the law</u>, by B. L. Cutler & S. D. Penrod.]  <u>Applied Cognitive Psychology</u>.

Pezdek, K. (1994).  [Review of <u>The handbook of emotion and memory: Research and theory</u>, by S.-A. Christianson.]  <u>American Journal of Psychology</u>, <u>107</u>, 476-479.

*Declaration of Dr. Kathy Pezdek in the Matter of Richard M. Ramirez v. Robert L. Ayers, Jr.*      19

## GRANT RELATED ACTIVITY

Fletcher Jones Foundation (2008-2009). "***More*** Methodological Considerations in Evaluating the Effectiveness of Eyewitness Expert Testimony," $8,000.

Fletcher Jones Foundation (2007-2008). "Methodological Considerations in Evaluating the Effectiveness of Eyewitness Expert Testimony," $7,975.

Fletcher Jones Foundation (2006-2007). "Forced Confabulation: Does Post Event Guessing during Police Interrogation Suggestively Influence Eyewitness Memory?" $6,000.

Fletcher Jones Foundation (2003 – 2004). *"Improving Jurors' Ability to Evaluate the Reliability of Eyewitness Evidence,"* $7,225.

National Science Foundation, Law & Social Sciences Program (2001 – 2004). *"Discriminating Between Children's Accounts of True and False Events,"* $229,807.

National Science Foundation, Law & Social Sciences Program (2000-2003). *"The Suggestive Influence of Viewing an Intervening Lineup on Eyewitness Memory Accuracy,"* $180,000.

Fletcher Jones Foundation (2002), *"Eyewitness Memory for the Events of 9/11,"* $5,000.

Haynes Foundation (2000). *"Discriminating between Children's Accounts of True and False Events,"* $10,000.

Fletcher Jones Foundation (1998). "*The Suggestibility of Memory in Old Age*," $7,900.

Haynes Foundation (1995). *"Curtailing Crime and Increasing Conviction Rates in Eyewitness Cases,"* $8,000.

National Institute of Education (1981-1983). *"Television Viewing: Processing and Memory for Auditorily and Visually Presented Information,"* $122,000.

Spencer Foundation (1976-1977). *"Developmental Changes in Semantic Integration of Sentences and Pictures,"* $10,000.  (Grant also accepted for funding by NIE).

National Academy of Sciences visiting scientist award to study at The Institute of Psychology, Jagiellonian University, Cracow, Poland, (1984).

<u>DECLARATION OF ANNE EVANS, Ph.D.</u>

I, DR. ANNE EVANS, declare as follows:

1.    I am a psychologist and marriage family child counselor currently in private practice in Los Angeles and licensed by the State of California.  In the capacity of forensic psychologist I specialize in capital cases.

2.    I received my B.A. in 1973 from Cornell University in Ithaca, New York.  I received my Masters in 1977 and my Ph.D. in 1979 in psychology from the California School of Professional Psychology in San Diego, California.

3.    As part of my professional training I completed internships at an adolescent residential treatment facility, Project Oz, San Diego, California (1975-1976); Jewish Family Services, San Diego, California (1976-1977); San Diego State University Counseling Center (1977-1978); and, County Mental Health adult outpatient and inpatient facilities in Escondido, California (1978-1979) and San Diego, California (1979).  As part of my postdoctoral training, I completed internships at the County Mental Health child/adolescent outpatient facility in El Cajon, California (1979-1980) and the County Mental Health Forensic Services in San Diego, California (1980).

4.    I am a member of the American Psychological Association, the California Psychological Association, the Society for Personality Assessment, the International Rorschach and Projective Techniques Society, the Society for the Scientific

1

Study of Sex, and the National Council on Sexual
Addiction/Compulsivity.  I am a Diplomate of the American Board
of Sexology and a Board Certified Sex Therapist.

    5.    During my professional career I have provided crisis
intervention, psychological assessments, and treatment to indi-
viduals with serious psychological disturbances.  In my capacity
as a postdoctoral intern at County Mental Health Forensic Servic-
es in San Diego my work involved court-ordered psychological
evaluations and reports, sentencing recommendations, on-site work
at honor camps, and consultation with probation officers.  Since
1981-82 I have worked in private practice as a forensic
psychologist in criminal cases, serving as expert consultant and
expert witness in numerous homicide cases and other serious
felonies.  I have served in this capacity in close to forty
capital cases, and I have testified both in Federal District
Court and in California trial courts.

    6.    In 1991, I was formally retained as a defense expert
on the capital murder case People v. Richard Ramirez (San
Francisco Municipal Court Case #1205560; Superior Court Case
#140188).  Between February 23rd and April 13th of 1991, I spent
a total of 12 hours with the defendant for the purposes of both
interview and the administration of a full psychological test
battery, including extensive personality testing.  I obtained his
informed consent on my initial interview with him in the presence
of his attorney, at which time he was able to paraphrase back to

2

me the information I had explained to him. The psychological tests I administered to Mr. Ramirez included: the Exner Comprehensive System Rorschach, the House-Tree-Person Test, the Minnesota Multiphasic Personality Inventory-2, the Reitan-Indiana Aphasia Screening Test, the Rotter Incomplete Sentences Blank, and the Wechsler Adult Intelligence Scale-Revised. During this time period my direct contact with Mr. Ramirez took place on five separate occasions and days.

At the request of his defense attorneys - Michael Burt, Daro Inouye and Dorothy Bischoff - I interviewed Mr. Ramirez for two hours on February 08, 1995, in order to assess his present-day mental competency to stand trial. At this time I again obtained informed consent from the defendant and his response to me reflected an understanding of the information explained to him. His charges include one count of murder with special circumstances (burglary and prior murder), use of a firearm, robbery and burglary. As part of this evaluation I administered the Georgia Court Competency Test - GCCT (1992 Revision). Between 1991 and the present, I have spent over 100 hours working on this case; this time included numerous attorney consultations, psychiatric and neuropsychological consultations, psychological test scoring and interpretation, and the review of records.

7. I am writing this declaration to address the issue of Mr. Ramirez's competency to stand trial. As defined in Section 1368 of the California Penal Code, to be found incompetent to stand trial a defendant must be found to have a mental disorder,

3

the effects of which render him unable to either:  1) understand
the duties of the officers of the court; and/or, 2) understand
the nature of the charges against him and the consequences of
those charges; and/or, 3) assist counsel in the conduct of a
defense in a rational manner.  My opinion regarding Mr. Ramirez's
competency to stand trial is based upon my own direct experience
with the defendant, the results of my psychological testing,
consultations with other mental health professionals regarding
their evaluations, interviews of attorneys and investigators,
neuropsychological and psychiatric reports, and extensive review
of relevant documents and records.  A complete external source
review is not possible, largely due to the extraordinary mass of
material related to the defendant's 13 prior murder convictions.
I have been provided with a wide scope of additional information
sources which include but are not limited to:  declarations;
police reports; newspaper articles; videotapes; books; and,
medical, psychiatric, psychological, neuropsychological,
neurological, educational, jail, prison, and trial records.  In
an assessment of a defendant's competency to stand trial these
types of materials are typically relied upon by forensic
psychologists to render a well-considered professional opinion.

        8.    The results of my psychological evaluation of Mr.
Ramirez's competency to stand trial indicate that Mr. Ramirez
suffers from a serious mental disorder.  The integration of all
of my psychological test results in combination with prior
assessment, history, records and consultation with current mental

                                4

health evaluators reveals a strong consistency in the findings of longstanding mental impairment.

On the Wechsler Adult Intelligence Scale-Revised, an objective and standardized intelligence test, Mr. Ramirez obtained a Full Scale I.Q. score of 86, placing him in the Low Average range - approximately the 18th percentile rank.  His lowest subtest scores were significantly below average ability, indicating difficulties with concentration and with abstraction. His Performance I.Q. score (93) is higher than his Verbal I.Q. score (84).  My findings on the WAIS-R are very similar to the results Mr. Ramirez obtained on the WAIS administered to him on October 04, 1976, by the psychologist who evaluated him at the El Paso Child Guidance Clinic, Inc. - Dr. Ursula Niziol.  The two lowest subtest scores on the Verbal I.Q. section of his 1976 WAIS still remain the lowest subtest scores found on his 1991 WAIS-R. These strongly consistent test findings verify that his significant problems with both concentration and abstraction date back to at least age 16, and that these deficits are not the result of malingering attempts on the part of Mr. Ramirez.

Findings on the Halstead-Reitan Battery from Myla Young, Ph.D.'s neuropsychological assessment of Mr. Ramirez - which included Freedom From Distractibility subscales of the WAIS-R - also showed impaired abilities for sustained attention.  Tasks of memory and higher cognitive functioning demonstrated particular impairment.  Tests she administered to evaluate for possible malingering also indicated that he was not attempting to fake

5

results of the evaluation, and that her test results can be considered a valid representation of his current functioning. His performance on the Wisconsin Card Sorting Test was quite impaired with scores below the fifth percentile on the categories of Failure to Maintain Set and %Perseverative Erros. This test is used to differentiate patients who have brain damage from patients who do not have brain damage.  What is most significant about these findings is how these impaired abilities relate to and effect Mr. Ramirez's competency to stand trial.  In Dr. Young's report she states:

> "The Wisconsin Card Sorting Test is a test which requires planning, organizing, utilizing information from the environment to develop appropriate plans of action, directing behavior towards achieving a goal, and modulating impulsive responding...Impaired performance on the Wisconsin Card Sorting Test, combined with overall intellectual functioning within normal ranges suggests that the patient may be able to describe knowledge of appropriate, adaptive behaviors, but may not have the brain resources to effectively alter and inhibit behaviors in adaptable ways."

Dr. Young assessed that a mental disorder due to epilepsy would be consistent with the defendant's early history of seizure disorder and with his pattern of neuropsychological impairment. She also noted severe depression, negative self evaluation, paranoia, perceptual inaccuracy, and gross distortion of reality which would at times become frankly delusional.

6

In the findings of the Exner System Rorschach which I administered to Mr. Ramirez there are strong indications that his thinking is seriously disturbed, disorganized, and fragmented. His information processing is very flawed. His perceptions are markedly inaccurate, leading him to faulty translations and flawed judgments. He is seriously out of touch with reality, and he frequently distorts the meaning of what is going on around him. His paranoia and tendency to project negativity onto others interferes significantly with his ability to develop close relationships and creates an intense need in him to control interactions. To make matters worse, this high degree of suspiciousness and mistrust leads him to rely upon his own internal processes to make decisions rather than upon objective feedback from others. His processing style is also one of "underincorporation" (a common finding in individuals who have attention deficit problems) Instead of attending to specifics and details, Mr. Ramirez's reading of the world is based upon rapid scanning and random inaccurate impressions. At the same time, he has difficulty shifting attention. When his thinking becomes confused - especially under stress - his ability to attend and concentrate worsens. Mr. Ramirez was unable to filter out and control his responses to the ambiguous stimuli of the Rorschach cards. This inability to modulate his behavior is most apparent when his attempts to organize his thinking are disrupted by areas of intense emotion or conflict - a frequent experience for him. He is habitually in poor control of his

7

emotions and not able to modulate his behavior. This strong potential for discontrol and volatility is common in seizure disorders and neurological problems.

Mr. Ramirez also suffers from intense mood swings and longstanding depression. His self awareness is severely lacking and his notions about himself are very distorted, particularly with regard to his self image. His self-valuing is likely to come out of imaginary experiences rather than real ones. Coupled with his lack of boundaries, this adds to his serious inability to relate interpersonally. Although lacking in maturity to the point of being very primitive and impulsive, he does not see himself as more important than others. His self image is fragile and vulnerable, as well as unrealistic. He has a lot of angry feelings and a great deal of mistrust toward others. This combination of factors is also part of a very self-destructive pattern. Although he may not be a serious suicide risk at the present time, such potential existed in the past and is likely to occur again in the future. Another aspect of his self-destructiveness is revealed by the MacAndrews Alcoholism Scale of the MMPI-2, which indicates that he has a chronic predisposition to developing dependencies on medications or other chemical substances. Because it measures risk potential for substance abuse, this scale can produce a positive score even in alcoholics who have been sober for many years.

The Minnesota Multiphasic Personality Inventory-2 (MMPI-2) is the most widely used and researched objective personality

8

inventory.  As part of Mr. Ramirez's psychological test battery,
findings on the MMPI-2 must be regarded as tentative
interpretations because of a high score on a scale which assesses
elevated items.  This sort of elevation may be due to any number
of factors.  It may be reflective of genuine emotional turmoil
and confusion, of carelessness, of reading difficulties, or of
the  intentional exaggeration of symptoms.  In this case, it is
my opinion that the results on this test are valid and accurate
for three main reasons.  The first reason is that other validity
checks show that Mr. Ramirez's elevation arose from the latter
half of the test.  The finding commonly occurs often when people
become fatigued and pay less attention to their responses,
creating an artificial elevation in this scale score.  The MMPI-2
is the longest test in the battery, taking approximately 1 1/2
hours to complete.  Mr. Ramirez's difficulties with attention and
concentration, together with test documentation of these
difficulties, clearly indicate that his high distractibility
interfered with his ability to focus on this long task.  This
hypothesis also matches my clinical observation of his test-
taking behavior while completing the MMPI-2.  This behavior can
best be characterized as inattentive and marked by increased
restlessness and fidgeting, leading to the necessity of reminders
for him to focus on the test.  The second reason the results are
likely to be valid comes from other test indicators.  One example
is his score on an additional MMPI-2 scale which stands as an
independent source of the measurement of malingering.  On this

9

scale Mr. Ramirez's score was ten points <u>below</u> the optimal
cutoff. That means that even if he had scored ten points
higher -the optimal cutoff score - 93% of faked MMPI-2 records
would still have exceeded his score. The third reason I believe
these MMPI-2 results are valid is that the profile interpretation
and symptoms are remarkably consistent with the rest of the
psychological test battery, clinical observations, history, other
assessments, etc. A psychological evaluator does not rely upon
results from any one test alone to form an opinion but must rely
upon the integration of all the relevant data. When possibly
tentative test results are found to match other test results with
a high degree of consistency, as they do in this instance, the
general configuration of the MMPI-2 pattern and its
interpretation can be considered accurate and appropriate.

It is also important to note that while the MMPI-2
assesses personality, it cannot determine the causation of
psychopathology or measure organicity. In Mr. Ramirez's case,
consistency with other data clearly exists in such MMPI-2
findings as vulnerability to decompensation, disorganized thought
processes, inappropriate behaviors, psychotic process,
suspiciousness, mood swings, and depression. Other similarities
include his easy distractibility, restlessness, aggressive
impulses, and, inappropriate and aberrant sexual behaviors.
Other test indicators warn us of a mild suicide risk due to
current ideation (1991). Mr. Ramirez endorsed items related to
ideas of reference, persecution, and delusions which are

10

consistent with his verbal descriptions and stated concerns.  His
paranoid responses are strongly indicative of delusional
material, clustered around persecutory ideas.  His ego strength
measures as very low, suggesting functioning at a less than
competent manner.  He also has a very low opinion of himself and
compares himself unfavorably to others.  Additional significant
test indicators include obsessive traits, bizarre mentation, and
extremely negative attitudes toward doctors and mental health.

        9.    In my professional opinion, Mr. Ramirez has clearly
not been able to assist his attorneys in the conduct of his
defense in a rational manner and, therefore, meets the c
riteria of incompetence to stand trial pursuant to California
Penal Code §1368.  It is also my professional opinion, to a
reasonable degree of psychological certainty, that this inability
is the result of a mental disorder.  Mr. Ramirez's responses to
the Georgia Court Competency Test (1992 Revision) indicate that
he has an adequate understanding of the duties of the officers of
the court and of the nature and consequences of the charges
against him.  However, the screening for atypical presentation
section of this instrument clearly reveals aspects of his
irrational belief system.  His responses to these questions are
also consistent with the pattern obtained by defendants who are
not feigning incompetency.  His explanation of one atypical
response, regarding his belief that people in the courtroom are
imposters, was:  "Because there's more than meets the eye.

11

Governments and those in power hold more jurisdiction and decision-making than what their title says they do." Mr. Ramirez's prior experiences with the legal system have contributed to his superficially adequate legal knowledge and courtroom orientation. Nonetheless, in one response to a basic question about what the defendant does during the trial, Mr. Ramirez's irrationality leaks through: "Sit and watch the whole facade - the stupidness of it. You have lay persons giving legal jargon that they don't go to school for even and pretend to do scientific stuff." When I asked to whom he was referring, his response was, "The jury!". Mr. Ramirez's ability to assist counsel in the conduct of his own defense is grossly inadequate due to the incapacitating effects of his mental disorder.

Mr. Ramirez suffers from a constellation of psychological symptoms which severely impairs both his ability to think and his ability to behave in an appropriate manner. A defendant must possess at least a minimal interpersonal capacity in order to relate to the average attorney. To possess this capacity one must have the ability to communicate relevantly. Mr. Ramirez cannot communicate rationally, let alone relevantly. His significant impairment with regard to the ability to trust also interferes with this interpersonal capacity. Further, he is not able to appreciate the strategic relationship - or even the connection - between possible legal defenses and the reality of his own particular legal circumstances.

Planning an appropriate strategy for the defense requires

12

the rational assistance and participation of the accused.
Despite the persistent efforts of his former defense attorney,
Randall Martin, Mr. Ramirez was so paranoid that he would not
even discuss with him the offense for which he was charged, nor
any prior offenses. Worse yet, all of Mr. Martin's attempts to
gather potentially helpful information from the defendant's past
for his legal defense were blocked by Mr. Ramirez. In order to
help save his client's life, Mr. Martin nonetheless persevered
and actually succeeded in gaining pertinent information through
family interviews in Texas. These efforts and results were met
by paranoid and irrational tirades on the defendant's part. Mr.
Ramirez adamantly insisted that none of the pertinent information
gained would ever be used in his defense. The combined effect of
Mr. Ramirez's paranoid delusions, severe cognitive
disorganization, and obsessive ruminations impaired his ability
to recognize Mr. Martin's superior abilities as an attorney (as
proven by his past successes with trial techniques). Mr.
Ramirez's mental impairment led him to make threats against Mr.
Martin and eventually rendered it impossible for Mr. Martin to
continue as trial counsel.

Unable to focus on his case, Mr. Ramirez spent his time
engaging in tirades with the investigators, expressing outrage
about his mail, obsessing about his girlfriends, money, books,
getting a wedding ring for his stripper girlfriend, etc. He
would irrationally determine for himself - and then announce to
his legal defense team - who would be "allowed" to speak with

13

whom.  He frequently overruled counsel's judgment - and for
reasons not based in reality or related rationally to his case.
For example, on more than one occasion, Mr. Ramirez intervened to
cancel appointments with potential significant witnesses.  On one
occasion, in 1991, a male investigator then retained on the case
arrived for a previously arranged interview with a female friends
of Mr. Ramirez's in Los Angeles, only to be told by her that she
was canceling their appointment because Mr. Ramirez told her not
to talk to him.  It is consistent with his behavior and paranoid
thought processes that Mr. Ramirez would cancel that appointment
out of his obsessive preoccupation with sex and his irrational
fears of being betrayed.  Mr. Ramirez's delusional paranoia
results in his extreme need to control everyone around him and
compels his actions far more powerfully than any rational
interest or concern about the outcome of his case.

        10.    Mr. Ramirez's inability to cooperate in his own
defense cannot be attributed to a one-time conflict with one
individual attorney, nor can it be explained as mere resistance.
To my knowledge, over the past ten years, every defense attorney
who has attempted to work with this defendant to develop a
defense strategy has encountered the same irrationality,
paranoia, and self-destructiveness.  Investigators on the case in
1991 were frustrated by Mr. Ramirez's refusal to discuss his
childhood or reveal anything about his feelings and thoughts at
the time of the offenses.  Once again, his profound paranoia
impaired his counsel's efforts to develop appropriate trial

                              14

information and strategy. Even Mr. Ramirez's own attempts to
pursue a course of strategy in his defense were thwarted by his
mental disabilities. Despite having personally sought out a
particular appellate attorney in and around 1991 to represent
him, Mr. Ramirez would go directly against his advice to not make
certain statements to the media which would hurt his defense. He
would also inform the appellate attorney that he was "too busy"
to meet with him; then Mr. Ramirez would make telephone calls to
that attorney's office which were so disconnected from reality
that they reached the point of sounding delusional. The attorney
indicated to me that Mr. Ramirez's mental problems led the
attorney to assess him as having the worst judgment of any of the
hundreds of defendants he had dealt with. Mr. Ramirez's
cognitive deficits, combined with his persecutory ideas that
people were conspiring against him, led the attorney to conclude
that it was impossible for him to continue to represent Mr.
Ramirez without a great deal more assistance.

Mr. Ramirez's current defense attorneys have also been
frustrated by the extraordinary difficulty of gaining information
from Mr. Ramirez necessary for his defense. Despite his strong
liking for one of his current female defense attorney, Dorothy
Bischoff, Mr. Ramirez's suspiciousness leads him to give her
information only on a "personal" level, admonishing her to not
put any of it in written form or in a file of any kind.
According to Ms. Bischoff, he has told her she could go to El
Paso "as my girlfriend, but not as my lawyer." In 1994, after

15

she went to El Paso without his knowledge, Mr. Ramirez "went berserk" - what he said while he was screaming, yelling, and pacing made absolutely no sense.  He became totally impossible to work with.  Any information his current defense attorneys have managed to find has been blocked from use by Mr. Ramirez's paranoia.  Despite the many hours his attorneys have spent in explanation, he has never been able to comprehend how the information could help him.  In his mind the only reason people want information from him is to make a name for themselves or to make money by writing a book about him in the future.

Mr. Ramirez has shown a consistent pattern of delusional attempts to block his own attorneys' communications with other counsel by trying to require each attorney to communicate only with him.  Each is constantly tested and any violation of this procedure was, and is, considered disloyalty.  Daro Inouye (who was co-counsel to Mr. Martin in 1991 and remains a counsel of record) experienced Mr. Ramirez's pattern with attorneys in general as one of significant paranoia, antagonism, and hypervigilence.  Mr. Inouye has recently been included in Mr. Ramirez's ever-widening delusional system, accused of being part of a conspiracy and of backstabbing.  Mr. Inouye is no longer "allowed" by the defendant to be in the holding tank, nor to sit next to him in court.  This inclusion by Mr. Ramirez occurred after he purportedly felt he had revealed "too much" about his personal background to Mr. Inouye.  It is clear this revelation, which resulted in Mr. Ramirez experiencing increased feelings of

16

vulnerability, led to a strong increase in his level of paranoia and mistrust. Mr. Inouye, Mr. Burt, Ms. Bischoff and I have all seen Mr. Ramirez with significant mood swings characterized by constant physical motion, lack of thought, impulsive action, high intensity fury, and an inability to reason. During these episodes, his lack of insight for functional purposes reduces to a level of non-existence; it is not possible to reason with him. To my knowledge, all defense team members have encountered and continue to experience similar episodes.

In this out-of-control state Mr. Ramirez's speech becomes rambling, incoherent, and nonsensical. He exhibits severely increased impulsivity and disconnectedness, and his degree of agitation is extreme. In 1991, he was clearly out of touch with reality and potentially explosive. Mr. Inouye described his experience of Mr. Ramirez at that time as "volcanic". Mr. Burt has described him in this state as a "trapped animal" with a surprised look in his eyes as they fixate back and forth. His rapid shifting from one topic to the next - like a "verbal panic" - obliterates his ability to follow the attorney's efforts to communicate. One example is Mr. Burt's attempt to explain to Mr. Ramirez that bringing girlfriends into the jail created security problems. This led to a rambling tirade of rapidly shifting topics, very loosely based on his conspiracy theory, and a series of random topics of betrayals - such as those Mr. Ramirez attributed to Mr. Inouye.

11. Mr. Ramirez's documented childhood history of

17

epilepsy coupled with his father's history of uncontrollable
rages led me to strongly recommend neurological and neuropsycho-
logical evaluations - because of the strong possibility that
organic factors might be the basis for his mental disorder.   In
discovery provided by the San Francisco District Attorney's
Office (from a September, 1985, Los Angeles Times newspaper
article) an interview with Frances Bustillos described her vivid
memory of Richard Ramirez as a fifth and sixth grader when he
"used to have seizures", and, "All of a sudden, you'd turn around
and he'd be kicking and screaming and they'd have to take him
out."  She also stated that his drug use began in the eighth
grade when he started sniffing glue, followed by the use of
marijuana.  Clifford Linedecker's book, The Night Stalker,
contains the same citation (in chapter nine), and further
describes that one of the defendant's sisters told Los Angeles
deputies that her brother had periodic seizures and convulsions,
and said he suffered from epilepsy.  To quote Mr. Linedecker:
"Police, however, never found any history of epilepsy in his
medical records, although others also said Ramirez sometimes
suffered epileptic-like convulsions."  In reality, documented
evidence does exist in the form of at least two abnormal EEG test
results.  One EEG test was performed on December 15, 1970 when
Mr. Ramirez was ten years old; the other is dated two years later
on December 2, 1972 at the age of 12.  In their conclusions
section, both EEG records were described as "abnormal".  Robert
Schneider, M.D., evaluated and treated him for a seizure disorder

18

in 1972 and 1973. His treatment included the prescription
medication, phenobarbital. Additionally, a psychological
evaluation from October 4 and 11, 1976, performed by Dr. Ursula
Niziol offers the diagnostic impression of a "convulsive
disorder" and verifies that he had convulsions at age 12 or 13
for which medication was prescribed. Learning disabilities
and/or minimal brain dysfunction were also noted. Dr. Niziol
also made note of his depression, suicidal ideation,
disorganization and the impression of a significant thought
disorder. Shortly thereafter (on November 9, 1976), a
psychiatrist - Delia Gallo, M.D. - assessed the following: "At
this point I feel that Ricardo's antisocial behavior is the
result of a low self-esteem, which very likely was the
consequence of the *organic factors* (e.g., seizure disorder,
drugs, learning problems) and the environmental circumstances
(family, peers)."

     12.  A defendant's capacity to disclose pertinent facts
surrounding the offense, including his mental state and actions,
is critically necessary to develop possible legal defenses. Yet,
Mr. Ramirez could not distinguish between what was harmful to him
and what was helpful to him in a legal sense. He was also not
able to understand how information about his childhood was
relevant to the preparation of a defense. Even when attempts
were made to carefully explain how specific childhood experiences
or examples of mental impairment could impact his defense, Mr.
Ramirez was unable to grasp the relevance of such information to

his case.  He would frequently engage in behavior such as telling
the 1991 investigator that he was withdrawing "all the
declarations I gave you," with no concept of the important
consequences of that choice.

Another investigator, Elise Taylor (now a licensed
marriage family child counselor), was later brought into the case
to gather historical information in order to prepare a
psychosocial history for use in the defendant's penalty phase.
In her declaration she described his adamant refusal to discuss
his life history, linking it to his extreme and irrational
obsession with confidentiality and security measures.  In her
estimation, Mr. Ramirez's few descriptions of his childhood
experiences had a "hallucinogenic quality", in contrast to his
strong conviction of their spiritual and religious content as
real experience.  She experienced him as perpetually unable to
participate in the preparation of his case.  She saw him as in
complete denial - "to the point of being almost dissociative" -
about the reality of his multiple death sentences.  Ms. Taylor's
assessment was that the defendant's predisposition towards a
paranoid mistrust resulted in significantly impaired judgment and
a pervasive need to maintain total control over any contact with
his family.

Mr. Ramirez's current defense attorney, Michael Burt, has
had to explain mental defenses and incompetency issues over and
over again to him.  The defendant keeps asking him the same
questions and cannot grasp how mental incompetency is litigated

20

or what insanity issues are about. He cannot understand that there is a difference between the determination of incompetency at the present time versus his mental state at the time of the offenses. Whenever Mr. Burt has explained to him relevant information - such as that my declaration must be disclosed in court and revealed to the prosecution - Mr. Ramirez reacts as if this is a new surprise. I had explained that process and gained verbal informed consent from him as far back as 1991 when I first interviewed him with his former appellate attorney. Another example of Mr. Ramirez's inability to process information relates to his own expression of interest in understanding what a writ was. He twice asked Ms. Bischoff to explain a writ to him; on neither occasion was Mr. Ramirez able to explain it back to her. Mr. Ramirez also cannot see that his fixation on issues not relevant to the case, such as gaining phone privileges, interferes with their work. After many months' fixation on telephone privileges and obsessive preoccupation with obtaining a court order for telephone access, Mr. Ramirez's defense attorneys went to court for him to present this issue. Within minutes, Mr. Ramirez was unable to focus on the legal arguments presented on his behalf, becoming focused on how Ms. Bischoff was dressed and on the process of flirting with her instead of on the hearing. Despite his attorneys attempts to support his expressed needs, Mr. Ramirez felt that Mr. Burt was colluding with the attorney general to deny him his rights and was working a backdoor deal with him. Mr. Ramirez then sent Mr. Burt a series of bizarre

21

letters, accusing him of being on the prosecution team.  He had
also asked him to destroy a note he'd sent to Mr. Burt about
wanting more phone access, because there might be "spies" in the
Public Defender's Office.

After my most recent visit with him, Mr. Ramirez told his
defense attorneys that I must now be working for the prosecution.
His reason for this was because some of my questions to him had
focused on the evidence against him.  His further explanation for
this belief was that the only reason anyone could have for
interest in the evidence against him would be to reveal it to the
prosecution.  In actuality, my questions were related to
assessing Mr. Ramirez's mental competence with regard to the
capacity for the appraisal of likely outcome.  In the recent past
he had asked his attorneys what evidence there was against him.
They had made numerous prior attempts to discuss specific
evidence with him - such as fingerprints, DNA, stolen property,
etc.  Despite constant reassurances that the only motive is to
develop his defense, anyone who tries to focus on evidence and
facts of his case becomes the delusional enemy who is colluding
with the prosecution against him.  Mr. Ramirez translates this
focus as a betrayal.  In his mind, if a defense team investigator
asks these questions, he must really be a police officer.
Because the neuropsychologist, Dr. Young, had previously worked
for the Department of Public Health, Mr. Ramirez saw that
position as akin to working for the police, and he therefore
decided she would hurt him if she testifies.  Mr. Ramirez told me

22

that his first defense attorney in the Los Angeles case, Alan Adasheck, took the information that he, Mr. Ramirez, had provided and gave it to the district attorney. He believes Mr. Adasheck was in cahoots with the D.A. and law enforcement. He believes that the Sheriff's Department in Los Angeles was drugging him at that time. Mr. Ramirez believes that he saw them put little vials into his coffee from their shirt pockets. He is certain it was not medication but something deliberately selected to give him pain. It was "CIA shit". His explanation for this is that it was a political thing. He believes there is no evidence to substantiate any of the 13 L.A. murder convictions, and my attempts to reality test were not successful. I showed Mr. Ramirez an evidence list from the San Francisco case and went over it item by item with him. He was unable to follow my attempts to rationally step-by-step focus on the evidence issue. Mr. Ramirez felt that I did not understand the obvious. He had not spoken with Mr. Inouye since September of 1993 because Mr. Inouye had conducted an investigation against Mr. Ramirez on behalf of Lieutenant Kennedy from the Sheriff's Office. His office is right next to Mr. Inoye's! What is obvious to Mr. Ramirez, that he felt I could not understand, is that his defense attorneys are deputy public defenders. "They're deputies-they're police!-They work for the court." I asked him how he understood the difference between defense attorneys and district attorneys. To Mr. Ramirez, they are basically the same! "They work hand-in-hand. It's all a game to them. It's political-a corporate

23

ladder.  This is the game-their playground where they work."
Like Marcia Clark and Johnny Cochran in reality whisper in each
other's ears! - in reality!  The courtroom stuff is just a game!"

13.   Mr. Ramirez's capacity to testify relevantly or to
realistically challenge prosecution witnesses is severely defi-
cient.  His mental processes and resultant verbalizations lack
coherence and relevance, and his capacity to use good judgment is
extremely poor.  I would have to rate Mr. Ramirez's capacity for
attentiveness-an essential element necessary for this sort of
trial participation-as among the worst I have ever seen.  Mr.
Martin remembered that Mr. Ramirez's very short attention span
and distractibility rendered Mr. Ramirez unable to stay on any
one track for more than a few moments.  Similarly, Mr. Inouye
observed that Mr. Ramirez could hold onto a thought for only a
second and then would switch directions.  He saw the defendant's
inability to focus as like that of a young child.  The former
appellate lawyer described Mr. Ramirez as having incredible
difficulty focusing and being unable to zero in on topics in
their conversations.  The investigators' experience of this
inability in him was that he was totally unable to stay on task.
Current defense counsel also consistently experience Mr.
Ramirez's inability to focus on - or even pay attention to - any
subject for more than a few moments.

14.   Mr. Ramirez is also significantly impaired in his
abilities with regard to appraisal of the role of the judge as
being neutral and of the jury as being the determiners of guilt

24

or innocence.  According to Mr. Inouye, once Mr. Ramirez had figured out in his own mind that there was a "political" aspect to his prosecution he has truly believed that.  One of the investigators described Mr. Ramirez's strong insistence that Mr. Martin was secretly in collusion with the judge.  This paranoid idea expanded into the further delusion that Mr. Martin was "actively trying to do him (Mr. Ramirez) in."  The bizarre and psychotic speech Mr. Ramirez made in 1989 to the Los Angeles judge who was deciding his fate - and who had the power to change his sentence - is a striking example of his severe impairment with regard to understanding the legal role of the judge.  I will cite a brief example of how Mr. Ramirez utilized his only opportunity to plead for his life:

> "You maggots make me sick... You don't understand me.  You are not expected to.  You are not capable of it.  I am beyond your experience.  I am beyond good and evil. Legions of the night, night breed, repeat not the errors of night prowler and show no mercy.  I will be avenged.  Lucifer dwells within us all."

15.   This defendant's recognition and utilization of typical legal safeguards has been minimal.  His self-destructive attempts to control the legal process clearly arise from his mental pathology.  Probably the most blatant and public evidence of this occurred after he was convicted of 13 murders in the Los Angeles Superior Court.  One would expect a defendant in this situation to take advantage of this opportunity to express remorse (even if such an expression were manipulative rather than genuine).  What is found instead in the November 7th, 1989,

25

transcript of Mr. Ramirez's statement to the sentencing court
(part of which is set forth above) is a bizarre and malevolent
verbal barrage, the seriously damaging effects of which would be
clearly obvious to any non-mentally impaired person.

   Mr. Ramirez had no sense that his irrational rantings and
scary references to Satanism could negatively impact his legal
situation.

   His former appellate lawyer had repeatedly advised Mr.
Ramirez to not participate in television talk shows because of
the potentially adverse effect on his defense efforts.   In August
of 1991, the appellate lawyer wrote to the defendant about his
agreement to participate in the Maury Povich Show after the
lawyer had rejected their previous requests and had warned Mr.
Ramirez how certain statements he made in the media would hurt
his defense efforts.   The defendant was so lacking in rationality
and judgment that he could not grasp that he was saying "crazy"
things.   He also had no awareness that he was irrationally
obsessed with his own notoriety- in favor of and to the detriment
of his legal proceedings. He had no understanding of cause and
effect with regard to his actions or verbalizations.   When the
lawyer tried to explain to Mr. Ramirez that he had been
manipulated by women trying to sell their stories about the
defendant, his only reaction was one of upset at the lawyer for
suggesting such a thing.   He was obsessed with sex, his
girlfriends, and attempting to control everyone around him; but
he was oblivious to the consequences and reality of his legal

26

situation.  Mr. Ramirez was incapable of using reason to
understand and appreciate what was going on in reality.  This
lawyer perceived him as a small child in a adult's body,
functioning at an extremely limited level of adaptation.  He was
unable to appreciate the seriousness of the reality of dealing
with 12 death sentences!

     16.  On the other extreme, according to Mr. Martin, Mr.
Ramirez very much wanted to live, yet he did nothing to help in
his defense and actively attempted to totally block access to his
family.  His paranoia caused him to be psychotically protective
of his family, to such an extreme that any attempts to discuss
possible ways to save his life were out of the question if his
family would be involved in any way.  The defendant irrationally
dictated when he would see Mr. Martin and everyone else working
on the case.  Out of his delusional system, he also attempted to
dictate when defense team members could <u>not</u> see him.  After Mr.
Martin went to El Paso to interview the defendant's family and
told Mr. Ramirez that he would work to save his life even without
the defendant's help, Mr. Ramirez became highly volatile even to
the point of threatening Mr. Martin, stating "I know how to
remove you."  He also left name-calling and hysterical telephone
messages, the quality of which struck Mr. Martin not just as
infantile but also as bizarre and psychotic.  One of the final
elements of Mr. Ramirez's building paranoia at that time was his
delusional belief that both Mr. Martin and an investigator had
sex with a witness (a former juror who wanted to marry Mr.

27

Ramirez... Mr. Ramirez had also tried for several months to get her appointed as a "paralegal"...) when they interviewed her in Los Angeles. Mr. Ramirez also filed a <u>Marsden</u> motion against Mr. Martin. The former appellate lawyer felt that Mr. Martin's work on the case had been superb and attempted to explain the how and why of it to Mr. Ramirez. Despite Mr. Ramirez's purported respect for the appellate lawyer's opinion, his extreme paranoia rendered him incapable of rational understanding. Unable to maintain or understand boundaries, he had distorted his relationship with Mr. Martin by projecting his own psychotic thought processes onto him. Because Mr. Ramirez was unable to focus on anything other than his own emotions and persecutory beliefs, he could not stay in reality. He also exhibited extremely poor judgment about other people and their motives. He was totally unable to appreciate that Mr. Martin was working <u>for</u> him to try to save his life.

17.    Mr. Ramirez's inappropriate and disruptive behavior, both in and out of court, clearly arises from a substantial degree of mental impairment. I would assess Mr. Ramirez as at times reaching the very severe range of unmanageable and psychotic behavior, in both verbal and motor functioning. The degree to which this behavior historically has disrupted the conduct of a trial and could potentially disrupt the conduct of a future trial would also be in the severe range. Some examples of behaviors the numerous professionals who have attempted to help Mr. Ramirez have been subjected to include:  banging on the

28

walls, screaming and yelling, volatile nonsensical rantings, arm flailing, constant body motion and angry paranoid tirades.

Mr. Ramirez's inability to control his sexual behavior around women creates major problems, due to his extreme obsessiveness and compulsivity in this area.  This hypersexuality may also be related to his mental disorder.  Unusual sexual behaviors, erection, disinhibition, and masturbation may occur in frontal and temporal lobe epilepsies.

Mr. Ramirez believes that he is unable to trust men - whom he at one time also stated he hates - and therefore is unable to work rationally with them.  However, in spite of the fact that Mr. Ramirez prefers relating with women, he cannot work rationally with them either.  Even though he is more willing and interested in communicating with females, his obsessive preoccupation with sex creates a huge barrier to productive work with him.  He perceives all women in whom he has any interest as his "girlfriends".  Just as he cannot understand how his constant obsessive focus on irrelevant issues interferes with work on his case, Mr. Ramirez does not understand how his sexual compulsivity impedes progress on his defense efforts.  I believe that every woman who has had any sort of professional relationship with Mr. Ramirez since his incarceration has experienced a degree of his sexual inappropriateness.  Those professionals include criminal defense attorneys, investigators, psychologists, law clerks, nurses and correctional officers.  One example of this behavior is cited in the jail writeup of an incident dated as July 14,

29

1990. This writeup documents a pattern of masturbation in front
of the female nursing staff, stating that other medical staff had
had similar experiences with Mr. Ramirez but did not write him up
at the time. Dr. Linda Meza, a psychologist working with Mr.
Martin, quit working on the case after Mr. Ramirez engaged in
similar behavior in her presence. More recently, Dr. Myla Young
described her frustration with his repeated attempts to sexually
expose and manipulate himself. Elise Taylor, a penalty phase
investigator, who worked for months with Mr. Ramirez attempting
to put together a social history, saw the intensity of his
distraction with sexual issues as almost delusional. In her
declaration, she describes his compulsive attempts to masturbate
in her presence, his sexual fetish with feet, and his obsession
with genitalia and sexual fantasies. Despite her very clear and
consistent statements that there would be no physical contact
between them, he went so far as to attempt to pull down his
pants and expose himself to her. Similarly - despite my constant
and firm reminders of our agreement with respect to boundaries -
at the end of my last meeting with Mr. Ramirez in 1991, he
grabbed for my breast while we were waiting for a guard to come
to unlock the door so that I could leave. Although Mr. Ramirez
very much wanted to continue meeting with me and knew that this
kind of behavior would end our contact, he was unable to control
himself. With women, his best efforts to cooperate are
frequently interfered with by his overwhelming drive to
masturbate and expose himself, and to gratify his fetish for

30

women's shoes and boots. Due to his obsessive fixation on certain
parts of the female anatomy - particularly feet - he will often
expend inordinate energy pleading with female defense team
members for a glimpse of their feet or the opportunity to touch
them.  Mr. Ramirez is incapable of delaying gratification for
more than a short period of time.  Although he does not see men
as sexual objects, his intense distrust and underlying negativity
toward his own gender creates different but equally severe
problems in his ability to relate rationally and productively
with him.

18.    In sum, it is my strong opinion that due to severe
mental impairment, Mr. Ramirez is mentally incompetent to stand
trial.  He is not capable of assisting and cooperating in his own
defense.  Once he is convinced that his own version of reality is
correct, any attempt to reason with him or to resolve
misperceptions is impossible.  The degree of disorganization in
Mr. Ramirez's thinking at times reaches psychotic proportions.
He suffers from delusions and paranoia. One example is his belief
that the prison guards put poison in his food to try to kill him
and to cause him intense pain because they did not want him to
"get off." Mr. Ramirez also believed that when he was on suicide
watch a person in the Mafia arranged a poisoned pizza for him,
but Mr. Ramirez gave it away to another inmate whom he later saw
being "wheeled out." There are many other examples of his
distorted thinking, flawed logic, and serious inability to
comprehend the reality of his  situation.  His extreme incapacity

31

to control his own impulses coupled with very inaccurate readings of the reality of the world around him often causes him to engage in bizarre behavior toward others which intimidates them.  His mental capacity is severely incapacitated by a thought disorder and by significant affective disruption.

He has extreme problems with mistrust and suspiciousness, leading to a constant need to control those around him in a hypervigilant manner.  He is highly impulsive and lacks the ability to control his behavior and emotions.  Mr. Ramirez's judgment, ability to perceive accurately, and understanding of reality are all at a severe level of impairment.

Dr. Ursula Niziol, the psychologist who evaluated Mr. Ramirez on two occasions in October of 1976, believed that he had a significant thought disorder which may have led to schizophrenia.  She described him as unable to separate reality from fantasy, disorganized, and as having very poor judgment.  Her suspicion was that he suffered from a hereditary neurological developmental disorder of childhood, including a seizure disorder, learning disabilities and impaired intellectual functioning.  His suicidal ideation and depression were also noted at that time.

There is strong evidence that Mr. Ramirez's mental impairment is related to temporal lobe dysfunction.  The constellation of symptoms and behaviors he exhibits are consistent with an organically-based syndrome of this type.  A temporal lobe syndrome can be characterized by problems in sexual

32

behavior, depression, paranoia, confusion, attention, memory,
altered sense of reality, loss of control, obsessiveness, rages,
bizarre thinking processes, and psychotic experiences.
Historically, at the early age of ten Mr. Ramirez was
experiencing complex partial seizures.  Documentation of this
temporal lobe disorder exists in the form of abnormal EEG test
results between the years 1970 and 1973.  Mr. Ramirez was
diagnosed with a seizure disorder and prescribed the medication
phenobarbital.  It is now known that, among the antiepileptic
drugs, phenobarbital exerts the most deleterious effect on
cognitive functioning.  Children treated with phenobarbital can
develop hyperactivity and irritability, memory and concentration
deficits, IQ declines, and motor impairment.  There is also
evidence that higher risk factors of violence in epilepsy are
associated with the use of phenobarbital in children, younger
age, early onset of seizures, lower socioeconomic status, and
left temporal seizure foci.

        In a 1986 neuropsychiatric report Dietrich Blumer, M.D.,
advised that the defendant needed to be medicated and recommended
further neurologic workup.  In 1988, Dr. Blumer evaluated Mr.
Ramirez at the L.A. County Sheriff's Department Jail Hospital; he
prescribed tegretol for what Dr. Blumer diagnosed as an organic
affective disorder (temporal lobe syndrome), as well as an
antidepressant.  More recent psychiatric and neuropsychological
evaluations performed by George Woods, Jr., M.D., and Myla Young,
Ph.D., respectively, further validate an organic basis for Mr.

                        33

Ramirez's impairment.

19. It is my further opinion that Mr. Ramirez's mental competency has not changed in any significant way between 1991 and 1995. This opinion is based upon my own observations and assessment of Mr. Ramirez in both 1991 and in 1995, as well as upon verbal and written reports of numerous professionals who have had contact with him throughout this time period. Ample evidence also corroborates similar behavior and problems existing much earlier in time from various professional sources, including medical and psychiatric. One such example is attorney Manuel Barraza's declaration which describes his experience with Mr. Ramirez in 1985. His opinion was that the defendant was incompetent to stand trial at that time. Mr. Barraza described Mr. Ramirez's paranoia, severe mood swings, incoherent and irrational dialogue, out-of-control agitation, and suicidal ideation. Symptoms of temporal lobe epilepsy reflect the same symptoms which are exhibited by Mr. Ramirez and which are consistently observed and reported by anyone who has had the experience of attempting to work with him for any length of time.

Clearly, Mr. Ramirez's mental problems have been of a longstanding and severe nature. Without intensive psychological treatment and appropriate medication - which I can safely say has not been provided for him either by the San Francisco County Jail or by San Quentin State Prison - the likelihood of any major changes occurring in Mr. Ramirez's mental condition is essentially non-existent.

34

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was signed on April 18, 1995, at Los Angeles, California.


_____
DR. ANNE EVANS

35

## DECLARATION OF RON SMITH

I, Ron Smith, hereby declare and state as follows:

1.     I am a latent fingerprint expert with over 30 years of experience in the field. I have been retained by the Los Angeles Office of the Federal Defender to assist with the examination of fingerprint evidence offered by the prosecution in the case of *People v. Richard Ramirez*, A771272.

2.     In order to render any opinions as to the quality of the fingerprint analysis and evidence offered by the prosecution in the case against Mr. Ramirez, I require access to the fingerprint evidence and exhibits introduced at his trial. Until I review such exhibits, I am unable to render any opinions or conclusions as to the quality of the fingerprint evidence introduced against Mr. Ramirez.

I declare under penalty of perjury under the laws of the United States of America and of the State of California that the foregoing is true and correct to the best of my recollection.

Executed on ___DECEMBER  12___, 2008 in Collinsville, Mississippi.

Ron Smith

## DECLARATION OF LISA ALLYN DiMEO

I, Lisa Allyn DiMeo, hereby declare and state as follows:

     1.    I am a forensic specialist trained in crime scene analysis and impression evidence.  In support of the State Petition for Writ of Habeas Corpus and the Informal Reply filed with the Supreme Court of California, I reviewed and evaluated trial exhibits and testimony related to shoeprint evidence in the case of *People v. Richard Ramirez*, A771272.  On May 21, 2004 and November 10, 2005, I submitted declarations stating my findings and conclusions having reviewed the relevant exhibits and testimony.

     2.    I have been retained by the Los Angeles Office of the Federal Defender to expound upon my findings and conclusions that I previously provided in my two declarations.  While I stand by my conclusions and findings as stated in my two declarations, which were reached under restrictive conditions to the physical evidence at that time, I desire an opportunity to go into further depth in analyzing the breadth of the shoeprint evidence introduced during Mr. Ramirez's trial.

     3.    My prior evaluation of the trial exhibits in this case was done at the Superior Court in the exhibit room.  I was only able to open, examine and photograph one exhibit at a time; I was required to work on a small counter with little surface area; and I had to conduct my examinations with available and limited

lighting. I require physical access to all of the relevant exhibits in my personal laboratory, with the use of my tools, equipment, proper lighting, and the time necessary, in order to render more detailed and complete findings and conclusions.

I declare under penalty of perjury under the laws of the United States of America and of the State of California that the foregoing is true and correct to the best of my recollection.

Executed on *December 12th*, 2008 in La Mesa, California.

Lisa DiMeo