I, Edward J. Bronson, declare as follows:

1.  I am a Professor Emeritus of Political Science at California State University, Chico.

2.  I make this affidavit for the purpose of, first, attempting to determine whether the trial court denied Mr. Ramirez due process by failing to grant a change of venue in his case.  Second, I will endeavor to determine whether counsel for Mr. Ramirez were ineffective in presenting that motion to the trial court and/or in conducting the voir dire

3.  This affidavit will be divided into four sections, as follows:

§I.  Qualifications ¶¶1-16.
§II.  The Change-of-Venue Issue ¶¶17-189
    A.  The Standards for Analysis
    B.  The Analysis of the Need for a Change of Venue
    in the Ramirez Case
§III.  The Voir Dire and Related Matters ¶¶190-224
§IV.  The IAC Issue. ¶¶225-239
§V.  Conclusions (¶¶240-242

**§I.  <u>Qualifications</u>.**

4. **A. General: Education, Employment, Research, and Testifying.**  I will begin by briefly reviewing my qualifications, and I have attached a current curriculum vitae to this affidavit as exhibit A.  After my undergraduate education, I received a J.D. from the University of Denver; an L.L.M. from New York University; and a Ph.D. in Political Science, emphasizing Public Law, from the University of Colorado.  As part of the study for my doctorate, I received training in various types of social scientific analysis.

5.  I have been employed since 1969 at California State University, Chico, where I have been a Professor of Political Science in the College of Behavioral and Social Sciences, now emeritus.  I have taught courses in Administration of Justice, Legal Analysis, and Constitutional Law.  In addition, I have taught at the University of Colorado as a Visiting Professor, and in summer programs at several law schools, including the University of San Francisco; the University of Santa Clara; the University of California at Hastings, Berkeley, and Los Angeles; the University of San Diego; California Western; and the University of Puget Sound (now Seattle).  I have been a Visiting Scholar at the University of Alaska and at the College of Micronesia, and in 1992 I was a Fulbright Scholar at the Center for Judiciary Studies, Ministry of Justice, in Lisbon, Portugal, where judges and public prosecutors are trained.  My role there was to explain the use of juries and social science in the American courts to policy makers, practitioners, and students.

6.  In my research, dating back to 1968, I have studied the attitudes of jurors toward relevant issues of criminal justice, the effects of those attitudes on verdicts, and the way that various processes, including voir dire and publicity, affect jury behavior.  I have done research and published articles about these subjects, a number of which are set forth in the accompanying curriculum vitae.

7.  In addition, I have acted as a consultant on ways to improve the fairness of voir dire and jury selection.  I have testified and submitted pretrial and post-trial affidavits on these matters in many cases, both federal and state around the country, have reviewed transcripts of voir dire as part of the preparation for drafting affidavits submitted for post-conviction relief and to testify on the efficacy of voir dire, and have lectured on voir dire and jury selection issues at various academic and professional organizations.

8.  **B. Venue**.  I have been studying and doing research on pretrial publicity for almost 40 years.  I have published and presented research papers at various academic and professional meetings; done pretrial and post-conviction publicity

analysis work for attorneys involved in hundreds of cases; made recommendations about the need for a change of venue or other remedy in many cases; developed, conducted, and evaluated surveys to measure the extent and nature of pretrial publicity; qualified and testified as an expert witness on change-of-venue motions in 122 cases, primarily testifying in person and occasionally by affidavit; submitted several additional affidavits in post-conviction proceedings where the issue involved possible prejudicial pretrial publicity; and testified several times on the need to close various hearings (preliminary, competency, and venue) or seal various matters in high profile cases.  I am the long-term author of the chapters on both venue and pretrial publicity in <u>California Criminal Law Procedure & Practice</u>, published under the auspices of the University of California and the State Bar of California, and widely used by lawyers and judges.

9.  In addition, I have recommended against a change of venue in 170 cases (22 times in testimony).  I have testified for and consulted with state prosecutors opposing venue changes, but only in seven cases, far less often than I have consulted with defense counsel.

10.  I have testified or consulted on the venue issue in such well-known cases as <u>United States v. McVeigh</u> (the Oklahoma City bombing), <u>Oklahoma v. Nichols</u>  (the state's more recent prosecution for the bombing), <u>United States v. Skilling, et al.</u> (the Enron case), <u>People v. Richard Allen Davis</u> (the Polly Klaas case), <u>United States v. Kaczynski</u> (the Unabomber case), the San Francisco dog mauling case, the John Walker Lindh case (the American Taliban), the case of one of the men charged with the African embassy bombings (Mamdouh Mahmud Salim), <u>United States v. Cary Stayner</u> (the Yosemite Park murder case), the cases against insurance companies arising out of the Hurricane Katrina disaster, and many other very well known cases, several of them in federal courts around the country.  In such federal cases as that of the Unabomber and the American Taliban, I recommended against the need for a change of venue, despite the very high profile of those cases.

11.   **C. Content Analysis.**  I have previously qualified many times as an expert in various courts throughout the country on the content analysis of pretrial publicity, assessing its impact under both social science and legal standards, as well as other issues such as voir dire and survey responses.  Content analysis is a technique used in social science and other areas to provide a scientific means of analyzing diverse material.  I have done research in this area and presented professional papers. I have also often analyzed and testified about content analysis of other areas, particularly such matters as open-ended responses on survey questionnaires and in voir dire.

12.   **D. Jury Voir Dire.**  I have also done much research on voir dire procedures, published in this area, lectured on the topic at professional meetings, both for lawyers and social scientists, taught California Continuing Education of the Bar classes on the topic, and testified many times on it as an expert witness, both as a possible remedy for prejudicial pretrial publicity and as to its effectiveness in a particular case, both in pretrial and post-conviction legal contexts.  Fairly recently I consulted with a trial court judge directly, extensively, and individually on appropriate voir dire procedures to use in a death penalty case.[1]

13.   **E. Survey Analysis.**  I have also qualified frequently on the conducting and critiquing of public opinion surveys.  I have training and extensive experience in this area and have conducted research and presented professional papers in the field. I am a member of the American Association of Public Opinion Research, and have spoken at national meetings of this and other professional groups.  I was a member of a four-person group that was commissioned to write standards for venue surveys, which have subsequently been published after being adopted by the American Society of Trial Consultants.

---

[1] People v. Choyce, San Joaquin County Superior Court, 2007-2008.  Of course that was done with the knowledge and approval of counsel.

14. **F. Death Qualification.** I have studied the process of qualifying juries in capital cases and have published several studies on this subject, which have been cited many times by appellate courts, including the California Supreme Court and the United States Supreme Court.  My experience has included testifying in over 50 cases in Alabama, Arizona, Colorado, Illinois, New Mexico, Nebraska, Oregon, and California, including the case of <u>Hovey v. Alameda County Superior Court</u>, 168 Cal.Rptr. 128 (1980), and in federal court in <u>Grigsby v. Mabry</u>, 569 F.Supp. 1273 (E.D. Ark. 1983), <u>aff'd</u>, 758 F.2d 226, (8th Cir. 1985), <u>rev'd, sub nom. Lockhart v. McCree</u>, 460 U.S. 1088 (1986).

15. G. **Ineffective Assistance of Counsel.**  I am generally familiar with the legal issue of ineffective assistance of counsel (IAC) and have submitted declarations to courts on the issue in some cases when the substantive issue was one I was knowledgeable about, although I am aware that my role is limited to assessing the role of the attorney and the likely effect of any IAC on the fairness of the trial.

16. <u>Summary of Qualifications</u>.  I believe I am qualified as an expert on all aspects of issues related to the impact of pretrial publicity on the need for a change of venue, including the use of social science techniques to do that analysis.  These include content analysis of media and survey responses, survey research design and analysis, available remedies to cure prejudicial pretrial publicity (including voir dire and many others), and overall on the issue of whether a defendant cannot receive a fair trial in a particular community in light of pretrial publicity about the case.  I believe I am also qualified on the death-qualification process and on the legal standards for assessing IAC.

**§II.  <u>The Change-of-Venue Issue</u>**

17. <u>Introduction</u>.  In this section I will first lay out the standards for a change of venue, then apply those standards to the Ramirez case to assess the need for a change of venue.

18.  **A. The Standards for Analysis: The Social Science and Legal Standards for Prejudice from Pretrial Publicity.**  I use both social science and legal standards in my analysis to assess the impact of prejudicial pretrial publicity.  The social science standards are a product of a substantial body of research on the topic.  The legal standard comes from the decisions of appellate courts in the venue area.

19.  An essential aspect of a fair trial is that the defendant begins the trial with his presumption of innocence intact.  Defendants can be and sometimes are acquitted in the face of heavily biased pretrial publicity.  Marion Barry and John DeLorean are classic examples -- national news programs showed secret recordings of their drug deals.[2]  There will always be cases where the prosecution overreaches or makes errors or where there is some unusual event that leads to an acquittal.  But that is not a fair trial as we know it, situations where the defendant can only win acquittal by proving his innocence or when there is no case at all.

20.  1.  <u>General Problems of Pretrial Publicity: Social Science</u>.  In a fairly recent and major review of the social science research spanning over 30 years on the effects of pretrial publicity (PTP) on jurors' consideration of evidence and their ultimate decisions, the authors did a meta-analysis of 44 empirical studies, representing 5,755 subjects, conducted by dozens of scholars using a variety of methodologies.  They concluded that, "Subjects exposed to negative PTP were significantly more likely to judge the defendant guilty compared to subjects exposed to less or no PTP."[3]  The prejudicial impact was found at all three stages: pretrial, post-trial but prior to deliberations, and post-deliberation.

21.  The authors suggest that PTP leads to the development of a "story model," like the idea of an evidentiary prism, noted below.  The story model has been

---

[2] Of course it should be noted that those same television broadcasts also strongly suggested that those defendants were entrapped, at least de facto, by government overreaching.
[3] N. Steblay, et al., "The Effects of Pretrial Publicity on Juror Verdicts: A Meta-Analytical Review," 23 <u>Law & Human Behavior</u>  219 (1999).

explored in a variety of work on memory.[4]  The model provides the means by which negative publicity provides not just isolated fragments of information, but a belief framework about the defendant's guilt.  Those exposed to PTP construct a story to make sense out of a particular event.  Once that belief is formed, it is very difficult to dislodge.  New information that is consistent with the story is readily absorbed, while inconsistent information tends to be rejected.

22.  The story of the case thus becomes the prism through which trial evidence and legal theories are viewed at trial.  If our story model leads us to believe that the defendant is guilty, then the credibility of prosecution witnesses is enhanced, and alibis or other defenses do not ring true.

23.  While developing a story model for jurors is important in trial litigation and a frequent topic at litigation training, at a fair trial the story develops at the trial, not during the preceding coverage of the case in the media.

24.  One author considered the issue of delay in a trial between the first exposure to evidence and to hearing contradictory evidence.[5] He noted several cognitive biases that research suggests are likely to arise as a result of the delay.  In particular, he noted that some people "fail to remember some information that is inconsistent with" their view of the case, and "'recall' information they have never heard before, simply because it is consistent with" their theme of the case.

> "[T]hese types of errors are likely to increase over time, as
> people are less able to recall specific events and come to rely
> more on their general and thematic
> knowledge about the events."[6]

---

[4] See some of the citations at id., 231.
[5] D. Sherrod, "Trial Delay as a Source of Bias in Jury Decision Making," 9 Law & Human Behavior 101 (1985).  This is analogous to the delay between exposure to PTP and sitting as a trial juror months later.
[6] Id, at 102 (citations to studies omitted).

25.  A review of the way memory works, based on themes or "schema," shows that "themes distort memory."[7]  Thus, it is likely that jurors hearing the defense evidence will not use the evidence in ways that conflict with their story model.  This is particularly troubling not just because of the powerful impact, but because of the great difficulty a voir dire questioner will have in discovering the information or attitude.

26.  2. <u>Legal Standards</u>.  The legal standards are those that have been laid out by the courts in many cases.[8]  There are two standards in California on testing for the need to change venue, the federal standard and the state standard.  I will first very briefly here note the federal standard, then discuss and apply the California standard to the Ramirez case, and conclude with presenting an analysis under federal law.  As to federal case law, I am familiar with many rulings by both trial and appellate courts.  Of course there is a long history of decisions on venue by the United States Supreme Court, including cases such as <u>Irvin v. Dowd</u>, 366 U.S. 717 (1961), <u>Rideau v. Louisiana</u>, 373 U.S. 723 (1963) and several others.  These cases clearly established Supreme Court precedent.

27.  Applying United States Supreme Court precedent (and specifically citing <u>Irvin v. Dowd</u>), in 2005 the Ninth Circuit decided the <u>Daniels</u> case,[9] overturning a state supreme court venue decision from California that had upheld the refusal of the trial judge to grant a change of venue.  The <u>Daniels</u> court applied the more demanding federal standard to the burden that California would have to meet when attempting to justify its refusal to order a change of venue.  There are two standards for determining prejudice, either of which could be applied to determine if due process requires a

---

[7] <u>Id</u>.

[8] I am aware that the standards for review by a federal appellate court may be different when reviewing a case coming to it from a federal trial court and one coming from a state trial arising from a habeas petition. Interestingly, it was my belief that no federal appellate court had reversed a federal court conviction for failure to grant a change of venue.  But in 2005 the Eleventh Circuit in a per curiam decision overturned the criminal conviction of the so-called "Cuban Spies" on venue grounds (although it later vacated the ruling). <u>U.S. v Campa</u>, 419 F3d 1219 (11th Cir 2005).  Still, even that temporary decision was unusual.

[9] <u>Daniels v. Woodford</u>, 428 F.3d 1181 (2005),

change of venue.  These are "presumed prejudice" and "actual prejudice."  In Daniels the court stated that the test is "presumed prejudice" (based on its analysis of the publicity and community reaction to it), rather than "actual prejudice."[10]  Since it is rarely possible for a criminal defendant to demonstrate, either from the voir dire or the actual trial, evidence of actual prejudice that the trial was unfair, it will be equally rare that a conviction can be overturned for failure to grant a change of venue.  That is because few jurors admit to bias (and they are excused), or if they do, they believe (or at least say) they can render a verdict based solely on the evidence adduced at trial, say they have no "fixed opinion" about the case, and/or say they can be fair and impartial.  Nor is it usually possible to show that the trial itself was unfair as a result of the pretrial publicity.  The California Supreme Court has exclusively used the "actual prejudice" test since 1989.  That may perhaps help explain why that court has not reversed a single appeal based on venue since 1989, a string of 53 consecutive cases.[11]

29.  For 40 years and in 98 cases through 2008, to date, the California appellate courts have developed detailed criteria in fleshing out the standards which the state supreme court adopted in 1968.[12]  The California framework, see Williams v. Superior Court, 668 P.2d 799, 801 (1983), and many other cases, examines the following:

1. The nature and extent of the publicity.

2. Nature and gravity of the crime.

3. Status of the victim(s) in the community.

4. Status of the defendant(s) in the community.

---

[10] The appellant had conceded that he could not show actual prejudice.  Daniels, 428 F.3d at 1211.  While this passage from the Ninth Circuit Daniels decision regarding venue is apparently dictum, its language is powerful and persuasive.  See discussion and application of the "presumed prejudice" test below.

[11] In fact the 1989 case, People v. Kenneth Williams, 48 Cal.3d 1112, appears to be anomalous.  In 1983 the court had granted a change of venue to Williams' brother Frank by way of a pretrial writ (Frank Williams v. Superior Court, 34 Cal.3d 584).  A significant portion of the prejudicial publicity against Kenneth Williams for the inter-racial rape murder came from the coverage of brother Frank Williams.  The Kenneth Williams case had been decided by the court six years later because it was a post-conviction appeal rather than a pretrial writ.  No doubt it would have been awkward to have granted the change of venue to the younger brother and deny it to the older brother, who had generated more hostile coverage.

[12] Maine v. Superior Court, 68 Cal.2d 375.

    5.  Size and nature of the community.

    29.  I have studied and analyzed these cases over many years, and in my experience in many jurisdictions, find them the most developed of any, while still embodying the same general criteria found elsewhere.

    30.  **B. The Analysis of the Need for a Change of Venue in the Ramirez Case.**  As best I can, I will attempt to measure the prejudice from pretrial publicity in Mr. Ramirez's case, first using the criteria the California state courts have adopted and then analyzing the case using the criteria of the United States Supreme Court, as reflected in the <u>Daniels</u> opinion.

    31.  There are three primary ways to assess the prejudice in this case.  The first is the content analysis of pretrial publicity.  The second is a review of the community survey done in the case.  The third is the jury voir dire conducted at trial.[13]  If this Court follows the <u>Daniels</u> criteria, however, a review of the voir dire would seem unnecessary.  Even if it were true that the voir dire demonstrated no <u>actual</u> prejudice, the Ninth Circuit in <u>Daniels</u> makes that analysis unnecessary if the defendant can demonstrate <u>presumed</u> prejudice.[14]  However, I will review the voir dire in the Ramirez case since the Supreme Court in cases like <u>Irvin</u> and <u>Rideau</u> made reference to it (but only to confirm its findings of actual prejudice based on community bias).

    32. 1.  <u>Content Analysis of the Pretrial Publicity in the Ramirez Case</u>.  a. <u>Method</u>. When confronted with a massive amount of material, as is the media coverage of this case, social scientists use a technique called content analysis.  Content analysis is a research tool devised to analyze large amounts of material in a

---

[13] For my review, I examined the following materials:
      1.  Log of and data about all Los Angeles newspaper material about the case, and Los Angeles times articles.
      2.  Transcript of change of venue hearing and voir dire.
      3.  Other miscellaneous materials.
[14] <u>Daniels</u>, 428 F.3d at 1211.

manner that is objective, neutral, and systematic.[15]  It is widely used in the social sciences and elsewhere to investigate areas as diverse as the interpreting of open-ended comments in a public opinion survey, to whether some of the work traditionally attributed to William Shakespeare was actually written by Francis Bacon.

33.  Suppose, for example, that one were interested in investigating the question of whether network news broadcasts are politically biased and, if so, in what direction and how much.  One would first determine what materials would be analyzed, most likely transcripts of the broadcasts over a given period of time.  In that situation, one might then make the task more manageable by using a representative sample of the material.  Then one would develop appropriate criteria to measure bias.  For example, one might measure the amount of air time devoted to stories that supported one party or the other, measuring the relative balance of the coverage within those stories, perhaps assessing such factors as the time spent presenting each side, the number and prominence of those who were interviewed or quoted on either side, or even the adjectives used.  The transcripts would then be coded to measure objectively the factors previously decided upon.  It is of critical importance that the process be transparent, so that the appropriateness of the criteria used can be considered, the research methodology can be critiqued, and the data can be re-analyzed if desired.

34.  Where the issue is whether the media coverage of a case has biased the community sufficiently to require a change of venue, the means for measurement are the social science and legal criteria.  Being specific about what it is in the publicity that is prejudicial, doing a comprehensive and systematic review, and identifying the sources, makes the review scientific rather than impressionistic and selective,

---

[15] See generally R. Weber, Basic Content Analysis (1985).

35. b.  <u>Application of the Content Analysis to the Ramirez Case</u>.
I will begin by laying out the materials on which I have relied and the methodology I
have used in analyzing the pretrial publicity in this case.  The articles used in this
review were collected from on-line sources and from clippings by various law offices,
supplemented by some searches I made.  In what follows, I will first do an analysis of
the five factors noted above from the California state courts: The nature and extent of
the publicity, the nature and gravity of the crime, the status of the victims in the
community, the status of the defendant in the community, and the size and nature of
the community.

36.  I will also review the publicity under the <u>Daniels</u> criteria:[16]

(1) [W]hether there was a "barrage of inflammatory publicity
immediately prior to trial, amounting to a huge . . . wave of public
passion"; (2) whether the news accounts were primarily factual
because such accounts tend to be less inflammatory than
editorials or cartoons; and (3) whether the media accounts
contained inflammatory or prejudicial material not admissible at
trial. <u>Id</u>. (citations omitted).

37.  (1) <u>The Nature and Extent of the Publicity</u>.  The first factor in the analysis
consists of two separate elements, nature and extent.  <u>Extent</u> is a quantitative measure
-- how much there was.  <u>Nature</u> is a qualitative measure and thus requires a more
extensive and complicated analysis.

38. (a) <u>The Extent of Newspaper Coverage</u>.  The extent of coverage of this
case was extraordinary.  As shown in exhibits B and C, the log of all the newspapers
with articles about the case and the articles themselves, there was a total of
903articles about the case.[17]

---

[16] <u>Daniels</u>, 428 F.3d at 1211.
[17] Newspaper Articles Relevant to Ramirez Case

39.   While that may seem like a huge volume of pretrial newspaper publicity, it is not immediately apparent to what extent this number of articles is an unusually high level, since there is no obvious or intuitive standard.  I can offer the Court two possible sources for this comparison.  One source is from my own cases covering over two decades of testimony in venue cases from around the country, though with an emphasis on California.  Another means of comparison can be obtained by examining those published California appellate venue cases in which the number of articles has been noted in the court's opinion.  California has an unusually large number of cases (98) dealing with venue issues, and a rather well developed set of standards.  I have analyzed those cases and will discuss them below.  Of course, the mere quantity of articles may not demonstrate prejudice -- that is dependent on the nature of the coverage -- but prejudice based on pretrial publicity is certainly related to the volume of that publicity and is unlikely to arise without it.

40.   <u>Comparison of This Case with Other High-Profile Venue Cases</u>: <u>Trial Courts</u>.[18]  Let me begin first with a comparison the 120 trial cases in which I have testified for over 25 years (excluding one other in which I had only a small sample of the coverage) with this case.  The median number of articles in the 120 cases was 91.5,[19] and even among the half with fewer articles, that is, under 92, approximately

| NEWSPAPER | NUMBER OF ARTICLES |
|---|---|
| Los Angeles Times | 211 |
| Los Angeles Herald Examiner | 197 |
| Los Angeles Daily News | 120 |
| La Opinion | 113 |
| Los Angles Daily Breeze | 108 |
| Other Local Newspapers   (those with under 100 articles) | 154 |
| Total Number of Articles | 903 |

Note: Apparently there are additional articles submitted to the trial court not included in the above table (see Reporter's Daily Transcript, December 29, 1986 and January 6, 1987 at 779 (hereinafter Transcript).

[18] These trial courts are mainly California state trial courts, but include federal and state courts from around the country.

[19] This average figure of 91.5 articles only includes those cases in which I testified.  I did not include well over 100 other cases in which I recommended against the need for a change of venue, where the number of articles was usually substantially less.

half of those motions were still granted by the trial judge.[20]  The extent of the number of newspaper articles in this case (903), is approximately 10 times as great as the median number in those prior cases, and is one of the very highest I have ever dealt with.[21]

41.  Comparison of This Case with Other High-Profile Venue Cases: Appellate Courts.  As noted above, California has extensive venue jurisprudence, with 92 cases.  In 41 of those cases, the court noted the number of articles, although in a few, the total included radio and/or television coverage as well.  The volume of newspaper coverage in this case would have substantially exceeded every single one of those 41 California cases.

42.  As expected, both trial judges and appellate courts have been more willing to grant venue changes when the volume of publicity has been high.  The overall rate of California appellate court granting was just 12.2%, 5 of 41 of the cases with the number of articles specified, and 19.3% of all cases (including those cases where the number of articles is not included in the opinion).  Significantly, I note that the percentage of grants in the California appellate courts (in those 41 cases where the number of articles was mentioned in the court's opinion) rose to 50 percent when the number of articles increased to just 30 or more.

43.  Other Quantitative Measures.  I will also note a few of the other quantitative measurements about the newspaper coverage, focusing on the L.A. Times.

_____

[20] Only 55 of the 60 cases reached the venue issue.  One case was settled early, and in the others, while the venue motion had been submitted to the court, I recommended against the change of venue, testifying that only a delay or improved voir dire procedures would be sufficient to protect the fair trial rights of the defendant.  Of these 55 venue cases, the courts granted 27 (49.1%) and denied 28 (50.9%).
[21] Of the 120 total cases, the number of newspaper articles in the Ramirez case would rank eighth, exceeded only by a handful of cases, such famous ones as the two Oklahoma City bombing cases (both the separate federal and state cases), the Enron case (defendants Skilling and Lay), and the cases against the Allstate Insurance Company arising from Hurricane Katrina.

44.  <u>Los Angeles Times: Breakdown of the Coverage</u>.  As I will explain below, rather than analyze the coverage in all of the Los Angeles newspapers, I have chosen to focus on just the coverage in the Los Angeles Times.  It was and is the newspaper that has the widest circulation, and it is the most prominent and comprehensive newspaper in the Los Angeles area.

45.  In the Times alone there were 211 case-relevant articles published between August 13, 1985 and August 11, 1988.  Just the articles in that one newspaper constitute well over twice the median number in all the previous cases in which I have testified on the venue issue, and the articles in the Times were only about one-fourth (23%) of relevant articles published in Los Angeles newspapers over that time.[22]

46.  I will first present a review over time of the publication dates (see Table 1.)  The yearly breakdown can be significant because in some cases there is a flurry of media coverage in the first few weeks, but then the publicity abates, sometimes sharply, before the venue issue is decided by the trial court.  For example, in one important California Supreme Court decision denying a change of venue, the court repeatedly noted that while there was heavy coverage in the period shortly after the police officer's killing was reported, it declined markedly thereafter.[23]

---

[22] It is important to note that in most cases the total number of newspaper articles is based on a count of several different newspapers, not just one, since there are usually -- though not always -- multiple newspapers within the trial venue.  I limited my review to the Los Angeles Times simply because there were so many articles just in that one publication, but it makes the comparison between the number of articles in this and the number in other cases unrealistic because most of the comparison cases included articles from multiple newspapers.

[23] <u>Odle v. Superior Court</u>, 32 Cal.3d 932 (1982).

Table 1.  Articles in Los Angeles Times, by Year

| YEAR | NUMBER OF ARTICLES |
|------|--------------------|
| 1985 | 84 |
| 1986 | 91 |
| 1987 | 19 |
| 1988 | 20 (6 ½ months) |
| TOTAL | **211** |

47.  The venue hearing in the Ramirez case concluded in January of 1987, by which time over 80 percent of the Times articles had been published.  Thus, even though the intensity of the coverage somewhat abated later, that was well after the trial judge had considered and denied the change of venue motion.

48.  Another factor to consider is the location of the articles in the newspaper. A prominent location means, first, that the article is likely to have been read, and second, that the newspaper editors determined that the subject matter was particularly newsworthy and important to readers.
Of the 211 articles in the Times, 97 were on the front page (32) or on the front page of an interior section (65), indicating that they were more likely to have been seen by readers and that the editors thought that coverage of the Ramirez case was significant to its readers and to the community.

49.  Another feature to assess in the Ramirez coverage was the number of pictures that accompanied the articles.  There were 97 pictures, which would both increase the article readership and in some instances increase the level of potential prejudice.

50.  While I do not have circulation data for all the newspapers as of 1985, the data I do have show, as would be expected, a huge number of potential readers.  Audit reports from the Audit Bureau of Circulations showed the following:

Table 3.  Circulation Data

| NEWSPAPER | CIRCULATION |
|---|---|
| Los Angeles Times | 1,314,542 (Sunday) |
| Los Angeles Herald Examiner | 214,705 (Sunday) |
| Los Angeles Daily News | 162, 360 (Sunday) |
| Los Angeles Press-Telegram | 141,053 (Sunday) |
| The Daily Breeze | 124, 576 (Sunday) |

Thus, the total (Sunday) circulation data for just these five newspapers was almost two million (1,957,236).

51.  These circulation numbers are high compared to today, even with the population growth, because of alternative sources available, especially the Internet. Also, it is estimated that there are an average of at least 2.4 readers for each newspaper.

52.  While all these numbers cited above are very impressive in documenting the extent of the media coverage,[24] they are not really anything that needs to be proved to show how much media coverage of this case existed in the trial venue.  As the California Supreme Court noted, the trial court had "described the coverage of this case as 'saturation, as much as they possibly can give.'[25]  Indeed, the trial judge said that this was saturation coverage.  Even the prosecution conceded the notoriety of the case.[26]

---

[24] I am aware of 15 reels of video tapes relevant to the Ramirez case being introduced at the venue hearing.  These were from channels 2, 4, and 11, and many were played at the venue hearing.  There was also a tape from channel 52. Transcript 780.

[25] People v. Ramirez, 46 Cal.4th 398, 434 (2006).  The trial judge had added at the end of the quoted remark, "And I would imagine that the reporters' editors have told them 'Go get everything you can and cover the case every day.' " Transcript 806.

[26] " 'Conclusion, the People are aware of the notoriety of the instant case, certainly no recent case has received as much widespread publicity.' " Defense counsel quoting from the Points and Authorities of the people, Transcript 805.  The previous trial court judge had made the comment as well. Transcript 805.  Note also that the courtroom was substantially filled with media during the change of venue hearing. Transcript 802.

53.  <u>Summary of Extent of Publicity</u>.  The extent, or quantity, of coverage in this case is extraordinarily high, whether viewed independently or whether compared to other trial-level cases or to appellate cases.  Thus the amount of coverage strongly supported then and now the need for a change of venue.

54.  (b) <u>The Nature of the Newspaper Coverage</u>.  As noted, the <u>extent</u> of the publicity, as discussed above, is a quantitative analysis, but the <u>nature</u> of the publicity examines its content.  Massive coverage, standing alone, is a necessary but insufficient factor in creating prejudice.  The prejudice is measured by doing a content analysis of what has appeared.

55.  In doing a content analysis of the nature of the publicity, I have developed a typology I call the Hierarchy of Prejudice.  At the top of this hierarchy is publicity that is <u>inflammatory</u>.  Inflammatory coverage contains elements of sensationalism or hostile, inflated, emotional, or loaded themes or language.  The primacy of such material is clear because of court decisions and social science research.  Emotionally laden coverage has more saliency to readers, affects them more powerfully, and is more likely to be remembered.  Experimental research demonstrates that emotional publicity has a substantially greater prejudicial impact than factual coverage, even when the factual coverage is heavily slanted towards guilt.[27]

56.  The second level is publicity that deals with <u>inadmissible</u> material.  It is self-evident that it does little to protect the defendants' fair trial rights by excluding certain evidence from the trial if even one juror is already aware of that information.

57.  The third level in the hierarchy is material that is <u>inaccurate</u>.  The printing of inaccurate material can be very damaging to the extent that such material is of a prejudicial nature.

---

[27] <u>E.g.</u>, G. Kramer, et al., "Pretrial Publicity, Judicial Remedies, and Jury Bias." 14 <u>Law & Human Behavior</u> 409 (1990).

58.  The fourth level in the Hierarchy of Prejudice arises even when publicity is non-inflammatory, is admissible, and is accurate.  It still may lead to the need for a change of venue if it creates a strong presumption of guilt.  Quoting from the highly respected California appellate court Justice Friedman's opinion in the Juan Corona case (Corona v. Superior Court, 24 Cal.App.3d 872 (1972)), the California Supreme Court in the leading Williams venue case noted, "A reasonable likelihood of unfairness may exist even though the news coverage was neither inflammatory nor productive of overt hostility." Williams v. Superior Court, 34 Cal.3d 585, 590 (1983).

59.  In presenting a content analysis, I focused on the newspaper articles published in the Los Angeles Times.  I first reviewed the Times articles.  Because the volume of articles was so great (even though the Times coverage constituted less than one-fourth of the total number of newspaper articles), I then decided to use a statistical sample of those articles, relying on every fourth article for my analysis.

60.  The number after each word or phrase in the analysis refers to the particular article, as numbered by the Exhibit of L.A. Times articles I reviewed, filed with the underlying Petition.  An (H) inserted after the word or phrase means that the word or phrase was in the headline.  Numbers in parentheses are the number of times that the word/phrase was used in that article.  If quotation marks used, the passage was in quotation marks in the article.  All material is an accurate reflection of newspaper material, either directly copied or a shortened version, even if quotation marks are not used.

61.  Some materials in the review are my explanations, definitions, analysis, or summary, and in a few instances, material is repeated where applicable under a second category.  Such words as "alleged" are usually omitted.

62.  1. Inflammatory Material.  Inflammatory coverage includes elements of sensationalism, inflated, emotional, or loaded language.  The coverage of this case was

among the most inflammatory I have ever encountered, full of fear and anger.  It may fairly be characterized as inflammatory overload.

63.  The California Supreme Court described what it viewed as inflammatory coverage justifying a change of venue in <u>Williams v. Superior Court</u> (1983) 34 Cal. 3d 584, 590:

> [S]ome of the accounts were capable of eliciting a hostile
> response from their audience.  For example, sexual assault or rape
> was referred to 145 times in the accounts.  'Bullet-ridden body'
> was used 4 times. 'Execution-style' killing was referred to 12
> times (variations were used 3 additional times).

64.  Compared to the nature and extent of the inflammatory publicity in the Ramirez case, the <u>Williams</u> coverage described above is a pale echo of serious prejudice.[28]  The Ramirez coverage no doubt accurately reflected the community's strong feelings, but also heightened them.  People who lived through and experienced those emotions are in a different state of mind than people in other communities who only read about the case, but did not see themselves and their community threatened. The inflammatory words and themes were pervasive; both because of the facts of the case and the way the media covered them.  Included below are only about a quarter of the volume of the use of these words, phrases, and themes just from the L.A. Times.[29] Among the inflammatory elements in the Times coverage are the following:

65.  <u>Inflammatory Names Given to Defendant</u>:

---

[28] However, <u>Williams</u> arose in a quite small county (Placer), the defendant was black in an overwhelmingly white community, and the California Supreme Court sometimes found the need for a change of venue, a practice it has abandoned since 1989.
[29] That is because I have included only about a fourth of the articles in the L.A. Times in the content analysis.  Beyond that, the Times. provided less than one-fourth of the total newspaper articles.  Thus, the content analysis below includes a review of less than one-sixteenth of the total case coverage just in area newspapers.

"Night Stalker" or "Stalker" referred to 158 times, 16 times in headline

Night Stalker" (102 references, 4 times in headline) 1, 16, 20 (8), 24 (H) (11), 28 (3), 32, 36 (7), 40 (2), 48 (4), 52 (4), 56, 60 (3), 64, 68 (3), 72 (2), 76 (H) (4), 80 (2), 84, 88, 92, 96 (2), 100, 104, 108, 116, 120, 124 (6), 128, 132, 136 (2), 140 (2), 144, 148, 152, 156, 160 (H) (2), 164 (2), 168, 172, 176 (2), 180 (H) (2), 184, 188, 192 (2), 196, 200, 204, 208

Stalker (56 references, 12 times in headline) 20 (H) (19), 24 (3), 28 (3), 36 (H), 40 (H) (19), 44, 52 (H), 84 (H), 100, 116 (H), 120 (H), 124 (H), 128 (H), 188 (H), 196 (H), 204 (H)

"Valley Invader" 1, "Valley Intruder" 1, 4, 8, 12 (3), 16, L.A. 'Intruder' 8 (H), 4, 16, Fearsome Intruder 4 (H), "Walk-in Killer" 1

"Jack the Ripper" scrawled on wall 12

"Jack the Knife" scrawled in lipstick 20

66. <u>Allusions to Satan</u>:

Devil worshiper 20

Diabolical 4

Satanic worship 20 (2), Satanic cult 20, Satanism 36, satanic overtones 40, satanic 184, satanic rituals 40, satanic activities 40, shouted "hail Satan!" as he was being led from the courtroom 80, self-proclaimed devil-worshiper 168

Ramirez flashed a pentagram inscribed on his palm to the courtroom audience 124, pentagrams drawn in Ramirez's courtroom holding cell 124, pentagrams discovered 20, 36, 124, stalker drew pentagrams on the walls 40, spray-painted pentagrams on walls of victims' homes 20, pentagrams drawn in lipstick 124, devil's horns 20, 40

He sent a postcard with a picture of a scorpion, a drawing of a pentagram and a threatening poem 148

Witness testified that Ramirez wore a baseball cap with the logo of the rock group AC/DC 140, hard-rock group AC/DC 20 (2), 36 (13), 40(2), 56, songs "Anti-Christ Devil's Child" 20, "Night Prowler" 36 (2), 40, "Highway to Hell" 36 (2), "Hell's Bells" 36, AC/DC stood for "After Christ, the Devil Comes" 36

"Highway to Hell" 20, 40, "What's the noise outside your window? What's the shadow on the blind? As you lay there naked like a body in a tomb, suspended animation as I slip into your room. I'm your night prowler" 20, 40

At House hearing regarding alleged pornography in rock music, panel was told by an expert about AC/DC, "one of their fans, I'm sure you know, is the accused Night Stalker," referring to serial murder suspect Richard Ramirez 56

The music has been called satanic that reportedly obsessed Richard Ramirez, the man suspected of the "Night Stalker" killings 184

67.  Inflammatory Characterization of the Crimes.

Spread terror 20, terrorized 28, 80, terrified California residents 96, 140, night of terror 140, really terrible 40

Someone was killing, again and again 32, "killing and killing and killing" 40

A trail of death and destruction 64

Atrocities 20, "terrible trauma" 76

Bloody rampage 40, savage assault 40

Seven-month crime spree 28, 196, 204, string of slayings, rapes and attacks 96, string of killings 124, string of sadistic nighttime murders 208

"More horrendous than (the Hillside Strangler)" 4, 40

Gruesome 100, 124, 128

Grisly details 128, grisly attacks 148, grisly series 180, grisly series of attacks 188

Gory 128

"Heinous" 20

Bizarre 4, 40

A trail of violence 40

Brutal, brutalized, brutality 20, 40, 48, 124

68.  Inflammatory Characterizations of the Defendant.

"Vicious serial killer" 12, serial killer loose 24, 40, serial killer 4, 8, 32, 40, 56, feared serial killer 148, serial murder 56, 208

69.  See also the analysis of the entries of the highly inflammatory material below in Nature of the coverage.

70.  2.  Possibly Inadmissible Material.  The major inadmissible material in the media concerned the emotionally charged reporting of the great fear and anger that swept the community (see below under Nature of the Crime) as the killings, rapes, and assaults continued.  I will cite a few other examples:

71.  Charge Dropped Because Young Victim Would Be Required to Testify in Open Court.  Girl, 8, won't testify at Stalker hearing 120 (H), an 8-year-old rape victim must testify in open court, so prosecutor will not introduce evidence will be presented (charges dropped) 120, Ramirez was charged with kidnapping and raping the 8-year old girl 120

72.  San Francisco Murders Dropped.  L.A 'Intruder tied to slaying in San Francisco 8 (H), Sheriff: the murder in San Francisco is linked to the "Valley Intruder" assault killings 8, sheriffs of L.A. and Orange counties announced that they had identified Ramirez as the Night Stalker 20, prime suspect in the attack in San Francisco 8, faces another murder charge in San Francisco 80, (many other references to the two murders in San Francisco)

The Stalker killed two in San Francisco, the second-story burglary proved just how tenacious the Stalker could be 20

Ballistic tests tie slaying in S.F. to 'Valley Intruder' 12 (H), three different forms of evidence link the 'Valley Intruder' to killings in San Francisco 12

San Francisco mayor: ballistics tests established the tie 12

A specific message scrawled on the wall found in S.F. case and at least one L.A. case 12

73.  <u>Other</u>.

Many previous arrests 20, history of drug offenses and driving stolen vehicles 20, several aliases 20

Tie to other infamous cases: "Hillside Strangler" murders 1, 4, 8, 40, "Jack the Ripper" 12, Kitty Genovese 32 (2)

74.  4.  <u>Presumption of Guilt</u>.  The entire tenor of the coverage reflects the view that Mr. Ramirez was guilty and deserving of death, even if the stories often included de rigueur terms such as "alleged" or "charged."  One reading through these articles is left with an abiding belief that the writers are convinced of Ramirez's guilt.  This is not to say that the reporters have written their stories unprofessionally -- it is to say that their personal exposure to what happened and how so many people over so long a period were so badly affected caused them to react as most people would.  And the way local jurors would if the trial is not moved.

75.  <u>Confessions or Admissions</u>.

Ramirez boasted that he was a "super-criminal" who killed 20 people in California and enjoyed watching them die 148 (2), "no one could catch him until he --- up, he left one fingerprint behind and that's how they caught him" 148

"Enjoyed killing people" 148 (H), "I love to kill people. I love watching people die. I would shoot them in the head and then they would wiggle and squirm all over the place, and then just stop or cut them with a knife and watch the face turn real white" 148 "I love all that blood" 148 (2)

"I told one lady one time to give me all her money. She said no. I cut her and pulled her eyes out" 148, her mutilated body was discovered with her eyes gouged out 148

"He waited outside until it was dark, went upstairs, saw two people lying there, and 'Boom. Boom. I did them in' " 148

He could have killed 10 police officers and the next time "no one" will get away 148

Hair raising-account 148

Two other officers testified that he was the feared serial killer and he asked for a gun to play Russian roulette because "I would rather die than spend the rest of my life in prison" 148

76. <u>Conclusory Statements (by Inference) of Guilt</u> (Note: Many such statements made by public officials such as the mayor and the sheriff).

Mayor:  "California can breathe a sigh of relief tonight," who went to the Hollenback station to congratulate police 20

Sheriff: "We have now definitely tied 14 murders (including the one in San Francisco) to this individual and possibly as many as 33 cases" 12

Authorities publicly identified Ramirez as the Stalker 20

"Thank God they caught him" 44

Most residents of the Los Angeles area felt relief when he was arrested 48

We all feel gratitude about the arrest 48

When a suspect was captured, Californians breathed a sigh of relief and celebrated their release from fear 64

We are entitled to rejoice when a threat of this magnitude has apparently been removed 64

77.  <u>Other Statements Directly or Inferentially Indicating Guilt</u>

Inspector: Ramirez acted alone in his attacks, "he is the <u>lone</u> stalker" 20

Sheriff: "We have now definitely tied 14 murders (including the one in San Francisco) to this individual and possibly as many as 33 cases" 12 (2), sheriff: a positive identification of Ramirez made through exhaustive studies of fingerprints 20, fingerprint match made in minutes in the state's brand-new $22-million computer 32, the statewide system zeroed in on Ramirez as the Night Stalker suspect in three minutes after being provided with a fingerprint 68, successfully identified "Night Stalker" suspect 172

San Francisco mayor: ballistics tests established the tie 12

78.  <u>Evidentiary Or Indirect Indications of Guilt</u>

Three different forms of evidence: ballistic tests, messages scrawled on walls and a "distinctive" but undisclosed piece of evidence 24

A specific message scrawled on the wall found in S.F. case and at least one L.A. case 12

Distinctive tennis shoe prints found at Stalker crime scenes that matched those at satanic cult meeting 20, 40

Eyewitness testimony 124 (2), Victim points to Ramirez as killer, rapist 136 (H) (2), another woman identified Ramirez as her assailant 136, the fourth and fifth surviving victims to identify Ramirez 136, testified about the night of terror in which her husband was slain and she was held captive, raped and beaten, identified her assailant as Ramirez 140

Witness testified Ramirez sold him items stolen by the Night Stalker 140

Bullet in man's slaying linked to Ramirez 144 (H) (2), several other bullets tied to Ramirez through scientific examinations 144, ballistic evidence 40

Expert fingerprint, shoe-print and blood witnesses 144

Many previous arrests 20, history of drug offenses and driving stolen vehicles 20, several aliases 20

Dressed in jail jump suit and chained at the wrists and ankles (implies guilt and dangerousness) 80, 84

79.  Exculpatory.  I always examine the media's coverage of a high-profile case to see if there is any exculpatory, helpful, positive, or sympathetic coverage.  In most cases I find a fair amount, but in this case I found almost nothing, not even any helpful social history or other sympathetic material for the penalty phase.

Defense questioning even the existence of a 'Stalker' 124 (H), other possibilities: inability of authorities to find victim Jennie Viscow's son, a Mafia hit possibility in another case, a murderous repairman theory, questions about the existence of a Night Stalker, the "no Night Stalker approach" 124, defense argues that eyewitness testimony is flawed 124

Counsel acknowledged that he had no proof that anyone else committed any of the crimes attributed to Ramirez 124. These defenses seemed to be received so skeptically by the newspaper as to seem silly and thus helpful to the prosecution.

80.  <u>Summary</u>.  The nature of the pretrial publicity in the Ramirez was extremely prejudicial, particularly in combination with the other inflammatory elements described below, to provide the strongest support for a change of venue.

81.  (2) <u>The Nature and Gravity of the Crime</u>.

(a)  <u>Gravity</u>.  The gravity of the crime is determined by the relative seriousness of the crime, as measured by its status in the Penal Code.  Of course the fact that this is a capital case puts it at the top of the gravity scale, but the fact that there were multiple victims and many other crimes charged increases its gravity.

82.  There are special problems with pretrial publicity in a capital trial.  One important matter is that the jury's role in the penalty phase is markedly different from its role at the guilt phase.  As the California Supreme Court has said:

A capital penalty jury . . . is charged with a responsibility different in kind from . . . guilt phase decisions: its role is not merely to find facts, but also -- and most important -- to render an individualized, <u>normative</u> determination about the penalty appropriate for the particular defendant -- i.e., whether he should live or die.

People v. Brown, 46 Cal.3d 432, 448 (1988) (emphasis in original).  See also
California v. Brown, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring) (emphasis in
original): "[T]he sentence imposed at the penalty stage should reflect a reasoned moral
response to the defendant's background, character, and crime."

83.  Unfortunately, factors like fear, anger, and other matters discussed in this
declaration, while not legitimately part of the calculus of penalty phase decision-
making, are often included in practice.  The risk is greater in a case like Ramirez in
which there has been extensive and prejudicial pretrial publicity, an especially
powerful risk when the publicity itself has focused on those issues.

84.  To be sure, there are standards of a sort to aid the jury in its penalty
decision, but ultimately they may well serve to justify rather than guide the jury in the
exercise of its awesome responsibility.  That is why the contamination of the penalty
jury by extensive media exposure is so dangerous.  It can change the prism through
which those unfairly exposed to the media assess the aggravating and mitigating
evidence presented by the parties.  Jurors are often unable to recognize what improper
material they know, since the attorneys cannot ask them about it; nor do the jurors
know just what extralegal media information is prejudicial or how it will affect them.

85.  Because of this, the media play an especially important role in the penalty
phase, which is, after all, a separate trial.  The defense wishes to humanize the
defendant and the prosecutor wishes to demonize him.  The prosecutor wishes to
humanize the victims, to present the victim-impact story.  The media performed the
prosecutor's role with respect to both the defendant and the victims in this case, as
will be seen when we look at the status of the victims and the defendant in the
sections below.

86.  I note that I only found only a few specific references to the death penalty
in the articles I reviewed:  60 (2), 100, 124 (2), 168, 188, 208 (3).

87.  (b) <u>Nature of the Crime</u>.  The nature of the crime goes to factors that made the crime especially bad or upsetting, particularly as compared with other crimes of the same gravity. As described above in the discussion of the inflammatory elements of the coverage, the media used extremely emotive and powerful terms to characterize the and the defendant and crimes in this case: "Night Stalker," diabolical, satanic, terror, bloody rampage, horrendous, and many others.  Rarely were the crimes simply called killings, homicides, stabbings, or shootings, and the fear and terror in the community were palpable and so described.

88.  The following are some of the L.A. Times entries that demonstrate the prejudicial nature of the coverage:

89.  1.  <u>Great Fear Generated Among Individuals and in the Broader Community</u>.

    a.  <u>General</u>.  The serial killer seems more fearsome because he attacks in the home and without a discernable pattern 4

    What made the crimes especially fearsome was the fact they occurred not on Skid Row, as with the Slasher, but in quiet suburbs.  And the victims were not prostitutes as in the Hillside Strangler case but middle-class men and women 48, he was not killing "them" in a faraway, dingy place, but people like "us" in comfortable, ordinary homes 48

    b.  <u>Personal Fear</u>.  Horrendous because this person goes into people's homes, he's going into your sanctuary, your private place. That's very frightening to me, and he's doing it in such a diabolical way" 4

Citizens lived with the fear of crime during the months when someone was killing, again and again 32

A fearsome intruder has San Gabriel Valley in uproar 4 (H), residents so upset they refuse to give their names 4

Every night he wakes his one-year-old daughter and drives to pick up his wife, who is afraid to walk alone a few feet to her car 4

She and her daughter shut the windows and lock themselves in the bedroom 4

Moved his daughter to an upstairs apartment 4, one of seven women in an apartment complex stays up every night to watch for the intruder 4

"I used to leave the windows open at night," now I shut them even though "it's so hot you're choking" 4

People are "buying the hell out of window locks" 4, buying more window and door locks 4, a run on window and door locks, particularly dead bolts 4

Turned on floodlights, barricaded doors and bought guns 40

"I was so scared I had my husband buy me a stun gun" 4

Husbands are buying guns for wives 4

Nurse: My ".12-gauge shotgun and a .44-caliber magnum are loaded" 4

Petrified at night 4

c.  <u>Community Fear</u>.  The random nature of the string of
killings led to a climate of near hysteria 124, "We're getting more
calls from people who notice things," police are doing 15 to 25
inspections daily for people who want to know if their houses are
properly secure 4

Emergency crime calls to police jump 24

People calling who want to form neighborhood watches, but such
calls rare before 4, homeowners patrolled their own backyards and
alleys 40 (2), Neighborhood Watch program expanded dramatically
because of the stalker threat 40

Guardian Angels began patrolling in response to several murders
attributed to the Night Stalker 72

Hundreds of tips from frightened citizens 40

The serial killer seems more fearsome because he attacks in the home
and without a discernable pattern 4

Citizens feared they might be next 40

Fear hung over us like smog 48, with a prime suspect the sense of a
pall being lifted from the city was palpable 48

> When a suspect captured, Californians breathed a sigh of relief and celebrated their release from fear 64, he was a proven, constant and unpredictable threat 64
>
> Fearsome Intruder 4 (H)
>
> "Of course, everybody knows (Ramirez) now" 20

90.  2.  <u>Anger</u>.  A jury pool drawn from a community angry at their tormentor, like one drawn from the community that feared him, may not be capable of meting out justice, unless justice is defined primarily in terms of retribution.

> Livid at the killer 4, Night Stalker chased, beaten with a steel rod and captured by angry citizens 20. East Los Angeles residents chased and captured Ramirez, 20, a young woman screamed as she was being pulled from her car, several irate citizens chased and held him 32, 40, Ramirez captured and beaten by angry citizens 24, beaten into submission by irate citizens 28, four angry men chased and beat the suspect 28, several men ran after Ramirez, caught him and beat him into submission 48, angry residents captured him 60
>
> The captors hailed as heroes by the City Council, the County Board of Supervisors and even the state legislature 48
>
> A crowd of 40 to 50 civilians gathered, and the crowd grew hostile and began to advance 28, citizens using their fists and a steel rod caught up with him 40
>
> A carnival atmosphere outside the police station where Ramirez taken, spectators gathered five and six deep 20, crowd cheered loudly as police

drove Ramirez away 20, hundreds of bystanders cheered as he was hauled off to jail 40

"I hope they give him the electric chair, that's what vicious killers deserve" 20

A man was arrested outside the police station with a knife, claimed the Stalker had killed his wife 20

"Oh, he won't last in jail, they'll kill him" 20

91.  3.  <u>Descriptions of the Crimes</u>

Some tied up with extension cords, some handcuffed and brutalized 20, 40, a brutally beaten woman handcuffed to a door in the house where her husband lay murdered 140

Afterward the stalker "stuck the shiv in even further, casually snacking on leftovers in the kitchens" 40

One woman victim had her eyeballs gouged out 20, 40, 148 (2), gouged out in a gruesome attack 124

Gruesome discovery of his 79-year-old mother, her throat slashed and repeatedly stabbed 100

Some shot to death with various handguns, others bludgeoned with hammers or tire irons, some stabbed, others had their throats slashed 20

Wearing soft cotton gloves, he also killed and maimed with a tire iron and a claw hammer 40

The brutality of the Night Stalker killings, rapes and robberies 48

"Pointed the gun on my head, said, 'Bitch, shut up' " 136

He sipped apple juice between attacks, raped her on the bedroom floor as her husband's body laid nearby 136

Another victim said he said, "Shut up, bitch, where is it?" 136

Cut telephone lines, attacked men first, usually shot them in the head, then attacked women, raping and sodomizing them 20, killed men first, then bludgeoned, slashed throats, raped and sodomized and shot the women 40, crept into tidy tract homes through unlocked windows and doors before dawn, cut telephone wires and attacked victims as they slept 40

A desperate call for assistance to the police, sounded as if he were "choking or gurgling and gasping" 116

A chronology of the cases against Night Stalker suspect Richard Ramirez, with many details 24, 6-year-old girl, 9-year-old girl, a girl, all kidnapped and sexually assaulted, kidnapped and raped children 124, 8-year-old beaten 24, other victims in their 60's (7), 70's (1), or 80's (2) 24, rape of an 84-year-old San Gabriel woman 1, kidnapped, raped, molested, shot, slashed and mutilated victims ranging from 6 to 84 years of age, leaving 16 dead 64

Countywide series of slayings and assaults, people have been shot, stabbed, raped and bludgeoned in their homes 1

The charges include murder, burglary, robbery, rape, sodomy and forced oral copulation 52, 61 new felony charges, at least 12 murder counts, at least 18 separate incidents, already faces eight felony charges 60, charged with attacking 28 people and murdering 15 76, 14 counts of murder with special circumstances and 54 related crimes 96, 100

92.  4.  <u>Law Enforcement Response</u>

"This case is so mind-boggling" 1

One of the most intense manhunts in California history 28, 40, massive hunt 40, a race against death 40

Manhunt "far more complex" than that mounted for the Hillside Strangler 1, 50 detectives and mounting 1

20 L.A. police officers, 35 detective from the Sheriff's Department, and investigators from Glendale, Monrovia, Monterey Park, Whittier, San Gabriel and Arcadia 40, many worked seven days a week, 16 hours a day 40, evidence collected by 14 law enforcement agencies 84

So far in preliminary hearing, prosecution has presented evidence from 51 police investigators, doctors, medical examiners and witnesses on seven murders 124

93.  <u>Randomness</u>.  The randomness of the Night Stalker attacks is an important feature in assessing possible prejudice in the publicity surrounding the case because it is one of the factors that contributed significantly to the great fear that arose in the community.  For those who lived there during those days, there was no way to determine who was at risk, so all were at risk.  This randomness was also a

large factor in the salience of the case to those living there.  Some of the relevant citations are as follows:

> He was not killing "them" in a faraway, dingy place, but people like "us" in comfortable, ordinary homes 48

> The serial killer seems more fearsome because he attacks in the home and without a discernable pattern 4

> He's just taking anyone at random 4, random attacks 180

> Murder of businessmen, retired couples, students, parking lot attendants and grandmothers 124

> Police: "When it starts happening in your town it makes you stop and think about it" 4

94. <u>Number of Crimes and Victims</u>.

> 14 murders, 17 murder cases 40, 14 murders and 54 other felonies 108, 112, 116, 120, 124, 128, 132, 136, 140, 144, 14 murder charges and 36 other felony counts 148, 14 murders and 31 felonies 180, 14 murders in Southern California and a slaying (sic) in San Francisco 168, 14 murders and 21 assaults 200, judge dismisses murder count, 13 remain (H) (2), 13 murders and 30 other felonies 196, 20-8, 13 murder counts plus 36 other felony counts 204

95.  Both the nature and gravity of the Night Stalker crimes and their coverage in the local media provide extremely strong support for the need to have changed venue in the case.

96.   (3) <u>The Status of the Victims in the Community</u>. Status of the victims is an important consideration in deciding on a change of venue because the status of a locally prominent or especially sympathetic victim is likely to affect the community's ability to be fair to the defendant.  Where the victim is prominent, well known, or highly respected, and especially when the defendant is an outsider, that may well serve to mobilize the community against the defendant.  While the victims were not much known outside of their personal circle before they were killed, the few victims and their families who were featured in the media and thus became recognizable became the public faces for the others.

97.   The issue in many of these types of cases is whether prominence achieved as an individual after death is sufficient to support a change of venue at least as to that factor.  The leading California case on this issue is <u>Odle v. Superior Court</u>, 32 Cal. 3d 932 (1982).  In that case there were two victims, a local police officer and a civilian, neither of whom was prominent or known by or to many local people prior to their murder.  As the court pointed out, however, that **"**fails to take into consideration that the slain officer, by virtue of the events and media coverage after the crimes, became a posthumous celebrity."  The court concluded, "In sum, the effect of the status and prominence of the two victims on the issue before us is inconclusive." 32 Cal. 3d at 940.

98.   As a social scientist, I believe that the court's legal analyses on this issue miss the point.  While it is clear that the prominence of a local victim prior to death could be a fact that might make it very difficult for the person charged with their murder to receive a fair trial in that locality, such prominence while they were alive is not the primary reason for the possible prejudice.  The prejudice arises because of a heightened degree of sympathy for the victim that could turn a jury against the defendant.  While prominence may facilitate that process, it is not the cause.[30]

---

[30] Indeed, prominence of the victim could benefit a defendant.  For example, it may be that Dan White's shockingly successful "Twinkie defense" was facilitated by the prominent status of his victim, Supervisor Harvey Milk, whose prominence by being the first openly gay man elected to public office in

99.  In this case, the victims never achieved any particular individual prominence, either before or after their deaths.  However, it is equally clear that by virtue of their number, the nature of the unspeakable things that befell them, and, ironically, their very ordinariness and random qualities, they may well have acquired the special kind of sympathy and empathy that likely generated the bias against the defendant with which this factor is concerned.  These victims are the "there but for the Grace of God go I" surrogates -- it could have happened to me.

100.  It is worth noting that all the victims were entirely blameless; there was not an iota of victim precipitation even to the extent of being in a bad or even a vulnerable place at a bad hour or unwisely, even if unwittingly, choosing to associate with a dangerous person.

101.  When victims in other cases make bad or unwise choices, they are less sympathetic and, perhaps more significantly, create less empathy, in the sense that we believe we would not have made a similar choice.[31]  This is a function of salience, discussed below.

102.  What we have in the media coverage of this case is called victim impact evidence.  The prosecutor wanted to maximize the humanizing of the victims, getting the jurors to empathize and sympathize with their plight.  Long prior to trial, the media had already done that, extensively and powerfully.  At the same time the prosecution wanted to demonize the defendant.  In the Ramirez case the press did the prosecution's job as well, indeed, almost literally.

---

the United States.  Of course, attitudes toward homosexuality have changed dramatically since that time, especially in San Francisco, where the trial occurred.

[31] See S. Sundby, "The Capital Jury and Empathy: The Problem of Worthy and Unworthy Victims, 88 Cornell L.Rev. 343 (2002).  This study by the Capital Jury Project was based on interviews of real jurors who had served in capital cases, showing that jurors tended to vote for death more often  in cases where the victims died in random killings.  While the status of the victims in this case, to the extent that factor comes into the trial, will be the same whether the case is tried in Los Angeles or Key West, jurors outside of the Los Angeles will not have been exposed to and steeped in the fear and horror for that period of time before Mr. Ramirez was captured.

103.  In most cases, the victims in the Night Stalker siege for purposes of venue analysis would have been the dozens of local citizens who were murdered, raped, assaulted, and robbed, as well as their families.  The focus would be on just that group, but only a few of them were singled out for sympathetic coverage by the media, which I will not repeat here.  In this case there was no Polly Klaas- or police-officer-type victim upon whom the prejudicial coverage would focus.  However, in the Night Stalker case the major victim was all or most of those ordinary citizens who lived in the jury-pool community during the reign of terror perpetrated by the Night Stalker.  Thus, all the prior citations in this declaration documenting the fear, anger, ugly nature of the crime, salience (below), and similar themes would apply in full force to the criterion of the status of the victim as providing very strong support for the need for a change of venue.

104.  (4) <u>The Status of the Defendant in the Community</u>.  As measured by the traditional criteria for finding prejudice in the media about the status of the defendant, the coverage of Mr. Ramirez certainly measured up.  He was identified as an outsider, from out-of-state and a drifter:

Drifter 20, 40, 48, 52, 60, 80, 96, 100, 116, 124, 136, 144, 168, 188, 208

A native of El Paso 48, 52, 60, 80, 96, 100, 116, 124, 136, 144, 168, 188

Also, while there were no direct references to his ethnicity, his surname and picture made it apparent that he was a member of a minority group.

105.  He was negatively characterized in other ways as well.  These include his criminal record: Many previous arrests 20, history of drug offenses and driving stolen vehicles 20, several aliases 20, arrested on stolen vehicle charges 40, a record of petty crimes in Texas and California 48, he had many aliases 40.

106.  The overall portrayal of Mr. Ramirez in the media was as a one-dimensional, comic book-type of an archetypal evil figure: The Joker preying on a hapless and helpless community.  Indeed he was repeatedly linked to various forms and symbols of Satanism, pentagrams, and the like.[32]

107.  The description of Mr. Ramirez's behavior in court bolstered that image: He was described as smiling and winking during court sessions (implying no remorse and not taking the many awful crimes seriously), and grinning as he passed the lead detective 80.  During graphic testimony about the murder of the woman whose body was discovered with her eyes gouged out, Ramirez looked on in court with a wide grin 148.  We were told that he was cunning and very, very dangerous 8 (2), and that "Most serial murder(er)s don't stop. They might relocate. They will kill again" 8.

108.  Most noticeable about this coverage was the total lack of anything sympathetic, humanizing, or mitigating.  I do not recall ever encountering such an absence in the over 200 potential change-of-venue cases I have previously dealt with.  There was no mention of a job history or supportive or at least sympathetic friends or family, and no social history to humanize or explain or present another side to this one-dimensional man.[33]  Particularly in contrast to the sympathetic portrayal of the victims, the status of the defendant in the media strongly supports the need for a change of venue.

109.  (4).The Size and Nature of the Community.  There are two factors to consider under this test.  The first is the population size of the trial venue, and the second is the nature of that community, particularly as it responds to this case.  I will first review the population data and its significance.

110.  Population Size.  The size of the population pool from which the jury is to be picked is an important factor in deciding whether a change of venue is needed.

---

[32] See, e.g., 1. Inflammatory Material, above.
[33] This is not to say that this and other characterizations of various aspects of the defendant and the case were inaccurate.  Accurate media can be no less prejudicial than misleading coverage.

At the time of trial, the population Los Angeles County was over eight million, by far the largest county population in California.[34]  I believe that the population size of Los Angeles County is the only factor that arguably weighs against the need for a change of venue.

111.  I became interested in how population size plays out in venue cases several years ago and came to believe that in some cases a larger population provided only marginal additional protection from community prejudice.[35]  In order to understand this issue, I identified what I took to be the practical and policy reasons for viewing population size as a protection and explored whether or not in some situations that perceived protection might be more of a gossamer shield than a bulwark.

112.  There are four major reasons that could explain how population size could make a change of venue less helpful.  These are: (a) The greater numbers make it easier to pick a jury, (b) the community communications network is less of a problem, (c) the attention on and memory of the case may be less, and (d) the number of those with a case connection will be a smaller percentage of the population.

113. (a) <u>Easier to Pick a Jury</u>.  The first reason why a change of venue tends to be less necessary in a jurisdiction with a larger population is that the larger

---

[34] Because of the population size and area of Los Angeles County, for many years Los Angeles County has selected jury pools from within a 20-mile radius of several county courthouses, and that was done in the Ramirez case, where the trial was held, and the jury pool selected from, the Downtown Courthouse.  While the population of that area is much less than that of the entire county, no doubt its population would rank among the top few counties in California.  However, the population in Riverside County at the time the <u>Daniels</u> case (the Ninth Circuit case discussed above) was tried, its population was approximately 600,000 (Riverside now ranks fourth in population size).  That is no doubt less than the pool of the Los Angeles Downtown Courthouse, but it demonstrates that a quite large population size is no bar to a successful venue challenge.  Indeed, California appellate courts have twice ordered a change of venue from Los Angeles County. <u>Smith v. Superior Court</u>, 276 Cal.App.2d 145(1969); <u>Powell v. Superior Court</u>, 232 Cal.App.3d 785 (1991) (the Rodney King case).

[35] <u>Size of the Community As a Factor in Change of Venue: When a Large Community Becomes Small for Purposes of Venue</u>.  California State University, Chico Discussion Paper Series, 1999.  Also published in 2000 Capital Case Defense Seminar Syllabus  L.A.: California Attorneys for Criminal Justice and California Public Defenders Association.

community, the better the chance, at least theoretically, of obtaining a venire that is untainted by pretrial publicity or other prejudice.

114.   There are problems with that approach, however.  First, it assumes that voir dire will allow us to determine who those fair jurors are.  For reasons I will discuss later, I have reservations about that assumption.  Second, it fails to recognize that there are important differences between a cause challenge and a change of venue motion.  Resolution of the venue question requires consideration of the responses of jurors who do not ultimately become members of the trial panel as well as those who do.  The test is not just the fairness of the actual jury, but also that of the panel and perhaps the community.  The California Supreme Court articulated this standard:

> While the propriety of a ruling on challenge for cause is governed by the statutes ... the ruling on motion to change venue -- the analysis of a reasonable likelihood that a fair trial cannot be had in the county -- is separate from, and requires a far more searching analysis than, the decision to qualify a particular juror.  That each juror is qualified under applicable statutes and, specifically, that no juror fails to meet the criteria of [being fair and impartial] is not controlling.  Resolution of the venue question requires consideration of the responses of jurors who do not ultimately become members of the trial panel as well as those who do.[36]

115.   After all, community prejudice can affect jurors who do not themselves harbor bias, even when those jurors can be identified.  For example, jurors may feel pressure from their community.  The nature of the media coverage of this event can create pressure on local jurors, perhaps consciously, perhaps not, to return a verdict of guilty lest they incur the displeasure of their friends, neighbors, and co-workers.  Jurors ought not to have to consider risking martyrdom in order to acquit, as has been the fate

---

[36] Odle v. Superior Court, 32 Cal. 3d 932, 944 (1982) (citations omitted).

of some who acquitted O.J. Simpson, although in that case there were some segments of the community who supported the defendant, less true in this case.[37]

116. A third problem is that analysis of survey data from many cases around the country in which I have consulted show that those who do not recognize a case like this or who have not prejudged are less likely to read newspapers, to watch or listen to the news, to participate in community activities, or be a involved; such uninterested people hardly comport with our ideal of jurors serving as a cross-section and as the conscience of the community. I have called this phenomenon "perverse effects."[38]

117. On the basis of my research and that of others, I believe that in a mega-case like this, the jury selection could not and did not adequately protect the fair trial rights of the defendant, can make the resulting pool less representative, and might exclude those usually thought of as the best jurors.[39]

118. (b) Communications Network. A second reason that size of the community is important relates to the network of communications through which residents learn about a case and make judgments thereon. Word travels more quickly in a smaller community. The communication is informal -- gossip over the back fence, rumors, coffee shop interchanges -- rather than formal, that is, through the media. That is especially true when the population is relatively homogeneous, and the smaller the community, the greater the likelihood of homogeneity. Yet from reading about the way the community reacted to the Night Stalker events, I would expect that this case was the dominant subject of conversation at work places, social gatherings, and other sites in Los Angeles.

---

[37] Similarly, local jurors who recently acquitted Michael Jackson have been excoriated.
[38] Jury Selection in High-Profile Cases: The Perverse Effects of Voir Dire, with R. Ross. California State University, Chico Discussion Paper Series, 1997; presented at national meeting of American Association for Public Opinion Research, Norfolk, 1997.
[39] E. Bronson, The Effectiveness of Voir Dire in Discovering Prejudice in High-Publicity Cases: An Archival Study of the Minimization Effect. California State University, Chico. Discussion Paper Series, 1989. Also published as The Effectiveness of Voir Dire in Discovering Prejudice in High Publicity Cases: A Case Study of the Minimization Effect in 20th Anniversary Celebration Seminar. California Attorneys for Criminal Justice, 1993, presented as Does Prejudicial Pretrial Publicity Affect Jurors? at national meeting, Law and Society Association, Madison, 1989.

119.  In smaller communities, there tends to be a higher level of cultural integration and shared values; people are less alienated and fragmented than in the large urban centers.  That can make it more difficult to find a fair jury.  In a smaller community, there also is a multiplier effect operating on whatever publicity one examines, which works through an informal communication system: the coffee shop, the service clubs, the few large employers, and the like.  Fear and concern about the Night Stalker case is likely to have reduced the otherwise ameliorating effect of size in this case, given the pervasiveness of the focus on this single community concern.  Under such conditions, the word travels fast, and that word is often distorted.

120.  (c) <u>Attention and Memory</u>.  A third reason why a change of venue is more likely to be granted from a smaller community is that a case tends to receive less attention in a larger area.  It would have to compete with a greater number of other local news stories.  For the same reason, it would tend to fade away more quickly.  That is clearly not true here.  Like "The Great Flood" or "The Great Earthquake" in other places, this case is now part of the collective memory of the community, and still is imbedded there.  Given the duration of the Night Stalker's reign of terror, the media coverage throughout that time, and the survey results, it is clear that there was no forgetting prior to the trial; the memory of this case was seared into the collective psyche of Los Angeles residents to become a brooding omnipresence.  In fact even today this case is part of the collective memory of that part of southern California, at least for those old enough to remember it.

121.  <u>Salience</u>.  Closely related to this issue is the matter of salience.  Cases are salient when they seem especially relevant to our lives.  Salience may arise because of propinquity -- it could happen to me, it happened near me or in a place I know or have been, it affects me, people like me are involved, and other similar factors.  Salience adds to our interest in the case, our personal and emotional involvement, our knowledge, and our retention.  It is the reason that editors put local stories on the front page.  While everyone knew about the Oklahoma City bombing, it had special salience

to the people of Oklahoma.  They lived through it, identified with the local victims, and were suffused with coverage.  That is why I recommended a change of venue in that case, but recommended against such a change in another notorious case, that of the Unabomber.  While most residents probably knew about the Unabomber case in Sacramento, where two of the murders occurred, there was no sufficiently special salience to the case among those who lived in Sacramento as compared with other areas.  In my own research, I have found that pretrial prejudice in high profile cases varies depending on feelings about the incident's closeness to home and how the crime resonated in the personal lives of respondents and in the local community.[40]

122.  This was a case of extremely high salience locally.  While those who lived in other parts of the state or even in other states may have known about the Night Stalker, none had lived in such fear of him, had dwelled on media reports so intently, or so often formed opinions about him, his guilt, or the appropriate penalty for him.

123.  A few examples of salience found in the Times are the following snippets: The case became more fearsome because he attacks in the home and without a discernable pattern 4, what made the crimes especially fearsome was the fact they occurred not on Skid Row, as with the Slasher, but in quiet suburbs. And the victims were not prostitutes as in the Hillside Strangler case but middle-class men and women 48, he was not killing "them" in a faraway, dingy place, but people like "us" in comfortable, ordinary homes 48.

124.  Other such citations include: "Seems even more horrendous because this person goes into people's homes, he's going into your sanctuary, your private place. That's very frightening to me, and he's doing it in such a diabolical way" 4, she is particularly angry at the intruder "because you're not even safe in your own home. It

---

[40] E. Bronson and R. Ross, <u>Gender and Salience As Factors in Jury Pool Bias: A Preliminary Investigation</u>, California State University, Chico.  Discussion Paper Series, 1999, presented at the Southwestern Political Science Association, San Antonio, 1999; and E. Bronson and R. Ross, <u>Justice in the Era of the High-Profile Defendant: Will a Change of Venue Help</u>? California State University, Chico. Discussion Paper Series, 1991, presented at national meeting, American Political Science Association, Washington, D.C. (1991).

seems like a violation of privacy even though you haven't been accosted" 4, and as a police officer stated, "When it starts happening in your town it makes you stop and think about it" 4.

125.  The district attorney in the case was quoted in the Times as saying about the issue of granting a change of venue in the Ramirez case, "Where are we going to try it—on the moon?" 84.  While there would have been wide knowledge about the case elsewhere, the case would have lacked the same powerful salience elsewhere. At least in Chico, where I live, no one had felt threatened by the nightly specter of the Night Stalker.

126.  (d) <u>Case Connection</u>.  A fourth reason the population size is important is that the number of people with a direct connection to a case is fairly stable across cases.  The number of parties and their families and friends, the witnesses, those who live nearby or have some involvement such as working at a hospital where a victim was taken, plus all of their families and friends, are not much different in a typical case whether arising in a large or a small community.  But as a percentage of the total population, that percentage is usually much higher in a venue with a small population than in one with a large one, leading to a much greater proportional tainting of the jury pool in the smaller venue.  In this case there were so many victims and incidents that the disproportion may have been reduced somewhat, but it still was significantly less because of the very large population of Los Angeles County.  But because most residents were directly affected, whether they lived in fear, participated in block patrols, added locks to their doors and windows, or changed their daily routine to guard against danger, the percentage of those involved may be comparable to what is found in a smaller community.

127.  <u>Nature of the Community</u>.  In addition to the size of the community, its nature can also play a role in deciding whether a change of venue is necessary, particularly as that nature changes in response to the crime charged.  The nature of the media's coverage of this case tells us much about the community's reaction, first,

because the media causes much of that reaction, and second, because it reflects a professional judgment by the media of its assessment as to what will interest the public, that is, what it wants to read about.  It is difficult to imagine any other criminal case receiving the kind of sensational, sustained, and extensive coverage in the area or around the state.[41]

128.  <u>Summary of Need for a Change of Venue Using the Maine[42] Criteria</u>. Measured against the first <u>Maine</u> criterion, the nature and extent of the publicity, the extent of the coverage of the Night Stalker case was extraordinary, with over 900 articles appearing prior to trial.  The nature of the publicity, even if measured just by the sample from the Times, is highly inflammatory and prejudicial, as I have shown. The California Supreme Court in its decision denying a change of venue to Mr. Ramirez quoted the trial court judge on extent of the publicity; he described "the media coverage ... as 'saturation, as much as they possibly can give.' "[43]As to the nature of the publicity, the California court simply observed that "the defendant did not show that the media coverage was unfair or slanted against him or revealed incriminating facts that were not introduced at trial."[44]  This characterization seemed to be unreasonable, as the evidence is clear the publicity was highly prejudicial.  As I have shown above, a review of what was available for analysis demonstrated extremely high levels of prejudice.

129.  As to the second criterion, the California Supreme Court simply conceded that the " 'nature and gravity' of the present offenses could not have been more serious," but then said this factor alone did not require a change of venue.

130.  As to the third and fourth criteria, the community status of the defendant and the community status of the victims, I have demonstrated a strong case that while

---

[41] Of course the Charles Manson case comes to mind, but that primarily involved just one incident, and while the interest was certainly extreme, residents had relatively little fear for their own lives and safety.
[42] <u>Maine v. Superior Court</u>, 68 Cal.2d 375 (1968).
[43] <u>People v. Ramirez</u>, 39 Cal. 4th 398, 434 (2006).
[44] <u>Id</u>.

the victims and defendant were unknown prior to the murders, their later characterization in the media became a major source of prejudice as the case was reported.

131.  The court also noted that the size of the community militated against the change of venue "because of the number of prospective jurors that could be assembled in Los Angeles County."[45]However, I have shown that the size of the Los Angeles County jury pool was not dispositive, given the unique salience issues and publicity in this case.

132. Assessing Prejudice Under Daniels.  If the actual prejudice test were used, the defendant would have to show that the voir dire demonstrated such prejudice or that the trial itself demonstrated that the trial was unfair.  Using California law, under the presumed prejudice test, the decision is based on a prediction of prejudice, applying the reasonable likelihood test, where the defendant challenging venue has only the much lighter burden of showing more than a mere possibility of prejudice, but not as much as more probable than not (that is, the defendant is not required to show a preponderance of evidence).[46]  However, even if it were true that the voir dire and trial in Ramirez demonstrated no actual prejudice, the Ninth Circuit in Daniels made that irrelevant if the defendant can demonstrate presumed prejudice.[47]  I believe that the publicity in this case strikingly demonstrated that presumed prejudice.

133.  The first task under the Daniels test is to determine whether to analyze the case under the presumed prejudice standard or the actual prejudice test.

---

[45] Id.
[46] Frazier v. Superior Court, 5 Cal. 3d 287, 294-95 (1970).  Frazier was the first California Supreme Court case explaining the new standard after the law on venue was substantially changed, both procedurally and substantively, in Maine v. Superior Court 68 Cal. 2d 375 (1968).  In addition, the Maine case stated, "Any lingering doubt  about the effectiveness of a continuance (in reducing prejudice) should be resolved in favor of a venue change" 68 Cal. 2d  at 387-388.
[47] Daniels, 428 F.3d at 1211.

> Prejudice is presumed only in extreme instances when the record
> demonstrates that the community where the trial was held was
> saturated with prejudicial and inflammatory media publicity about
> the crime (citation omitted).[48]

134.  Both the trial court judge and the California Supreme Court conceded, and my analysis demonstrates, that the pretrial publicity in <u>Ramirez</u> was at the saturation level.[49]  The nature of the coverage clearly shows how prejudicial and inflammatory that coverage was.  Thus, the presumed-prejudice analysis is required, meaning that neither the voir dire nor the trial need be considered.

135.  The three-part analysis of the Ramirez case pretrial publicity under the <u>Daniels</u> criteria for presumed prejudice is straightforward.  The test is as follows:

> (1) [W]hether there was a "barrage of inflammatory publicity
> immediately prior to trial, amounting to a huge . . . wave of public
> passion"; (2) whether the news accounts were primarily factual
> because such accounts tend to be less inflammatory than editorials
> or cartoons; and (3) whether the media accounts contained
> inflammatory or prejudicial material not admissible at trial. <u>Id</u>.
> (citations omitted).[50]

136. The first part of the test for presumed prejudice, the "barrage of inflammatory publicity" and the "wave of public passion," was clearly demonstrated in the content analysis described above.  Examining the second part, whether the news accounts were primarily factual, of course many facts were reported.  But those facts were usually themselves extremely inflammatory, and inflated emotional

---

[48] <u>Daniels</u>, 428 F.3d at 1211.
[49] Indeed, as will be discussed below, the community survey in the case demonstrated that 94.3% of a representative cross-section of those eligible for jury duty in the relevant portion of the county were familiar with the case and 11 of the 12 members (91.7%) of the trial jury knew about the case.  That compares with 87% of the jury in <u>Daniels</u> that recognized the case.
[50] <u>Daniels</u>, 428 F.3d at 1211.

language was often used to describe them.  As for the third part, at least some of the material reported was inadmissible, as noted above under the heading, Possibly Inadmissible Material.

137.  <u>Conclusions on Media Coverage</u>.  It no doubt was very difficult for any juror exposed to such publicity as described herein to accord to the defendant any meaningful presumption of innocence.  That is so despite the willingness of jurors to have made such theoretical commitments.  Given the extraordinary extent of the media coverage of this case, plus the unusually prejudicial nature of that coverage, the media coverage provides strong evidence in support of the need for a change of venue under either the federal of state standard.[51]

138.  2. <u>The Public Opinion Survey</u>.  In the seminal 1968 venue case in California, <u>Maine v. Superior Court</u>, 68 Cal.2d 375 (1968), the California Supreme Court adopted the standards promulgated by the American Bar Association in its Reardon Report.[52]  Besides adopting the reasonable likelihood standard and providing for a pretrial writ procedure, the court also identified three sources of evidence.  The first source is the media itself, which I have reviewed in the content analysis.  A second source of evidence on the possible need for a change of venue is "qualified public opinion surveys."[53]

---

[51] It is puzzling why the Supreme Court of California would ignore the Ninth Circuit's reversal decision in <u>Daniels</u>.  Since the Ninth Circuit's <u>Daniels</u> decision came down, there have been four California Supreme Court cases on an aspect of the the venue issue.  In two of those cases the court cited its own <u>Daniels</u> decision on the venue issue (<u>People v. Leonard</u>, 40 Cal. 4th 1370 (2007), and <u>People v. Alfaro</u>, 41 Cal.4th 1277 (2007), but neither citation noted that its own decision had been overturned.

  While I understand that a state court is not bound by a federal court's interpretation of the law (except for that of the United States Supreme Court), it would seem that for practical reasons, a sense of comity, and perhaps for following the rules of citations, it should have done so.  Also, since there are many other cases that made the same point and could have been cited (about the need to exhaust peremptory challenges and/or use other procedures in order to save the venue issue), it almost seems like an intentionally gratuitous gesture to select the <u>Daniels</u> case and without reference to the Ninth Circuit opinion.

[52] American Bar Association Project on Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press (1966).

[53]  The third source is opinion testimony.

139.     A qualified survey in a venue case was later defined by the eminent Justice Friedman as follows:

> We take it that the term "qualified" means only that the survey be well-conceived, impartially conducted and accurately recorded. So qualified, a survey should be acceptable even when it is conducted (as it usually is) at the behest and expense of an interested party.

Corona v. Superior Court, 24 Cal. App. 3d 872, 882 (1972).

140.   In my judgment the survey conducted in this case meets the highest standards of what the courts require of survey research, as measured by a whole range of professional criteria.  The methodology is well beyond what is required to demonstrate results that are both reliable and valid.  I will first enumerate some of these important elements, but there are others that I could have included:

141.   a.  Aspects of the Survey.  The survey in this case was conducted by Dr. Paul Strand, a long time professor of Political Science at San Diego State University. Dr. Strand has also served as Chair of the Political Science Department, Dean of his college, and of most relevance here, Director of the Social Science Research Laboratory at San Diego State, which among other responsibilities, conducts various surveys such as the one introduced in the Ramirez case.  I should note that Dr. Strand has conducted surveys for me, and I know him personally.  In fact, when I was teaching at a law school in San Diego, I worked with him on a venue survey for a then pending case against Mr. Ramirez in Orange County.

142.  Reputation of Dr. Strand and the Social Science Research Laboratory. The drafting of the questionnaire was done by Dr. Strand and it was his responsibility to have the survey conducted.  Dr. Strand is highly respected in the field of survey research generally and especially as an expert in change of venue.  As for the Social

Science Research Center (which I have toured), the methodology it uses is excellent, and being associated with a major university is certainly an important consideration.[54]

143.  b. <u>Methodology</u>. (1)  <u>Confidence Interval, Confidence Level, and Sample Size</u>.  There are three numbers or factors to consider in a representative random survey of the sort usually reported in a newspaper or television opinion poll. These are the confidence interval, sometimes called the margin of error, (<u>e.g.</u>, the result obtained plus or minus 5%), the confidence level (<u>e.g.</u>, 95%, meaning that if you repeated this survey 100 times, 95 times you would get the same result, plus or minus the confidence interval), and the sample size (how many interviews were completed).  The larger the sample size, the more confidence you have in the result. Note that the bell-shaped distribution curve tells us that the results will tend to cluster around ±5% of the obtained result.  The 95% confidence level means you can be 95% certain of your result within the margin of error.  Most social science researchers use the 95% confidence level.

144.  Said another way, when you put the confidence level and the confidence interval together, you can say that you are 95% sure that the true percentage of the population with that opinion is ±5.7% of the obtained result (depending on the sample size).

145.  How confident and accurate you can be depends on the sample size. Most venue surveys interview 200-400 respondents, and in this case the sample size was 300.

146.  For a confidence interval or margin of error of 5.7% at a confidence level of 95%, a sample size of 300 is required,[55] and that was the sample size used in the Strand survey.  The sample size used in this survey of 300 was a standard venue

---

[54] My information for this discussion of the survey in this case comes from a review of the transcript of the change of venue hearing and my personal knowledge of survey research.

[55] The calculation is a little more complicated, since it assumes a 50-50 division.  There is a slight variation with respect to other types of responses to the questionnaire, with increasingly smaller sample sizes required as the division moves toward 60-40, 70-30, etc.

sample size, generating a confidence level ±5.7%.  Said another way, 95% of the time this sample size gives a result that is within approximately plus or minus 5.7%.

147.  2. <u>Proper Sample: Random Sample</u>.  Randomized selection is the proper survey technique to give everyone in the universe being sampled (jury-eligible residents of the judicial division) an equal chance of being interviewed and that interviews within the sample were chosen randomly.  The proper sample means that in this survey only those who met the standards for the jury pool were interviewed.[56]

148.  <u>Screening</u>.  The questionnaire first asked those respondents contacted some screening questions to ensure that those who were interviewed were all United States citizens aged 18 or older who were either registered to vote or who had a California drivers license.

149.  <u>Other Methodology Issues</u>.  Interviewers received general training on interviewing plus additional training on possible difficulties with the particular survey.  All interviewers were experienced, having done calling in a dozen or so previous cases.  Calls were made both during the week and on weekends.  There are a variety of other standard procedures beyond those few listed above that skilled professional survey researchers utilize.  It is clear to me that the survey conducted here is not merely a proper one, but an exemplary one.

150.  <u>The Survey Instrument</u>.  My review of the survey instrument (questionnaire) written by Professor Strand and administered by the Social Science Research Laboratory in this case shows that it conforms to the guidelines for venue surveys adopted and published by the American Society of Trial Consultants.[57]  In the

---

[56] Thus, only the telephone numbers of those who lived within 20 miles of the courthouse were included within the pool of those called, and those actually called were selected by a random digit dialing system where every number had an equal chance of being selected.
[57] <u>Guidelines for Survey Research in Connection with Motions to Change Venue</u>, updated 2002 from <u>Proposed Minimum Standards for Survey Research in Connection with Motions to Change Venue</u>, E. Bronson, S. Macpherson, E. Krauss, R. Dillehay. Court Call, Journal of the American Society of Trial Consultants, Spring 1998; republished as part of the <u>Code of</u>

interest of full disclosure, I note that I was one of the authors of the guidelines, which I also presented to the American Association for Public Opinion Research and the Midwest Association of Public Opinion Research in panels that I organized to obtain professional feedback.

151.  <u>Survey Results</u>. This survey was designed to determine case awareness, predisposition toward guilt or innocence, and possible additional knowledge or attitudes about the case or the defendant.  The straightforward questions in the survey generated answers by which to measure possible prejudice, clearly showing that there were unacceptable levels of prejudice in the venue.

152.  <u>Case Recognition</u>.  The first question measured case recognition:

As you may know, Richard Ramirez was arrested in August of last year. He is suspected of being the "Night Stalker" and has been charged with a series of 14 murders in the Los Angeles area between June 1984 and August 1985.

Have you read or heard anything about this case or not?

153.  This is a bare-bones recognition question, giving only basic information about the case (so as not to inflate the guilt and other responses later on the questionnaire).  The recognition of the case was a remarkable 94.3% (283 of 300), one of the highest recognition rates I have encountered.  Only 17 respondents did not recognize the case.  This result is impressive because the survey was conducted about a year and one-half after the significant media began and a year and three months after the capture of Mr. Ramirez.

154.  From a comparative point of view, of 42 cases decided by the California

<u>Professional Standards</u>, American Society of Trial Consultants, 2003; also printed in <u>Change of Venue</u>, in E. Krauss & B. Bonora (Eds.), with D. Logan. <u>Jurywork: Systematic Techniques</u>  (2nd ed.). Ch. 7. New York: Clark Boardman, 1999 and subsequent revisions.

Supreme Court since 1968 in which the survey or voir dire results were reported in the opinion, only three were higher than in the Ramirez case, one of those being the Rodney King case.  To make an additional comparison, I note that in <u>Daniels</u>, the Ninth Circuit stated, "That the news coverage saturated the county is reflected in the fact that eighty-seven percent of the jury pool recognized the case from the media coverage,"[58] as compared with the 94.3% recognition in the Ramirez survey (and the even higher recognition among the actual Ramirez jury pool sample and a full review of the recognition of those who served in the case.

155.  In my own experience, just 11 of 121 cases had a higher recognition rate, including the Oklahoma bombing and the dog mauling case in San Francisco.

156.  While recognizing the case does not necessarily lead to community prejudice generated from pretrial publicity, such case familiarity is the means by which the respondent is exposed to prejudicial coverage.  The unusually high recognition rate in this case is a necessary if insufficient element of prejudice.

157.  <u>Prejudgment</u>.  The next important element in measuring possible prejudice is the prejudgment of the case by the respondents.  The survey measured this with the following question:

> Based on what you have seen or heard, do you think that Mr.
> Ramirez is responsible for the Night Stalker murder(s), or do
> you need more information to make up your mind?

158. The guilt prejudgment of all 300 respondents, including those who did not recognize the case and thus were not asked the prejudgment question, was 51.7%. This is a very high percentage but not extremely so.  But even the 51.7% guilt rate as enunciated by Dr. Strand is ranked number three of all California Supreme Court cases that listed guilt by this particular method of measuring it.

---

[58] <u>Daniels</u>, 428 F.3d at 1211.

159.  One might compare the prejudgment of guilt of this defendant with the answers of respondents to a question that I have asked in most of my own surveys: "If the government brings someone to trial, that person is probably guilty."  In the most recent survey I completed, in the very conservative (and therefore more law and order oriented) Stanislaus County was 33.8%.  In a venue survey I conducted last year in San Francisco, just 14.4% agreed with this presumption of guilt.  The disparity between the high level of guilt found in the Ramirez survey and a general belief in the guilt of those charged is particularly impressive because it is -- or should be -- more difficult to believe a particular defendant is guilty than that defendants in general are "probably guilty."

160.  However, the real prejudgment in the case was almost assuredly higher than the reported 51.7%, for several reasons:

(a)  The first problem concerns how the guilt rate is measured.  I believe there are two guilt rates that are important to a court.  In my own studies I have called them Guilt 1 (G1) and Guilt 2 (G2).  G1 is the percentage of those who recognized the case who say they believe the defendant is guilty.  G2 is the percentage of everyone in the survey, including those who do not recognize the case and were not asked about guilt, who say they believe the defendant is guilty.  G2 tells the court what percentage of everyone who enters the courtroom for jury duty has some predisposition to convict the defendant on trial, and G1 tells the court what percentage of those who recognize the case believe the defendant is guilty.[59]  G2 will always be less than G1 unless the case recognition is 100%.

161.  I always report both G1 and G2, but for some reason only the G2 rate was presented to the court in the Ramirez hearing.  G1 in the Ramirez case was

_____

[59] G1 might be useful to a court in voir dire if there is a large disparity between the voir dire levels and the survey levels.  The court might then consider whether prospective jurors were giving socially desirable answers rather than their true beliefs.  This is especially problematic in open voir dire where the pool is learning the "correct" answers while listening to the voir dire of others, just as they learn what responses work to get a hardship excusal.

55.4%.  This is only a fairly small increase, but it is cumulative with other aspects of the survey that I believe substantially reduced the apparent guilt rate.[60]

162. (b)  The second problem almost surely had a much larger impact in lowering the prejudgment found in the survey.  As previously noted, the prejudgment question gave the respondents three possible options as answers to whether Mr. Ramirez was responsible for the Night Stalker crimes.  In addition to yes or no, they were given the choice of, "or do you need more information to make up your mind?"

163.  That so many -- just over half of the respondents -- said the defendant was responsible for the murders, when also offered the attractive cop-out choice of getting more information before deciding on the guilt of Mr. Ramirez, is almost shocking.  In formulating survey questions, it is essential to avoid the types of questions that are formulated such that the pressure to respond in a socially desirable manner distorts the validity of the responses.  Indeed, specifically focusing on venue surveys, the national standards tell us:

> All survey questions should be carefully assessed to attempt to
> determine the influence of the tendency to
> give socially desirable responses.[61]  Efforts should be made to avoid
> context, wording or other influences that raise the likelihood of
> responses due to social desirability or other response bias.[62]

164.  Specifically dealing with the guilt question, the standards note, "The wording of questions designed to measure guilt or prejudgment should not suggest the

---

[60] The small difference is explained by the very high recognition rate in the case, approaching the maximum 100%.

[61] See, Fowler, F.J., (2002), Fowler, F.J. (1995), Wentland, E. J. & Smith, K. W. (1993).

[62] From ASTC (American Society of Trial Consultants) website: ASTC Professional Code, Practice Area A. Venue Surveys, Professional Standards, II. Basic Questionnaire Design, p. 8.  Of course there were no national standards in place at the time Dr. Strand wrote his survey in the Ramirez case.

socially desirable response."[63]  Offering respondents to the guilt question the option of saying they would need more information to make up their minds is clearly the socially desirable choice.  After all, not many would assume that, even though they may have followed the case in the media and discussed it with friends, they had not learned about information suggesting alibis, possible defenses, or other matters.  Even if they are certain about guilt, they do not wish to appear closed minded or foolish.

165.  I believe that Professor Strand used this approach in order to present an extremely conservative estimate of prejudgment; in fact he testified, "[T]hat phrase is included to actively discourage to assessment of guilt or force (the) respondent (not to assess guilt by) saying, 'Yes, he did it.'  It offers them the, probably socially desirable response, of saying, 'I need more information.' "[64]

166.  While such an approach is understandable, I know of no one else in the field who uses it, except for one man, from another university in San Diego, who is only used by the prosecution, both on the venue and the eye witness testimony issues, who has never found a venue motion justified, and who once testified in response to a judge's question that a change of venue was not needed from that county since there was no mob at the courthouse door.

167.  The problem is that since almost all other venue survey professionals measure guilt without actively discouraging respondents from saying they believe the defendant is guilty, the inevitable comparisons between guilt levels found in other cases against the one found in the Ramirez case is extremely prejudicial.[65]

168.  (c) A third problem with the guilt question is that there was no scaling of

---

[63] Id.,

[64] Transcript 529.

[65] I have long been interested in this topic.  I have written about it (Measuring Prejudice in Venue Surveys: How Much Is Enough? with R. Ross, presented at panel, Surveys and the Courts, a paper presented at the national meeting of the American Association for Public Opinion Research, St. Louis, 1998, and I almost always present data on comparisons between other cases, both from appellate data and other cases in which I have testified, as I have done to some extent in this declaration.  Those comparisons are important because there are no other standards to look to for guidance.

that question, a practice the ASTC standards recommends.  Dr. Strand simply asks respondents if they believe Mr. Ramirez is or is not responsible (plus the need-more-information choice).  In a typical scaled prejudgment question, the respondent would be asked, "Based on what you have read or heard do you think that XXXX is definitely not guilty, probably not guilty, probably guilty, or definitely guilty." Obviously, those who answer definitely guilty are more dangerous than those who say probably guilty, and a few of the probably-guilty respondents slide over to responding don't know or to the need-more-information option in Dr. Strand's survey.  The ASTC format allows more subtle distinctions of prejudgment to be made, but also probably increases the overall guilt level.

169.  I note that Professor Strand testified that the survey he conducted in the Ramirez case demonstrated both the highest recognition and highest prejudgment rates he had ever seen.[66]

170.  <u>Other Survey Findings</u>: <u>Prejudgment of Penalty</u>.  With respect to the death penalty question in the survey, once again, Professor Strand reported what appears to be a very low level of support, in this instance, for those choosing the death penalty for Mr. Ramirez should he be convicted -- just 43.3%.  That level is much lower than the general support level for the death penalty at that time, around 80%[67], although it was probably somewhat lower in Los Angeles than in other counties in California.  Even so, that very low 43.3% figure reported in the survey would suggest that it was the prosecution that should have been seeking the venue change.

171.  However, if we examine the data, we find that the extremely low figure dramatically understates the community's strong belief that Mr. Ramirez should die if found guilty.  Respondents were asked, "If convicted, do you feel Mr. Ramirez

---

[66] Transcript 463-464.
[67] "The Gallup Poll's latest national survey of American opinion on the death penalty found that support for capital punishment dropped by 5 percentage points from 2007, down to 64% support from 69% last year....  Support had reached a high of 80% in 1994." Death Penalty Information Center, November 24, 2008 on-line posting.

should be given the death penalty for his crime?"

172.   There were 130 who answered yes to this question, 43.3% of the 300 people in the survey.  But only 155 respondents were even asked the penalty question, only those who had earlier said that Mr. Ramirez was guilty, or responsible, for the Night Stalker murders.  When testifying, Dr. Strand did not mention the far more meaningful percentage of those actually asked about penalty who chose death.  That percentage was a remarkable 83.8%.

173.   In 32 venue cases in which I have asked a death penalty question in a survey, the median support level of support for the death penalty has been 57.5%, and this case had by far the highest level.  In fact, the next three ranking cases were the only cases in the seventies, at 75%, 72%, and 72%.[68]  Thus, local support for executing Mr. Ramirez was off the scale.  While the very high prejudgment of his guilt made the likelihood of a fair and impartial guilt phase trial very problematic, the chances of a fair trial at a penalty phase were de minimus.

174.   On many of the important survey findings, again and again the reported percentages were based on the whole sample of 300, even though only some of the respondents had been asked the question.  That approach appeared to confuse the judge; even after being corrected he would again misinterpret the meaning of the percentages.  That is no doubt understandable because the manner in which the

---

[68] In a current case, involving the murder of a highway patrolmen, the question was as follows:
   The district attorney is seeking the death penalty for xxx.  Let's assume the jury finds him guilty of first-degree murder.  Then there will be just two possible sentences, either the death penalty or life without possibility of parole.  Based on what you know about the case and the defendant from the media, which sentence do you believe the jury should select for xxx, the death penalty or life without possibility of parole?

   | | | |
   |---|---|---|
   | Death penalty……….......... | N = 101 | % = 56.7 |
   | LWOP ………….........…..... | 77 | 43.3 |
   | Don't know……………........ .. | 0 | |
   | Refused/NA……………........ | 0 | |

   Note: I ask the penalty question of all respondents who recognize the case.

percentages were reported, while conservative, was confusing and difficult to follow.

175.  Using as the denominator the total number in the survey in computing the percentage leads to a percentage that is perhaps interesting and useful, but using as a denominator the number of those asked the question yields a percentage more meaningful as well as perhaps as interesting and perhaps more useful in measuring prejudice.  Certainly, at the least the latter percentage should also have been presented.

176.  All the data provided support the overall findings of the survey.  The findings were that there was a high awareness of the case, that a very large percentage of a representative cross-section of the jury pool had prejudged both the guilt and the penalty determinations against Mr. Ramirez, and that there was much additional information to explain and support those findings.

177.  3.  <u>Opinion Testimony</u>.  I have previously discussed the first two sources of evidence that the California Supreme Court, beginning with <u>Maine</u>, said the courts should rely on in determining the need for a change of venue, an analysis of the publicity and a community survey. The third source of evidence on the possible need for a change of venue is opinion testimony.  In this case there was some useful opinion evidence introduced in the venue hearing, **and my review of the transcript indicates the opinion testimony offered further evidence of the necessity of a change of venue in Richard Ramirez's case.**

178.  Mr. Scott McKeown, the L.A. Regional Coordinator for the Guardian Angels, noted the increase in requests for house sitting by those in fear of crime during the Night Stalker crimes.  Mr. McKeown (and another witness from the Guardian Angels) appeared very reluctant to testify or provide information to the court, but did acknowledge that the organization may have been involved in setting

up traps for the Night Stalker.[69]

179.  Dr. Paul Blair, a well-qualified psychiatrist, had dealt with hostage negotiations and was also the Director of Emergency Psychiatry in an inpatient unit at his hospital.  He testified that he was familiar with the fear of the Night Stalker: "People were very afraid, some people were semi-panicky, people buying weapons in large numbers for the purpose of self-protection."[70]

180.  Dr. Blair also testified about the special role that the randomness of the murders and assaults had in increasing that fear: "The concept of randomness does cause an increased amount of fear ... like a fear of the unknown, a fear of the dark."[71] "The fact that someone was getting into these homes on a regular basis without a whole lot of knowledge about who was doing this or where this person was going to come to next, did play a role (in fear of the Night Stalker)."[72]  He noted: "Randomness ... makes people uneasy ... who is going to be next? Will it be me? Will it be my family?"[73] and "This whole background of tension and fear seemed to feed upon itself."[74]

181.  Dr. Blair then testified about the role of the media in the Night Stalker case in increasing the fear:  "The more information that comes out in the press ... the more people will read it, the more people talk about it ....  Things begin to get distorted and the tension level goes up dramatically."[75]

182.  <u>Salience-Location Prejudice</u>.  Dr. Blair then discussed how those who lived closer to the Night Stalker's crimes would have greater fear and tension that could affect their ability to be fair and impartial as jurors, the notion of how salience

---

[69] Mr. McKeown was a very recalcitrant and evasive witness. Transcript 418-428.
[70] Transcript 574.
[71] <u>Id</u>.
[72] Transcript 576.
[73] Transcript 577.
[74] Transcript 578.
[75] Transcript 581.

affects those in the community discussed above.  He said that, "The incidence of fear and level of tension would be higher in the area where the actual episodes were taking place."[76]

183.  The court then asked some pointed questions about how this experience had played out in the area:

> Court: [D]o you think, sir ... that actual knowledge or first-hand hearsay among friends, relatives, associates, neighbors of (sic) where these incidents occurred might have any impact on the intensity on the fear level in the community?[77]

Dr. Blair responded that it would.

184.  The court then focused on how greater salience of the victims to residents in the unfolding of the frightening episodes would affect their fear: "Is the anxiety level of the general public apt to be higher if they personally identify with the victims?"  Dr. Blair, "Yes."

> Court: So, if the people who were victims were ordinary, everyday citizens in their homes, would the level of anxiety among ordinary everyday citizens in their homes be higher than it would if the victims were, say, skid row persons, or Hollywood celebrities, or gang members or people like that?[78]  W: (Yes).

185.  Dr. Blair also dealt with the crucial question of how some jurors' ability to ignore their experience and be fair and impartial might be affected.  Based on a question from counsel about a group defined by the court as the people "who had anxiety, who carried it over, who went from

---

[76] Transcript 583.
[77] Transcript 585
[78] Transcript 597.

carry-over anxiety to anger, and are now called upon (as jurors) to be objective," Dr. Blair said:

> Some them could not be objective and some of them could be objective....  There would be an unconscious residual for some of these people, that despite their best intentions, they would not be able to overcome, and their decision-making process would indeed be influenced.[79]

186.  Captain Joseph Santoro of the Monterey Park Police Department testified about his experience during the Night Stalker homicides as manager of various investigations who had worked with other departments' task forces.  He had given press conferences during the Night Stalker killings because one of his responsibilities at that time was to talk to the community and disseminate information about the case.

187.  He said that 20% of the entire city had joined neighborhood watches to protect themselves and the community from the Night Stalker.  An action plan was installed by the police department, which doubled and tripled patrols.  An emergency radio watch recorded license numbers of cars entering the area and then ran them. The department encouraged people to call the police if they saw anything suspicious and instructed them on how to protect themselves by joining neighborhood watch, installing dead bolts, leaving certain lights on, not sitting in front of windows so they could be seen to be alone, and other techniques.  They set up a program for elderly people to get dead bolts free of cost.  He said that these crimes were an absolutely terrible problem.  People were scared and they had a volunteer force.  Calls to the police doubled or tripled the usual.[80]

---

[79] Transcript 590-591.
[80] Transcript 606-633.

188.   Another witness was Patrick Bates, the manager of a local gun shop.  He testified that gun sales increased at least 50%, and then tripled, especially among women.  Some also bought rifles.  After Mr. Ramirez's arrest, sales came back to normal.[81]

189.   The testimony of the witnesses described above provided strong additional evidence that widespread fear and anger arose a direct result of the crime wave attributed to the Night Stalker, that those emotions were powerful, likely to be of substantial duration, and would make it difficult for many jurors to act in a disinterested fashion, especially because they had been personally affected and involved due to the great salience of the events to them.

190.   <u>Summary of Analysis of Prejudice Found at the Venue Hearing</u>.  My analysis of the application of the evidence available at the venue hearing -- media, survey, and opinion -- convince me that under both the federal and state legal standards as well as under the social science criteria, the Ramirez case is about as strong a case for requiring a change as can be made.

### §III.  THE VOIR DIRE AND RELATED MATTERS

190.   As I have previously indicated, if a defendant can demonstrate presumed prejudice, as in cases like <u>Rideau</u> and <u>Daniels</u>, it is unnecessary to explore for actual prejudice, as usually shown by the voir dire of the jury or jury pool, but in some of the cases the court uses the voir dire as an additional demonstration of prejudice.[82]

191.   Given the limitations on time and resources, while I reviewed all the voir dire of those who served as jurors or alternates at the Ramirez trial, I used a sampling

---

[81] Transcript 634-652.
[82] <u>E.g.</u>, <u>Irvin</u> and <u>Rideau</u>.

technique to conduct a selective analysis of a portion of the voir dire of the other jury panel members.

192.  <u>Voir Dire of the Pool of Venire Members</u> (excluding those who served as jurors or alternates).[83]  When examining the trial court's voir dire, it is important not to limit the review to the voir dire of those who actually served on the jury, but to examine the questioning of the entire panel.  Is it very important to inquire about the bias of the entire panel, not just that of the sitting jurors.[84]

193.  In order to obtain a reasonably representative and manageable sample, counsel provided me with the publicity voir dire (conducted after hardship examination) of the first 10 panel members on three dates: the first day of publicity voir dire, the last day of publicity voir dire, and the date falling in the middle of the process.  Thus, I had the entire voir dire examination on publicity of 30 panel members who served neither as jurors nor alternates.

194.  The manner in which the voir dire was conducted had both helpful and limiting features. The court allowed counsel to question panel members, which promotes forthrightness.  Most important, the voir dire was individualized and sequestered.  This was only partially the court's decision, since <u>Hovey v. Alameda County Superior Court</u>, 168 Cal.Rptr. 128(1980), was in force at that time, requiring individualized and sequestered voir at least for death qualification.[85]  Even with the publicity portion of the voir dire, the process tends also to make jurors somewhat more forthcoming, guards against a learning process that "teaches" them the "correct" answers by repetition, and prevents exposing them to prejudicial or inadmissible knowledge or feelings that others may express in their presence.

---

[83] I will examine the voir dire of those who served below.
[84] <u>See</u> discussion associated with footnote 36.
[85] But that was not required for publicity.  The requirement for sequestration during death qualification was overturned by the California voters with the adoption of Proposition 115 in 1990.

195.  What the trial court gave with using <u>Hovey</u>, it then took away with its introductory instructions and questions that came before defense counsel could ask any questions.  The court began with more or less the same introduction and questions as follows:

> (W)hat we're interested in is hearing from you whether or not, because of what you have heard or seen or gathered about this case, you have any <u>firm</u> opinions about the guilt or innocence of Mr. Richard Ramirez, the defendant in this case (emphasis added).[86]

> It is important that jurors be unbiased and free from any preconceived notions about whether this defendant in a criminal case is guilty or innocent.[87]

196.  The court had previously instructed most or all of the panel members about the presumption of innocence and the burden of proof.[88] The court continued with the following set of questions, sometimes varying the content and specific language:

> Have you heard or read or seen anything about this case in the media?  What was the nature of that material?

> Have you formed any opinion about this case or about the guilt or innocence of Mr. Ramirez?

---

[86] Transcript 4806.  In questioning other panel members about guilt, the court sometimes also asked for any opinion about the defendant himself.
 Later in the voir dire the court would include a reference to the Night Stalker.
 The wording and sequence of the questions sometimes varied, and not all instructions and questions were the same for every venireperson.
 I am omitting all names of jurors or panel members from my declaration.
[87] Transcript 4856.
[88] Then the court invoked that instruction from time to time during the individual voir dire, seemingly to remind the panel member that it would be wrong to say they believe the defendant is guilty: "The Court: Do you remember my -- the last thing I gave to the jury this morning about presuming the defendant innocent?" Transcript 7078, 7046, and see 7094-7095 and 9380.

Do you believe it is possible to put aside those opinions and

presume Mr. Ramirez innocent if you are selected as a juror in this

case to render a fair and impartial verdict in this case?[89]

197.   <u>Problems in Relying on This Voir Dire</u>.  Some of the problems with this early portion of the voir lessened its utility.  As to pre-instructing en masse, it is obviously crucial to instruct jurors on the presumption of innocence, the burden of proof, and similar basic matters.  The issue is simply when that should be done.  If done prior to the voir dire or filling out questionnaires, it interferes with the ability of counsel and the court to make an accurate assessment of possible bias.  That is, the judge is not just inquiring, but he is giving the prospective jurors the correct or best answers in advance.  Obviously such pre-instructions given after the voir is certainly appropriate.

198.   The court gave additional "answers" to the jurors individually, as seen above.  They learned, at least by implication, that they should say that they can put aside any opinions they have in order to be a fair and impartial juror.  Of course it is only a <u>firm</u> opinion on guilt the court inquired about.  Since holding such an opinion based only or primarily on the media suggests something of a closed mind, there is pressure not to say you have such an opinion, especially when you have just been told by the black-robed eminence sitting above you that you must accept the presumption of innocence.

199.   More importantly, counsel may be even more concerned about getting information from those who do not have a <u>firm</u> belief in the guilt of the defendant, but still think the defendant is guilty to some degree.  Counsel would like to explore that, but is in the position that getting a panelist to concede that he or she does have some perhaps less than firm feeling that the defendant is guilty would require the panelist to contradict what he or she has just told the judge about not having an opinion on guilt.

---

[89] Transcript 4857.

200.  After all, a juror who starts the trial believing the defendant is guilty will have to change his or her mind during the trial, thus shifting the burden of proof to the defendant to present some evidence of innocence.

201.  To illustrate how to avoid some of these problems, one federal case with which I am familiar, <u>United States v. Layton</u> (the Jonestown mass suicide case), is worth noting. The esteemed Chief Judge Robert F. Peckham of San Francisco, introduced the voir dire process as follows:

> Ladies and gentlemen, I am going to briefly talk with you this morning . . . and then we will ask you your indulgence while we ask individual prospective jurors questions. ...

> The process we are about to begin is known as voir dire.  I will ask you questions regarding your qualifications to serve. As I indicated, it will be done individually. ...

> With respect to the questions that I will ask you individually, I want to emphasize that there are no right or wrong answers; that this is not the giving of a test; that I have no expectation from you as to what your answer ought to be; that you shouldn't in any way ... feel that you should strive to give an answer that will be acceptable to me. ...

> What this is all about is to get your honest, straightforward feelings when we ask you what they are, or straightforward answers as to your opinions or a factual response. ...  I emphasize that, because ... it has been suggested by those who have studied the process that prospective jurors may feel that the authoritarian figure of the judge may play a role that

is not really helpful to the process, and I can assure you that
that's not my purpose.  It will be a very informal atmosphere
in which the questions are given to you ... and your only
obligation is to answer truthfully.  There are no right or
wrong answers.

What is most important is that you be as honest and
forthright as you possibly can.  Many of you will be excused
from this jury.  It should not be an embarrassment to you in
any way. ...  It carries with it no disqualification, certainly no
stigma. ...

What we ask is that above all you be, again, honest and
forthright in stating your opinions and feelings.[90]

202.  This first part of the discussion of the voir dire in the Ramirez case is not
meant to suggest that the process was fundamentally unfair or unacceptable,
especially not under the standards utilized during most appellate reviews.  It is,
however, to suggest that the information obtained from this certainly not atypical
process should be weighed carefully if offered to show that there was no need to have
granted a change of venue.

203.  Recognition.  I will next explore the sample of 57 voir dire examinations
in the Ramirez voir dire, beginning with the 30 panel members not actually selected
for the jury.  Of those 30 panel members, every single one recognized the case, a
100% recognition rate.  While standing alone, such recognition is not sufficient to
demonstrate prejudice from pretrial publicity,[91] it is a necessary prerequisite.  As one

---

[90] United States v. Layton, CR-80-416-RFP, N.D. Calif., July 1981, Trial Transcript at 933 et seq.
[91] That would require a showing that the content of the publicity was prejudicial.  For example, in the
Ellie Nessler case in Tuolumne County in California, the defendant was charged with murder for the
killing in the courtroom of the man she believed had sexually molested her son.  While most in the small
community knew about the case, no doubt most believed she should get a medal rather than be
prosecuted.

jury panelist remarked, "I don't think anybody has not heard the name (Richard Ramirez) mentioned."[92]  In fact, the trial judge appeared to be so certain of universal case recognition that he did not bother to ask a recognition question before moving on to the guilt question.

204. There was a third source of case recognition.  After the publicity voir dire, those remaining in the pool (306) filled out a questionnaire which showed a case recognition of almost exactly the same found in the Strand survey, although just a little higher at 94.7% (291), compared with the 94.3% recognition that Professor Strand found.

205.  What makes these recognition numbers so impressive is two-fold: First, the length of time between when the significant news coverage commenced (May of 1985) and the time when the jury voir dire and juror questionnaire data were obtained (January of 1988) is a very long period of time (two and one-half years) for case awareness to remain at such a very high level; second, it is almost an inexorable rule that case recognition declines over time (barring intervening high-profile intervening events), while in this case the recognition rate rose from the 94.3% obtained in the Strand venue survey in 1986 to 94.7% in 1988.  That is a very strong indicator that the case was part of the collective memory of the county.  Unlike most cases in Los Angeles, with only 15 minutes of fame (if that), this case had a long shelf life.  In that sense, Los Angeles became the functional equivalent of a much smaller community.

206.  Prejudgment of Guilt.  As for the guilt question, of the 30 panelists, all of whom recognized the case, 14 said they thought the defendant was guilty, 46.7%, despite the judge's efforts to dissuade them.  Others noted their relief when the defendant was arrested, strongly suggesting the right man was arrested, and thus Mr. Ramirez was guilty.  On top of that, 11 of these 30 were excused for cause because of

---

In the DeLorean and Marion Berry cases, television showed the defendants in the act of committing the crimes charged, but also implicitly charged the government with entrapment.

[92] Transcript 4880.

their strong opinion on guilt,[93] despite pressure to say they could put that opinion aside and be fair and impartial.  For example, the court asked, "Do you think it would be <u>impossible</u> for you to set aside that opinion that he is guilty of these crimes and render a fair and impartial verdict in this case?"[94]

207.  As an example of how prospective jurors had been "taught" to give "correct" answers, the trial judge asked one venireperson if she had any opinion on guilt.  She responded, "I heard what you said this morning about being innocent until you are proven guilty. I would go by that."  Her answer seemed to be more a product of training rather than her true feelings, as we can see from what she added later, "I can't understand how anybody could do such things and be innocent."[95] She also said, "(H)e's claimed to have done it, you know."[96]  Despite these strong indications that she strongly believed the defendant was guilty, she then showed that she would give the expected proper answer, saying she could give him the presumption of innocence and a fair trial.[97]

208.  The voir dire of another panelist revealed a similar pattern.  That person initially said forthrightly that he believed Mr. Ramirez was guilty.[98]  The court then rehabilitated him, getting him to agree he could render a fair and impartial verdict and had no reservations about that opinion.  This was one of the few times that counsel then did a good job in demonstrating that the panelist knew a lot of details about the case and really could not be fair and impartial.  The voir dire of this respondent occupied 14 pages of transcript, four or five times the length of the voir dire of most other panel members, and one of the only times counsel used up most of his allotted time of ten minutes per panel member.  The venire person then remembered that "everybody" he knew was afraid or worried about their safety and was relieved at the arrest, that everybody was buying guns and locking their windows at night," and that

---

[93] But that includes one woman whose son had recently been murdered.
[94] Transcript 4876 (emphasis added).
[95] Transcript 7093.
[96] Transcript 7097.
[97] Transcript 7098.
[98] Transcript 9389.

he had realized "immediately" after the arrest "that no longer was anybody crawling through people's windows and stuff and getting shot in the head ... while they were sleeping."[99]  He decided then that the defendant was guilty.  "I think that just about everybody has some opinion."[100]  He later said, "But they say that you are not supposed to (have prejudice)."[101]  Finally, he conceded that it would be very difficult for him to be entirely impartial, and it would not be fair to Mr. Ramirez if he were to sit as a juror.  The court then excused him.  This was an example of how much information and prejudice went undiscovered through this approach of preinstructing jury pool members before the voir dire, especially since counsel rarely inquired of others with the same diligence he showed with this panel member.

209.  When asked about it, many noted the community's fear and that of their family and friends, and as noted, many said they and others were relieved with the arrest.  Further, since every single one of these panel members said they recognized the case, that meant that they had been exposed to at least some of the publicity, or to discussions with family, friends, coworkers, and others, or to inadmissible evidence, or to all of those and to other possible sources of prejudice.  There was minimum exploration of such matters during the voir dire.  The court and counsel relied mainly on recall questions ("what do you remember?") rather than recognition questions to get information.[102]  To a large extent that is because one is appropriately reluctant to give jury pool members the very facts (in recognition questions) you are hoping they do not have, e.g., have you heard my client confessed or that he is a devil worshipper?

210.  If someone said that he or she had no opinion on guilt, counsel made no effort to pierce that veil.  Some could have had some opinion, but less than a firm one.  Others might have had information they should not have as jurors, such as uncharged crimes, defendant's devil worshipping, or many other matters.  Some might have discussed the crimes at length, a matter we do not even allow the actual

---

[99] Transcript 9393.
[100] Transcript 9396.
[101] Transcript 9398.
[102] If a person has certain knowledge in their memory, it is substantially easier to retrieve that memory with a recognition question than with a recall question.

jurors to do with each other prior to formal deliberations.  Such discussions often lead to rumors, gross exaggerations, and distortions.  Only a very few panelists were asked about such discussions, their fears, their safety precautions, and many other potentially serious concerns.  While it was not reasonable to explore every one of these matters with every panel member, at least some should have been pursued with each.

211.  People often do not realize what knowledge and biases they have and how that affects their judgment and most of us overestimate our ability to control them.  For some panelists, asserting they could be fair and impartial could simply mean that given this defendant's obvious guilt and the evil nature of his crimes, that the proper fair and impartial verdict would be death, but proceeded by a "fair" trial.

212.  The trial court did excuse those prospective jurors who made it unmistakably clear that they could not be fair and impartial, but that allowed many to slip by, since those on the panel who fell short of such an extreme position were passed.  For example, one panelist said, "he (Mr. Ramirez) is the Night Stalker."[103] She added that her friends who were followers of the news had given her their opinions about this case.  There was no follow-up question by the court on what those opinions were and whether she agreed with them, but counsel did inquire about it. She said, "Everyone assumed right away he was guilty, why do they want to have a trial."[104]  She also said, "I had a couple of girlfriends that were afraid to see his face on T.V. They said he was evil, 'Oh, he looks evil.' "[105]  A lot of her friends were afraid of being victimized by the Night Stalker and were careful on their way home. She felt sympathy for them; "they were sleeping with their guns under the bed," and one lady "couldn't sleep at all until he was captured."[106]  Her friends were sure the defendant was guilty but she only had a "shaky" opinion of his guilt.[107]  She also

---

[103] Emphasis added, transcript 7046.
[104] Transcript 7050.
[105] Transcript 7053.
[106] Id.
[107] Transcript 7058.

seemed to expect Mr. Ramirez to disprove the things she had heard.[108]Counsel initially challenged that woman, but withdrew it when the judge denied his challenge and said that, "(T)his lady has indicated that she could be a good juror."[109]

213.   <u>Voir Dire in Potentially High-Prejudice Cases</u>.   In reading transcripts of many potentially high-prejudice cases, I found it easy to be lulled into believing that while many jurors knew something or had feelings about the case, they did not know too much, and almost all could be fair.   Even in this case, despite all the obvious prejudgment, it was somewhat less blatant than the content analysis of the publicity demonstrated and the survey showed.   What is called response bias causes the juror-interviewee to pick up the subtle, and not so subtle, clues as to what the lawyer-judge-interviewer wants to hear.   In addition, those selected for jury duty enter the courtroom with their Civics 1 lessons in mind.   During voir dire on prejudice, the message from the attitudes about (and platitudes) we bring to the courthouse plus the judge's message is clear:   Good jurors are not supposed to have prejudicial information or biases about the case or the guilt of the defendant, but if they do, good jurors can set aside such matters and decide the case solely on the presumption of innocence and only the law and the evidence presented in court.   And that is what jurors say generally and many did in the Ramirez voir dire.   This is not to suggest that generally the venire person will consciously dissemble; it is to suggest that response bias will tend to mask certain information, both from the interviewer and the interviewee.

214.   The same "good citizen" impulse leads a number of respondents in anonymous telephone surveys to claim that they are registered to vote when in fact they are not.[110]   This effect, in response to an anonymous telephone pollster, is amplified in the presence of real authority figures in the courtroom, and particularly

---

[108] Transcript 7059.
[109] Transcript 7061.
[110] Silver, B., et al., "Who Overreports Voting?" 80 <u>American Political Science Review</u> 613 (1986).

when the voir dire seemed specifically designed to mute as much bias as possible. That is why it is difficult to assess problematic attitudes in prospective jurors.[111]

215.  Fear of Community Resentment.  Another concern I have that was unexplored in the voir dire is the specter of panel members feeling some pressure of possible community resentment should they not convict Mr. Ramirez and sentence him to death.  A substantial number had often talked to family, friends, co-workers and others about the case, and thus learned of their fear, anger, and belief in the

---

[111]A powerful example occurred in a Florida case in which I was involved.  I wrote about it in a paper I presented at the national meeting of the Law and Society Association, Does Prejudicial Pretrial Publicity Affect Jurors? A Case Study of the Minimization Effect, Madison, 1989 published as The Effectiveness of Voir Dire in Discovering Prejudice in High-Publicity Cases: An Archival Study of the Minimization Effect.  California State University, Chico, Discussion Paper Series, 1989.

In that case the two defendants were black males and the victim was a young and very well known white woman who had been kidnapped, raped, and murdered.  In a series of face-to-face interviews in the small rural county, local people made remarks like "Damn niggers should be hung;" "It's a shame all those niggers come down from Tallahassee and commit crimes;" "They ought to cut their cocks off;" "Twenty years ago they would have hung 'em instead of all this crap;" "People are ready to take the jail apart.  They better not get turned loose;" "It's about as serious as the Bundy case.  If they need a hangman, I'll be glad to donate my time free;" and many others.  The interviewers were threatened and received anonymous late-night phone calls.  A scientific university survey documented the extent and depth of the prejudice, and content analysis of the newspaper coverage of the interracial rape-murder made the prejudice obvious.  A very substantial percentage of this county of just 10,000 was either related to or knew the victim or her family.

Yet the tone at the voir dire was entirely different from what was measured through interviews and the survey.  One reading the transcript of that voir dire found not a single racial epithet, no threats of lynching, and no characterizations of the trial as "crap," even though one knew, based on surveys and interviews, how widespread those quoted feelings were in that jury pool.  The voir dire did not demonstrate the depth and breadth of prejudice in a case where it was palpable, This masking process is one problem that seems clear to me in the Ramirez voir dire.

In my study of the Florida case, I discovered that the problem with voir dire in that and in many other cases I have studied since was often revealed in the choice of vocabulary used by panel members when answering questions about prejudicial pretrial publicity.  Consciously or unconsciously they adopted words that minimized their prejudicial knowledge.  Many of these same words were often used in the Ramirez case: "just," "only," "all I know is," "don't know too much," "vaguely," "don't know too much," "that's all," "no more than," and others.  Of course, it is possible that the person was simply accurately describing his or her minimum knowledge, but often in my case study and in other cases, the context reveals that the person knew more; sometimes the use is a non-sequitur, e.g., "all I know is he raped and murdered her," or "I just know what was in the newspapers and on the television," etc.

One panelist in the Ramirez voir dire strongly illustrates the point.  She initially said she had not heard about the case, "I don't read the newspaper much."  When asked if she thought Mr. Ramirez was guilty, she said, "Not really."  Later she said, "I know about it, but nothing specific. ...  I mean, I haven't read or really seen anything on the T.V. about it. ... I don't even know much about it."  She then pronounced, "I just know that he killed a lot of people," followed by, "That's all I know." "Just that he killed a lot of people supposedly."  (However, she also said she was thinking of the Night Stalker (and thus not necessarily Mr. Ramirez). Transcript 9331-9334.

defendant's guilt.  They might feel some pressure to avoid having to explain a vote favorable to Mr. Ramirez.[112]

216.  <u>The Stealth Juror</u>.  Another potential problem in this and other super-high-profile cases is the stealth juror.  These are folks for whom jury duty in such a case has great personal value, and they will do what it takes to survive the voir dire.  Whether it is their own 15-minutes of fame, the need to feel important, hope to write a book, a need to punish or get even, the existence of such people is almost always unknown and unknowable before voir dire, but a few such cases have emerged later.  While this is a problem in any case, it is obviously more likely in the case of the Night Stalker, but obviously I have no evidence or suspicions that it happened in this case.

217.  <u>Time Limit</u>.  I note another limitation of the voir dire, that the court limited the time to 10 minutes per person.  Counsel objected to this limitation but the rule prevailed.  In the voir dire questioning of the 60 panelists I reviewed, I noticed just five times that the judge warned Mr. Hernandez that he was approaching the time limit, either at two minutes or one minute.[113]

218.  <u>Voir Dire of Those Who Served As Jurors Or Alternates</u>.  In general, the same problems discussed above with the voir dire of the 27 actual jurors and alternates persisted with the random sample of panelists, but I will focus on those who served in this section.  Ironically, in some ways the group who served was less scrutinized than many of those who did not.  The case recognition rate was not 100%, however.  One of the 27 did not recognize the case, and about the only thing we know about that person is that he doe not read the newspaper.[114]  That is only a modest indication of some perverse effects of selecting a jury from those who know nothing

---

[112] Unlike the jurors in the O.J. Simpson case, whose verdict had support in their own communities.
[113] Transcript 6738, 7056, 7058, 9398, 7056.
[114] Transcript 9408-9411.

about a case, however, since I have no other source about them, as I do when I conduct a community survey and can ask a range of demographic questions.[115]

219.  There was another juror whose voir dire was of some interest.  She answered "no" to the question from the judge, "Have you read, heard or seen anything in the news media about this case?"[116]  It turned out that she had only fairly recently moved to Los Angeles (less than two years prior).  That would mean that she showed one of the indicia of perverse effects from picking a jury from those who are unaware of a very high-profile case.  Rather than reflecting community values and experience, there is often a disproportionate number of relative outsiders selected to serve.  Of course, there were so few who did not know about this case that this was not an issue.  She still learned about the case from her roommate, who had told her she had been frightened at night, was afraid to be alone, and "that the story was that he would meet girls and take them up in the hills and kill them."[117]  The latter would seem to be a false rumor, the very sort of problem that arises from widespread discussions of infamous and frightening cases in a community.  Her roommate also was glad the defendant was caught.

220.  I noticed another point among these jurors that suggested the court had done a thorough job in getting people to know that good jurors do not enter the courtroom with any opinions about the guilt of the defendant.  We would of course prefer they do not, but the purpose of the voir dire is to get at their real feelings, not to encourage them to say what they think the court wants to hear.  As examples, one responded when asked whether he had formed any opinion, "I <u>actually</u> have not."[118]  Another said, "<u>Truthfully</u>,[119] no."

---

[115] If time were available and the issue was more central to my analysis, I could also have reviewed the juror questionnaires.
[116] Transcript 8747.
[117] Transcript 8750.
[118] Transcript 7114 (emphasis added).
[119] Transcript 5476 (emphasis added).

221.   The underlined words would seem to suggest that the jurors wanted the court to know that they really accepted its civics lesson about the presumption of innocence, but also likely that they assumed the court would be incredulous about such an assertion when the coverage was so widespread and prejudicial, and they thought everyone likely believed the defendant was guilty.

222.   The voir dire examination of those who served on Mr. Ramirez's jury gives me little confidence in the ability of many to serve fairly in the face of a "record (that) demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime (citation omitted)."[120]

223.   As was true with the voir dire of those who did not serve as jurors or alternates, many who did serve as jurors were not questioned at all by counsel,[121] or just barely questioned.[122]  Mr. Hernandez would at times not only fail to ask about much, or fail to follow up on concerns, but then merely asked a conclusory question on whether they could be fair and impartial, identical to the question the judge had asked the juror just before, and not surprisingly drawing the same response.[123]

224.   Summary of Voir Dire Analysis.  The voir dire in the Ramirez case confirmed that there was extraordinary case recognition and a very high level of prejudgment, including an unusual number who said they could not be fair and impartial.  However, the weak voir dire process, featured by the court's approach that impeded identifying those who might have had some bias, and by very weak questioning by counsel, made it difficult to fully identify the real scope of the

---

[120] Daniels, 428 F.3d at 1211
[121] E.g., transcript, 5466.  This person seemed to know very little, and it may have been unnecessary to question her much, but it would have been useful to ask if she had heard or participated in discussions, whether she had any fear or had taken precautions.   At least, we found out from the judges limited questioning that her routine consisted of getting up very early, going to work, coming home, and then going to bed with almost no exposure to the media or seemingly much else, thus another likely example of perverse effects.
[122] One such person seemed to be a possibly fruitful source of questioning, transcript 9472-9476.
[123] Transcript 9476.

prejudice.  However, just the prejudice that was revealed in the voir dire fully documented the need to move the trial.

### §IV. THE IAC ISSUE

225.  This section focuses on what I perceive to be the serious IAC on the crucial issue of ascertaining and protecting Mr. Ramirez from the pretrial publicity that had poisoned the atmosphere for this trial.  I will not deal with counsel's IAC during the presentation of the venue motion because the trial judge made that IAC so abundantly clear in his meeting in camera with the defendant at the end of the presentation of evidence on that motion.  To expand on that here by identifying the many glaring examples would be to belabor the obvious.  The court said simply. directly to the defendant, on the record, and with days of testimony recorded in the transcript to support his conclusion: "Your lawyers are incompetent. ..."[124]

226.  As to counsel's performance during voir dire about the pretrial publicity and related topics, it was very weak overall, was generally ineffective and unhelpful, and demonstrated a lack of understanding of the legal requirements of the California courts to preserve the venue motion for appeal.

226.  To begin with, I note that the juror questionnaire was distributed to venire persons after, rather than before, the publicity voir dire.  That would seem to violate common sense, was a waste of time, undermined the efficacy of the voir dire itself, and was contrary to what was done in every case about which I have some knowledge.  The questionnaire obviates the need for repeating the same standard

---

[124] The full lecture is found at Transcript 733-735.

 I note that the statement by the judge is definitive in establishing the first prong in the classic Strickland IAC test (Strickland v. Washington, 466 U.S. 668 (1984), showing a deficient performance during the motion stage. I also believe the deficient performance also met the second prong, that the defendant was prejudiced. In many ways, obtaining a venue change was crucial to saving Mr. Ramirez's life, and a proficient performance by his attorney very likely could have convinced the court to transfer the case.  As I will demonstrate next, I believe that counsel's performance during the voir dire also clearly met the Strickland test.  Certainly the combined performance, in the motion presentation and during the voir dire make this a clear instance of Strickland error.

questions to every single prospective juror at voir dire.  If properly written, it can identify those areas that need to be explored on voir dire.  It also can allow the court to eliminate the many people in this case whose strong biases allowed excluding them for cause without any need to voir dire them.  It also standardizes the questioning.

227.  Furthermore, the questionnaire was not particularly helpful in getting much, if any, of the information needed about the person's possible bias arising from the pretrial publicity.  While there are certain matters that should not be inquired into in a questionnaire or in voir dire for fear of imparting to the panel members the very information you hope they do not have, this questionnaire explored almost nothing of substance, even though the court had a model of some needed areas and questions from the Strand questionnaire, the hearings on the venue motion, and the voir dire. There were only three or so possibly meaningful question on the venue issue.  Section B, Information Regarding News Coverage, had an odd introduction section, which included, "(T)he court must know whether you will be able to avoid all contact with any media coverage of this case which might occur ....,"  This is speaking of <u>future</u> media contact, which is not the issue, followed by question 28, "What, if anything, have you already learned about this case, <u>People v. Richard Ramirez</u>, or about Mr. Ramirez?"  This is getting a little closer to the information that is sought, but is too unfocused, and the person answering is provided almost no space for an answer. Then we finally come to question 55 (of 60), when the respondent is asked, "Have you ever heard of this case?"  By this time respondents have been through the voir dire, and have read in the questionnaire about the charges and special circumstances, so placing the question there is not appropriate or of much utility.  However, I do not know the extent to which defense counsel helped draft the questionnaire or opposed it.

228.  As for the voir dire itself, counsel rarely used his time to ferret out needed information on knowledge, attitudes, or bias.  Even where such answers might not lead to a challenge for cause, it would help to make better use of peremptory challenges or with a better understanding of what trial tactics might work or should be avoided.  This

is unfortunate because while many times he missed obvious follow-up opportunities, he sometimes got results when he did pursue the matter.  When counsel did ask about various potentially prejudicial issues, it would vary from panelist to panelist, but it was a random procedure, just hit or miss.

229.  I have laid out some of the problems with counsel's voir dire in my previous discussion, so I will not repeat them here.  Briefly, they included not determining what prejudicial themes they had been exposed to (since all were familiar with the case), not exploring issues systematically, not asking whether they had discussed the case and what they had heard, or whether they had had personal concerns, and many of the facts explored in the Strand survey.  I will also note that many panelists were not questioned at all, and that counsel was more skilled at rehabilitating jurors than developing the case for a cause challenge.

230. While occasionally counsel acquired information that the panelist had discussed the case or overheard others discussing it, he did not seek out such information and follow up on it, even though this is a particularly troubling area.  Discussing the case acts as a multiplier of the media stories by exposing the community to repeated re-telling of what was in that coverage.  It is worth considering the difference between "evidence" in the media and that to which jurors will eventually exposed to in the courtroom.  Those same facts are introduced at trial in a controlled setting.  The atmosphere is sober, the judge is there and in control, and defense lawyers are standing by ready to object, cross-examine, and rebut.  That is certainly not so while discussing the case over the back fence, at the breakfast table, in the workplace, over coffee, at the barber or beauty shop, or many other informal settings.

231.  Rules of evidence do not control such discussions, and gossip, rumors, hearsay, and the like are the currency of that "trial."  The elements of those discussions are likely to include material that is inadmissible, inaccurate,[125] emotional, and inflammatory,

---

[125] E.g., the young woman who "learned" that the defendant was in the habit of taking girls into the hills and killing them.

content speculative, and expressing shared outrage.

232.   The stories and opinions of friends, relatives, neighbors, and coworkers may have a special credibility.  This could lead to a sort of pressure to convict or to face a perceived need to explain the verdict to those family members, friends, neighbors, and fellow workers.  Such prior discussion of the case would not automatically disqualify a person from serving on the jury, but it would be disquieting.  Not even jury members are supposed to discuss the case before it is submitted to them, and those jury discussions are likely to be much less prejudicial than those held at a neighborhood bar.

233.   Much worse than failing to inquire about a particular area was counsel's failure to ask any questions at all of many panelists.  For example, two consecutive panelists were asked no questions by counsel.  One had read newspaper articles,[126] and the other had read the papers and seen TV.[127]  There were other examples as well.[128] Unfortunately, we have no way of knowing now what they knew or felt about the case. What he learned about a particular panelist was largely random, since counsel varied his areas of inquiry from panelist to panelist, meaning that he might discover prejudice or not, depending on the luck of the draw.

234.   There is a voir dire of a particular juror that is of great concern.[129]  This juror used more minimization terms than any I ever recall seeing.  When finally pushed with specific question, however, she acknowledged that she knew the defendant was the Night Stalker, remembered his picture (when he was in court) and recognized him in court, said that he committed murder of families, was familiar with the case before he was arrested, said she would expect Mr. Ramirez to bring in evidence to prove he's not guilty and to disprove what she had heard on the media, that she may be convinced that he's guilty but would listen to him if he has something

---

[126]  Transcript 4885-4586.
[127] Transcript 4887-4888.
[128]  E.g., transcript 4895-4896. Often venirepersons were just asked about coverage in the last few weeks.  A juror who was asked very little, even when she seemed to possess potentially damaging information, is seen at transcript 6967-6974; also 8465.  Another failure to follow up is found at 7304.
[129] Transcript 6729-6739.

to explain his side of it, thinks it would be difficult for her to forget the things she had heard on the media, and had heard he was a devil worshiper.  After this extraordinary litany, counsel then asked her the sort of rehabilitation question usually posed by the prosecutor or court, and he did not make a challenge for cause.  This person actually served as a juror or alternate.  Not only is the voir dire of this panelist very troubling on its own,[130] but it provides powerful support that if other prospective jurors had been asked about specific areas of concern, they too would have revealed information or attitudes that required more than the cursory examination to which they were subjected.  Strangely enough, counsel followed up even less often with those who ended up serving on the jury than he did with those who were not selected (but perhaps they may have presented fewer problems).

235.  In addition to the instance cited above, counsel locked in several jurors who might have been at least somewhat problematic.  For example, with one panelist who had a lot of potentially damaging information about the case, discussions he had, his family's safety, etc., he asked, "And as of today then you feel that you could be and listen to the instructions of the court and make a decision based on -- not on what you've heard?"[131]  With another, he asked, "You didn't really gather much information about the case, in other words?"[132]  Another: "Would that be about it?" (instead of probing, what else or probing a specific area);[133]  Again: "So you don't read the articles in detail?"  And, "So there is nothing that you've heard or read ... in the last year or so that would in any way influence your feelings or attitudes about Mr. Ramirez?"[134]  This approach is exactly the opposite of what competent counsel does during voir dire.

236.  As noted above, the court imposed a 10-minute time limit on the questioning of each panel member.  Counsel never exceeded that limit (in the 57

---

[130] An equally or perhaps more troubling voir dire (with a similar result) occurred at transcript 4864-4871.
[131] Transcript 4870.
[132] Transcript 7117.
[133] Transcript 5477.
[134] Transcript 9427.

persons examined) and only very rarely came close, coming within two minutes or one minute just five times.  With those five exceptions, Mr. Hernandez did not appear to come close to using up his 10 minutes on anyone, and occasionally asked no questions at all.  Also, he never asked for more time with a particular panel member while he was questioning him or her, even when he seemed to be appropriately exploring a potential problem.  The time limit may explain, but certainly does not justify, why he very rarely initiated, pursued, or followed-up on crucial issues and appeared to use only a fraction of his 10 minutes on anyone.

237.  As previously noted, counsel relied mainly on recall questions ("what do you remember?") rather than recognition questions ("do you remember anything about ...?" to get information, making it much more difficult to retrieve that memory, should it have been in the person's memory banks.

238.  Counsel committed a serious series of procedural errors with respect to the venue issue that no competent counsel should have failed to recognize.  Counsel did not request additional peremptory challenges, failed to renew the venue motion after the voir dire, did not indicate that he was not satisfied with the jury as constituted, and failed to file for a writ of mandate, all very important legally and practically.  Counsel also did not file a request that the same judge that heard the venue motion should also conduct the voir dire so as to identify both the scope of the problems with the pretrial publicity and the requirements of the questionnaire.  Or if the new court found it unnecessary because of its own intimate familiarity with the facts that may itself may be some indication of the need to change venue.

239.  Counsel's performance during voir simply failed to meet what is expected of counsel with respect to protecting his client from a publicity-tainted jury and/or obtaining the critically needed change of venue.[135]

---

[135] See discussion of the Strickland test in footnote 124.

§V.  **CONCLUSION.**

240.  There are two issues on which I have reached a conclusion.  The first is whether or not the trial court committed error in not granting a change of venue for the trial of Mr. Ramirez, and is that error of such federal dimensions as to be cognizable in federal court.  My simple answer is that if this case did not require a change of venue, even by the federal courts, it is hard to imagine any case that would.

241.  The trial should have been moved from Los Angeles because cases should be tried in the courtroom on evidence adduced therein, not tried in the newspapers.  Where, as here, the defendant was likely to have already been tried and convicted in the media's court of public opinion, the trial is inherently unfair.  That is because, in effect, the burden of proof has shifted to the defendant, who had to convince the jury that he was innocent.  As the highly respected Justice Leonard Friedman wrote in Corona v. Superior Court (1972):  "Indispensable to any morally acceptable system of criminal justice is a verdict based upon evidence and argument received in open court, not from outside sources."[136]

242.  The second issue is whether counsel's performance during the venue motion and during the voir violated the Strickland standard for ineffective assistance of counsel.  For the reasons discussed above, I believe that it did.

I declare under penalty of perjury that the foregoing is true and correct, except as to those matters stated on information and belief, and as to those matters, I believe them to be true.

Executed on this 10th day of December 2008, at Chico, California.

Edward J. Bronson

---

[136] 24 Cal.App.3d, 872, 877 (footnote omitted).

# EXHIBIT A

**Curriculum Vita**
December 2008

Edward J. Bronson                    Professor Emeritus, Political Science, Public Law
Home office: ███████████████        California State University, Chico
███████████████                      e-mail: ebronson@csuchico.edu

EDUCATION    Ph.D., Political Science (Public Law), University of Colorado, 1972
             LL.M., New York University, 1961
             B.S., J.D., University of Denver, 1957, 1959

ACADEMIC EXPERIENCE

        Professor of Political Science, Public Law, California State University, Chico,
          since 1969 (now Emeritus)
          Courses: Constitutional Law, Administration of Justice, Legal Analysis

        University of Colorado
          Visiting Assistant Professor, Spring 1972. Teaching Associate/Instructor, 1965-69

        University of Alaska, Anchorage
          Visiting Scholar, Spring 1981

        College of Micronesia
          Visiting Scholar, Spring and Summer 1978

        Center for Judiciary Studies, Ministry of Justice, Lisbon
          Fulbright Scholar, Researcher and Lecturer, Spring 1992

    OTHER TEACHING  (including summer teaching and other programs)

        School of Law, University of Santa Clara, 1991, 1983, 1979, 1975, 1974
          Constitutional Law, Jurisprudence, Legal Analysis (CLEO)

        School of Law, Univ of San Francisco, 1990, 1982.  Jurisprudence, Legal Analysis (CLEO)

        Hastings College of Law, University of California, 1989.  Legal Writing (CLEO)
          La Raza LEOP, 1976. Constitutional Law, Legal Analysis

        School of Law, University of San Diego, 1988, 1987.  Jurisprudence, Legal
          Analysis (CLEO)

    Boalt Hall School of Law, University of California, Berkeley, 1986, 1984
      Jurisprudence, Legal Analysis (CLEO)

California Western School of Law, 1985.  Jurisprudence, Legal Analysis (CLEO)

Saipan, Commonwealth of the Northern Mariana Islands; Trust Territory of the Pacific
  Islands; and Ponape, Federated States of Micronesia; 2002, 2000, 1994, 1987, 1979,
  1978, 1977.  Program Director; taught Constitutional Law, Legal Writing and Analysis

Justice Center, University of Alaska, Anchorage, 1982, 1981, 1980
   Program Director; Constitutional Law

School of Law, University of Puget Sound (now Seattle), 1981.  Constitutional Law,
  Jurisprudence (CLEO)

School of Law, University of California, Los Angeles, 1977.  Legal Analysis (CLEO)

Third World Studies Institute. New College of Law, 1977.  Constitutional Law, Legal
  Analysis

California Northern School of Law.  Former Academic Advisor to Board of Directors;
  taught Constitutional Law


## PUBLICATIONS AND CONFERENCE PAPERS

Based on What You Know...: Race, Prejudgment, and the Death Penalty, with R. Ross,
  Public Opinion Pros, July 2007 (selected for publication by editors from among papers
  presented at national meeting of AAPOR)

Change of Venue, with J. Philipsborn, Ch. 15, in California Criminal Law: Procedure &
  Practice, 1995-2007 ed.; Berkeley: Continuing Education of the Bar, California

Pretrial and Trial Publicity, with J. Philipsborn, Ch. 14, in California Criminal Law:
  Procedure & Practice, 1995-2007 eds.; Berkeley: Continuing Education of the Bar,
California

Support for the Death Penalty When Knowing the Defendant's Race, with R. Ross,
  presented at American Association for Public Opinion Research, Anaheim, 2007

True Feelings: Strength of Opinion of Those Who Support the Death Penalty, with R. Ross,
  Public Opinion Pros, July 2006 (selected for publication by editors from among papers
  presented at national meeting of AAPOR)

Severance, in W. Rountree (Ed.), Jurywork: Systematic Techniques  (3d ed.)  New
 York: Clark Boardman, 2006 ed.
Strength of Opinion in Death Penalty Decisions: An Investigation of Death Qualification on
 Producing Pro-Prosecution Attitudes and Unrepresentativeness of Juries in Capital Cases,
 with R. Ross, presented at American Association for Public Opinion Research, Montreal,
 2006

Severance of Defendants in Capital Trials. 2006 Capital Case Defense Seminar
   Syllabus.  Sacramento: California Attorneys for Criminal Justice and California Public
   Defenders Association

Death Penalty, in E. Krauss & B. Bonora (Eds.), with D. Logan. Jurywork: Systematic
   Techniques  (2nd ed.), New York: Clark  Boardman, 1987-2005 eds, , 2006 ed., W.
    Rountree (Ed.)

Change of Venue in Civil Cases, presented at national meeting of American Society of
   Trial Consultants, Austin, 2006

Standards for Survey Research in Connection with Motions to Change Venue, with R.
   Dillehay, E. Krauss, S. Macpherson, American Society of Trial Consultants, revised
   for adoption at 2006 national meeting

The Effects of Race on the Prejudgment of Guilt and Penalty in 60 Venue Surveys,
     with R. Ross, presented at American Association for Public Opinion Research,
     Nashville, 2003

The Media and Pre-Trial Prejudice, presented at national meeting of American Society
    of Trial Consultants, Reno, 2003

Size of the Community As a Factor in Change of Venue: When a Large Community
    Becomes Small for Purposes of Venue.  Originally published in California State
    University,  Chico Discussion Paper Series, 1999. Also published in "Jury Reforms and
    Innovations, The American Society of Trial Consultants 2003; also in 2000 Capital Case
    Defense Seminar Syllabus.  L.A.: California Attorneys for Criminal Justice and California
    Public Defenders Association

Some Notes on Waiting Until Voir Dire to Decide Whether to Grant a Change of Venue:
    Bad Law, Bad Social Science. 2003 Capital Case Defense Seminar Syllabus. Sacramento:
    California Attorneys for Criminal Justice and California Public Defenders Association

Exploring the Standards for Prejudice from Pretrial Publicity. 2003, 2002 Capital Case
    Defense Seminar Syllabus.  L.A.: California Attorneys for Criminal Justice and
    California Public Defenders Association

Guidelines for Survey Research in Connection with Motions to Change Venue, updated 2002
    from Proposed Minimum Standards for Survey Research in Connection with Motions to
    Change Venue, with S. Macpherson, E. Krauss, R. Dillehay. Court Call, Journal of the American
    Society of Trial Consultants, Spring 1998; republished as part of Code of Professional Standards,
    American Society of Trial Consultants, 2003; also printed in Change of Venue, in E. Krauss & B.
    Bonora (Eds.), with D. Logan. Jurywork: Systematic Techniques  (2nd ed.). Ch. 7. New York:
    Clark Boardman, 1999 rev.

A Declaration on Sealing the Grand Jury Transcript and on a Possible Change of Venue
     The 2002 CACJ/CPDA Capital Case Seminar Electronic Syllabus

Survey Data to Support a Change of Venue: How Much Prejudice Does It Take? with R. Ross.
 California State University, Chico Discussion Paper Series, 1998; also published as How Much
 Prejudice Does It Take for a Change of Venue? in 2001 Capital Case Defense Seminar
 Syllabus.  L.A.: California Attorneys for Criminal Justice and California Public Defenders Assn.

The Effects of Race on the Prejudgment of Guilt and Penalty in 20 Venue Surveys,
 with R. Ross, presented at VIIIth Conference of International Society for Justice
 Research, International Society for Justice Research, Tel Aviv, 2000

A Meta-Analysis of the Effect of the Race of the Defendant and Victim on the Prejudgment
 of Guilt and Penalty by Whites and Blacks in the Jury Pool, with R. Ross, presented at
 American Association for Public Opinion Research, Portland, 2000, published as part of
 California State University, Chico Discussion Paper Series, 2000

Gender and Salience As Factors in Jury Pool Bias: A Preliminary Investigation, with R.
 Ross, presented at panel at Southwestern Political Science Assn, San Antonio,1999,
 published as part of California State University, Chico Discussion Paper Series, 1999

Minimum Standards for Venue Surveys, presenter, organizer and chair of panel at
 American Association for Public Opinion Research, St. Louis,1998

Measuring Prejudice in Venue Surveys: How Much Is Enough? with R. Ross,
 presented at panel, Surveys and the Courts, at American Association for Public
 Opinion Research, St. Louis, 1998

Chair, Plenary Session, The Death Penalty in America; presenter, The Continuing
 Impact of Race in the Administration of the Death Penalty, VIIth Conference of
 International Society for Justice Research, Denver, 1998

Discriminatory Charging of the Death Penalty: A Modest Proposal. 1998 Capital Case
 Defense Seminar Syllabus.  L.A.: California Attorneys for Criminal Justice and
 California Public Defenders Association

Jury Selection in High-Profile Cases: The Perverse Effects of Voir Dire, with R. Ross.
 California State University, Chico Discussion Paper Series, 1997

Declaration in Support of a Motion for Discovery on Arbitrary Charging of the Death
 Penalty. 1997 Capital Case Defense Seminar Syllabus. L.A.: California Attorneys for
 Criminal Justice and California Public Defenders Association
Developing Standards for Change of Venue Surveys, panel at Midwest Association for
 Public Opinion Research, Chicago, 1997 (convenor of panel)

Jury Selection in High Profile Cases: The Perverse Effects and Limitations of Voir
 Dire, with R. Ross, presented at American Association for Public Opinion Research,
 Norfolk, 1997, organizer of panel: The Change of Venue in High Profile Cases:
 Measuring Prejudice and Its Impact on the Jury

Political Process and Race in the Administration of the Death Penalty, presented at VIth
 Conference of International Society for Justice Research, Potsdam, FRG, 1997

Prejudgment in High-Profile Cases: A Preliminary Analysis of the Relative Importance
 of Print Versus Electronic Sources of Information, and Its Implications, with R. Ross.
 California State University, Chico Discussion Paper Series, 1996, presented as
 Prejudgment in High-Profile Cases: A Meta-Analysis of the Relative Importance of
 Print Versus Electronic Sources of Information, at American Association for Public
 Opinion Research, Salt Lake City, 1996

Race in the Courtroom: It's More Than the "N" Word.  California Death Penalty
 Defense Manual  (1996 ed.). L.A.: California Attorneys for Criminal Justice and
 California Public Defenders Association

Declaration on Discriminatory or Arbitrary Imposition of the Death Penalty.  California
 Death Penalty Defense Manual  (1996 ed.).  L.A.: California Attorneys for
 Criminal Justice and California Public Defenders Association

The Meaning of Life: Why Capital Jurors Choose Death.  California State University,
 Chico  Discussion Paper Series, 1995

Severance of Co-Defendants in Capital Cases: Some Empirical Evidence.  21 Forum  52
 (1994).  (Also published in California State University, Chico Discussion Paper Series, 1994.)

Fatal Misconception: Convincing Capital Jurors That LWOP Means Forever, with J.
 Ramos & J. Sannes-Pond, 21 Forum  42 (1994)

The Effectiveness of Voir Dire in Discovering Prejudice in High-Publicity Cases: An
 Archival Study of the Minimization Effect.  California State University, Chico
 Discussion Paper Series, 1989.  Also published as The Effectiveness of Voir Dire in
 Discovering Prejudice in High Publicity Cases: A Case Study of the Minimization
 Effect in 20th Anniversary Celebration Seminar. California Attorneys for Criminal
 Justice, 1993

A Practical Approach to Researching and Presenting the Basis for a Change of Venue
 Motion, with J. Philipsborn & Q. Denvir.  California Death Penalty Defense Manual
 (1993 ed.). L.A.: California Attorneys for Criminal Justice and California Public
 Defenders Association
Change of Venue in the California Courts: What They Say and What They Do,
 California State University, Chico Discussion Paper Series, 1992.  Also published in
 Proceedings of the Annual Meetings, American Political Science Association 1992.
 Also published as The California Appellate Courts and the Change of Venue: Politics
 in Search of Law in 20th Anniversary Celebration Seminar.  California Attorneys for
 Criminal Justice, 1993

Exposing the Capital Defendant to Jurors Biased by Prejudicial Pretrial Publicity: The

Fruit of the Poisoned Pen, panel presentation on Pretrial Publicity and the Capital
Juror in Symposium, Justice and the Capital Juror, IVth Conference of International
Society for Justice Research, University of Trier, FRG, 1993

Change of Venue in the California Courts: What They Say and What They Do¨,
 presented at national meeting, American Political Science Association, Chicago, 1992

Justice in the Era of the High-Profile Defendant: Will a Change of Venue Help? presented at
 national meeting, American Political Science Association, Washington, D.C.,1991

Declaration in Support of Motion to Compel Discovery of Death Penalty Charging
 Practices.  California Death Penalty Defense Manual  (1992 ed.).  L.A.: California
 Attorneys for Criminal Justice and California Public Defenders Association

Effective Jury Voir Dire, with Hon. M. Virga, J. Morris, Jr.,  C. Wieckowski.  Tapes
 and materials.  Berkeley: Continuing Education of the Bar, 1991

Justice in the Era of the High-Profile Defendant: Will a Change of Venue Help? with R.
 Ross.  California State University, Chico Discussion Paper Series, 1991.  Also
 published as part of Proceedings of the Annual Meetings, American Political Science
 Association 1991. Nominated by Section on Law and Courts for the Pi Sigma Alpha
 Award for best paper at annual meeting

California Appellate Decisions Since Maine, in M. Arkelian, Ed., Homicide Defense.
 Section 2. California Public Defenders Association, 1991

Declaration in Support of a Change of Venue Motion, in E. Krauss & B. Bonora, Eds.,
 Jurywork: Systematic Techniques  (2nd ed.)  Appendix E-2).  New York: Clark
 Boardman, 1987, 1989 rev. Reprinted as part of Ch. 7, 78-22, 1990 rev., 1998 rev.

Does Prejudicial Pretrial Publicity Affect Jurors? A Case Study of the Minimization Effect,
 presented at national meeting, Law and Society Association, Madison, 1989

Challenging the Death-Qualifying Voir Dire After Lockhart, in E. Krauss & B. Bonora
 (Eds.), Jurywork: Systematic Techniques, 2nd ed. Ch. 3.  New York: Clark
 Boardman, 1987

Declaration in Support of Proposed Voir Dire Procedures.  California Death Penalty
 Defense Manual  (1987 ed.).  L.A.: California Attorneys for Criminal Justice and
 California Public Defenders Association

Surveys and the Law, panel, American Statistical Association national meeting, Las Vegas, 1985

Does the Exclusion of Scrupled Jurors in Capital Cases Make the Jury More Likely to
 Convict? Some Evidence from California.  Woodrow Wilson Journal  of Law, 1981

Measuring the Number of Automatic Death Penalty Jurors: A Response to Hovey
 (1981).  Research monograph submitted to several courts

The Exclusion of Scrupled Jurors in Capital Cases: The California Evidence on
  Conviction Proneness and Representativeness.  California State University, Chico
  Discussion Paper Series, 1979

Trial by Numbers: The LSAT and Cultural Bias.  The Guild Practitioner, 1977

On the Conviction Proneness and Representativeness of the Death-Qualified Jury:
  An Empirical Study of Colorado Veniremen.  42 University of Colorado Law
  Review 1, 1970


## NON-ACADEMIC CONFERENCES & OTHER PROFESSIONAL PRESENTATIONS

Using Venue and Jury Composition Challenges to Get Better Trial Conditions, Death Penalty
Conference, Monterey (2008)

The Crime Within: Prison Law Symposium, King Hall, University of California, Davis School of
  Law (2007)

Federal Death Penalty-Multi-Defendant Cases, Death Penalty Conference, Monterey (2007)

Community Attitude Survey in Civil Cases, national meeting of American Society of
  Trial Consultants, Austin (2006)

Severance of Defendants in Capital Trials, Death Penalty Conference, Monterey (2006)

The Media and Pre-Trial Prejudice, national meeting of American Society of Trial
  Consultants, Reno (2003)

Free Press vs. Fair Trial, invited presentation, San Diego Psych-Law Association (2002)

The Role of Juries in a Democratic Society, invited presentation for the NMI Council for
  Humanities and the Commonwealth, Supreme Court, Saipan (20002).  Also, a separate
  invited presentation, Public Funding of Private Schools
Social Science in the Courts: Change of Venue in a High-Profile Case, invited
  presentation at McGeorge School of Law (2002)

Voir Dire Procedure, CLE presentation, Commonwealth of the Northern Mariana,
  Islands, Saipan (2002)

Exploring the Standards for a Change of Venue Motion, Death Penalty Conference,
  Monterey (2002)

How Much Prejudice Does It Take for a Change of Venue?  Death Penalty
  Conference, Monterey (2001)

The Role of the Jury in a Democratic Society, invited presentation at the Public Law Forum, sponsored by the Northern Marianas Council for the Humanities, Saipan (2000)

Change of Venue Motions, Death Penalty Conference, Monterey (2000)

Venue and Social Science, Visiting Scholar Series, Grant Sawyer Center for Justice Studies, and Graduate Program in Social Psychology, University of Nevada, Reno (1999)

Discriminatory Charging of the Death Penalty: A Modest Proposal, presentation at plenary session, Death Penalty Conference, Monterey (1998)

How Size and Nature of the County Affects Venue and Other Issues, presentation in panel, Small County Issues, Death Penalty Conference, Monterey  (1998)

The Anti-Terrorism Act: Can We Rely on a Politicized State Judiciary? presented in Symposium, The Politics of Criminal Prosecution, California State University, Chico  (1997)

Effective Jury Voir Dire, presentation, Continuing Education of the Bar, Sacramento (1997)

Race in the Courtroom: It's More Than the "N" Word, presentation at Death Penalty Conference, Monterey  (1996)

From Oklahoma City to Denver: The Change of Venue in a High-Profile Death Penalty Case, Public Lecture at University of Colorado School of Law (1996)

Social Science in High-Profile Death Penalty Cases: Examining Pretrial Publicity, Race, and the Jury, Public Lecture sponsored by Grant Sawyer Center for Justice Studies, University of Nevada, Reno (1996)

Delegate to First National Conference on Eliminating Racial and Ethnic Bias in the Courts, National Center for State Courts, Albuquerque (1995) (appointed by Chief Justice of Supreme Court of the Commonwealth of Northern Mariana Islands); Racial and Ethnic Fairness Subcommittee meeting, California State Team. Los Angeles (1997)

The Meaning of Life: Why Capital Jurors Choose Death, panel presentation on Death Penalty Justice: Social Science Research and Courtroom Practice, Vth Conference of International Society for Justice Research, University of Nevada (1995)

Effective Jury Voir Dire, presentation, Continuing Education of the Bar, McGeorge School of Law, Sacramento (1995)

Presenting Social Science Research in Support of Novel Motions and Other Courtroom Applications, presenter and panel chair, American Society of Trial Consultants, Portland (1994)

The Third Constitutional Convention of the Commonwealth of the Northern Mariana Islands, two public fora sponsored by the Commonwealth Council for the Humanities, Saipan (1994)

Bold Beginnings for the Defense: Venue and Jury Selection Strategy, address to annual meeting, California Attorneys for Criminal Justice, San Francisco (1993)

In Limine and Trial Motions, Death Penalty College, School of Law, University of Santa Clara (1993)

Public Opinion, Media, and Criminal Justice, university lecture, Centro de Estudos Sociais, Faculdade de Economia, Universidade de Coimbra, Coimbro, Portugal (1992); Lisbon, 1992: Social Science Research in the Courts, and The Adversary System of Justice in the United States, lectures to faculty and student body, Centro de Estudos Judiciários, Ministério da Justiça; The American Justice System, lecture, Faculdade de Direito de Lisboa, Cidade Universitório; Law and Justice in the United States, Juries and Public Opinion, lectures, Instituto Superior de Ciências do Trabalho e da Empresa; The Role of Juries in the Transformation of Society, lecture, Universidade de Psicologia, Instituto Superior de Psicologia Aplicada

Effective Jury Voir Dire, presentation, Continuing Education of the Bar, McGeorge School of Law, Sacramento (1991)

The Change of Venue in California, presentation to California Public Defenders Association meeting, Homicide Defense, Napa (1991)

Analysis of Media Coverage of Capital Cases, presented at national meeting, Amnesty International, Chicago (1989)

Social Science Analysis of Pretrial Publicity, at Death Penalty Conference, Monterey  (1988)

Venue Issues and Answers, at Death Penalty Conference, Monterey  (1988)

Change of Venue, panel presentation at Death Penalty Conference, Monterey  (1986)

A Matrix Remedy Analysis of Solutions to Hovey, in panel, Jury Selection in Capital Cases, Death Penalty Conference, Monterey  (1985)

## TESTIFYING & CONSULTING

VENUE:  Expert witness on change of venue motions in 120 cases, testifying (21 times by declaration) regarding publicity analyses, public opinion surveys, evaluations of research, and remedies in California (state and federal), Colorado, Florida (federal), Illinois, Kansas (state and federal court), Mississippi (federal and state court), Missouri (federal court), Montana (federal), Oklahoma (state and federal court), Oregon, and Texas. (Motion granted in 50 of 113 cases decided by trial court.)

Cases have included the Oklahoma bombing case, Enron/Jeff Skilling/Ken Lay case, Unabomber case, Polly Klaas case, American Taliban case, Hurricane Katrina insurance cases, Orange County bankruptcy, San Francisco dog mauling case, Billionaire Boys Club, etc.

Presented evidence on venue by declaration or affidavit in other cases (pretrial and post-trial, criminal and civil) in Alabama, Arizona, California, Florida, Georgia (testified), Illinois, Indiana, Kansas, Kentucky, Nevada, New Mexico, New York, North Carolina, Pennsylvania,

Virginia, and Wyoming.  Consulted with attorneys, did publicity analyses, and worked on public opinion surveys on venue in many other cases.  Reviewed and analyzed many transcripts of voir dire in high-publicity cases.  Wrote and/or analyzed juror questionnaires

Recommended and/or testified against change of venue in 169 cases; testified in favor of change of venue in 106 cases

SEVERANCE:  Testified about, consulted on, and empirically researched issues related to severance and joinder, pretrial and post-trial, particularly in capital cases.  Dealt with severance of co-defendants and of charges.  Research dealt with case-specific problems and general issues

On severance of defendants, testified in New Mexico (federal court), Colorado (federal court), Pennsylvania, California in counties of Fresno, San Diego, San Francisco, San Jose, Trinity. By declaration in federal courts in Arizona, California, Colorado, Florida, New Mexico, New York, Oklahoma, Virginia, West Virginia; in state courts in California (5), Indiana (2)

On severance of charges, testified in San Diego, San Bernardino, Sacramento.  And by declaration in other cases

DISCRIMINATION:  Testified, submitted declarations and/or consulted on possible abuse of prosecutorial discretion in death penalty charging in several counties.  Presented statistical analyses

Testified, submitted declaration and/or consulted on jury selection and discrimination issues, including compositional challenges to trial and grand juries, cognizability of certain groups; presented statistical analyses of data

Testified on possible effects of community racial discrimination against Indians, as measured by media coverage on Indian and police officer in killing of police officer
Testified and/or consulted on impact of community racial prejudice on fair trial rights

Delegate to First National Conference on Eliminating Racial and Ethnic Bias in the Courts, National Center for State Courts, Albuquerque (1995) (appointed by Chief Justice of Supreme Court of the Commonwealth of Northern Mariana Islands)

Did studies and consulted on community prejudice regarding race, as it affected police, prosecutors, and prospective jurors.  Conducted community forum attempting to alleviate racial tension between police and young black males

VOIR DIRE:  Testified numerous times as expert witness and submitted many declarations on voir dire conditions and on the efficacy of voir dire in various contexts, including death qualification, pretrial publicity, insanity, and sensitive issues (such as race, gangs, mental issues, and AIDS).  Issues included use of questionnaires, attorney-conducted voir dire, individualized and sequestered voir dire, questioning techniques.  Also, on ineffectiveness of counsel at voir dire

Appointed by court in capital trial as its advisor on voir dire, jury selection procedures, death qualification, and related matters (San Joaquin County Superior Court, 2006)

DEATH QUALIFICATION:  Testified in Hovey v. Superior Court  (1980) 28 Cal.3d 1, and Lockhart v. McCree (1986) 476 U.S. 162.  My research cited in these and many other appellate cases

Testified as expert witness on death-qualified-jury issues over 50 times.  In Alabama, Arkansas (federal court), Arizona, California, Colorado, Illinois, Nebraska, New Mexico, and Oregon

Submitted affidavits and/or consulted with attorneys regarding death qualification in dozens of cases throughout U.S. and in Canada, pretrial and post-conviction.  Issues included guilt proneness, juror attitudes, voir dire, representativeness, the automatic-death-penalty juror problem, voir dire process effects, and various remedies

OTHER TESTIFYING AND CONSULTING

Testified, consulted, and did empirical research on other jury issues, including compositional challenges (grand and trial juries), closing preliminary and competency hearings, sealing transcripts and other records, meaning of LWOP to jurors and effect on sentencing decision

Consultant to Continuing Education of the Bar, California, for California Criminal Law Procedure & Practice, on venue, voir dire, and death penalty

Court-appointed coordinator to monitor and coordinate implementation of consent decree regarding conditions at Butte County Jail (since 1995)

Consultant, Amnesty International, content analysis of media coverage of the death penalty in the United States (1989)

Consultant, United States Department of the Interior, National Park Service, training on penal history for Alcatraz staff (1989-90); Member, Advisory Board, Alcatraz Exhibit, Federal Bureau of Prisons and United States Department of Interior (1990-91)

Consultant to Justice Improvement Commission, Trust Territory of the Pacific Islands, criminal justice education, training, and practice; also on legal education (1977-1987)

Consultant, Legal Services section, Title I, Higher Education Act (1970-1973)

OTHER:  PRIOR CRIMINAL JUSTICE ACTIVITIES:

California Correctional Center, Susanville, California: Taught in-service training for prison correctional staff; taught law classes for prisoners and paralegal classes for

Inmate Resource Center program; on Board of Directors.  Member, Chavareem, multiracial prisoner group

Served on oral boards for court OR program director, probation, and police hiring

Established, coordinated Criminal Justice program; established and taught in off-campus degree programs for criminal justice personnel. California State University, Chico.

Criminal Justice Chair, Law Enforcement Committee, Regional Criminal Justice Planning Board Executive Comm., Training and Education System Project that planned Butte Regional Criminal Justice Training Center, member of advisory board and committees, one-time vice chair; and Chair, Policy Sub-Committee, Butte County Jail Advisory Committee; Project STAR, Teaching Criminal Justice Role Training, Academy of Justice, Riverside, CA

## GRANTS AND PROGRAMS FOUNDED OR CO-FOUNDED:

Legal Services section, Title I, Higher Education Act

Public Law Internship.  Follow-up to Title I grant, from Associated Students, CSU Chico. Now Community Legal Information Center  (CLIC), 12 separate clinical law programs

Chico Area Legal Services grant.  Also, former Chair, Board of Directors, Senior Information and Referral Center grant, now Area Agency on Aging. Project Director, then Vice-Chair of board; Board of Directors, Legal Services of Northern California and predecessor organizations

Other Local Program Development (all programs still operating):

| | |
|---|---|
| Butte County Welfare Rights (1970) | Chico Consumer Protection Agency (1974) |
| Own Recognizance Bail Project (1971) | Penal Law Project (1974) |
| Housing Affairs Office (1971) | Women's Law Project (1975) |
| Family Law Program (1972) | Disabled and the Law Project (1976) |
| Environmental Advocates (1973) | |

## OTHER:

Served on doctoral committees in psychology and political science at University of California, University of Colorado, University of Nevada

Some additional past activities: Coordinator and founder, Public Law Program; Paralegal Certificate Program; also campus Pre-Law Advisor; founder and advisor, Minority Student Law Union; Chair, Speech and Advocacy Committee (all at California State University, Chico)

Vice-Chair, Butte County Personnel Appeals Commission; Clerk to Associate Justice, Colorado Supreme Court

Since 1994, court-appointed Coordinator to monitor, coordinate, and audit implementation of Superior Court consent decree regarding conditions at Butte County Jail

The Outstanding Teacher, 1988, California State University, Chico.  Also, The Meritorious Professional Performance Award, 1990; Professional Achievement Honors Award, 1995

Fulbright Scholar Award, Portugal, 1992

Ed Bronson-Ron Dillehay Award, established by the American Society of Jury Consultants Foundation for significant contributions through research and education in the fields of venue, voir dire, and procedural justice (2006)

# EXHIBIT B

Newspaper Article List (up to 9-1-88).xlsx

| TOTAL TALLY | DATE | TITLE & SUMMARY | CURRENT LOCATION | SOURCE |
|---|---|---|---|---|
| | | DATE RANGE -- 1/29/1985 - 9/1/1988 | | |
| 1 | 5/15/1985 | Man Shot, Wife Raped by Intruder | Tr. Ex B-1 | San Gabriel Valey Tribune |
| 2 | 6/30/1985 | Arcadia Woman Found Beaten to Death | Tr. Ex B-2 | San Gabriel Valey Tribune |
| 3 | 7/7/1985 | Teacher Death Stuns Peers | Tr. Ex B-3 | San Gabriel Valey Tribune |
| 4 | 7/9/1985 | Police Seek Link in Valley Deaths | Tr. Ex B-4 | San Gabriel Valey Tribune |
| 5 | 7/14/1985 | Police Say Valey Slaings May be Linked | Tr. Ex B-5 | San Gabriel Valey Tribune |
| 6 | 7/18/1985 | Detectives Prope Strink of Valley Slayings | Tr. Ex B-6 | San Gabriel Valey Tribune |
| 7 | 7/10/1985 | Witnesses focus on attacker's bad teeth | Tr. Ex B-7 | San Gabriel Valey Tribune |
| 8 | 8/14/1985 | County offers $10,000 reward for murderer | Tr. Ex B-8 | San Gabriel Valey Tribune |
| 9 | 8/14/1985 | Rape not tied to murders | Tr. Ex B-9 | San Gabriel Valey Tribune |
| 10 | 8/15/1985 | Residents Worried by Killings Buy Locks, Guns | Tr. Ex B-10 | San Gabriel Valey Tribune |
| 11 | 8/15/1985 | Diamond Bar united to Battle Valley Intruder | Tr. Ex B-11 | San Gabriel Valey Tribune |
| 12 | 8/16/1985 | In Monterey Park Forum | Tr. Ex B-12 | San Gabriel Valey Tribune |
| 13 | 8/19/1985 | Fearful SGV Residents Form Guardian Angels | Tr. Ex B-13 | San Gabriel Valey Tribune |
| 14 | 8/22/1985 | "Valley Killer" Suspect in Bay Area Murder | Tr. Ex B-14 | San Gabriel Valey Tribune |
| 15 | 8/24/1985 | 14 Slayings Now Linked to Valley Killer, Sheriff Say | Tr. Ex B-15 | San Gabriel Valey Tribune |
| 16 | 8/25/1985 | Manhunt for Valley Killer May be Hampered by Information Leaks | Tr. Ex B-16 | San Gabriel Valey Tribune |
| 17 | 8/26/1985 | Valley Killer Attacks Pair in Orange County | Tr. Ex B-17 | San Gabriel Valey Tribune |
| 18 | | Police Dount Man Chased in San Marino is the Killer | Tr. Ex B-18 | San Gabriel Valey Tribune |
| 19 | 8/16/1985 | Valley Groups Form for Protection | Tr. Ex B-19 | San Gabriel Valey Tribune |
| 20 | 9/1/1985 | Temple City Woman Sure She Saw Killer | Tr. Ex B-20 | San Gabriel Valey Tribune |
| 21 | 9/17/1985 | Eyes of One "Killer" Victim Cut Out. Document Says | Tr. Ex B-21 | San Gabriel Valey Tribune |
| 22 | 9/17/1985 | Mishandling of Ramirez Defense Charged | Tr. Ex B-22 | San Gabriel Valey Tribune |
| 23 | 9/00/1985 | Valley Killer May Have Left Ammo at Depot | Tr. Ex B-23 | San Gabriel Valey Tribune |
| 24 | 9/17/1985 | Molds Made of Richard Ramirez Teeth | Tr. Ex B-24 | San Gabriel Valey Tribune |
| 25 | 9/18/1985 | Gag Order Imposed in Valley Killer Case | Tr. Ex B-25 | San Gabriel Valey Tribune |
| 26 | 9/19/1985 | Ramirez Too Isolated, Says Family | Tr. Ex B-26 | San Gabriel Valey Tribune |
| 27 | 9/22/1985 | Computer Speeds Fingerprint (Unable to Cont.) | Tr. Ex B-27 | San Gabriel Valey Tribune |
| 28 | 9/27/1985 | Ramirez Due to Enter Plea | Tr. Ex B-28 | San Gabriel Valey Tribune |
| 29 | 9/28/1985 | Ramirez Charged with 68 Valley Killer Crimes | Tr. Ex B-29 | San Gabriel Valey Tribune |
| 30 | 9/29/1985 | Ramirez Wants to Plead Guilty, Sister Reports | Tr. Ex B-30 | San Gabriel Valey Tribune |
| 31 | 10/2/1985 | Fund Set Up to Help Valley Killer Victim | Tr. Ex B-31 | San Gabriel Valey Tribune |
| 32 | 10/7/1985 | Defense Fight May Delay Killer Case | Tr. Ex B-32 | San Gabriel Valey Tribune |
| 33 | 10/10/1985 | Ramirez Has New Lawyer | Tr. Ex B-33 | San Gabriel Valey Tribune |
| 34 | 10/11/1985 | Lawyer Says Ramirez Wants New Counsel | Tr. Ex B-34 | San Gabriel Valey Tribune |
| 35 | 10/16/1985 | Ramirez Attorney to Stay With Case | Tr. Ex B-35 | San Gabriel Valey Tribune |
| 36 | 10/17/1985 | Gates, Bradley Disagree Over "Killer" Reward | Tr. Ex B-36 | San Gabriel Valey Tribune |
| 37 | 10/19/1985 | Friends Assist Valley Killer Survivor | Tr. Ex B-37 | San Gabriel Valey Tribune |
| 38 | 10/23/1985 | Ramirez Asks New Lawyer | Tr. Ex B-38 | San Gabriel Valey Tribune |
| 39 | 10/25/1985 | Ramirez Greets Satan, Enters Innocent Pleading | Tr. Ex B-39 | San Gabriel Valey Tribune |
| 40 | 11/14/1985 | Ramirez Attorney Faces Disciplinary Motion | Tr. Ex B-40 | San Gabriel Valey Tribune |
| 41 | 11/15/1985 | "Killer" Suspect Gaines Delay in Court Case | Tr. Ex B-41 | San Gabriel Valey Tribune |
| 42 | 12/14/1985 | Judge Approves Ramirez Exercise | Tr. Ex B-42 | San Gabriel Valey Tribune |
| 43 | 7/22/1985 | Ramirez Lawyers Ask Dismissal of Charges | Tr. Ex B-43 | San Gabriel Valey Tribune |
| 44 | 8/2/1986 | "Night Stalker" Trial Delayed 3 Months | Tr. Ex B-44 | San Gabriel Valey Tribune |
| 45 | 8/10/1986 | Step Outside and Fight Crime | Tr. Ex B-45 | San Gabriel Valey Tribune |
| 46 | 8/12/1986 | Diamong Bar Family Sues Night Stalker Defendant | Tr. Ex B-46 | San Gabriel Valey Tribune |
| 47 | 8/13/1986 | Babble in Court? | Tr. Ex B-47 | San Gabriel Valey Tribune |
| 48 | 8/13/1986 | Relatives Boost Ramirez Spirits | Tr. Ex B-48 | San Gabriel Valey Tribune |
| 49 | 8/31/1986 | "Stalker" Suspect's Captors Speak With Pride One Year Later | Tr. Ex B-49 | San Gabriel Valey Tribune |
| 50 | 9/3/1986 | Night Stalker Defense Delays New Motions | Tr. Ex B-50 | San Gabriel Valey Tribune |
| 51 | 8/2/1986 | Night Stalker Suspect Gets Delay in Trial | Tr. Ex E-1 | Press Telegram |
| 52 | 8/24/1986 | Stalker" Case Victim Seek $200 Million | Tr. Ex E-2 | Press Telegram |
| 53 | 3/4/1986 | Traminez en Audencia Preliminar | Tr. Ex F-1 | Noticias Del Mundo |
| 54 | 7/22/1986 | Piden Retirar Cargos | Tr. Ex F-2 | Noticias Del Mundo |
| 55 | 8/15/1986 | Colaboracion Con la Policia | Tr. Ex F-3 | Noticias Del Mundo |
| 56 | 9/3/1986 | El "Invasor Nocturno" Un Ano Despues | Tr. Ex F-4 | Noticias Del Mundo |
| 57 | 9/3/1986 | Abogados Desean Trasladar Proceso de Richard Ramirez Para El Norte de California | Tr. Ex F-5 | Noticias Del Mundo |
| 58 | 7/23/1986 | Attorneys for Ramirez Seek Change of Venue | Tr. Ex G-1 | L.A. Daily Journal |
| 59 | 8/4/1986 | Ramirez Attorneys Win Delay in Court Hearings | Tr. Ex G-2 | L.A. Daily Journal |
| 60 | 7/22/1986 | Lawyers: Drop Stalker Charges | Tr. Ex H-1 | Pomona Progress Bulletin |
| 61 | 7/23/1986 | "Night Stalker" Trial Delayed | Tr. Ex H-2 | Pomona Progress Bulletin |
| 62 | 8/9/1986 | Satanism Linked to 800 Crimes | Tr. Ex H-3 | Pomona Progress Bulletin |
| 63 | 8/13/1986 | Night Stalker Suit Filed | Tr. Ex H-4 | Pomona Progress Bulletin |
| 64 | 8/24/1986 | "Night Stalker" Victims File Suit | Tr. Ex H-5 | Pomona Progress Bulletin |
| 65 | 7/31/1986 | Sketching the Players in Courtroom Dramas | Tr. Ex I-1 | Palisadian Post |
| 66 | 7/29/1986 | Family of Slain Arcadian Sues Ramirez | Tr. Ex K-1 | Arcadia Tribune |
| 67 | 6/29/1986 | Hearing in Orange County Postponed in Stalker Case | Tr. Ex K-2 | Arcadia Tribune |
| 68 | 7/23/1986 | Ramirez Lawyers Move for Dismissal | Tr. Ex K-3 | Arcadia Tribune |
| 69 | 8/3/1986 | Ramirez Trial Put Off Until December | Tr. Ex K-4 | Arcadia Tribune |
| 70 | 6/26/1986 | Ramirez Sued by Murder Victim Doi's Family | Tr. Ex L-1 | Rafu Shimpu |
| 71 | 7/31/1986 | Ramirez's Lawyers Want 3 Month Delay | Tr. Ex L-2 | Rafu Shimpu |
| 72 | 8/1/1986 | Ramirez Gets Delay | Tr. Ex L-3 | Rafu Shimpu |
| 73 | 7/23/1986 | Ramirez Lawyers Move for Dismissal | Tr. Ex N-1 | Monrovia News Post |
| 74 | 7/30/1986 | Night Stalker Judge Resumes New Post | Tr. Ex N-2 | Monrovia News Post |
| 75 | 7/13/1986 | Lawyers Ask Ramirez Charges be Dropped | Tr. Ex P-1 | Whittier Daily News |
| 76 | 7/23/1986 | Ramirez Lawyers Move for Dismissal | Tr. Ex Q-1 | Duartean Dispatch |
| 77 | 7/28/1986 | Alleged "Night Stalker" Sued by Victims Family | Tr. Ex R-1 | Glendale News Press |
| 78 | 8/2/1986 | Judge Grants Delay for Defense | Tr. Ex R-2 | Glendale News Press |
| 79 | 8/28/1986 | Murder Victim Knew Assailant(s) | Tr. Ex R-3 | Glendale News Press |
| 80 | 7/26/1986 | Benoit Donations Help Officer Become Fingerprint Expert | Tr. Ex S-1 | Eagle Rock Sentinel |
| 81 | 8/31/1985 | Police Identify Stalker Suspect - 25 y/o L.A. man named in 7 month spree of killing | FPD - 1 | L.A. Times |
| 82 | 9/1/1985 | Citizens Capture Stalker Fugitive - E.L.A. residents foil suspect's attemot to elude police pursuit | FPD - 2 | L.A. Times |
| 83 | 9/1/1985 | Neighbors Gang Up - Suspect didn't have a chance among heroes | FPD - 3 | L.A. Times |
| 84 | 9/1/1985 | Survived Shooting - Arrest ends nightmare for couple who lived | FPD - 4 | L.A. Times |
| 85 | 9/1/1985 | Suspect's Dad pouts Blame on Drug Use | FPD - 4.5 | L.A. Times |
| 86 | 9/1/1985 | A Chronology of the Night Stalker's Spree | FPD - 5 | L.A. Times |
| 87 | 9/1/1985 | Laser Plays Key Role in Stalker Arrest - Sheriff's high tech criminal lab called "a hero" in investigation | FPD - 6 | L.A. Times |
| 88 | 9/2/1985 | Other Serial Slayings Tinged by Santanism - Elements of devil worship in stalker case may not be factors in motivation, experts caution | FPD - 7 | L.A. Times |
| 89 | 9/2/1985 | Stalker Suspect Isnt Talking - Ramirez described as passive and compliant | FPD - 8 | L.A. Times |
| 90 | 9/2/1985 | "I'm No Hero. Citizens Did All the Work" - Deputy Minimizes his role in arrest | FPD - 9 | L.A. Times |
| 91 | 9/3/1985 | Ramirez Missed News on Identity, Authorities Think | FPD - 10 | L.A. Times |
| 92 | 9/3/1985 | Discovery of Stalker Suspect's car - Fear over neighborhood safety ends | FPD - 11 | L.A. Times |
| 93 | 9/4/1985 | Stalker Suspect Arraigned; Also Charged in S.F. | FPD - 12 | L.A. Times |
| 94 | 9/5/1985 | They Got Involved | FPD - 13 | L.A. Times |
| 95 | 9/5/1985 | Night Stalker Suspect to '84 Killing - Fingerprint on screen where Glassell Park woman, 79, was slain | FPD - 14 | L.A. Times |
| 96 | 9/6/1985 | Boy Who Spotted Suspect's Car Gets Wheels of His Own | FPD - 15 | L.A. Times |
| 97 | 9/6/1985 | Victims of Stalker See Ramirez in Jail Lineup | FPD - 16 | L.A. Times |
| 98 | 9/6/1985 | AC/DC Fans Don't See a Stalker Tie | FPD - 17 | L.A. Times |
| 99 | 9/7/1985 | Most Stalker Rewards to Hinge on the Conviction of a Suspect | FPD - 18 | L.A. Times |
| 100 | 9/7/1985 | Ramirez Defense: Publicity Effect Cited | FPD - 19 | L.A. Times |
| 101 | 9/8/1985 | The Devil, You Say? No Way - AC/DC's message: Rebellion, not satan worship | FPD - 20 | L.A. Times |
| 102 | 9/8/1985 | Law Enforcement Aided by Public - Search for the Stalker - unity born of fear | FPD - 21 | L.A. Times |
| 103 | 9/8/1985 | Recalling Ramirez: Even Friends Didn't Trust Him | FPD - 22 | L.A. Times |
| 104 | 9/9/1985 | Capture of Ramirez | FPD - 23 | L.A. Times |
| 105 | 9/9/1985 | Capture of Ramirez | FPD - 24 | L.A. Times |
| 106 | 9/9/1985 | Capture of Ramirez | FPD - 25 | L.A. Times |

Page 1 of 9

Newspaper Article List (up to 9-1-88).xlsx

| TOTAL TALLY | DATE | TITLE & SUMMARY | CURRENT LOCATION | SOURCE |
|---|---|---|---|---|
| 107 | 9/10/1985 | Ramirez's New Lawyer Seeks Change of Venue | FPD - 26 | L.A. Times |
| 108 | 9/10/1985 | Stalker's Loot Found in Texas, Detectives Say | FPD - 27 | L.A. Times |
| 109 | 9/11/1985 | Loot Linked to Ramirez Found in El Paso Home | FPD - 28 | L.A. Times |
| 110 | 9/12/1985 | Gratitude and a Band of "Heroes" | FPD - 29 | L.A. Times |
| 111 | 9/12/1985 | Night Stalker Case Demonstrates Effectiveness of Systems | FPD - 30 | L.A. Times |
| 112 | 9/12/1985 | The Region | FPD - 31 | L.A. Times |
| 113 | 9/14/1985 | Kin Seek New Attorney for Stalker Suspect | FPD - 32 | L.A. Times |
| 114 | 9/14/1985 | Stalker' Victim Going to Rehab Center | FPD - 33 | L.A. Times |
| 115 | 9/15/1985 | Raising the Devil | FPD - 34 | L.A. Times |
| 116 | 9/18/1985 | Judge Imposes Gag Order on Stalker Case Comments | FPD - 35 | L.A. Times |
| 117 | 9/19/1985 | The Region | FPD - 36 | L.A. Times |
| 118 | 9/20/1985 | Zapping the Threat of Censorship | FPD - 37 | L.A. Times |
| 119 | 9/22/1985 | He Was Like a Needle in a Haystack | FPD - 38 | L.A. Times |
| 120 | 9/22/1985 | The Threat is Illusory | FPD - 39 | L.A. Times |
| 121 | 9/27/1985 | Ramirez Faces 13 New Counts | FPD - 40 | L.A. Times |
| 122 | 9/27/1985 | New Charges to Be Filed on Ramirez | FPD - 41 | L.A. Times |
| 123 | 9/28/1985 | Stalker Suspect Ramirez Charged in 13 More Deaths | FPD - 42 | L.A. Times |
| 124 | 9/29/1985 | Governor to Sign 75 Bills Aimed at Lessening Crime | FPD - 43 | L.A. Times |
| 125 | 10/1/1985 | The Region - Baldt talks with Ramirez | FPD - 44 | L.A. Times |
| 126 | 10/3/1985 | Lawyers' Distrust of Jury Impartiality: a Case of Prejudice | FPD - 45 | L.A. Times |
| 127 | 10/3/1985 | Pickets Protest Police Handling of Prostitutes' Deaths | FPD - 46 | L.A. Times |
| 128 | 10/6/1985 | Choice of Lawyers Clouds Ramirez Case | FPD - 47 | L.A. Times |
| 129 | 10/10/1985 | Ramirez Allowed to Switch Lawyers | FPD - 48 | L.A. Times |
| 130 | 10/10/1985 | LAPD Wants to Tie in to Print Computer - Gates, 2 Councilmen Cite State System's Recent Successes | FPD - 49 | L.A. Times |
| 131 | 10/13/1985 | AC/DC's Young: Can't People Take a Joke | | L.A. Times |
| 132 | 10/13/1985 | Composite Drawings | FPD - 50 | L.A. Times |
| 133 | 10/23/1985 | LAPD Purchase of Fingerprint Computer Backed | FPD - 51 | L.A. Times |
| 134 | 10/23/1985 | Ramirez Again Seeks New Attorneys; Case Delayed | FPD - 52 | L.A. Times |
| 135 | 10/24/1985 | San Gabriel Valley Digest - Arcadia - Guardian Angeles Form Chapter | FPD - 53 | L.A. Times |
| 136 | 10/24/1985 | Ramirez Says He's Innocent - Hail Satan | FPD - 54 | L.A. Times |
| 137 | 10/25/1985 | Hail Satan!' Yells Suspect in Killings - Ramirez shouts as he leaves Court after plea of not guilty to Night Stalker murder charges | FPD - 55 | L.A. Times |
| 138 | 10/30/1985 | Block Announces Candidacy for a Second Term | FPD - 56 | L.A. Times |
| 139 | 11/11/1985 | Orange County Digest - Mission Viejo. Night Stalker Shooting Victim is Recovering | FPD - 57 | L.A. Times |
| 140 | 11/12/1985 | The Region | FPD - 58 | L.A. Times |
| 141 | 11/13/1985 | Ramirez Hearing Pushed | FPD - 59 | L.A. Times |
| 142 | 11/14/1985 | Stalker' Suspect Hearing Set | FPD - 60 | L.A. Times |
| 143 | 11/15/1985 | Ramirez Hearing Set to Begin Feb. 24 | FPD - 61 | L.A. Times |
| 144 | 11/24/1985 | Arcadia's Chief as Old Hand with New Ideas | FPD - 62 | L.A. Times |
| 145 | 11/25/1985 | Pride and Fear Linger on the Street of Heroes - Captors of Night Stalker Suspect Live with Daily Reminders of Instant Fame | FPD - 63 | L.A. Times |
| 146 | 12/13/1985 | Camera Ban at Ramirez Hearing to Face Challenge | FPD - 64 | L.A. Times |
| 147 | 12/15/1985 | Stalker' Suspect Gets ok to Exercise Outside Cell | FPD - 65 | L.A. Times |
| 148 | 1/1/1986 | A New Year, a New Season of State law | FPD - 66 | L.A. Times |
| 149 | 1/1/1986 | L.A. 85 | FPD - 67 | L.A. Times |
| 150 | 1/1/1986 | 1985 in Quotes | FPD - 68 | L.A. Times |
| 151 | 1/4/1986 | State's New Fingerprint Computer Nets Two Suspects in Rapes of Elderly Women | FPD - 69 | L.A. Times |
| 152 | 1/7/1986 | The Region | FPD - 70 | L.A. Times |
| 153 | 1/8/1986 | Council Again Votes for Fingerprint ID System | FPD - 71 | L.A. Times |
| 154 | 1/12/1986 | Joseph Gallegos, 56; Was Fired as 'Night Stalker' Attorney | FPD - 72 | L.A. Times |
| 155 | 1/13/1986 | L.A. 'Prime-Time' Justice Will Debut With Night Court | FPD - 73 | L.A. Times |
| 156 | 1/28/1986 | Bradley Drops Objection over $6-Million Cost | FPD - 74 | L.A. Times |
| 157 | 1/29/1986 | The Region | FPD - 75 | L.A. Times |
| 158 | 2/3/1986 | Maxine Thomas - She Has Gavel and Will Travel - Municipal Court head is LA girl who made it | FPD - 76 | L.A. Times |
| 159 | 2/12/1986 | TV Barred at Ramirez Hearing | FPD - 77 | L.A. Times |
| 160 | 2/13/1986 | The Region | FPD - 78 | L.A. Times |
| 161 | 2/25/1986 | Hearing for Ramirez to Be Open to the Public | FPD - 79 | L.A. Times |
| 162 | 2/26/1986 | Preliminary Hearings, Tainted Juries and Public Rights | FPD - 80 | L.A. Times |
| 163 | 3/4/1986 | Son Describes Finding of 1st Victim in Stalker Case | FPD - 81 | L.A. Times |
| 164 | 3/4/1986 | Finding of 1st Stalker Case Victim Described by Son | FPD - 82 | L.A. Times |
| 165 | 3/5/1986 | Ramirez Lawyers Seek to Bar Evidence - Police violated suspect's rights during questioning, they say | FPD - 83 | L.A. Times |
| 166 | 3/5/1986 | Police Coerced Ramirez, Lawyers Say - Defense seeks to bar certain evidence in Night Stalker case | FPD - 84 | L.A. Times |
| 167 | 3/5/1986 | L.A. Plans to Post Reward in Prostitute Slayings | FPD - 85 | L.A. Times |
| 168 | 3/6/1986 | Defense in Stalker Case Demands Evidence From Lineup Be Excluded | FPD - 86 | L.A. Times |
| 169 | 3/6/1986 | Industry Sheriff's Station Tool - New computer keys on career criminal | FPD - 87 | L.A. Times |
| 170 | 3/11/1986 | Night Stalker Victim Identifies Ramirez | FPD - 88 | L.A. Times |
| 171 | 3/11/1986 | The Region | FPD - 89 | L.A. Times |
| 172 | 3/12/1986 | Night Stalker' Survivor Picks Out Ramirez in Courtroom | FPD - 90 | L.A. Times |
| 173 | 3/12/1986 | Woman Points to Ramirez in Courtroom as Her Assailant | FPD - 91 | L.A. Times |
| 174 | 3/13/1986 | The Region | FPD - 92 | L.A. Times |
| 175 | 3/13/1986 | Witness Unavailable, Slaying Trial Delayed | FPD - 93 | L.A. Times |
| 176 | 3/15/1986 | Ramirez Pleads Innocent in Orange County Case | FPD - 94 | L.A. Times |
| 177 | 3/19/1986 | Eyewitness Says He Can't Be Sure he Saw Ramirez | FPD - 95 | L.A. Times |
| 178 | 3/20/1986 | Alleged Night Stalker Victim - L.A. Deputy describes mutilation of woman | FPD - 96 | L.A. Times |
| 179 | 3/21/1986 | Alleged Stalker Victim's Call for Help Told | FPD - 97 | L.A. Times |
| 180 | 3/24/1986 | Chilling Stalker Testimony Turns Up Few Firm Links | FPD - 98 | L.A. Times |
| 181 | 3/25/1986 | The Region | FPD - 99 | L.A. Times |
| 182 | 3/26/1986 | Stalker St, Victim Bore Pentagrams | FPD - 100 | L.A. Times |
| 183 | 3/26/1986 | Girl, 8, Wont Testify at Stalker Hearing - Prosecutor acts after judge refuses to allow closed testimony | FPD - 101 | L.A. Times |
| 184 | 3/27/1986 | Witness Tells of Pentagrams - Officer says alleged stalker victim bore marks | FPD - 102 | L.A. Times |
| 185 | 3/28/1986 | The Region | FPD - 103 | L.A. Times |
| 186 | 3/28/1986 | Ramirez's Lawyers Assail Visit to Holding Cell | FPD - 104 | L.A. Times |
| 187 | 3/30/1986 | Defense Questioning Even the Existence of a 'Stalker' | FPD - 105 | L.A. Times |
| 188 | 4/1/1986 | Mother Identifies Ramirez as Her Rapist at Hearing | FPD - 106 | L.A. Times |
| 189 | 4/3/1986 | Saw Ramirez near Victim's Home, Woman Says | FPD - 107 | L.A. Times |
| 190 | 4/6/1986 | Mass Killers Often Are Obejcts of Female Adoration, Experts Say | FPD - 108 | L.A. Times |
| 191 | 4/6/1986 | Judge in Stalker Case Brings High Tech to His Court | FPD - 109 | L.A. Times |
| 192 | 4/8/1986 | Ramirez's Bid to Dodge His Hearing fails | FPD - 110 | L.A. Times |
| 193 | 4/9/1986 | Nurse Identifies Ramirez as Man Who Attacked Her | FPD - 111 | L.A. Times |
| 194 | 4/10/1986 | Presiding Judge Assailed by Colleagues | FPD - 112 | L.A. Times |
| 195 | 4/10/1986 | Possibility of Insanity Defense Raised by Lawyers Move in Ramirez Hearing | FPD - 113 | L.A. Times |
| 196 | 4/12/1986 | Court Artist Go Where Cameras Dare Not Tread | FPD - 114 | L.A. Times |
| 197 | 4/14/1986 | Ramirez Hearing - Daily Ritual of Testimony and Stares | FPD - 115 | L.A. Times |
| 198 | 4/15/1986 | Woman Points to Ramirez as Killer, Rapist | FPD - 116 | L.A. Times |
| 199 | 4/15/1986 | Woman Points to Ramirez as Killer, Rapist | FPD - 117 | L.A. Times |
| 200 | 4/16/1986 | A Sixth Victim Points to Ramirez as Attacker | FPD - 118 | L.A. Times |
| 201 | 4/16/1986 | Ramirez Ordered Her to 'Swear Upon Satan', Rape Victim Testifies | FPD - 119 | L.A. Times |
| 202 | 4/17/1986 | Ramirez Sold Him Victims' Items Man Testifies | FPD - 120 | L.A. Times |
| 203 | 4/17/1986 | Bought Stolen Goods From Ramirez, Witness Testifies | FPD - 121 | L.A. Times |
| 204 | 4/25/1986 | Ban on Airing Stalker Case Names Lifted | FPD - 122 | L.A. Times |
| 205 | 5/1/1986 | Bailiffs Drag Ramirez Out of Courtroom | FPD - 123 | L.A. Times |
| 206 | 5/4/1986 | Stalker Suspect and Friends Have Reunion of Sorts | FPD - 124 | L.A. Times |
| 207 | 5/6/1986 | Bullet in Man's Slaying Linked to Ramirez | FPD - 125 | L.A. Times |
| 208 | 5/7/1986 | Ramirez Ordered to Stand Trial in 14 Stalker Murders | FPD - 126 | L.A. Times |
| 209 | 5/8/1986 | Ramirez Admitted He Was the Stalker, Officer Says | FPD - 128 | L.A. Times |
| 210 | 5/8/1986 | Enjoyed Killing People,' Ramirez Allegedly Said | FPD - 129 | L.A. Times |

Ex. 75, p. 294

Newspaper Article List (up to 9-1-88).xlsx

| TOTAL TALLY | DATE | TITLE & SUMMARY | CURRENT LOCATION | SOURCE |
|---|---|---|---|---|
| 211 | 5/21/1986 | The Region - 5 Ramirez Counts Null | FPD - 130 | L.A. Times |
| 212 | 5/23/1986 | Stalker Suspect Pleads Innocent | FPD - 131 | L.A. Times |
| 213 | 5/23/1986 | Night Stalker Suspect Pleads Not Guilty | FPD - 132 | L.A. Times |
| 214 | 6/15/1986 | Municipal Judges Seek the Ouster of Thomas | FPD - 133 | L.A. Times |
| 215 | 6/18/1986 | The Region | FPD - 134 | L.A. Times |
| 216 | 6/26/1986 | The Region - Night Stalker suspect sued | FPD - 135 | L.A. Times |
| 217 | 6/29/1986 | The Region | FPD - 136 | L.A. Times |
| 218 | 6/30/1986 | Forced Busing - but Not to Schoolhouse - Sheriff's Transit System gives its riders, 1.5 million each year, lots of attention | FPD - 137 | L.A. Times |
| 219 | 7/18/1986 | The Region | FPD - 138 | L.A. Times |
| 220 | 7/22/1986 | The Region | FPD - 139 | L.A. Times |
| 221 | 7/31/1986 | Defense Attoenys in Night Stalker Case Seek Delay | FPD - 140 | L.A. Times |
| 222 | 8/1/1986 | Night Stalker Case Delayed | FPD - 141 | L.A. Times |
| 223 | 8/2/1986 | Ramirez's Attorneys Say Non-English Speakers Should Be Considered as Jurors | FPD - 142 | L.A. Times |
| 224 | 8/14/1986 | The Region | FPD - 143 | L.A. Times |
| 225 | 8/21/1986 | The Region | FPD - 144 | L.A. Times |
| 226 | 9/25/1986 | Major Preliminaries - While most pretrial hearings are short, a few have become increasingly long, complex and expensive | FPD - 145 | L.A. Times |
| 227 | 9/25/1986 | Longest Preliminary Hearings | FPD - 146 | L.A. Times |
| 228 | 10/5/1986 | Police Learning to Search for Clues of Satanism | FPD - 147 | L.A. Times |
| 229 | 11/4/1986 | Judge Scans TV News on Night Stalker Slayings | FPD - 148 | L.A. Times |
| 230 | 11/13/1986 | The Region | FPD - 149 | L.A. Times |
| 231 | 11/17/1986 | Night Stalker' Judge Takes Self Off Case but Will Rule on Venue | FPD - 150 | L.A. Times |
| 232 | 11/18/1986 | Judge Removes Himself from Night Stalker Case | FPD - 151 | L.A. Times |
| 233 | 11/25/1986 | Dental World | FPD - 152 | L.A. Times |
| 234 | 11/27/1986 | The Region | FPD - 153 | L.A. Times |
| 235 | 12/3/1986 | The Region | FPD - 154 | L.A. Times |
| 236 | 12/11/1986 | The Region | FPD - 155 | L.A. Times |
| 237 | 12/31/1986 | For Whats It's Worth, 1986 is History | FPD - 156 | L.A. Times |
| 238 | 1/1/1987 | The Region | FPD - 157 | L.A. Times |
| 239 | 1/10/1987 | Judge Notes Variety of Jury Pool, Rejects Stalker Case Venue Change | FPD - 158 | L.A. Times |
| 240 | 4/27/1987 | Morning Report - Movies | FPD - 159 | L.A. Times |
| 241 | 5/8/1987 | Galanter, Aides Confer Amid Signs She'll Stay in Race | FPD - 160 | L.A. Times |
| 242 | 5/28/1987 | Trial Date in Night Stalker Case Scheduled for Sept. 30 | FPD - 161 | L.A. Times |
| 243 | 6/7/1987 | Central Jail's Overcrowding: Its Bad and Getting Worse | FPD - 162 | L.A. Times |
| 244 | 6/8/1987 | The Region - Orange County may try Ramirez first | FPD - 163 | L.A. Times |
| 245 | 7/4/1987 | Ramirez's Lawyers Win Interview with Victim | FPD - 164 | L.A. Times |
| 246 | 8/9/1987 | Heavy Going - Metal rockers stake out their own turf on Hollywood Blvd. | FPD - 165 | L.A. Times |
| 247 | 8/21/1987 | The Region | FPD - 166 | L.A. Times |
| 248 | 8/27/1987 | Epitome of Smut, Prosecutor Says of Punk Rock Poster | FPD - 167 | L.A. Times |
| 249 | 9/2/1987 | The Region | FPD - 168 | L.A. Times |
| 250 | 10/15/1987 | Local News in Brief - Stalker' suspect trial set | FPD - 169 | L.A. Times |
| 251 | 10/22/1987 | Night Stalker Suspect Denies Saying, 'I did it' | FPD - 170 | L.A. Times |
| 252 | 11/12/1987 | Bearing the Cost of Prosecution | FPD - 171 | L.A. Times |
| 253 | 11/14/1987 | Orange County Sets Ramirez Trial | FPD - 172 | L.A. Times |
| 254 | 11/24/1987 | Judge Dismisses Murder Count Against Ramirez; 13 Remain | FPD - 173 | L.A. Times |
| 255 | 1/2/1988 | No Delay for 'Stalker' Trial | FPD - 174 | L.A. Times |
| 256 | 1/8/1988 | Local News in Brief - No delay in Stalker trial | FPD - 175 | L.A. Times |
| 257 | 1/20/1988 | Court Order Could Delay Ramirez Trial Six Months | FPD - 176 | L.A. Times |
| 258 | 1/26/1988 | Local News in Brief - Stalker' trial delayed | FPD - 177 | L.A. Times |
| 259 | 2/27/1988 | Ex-Cops Inside Prison - Their cases command headlines during trial, but afterall, convicted law officers pass into the uneasy obscurity of a jail cell 'You're subhuman when you're in this place,' said one former deputy. 'You used to be a caop, but you're not anymore.' | FPD - 178 | L.A. Times |
| 260 | 3/15/1988 | S.F. Prosecutors Focus on 2 Cases Against Ramirez | FPD - 179 | L.A. Times |
| 261 | 3/17/1988 | Local News in Brief - New Stalker trial delay | FPD - 180 | L.A. Times |
| 262 | 4/24/1988 | $10,000 Reward Offered by State in Gang Killings | FPD - 181 | L.A. Times |
| 263 | 4/26/1988 | Night Stalker' Trial Set June 30 | FPD - 182 | L.A. Times |
| 264 | 4/27/1988 | Local News in Brief - Ramirez trial date set | FPD - 183 | L.A. Times |
| 265 | 5/1/1988 | True Grit - One woman's triumph over the nightmare on random violence | FPD - 184 | L.A. Times |
| 266 | 6/22/1988 | Local News in Brief - Stalker Judge challenged | FPD - 185 | L.A. Times |
| 267 | 7/5/1988 | Local News in Brief - Stalker motion ruling due | FPD - 186 | L.A. Times |
| 268 | 7/15/1988 | Ramirez Won't Make Insanity Plea | FPD - 187 | L.A. Times |
| 269 | 7/17/1988 | Ramirez Trial May Take Two Years - Slow pace of 'Stalker' case tests patience of Justice | FPD - 188 | L.A. Times |
| 270 | 7/21/1988 | Slow Road to Justice | FPD - 189 | L.A. Times |
| 271 | 7/21/1988 | Jury Selection Starts Today in 'Night Stalker' Trial | FPD - 190 | L.A. Times |
| 272 | 8/3/1988 | Night Stalker Prosecutor Tells of Death Threat | FPD - 191 | L.A. Times |
| 273 | 8/11/1988 | The Sky is the Limit for Anti-Crime 'Night Out' | FPD - 192 | L.A. Times |
| 274 | 4/11/1988 | Local News in Brief - Trial date set in Night Stalker case | FPD - 196 | L.A. Times |
| 275 | 8/30/1985 | Hermosa man to be questioned as suspect in Night Stalker case. | FPD - 421 | Daily Breeze |
| 276 | 8/30/1985 | Fingerprints studied for clues to Stalker | FPD - 422 | Daily Breeze |
| 277 | 8/30/1985 | Night Stalker by any other name: He's still a scourge | FPD - 423 | Daily Breeze |
| 278 | 8/29/1985 | Police examine possible Night Stalker vehicle; Reward for serial killer reaches $70,000 | FPD - 424 | Daily Breeze |
| 279 | 8/28/1985 | Stolen car believed used by 'Night Stalker' found | FPD - 425 | Daily Breeze |
| 280 | 8/27/1985 | Investigators link orange station wagon to Night Stalker | FPD - 426 | Daily Breeze |
| 281 | 8/26/1985 | Night Stalker' attacks couple in home; Orange County man near death | FPD - 427 | Daily Breeze |
| 282 | 8/24/1985 | Night Stalker victim list grows; reports anger Block | FPD - 428 | Daily Breeze |
| 283 | 8/23/1985 | Short takes | FPD - 429 | Daily Breeze |
| 284 | 8/20/1985 | Reward offered | FPD - 430 | Daily Breeze |
| 285 | 8/19/1985 | Woman bludgeoned; Rape-slaying may be work of Stalker | FPD - 431 | Daily Breeze |
| 286 | 8/14/1985 | $10,000 reward offered for 'Night Stalker' | FPD - 432 | Daily Breeze |
| 287 | 7/22/1988 | Night Stalker' trial begins / Jury selection gets under way | FPD - 587 | Daily Breeze |
| 288 | 7/5/1988 | Stalker' trial again delayed | FPD - 588 | Daily Breeze |
| 289 | 4/26/1988 | Night Stalker trial will begin June 30 | FPD - 589 | Daily Breeze |
| 290 | 1/20/1988 | Night Stalker' trial delayed indefinitely | FPD - 590 | Daily Breeze |
| 291 | 1/8/1988 | Night Stalker' suspect loses trial delay bid | FPD - 591 | Daily Breeze |
| 292 | 11/14/1987 | Stalker' case to go to trial / Judge finds enough evidence | FPD - 592 | Daily Breeze |
| 293 | 11/11/1987 | Trial nears in 'Night Stalker' case | FPD - 593 | Daily Breeze |
| 294 | 8/6/1987 | Media legal flap delays 'Stalker' trial | FPD - 594 | Daily Breeze |
| 295 | 7/30/1987 | Firefighters halt blazes / Ramirez' lawyers appeal | FPD - 595 | Daily Breeze |
| 296 | 7/22/1987 | Night Stalker' defense wants closed hearing | FPD - 596 | Daily Breeze |
| 297 | 7/15/1987 | Hearing delayed in 'Night Stalker' case | FPD - 597 | Daily Breeze |
| 298 | 6/27/1987 | Ramirez OK's postponement / Woman shoots, kills pit bull / Frustac may face cjarge / Disabled man found OK | FPD - 598 | Daily Breeze |
| 299 | 6/7/1987 | Man injured in cliff fall / Ramirez makes trial request | FPD - 599 | Daily Breeze |
| 300 | 5/28/1987 | Twilight' jury resumes talkes / Trial dates set for Ramirez / Mom protests IQ test ruling / Police seek outlaw hookups | FPD - 600 | Daily Breeze |
| 301 | 5/5/1987 | Ramirez displayed crime-scene photos | FPD - 601 | Daily Breeze |
| 302 | 4/25/1987 | Ramirez's attorney complains about 'Night Stalker' movie | FPD - 602 | Daily Breeze |
| 303 | 2/26/1987 | Ramirez prosecutor says wounds couldn't be seen | FPD - 603 | Daily Breeze |
| 304 | 1/10/1987 | Judge denies 'Stalker' venue change | FPD - 604 | Daily Breeze |
| 305 | 1/1/1987 | Mcmartin preschool costs reach $4.7 million | FPD - 605 | Daily Breeze |
| 306 | 12/3/1986 | Night Stalker' trial delayed months | FPD - 606 | Daily Breeze |
| 307 | 11/28/1986 | Fingerprint-ID computer in use | FPD - 607 | Daily Breeze |
| 308 | 11/27/1986 | Night Stalker defendant sees case unfold / Defense shows TV tapes in seeking venue change | FPD - 608 | Daily Breeze |
| 309 | 11/20/1986 | Community Watch | FPD - 609 | Daily Breeze |
| 310 | 11/19/1986 | Delay due in Ramirez trial | FPD - 610 | Daily Breeze |
| 311 | 11/18/1986 | Stalker' judge replaced | FPD - 611 | Daily Breeze |
| 312 | 11/4/1986 | Change of venue sought in 'Stalker' murder trial | FPD - 612 | Daily Breeze |
| 313 | 10/17/1986 | Mcmartin prosecution 'snitches' for evidence | FPD - 613 | Daily Breeze |
| 314 | 9/3/1986 | In Court | FPD - 614 | Daily Breeze |
| 315 | 8/31/1986 | A year later, neighbors proud catching 'Stalker' suspect | FPD - 615 | Daily Breeze |

Ex. 75, p. 295

Newspaper Article List (up to 9-1-88).xlsx

| TOTAL TALLY | DATE | TITLE & SUMMARY | CURRENT LOCATION | SOURCE |
|---|---|---|---|---|
| 316 | 8/24/1986 | 2 Victims Sue Accused "Night Stalker" | FPD - 616 | Daily Breeze |
| 317 | 8/13/1986 | Victims's family files $20 million lawsuit | FPD - 617 | Daily Breeze |
| 318 | 7/31/1986 | Ramirez's attorneys request 3-month delay | FPD - 618 | Daily Breeze |
| 319 | 7/24/1986 | Ex-presiding judge presses campaign for higher office | FPD - 619 | Daily Breeze |
| 320 | 6/29/1986 | Orange County may not prosecute Ramirez | FPD - 620 | Daily Breeze |
| 321 | 6/28/1986 | Postponement OK'd in "night Stalker' case | FPD - 621 | Daily Breeze |
| 322 | 6/18/1986 | Ramirez's lawyers get a reprimand | FPD - 622 | Daily Breeze |
| 323 | 5/29/1986 | Police say strangles woman is victim of Southland Killer | FPD - 623 | Daily Breeze |
| 324 | 5/25/1986 | Hankla says record county budget balances, but.. | FPD - 624 | Daily Breeze |
| 325 | 5/21/1986 | Ramirez pleads innocent to 45 counts in 'Stalker' case | FPD - 625 | Daily Breeze |
| 326 | 5/18/1986 | Satanism widespread | FPD - 626 | Daily Breeze |
| 327 | 5/14/1986 | LAPD fingerprint computer OK'd | FPD - 627 | Daily Breeze |
| 328 | 5/9/1986 | Deputy says Stalker suspect bragged, 'I love to kill people' | FPD - 628 | Daily Breeze |
| 329 | 5/7/1986 | Ramirez to stand trial in Night Stalker deaths | FPD - 629 | Daily Breeze |
| 330 | 5/1/1986 | Ramirez dragged to holding cell | FPD - 630 | Daily Breeze |
| 331 | 4/25/1986 | Judge allows release of names og Night Stalker's rape victims | FPD - 631 | Daily Breeze |
| 332 | 4/17/1986 | Witness says he was fense for Ramirez | FPD - 632 | Daily Breeze |
| 333 | 4/17/1986 | Bradley bidget includes mora pplice, sewer projects | FPD - 633 | Daily Breeze |
| 334 | 4/16/1986 | Sixth 'Stalker' victim indentifies Ramirez | FPD - 634 | Daily Breeze |
| 335 | 4/15/1986 | Tearful Stalker witness details horror of assault | FPD - 635 | Daily Breeze |
| 336 | 4/2/1986 | Coroner details violent death of alleged Night Stalker victim | FPD - 636 | Daily Breeze |
| 337 | 4/1/1986 | Woman identifies Ramirez as man who attacked her | FPD - 637 | Daily Breeze |
| 338 | 3/28/1986 | Ramirez mugs for camera after attorneys protest tour of cell | FPD - 638 | Daily Breeze |
| 339 | 3/26/1986 | Alleged rape victim, it, won't testify at 'Night Stalker' trial | FPD - 639 | Daily Breeze |
| 340 | 3/20/1986 | Night Stalker crimes detailed | FPD - 640 | Daily Breeze |
| 341 | 3/20/1986 | Murder scene detailed at Stalker hearing; Ramirez listens calmly to deputies' testimony | FPD - 641 | Daily Breeze |
| 342 | 3/18/1986 | Man identifies Ramirez as Stalker victim's assailant | FPD - 642 | Daily Breeze |
| 343 | 3/17/1986 | Anniversary of fear: 'Night Stalker' panic took root a year ago | FPD - 643 | Daily Breeze |
| 344 | 3/15/1986 | Ramirez pleads innocent | FPD - 644 | Daily Breeze |
| 345 | 3/13/1986 | Prints not linked to Ramirez | FPD - 645 | Daily Breeze |
| 346 | 3/12/1986 | Attack survivor identifies Ramirez as 'Night Stalker' | FPD - 646 | Daily Breeze |
| 347 | 3/5/1986 | reward proposed in prostitute killings | FPD - 647 | Daily Breeze |
| 348 | 3/4/1986 | Victim's son focus on 'Stalker' case | FPD - 648 | Daily Breeze |
| 349 | 3/3/1986 | Judge refuses to shut 'Night Stalker' hearing | FPD - 649 | Daily Breeze |
| 350 | 2/25/1986 | Area briefs: Meeting on dump scheduled / Ramirez lawyers plan appeal / Son charged with murder | FPD - 650 | Daily Breeze |
| 351 | 2/25/1986 | 'Night Stalker' judge refuses to close preliminary hearing | FPD - 651 | Daily Breeze |
| 352 | 2/20/1986 | Stalker' lawyer seek delay | FPD - 652 | Daily Breeze |
| 353 | 2/13/1986 | Judge bars TV coverage of 'Night Stalker' hearing | FPD - 653 | Daily Breeze |
| 354 | 9/27/1985 | 68 counts in 'Stalker' case; ramirez charged in 14 deaths | FPD - 654 | Daily Breeze |
| 355 | 9/27/1985 | $10,000 reward offered in hunt for serial killer | FPD - 655 | Daily Breeze |
| 356 | 9/26/1985 | Latinos' apprehension of Ramirez lends support - finally - to Bird | FPD - 656 | Daily Breeze |
| 357 | 9/18/1985 | Gag order imposed in 'Night Stalker' case | FPD - 657 | Daily Breeze |
| 358 | 9/14/1986 | Night Stalker ammo found after Ramirez's arrival here | FPD - 658 | Daily Breeze |
| 359 | 9/13/1985 | Ramirez' family urged to dump defender | FPD - 659 | Daily Breeze |
| 360 | 9/11/1985 | Was gruesome 'Night Stalker' package mailed to Texas? | FPD - 660 | Daily Breeze |
| 361 | 9/10/1985 | Ramirez claims innocence in 'Night Stalker' slayings | FPD - 661 | Daily Breeze |
| 362 | 9/9/1985 | Stalker suspect's plea delayed; attorney requests more time | FPD - 662 | Daily Breeze |
| 363 | 9/9/1985 | Friend says Ramirez was cocaine addict | FPD - 663 | Daily Breeze |
| 364 | 9/8/1985 | Short Takes | FPD - 664 | Daily Breeze |
| 365 | 9/7/1985 | Teen credited with 'Stalker' clue rewarded | FPD - 665 | Daily Breeze |
| 366 | 9/6/1985 | $5,000 one-day reward offered for gun | FPD - 666 | Daily Breeze |
| 367 | 9/6/1985 | Rush for publicity 'incredibly foolish' | FPD - 667 | Daily Breeze |
| 368 | 9/6/1985 | Police attempt to draw tighter net around Ramirez; Witnesses, survivors see 'Stalker; suspect in lineup | FPD - 668 | Daily Breeze |
| 369 | 9/6/1985 | Police correct report on San Pedro arrest | FPD - 669 | Daily Breeze |
| 370 | 9/5/1985 | Bradley wants Stalker reward distributed; ACLU urges wait | FPD - 670 | Daily Breeze |
| 371 | 9/5/1985 | Stalker' suspect arrested in '84 | FPD - 671 | Daily Breeze |
| 372 | 9/4/1985 | 5 honored as heroes in capture of Stalker suspect | FPD - 672 | Daily Breeze |
| 373 | 9/4/1985 | Single count of murder in 'Stalker' case | FPD - 673 | Daily Breeze |
| 374 | 9/3/1985 | Long line forming for 'Night Stalker' reward | FPD - 674 | Daily Breeze |
| 375 | 9/3/1985 | Arrest relieves lookalike 'Stalker' | FPD - 675 | Daily Breeze |
| 376 | 9/3/1985 | Police probe Arizona links of Ramirez | FPD - 676 | Daily Breeze |
| 377 | 9/2/1985 | Arresting officer had no idea of how big a pinch he made | FPD - 677 | Daily Breeze |
| 378 | 9/2/1985 | Residents may get share of reward money | FPD - 678 | Daily Breeze |
| 379 | 9/2/1985 | Night Stalker' scrawled signs of the devil in victims' homes | FPD - 679 | Daily Breeze |
| 380 | 9/1/1985 | Mob chases, captures "Night Stalker' suspect | FPD - 680 | Daily Breeze |
| 381 | 9/1/1985 | residents say suspect picked wrong community | FPD - 681 | Daily Breeze |
| 382 | 8/31/1985 | Night Stalker suspect named, Police hunt 25-year old man in 16 brutal California slayings | FPD - 682 | Daily Breeze |
| 383 | 8/13/1985 | Latest Attack is Not Believed Tied to 'Valley Intruder' | FPD - 683 | L.A. Times |
| 384 | 8/14/1985 | County Posts $10,000 reward for Information on Intruder | FPD - 684 | L.A. Times |
| 385 | 8/20/1985 | Man Wasn't 'Valley Intruder' | FPD - 685 | L.A. Times |
| 386 | 8/25/1985 | Valley Intruder: The 14 Victims' Stories | FPD - 686 | L.A. Times |
| 387 | 8/14/1985 | Rape of Woman, 84, Not Believed Tied to So-Called 'Intruder' | FPD - 687 | L.A. Times |
| 388 | 8/15/1985 | A Fearsome Intruder Has San Gabriel Valley in Uproar | FPD - 691 | L.A. Times |
| 389 | 8/21/1985 | Family of Slain Woman Offers $10,000 Reward | FPD - 693 | L.A. Times |
| 390 | 8/22/1985 | The Region : L.A. Checking S.F. 'Intruder' Slaying | FPD - 694 | L.A. Times |
| 391 | 8/15/1985 | Valley News: The Face Haunted her, So She Bought a Shotgun. It Cost $129 | FPD - 695 | L.A. Times |
| 392 | 8/14/1985 | Veteran Detective Leads Search for 'Valley Intruder' : Homicide Cop is Perfect Man for the Job | FPD - 699 | L.A. Times |
| 393 | 8/24/1985 | Ballistics Tests Tie Slaying in S.F. to 'Valley Intruder' | FPD - 700 | L.A. Times |
| 394 | 8/26/1985 | Valley Intruder Assaults Two in Orange County | FPD - 701 | L.A. Times |
| 395 | 8/22/1985 | On Guard: Angeles Rush in: As residents Worry Over 'Valley Intruder' Crimes, Volunteer Patrol Gets Recruits ready for Action | FPD - 702 | L.A. Times |
| 396 | 8/23/1985 | Slaying in S.F. Man Linked to Valley Intruder | FPD - 703 | L.A. Times |
| 397 | 8/24/1985 | Valley Intruder' Leaves His Mark: Tests Link Slayings in S.F. and L.A. | FPD - 704 | L.A. Times |
| 398 | 8/15/1985 | The State: Slaying Tied to 'Intruder' | FPD - 707 | L.A. Times |
| 399 | 8/28/1985 | New Night Stalker Sketch Adds Black Cap | FPD - 711 | L.A. Times |
| 400 | 8/27/1985 | Intruder Look-Alike Spotted on Amtrak: Trail Lost in Delay in Notifying Police; Demand High for Guns,Locks and Dogs | FPD - 712 | L.A. Times |
| 401 | 8/13/1985 | Police discounting link between rape, murders | FPD - 714 | Pasadena Star News |
| 402 | 8/14/1985 | $10,000 offered to catch murder suspect | FPD - 715 | Pasadena Star News |
| 403 | 8/20/1985 | Stalker' suspect cornered? | FPD - 716 | Pasadena Star News |
| 404 | 8/21/1985 | San Marino search for 'Stalker' proves false alarm | FPD - 717 | Pasadena Star News |
| 405 | 8/22/1985 | San Francisco area attack similar to 'Stalker' killings | FPD - 718 | Pasadena Star News |
| 406 | 8/23/1985 | S.F. death linked to 'Stalker' | FPD - 719 | Pasadena Star News |
| 407 | 8/24/1985 | 14 murders linked to Night Stalker | FPD - 720 | Pasadena Star News |
| 408 | 8/25/1985 | Stalker' driven by obession | FPD - 721 | Pasadena Star News |
| 409 | 8/25/1985 | Stalker teeth may aid in capture | FPD - 722 | Pasadena Star News |
| 410 | 8/26/1985 | Angel: House-sitting offered for elderly | FPD - 723 | Pasadena Star News |
| 411 | 8/25/1985 | Dentist watch for Stalker | FPD - 724 | Pasadena Star News |
| 412 | 8/26/1985 | Night Stalker strikes in Mission Viejo | FPD - 725 | Pasadena Star News |
| 413 | 8/27/1985 | Fear of Night Stalker spreads after latest attacks | FPD - 726 | Pasadena Star News |
| 414 | 8/27/1985 | Head Angel pays visit | FPD - 727 | Pasadena Star News |
| 415 | 8/28/1985 | Stalker linked to earlier abductions / Guardian Angels keep watch in San Gabriel Valley homes | FPD - 728 | Pasadena Star News |
| 416 | 8/28/1985 | Angels: The watch begins | FPD - 729 | Pasadena Star News |
| 417 | 8/28/1985 | Stalker: Suspect linked to earlier child abductions | FPD - 730 | Pasadena Star News |
| 418 | 8/28/1985 | Forget coming up with names - just catch the killer | FPD - 731 | Pasadena Star News |
| 419 | 8/29/1985 | Car suspected stolen by Stalker found | FPD - 732 | Pasadena Star News |
| 420 | 8/29/1985 | Gun course offered | FPD - 733 | Pasadena Star News |
| 421 | 8/30/1985 | Two more slayings linked to Stalker | FPD - 734 | Pasadena Star News |
| 422 | 8/30/1985 | Heavy meta's connection to deadly Night Stalker cited | FPD - 735 | Pasadena Star News |
| 423 | 8/31/1985 | Stalker suspect named | FPD - 736 | Pasadena Star News |
| 424 | 8/31/1985 | Markets, gas stations to get flyers on Stalker | FPD - 737 | Pasadena Star News |
| 425 | 9/1/1985 | After 16 killings, Stalker suspect nabbed by citizens, jailed in L.A. | FPD - 738 | Pasadena Star News |

Page 4 of 9

Newspaper Article List (up to 9-1-88).xlsx

| TOTAL TALLY | DATE | TITLE & SUMMARY | CURRENT LOCATION | SOURCE |
|---|---|---|---|---|
| 426 | 9/1/1985 | A brutal reign of terror | FPD - 739 | Pasadena Star News |
| 427 | 9/1/1985 | Angry crowd gathers outside station | FPD - 740 | Pasadena Star News |
| 428 | 9/1/1985 | Father blames drugs for all Ramirez' troubles | FPD - 741 | Pasadena Star News |
| 429 | 9/1/1985 | Stalker's possible capture doesn't end crime | FPD - 742 | Pasadena Star News |
| 430 | 9/1/1985 | Night Stalker suspect arrested in East L.A. | FPD - 743 | Pasadena Star News |
| 431 | 9/2/1985 | Finaly, a quiet day for police: Ramirez kept in isolation | FPD - 744 | Pasadena Star News |
| 432 | 9/2/1985 | Relief and wariness: Despite the capture, many still on guard | FPD - 745 | Pasadena Star News |
| 433 | 9/3/1985 | Stalker suspect to be arraigned today: Suspect decribed as a loner | FPD - 746 | Pasadena Star News |
| 434 | 9/3/1985 | Police will file one or two charges | FPD - 747 | Pasadena Star News |
| 435 | 9/3/1985 | Stalker killed attention Pasadenan's death should've received | FPD - 748 | Pasadena Star News |
| 436 | 9/4/1985 | Stalker suspect arraigned: Charged with 1 murder in Monterey Park | FPD - 749 | Pasadena Star News |
| 437 | 9/4/1985 | On a day of joy, deciding how to reward heroes | FPD - 750 | Pasadena Star News |
| 438 | 9/4/1985 | Charges: These are horrible crimes | FPD - 751 | Pasadena Star News |
| 439 | 6/4/1985 | Ramirez linked to 2 valley incidents | FPD - 752 | Pasadena Star News |
| 440 | 9/5/1985 | '84 killing linked to Ramirez | FPD - 753 | Pasadena Star News |
| 441 | 9/6/1985 | Night Stalker suspect viewed in L.A. lineup | FPD - 754 | Pasadena Star News |
| 442 | 9/6/1985 | Opinion: Letters | FPD - 755 | Pasadena Star News |
| 443 | 9/7/1985 | Evidence sought in Stalker case: Ramirez's ex-roommate says, 'I knew he had a problem' | FPD - 756 | Pasadena Star News |
| 444 | 9/8/1985 | The Night Stalker case: Accumulation of clues helped piece case together | FPD - 757 | Pasadena Star News |
| 445 | 9/8/1985 | L.A. police search Stalker suspect's boyhood home | FPD - 758 | Pasadena Star News |
| 446 | 9/10/1985 | Ramirez hearing delayed | FPD - 759 | Pasadena Star News |
| 447 | 9/10/1985 | Opinion: Don't complain | FPD - 760 | Pasadena Star News |
| 448 | 9/11/1985 | Gruesome turn in Stalker case | FPD - 761 | Pasadena Star News |
| 449 | 9/13/1985 | 21 area crimes with possible Stalker link under investigation | FPD - 762 | Pasadena Star News |
| 450 | 9/14/1985 | Witch experts consulted in case | FPD - 763 | Pasadena Star News |
| 451 | 9/17/1985 | Ramirez's kin may sell story | FPD - 764 | Pasadena Star News |
| 452 | 9/18/1985 | Judge issues gag order in Night Stalker case | FPD - 765 | Pasadena Star News |
| 453 | 9/18/1985 | Night Stalker attack shatters a family forever | FPD - 766 | Pasadena Star News |
| 454 | 9/18/1985 | Links sought between 2 murders | FPD - 767 | Pasadena Star News |
| 455 | 9/20/1985 | Rush to judgement threat to fair trial | FPD - 768 | Pasadena Star News |
| 456 | 9/24/1985 | LAPD seeking serial killer | FPD - 769 | Pasadena Star News |
| 457 | 9/25/1985 | Fear stalked the neighborhood | FPD - 770 | Pasadena Star News |
| 458 | 9/28/1985 | 68 charges filed against Stalker suspect | FPD - 771 | Pasadena Star News |
| 459 | 10/1/1985 | Belli may defend Ramirez | FPD - 772 | Pasadena Star News |
| 460 | 10/9/1985 | Ramirez denied access | FPD - 773 | Pasadena Star News |
| 461 | 10/10/1985 | Ramirez hires attorney: Night Stalker defendant's plea date postponed | FPD - 774 | Pasadena Star News |
| 462 | 10/16/1985 | Ramirez to file innocence plea | FPD - 775 | Pasadena Star News |
| 463 | 10/23/1985 | Ramirez asks for another attorney | FPD - 776 | Pasadena Star News |
| 464 | 10/25/1985 | Night Stalker suspect says he's innocent | FPD - 777 | Pasadena Star News |
| 465 | 10/26/1985 | Corrections officers give an eye to occult symbols | FPD - 778 | Pasadena Star News |
| 466 | 11/2/1985 | Stalker probe concludes | FPD - 779 | Pasadena Star News |
| 467 | 11/14/1985 | Night Stalker can back in court | FPD - 780 | Pasadena Star News |
| 468 | 11/15/1985 | Ramirez's hearing set for February | FPD - 781 | Pasadena Star News |
| 469 | 11/24/1985 | Night Stalker trial could reach record proportions | FPD - 782 | Pasadena Star News |
| 470 | 12/3/1985 | Ramirez charged in Orange County | FPD - 783 | Pasadena Star News |
| 471 | 12/14/1985 | Stalker suspect Ramirez wins OK for exercise | FPD - 784 | Pasadena Star News |
| 472 | 12/14/1985 | Ramirez proceedings rescheduled | FPD - 785 | Pasadena Star News |
| 473 | 12/30/1985 | Night Stalker made it a summer of fear | FPD - 786 | Pasadena Star News |
| 474 | 8/14/1985 | Board sets $10,000 reward in effort to capture intruder | FPD - 787 | L.A. Daily News |
| 475 | 8/29/1985 | Toyota scoured for clues: Night Stalker may have used it | FPD - 788 | L.A. Daily News |
| 476 | 8/29/1985 | Public cautioned agaisnt hysteria over serial killer | FPD - 789 | L.A. Daily News |
| 477 | 8/30/1985 | Earlier deaths called Stalker's work | FPD - 790 | L.A. Daily News |
| 478 | 8/30/1985 | 16 killings believed by Stalker | FPD - 791 | L.A. Daily News |
| 479 | 8/30/1985 | Fingerprint found in stolen Toyota | FPD - 792 | L.A. Daily News |
| 480 | 8/30/1985 | Glendale residents fight fear of Night Stalker | FPD - 793 | L.A. Daily News |
| 481 | 8/31/1985 | Stalker suspect identified: Police intensify search for Richard Ramirez | FPD - 794 | L.A. Daily News |
| 482 | 8/31/1985 | The Victims: if there is shared trait, it is ordinariness | FPD - 795 | L.A. Daily News |
| 483 | 9/1/1985 | Night Stalker suspect is named: Richard Ramirez target of statewide hunt | FPD - 796 | L.A. Daily News |
| 484 | 9/1/1985 | Unemployed man suspected as killer | FPD - 797 | L.A. Daily News |
| 485 | 9/1/1985 | The Victims: if there is shared trait, it is ordinariness | FPD - 798 | L.A. Daily News |
| 486 | 9/1/1985 | Stalker crimes seen as type of odd vendetta | FPD - 799 | L.A. Daily News |
| 487 | 9/1/1985 | Fear of killer has helped cut crime | FPD - 800 | L.A. Daily News |
| 488 | 9/1/1985 | Angry crowd captures Night Stalker suspect | FPD - 801 | L.A. Daily News |
| 489 | 9/1/1985 | How the manhunt came to dramatic end | FPD - 802 | L.A. Daily News |
| 490 | 9/1/1985 | Capture spurs neighborhood celebration | FPD - 803 | L.A. Daily News |
| 491 | 9/1/1985 | His eyes looked like the devil's eyes' | FPD - 804 | L.A. Daily News |
| 492 | 9/1/1985 | Known victims of serial killer | FPD - 805 | L.A. Daily News |
| 493 | 9/1/1985 | Few recal 'Rickie' Ramirez | FPD - 806 | L.A. Daily News |
| 494 | 9/1/1985 | Angry crowd nabs Stalker suspect | FPD - 807 | L.A. Daily News |
| 495 | 9/1/1985 | Victims of Night Stalker | FPD - 808 | L.A. Daily News |
| 496 | 9/1/1985 | L.A. County not hooked to ID files | FPD - 809 | L.A. Daily News |
| 497 | 9/1/1985 | Composite sketches can help or hinder police | FPD - 810 | L.A. Daily News |
| 498 | 9/1/1985 | Fear of Stalker increased security awareness | FPD - 811 | L.A. Daily News |
| 499 | 9/2/1985 | Auto, gun found in Stalker probe | FPD - 812 | L.A. Daily News |
| 500 | 9/2/1985 | Growing up tough: Ramirez traded school for streets | FPD - 813 | L.A. Daily News |
| 501 | 9/2/1985 | Stalker scrawled satanic symbols | FPD - 814 | L.A. Daily News |
| 502 | 9/2/1985 | Northridge pair may never recover from Stalker attack | FPD - 815 | L.A. Daily News |
| 503 | 9/3/1985 | Stalker: Ramirez ticketed days before arrest | FPD - 816 | L.A. Daily News |
| 504 | 9/3/1985 | Suspect survived as Skid Row loner | FPD - 817 | L.A. Daily News |
| 505 | 9/3/1985 | Lessons from earlier cases helped guide Stalker probe | FPD - 818 | L.A. Daily News |
| 506 | 9/4/1985 | Night Stalker suspect faces murder count | FPD - 819 | L.A. Daily News |
| 507 | 9/4/1985 | Stalker case gun found in Tijuana | FPD - 820 | L.A. Daily News |
| 508 | 9/4/1985 | Stalker left legacy of fear in suburbia | FPD - 821 | L.A. Daily News |
| 509 | 9/4/1985 | Man fitting Ramirez' description was jailed for car theft | FPD - 822 | L.A. Daily News |
| 510 | 9/4/1985 | Residue of Stalker warrants: Police recover stolen goods | FPD - 823 | L.A. Daily News |
| 511 | 9/5/1985 | Ramirez tied to 15-month-old killing | FPD - 824 | L.A. Daily News |
| 512 | 9/5/1985 | 6 itemes found in Stalker search | FPD - 825 | L.A. Daily News |
| 513 | 9/6/1985 | Night Stalker victims view police lineup | FPD - 826 | L.A. Daily News |
| 514 | 9/6/1985 | Officer says Ramirez implicated self | FPD - 827 | L.A. Daily News |
| 515 | 9/6/1985 | New heroes in chase emerge: Three E.L.A. men were first to spot Stalker suspect, alert police | FPD - 828 | L.A. Daily News |
| 516 | 9/6/1985 | 4 cities checking unsolved killings for Stalker links | FPD - 829 | L.A. Daily News |
| 517 | 9/7/1985 | Ramirez changed, ex-roommate says | FPD - 830 | L.A. Daily News |
| 518 | 9/8/1985 | Satanic crimes: more fantasy than factual | FPD - 831 | L.A. Daily News |
| 519 | 9/8/1985 | Night Stalker case: taking stock of the evidence | FPD - 832 | L.A. Daily News |
| 520 | 9/8/1985 | Satanic crimes: Despite allegations, evidence says devil did not make them do it | FPD - 833 | L.A. Daily News |
| 521 | 9/8/1985 | Year delay in Stalker reward seen | FPD - 834 | L.A. Daily News |
| 522 | 9/10/1985 | Depressed Ramirez claims innocence, attorney says | FPD - 835 | L.A. Daily News |
| 523 | 9/11/1985 | Jewelry recovered in home of Ramirez's sister | FPD - 836 | L.A. Daily News |
| 524 | 9/12/1985 | Woman says Ramirez told Stalker jokes: Oakland friend describes suspect's veiled threats | FPD - 837 | L.A. Daily News |
| 525 | 9/13/1985 | Bullets tied to Ramirez: Same type used in Stalker killings | FPD - 838 | L.A. Daily News |
| 526 | 9/14/1985 | Stalker's final victim set to leave hospital | FPD - 839 | L.A. Daily News |
| 527 | 9/16/1985 | Ramirez isolated sister | FPD - 840 | L.A. Daily News |
| 528 | 9/16/1985 | Judge moves up order in 'Stalker' case | FPD - 841 | L.A. Daily News |
| 529 | 9/17/1985 | Plaster made of Night Stalker suspect | FPD - 842 | L.A. Daily News |
| 530 | 9/18/1985 | Kin says Ramirez held in isolation | FPD - 843 | L.A. Daily News |
| 531 | 9/19/1985 | Ramirez x-rays probed: Stalker dental clues reported | FPD - 844 | L.A. Daily News |
| 532 | 9/19/1985 | Hospital releases 'last' Stalker victim | FPD - 845 | L.A. Daily News |
| 533 | 1/4/1986 | Computer rlogs 2 rape suspects | FPD - 846 | L.A. Daily News |
| 534 | 1/7/1986 | Bradley stalls ID system bid | FPD - 847 | L.A. Daily News |
| 535 | 1/7/1986 | Southland report: Briefly - Belli to appeal in suit | FPD - 848 | L.A. Daily News |
| 536 | 1/7/1986 | Cameras banned in Ramirez hearing | FPD - 849 | L.A. Daily News |
| 537 | 1/8/1986 | Editorials - A crime computer says | FPD - 850 | L.A. Daily News |
| 538 | 1/22/1986 | Ramirez: 'Thumbs up' in court | FPD - 851 | L.A. Daily News |

Page 5 of 9

Newspaper Article List (up to 9-1-88).xlsx

| TOTAL TALLY | DATE | TITLE & SUMMARY | CURRENT LOCATION | SOURCE |
|---|---|---|---|---|
| 539 | 1/29/1986 | Hearing for Night Stalker suspect shifted | FPD - 852 | L.A. Daily News |
| 540 | 2/6/1986 | Ramirez attorney fined in unrelated case | FPD - 853 | L.A. Daily News |
| 541 | 2/12/1986 | Charges in bombing to be decided | FPD - 854 | L.A. Daily News |
| 542 | 2/13/1986 | Judge tells lawyers to halt squabble in Ramirez case | FPD - 855 | L.A. Daily News |
| 543 | 2/16/1986 | Computer puts finger on suspects - identification system helps solve old crimes | FPD - 856 | L.A. Daily News |
| 544 | 2/20/1986 | Delay of ramirez hearing sought | FPD - 857 | L.A. Daily News |
| 545 | 2/21/1986 | Night Stalker hearing slated to start Monday | FPD - 858 | L.A. Daily News |
| 546 | 2/25/1986 | Ramirez's request to close hearing denied by judge | FPD - 859 | L.A. Daily News |
| 547 | 3/1/1986 | Defense laywers for Ramirez want a closed hearing | FPD - 860 | L.A. Daily News |
| 548 | 3/2/1986 | Stoners: New breed of gang bonded by narcotics, occult | FPD - 861 | L.A. Daily News |
| 549 | 3/4/1986 | First witness testifies in 'Stalker' hearing - man recalls finding slain mother | FPD - 862 | L.A. Daily News |
| 550 | 3/5/1986 | Lawyers Say Police Denied Ramirez's Rights | FPD - 863 | L.A. Daily News |
| 551 | 3/6/1986 | Arrival of witness in court draws laugh from Ramirez | FPD - 864 | L.A. Daily News |
| 552 | 3/7/1986 | Stalker case judge bars public again | FPD - 865 | L.A. Daily News |
| 553 | 3/11/1986 | Ramirez lawyers lose on line-up issue | FPD - 866 | L.A. Daily News |
| 554 | 3/12/1986 | Stalker victim testifies - Ramirez fired shot, she said | FPD - 867 | L.A. Daily News |
| 555 | 3/13/1986 | Victim of Stalker died on street, officer testifies | FPD - 868 | L.A. Daily News |
| 556 | 3/15/1986 | Innocent plea from Ramirez | FPD - 869 | L.A. Daily News |
| 557 | 3/17/1986 | Fan of 'Stalker' suspect | FPD - 870 | L.A. Daily News |
| 558 | 3/18/1986 | 2nd witness identifies Ramirez | FPD - 871 | L.A. Daily News |
| 559 | 3/19/1986 | Ramirez brother caught in court - Prosecutor fears case affected | FPD - 872 | L.A. Daily News |
| 560 | 3/20/1986 | Deaths of Whittier pair described at convening hearing | FPD - 873 | L.A. Daily News |
| 561 | 3/21/1986 | Night Stalker testimony turns to Monterey Park killing | FPD - 874 | L.A. Daily News |
| 562 | 3/22/1986 | Public forum - how long can Bradley duck court questions? | FPD - 875 | L.A. Daily News |
| 563 | 3/23/1986 | Ramirez hearing is moving slowly - legalisms, tempers take over | FPD - 876 | L.A. Daily News |
| 564 | 3/26/1986 | Girl 8, wont testify in Ramirez case | FPD - 877 | L.A. Daily News |
| 565 | 3/27/1986 | Pentagrams Described in Ramirez Hearing | FPD - 878 | L.A. Daily News |
| 566 | 3/28/1986 | Attorney's ask Stalker' case closure | FPD - 879 | L.A. Daily News |
| 567 | 4/1/1986 | Woman identifies Ramirez in rape | FPD - 880 | L.A. Daily News |
| 568 | 4/2/1986 | Contractor testifies on findings of eighth Night Stalker victim | FPD - 881 | L.A. Daily News |
| 569 | 4/8/1986 | Judge rules suspect must attend stalker hearing | FPD - 882 | L.A. Daily News |
| 570 | 4/11/1986 | Judge hints prejudice may underlie criticism | FPD - 883 | L.A. Daily News |
| 571 | 4/15/1986 | 2 women point out Ramirez at hearing as their attacker | FPD - 884 | L.A. Daily News |
| 572 | 4/17/1986 | Witness Connects Ramirez to Key Stalker Evidence | FPD - 885 | L.A. Daily News |
| 573 | 4/20/1986 | Store evaluations, community forums seek to enhance credibility | FPD - 886 | L.A. Daily News |
| 574 | 4/24/1986 | Media may name Stalker rape victims | FPD - 887 | L.A. Daily News |
| 575 | 4/29/1986 | Southland report : briefly - Stalker case unfolds | FPD - 888 | L.A. Daily News |
| 576 | 5/1/1986 | Bailiff's drag Ramirez away during courtroom fracas | FPD - 889 | L.A. Daily News |
| 577 | 5/4/1986 | Emmy's reflect KNBC news gain | FPD - 890 | L.A. Daily News |
| 578 | 5/7/1986 | Ramirez ordered to trial - drifter linked to 14 slayings | FPD - 891 | L.A. Daily News |
| 579 | 5/8/1986 | Confession by Ramirez disclosed | FPD - 892 | L.A. Daily News |
| 580 | 5/9/1986 | Guard: Ramirez detailed killings | FPD - 893 | L.A. Daily News |
| 581 | 5/14/1986 | Southland report: Briefly - Office building fire | FPD - 894 | L.A. Daily News |
| 582 | 5/21/1986 | Southland report: Briefly - 5 charges dismissed | FPD - 895 | L.A. Daily News |
| 583 | 5/22/1986 | Ramirez pleads innocent | FPD - 896 | L.A. Daily News |
| 584 | 6/13/1986 | LAPD gets new laser print lifter | FPD - 897 | L.A. Daily News |
| 585 | 6/18/1986 | Ramirez trial set Sept. 2 - postponement plea rejected | FPD - 898 | L.A. Daily News |
| 586 | 6/26/1986 | Damage suits filed in Stalker killings | FPD - 899 | L.A. Daily News |
| 587 | 6/28/1986 | Ramirez may avoid Orange County trial | FPD - 900 | L.A. Daily News |
| 588 | 7/18/1986 | Southland report: Briefly Bradley urges action | FPD - 901 | L.A. Daily News |
| 589 | 7/22/1986 | New site for ramirez trial asked | FPD - 902 | L.A. Daily News |
| 590 | 7/23/1986 | resident watch stares down crime | FPD - 903 | L.A. Daily News |
| 591 | 7/24/1986 | Thomas turns election - ouster political, says ex-presiding judge | FPD - 904 | L.A. Daily News |
| 592 | 7/31/1986 | Southland report - Bishop's services set | FPD - 905 | L.A. Daily News |
| 593 | 8/2/1986 | Non-english-speaking jurors urged for Ramirez | FPD - 906 | L.A. Daily News |
| 594 | 8/9/1985 | L.A. Night Stalker's deadly trail | FPD - 907 | L.A. Herald Examiner |
| 595 | 8/10/1985 | L.A. bolts its doors, windows: Residents brace for new attack by Night Stalker | FPD - 908 | L.A. Herald Examiner |
| 596 | 8/10/1985 | What makes this killer different | FPD - 909 | L.A. Herald Examiner |
| 597 | 8/11/1985 | Task force continues search for Night Stalker | FPD - 910 | L.A. Herald Examiner |
| 598 | 8/12/1985 | Night Stalker strikes again: San Gabriel woman raped by intruder | FPD - 911 | L.A. Herald Examiner |
| 599 | 8/12/1985 | Home intruder beats and rapes San Gabriel woman | FPD - 912 | L.A. Herald Examiner |
| 600 | 8/13/1985 | Name droppers and Night Stalker | FPD - 913 | L.A. Herald Examiner |
| 601 | 8/13/1985 | Callers bombard police with tips and questions on the Night Stalker | FPD - 914 | L.A. Herald Examiner |
| 602 | 8/13/1985 | Night Stalker: $10,000 reward: County supervisors join appeal for capture | FPD - 915 | L.A. Herald Examiner |
| 603 | 8/13/1985 | With their porch lights on and dander up, Americans have 'Night out' against crime | FPD - 916 | L.A. Herald Examiner |
| 604 | 8/14/1985 | Ganging up against Night Stalker | FPD - 917 | L.A. Herald Examiner |
| 605 | 8/14/1985 | Police and Public unite to fight crime in Los Angeles: Neighbors meet as another killing linked to Stalker | FPD - 918 | L.A. Herald Examiner |
| 606 | 8/15/1985 | Night Stalker linked to March 17 slaying of woman at her car | FPD - 919 | L.A. Herald Examiner |
| 607 | 8/18/1985 | Temple City shaken by Night Stalker: Brutal attacks shatter peace of community | FPD - 920 | L.A. Herald Examiner |
| 608 | 8/18/1985 | New Guardian Angeles chapter formed by valley residents begins night patrols | FPD - 921 | L.A. Herald Examiner |
| 609 | 8/18/1985 | Night Stalker attack in Santa Monica? / Woman assaulted, slain in apartment | FPD - 922 | L.A. Herald Examiner |
| 610 | 8/18/1985 | Letters to the Editor: Night Stalker coverage | FPD - 923 | L.A. Herald Examiner |
| 611 | 8/19/1985 | Police still studying Night Stalker link to murder in Santa Monica | FPD - 924 | L.A. Herald Examiner |
| 612 | 8/20/1985 | Plan would allow donations to Night Stalker reward fund | FPD - 925 | L.A. Herald Examiner |
| 613 | 8/21/1985 | State of siege in San Marino during Night Stalker search | FPD - 926 | L.A. Herald Examiner |
| 614 | 8/21/1985 | San Marino area under siege during Night Stalker search | FPD - 927 | L.A. Herald Examiner |
| 615 | 8/22/1985 | Night Stalker may have hit the Bay area: L.A. investigators meeting S.F. police | FPD - 928 | L.A. Herald Examiner |
| 616 | 8/22/1985 | S.F. link to Night Stalker: Sheriff Block confirms murder is related to L.A. valley killings | FPD - 929 | L.A. Herald Examiner |
| 617 | 8/23/1985 | Night Stalker sends chills through S.F. | FPD - 930 | L.A. Herald Examiner |
| 618 | 8/23/1985 | Night Stalker reward now up to $35,010 | FPD - 931 | L.A. Herald Examiner |
| 619 | 8/23/1985 | fear of killer spreads to San Francisco | FPD - 932 | L.A. Herald Examiner |
| 620 | 8/24/1985 | Night Stalker has killed 16: L.A. sheriff now links 33 cases to fiend | FPD - 933 | L.A. Herald Examiner |
| 621 | 8/25/1985 | Night Stalker now tied to 14 murders: Sheriff complains about news leaks | FPD - 934 | L.A. Herald Examiner |
| 622 | 8/25/1985 | Night Stalker's dental records add new clue | FPD - 935 | L.A. Herald Examiner |
| 623 | 8/25/1985 | Message is the killer's "signature': Scrawl holds key to his personality | FPD - 936 | L.A. Herald Examiner |
| 624 | 8/25/1985 | A look at Night Stalker's victims and fear instilled in neighbors | FPD - 937 | L.A. Herald Examiner |
| 625 | 8/26/1985 | Stalker hits Orange County: Couple attacked in Mission Viejo | FPD - 938 | L.A. Herald Examiner |
| 626 | 8/26/1985 | Police mum on serial killer; Hahn protests | FPD - 939 | L.A. Herald Examiner |
| 627 | 8/26/1985 | Mission Viejo caught off guard by Night Stalker | FPD - 940 | L.A. Herald Examiner |
| 628 | 8/26/1985 | police silent on slayings; Hahn protests | FPD - 941 | L.A. Herald Examiner |
| 629 | 8/27/1985 | Night Stalker phone calls flood police | FPD - 942 | L.A. Herald Examiner |
| 630 | 8/27/1985 | New lead in the hunt for Night Stalker | FPD - 943 | L.A. Herald Examiner |
| 631 | 8/27/1985 | Police release another sketch of Night Stalker | FPD - 944 | L.A. Herald Examiner |
| 632 | 8/28/1985 | New clues about Night Stalker / Police release updated sketch | FPD - 945 | L.A. Herald Examiner |
| 633 | 8/28/1985 | Night Stalker Toyota is found: L.A. council raises reward by $25,000 | FPD - 946 | L.A. Herald Examiner |
| 634 | 8/29/1985 | Sheriff takes his vacation in midst of manhunt | FPD - 947 | L.A. Herald Examiner |
| 635 | 8/29/1985 | High-tech sleuthing for Stalker: car stolen by killer scrutinized for clues | FPD - 948 | L.A. Herald Examiner |
| 636 | 8/29/1985 | Serial killer's many labels spelled confusion for public | FPD - 949 | L.A. Herald Examiner |
| 637 | 8/29/1985 | How latest serial killer became the Night Stalker | FPD - 950 | L.A. Herald Examiner |
| 638 | 8/29/1985 | Child kidnap / rapes linked to Night Stalker | FPD - 951 | L.A. Herald Examiner |

Ex. 75, p. 298

Newspaper Article List (up to 9-1-88).xlsx

| TOTAL TALLY | DATE | TITLE & SUMMARY | CURRENT LOCATION | SOURCE |
|---|---|---|---|---|
| 639 | 8/29/1985 | Police confusion in Stalker case | FPD - 952 | L.A. Herald Examiner |
| 640 | 8/30/1985 | Laser turns up fingerprints other than owner's in Toyota | FPD - 953 | L.A. Herald Examiner |
| 641 | 8/30/1985 | Block vacation won't affect Stalker hunt, officials insist | FPD - 954 | L.A. Herald Examiner |
| 642 | 8/30/1985 | 16 murder counts for Stalker: police link 2 more cases to mass killer | FPD - 955 | L.A. Herald Examiner |
| 643 | 8/30/1985 | Letters to the Editor: No one called | FPD - 956 | L.A. Herald Examiner |
| 644 | 8/30/1985 | How police found stolen car linked to mass killer | FPD - 957 | L.A. Herald Examiner |
| 645 | 8/30/1985 | Night Stalker flier sent to gas, retail outlets in state | FPD - 958 | L.A. Herald Examiner |
| 646 | 8/31/1985 | Stalker suspect named: he's from Texas uses five aliases and is still at large | FPD - 959 | L.A. Herald Examiner |
| 647 | 8/31/1985 | Fingerprints in stolen car pointed police to Ramirez | FPD - 960 | L.A. Herald Examiner |
| 648 | 8/31/1985 | Letters to the Editor: During a visit | FPD - 961 | L.A. Herald Examiner |
| 649 | 8/31/1985 | Night stalker suspect is identified | FPD - 962 | L.A. Herald Examiner |
| 650 | 9/1/1985 | Fear puts Southland under siege: Shadowy killer's spree strikes nerve | FPD - 963 | L.A. Herald Examiner |
| 651 | 9/1/1985 | Fear of the Night Stalker held important lesson to parents | FPD - 964 | L.A. Herald Examiner |
| 652 | 9/1/1985 | Some of the heroes in the Stalker chase / How Night Stalker suspect was caught | FPD - 965 | L.A. Herald Examiner |
| 653 | 9/1/1985 | Fugitive takes a road to nowhere | FPD - 966 | L.A. Herald Examiner |
| 654 | 9/1/1985 | Residents relieved, still wary following dramatic capture | FPD - 967 | L.A. Herald Examiner |
| 655 | 9/1/1985 | Chronology of killer's deadly spree | FPD - 968 | L.A. Herald Examiner |
| 656 | 9/1/1985 | For many residents, need to feel secure far outweighs fear of guns | FPD - 969 | L.A. Herald Examiner |
| 657 | 9/1/1985 | How reign of terror affected our psyches | FPD - 970 | L.A. Herald Examiner |
| 658 | 9/1/1985 | San Francisco police take credit for helping crack case | FPD - 971 | L.A. Herald Examiner |
| 659 | 9/1/1985 | Police elated over role of photo in capture | FPD - 972 | L.A. Herald Examiner |
| 660 | 9/1/1985 | Who will receive the $70,000 reward? | FPD - 973 | L.A. Herald Examiner |
| 661 | 9/1/1985 | El maton' is run to earth in East L.A. | FPD - 974 | L.A. Herald Examiner |
| 662 | 9/1/1985 | Ramirez could face death penalty if convicted | FPD - 975 | L.A. Herald Examiner |
| 663 | 9/1/1985 | How can I tell you it doesn't hurt?' says the suspect's father | FPD - 976 | L.A. Herald Examiner |
| 664 | 9/1/1985 | Mission Viejo man slightly improved | FPD - 977 | L.A. Herald Examiner |
| 665 | 9/2/1985 | New Stalker evidence sought: Suspect's car found, plea for gun issued | FPD - 978 | L.A. Herald Examiner |
| 666 | 9/2/1985 | Neighbors who caught Ramirez meet press | FPD - 979 | L.A. Herald Examiner |
| 667 | 9/3/1985 | Getting a sense of the senseless | FPD - 980 | L.A. Herald Examiner |
| 668 | 9/3/1985 | Night Stalker look-alike glad about capture | FPD - 981 | L.A. Herald Examiner |
| 669 | 9/3/1985 | TV news has devil of a time with its coverage of the Night Stalker | FPD - 982 | L.A. Herald Examiner |
| 670 | 9/3/1985 | Night Stalker case: Police downplay role of satanism in murder spree | FPD - 983 | L.A. Herald Examiner |
| 671 | 9/3/1985 | Ramirez to be arraigned today in Stalker case | FPD - 984 | L.A. Herald Examiner |
| 672 | 9/4/1985 | Ramirez charged as Stalker | FPD - 985 | L.A. Herald Examiner |
| 673 | 9/4/1985 | Imprisoned by a lack of courage | FPD - 986 | L.A. Herald Examiner |
| 674 | 9/4/1985 | Man aided by Night Stalker listed stable | FPD - 987 | L.A. Herald Examiner |
| 675 | 9/4/1985 | Stalker victim's daughter makes a plea for justice | FPD - 988 | L.A. Herald Examiner |
| 676 | 9/4/1985 | 1984 slaying now linked to Stalker suspect | FPD - 989 | L.A. Herald Examiner |
| 677 | 9/4/1985 | Man shot by Night Stalker listed stable | FPD - 990 | L.A. Herald Examiner |
| 678 | 9/5/1985 | Stalker linked to more attacks: Crime spreee began last summer, say authorities | FPD - 991 | L.A. Herald Examiner |
| 679 | 9/5/1985 | LAPD gets more ammunition in fight for fingerprint computer | FPD - 992 | L.A. Herald Examiner |
| 680 | 9/5/1985 | Ramirez may face additional charges | FPD - 993 | L.A. Herald Examiner |
| 681 | 9/5/1985 | Bradley says give heroes reward now: he says conviction shouldn't be factor | FPD - 994 | L.A. Herald Examiner |
| 682 | 9/5/1985 | Letters to the editor: Signs of relief | FPD - 995 | L.A. Herald Examiner |
| 683 | 9/5/1985 | Fingerprint ties ramirez to '84 killing: First to be found at a murder scene | FPD - 996 | L.A. Herald Examiner |
| 684 | 9/6/1985 | Might Stalker police lineup: Distraught victims try to identify serial killer | FPD - 997 | L.A. Herald Examiner |
| 685 | 9/6/1985 | Boy rewarded for giving key tip on killer | FPD - 998 | L.A. Herald Examiner |
| 686 | 9/6/1985 | Victims try to identify Stalker suspect in lineup | FPD - 999 | L.A. Herald Examiner |
| 687 | 9/7/1985 | Ramirez joked with friend about being killer | FPD - 1000 | L.A. Herald Examiner |
| 688 | 9/8/1985 | Ramirez's attorney says it's just another case | FPD - 1001 | L.A. Herald Examiner |
| 689 | 9/9/1985 | Attorney wants Stalker trial moved | FPD - 1002 | L.A. Herald Examiner |
| 690 | 9/10/1985 | Ramirez tells lawyer he's innocent | FPD - 1003 | L.A. Herald Examiner |
| 691 | 9/10/1985 | Night Stalker | FPD - 1004 | L.A. Herald Examiner |
| 692 | 9/10/1985 | Items allegedly stolen by Ramirez found in his sister's texas home | FPD - 1005 | L.A. Herald Examiner |
| 693 | 9/11/1985 | Detectives search for eyeballs Night Stalker tore from victim | FPD - 1006 | L.A. Herald Examiner |
| 694 | 9/12/1985 | Ramirez family lawyer says public defender is after book, movie deals | FPD - 1007 | L.A. Herald Examiner |
| 695 | 9/13/1985 | Stalker's last victim will be transferred to rehabiliation | FPD - 1008 | L.A. Herald Examiner |
| 696 | 9/17/1985 | Prosecution makes mold of Ramirez's teeth | FPD - 1009 | L.A. Herald Examiner |
| 697 | 9/18/1985 | Ramirez defense wins gag order on Stalker case | FPD - 1010 | L.A. Herald Examiner |
| 698 | 9/18/1985 | Judge slaps gag order on Night Stalker case | FPD - 1011 | L.A. Herald Examiner |
| 699 | 9/19/1985 | Last Night Stalker victim released from hospital | FPD - 1012 | L.A. Herald Examiner |
| 700 | 9/27/1985 | Ramirez may face additional charges inNight Stalker case | FPD - 1013 | L.A. Herald Examiner |
| 701 | 9/27/1985 | Ramirez now charged with 14 murders | FPD - 1014 | L.A. Herald Examiner |
| 702 | 9/28/1985 | 14 murders now charged to Ramirez: Suspected Night Stalker skips big date in court | FPD - 1015 | L.A. Herald Examiner |
| 703 | 9/28/1985 | Ramirez is arraigned amid errie setting in courtroom | FPD - 1016 | L.A. Herald Examiner |
| 704 | 9/29/1985 | Ramirez is arraigned amid eerie setting in courtroom | FPD - 1017 | L.A. Herald Examiner |
| 705 | 9/29/1985 | Guilty plea was sought by ramirez | FPD - 1018 | L.A. Herald Examiner |
| 706 | 10/9/1985 | Ramirez gets a new attorney | FPD - 1019 | L.A. Herald Examiner |
| 707 | 10/10/1985 | Ramirez hires convicted felon as newa ttorney in Stalker case | FPD - 1020 | L.A. Herald Examiner |
| 708 | 10/10/1985 | New attorney for Richard Ramirez was convicted in attack of prostitute | FPD - 1021 | L.A. Herald Examiner |
| 709 | 10/22/1985 | Mother of suspected Night Stalker may attend arraignment | FPD - 1022 | L.A. Herald Examiner |
| 710 | 10/23/1985 | Angry Ramirez demands new lawyers, but judge delays switch | FPD - 1023 | L.A. Herald Examiner |
| 711 | 10/23/1985 | Disorder in the court over lawyers for Ramirez | FPD - 1024 | L.A. Herald Examiner |
| 712 | 10/24/1985 | Ramirez: 'Not guilty, hail Satan' | FPD - 1025 | L.A. Herald Examiner |
| 713 | 10/25/1985 | Night Stalker suspect: 'Hail Satan!' | FPD - 1026 | L.A. Herald Examiner |
| 714 | 10/25/1985 | Night Stalker suspect pleads innocent | FPD - 1027 | L.A. Herald Examiner |
| 715 | 10/25/1985 | Court gesture of satanic significance? | FPD - 1028 | L.A. Herald Examiner |
| 716 | 11/14/1985 | Ramirez lawyer has hisotry of court no-shows | FPD - 1029 | L.A. Herald Examiner |
| 717 | 11/20/1985 | Man arrested in 'Stalker' murder in Santa Monica | FPD - 1030 | L.A. Herald Examiner |
| 718 | 12/3/1985 | 8 more Stalker charges | FPD - 1031 | L.A. Herald Examiner |
| 719 | 12/24/1985 | Stalker's last victim released from hospital | FPD - 1032 | L.A. Herald Examiner |
| 720 | 8/1/1987 | Ramirez to first face trial in LA county in Night Stalker case | FPD - 1033 | L.A. Herald Examiner |
| 721 | 8/21/1987 | Judge orders Night Stalker hearing opened to public, press | FPD - 1034 | L.A. Herald Examiner |
| 722 | 7/5/1987 | Night Stalker' attorneys gain ruling on evidence | FPD - 1035 | L.A. Herald Examiner |
| 723 | 7/22/1987 | Stalker attorney want public barred from hearing | FPD - 1036 | L.A. Herald Examiner |
| 724 | 1/1/1986 | 1985 looking back on a colorful year | FPD - 1037 | L.A. Herald Examiner |
| 725 | 1/1/1986 | Terror: Night Stalker's trail of death finally ends | FPD - 1038 | L.A. Herald Examiner |
| 726 | 1/6/1986 | TV cameras barred from hearings in Night Stalker case | FPD - 1039 | L.A. Herald Examiner |
| 727 | 1/7/1986 | Stalker suspect's court antics force ban on cameras | FPD - 1040 | L.A. Herald Examiner |
| 728 | 1/22/1986 | Stalker suspect Ramirez gives thimb up in court | FPD - 1041 | L.A. Herald Examiner |
| 729 | 1/29/1986 | New judge appointed for Night Stalker hearing | FPD - 1042 | L.A. Herald Examiner |
| 730 | 2/25/1986 | Judge in Stalker case refuses to close pretrial hearing | FPD - 1043 | L.A. Herald Examiner |
| 731 | 2/28/1986 | Court bars lawyers' bid to close hearing for Ramirez | FPD - 1044 | L.A. Herald Examiner |
| 732 | 3/4/1986 | Testimony gets under way at 'Night Stalker' hearing | FPD - 1045 | L.A. Herald Examiner |
| 733 | 3/4/1986 | First victim's son testifies at 'Night Stalker' hearing | FPD - 1046 | L.A. Herald Examiner |
| 734 | 3/5/1985 | Stalker interrogation illegal, defense contends | FPD - 1047 | L.A. Herald Examiner |
| 735 | 3/6/1986 | Stalker victim who lived takes stand at the trial | FPD - 1048 | L.A. Herald Examiner |
| 736 | 3/11/1986 | Ramirez Mellows Out In Court | FPD - 1049 | L.A. Herald Examiner |
| 737 | 3/12/1986 | Stalker survivor points out Ramirez | FPD - 1050 | L.A. Herald Examiner |
| 738 | 3/15/1986 | Ramirez pleads innocent to charges in Orange County | FPD - 1051 | L.A. Herald Examiner |
| 739 | 3/16/1986 | Night Stalker suspect pleads innocent | FPD - 1052 | L.A. Herald Examiner |
| 740 | 3/18/1986 | Witness puts Ramirez at murder scene | FPD - 1053 | L.A. Herald Examiner |
| 741 | 3/19/1986 | Witness backs off on Ramirez identification | FPD - 1054 | L.A. Herald Examiner |
| 742 | 3/20/1986 | Ramirez giggles during gruesome testimony in Night Stalker case | FPD - 1055 | L.A. Herald Examiner |
| 743 | 3/23/1986 | Evidence emerging slowly in Night Stalker case | FPD - 1056 | L.A. Herald Examiner |
| 744 | 2/25/1986 | Daughter of victim in Stalker case IDs jewelry | FPD - 1057 | L.A. Herald Examiner |

Page 7 of 9

Ex. 75, p. 299

Newspaper Article List (up to 9-1-88).xlsx

| TOTAL TALLY | DATE | TITLE & SUMMARY | CURRENT LOCATION | SOURCE |
|---|---|---|---|---|
| 745 | 3/26/1986 | Molested girl removed as witness in Night Stalker case | FPD - 1058 | L.A. Herald Examiner |
| 746 | 3/27/1986 | Night Stalker drew pentagram on thigh of 83-year-old victim | FPD - 1059 | L.A. Herald Examiner |
| 747 | 3/28/1986 | Judge in Night Stalker Case Criticized for Allowing Access to Cell | FPD - 1060 | L.A. Herald Examiner |
| 748 | 3/31/1986 | Night Stalker hearing focuses on pentagrams | FPD - 1061 | L.A. Herald Examiner |
| 749 | 4/1/1986 | Woman testifies Ramirez was her attacker | FPD - 1062 | L.A. Herald Examiner |
| 750 | 4/3/1986 | Witness says Ramirez had cat around neck near victim's house | FPD - 1063 | L.A. Herald Examiner |
| 751 | 4/8/1986 | Ramirez wants to skip rest of Stalker hearing | FPD - 1064 | L.A. Herald Examiner |
| 752 | 4/9/1986 | Rape victim, 63, identifies Ramirez as her attacker | FPD - 1065 | L.A. Herald Examiner |
| 753 | 4/10/1986 | Why Ramirez defense wants to skip preliminary | FPD - 1066 | L.A. Herald Examiner |
| 754 | 4/15/1986 | More victims identify Ramirez as the Stalker | FPD - 1067 | L.A. Herald Examiner |
| 755 | 4/16/1986 | Frail victims recalls Stalker's bloody visit | FPD - 1068 | L.A. Herald Examiner |
| 756 | 4/17/1986 | Man testifies he bought stolen goods from Ramirez | FPD - 1069 | L.A. Herald Examiner |
| 757 | 4/21/1986 | The Killer had a lifestyle - and a deathstyle | FPD - 1070 | L.A. Herald Examiner |
| 758 | 4/24/1986 | Judge lifts publishing ban on names of Stalker victims | FPD - 1071 | L.A. Herald Examiner |
| 759 | 4/28/1986 | The Stalker hearing:  Press undermines eyewitness accounts, lawyers argue | FPD - 1072 | L.A. Herald Examiner |
| 760 | 4/29/1986 | Jewelry from attacks was found in house of Ramirez's sister | FPD - 1073 | L.A. Herald Examiner |
| 761 | 5/1/1986 | Ramirez pummeled by bailiffs, dragged away from courtroom | FPD - 1074 | L.A. Herald Examiner |
| 762 | 5/5/1986 | The DA's treasure of evidence in ramirez case | FPD - 1075 | L.A. Herald Examiner |
| 763 | 5/6/1986 | Prosecution wraps up chain of evidence against Ramirez | FPD - 1076 | L.A. Herald Examiner |
| 764 | 5/7/1986 | Ramirez to face trial | FPD - 1077 | L.A. Herald Examiner |
| 765 | 5/7/1986 | Ramirez must face Stalker trial | FPD - 1078 | L.A. Herald Examiner |
| 766 | 5/8/1986 | Of course I did it,' ramirez quoted in sealed transcript | FPD - 1079 | L.A. Herald Examiner |
| 767 | 5/8/1986 | Ramirez claims he'd kill, take photos, jailer says | FPD - 1080 | L.A. Herald Examiner |
| 768 | 5/9/1986 | Ramirez's grisly discussion with jailer | FPD - 1081 | L.A. Herald Examiner |
| 769 | 5/21/1986 | Five robbery charges dropped in Stalker case | FPD - 1082 | L.A. Herald Examiner |
| 770 | 5/21/1986 | Stalker suspect pleads innocent to 14 murders, 31 other counts | FPD - 1083 | L.A. Herald Examiner |
| 771 | 5/22/1986 | Richard Ramirez pleads innocent to Stalker crime spree | FPD - 1084 | L.A. Herald Examiner |
| 772 | 6/17/1986 | Night Stalker' trial date set | FPD - 1085 | L.A. Herald Examiner |
| 773 | 6/18/1986 | Judge sets Ramirez trial for September | FPD - 1086 | L.A. Herald Examiner |
| 774 | 7/22/1986 | Stalker suspect's attorneys ask for trial outside L.A. | FPD - 1087 | L.A. Herald Examiner |
| 775 | 7/26/1986 | L.A.'s worst serial killers | FPD - 1088 | L.A. Herald Examiner |
| 776 | 8/2/1986 | Defense Granted 3-Month Delay in Night Stalker case | FPD - 1089 | L.A. Herald Examiner |
| 777 | 8/3/1986 | Night Stalker suspect wins delay of trial | FPD - 1090 | L.A. Herald Examiner |
| 778 | 8/10/1986 | Devil worship:  Police confront a modern nightmare | FPD - 1091 | L.A. Herald Examiner |
| 779 | 11/12/1986 | Prosecutor challenges 'Night Stalker' judge | FPD - 1092 | L.A. Herald Examiner |
| 780 | 11/13/1986 | Prosecutor plays 'trump card' to speed 'Night Stalker' case | FPD - 1093 | L.A. Herald Examiner |
| 781 | 11/18/1986 | New judge takes over Night Stalker trial | FPD - 1094 | L.A. Herald Examiner |
| 782 | 11/18/1986 | New Stalker judge sees trial delay | FPD - 1095 | L.A. Herald Examiner |
| 783 | 12/9/1986 | New Night Stalker judge puts off trial for 3 months | FPD - 1096 | L.A. Herald Examiner |
| 784 | 12/12/1986 | Night Stalker case known to most in L.A., poll shows | FPD - 1097 | L.A. Herald Examiner |
| 785 | 12/13/1986 | Night Stalker defense tries for change of venue | FPD - 1098 | L.A. Herald Examiner |
| 786 | 1/22/1987 | Night Stalker crime photos seized from Ramirez's cell | FPD - 1099 | L.A. Herald Examiner |
| 787 | 5/15/1987 | Ramirez scared off inmates with photos of corpses | FPD - 1100 | L.A. Herald Examiner |
| 788 | 6/7/1987 | First Night Stalker trial may take place in Orange County | FPD - 1101 | L.A. Herald Examiner |
| 789 | 6/27/1987 | Ramirez due in court July 14 in Orange County | FPD - 1102 | L.A. Herald Examiner |
| 790 | 3/30/1985 | Piden ayuda publica para aclarar crimen | FPD - 1103 | LA Opinion |
| 791 | 8/7/1985 | Pareja baleada continuaba grave | FPD - 1104 | LA Opinion |
| 792 | 8/10/1985 | Cooperacion publica para localizar a asesino | FPD - 1105 | LA Opinion |
| 793 | 8/11/1985 | Investigan las Policias 'Crimenes de los Valles' | FPD - 1106 | LA Opinion |
| 794 | 8/12/1985 | Violan a senora de edad avanzada | FPD - 1107 | LA Opinion |
| 795 | 8/13/1985 | Advierte el Sdheriff contra el 'Invasor del Valle' | FPD - 1108 | LA Opinion |
| 796 | 8/14/1985 | Ofrecen recompensa por el 'Invasor nocturno' | FPD - 1109 | LA Opinion |
| 797 | 8/19/1985 | Posible ataque del Invasor del Valle en Santa Monica | FPD - 1110 | LA Opinion |
| 798 | 8/21/1985 | En 13 horas, hallan cuatro cadaveres de mujeres posiblemente asesinadas | FPD - 1111 | LA Opinion |
| 799 | 8/23/1985 | Asesinato en S. Francisco, obra del 'Invasor del Valle' dicen | FPD - 1112 | LA Opinion |
| 800 | 8/24/1985 | Piden ayuda para atrapar al "Invasor del Valle" | FPD - 1113 | LA Opinion |
| 801 | 8/27/1985 | Lucha por su vida victima del invasor | FPD - 1114 | LA Opinion |
| 802 | 8/28/1985 | La policia da nuevo retrato hablado del Invasor nocturno | FPD - 1115 | LA Opinion |
| 803 | 8/29/1985 | Estrechan cerco a Invasor Nocturno | FPD - 1116 | LA Opinion |
| 804 | 8/30/1985 | Hallan huellas en auto que se cree uso el Invasor Nocturno | FPD - 1117 | LA Opinion |
| 805 | 8/31/1985 | Identificado el 'Invasor Nocturno' | FPD - 1118 | LA Opinion |
| 806 | 8/31/1985 | Distribucion masiva de informacion de boletines sobre Invasor nocturno | FPD - 1119 | LA Opinion |
| 807 | 8/31/1985 | Identificado el 'Invasor Nocturno' | FPD - 1120 | LA Opinion |
| 808 | 9/1/1985 | Preso el Invasor Nocturno:  Lo deruvieron ciudadanos del este de L.A. | FPD - 1121 | LA Opinion |
| 809 | 9/1/1985 | Nexo satanico en el caso del invasor | FPD - 1122 | LA Opinion |
| 810 | 8/22/1987 | Abruran al publico el juicio de Ramirez | FPD - 1123 | LA Opinion |
| 811 | 9/2/1987 | Muy vigilado el juicio de R. Ramirez | FPD - 1124 | LA Opinion |
| 812 | 9/4/1987 | Joven testigo declara en juicio de R. Ramirez | FPD - 1125 | LA Opinion |
| 813 | 9/11/1987 | Posible victima alega que Richard Ramirez la violo | FPD - 1126 | LA Opinion |
| 814 | 10/1/1987 | Defensor niega credibilidad a testigo que identificado a Ramirez | FPD - 1127 | LA Opinion |
| 815 | 10/15/1987 | Hasta febrero sera el juicio de Ramirez | FPD - 1128 | LA Opinion |
| 816 | 11/14/1987 | Ordenan se juzgue a Ramirez | FPD - 1129 | LA Opinion |
| 817 | 11/22/1987 | Reportan alto costo del lento proceso judicial en contra de Richard Ramirez | FPD - 1130 | LA Opinion |
| 818 | 11/28/1987 | Dicen que returaran various cargos a Ramirez en Orange | FPD - 1131 | LA Opinion |
| 819 | 1/6/1988 | Buscan retraso en costoso juicio de Richard Ramirez | FPD - 1132 | LA Opinion |
| 820 | 1/8/1988 | Rechazan nuevo plazo en juicio de Richard Ramirez | FPD - 1133 | LA Opinion |
| 821 | 1/20/1988 | Se prolongo mas el juicio a Ramirez | FPD - 1134 | LA Opinion |
| 822 | 1/28/1988 | Otra prorroga en juicio de Ramirez, ahora dicen que sera el 22 de marzo | FPD - 1135 | LA Opinion |
| 823 | 1/28/1988 | Pediran a Suprema Corte acelere el costoso juicio de Richard Ramirez | FPD - 1136 | LA Opinion |
| 824 | 2/23/1988 | Abogados defensores quieren eliminar ciertas huellas en el caso de Ramirez | FPD - 1137 | LA Opinion |
| 825 | 2/25/1988 | Abogados de Richard Ramirez dicen estar listos para comenzar a seleccionar jurado | FPD - 1138 | LA Opinion |
| 826 | 3/8/1988 | Pronto iniciaran seleccion de jurado para juicio de Ramirez | FPD - 1139 | LA Opinion |
| 827 | 4/27/1988 | Estabiecen fecha para juicio de Ramirez | FPD - 1140 | LA Opinion |
| 828 | 6/1/1988 | Juez deniega ultima mocion previa al juicio de Ramirez | FPD - 1141 | LA Opinion |
| 829 | 6/23/1988 | Abogados intentan otra accion dilatoria en juicio de Ramirez | FPD - 1142 | LA Opinion |
| 830 | 7/1/1988 | Un magistrado decidira sijuez de R. Ramirez esta prejuiciado | FPD - 1143 | LA Opinion |
| 831 | 7/9/1988 | Deniegan solicitud de retirar al juez en caso de R. Ramirez | FPD - 1144 | LA Opinion |
| 832 | 7/15/1988 | R. Ramirez retira pedido de que se aplace su juicio | FPD - 1145 | LA Opinion |
| 833 | 7/19/1988 | Informan a Ramirez de sus opciones | FPD - 1146 | LA Opinion |
| 834 | 7/22/1988 | Seleccion de jurado de Ramirez sera publica, dice el juez | FPD - 1147 | LA Opinion |
| 835 | 7/27/1988 | Juicio de Ramirez podria tardar dos anos | FPD - 1148 | LA Opinion |
| 836 | 8/3/1988 | Fiscal dice Richard Ramirez ha amenzado con matarlo | FPD - 1149 | LA Opinion |
| 837 | 8/4/1988 | Juez reconsidera medidad de seguridad en juicio de Ramirez | FPD - 1150 | LA Opinion |
| 838 | 9/2/1985 | Por contribuir en la captura del presento Invasor Nocturno | FPD - 1151 | LA Opinion |
| 839 | 9/5/1985 | Entrega el alcalde reconocimientos a los captores del Invasor Nocturno | FPD - 1152 | LA Opinion |
| 840 | 9/5/1985 | Supuestamente degollo a mujer de 79 anos en 1984, informan | FPD - 1153 | LA Opinion |
| 841 | 9/10/1985 | Abogado declara que Richard Ramirez afirma que es inocente | FPD - 1154 | LA Opinion |
| 842 | 9/10/1985 | Desvirtuan rumores sobre el Invasor | FPD - 1155 | LA Opinion |
| 843 | 9/27/1985 | Richard Ramirez debera decir hoy si es culpable o inocente | FPD - 1156 | LA Opinion |
| 844 | 10/2/1985 | Siquiatra debe hacer examen a Richard Ramirez, dice un abogado | FPD - 1157 | LA Opinion |
| 845 | 10/6/1985 | Temen interferencias en el juicio contra Richard Ramirez | FPD - 1158 | LA Opinion |
| 846 | 10/8/1985 | Richard Ramirez declararia el 17 de octubre | FPD - 1159 | LA Opinion |
| 847 | 10/10/1985 | Permiten que otro abogado represente a Richard Ramirez | FPD - 1160 | LA Opinion |
| 848 | 10/11/1985 | Richard Ramirez no cambiara de abogado, afirma defensor | FPD - 1161 | LA Opinion |
| 849 | 9/12/1985 | Dice su abogado | FPD - 1162 | LA Opinion |
| 850 | 10/16/1985 | Abogado Joseph Gallegos afirma representar a Richard Ramirez | FPD - 1163 | LA Opinion |
| 851 | 10/22/1985 | Richard Ramirez declarara hoy su inocencia o culpabilidad a 14 crimenes que e atribuyen | FPD - 1164 | LA Opinion |
| 852 | 10/25/1985 | Ramirez se declara inocente | FPD - 1165 | LA Opinion |

Newspaper Article List (up to 9-1-88).xlsx

| TOTAL TALLY | DATE | TITLE & SUMMARY | CURRENT LOCATION | SOURCE |
|---|---|---|---|---|
| 853 | 10/23/1985 | Magistrada rechaza cambio de abogados pedido por Ramirez | FPD - 1166 | LA Opinion |
| 854 | 11/2/1985 | Posibles cargos en Orange contra Richard Ramirez por su homicidio | FPD - 1167 | LA Opinion |
| 855 | 12/14/1985 | La juez Candance Cooper confirmo ayer la prohibicion de ingresar las camaras de television a su sala judicial | FPD - 1168 | LA Opinion |
| 856 | 12/24/1985 | Posponen hasta enero la audiencia para procesar a Richard Ramirez | FPD - 1169 | LA Opinion |
| 857 | 1/21/1986 | Hoy se reanuda el juicio contra Richard Ramirez | FPD - 1170 | LA Opinion |
| 858 | 1/22/1986 | Entregan a la juez ultimas pruebas contra Richard Ramirez, el supuesto invasor mocturno | FPD - 1171 | LA Opinion |
| 859 | 1/29/1986 | Ordenan cambio de juez presidente para audiencia a Richard Ramirez | FPD - 1172 | LA Opinion |
| 860 | 2/13/1986 | No habra camaras en juicio a Richard Ramirez | FPD - 1173 | LA Opinion |
| 861 | 2/21/1986 | Juez niega mocion de defensores del presunto Invasor Nocturno | FPD - 1174 | LA Opinion |
| 862 | 2/24/1986 | En el caso del Invasor Nocturno: Defensora acusa a agentes del Sheriff de 'inducir' a victimas a identificar a Ramirez como agresor | FPD - 1175 | LA Opinion |
| 863 | 2/25/1986 | Juez niega peticion de los abogados de Ramirez de evitar publico en juicio | FPD - 1176 | LA Opinion |
| 864 | 3/1/1986 | Defensa de Richard Ramirez no desea diligencias publicas en el juicio contra su cliente | FPD - 1177 | LA Opinion |
| 865 | 3/5/1986 | Rechaza juez municipal mociones de los abogados de Richard Ramirez | FPD - 1178 | LA Opinion |
| 866 | 3/6/1986 | Supuesta sobreviente de ataques de 'invasor nocturno', da testimonio | FPD - 1179 | LA Opinion |
| 867 | 3/11/1986 | Juez rechaza supuesta violacion a derechos de Richard Ramirez | FPD - 1180 | LA Opinion |
| 868 | 3/12/1986 | Una mujer identifica y declara en corte contra Richard Ramirez | FPD - 1181 | LA Opinion |
| 869 | 3/12/1986 | Asegura el fiscal Phil Halpin que probara crimen de Richard Ramirez | FPD - 1182 | LA Opinion |
| 870 | 3/17/1986 | Mujer cuyo padre fue asesinado identifica joyas confiscadas a familia de Richard Ramirez | FPD - 1183 | LA Opinion |
| 871 | 3/19/1986 | Declarara hermano de Richard Ramirez | FPD - 1184 | LA Opinion |
| 872 | 3/20/1986 | Sonrisas de Richard Ramirez a su abogado y una admiradora | FPD - 1185 | LA Opinion |
| 873 | 3/21/1986 | Una victima del 'Invasor Nocturno' pidio auxilio por el telefono 911 | FPD - 1186 | LA Opinion |
| 874 | 3/26/1986 | No declaro una nina, supuesta victima del Invasor Nocturno, en su audiencia | FPD - 1187 | LA Opinion |
| 875 | 3/27/1986 | Simbolo satanica hallado en lugares de crimenes del 'Invasor Nocturno,' es relacionado con Richard Ramirez | FPD - 1188 | LA Opinion |
| 876 | 3/28/1986 | Richard Ramirez se carcajea al final de audiencia especial | FPD - 1189 | LA Opinion |
| 877 | 4/1/1986 | Identifica a Richard Ramirez como el sujeto que la violo y sodomizo a punta de pistola | FPD - 1190 | LA Opinion |
| 878 | 4/2/1986 | testigos declararon sobre la muerte de una victima del Invasor Nocturno | FPD - 1191 | LA Opinion |
| 879 | 4/4/1986 | Declaracion de una testigo situa a Richard Ramirez cerca de la casa de una victima del Invasor Nocturno | FPD - 1192 | LA Opinion |
| 880 | 4/8/1986 | Joven de 17 anos declara contra Richard Ramirez | FPD - 1193 | LA Opinion |
| 881 | 4/9/1986 | Sobreviviente de ataque identifica a Ramirez como el Invasor Nocturno | FPD - 1194 | LA Opinion |
| 882 | 4/10/1986 | Pretenden que Ramirez Ramirez no este en corte en la audiencia | FPD - 1195 | LA Opinion |
| 883 | 4/15/1986 | Una mujer senala a Richard Ramirez como el asesino de su esposo y quien la violo | FPD - 1196 | LA Opinion |
| 884 | 4/16/1986 | Septima victima identifica a Richard Ramirez como el Invasor Nocturno | FPD - 1197 | LA Opinion |
| 885 | 5/1/1986 | Richard Ramirez lucho contra 4 alguaciles ayer | FPD - 1198 | LA Opinion |
| 886 | 5/6/1986 | Ex repartidora de diarios senala a Richard Ramirez; que lo vio cerca de donde se cometieron tres asesinatos | FPD - 1199 | LA Opinion |
| 887 | 5/7/1986 | Ordenan el enjuiciamiento de R. Ramirez | FPD - 1200 | LA Opinion |
| 888 | 5/8/1986 | Ramirez supuestamente confeso ser el invasor nocturno, revelan | FPD - 1201 | LA Opinion |
| 889 | 5/9/1986 | Ramirez conto supeastamente, haber matado a 20, revelan | FPD - 1202 | LA Opinion |
| 890 | 5/22/1986 | Solicitaran que se le procese en otro condado | FPD - 1203 | LA Opinion |
| 891 | 6/28/1986 | Fiscal del condado de Orange dice que juicio alli a Richard Ramirez, depende de disposicion de la Suprema Corte estatal sobre pena capital | FPD - 1204 | LA Opinion |
| 892 | 8/2/1986 | Aplazado para diciembre 2 inicio de juicio contra Richard Ramirez | FPD - 1205 | LA Opinion |
| 893 | 11/4/1986 | Richard Ramirez sonrie al ver en TV noticiero sobre crimenes que supuestamente el cometio | FPD - 1206 | LA Opinion |
| 894 | 11/19/1986 | Juez en caso de Richard Ramirez contempla nueva posposicion | FPD - 1207 | LA Opinion |
| 895 | 11/27/1986 | Abogados de Richard Ramirez dicen tener pruebas para trasladar juicio | FPD - 1208 | LA Opinion |
| 896 | 12/30/1986 | Posponen decision sobre cambio de sede al juicio contra Richard Ramirez | FPD - 1209 | LA Opinion |
| 897 | 1/22/1987 | Juez no retiro cargos contra Richard Ramirez | FPD - 1210 | LA Opinion |
| 898 | 5/5/1987 | Defensa de Richard Ramirez discute determinacion de testigos en el caso | FPD - 1211 | LA Opinion |
| 899 | 5/26/1987 | El 30 de septiembre inician juicio a Richard Ramirez | FPD - 1212 | LA Opinion |
| 900 | 6/27/1987 | Batalla para decidir cuando juzgaran a Richard Ramirez | FPD - 1213 | LA Opinion |
| 901 | 7/15/1987 | Nuevo retraso en el juicio a R. Ramirez | FPD - 1214 | LA Opinion |
| 902 | 8/1/1987 | Se acerca el juicio a Ramirez | FPD - 1215 | LA Opinion |
| 903 | 4/2/1986 | Bloody Testimony at Stalker Suspect's Hearing | Tr. Ex D-10 | L.A. Herald Examiner |

Page 9 of 9

# EXHIBIT C

Ex. 75, p. 302

# SAN GABRIEL VALLEY TRIBUNE

NAME OF MEDIA SOURCE: SAN GABRIEL VALLEY TRIBUNE

| DATE OF ARTICLE | NAME OF REPORTER | TITLE OF ARTICLE | EXHIBIT NUMBER |
|---|---|---|---|
| 5/15/85 | ASSOCIATED PRESS | MAN SHOT, WIFE RAPED BY INTRUDER | B-1 |
| 6/30/85 | STAFF RPTR | ARCADIA WOMAN FOUND BEATEN TO DEATH | B-2 |
| 7/2/85 | STAFF RPTR | TEACHER DEATH STUNS PEERS | B-3 |
| 7/9/85 | RICHARD GRAY | POLICE SEEK LINK IN VALLEY DEATHS | B-4 |
| 7/14/85 | ASSOCIATED PRESS | POLICE SAY VALLEY SLAYINGS MAY BE LINKED | B-5 |
| 7/18/85 | LEE GARBER | DETECTIVES PROBE STRING OF VALLEY SLAYINGS | B-6 |
| 8/10/85 | ASSOCIATED PRESS | WITNESSES FOCUS ON ATTACKER'S BAD TEETH | B-7 |
| 8/14/85 | LORAN LEWIS | COUNTY OFFERS $10,000 REWARD FOR MURDERER | B-8 |
| 8/14/85 | LEE GARBER | RAPE NOT TIED TO MURDERS | B-9 |
| 8/15/85 | ASSOCIATED PRESS | RESIDENTS WORRIED BY KILLINGS BUY LOCKS, GUNS | B-10 |
| 8/15/85 | GARY HOPKINS | DIAMOND BAR UNITES TO BATTLE VALLEY INTRUDER | B-11 |

Ex. 75, p. 304

NAME OF MEDIA SOURCE: SAN GABRIEL VALLEY TRIBUNE (CONTINUED)

| DATE OF ARTICLE | NAME OF REPORTER | TITLE OF ARTICLE | EXHIBIT NUMBER |
|---|---|---|---|
| 8/16/85 | TOM WALDEN | IN MONTEREY PARK FORUM | B-12 |
| 8/19/85 | ASSOCIATED PRESS | FEARFUL SGV RESIDENTS FORM GUARDIAN ANGELS | B-13 |
| 8/22/85 | AP | "VALLEY KILLER" SUSPECT IN BAY AREA MURDER | B-14 |
| 8/24/85 | AP | 14 SLAYINGS NOW LINKED TO VALLEY KILLER, SHERIFF SAY | B-15 |
| 8/25/85 | STAFF RPTR | MANHUNT FOR VALLEY KILLER MAY BE HAMPERED BY INFORMATION LEAKS | B-16 |
| 8/26/85 | STEVE TAMAYA | VALLEY KILLER ATTACKS PAIR IN ORANGE COUNTY | B-17 |
| | LEE GARBER | POLICE DOUBT MAN CHASED IN SAN MARINO IS THE KILLER | B-18 |
| 8/16/85 | GARY HOPKINS & JOHN F. THOMPSON | VALLEY GROUPS FORM FOR PROTECTION | B-19 |
| 9/1/85 | RICHARD GRAY | TEMPLE CITY WOMAN SURE SHE SAW KILLER | B-20 |
| 9/17/85 | AP | EYES OF ONE 'KILLER' VICTIM CUT OUT, DOCUMENT SAYS | B-21 |

Ex. 75, p. 305

NAME OF MEDIA SOURCE: SAN GABRIEL VALLEY TRIBUNE (CONTINUED)

| DATE OF ARTICLE | NAME OF REPORTER | TITLE OF ARTICLE | EXHIBIT NUMBER |
|---|---|---|---|
| 9/19/85 | AP | MISHANDLING OF RAMIREZ DEFENSE CHARGED | B-22 |
| 9/ /85 | AP | VALLEY KILLER MAY HAVE LEFT AMMO AT DEPOT | B-23 |
| 9/17/85 | AP | MOLDS MADE OF RICHARD RAMIREZ TEETH | B-24 |
| 9/18/85 | AP | GAG ORDER IMPOSED IN VALLEY KILLER CASE | B-25 |
| 9/19/85 | AP | RAMIREZ TOO ISOLATED, SAYS FAMILY | B-26 |
| 9/22/85 | STEVE BREWER | COMPUTER SPEEDS FINGERPRINT (UNABLE TO CONT.) | B-27 |
| 9/27/85 | AP | RAMIREZ DUE TO ENTER PLEA | B-28 |
| 9/28/85 | RICHARD GRAY | RAMIREZ CHARGED WITH 68 VALLEY KILLER CRIMES | B-29 |
| 9/29/85 | AP | RAMIREZ WANTS TO PLEAD GUILTY, SISTER REPORTS | B-30 |
| 10/2/85 | STAFF RPTR | FUND SET UP TO HELP VALLEY KILLER VICTIM | B-31 |
| 10/7/85 | AP | DEFENSE FIGHT MAY DELAY KILLER CASE | B-32 |
| 10/10/85 | AP | RAMIREZ HAS NEW LAWYER | B-33 |

Ex. 75, p. 306

NAME OF MEDIA SOURCE: SAN GABRIEL VALLEY TRIBUNE (CONTINUED)

| DATE OF ARTICLE | NAME OF REPORTER | TITLE OF ARTICLE | EXHIBIT NUMBER |
|---|---|---|---|
| 10/11/85 | AP | LAWYER SAYS RAMIREZ WANTS NEW COUNSEL | B-34 |
| 10/16/85 | AP | RAMIREZ ATTORNEY TO STAY WITH CASE | B-35 |
| 10/17/85 | AP | CATES, BRADLEY DISAGREE OVER 'KILLER' REWARD | B-36 |
| 10/19/85 | STAFF RPTRE | FRIENDS ASSIST VALLEY KILLER SURVIVOR | B-37 |
| 10/23/85 | AP | RAMIREZ ASKS NEW LAWYERS | B-38 |
| 10/25/85 | AP | RAMIREZ GREETS SATAN, ENTERS INNOCENT PLEADING | B-39 |
| 11/14/85 | AP | RAMIREZ ATTORNEY FACES DISCIPLINARY MOTION | B-40 |
| 11/15/85 | AP | 'KILLER' SUSPECT GAINS DELAY IN COURT CASE | B-41 |
| 12/14/85 | AP | JUDGE APPROVES RAMIREZ EXERCISE | B-42 |
| 7/22/86 | CITY NEWS SERVICE | RAMIREZ LAWYERS ASK DISMISSAL OF CHARGES | B-43 |
| 8/2/86 | ASSOCIATED PRESS | 'NIGHT STALKER' TRIAL DELAYED 3 MONTHS | B-44 |
| 8/10/86 | STAFF RPTR | STEP OUTSIDE AND FIGHT CRIME | B-45 |

Ex. 75, p. 307

NAME OF MEDIA SOURCE: SAN GABRIEL VALLEY TRIBUNE (CONTINUED)

| DATE OF ARTICLE | NAME OF REPORTER | TITLE OF ARTICLE | EXHIBIT NUMBER |
|---|---|---|---|
| 8/12/86 | ROB WAGNER | DIAMOND BAR FAMILY SUES NIGHT STALKER DEFENDANT | B-46 |
| 8/13/86 | STAFF RPTR | BABBLE IN COURT? | B-47 |
| 8/13/86 | CITY NEWS SERVICE | RELATIVES BOOST RAMIREZ SPIRITS | B-48 |
| 8/31/86 | ASSOCIATED PRESS | 'STALKER' SUSPECT'S CAPTORS SPEAK WITH PRIDE ONE YEAR LATER | B-49 |
| 9/3/86 | CITY NEWS SERVICE | NIGHT STALKER DEFENSE DELAYS NEW MOTIONS | B-50 |

------------------------------------------------

Ex. 75, p. 308



**BRIEFLY...** MAY 15 1995

## Man shot, wife raped by intruder

Ex. 75, p. 309



0452



0453



# Police seek link in Valley deaths

Ex. 75, p. 312



Exhibit B-5

A3 Tulare News

Associated Press

SUNDAY, JULY 14, 1985

# Police say Valley slayings may be linked

Ex. 75, p. 313



A2  SAN GABRIEL VALLEY TRIBUNE  ★  THURSDAY, JULY 18, 1985

# Detectives probe string of Valley slayings

0456

Ex. 75, p. 314



# Witnesses focus on attacker's bad teeth

**Associated Press**

A half-dozen killings and dozens of rapes and assaults, possibly perpetrated by a curly-haired man with rotting teeth, has spawned a rash of calls from citizens concerned about the attacks, investigators said Friday.

The hunt for the serial killer, who walks through unlocked doors or windows before dawn to attack his victims while they sleep, has mobilized the investigators since the serial Hillside Strangler case in the late 1970s.

"We are concerned this man is going to make a mistake and get caught," said Los Angeles County sheriff's Sgt. Robert Souza. "We think that he's going to continue until we find him."

Investigators have linked the attacker's DNA to six slayings and dozens of rapes and assaults.

Police said the attacks date back to May, but a serial killings have been linked to a man with discolored teeth. The slayings are among about 25 random assaults that may have been committed this year by one man.

As in the Hillside Strangler case, in which women were kidnapped, raped and killed before their bodies were dumped in Southern California foothill areas, the residents are expressing alarm at the wave of attacks.

In the latest attack, early Thursday, Elyas Abowath, 31, was fatally shot and his 28-year-old wife beaten and raped inside their Diamond Bar home.

The couple's sons, ages 3 years and 3 months, were unharmed.

The attack came two days after a sleeping Diamond Bar couple were shot in the heads by an intruder who slipped through an unlocked door. Christopher Petersen, a construction worker, was killed, and his wife, Virginia, 27, was shot and released from a local hospital. Their 4-year-old daughter was unharmed.

Of the 25 attacks under investigation, the task force has linked six of them. "In all of the half-dozen of the cases involved, there is a man with curly hair, black and

## Suspect



# County offers $10,000 reward for murderer

The county Board of Supervisors Tuesday offered a $10,000 reward for information leading to the arrest and conviction of the man wanted in a series of murders in the San Gabriel and San Fernando valleys.

A motion brought by Supervisor Pete Schabarum was unanimously approved by the board.

The reward was prompted by a series of murders, rapes and beatings police believe could be the work of the same person.

The incidents usually occur when the intruder enters a home through an unlocked door or window, then attacks the occupant.

Because of the nature of the incidents, the murderer has been labeled the "Night Stalker" by authorities.

"It is important that this board do all it can to bring this person ...

... said.

Supervisor Ed Edelman agreed. "We're becoming a fear city and county. Elderly women are afraid to be in their homes at night," he said.

The motion called for the reward in exchange for information that leads to "a determination of the identity, apprehension and conviction" of the assailant.

Police believe 25 incidents, including seven murders, are the work of the killer.

Several of the attacks in the Monterey Park and San Gabriel area have been linked to a man with curly hair and stained teeth.

Information about the incidents should be directed to the county Sheriff's Department.

— LORAN LEWIS

AUG 14 1985

EXHIBIT B-8



AUG 1 4 1985

**Different MO**

# Rape not tied to murders

By LEE GARBER
Staff Writer

The man who raped an elderly woman in her San Gabriel area home early Sunday is not wanted in connection with a string of murders and assaults in the San Gabriel and San Fernando valleys.

Although officers had been investigating a link between the cases, the rapist's method of operation was different in a number of ways from that used by the Valley killer, said sheriff's Sgt. Irene McReynolds.

Sheriff's homicide Detective Frank Salerno said he could not release any details about those differences because that could threaten the murder investigation.

One apparent difference is that Sunday's rapist reportedly wore a mask, which the Valley killer has not yet done, according to officers' reports.

The incidents were similar in that the attack occurred just before dawn, and the assailant entered through an unlocked window.

Sunday's rape occurred at 5:15 a.m. in a house on the 5600 block of Angelus Avenue in an unincorporated area near San Gabriel.

A man entered through a rear window and raped the 84-year-old woman who lived in the residence.

She was subsequently transported to a nearby hospital, treated and released.

Since March, officers have listed about 25 attacks as possibly related. The incidents have occurred in Monrovia, Diamond Bar, Monterey Park, Rosemead, Arcadia, San Gabriel, Glendale, Northridge and Los Angeles.

Six victims were killed after being shot or beaten, or after having their throats cut.

Women were sexually assaulted in several cases.

The assailant, described as a curly-haired man with rotting teeth, has gained entrance to homes through unlocked doors or windows.

The county sheriff's department is coordinating the investigation into the attacks.

Also participating are the Monrovia, San Gabriel, Monterey Park, Arcadia, Glendale and Los Angeles police departments.

EXHIBIT:

B-9

0459

Ex. 75, p. 317

12 SAN GABRIEL VALLEY TRIBUNE THURSDAY, AUGUST 15, 1985

# Residents worried by killings buy locks, guns

## Sales up 75 percent, one gun shop manager says

[illegible]

[illegible] want to protect themselves," said Moore as a young couple [illegible] in to inquire about purchasing a handgun.

Related story, B1

At the Puente Hills East shopping center in Industry, the sporting goods department at the Best retail outlet also is selling firearms at a rapid pace.

"We've been very, very busy," said sales clerk Marta Paredes, who said a special sale on the weapons inadvertently coincided with the consumer rush spurred by the killing of a man in nearby Diamond Bar last week.

[illegible], while firearms retailers [illegible] in the sudden spate of [illegible] sales, a clerk for the Village [illegible] outlet next door to [illegible] Corner Gunsmith [illegible] sales [illegible].

"They'd rather shoot him the [illegible] than [illegible] him out, I suppose," said the clerk who declined [illegible] herself.

[illegible] though the buying pattern reflects police warnings [illegible] the killer's method of choosing residences with unlocked doors and windows and that are poorly lighted.

Indeed, hardware stores throughout the Valley reported brisk sales of sliding door and window lock devices instead of traditional front door locks and dead-bolts.

"I had to place a double order on window locks," said Manuel Ortiz, hardware department manager for Builders Emporium in Montebello. The store also serves Monterey Park, where police believe two people may have been killed by the suspect in separate incidents in May and July.

"Since the killings, we've sold about 50 percent more of the window and sliding door locks," said Ortiz.

Gun store manager Moore said customers are buying weapons ranging in price from $80 to $350. "They're buying rifles and shotguns because there is no 15-day waiting requirement to take them home like there is on handguns," he said.

Moore said most of the recent buyers have cited the nighttime attacks as their reason for purchasing a weapon. He said the store has also sold a limited number of non-lethal electric "stun guns" to people he described as "wanting to protect themselves without having to kill someone."

Deputies are pleased that the killer's spree has motivated residents to increase home security, but they are concerned about the rise in firearm sales.

"We don't encourage people to buy weapons, especially if they don't know how to handle them," said Sgt. John Kellaris, who heads the community relations department at the sheriff's station in Temple City.

A check of local gun clubs and shooting ranges in the Valley was inconclusive as to whether more people are practicing with firearms in response to the series of attacks.

"This is the time of year when people are preparing for the deer-hunting season," said Dave Collier of the San Gabriel Valley Gun Club. "Although our patronage has doubled in recent weeks, it's difficult to say whether there's a relationship to the killer."

Sgt. Kellaris' concerns over citizens arming themselves en masse was shared by Sgt. Don Sachs, who is in charge of community relations at the sheriff's Industry station.

The station serves Diamond Bar, where a 35-year-old man was killed and his wife assaulted last week by the suspect.

## Officials blame ~~7th killing~~ on elusive Valley Intruder

By RICHARD GRAY
Staff Writer

The number of murders linked to the killer stalking the Valley at night was raised to seven after investigators tied the murder last March of a Monterey Park woman to the serial slayings.

Investigators have linked the March 17 murder of Tsai-Lian Yu, 30, to the murders of six others, sheriff's Deputy Robert Stoneman of the sheriff's information bureau said Wednesday.

Detectives linked her murder based on the similarities in all the killings, but to protect the investigation investigators would not reveal what the similarities are, Stoneman said.

The killer pulled Yu out of her car at about 11:45 p.m. in the 500 block of Alhambra Avenue and shot her numerous times, Stoneman said.

Yu's murder is similar to what detectives suspect may have been the first of the serial killings, which also occurred on March 17.

Dayle Okazaki, 34, was fatally shot in her Rosemead apartment and her roommate, Maria Hernandez, 25, was wounded in the [illegible] hand when the assailant accosted her in the apartment's garage.

Investigators have linked Okazaki's murder to the June 2 fatal beating of Mabel Bell, 84, of Monrovia, and the June 28 murder of Patty Elaine Higgins, 32, of Arcadia, whose throat was slashed.

Other slayings linked are the June 2 throat slashing of Mary Cannon, 75, of Arcadia; the shooting of Chainarong Khovananth, 32, at his Sun Valley home; and the Aug. 8 shooting of Elyas Abowath, 35, of Diamond Bar.

Detectives also suspect numerous assaults, beatings and child molestations may have been committed by the same man.

The survivors of these attacks have enabled investigators to describe the killer as a curly-haired man with rotting teeth who enters his victims' homes through unlocked doors or windows.

A growing task force of sheriff's and police detectives is investigating the serial killings and the county board of supervisors Tuesday offered a $10,000 reward for information leading to the killer's arrest and conviction.

P.-10

0460

in monterey
Park forum

Fund — has been set up at the
Grand Avenue branch of Security
Pacific bank in Diamond Bar.

Ledesma also said the neighbor-
hood has been plagued since the
murder by people driving by to
look at the house.

Councilman Paul Horcher
called for the creation of a task
force of local elected officials and
volunteers from Valley commun-
ities while the killer is at large.

Among other projects, the task
force could set up a hotline to
give the public information on the
case, he said.

The MAC will consider his pro-
posal at its next meeting.

## INTRUDER
### From B1
# Diamond Bar unites to battle Valley intruder

**By GARY HOPKINS**
**Staff Writer**

Sheriff's Department officers
met with Diamond Bar residents
Tuesday to calm their fears and
urge them to safeguard them-
selves against the killer who has
been terrorizing the San Fernan-
do and San Gabriel valleys.

The officers attending an emo-
tional Diamond Bar Municipal
Advisory Council meeting told
residents to lock their doors and
windows at night and disclosed
new details about the killer.

Sheriff's Department investiga-
tors have linked the attacker to
seven slayings and up to 18 brutal
assaults since March.

Some 35 local residents filled
the room in the Diamond Bar
public library for the meeting,
which attracted extensive televi-
sion news coverage.

Standing in the glare of televi-
sion camera lights, Capt. Don
Webster of the sheriff's Indu. try
station confirmed investigators
have linked the Aug. 8 murder of
Diamond Bar resident Elyas
Abowath to the series of slayings,
rapes and assaults in other areas.

"Certain behaviors of the sus-
pect link that crime to a series of
crimes by a suspect known as the
Valley Murderer or Valley Intrud-
er," Webster said.

Abowath, 35, was shot to death,
and his wife beaten and sexually
assaulted by an intruder who
entered their Diamond Bar home
in the early hours of Aug. 8.

The couple's two children —
aged 3 years and 2½ months —
were unharmed.

Webster said that, before com-
ing to Tuesday's meeting, he
drove past the Abowath's Pasehull
Lane home to consider again why
the killer might have chosen their
house

"This evening I reached the
same conclusion as I reached
(Aug. 8)," he said. "It was a
random selection. But the com-
mon thread (with the other slay-
ings) was the presence of an open
window or open door."

He said, to his knowledge, none
of the homes where residents
have been murdered or assaulted
by the prowler had been broken
into.

to check that doors and windows
are secured before they go to bed
at night.

He also urged them to join or
form  Neighborhood  Watch
groups.

"That generates an awareness,
a concern, a mutual interest in
the safety of everyone on the
block," he said.

Responding to questions from
the residents, Webster and Capt.
Bill Hinkle of the Sheriff's Infor-
mation Bureau added some pre-
viously undisclosed details to the
physical appearance of the killer.

> **❝** It was a ran-
> dom selection. But
> the    common
> thread (with the
> other slayings) was
> the presence of an
> open window or
> open door. **❞**
>
> —Capt. Don Webster
> Sheriff's Industry station

The man has been described as
between 25 and 30, about 6 feet
tall with dark, curly hair and
discolored teeth.

Victims have also said the man
is either Hispanic or white, Hinkle
said, "although there is nothing
distinctive in his speech that indi-
cates foreign extraction."

The killer also has a "very
unique" body odor, according to
Webster, and has large gaps be-
tween his teeth.

No fingerprints have been found
at any of the homes, he said.

The killer may be using the
freeways to reach the areas
where attacks have occurred
since many of the houses have
been near freeway exits, Webster
said.

The Aug. 8 murder in Diamond
Bar is the first time the killer has
struck east of the 605 freeway, he
added.

## in Monterey Park forum

By TOM WALDMAN
Staff Writer

Sen. Alan Cranston on Thursday discussed crime with residents of Monterey Park, a city where people are fearful of a random killer who has stalked the San Gabriel Valley since March.

The California Democrat fielded questions from residents and listened to the comments and suggestions offered by a panel of community experts.

His appearance was billed as a community forum, one of 30 such events he has held in California this year on a host of topics.

The audience, which jammed Monterey Park City Hall, did not speak publicly to Cranston about the series of seven killings over the last five months that have frightened people in the San Gabriel and San Fernando Valleys.

But in private they acknowledged that the killings are weighing heavily on the community's mind.

Eli Isenberg, a former newspaper publisher in Monterey Park and a resident of the city since 1947, said the large crowd at Thursday's event reflected the fact that people are "scared as hell."

Robert Lavine said the citizens of Monterey Park are as afraid of this killer as they have been of anything else in the 36 years he has lived in the city.

A Monterey Park woman has been identified by investigators as one of the victims of the killer.

Tsai-Lian Yu was pulled from her car in Alhambra last March and shot to death.

Authorities speculate that the murder of a 61-year-old Monterey Park woman during an apparent



Photo / Associated Press

**Sen. Alan Cranston responds to audience question**

burglary of her home last month was committed by the same man who shot Yu.

The worry of residents is being translated into action.

Ruth M. Willner, a member of Monterey Park's Committee on the Future, said an increasing number of residents have joined one of the city's 182 Neighborhood Watch programs.

Lt. Joe Santoro of the Monterey Park Police Department said 20 percent of the city's population of 58,000 now belong to Neighborhood Watch.

Cranston praised the success of Neighborhood Watch in Monterey Park, and he contended that community involvement is one of the most important ways to prevent

crimes of any sort.

"A united community effort to prevent and report crime," said Cranston, "deters criminals from targeting neighborhoods."

Cranston emphasized to the audience that the forums are primarily a way for him to learn the views of constituents.

Accordingly, he did not offer any solutions to the crime problem, but spoke in general terms about the role of government in this area.

"We must reduce crime significantly without reducing our freedoms," he said.

Cranston is scheduled to hold 1 community forums this month i locations throughout the state.

Ex. 75, p. 320



## UARDIAN

# Fearful SGV residents form Guardian Angels

**Associated Press**

Residents fearing another attack by a nighttime killer linked to seven murders and dozens of assaults have formed a Guardian Angels chapter in the San Gabriel Valley.

"People are really spooked," said Jim Sherwood, 25, of Arcadia. "I'm spooked. He's come through an unlocked door or window. People are pretty paranoid."

Sherwood is among more than 40 residents who have formed a Guardian Angels chapter because of the series of attacks in the San Fernando, San Gabriel and Pomona valleys adjoining Los Angeles.

Six of the seven murders occurred in the San Gabriel Valley. Responding to resident pleas, the Hollywood and West Side chapters of the Guardian Angels began patrols in the area July 11.

"People called us in New York asking for me or my wife, Lisa," said Curtis Sliwa, who founded the Guardian Angels in 1979 in New York City as citizen safety patrols. "They were crying. They're in mortal fear for their lives."

The Guardian Angels — volunteers who have formed chapters throughout the country — have been watching out for suspicious individuals in the area three nights a week, with plans to increase patrols to every night after the Valley chapter completes training that normally takes two months.

The volunteers forming the chapter, ranging in age from 16 to 50, began physical training and foot and vehicle patrols after residents attended a Guardian Angels meeting July 22.

Police said they welcome the additional eyes and ears on the street.

"The more eyes out there the better," said Monrovia Police Capt. Gary Gunther.

A wave of approximately violent attacks this year has be

**Please see GUARDIAN / A**

*Valley ...*

## G... ...IAN

**From A1)**

linked to an attacker believed to have curly hair and bad teeth.

In another development Sunday, Santa Monica police dismissed the possibility that the rape and slaying of a woman in her apartment Saturday was linked to the elusive attacker.

"The method of entry was superficially similar," said Santa Monica Police Sgt. Bill Brucker. "But subsequent investigation made it evident that this case is not related to the ones in the San Fernando and San Gabriel valleys."

Investigators said the body of the victim, who was in her 50s, was discovered by paramedics who came to an apartment complex in response to a neighbor's call. The neighbor said she had become concerned when the woman, who lived alone, did not answer her door.

Brucker said other details of the case were still under investigation. The victim's identity is being withheld pending notification of her family.

Ex. 75, p. 321



## BRIEFLY ...

### 'Valley Killer' suspect in Bay Area murder

SAN FRANCISCO (AP) — San Francisco Police Lt. Dennis Schatzel refused to comment on the arrest or discuss the details of the latest murder case.

The "Valley Killer" suspected in a series of grisly murders in the San Gabriel Valley and in greater Los Angeles must be responsible for a recent slaying in the San Francisco Bay area, authorities said.

Los Angeles homicide investigators and Wednesday with San Francisco authorities to discuss similarities between a murder case in San Francisco and the serial killings in the Los Angeles area.

Also known as the "Valley Intruder" or "Walk-in Killer," the man has terrorized the San Gabriel and San Fernando valleys, sneaking into homes through unlocked doors or windows and attacked his victims while they slept.

0464

*Block complains of press coverage*

AUG 2 4 1985

# 14 slayings now linked to Valley Killer, sheriff says

**Associated Press**

A killer who has terrorized cities at both ends of California has now been linked to at least 14 slayings and possibly as many as 20 individual murders, the county sheriff said Friday night.

Sheriff Sherman Block also complained that some media accounts of the probe into the "Valley Killer" also known as the "Night Stalker," have revealed sensitive information about the case.

Speaking at a news conference, Block said investigators have added another six slayings to three attributed to the killer, described as a curly-haired man who raped both his elderly female victims and has raped and beaten many other victims.

Earlier Friday, officials had said a weekend slaying in San Fernando had been added to the tally of seven deaths of the San

Fernando, San Gabriel and Pomona valleys.

We have definitely tied 14 murders to this individual and possibly as many as 20 individual cases in LA County and the case in San Francisco, Block said.

The 14 cases cited by Block included attacks in which no one was killed. The last assault was reported Feb. 8 and the first slaying March 17, the sheriff said.

Reward for the capture of the Valley Killer reached $35,000 Friday as officers cast a dragnet over the entire state.

San Francisco Mayor Dianne Feinstein announced a $10,000 reward for information leading to the arrest and conviction of the man.

The Los Angeles County Board of Supervisors had previously offered a $10,000 reward, which was more than doubled Friday with $10,000 offered by anonymous do-

nors. The city of Arcadia had earlier posted a $5,000 reward.

Los Angeles County Sheriff's deputies searched an unincorporated Glendora area at mid-afternoon Friday when an attempted rape was thought to be the work of the man.

"But after reviewing the information, detectives determined it was not related to the Night Stalker investigation," said sheriff's Sgt. Michael Kenyon.

Feinstein revealed at a news conference that her office has linked the weekend shooting death of Peter Pan, 66, in San Francisco, to the slayings near Los Angeles.

Los Angeles County Sheriff's officers earlier Friday declined to discuss reports they had sent a statewide bulletin to detectives to cruise the Valley Killer left a medical card with dental information at one of the Southern California crime scenes.

*Not related to Valley Killer*

Ex. 75, p. 323



(LA74-Aug.23)--NIGHT STALKER SKETCH--This is a Los Angeles Police Department artist's sketch of a man authorities are seeking in connection with at least 14 similar attacks in the Southern California and San Francisco areas since March. The sketch also includes a detail of the man's teeth which are stained and gapped. This is the latest sketch of the man released by police who are wearing a ball cap. It is the same as the other sketch, but with the hat. (AP laserphoto) (pjh)1545ho/lapd) 1985 SLUG:

## Manhunt for Valley Killer may be hampered by information leaks

**By STEVE TAMAYA**
Staff Writer

Disclosure of sensitive information about the investigation of murders and assaults committed by the so-called "Valley Killer" may hamper the widening manhunt for the suspect, a spokesman for the Los Angeles County Sheriff's Department said Saturday.

Deputy Robert Stoneman of the Sheriff's Information Bureau said media reports of evidence linking at least 14 brutal slayings in the San Gabriel and San Fernando valleys could make it more diffi-

cult for authorities to track down the elusive killer.

"The information that is ng released cause killer) to know," what h he has been doing," Stoneman said.

The Sheriff's Department is coordinating the investigation of the months-long string of

slayings and assaults in the two valleys with local police agencies.

On Friday, Sheriff Sherman R. Block criticized some of those law enforcement agencies, the communications media and others for releasing sensitive information about the case.

That information has included reports detailing some of the common physical evidence found at several of the crime scenes.

One of the evidentiary links was revealed by San Francisco Mayor Dianne Feinstein at a news con-

**Please see KILLER / A7**

EXHIBIT: B-16

Ex. 75, p. 324



AUG 25 1985

**From A1**

...about a murder last weekend ... city which is believed to be the most recent crime ... committed by the Valley Killer.

Feinstein told reporters that ballistics tests clearly linked the San Francisco murder to at least two of the 13 slayings in the San Gabriel and San Fernando valleys.

While Feinstein declined to disclose the caliber of the weapon or other details, Block is discussing the results of the ballistics tests.

Other media reports have revealed to the suspect, that investigators have found messages scrawled on the walls at some of the crime scenes and that copies are believed to be the the killer's serial records have been circulated to 3,000 dentists in the Los Angeles area.

The records were obtained from a dentist whose business card was found in a car that apparently had been used by the killer.

Stoneman, who declined Saturday to comment on the media accounts about such evidence, reported has been "released in error." He said "information has been released that normally would not be released" during criminal investigations.

Asked if the disclosures could ...

... publicity surrounding the case, Stoneman replied only, that has nothing to do with it."

Stoneman said despite the leaks of information, the Sheriff's Department has not ordered local police departments working on the case to refrain from releasing further findings.

"We can't dictate what other agencies do," he said.

The suspect, who enters his victims' homes at night through unlocked doors and windows, is described a curly-haired man in his late 20s or early 30s with gapped and stained teeth.

At least 10 slayings in the San Gabriel Valley, dating back to March, have been linked to the killer.

**A list of dates and victims:**

■ March 17: Dayle Okazaki, 34, was found shot to death in her Rosemead condominium on Vicinda Drive. Her roommate, Maria Hernandez was wounded but survived the attack, which occurred at around 11 p.m.

■ March 17: Tsai-Lian Yu, 35, of Monterey Park, apparently was pulled from her car in the 300 block of Alhambra Avenue and shot repeatedly. Police believe she was shot at 11:45 p.m., nearly ...

... read.

■ March 27: Vincent Zazzara, 64, and his wife, Maxine, 44, were found dead in their home on Strong Avenue near Whittier. The execution was when the murders occurred has not been determined.

■ May 14: William Doi, 66, of Monterey Park, was killed between 8 a.m. and 9 a.m. at his Truelove Street home.

■ June 1: Mabel Cluse Bell, 84, of Monrovia, was found bludgeoned to death at her home on Alta Vista Avenue. Her sister, Florence Lang, 84, was beaten but survived.

■ June 28: Patty Elaine Higgins, 32, of Arcadia, was found dead at her home on Maioni Avenue. Her throat was slashed, and she had been killed between midnight and 2 a.m.

■ July 1: Mary Cannon, 75, of Arcadia, was found dead in her Haven Avenue home. She had been beaten and her throat also was slashed.

■ July 7: Joyce Nelson, 60, of Monterey Park was killed at her Ralph Street home.

■ Aug. 8: Elyas Abowath, 35, of Diamond Bar, was shot to death at his home on Pine Hill Lane. His wife, 28, was raped and assaulted during the at ... attack ...

Ex. 75, p. 325

# Valley Killer attacks pair in Orange County

AUG 2 6 1985

The Los Angeles County Sheriff's Department confirmed Sunday that the shooting of a Mission Viejo man and sexual assault of his girlfriend have been linked to the same man believed responsible for a series of brutal slayings in the San Gabriel and San Fernando valleys.

Dubbed the "Valley Killer" because he has previously committed his crimes in the two valleys except for a recent murder in San Francisco, the assailant has apparently returned to Southern California and struck for the first time in Orange County, authorities said.

"At this point, yes, it is the same guy," said Deputy Sam Jones of the Sheriff's Information Bureau.

Jones declined to reveal what similarities were found between the Mission Viejo attack early Sunday morning and the 33 other violent crimes, including 14 murders, that have been linked to the serial killer, also called the "Night Stalker."

But Jones did confirm that investigators are searching for a specific car in connection with Sunday's attack. He refused to disclose further details about the vehicle.

Orange County sheriff's Capt. Jim Guess declined to comment on the case, except to say that the link between the Mission Viejo assault and the "Night Stalker" crimes was made through "evi-

the "Night Stalker,'" Orange County sheriff's Lt. Richard Olson added.

Sunday's incident was reported by a woman who called at 2:40 a.m. to say her boyfriend had been shot by a man in their Mission Viejo home, Olson said.

The man suffered a bullet wound to the head and the woman was sexually attacked, said Olson.

The shooting victim, William Carns, 29, was in extremely critical condition after surgery at Mission Community Hospital, according to a nursing supervisor. Guess, however, refused to confirm the man's identity. He added that the man was not expected to live.

The woman, also 29, was treated at Saddleback Hospital and released in good condition early Sunday, said nursing supervisor Janet Pitlone.

The "Valley Killer" strikes in suburban homes at night, entering through unlocked windows or an open sliding-glass door. He has been linked to slayings from Southern California to San Francisco.

Survivors of the killer's attacks have described him as having curly black hair and badly stained and gapped teeth.

Detective Frank Salerno of the Los Angeles County Sheriff's Department, which is spearheading the "Night Stalker" investigation, joined Orange County authorities ... some but declined com-

Please see KILLER / A2

## City woman

From A1

...ment on the case.

Until recently, the slayings blamed on the serial killer occurred only in Los Angeles County — from Northridge to Diamond Bar.

But ballistics tests linked him to the Aug. 17 slaying of San Francisco resident Peter Pan, 66, and the attempted killing of his wife, Barbara, 64.

On Friday, Los Angeles County Sheriff Sherman Block said the "Valley Killer" had committed 33 murders, including 14 murders.

In San Francisco, where police appealed to the public for information, more than 500 telephone tips had come in by Saturday night.

"We're getting a call every 10 seconds," said Officer Jack Sirard.

One of the calls came from the Lowell Levine of New York, who

helped identify the remains of Nazi death camp surgeon Dr. Joseph Mengele earlier this year. Levine said the killer's decayed teeth may indicate he is a drug addict.

"If you want to speculate, we tend to see that thing (the missing teeth) in addicts and former addicts," Levine said. "So many dicts," Levine said. "So many missing teeth and cavities."

Levine offered the theory after reading a task force bulletin sent to 3,500 dentists, he said. The bulletin describes a man missing 12 of his 32 teeth.

San Francisco Mayor Dianne Feinstein has added $10,000 to a reward fund for information leading to the capture of the attacker. The total amount stands at $90,000.

The last attack reported in the case was reported Feb. 8 and the first slaying March 17.

— STEVE TANAKA

EXHIBIT [...]
0468

# The Valley

FRIDAY, AUGUST 16, 1985 — SAN GABRIEL VALLEY TRIBUNE

**VICTIMS OF THE VALLEY KILLER**



# Valley groups form for protection

By GARY HOPKINS
and JON F. THOMPSON
Staff Writers

Fear that the prowler responsible for a series of murders, rapes and assaults may strike again in the San Gabriel Valley has prompted a number of efforts to protect local homes and neighborhoods.

The majority of Valley residents interviewed by The Tribune Thursday said they are heeding police warnings to lock their windows and doors at night.

Some of the residents said they are relying on weapons — from pistols to baseball bats — for self-protection.

Prompted by the most recent attacks — the Aug. 8 murder of a Diamond Bar man — an effort is under way to mobilize a force of volunteers from communities.

Of seven murders and from 20 to 30 assaults in the San Gabriel and San Fernando valleys have been linked by investigators to the same prowler who enters homes in the early hours of the morning.

The proposed task force would assist in the investigation of the murders by distributing fliers

In all, seven murders and from 20 to 30 assaults in the San Gabriel and San Fernando valleys have been linked by investigators to the same prowler, who enters homes in the early hours of the morning.

those Valley residents asked to The Tribune what precautions they are taking to protect themselves.

with composite pictures of the killer, said Diamond Bar Municipal Advisory Councilman Paul Horcher.

Volunteers also would operate a hotline giving residents information on how to protect their homes, he said.

Horcher's proposal received a favorable reception from the Walnut City Council Wednesday night.

Horcher said after the meeting that he intends to meet with the representative bodies of as many Valley communities as he can to enlist their support.

West Covina resident Sue Rodriguez's comments were typical of

"We've locked windows we didn't lock before and put a board against a sliding glass door to keep it from being opened," she said. "We also keep two dogs in the house at night."

"We do a security check after the kids are in to make sure all the doors are locked," said Bob Rodriguez of West Covina.

He added that he also keeps a pistol handy in the bedroom.

"I'm going to do just get a gun," said Chris Brown, also of West Covina. "Don't know how to use one a little but — so long as it stands. I'm not going to worry about it.

"I have a lot to ...

bed," said Lavant Brooks of Covina.

San Dimas resident John Norton said his community is relying on its neighborhood watch program for protection.

"I'm not worried about the killer," he said. "If he comes into my neighborhood there's no chance for him. We've got our neighborhood watch together. Our neighborhood is tight."

Capt. Don Webster of the Industry sheriff's station praised the concept of a community task force, saying "any assistance from the citizenry that helps to enhance and increase the awareness of the public can only help.

But Webster said he was concerned about residents arming and taking guns for protection.

The potential for accident in the home is enormous," Webster said.

please see TASK FORCE / A7

EXHIBIT: B-19

0469

Ex. 75, p. 327



From B1

in the h...

Several Valley police departments reported a significant increase in calls from residents reporting suspicious behavior in their neighborhoods.

Normally, the West Covina Police Department receives between four and five calls a day reporting prowlers, Cmdr. Ray Leavitt said.

"Over the last week, that has increased to between 10 and 12," he said.

Covina police have been receiving on average two calls a night from people concerned that suspicious noises near their homes might be the killer, said police Chief John Lentz.

"That shows there is a lot of awareness, a lot of concern in the community," he added.

Baldwin Park Police Chief Dave Snowden said his department has received few calls.

"People are very concerned, but they're confident that law enforcement is doing what it can to stop (the killer)," he said.

Sgt. Kathy Howard, a crime prevention supervisor with the West Covina Police Department, said residents should be alert to anyone they see loitering, sitting in cars, or driving slowly through the neighborhood, who appear to be checking on homes.

Women and elderly people living alone should be especially cautious about closing and locking windows, she said.

"We want people to be alert, but not to get themselves in a state of fear which may cause them to react in fear and forget to call the Police Department," she said.

EXHI 0470 K-17

# Temple City woman sure she saw killer

Christy Sanders is convinced a scary-looking man with "big eyes" who rapped on the kitchen window of her Temple City home late Monday night was the "Valley Killer."

The man rapped on the window at the back of her home at 9:30 and 11 p.m. and again at 1 a.m., she said.

"The guy knocked on the window and I looked up because the knock scared me really bad, and there he was, standing by the window," she said.

"He looked more like the photograph of Richard Ramirez, 25, arrested Saturday in Los Angeles as a suspect in the serial killings which have terrorized the Valley and Southern California, than the composite drawing made from the recollections of survivors, she said.

"He was standing so close I could see his eyes," she said. "All that really stood out was his big, big eyes. His eyes were just outrageous."

The composite drawing depicts large, almond-shaped eyes, badly stained and gapped teeth, curly hair and a thin face.

"His hair was a looser curl. His face was a little fuller," she said. "The guy (Ramirez) looks more like it than anything I've seen drawn. It's (the photograph) really close. I'm pretty sure it's the same one."

The Valley Killer has targeted yellow houses, which worried her because her house also is yellow. And it sits somewhat secluded behind another house.

The Valley Killer is linked to 16 murders and 35 assaults since February from as far north as San Francisco and south to Mission Viejo. He enters homes through unlocked windows and glass doors in the early morning hours and has targeted women and couples.

"This is a maniac," she said. "I feel like a victim mentally. It was horrible."

Sanders called sheriff's deputies that night and they found trampled bushes, evidence that someone had been prowling around her home. And they seemed interested in the rapping at the window.

"That's his style, that's how the officer put it," she said.

"All through the night we heard things," she said. "It wasn't just imagination."

The three rapping episodes worried her so much she had two Guardian Angels stay overnight at her home Tuesday night.

Her temporary protectors were hoping to lure the killer into her home and hold him there until police arrived.

"I felt comfortable," she said. "I could sleep, and that was the first time in a long time."

The night passed uneventfully.

After that, Sanders had friends stay at her home while her boyfriend was working.

She keeps a loaded shotgun within handy reach, and she said at target practice she hit 40 out of 60 clay pigeons.

"I can't sleep without it loaded," she said. "I don't think it should go out of the home, but if someone comes into my home, they're not going to walk out."

— RICHARD GRAY

SEP 4, 1985

Ex. 75, p. 329

# Valley Killer may have left ammo at depot

**Associated Press**

Ammunition similar to that used in the last four Valley Killer attacks was found at a downtown Los Angeles bus station a few hours after the defendant in the serial murder case arrived there, a newspaper reported Friday.

"Distinctive" ammunition for a .25-caliber pistol was found in the Greyhound terminal at Sixth and Los Angeles streets an hour or a few hours after Richard Ramirez was chased and beaten by angry East Los Angeles residents and arrested, the Daily News of Los Angeles reported.

Authorities have said Ramirez, a drifter originally from El Paso, Texas, arrived in the terminal from Arizona less than two hours before his arrest.

Ramirez, 25, has been charged with one of 14 serial slayings attributed to the Killer in the Los Angeles area and named in an arrest warrant for a 15th slaying in San Francisco.

He is being held without bail at Los Angeles County Jail. The lawyer appointed to represent him could not be reached to comment on the report about the ammunition.

The Daily News said the base of the ammunition had a pink tinge, and it was of a type that had not been manufactured for several years. The number of bullets and the area where they were found was not disclosed.

Ammunition with a pink primer was used in several Valley Killer attacks, according to court documents filed last week in Texas as part of a search warrant request for the homes of Ramirez's sister and father.

Officials have said ballistics tests have linked a single .25-caliber semi-automatic to the August slaying in San Francisco, another fatal shooting that month in Diamond Bar, and the shooting of a Northridge couple and a Mission Viejo man who survived.

Authorities are still seeking a small pistol, which they believe Ramirez threw away while being chased in East Los Angeles, sheriff's Lt. Richard Walls said Friday.

In another development, the Pasadena Star-News said it had obtained records filed with the court that indicated authorities are investigating eight child molesting cases they believe may be linked to the Valley Killer.

Investigators earlier had said they were looking into four cases in which young children were kidnapped and molested.

Manuel Barraza, a Texas lawyer retained by Ramirez's family, said Thursday he would advise the family to hire a private attorney because a Los Angeles County deputy public defender is mishandling Ramirez's defense.

Deputy Public Defender Allen Adashek countered that Barraza had generated undue publicity in the case since he flew into town Monday at the request of Ramirez's parents.

"Mr. Barraza, ever since he's been here, has been on every (television) station, in every newspaper talking constantly about the case at the same time I'm expressing a concern over Mr. Ramirez getting a fair trial because of the publicity," Adashek told KNBC-TV Thursday night.

GR..... - 23

Ex. 75, p. 330

# Molds made of Richard Ramirez's teeth

**Associated Press**

Molds of Richard Ramirez's teeth have been made and his teeth x-rayed under an order by a judge allowing investigators with a record of that patient's dental problems.

Halpin said the X-rays taken during the earlier dental treatment when compared with Friday's photographs "will help determine the defendant's whereabouts during that period in question."

In support of the court order, Halpin quoted a 1975 court case that referred to teeth molds which "would be used to compare with the teeth marks on the murder victims' bodies."

Deputy District Attorney Alan Yochelson obtained a court order Friday from Municipal Court Judge Elva Soper for the procedure. The impressions were taken by the staff of a mobile dentistry for the Los Angeles County Coroner's Office, at the Los Angeles County Jail, where Ramirez is held in lieu of $3 million bail.

Ramirez, 26, defense from El Paso, Texas, is charged with one of the 19 slayings attributed to the killer known as the Night Stalker. He is named in a warrant in another killing.

Victims and witnesses who have seen the killer told investigators his teeth are badly stained and rotten teeth.

Authorities have said they believe a dentist in Los Angeles treated Ramirez under...

But Lt. Dick Walls of the Los Angeles County Sheriff's Department...

meets either the victims had better marks. Halpin declined further comment.

Deputy Public Defender Alan Adashek has also obtained two court orders, one to prevent any attorney from visiting Ramirez in jail without the approval of Adashek or his office, and the other barring visitors altogether without Adashek's approval.

The first order apparently stemmed from last week's visit by El Paso lawyer Manuel Barraza, at the request of Ramirez' relatives, who later criticized Adashek's handling of the case.



# Gag order imposed in Valley Killer case

*Associated Press*

A judge imposed a gag order Tuesday on public comment from all officials and witnesses in the Valley Killer case, shutting off information to the news media and public.

All documents in the case were also ordered sealed by the court's Municipal Court Judge Elva Soper after she learned that reporters were reading subpoenaed ...

... for medical records and information about molds taken of Richard Ramirez's poorly spaced teeth.

The order was sought by Deputy Public Defender Allen Adashek, with concurrence by Deputy District Attorney Philip Halpin ...

... District Attorney ... a driver ... charged with one ... Ramirez, a driver ... from El ... slaying attributed to a ... Stalker. He also is known as ... Night Stalker. He is named in a ...

Officials also are barred from discussing the case outside court proceedings.

The teeth molds were made to ... in tracing the move... his distinguishable charac... his arrest, authori... is badly stained and re...

... warrant in another killing ... is saying, eight occurred in the ... San Gabriel Valley.

Victims and witnesses who have ... seen the killer told investigators ... Halpin obtained a court order ... Friday from Soper for the prose... cution. The impressions were taken ... the same day by Dr. Gerald Vale.

... chief of forensic d... Los Angeles County C... fice, at the LA Kaj... Jail, where Ramirez is held in ... solitary custody ...

Also photos ... photographs of the suspect's teeth ... particular pattern, the offic... der said.

Authorities have said the po... have a dental ... of Ramirez's teeth ...

EXHIBIT
0474



"... never," said Valdez.

# Ramirez too isolated, says family

SEP 1 9 1985

**Associated Press**

"Valley Killer" defendant Richard Ramirez is being held "like a prisoner in communist China," deprived of family visits on orders of the attorney defending him in the murder case, his sister says.

Defense attorneys deny that, but in another development, the state attorney general's office says it will head off any effort by the defense to seek lucrative publication contracts to help defray Ramirez's legal expenses.

"We won't let it happen," Duane Peterson, assistant to the attorney general in Sacramento, said Tuesday.

He said the state would invoke the "no-books-for-crooks" law against criminals profiting from stories about their crimes.

An El Paso attorney retained by the family, Manuel Barraza, had said he was trying to contact producers about rights to Ramirez's story.

Ramirez, 25, is accused of killing one of 14 murder victims linked to the Valley Killer in Southern California, and is named in a warrant for investigation of another in San Francisco.

The killer is believed to have attacked at least 21 other people in Southern California during a six-month spree of violence this year.

Also on Wednesday, stalker victim William Carns, 29, was released from Mission Community Hospital, in Mission Viejo and admitted to a rehabilitation center for therapy. He and his girlfriend were attacked Aug. 27 around 2:40 a.m. The woman was beaten and raped in the last attack before Ramirez was arrested Aug. 31.

"My brother is being held like a prisoner in communist China, where you don't have any rights," Ramirez's sister, Rosa Flores, said Tuesday in El Paso, Texas. "Like any other prisoner, he should be able to have his closest relatives visit him."

Deputy Public Defender Allen Adashek, who obtained a court order requiring his permission for people to visit Ramirez, says he never meant to exclude relatives.

Deputy Public Defender Henry Hall said the restriction was designed to protect Ramirez from the general jail population. Hall said, he heard there had been threats against Ramirez or "echoes from jackson: 'Let us at him.'"

Ms. Flores also claimed investigators had seized some of her own jewelry, besides items raided by her brother, when they searched a search warrant at her El Paso home two weeks ago.

She said investigators were wrong in thinking Ramirez would have mailed family parts, as he gouged eyes. At least one of the ...killer's victim had her eyes gouged out, and an official said nothing the ...

0475

Local police to get terminals

# Computer speeds fingerprint mat



By STEVE BREWER,
Associated Press
SAN FRANCISCO — When po-
ently connected Richard,
the terrifying string of
and assaults blamed on
California's "Night Stalker," the
real hero was a computer that
matched a crime-scene finger-
print to Ramirez' files.
Soon, that story could be dupli-
cated in police departments
across the state. Before it ad-
journed last week, the Legislature
approved a bill to provide remote

terminals connected to that cen-
tral computer in Sacramento.
Computer consultant Tom Rug-
gles says the system "gives you
the ability to do something that
heretofore could never be done —
the ability to find a needle in a
haystack."
With the system, the computer
does the matching of tiny data
from fingerprints found at crime
scenes to prints on file. The ma-
chine can do in minutes what
could take a fingerprint analyst
months, even years, to do by

hand.
In the Night Stalker case, the
computer-aided fingerprint
search helped police move quick-
er in linking Ramirez to the case.
Fingerprints taken from the
scene of one of the Night Stalker
incidents were flown to Sacra-
mento to be checked by the new
state Department of Justice com-
puter, made operational especial-
ly for the case, officials said. In
14 minutes, the computer
produced the names of Ramirez
and five others with similar fin-

gerprint patterns.
was at the top of t
Since then, Ra
been charged with
other crimes in t
has been served,
warrant, stemmin
Francisco killing.
In San Francis
have become accu
results from finge
The city police
stalled a system
in Sacramento 19
Please see C

EXHIBIT: E-27

0476

Ex. 75, p. 334



A2  SAN GABRIEL VALLEY TRIBUNE ★ FRIDAY, SEPT. 27, 1985       SEP 27 1985

# Ramirez due to enter plea

**Associated Press**

Richard Ramirez is scheduled to appear in court in Los Angeles today to enter a plea in connection with one of 14 grisly "Valley Killer" slayings, even as authorities planned to bring more charges against him.

Ramirez, 25, was set to enter the plea about 10:30 a.m. before Municipal Court Judge Elva Soper, Deputy Public Defender Allen Adashek said Thursday.

He declined to discuss the plea, citing the judge's gag order which prohibits those involved in the case from commenting on it outside court.

Additional charges against Ra-

mirez were expected to be announced at a 9 a.m. press conference by District Attorney Ira Reiner in the downtown Criminal Courts Building, spokesman Schuyler Sprowles said.

"What we are doing is discussing charges being filed," he said. "We're not going to discuss evidence or details of the investigation" because of the gag order.

Ramirez, a drifter from El Paso, Texas, was arrested Aug. 31 after he was chased down by angry East Los Angeles residents. He is being held without bail in county jail.

A Sept. 3 criminal complaint charged Ramirez with one count

of murder with special circumstances, which would make him eligible for the death penalty if convicted.

The complaint included two other felony counts of burglary and robbery, and one count each of rape, oral copulation and sodomy. Ramirez was arraigned on the charges but did not enter a plea because Adashek requested more time to prepare his case.

Ramirez also has been named in an arrest warrant for a slaying in San Francisco.

Investigators are continuing efforts to link him to _____ of the more than 20 slaying attacks this year.

## Writer sentenced in Beirut

Ex. 75, p. 335

# Ramirez charged with 68 Valley Killer crimes

**By RICHARD GRAY**
Staff Writer

SEP 2 8 1985

Vowing to seek the death penalty, prosecutors charged Valley Killer defendant Richard Ramirez with 14 murders Friday night — eight of them in the San Gabriel Valley and two in Whittier — and with 54 other felonies.

Later in the day, the lanky, stained-tooth Ramirez, 25, was arraigned on the murders as well as 22 sexual assaults and 32 other felonies ranging from burglary to attempted murder.

The total of 68 crimes Ramirez is charged with are attributed to the Valley Killer, also known as the "Night Stalker," a killer who entered homes through unlocked doors and windows in the middle of the night, terrifying the Valley and the rest of the Southland for months.

Ramirez, a native of El Paso, Texas, living in the Los Angeles area, was not in the courtroom for his arraignment.

"Mr. Ramirez is in lockup and the proceedings are being piped into the lockup for his benefit," Los Angeles Municipal Court Judge Elva Soper told reporters packing the courtroom.

Sounds of a man screaming could be heard throughout the brief court session from behind the doors leading to the lockup, and there were sounds of someone banging on cell bars.

Ramirez's public defender and court officials would not say if the shouts and clanking were coming from Ramirez.

Normally, a defendant is removed from the courtroom only if he is disruptive or it is believed his life is in danger.

Deputy Public Defender Allen Adashek repeatedly refused to say why his client was not in court. The judge had previously imposed a strict gag order forbidding attorneys, law officers and court officials from discussing the case with reporters.

Adashek did say there had been a brief meeting in chambers between the judge and lawyers, who decided to postpone the entering of Ramirez's plea until Oct. 17.

During the meeting in chambers, Adashek said he waived Ramirez's right to have the new complaint read to him in court and said the defendant was considered to have been arraigned.

Adashek, who was mobbed by reporters and camera crews outside the courtroom, said he was considering filing a motion to move the case out of Los Angeles. But he said in light of the many new charges, he was uncertain exactly how he would proceed.

"The publicity that goes along with this case is a very big problem," he said.

He also disclosed that the judge

**RAMIREZ / A2**

EXHIBIT   B-29



Ex. 75, p. 337

# Ramirez wants to plead guilty, sister reports

Associated Press

Richard Ramirez, the Texas drifter charged with 14 slayings and 22 sexual assaults in the "Valley Killer" string of attacks, wants to plead guilty but his lawyer won't let him, his sister said in Los Angeles.

"He just said that his life was in danger in there (jail) and that's the plea he wanted to enter," Rosa Flores said Friday in an interview with KCBS television. She was relaying the message for her brother, she said.

"Due to the extensive publicity, he says he cannot receive a fair trial and wants to give himself guilty," Ms. Flores said, adding she traveled from Texas with other family members to be near Ramirez.

She said her brother's attorney was aware of Ramirez's wish, but kept him from appearing in court Friday. Officials couldn't confirm if Ms. Flores had visited her brother, sheriff's spokesman Stave Lee said Saturday.

Municipal Judge Elva Soper has imposed a gag order that forbids attorneys and investigators from discussing the case with reporters.

Ramirez, 25, was arraigned Friday on 68 felony counts based on 20 attacks upon 28 victims in Los Angeles County between June 27, 1984, and Aug. 8, 1985. District Attorney Ira Reiner said. The charges include first-degree murder, one of which is a murder count.

Eight murders were in the San Gabriel Valley and Venita, Whittier.

The defendant also has been named by San Francisco authorities in an arrest warrant for investigation of the Aug. 17 slaying of Peter Pan, 66.

He was arraigned Friday, but was kept out of open court in a holding cell for reasons attorneys refused to discuss.



# Fund set up to help Valley Killer victim

Friends of Valley Killer survivor William Carns of Mission Viejo have established a fund to help pay for expenses as he recovers from three gunshot wounds to his head.

Carns, 29, is paralyzed on his left side and has suffered some brain damage. Physicians are not sure if he will fully recover from the Aug. 25 attack in which he was shot and his fiancee sexually assaulted.

Two of the three bullets remain lodged in his head, one in the back of his neck and the other in the lower right side of the skull.

"His situation is still one of stability with limited progress," said Stoffel, a close friend of Carns who is speaking for the family, said Tuesday.

Carns' fiancee has returned to work and is spending a great deal of time with him at an Orange County rehabilitation center, Stoffel said.

Stoffel said Carns has not yet been told how he was injured or

that authorities have arrested and charged Richard Ramirez, 25, with the Valley Killer slayings and assaults, including eight murders in the San Gabriel Valley and two in Whittier.

Physicians expect his rehabilitation to continue for at least a year, said Stoffel, who established the fund to centralize contributions.

"The money will be used for non-medical expenses relating to Bill's rehabilitation, such as remodeling his home to accommodate the special needs of a patient in rehabilitation and personal travel to and from North Dakota where his family lives," Stoffel said.

Fund contributions are not tax deductible, he said.

Contributions may be made to The Conservatorship of William Carns, Jr., in care of the Law Offices of Lawrence S. Ross, 26521 Paseo de Valencia, Suite 210 B, Laguna Hills, Calif., 92653.

0481

Ex. 75, p. 339



San Gabriel Valley Daily

# TRIBUNE

October 7, 1985
25 cents
VOL. 31, NO. 240

# Defense fight may delay Killer case

EXHIBIT B-32

## Ramirez has new lawyer

**Associated Press**

Richard Ramirez, accused of 14 "Valley Killer" slayings, replaced his public defender Wednesday with a private attorney, after weeks of wrangling over who would represent him.

Municipal Court Judge Elva Soper approved the change, replacing Deputy Public Defender Allen Adashek, in a hastily called five-minute hearing at which Ramirez appeared in handcuffs, leg irons and a blue jail jumpsuit and spoke only two words. He answered "yes" twice when asked if he wanted Joseph Gallegos of Oxnard to represent him and

Please see RAMIREZ / A2

this case... Gallegos had said earlier. "He feels that there definitely is a defense. He is in good spirits. He radiated confidence...

Before being approved for the case, Gallegos had said he would probably plead his client innocent and he was still undecided whether or to seek a change of venue due to extensive publicity.

"Gallegos, 38, had his own troubles with the law. In 1976 he was arrested for investigation of attempted murder, but a judge reduced the conviction to assault with a deadly weapon and granted probation. He served no prison term."

"Yes, that was about 10 years ago," Gallegos confirmed Wednesday. "This is me. This is Mr. Ramirez's trial. It wouldn't comment beyond that."

He said he took Ramirez's case for several reasons.

"I am able to communicate with him in Spanish, as can Mr. Ramirez, especially being of Latin descent, gets a fair trial," he said.

"He wanted someone who would take a personal interest in

He declined further comment.

"There is a gag order in the case," Gallegos said.

Mr. Soper ruled Ramirez would continue to be held without bail. Earlier this week Ramirez's sister complained he was being de...

Ex. 75, p. 341

# Lawyer says Ramirez wants new counsel

**Associated Press**

A Texas attorney says Richard Ramirez, accused of 14 "Valley Killer" killings, wants to change counsel again because the attorney now representing him was convicted of assault with a deadly weapon.

But Joseph Gallegos of Oxnard, who only two days ago replaced a public defender as Ramirez's attorney, said he had talked with the defendant Wednesday and "he assured me he did not want anyone else. He wants me to handle the case exclusively."

Manuel Barraza, an attorney from El Paso, Texas, who says he represents Ramirez's family, said Thursday that Ramirez had read newspaper stories about Gallegos' 1978 conviction for firing a gun at a prostitute and wants to hire a pair of attorneys selected by his sister, Rosa Flores.

Barraza, who is not licensed to practice law in California, said he and Ms. Flores met with Ramirez Wednesday at the Los Angeles County Jail.

He said Ramirez was a little disturbed when told about Gallegos' conviction, "but when he read all about it in the paper, he said he knew this man would not serve his best interest."

OCT 1 1 1985

0484

Ex. 75, p. 342



## Ramirez attorney to stay with case

**Associated Press**

The attorney for "Walk er" defendant Richard Ramirez said Tuesday he will continue to represent the man charged in the serial killings, despite claims that Ramirez wants two San Jose lawyers as counsel.

Joseph Gallegos, who replaced Deputy Public Defender Alan Adashek at Ramirez's request, filed a motion for discovery Tuesday in Municipal Court and said he will represent the 25-year-old drifter at his next hearing on Oct. 22.

But two San Jose attorneys, Arturo and Daniel Hernandez, say that the jailed drifter from El Paso, Texas wants them to represent him.

Ramirez is accused of 68 felony counts stemming from the series of attacks on men and women in their suburban homes from June 1984 to 1985.

**INSIDE THE TRIBUNE**

0485

Ex. 75, p. 343



## Gates, Bradley disagree over 'Killer' reward

**Associated Press** OCT. 1 7 1985

A disagreement between Mayor Tom Bradley and Police Chief Daryl Gates has dimmed prospects of a $25,000 city reward being handed out soon in the "Valley Killer" case.

Seriously worried letter to the Los Angeles Police Commission, Gates recommended the reward be held until after the trial of Richard Ramirez, who is charged with 14 murders in the case.

Police participation in reward discussions now "would be extremely premature and irresponsible from both a legal and professional standpoint," Gates said. However, a spokeswoman for Bradley said the mayor believes the $25,000 should be distributed quickly.

The commission removed from its Tuesday agenda a decision on whether Gates' letter should be forwarded to the City Council as the department's official position.

Other rewards offered in the case — including $9,435 from private contributors, $10,000 from Los Angeles County and $5,000 from the city of Azusa — have been locked in a connection in the Valley Killer case. But the Los Angeles reward ended only for Ramirez.

He pleaded innocent Monday to first-degree murder charges and least 14 counts after he allegedly shot a woman and tried to steal her car. Officials are wary of the rewards have claimed various rewards before the case.

04186



OCT. 1 8 1985

# Friends assist Valley Killer survivor

Volunteers have raised more than $10,000 for Valley Killer survivor Bill Carns of Mission Viejo, and events are planned to raise more money to help pay for his medical and rehabilitation expenses.

"Presently our goal is to raise $40,000 to contribute toward Bill's rehabilitation costs," said "Ron" Stoffel, a friend of Carns who established a conservatorship to coordinate donations.

Children in Dana Point recently held a car wash on the grounds of the Capistrano-by-the-Sea Hospital for Carns, Stoffel said.

A "Bill Carns day" is planned from noon to 5 p.m. today at the Mission Viejo Mall. Appearances by the Rams cheerleaders and others are planned for the event, Stoffel said.

A "Benefit Bowl" football game

is planned for Nov. 9 at Saddleback College. Proceeds will go to the fund, he said.

Carns survived three shots to the head in the Aug. 25 attack at his home. He remains in stable condition at Saddleback Community Rehabilitation Center in Laguna Hills.

His rehabilitation therapy is expected to continue indefinitely, Stoffel said.

Ex. 75, p. 345



OCT. 23 1985

Richard Ramirez is flanked by Daniel Hernandez, left, and Arturo Hernandez

Photo / Associated Press

## Ramirez asks new lawyers

**Associated Press**

Richard Ramirez, the man accused of 14 counts of murder in the "Valley Killer" serial killings, is demanding to be allowed to pick new defense attorneys and is notibly interrupting court proceedings.

Los Angeles Municipal Court Judge Elva Soper rebuked Ramirez on Tuesday for attempting to change defense attorneys for a second time within a few weeks.

Ramirez has been in custody seven weeks, but has yet to enter pleas to charges, largely because of uncertainly over who represents him.

"This court not only has a duty to the defendant," Judge Soper said, "it also has a duty to see that this case is brought to trial in a speedy manner. It cannot be done if at every hearing the defendant requests a new attorney."

Ramirez, 25, bobbing his head

and bouncing on his feet as he stood in shackles, interrupted the proceedings in a loud voice.

"I want these lawyers," an agitated Ramirez told the judge, referring to a pair of San Jose attorneys favored by his relatives.

The defendant was to enter a plea to 68 felony charges, but that was delayed when Judge Soper agreed to meet in chambers with Ramirez, his current attorney, Joseph Gallegos, the San Jose attorneys and Deputy District Attorney Philip Halpin.

The San Jose attorneys, Daniel Hernandez and Arturo Hernandez, are not related.

After a three-hour meeting, the judge told the pair they were not qualified because they lacked experience in complex criminal cases.

She also noted both had been held in contempt of court in Santa Clara County in Northern California and appointed an independent attorney, Victor E. Chavez, to review the Hernandezes' proposed contract with Ramirez.

She said, however, that a defendant does have the right to pick his own counsel and that if Ramirez still wanted the new attorneys, she would consider the matter Thursday when Ramirez is scheduled to enter a plea.

Gallegos took over representation of Ramirez earlier this month. Before that, Ramirez was represented by Deputy Public Defender Alan Adashek.

Ramirez is a native of El Paso, and most of his family still lives there. Members of his family including his sister, Rosa Flores, mother, Mercedes Ramirez, and brothers, Julian and Robert — were in court Tuesday.

"He told us he was not guilty and we believe him," Ms. Flores told reporters.

Ex. 75, p. 346



## Ramirez greets Satan, enters innocent pleading

Defendant Richard Ramirez pleaded innocent Thursday to 43 felonies, including 14 murder counts, and shouted "Hail Satan" as he was led from court.

Ramirez, 25, wearing manacles and leg irons as he entered court, also twice raised his left palm to display a pentagram, a five-point star that some claim is a symbol of the devil. Printed below the pentagram were the numerals "666," the symbol "666" is referred to in the Bible's book of Revelation as the mark of the Antichrist.

"Hail Satan!" yelled Ramirez after entering his pleas at the hearing. The court stenographer confirmed the quote.

Ramirez, a teenager with devil worship and the heavy-metal rock group AC/DC, has been described in court documents and by friends and relatives, including his brother, as a baseball cap with the logo of the rock group, which is known for such songs as "Highway to Hell" and "Night Prowler," was found at the scene of one murder.

Municipal Court Justice Elva Soper scheduled a hearing for Dec. 13.

Ex. 75, p. 347



# Ramirez attorney faces disciplinary motion

SAN JOSE (AP) — One of the attorneys representing "Night Stalker" suspect Richard Ramirez faces a disciplinary motion, it was disclosed Tuesday.

Daniel V. Hernandez, 41, appeared in court Tuesday to defend himself against the latest in a string of disciplinary actions.

However, a Superior Court judge suspended action on the motion until Dec. 6.

The newspaper reported that Deputy District Attorney Rod Braughton sought the action against Hernandez in the case of Ignacio Peña. Braughton said Hernandez asked Peña's then had his client plead guilty to a second-degree murder charge.

which was part of a plea bargain, in the district attorney's office.

In the case, Hernandez was fined $150 by Municipal Court Judge Richard Turrone Nov. 1 for failing to tell court officials he...

0490



## BRIEFLY...

Nov 15 1985

### 'Killer' suspect gains delay in court case

Associated...

Richard Ramirez... ...his... his right Thursday... speedy trial in the 14 Valley Killer slayings but did not get his case delayed as long as his lawyers requested.

Ramirez, a 25-year-old drifter from El Paso, Texas, is charged with 56 felonies stemming from the series of attacks in Califor-

nia from June 1984 through August 1985.

Municipal Court Judge Candace Cooper, who scheduled Ramirez's preliminary hearing for Feb. 24, ordered prosecutors to give the defense access to evidence in the case including some 7,000 clues on which police recorded phone tips from the public in the Valley Killer case.

...new Miss World

Ex. 75, p. 349



Ex. 75, p. 350



# 'Night Stalker' trial delayed 3 months

AUG 2 - 1985

"Night Stalker" defendant Richard Ramirez sat slumped in his chair in a Los Angeles courtroom Friday as his lawyers won their motion to delay to prepare their defense to 14 murder charges and 54 other felonies.

Superior Court Judge Dion G. Morrow postponed the start of the trial from Sept. 2 to Dec. 2, after Ramirez, a native of El Paso, Texas, allegedly carried out a series of slayings, rapes and assaults in the Los Angeles area — that touched a peak last summer.

Defense attorney Arturo Hernandez argued that his research shows multiple-murder cases rarely come to trial sooner than 12 to 18 months after arraignment.

"It is totally absurd to have this limited amount of time to prepare a case of this magnitude," Hernandez said.

The tall, thin Ramirez slumped deep in his chair for much of the hearing, his ankle and wrist shackles clanking occasionally as he turned several times to survey the courtroom audience, smiling tightly as news cameras clicked.

The judge indicated from the start he was sympathetic to the defense attorney's pleas for more time, despite Deputy District Attorney P. Philip Halpin's objections to any lengthy delay.

"Mr. Hernandez, you're beating a horse that doesn't need to be beaten," Morrow said as the attorney tried to elaborate on his argument for delaying a pretrial motion. "If you need time to prepare for trial you will have time."

The judge granted requests to continue two pretrial motions until later. A defense motion to dismiss the charges against Ramirez was scheduled for Sept. 3 and a motion to move the trial out of Los Angeles County was set for Nov. 3.

Morrow denied a motion by Hernandez to bar news photographers from the courtroom.

Hernandez said he, co-counsel Daniel Hernandez and investigators are studying the preliminary hearing transcript of the preliminary hearing at which charges against Ramirez were upheld. The attorneys are not related.



San Gabriel, CA
(Los Angeles Co.)
San Gabriel Valley
Daily Tribune
(Cir. D. 49,250)
(Cir. Sat. 52,603)
(Cir. Sun. 56,104)

AUG 10 1986

## Tuesday is Whittier's 'Night Out'

# Step outside and fight crime

In a departure back to the days of Kool-Aid cooled summer eventing and neighborly concern, Whittier residents are invited to join the nation in a Night Out Tuesday.

"It's designed to bring the people together and do something together for one hour in a crime prevention manner and to let other people know, maybe even crooks, that we are sticking together to fight crime," said Agent Ed Childs of the Whittier Police Department.

This is the third annual National Night Out, but the first one Whittier will take part in.

"We were never formally invited to participate (before)," said Childs.

Night Out is a symbolic show of support from residents against crime. From 8 p.m. to 9 p.m. this Tuesday, families are invited to spend an hour outside in front of their homes, on porches, lawns, front steps, stoops, whatever.

Whittier Police will be informally watching what happens that night but Childs said with the use of the department's new computer system he may be able to determine if crime dropped in that hour.

Stemming from the same concept as Neighborhood Watch, Night Out is a grass roots movement going back to a time when it was common for neighbors to watch out for one other. That concept also happens to be one of the most effective tools for fighting crime today, said Police Chief James Bale.

Neighborhood Watch, at least in Whittier, hasn't been what it could be, said Childs.

During the Night Stalker scare, police hosted up to 30 Neighborhood Watch meetings a month, said Childs.

"As soon as he was arrested, 'zappo,' people weren't concerned anymore," and the number of meetings dropped to two or three a month, he said.

Some 7,000 families are expected to hang out Tuesday night but Childs said he'd like to see more.

"I'd like to see 10,000 households go for it... At least half this city," he said.

"It's understandable that most people don't want to get involved in crime prevention. I would like everyone to always think of crime prevention and be aware that it could happen to them even when there's no current emergency crime problem," he said.

"Don't let your guard down," he urged.

Ex. 75, p. 352



San Gabriel, CA
Los Angeles Co.
San Gabriel Valley
Daily Tribune
(Cir. D. 49,290)
(Cir. Sat. 63,002)
(Cir. Sun. 60,164)

AUG 1 2 1988

# Diamond Bar family sues Night Stalker defendant

**By RON WAGNER**
**Staff Writer**

A Diamond Bar family has filed a wrongful death lawsuit in Pomona Superior Court against accused Night Stalker defendant Richard Ramirez.

Sakina, Aamir and Aadir Abowath are alleging that Ramirez is responsible for the Aug. 8, 1985 shooting death of Elyas Abowath.

The lawsuit seeks $25 million in damages from Ramirez, who is listed as the sole defendant.

Ramirez, a 28-year-old drifter from El Paso, Texas, is charged with 14 counts of murder and 45 other felonies. The killings occurred during burglaries in which victims were shot or beaten. Other victims were raped.

The complaint, filed Aug. 7 by Long Beach attorney George Rei-ly, asserts that Ramirez entered the Abowath home during the early morning hours and shot Elyas Abowath as he slept.

The assailant then attacked, beat and raped the victim's wife, 28-year-old Sakina Abowath, the suit charges.

The children, Aamir and Aadir, were aware of the shooting and subsequent beating of their mother, the complaint claims.

The complaint asserts the wife is suffering mental anguish and suffered a loss of past and future earnings.

The Abowath family went to their native Pakistan shortly after the attack and has since returned to Diamond Bar.

Ramirez is scheduled Dec. 2 for trial in Los Angeles Superior Court.

Ex. 75, p. 353



## Babble in court?

Ex. 75, p. 354



# Relatives boost Ramirez spirits

AUG 3 1 1986

# PRIDE

2nd

From A1

In seemingly random killings and several rapes, robberies and other crimes blamed on a devil-obsessed man the media dubbed the Night Stalker.

"You read about it, you hear about it, but I never thought he'd come here," said Reyna Pinon, whose husband, Faustino, was one of the men credited with catching Ramirez.

"On this block we're all godparents to each other's children," she said of the largely Hispanic East Los Angeles neighborhood. "We keep an eye on each other."

Ramirez, 26, a drifter originally from El Paso, Texas, is charged in Los Angeles County with 14 murders and 31 other felonies, including attempted murder, rape, sodomy and robbery.

He has pleaded innocent to those charges, and to murder and rape charges stemming from an attack in neighboring Orange County. San Francisco had a similar case, but Ramirez is not charged there.

His Los Angeles trial has been delayed until Dec. 2.

On Tuesday, a hearing is scheduled on a defense request for prosecution documents. Among them would be notes taken by officers who have testified that Ramirez admitted guilt after shouting in Spanish, "It's me, it's me," as he was being driven away from the crowd on Hubbard Street.

Testimony at a preliminary hearing gave grisly details of attacks by a man who walked into unlocked homes. One woman's eyes were gouged

out. Another woman was raped as her husband lay dead beside her.

Ramirez fueled speculation about his alleged fascination with the satanic, shouting "Hail Satan" during one court appearance and flashing a palm emblazoned with a star design associated with devil worship.

His arrest came just days after police announced they had fingerprints linking him to the attacks and released his name and photograph to the news media.

Police said that on the day Ramirez was arrested, he had seen his picture on the front page of a paper in a Skid Row liquor store and bolted. Store workers called police while Ramirez made his way by bus and on foot about 3½ miles east to Hubbard Street.

Mrs. Pinon said he first tried to steal her daughter's car, then to take Angie de la Torre's car as she backed out from her driveway.

Jose Burgoin, 55, grabbed the man and Mrs. de la Torre's husband, Manuel, beat him on the head with a metal bar yanked from a fence. A crowd quickly gathered and surrounded Ramirez.

"I didn't know it was him, I just thought it was somebody trying to get the car," Burgoin said. "We take care of each other here."

Pinon, Burgoin and de la Torre are among the dozen or so people who have applied for more than $80,000 in reward money offered by various agencies for help in breaking the Night Stalker case. The funds won't be distributed unless there is a conviction.

# 'Stalker' suspect's captors speak with pride one year later

2896

Associated Press

A year after their relatives and neighbors beat and captured the man accused in the "Night Stalker" serial killings, people on Hubbard Street in East Los Angeles speak with pride of their working-ve neighborhood.

"I feel it's safer now," says Jenny Zamarripa, looking outside at the fence where her neighbors cornered Richard Ramirez last Aug. 31.

Men had dragged Ramirez from a woman's car he allegedly tried to commandeer, beat him on the head with a steel bar and chased him six doors down the street to Mrs. Zamarripa's yard, where police arrested him.

"The way they came out and helped that lady, I never thought they'd do that," Mrs. Zamarripa said of her neighbors Friday. "I guess when you need help, people will come."

Police said the crowd ended a yearlong series of

Please see STATS / A5

0498

Ex. 75, p. 356



San Gabriel, CA
(Los Angeles Co.)
San Gabriel Valley
Daily Tribune
(Cir. D. 46,160)
(Cir. Sat. 49,601)
(Cir. Sun. 61,173)

SEP 3

Allen's P. C. B. Est. 1886

## Night Stalker defense delays new motions

2880

**City News Service**

Attorneys for Night Stalker suspect Richard Ramirez Tuesday temporarily withdrew their request that the charges against their client be dismissed because of alleged constitutional rights violations and insufficient evidence.

Attorney Arturo Hernandez said the defense needs to complete discovery in the case before going ahead with the motion.

The attorneys had just been given a box of discovery items by Deputy District Attorney P. Philip Halpin.

Hernandez said after the hearing that the box contains copies of police reports and detective notes. The dismissal motions and a request that the case be moved to another county will be heard Nov. 3, he said.

Hernandez declined to say specifically what he and his co-counsel, Daniel Hernandez, claim in their request. But he said there wasn't enough evidence presented against Ramirez during the preliminary hearing and his rights had been violated.

He also declined to tell reporters what the attorneys, Ramirez and Superior Court Judge Dion Morrow had discussed during a brief closed session.

Ramirez, who attended Tuesday's hearing, is in good spirits, Hernandez said.

"He seems to feel we have done an adequate job of representing him, and that's given him hope," Hernandez said.

The trial is set for Dec. 2, but the Hernandezes have said they will seek further delay.

Ex. 75, p. 357

# PRESS TELEGRAM

Ex. 75, p. 358

---------------------------------------------------------------

NAME OF MEDIA SOURCE:  PRESS TELEGRAM

| DATE OF ARTICLE | NAME OF REPORTER | TITLE OF ARTICLE | EXHIBIT NUMBER |
|---|---|---|---|
| 8/2/86 | STAFF RPTR | NIGHT STALKER SUSPECT GETS DELAY IN TRIAL | E-1 |
| 8/24/86 | ASSOCIATED PRESS | 'STALKER' CASE VICTIMS SEEK $200 MILLION | E-2 |



## state briefly

### Night Stalker suspect gets delay in trial

"Night Stalker" defendant Richard Ramirez sat slumped in shackles Friday in Los Angeles as his lawyers won a three-month delay to prepare their defense to 14 murder charges and 31 other felonies. Superior Court Judge Dion G. Morrow postponed the start of the trial from Sept. 2 to Dec. 2 for Ramirez, who is accused in a series of slayings and rapes.

0575



## 'Stalker' case victims seek $200 million

**Associated Press**

Two victims of "Night Stalker" attacks are suing defendant Richard Ramirez for $200 million to save any profits he may earn by selling film or book rights to his story.

A 30-year-old Mission Viejo woman filed a $100 million lawsuit Friday, claiming she suffered mentally and physically when raped Aug. 25, 1985.

William Carns, her fiance, filed his own $100 million lawsuit at the same time. Carns, 30, was shot and critically wounded during the assault on his fiancee in the couple's home.

Ramirez, 26, a drifter from El Paso, Texas, has been ordered to stand trial in Los Angeles County on 14 murder charges and 31 other felony counts stemming from the seven-month rampage of kidnapping, rape and murder that terrorized the state a year ago.

In Orange County, Ramirez also is charged with attempted murder, rape, burglary and robbery in connection with the attacks on Carns and his fiancee.

The suits target any media-related profits that Ramirez might obtain from film or book rights to his story, said the couple's attorney, Norah M. Morrison of Fountain Valley.

Carns, still recovering at a Long Beach residential care facility for people with severe head injuries, returns home to his fiancee on weekends. He suffers from short-term memory loss, partial paralysis of his left arm and leg and at least one bullet remains lodged in his head.

Carns' mother, William Carns Sr., and mother, Anne, of Wellington, N.D., say there was no recovery for him.

Ex. 75, p. 361

# NOTICIAS DEL MUNDO

NAME OF MEDIA SOURCE: NOTICIAS DEL MUNDO

| DATE OF ARTICLE | NAME OF REPORTER | TITLE OF ARTICLE | EXHIBIT NUMBER |
|---|---|---|---|
| 3/4/86 | JAIME OLIVARES | RAMIREZ EN AUDENCIA PRE-LIMINAR | F-1 |
| 7/22/86 | UPI | PIDEN RETIRAR CARGOS | F-2 |
| 8/15/86 | STAFF RPTR | COLABORACION CON LA POLICIA | F-3 |
| 9/1/86 | JAIME OLIVARES | EL "INVASOR NOCTURNO" UN AÑO DESPUES | F-4 |
| 9/3/86 | JAIME OLIVARES | ABOGADOS DESEAN TRASLADAR PROCESO DE RICHARD RAMIREZ PARA EL NORTE DE CALIFORNIA | F-5 |

Ex. 75, p. 363

MARCH 4, 1986

25¢

**Noticias** **Mun**

# Ramírez en Audiencia Preliminar

**Por Jaime Olivares**
NOTICIAS DEL MUNDO

Con el testimonio de uno de los hijos de una mujer asesinada en Eagle Rock, el 28 de junio de 1984, se inició ayer la audiencia preliminar del caso Richard Ramírez, quien ha sido acusado

Pasa a página 4A



Richard Ramírez, el presunto "Invasor Nocturno", que compareció ayer ante el juez James Nelson, en el inicio de la audiencia preliminar de su caso. (foto Jaime Olivares).

## EN ESTA EDICION:

Metropolitanas........................................... 1A a 4A
Entretenimientos.......................................... 5A
Clasificados............................................... 6A a XX
Deportes.................................................. 9A a 12A

## EL TIEMPO:

Día despejado con una temperatura máxima de 76 y una mínima de 50 grados Fahrenheit.

EXH          F-1

Ex. 75, p. 364



**Noticias del Mundo**

**Edición Los Angeles**

AÑO 2
NUMERO 42
MARTES 4 de MARZO de 1986

© 1984 News World Communication, Inc.

## Declara Primer Testigo

Viene de página 1A de ese y otros trece homicidios en el área de Los Angeles.

Jack Vincow, que vivía en el mismo edificio de su madre y la visitaba diariamente, declaró que ese día la encontró muerta sobre la cama, con la garganta cercenada y varias puñaladas en el cuerpo.

El testigo, que es el primero presentado por el fiscal Halpin, dijo que llegó al apartamento de su madre, Jennie Vincow, de 79 años, y encontró que faltaba la rejilla de unas de las ventanas y que la puerta estaba sin seguro.

Una vez en el interior, Jack Vincow halló todo en desorden y el cadáver de su madre bajo una colcha.

Pero al ser interrogado por el abogado Daniel Hernández, uno de los defensores de Ramírez, Vincow reveló que su hermano Manny, supuestamente enfermo mental y hospitalizado en varias oportunidades, vivía con su madre en Brooklyn, Nueva York, hasta 1981, cuando ella decidió venirse a Los Angeles después de tener problemas con él.

Vincow se rehusó a someterse a un detector de mentiras, cuando la policía se lo pidió tras recibir información de que un hombre que se le parecía había sido visto en el apartamento horas antes de que se descubriera el cadáver de su madre.

El fiscal Phil Halpin, sin embargo, afirmó que ni Vincow ni su hermano Manny eran considerados sospechosos del homicidio.

La audiencia preliminar, que había sido postergada en varias ocasiones, sufrió una nueva demora ayer cuando los abogados Daniel y Arturo Hernández pidieron al juez James Nelson que se excluyera de las evidencias las declaraciones hechas por Ramírez a la policía inmediatamente después de ser arrestado.

Durante más de tres horas, el juez Nelson escuchó las grabaciones de las mencionadas declaraciones, a puertas cerradas, para decidir si ellas violaban los derechos del acusado.

Según los abogados Hernández, la policía interrogó a Ramírez, en esa oportunidad, sin la presencia de un abogado solicitado por el presunto "Invasor Nocturno".

Por otra parte, los abogados defensores acusaron al fiscal Halpin de violar la orden de reserva de información sobre el caso de Ramírez, por haber dado declaraciones a los periodistas cuando murió un agente policial, experto en explosivos, que supuestamente iba a ser uno de los testigos en el juicio.

Los abogados Hernández pidieron al juez Nelson una audiencia para aclarar las acusaciones contra Halpin.

Pero el juez no indicó si dicha audiencia se realizará hoy, antes de proseguir la audiencia preliminar, o se efectuará más adelante.

Julián Ramírez, hermano del supuesto "Invasor Nocturno" que se encontraba presente en la corte ayer, dijo que era probable que fuera llamado a testificar en los próximos días.

EX... F-1

Ex. 75, p. 365



### Piden Retirar Cargos Contra Richard Ramírez

Los abogados de Richard Ramírez, el supuesto Invasor Nocturno, presentaron ayer mociones para que su próximo juicio se lleve a cabo fuera del condado de Los Ángeles, y para que se desechen los 14 cargos de asesinato y 30 de crímenes mayores que existen contra éste.

Los abogados Daniel y Arturo Hernández opinaron que la excesiva publicidad que se le dio en el área de Los Ángeles, habría preocupado a los posibles miembros del jurado contra Ramírez, lo que pone en peligro su derecho a gozar de un juicio imparcial.

Los abogados señalaron que "existe una razonable posibilidad de que si no se accede a la moción de cambio de sitio para el juicio, el acusado no podría gozar de un juicio imparcial".

Dijeron también que habían pedido que se desecharan los cargos contra el acusado, porque en la audiencia preliminar se le había privado de "significativos" derechos constitucionales, y se había ordenado su juicio sin que existiera una causa probable.

Pasa a página 4A

Los Ángeles, CA
(Los Angeles CA)
Noticias Del Mundo
(Cir. W. 90,000)

JUL 30 1985

### Piden Retirar Cargos

viene de página 1A

Estas mociones serán discutidas en la audiencia previa al juicio, que se celebrará el 10, de agosto. El juicio ha sido señalado para principiar el 2 de septiembre.

Ramírez es el extranjero originario de El Paso, Texas, que permanece bajo custodia sin fianza. Se le acusa también de un asesinato en San Francisco y otro intento de asesinato en el condado de Orange.

De resultar culpable, podría recibir condena de muerte (...).

EXHIBIT  A

Ex. 75, p. 366



Los Angeles, CA.
(Los Angeles Co.)
Noticias Del Mundo
(Cir. W. 30,000)

## Colaboración con la Policía

## Help the Police

Ex. 75, p. 367



# El "Invasor No

Por Jaime Olivares

Angelina De la Torre, que vivía con su esposo y familia en la cuadra 3700 de la calle Hubberd, en el Este de Los Angeles, jamás se imaginó que al salir de compras en la mañana del sábado 31 de agosto de 1985, se encontraría cara a cara con el hombre que la policía había descrito como el "Invasor Nocturno".

Cuando se disponía a partir en su carro, estacionado frente a la casa, un hombre se acercó corriendo y la narró a golpes del auto, con intención de robárselo.

Caída al lado del carro, Angelina reconoció a su atacante como al temido "Invasor Nocturno", cuya foto había visto en la televisión y los periódicos.

Aterrorizada, le entregó las llaves del carro, pero en ese momento su marido, Manuel de la Torre, que había sido advertido por una vecina de que su esposa estaba atacada, acudió en su defensa y luchó con el asaltante para tratar de sacarlo del auto.

José Burgoin, sus dos hijas, y Faustino Piñon, todos vecinos del sector, salieron también a perseguir al delincuente, que trataba de escapar corriendo después de su intento frustrado de robar el carro de la señora De la Torre.

Pero los decididos residentes de la calle Hubbard lograron inmovilizar al sujeto hasta que llegó la policía.

Al ver a los agentes policiales,

el sospechoso les gritó "Soy yo, soy yo, soy el que buscan", identificándose como Richard Ramírez, el hombre más buscado en aquella época, al que se le atribuían por lo menos 16 asesinatos cometidos en los condados de Los Angeles y Orange, y en la ciudad de San Francisco.

Ramírez, nacido en El Paso, Texas, hijo de inmigrantes mexicanos, trataba desesperadamente en el momento de su captura, de huir del lugar, después de ser reconocido por algunos clientes de un mercado cercano, que vieron su foto en los periódicos de esa mañana.

Según el testimonio de los policías que lo llevaron detenido, Ramírez habría confesado una cantidad no especificada de crímenes, y dicho que le gustaba ver morir a sus víctimas.

La secuela de asesinatos y las escalofriantes descripciones de los crímenes que aparecían en los periódicos, habían creado una especie de histeria colectiva, especialmente entre las mujeres que vivían "en casas amarillas y de un piso", que serían supuestamente las más probables víctimas del asesino.

Mientras los vecinos que capturaron al presunto "Invasor Nocturno" eran felicitados y premiados por el condado de Los Angeles, el padre de Ramírez declaraba desde El Paso que no creía que su hijo era culpable de los crímenes que se le atribuían, pero reconocía que había "cambiado mucho" desde que comenzó a juntarse con amigos drogadictos.

EXHIBIT

0582

# cturmo". Un Año Desp

NOTICIAS DEL MUNDO 9-1-86



Richard Ramírez, el presunto "Invasor Nocturno", fue capturado hace un año por vecinos del Este de Los Angeles, mientras trataba de robar un carro. (Foto: UPI)

Uno de esos amigos, entrevistado en el Norte de California, agregó que Ramírez no sólo era un fuerte consumidor de drogas sino que también se había vinculado a ciertos cultos satánicos.

La relación de Ramírez con los cultos satánicos volvió a surgir durante la audiencia preliminar del caso, cuando testigos declararon que en la pierna de una de las víctimas del "Invasor Nocturno" encontraron un pentagrama satánico pintado, el igual que en una de las paredes de la casa en que vivía la mujer.

Casi al mismo tiempo de esa declaración, reporteros que vi-

sitaron la celda en que mantenían a Ramírez durante sus presentaciones en la Corte, descubrieron un pequeño pentagrama satánico dibujado sobre la puerta.

A menos de un mes de la captura de Ramírez, el Procurador del condado de Los Angeles, Ira Reiner, ofreció una conferencia de prensa, el 27 de septiembre de 1985, en la que anunció oficialmente que el supuesto "Invasor Nocturno" sería acusado de cometer 68 crímenes diversos, incluyendo 14 asesinatos, y 17 robos a residencias, y ...

"La evidencia es clara: Una

sola persona cometió todos estos crímenes" -aseguró Reiner.

Careciendo de un abogado privado que lo defendiera, se le asignó un defensor público, Alan Adashek.

Pero algunas semanas más tarde, un abogado de Ventura, Joseph Gallegos, se presentó ante la juez Elva Soper como representante de Ramírez, y pidió que Adashek fuera relevado del caso.

La familia de Ramírez no estuvo de acuerdo, sin embargo, con el nombramiento de Gallegos como abogado defensor, y contrataron a dos abogados de San José, Arturo y Daniel Hernández, que no son parientes entre sí, para que defendieran al presunto "Invasor Nocturno".

Después de una conflictiva sesión, en la que la juez Soper se negó a permitir a los abogados Hernández que tomaran la defensa de Ramírez, se llegó finalmente a un acuerdo y Gallegos se retiró del caso.

El abogado Gallegos murió a comienzos de 1986, de un ataque cardiaco, en Ventura.

Los nuevos defensores de Ramírez pidieron en repetidas oportunidades que la audiencia preliminar fuera pospuesta "para tener tiempo de estudiar los más de diez mil documentos con antecedentes y evidencias sobre el caso".

Entretanto, la juez Soper pidió que se le relevara del caso debido a otros juicios pendientes a su cargo, y las audiencias de Ramírez fueron trasladadas al juez James Nelson.

Cinco testigos reconocieron a Ramírez en la Corte, y dijeron que había sido su atacante o que lo habían visto en las cercanías de las escenas de los crímenes.

Sin embargo, los abogados Hernández adujeron que muchos de los testigos estaban influidos por la enorme publicidad que se dio en los medios informativos al "Invasor Nocturno", antes de la captura de Ramírez, y que por eso podían ...

Ex. 75, p. 369

SEP 3 - 1996



# Abogados Desean Trasladar Proceso de Richard Ramírez para el Norte de California

**Por Jaime Olivares**
NOTICIAS DEL MUNDO

Los abogados de Richard Ramírez anunciaron ayer que el 3 de noviembre presentarán una moción para que el juicio contra el supuesto "Invasor Nocturno" sea trasladado a una ciudad del Norte de California, en el área de la Bahía de San Francisco, aduciendo que la publicidad dada al caso en Los Angeles impide tener un jurado imparcial.

La fecha para el inicio del juicio se ha fijado para el 2 de diciembre, pero los abogados de la defensa han manifestado su intención de pedir que se posterguc.

Entrevistado después de una audiencia ante el juez Dion Morrow, en la que el fiscal Phil Halpin le entregó una caja con nueva evidencia sobre el caso, Arturo Hernández declaró también que postergaría su petición de que algunos de los cargos contra Ramírez fueran retirados, hasta estudiar detenidamente la nueva evidencia.

"En algunos de los cargos que se hacen contra Ramírez, en evidencia de que no hay mucha evidencia concreta, hay mucha especulación, y eso es lo que tenemos que estudiar para presentar una moción para que se retiren esos cargos" -explicó Hernández.

El abogado agregó que le llevaría "semanas" estudiar los reportes y notas policiales que le fueron entregados ayer por el fiscal.

"Es raro que un fiscal no me proporcione la evidencia a tiempo y adecuadamente. Eso nos da lugar a sospechar" -comentó.

Hernández dijo que, dependiendo de lo que encontraran en la nueva evidencia recibida, podrían pedir que uno, varios o la totalidad de los cargos contra Ramírez fueran retirados, pero declinó especificar cuáles.

"Por ejemplo, hay varios casos en los que la policía encontró cabellos cafés o rubios en la escena del crimen, que no son los de mi cliente" indicó.

"Pero no han identificado a quien corresponden, y eso podría ser una muestra o evidencia, es decir que habría la posibilidad de que una tercera persona fuera el autor del crimen."

En caso de que algunos de los cargos se retiren, el fiscal tendría que volver a intentar traer



Richard Ramírez

apoyándolos en evidencia más concreta y directa.

Refiriéndose al posible traslado del juicio al Norte de California, Hernández afirmó que la publicidad negativa que se había hecho en los medios informativos sobre Ramírez "antes y después de su arresto, determina que toda la gente esté en contra de Ramírez".

Como ejemplo de la "histeria colectiva" en torno al caso, el abogado citó el temor general de la población al "Invasor Nocturno", antes del arresto de Ramírez.

"Sobran ejemplos de personas que dormían con pistolas bajo la almohada, o que no se atrevían a salir de noche aunque tuvieran que comprar leche a los niños".

"La publicidad dada al caso en el área de la Bahía de San Francisco, en cambio, ha sido mucho menor porque no es una noticia local, aunque también se acusa a Ramírez de un homicidio allá" terminó diciendo.

Al concluir la audiencia preliminar, el juez decidió que había evidencia suficiente para enjuiciar a Ramírez por 14 homicidios y 31 delitos diferentes, incluyendo violaciones y robos.

Otros 23 cargos fueron retirados por falta de evidencias o porque las víctimas se negaron a declarar en la Corte.

Ex. 75, p. 370



**NOTICIAS DEL MUNDO**
9-1-86

tenían una imagen prejuiciada
sobre el acusado.

"Varios de los testigos dicen
que vieron a Ramírez, pero en
realidad, pudo haber sido otra
persona porque el lugar estaba
oscuro o porque no tuvieron
tiempo de observarlo lo sufi-
ciente como para reconocerlo"
-declaró Arturo Hernández.

"En esas condiciones, una per-
sona que ha visto la foto de Ra-
mírez en la televisión o en los
diarios, y que ha escuchado ha-
blar del "Invasor Nocturno",
puede pensar que esa fue la per-
sona que la asaltó" -agregó.

Los abogados Hernández in-
tentaron infructuosamente que
la audiencia preliminar y el jui-
cio contra Ramírez -que se ini-
ciará este mes- se llevara a cabo
en una ciudad fuera del conda-
do de Los Ángeles.

"La publicidad sobre este caso
ha sido tan grande, que será
muy difícil encontrar un jurado
imparcial" -opinaron.

Al terminar la audiencia preli-
minar, que se prolongó por más
de dos meses, el juez decidió
que había suficientes eviden-
cias como para enjuiciar a Ra-
mírez. Sin embargo, varias de
los cargos que había en su con-
tra, incluyendo algunos de abu-
so sexual contra niños y robos,
fueron retirados por falta de
evidencia.

Mercedes Ramírez, madre del
presunto "Invasor Nocturno".

EXHIBIT  5
0584

Ex. 75, p. 371

# L.A. DAILY JOURNAL



NAME OF MEDIA SOURCE:   L. A. DAILY JOURNAL

| DATE OF ARTICLE | NAME OF REPORTER | TITLE OF ARTICLE | EXHIBIT NUMBER |
|---|---|---|---|
| 7/23/86 | UNITED PRESS INTERNATIONAL | ATTORNEYS FOR RAMIREZ SEEK CHANGE OF VENUE | G-1 |
| 8/4/86 | FROM WIRE REPORTS | RAMIREZ ATTORNEYS WIN DELAY IN COURT HEARINGS | G-2 |

0586



Los Angeles, CA
(Los Angeles Co.)
Los Angeles Daily
Journal
(Cir. D. 20,432)

JUL 23 1985

*illen I J. C.M. 1717844*

## Attorneys for Ramirez Seek Change of Venue

**2980 United Press International**

Attorneys for accused serial murderer Richard Ramirez have asked for a change of venue, claiming publicity about the helplessness of the victims and the viciousness of the crimes has made a fair trial impossible in Los Angeles County.

Defense attorneys Daniel Hernandez and Arturo Hernandez also filed a motion Monday to dismiss 14 counts of murder and 30 other felonies against Richard Ramirez. They argued that massive pretrial publicity in the Los Angeles area has prejudiced potential jurors against Ramirez, 26, jeopardizing his right to a fair trial.

"The very nature of this case aroused public hysteria," the attorneys said. "The victims in this case are particularly sympathetic and this theme runs throughout the publicity.

"Thus, many stories, reiterated the fact that the victims were elderly, weak, bedridden, very young, working class citizens, randomly selected, and that they suffered multiple and severe wounds. Thus, defendant submits the publicity about the victims undoubtedly engendered community sympathy.

"The only logical and fair method to protect the defendant's right to a fair trial is to grant his motion for a change of venue," the attorneys said.

The attorneys also asked that the charges against Ramirez, a self-proclaimed devil worshipper from El Paso, Texas, be dismissed on grounds he was denied "substantial" rights at his preliminary hearing and was ordered to stand trial without probable cause.

Deputy District Attorney P. Philip Halpin said Monday he will oppose both defense motions, which are scheduled to be argued at a pretrial hearing Aug. 1. Ramirez's trial is scheduled to begin Sept. 2.

The charges stem from a series of terrifying night-time assaults in 1984-85 in which a marauder popularly called the "Night Stalker" slipped into darkened homes where sleeping victims were shot, stabbed, raped, and mutilated.

Ramirez is charged with a 15th murder in San Francisco and a related but non-fatal attack in Orange County.

He was ordered to stand trial in Los Angeles County following a nine-week preliminary hearing.

Ramirez remains in custody without bail. If convicted he could be sentenced to death.

Ex. 75, p. 374



Los Angeles, CA
(Los Angeles Co.)
Los Angeles Daily
Journal
(Cir. D. 20,600)

AUG 4 1986

Allen's P.C. B

## Ramirez Attorneys Win Delay in Court Hearings

**2880**   Press Wire Reports

A Los Angeles judge Friday granted a defense request to postpone the Sept. 2 trial of serial murder suspect Richard Ramirez and also agreed to delay defense dismissal and change of venue motions.

Defense attorneys Arturo Hernandez and Daniel Hernandez wanted the trial and pretrial motions — scheduled to be argued Friday — postponed so they could have more time to prepare.

Superior Court Judge Dion Morrow delayed the change of venue motion until Nov. 3 and the dismissal motion until Sept. 2.

The judge said he would also postpone Ramirez's Sept. 2 trial date, but had not yet selected a new trial date.

Ramirez, 26, a self-proclaimed devil worshipper from El Paso, Texas, is charged

with 14 murders in Los Angeles County and 31 other felonies. He is charged with a 15th murder in San Francisco and a non-fatal attack in Orange County.

The defense attorneys said they hope to show Morrow that there is insufficient evidence against Ramirez to require him to stand trial on all counts. They also claimed the charges should be dismissed because his rights were violated following his arrest and during the preliminary hearing.

Ex. 75, p. 375

# POMONA PROGRESS BULLETIN

Ex. 75, p. 376

```
-------------------------------------------------------------
```

NAME OF MEDIA SOURCE:  POMONA PROGRESS BULLETIN

| DATE OF ARTICLE | NAME OF REPORTER | TITLE OF ARTICLE | EXHIBIT NUMBER |
|---|---|---|---|
| 7/22/86 | AP | LAWYERS; DROP STALKER CHARGES | H-1 |
| 8/2/86 | GEORGE GARTIES | 'NIGHT STALKER' TRIAL DELAYED | H-2 |
| 8/9/86 | THOMAS D. ELIAS | SATANISM LINKED TO 800 CRIMES | H-3 |
| 8/13/86 | STAFF RPTR | NIGHT STALKER SUIT FILED | H-4 |
| 8/24/86 | AP | 'NIGHT STALKER' VICTIMS FILE SUIT | H-5 |

```
-------------------------------------------------------------
```

NAME OF MEDIA SOURCE: PALISADIAN POST

| DATE OF ARTICLE | NAME OF REPORTER | TITLE OF ARTICLE | EXHIBIT NUMBER |
|---|---|---|---|
| 7/31/86 | JULIET P. SCHOEN | SKETCHING THE PLAYERS IN COURTROOM DRAMAS | I-1 |

Ex. 75, p. 377



Pomona, CA
(Los Angeles CA)
Progress Bulletin
Cir. D. 40,320
Cir. S. 42,160

JUL 22

### Lawyers: Drop stalker charges

LOS ANGELES (AP) — Attorneys for Richard Ramirez say there is no evidence their client committed 14 "Night Stalker" murders and 31 related and have asked a judge to drop the charges.

Arturo Hernandez and Daniel Hernandez, who are unrelated, also filed Superior Court papers Monday seeking a change of venue for Ramirez' upcoming trial.

A hearing on both requests is scheduled for Aug.

The attorneys allege that Ramirez' constitutional rights were denied when Municipal Court Judge James Nelson allowed statements Ramirez purportedly made to police to be admitted during his preliminary hearing.

They contend Ramirez could not receive a fair trial in Los Angeles County — the site of most of the gruesome attacks that terrorized Californians last year — because of massive publicity.

H-I

0590

Ex. 75, p. 378



# 'Night Stalker' trial delayed

**By GEORGE GARTIES**
**Associated Press Writer**

LOS ANGELES — "Night Stalker" defendant Richard Ramirez sat slumped in shackles Friday as his lawyers won a three-month delay to prepare their defense to 14 murder charges and 31 other felonies.

Superior Court Judge Dion G. Morrow postponed the start of the trial from Sept. 2 to Dec. 2 for Ramirez, a 28-year-old drifter originally from El Paso, Texas.

Ramirez is accused in a series of slayings, rapes and assaults in California homes, some with two forms of devil worship that rocked a quiet summer.

Defense attorney Arturo Hernandez argued that his research-heavy multiple-murder cases rarely come to trial sooner than 11 to 18 months after arraignment.

"It is totally absurd to have this limited amount of time to prepare a case of this magnitude," Hernandez said.

The tall, thin Ramirez slumped deep in his chair for much of the hearing, his ankle and wrist shackles clanking occasionally as he moved.

turned several times; he rarely the courtroom audience, smiling slightly as news cameras clicked.

The judge indicated twice he was sympathetic to the defense attorney's plea for more time. Deputy District Attorney P. Philip Halpin's objection to any lengthy delay.

"Mr. Hernandez, you certainly know that doesn't need to be below," Morrow said as the attorney tried to subbocate on his argument for delaying pretrial motions, "You need time to prepare for trial you will have time."

The judge granted requests to continue two pretrial motions until later. A defense motion to dismiss the charges against Ramirez was scheduled for Sept. 2 and a motion to move the trial out of Los Angeles County was set for Nov. 5.

Morrow denied a motion by Hernandez to bar news photographers from the courtroom.

Hernandez said he, co-counsel Daniel Hernandez and investigators are studying some 1800 pages of transcripts of the preliminary hearing at which charges against Ramirez were upheld.

Ramirez was arrested last Aug. 31, after an angry crowd chased and beat him.

EXHIBIT H-2

0591

Ex. 75, p. 379



12 **PROGRESS BULLETIN** Saturday, August 9, 1986

## Devil worship growing in popularity

# Satanism linked to 800 crimes

**By THOMAS D. ELIAS**
Scripps Howard News Service

SAN FRANCISCO — From small towns like Sanford, Me. and big cities like San Francisco and Los Angeles, a steady stream of crime reports are indicating that satanism — devil worship — is becoming a fast-growing-but-still unmeasurable force in America.

When Richard Ramirez, the accused Night Stalker, raised his right hand in a Los Angeles courtroom, where he was accused of 14 murders and dozens of other felonies, his palm displayed an inked pentagram.

The five-pointed star within a circle positioned with two points up to symbolize the devil's horns was found at several Night Stalker murder scenes, and the wife of one victim testified Ramirez forced her to "swear on Satan" she wouldn't alert neighbors by screaming.

In Maine, a jailed 18-year-old killer of a 13-year-old girl left behind drawings police say combined heavy metal music themes with satanism.

In Huntington Beach, 33 small animals kept in an elementary school yard were slaughtered last May, a crime police say was apparently part of a Satanic ritual.

In Contra Costa County, the battered body of a 17-year-old boy who had graduated from playing "Dungeons and Dragons" to being involved with a Satanic coven was found dead at the bottom of a cliff near San Francisco Bay last year. He had told his father and others he wanted to leave the group.

Police call the death a suicide, but a coroner's report says the body bore marks more like those from a beating with sticks than bruises typically received in a fall.

Scores of reports link child molestations to Satanic rituals, featuring chalices of blood and participants either nude or wearing black hoods.

Altogether, as many as 800 crimes now under investigation by police nationwide are said to be linked somehow to devil worship.

Detectives from seven western states last spring held a closed-door session to plan strategies against satanism.

One tactic they reportedly agreed upon: Deny its involvement in crimes to discourage publicity and copycats.

Consistent with this idea, police and prosecutors are almost invariably hesitant to label devil worship and sacrifice as the motive behind any

crime. No one has been convicted of a crime on the basis of Satanic involvement for more than a decade.

Police usually say satanism exists, but has only peripheral involvement at most in crimes committed by alleged Satanists.

"One hears about cases," says Joseph Krasnycki, a crime analyst for the San Bernardino Police Department. "But when you track them down you find you're mostly chasing shadows. The vandalous nature of these things may not be organized and conspiratorial, but a response to stimuli like rock music."

And some of the leading fighters against satanism say there is a distinct difference between organized Satanists like those belonging to San Francisco's Church of Satan and "freelance Satanists."

"In the formal churches, you get no murders, only symbolic actions," says Karen Hoyt, executive director of the Berkeley-based Spiritual Counterfeits Project. "But freelancers sacrifice animals and reportedly infants, although no one has found a body as yet."

Church of Satan members adamantly deny use of actual animal or human sacrifices, although "The Satanic Bible" written by church founder Anton LaVey spells out rituals calling for "symbolic" human sacrifices.

Covens centered around drugs, homosexuality, sexual fetishes, child molesting and other illicit activities are known to use rituals from the Satanic Bible and a later companion volume. So do groups using Druidism, Celtic witchcraft and Egyptian mythology. Even "children's covens" are known to use such rituals.

Like many fundamentalists, Roger Burt, an evangelical minister and president of the Christian Counseling Association in Los Angeles, believes the current state of satanism is part of a long war between the forces of good and evil.

Games like Dungeons and Dragons, with medieval imagery, help attract children and teenagers to Satanic rituals, which sometimes involve archaic dress.

Rock music groups are even more of an influence, according to many police officials.

Burt lists heavy metal groups like Iron Maiden, Black Sabbath, Motley Crue, Van Halen, Blue Oyster Cult and Merciful Fate among the most influential. All have performed music with a Satanically message that critics contend is taken literally by many listeners.

EXHIBIT 11 2



Pomona, CA.
(Los Angeles Co.)
Progress Bulletin
(Cir. D. 30,240)
(Cir. S. 37,140)

AUG 1 3 1986

## Night Stalker suit filed

As pretrial hearings continue in the Night Stalker multiple murder case, the family of one of the victims has filed a lawsuit against defendant Richard Ramirez seeking $20 million in damages.

The complaint, filed in Pomona Superior Court by attorney George Kelly, alleges that Ramirez entered the Diamond Bar home of Elyas Abowath and shot him as he slept, according to the Associated Press.

The assailant then beat and raped the victim's 28-year-old wife, the suit filed Aug. 7 alleges. The couple's two children were aware of the shooting and subsequent beating of their mother, the complaint claims.

It asserts the wife is suffering mental anguish, plus loss of past and future earnings.

Ramirez, a 26-year-old drifter from El Paso, Texas, is the only defendant named in the civil lawsuit.

EXHIBIT: H-4

Ex. 75, p. 381



Pomona, CA
(Los Angeles Co.)
Progress Bulletin
(Cir. D. 40,349)
(Cir. S. 42,140)

AUG 2 4 1985

# 'Night Stalker' victims file suit

SANTA ANA (AP) — Two victims of "Night Stalker" attacks are suing defendant Richard Ramirez for $800 million to seize any profits he may earn by selling film or book rights to his story.

A 30-year-old Mission Viejo woman filed a $100 million lawsuit Friday, claiming she suffered mentally and physically when she was raped Aug. 25, 1985.

William Carns, her fiance, filed his own $100 million lawsuit at the same time. Carns, 30, was shot and critically wounded during the assault on his fiancee in the couple's home.

Ramirez, 25, a drifter from El Paso, Texas, has been ordered to stand trial Dec. 2, in Los Angeles County on 14 murder charges and 31 other felony counts stemming from the seven-month rampage of kidnapping, rape and murder that terrorized the state a year ago.

In Orange County, Ramirez also is charged with attempted murder, rape, burglary and robbery in connection with the attack on Carns and fiancee.

In the tree-lined neighborhood where Carns and his fiancee were shot, life is just starting to return to normal. Ramirez was captured by angry residents in an East Los Angeles neighborhood and turned over to police last Aug. 31.

"This Night Stalker business has left terror in the lives of so many people," said Jean Dickson, 65, a retired personnel manager who lives on the drive near where Carns and his girlfriend were attacked, 50 miles southeast of Los Angeles.

Dickson installed bolts in her sliding glass doors, locks on an outside gate and extra floodlights around her home during the reign of terror that began in February 1985.

Carns, still recovering at a Long Beach residential care facility for people with severe head injuries, returns home to his fiancee on weekends. He suffers from short-term memory loss, partial paralysis of his left arm and leg and at least one bullet remains lodged in his head.

A family friend said Carns will require surgery to cover a missing skull fragment. His father, William Carns Sr., and mother Anne of Williston, N.D., say their son may never fully recover.

EXHIBIT:   H - 5

Ex. 75, p. 382