**WITNESS CARD**

**Please Print**

LINE UP # _____ 6

YOUR NAME _____ CAROL ANN KYLE _____ DATE _____ 9-5-85

POLICE DEPT. HANDLING YOUR CASE _____ BURBANK

I AM UNABLE TO MAKE AN IDENTIFICATION _____

THE SUSPECT IN MY CASE IS NUMBER _____ 2

REMARKS: _I'm absolutely positive. Even the inflection in his voice is the same, particularly the first time he spoke!_

_Carol Ann Kyle_
SIGNATURE OF WITNESS

76W204 - SH-CR-509 - (REV. 3-81) PS 3-83

---

# SHERIFF'S DEPARTMENT—COUNTY OF LOS ANGELES

## WITNESS CARD

**Please Print**

LINE UP # _____ 6

YOUR NAME _____ Ruthy Moore _____ DATE _____ 9/5/85

POLICE DEPT. HANDLING YOUR CASE _____ San Francisco

I AM UNABLE TO MAKE AN IDENTIFICATION _____

THE SUSPECT IN MY CASE IS NUMBER _____ 2

REMARKS: _____

_____

_____

_____

SIGNATURE OF WITNESS

76W204 - SH-CR-509 - (REV. 3-81) PS 3-83

220006

# SHERIFF'S DEPARTMENT—COUNTY OF LOS ANGELES

## WITNESS CARD

### Please Print

YOUR NAME _FELIPE SOLANO_

LINE UP # _6 - B_

DATE _9- 5 85_

POLICE DEPT. HANDLING YOUR CASE _____

I AM UNABLE TO MAKE AN IDENTIFICATION _____

THE SUSPECT IN MY CASE IS NUMBER _2_

REMARKS: _____

_____

_____

_Felipe Solano_
SIGNATURE OF WITNESS

N204 - SH-CR-509 - (REV. 3-81) PS 3-83





220017

MONTEREY PARK POLICE DEPARTME..
SUPPLEMENTARY REPORT

FILE NO.   85-2050
DATE   03/18/85

187 P.C. - MURDER

ASSIFICATION OF OFFENSE

## PERSONS INVOLVED (ARRESTED OR CONTACTS)                # 80

| | LAST | FIRST | MIDDLE | ADDRESS | LOCAL I.D. # |
|---|---|---|---|---|---|
| L ☑ | YU, | TSAILAN | | 430 S. Chandler Ave., Monterey Park | |
| 2 ☐ | AKA: YU, VERONICA | | | | |
| 3 ☐ | | | | | |
| 4 ☐ | | | | | |

OTHER CASES CLEARED

PROPERTY RECOVERED

ADDITIONAL INFORMATION

3/18/85 - 0230 Hrs.

WITNESS: CALDERON, JORGE GALLEGOS

   Telephones:  Home - (213) 927-3986   Work - (213) 937-4633 - 921-0051
   Business Address:  Tuftex Carpet Mills, 15305 Valley View
                      Santa Fe Springs

I contacted Witness Calderon at the Monterey Park P.D.  He related the following
to me.  He said that at about 2342 hours on 3/17/85, he was at his girlfriend's
house at 524 N. Alhambra Avenue.  He was with his girlfriend in his cousin's white
Ford pickup truck.  He told me that he was parked on Alhambra Avenue along the west
curbline facing south.  He said that he was parked about thirty feet ahead of the
victim's yellow car.

Calderon said that while he was talking to his girlfriend, he heard what sounded like
a crying child or a scream.  He said that he paid little attention.  About five
seconds after the first cry, he heard another scream.  Both of those sounds came from
the rear of his vehicle from the direction of the victim's car.

Calderon said that suddenly a car passed him from the rear with its headlights
turned off.  He said that he saw the person driving the car only from the rear.  He
could not be sure if the driver was Oriental or Latin.  He described him only as
having dark hair.  He told me that he looked at the vehicle and the license plate
and he memorized the license plate.  He told officers at the scene that the plate
was 521MCD.  He told me that initially he thought that maybe a child was being ab-
ducted against its will.

510293

| FOUNDED ☐ | UNFOUNDED ☐ | CLEARED ☐ | ACTIVE ☐ | INACTIVE ☐ |
|---|---|---|---|---|

CFCR _D.F. Corrigan_, Detective   I.D. # 192   APPROVED BY _____, J.F. Burks, Lieutenant   DATE 3/18/85

26

Ex. 87, p. 2804

187 P.C. - MURDER                    PAGE 2                    FILE 85-2050

He said that he exited the truck and he ran to the rear of his truck and he saw the victim on the ground ahead of her vehicle. She was squatted down on her haunches with her right leg extended forward and she was dragging herself backwards along the street. Calderon said that he heard she say, "Help me," and then she doubled over and she fell onto her side. He said that her fists were clenched and her tongue was protruding out of her mouth and her arms were rigid. He said that he thought that she was having a seizure of some sort.

Calderon said that as he was going to the victim's aid, and he did not see which way the suspect vehicle went, as it approached Emerson Avenue. Calderon described the vehicle as a 1978-1979 Plymouth Arrow or a similar type vehicle. He said that it was blue in color with a hatchback squared off rear end.

Calderon told me that the victim he saw had one shoe off. He did not know where the other shoe was. I conducted the interview with Calderon in Spanish.

I took photographs of the crime scene and then I went to the Garfield Hospital, and I took photographs of the victim.

_____
J.F. Burks, Lieutenant                         D.F. Corrigan, Detective

510294

27

Ex. 87, p. 2805

#47 (13)

## COUNTY OF LOS ANGELES – SHERIFF'S DEPARTMENT – SUPPLEMENTARY REPORT

DATE **APRIL 15, 1985**                    FILE NO. **085-04423-0533-011**

C. **MURDER, 187 P.C./ATTEMPT**
   **MURDER, 664/187 P.C.**            Action Taken **ACTIVE/INVESTIGATION MADE/**
                                            **EVIDENCE HELD/CC #85-3822**
                                            **ISSUED.**

V. #1: OKAZAKI, DAYLE, FO/34 (DECEASED)

V#2: HERNANDEZ, MARIA, FM/20 (INJURED)

S. **UNKNOWN**

EVIDENCE HELD:

Item #1 - baseball type cap, dark blue in color, with letters
AC/DC on the front and a lightning bolt separating
the "AC" from the "DC", adult size adjustable, NFD,
found inside garage on the floor behind Victim
Okazaki's car at location (Receipt #G-050517
issued);



Item #2 - Bullet, expended, contained in coroner's envelope,
retrieved by Dr. Wegner at autopsy of Victim Okazaki
(Receipt #D-90868 issued);

Item #3 - Bullet, expended, fragments, contained in 2 plastic
vials, retrieved by staff physician at Beverly
Hospital from the hand of Victim Maria Hernandez
(Receipt #G-050518 issued);



**********************************************************************

On Sunday, 3/17/85 at 2345 hours, Investigators were assigned
to investigate the circumstances surrounding the death of Victim
#1, Dayle Okazaki, FO/34, and the injuring of Victim #2, Maria
Hernandez.

Upon Investigators' arrival at 0020 hours, 3/18/85 (Monday), we
contacted Deputies Dalbis, #015139, and Powell, #195877, of
Temple Patrol, Unit #53V, who related that at 2254 hours, they
had received a radio call of a gunshot victim at the location,
and that upon their arrival they had discovered the body of
Victim Okazaki and had made contact with Victim #2, Maria
Hernandez. They further related that, according to Victim
Hernandez, a lone male had entered the location, a condominium,
via the garage as she was attempting to gain entry into the
living area after having arrived home for the evening. She
further related that the lone gunman shot her first, then
entered the condominium and shot her roommate. A complete and
detailed report covering the actions of these deputies will be

Ex. 88, p. 2806

(14)

APRIL 15, 1985            PAGE 2              085-04423-0533-011

obtained and made a permanent part of this file.

Investigators found the location, 8510 E. Village Lane, Rosemead,
to be a two-bedroom condominium with attached garage.  It is a
single unit that is attached to five other units in the same
building.  It is the last apartment on the west end of the
building, with the remaining apartments extending to the east.
The front door to the apartment faces north, and the garage
door, which is electronically operated, faces south.  There is
an alleyway that runs east to west at the rear of the location
which allows entry into the garages and Village Lane, which is
in the front, and is an east-to-west street that allows access
to the rest of the condominium complex.  The entire complex is
located at the intersection of Walnut Grove Avenue and San
Gabriel Boulevard in the city of Rosemead.

Investigators noted that there were what appeared to be blood
droplets that led from the interior of the garage at the location
and went east through the alleyway to the end of the building.
The droplets then continued in a northern direction towards the
front of the building, and then west, when they reached the
roadway of Village Lane.  This same trail of what appears to be
blood continued west on the road for approximately 145 feet, at
which point it goes south up a staired walkway and east on the
sidewalk that runs east to west, directly in front of the
apartments.  The blood continues east for approximately 28 feet,
which is directly in front of the doorway to 8510 Village Lane
(location).  The blood trail then enters via the front door into
the apartment and eventually up to the bedroom that is later
identified as that belonging to Maria Hernandez.

Prior to entering the apartment, Investigators noted that there
were four vehicles parked on the south side of Village Lane
facing west, directly in front of the building.

Upon entering the apartment via the front door, one enters into
the front room.  Just to the east is the dining area, and north
of the dining area is the kitchen with the two being divided by
a bar type kitchen counter.  On the east side of the dining area
are some steps that lead down to a door that opens into the
attached garage at the south end of the apartment.

If one were once again standing in the front doorway facing
south, one could see the stairs at the south end of the living
room that lead up to the upstairs bathrooms and bedrooms.

It was later learned by Investigators that the southeast bedroom
was being used by William Hernandez, and the southwest bedroom
was being used by Victim Okazaki.



APRIL 15, 1985          PAGE 3          085-04423-0533-011

While inside the location, Investigators noted that the body of Victim Okazaki was lying on the kitchen floor in a supine position, with her head pointed east and her feet pointed west. She was dressed in white jogging type shoes, blue Levi trousers, and a blue-and-white "Dodger" pullover shirt. There was a large pool of blood beneath her head, and she appeared to have a single gunshot wound to the front of her forehead, just to the right of midline.

Investigators observed a small flower vase on the kitchen floor just south of the pool of blood that surrounded the victim's head. Also lying on the floor just south of the victim's body, between her and the kitchen counter that separates the kitchen from the dining room, was a small brown paper sack that contained trash.

In the dining room, Investigators observed a glass top dining table that had four yellow chairs that were part of the dining set. The chair on the west side of this rectangular table was upside down with its four legs in the air. There also appeared to be blood droplets on the back and bottom side of the chair.

Continuing south from the dining room, Investigators noted that the blood droplets trailed into the bathroom which is located just north of Victim Hernandez's room, and then into her bedroom. There was also a good amount of blood on the telephone, which was in the same bedroom.

Investigators then exited the interior of the apartment and entered the attached garage via the open garage door. Upon entering the garage, Investigators noted the evidence held baseball cap on the floor just inside the garage and to the rear of Victim Okazaki's car, which was parked on the east side of Victim Hernandez's car, both of which were parked head-in, facing north.

Directly adjacent to Victim Okazaki's gold Camaro was an orange-colored carpet which ran along the passenger side of the vehicle up to just about the entryway into the apartment. Upon closer examination of the entryway, Investigators observed what appeared to be blood spatterings on the door leading into the apartment, as well as the wall that were near this door. By the amount of blood and direction of spatterings in this particular area, it indicated to Investigators that this was perhaps the area where Victim Hernandez had sustained her injury. Investigators also noted that this appeared to be where the previously described blood trail had started.





APRIL 15, 1985          PAGE 4          085-04423-0533-011

While at the location at 0030 hours, Deputy VanderWende of the
Sheriff's Crime Lab arrived and took photographs and dusted for
fingerprints, at the direction of Investigators.  A written
report detailing Deputy VanderWende's actions will be prepared
by him, a copy of which will be made a permanent part of this
file.

At 0020 hours, Deputy Coroner's Investigator Rainey arrived at
the location and took charge of the victim's remains.  While
at the location Deputy Rainey advised Investigators as to the
issuance of Coroner's Case #85-3822.

At 0330 hours, prior to leaving the location, PAULINE ROGERS,
FM/42, arrived and advised Investigators that she was the mother
of Victim Hernandez.  She further advised Investigators that her
daughter was currently under sedation at Beverly Hospital await-
ing surgery for a gunshot wound to the hand.  Due to the condition
of Victim Hernandez, Investigators chose not to contact her at
this time.  Mrs. Rogers could add nothing further at this time
and the interview was terminated.

On 3/18/85 at 1500 hours, Investigators responded to Beverly
Hospital where they contacted Victim #2, MARIA HERNANDEZ.  When
asked by Investigators to recount her actions leading up to and
during the shooting incident the night before, Victim Hernandez
stated she would.  She advised Investigators that she had just
arrived at home (location) after dropping off her boyfriend,
Gordon Toevs, MW/26, at his home in the city of Arcadia.  She
stated that as on any other occasion she opened the garage with
her electronic garage door opener and entered, parking her car
on the west side of her roommate's.  She stated that after
exiting her car she walked around the back end of it, and after
crossing the rear of Dayle's (Victim #1's) car she headed north
for the door into the condominium.  She continued that upon
reaching the door she stuck her house key in the door, while
simultaneously hitting the button that closes the garage door
with her left hand.  She continued that as soon as she had
unlocked both the dead bolt and the door knob lock to the door
she heard an undistinguishable noise, which caused her to
immediately look over her shoulder.  Upon turning around she
instantly observed a light-skinned male, either Mexican or
caucasian, 5'9" to 6'1", thin build, dark hair, wearing a black
"Members Only" type jacket, white shirt, and black trousers.
She stated that this male, who appeared to be 19 to 25 years of
age, was within six feet of her as he walked in her direction
while pointing a gun at her head.



APRIL 15, 1985                 PAGE 5            085-04423-0533-011

Victim Maria Hernandez stated that as the male drew closer to
her location she noted that she had what she described to be a
very determined look on his face.  She stated that the suspect
was using a two-handed grip on the gun, with his arms being
extended out from the shoulder towards her.  She stated that
because of the intense stare in the suspect's eyes she knew
he was about to shoot her, so she began pleading with him not
to shoot.  She related that when he came within one or two
feet from her face she began to squat down, keeping her hand
in front of her face, pleading for her life.  She stated that
while on her way down, the garage light, which is on a timer
with the door, went out.  As soon as the light went out the
suspect fired a single shot from the four to six-inch blue
steel gun in his hands.  She stated that the bullet struck
her on the hand, but due to the fact that it was dark she
pretended to be dead in hopes that the suspect would leave
her alone.

After the suspect had fired this shot he opened the now
unlocked door which leads into the apartment, and after pushing
her body out of the way, ran up the stairs into the condominium.
She went on to state that as soon as he entered the condominium
she hit the garage door button and went running out of the
garage.  She stated that shortly after getting out of the garage
she lost her footing and fell to the ground.  She stated that
right around the time she fell to the ground she remembered
hearing possibly another gunshot.

Victim Hernandez stated that as she ran east through the alleyway
at the rear of the building, she was worried about her roommate
who she felt was inside because her car was in the garage.  It
was for this reason that Victim #2, Maria Hernandez, chose to
run around to the front of the building in an attempt to get to
the front door and help her roommate.  She stated that upon
rounding the corner and running west onto Village Lane, she
passed the first set of steps and was running next to a
neighbor's Volkswagen car when she observed the suspect walking
east on the sidewalk in front of the building.  (It should be
noted that these steps are located approximately 17 feet west
of the extended west curb line, which is at the east end of the
building).

Victim Hernandez continued by saying that as soon as the suspect
noticed that she was next to the Volkswagen he gave her a look
of surprise, and then once again in a two-handed point shoulder
position pointed the gun at her as he continued walking east to
the stairs that lead down to the street level.  She stated that
as he continued to point the gun at her, the only thing that

*(17)*

Ex. 88, p. 2810



APRIL 15, 1985

PAGE 6

085-04423-0533-011

separated them was the Volkswagen, so she pleaded with him by saying, "Please don't shoot me again." She went on to say that as soon as the suspect walked down the stairs he turned and ran first east, then north out of sight.

Victim Hernandez stated that although she did not see a vehicle, she did hear a car door slam shut, engine start, and tires squeal as if there was a rapid acceleration. She stated that she remembers seeing headlights to this vehicle, but was unsure if she in fact saw the headlights or only their reflection.

Victim Hernandez stated after the car left the location she continued running west on Village Lane in front of the apartment building until she arrived at a point on the west end where there was a cement stair walkway leading up to the sidewalk which ran east and west in front of her condominium. She stated that upon reaching the front of her apartment she noticed the front door was left open, at which time she entered and went in search of her roommate.

Victim Hernandez continued that upon entering the condominium she immediately noticed that her roommate, Victim Okazaki, was lying face down bleeding on the kitchen floor, at which time she ran up to her room and phoned for police assistance by using the 911 system.

When asked by Investigators as to the fallen chair in the dining room, Victim Hernandez stated that she had in fact noticed that this chair was in the fallen position at the time that she re- entered the apartment.

Investigators further questioned Victim Hernandez as to if she or her roommate owned a baseball type cap that may have been in the garage. She advised Investigators that neither she nor Victim Okazaki owned a baseball cap that had been in the garage.

When asked by Investigators if she remembered ever seeing the suspect with anything on his head, Victim Hernandez replied that if he had anything on his head it would have been a dark colored baseball type cap, but she could not remember for sure.

Victim Hernandez concluded by saying that although she has never seen the suspect, nor did she recognize him as being acquainted with her roommate, Victim Okazaki, she felt that she would be able to identify him if seen again, and in order to assist Investigators was willing to meet with the staff artist ior

⑱

APRIL 15, 1985          PAGE 7          085-04423-0533-011

purposes of making a composite drawing.  Victim Hernandez could add nothing further and the interview was terminated.

On 3/18/85 at 2000 hours, Investigators were contacted by Deputy Coleman of the Sheriff's Staff Artists Unit, who advised Investigators that he had met with Victim Hernandez earlier that evening and had completed a staff artist's composite based on her suspect description.  Copies of this drawing will be obtained and made a permanent part of this file.

On 3/19/85 at 1045 hours, Investigators were present at the Los Angeles County Coroner's Office, where Dr. Wegner performed an autopsy on the remains of Victim Okazaki.  At approximately 1110 hours, in our presence, Dr. Wegner retrieved Evidence Held Item #2 (bullet) under Receipt #D-90868, from the head of Victim Okazaki.  Upon completion of his autopsy, Dr. Wegner attributed the cause of the victim's death to be a gunshot wound to the head.  A detailed report prepared by Dr. Wegner covering his findings will be obtained and made a permanent part of this file.

While at the autopsy, Investigators were contacted by Investigator Romero of the Monterey Park Police Department, who also was attending a post mortem examination of a murder victim. This victim had also been Oriental, of Chinese descent, and was shot and killed at approximately 2350 hours, 3/17/85, also with a small caliber handgun, approximately six miles from our location.  The victim showed no signs of rape or robbery as her purse was still in her vehicle, and was an apparent random-type street shooting with no discernible motive.  The doctor performing the autopsy on this victim removed two .22 caliber projectiles, which the Monterey Park Police Department will transport to the Los Angeles County Sheriff's Department Crime Lab - Ballistics Section, for comparison with the projectile removed from Victim — Okazaki.

On 3/19/85 at 1200 hours, Sgt. Mercer responded to the Sheriff's Crime Lab where he left Evidence Held Item #2 (expended bullet from the Coroner's Office), and Evidence Held Item #1 (baseball cap) in the appropriate sections of the Sheriff's Crime Lab for analysis.

On Wednesday, 3/20/85, Sgt. Mercer was advised by Sgt. Christiansen of the Sheriff's Firearms Identification Section that upon comparison of the projectiles in the Monterey Park homicide and Sgt. Mercer's homicide, that in his professional opinion he felt that the bullets were fired from the same gun,





APRIL 15, 1985                PAGE 8              085-04423-0533-011

and that if he had a chance to test fire that particular gun he would expect to match the bullets.  His findings will be contained in a separate report and made a permanent part of this file.

This investigation is continuing with further reports to follow.


SGT. JAMES F. MERCER, #061592
INVESTIGATOR GILBERT CARRILLO, #014031
APPROVED:  LT. ANTHONY R. TOOMEY, #091597
HOMICIDE BUREAU - DETECTIVE DIVISION

Watson/Steno

# BURBANK POLICE REPORT

| VICTIM NUMBER 1 LOSER OR FINDER ///////////// | | | | 1D. DR NUMBER 85-150-5263 | |
|---|---|---|---|---|---|
| 7. NAME, ADDRESS, SEX, AGE, PHONE, ZIP CODE | | | | | |
| KYLE, Carol A. (F/40) ▓ 44 242 North Avon Burbank, CA 91505   843-7229 | | | | 3D. CASE CLASSIFICATION 261 PC - Forcible Rape | |
| | | | | //////////////////////////////////// FOR RECORD BUREAU USE ONLY | |
| 7. DATE AND TIME OCCURRED 5-30-85   0400-0510 | | 7B. DATE AND TIME REPORTED 5-30-85   0618 | | TYPED ___ p | |
| 9. LOCATION OF OCCURRENCE 242 N. Avon, Burbank - Single family dwelling | | | | INDEXED _____ | |
| 11. METHOD OF OPERATION - POINT OF ENTRY S enters res. via rear doggie door, commits res. robbery; rapes & sodomizes V-1 | | | | INDEXED _____ | |
| | | | | LOGGED _____ | |
| 13. WEAPON OR INSTRUMENT USED 1 dark small auto handgun & 1 small silver revolver | | | | TALLIED _____ | |
| 15. VICTIM'S VEH. | 15A. MODEL | 15B. COLOR | 15C. LICENSE | COURTESY REPORT ☐ | |
| 17. DAY OF WEEK Thurs. | 17A. SECTOR -- | 17B. BEAT G | 17C. WATCH I | COPY TO: _____ | |
| 19. VICTIM'S BUSINESS NAME, ADDRESS AND OCCUPATION (Med. Sec.) Dr. Hambrecht 2625 W. Alameda #116, Burbank | | | | 19D. HOURS OF WORK 0900-1500 | 19E. BUSINESS PHONE 762-0641 |
| VICTIM NUMBER 2 /////////////////////////////////////////////////////////////////////////////////////// | | | | | |
| 22. NAME, ADDRESS, SEX AND AGE KYLE, Mark C. (M-12) 242 N. Avon, Burbank, CA 91505 | | | | 22E. RESIDENCE PHONE 843-7229 | |
| 24. BUSINESS NAME, ADDRESS AND OCCUPATION Student - Jordan Junior High - 7th grade | | | | 24D. HOURS OF WORK | 24E. BUSINESS PHONE |
| INFORMANT ////////////////////////////////////////////////////////////////////////////////////// | | | | | |
| 7. NAME, ADDRESS, SEX AND AGE V | | | | 27E. RESIDENCE PHONE | |
| . BUSINESS NAME, ADDRESS AND OCCUPATION | | | | 29D. HOURS OF WORK | 29E. BUSINESS PHONE |
| MISCELLANEOUS INFORMATION ////////////////////////////////////////////////////////////////// | | | | | |
| 32. PREMISES SECURED BY WHOM? V-1 | | | | 32D. DATE | 32E. TIME |
| 34. CRIME DISCOVERED BY V-1 | | | | 34D. DATE 5/30/85 | 34E. TIME 0400 |
| 36. EXACT WORDS USED BY SUSPECT "Get up," "Don't make any noise" | | | | | |
| 38B. VICTIM ADVISED REGARDING AID TO VICTIMS OF VIOLENT CRIME BY: | | | | 38D. CROSS REFERENCE NUMBERS | |
| 40. PROPERTY TAG NUMBERS 72410 & 72411 | | 40B. NO. OF PHOTOS | 40C. PHOTOS BY R. Cestaro | 40D. PRINTED BY R. Cestaro #6950 | 40E. PENRY ID |
| 42. PENRY CODE G069566 6/3 | | 42B. TT'S SENT TO X-Loc | | 42D. TOTAL LOSS Unk | 42E. TOTAL RECOVERY |
| 44. REMARKS: DESCRIBE PROPERTY INVOLVED | | | | | |

On 5/30/85, at 0618 hours, Officers J. Calicchio #5845, K. Barcus #4222, and I were dispatched to 242 N. Avon, in response to two incomplete 911 emergency calls received from that residence, per Desk Officer P. Santos #4240. The call back number was busy.

Upon arrival, at 0625 hours, I observed V-2 inside the residence at the N/W bedroom window. V-2 was waving his left arm in an attempt to get my attention. I proceeded to that window and asked V-2 what was wrong. V-2 stated, "We've been robbed, and we're handcuffed to the bed." I asked V-2 if the S(s) were gone to which he said yes. Officer Barcus and I then

| 58. REPORT SUBMITTED BY Cervenka #6009 | 58B. DATE AND TIME 5-30-85 1600 | 58C. REPORT APPROVED BY Sgt. F. Reilman | 58E. DATE AND TIME 5-30-85 1600 |
|---|---|---|---|

# BURBANK POLICE REPORT

| WITNESS NUMBER 1 //////////////////////////////////////////////////////// | | 1D. CASE CLASSIFICATION 261 PC | 1E. DR NUMBER 85-150-5263 |
|---|---|---|---|
| 1 NAME, ADDRESS, SEX AND AGE | | | 3E. RESIDENCE PHONE |
| BUSINESS NAME AND ADDRESS | | 5D. HOURS OF WORK | 5E. BUSINESS PHONE |

| WITNESS NUMBER 2 //////////////////////////////////////////////////////////////// | | | |
|---|---|---|---|
| 8. NAME, ADDRESS, SEX AND AGE | | | 8E. RESIDENCE PHONE |
| 10. BUSINESS NAME AND ADDRESS | | 10D. HOURS OF WORK | 10E. BUSINESS PHONE |

| SUSPECT NUMBER 1 ///////////// | 11C. IB # | 11E. ARREST # | |
|---|---|---|---|
| 13. NAME AND ADDRESS | | | 13E. RESIDENCE PHONE |
| 15. BUSINESS NAME AND ADDRESS | | 15D. HOURS OF WORK | 15E. BUSINESS PHONE |

| 17. DOB(OR AGE) Mid-late 20's | 17A. SEX - RACE M-Mex | 17B. HEIGHT 5-10 to 6-0 | 17C. WEIGHT 175 | 17D. HAIR Med. length blk. wavey hair | 17E. EYES Brn |
|---|---|---|---|---|---|
| 19. SOCIAL SECURITY NUMBER | | 19B. CLOTHING Blk. leather jacket/ tan & blk plaid shirt/dark pants/blk gloves | | 19C. OTHER FEATURES Loose hang ing belt around wai |

| SUSPECT NUMBER 2 ///////////// | 20C. IB # | 20E. ARREST # | |
|---|---|---|---|
| 22. NAME AND ADDRESS | | | 22E. RESIDENCE PHONE |
| 24. BUSINESS NAME AND ADDRESS | | 24D. HOURS OF WORK | 24E. BUSINESS PHONE |

| 26. DOB(OR AGE) | 26A. SEX - RACE | 26B. HEIGHT | 26C. WEIGHT | 26D. HAIR | 26E. EYES |
|---|---|---|---|---|---|
| SOCIAL SECURITY NUMBER | | 28B. CLOTHING | | 28D. OTHER FEATURES | |

| VEHICLE USED BY SUSPECT ///////////////////////////////////////////////////// | | | | | |
|---|---|---|---|---|---|
| 31. YEAR | 31A. MAKE | 31B. MODEL | 31C. BODY TYPE | 31D. COLOR | 31E. LICENSE NUMBER |
| 33. OTHER IDENTIFYING FEATURES | | | 33C. REGISTERED TO | | |

REMARKS /////////////////////////////////////////////////////////////////////////

36.

walked to the front (west) door and found it locked. We then proceeded toward the rear of the residence via the driveway (south side of residence), and observed the chain link gate approximately four feet. We observed the rear (east) kitchen door ajar. Officer Barcus and I entered the residence and found it severely ransacked. I proceeded to the N/W bedroom (V-1's bedroom) and observed V-1 and V-2 laying on the bed with V-1's left hand handcuffed to V-2's right hand through the metal headboard. I asked V-2 who the handcuffs belonged to. V-2 said they were the S's and that the key was on the fireplace mantle. I utilized that key to free the victims as my handcuff key would not work.

V-1 then told me that in addition to the residence robbery, she had been raped by S at gunpoint. I then separated V-1 and V-2 (her 12 year old son) and asked her if she would prefer to be interviewed by a female officer. V-1 declined a female officer. I then questioned V-1 about the entire incident to which she related the following:

V-1 secured her residence on 5/30/85, at approximately 0130 hours, and went to bed in her bedroom (N/W corner of residence). At approximately 0400 hours, V-1 was awakened by S shining a flashlight in her face and pointing a blue steel small automatic handgun at her head. V-1 heard S state "Get up, don't make any noise." V-1 added that S's voice had a slight

B320-11B  3/76

BURBANK POLICE REPORT          PAGE:  3          DR: 85-150-5263

Spanish accent to it. V-1 complied with S's demand and got up.  V-1
observed S to be a male Mexican, 25-30 years, 5-10 to 6-0, 175 pounds,
with medium length black wavey hair, wearing a black jacket, black and tan
plaid shirt, dark pants, black gloves, with a loose hanging belt around
his waist. ¨S led V-1 out of her bedroom into the living room area.  S then
asked V-1, "Who else is in the house?"  V-1 told S that her 12 year old
son was asleep in his bedroom.  S then led V-1 into V-2's bedroom located
in the center of the east side of the residence.  Upon entering the bedroom,
S turned on the bedroom light, thus waking V-2.  S then pushed V-1 onto
V-2's bed and yelled, "Don't look at me, I don't want you to be able to
identify me."  S then backed out of the bedroom (north door) and stopped
at a hall closet along the south side of the hallway, approximately five
feet west of V-2's bedroom door.  S then began ransacking this hall closet
and throwing its contents into the hallway.  S then returned to V-2's
bedroom and ordered victims into this hall closet.  As V's were getting
into the closet, S asked victims, "Do you have any guns?"  Victims told
S no and S apparently didn't believe them, so he ordered them back into
V-2's bedroom where he told them to sit on the floor.  S then took a sheet
from V-2's bed and threw it over victims stating, "Don't look at me or I'll
gouge your eyes out so you can't identify me."

S then left the bedroom and continued ransacking the residence for approx-
imately ten minutes.  During this time, S would occassionally re-enter
V-2's bedroom and yelled threats at victims.  At the end of this time,
S took the sheet off of the victims and ordered V-2 to stand up.  Upon
doing to, S pulled a pair of handcuffs from his pocket (unknown which one)
and handcuffed V-2 behind his back.  S then ordered V-2 into the hall closet
closing the door behind V-2.  S then ordered V-1 back into her bedroom
where he tied V-1's hands behind her back with a pair of nylon pantyhose
stockings.  S then pushed V-1 down on her bed face down and put a black
sweater on V-1's head to prevent her from looking at him.  S then continued
ransacking the residence. On two occasions, S re-entered V-1's bedroom
and began yelling at V-1.  S then punched V-1 on her back with his closed
fists.  S apparently did so as he was angry that victims did not have
many valuables in her residence.  After approximately fifteen minutes,
S entered V-1's redroom and asked where her gold was kept.  V-1 told S
that she was wearing a very valuable necklace and that if S promised to
leave, she would give it to him.  S said, "Let's see it."  V then sat up
on and bed, and S unfastened her necklace and put the necklace in his
pants pocket and asked, "Where's the gold at?"  V-1 told S that he'd be
mad because she didn't have very many valuables.  V-1 then sat up and
opened a nightstand drawer next to the bed (with her hands still bound)
to get a small jewelry box.  S then yelled at V-1 not to make anymore fast
moves or he would kill her.  S then stated, "I'm a murderer already."

V-1 added that it was at this time that S ripped off her nightgown and
threw it aside on the bed.  S then pushed V-1 down on the bed (on her
back with her hands still bound behind her).  S then pulled V-1's panties
down and off and threw them aside.  S then unbuckled his pants and pulled
them down to his knees.  S then layed down on top of V-1.  S then began
kissing and sucking on V-1's nipples and breasts.  S then orally copulated
V-1 for several minutes.  S then, again, layed on top of V-1 and tried to
kiss V-1 on the mouth, but V-1 turned her head.  S then inserted his penis
into V-1's vagina.  V-1 stated that, initially, S was having difficulty

BURBANK POLICE REPORT

PAGE: DR: 85-150-5263

penetrating her as his penis was not completely erect, but he eventually became erect and had sexual intercourse with her for approximately five minutes. S then withdrew his penis from V-1, rolled her over onto her stomach, and inserted his erect penis into V-1's anus. S then sodomized V-1 for approximately two or three minutes, after which he got off of V-1, stood up and pulled his pants up. V-1 is unsure if S ejaculated in her. V-1 then sat up on the bed. S stated to V-1, "I bet your son would enjoy seeing you like this." V-1 then asked S if he would hand her a robe from her closet (east wall of the bedroom). S complied with V-1's request and threw the robe on V-1. V-1 then asked S if he would untie her as her hands were hurting her. S untied one of her wrists and V-1 brought her hands in front of her. S was having difficulty untying the other knot so V-1 asked S to cut the pantyhose off, directing S to some scissors along the west wall of the bedroom. S complied with V-1's request and cut V-1 loose. V-1 then put on her robe and remained on the bed. V-1 added that S never set down the blue steel automatic handgun during the sexual assault.

S next let V-2 out of the closet and led him into V-2's bedroom. S then handcuffed V-2 and told him to sit on V-1's bed next to V-1. S then attempted to handcuff V-1 to V-2 in a manner to prevent victims from following S out of the residence. V-1 suggested that S handcuff them together around the headboard of her bed. (Note: V-1 did so in an attempt to expedite S to leave the scene). S did as V-1 suggested. After handcuffing victims to the headboard, he stated, "This is Glendale, isn't it?" V-1 told S that this was Burbank. S then asked V-1, "Where's the freeway?", (probably meaning the 134 Freeway), to which V-1 pointed in a southernly direction stating, "Right down the street." S then stated, "Oh, yeah, that right." S then started to walk out of the bedroom when V-2 asked S to please leave the handcuff key. S agreed to do so, but couldn't figure out where to put it. S asked victims if anyone was going to be coming home soon to which V-1 told S that her daughter would be home around 0600 hours. S then left the handcuff key on the mantle. S then ripped the handset from the telephone in V-1's bedroom. S also damaged the phone in the kitchen. S then fled the residence, and a short time later, victims heard a vehicle start and leave the area.

Victims were waiting the arrival of V-1's daughter (who had spent the night at a friend's house, and was due home at 0600 hours), when they thought of attempting a 911 call. V-2 reached the phone, depressed the disconnect button, and dialed 911. V-2 did so twice and at 0618 hours, BPD received two 911 incomplete calls.

(For statements of V-2, refer to Officer Fischer's follow-up.)

I observed that S had gained entry into victim's residence by reaching in through a doggie door on the rear kitchen door and unlocking the door. S apparently fled via this door as the front door was bolted locked upon our arrival.

I transported V-1 to St. Joseph Medical Center, where Dr. J. Leung and Nurse L. Snedecor conducted a sexual assault check-up on V-1. Dr. Leung obtained pubic samples from V-1 and completed smears from V-1's vagina and anus. After the examination and collection of evidence, Dr. Leung advised me that V-1 had a bruise on her back and had an abrasion in her vagina.

B320-11C  3/76

BURBANK POLICE REPORT

PAGE:   5          DR:  85-150-5263

Dr. Leung advised me that these injuries were consistent with a sexual assault.  I took custody of the sexual assault evidence kit and V-1's panties from nurse Snedecor and subsequently booked them into evidence under tag numbers 72410 and 72411, respectively.

V-1 advised me that she can positively I.D. S.

Fet R. Cestaro #6950 responded and conducted a crime scene investigation (refer to his follow-up for details).

Officers Barcus and Calicchio conducted a neighborhood check for witnesses with negative results.

Fet Cestaro informed me that while he was at the scene, a Mr. Al Bodine of 230 N. Avon (213) 849-7451 heard of the incident through other neighbors and recalled seeing a M-Mex, 6-0, short dark hair, well groomed, in the neighborhood on 5/29/85, around 1030-1100 hours.  Mr. Bodine added that he does not know if this was possibly the S casing for the crime or if its unrelated to this incident.  I attempted to phone Mr. Bodine, but there was no answer.

For details of the items stolen, refer to Officer Fischer's follow-up report and pending inventory list.

Ex. 89, p. 2818

*Corrigan* *Special Attn*
*Giselle Levine*
*refer receipt # G0757*

MONTEREY PARK POLICE DEPT.
320 WEST NEWMARK AVENUE
MONTEREY PARK, CA 91754

85-4952

PAGE 1 OF 1

| 1. CODE SECTION 459 P.C. 261 P.C. 245 P.C. 286(A) P.C. 211 PC | 2. CRIME BURGLARY, RAPE, A.D.W. SODOMY, ROBBERY | 4. CLASSIFICATION RESIDENCE, ARMED. | 5. REPORT AREA 4 |
|---|---|---|---|
| 6. DATE AND TIME OCCURRED - DAY 7/07/85 0320 to 0340 SUN. | 7. DATE AND TIME REPORTED 07/07/85, 0342 | 8. LOCATION OF OCCURRENCE 1920 HOLLYOAK DR. MPK. 9175 | |
| 9. VICTIM'S NAME - LAST, FIRST, MIDDLE (FIRM IF BUSINESS) DICKMAN, SOPHIE NMN. | | 10. RESIDENCE ADDRESS 1920 HOLLYOAK DR MPK | 11. RES. PHONE 288-79 |
| 12. OCCUPATION ADMN. NURSE | 13. RACE - SEX W A F | 14. AGE 63 | 15. DOB -21 | 16. BUSINESS ADDRESS (SCHOOL IF JUVENILE) 1200 N STATE ST. LA | 17. BUS. PHONE 226-6751 |

CODES FOR BOXES 20 AND 30    V=VICTIM   W=WITNESS   P=PARENT   RP=REPORTING PARTY   DC=DISCOVERED CRIME

18. CHECK IF MORE NAMES IN CONTINUATION

| 19. NAME - LAST, FIRST, MIDDLE HERNANDEZ, RICK | | 20. CODE RP | 21. RESIDENCE ADDRESS | 22. RESIDENCE PH. |
|---|---|---|---|---|
| 23. OCCUPATION DEPUTY SHERIFF | 24. RACE - SEX M A M | 25. AGE 32 | 26. DOB -52 | 27. BUSINESS ADDRESS (SCHOOL IF JUVENILE) 130 S FETTERLY LA 90022 | 28. BUSINESS PHONE (E1) 264-70 |
| 29. NAME - LAST, FIRST, MIDDLE | | 30. CODE | 31. RESIDENCE ADDRESS | 32. RESIDENCE PH. |
| 33. OCCUPATION | 34. RACE - SEX | 35. AGE | 36. DOB | 37. BUSINESS ADDRESS (SCHOOL IF JUVENILE) | 38. BUSINESS PHO |

**MODUS OPERANDI (SEE INSTRUCTIONS)**

39. DESCRIBE CHARACTERISTICS OF PREMISES AND AREA WHERE OFFENSE OCCURRED
GOLD STUCCO FORMER THREE BEDROOM, SINGLE FAMILY HOME, RESIDENTIAL AREA.

40. DESCRIBE BRIEFLY HOW OFFENSE WAS COMMITTED
SUSP. FORCES ENTRY INTO RESIDENCE VIA EAST DEN SLIDING GLASS DOOR, WAKES VICT. AND POI-
GUN AT HER, HANDCUFFS HER, RANSACKS RESIDENCE, RAPES, AND SODOMIZES VICT. FLEES S

41. DESCRIBE WEAPON, INSTRUMENT, EQUIPMENT, TRICK, DEVICE OR FORCE USED
SEMI AUTOMATIC, WHITE METAL, NEW, POSSIBLE SMALL CALIBER, PISTOL.

42. MOTIVE - TYPE OF PROPERTY TAKEN OR OTHER REASON FOR OFFENSE
THEFT - SEXUAL GRATIFICATION.

43. ESTIMATED LOSS VALUE AND/OR EXTENT OF INJURIES - MINOR, MAJOR
SEE DETECTIVE SUPPLEMENTAL REPORT FOR PROPERTY LOSS - VICT. SUFFERED TEARS TO VAGINAL ARE

44. WHAT DID SUSPECT/S SAY - NOTE PECULIARITIES "DON'T CALL THE POLICE" "WILL SOMEBODY COME IN THE MORNING?"
"GET UP BITCH." "SHUT UP BE QUIET" "WHERES THE MONEY?" "WHERES THE RING?" DO YOU LIKE IT

45. VICTIMS ACTIVITY JUST PRIOR TO AND/OR DURING OFFENSE
SLEEPING IN BED.

46. TRADEMARK - OTHER DISTINCTIVE ACTION OF SUSPECT/S SUSP. BURGLARIES VICTS. RESIDENCE
RESIDEN:
SUSP. WEARS GLOVES, SUSP. RAPES AND SODOMIZES ELDERLY FEMALE WHO IS ALONE IN HE

47. VEHICLE USED - LICENSE NO. - I.D NO. - YEAR - MAKE - MODEL - COLORS (OTHER IDENTIFYING CHARACTERISTICS)
UNK. SMALL VEHICLE.

| 48. SUSPECT NO. 1 (LAST, FIRST, MIDDLE) UNKNOWN NAME. | 49. RACE - SEX W M | 50. AGE 27 | 51. HT. 508"-509" | 52. WT. 140 -150 | 53. HAIR BLK | 54. EYES UNK. | 55. ID NO. OR DOB | 56. AR |
|---|---|---|---|---|---|---|---|---|

57. ADDRESS, CLOTHING AND OTHER IDENTIFYING MARKS OR CHARACTERISTICS
DARK POSSIBLE BLACK LEATHER JACKET, DARK POSS. BLACK JEANS, (NOT BLU LEVIS) NO FACIAL HAIR?
CLOTH MESH BLACK GLOVES, BLACK HIGH TOP SNEEKERS. HAIR HAS SOFT NATURAL CURLS.

| 58. SUSPECT NO. 2 (LAST, FIRST, MIDDLE) | 59. RACE - SEX | 60. AGE | 61. HT. | 62. WT. | 63. HAIR | 64. EYES | 65. ID NO. OR DOB | 66. AR |
|---|---|---|---|---|---|---|---|---|

67. ADDRESS, CLOTHING AND OTHER IDENTIFYING MARKS OR CHARACTERISTICS

68. CHECK IF MORE NAMES IN CONTINUATION

| REPORTING OFFICERS W.P. COSTLEIGH #225. | RECORDING OFFICER | TYPED BY | DATE AND TIME | ROUTED |
|---|---|---|---|---|

FURTHER ACTION: [ ] YES [ ] NO
COPIES TO: [✓] DETECTIVE [ ] CII [ ] JUVENILE [ ] PATROL [ ] DIST. ATTNY [✓] OTHER STAT [ ] SO./P.D. [ ] OTHER

000028

REVIEWED BY
S.T. Piper 125

DATE 7 2 85

LAPD 03.11.5 (1-82)

**PRESS RELEASE FORMAT** | DR 85-16-18811 | DATE 8-5-85 | TIME 0900

INFORMATION SUMMARY: DO NOT INCLUDE INFORMATION WHICH MAY LATER BE PERTINENT TO THE CASE.

On 7-20-85, at approximately 0550, a residential Robbery-Murder occurred at 13037 Schoenborn Street, Sun Valley. The murder victim was identified as 32 year old Chainarong Khovananth, a Thailand immigrant of 10 years, who died of a gunshot wound to the head while he slept. Also in the residence at the time of the murder was the victim's 29 year old wife, Somkid, their 8 year old son and 2½ year old daughter. The eight year old son was beaten and the murder victim's wife was beaten and sexually assaulted. Both were bound by the suspect, who left the residence with money and jewelry in excess of $30,000. The suspect entered the residence from the rear yard and is believed to have fled in a 1978/80 Pontiac Grand Prix, 2 door, maroon, with traffic accident damage to the right front fender.

The victims had resided at the location for approximately 2½ years.

If anyone has information as to the identity of the suspect or location of the vehicle, please contact the Los Angeles Police Department at either /213/ 485-2531 or /213/ 485-3261.

Composite of suspect is available.

Suspect's Description:   Male, White, tan complexion, brown curly hair, brown eyes, 6-0/6-2, 150, 30-35, stained gapped teeth.

CONTINUE ON REVERSE SIDE IF NECESSARY

INVESTIGATORS ASSIGNED
L. Orozco #11072

P. Tippin #15240

SUPERVISOR MAKING RELEASE
Lt. R. Lewis

PRESS NOTIFICATIONS

512105

374

```
                                      FILE# _____
                                           (INV. USE ONLY)

                                      DR# _____

RE-
RSON INTERVIEWED: Virginia Marie Petersen    DATE & TIME 8-8-85   1840

SEX F  RACE W HAIR____ EYES____ HT____ WT____ DOB: ███-57  AKA: Sonny

DRIVER'S LIC.# _____ SS# _____

RESIDENCE ADDRESS: ███████  Northridge  PHONE:818  349-6816

BUSINESS ADDRESS: Civic Center Post Office    PHONE: _____
                  6200 Van Nuys Blvd   VAn Nuys
```

Victim stated Monday 8-5-85 was her day off.  Victim spent the morning obtaining her transcripts from her high school in Panorama City for enrollment in college after which she went to her girlfriend's, Lori Thomas on Clair Street, Reseda, 818-344-8643, arriving at approximately 1000.  Victim and Miss Thomas went shopping at JC Penneys outlet on Fallbrook and Canoga Park and picked up Miss Thomas' son from pre-school.  They stopped at McDonalds for lunch and returned to the residence of Miss Thomas.

Victim returned home at approximately 1645 shortly prior to her husband.  Victim described the evening as normal.  Victim did light house work and fixed dinner and watched television.  Victim retired for the evening at 2145 which is her normal routine as she gets up at 0430.  Victim's husband remained watching television.

Victim went to sleep on the right side of the bed which is nearest to the bedroom door.  Victim was lying on her left side facing the edge of the bed.  Victim sensed/heard a footstep on the hardwood floor indicative of a person turning into the small hallway in front of the bedroom door.  Victim opened her eyes and observed a male figure pivot into the room along the east wall which was on her side of the bed.  Victim momentarily believed the figure to be her husband, then realized he was in bed next to her.  In that instant, suspect reached the bed along side victim.

Victim started to sit up and swing her legs out of bed while screaming/ yelling "Who are you"?  What do you want"?  Victim indicated suspect may have made a statement at the same time but victim could not be sure.  The intruder (suspect) pushed victim back towards the bed by placing his hand on her chest.  Victim started to fall back on the bed and observed the suspect's arms coming down from over his head in a two handed pistol stance.  Victim observed a shiny chrome gun which was directly in front of victim's face.

Victim, knowing she was going to be shot to death, attempted to twist to her right to shield her husband from similar fate.  As victim turned, suspect fired point blank into victim's face.  Victim stated the gun made a double clicking sound.  Victim fell onto her husband as he was sitting up.  Out of the corner of her eye, victim observed the suspect's arms going up in the same

INVESTIGATOR MAKING INTERVIEW

RE-INTERVIEW OF:  VIRGINIA PETERSEN
Page two

two handed shooting style.  Victim heard a second double cracking sound and a glow as she felt something flash past her face like an orange yellow light.

Victim stated both she and her husband were yelling.  Victim fell face down on the bed.  Victim heard suspect running down the hall being chased by her husband.  Victim heard two rapid shots and feared for the safety of her husband.  Victim got out of bed and walked to the bedroom door and observed her husband getting up off the hall floor.  Victim continued thru the house in a daze, ending up outside with her daughter.

Victim observed the east gate to the neighbors' driveway open (victim later learned the gate had been opened by her husband).  Victim went to the rear sliding door of the neighbors' and bangled on the door yelling for help.  Victim could not rouse the neighbors.

Victim realized she was not clothed and returned to her residence.  Victim put a shift on in the bedroom afterwhich she contacted the police on the 911 line from the living room phone.  Victim could not locate her husband in the residence.  Victim exited the residence with her daughter and located her husband preparing to leave for the hospital.  Victim's husband opened the driveway gate and placed their daughter into the truck while victim ran into the street screaming for help.  Victim's husband yelled at victim to get into the rear of the truck and he rapidly drove around the corner eastbound on Acre to the hospital.

Victim described the suspect as male, light complected, tall (at least 6-0 feet) and athletically thin.  Suspect's hair appeared dark and curly or wavy but not kinky and was combed back from his face.  Suspect's facial features were angular.  Victim described suspect's hands as being long and slender with clean well manicured fingers.  Suspect's hands gave victim the impression of strength.  Suspect was wearing snug fitting pants, possibly blue jeans and a snug fitting dark shirt.  The shirt covered the throat and was possibly long sleeve as suspect's hands were remarkably lighter than his arms with a sharp line of demarcation.  Victim's observations were made with available light from a small lamp in the living room by the telephone and the television in her daughter's room.

Victim stated she felt the suspect was wearing tennis shoes as he was extremely quiet on his feet.  Victim indicated she is a very light sleeper and suspect was able to traverse the entire width of the residence before she sensed his presence.  The suspect was also able to breech one of two gates leading to the rear yard, both of which are unavoidably noisy and open the sliding glass door which has an accumulation of sand and grit in the rails.

The attached drawing, signed and dated by victim, is a facsimile of the weapon used by the suspect.

COUNTY OF LOS ANGELES SHERIFF'S DEPARTMENT

SUPPLEMENTARY REPORT

AUGUST 8, 1985

FILE 085-17254-1485-011

C  -  MURDER  187 PC
     BURGLARY  459 PC
     RAPE BY FORCE  261.2 PC

ACTIVE/ADDITIONAL CLASSIFI-
CATIONS OF BURGLARY 459 PC
AND RAPE BY FORCE  261.2 PC/
ADDITIONAL VICTIM IDENTIFIED

V1  -  ABOWATH, ELYAS YAKUB MO/35 (DECEASED)

V2  -  ABOWATH, SAKINA ELYAS FO/28

S  -  MW/25-30, 6/0-6/2, thin build, light brown or blond curly hair,
      wearing blue jeans

We responded to the location (21309 Pinehills Ln., Diamond Bar) in regards to
an armed robbery having just occurred.  During our response, the call was
updated that there may be a dead body at the location.

Upon our arrival, we observed the front screen door off its hinges and propped
against the front of the house just south of the open front door.  We heard a
woman inside the location crying, so we entered and contacted Raul Ledesma MM/41
(                    Diamond Bar, 714 861-0979) in the entryway.  I (Deputy
K. Smith) determined that Mr. Ledesma was at the location assisting the
victims.  I ordered Mr. Ledesma to walk outside, which he did.

As we walked south from the living room and down the hallway, we observed
Victim Sakina Abowath sitting on the floor, crying, with her left wrist hand-
cuffed to the southeast bedroom door knob.  Sitting next to Victim Sakina
Abowath's right was a neighbor Emilie Ledesma FW/38
Diamond Bar, 91765, phone 714 861-0979 who was trying to comfort her.

I (Deputy K. Smith) escorted Mrs. Ledesma outside the location.  When I
returned seconds later, we went to the southwest bedroom and observed Victim
Elyas Abowath lying on his back, feet to the east, head to the west, on the
bed of the master bedroom.  He was fully clothed in his pajamas.

Deputy Knight checked Victim Elyas Abowath and observed he was obviously dead,
due to his lack of pulse, heartbeat and respiration, and his eyes were non-
reactive to light.

Deputy Knight then freed Victim Sakina Abowath by kicking the bedroom door
knob off the door.  I (Deputy K. Smith) escorted her outside the location,
where Mrs. Ledesma escorted Victim Sakina Abowath next door to

Now that the location was cleared and the Fire Department had just arrived,
Fireman/Paramedic Leonard Fontes of Engine Co. #120 and myself entered the
location and Victim Elyas Abowath was declared dead at 0416 hrs. by Fontes.

//Continued on Page Two//

②

Ex. 93, p. 2823

AUGUST 8, 1985                    - 2 -              FILE 085-17254-1485-011

As Fontes and I were walking out of the location, we contacted Deputy Keelin #048463, who was walking toward the southwest master bedroom. I asked Deputy Keelin to escort Fireman/Paramedic Fontes outside, which he did. I walked toward the front door and contacted Deputy Garland #213590 in the living room area next to the front door. I asked Deputy Garland to exit the location, which he did.

Sgt. Bayer #004984 and I checked the location and discovered that the point of entry was the rear west facing sliding glass door. This was determined to be the point of entry, as evidenced by the sliding glass door and the screen door being open approximately two feet. Adjacent to where the sliding glass door locks to the frame was an open window with the lower corner of the window screen, nearest to the sliding glass door, bent outward. We exited the location and cordoned off the location until Homicide arrived.

While I was inside the location, I observed the southwest master bedroom and the southeast bedroom had been ransacked. I also observed a partially consumed melon lying on the kitchen breakfast nook counter, with a spoon in it. There were melon seeds on the hallway carpet, where Victim Sakina Abowath had been handcuffed to the door.

In the southwest master bedroom I observed that Victim Elyas Abowath had a small caliber entry wound on the left side of his head and a small amount of blood on the pillow which was under his head. On the bed sheet next to the left side of Victim Elyas Abowath's head was a small spent semi-automatic shell casing. Also in the master bedroom I discovered a small infant Aabdil Abowath MO/3 months, asleep in its crib.

After we cordoned off the location, Victim Sakina Abowath informed us that she had been raped by the suspect (refer to supplementary rape report by Deputy L. Koblick #18496). She added that the suspect smelled dirty, as though he needed a bath. Victim Sakina Abowath was transported to Pomona Valley Community Hospital by Cole-Schaefer ambulance, where she was met by Deputy L. Koblick. DISC — W.

We contacted Charles Robert Wilson MW/39 (                    Diamond Bar, 91765, phone 714 861-0962), who stated that he and his wife (Roswitha Christiane Wilson FW/33) were awakened by the ringing of their door bell at approximately 0400 hrs. They went to the front door and contacted the victims' son (Aamer Abowath MO/3). The son informed them in broken English that his family needed help and then ran next door to his house. Mr. Wilson followed the son into the house and observed Victim Sakina Abowath handcuffed to a bedroom door knob. Victim Sakina Abowath was crying and asked Mr. Wilson to help her husband (Victim Elyas Abowath). Mr. Wilson observed the husband lying on the bed, not moving. The husband was not moving, so Mr. Wilson checked him for signs of life and found none. Mr. Wilson touched Victim Elyas Abowath's forehead, chin, chest and left wrist during his check for signs of life. Mr. Wilson then went to the kitchen to find a telephone to call the police, but could not find one.

//Continued on Page Three//

Ex. 93, p. 2824

AUGUST 8, 1985                   - 3 -                 FILE 085-17254-1485-011

He immediately ran back to his house and called Industry Station to report the
incident.

We contacted Mrs. Wilson, who stated that she and her husband (Mr. Wilson)
were awakened by the ringing of their door bell at approximately 0400 hrs.
They went to their front door and contacted the victims' son.  The son informed
them in broken English that his family needed help, then ran next door to his
house.  Mrs. Wilson stayed in her house and tried to call the Abowaths, but
dialed the wrong number.  She then ran next door to the victims' house and went
inside with her husband.

She contacted the son (Aamer Abowath) and escorted him outside the house to
the front yard.

It should be noted that upon our arrival we observed Aamer Abowath's right
wrist had a blue bathrobe belt tied around it.  We removed the bathrobe belt
and a pink plastic toy watch from Aamer Abowath and gave them to Homicide
investigators.  We also cut the handcuffs off Victim Sakina Abowath and gave
them to Homicide investigators.

The location is a three bedroom single story house with a den.  The living room
is open and in the northeast corner of the house.  The kitchen is west of
(behind) the living room.  The dining room is in the northwest corner of the
house and adjacent to the open kitchen, but separated by a breakfast nook.
A hallway to the bedrooms is west of the den and runs south from the living
room.  There is a bathroom just west of the hallway.  The bedrooms are on the
south end of the location.  The master bedroom is on the southwest corner of
the house, with a bathroom on the northwest of this bedroom only.  On the
southeast corner of the house is a bedroom, and in between this bedroom and the
master bedroom is a child's room.

The house is located east of the 57 Freeway and north of Pathfinder Rd.  It is
the second house north of the corner of Autumnglow and Pinehills on the west
side of Pinehill Ln., which is a cul-de-sac.

Industry Station Watch Commander A/Lt. G. Johnson notified at 0410 hrs. by
Deputy Knight.

LASD Homicide Deputy Riordan #077592 notified at 0430 hrs. by Deputy Knight.
Homicide Inv. Dick Rogers #077592 arrived at 0505 hrs. and took charge of the
investigation.

Latent prints Deputy Salazar arrived at 0539 hrs.

Deputy Coroner Payne #309 arrived at 1018 hrs. and took charge of the remains.
Coroner's case #85-10167 assigned by Deputy Coroner Payne.

//Continued on Page Four//

Ex. 93, p. 2825

AUGUST 8, 1985                   - 4 -                    FILE 085-17254-1485-011

The baby (Aabdil Abowath MO/3 months) was transported to Pomona Valley
Community Hospital by Industry Unit 144 E.M.'s (Deputies Garland and Keelin)
to be with his mother (Sakina Abowath).

A crime broadcast was made via Sheriff's Radio (KMA 628) at 0515 hrs. on
08-08-85 by Deputy Knight.

The coroner did not issue a blue property receipt, because Victim Elyas Abowath
did not have any property.

Deputies checked adjoining residences, and on the following pages are the
locations which were checked by deputies and the outcome of their contact.

//Continued on Page Five//

⑤

Ex. 93, p. 2826

AUGUST 8, 1985                    - 5 -                    FILE 085-17254-1485-011

Locations checked by Deputies Garland and Keelin:

▮▮▮▮▮                    Sandifer, Connie  FW/33,
                         phone 714 861-0960,
                         heard nothing; location checked O.K.

▮▮▮▮▮                    No one home

▮▮▮▮▮                    Kim, Jack  MO/14,
                         heard nothing; location checked O.K.

▮▮▮▮▮                    Krok, Edward  MW/31,
                         heard nothing; location checked O.K.

▮▮▮▮▮                    Romano, Lou  MW/60,
                         phone 714 861-7896,
                         heard nothing; location checked O.K.

▮▮▮▮▮                    Brown, Ron  MW/38,
                         phone 714 861-2473,
                         heard dog barking at 0100 hrs., NFD.
                         location checkd O.K.

▮▮▮▮▮                    Betance, Jill  FW/26,
                         phone 714 861-4306,
                         heard nothing; location checked O.K.

WITNESES
Phone
Cont.

//Continued on Page Six//



Ex. 93, p. 2827

AUGUST 8, 1985                          - 6 -                  FILE 085-17254-1485-

Locations checked by Deputy Knight:

1. ███████████████
Fernandez, Dora Montenegro FM/36,
home phone 714 861-5316,
heard nothing; location checked O.K.

2. ███████████████
Clark, Robert Lyle MW/38,
home phone 714 861-0251,
heard nothing; location checked O.K.

3. ███████████████
Bowen, Allen Leon MW/32,
home phone 714 861-8635,
heard dogs barking approximately 0130 hrs.
location checked O.K.

4. ███████████████
Weesner, Hillery Fidna FW/36,
home phone 714 861-8790,
heard nothing; location checked secure.

5. ███████████████
Hart, Jo Ella FW/32,
home phone 714 861-7706,
heard nothing; location checked secure.

6. ███████████████
Sands, Eric Phillip MW/33,
home phone 714 861-6599,
heard nothing; location checked secure.

7. ███████████████
Maly, Sylvia FM/32,
home phone 714 861-1651,
heard nothing; location checked secure.

8. ███████████████
Sacands, Patty FM/31
home phone 714 861-2670,
heard nothing; location checked secure.

9. ███████████████
Baecker, Adele FW/35,
home phone 714 861-7310,
heard nothing; location checked secure.

10. ███████████████
Morgan, Sherry FW/25,
home phone 714 860-0715,
heard nothing; location checked secure.

11. ███████████████
Smith, Harriet,
home phone 714 861-6899,
heard nothing; location checked secure.

12. ███████████████
McGlone, Mary FW/37,
home phone 714 861-0080,
heard nothing; location checked secure.

//Continued on Page Seven//

⑦

Ex. 93, p. 2828

AUGUST 8, 1985                       - 7 -              FILE 085-17254-1485-011

Locations checked by Deputy Knight (cont.)



13. ▮▮▮▮▮▮▮▮▮               Wells, Nancy  FW/50,
                            home phone 714 861-2851,
                            heard nothing; location checked secure.

14. ▮▮▮▮▮▮▮▮▮               Lee, Pam  FW/73,
                            home phone 714 861-0184,
                            heard nothing; location checked secure.

15. ▮▮▮▮▮▮▮▮▮               No answer.

Locations checked by Deputy Smith:

16. ▮▮▮▮▮▮▮▮▮               Liss, William  MW/30,
                            home phone 714 861-1113,
                            heard nothing; location checked secure.

17. ▮▮▮▮▮▮▮▮▮               Pomeroy, John  MW/36,
                            home phone 714 861-0664,
                            heard nothing; location checked secure.

18. ▮▮▮▮▮▮▮▮▮               Ponce, Thomas  MW/50,
                            home phone 714 861-7015,
                            heard nothing; location checked secure.

19  ▮▮▮▮▮▮▮▮▮               Huffman, Jennie  FW/40,
                            home phone 861-3938,
                            heard nothing; location checked secure.

20. ▮▮▮▮▮▮▮▮▮               No answer.

21. ▮▮▮▮▮▮▮▮▮               No answer.

22. ▮▮▮▮▮▮▮▮▮               Cowry, Timothy  MW/37,
                            home phone 714 861-0803,
                            heard nothing; location checked secure.

23. ▮▮▮▮▮▮▮▮▮               Searles, Michelle  FN/22,
                            home phone 714 861-1214,
                            heard nothing; location checked secure.

Deputies Kirk Smith #207236 and John Knight #150716
By Kirk Smith - Car 149 E.M.
Approved:  Sgt. P. Larson #052147
City of Industry - Erskine

Assigned:  Homicide Bureau

C O N F I D E N T - I A L                          #42

<u>COUNTY OF LⷱANGELES – SHERIFF'S DEPARTMENTⳑ SUPPLEMENTARY REPORT</u>

DATE <u>August 31, 1985</u>          FILE NO. <u>085 00077 2699 999</u>  -

C <u>      MURDER - 187P.C.      </u>  Action Taken <u>ACTIVE/SUSPECT ARRESTED/</u>

<u>                                      ADDITIONAL INFORMATION</u>

V.#1    VIANUEVA, MANUELA    F/M    DOB: ████-22
#2     PINON, FASTINO HERNANDEZ    M/M    DOB: ████-26
0.#3   DE LA TORRE, ANGELINA    F/M.   DOB: 1████-52

S       ARRESTED:   RAMIREZ, RICARDO    SEX/M    RAC/M
                    HAIR/BRO    EYES/BRO    HGT/601    WGT/150
                    DOB/████-60
        DETAINED:   MCJ - BKG# 8219 866
        CHARGE:     187 PC - MURDER
        ARRAIGN:    East Los Angeles Detective Bureau

        WITNESS: #1  BURJOIN, JOSE    M/M    DOB: ████-31
                     ████████████      Los Angeles
                     P/N: (213) 262-2420
                     Unemployed

                 #2  ROBLES, CARMELO    M/M    DOB: ████-43
                     ████████████,      Los Angeles
                     P/N: (213) 663-9574
                     Unemployed

                 #3  MORENO, FRANK    M/M    DOB: ████-46
                     ████████████      Los Angeles
                     P/N: (213) 266-2298
                     Unemployed

                 #4  DE LA TORRE, MANUEL    M/M    DOB: ████-49
                     ████████████      Los Angeles
                     P/N: (213) 261-7211
                     (Bus) 2392 E. 48th St.,  Los Angeles  P/N: Unk

        EVIDENCE:   METAL BAR, APPROXIMATELY 3 FEET IN LENGTH
                    W/AN "L" SHAPE HANDLE, APPROXIMATELY 5 INCHES
                    W/AN APPROXIMATELY 1/4 INCH DIAMETER, NFD.

        S/R 1 - 1:  MOTOR VEHILCE, 1966 FORD  LIC# SYE911
                    SEE CHP 180, BELONGING TO VICTIM PINON, NFD.

        BY:   DEPUTY A. RAMIREZ  #196068
              ELA    UNIT 24    DAYS
        APP:  SGT. M. ALLEN    #001069
        ELA:  C.RAMOS

        ASN:  HOMICIDE BUREAU/ELA DETECTIVES

                                          - - -          572174



MEMORIAL HOSPITAL

EL PASO, TEXAS

| RAMIREZ, NEWBORN (MALE) | 73,894 | NSY |
| BERNELL, E.C. | ███-60 2:07AM | 3-15-60 @ 3:30 pm |
| 301 W. 7TH ST., EL PASO, TEXAS | | 2 days |

CATHOLIC

RAMIREZ, NEWBORN (MALE)

MR JULIAN T. RAMIREZ    FATHER    SAME    SAME

FATHER    SAME    LABORER FOR SANTA FE RAILROAD

JULIAN T. RAMIREZ    NSY

MERCEDES MUNOZ

RAMIREZ,    M    NSY    NEWBORN    NBC    ASF

I HEREBY CERTIFY THAT THE HOSPITAL IS NOT RESPONSIBLE FOR PERSONAL PROPERTY WHICH MAY BE KEPT IN THE PATIENT'S ROOM.

DIAGNOSIS:

Term birth, living male infant

OPERATIONS:

THIS INFORMATION HAS BEEN DISCLOSED TO YOU FROM CONFIDENTIAL MEDICAL RECORDS. YOU ARE PROHIBITED FROM MAKING ANY FURTHER DISCLOSURE WITHOUT THE SPECIFIC WRITTEN CONSENT OF THE PERSON TO WHOM IT PERTAINS OR HIS LEGAL REPRESENTATIVE.

CODING

733003

E.C. Bernell, M.D.

Name _Ramirez_____ Sex _Boy_ Birthdate ____/60  Time _3^07_ FM OB _Bo__

Parents' Name _Julian T. Ramirez__ Address _301 W. 7^th__  Phone _—_ Rel. _Cath_

Maternal History: Para _IV_ Grav. _VI_ Age _42_ Race _W._ Serology _Neg._ RM _Pos_ RM Titre ____

Complications _____

Previous Pregnancies _____
EDC March 3rd                                    Spont.    Early
Present Delivery: Gestation _39_ wks. Labor _6_ hrs. Membranes Rupt. Artif. ___ Late ___
Analgesia (Type and Time) _Demerol Gm  Demerol 100 mg  Scop. Phen 150 m_
Anesthesia _Sodium Seridol_
Presentation _ROA_____ Type of Delivery _Low forceps__
Complications of Delivery _____
Cord Blood to Lab: _____ Yes __/__ No

Condition of Baby:
| Color: | | Cry: | | Respirations: | | O₂ Therapy | Yes _for_ |
|---|---|---|---|---|---|---|---|
| Pink | ✓ | Good | ✓ | Immediate | ✓ | | No |
| Blue | | Shrill | | Delayed | | Halime | Yes |
| Gray | | Grunty | | Induced | | | No |
| White | | | | | | Vit K | Yes |
| | | | | | | | No |

Anomalies _None noted_                     AgNO₃ in Eyes By _M Llagerra_
Identification and Sex checked by _M Llagerra_ and _____
                              (Delivery Room Nurse)              (Nursery Nurse)
Pediatrician _____,      Notified by _____ At ___ AM Date _____

## PHYSICAL EXAMINATION

Birth Weight _9_ Lbs _6_ oz.  Length _21½_  Head ___ Chest ___ Abdomen ___

| ✓ | 1. Gen'l Appearance |
|---|---|
| ✓ | 2. Skin |
| ✓ | 3. Head and Neck |
| ✓ | 4. Eyes |
| ✓ | 5. E.N.T. |
| ✓ | 6. Thorax |
| ✓ | 7. Lungs |
| ✓ | 8. Heart |
| ✓ | 9. Abdomen |
| ✓ | 10. Genitals |
| ✓ | 11. Trunk and Spine |
| ✓ | 12. Extremities |
| ✓ | 13. Reflexes |
| ✓ | 14. Anus |
| ✓ | 15. Neurological |

CODE: Abnormal _X_
      Normal _X_

DESCRIPTION OF ABNORMAL FINDINGS: _pleuris_

INFORMATION HAS BEEN PROHIBITED FROM CONFIDENTIAL MEDICAL RECORD, YOU ARE PROHIBITED FROM MAKING ANY FURTHER DISCLOSURE WITHOUT THE SPECIFIC WRITTEN CONSENT OF THE PERSON TO WHOM IT PERTAINS, OR HIS LEGAL REPRESENTATIVE.

IMPRESSION: _Healthy male_

Date _9/14_      Signature _____

733004

**NEUROBEHAVIOR CLINIC**
UNIVERSITY OF SOUTHERN CALIFORNIA SCHOOL OF MEDICINE
THE HOSPITAL OF THE GOOD SAMARITAN
637 SOUTH LUCAS AVE., SECOND FLOOR, SUITE 5
LOS ANGELES, CA 90017
213/977-0613



May 29, 1987

Arturo Hernandez, Esq.
Hernandez & Hernandez
15 South 34th Street
San Jose, CA 95116

RE: <u>Ramirez Case</u>

Dear Mr. Hernandez:

As you know, I had the opportunity to examine Mr. Ramirez in the County jail on May 9, 1987. As I have previously told you, my neurological findings indicate that Mr. Ramirez has suffered brain damage.

In order to evaluate the significance of my findings, it is important that several additional diagnostic steps be undertaken. These include (1) magnetic resonance imaging (MRI scan) of the brain, (2) electroencephalography (EEG), and (3) neuropsychological assessment. The latter can be done by a neuropsychologist while Mr. Ramirez remains in jail, but the first two tests would require that he be escorted to the appropriate medical facility.

I will be happy to work with you in arranging these additional studies.

Sincerely yours,

Victor W. Henderson, M.D.

576201

Ex. 96, p. 2833

C T. WADE, M.D.
W.W.M. LO, M.D.
F.H. SHIMIZU, M.D.
Y.R. RAO, M.D.
A. McMONIGLE, M.D.

D.L. MAGARAM, M.D.
L. SOLTI-BOHMAN, M.D.
V. WALUCH, M.D.
J. LOIS, M.D

**RADIOLOGICAL CONSULTATION**
**DEPARTMENT OF RADIOLOGY**

# St. Vincent Medical Center 2131 WEST THIRD ST. LOS ANGELES, CALIF. 90057

**MAGNETIC RESONANCE IMAGING FACILITY**
DE PAUL PAVILION 2201 Miramar Street. Los Angeles, Calif. 90057 Ph. 484-7235

VICTOR HENDERSON, M.D. - LAC-USC MEDICAL CENTER
Neurology Dept., Suite #5641
1200 North State Street
Los Angeles, Ca. 90033

RAMIREZ, Richard - 30 13 66     (901 00 2637)     08-28-69         OP

037047-9 HIGH RESOLUTION MAGNETIC RESONANCE IMAGING OF THE BRAIN:

TECHNIQUE: 4 sequences; interlaced axial and coronal images are performed using
TR/TE = 2.0/40:90.

FINDINGS:

The basal cisterns, the ventricles and midline structures are normal. There is
no evidence of midline shift, mass effect, extra-axial fluid collection or ab-
normal brain intensity.

IMPRESSION:

NORMAL MAGNETIC RESONANCE IMAGING OF THE BRAIN.

D.L. MAGARAM, M.D.

dd/09-05-89
ck/09-05-89

**576205**

DOCTORS COPY

Word Processing  310-69  2-85

Ex. 97, p. 2834

MYLA H. YOUNG, PH.D.

Licensed Clinical Psychologist
PSY 11916

1

CONFIDENTIAL
NEUROPSYCHOLOGICAL EVALUATION

Name:  Richard Ramirez
D.O.B.:  ▓▓▓▓/60
Age at Date of Evaluation:  34 years 9 months
Education:  Completed 9th Grade
Handedness:  Right
Dates of Evaluation:  12/9/94; 12/10/94; 12/28/94
Date of Report:  03/13/95

REASON FOR REFERRAL:
Richard Ramirez was referred for Neuropsychological
Evaluation by defense attorneys Michael Burt, Daro Inouye,
and Dorothy Bischoff.  Reason for referral was to provide
description of Mr.  Ramirez's intellectual,
neuropsychological, and psychological functioning.

DOCUMENTS REVIEWED:
Multiple documents were reviewed prior to preparing this
report.  These documents include the following categories of
information:
                    Summary of Criminal Offenses
                    Police Reports of Criminal Offenses
                    Medical Records
                    School Records
                    Psychological Reports
                    Psychological Assessment Data

BACKGROUND INFORMATION:
Mr. Ramirez is a 34 year old Latino male who has been
convicted on 43 Counts in the County of Los Angeles, and is
currently being prosecuted in San Francisco County on two
additional counts.  Offenses include various combinations of
Burglary, Attempted Murder, Murder, and various Sexual
Offenses (Rape, Sodomy, Oral Copulation).  Mr. Ramirez
has received 12 death sentences.

Mr. Ramirez did not discuss information regarding his family
or childhood.  Information gained from various records,
however, indicates that Mr.  Ramirez is the youngest of five
children.  His father was born in Mexico and his mother was
born in the United States.  Mr.  Ramirez's childhood was
spent predominantly in Texas.  There is information which
suggests that Mr. Ramariz was physically abused as a child.

School reports indicate that Mr. Ramirez's early school years were characterized by academic success, without mention of behavioral problems. His later school years, however, were characterized by academic failure and behavioral problems, particulary school truancy.

Mr. Ramirez's work history is limited to brief periods of employment (ranging from 2-6 months each) in jobs which included working in a meat-packing plant, butcher shop, and cleaning smokestacks.

Mr. Ramirez acknowledges a history of drug abuse since 7th grade. Drug use includes Alcohol, Marijuana, Amphetamines, LSD, and Cocaine. Mr. Ramirez reports that the drug of greatest abuse was Cocaine.

Mr. Ramirez's medical history is noteworthy for apparent seizure episodes beginning at 10 years of age. Abnormal EEG patterns are reported at ages 10 and 12 years of age. Treatment included administration of anticonvulsant medication (Phenobarbital). Currently, Mr. Ramirez is not treated with anticonvulsant medication. He, however, reports persistent, severe headaches and periods of time when he "just space(s) out". Jail and Prison medical records indicate repeated administration of medication for treatment of headaches. Psychological reports indicate, and Mr. Ramirez confirms, that behavioral changes occurred following onset of these apparent seizure episodes.

BEHAVIORAL OBSERVATIONS
Evaluation was completed at the San Francisco County Jail and at San Quentin Prison. Evaluation was uninterrupted, and was conducted in rooms which were acceptably free from noise and distractions. On several occasions during the evaluation Mr. Ramirez attempted to sexually expose and manipulate himself. Although he required multiple, persistent reminders, he was able to respond to my demands that he place his hands on the table for the period of time needed to complete this assessment. Mr. Ramirez's attempted masturbatory behavior did not occur during direct administration of test items, but did occur at times of transition between tasks. Mr. Ramirez attempted all tasks requested of him, and appeared to be expending an appropriate level of motivation to complete tasks to the best of his ability. His performance on tests which were administered to specifically evaluate for possible malingering indicates that Mr. Ramirez was not attempting to fake results of this evaluation. This evaluation is considered a valid representation of Mr. Ramirez's current functioning.

TESTS ADMINISTERED
15 Item Test
Dot Counting Test
Wechsler Adult Intelligence Scale-Revised (WAIS-R)
Peabody Individual Achievement Test-Revised (PIAT-R)
    Information
    Reading Recognition
    Reading Comprehension
Reitan-Klove Sensory Perceptual Examination
Reitan-Indiana Aphasia Screening Test
Finger Tapping Test
Strength of Grip Test
Grooved Pegboard
Tactual Performance Test
Seashore Rhythm Test
Stroop Color Word Test
Wechsler Memory Scale-Revised (WMS-R)
    Logical Memory I and II
    Visual Reproduction I and II
Buschke Selective Reminding Test
Developmental Test of Visual Motor Integration
Trail Making Test (Parts A and B)
Short Category Test
Wisconsin Card Sorting Test
Rorschach Test

INTELLECTUAL FUNCTIONING
Mr. Ramirez's intellectual functioning was evaluated
utilizing the WAIS-R.  His performance on this test
demonstrates overall intellectual functioning in the Low
Average Range (FIQ=88), with essentially equal abilities for
verbal comprehension (VIQ=89) and for thinking in visual
images (PIQ=91).  This performance places Mr. Ramirez's
overall intellectual functioning in the 21st percentile.

ACADEMIC FUNCTIONING:
Mr. Ramirez's reading abilities were evaluated utilizing the
PIAT-R Information, Reading Recognition, and Reading
Comprehension Subscales.  His performance on all these tasks
was at a 12th Grade Equivalent.

NEUROPSYCHOLOGICAL FUNCTIONING
Mr. Ramirez's neuropsychological functioning was evaluated
utilizing a series of tests selected to evaluate his sensory,
motor, attention, memory, language, visual perceptual, and
higher cognitive reasoning.   Overall, Mr. Ramirez's
performance on these tasks was in the mildly impaired range,
but with performance on individual neuropsychological
tasks ranging from within normal ranges to severely
impaired.  Mr. Ramirez demonstrated particular impairment
on tasks of memory and higher cognitive functioning.
Although there could be more than one neurological
explanation for this impaired performance, the pattern of Mr.

Ramirez's impaired performance is similar to that of individuals who have a known history of cognitive impairment secondary to seizure disorder.

Sensory:  Mr. Ramirez's sensory perception was evaluated utilizing the Reitan-Klove Sensory Perception Examination. His performance on these tasks was within normal ranges.

Motor:  Mr. Ramirez's motor functioning was evaluated utilizing the Finger Tapping Test, Strength of Grip Test, Grooved Pegboard, and Tactual Perceptual Test-Total Time. His performance on all tasks except the Grooved Pegboard was within normal ranges.  Mr. Ramirez's performance on the Grooved Pegboard was moderately impaired.  This suggests that Mr. Ramirez experiences impaired ability for sustained, fine motor functioning.

Attention:  Mr. Ramirez's attentional abilities were evaluated utilizing the Seashore Rhythm Test, Stroop Color Word Test, Trail Making Test Part A, and Freedom From Distractibility subscales of the WAIS-R.  Mr. Ramirez's performance on the Seashore Test and Digit Symbol Subscale of the WAIS-R was mildly impaired.  His performance on all other tasks was Borderline, but within normal ranges.  This suggests that although Mr. Ramirez does not experience a typical Attention Deficit Disorder, he does demonstrate impaired abilities for sustained attention.

Memory:  Mr. Ramirez's memory was evauated utilizing the Tactual Perception Test Memory and Localization Tasks, Logical Memory and Visual Reproductions Scales of the Wechsler Memory Scale-Revised, and the Buschke Selective Reminding Test.  Although Mr. Ramirez's peformance on the Tactual Perception Localization Task and the Visual Reproduction Scales of the Wechsler Memory Scale was within normal ranges, his performance on all other memory tasks was impaired.  Of particular note is Mr. Ramirez's impaired ability for delayed recall of information, as well as his impaired ability to learn and recall new information.  This suggests that, overall, Mr. Ramirez experiences moderately impaired memory.

Language:  Mr. Ramirez's language abilities were evaluated utilizing the Aphasia Test, WAIS-R Verbal Subscales, and PIAT-R Information and Reading Subscales.  Mr. Ramirez's performance on all these tasks was within normal ranges.

Visual-Perceptual:  Mr. Ramirez's visual-perceptual abilities were evaluated utilizing the Construction tasks of the Aphasia Test, Developmental Test of Visual-Motor Integration, and the WAIS-R Performance Subscales.  Although Mr. Ramirez's performance on these tasks was not within the impaired range, his performance was consistently in the

Borderline range of impairment. This suggests that Mr. Ramirez's visual-perceptual skills are not as efficient as would be expected for his overall level of intellectual functioning.

Higher Cognitive Functioning: Mr. Ramirez's abilities for thinking, reasoning, and problem solving were evaluated utilizing the Short Category Test, Trail Making Test Part B, and the Wisconsin Card Sorting Test. Although his performance on the Short Category Test and Trail Making Part B was within normal ranges, his performance on the Wisconsin Card Sorting Test was quite impaired. For example, although Mr. Ramirez's overall intellectual functioning is in the 21st percentile, and although Mr. Ramirez has maintained appropriate Reading abilities, his performance on critical categories of the Wisconsin Card Sorting Test was at or below the 5th percentile. Mr. Ramirez's performance on critical Wisconsin Card Sorting tasks was as follows:

| Task | Percentile |
|------|-----------|
| Categories Completed | 2-5th % |
| Number of Trials | Below 1st % |
| Perseverative Responses | 5th % |
| % Perseverative Errors | 4th % |
| Failure to Maintain Set | Below 1st % |

The Wisconsin Card Sorting Test is a test which requires planning, organizing, utilizing information from the environment to develop appropriate plans of action, directing behavior towards achieving a goal, and modulating impulsive responding. The Wisconsin Card Sorting Test is also a test which has been used extensively and successfully in differentiating patients who have brain damage from patients who do not have brain damage. Impaired performance on the Wisconsin Card Sorting Test, combined with overall intellectual functioning within normal ranges suggests that the patient may be able to describe knowledge of appropriate, adaptive behaviors, but may not have the brain resources to effectively alter and inhibit behaviors in adaptable ways. Individuals who demonstrate the level of impairment on the Wisconsin Card Sorting Test that was demonstrated by Mr. Ramirez would have difficulty planning, organizing, utilizing information from the environment in order to adapt their behavior to the demands of the situation, and would have difficulty withholding and modulating impulsive behaviors.

EMOTIONAL FUNCTIONING
Mr. Ramirez's emotional functioning was evaluated utilizing the Rorschach Test. He provided 39 Responses, with an appropriate level of cognitive complexity, indicating that this administration of the Rorschach Test is a valid representation of Mr. Ramirez's emotional functioning.

The most salient feature of Mr. Ramirez's responses to the
Rorschach Test is indication of severe depression.  The level
of depression is such that depressed mood would interfere
with Mr. Ramirez's everyday functioning, and would affect his
thinking, feeling, and behavior.  The nature of the depressed
affect experienced by Mr. Ramirez would be a painful sense of
sadness, negative self evaluation, feelings of isolation and
aloneness, and overwhelming anger and dissatisfaction.
Although Mr.  Ramirez's observable presentation may be one of
self-assured emotional control, his Rorschach responses
indicate an underlying severe depression.

Mr. Ramirez's Rorschach responses also indicate that he
frequently tends to misperceive and misinterpret reality, and
that he tends to become "lost" in a distorted internal world.
This internal world would have limited relationship to
reality; would at times be grossly distorted; and would at
times become frankly delusional.

SUMMARY
In summary, Richard Ramirez is a 34 year old Latino male who
has been convicted on 43 counts in Los Angeles County and is
currently being prosecuted on 2 counts in San Francisco
County.  Offenses include various combinations of Burglary,
Murder, Attempted Murder, and various Sexual Offenses.  He
has received 12 Death Sentences.

Mr. Ramirez was born and spent much of his childhood in
Texas.  His school history is characterized by early
educational achievement, but later educational failure and
truancy.  His work history is limited, with Mr.  Ramairez
working as a meat cutter, butcher, and smoke stack cleaner.
Mr. Ramirez reports a substantial drug abuse history,
beginning in early adolescence and continuing until
his arrest.  He has experimented with various substances,
including Alcohol, Marijuana, Amphetamines, LSD, and Cocaine.
Cocaine is reported as the primary drug of abuse.

Medical history of note includes apparent seizure episodes
between the ages of 10 and 12 years; abnormal EEG consistent
with a seizure disorder; treatment with anticonvulsant
medication; and behavioral change following onset of apparent
seizure episodes.  At the present time Mr.  Ramirez is not
treated with anticonvulsant medications.  He reports--and
prison and jail records support--frequent and severe
headaches, and episodes where Mr. Ramirez indicates he
"spaces out."

Mr. Ramirez's intellectual funtioning is in the Low Average
Range (FIQ=88), with essentially equal abilities for verbal
comprehension (VIQ=89) and for thinking in visual images
(PIQ=91).  His reading ability is consistent with his
intellectual functioning, with Mr. Ramirez's reading

7

recognition and reading comprehension being above the 12th grade level.

Although Mr. Ramirez's intellectual functioning is in the Low Average Range (21st percentile), his performance on neuropsychological evaluation demonstrates impaired cognitive functions.  Overall, Mr. Ramirez's neuropsychological functioning is in the mildly impaired range, but with performance on individual tasks ranging from within normal ranges to severely impaired.  He demonstrates particularly impaired abilities for memory and higher cognitive functioning.  Although this pattern of impairment is demonstrated in several neurological disorders, the combination of history of childhood seizure disorder, as well as a pattern of neuropsychological impairment demonstrated by individuals who have a known history of seizure disorder, suggests that Mr. Ramirez experiences a mental disorder due to Epilepsy.

Of particular concern is Mr. Ramirez's performance on neuropsychological tasks which evaluate abilities for planning, organizing, utilizing information from the environment to develop appropriate plans of action, and modulating impulsive responding.  Although Mr. Ramirez's overall intellectual functioning is in the 21st percentile, his performance on tests which evaluate the previously mentioned higher cognitive abilities ranged from below the 1st percentile to the 5th percentile.  This pattern of spared intellectual functioning, combined with impaired current abilities for higher cognitive reasoning suggests that Mr. Ramirez experiences brain impairment which would affect his abilities for judgment, planning ahead, anticipating consequences of behavior, and modulating his impulses.

Mr. Ramirez's responses to the Rorschach Test indicate evidence of severe, painful depression, pervasive anger, and unmodulated, impulsive emotionality.  His responses also indicate that Mr. Ramirez tends to become lost in an internal world that is perceptually inaccurate; at times is grossly distorted; and at times reaches delusional proportions.

Considering clinical information and performance on neuropsychological evaluation, the following diagnostic impression is suggested:

```
Axis I:    310.0  Personality Change Due to Epilepsy,
                  Combined Type (Disinhibited, Aggressive,
                  Paranoid Features)
           293.83 Mood Disorder Due to Epilepsy, with
                  Depressive Features
Axis II:   799.9  Diagnosis Deferred on Axis II
Axis III: 345.40  Epilepsy, partial, with impairment of
                  consciousness (Temporal Lobe) (By history)
```

8

Thank you for the opportunity of being a part of this evaluation.  If I may provide additional information, please advise me.

Myla H. Young, Ph.D.
Licensed Clinical Psychologist
PSY 11916

I, Elise Taylor, MFCC, am a licensed psychotherapist, and my area of expertise has been mitigation preparation for capital cases, including the development of psychosocial histories, and in that capacity, I have worked on approximately 25 capital cases, at both the pre-trial and appellate levels. While working for Simon and Unger as a penalty phase investigator, the firm was retained by Michael Burt of the San Francisco Public Defender's Office to work on the case of People v. Richard Ramirez. When I was brought into the Ramirez case, it was with the primary intent of working with Mr. Ramirez to prepare his psychosocial history for use in his penalty phase.

When I first started working with Mr. Ramirez, I was informed by his defense team that he had expressed significant concerns about confidentiality, and that his obsession with that issue had reached an almost paranoid level. This was confirmed when I began meeting with Mr. Ramirez, and he repeatedly stated to me that he refused to discuss his life history with me, primarily due to concerns about the safety of any information he might release to me.

For the first months I met with Mr. Ramirez, a significant portion of the time we spent together was taken up by his repeated questioning of the security measures in my office, in the public defender's office, what kind of locks were used, who had keys, the security of telephone lines, who had access to my notes, etc.. Mr. Ramirez also spoke about his pervasive lack of trust, and, during the first months that we worked together, he devised complex plans for trying to determine the lines of communication within the defense team. Despite the fact that I had made clear to him that I would <u>not</u> hold anything he said secret from his attorney, and that anything he told me in <u>any</u> context would be shared with the rest of his defense team, he seemed obsessed to distraction by trying to "catch" someone lying to him.

1

As the months went by, Mr. Ramirez' obsessive ruminations about security and trust became somewhat less prominent, but they would immediately come to the foreground when I attempted to talk with him about his life story. He was extremely protective of his family, and it took many, many hours before he was willing to even acknowledge that there may have been issues in his childhood and family life that had a significant impact on him. Any attempt on my part to discuss his childhood, or any part of it that might have been perceived of as a negative reflection on his parents, was immediately dismissed by Mr. Ramirez, and he remained adamant in his refusal to participate in the gathering of historical information, often changing the subject to new security concerns.

This protectiveness about family, and unwillingness to participate in the penalty phase, is quite common in penalty phase work. The feelings of ambivalence or guilt about sharing "family secrets" are almost always experienced at some point or points during the preparation of a social history, with eventual resolution. In Mr. Ramirez' case, however, there was an intensity to his avoidance that seemed, at times, to be more than volitional. He was unable to understand the importance of the presentation of his social history to the jury. The few pieces of information that he did share about his childhood included some spiritual and religious content that was obviously significant and quite real to Mr. Ramirez, despite the hallucinogenic quality with which he described it. Despite his insistence to the contrary, I was left with the sense that these experiences had a profound impression on him, and I wondered whether they, along with the death of Mr. Ramirez' father during Mr. Ramirez' incarceration, had some influence over his willingness and/or ability to discuss his childhood experiences.

Although Mr. Ramirez never became any more forthcoming in discussing his life history, his obsessions with security (e.g., questioning me during each visit about locks, tape recordings, etc.) did become somewhat less prominent as the months went by. However, these were replaced by increasingly repetitive and ruminative

2

obsessions with various sexual issues. Prior to beginning work on the case, I had been informed that Mr. Ramirez had displayed this sort of behavior with other female defense team members, and, accordingly, I discussed the structure and purpose of our relationship with him when we first met, including the absolute and non-negotiable absence of any physical contact of any kind. Although he seemed to comprehend what I was saying, he displayed an almost compulsive tendency towards an extremely adolescent (and, at times, pre-adolescent) obsession with sex, including repeated discussion of masturbation, his thoughts about genitalia, and his various sexual fantasies.

Again, in my experience working with almost exclusively male clients, it is not uncommon for such issues to be addressed at some point. However, at no time have I experienced what was in my opinion, the delusional intensity of Mr. Ramirez' distraction with sexual issues. After many months of meeting, as he came to realize that the nature of my relationship was not going to change as a result of his repeated discussions about sex, he initiated this as a subject of conversation somewhat less frequently. However, in much the same way that his security concerns had come to the fore earlier in our relationship, whenever I attempted to engage him in conversation concerning even the most basic of issues pertaining to his life history, he would begin discussing his sexualized thoughts about me.

Mr. Ramirez' sexual obsessions (and occasional compulsions in the form of attempting to masturbate in my presence) included a significant fixation on feet. It became apparent that this was not restricted to me, and that many of his sexual fantasies incorporated this fetish. During the course of our meetings, if a female walked by in front of our interview room, he would often comment on her shoes.

The quality and nature of Mr. Ramirez' sexual obsessiveness was unique, in that it appeared to significantly cloud his judgement at times. Whereas most other clients with whom I have addressed this issue have behaved in a relatively discreet

3

manner, and remained quite conscious of the possible ramifications of "overdoing" such attempts, Mr. Ramirez had no such hesitations.

Mr. Ramirez would behave in a manner that (if he were thinking rationally) he knew could potentially result in significant and distressing punitive consequences (i.e., attempting to pull down his pants and expose himself to me), with no apparent concern for the results of that behavior. Even after many months of my unquestionably consistent negative response to, and dismissal of, this behavior, it appeared as though he approached every incident with the real belief that I might respond positively. His repeated suggestions that we might have sex in the interview room were presented with a sincerity and intensity that indicated that he actually believed that this was a possibility, despite the constant presence of a guard three feet in front of a large glass window in the front of the room. Whereas one might expect that there would be some extinction of this behavior after more than a year of repeated attempts and requests on his part, it was as though each time, he was proposing it for the first time; as though he had never mentioned it before.

In working on capital cases for over five years, at no time have I ever experienced a defendant who was so perpetually unable to participate in the preparation of his case. In addition to the specific behaviors and characteristics described above, it was my distinct impression that Mr. Ramirez' experience with his Los Angeles trial attorneys had fed into his predisposition towards a paranoid mistrust, leaving him feeling that it was useless to participate. Despite his unwillingness to discuss it in any detail, it was quite clear that he was significantly distressed by the fact that his father had been called to appear in court during his Los Angeles trial; he states that this was done without his knowledge or consent.

This played a significant role in Mr. Ramirez' hesitation and resistance to our communicating with or involving his family in any way, and he was consistent in maintaining his pervasive need for absolute control over every aspect of our contact

with his family, to the point of requesting that meetings be tape-recorded for his review.  Once again, this level of concern caused me to wonder whether he was worried that some member of his family might discuss something that he had told them to avoid, and he insisted on speaking with them immediately before any discussion we had with them.  Mr. Ramirez consistently called and/or wrote to his family, dictating whom they could talk to and telling them specifically what they should and should not say.

Mr. Ramirez' multiple death sentences were addressed numerous times and in many different contexts during the course of our months together.  Again, there was a quality to his response to them that differed significantly from that which I have seen in other condemned defendants.  Although he never actually stated that he did not believe it would happen, it was quite apparent that he was simply in complete denial about the potential finality of the sentence.  In stark contrast to other defendants, who struggle with feelings of anger, hostility, frustration, betrayal, fear, and denial, Mr. Ramirez' response was much more akin to a 12-year-old who had been grounded for a week.  In other words, his denial was seamless, to the point of being dissociative.  He could discuss the fact that he had received multiple death sentences, but at no time acknowledged any concern for it, or any understanding of the impact it has had on his family.  This was particularly significant from the perspective of his mother, for whom he appeared to have the most sincere concern, yet whose fears surrounding his death sentence, he could not in any way understand or respond to.

Later in the course of my meetings with Mr. Ramirez, I attempted to confront him with the inconsistency between his refusal to cooperate with me in the preparation of his social history, and his apparent willingness to sell his life story for publication.  His response to this was always the same: that he would simply censor his story and present it in such a way that it was marketable (to allow him to provide some financial security for his mother), without being destructive to his

5

family.  It was clear, even after repeated explanations by multiple defense team members over a period of a year, that Mr. Ramirez could not weigh and determine the strategic damage such an act would have on his case.  His concerns about security also came into play in addressing this issue, in that he was convinced that if he were to discuss his life history with me, that information would somehow end up being published, and would therefore cause him to lose his window of opportunity to sell the story.

It was apparent that Mr. Ramirez' concerns went far beyond any sort of logical response.  He acknowledged that he did not doubt my trustworthiness, nor that of his attorney, and said that he understood the ramifications for my professional life if I were to ever discuss his case with anyone, let alone sell confidential information.  However, in much the same sort of concrete, obsessional thinking displayed in his sexualized interactions, this information did not appear to factor in to his decision-making process.  In my professional opinion, Richard's judgement concerning who he could and should trust (based on all logical and rational information) was significantly impaired, and he seemed truly surprised and taken aback when various media personnel did not present him (and various bits and pieces of his story) in exactly the manner in which he had provided it to them.  Again, despite Mr. Ramirez' extensive history with the media, and his apparent ability to acknowledge the bias with which he felt his case had always been presented, in my professional opinion that knowledge was not in any way incorporated into his thought process.  In much the same way that his sexualized behavior with me did not in any way accommodate or adjust to my responses, it was as though in this arena, as well, he was totally unable to learn from past experience.

Elise Taylor, MFCC

3/6/95
Date

6



**GEORGE W. WOODS, JR. M.D.**
A PROFESSIONAL CORPORATION
DIPLOMATE OF THE AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY

April 19, 1995


To: Michael Burt, Esq.
    Deputy Public Defender
    555 7th Street
    San Francisco, California 94103

Re: Richard Ramirez
    Case: 140188

Mr. Burt,

     You have asked me to interview Mr. Richard Ramirez, a 34-year-old Hispanic male, currently incarcerated at San Quentin State Prison, pursuant to Penal Code §1367 et seq.

     In order to complete this evaluation, I referred to multiple sources of information, including but not limited to:

1.   Declaration of and consultation with Anne Evans, Ph.D.

2.   Report of and consultation with Myla Young, Ph.D.

3.   Declaration of Elise Taylor, MFCC.

4.   Declaration of Manuel J. Barraza, Attorney.

5.   Report of interview and 1976 psychological reports of Dr. Ursula M. Niziol, Ed.D.

6.   Approximately fourteen hours of structured clinical interviews with Mr. Ramirez.

7.   Approximately 2 hours of videotaped coverage of Mr. Ramirez' Los Angeles trial, interviews with the defendant and news reports.

8.   Three hours observation of defense counsel's structured interview with defendant.

9.   Four hours of attorney interviews.

10.  Review of materials including but not limited to medical records, school records, pertinent police reports and CDC records.

PHONE (510) 724-1282  FAX (510) 724-7817  1430 TARA HILLS DRIVE, SUITE C, PINOLE, CALIFORNIA 94564

Ex. 100, p. 2849

incompetent to stand trial, as outlined in section 1367 of the California Penal Code.

In order to be found incompetent to stand trial, an individual must, first, be found to have a mental disorder. Once the individual's mental disorder has been established, the effects of the mental disorder must render the individual unable either:

1.   to understand the duties of the officers of the court; and/or

2.   to understand the nature of the charges against him and the consequences of those charges; and/or

3.   to assist counsel in the conduct of a defense in a rational manner.

After reviewing extensive materials on Mr. Ramirez, including material that predated his criminal justice contacts, and interviewing Mr. Ramirez, both alone and in the presence of counsel, for extended periods of time, both in San Quentin and at the San Francisco County Jail, it is my professional opinion that Mr. Ramirez suffers from a severe mental disorder. Mr. Ramirez suffers a Psychotic Disorder due to a Temporal Lobe Syndrome, which includes delusions that are both paranoid and erotomanic. He has significant organic impairment, most prominently identified in the prefrontal and frontal areas, and also identified, both currently and historically, in the temporal area. This organic impairment impacts his ability to monitor his behavior, as well as benefit from feedback, among other deficits. Mr. Ramirez also experiences significant obsessive behavior, which has been described by multiple clinical specialists and lay persons as being compulsive in nature. Consequently, the fact that Mr. Ramirez since childhood has suffered from an organically based constellation of symptoms that impairs his cognitive, intellectual, and emotional functioning has been well-documented.

When Mr. Ramirez was ten years old, he began to experience both petit mal and grand mal seizures. He underwent EEG analyses on two separate occasions during this period in his life, with abnormal results on three out of four EEGs. The first series of EEGs, performed at age ten, reflected bilateral findings of aberrant electrical activity. The second abnormal EEG, performed approximately two years later, appears to have been more focal, with unusual electrical activity occurring primarily in the left frontotemporal region of the brain. The seizure activity was clinically significant, to the degree that medication was indicated. Mr. Ramirez's school records indicate a consistent decline in his academic abilities during this period of developing seizure activity. This is consistent with the organic compromise one often finds in Temporal Lobe Syndrome with adolescent seizure activity, and reinforces aspects of the current cumulative neuropsychological findings.

When Mr. Ramirez was sixteen years old, he was taken to a mental health clinic by his parents. Dr. Ursula Niziol, the

Ex. 100, p. 2850

psychologist who evaluated Mr. Ramirez on two occasions in 1976, remembers Mr. Ramirez as a child she suspected was schizophrenic. However, due to her clinical sense that he was too young to be labelled with such a definitive diagnosis, Dr. Niziol only described her findings and recommended follow-up with a psychiatrist. Dr. Niziol noted in one of her 1976 reports, "The boy's thinking pattern appears to be disorganized. He began to narrate some complicated ideas and the longer he went, the more confused he became. Most of the TAT responses were suggestive of an inability to separate reality from fantasy."

Although Dr Niziol strongly recommended psychiatric follow-up for Mr. Ramirez, this was not thoroughly accomplished. His family failed to respond or follow through with the recommended course of treatment. Nevertheless, her findings are significant in that they provide strong evidence of Mr. Ramirez's organically based psychiatric dysfunction at an early age, well before the onset of his serious criminal justice contact.

Anne Evans, Ph.D., a forensic psychologist, performed an extensive evaluation of Mr. Ramirez in February, March and April of 1991, and also in February of 1995. During both periods, she administered a number of psychological instruments to Mr. Ramirez. Her tests and interview findings are consistent with those of Dr. Niziol and illustrate thought content that, according to Dr. Evans, "...at times reaches psychotic proportions." She notes that he suffers from delusions and paranoia, and that "His mental capacity was severely incapacitated by a thought disorder." She also felt that, "Neurological problems are likely to play a part as well..." This clinical intuition was later confirmed by Dr. Myla Young.

Myla Young, Ph.D., a forensic neuropsychological consultant, evaluated Mr. Ramirez on December 9, 10 and 28, 1994, and conducted a series of neuropsychological and personality tests with Mr. Ramirez. She found significant organic impairment, particularly in the left temporal and frontal-orbital areas of his frontal lobes. This area is important in terms of processing information, and inhibiting organic impulses. The neuropsychological findings pointed to organic impairment consistent with previous EEGs as well as the diagnosis of Dr. Dietrich Blumer in 1986.

Umbricht, Degreef, Barr, et al. in their American Journal of Psychiatry article entitled <u>Post Ictal and Chronic Psychoses in Patients with Temporal Lobe Epilepsy</u>, February 19, 1995, correlate the findings of Drs. Niziol, Evans, Young, and Blumer, by demonstrating "...that both schizophrenia and temporal lobe epilepsy show pathology in the temporal lobe... which leads to the emergence of symptoms shortly before or during adolescence. Our data seem consistent with this model insofar as they demonstrate that the onset of epilepsy in patients with chronic psychoses was on average shortly before the beginning of puberty...." This article, suggesting that the time point during brain maturation at which seizures begin is crucial, allows us to see that Mr. Ramirez's organic brain pathology arose at a seminal point in his life.

Ex. 100, p. 2851

I interviewed Mr. Ramirez on five separate occasions. The results of the psychological testing and observations as set forth above are consistent with the symptoms that I encountered in this defendant. Mr. Ramirez manifests a symptom constellation that includes suicidal ideation, obsessive thinking, and compulsive behavior, tangential to loose associations, paranoid ideation, and paranoid as well as erotomanic delusions. He also exhibited forced thinking, depersonalization, as well as altered sexual interest. These findings, along with the historical and present medical findings, point to temporal lobe disorders and are consistent with the description of Temporal Lobe Syndrome set forth in "Temporolimbic Epilepsy and Behavior," Chapter 8 in the textbook, Principles of Behavioral Neurology (1992).

Drs. Perrine and Congett note on page 135 of Neurobehavioral Problems in Epilepsy (Neurologic Clinics of North America) Vol. 12, No. 1 (Feb. 1994), "Factors related to a higher risk of violence in epilepsy include younger age, use of phenobarbital in children, early onset of seizures, lower socioeconomic status, and left temporal seizure foci; however, except for the latter, these risk factors are not necessarily related to epilepsy because aggression is greater in young males of lower intelligence quotients and socioeconomic status in nonneurologic settings."

Mr. Ramirez's medical history, his school records, his history of insomnia and headaches, his decrease in functioning after the onset of seizures, neuropsychological findings and present mental status examination are all internally consistent and point toward an organic basis for his symptom constellation.

It is my professional opinion, which I hold to a reasonable medical certainty, that Mr. Ramirez is not capable of rationally assisting his attorneys in preparing his defense. This inability to rationally assist his attorneys has been clear since the inception of Mr. Ramirez's contact with the criminal justice system.

Manuel Barraza, Esq., one of the first attorneys involved with Mr. Ramirez in Los Angeles, met with Mr. Ramirez on approximately four occasions within one or two months after Mr. Ramirez's arrest in August of 1985. Mr. Barraza found Mr. Ramirez "unable to rationally or meaningfully participate in the conduct of his defense" and his declaration states, "It was difficult to communicate with him on any level, and it was impossible to strategize with him." Mr. Barraza's declaration reflects in Mr. Ramirez in 1985 the same inability to focus, reason, sequence, prioritize, and act rationally that is experienced by his current defense lawyers and identified in the neuropsychological testing.

Dr. Anne Evans, as mentioned previously, was a consultant to the lawyers representing Mr. Ramirez in 1991 in the San Francisco case. She talked many times with counsel and other defense team members attempting to work with Mr. Ramirez at the time. In her declaration she describes her perception of his inability to cooperate. Particularly significant is her discussion of the

4

the lawyers representing Mr. Ramirez in 1991 in the San Francisco case. She talked many times with counsel and other defense team members attempting to work with Mr. Ramirez at the time. In her declaration she describes her perception of his inability to cooperate. Particularly significant is her discussion of the attempts of Mr. Randall Martin (an attorney on the case in 1991) to gather information for the case:

> "Planning an appropriate strategy for the defense requires the rational assistance and participation of the accused. Despite the persistent efforts of his former attorney, Randall Martin, Mr. Ramirez was so paranoid that he would not even discuss the offense for which he was charged, nor any prior offenses... Mr. Ramirez's paranoid delusions, severe cognitive disorganization and obsessive ruminations impaired his ability to recognize Mr. Martin's superior abilities as an attorney (as proven by his past successes with trial techniques). Mr. Ramirez's mental impairment led him to make threats against Mr. Martin and eventually rendered it impossible for Mr. Martin to continue as trial counsel."

Dr. Evans also noted the lack of concentration and inability to distinguish between relevant and nonrelevant information (due to his paranoid delusions), as aspects of Mr. Ramirez's cognitive deficits contributing to his incompetence.

Mr. Ramirez' inability to rationally assist counsel in the preparation of his own defense extended also to Elise Taylor, MFCC (currently a licensed psychotherapist), an investigator hired to prepare a psychosocial history of the defendant and who had contact with Mr. Ramirez over a period of years. Ms. Taylor noted that in over five years of working with clients in capital cases, she had never experienced a person so clearly incompetent to participate in the preparation of his own defense.

In order to observe and evaluate his potential level of assistance to counsel, I interviewed him on two occasions in the presence of counsel. On the first occasion, I interviewed him in the presence of Michael Burt, and on the second occasion in the presence of Daro Inouye and Dorothy Bischoff. These interviews were held with Mr. Ramirez's consent. I asked each of the defense attorneys to discuss various aspects of the case with Mr. Ramirez, including interviews with family members, the attorney's own relationship to him, legal and factual issues to be investigated, etc.

Mr. Ramirez displayed a total inability to understand various aspects of his case. For example, Mr. Ramirez adamantly refused to allow Mr. Burt to interview various members of his family, although he expressed the belief that these people had important information about his past history. Mr. Ramirez also discussed at length his

5

fantasy to publish a book about himself, although he acknowledged that Mr. Burt had repeatedly discussed with him the extreme damage that any such publication would pose to his case. Mr. Ramirez stated that he could censor a book in such a way as to protect himself, and even though Mr. Burt pointedly explained to him the dangers with which this approach was fraught, Mr. Ramirez was unable to process this information.

The competency interview with Ms. Bischoff and Mr. Inouye reflected the same lack of concentration and poor attention span, inability to sequence and change sets that Dr. Evans and Dr. Young noted in their psychological evaluations. Repeated attempts to discuss salient events in the strategy, such as significant witnesses to be interviewed as well as tasks to be undertaken were thwarted by Mr. Ramirez's extreme paranoia. He discussed in some detail his fear that Mr. Inouye was too close to employees of the San Francisco Sheriff's Department. This was also the first time that I heard Mr. Ramirez discuss his belief that there had been attempts to poison his food. He specifically mentioned his theory that the Los Angeles Sheriff's Department had poisoned his food early in his incarceration. He is certain that this is true because, suspecting that the food was poisoned, Mr. Ramirez reports that he gave it to another inmate who subsequently became sick and was removed from the jail on a gurney. This issue of poisoned food or other ways to "get" Mr Ramirez permeates his conversations about the custodial staff of the jail and the prison. He cannot explain rationally, however, why the guards would want to kill him. The interviews in the presence of counsel confirmed the difficulties that counsel had shared with me concerning their inability to gain the rational assistance of Mr. Ramirez.

This same lack of control over his thought content and processes is reflected in the actual televised interviews that Mr. Ramirez has granted. The interviews themselves, not to mention the substance of those interviews, clearly were contrary to any strategy promoted by his attorneys. He noted in one television interview concerning his forced thoughts, "If I didn't give in to them, I would be crushed by them."

Those interviews that I had alone with Mr. Ramirez also highlighted important aspects of Mr. Ramirez's cognitive impairment. It is extremely important to note that there were no psychological tests given that reflected any malingering by Mr. Ramirez. The Rey's 15 Item Test, a screening test for malingering, was done quickly and efficiently by Mr. Ramirez. There were no attempts at overt malingering, including attempts at disorientation, feigning of perceptual disorders, etc. None of the psychological testing performed on Mr. Ramirez by Dr. Anne Evans and Dr. Myla Young shows signs of malingering and all were considered to be valid tests.

The specific deficits that Mr. Ramirez exhibits are deficits in processing information, attending to relevant material, being able to process, synthesize, and analyze data, and understanding a coherent plan. These are the some of the cognitive deficits that

Ex. 100, p. 2854

have been validated in Dr. Young's and Dr. Evans' testing. Mr Ramirez also has profound psychological symptoms, such as pervasive paranoia, lack of concentration, marked depression, and underincorporation, all of which are equally destructive to the task of attempting to understand and assist in the development of a legal strategy.

In summary, there is an abundance of material that reflects a mental disorder in Mr. Ramirez that extends at least as far back as his preadolescence and definitely prior to his serious criminal justice contacts. Furthermore, there is a wealth of information from multiple clinical and legal sources that clearly indicates a history of incompetence to rationally assist his attorneys in the development of a defense. This historical information only buttresses the contemporaneous findings of extreme paranoia, an inability to attend to relevant data, a substantial lack of concentration, significant denial even of issues that are important to his legal strategy, impaired judgment, and limited insight; all symptoms of Mr. Ramirez' organically based mental disorder.

## CURRENT CHARGES

Mr. Ramirez is currently charged with one count of murder with special circumstances (burglary and prior murder), use of a firearm, robbery and burglary.

## FAMILY HISTORY

Mr. Ramirez's family history is essentially noncontributory to the question of his present competency to stand trial, except for the medical history of the clinical findings of Dr. Niziol.

## MENTAL STATUS EXAMINATION

Mr. Ramirez is a tall, thin hispanic male who looks his stated age. He was oriented to person, place, time and date. His mood was anxious, with significant interspersed depression. He denies auditory, tactile, visual and olfactory hallucinations. Affect was labile, and was often inappropriate to the content of the conversation. Thought processes were obsessive and tangential, although he could focus with extreme effort. There were times when he could be coherent for greater than twenty minutes without significant thought intrusion and tangentiality. There were other times when he was not able to focus for longer than several minutes. Insight was extremely limited. He had a rudimentary understanding of the charges he was facing, but no **insight** into the development of defense strategies, reflecting organic impairments in processing and analyzing information. Mr. Ramirez's judgment is significantly impaired by his organic processes. His underincorporator-hypervigilant style reflects someone who scans the environment for clues, yet, due to the inability to process properly, often makes decisions rashly, based on too little information. Thought contents remain paranoid, primitive and at times delusional. He has been intermittently suicidal, but denies homicidal ideation.

Ex. 100, p. 2855

**SUMMARY**

Mr. Richard Ramirez is a 34 year old Hispanic male, currently charged with murder with special circumstances. Mr. Ramirez has a mental disorder, diagnosed as Psychotic Disorder secondary to Temporal Lobe Syndrome, that has been amply documented since childhood. As recently as 1987, Mr. Ramirez was diagnosed by Dr. Victor Henderson as suffering neurological deficits and by Dr. Dietrich Blumer as suffering from a Temporal Lobe Syndrome. This organic disorder currently renders him unable to rationally assist his attorney in the preparation of his own defense. The symptoms that specifically impair this ability include paranoia, impaired concentration, poor attention span, delusional thinking, forced thinking, severe mood swings, inability to analyze and process relevant data, altered sexual interest, limited insight and judgment, and profound depression. In my professional opinion, which I hold to a reasonable degree of medical certainty, Mr. Ramirez is currently incompetent to stand trial.

George Woods, Jr., MD

8